No. 21-11643

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## MUSCOGEE (CREEK) NATION, et al.,

### Plaintiffs-Appellants,

### v.

## BUFORD ROLIN, et al.,

### Defendants-Appellants.

---

**Appeal from the District Court of the United States for the Middle District of Alabama, Northern Division**
**District Court No. 2:12cv1079-MHT (CSC) (Hon. Myron H. Thompson)**

---

## APPELLANTS' BRIEF

---

Mary Kathryn Nagle
ATTORNEY AT LAW
P.O. Box 506
McLean, VA 22101
(202) 407-0591

David McKnight
DILLARD, MCKNIGHT, JAMES &
MCELROY, LLP
2700 Highway 280
Suite 110 East
Birmingham, AL 35223


Devra R. Cohen
FOSTER GARVEY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
(206) 447-4400

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel of record for the Appellants hereby certifies the following is a complete list of all trial judges, attorneys, persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10 percent of more of a party's stock, and other identifiable legal entities related to a party.

Allan, Aria – Counsel for Defendant/Appellee Auburn University

Auburn University – Defendant/Appellee

Balch & Bingham LLP – Counsel for Defendant/Appellee Auburn University

Benge, Shawn, Deputy Director of the National Park Service – Defendant/Appellee

Body, David Randall – Counsel for Defendant/Appellee Auburn University

Bryan Gantt, Amy – Defendant/Appellee

Bryan, Stephanie A. – Defendant/Appellee

Carter, Dewitt – Defendant/Appellee

Cohen, Devra R. – Counsel for Appellants

Dauphin, Charles A. – Counsel for Poarch Defendants/Appellees

Dauphin Paris, LLC – Counsel for Poarch Defendants/Appellees

The Department of the Interior – Defendant/Appellee

Dillard, McKnight, James & McElroy, LLP – Counsel for Appellants

DuBois, James J. – Counsel for Federal Defendants/Appellees

i

Fayard, Candace – Defendant/Appellee

Flintco, LLC –former Defendant

Foster Garvey, P.C. – Counsel for Plaintiffs/Appellants

Gehman, David – Defendant/Appellee

Halland, Debra A., Secretary of the U.S. Department of the Interior – Defendant/Appellee

Haikey, Larry – Defendant/Appellee

Hammer, Jaime Stone – Counsel for Defendant/Appellee Auburn University

Heron, Rachel – Counsel for Federal Defendants/Appellees

Hickory Ground Tribal Town – Plaintiff/Appellant

Hollinger, Sandy – Defendant/Appellee

Jeffries, Arielle Mourrain – Counsel for Federal Defendants/Appellees

Kilpatrick Townsend & Stockton LLP – Counsel for Poarch Defendants/Appellees

King, Lauren – U.S. District Judge for the Western District of Washington and Former Counsel for Plaintiffs/Appellants

Knight, Griffin Lane – Attorney for Defendant/Appellee Auburn University

Lazarus, William B. – Attorney for Federal Defendants/Appellees

Manning, Timothy A. – Defendant/Appellee

Martin, Keith – Defendant/Appellee

McCune, Devon Lehman – Counsel for Federal Defendants/Appellees

McGhee, Robert R. - Defendant/Appellee

McKnight, Stewart Davidson III – Counsel for Plaintiffs/Appellants

Meckel, Charlotte – Defendant/Appellee

Mothershed, Arthur – Defendant/Appellee

Munson, Catherine F. – Counsel for Poarch Defendants/Appellees

Muscogee (Creek) Nation – Plaintiff/Appellant

Nagle, Mary Kathryn – Counsel for Plaintiffs/Appellants

Newland, Bryan, Principal Deputy Assistant Secretary of Indian Affairs – Defendant/Appellee

Poarch Band of Creek Indians – Defendant/Appellee

PCI Gaming Authority d/b/a Wind Creek Hospitality – Defendant/Appellee

Poust, Teresa E. - Defendant/Appellee

Reeves, Mark H. – Counsel for Poarch Defendants/Appellees

Rolin, Buford – Defendant/Appellee

Schwarz, Jody H. – Counsel for Federal Defendants/Appellees

Sells, Garvis – Defendant/Appellee

Smith, Billy – Defendant/Appellee

Sport, Morgan McCue – Counsel for Defendant/Appellee Auburn University

Sprague, Mary Gabrielle – Counsel for Federal Defendants/Appellees

Thompson, George – Plaintiff/Appellant

Thompson, Myron H. – U.S. District Judge for the Middle District of Alabama

Tullis, Eddie L. – Defendant/Appellee

United States Department of Justice – Counsel for Federal Defendants/Appellees

Villagomez, Chloe – Counsel for Plaintiffs/Appellants

Walker, Jordan Dorman, Jr. – Attorney for Defendant/Appellee Auburn University

Woodruff, Westly L. – Defendant/Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request that this court hear oral argument on this matter. This case addresses several important questions regarding sovereign immunity, including the appropriate application of *Ex parte Young* and the continuing validity or appropriate scope of the *Coeur d'Alene* exception to that doctrine. Oral argument would facilitate this Court's review of these important legal questions and its disposition of this case.

# **TABLE OF CONTENTS**

I.    STATEMENT OF JURISDICTION ....................................................1

   A.   Subject Matter Jurisdiction...............................................1

   B.   Appellate Jurisdiction.....................................................2

II.   STATEMENT OF THE ISSUES ....................................................3

III.  STATEMENT OF THE CASE .....................................................5

   A.   Nature Of The Case .......................................................5

   B.   Course Of Proceedings...................................................6

   C.   Statement Of Facts .......................................................9

      1.  Hickory Ground Bears Great Historical Significance For The Muscogee (Creek) Nation And The Entire United States.....................................9

      2.  Mekko Thompson's Connection To Hickory Ground Is Unique And Exceptional ..............................................................11

      3.  Poarch Has No Historical Connection To Hickory Ground .........................12

      4.  Poarch Promises To Protect Hickory Ground ...............................14

      5.  Poarch Requests, And Accepts, Federally Delegated Authority Under The NHPA....................................................................16

      6.  Poarch Broke Its Promises And Destroyed Hickory Ground To Build A Casino Resort ...........................................................17

   D.   Standard Of Review ....................................................19

IV.   SUMMARY OF THE ARGUMENT................................................20

V.    ARGUMENTS AND CITATIONS TO AUTHORITY ....................................24

   A.   Sovereign Immunity Does Not Bar The Nation's Claims For Prospective, Injunctive Relief Against The Poarch Officials......................................24

B.    The District Court's Application Of *Coeur d'Alene* Conflicts With This Court's Precedent And The Precedents Of Almost Every Other Circuit ...............26

C.    The District Court Erred When It Applied The *Coeur D'Alene* Exception To The Present Case .................................................................................................34

    1.  The Nation's Claims Do Not Implicate The "Special Sovereignty Interests" At Issue In *Coeur D'Alene* ..................................................................34

    2.  Poarch Has No Special Sovereignty Interest In Hickory Ground, Or In Violating The Federal Laws That Protect Hickory Ground ...............................36

    3.  This Suit Is Not The Equivalent Of A Quiet Title Action ............................41

D.    The District Court's Dismissal Under Rule 19 Should be Reversed ............43

VI.    CONCLUSION ...............................................................................................48

# TABLE OF CITATIONS

## Cases

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
  851 F.3d 507 (5th Cir. 2017) ........................................................31

*Alabama v. PCI Gaming Auth.*,
  801 F.3d 1278 (11th Cir. 2015) ...................................................25

*Antrican v. Odom*,
  290 F.3d 178 (4th Cir. 2002) .......................................................40

*AT&T Commc'ns v. BellSouth Telecomms. Inc.*,
  238 F.3d 636 (5th Cir. 2001) .......................................................31

*Cardenas v. Anzai*,
  311 F.3d 929 (9th Cir. 2002) .......................................................32

*CSX Transp., Inc. v. Bd. of Pub. Works*,
  40 F. App'x 800 (4th Cir. 2002) ...................................................33

*Curling v. Sec'y of Ga.*,
  761 F. App'x 927 (11th Cir. 2019) .....................................22, 28, 29

*Day v. Taylor*,
  400 F.3d 1272 (11th Cir. 2005) ...................................................13

*Doe v. Shibinette*,
  16 F.4th 894 (1st Cir. 2021) ........................................................31

*Dubuc v. Mich. Bd. of L. Exam'rs*,
  342 F.3d 610 (6th Cir. 2003) .......................................................31

*\*Ex parte Young*,
  209 U.S. 123 (1908)....................................................................20

*Green v. Mansour*,
  474 U.S. 64 (1985)......................................................................20

*Harris v. Owens*,
  264 F.3d 1282 (10th Cir. 2001) ...................................................41

*Hollywood Mobile Ests. Ltd. v. Cypress*,
  415 F. App'x 207 (11th Cir. 2011)..........................................19, 28

*Idaho v. Coeur d'Alene Tribe of Idaho*,
  521 U.S. 261 (1997)........................................................................ passim

*In re Deposit Ins. Agency*,
  482 F.3d 612 (2d Cir. 2007) .......................................................37

*Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*,
  603 F.3d 365 (7th Cir. 2010) ..........................................22, 30, 31

*J.B. ex rel. Hart v. Valdez*,
  186 F.3d 1280 (10th Cir. 1999) ...................................................41

*Jamul Action Comm. v. Simermeyer*,
  974 F.3d 984 (9th Cir. 2020) ......................................................32

*Kansas v. United States*,
  249 F.3d 1213 (10th Cir. 2001) ...................................................44

*Lacano Invs., LLC v. Balash*,
  765 F.3d 1068 (9th Cir. 2014) ....................................................32

*Laker Airways, Inc. v. British Airways, PLC*,
  182 F.3d 843 (11th Cir. 1999) ....................................................19

*Lane v. Cent. Ala. Cmty. Coll.*,
  772 F.3d 1349 (11th Cir. 2014) ..............................................22, 29

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012)..................................................................42, 43

*MCI Telecomm. Corp. v. Bell Atl. Pa.*,
  271 F.3d 491 (3d Cir. 2001) .......................................................37

*MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*,
  222 F.3d 323 (7th Cir. 2000) .....................................................41

*Michigan v. Bay Mills Indian Cmty.*,
  572 U.S. 782 (2014)..................................................................24, 25

*Mille Lacs Band of Chippewa Indians v. Minnesota*,
  124 F.3d 904 (8th Cir. 1997) .....................................................33

*Muscogee (Creek) Nation v. Pruitt*,
  669 F.3d 1159 (10th Cir. 2012) ..................................................30

*Crowe & Dunlevy, P.C. v. Stidham*,
   640 F.3d 1140 (10th Cir. 2011) ................................................................25

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984)....................................................................20, 23, 34

*Republic of Philippines v. Pimentel*,
   553 U.S. 851 (2008)..............................................................................45

*Salt River Project Agric. Improvement & Power Dist. v. Lee*,
   672 F.3d 1176 (9th Cir. 2012) ...............................................................44

*Santa Clara Pueblo v. Martinez*,
   436 U.S. 49 (1978)...............................................................................24

*Santiago v. Honeywell Int'l, Inc.*,
   768 F. App'x 1000 (11th Cir. 2019)........................................................19

\* *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
   535 U.S. 635 (2002).....................................................................21, 25, 27

*Seneca Nation v. Hochul*,
   58 F.4th 664 (2d Cir. 2023) ..................................................................39

*Summit Med. Assocs., P.C. v. Pryor*,
   180 F.3d 1326 (11th Cir. 1999) ..............................................................29

*Tamiami Partners, Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*,
   177 F.3d 1212 (11th Cir. 1999) ..............................................................25

\**Tarrant Reg'l Water Dist. v. Sevenoaks*,
   545 F.3d 906 (10th Cir. 2008) ........................................................21, 30

*TFWS, Inc. v. Schaefer*,
   242 F.3d 198 (4th Cir. 2001) .................................................................37

*Va. Office for Prot. and Advoc. v. Stewart*,
   563 U.S. 247 (2011)..............................................................................26

*Vann v. Kempthorne*,
   534 F.3d 741 (D.C. Cir. 2008)..........................................................33, 41

ix

*Vann v. U.S. Dep't of Interior*,
  701 F.3d 927 (D.C. Cir. 2012)...................................................................44

*W. Mohegan Tribe & Nation v. Orange Cnty.*,
  395 F.3d 18 (2d Cir. 2004) .....................................................................33

*Williams On Behalf of J.E. v. Reeves*,
  954 F.3d 729 (5th Cir. 2020) ..................................................................31

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
  746 F.3d 1008 (11th Cir. 2014) ..............................................................20

## Statutes

54 U.S.C. § 302704 ....................................................................................17

## Other Authorities

Final Determination for Federal Acknowledgment of the Poarch Band of Creeks, 49
  Fed. Reg. 24083 (June 11, 1984)............................................................14

## Rules

11th Cir. R. 36-2.........................................................................................19

Fed. R. App. P. 4 .........................................................................................2

Fed. R. Civ. P. 19 .......................................................................................46

## Regulations

36 C.F.R. § 800.2 ........................................................................................17

## I.    STATEMENT OF JURISDICTION

### A.    Subject Matter Jurisdiction

This suit—brought by Appellants Muscogee (Creek) Nation, a federally recognized Indian Tribe; Hickory Ground Tribal Town (Oce Vpofv Etvlwv), a traditional Tribal Town (Etvlwv) and ceremonial ground (Cuko Rakko) of the Muscogee (Creek) Nation; and Mekko George Thompson, Chief ("Mekko") of Hickory Ground Tribal Town (collectively "the Nation") arises under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*; the Indian Reorganization Act, 25 U.S.C. §§ 5101 *et seq.*; the National Historic Preservation Act, 54 U.S.C. §§ 300101 *et seq.*; the Native American Graves Protection and Repatriation Act of 1990, 25 U.S.C. §§ 3001 *et seq.*; the Archeological Resources Protection Act, 16 U.S.C. §§ 470aa *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 28 U.S.C. § 1361 (mandamus); and federal common law. The Nation's claims also include supplemental state law claims.

The District Court had jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel a governmental officer to perform his duty), 1362 (jurisdiction over civil actions brought by Indian Tribes arising under the laws of the United States), 1367 (supplemental jurisdiction over state law claims forming part of the same claim or controversy); 25 U.S.C. § 3013 (jurisdiction over actions alleging violations of the Native American Graves Protection and Repatriation Act); and 54 U.S.C. § 307105 ("any interested person" may enforce the National Historic Preservation Act).

### B.    Appellate Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The District Court issued its Opinion granting the Poarch Band of Creek Indians' motion to dismiss on March 15, 2021, and issued its corresponding Order and Judgment that same day. Docs. 223, 224, & 225.[1] The March 15, 2021, Order and Judgment dismissed the claims against all parties except defendant Martin Construction, Inc., against whom proceedings had been stayed as a result of Martin Construction, Inc.'s declaration of bankruptcy. Docs. 224, 225. On March 19, 2021, the District Court entered a Judgment dismissing Martin Construction, Inc. Doc. 227. The Notice of Appeal was timely filed on May 12, 2021. Doc. 228; *see* Fed. R. App. P. 4(a)(1)(B).

---

[1] "Doc." refers to the Document number that appears in the header generated by the district court's electronic filing system.

## II.    STATEMENT OF THE ISSUES

A.    Whether the Supreme Court's decision in *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), abrogated the Court's earlier decision in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), such that the question of whether the Nation's claims for injunctive, prospective relief against the Poarch Band of Creek Indians' Officials is determined by the "straightforward inquiry" test set forth in *Verizon Maryland* and *Ex parte Young*, 209 U.S. 123 (1908), not the nebulous "special sovereignty interests" test articulated in *Coeur D'Alene*.

B.    Alternatively, if *Coeur D'Alene* controls, whether tribal officials from a tribal entity with no historic ties to a sacred site listed on the National Register can claim "special sovereignty interests" in the site when they violate their own promises and the federal laws passed to protect the site.

C.    Whether the District Court's Rule 19(b) dismissal should be reversed because the Nation's claims against the Poarch Band of Creek Indians' officials should be allowed to proceed.

D.    In the alternative, whether the District Court abused its discretion when it determined the Nation's claims against the Department of the Interior, the National Park Service, the Bureau of Indian Affairs, the officials who head each of those entities, and Auburn University could not proceed under Federal Rule of

3

Civil Procedure 19(b) without the joinder of the Poarch Band of Creek Indians or its officials.

### III.    STATEMENT OF THE CASE

#### A.    Nature Of The Case

This appeal stems from the ongoing, unlawful desecration of one of the United States's most significant historical and cultural sacred sites: Hickory Ground. At its core, this case seeks to ensure compliance with federal laws Congress passed to protect and preserve the burials of Native Americans. The Nation's claims also seek compliance with federal laws Congress enacted to protect sites significant to American history and culture.

Although the appeal concerns questions of sovereign immunity in relation to a tribal entity, at its core, this case concerns the failure of several federal agencies and officials to abide the duties Congress set out for them in federal statutes—statutes that make clear that historic sites and Native American burials are to be protected and preserved, not destroyed. Notably, the authority the District Court relied on to conclude that the Nation's claims must be dismissed due to sovereign immunity (*Coeur d'Alene*) has been abrogated and/or significantly limited in its application by nearly every federal appellate court to consider it. Regardless of whether *Coeur D'Alene* applies, there is no such thing as a "special sovereignty interest" in land that the sovereign has no historic connection to, nor is there any "special sovereignty interest" in violating federal law. The federal laws that Congress passed to protect Hickory Ground did not dissipate simply because the

corporation that purchased the site in 1980 subsequently received federal recognition as a tribal entity. The Nation respectfully requests that this Court reverse the District Court's dismissal of the Nation's claims and allow them to instead be adjudicated on the merits.

### B.    Course Of Proceedings

On March 9, 2020, the Muscogee (Creek) Nation, Hickory Ground Tribal Town (Oce Vpofv Etvlwv), and Mekko Thompson filed the operative Second Amended Complaint ("the Complaint"). Doc. 190. The Complaint alleges different claims against different Appellees, including the Department of the Interior, the National Park Service, the Bureau of Indian Affairs, and the officials who head each of those entities (collectively the "Federal Defendants"), the Poarch Band of Creek Indians ("Poarch"), the PCI Gaming Authority, and Poarch's Tribal Officials ("Poarch Officials"), and Auburn University. The Complaint includes claims that arise under the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 5123 *et seq*., Alabama common law, federal common law, the Native American Graves Protection and Repatriation Act of 1990 ("NAGPRA"), 25 U.S.C. §§ 3001 *et seq.*, the First Amendment of the United States Constitution, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, *et seq*., the American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, *et seq.*, the Archeological Resources Protection

Act ("ARPA"), 16 U.S.C. §§ 470aa *et seq.*, and the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101 *et seq. See* Doc. 190.

All of the Appellees—except Auburn University—filed motions to dismiss the Complaint. Docs. 200, 202 & 205. Although the motions to dismiss covered many substantive legal issues on the merits, the District Court cabined its decision on the motions to two issues: (1) the sovereign immunity of Poarch and the Poarch Officials and (2) the dismissal of the entire case under Federal Rule of Civil Procedure 19. *See* Doc. 223.

The District Court first concluded that Poarch did not waive its sovereign immunity when it signed an agreement with the National Park Service and agreed to take on specific legal duties under the NHPA with regards to Hickory Ground. *Id.* at 16–17. The District Court then turned to the Poarch Officials. The District Court noted that "[i]n general, suits for equitable relief against officers in their official capacities are not barred by sovereign immunity under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908)." *Id.*

The District Court dismissed Poarch's argument that Plaintiffs' request for relief was not for ongoing harm or unlawful actions. *Id.* at 19. The District Court reached this conclusion because:

> [Plaintiffs] ask that the defendants be enjoined from continuing to excavate Hickory Ground or operate the Wind Creek Wetumpka, and that they be required to return to the plaintiffs the cultural items removed from Hickory Ground and restore the land itself into the

> condition it was in before the excavations began. They say that the
> defendants are engaging in an ongoing violation of federal law by
> retaining the excavated cultural items and continuing to operate the
> Wind Creek Wetumpka. And they do not ask for money damages from
> the official defendants for these alleged violations.

*Id.*

Accordingly, the District Court concluded that the claims against the Poarch

Officials "fall[] within the boundaries of *Ex parte Young*." *Id.* at 20. However, the

District Court did not end its analysis there. Instead, the Court concluded that the

Supreme Court's decision in *Coeur d'Alene v. Idaho* precludes the application of *Ex*

*parte Young* to the Poarch Officials because, ultimately, the Nation's lawsuit

implicates "special sovereignty interests." *Id.* at 20 (quoting *Coeur d'Alene*, 521 U.S.

at 281).

Accordingly, the District Court dismissed Poarch, the Poarch Officials, and

the PCI Gaming Authority (collectively, the "Poarch Defendants") from the lawsuit.

With only the Federal Defendants and Auburn University remaining, the Court next

turned to Federal Rule of Civil Procedure 19. Under Rule 19(a), the District Court

opined that the Poarch Defendants are a "required party" to the litigation. *Id.* at 26.

But, due to the Court's ruling with regards to sovereign immunity, none of the

Poarch Defendants could be joined. *See id.*

Thus, the District Court turned its attention to Rule 19(b). In reaching the

conclusion that the lawsuit cannot proceed without the Poarch Defendants, the Court

relied exclusively on the United States Supreme Court's decision in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008). *Id.* at 29. According to the District Court, because the Poarch Defendants were protected by "sovereign immunity," "dismissal of the action must be ordered." *Id.* (quoting *Republic of Philippines*, 553 U.S. at 867).

The Nation filed its timely Notice of Appeal on May 12, 2021. Doc. 228.

### C.    Statement Of Facts

#### 1.    Hickory Ground Bears Great Historical Significance For The Muscogee (Creek) Nation And The Entire United States

Hickory Ground is a sacred ceremonial ground of the Muscogee (Creek) Nation, located on the east bank of the Coosa River, south of present-day Wetumpka and approximately two miles north of Fort Toulouse. Doc. 190 at 14 ¶ 47.[2] Prior to the Nation's forced removal on the Trail of Tears, the Muscogee (Creek) Nation had occupied Hickory Ground for millennia. *Id*. at 13 ¶ 43. Hickory Ground was placed on the National Register of Historic Places in 1980. *Id*. at 5 ¶ 3.

Hickory Ground's historical and cultural significance to both the Nation and Americans cannot be overstated. When European nations questioned the sovereignty of the newly formed United States, President George Washington sought to sign

---

[2] For the Court's convenience, where appropriate, citations include the page number in the header generated by the court's electronic filing system as well as the specific paragraph number supporting the factual assertion.

treaties with Indian Nations, including the Muscogee (Creek) Nation, whose sovereignty had previously been affirmed through treaties signed with France, Spain, and England. *Id*. at 13 ¶ 44. Thus, one of President George Washington's first acts following the ratification of the U.S. Constitution was to execute a treaty with the Muscogee (Creek) Nation. *See id.* This was indeed the very first treaty the United States signed under the new Constitution. *See id.* The head of the Muscogee treaty delegation was from Hickory Ground. *Id.* Through Hickory Ground, the United States used the sovereignty of the Muscogee (Creek) Nation to lend legitimacy to the nascent sovereignty of the United States. *Id*.

Hickory Ground's diplomatic role with other nations comes as no surprise, as it served as the capital of the Muscogee (Creek) Nation—then one of the largest civilizations in existence in the Western Hemisphere. *Id.* But in addition to a political purpose, Hickory Ground served a critical cultural purpose. Hickory Ground was a sacred ceremonial ground and Muscogee Tribal Town where the Muscogee people practiced their religion. *Id*. at 13, 14 ¶¶ 43, 49. For millennia, Hickory Ground was their home. *See id.* Hickory Ground is where they held ceremony, conducted governmental meetings, shared communal meals, lived their lives, and buried their loved ones. *Id.* at 13–14 ¶¶ 43–49; *see id.* at 16.

When the Muscogee (Creek) Nation was forcibly removed on the Trail of Tears, members of Hickory Ground walked the sacred fire over 800 miles all the

way to Indian Territory (present-day Oklahoma) and reestablished their Tribal Town and sacred ceremonial grounds near Henryetta. *Id.* at 7 ¶ 12. Although violently and forcibly removed from the sacred ground where they held ceremony since time immemorial, the modern-day members of Hickory Ground have kept the traditions, culture, and ceremonies of their Muscogee ancestors alive at the present-day Hickory Ground on the Muscogee Reservation in Oklahoma. *See id.* at 18–19 ¶ 67. Although the Trail of Tears separated Mekko Thompson and the members of Hickory Ground Tribal Town from the final resting place of their relatives, the protection and preservation of the original Hickory Ground site remains of paramount importance to their spirituality, religion, and general mental health and well-being. *See* Doc. 190-1 at 4; Doc. 190 at 17 ¶¶ 55–57.

### 2. Mekko Thompson's Connection To Hickory Ground Is Unique And Exceptional

Each Tribal Town is led by its chief, or *mekko*, who holds a lifetime leadership commitment. Mekko George Thompson is the *kosa mekko* of Hickory Ground and has been since 1977. *Id.* at 13 ¶ 46. He is known as *kosa mekko*, or Coosa Chief, as Hickory Ground dates back to the very first Muscogee Tribal Town known as *kosa* or Coosa. *Id.* He is a fluent speaker of the Muscogee language, and at 80 years of age, he has held the position of Mekko for more than half his life (a total of 46 years). *Id.* at 7 ¶ 14.

Since time immemorial, Mekko Thompson's ancestors have served as Mekko

of Hickory Ground Tribal Town. *See id.* Indeed, Mekko Thompson is the direct—not distant—descendant of Muscogee individuals buried at Hickory Ground in present-day Alabama. *Id.* at 7, 13–14 ¶¶ 14, 46, 51–52. In fact, because their Muscogee religion dictates that *mekkos* be buried under the *mekkos'* arbor (the east-facing arbor in the ceremonial ground), Mekko Thompson would have been able to say with certainty where several of his relatives were buried at Hickory Ground. *Id.* at 14 ¶¶ 51–52. Until Poarch excavated them.

As Mekko, and as a direct descendant of the Muscogee relatives whose remains the Poarch Officials and Auburn University disturbed, exhumed, and stuffed into plastic bins, Mekko Thompson maintains a unique and critical responsibility to ensure his relatives and all Muscogee people from Hickory Ground are treated with the basic human dignity and respect that the Muscogee religion requires. *Id.* at 50–51 ¶¶ 225–226. The destruction of his relatives' burial grounds has caused him extreme anguish, torment, and suffering. *Id.* at 50 ¶ 225.

### 3.    Poarch Has No Historical Connection To Hickory Ground

Before 1980, Poarch had no connection to Hickory Ground. *Id.* at 18 ¶ 63. When the individuals who called themselves "Poarch Creek" submitted an application to become a tribe, they told the federal government that their ancestral ties to the Southeast are limited to the areas surrounding Tensaw and Atmore in present-day southwestern Alabama, sites that are more than 120 miles away from

Hickory Ground. *Id.* This is not surprising because before 1984, Poarch did not exist as a tribe. *Id.* at 21–24 ¶ 76. Instead, the present-day members of Poarch are the descendants of Creek individuals who intermarried with white settlers and settled in a small geographic area known as Tensaw, located in southwest Alabama.[3] *See id.* at 8 ¶ 16.

Then, during the Creek Wars, when Andrew Jackson sought to exterminate the "Upper Creeks" (citizens of the Muscogee (Creek) Nation who had not intermarried with whites and who opposed removal and slavery), some of Poarch's ancestors teamed up with General Jackson and assisted in his attempts to wipe out the full-blood Muscogee (Creek) Nation citizens.[4] *Id.* at 7–8 ¶ 15; Doc. 190-1 at 3–

---

[3] Poarch's federal acknowledgement recommendation and evaluation states that the individuals who identify as Poarch have "lived in the same general vicinity in southwestern Alabama within an eighteen-mile radius for a time period beginning in the late 1700's to the present." U.S. Dep't of the Interior, Bureau of Indian Affairs, Memorandum on recommendation and summary evidence for proposed finding for Federal acknowledgment of the Poarch Band of Creeks of Alabama pursuant to 25 C.F.R. 83 (Dec. 29, 1983) at 2, https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ofa/petition/013_prchcr_AL/013_pf.pdf. The acknowledgment recommendation and evaluation is cited in the Nation's Complaint. Doc. 190 at 18 ¶ 63. Therefore, the Memo is considered part of the record for purposes of this appeal. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("Our prior decisions also make clear that a document need not be physically attached to a pleading to be incorporated by reference into it . . . . ").

[4] Indeed, the Department of the Interior's acknowledgment recommendation and evaluation states that Poarch's ancestors fought on the side of Andrew Jackson during the "Creek War." *See* U.S. Dep't of the Interior, *supra* note 3, at 13 ("many

4. In exchange for supporting Andrew Jackson, they were given land grants in and near Tensaw. Doc. 190 at 7–8 ¶ 15; *see also* U.S. Dep't of the Interior, *supra* note 3, at 16 ("the lands they chose were . . . close to the Tensaw/Little River area"). By agreeing to stay, and by accepting these land grants, they gave up all political rights they had previously held as Muscogee (Creek) Nation citizens. Doc. 190 at 7–8 ¶ 15.

In 1984, the Department of the Interior ("DOI") granted federal recognition to the group, now known as the "Poarch Band of Creek Indians." *Id*. at 20–21 ¶ 73. In doing so, DOI stated that "[t]he Poarch Band remained in Alabama after the Creek Removal of the 1830s . . . and settled permanently near present-day Atmore, Alabama." Final Determination for Federal Acknowledgment of the Poarch Band of Creeks, 49 Fed. Reg. 24083 (June 11, 1984). At that time, Poarch did not claim to have—and DOI did not recognize Poarch as having—any historical ties or connection to Hickory Ground.[5] *See id.*

### 4.    Poarch Promises To Protect Hickory Ground

In 1980, Poarch (then operating as an incorporated entity because it was not yet a federally recognized tribe) acquired the Hickory Ground property in fee using

_____

of the present group's ancestors, including Lynn McGhee, received grants for their land in the Tensaw area from the United States for their support in the Creek War.").

[5] Notably, nowhere the 131-page acknowledgment recommendation and evaluation is Hickory Ground or a historical connection thereto mentioned. *See* U.S. Dep't of the Interior, *supra*, note 3, at 8–131.

federal preservation grant funds. *See id.* at 8, 17 ¶¶ 16, 61. In Poarch's application for the funds, Poarch stated that its "[a]cquisition of the property is principally a protection measure." Doc. 190-1 at 4. Poarch further stated that its "[a]cquisition would prevent development on the property." *Id*. Indeed, Poarch told the federal government that if the government gave Poarch money to purchase Hickory Ground, then:

> The property will serve as a valuable resource for cultural enrichment of Creek people…. The Creek people in Oklahoma['s] pride in heritage and ties to original homeland can only be enhanced. There is still an existing Hickory Ground tribal town in Oklahoma. ***They will be pleased to know their home in Alabama is being preserved***…. The Hickory Ground site will continue to enhance their understanding of their history, ***without excavation***.

Doc. 190 at 18–19 ¶ 67 (quoting Doc. 190-1 at 4 (emphasis added)). Poarch proclaimed that "[d]estruction of archaeological resources in Alabama . . . destroy[s] the cultural history of Creek people." Doc. 190-1 at 7. Ultimately, Poarch told the federal government that its acquisition of Hickory Ground was "necessary to prevent destruction of the site." *Id.* at 5. Poarch was successful in its bid to receive federal funding to purchase Hickory Ground. Doc. 190 at 17 ¶ 61.

Effective April 12, 1985, the United States wrongfully accepted legal title to a majority of the Hickory Ground Site in trust for the benefit of Poarch, purportedly pursuant to the Indian Reorganization Act of 1934. *Id*. at 20–21 ¶ 73.

### 5. Poarch Requests, And Accepts, Federally Delegated Authority Under The NHPA

In 1999, Poarch requested that the National Park Service ("NPS") delegate its historic preservation responsibilities for Hickory Ground to Poarch. *Id*. at 24 ¶ 80; Doc. 190-1 at 115 (The NPS Agreement states that "the chief governing authority of the Poarch Band of Creek Indians [] *requested* approval to assume" the agency's duties and legal responsibilities under the NHPA (emphasis added)). The NPS acquiesced, and on June 10, 1999, the NPS and Poarch signed an agreement ("NPS Agreement") whereby NPS delegated its authority under the NHPA to protect and preserve Hickory Ground, as a historic site, to Poarch. Doc. 190 at 24–25 ¶ 81.

By signing the NPS Agreement, Poarch Officials agreed to assume the NPS's duties and obligations under the NHPA. *Id.* Among other things, Poarch agreed to "carry out [] responsibilities for review of Federal undertakings pursuant to Section 106 of the Act in accordance with the regulations (36 CFR Part 800) of the Advisory Council on Historic Preservation." Doc. 190-1 at 117 ¶ 5. By signing the NPS Agreement, Poarch Officials also agreed to consult:

> [W]ith representatives of any other tribes whose traditional lands may have been within the Poarch Band of Creek Indians Reservation . . . . [and] periodically solicit and take into account comments on the program from all those individuals and groups who may be affected by the program's activities . . . .

*Id*. at 117 ¶ 7. Furthermore, Poarch Officials contractually agreed that, "[i]n any case where an action arising pursuant to the Act [NHPA] may affect the traditional lands

of another Tribe, the [Poarch THPO] will, on an as-needed basis, seek and take into account the views of that Tribe." *Id.* The duties and obligations under the NHPA that Poarch Officials requested and voluntarily assumed were numerous and detailed, and accordingly, the "Tribe [] provided [] the Secretary of the Interior acting through the National Park Service a plan that describes how the functions of the tribe . . . will be carried out[.]" *Id.* at 115.

The Secretary's authority to delegate an agency's administrative authority under the NHPA to a tribe is premised on that tribe's agreement to obey and implement the NHPA's governing law. *See* 54 U.S.C. § 302704. Notably, the governing regulation specifically defines tribal officials as "agency officials" if and when the Secretary delegates its authority under the NHPA to a specific tribe. 36 C.F.R. § 800.2(a) ("The *agency official* may be a State, local, or *tribal government official* who has been delegated legal responsibility for compliance with section 106 in accordance with Federal law." (emphasis added)). Poarch Officials understood the delegated federal authority they requested and accepted by signing the NPS Agreement.

### 6. Poarch Broke Its Promises And Destroyed Hickory Ground To Build A Casino Resort

After successfully securing the transfer of Hickory Ground into trust, and after successfully transferring NPS's historic preservation responsibilities to itself, Poarch broke its promises and abrogated its responsibilities under the NHPA to make way

for its second casino resort (Poarch already had one in Atmore). Doc. 190 at 28 ¶ 100. In violation of its own promises and federal law, Poarch desecrated Hickory Ground, removing over 57 bodies, thousands of funerary objects, and sacred artifacts. *Id.* at 31, 32 ¶¶ 117–19, 125. Auburn University, at Poarch's request, conducted the excavation. *Id.* at 5–6 ¶ 5. Some remains, and numerous archaeological artifacts, have never been reburied and are being mishandled and improperly stored by Auburn University and the Poarch Officials, in violation of federal law. *Id.* Although their delegated NHPA duties under the NPS Agreement required Poarch Officials to consult with the Nation, Poarch Officials never once engaged in the § 106 consultation that the NHPA requires. *Id.* at 55, 66 ¶¶ 249, 295. Although Mekko Thompson is the direct descendant of the individuals the Poarch Officials ordered exhumed from Hickory Ground, to this day, Poarch Officials have refused to return the human bodies, cultural resources, and sacred funerary objects they wrongfully excavated from beneath the surface of Hickory Ground. *Id.* at 55–56 ¶ 252.

Poarch Officials violated federal common law, federal statutory law, and their historic preservation duties under the NHPA by desecrating Hickory Ground and by failing to consult with, and obtain consent from, the Muscogee (Creek) Nation before conducting excavation and construction at this sacred and historic site. *See generally id.* at 44, 53–63, 64–76 ¶¶ 184, 237–82, 284–334. Poarch's ongoing desecration of

Hickory Ground caused, and continues to cause harm to the Nation, in violation of the laws of the United States. *See id.* Poarch Officials' ongoing refusal to return and repatriate the human remains and funerary objects to the Nation (and Mekko Thompson) constitutes an ongoing violation of federal law, one that continues to cause significant harm and damage.

### D.    Standard Of Review

This Court reviews the District Court's dismissal of a complaint for sovereign immunity *de novo*. *See, e.g.*, *Hollywood Mobile Ests. Ltd. v. Cypress*, 415 F. App'x 207, 208 (11th Cir. 2011).[6] The Court reviews the District Court's dismissal based on Rule 19 for abuse of discretion. *See Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847 (11th Cir. 1999). "[A] district court may abuse its discretion 'when a relevant factor that should have been given significant weight is not considered.'" *Santiago v. Honeywell Int'l, Inc.*, 768 F. App'x 1000, 1004 (11th Cir. 2019) (quoting *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005)). Likewise, this Court has found that "[a] district court abuses its discretion when, in reaching a decision, it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008,

---

[6] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

1039 (11th Cir. 2014) (quoting *United States v. Rigel Ships Agencies, Inc.*, 432 F.3d 1282, 1291 (11th Cir. 2005)).

## IV.    SUMMARY OF THE ARGUMENT

The well-established doctrine of *Ex parte Young* allows lawsuits against tribal officials to proceed where the plaintiff seeks prospective, injunctive relief for ongoing harm and unlawful conduct. *See Ex parte Young*, 209 U.S. 123, 159–60 (1908). The *Ex parte Young* doctrine serves a critical function, as it is "necessary to permit the federal courts to vindicate federal rights." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984); *see also Green v. Mansour*, 474 U.S. 64, 68 (1985) (explaining that *Young* furthers the federal interest in vindicating federal law). The interest in vindicating federal law is of paramount importance in the present case, where the tribal officials asserting sovereign immunity continue to engage in violations of federal law, but also specifically requested that a federal agency delegate to them the authority to uphold and administer that federal law. Indeed, this case calls for the application of *Ex parte Young*.

Indeed, the District Court concluded that the Nation seeks only prospective, injunctive relief against the Poarch Officials, as allowed by *Ex parte Young*. The District Court, however, did not end its analysis there, and instead incorrectly concluded that the Poarch Officials were entitled to sovereign immunity under *Idaho v. Coeur d'Alene Tribe of Idaho*, based on a finding that the suit implicated the

"special sovereignty interests" of Poarch.

The District Court's reliance on *Coeur d'Alene* is problematic for several reasons, not the least of which is the fact that several federal appellate courts have concluded that *Coeur d'Alene* was abrogated by the Supreme Court's subsequent decision in *Verizon*. *See Verizon Md. Inc.*, 535 U.S. 635. In *Verizon*, the Court clarified that, when conducting an *Ex parte Young* analysis, a lower court "need *only* conduct a '*straightforward inquiry*' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 645 (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and in judgment) (emphasis added)). In *Verizon*, the Supreme Court did not instruct lower courts to consider whether there are any "special sovereignty interests" that may be affected after engaging in this straightforward inquiry. *See id.*

Following the Supreme Court's decision in *Verizon*, several federal appellate courts have concluded that *Verizon* abrogated *Coeur d'Alene*. *See, e.g.*, *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 912 (10th Cir. 2008) (concluding that to the extent courts previously read *Coeur d'Alene* to require "federal courts [to] examine whether the relief sought . . . implicates special sovereignty interests, . . . *Verizon Maryland* abrogated this step" (brackets in original) (citation and quotation marks omitted)); *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs.*

*Admin.*, 603 F.3d 365, 372 (7th Cir. 2010) (concluding that in *Verizon*, the Court "returned to the 'straightforward' inquiry into 'whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective'" (brackets in original) (quoting *Verizon*, 535 U.S. at 645)). It is questionable what, if any, validity *Coeur d'Alene*'s "special sovereignty interests" test retains after *Verizon*.

This Court has had several opportunities to consider the application of *Coeur d'Alene*'s "special sovereignty interests" test and, repeatedly, has limited *Coeur d'Alene* to the narrow fact pattern present in that case. *See, e.g.*, *Curling v. Sec'y of Ga.*, 761 F. App'x 927, 933–34 (11th Cir. 2019) (concluding that the *Coeur d'Alene* exception does not apply, as *Coeur d'Alene* was a unique and "unusual case"); *Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) ("This case is not like *Coeur d'Alene*.").

Thus, even if this Court were to conclude that *Verizon* did not abrogate *Coeur d'Alene*, under this Court's precedent and authority interpreting *Coeur d'Alene*, it is clear the Nation's claims for relief do not implicate Poarch's "special sovereignty interests." The only reason Poarch possesses Hickory Ground is because Poarch promised to protect it. Poarch has no "sovereignty interest" in breaking the promises it made when it told the United States that granting Poarch the money to purchase Hickory Ground was "necessary to prevent destruction of the site." Doc. 190-1 at 3.

22

Poarch also has no "sovereignty interest" in violating federal law. Nor does it have a "sovereignty interest" in violating the delegated authority Poarch requested, and accepted, when it signed the NPS Agreement.

Poarch did not just ask the United States for money to purchase Hickory Ground. Poarch went further, asking the federal government to delegate its federal responsibility to protect Hickory Ground under the NHPA to Poarch. Under these circumstances, the federal interests that *Ex parte Young* serves are paramount. Poarch Officials not only continue to violate federal law, but also they specifically requested—and continue to enjoy—a specific delegation of federal authority under federal law, specifically the NHPA. Here, the unqualified application of *Ex parte Young* is "necessary to permit the federal courts to vindicate federal rights." *Pennhurst*, 465 U.S. at 105.

Relying on its erroneous conclusion that the Poarch Officials were fully protected from suit by sovereign immunity, the District Court incorrectly dismissed this suit for the inability to join an indispensable party under Federal Rule of Civil Procedure 19. Because the Poarch Officials can be sued under *Ex parte Young*, the District Court's decision should be reversed, and this case should proceed. And even if this Court finds the Poarch Officials are entitled to sovereign immunity, Rule 19 does not require dismissal of the Nation's claims against the Federal Defendants and Auburn University.

Hickory Ground constitutes one of the most significant sacred sites to be placed on the National Register of Historic Places. As a site on the National Register, Hickory Ground is protected by federal law. The federal laws that protect Hickory Ground did not dissipate when Poarch acquired it. Nor did they dissipate when Poarch requested and received federally delegated authority under the NHPA. The Poarch Officials are not immune from the Nation's claims for prospective, injunctive relief.

The District Court's decision should be reversed and the Nation's claims should be allowed to proceed on the merits.

## V.    ARGUMENTS AND CITATIONS TO AUTHORITY

### A.    Sovereign Immunity Does Not Bar The Nation's Claims For Prospective, Injunctive Relief Against The Poarch Officials

Under the doctrine of *Ex parte Young*, tribal sovereign immunity does not bar a suit for prospective relief against tribal officers alleged to have acted in violation of applicable law. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978) ("As an officer of the [tribe], [the tribe's governor] is not protected by the tribe's immunity from suit."). That is, as this Court has previously explained, *Ex parte Young* creates an exception to sovereign immunity for suits,

> against state officials for prospective declaratory or injunctive relief to stop ongoing violations of federal law. Under the legal fiction established in *Ex Parte Young*, when a state official violates federal law,

24

he is stripped of his official or representative character and [is] no longer immune from suit.

*Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1288 (11th Cir. 2015) (citation omitted). Like state officials sued in their official capacities, tribal officials sued in their official capacities are not immune from suit for equitable relief for ongoing violations of applicable law.[7] *Tamiami Partners, Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*, 177 F.3d 1212, 1225 (11th Cir. 1999) (holding tribal officials sued in their official capacity not immune from suit under *Ex parte Young* in suit seeking prospective declaratory or injunctive relief for violations of applicable law). The governing precedent dictates that *Ex parte Young* involves "a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon*, 535 U.S. at 645 (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and in judgment)).

Thus the District Court properly found that the Nation's claims against the Poarch Officials meet this straightforward test because the Nation alleges ongoing violations of federal law and seeks only prospective, injunctive relief. *See* Doc. 223 at 18–20. The Nation alleges that the Poarch Officials "are engaging in an ongoing

---

[7] Applicable law can include federal law, federal common law, and state law. *See PCI Gaming Auth.*, 801 F.3d at 1290; *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1156 (10th Cir. 2011); *Bay Mills*, 572 U.S. at 796.

violation of federal law by retaining the excavated cultural items and continuing to operate the Wind Creek Wetumpka." *Id.* at 19. The Nation seeks injunctive relief, prohibiting the Poarch Officials "from continuing to excavate Hickory Ground or operate the Wind Creek Wetumpka," and requiring that they "return to the plaintiffs the cultural items removed from Hickory Ground and restore the land itself into the condition it was in before the excavations began." *Id.* The Nation does not seek money damages from the Poarch Officials for these violations. *Id.*

This satisfies the "straightforward inquiry" articulated by the United States Supreme Court. *See Va. Office for Prot. and Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) ("[A] court need *only* conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of [applicable] law and seeks relief properly characterized as prospective.'" (second brackets in original) (emphasis added)). As explained below, this should be the end of the analysis, and this Court should reverse the District Court's dismissal of the Poarch Officials.

**B.    The District Court's Application Of *Coeur d'Alene* Conflicts With This Court's Precedent And The Precedents Of Almost Every Other Circuit**

The District Court, however, did not end its analysis with the "straightforward inquiry" that *Verizon* commands. Instead, the District Court continued, concluding that although *Ex parte Young* applies, the Supreme Court's decision in *Coeur d'Alene* controls and requires dismissal of the Nation's claims against the Poarch

Officials. Doc. 223 at 21-25. The District Court's decision was in error and should be reversed.

First, *Coeur d'Alene* does not constitute a controlling precedent. The majority of federal courts, including the United States Supreme Court and this Court, have either limited the decision's application or concluded that it has been altogether abrogated. The District Court's reliance on *Coeur d'Alene* to conclude that *Ex parte Young* does not apply to the Nation's claims, therefore, renders it an outlier.

The Supreme Court has called into question the ongoing vitality of *Coeur d'Alene*. In *Verizon*, the Supreme Court stated that "a court need *only* conduct a '*straightforward inquiry* into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" 535 U.S. at 645 (emphasis added) (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring in part and in judgment)).[8] The Court did not indicate that a lower court needs to consider whether there are any "special sovereignty interests" that may be affected after engaging in this straightforward inquiry. *See id.*

In light of the Supreme Court's clarification of *Ex parte Young* in *Verizon*, most courts have questioned whether *Coeur d'Alene*'s "special sovereignty

---

[8] Notably, the straightforward inquiry *Verizon* dictates was not part of the Opinion of the Court in *Coeur d'Alene*, likely because in that case the Court did *not* engage in a "straightforward inquiry."

exception" remains valid. To the extent it remains, this Court—and others—have strictly limited it to cases where the facts mirror the facts in *Coeur d'Alene*, *e.g.*, a *de facto* quiet title action.

Indeed, this Court has emphasized that *Coeur d'Alene* was a unique and "unusual case." *See Curling*, 761 F. App'x at 933–34 (*Coeur d'Alene* was an "unusual case that presented an exception to the *Ex parte Young* doctrine because ruling in the tribe's favor would 'extinguish' the state's ownership over 'a vast reach of lands and waters long deemed by the State to be an integral part of its territory.'" (quoting *Coeur d'Alene*, 521 U.S. at 282))). Like other circuits, this Court has consistently limited *Coeur d'Alene*'s exception to cases in which the facts mirror *Coeur d'Alene* almost precisely.

For example, in *Hollywood Mobile Estates Ltd. v. Cypress*, this Court rejected *Coeur d'Alene*'s exception in a case in which Hollywood Mobile Estates, Ltd. ("HME") requested an injunction compelling officials of the Seminole Tribe of Florida to restore HME to possession of certain property owned by the Tribe. *Hollywood Mobile Estates Ltd.*, 415 F. App'x at 209–10. The Court emphasized that *Coeur d'Alene*'s protection extended only to the type of suit at issue in that case—a "'functional equivalent' of a quiet title action against the state." *Id.* at 211; *see also id.* ("The fact the tribal officials may have to take a vote to effect compliance with such an injunction does not create a 'special sovereignty interest.'").

Similarly, in *Curling*, this Court refused to extend *Coeur d'Alene*, explaining that "there is nothing unusual about Plaintiffs' case that would necessitate summoning *Coeur d'Alene Tribe*'s exception." *Curling*, 761 F. App'x at 934. Notably, in describing the unusual nature of *Coeur d'Alene*, *Curling* cited to the Tenth Circuit's decision in *Tarrant*, which explicitly held that courts need not determine whether there are any "special sovereignty interests" in assessing the availability of *Ex parte Young* following the Supreme Court's decision in *Verizon*. *See Curling*, 761 F. App'x at 934 (citing *Tarrant Reg'l Water Dist.*, 545 F.3d at 912, for the proposition that *Verizon* "limited the 'reach' of *Coeur d'Alene Tribe*"). This Court routinely finds the *Coeur d'Alene* decision inapplicable. *See, e.g.*, *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1340 (11th Cir. 1999) ("Unlike the quiet title action in *Coeur d'Alene*, the relief sought here does not implicate the state's real property interests."); *Lane*, 772 F.3d at 1351    ("This case is not like *Coeur d'Alene*.").

This Court's sister circuits have gone even further, with several concluding that the Supreme Court's decision in *Verizon* fully abrogated the Court's prior decision in *Coeur d'Alene*. For instance, the Tenth Circuit explained that in *Verizon*:

> [T]he Supreme Court did not analyze whether the claim for Eleventh Amendment immunity involved special sovereignty interests. Instead, the Court held that "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly

characterized as prospective.'"

*Tarrant Reg'l Water Dist.*, 545 F.3d at 912 (citation omitted) (quoting *Verizon*, 535 U.S. at 645).

The Tenth Circuit went on to explain that to the extent it had previously read *Coeur d'Alene* to require "federal courts [to] examine whether the relief sought against a state official 'implicates special sovereignty interests,' we recognize . . . that *Verizon Maryland* abrogated this step." *Id.* (quoting *Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007)). The Tenth Circuit further reasoned that under *Verizon*, "we are to proceed immediately in every case to the 'straightforward [or so one might hope] inquiry' whether the relief requested is 'properly' characterized as prospective or is indeed the functional equivalent of impermissible retrospective relief." *Id.* at 912 (quoting *Hill*, 478 F.3d at 1259); *see also, e.g.*, *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012) ("[I]n *Verizon*, the Supreme Court stated that this inquiry [whether the suit implicates special sovereignty interests] was no longer required under an *Ex parte Young* analysis.").

The Seventh Circuit has likewise recognized that in *Verizon*, the Supreme Court turned away from the "new balancing approach (and new uncertainty) to the application of *Ex parte Young*" that *Coeur d'Alene* introduced. *Ind. Protec. & Advoc. Servs.*, 603 F.3d at 372. Thus, according to the Seventh Circuit, under *Verizon*, the Court "returned to the 'straightforward' inquiry into 'whether [the] complaint alleges

an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (quoting *Verizon*, 535 U.S. at 645).

The Fifth and Sixth Circuits are in accord with both the Tenth and Seventh. In *AT&T Communications v. BellSouth Telcommunications Inc.*, the Fifth Circuit ruled that it "has rejected the idea that *Coeur d'Alene* affects the traditional application of *Ex parte Young* . . . ." 238 F.3d 636, 648 (5th Cir. 2001); *see also Williams On Behalf of J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) ("We have never before applied the holding of *Coeur d'Alene* in a context outside of the unique land rights challenge in that case. To the contrary, 'this circuit has rejected the idea that *Coeur d'Alene* affects the traditional application of *Ex parte Young*.'" (citations omitted) (quoting *AT&T Comm'ns*, 238 F.3d at 648)); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) ("[T]he Court has reinforced *Ex parte Young*'s being a 'straightforward inquiry' and specifically rejected an approach that would go beyond a threshold analysis." (citing *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring in part and in judgment))); *Dubuc v. Mich. Bd. of L. Exam'rs*, 342 F.3d 610, 617 (6th Cir. 2003) ("In *Verizon Maryland*, the Court reaffirmed the traditional 'straightforward inquiry' advocated by Justice O'Connor in her concurring opinion in *Coeur d'Alene*."). The First Circuit has likewise endorsed the *Verizon* Court's "straightforward" approach. *See Doe v. Shibinette*, 16 F.4th 894, 903 (1st Cir. 2021) ("In determining whether the doctrine

of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" (quoting *Verizon*, 535 U.S. at 645)).

While other Circuits have not gone so far as to say that *Verizon* abrogates *Coeur d'Alene*'s exception, they have limited the exception to *Coeur d'Alene*'s unique facts. For instance, the Ninth Circuit has concluded that "*Coeur d'Alene* provides only a 'unique' and 'narrow' exception to *Young*," and that *Coeur d'Alene* only applies "when an action implicates the 'exact issues' of *Coeur d'Alene* itself, namely 'navigability of waters or the state's control over submerged lands.'" *Lacano Invs., LLC v. Balash*, 765 F.3d 1068, 1074 (9th Cir. 2014); *see also Cardenas v. Anzai*, 311 F.3d 929, 938 (9th Cir. 2002) ("We have interpreted *Coeur d'Alene* narrowly, and have rejected efforts to expand the list of core sovereignty exceptions to *Ex parte Young*.").[9]

The D.C. Circuit has concluded that it "cannot extend *Coeur d'Alene* beyond its 'particular and special circumstances,' which involved the protection of a State's

---

[9] The Ninth Circuit's recent decision in *Jamul Action Committee v. Simermeyer*, 974 F.3d 984 (9th Cir. 2020), does not expand the Ninth Circuit's understanding of *Coeur d'Alene*'s narrow reach. That case involved a challenge to the tribe's status as a legitimate sovereign government *and* its property interests. *See id.* at 996.

land." *Vann v. Kempthorne*, 534 F.3d 741, 756 (D.C. Cir. 2008) (citation omitted) (quoting *Coeur d'Alene*, 521 U.S. at 287). And the Fourth Circuit has "refuse[d] to read *Coeur d'Alene* [] broadly." *CSX Transp., Inc. v. Bd. of Pub. Works*, 40 F. App'x 800, 804 (4th Cir. 2002). Likewise, the Eighth Circuit follows Justice O'Connor's concurrence in *Coeur d'Alene*, which affirmed a straightforward application of *Ex parte Young*. *See Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 914 (8th Cir. 1997) (adopting "the concurring opinion's appraisal of *Ex parte Young*: '[A] *Young* suit is available where a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective.'" (alteration in original) (quoting *Coeur d'Alene*, 521 U.S. at 294 (O'Connor, J., concurring in part and in judgment))).[10]

Consequently, the District Court's application of *Coeur d'Alene* conflicts with the precedent of this Court, the Supreme Court, and numerous federal appellate courts. This Court should join the First, Tenth, Fifth, Sixth, and Seventh Circuits in their conclusion that *Verizon* abrogated *Coeur d'Alene*. It is clear that, in the wake of *Verizon*, *Coeur d'Alene* undermines the doctrinal purpose behind *Ex parte Young*.

---

[10] The few instances where federal appellate courts *have* applied and followed *Coeur d'Alene* involve circumstances that closely mirror the facts of the exception's namesake. *See, e.g.*, *W. Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 23 (2d Cir. 2004) (concluding *Coeur d'Alene* applied because the tribe sued the state for possession of submerged lands and therefore the suit was the functional equivalent of a quiet title action).

The doctrine of *Ex Parte Young* exists because it is "necessary to permit the federal courts to vindicate federal rights." *Pennhurst*, 465 U.S. at 105. As this case demonstrates, subjugating the vindication of federal rights to an amorphous and unbridled "special sovereignty interest" results in inconsistent, unreliable results, and ultimately allows some officials to violate federal law without justification. This was not the design of *Ex parte Young*.

Accordingly, this Court should reverse the District Court and make clear that *Ex parte Young* applies to the Nation's claims against the Poarch Officials for prospective, injunctive relief.

### C.    The District Court Erred When It Applied The *Coeur D'Alene* Exception To The Present Case

Even if this Court were to conclude that *Coeur d'Alene* remains good law and controls, it is clear the District Court did not correctly apply it. The District Court's application of *Coeur d'Alene* constitutes error in two ways. First, the Nation's claims to protect and preserve Hickory Ground do not implicate "special sovereignty interests," as defined by the Court's decision in *Coeur d'Alene*. And second, this suit is not the equivalent of a quiet title action.

### 1.    The Nation's Claims Do Not Implicate The "Special Sovereignty Interests" At Issue In *Coeur D'Alene*

Understanding the District Court's misapplication of *Coeur d'Alene*'s "special sovereignty interests" test requires examination of the decision itself. In

*Coeur d'Alene*, a divided Supreme Court addressed whether the Coeur d'Alene Tribe owned the beds and banks of Lake Coeur d'Alene and the navigable rivers and streams that are part of its water system (the "submerged lands"), all located within the borders of Idaho. 521 U.S. at 264. The Tribe claimed a beneficial interest (subject to the trusteeship of the United States) in the submerged lands within the original boundaries of the Tribe's reservation, or in the alternative, ownership pursuant to unextinguished aboriginal title. *Id*. at 264–65. In addition, the Tribe sought declaratory relief establishing the Tribe's "entitlement to the exclusive use and occupancy and the right to quiet enjoyment of the submerged lands," the invalidity of all state regulation of the submerged lands, and an injunction prohibiting the State (or its officials) from regulating or taking any action in violation of the Tribe's exclusive ownership rights in the submerged lands. *Id.* at 265.

The alleged ongoing violations of federal law and request for prospective relief would ordinarily have been sufficient to invoke *Ex parte Young*. *Id.* at 281. However, the Supreme Court found that the case was "unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests." *Id.* Accordingly, the Court determined that it "must examine the effect of the Tribe's suit on these special sovereignty interests in order to decide whether the *Ex parte Young* fiction is applicable." *Id.*

The Supreme Court went on to explain that the relief the Tribe sought was the

"functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe." *Id.* at 282. This was "especially troubling" in light of the "far-reaching and invasive relief" the Tribe sought, which would effectively "extinguish[] the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory." *Id.* These submerged lands, the Court emphasized, have a "unique status in the law." *Id.* at 283. Title to submerged lands is conferred to the States "not by Congress but by the Constitution itself," and state ownership of them has long been "considered an essential attribute of sovereignty." *Id.* (internal citations and quotations omitted). The Court ultimately concluded that "[u]nder these particular and special circumstances," the *Ex parte Young* exception was inapplicable. *Id.* at 287.

The District Court erred when it concluded that the unique circumstances in *Coeur d'Alene* align with, or are akin to, the circumstances surrounding Appellants' claims for injunctive, prospective relief against the Poarch Officials.

### 2. Poarch Has No Special Sovereignty Interest In Hickory Ground, Or In Violating The Federal Laws That Protect Hickory Ground

First, Poarch's connection to Hickory Ground is not at all akin to Idaho's connection to the submerged lands at issue in *Coeur d'Alene*. The *Coeur d'Alene* Court's primary concern was that the relief sought by the Tribe would have transferred title of submerged lands, the beds and banks of Lake Coeur d'Alene and

its navigable rivers and streams, from the State of Idaho to the Tribe. *See* 521 U.S. at 281–87; *see also, e.g.*, *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 205 (4th Cir. 2001) ("The [*Coeur d'Alene*] Court relied on history to explain the importance of submerged lands to state sovereignty."); *In re Deposit Ins. Agency*, 482 F.3d 612, 620 (2d Cir. 2007) (emphasizing the nature of the land at issue in *Coeur d'Alene* in its description of that case); *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506–07 (3d Cir. 2001) (emphasizing the importance of the unique status of submerged lands in its description of *Coeur d'Alene*).

The relationship of these lands to States is deeply rooted and unique. Submerged lands "have historically been considered 'sovereign lands,'" and "[s]tate ownership of them has been 'considered an essential attribute of sovereignty.'" *Coeur d'Alene*, 521 U.S. at 283 (quoting *Utah Div. of State Lands v. United States*, 482 U.S. 193, 195, 197 (1987)). These submerged lands were conveyed to the States as sovereigns by the Constitution under the equal footing doctrine. *Id.* "The principle which underlies the equal footing doctrine and the strong presumption of state ownership is that navigable waters uniquely implicate sovereign interests." *Id.* at 284. The Tribe's suit would have "divest[ed] the State of its sovereign control over submerged lands, lands with a unique status in the law and infused with a public trust the State itself is bound to respect." *Id.* at 283.

In contrast, Hickory Ground was *not* conveyed to Poarch by the Constitution

or any treaty (Poarch has never signed one with the United States), nor has Hickory Ground historically been considered part of Poarch's "sovereign lands." *See* Doc. 190 at 8, 17–18 ¶¶ 16–17, 61–63. Hickory Ground is situated within ***Muscogee (Creek) Nation's*** historic treaty territory and was the last tribal capitol of the Nation before the Nation was forcibly removed on the Trail of Tears—it was never part of Poarch's historic territory. *Id.* at 5, 17–18 ¶¶ 2, 61–63, 66. Indeed, when Poarch applied for federal recognition, the federal government concluded that the individuals Poarch citizens descend from historically resided in an 18-mile radius around Tensaw, Alabama—located more than 100 miles southwest of Hickory Ground—and that Poarch individuals resided in Tensaw pursuant to *permission* from the Muscogee (Creek) Nation. *Id.* at 8, 18 ¶¶ 16, 63; U.S. Dep't of the Interior, *supra* note 3, at 2, 3. In evaluating Poarch's application for federal recognition, the federal government went through painstaking detail to list all of Poarch's historic connections to events and specific places in present-day Alabama. *See* U.S. Dep't of the Interior, *supra* note 3 at 1–46. Nowhere in the 131-page acknowledgment recommendation and evaluation is Hickory Ground mentioned. *See generally id.*

Prior to 1980, Poarch had not occupied Hickory Ground, Poarch had never owned Hickory Ground, Poarch had never participated in ceremonies at Hickory Ground, and Poarch never buried any of its people at Hickory Ground. Doc. *See* Doc.190 at 18 ¶ 63. Unlike Idaho in *Coeur d'Alene*, which understood that it owned

the lake since the State's inception, at the time of Poarch's inception, Poarch acknowledged that Hickory Ground was Muscogee (Creek) Nation land. *Id.* at 18 ¶ 66. Accordingly, nothing in the record would support the conclusion that Hickory Ground has been "long deemed by [Poarch] to be an integral part of its territory." *Coeur d'Alene*, 521 U.S. at 282; *see also Seneca Nation v. Hochul*, 58 F.4th 664, 673 (2d Cir. 2023) (denying application of *Coeur d'Alene* where the sovereign "has not historically governed the land in question.").

In contrast to Idaho, which acquired the lands at issue in *Coeur d'Alene* through the United States Constitution, Poarch acquired Hickory Ground through a contemporary purchase made with federal preservation grant funds. Doc. 190 at 17 ¶ 61. At the time that Poarch acquired Hickory Ground, it was a corporate entity— not a sovereign government. *See id.* at 17, 20–21 ¶¶ 61, 73. Moreover, Poarch made specific promises to secure its acquisition of Hickory Ground. At the time, Poarch represented to the Muscogee (Creek) Nation, the Alabama Historic Commission, and the United States that its purpose in acquiring the Hickory Ground Site was to preserve the historic property for the benefit of all Creek Indians, including the "'existing Hickory Ground tribal town in Oklahoma,' and to preserve the Site 'without excavation.'" *Id.* at 18 ¶ 64 (quoting Poarch Application for Historic Preservation Grant Re U.S. Department of the Interior (HCRS [Heritage Conservation and Recreation Service]) letter 712 at 2 (2/12/1980)).

In its National Preservation Grant Application, Poarch averred that "[a]cquisition of the property is principally a protection measure. Acquisition will prevent development on the property." Doc. 190-1 at 4. Poarch went on to state that the Nation and specifically Hickory Ground Tribal Town "will be pleased to know their home in Alabama is being preserved. . . .The Hickory Ground site will continue to enhance their understanding of their history, ***without excavation***." *Id.* (emphasis added). Thus, in contrast to Idaho—whose sovereign right to own the lands at issue in *Coeur d'Alene* was derived exclusively from the U.S. Constitution—Poarch's right to own the lands at issue here comes from a federal grant premised not on Poarch's existence as a sovereign government, but rather, on Poarch's promise to protect and preserve Muscogee (Creek) Nation's connection to Hickory Ground. These interests are not at all alike, and actually, are dramatically disparate.

Poarch does not have a special sovereignty interest in breaking the promises it made to the Nation, Alabama, or the United States. Nor does it have a special sovereignty interest in refusing to carry out its delegated historic preservation responsibilities under the NPS Agreement. *See Antrican v. Odom*, 290 F.3d 178, 189–90 (4th Cir. 2002) (holding *Coeur d'Alene* did not apply and explaining that "[a]lthough North Carolina may retain a special sovereignty interest in choosing whether to participate in the Medicaid program, once it elects to participate, it is not entitled to assert that interest to insulate itself from the requirements of the federal

program."); *see also J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1287 (10th Cir. 1999) ("A state's interest in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of *Ex Parte Young*."). As stated by the D.C. Circuit Court in *Vann*, "[t]he tribe does not just lack a 'special sovereignty interest' in [conduct that violates federal law]—it lacks *any* sovereign interest in such behavior." *Vann*, 534 F.3d at 756.

Poach's regulatory authority and ownership over Hickory Ground was bestowed by Congress and the NPS, based on promises Poarch made to comply with the NHPA. *See MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 348 (7th Cir. 2000) (concluding that States cannot claim a "sovereign interest" that precludes the application of *Ex parte Young* when the power to exercise that interest "is derived solely from the regulatory role Congress has bestowed upon the states."). Poarch has no sovereign interest in violating the NHPA, or its own promises.[11]

### 3.    This Suit Is Not The Equivalent Of A Quiet Title Action

Second, this suit is *not* the functional equivalent of an action for quiet title. If the Nation prevails on any of its claims, Poarch will still own Hickory Ground. It

---

[11] To the extent Poarch contends its sovereign interest implicated by the Nation's requested relief is generating economic revenue, that concept has been dismissed by the courts. *See, e.g.*, *Harris v. Owens*, 264 F.3d 1282, 1293 (10th Cir. 2001) ("[T]he state has no special sovereign interest in future sources of revenue.").

will still be able to use and enjoy Hickory Ground. The only restrictions will be those that are necessary to enforce Poarch's *own* promises to protect and preserve the historic, cultural, and religious significance of the site, as well as Poarch's obligations under the NHPA—obligations that Poarch specifically requested that NPS delegate to Poarch. Requiring Poarch to comply with it promises, federal law, and delegated federal authority does not transform this action into a quiet title action, as Poarch has no "sovereignty interest" in violating federal law.

Furthermore, the fact that this suit involves a claim that the Secretary violated the IRA when placing Hickory Ground in trust for Poarch in no way transforms this action into the functional equivalent of a quiet title action. In this regard, the District Court's analysis is erroneous and misplaced. *See* Doc. 223 at 22 (concluding, in part, that Poarch's special sovereignty interests are implicated because "the plaintiffs' IRA claim seeks to convert Hickory Ground from reservation land held by the Interior Department in trust for PBCI into a parcel owned by the Tribe in fee simple."). The District Court's application of *Coeur d'Alene*, therefore, conflates a quiet title action with a challenge to secretarial action brought under the IRA.

The Supreme Court, however, has held that the two are not interchangeable. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215–24 (2012). This is because when a plaintiff brings a claim that the Secretary violated the IRA by taking land into trust, that claim "falls within the APA's general

waiver of sovereign immunity"—regardless of any special sovereignty interests a court might apply with regards to a separate *Ex Parte Young* analysis. *Id.* at 224. Like the plaintiff in *Patchak*, the Nation "wants a court to strip the United States of title to the land," based on the argument "that the Secretary's decision to take land into trust violates a federal statute," and consequently, the Nation's challenge presents "a garden-variety APA claim." *Id.* at 220. Like the plaintiff's lawsuit in *Patchak*, the Nation's "lawsuit therefore lacks a defining feature of a [quiet title] action." *Id.*

The Nation's IRA claim is against the United States, and not Poarch or the Poarch Officials. The Nation is not attempting to transfer title to itself. If it succeeds on the IRA claim, Poarch will still own the land, just no longer in trust. The Nation's claims, with regards to the Poarch Officials, merely seek to enforce the promises these Poarch Officials made and the requirements of federal law. A lawsuit that does not transfer ownership of land and instead merely requires compliance with federal law does not implicate "special sovereignty interests." Thus, even if *Coeur d'Alene* remains applicable, governing precedent, it simply does not apply to the facts in this case. This Court should reverse the District Court's determination that the Poarch Officials are immune from the Nation's claims for prospective, injunctive relief.

### D.  The District Court's Dismissal Under Rule 19 Should be Reversed

The District Court properly found that the Nation alleged ongoing violations

of federal law and sought injunctive relief, thus bringing the Nation's case against the Poarch Officials under *Ex parte Young*. Doc. 223 at 19. It was only the District Court's erroneous application of *Coeur d'Alene* that resurrected the Poarch Officials' immunity and led the Court to dismiss the entire case pursuant to Rule 19. *See* Doc. 223 at 5, 25–32. Because the Poarch Officials can properly be sued in this matter, the Court should reverse the District Court's Rule 19-based dismissal.[12]

Alternatively, if this Court determines that the Poarch Officials are indeed entitled to sovereign immunity, this Court should reinstate the Nation's claims against the Federal Defendants and Auburn University, as the District Court's dismissal of those claims under Rule 19 constitutes an abuse of discretion. In concluding that the Nation's claims against the Federal Defendants and Auburn University should be dismissed under Rule 19, the District Court erroneously applied the Supreme Court's decision in *Republic of Philippines*. Doc. 223 at 29. *Pimentel*

---

[12] It is well-established that tribal officials can adequately represent the interests of a tribal entity when tribal officials are named as defendants, thus satisfying Rule 19. *See, e.g.*, *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1177, 1180 (9th Cir. 2012) (explaining that an absent party is not a necessary party under Rule 19(a) if the absent party is adequately represented and concluding that "Navajo official defendants can be expected to adequately represent the Navajo Nation's interests"); *Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 930–31 (D.C. Cir. 2012); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001). Indeed, Poarch conceded that its officials could adequately represent it in this suit. *See* Doc. 217 at 97 ("With respect to the Tribal Officials, the Plaintiffs may be correct that they could adequately represent PBCI's interests for Rule 19 purposes if they remained in the suit as defendants.").

does not apply to this case.

As the Supreme Court acknowledged, *Pimentel* required the Court "to address the Rule's operation in the context of foreign sovereign immunity." 553 U.S. at 854. Poarch, however, is not a foreign country. *See* Doc. 190 at 8 ¶ 16. It is a tribal entity that came into existence as a result of federal recognition bestowed through federal administrative action in 1984. *See id.* In *Pimentel*, the Supreme Court concluded the lawsuits to recover the assets of the Republic of Philippines could not proceed without the foreign sovereign's participation in the lawsuit due to a privilege "codified by federal statute," specifically, the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611. *See* 553 U.S. at 865. In contrast, Poarch is not a foreign sovereign and does not enjoy the same privilege codified by statute. *Pimentel* has no application to the claims brought in this case against Poarch, the Poarch Officials, the Federal Defendants, and Auburn University. The District Court's adherence to an irrelevant legal authority constitutes an abuse of discretion.

Furthermore, Rule 19(b)'s four factors, when considered in their totality, warrant reversal of the District Court's decision. Specifically, the Court is required to consider:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
>> (A) protective provisions in the judgment;
>> (B) shaping the relief; or

      (C) other measures;

          (3) whether a judgment rendered in the person's absence would be adequate; and

          (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Although, under the first factor, a judgment on the Nation's claims against the Federal Defendants rendered in Poarch's absence is likely to prejudice Poarch, the District Court offered no reason—nor is there one—to explain how judgment on the Nation's claims against Auburn University might prejudice Poarch. Notably, the District Court's Rule 19 analysis contains no mention of Auburn University or the Nation's claims against the University. The Nation's claims against Auburn include Counts VII (NAGPRA) and XI (ARPA) and center on Auburn University's actions in excavating the remains of the Nation's relatives who, before Auburn undertook its illegal actions, were buried peacefully at Hickory Ground. Doc. 190 at 5–6 ¶¶ 5–6.

The Nation alleges that "Auburn receives federal funds and, on information and belief, exercised, and continues to exercise, possession or control over remains and cultural items that Auburn excavated from Hickory Ground." *Id.* at 12 ¶ 42. As the federal acknowledgment recommendation and evaluation demonstrates, Poarch has no ancestors buried at Hickory Ground and instead traces its lineage to individuals who resided historically at Tensaw, Alabama, more than 120 miles away.

*Id.* at 8, 18 ¶ 16, 63.

Thus, the Nation's claims to recover and repatriate the remains of the Nation's relatives in no way prejudices Poarch. Of course, if Auburn University dug up and placed the remains of Poarch's ancestors in plastic bins and stored them on the University's campus, the Nation would not interfere nor intercede with Poarch's right to recover and repatriate them. Doing so would be morally unconscionable, and ultimately, unsupported by federal law. Whether Auburn returns the remains of Mekko Thompson's and Hickory Ground Tribal Town's relatives to the Nation in no way involves Poarch or the Poarch Officials, and thus the Nation's claims can and should proceed without them, if sovereign immunity precludes their participation in the present litigation.

Finally, the fourth factor weighs heavily in the Nation's favor. It is clear that the Nation will have *no* remedy if this lawsuit is dismissed for nonjoinder. For the Muscogee (Creek) Nation, the Hickory Ground Tribal Town, and Mekko Thompson, the only way to protect the final resting place of their relatives is to bring claims requiring the Federal Defendants and Auburn University to uphold their duties and obligations under federal law. Hickory Ground was placed on the National Register *before* Poarch had any connection to it. The fact that Poarch was able to subsequently purchase it in no way removed the protections federal law affords Hickory Ground or the Nation's historic, sovereign, and cultural connections to it. The idea that the

Nation cannot hold the federal government or Auburn University accountable for their violations of federal law without the presence of Poarch violates all notions of equity and good conscience.

The District Court's decision to dismiss the Nation's claims against Auburn and the Federal Defendants, therefore, should be reversed, and regardless of whether the Poarch Officials return to the action, the Nation's claims against the Federal Defendants and Auburn should be allowed to proceed.

## VI.    CONCLUSION

The Nation respectfully requests that this Court reverse the District Court's determination that the Poarch Officials are entitled to sovereign immunity. The Nation also respectfully requests that this Court reverse the District Court's Rule 19-based dismissal against the Federal Defendants and Auburn University.

Respectfully submitted,

(s) *Mary Kathryn Nagle*
Mary Kathryn Nagle
ATTORNEY AT LAW
P.O. Box 506
McLean, VA 22101
(202) 407-0591
mkn@mknaglelaw.onmicrosoft.com

OF COUNSEL:

Chloe Thompson Villagomez
Devra R. Cohen
FOSTER GARVY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
(206) 447-4400
chloe.villagomez@foster.com
devra.cohen@foster.com


OF COUNSEL:

David McKnight
DILLARD, MCKNIGHT, JAMES & MCELROY, LLP
2700 Highway 280, Suite 110 East
Birmingham, AL 35223
(205) 271-1100
dmcknight@dillardmcknight.com

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,483.

2.      This document complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

(s) <u>*Mary Kathryn Nagle*</u>

Attorney for Appellants

Dated: <u>7/20/2023</u>.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2023, I electronically filed the foregoing APPELLANTS' OPENING BRIEF with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties entitled to receive notice.

(s) *David McKnight*
OF COUNSEL