No. 21-11643

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## MUSCOGEE (CREEK) NATION, et al.,

### Plaintiffs-Appellants,

### v.

## BUFORD ROLIN, et al.,

### Defendants-Appellants.

---

**Appeal from the District Court of the United States for the Middle District of Alabama, Northern Division**
**District Court No. 2:12cv1079-MHT (CSC) (Hon. Myron H. Thompson)**

---

## APPELLANTS' APPENDIX – VOLUME 1

---

Mary Kathryn Nagle
ATTORNEY AT LAW
P.O. Box 506
McLean, VA 22101
(202) 407-0591

David McKnight
DILLARD, MCKNIGHT, JAMES &
MCELROY, LLP
2700 Highway 280
Suite 110 East
Birmingham, AL 35223


Devra R. Cohen
FOSTER GARVEY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
(206) 447-4400

*Counsel for Plaintiffs-Appellants*

# INDEX OF APPENDIX

**Docket/Tab #**

**Volume 1**

District Court Docket Sheet……………………………………………….    A

Second Amended Complaint and Supplemental Complaint………………    190

Exhibits to Second Amended Complaint…………………………………    190-1

**Volume 2**

Answer of Defendant Auburn University to Second Amended…………..    194
Complaint

Notice of Constitutional Question………………………………………    197

Federal Defendants' Motion to Dismiss Second Amended
Complaint  and Supplemental Complaint…………………………………    199

Federal Defendants' Memorandum in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and Supplemental
Complaint…………………………………………………………………    200

Tribal Defendants' Motion to Dismiss Second Amended Complaint……..    201

Brief in Support of Tribal Defendants' Motion to Dismiss
Second Amended Complaint………………………………………………    202

Declaration of Lori M. Stinson in Support of Tribal Defendants'
Motion to Dismiss Second Amended Complaint…………………………    203

**Volume 3**

Individual Defendants' Motion to Dismiss Second Amended
Complaint…………………………………………………………………    204

Brief in Support of Individual Defendants' Motion to Dismiss
Second Amended Complaint………………………………………………    205

Notice of Correction…………………………………………….....    213

Plaintiffs' Response and Memorandum in Support of Response
to Federal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint…………………………....    213-1

Plaintiffs' Response and Memorandum in Support of Response
to Individual Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint…………………………....    213-2

Plaintiffs' Response and Memorandum in Support of Response
to Tribal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint…………………………....    213-3

## Volume 4

Federal Defendants' Reply in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and
Supplemental Complaint……………………………………………...    216

Tribal Defendants' Reply Brief in Support of Motion to Dismiss
Second Amended Complaint……………………………………….    217

Individual Defendants' Reply and Memorandum in Support of
Motion to Dismiss Second Amended Complaint…………………....    218

Final Opinion……………………………………………………….    223

Final Judgment…………………………………………………….....    224

Order re Martin Construction bankruptcy………………………….    225

## Volume 5

Judgment re Martin Construction bankruptcy……………………....    227

Plaintiffs' Notice of Appeal………………………………………....    228

Certificate of Service

# TAB A

APPEAL,CLOSED,CSC_ClerkC,MHT-ClerkA,MHT-ClerkB

# U.S. District Court
## Alabama Middle District (Montgomery)
## CIVIL DOCKET FOR CASE #: 2:12-cv-01079-MHT-CSC

| | |
|---|---|
| Muscogee (Creek) Nation et al v. Poarch Band of Creek Indians et al | Date Filed: 12/12/2012 |
| Assigned to: Honorable Judge Myron H. Thompson | Date Terminated: 03/19/2021 |
| Referred to: Honorable Judge Charles S. Coody | Jury Demand: None |
| Case in other court: 21-11643-D | Nature of Suit: 890 Other Statutory Actions |
| Cause: 28:2201 Declaratory Judgement | Jurisdiction: U.S. Government Defendant |

### Plaintiff

**Muscogee Creek Nation**
*a federally recognized Indian tribe*
*TERMINATED: 03/09/2020*

represented by **Brendan Ludwick**
Brendan Ludwick, Esq.
5042 Wilshire Blvd.; 23340
Los Angeles, CA 90036
888-929-9602
Fax: 888-929-9603
Email: Brendan@ludwicklaw.com
*TERMINATED: 01/12/2017*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. King**
Foster Garvey PC
1111 Third Avenue; Suite 3000
Seattle, WA 98101
206-447-6286
Email: lauren.king@foster.com
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stewart Davidson McKnight , III**
Dillard, McKnight, James & McElroy LLP
2700 Highway 280; Suite 110 East
Birmingham, AL 35223
205-271-1100
Fax: 205-271-1108
Email: dmcknight@dillardmcknight.com
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Joseph Baxley**

Baxley Jackson Law Firm
300 Vestavia Parkway; Suite 3200
Vestavia Hills, AL 35216
205-290-5262
Fax: 205-290-5263
Email: Bill@baxleyjackson.com
*TERMINATED: 03/02/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Muscogee (Creek) Nation**                 represented by     **Brendan Ludwick**
*a federally recognized Indian tribe*                          (See above for address)
*TERMINATED: 03/15/2021*                                       *TERMINATED: 01/12/2017*
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Lauren J. King**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Stewart Davidson McKnight , III**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **William Joseph Baxley**
                                                               (See above for address)
                                                               *TERMINATED: 03/02/2020*
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hickory Ground Tribal Town**              represented by     **Brendan Ludwick**
*TERMINATED: 03/15/2021*                                       (See above for address)
                                                               *TERMINATED: 01/12/2017*
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Lauren J. King**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Stewart Davidson McKnight , III**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**William Joseph Baxley**
(See above for address)
*TERMINATED: 03/02/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**George Thompson**
*Mekko, individually and as traditional representative of the lineal descendants of those buried at Hickory Ground Tribal Town in Wetumpka, Alabama*

represented by **Brendan Ludwick**
(See above for address)
*TERMINATED: 01/12/2017*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. King**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stewart Davidson McKnight , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Joseph Baxley**
(See above for address)
*TERMINATED: 03/02/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Buford Rollin**
*PBCI Tribal Council Member, in his official capacity*
*TERMINATED: 01/07/2013*

represented by **Charles Alexander Dauphin**
Dauphin Paris LLC
300 Vestavia Parkway; Suite 3400
Vestavia Hills, AL 35216
205-637-0591
Fax: 205-979-6019
Email: CDauphin@Dauphinparis.com
*TERMINATED: 01/07/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Coventry Smith**
Southern Ute Indian Tribe
Legal Department
356 Ouray Drive

Ignacio, CO 81137
970-563-2140
Fax: 970-563-4854
Email: dasmith@southernute-nsn.gov
*TERMINATED: 07/11/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
Kilpatrick Townsend & Stockton LLP
Enterprise Mill
1450 Greene Street, Suite 230
Augusta, GA 30901
706-823-4206
Fax: 706-828-4488
Email: mreeves@kilpatricktownsend.com
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Garvis Sells**
*PBCI Tribal Council Member, in his official
capacity*
*TERMINATED: 01/07/2013*

represented by **Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 01/07/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Coventry Smith**
(See above for address)
*TERMINATED: 07/11/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert Thrower**
*PBCI Tribal Historic Preservation Officer,
in his official capacity*
*TERMINATED: 03/09/2020*

represented by **Catherine F. Munson**
Kilpatrick Townsend & Stockton LLP
607 14th St NW - Ste 900
Washington, DC 20005
202-824-1435
Fax: 202-585-0017
Email: cmunson@kilpatricktownsend.com
*TERMINATED: 03/09/2020*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Coventry Smith**
(See above for address)
*TERMINATED: 07/11/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bridget Wasdin**
*PCI Gaming Authority member, in her*
*official capacity*
*TERMINATED: 03/09/2020*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Coventry Smith**
(See above for address)
*TERMINATED: 07/11/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Matthew Martin**                                    represented by    **Catherine F. Munson**
*PCI Gaming Authority member, in his*                                   (See above for address)
*official capacity*                                                     *TERMINATED: 03/09/2020*
*TERMINATED: 03/09/2020*                                                *LEAD ATTORNEY*
                                                                        *PRO HAC VICE*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Charles Alexander Dauphin**
                                                                        (See above for address)
                                                                        *TERMINATED: 03/09/2020*
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **David Coventry Smith**
                                                                        (See above for address)
                                                                        *TERMINATED: 07/11/2019*
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Mark H. Reeves**
                                                                        (See above for address)
                                                                        *TERMINATED: 03/09/2020*
                                                                        *LEAD ATTORNEY*
                                                                        *PRO HAC VICE*
                                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Billy Smith**                                       represented by    **Catherine F. Munson**
*in his official capacity as a PCI Gaming*                              (See above for address)
*Board member*                                                          *TERMINATED: 03/15/2021*
*TERMINATED: 03/15/2021*                                                *LEAD ATTORNEY*
                                                                        *PRO HAC VICE*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Charles Alexander Dauphin**
                                                                        (See above for address)
                                                                        *TERMINATED: 03/15/2021*
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **David Coventry Smith**
                                                                        (See above for address)
                                                                        *TERMINATED: 07/11/2019*
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Mark H. Reeves**
                                                                        (See above for address)
                                                                        *TERMINATED: 03/15/2021*
                                                                        *LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Flintco, LLC**
*TERMINATED: 03/02/2020*

represented by **Daniel E Gomez**
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK 74172
918-586-8984
Fax: 918-586-8311
Email: dgomez@cwlaw.com
*TERMINATED: 03/02/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Lister Hubbard**
Capell Howard PC
PO Box 2069
Montgomery, AL 36102-2069
334-241-8035
Fax: 334-241-8235
Email: jlh@chlaw.com
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Forrester-Sellers**
Conner & Winters
4000 One Williams Center
Tulsa, OK 74172
918-586-5724
Fax: 918-586-8624
Email: jsellers@cwlaw.com
*TERMINATED: 04/29/2013*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Larry Bailey Lipe**
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK 74172
918-586-8512
Fax: 918-586-8612
Email: llipe@cwlaw.com
*TERMINATED: 03/02/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paige N. Shelton**
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK 74172
918-586-8558
Fax: 918-586-8642
Email: pshelton@cwlaw.com
*TERMINATED: 03/02/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Allen Sheehan**
Capell & Howard, P.C.
150 South Perry Street
Montgomery, AL 36104
334-241-8000
Email: allen.sheehan@chlaw.com
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**D.H. Griffin Companies**
*TERMINATED: 01/07/2013*

**Defendant**

**Ken Salazar**
*in his official capacity as Secretary of the*
*U.S. Department of Interior*
*TERMINATED: 06/13/2019*

represented by **Devon Lehman McCune**
US DOJ
Environmental & Natural Resources
999 18th St / S Terrace - Ste 370
Denver, CO 80026
303-844-1487
Email: devon.mccune@usdoj.gov
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Joseph DuBois**
U. S. Attorney's Office
PO Box 197
Montgomery, AL 36101
334-223-7280
Fax: 334-223-7418
Email: james.dubois2@usdoj.gov
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody Helen Schwarz**

U.S. Department of Justice, Environment
and Natural Resource
P.O. Box 7611
Washington, DC 20044
202-305-0245
Fax: 202-353-2021
Email: jody.schwarz@usdoj.gov
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jonathan Jarvis**                                    represented by   **Devon Lehman McCune**
*in his official capacity as Director of the*                          (See above for address)
*National Park Service*                                                *TERMINATED: 06/13/2019*
*TERMINATED: 06/13/2019*                                               *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **James Joseph DuBois**
                                                                       (See above for address)
                                                                       *TERMINATED: 06/13/2019*
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Jody Helen Schwarz**
                                                                       (See above for address)
                                                                       *TERMINATED: 06/13/2019*
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin Washburn**                                     represented by   **Devon Lehman McCune**
*in his official capacity as Assistant*                                (See above for address)
*Secretary, Bureau of Indian Affairs*                                  *TERMINATED: 06/13/2019*
*TERMINATED: 06/13/2019*                                               *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **James Joseph DuBois**
                                                                       (See above for address)
                                                                       *TERMINATED: 06/13/2019*
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Jody Helen Schwarz**
                                                                       (See above for address)
                                                                       *TERMINATED: 06/13/2019*
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**D.H. Griffin Wrecking Company, Inc.**
*TERMINATED: 03/02/2020*

represented by   **Helen Johnson Alford**
Alford Bolin, LLC
One Timber Way
Suite 101
Daphne, AL 36527
251-415-9214
Fax: 251-432-1700
Email: halford@alfordbolin.com
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina May Bolin**
Christian & Small LLP
1 Timber Way; Suite 101
Daphne, AL 36527
251-415-9280
Fax: 251-432-1700
Email: cmbolin@csattorneys.com
*TERMINATED: 03/15/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dan Smith**
*in his official capacity as Acting Director of*
*the National Park Service*
*TERMINATED: 03/09/2020*

represented by   **Devon Lehman McCune**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Joseph DuBois**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody Helen Schwarz**
(See above for address)
*TERMINATED: 03/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Poarch Band of Creek Indians**
*a federally recognized tribe*
*TERMINATED: 03/15/2021*

represented by   **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**

(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Stephanie A. Bryan**
*individually and in her official capacity as
Chair of the Poarch Band of Creek Indians
("Poarch") Tribal Council
TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert R. McGhee**
*individually and in his official capacity as
Vice Chair of Poarch Tribal Council
TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Amy Bryan**                                            represented by   **Mark H. Reeves**
*in her official capacity as Treasurer of the*                            (See above for address)
*Poarch Band of Creek Indians Tribal*                                     *TERMINATED: 03/15/2021*
*Council*                                                                 *LEAD ATTORNEY*
*TERMINATED: 03/15/2021*                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Charlotte Meckel**                                     represented by   **Mark H. Reeves**
*in her official capacity as Secretary of the*                            (See above for address)
*Poarch Band of Creek Indians Tribal*                                     *TERMINATED: 03/15/2021*
*Council*                                                                 *LEAD ATTORNEY*
*TERMINATED: 03/15/2021*                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Dewitt Carter**                                        represented by   **Mark H. Reeves**
*in his official capacity as At Large member*                             (See above for address)
*of the Poarch Band of Creek Indians Tribal*                              *TERMINATED: 03/15/2021*
*Council*                                                                 *LEAD ATTORNEY*
*TERMINATED: 03/15/2021*                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Sandy Hollinger**                                      represented by   **Catherine F. Munson**
*individually and in her official capacity as*                            (See above for address)
*At Large member of the Poarch Band of*                                   *TERMINATED: 03/15/2021*
*Creek Indians Tribal Council*                                            *LEAD ATTORNEY*
*TERMINATED: 03/15/2021*                                                  *PRO HAC VICE*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Charles Alexander Dauphin**
                                                                          (See above for address)
                                                                          *TERMINATED: 03/15/2021*
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Mark H. Reeves**
                                                                          (See above for address)
                                                                          *TERMINATED: 03/15/2021*
                                                                          *LEAD ATTORNEY*
                                                                          *PRO HAC VICE*
                                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Keith Martin**                                         represented by   **Catherine F. Munson**
*individually and in his official capacity as*                            (See above for address)
*At Large member of the Poarch Band of*                                   *TERMINATED: 03/15/2021*

*Creek Indians Tribal Council*
*TERMINATED: 03/15/2021*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Arthur Mothershed**
*individually and in his official capacity as*
*At Large member of the Poarch Band of*
*Creek Indians Tribal Council*
*TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Garvis Sells**
*individually and in his official capacity as*
*At Large member of the Poarch Band of*
*Creek Indians Tribal Council*
*TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eddie L. Tullis**                                       represented by    **Catherine F. Munson**
*in his official capacity as a PCI Gaming*                                  (See above for address)
*Board member*                                                             *TERMINATED: 03/15/2021*
*TERMINATED: 03/15/2021*                                                   *LEAD ATTORNEY*
                                                                           *PRO HAC VICE*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Charles Alexander Dauphin**
                                                                           (See above for address)
                                                                           *TERMINATED: 03/15/2021*
                                                                           *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Mark H. Reeves**
                                                                           (See above for address)
                                                                           *TERMINATED: 03/15/2021*
                                                                           *LEAD ATTORNEY*
                                                                           *PRO HAC VICE*
                                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Buford Rolin**                                          represented by    **Catherine F. Munson**
*an individual*                                                            (See above for address)
*TERMINATED: 03/15/2021*                                                   *TERMINATED: 03/15/2021*
                                                                           *LEAD ATTORNEY*
                                                                           *PRO HAC VICE*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Charles Alexander Dauphin**
                                                                           (See above for address)
                                                                           *TERMINATED: 03/15/2021*
                                                                           *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Mark H. Reeves**
                                                                           (See above for address)
                                                                           *TERMINATED: 03/15/2021*
                                                                           *LEAD ATTORNEY*
                                                                           *PRO HAC VICE*
                                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**David Gehman**
*an individual*
*TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Larry Haikey**
*in his official capacity as Poarch Band of
Creek Indians Tribal Historic Preservation
Officer*
*TERMINATED: 03/15/2021*

represented by **Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PCI Gaming Authority**
*TERMINATED: 03/15/2021*
*doing business as*
Wind Creek Hospitality
*TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Westly L. Woodruff**
*in his official capacity as board member of*
*the PCI Gaming Authority*
*TERMINATED: 03/15/2021*

represented by **Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Stuart Mark Altman**
*in his official capacity as board member of*
*the PCI Gaming Authority*
*TERMINATED: 05/11/2020*

represented by **Mark H. Reeves**
(See above for address)
*TERMINATED: 05/11/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Venus McGhee Prince**
*in her official capacity as board member of*
*the PCI Gaming Authority*
*TERMINATED: 05/11/2020*

represented by **Mark H. Reeves**
(See above for address)
*TERMINATED: 05/11/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Teresa E. Poust**
*in her official capacity as board member of*
*the PCI Gaming Authority*
*TERMINATED: 03/15/2021*

represented by **Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Timothy A. Manning**
*in his official capacity as board member of*
*the PCI Gaming Authority*
*TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Martin Construction, Inc.** <br> *an Alabama Corporation;* | represented by | **Dennis Mitchell Henry** <br> Webster Henry Bradwell Cohan Speagle & <br> Deshazo PC <br> P O Box 239 <br> Montgomery, AL 36101-0239 <br> 334-264-9472 <br> Fax: 334-264-9599 <br> Email: mhenry@websterhenry.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| | | **Frank Eady Bankston , Jr.** <br> Webster Henry Bradwell Cohan Speagle & <br> Deshazo <br> 105 Tallapoosa Street; Suite 101 <br> Montgomery, AL 36104 <br> 334-264-9472 <br> Fax: 334-264-9599 <br> Email: fbankston@websterhenry.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **The Department of the Interior** <br> *TERMINATED: 03/15/2021* | represented by | **Devon Lehman McCune** <br> (See above for address) <br> *TERMINATED: 03/15/2021* <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| | | **James Joseph DuBois** <br> (See above for address) <br> *TERMINATED: 03/15/2021* <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| | | **Jody Helen Schwarz** <br> (See above for address) <br> *TERMINATED: 03/15/2021* <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Tara MacLean Sweeney** <br> *in her official capacity as Assistant* <br> *Secretary of Indian Affairs* <br> *TERMINATED: 03/15/2021* | represented by | **Devon Lehman McCune** <br> (See above for address) <br> *TERMINATED: 03/15/2021* <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| | | **James Joseph DuBois** <br> (See above for address) |

*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody Helen Schwarz**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**David Bernhardt**
*in his official capacity as Secretary of the*
*United States Department of the Interior*
*TERMINATED: 03/15/2021*

represented by **Devon Lehman McCune**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Joseph DuBois**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody Helen Schwarz**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**David Vela**
*in his official capacity as Acting Director of*
*the National Park Service*
*TERMINATED: 03/15/2021*

represented by **Devon Lehman McCune**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Auburn University**
*TERMINATED: 03/15/2021*

represented by **David Randall Boyd**
Balch & Bingham
445 Dexter Avenue
Suite 8000
Montgomery, AL 36101
334-269-3132
Fax: 334-269-3115
Email: dboyd@balch.com
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Griffin Lane Knight**

Balch & Bingham
Post Office Box 78
Montgomery, AL 36104
334-834-6500
Fax: 334-269-3115
Email: lknight@balch.com
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime Stone Hammer**
Auburn University
182 South College Street
101 Samford Hall
Auburn, AL 36849
334-844-5176
Fax: 334-844-4575
Email: jsh0073@auburn.edu
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jordan Dorman Walker , Jr.**
Balch & Bingham LLP
P O Box 78
Montgomery, AL 36101
334-834-6500
Fax: 866-736-3854
Email: dwalker@balch.com
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Morgan Mccue Sport**
Auburn University
182 S College St - 101 Samford Hall
Office of the General Counsel
Auburn University
Auburn, AL 36849
334-844-5176
Fax: 334-844-4575
Email: mms0116@auburn.edu
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tribal Defendants**
*TERMINATED: 03/15/2021*

represented by **Catherine F. Munson**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Dauphin**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark H. Reeves**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Federal Defendants**          represented by  **Devon Lehman McCune**
*TERMINATED: 03/15/2021*                   (See above for address)
                                          *TERMINATED: 03/15/2021*
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**James Joseph DuBois**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody Helen Schwarz**
(See above for address)
*TERMINATED: 03/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/12/2012 | 1 | COMPLAINT against Auburn University, Stephanie Bryan, D.H. Griffin Companies, Flintco, LLC, David Gehman, Sandy Hollinger, Jonathan Jarvis, Tim Manning, Keith Martin, Matthew Martin, Martin Construction, Inc., Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rollin, Ken Salazar, Garvis Sells, Billy Smith, Robert Thrower, Eddie Tullis, U.S. Department of Interior, Bridget Wasdin, and Kevin Washburn ( Filing fee $ 400.00 receipt number 4602025243.), filed by Hickory Ground Tribal Town, Muscogee Creek Nation, and George Thompson. (Attachments: # 1 Filing Fee Receipt and PRO HAC VICE Receipt)(scn, ) (Entered: 12/14/2012) |
| 12/12/2012 | 2 | Motion for Brendan Ludwick to Appear Pro Hac Vice by Hickory Ground Tribal Town, Muscogee Creek Nation, and George Thompson. (Fee paid; see 1 Complaint for Receipt.) |

| | | (Attachments: # 1 Application, # 2 USDC Certificate of Good Standing)(scn, ) (Entered: 12/14/2012) |
|---|---|---|
| 12/12/2012 | 3 | Corporate/Conflict Disclosure Statement by Hickory Ground Tribal Town, Muscogee Creek Nation, and George Thompson. (scn, ) (Entered: 12/14/2012) |
| 12/12/2012 | 4 | Summons Issued as to All Defendants; returned to Counsel for personal service. (scn, ) (Entered: 12/14/2012) |
| 12/18/2012 | 5 | ORDER that the 2 Motion to Appear Pro Hac Vice is granted. Signed by Honorable Judge Myron H. Thompson on 12/18/2012. (dmn, ) (Entered: 12/18/2012) |
| 12/19/2012 | 6 | SUMMONS Returned Executed; Martin Construction, Inc. served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 7 | SUMMONS Returned Executed; Robert Thrower served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 8 | SUMMONS Returned Executed; Tim Manning served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 9 | SUMMONS Returned Executed; Matthew Martin served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 10 | SUMMONS Returned Executed; Eddie Tullis served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 11 | SUMMONS Returned Executed; Bridget Wasdin served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 12 | SUMMONS Returned Executed; Sandy Hollinger served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 13 | SUMMONS Returned Executed; Poarch Band of Creek Indians served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 14 | SUMMONS Returned Executed; Garvis Sells served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 15 | SUMMONS Returned Executed; Keith Martin served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 16 | SUMMONS Returned Executed; PCI Gaming Authority served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 17 | SUMMONS Returned Executed; David Gehman served on 12/18/2012, answer due 1/8/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 18 | SUMMONS Returned Executed; Buford Rollin served on 12/15/2012, answer due 1/7/2013. (scn, ) (Entered: 12/20/2012) |
| 12/19/2012 | 19 | SUMMONS Returned Executed; Stephanie Bryan served on 12/15/2012, answer due 1/7/2013. (scn, ) (Entered: 12/20/2012) |
| 12/20/2012 | 20 | SUMMONS Returned Executed; Auburn University served on 12/17/2012 via CMRRR from the Plaintiff's Attorney's Office, answer due 1/7/2013. (scn, ) (Entered: 12/21/2012) |

| 12/20/2012 | 21 | SUMMONS Returned Executed; Billy Smith served on 12/19/2012, answer due 1/9/2013. (scn, ) (Entered: 12/21/2012) |
|---|---|---|
| 12/26/2012 | 22 | MOTION for Extension of Time to File Response/Reply by Poarch Band of Creek Indians. (Dauphin, Charles) (Entered: 12/26/2012) |
| 12/26/2012 | | ***Attorney Charles Alexander Dauphin for Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Buford Rollin, Garvis Sells, Billy Smith, Robert Thrower, Eddie Tullis, and Bridget Wasdin added pursuant to 22 Motion. (scn, ) (Entered: 12/26/2012) |
| 12/26/2012 | 23 | ORDER directing that the 22 motion for extension of time is granted. Signed by Honorable Judge Myron H. Thompson on 12/26/12. (scn, ) (Entered: 12/26/2012) |
| 12/26/2012 | 24 | SUMMONS Returned Executed: Robert McGhee served on 12/24/2012, answer due 1/14/2013; Arthur Mothershed served on 12/24/2012, answer due 1/14/2013. (scn, ) (Entered: 12/26/2012) |
| 12/26/2012 | | ***Attorneys David C. Smith and Mark H. Reeves for Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rollin, Garvis Sells, Billy Smith, Robert Thrower, Eddie Tullis, and Bridget Wasdin added pursuant to 22 Motion. (scn, ) (Entered: 12/27/2012) |
| 12/28/2012 | 25 | SUMMONS Returned Executed; Ken Salazar served on 12/20/2012 (signed by A. Wright), answer due 2/18/2013. (scn, ) (Entered: 12/28/2012) |
| 12/28/2012 | 26 | SUMMONS Returned Executed; U.S. Department of Interior served on 12/20/2012 (signed by A. Wright), answer due 2/18/2013. (scn, ) (Entered: 12/28/2012) |
| 12/28/2012 | 27 | SUMMONS Returned Executed: Kevin Washburn served on 12/20/2012 (signed by A. Wright), answer due 2/18/2013. (scn, ) (Entered: 12/28/2012) |
| 12/28/2012 | 28 | SUMMONS Returned Executed: Flintco, LLC served on 12/17/2012 (signed by Laura Payne), answer due 1/7/2013. (scn, ) (Entered: 12/28/2012) |
| 12/28/2012 | 29 | Summons Returned Unexecuted as to D.H. Griffin Companies. (scn, ) (Entered: 12/28/2012) |
| 01/04/2013 | 30 | NOTICE by Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn *(Jody H. Schwarz's Notice of Appearance)* (DuBois, James) (Additional attachment(s) added on 1/4/2013: # 1 Corrected certificate of service) (scn, ). (Additional attachment(s) added on 1/4/2013: # 2 Corrected main document with corrected certifcate of service) (scn, ). (Entered: 01/04/2013) |
| 01/04/2013 | | ***Attorney James Joseph DuBois for Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, and Kevin Washburn added pursuant to 30 Notice. (scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | | ***Attorney Jody H. Schwarz for Jonathan Jarvis, Ken Salazar, Kevin Washburn, and U.S. Department of Interior added pursuant to 30 Notice. (scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 31 | MOTION for Extension of Time to File Answer *or Respond to Complaint (Unopposed)* by Auburn University. (Boyd, David) (Entered: 01/04/2013) |

| 01/04/2013 | 32 | NOTICE of PDF Correction re 30 Notice to reflect correction to certificate of service to include non-CM/ECF recipients. (Attachments: # 1 Corrected docket entry 30 )(scn, ) (Entered: 01/04/2013) |
| --- | --- | --- |
| 01/04/2013 | | ***Attorneys Griffin Lane Knight and Lee Ford Armstrong for Auburn University added pursuant to 31 Motion. (scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 33 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Arthur Mothershed. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 34 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Auburn University. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 35 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Billy Smith. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 36 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Buford Rollin. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 37 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to David Gehman. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 38 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Sandy Hollinger. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 39 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Jonathan Jarvis. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 40 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Keith Martin. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 41 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Matthew Martin. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 42 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to PCI Gaming Authority. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 43 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Poarch Band of Creek Indians. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 44 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Robert McGhee. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |

| 01/04/2013 | 45 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Ken Salazar. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 46 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Garvis Sells. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 47 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Stephanie Bryan. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 48 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Robert Thrower. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 49 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Tim Manning. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 50 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Eddie Tullis. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 51 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to U.S. Department of Interior. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 52 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Bridget Wasdin. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/04/2013 | 53 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Kevin Washburn. Corporate Disclosures due by 1/14/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 01/04/2013) |
| 01/07/2013 | 54 | NOTICE of Appearance by Joseph Lister Hubbard on behalf of Flintco, LLC (Hubbard, Joseph) (Entered: 01/07/2013) |
| 01/07/2013 | 55 | MOTION for Extension of Time to File *RESPONSIVE PLEADINGS* by Flintco, LLC. (Hubbard, Joseph) (Entered: 01/07/2013) |
| 01/07/2013 | 56 | Corporate/Conflict Disclosure Statement by Flintco, LLC. (Hubbard, Joseph) (Entered: 01/07/2013) |
| 01/07/2013 |  | ***Attorney William Allen Sheehan for Flintco, LLC added pursuant to 54 Notice. (scn, ) (Entered: 01/08/2013) |
| 01/08/2013 | 57 | AMENDED COMPLAINT against All Defendants, filed by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson.(Baxley, William) (Entered: 01/08/2013) |
| 01/08/2013 |  | ***Attorneys David C. Smith, Mark H. Reeves, and Charles Alexander Dauphin for Buford Rolin and Garvin Sells added pursuant to 57 Amended Complaint. (No PDF document attached to this entry.) (scn, ) (Entered: 01/08/2013) |

| 01/08/2013 | 58 | Corporate/Conflict Disclosure Statement by Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn re 39 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Jonathan Jarvis, 45 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Ken Salazar, 51 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to U.S. Department of Interior, and 53 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Kevin Washburn. (DuBois, James) Modified on 1/9/2013 to create relationships for attorney to 39 , 45 , 51 , and 53 Notices of Deficiencies (scn, ). (Additional attachment(s) added on 1/11/2013 to reflect correction to certificate of service: # 1 Corrected main document) (scn, ). (Entered: 01/08/2013) |
|---|---|---|
| 01/09/2013 | 59 | Motion for David C. Smith and Mark Howard Reeves to Appear Pro Hac Vice by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Attachments: # 1 Exhibit Cert of Good Standing, # 2 Exhibit Cert of Good Standing)(Dauphin, Charles) (Entered: 01/09/2013) |
| 01/09/2013 | 63 | SUMMONS Returned Executed; Jonathan Jarvis served on 12/19/2012, answer due 2/17/2013. (scn, ) (Entered: 01/10/2013) |
| 01/10/2013 | 60 | ORDER directing that the 31 motion for extension of time to answer or respond is granted. Signed by Honorable Judge Myron H. Thompson on 1/10/13. (scn, ) (Entered: 01/10/2013) |
| 01/10/2013 | 61 | Corporate/Conflict Disclosure Statement by Auburn University re 34 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Auburn University. (Boyd, David) Modified on 1/11/2013 to create relationship to 34 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Auburn University (scn, ). (Entered: 01/10/2013) |
| 01/10/2013 | 62 | ORDER granting 55 Motion for Extension of Time. Signed by Honorable Judge Myron H. Thompson on 1/10/13. (scn, ) (Entered: 01/10/2013) |
| 01/10/2013 | 64 | Summons Issued as to D.H. Griffin Wrecking Company, Inc.; mailed CMRRR with copy of 57 Amended Complaint. (scn, ) (Entered: 01/10/2013) |
| 01/11/2013 | 65 | NOTICE of PDF Correction re 58 Corporate/Conflict Disclosure Statement to reflect correction to certificate of service. (Attachments: # 1 Corrected main document of Docket Entry 58 )(scn, ) (Entered: 01/11/2013) |
| 01/11/2013 | 66 | Corporate/Conflict Disclosure Statement by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin re 33 , 35 , 36 , 37 , 38 , 40 , 41 , 42 , 43 , 44 , 46 , 47 , 48 , 49 , 50 , and 52 Notices of Deficiency requiring filing of Corporate Disclosure/Conflict Statement. (Dauphin, Charles) Modified on 1/14/2013 to create relationships to the notices (scn, ). (Entered: 01/11/2013) |
| 01/14/2013 | 67 | ORDER granting 59 Motion for Leave for David C. Smith and Mark Howard Reeves to Appear Pro Hac Vice. Signed by Honorable Judge Myron H. Thompson on 1/14/13. (scn, ) (Entered: 01/14/2013) |

| 01/14/2013 | 68 | Return Receipt Card showing service of 64 Summons and 57 Amended Complaint signed by Laura Payne for D.H. Griffin Wrecking Company, Inc. served on 1/11/2013, answer due 2/1/2013. (scn, ) (Entered: 01/15/2013) |
| 01/17/2013 | 69 | Filing fee re 59 Motion for David C. Smith and Mark Howard Reeves to Appear Pro Hac Vice: $ 100.00, receipt number 4602025622 (Received on 01/16/2013) (scn, ) (Entered: 01/17/2013) |
| 02/04/2013 | 72 | Motion for Larry Bailey Lipe and Julia Forrester-Sellers to Appear Pro Hac Vice ( Filing fee $ 100.00 receipt number 4602025785.) by Flintco, LLC. (Attachments: # 1 Exhibit A - USDC Certificate of Good Standing, # 2 Exhibit B - USDC Certificate of Good Standing, # 3 PHV Filing Fee)(scn, ) (Entered: 02/06/2013) |
| 02/04/2013 | | ***Attorneys Larry Bailey Lipe and Julia Forrester-Sellers for Flintco, LLC added pursuant to 72 Motion for Admission PHV. (scn, ) (Entered: 02/06/2013) |
| 02/05/2013 | 70 | NOTICE of Appearance by James Marshall Gardner on behalf of Martin Construction, Inc. (Gardner, James) (Entered: 02/05/2013) |
| 02/05/2013 | 71 | Corporate/Conflict Disclosure Statement by Martin Construction, Inc.. (Gardner, James) (Entered: 02/05/2013) |
| 02/06/2013 | 73 | ANSWER to 1 Complaint,, by Auburn University.(Boyd, David) (Entered: 02/06/2013) |
| 02/06/2013 | 74 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND BRIEF IN SUPPORT* by Flintco, LLC. (Hubbard, Joseph) (Entered: 02/06/2013) |
| 02/06/2013 | 75 | MOTION to Dismiss by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Smith, David) (Entered: 02/06/2013) |
| 02/06/2013 | 76 | BRIEF/MEMORANDUM in Support re 75 MOTION to Dismiss filed by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Smith, David) (Entered: 02/06/2013) |
| 02/06/2013 | 77 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Martin Construction, Inc.. (Henry, Dennis) (Entered: 02/06/2013) |
| 02/06/2013 | | BRIEF/MEMORANDUM in Support re 74 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND BRIEF IN SUPPORT* filed by Flintco, LLC. (No PDF document attached to this entry; see 74 Motion to Dismiss.) (scn, ) (Entered: 02/07/2013) |
| 02/06/2013 | | ***Attorney Frank Eady Bankston, Jr for Martin Construction, Inc. added pursuant to 77 Motion to Dismiss. (No PDF document attached to this entry.) (scn, ) (Entered: 02/07/2013) |
| 02/07/2013 | 78 | MOTION for Extension of Time to File Answer *Unopposed* by Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn. (Schwarz, Jody) (Entered: 02/07/2013) |
| 02/07/2013 | 79 | MOTION to Withdraw as Attorney *of Record* by Martin Construction, Inc.. (Gardner, James) (Entered: 02/07/2013) |

| 02/11/2013 | 80 | ORDER granting 72 Motion for Leave for Larry Bailey Lipe and Julia Forrester-Sellers to Appear Pro Hac Vice. Signed by Honorable Judge Myron H. Thompson on 2/11/13. (scn, ) (Entered: 02/11/2013) |
| 02/11/2013 | 81 | ORDER granting 79 Motion for J. Marshall Gardner to Withdraw as Attorney. Signed by Honorable Judge Myron H. Thompson on 2/11/13. (scn, ) (Entered: 02/11/2013) |
| 02/11/2013 | | *** Attorney James Marshall Gardner terminated pursuant to 81 Order. (scn, ) (Entered: 02/11/2013) |
| 02/11/2013 | 82 | ORDER directing that the 74 , 75 , and 77 motions to dismiss are set for submission, without oral argument, on March 25, 2013, with any opposition briefs due by March 15, 2013, and any replies to the oppositions due by March 25, 2013. Signed by Honorable Judge Myron H. Thompson on 2/11/13. (scn, ) (Entered: 02/11/2013) |
| 02/11/2013 | 83 | ORDER directing as follows: (1) The 78 motion for extension of time to answer or otherwise respond, filed by the "federal defendants," is granted; (2) The "federal defendants" are allowed until February 27, 2013, to respond. Signed by Honorable Judge Myron H. Thompson on 2/11/13. (scn, ) (Entered: 02/11/2013) |
| 02/12/2013 | 84 | Motion for Daniel E. Gomez to Appear Pro Hac Vice (Filing fee $ 50.00 receipt number 4602025931.) by Flintco, LLC. (Attachments: # 1 Exhibit A, # 2 Filing Fee)(scn, ) (Entered: 02/12/2013) |
| 02/12/2013 | | ***Attorney Daiel E. Gomez for Flintco, LLC added PURSUANT TO 84 Motion for Admission PHV. (scn, ) (Entered: 02/12/2013) |
| 02/14/2013 | 85 | ORDER granting 84 Motion for Leave for Daniel E. Gomez to Appear Pro Hac Vice. Signed by Honorable Judge Myron H. Thompson on 2/14/13. (scn, ) (Entered: 02/14/2013) |
| 02/20/2013 | 86 | NOTICE of Appearance by Helen Johnson Alford on behalf of D.H. Griffin Wrecking Company, Inc. (Alford, Helen) (Additional attachment(s) added on 2/22/2013: # 1 Corrected certificate of service) (scn, ). (Entered: 02/20/2013) |
| 02/20/2013 | 87 | NOTICE of Appearance by Christina May Bolin on behalf of D.H. Griffin Wrecking Company, Inc. (Bolin, Christina) (Additional attachment(s) added on 2/22/2013: # 1 Corrected certificate of service) (scn, ). (Entered: 02/20/2013) |
| 02/21/2013 | 88 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by D.H. Griffin Wrecking Company, Inc.. (Alford, Helen) (Entered: 02/21/2013) |
| 02/21/2013 | 89 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to D.H. Griffin Wrecking Company, Inc.. Corporate Disclosures due by 3/4/2013. (Attachments: # 1 Standing ORDER and sample format)(scn, ) (Entered: 02/21/2013) |
| 02/21/2013 | 90 | Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by D.H. Griffin Wrecking Company, Inc.. (Alford, Helen) (Entered: 02/21/2013) |
| 02/21/2013 | 91 | Corporate/Conflict Disclosure Statement by D.H. Griffin Wrecking Company, Inc. re 89 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to D.H. Griffin Wrecking Company, Inc.. (Alford, Helen) Modified on 2/22/2013 to create relationship to 89 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to D.H. Griffin Wrecking Company, Inc. (scn, ). (Entered: 02/21/2013) |

| 02/22/2013 | 92 | NOTICE of PDF Correction re 86 and 87 Notices of Appearance to reflect correction to certificates of service. (Attachments: # 1 Corrected certificate of service re 86 Notice, # 2 Corrected certificate of service re 87 Notice)(scn, ) (Entered: 02/22/2013) |
| --- | --- | --- |
| 02/26/2013 | 93 | ORDER directing that the 88 and 90 motions to dismiss are set for submission, without oral argument, on March 25, 2013, with any opposition briefs due by March 15, 2013, and any replies to the oppositions due by March 25, 2013. Signed by Honorable Judge Myron H. Thompson on 2/26/13. (scn, ) (Entered: 02/26/2013) |
| 02/27/2013 | 94 | MOTION to Dismiss for Lack of Jurisdiction by Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn. (Schwarz, Jody) (Entered: 02/27/2013) |
| 02/27/2013 | 95 | BRIEF/MEMORANDUM in Support re 94 MOTION to Dismiss for Lack of Jurisdiction filed by Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn. (Attachments: # 1 Affidavit Declaration in Support of Motion to Dismiss, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K)(Schwarz, Jody) (Entered: 02/27/2013) |
| 03/05/2013 | 96 | ORDER directing that the 94 motion to dismiss is set for submission, without oral argument, on March 25, 2013, with any opposition briefs due by March 13, 2013, and any replies to the oppositions due by March 25, 2013. Signed by Honorable Judge Myron H. Thompson on 3/5/13. (scn, ) (Entered: 03/05/2013) |
| 03/11/2013 | 97 | MOTION for Extension of Time to File Response/Reply *to Defendants' Motions to Dismiss* by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (McKnight, Stewart) (Additional attachment(s) added on 3/12/2013: # 1 Corrected Certificate of Service) (wcl, ). (Entered: 03/11/2013) |
| 03/11/2013 | 98 | RESPONSE to Motion re 97 MOTION for Extension of Time to File Response/Reply *to Defendants' Motions to Dismiss* filed by Flintco, LLC. (Sheehan, William) (Additional attachment(s) added on 3/12/2013: # 1 Corrected Certificate of Service) (wcl, ). (Entered: 03/11/2013) |
| 03/12/2013 | 99 | ORDERED as follows: (1) The 97 MOTION to Extend is granted; (2) The 74 , 75 , 77 , 88 , 90 , and 94 MOTIONS to Dismiss are reset for submission, without oral argument, on 4/1/2013, with any opposition briefs due by 3/22/2013, and any replies to the oppositions due by 4/1/2013. Signed by Honorable Judge Myron H. Thompson on 3/12/2013. (wcl, ) (Entered: 03/12/2013) |
| 03/22/2013 | 100 | RESPONSE in Opposition re 94 MOTION to Dismiss for Lack of Jurisdiction , 74 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND BRIEF IN SUPPORT,* 90 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 75 MOTION to Dismiss , 78 MOTION for Extension of Time to File Answer *Unopposed,* 88 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 77 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (Attachments: # 1 Exhibit A) (McKnight, Stewart) (Entered: 03/22/2013) |
| 04/01/2013 | 101 | RESPONSE in Support re 75 MOTION to Dismiss filed by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Dauphin, Charles) (Entered: 04/01/2013) |

| 04/01/2013 | 102 | RESPONSE in Support re 94 MOTION to Dismiss for Lack of Jurisdiction filed by Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn. (Attachments: # 1 Exhibit A)(Schwarz, Jody) (Entered: 04/01/2013) |
| --- | --- | --- |
| 04/01/2013 | 103 | REPLY to Response to Motion re 74 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND BRIEF IN SUPPORT* filed by Flintco, LLC. (Gomez, Daniel) (Entered: 04/01/2013) |
| 04/01/2013 | 104 | REPLY BRIEF re 88 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by D.H. Griffin Wrecking Company, Inc.. (Bolin, Christina) (Entered: 04/01/2013) |
| 04/01/2013 | 105 | REPLY to Response to Motion re 77 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Martin Construction, Inc.. (Henry, Dennis) (Entered: 04/01/2013) |
| 04/25/2013 | 106 | MOTION for Julia Forrester-Sellers to Withdraw as Attorney by Flintco, LLC. (Forrester-Sellers, Julia) (Entered: 04/25/2013) |
| 04/29/2013 | 107 | ORDER granting 106 Motion for Julia Forrester-Sellers to withdraw as counsel; Attorney Julia Forrester-Sellers terminated as counsel for Flintco LLC. Signed by Honorable Judge Myron H. Thompson on 4/29/13. (scn, ) (Entered: 04/29/2013) |
| 06/14/2013 | 108 | Motion for Paige N. Shelton to Appear Pro Hac Vice by Flintco, LLC. (Hubbard, Joseph) (Entered: 06/14/2013) |
| 06/14/2013 |  | ***Attorney Paige N. Shelton for Flintco, LLC added pursuant to 108 Motion for Admission. (scn, ) (Entered: 06/17/2013) |
| 06/14/2013 | 109 | Filing fee re 108 Motion for Admission PHV: $ 50.00, receipt number 4602027465 (scn, ) (Entered: 06/17/2013) |
| 06/17/2013 | 110 | ORDER granting 108 Motion for Leave for Paige N. Shelton to Appear Pro Hac Vice. Signed by Honorable Judge Myron H. Thompson on 6/17/13. (scn, ) (Entered: 06/17/2013) |
| 09/03/2013 | 111 | MOTION for Preliminary Injunction Hearing, by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (Attachments: # 1 Exhibit A)(McKnight, Stewart) Modified on 9/4/2013 to correct MOTION type to reflect PDF document (scn, ). (Entered: 09/03/2013) |
| 09/03/2013 | 112 | MOTION Supplement Plaintiff's Response to Defendants' Motion to Dismiss re 100 Response in Opposition to Motion,, by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (Attachments: # 1 Exhibit A)(McKnight, Stewart) (Entered: 09/03/2013) |
| 09/04/2013 | 113 | ORDER granting 112 Motion to supplement. Signed by Honorable Judge Myron H. Thompson on 9/4/13. (scn, ) (Entered: 09/04/2013) |
| 09/04/2013 | 114 | RESPONSE to Motion re 111 MOTION for Preliminary Injunction Hearing filed by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Dauphin, Charles) (Entered: 09/04/2013) |
| 09/05/2013 |  | Set Hearings: Telephone Conference re 111 M/ Preliminary Injunction Hearing set for 9/6/2013 11:45 AM by telephone before Honorable Judge Myron H. Thompson. (ag, ) (Entered: 09/05/2013) |

| 09/06/2013 | 115 | Minute Entry for proceedings held before Honorable Judge Myron H. Thompson: Telephone Conference re 111 M/Preliminary Hearing held on 9/6/2013 (PDF available for court use only). (Recording Time 11:57 - 12:15:58.). (ag, ) (Main Document 115 replaced on 9/9/2013) (ag, ). (Entered: 09/09/2013) |
|---|---|---|
| 01/24/2014 | 116 | MOTION To Submit Supplemental Authority in Response to Defendants' Motions to Dismiss by Hickory Ground Tribal Town, Muscogee Creek Nation. (Attachments: # 1 Exhibit A)(Baxley, William) (Entered: 01/24/2014) |
| 02/14/2014 | 117 | RESPONSE to Motion re 116 MOTION To Submit Supplemental Authority in Response to Defendants' Motions to Dismiss filed by Ken Salazar, U.S. Department of Interior, Kevin Washburn. (Schwarz, Jody) (Entered: 02/14/2014) |
| 02/19/2014 | 118 | RESPONSE to Motion re 116 MOTION To Submit Supplemental Authority in Response to Defendants' Motions to Dismiss filed by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvis Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Attachments: # 1 Exhibit) (Dauphin, Charles) (Additional attachment(s) added on 2/24/2014: # 2 Corrected certificate of service) (scn, ). (Entered: 02/19/2014) |
| 05/22/2014 | 119 | MOTION for D. Mitchell Henry and Frank E. Bankston, Jr. to Withdraw by Martin Construction, Inc.. (Henry, Dennis) (Additional attachment(s) added on 5/22/2014: # 1 Corrected certificate of service) (scn, ). (Entered: 05/22/2014) |
| 08/22/2014 | 120 | NOTICE of Change of Address by Stewart Davidson McKnight, III (McKnight, Stewart) (Entered: 08/22/2014) |
| 09/29/2014 | 121 | TEXT ORDER granting 116 Motion To Submit Supplemental Authority in Response to Defendants' Motions to Dismiss. Signed by Honorable Judge Myron H. Thompson on 9/29/14. (No PDF document attached to this entry.) (scn, ) (Entered: 09/29/2014) |
| 09/30/2014 | 122 | Supplemental Response to 116 Motion to Submit Supplemental Authority, filed by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Dauphin, Charles) Modified on 10/1/2014 to remove relationship to 118 Response, to create relationship to 116 Motion, and to correct docket text pursuant to PDF document (scn, ). (Entered: 09/30/2014) |
| 09/30/2014 | | NOTICE of Docket Text Correction re 122 BRIEF/MEMORANDUM in Support to reflect changing text to Supplemental Response to 116 Motion, pursuant to PDF document. (No PDF document attached to this entry.) (scn, ) (Entered: 10/01/2014) |
| 12/18/2014 | 123 | NOTICE of Change of Address by Stewart Davidson McKnight, III (McKnight, Stewart) (Entered: 12/18/2014) |
| 01/13/2015 | 124 | MOTION to Dismiss for Lack of Jurisdiction *and Brief in Support* by Flintco, LLC. (Attachments: # 1 Affidavit)(Gomez, Daniel) (Entered: 01/13/2015) |
| 01/13/2015 | | MOTION for Summary Judgment by Flintco, LLC. (No PDF document attached to this entry; see 124 Motion to Dismiss) (scn, ) (Entered: 01/13/2015) |
| 01/13/2015 | | BRIEF/MEMORANDUM in Support re 124 MOTION to Dismiss for Lack of Jurisdiction and MOTION for Summary Judgment, filed by Flintco, LLC. (No PDF document attached to this entry; see 124 Motions.) (scn, ) (Entered: 01/13/2015) |

| 01/15/2015 | 125 | JOINDER re MOTION for Summary Judgment, 124 MOTION to Dismiss for Lack of Jurisdiction *and Brief in Support*, BRIEF/MEMORANDUM in Support by D.H. Griffin Wrecking Company, Inc.. (Attachments: # 1 Exhibit A - Affidavit of Larry Gillen)(Bolin, Christina) (Entered: 01/15/2015) |
| 01/16/2015 | 126 | Amended Joinder in Flitco LLC's 124 Motion to Dismiss and 124 Motion for Summary Judgment, by D.H. Griffin Wrecking Company, Inc.. (Attachments: # 1 Exhibit A - Affidavit of Larry Gillen)(Bolin, Christina) Modified on 1/16/2015 to correct docket text pursuant to PDF document (scn, ). (Entered: 01/16/2015) |
| 02/12/2015 | 127 | MOTION to Stay *Discovery* by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rollin, Garvin Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Dauphin, Charles) (Entered: 02/12/2015) |
| 02/27/2015 | 128 | JOINDER re 127 MOTION to Stay *Discovery* by D.H. Griffin Wrecking Company, Inc.. (Bolin, Christina) (Entered: 02/27/2015) |
| 03/05/2015 | 129 | ORDER directing that the motion to dismiss or for summary judgment (doc. no. 124 ) is set for submission, without oral argument, on April 9, 2015, with any opposition brief and evidentiary materials due by March 26, 2015, and any reply to the opposition due by April 9, 2015. Signed by Honorable Judge Myron H. Thompson on March 5, 2015. (scn, ) (Entered: 03/05/2015) |
| 03/06/2015 | 130 | First MOTION for Protective Order *Discovery* by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvis Sells, Billy Smith, Robert Thrower, Eddie Tullis, Bridget Wasdin. (Dauphin, Charles) (Entered: 03/06/2015) |
| 03/09/2015 | 131 | JOINDER re 130 First MOTION for Protective Order *Discovery* by D.H. Griffin Wrecking Company, Inc.. (Bolin, Christina) (Entered: 03/09/2015) |
| 03/09/2015 | 132 | MOTION for Joinder *in Motion for Protective Order* by Martin Construction, Inc.. (Bankston, Frank) (Entered: 03/09/2015) |
| 03/09/2015 | 133 | MOTION for Joinder *in Motion to Stay Discovery* by Martin Construction, Inc.. (Bankston, Frank) (Entered: 03/09/2015) |
| 03/09/2015 | 134 | First MOTION for Protective Order *and Brief in Support* by Flintco, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Gomez, Daniel) (Entered: 03/09/2015) |
| 03/09/2015 | 135 | JOINDER re 127 MOTION to Stay *Discovery* by Flintco, LLC. (Gomez, Daniel) (Entered: 03/09/2015) |
| 03/09/2015 | 136 | JOINDER re 130 First MOTION for Protective Order *Discovery* by Flintco, LLC. (Gomez, Daniel) (Entered: 03/09/2015) |
| 03/09/2015 | | BRIEF/MEMORANDUM in Support re 134 First MOTION for Protective Order *and Brief in Support* filed by Flintco, LLC. (No PDF document attached; see 134 Motion) (scn, ) (Entered: 03/10/2015) |
| 03/13/2015 | 137 | MOTION for Protective Order by Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn. (Attachments: # 1 Exhibit A (discovery served), # 2 Exhibit B |

| | | (e-mail correspondence))(Schwarz, Jody) (Entered: 03/13/2015) |
|---|---|---|
| 03/20/2015 | 138 | MOTION for Joinder *in Flintco's Motion to Dismiss or, in the Alternative, for Summary Judgment, and Brief in Support* by Martin Construction, Inc.. (Attachments: # 1 Exhibit A)(Bankston, Frank) (Entered: 03/20/2015) |
| 03/20/2015 | | JOINDER re 124 MOTION to Dismiss or, in the Alternative, MOTION for Summary Judgment, and BRIEF in Support by Martin Construction, Inc.. (No pdf attached to this entry - See doc 138 for pdf - Counsel erroneously e-filed as a motion for joinder) (wcl, ) (Entered: 03/23/2015) |
| 03/26/2015 | 139 | RESPONSE in Opposition re 124 Second MOTION to Dismiss for Lack of Jurisdiction, or in the Alternative, MOTION for Summary Judgment, *and Brief in Support* filed by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (Attachments: # 1 Exhibit A)(McKnight, Stewart) Modified on 3/26/2015 to add the link to the motion for summary judgment (wcl, ). (Entered: 03/26/2015) |
| 03/31/2015 | 140 | ORDER granting 119 Motion for D. Mitchell Henry and Frank E. Bankston, Jr. to Withdraw. Signed by Honorable Judge Myron H. Thompson on March 31, 2015. (scn, ) (Entered: 03/31/2015) |
| 03/31/2015 | | *** Attorney Frank Eady Bankston, Jr and Dennis Mitchell Henry terminated as counsel of record for Martin Construction, Inc. pursuant to 140 Order. (No PDF document attached to this entry.) (scn, ) (Entered: 03/31/2015) |
| 04/03/2015 | 141 | NOTICE of Appearance by Dennis Mitchell Henry on behalf of Martin Construction, Inc. (Henry, Dennis) (Entered: 04/03/2015) |
| 04/03/2015 | 142 | NOTICE of Appearance by Frank Eady Bankston, Jr on behalf of Martin Construction, Inc. (Bankston, Frank) (Entered: 04/03/2015) |
| 04/08/2015 | 143 | REPLY to Response to Motion re MOTION for Summary Judgment, 124 MOTION to Dismiss for Lack of Jurisdiction *and Brief in Support* filed by Flintco, LLC. (Gomez, Daniel) (Entered: 04/08/2015) |
| 04/09/2015 | 144 | REPLY to Response to Motion re MOTION for Summary Judgment, 124 MOTION to Dismiss for Lack of Jurisdiction *and Brief in Support* filed by D.H. Griffin Wrecking Company, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Bolin, Christina) (Entered: 04/09/2015) |
| 04/09/2015 | 145 | JOINDER *in Flintco, LLC's Reply in Support of Its Second Motion to Dismiss, or in the Alternative, for Summary Judgment* by Martin Construction, Inc.. (Bankston, Frank) (Entered: 04/09/2015) |
| 04/15/2015 | | Motions No Longer Referred: 130 First MOTION for Protective Order, 134 First MOTION for Protective Order, and 137 MOTION for Protective Order (No PDF document attached to this entry.) (scn, ) (Entered: 04/15/2015) |
| 06/08/2015 | 146 | MOTION for Leave to File *Supplemental Authority* by Poarch Band of Creek Indians. (Attachments: # 1 Exhibit Big Lagoon v. California)(Dauphin, Charles) (Entered: 06/08/2015) |
| 09/04/2015 | 147 | NOTICE by PCI Gaming Authority, Poarch Band of Creek Indians re 76 BRIEF/MEMORANDUM in Support, *Motion to Dismiss* (Attachments: # 1 Exhibit A) (Dauphin, Charles) (Entered: 09/04/2015) |

| 09/04/2015 | | MOTION to submit supplemental authority in support of motion to dismiss by PCI Gaming Authority, Poarch Band of Creek Indians. (NO PDF document attached to this notice-See Docket Entry 147 filed on the docket as a Notice). (djy, ) (Entered: 09/08/2015) |
|---|---|---|
| 01/11/2017 | 148 | Motion to Appear Pro Hac Vice by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (Attachments: # 1 Exhibit A)(McKnight, Stewart) (Entered: 01/11/2017) |
| 01/11/2017 | | ***Attorney Lauren J. King for Hickory Ground Tribal Town,Lauren J. King for Muscogee Creek Nation,Lauren J. King for George Thompson added pursuant to 148 motion (NO PDF document attached to this notice). (djy, ) (Entered: 01/11/2017) |
| 01/11/2017 | 149 | TEXT ORDER granting 148 Motion for Lauren King Leave to Appear Pro Hac Vice. Signed by Honorable Judge Myron H. Thompson on 1/11/17. (NO PDF document attached to this notice). (djy, ) (Entered: 01/11/2017) |
| 01/11/2017 | 150 | MOTION to Withdraw by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (McKnight, Stewart) (Entered: 01/11/2017) |
| 01/12/2017 | 151 | TEXT ORDER granting 150 Motion for Brendan Ludwick to Withdraw as attorney. Signed by Honorable Judge Myron H. Thompson on 1/12/17. (NO PDF document attached to this notice). (djy, ) (Entered: 01/12/2017) |
| 01/12/2017 | | *** Attorney Brendan Ludwick terminated pursuant to 151 text order (NO PDF document attached to this notice). (djy, ) (Entered: 01/12/2017) |
| 01/12/2017 | 152 | Received Pro Hac Vice Filing fee re 148 motion for Lauren King: $ 50, receipt number 4602043747 (djy, ) (Entered: 01/12/2017) |
| 11/17/2017 | 153 | NOTICE of Change of Address by Lauren J. King (King, Lauren) (Entered: 11/17/2017) |
| 11/27/2017 | 154 | NOTICE of Change of Address by Lauren J. King (King, Lauren) (Entered: 11/27/2017) |
| 12/05/2017 | 155 | MOTION to Stay *Case Temporarily Pending Settlement Negotiaions* by Poarch Band of Creek Indians. (Dauphin, Charles) Modified on 12/6/2017 to clarify text to reflect as JOINT also filed on behalf of Muscogee Creek Nation, Hickory Ground Tribal Town,George Thompson,Buford Rolin, Stephanie Bryan, Robert McGhee, David Gehman, Arthur Mothershed, Keith Martin, Sandy Hollinger, Garvis Sells, Eddie Tullis, Robert Thrower, PCI Gaming Authority, Bridget Wasdin, Matthew Martin, Billy Smith, and Tim Manning. (Entered: 12/05/2017) |
| 01/16/2018 | 156 | **ORDER granting 155 Motion to Stay, and this case is stayed until 4/2/2018, pending settlement negotiations; further ORDERED that all pending motions are denied with leave to renew; further ORDERED that this case is closed administratively. Signed by Honorable Judge Myron H. Thompson on 1/16/2018. (wcl, )** (Entered: 01/16/2018) |
| 03/30/2018 | 157 | JOINT MOTION to Extend Temporary Stay Pending Settlement Negotiations re 156 Order by Poarch Band of Creek Indians. (Reeves, Mark) Modified on 4/2/2018 to clarify text to reflect as JOINT also filed on behalf of Muscogee Creek Nation, Hickory Ground Tribal Town, Thompson, Rolin, Bryan, McGhee, Gehman, Mothershed, K. Martin, Hollinger, Sells, Tullis Thrower, PCI Gaming Authority, Wasdin, M. Martin, Smith, & Manning (qc/djy, ). Modified on 4/4/2018 to clarify the docket text (qc/wcl, ). (Entered: 03/30/2018) |

| 04/04/2018 | 158 | **TEXT ORDER granting 157 Joint Motion to Extend Temporary Stay Pending Settlement Negotiations and extending the stay through 7/1/2018. Signed by Honorable Judge Myron H. Thompson on 4/4/2018. (No pdf attached to this entry) (wcl, ) (Entered: 04/04/2018)** |
|---|---|---|
| 06/05/2019 | 159 | MOTION for Leave to File *Second Amended Complaint* by Muscogee Creek Nation. (Attachments: # 1 Exhibit Declaration of Lauren J. King, # 2 Exhibit A to King Declaration: Second Amended Complaint, # 3 Exhibits A-Q to Second Amended Complaint, # 4 Exhibit B to King Declaration: Chart)(Baxley, William) Modified on 6/6/2019 to clean up text and include exhibit descriptions. (dmn, ) (Entered: 06/05/2019) |
| 06/06/2019 | 160 | RESPONSE to Motion re 159 MOTION for Leave to File *Second Amended Complaint* filed by D.H. Griffin Wrecking Company, Inc.. (Bolin, Christina) (Entered: 06/06/2019) |
| 06/10/2019 | 161 | **ORDER: Based on the representations in plaintiffs motion for leave to file a second amended complaint (doc. no. 159 ) that settlement discussions have concluded, it is ORDERED that the stay of this case is lifted. The clerk of court is DIRECTED to administratively reopen this case. Signed by Honorable Judge Myron H. Thompson on 6/10/2019. (dmn, )** (Entered: 06/10/2019) |
| 06/10/2019 | 162 | **ORDER directing other parties TO SHOW CAUSE, if any there be, as to why the 159 Motion for Leave to File a Second Amended Complaint, filed by Muscogee Creek Nation should not be granted. Show Cause Response due by 6/24/2019.. Signed by Honorable Judge Myron H. Thompson on 6/10/2019. (dmn, )** (Entered: 06/10/2019) |
| 06/13/2019 | 163 | Joint MOTION for Extension of Time in Which to File Response to 162 Order to Show Cause, by Poarch Band of Creek Indians, Buford Rolin, Stephanie Bryan, Robert McGhee, David Gehman, Arthur Mothershed, Keith Martin, Sandy Hollinger, Garvin Sells, Eddie Tullis, Robert Thrower, PCI Gaming Authority, Bridget Wasdin, Matthew Martin, Billy Smith, Tim Manning, U. S. Department of Interior, Martin Construction, Inc., David Bernhardt, Dan Smith, Tara MacLean Sweeney. (Reeves, Mark) Modified on 6/14/2019 to include additional filers. (dmn, ) (The successors of the federal officials names in the amended complaint are automatically substituted as parties pursuant to FRCP 25(d).) (Entered: 06/13/2019) |
| 06/13/2019 | | ***Attorney Devon Lehman McCune added for Jonathan Jarvis, Ken Salazar, U.S. Department of Interior, Kevin Washburn (collectively the Federal Defendants). (dmn, ) (see Doc. 163 ) (Entered: 06/14/2019) |
| 06/14/2019 | 164 | **TEXT ORDER granting 163 Joint MOTION for Extension of Time to File Response to 162 Order to Show Cause, and extending the deadline for response to the order to show cause to 7/10/2019. Signed by Honorable Judge Myron H. Thompson on 6/14/2019. (dmn, ) (NO PDF)** (Entered: 06/14/2019) |
| 06/21/2019 | 165 | Tribal Defendants' Motion for Catherine F. Munson to Appear Pro Hac Vice by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Garvis Sells, Billy Smith, Eddie Tullis, Bridget Wasdin. (Attachments: # 1 Exhibit Certificate of Good Standing)(Dauphin, Charles) Modified on 6/25/2019 to include attorney information. (dmn, ) (Main Document 165 replaced on 6/28/2019). Modified on 6/28/2019 to include attorney information, address, etc. (dmn, ). (Main Document 165 replaced 2nd time on 6/28/2019) (dmn, ). Modified on 6/28/2019 to |

| | | |
|---|---|---|
| | | include proper party name in 1st sentence due to typographical error. (dmn, ) (Entered: 06/21/2019) |
| 06/21/2019 | | ***Attorney Catherine F. Munson added for Stephanie Bryan, Tim Manning, Matthew Martin, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Tribal Defendants, Eddie Tullis, Bridget Wasdin. (dmn, ) (see Doc. 165 for pdf) (Entered: 06/28/2019) |
| 06/28/2019 | 166 | NOTICE of Correction re 165 Motion to Appear Pro Hac Vice. The original pdf did not contain the attorney appearing pro hac vice bar number, address, email, etc. Also, to correct party name, Stephanie Bryan, in 1st sentence due to typographical error. The correct pdf is attached to this notice. (Attachments: # 1 Correct pdf of 165 Motion)(dmn, ) (Attachment 1 replaced on 6/28/2019 to include proper party name, Stephanie Bryan, in 1st sentence due to typographical error.) (dmn, ). Modified on 6/28/2019 (dmn, ) (Entered: 06/28/2019) |
| 07/05/2019 | 167 | MOTION to Dismiss ("Stipulated Order of Dismissal with Prejudice of Defendants Flintco, LLC and D. H. Griffin Wrecking Co., Inc.") by Muscogee Creek Nation, Tribal Defendants, Flintco, LLC, D. H. Griffin Wrecking Company, Inc., Auburn University, Federal Defendants, Martin Construction, Inc., Hickory Ground Tribal Town, George Thompson. (McKnight, Stewart) Modified on 7/8/2019 to reflect actual title and include additional filers. (dmn, ) (Entered: 07/05/2019) |
| 07/08/2019 | 168 | Pro Hac Vice Filing fee received for Attorney Catherine F. Munson re 165 Motion: $ 75.00, receipt number 4602054161. (dmn, ) (Entered: 07/08/2019) |
| 07/09/2019 | 169 | **TEXT ORDER granting 165 Motion for Catherine F. Munson to Appear Pro Hac Vice. Signed by Honorable Judge Myron H. Thompson on 7/9/2019. (dmn, ) (NO PDF)** (Entered: 07/09/2019) |
| 07/10/2019 | 170 | RESPONSE in Opposition re 159 MOTION for Leave to File *Second Amended Complaint* filed by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Tribal Defendants, Eddie Tullis, Bridget Wasdin. (Reeves, Mark) (Entered: 07/10/2019) |
| 07/10/2019 | 171 | RESPONSE to Motion re 159 MOTION for Leave to File *Second Amended Complaint* filed by Federal Defendants, Dan Smith, Tara MacLean Sweeney, U.S. Department of Interior. (McCune, Devon) (Entered: 07/10/2019) |
| 07/10/2019 | 172 | RESPONSE in Opposition re 159 MOTION for Leave to File *Second Amended Complaint* filed by Martin Construction, Inc.. (Bankston, Frank) (Entered: 07/10/2019) |
| 07/10/2019 | 173 | RESPONSE TO 162 ORDER TO SHOW CAUSE regarding Proposed Second Amended Complaint and Supplemental Complaint by Auburn University. (Boyd, David) Modified on 7/12/2019 to include actual title. (dmn, ) (Entered: 07/10/2019) |
| 07/10/2019 | 174 | MOTION to Withdraw as Attorney by Stephanie Bryan, David Gehman, Sandy Hollinger, Tim Manning, Keith Martin, Matthew Martin, Robert McGhee, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Buford Rolin, Garvin Sells, Billy Smith, Robert Thrower, Tribal Defendants, Eddie Tullis, Bridget Wasdin. (Smith, David) (Entered: 07/10/2019) |

| 07/10/2019 | | ***Attorney Morgan Mccue Sport, and Jaime Stone Hammer added for Auburn University. (dmn, ) (see Doc. 173 for pdf) (Entered: 07/12/2019) |
|---|---|---|
| 07/11/2019 | 175 | **TEXT ORDER granting 174 Motion for David Coventry Smith to Withdraw as Attorney. Signed by Honorable Judge Myron H. Thompson on 7/11/2019. (dmn, ) (NO PDF) (Entered: 07/11/2019)** |
| 07/11/2019 | 176 | **ORDER: Upon consideration of the responses in opposition to plaintiffs' 159 Motion for leave to file a second amended complaint, it is ORDERED that plaintiffs shall file a reply brief by 7/25/2019. Signed by Honorable Judge Myron H. Thompson on 7/11/2019. (dmn, )** (Entered: 07/11/2019) |
| 07/11/2019 | 177 | MOTION to Withdraw as Attorney *of Lee F. Armstrong* by Auburn University. (Knight, Griffin) (Entered: 07/11/2019) |
| 07/11/2019 | | *** Attorney David Coventry Smith terminated pursuant to 175 Text Order. (dmn, ) (Entered: 07/12/2019) |
| 07/11/2019 | | ***Attorney Jordan Dorman Walker, Jr added for Auburn University. (dmn, ) (see Doc. 177 for pdf) (Entered: 07/12/2019) |
| 07/12/2019 | 178 | **TEXT ORDER granting 177 Motion for Lee F. Armstrong to Withdraw as Attorney. Signed by Honorable Judge Myron H. Thompson on 7/12/2019. (dmn, ) (NO PDF)** (Entered: 07/12/2019) |
| 07/12/2019 | | *** Attorney Lee Ford Armstrong terminated pursuant to 178 Text Order. (dmn, ) (Entered: 07/12/2019) |
| 07/25/2019 | 179 | REPLY to Response to Motion re 159 MOTION for Leave to File *Second Amended Complaint* filed by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (Attachments: # 1 Affidavit Second Declaration of Lauren J. King) (McKnight, Stewart) (Entered: 07/25/2019) |
| 07/31/2019 | 180 | MOTION to Withdraw as Attorney *for Martin Construction, Inc. (D. Mitchell Henry and Frank E. Bankston, Jr.)* by Martin Construction, Inc.. (Bankston, Frank) (Entered: 07/31/2019) |
| 08/01/2019 | 181 | MOTION for Larry B. Lipe to Withdraw as Attorney by Flintco, LLC. (Lipe, Larry) Modified on 8/15/2019 to include attorney name requesting withdrawal. (dmn, ) (Entered: 08/01/2019) |
| 08/01/2019 | 182 | MOTION for Paige N. Shelton to Withdraw as Attorney by Flintco, LLC. (Shelton, Paige) Modified on 8/15/2019 to include attorney name requesting withdrawal. (dmn, ) (Entered: 08/01/2019) |
| 08/01/2019 | 183 | MOTION for Daniel E. Gomez to Withdraw as Attorney by Flintco, LLC. (Gomez, Daniel) Modified on 8/15/2019 to include name of attorney requesting withdrawal. (dmn, ) (Entered: 08/01/2019) |
| 10/30/2019 | 184 | MOTION to Withdraw as Attorney by Hickory Ground Tribal Town, Muscogee Creek Nation, George Thompson. (Baxley, William) (Entered: 10/30/2019) |
| 03/02/2020 | 185 | **TEXT ORDER granting 184 Motion for William Baxley to Withdraw as Attorney. Signed by Honorable Judge Myron H. Thompson on 3/2/2020. (dmn, ) (no pdf)** (Entered: 03/02/2020) |

| 03/02/2020 | | *** Attorney William Joseph Baxley terminated pursuant to 185 Text Order. (dmn, ) (Entered: 03/02/2020) |
|---|---|---|
| 03/02/2020 | 186 | **JUDGMENT: Pursuant to the stipulated order of dismissal with prejudice (doc. no. 167 ), it is the ORDER, JUDGMENT, and DECREE of the court that all claims against defendants Flintco, LLC and D. H. Griffin Wrecking Company, Inc. are dismissed with prejudice and said defendants are terminated as parties, with costs taxed as paid. All claims against all other defendants remain. The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to FRCP 58. This case is not closed. Signed by Honorable Judge Myron H. Thompson on 3/2/2020. (dmn, ) (Entered: 03/02/2020)** |
| 03/02/2020 | 187 | **ORDER: It is ORDERED that the motions to withdraw of Hons. Larry B. Lipe, Paige N. Shelton, and Daniel E. Gomez (doc. no. 181 , 182 , and 183 ) are granted. Signed by Honorable Judge Myron H. Thompson on 3/2/2020. (dmn, ) (Entered: 03/02/2020)** |
| 03/02/2020 | 188 | **ORDER: It is ORDERED that the Motion to Withdraw as Attorney for defendant Martin Construction, Inc. (doc. no. 180 ) is denied. "The rule is well established that a corporation is an artificial entity that can act only through agents, cannot appear pro se, and must be represented by counsel." Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir. 1985). Signed by Honorable Judge Myron H. Thompson on 3/2/2020. (dmn, ) (Entered: 03/02/2020)** |
| 03/04/2020 | 189 | **ORDER: It is ORDERED that plaintiffs motion for leave to file a second amended complaint and supplemental complaint (doc. no. 159 ) is granted. It is the courts opinion that the substantive issues raised in opposition to the motion to amend would be better addressed on motions filed in response to the amendedcomplaint. Plaintiffs shall file the second amended complaint and supplemental complaint within five business days of the entry of this order. Signed by Honorable Judge Myron H. Thompson on 3/4/2020. (dmn, ) (Entered: 03/04/2020)** |
| 03/09/2020 | 190 | SECOND AMENDED COMPLAINT *and Supplemental Complaint* against All Defendants, filed by Muscogee (Creek) Nation, George Thompson, Hickory Ground Tribal Town. (Attachments: # 1 Exhibits to Second Amended Complaint)(McKnight, Stewart) Modified on 3/10/2020 to add as also filed on behalf of Plfs Thompson & Hickory Ground Tribal Town (amf, ). (Entered: 03/09/2020) |
| 03/09/2020 | 191 | NOTICE re Filing of Second Amended and Supplemental Complaint by Muscogee Creek Nation re 190 Second Amended Complaint (McKnight, Stewart) (Entered: 03/09/2020) |
| 03/12/2020 | 192 | UNOPPOSED JOINT MOTION for Extension of Time to File Answer (Respond) to 190 Second Amended Complaint and Supplemental Complaint, by Federal Defendants David Bernhardt, Tara MacLean Sweeney, The Department of the Interior, David Vela; and Defendants Poarch Band of Creek Indians, Stephanie Bryan, Robert R. McGhee; Amy Bryan, Charlotte Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Arthur Mothershead, Garvis Sells, Eddie L. Tullis, Buford Rolin, David Gehman, Larry Haikey, PCI Gaming Authority d/b/a Wind Creek Hospitality, Westly Woodruvv, Stuart Mark Altman, Venus McGhee Prince, Teresa E. Proust, and Timothy A. Manning. (McCune, Devon) Modified on 3/12/2020 to clean up text and include additional filers. (dmn, ) (Entered: 03/12/2020) |
| 03/12/2020 | 193 | **TEXT ORDER granting 192 UNOPPOSED JOINT MOTION for Extension of Time to File Answer (Respond) to 190 Second Amended Complaint and Supplemental** |

| | | |
|---|---|---|
| | | **Complaint, and extending the time to respond to 4/23/2020. Signed by Honorable Judge Myron H. Thompson on 3/12/2020. (dmn, ) (no pdf)** (Entered: 03/12/2020) |
| 03/23/2020 | 194 | ANSWER to 190 Second Amended Complaint by Auburn University. (Attachments: # 1 Exhibit 1)(Boyd, David) (Entered: 03/23/2020) |
| 04/09/2020 | 195 | UNOPPOSED MOTION for Extension of Time to Respond to 190 Second Amended Complaint and Supplemental Complaint by Martin Construction, Inc. (Bankston, Frank) Modified on 4/9/2020 to clean up text. (dmn, ) (Entered: 04/09/2020) |
| 04/09/2020 | 196 | **TEXT ORDER granting 195 Unopposed Motion for Extension of Time to Respond to Second Amended Complaint and Supplemental Complaint, extending time to respond to April 23, 2020. Signed by Honorable Judge Myron H. Thompson on 4/9/2020. (dmn, ) (NO PDF) (dmn, )** (Entered: 04/09/2020) |
| 04/21/2020 | 197 | NOTICE OF CONSTITUTIONAL QUESTION re 190 Second Amended and Supplemental Complaint, stating Plaintiffs will serve the Attorney General of U.S., filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. (McKnight, Stewart) Modified on 4/21/2020 to create link and include additional text. (dmn, ) (Entered: 04/21/2020) |
| 04/22/2020 | 198 | SUGGESTION OF BANKRUPTCY Upon the Record as to Martin Construction, Inc. by Martin Construction, Inc.. (Fritz, Michael) (Entered: 04/22/2020) |
| 04/23/2020 | 199 | MOTION to Dismiss *190 Second Amended Complaint and Supplemental Complaint* by David Bernhardt, Federal Defendants, Tara MacLean Sweeney, The Department of the Interior, David Vela. (McCune, Devon) Modified on 4/24/2020 to include additional text. (dmn, ) Modified on 5/22/2020 to create link. (dmn, ) (Entered: 04/23/2020) |
| 04/23/2020 | 200 | BRIEF/MEMORANDUM in Support of 199 MOTION to Dismiss *190 Second Amended Complaint* filed by David Bernhardt, Federal Defendants, Tara MacLean Sweeney, The Department of the Interior, David Vela. (Attachments: # 1 Affidavit Declaration of Devon Lehman McCune, # 2 Exhibits A-J)(McCune, Devon) Modified on 5/22/2020 to create link and exhibit description. (dmn, ) (Entered: 04/23/2020) |
| 04/23/2020 | 201 | MOTION to Dismiss *190 Second Amended Complaint* by Stuart Mark Altman, Amy Bryan, Stephanie A. Bryan, Dewitt Carter, Larry Haikey, Sandy Hollinger, Timothy A. Manning, Keith Martin, Robert R. McGhee, Charlotte Meckel, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Venus McGhee Prince, Garvis Sells(PBCI Tribal Council Member, in his official capacity), Westly L. Woodruff. (Reeves, Mark) Modified on 5/22/2020 to create link. (dmn, ) (Entered: 04/23/2020) |
| 04/23/2020 | 202 | BRIEF/MEMORANDUM in Support re 201 MOTION to Dismiss *190 Second Amended Complaint* filed by Stuart Mark Altman, Amy Bryan, Stephanie A. Bryan, Dewitt Carter, Larry Haikey, Sandy Hollinger, Timothy A. Manning, Keith Martin, Robert R. McGhee, Charlotte Meckel, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Teresa E. Poust, Venus McGhee Prince, Garvis Sells(PBCI Tribal Council Member, in his official capacity), Westly L. Woodruff. (Reeves, Mark) Modified on 5/22/2020 to create link. (dmn, ) (Entered: 04/23/2020) |
| 04/23/2020 | 203 | AFFIDAVIT in Support re 201 MOTION to Dismiss *190 Second Amended Complaint* filed by Stuart Mark Altman, Amy Bryan, Stephanie A. Bryan, Dewitt Carter, Larry Haikey, Sandy Hollinger, Timothy A. Manning, Keith Martin, Robert R. McGhee, Charlotte Meckel, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Teresa E. Poust, Venus McGhee Prince, Garvis Sells(PBCI Tribal Council |

| | | |
|---|---|---|
| | | Member, in his official capacity), Westly L. Woodruff. (Attachments: # 1 Exhibit A - protective covenant, # 2 Exhibit B - 1984 deed transferring property)(Reeves, Mark) Modified on 5/22/2020 to create link. (dmn, ) (Entered: 04/23/2020) |
| 04/23/2020 | 204 | MOTION to Dismiss *190 Second Amended Complaint* by Stephanie A. Bryan, David Gehman, Sandy Hollinger, Keith Martin, Robert R. McGhee, Arthur Mothershed, Buford Rolin, Garvis Sells(individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council), Eddie L. Tullis. (Reeves, Mark) Modified on 5/22/2020 to create link. (dmn, ) (Entered: 04/23/2020) |
| 04/23/2020 | 205 | BRIEF/MEMORANDUM in Support re 204 MOTION to Dismiss *190 Second Amended Complaint* filed by Stephanie A. Bryan, David Gehman, Sandy Hollinger, Keith Martin, Robert R. McGhee, Arthur Mothershed, Buford Rolin, Garvis Sells(individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council), Eddie L. Tullis. (Reeves, Mark) Modified on 5/22/2020 to create link. (dmn, ) (Entered: 04/23/2020) |
| 04/28/2020 | 206 | **ORDER: Per the agreement of the parties, it is ORDERED that the motions to dismiss (doc. no. 199 , 201 , 204 ) are set for submission, without oral argument, on 8/6/2020, with plaintiffs' response brief(s) due on 6/22/2020, and any replies to the response due on 8/6/2020. Signed by Honorable Judge Myron H. Thompson on 4/28/2020. (dmn, ) (Entered: 04/28/2020)** |
| 05/11/2020 | 207 | NOTICE by PCI Gaming Authority *of Substitution of Official Capacity Defendants* (Reeves, Mark) (Entered: 05/11/2020) |
| 06/11/2020 | 208 | UNOPPOSED MOTION to Revise Briefing Schedule on Motions to Dismiss the Second Amended Complaint and Supplemental Complaint re 206 Order, by Hickory Ground Tribal Town, Muscogee (Creek) Nation. (King, Lauren) Modified on 6/11/2020 to clean up text. (dmn, ) (Entered: 06/11/2020) |
| 06/11/2020 | 209 | **TEXT ORDER granting 208 Unopposed Motion to Revise Briefing Schedule on Motions to Dismiss the Second Amended Complaint and Supplemental Complaint. The motions to dismiss (doc. no. 199 , 201 , 204 ) are reset for submission, without oral argument, on 8/20/2020, with plaintiff's response brief(s) due on 7/6/2020, and any replies to the response due on 8/202020. Signed by Honorable Judge Myron H. Thompson on 6/11/2020. (dmn, ) (no pdf) (Entered: 06/11/2020)** |
| 07/06/2020 | 210 | RESPONSE and MEMORANDUM in Support of Response to Federal Defendants' 199 MOTION to Dismiss Second Amended Complaint filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. (King, Lauren) Modified on 7/7/2020 to reflect actual title, clean up text. (dmn, ) (Main Document 210 replaced on 7/8/2020) (dmn, ). Modified on 7/8/2020 to remove Muscogee Creek Nation as a filer, selected in error when originally filed; and to include correct pdf containing signatures. (dmn, ) (Entered: 07/06/2020) |
| 07/06/2020 | 211 | RESPONSE and MEMORANDUM in Support of Response to Individual Defendants' 204 MOTION to Dismiss Second Amended Complaint and Supplemental Complaint filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. (King, Lauren) Modified on 7/7/2020 to reflect actual title, clean up text. (dmn, ) (Main Document 211 replaced on 7/8/2020) (dmn, ). Modified on 7/8/2020 to remove Muscogee Creek Nation as a filer, selected in error when originally filed; to include correct pdf containing signatures, and correct certificate of service. (dmn, ) (Entered: 07/06/2020) |

| 07/06/2020 | 212 | RESPONSE and MEMORANDUM in Support of Response to Tribal Defendants' 201 MOTION to Dismiss Second Amended Complaint and Supplemental Complaint filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. (King, Lauren) Modified on 7/7/2020 to reflect actual tite, clean up text. (dmn, ) (Main Document 212 replaced on 7/8/2020) (dmn, ). Modified on 7/8/2020 to remove Muscogee Creek Nation as filer, selected in error when originally filed; and to include correct pdf containing signatures. (dmn, ) (Entered: 07/06/2020) |
|---|---|---|
| 07/06/2020 |  | MEMORANDUM in Support of 210 Response to Federal Defendants' 199 Motion to Dismiss Second Amended Complaint and Supplemental Complaint filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. (dmn, ) (no pdf, see Doc. 210 for pdf) (Entered: 07/07/2020) |
| 07/06/2020 |  | MEMORANDUM in Support of 211 Response to Individual Defendants' 204 Motion to Dismiss Second Amended Complaint and Supplemental Complaint filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. (dmn, ) (no pdf, see Doc. 211 for pdf) (Entered: 07/07/2020) |
| 07/06/2020 |  | MEMORANDUM in Support of 212 Response to Tribal Defendants' 201 Motion to Dismiss Second Amended Complaint and Supplemental Complaint filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. (dmn, ) (no pdf, see Doc. 212 for pdf) (Entered: 07/07/2020) |
| 07/08/2020 | 213 | NOTICE of Correction re 211 Response, 210 Response, 212 Response. The original pdfs did not contain signatures. The correct pdfs are attached to this notice. (Attachments: # 1 Correct pdf of Doc. 210 , # 2 Correct pdf of Doc. 211 , # 3 Correct pdf of Doc. 212 ) (dmn, ) (Entered: 07/08/2020) |
| 07/29/2020 | 214 | Unopposed MOTION to Revise Briefing Schedule for Defendants' Replies to Plaintiffs' Responses to Motions to Dismiss the Second Amended Complaint and Supplemental Complaint re 212 Response and Memorandum, 211 Response and Memorandum, 210 Response and Memorandum, by Stuart Mark Altman, Amy Bryan, Stephanie A. Bryan, Dewitt Carter, Larry Haikey, Sandy Hollinger, Timothy A. Manning, Keith Martin, Robert R. McGhee, Charlotte Meckel, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Teresa E. Poust, Venus McGhee Prince, Garvis Sells(PBCI Tribal Council Member, in his official capacity), Westly L. Woodruff. (Reeves, Mark) Modified on 8/6/2020 to clarify the docket text (amf, ). (Entered: 07/29/2020) |
| 08/06/2020 | 215 | **TEXT ORDER granting 214 Unopposed MOTION to Revise Briefing Schedule for Defendants' Replies to Plaintiffs' Responses to Motions to Dismiss the Second Amended Complaint and Supplemental Complaint. Signed by Honorable Judge Myron H. Thompson on 8/6/2020. (No PDF attached to this entry) (amf, ) (Entered: 08/06/2020)** |
| 09/04/2020 | 216 | REPLY BRIEF re 199 MOTION to Dismiss *Second Amended Complaint* filed by David Bernhardt, Tara MacLean Sweeney, The Department of the Interior, David Vela. (McCune, Devon) (Entered: 09/04/2020) |
| 09/04/2020 | 217 | REPLY BRIEF re 201 MOTION to Dismiss *Second Amended Complaint* filed by Stuart Mark Altman, Amy Bryan, Stephanie A. Bryan, Dewitt Carter, Larry Haikey, Sandy Hollinger, Timothy A. Manning, Keith Martin, Robert R. McGhee, Charlotte Meckel, Arthur Mothershed, PCI Gaming Authority, Poarch Band of Creek Indians, Venus |

| | | McGhee Prince, Garvis Sells(PBCI Tribal Council Member, in his official capacity), Westly L. Woodruff. (Reeves, Mark) (Entered: 09/04/2020) |
|---|---|---|
| 09/04/2020 | 218 | REPLY BRIEF re 204 MOTION to Dismiss *Second Amended Complaint* filed by Stephanie A. Bryan, David Gehman, Sandy Hollinger, Keith Martin, Robert R. McGhee, Arthur Mothershed, Buford Rollin, Garvis Sells(individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council), Eddie L. Tullis. (Reeves, Mark) (Entered: 09/04/2020) |
| 09/09/2020 | 219 | NOTICE of Supplemental Authority in Support of 201 Motion to Dismiss Second Amended Complaint by Tribal Defendants. (Attachments: # 1 Exhibit Jamul Action Committee v. Simermeyer Opinion)(Reeves, Mark) Modified on 9/25/2020 to clean up text. (dmn, ) (Entered: 09/09/2020) |
| 09/23/2020 | 220 | RESPONSE to Tribal Defendants' 219 Notice of Supplemental Authority by Muscogee (Creek) Nation. (McKnight, Stewart) Modified on 9/25/2020 to clean up text. (dmn, ) (Entered: 09/23/2020) |
| 02/19/2021 | 221 | NOTICE of Supplemental Authority in Support of 201 Motion to Dismiss 190 Second Amended Complaint by Tribal Defendants (Attachments: # 1 Exhibit Apache Stronghold Opinion)(Reeves, Mark) Modified on 2/26/2021 to reflect actual title and create link. (dmn, ) (Entered: 02/19/2021) |
| 03/09/2021 | 222 | RESPONSE in Opposition re 221 Notice (Other), *Plaintiffs' Response to Tribal Defendants' Notice of Supplemental Authority* by Hickory Ground Tribal Town, Muscogee (Creek) Nation, Muscogee Creek Nation, George Thompson. (King, Lauren) (Entered: 03/09/2021) |
| 03/15/2021 | 223 | **OPINION. A separate judgment will issue. Signed by Honorable Judge Myron H. Thompson on 3/15/2021. (dmn, )** (Entered: 03/15/2021) |
| 03/15/2021 | 224 | **JUDGMENT: In accordance with the opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that: (1) The Tribal Defendants' motion to dismiss (Doc. 201 ) is granted. The claims against them are dismissed without prejudice, and these defendants are terminated. (2) Pursuant to FRCP 19, the claims against all remaining defendants except defendant Martin Construction, Inc., are dismissed without prejudice. These defendants are terminated as parties. (3) The motions to dismiss filed by these remaining defendants (Doc. 199 and Doc. 204 ) are denied as moot. It is further ORDERED that no costs are taxed. The court recognizes that the proceedings have been stayed as to defendant Martin Construction, Inc., and said defendant has not been dismissed. If the other parties believe it is necessary for the judgment to be designated as a final judgment pursuant to FRCP 54(b), they may move the court to so designate the judgment. This case is not closed. Signed by Honorable Judge Myron H. Thompson on 3/15/2021. (Attachments: # 1 Civil Appeals Checklist)(dmn, ) (dmn, )** (Entered: 03/15/2021) |
| 03/15/2021 | 225 | **ORDER: In accordance with the opinion and judgment entered today, it is ORDERED that the clerk of the court is to close this case administratively pending resolution of defendant Martin Construction, Inc.'s bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Alabama. See Notice of Bankruptcy (Doc. 198 ). Because the only party remaining in this case has declared bankruptcy, it is further ORDERED that the parties should inform the court by 5:00 p.m. on 3/17/2021, whether they agree to the court's entering the following** |

| | | standard order when a party suggests bankruptcy as further set out in the order. **"The clerk of the court is DIRECTED to mail a copy of this order to the bankruptcy court. "This case is closed." Signed by Honorable Judge Myron H. Thompson on 3/15/2021. Furnished USBC. (dmn, )** Modified on 5/13/2021 to include additional text and signed by Judge text, omitted in error at time of docketing. (dmn, ) (Entered: 03/15/2021) |
|---|---|---|
| 03/17/2021 | 226 | AGREEMENT TO ENTERING STANDARD ORDER by George Thompson re 225 Order. (King, Lauren) Modified on 3/19/2021 to clean up text. (dmn, ) (Entered: 03/17/2021) |
| 03/19/2021 | | Case reopened due to 227 Judgment entered. (dmn, )(no pdf) (Entered: 03/19/2021) |
| 03/19/2021 | 227 | **JUDGMENT: Defendant Martin Construction, Inc., having made a suggestion of bankruptcy (Doc. 198 ), and counsel for the plaintiffs having informed the court that they do not object to this order (Doc. 226 ), and bankruptcy counsel for defendant Martin Construction, Inc., having informed the court by email (a copy of which is attached) that said defendant does not object to this order, it is the ORDER, JUDGMENT, and DECREE of the court: (1) That defendant Martin Construction, Inc., is dismissed and terminated without prejudice to the right of any party to petition to reinstate this defendant as a party to pursue any claim embraced herein not adjudicated in or discharged by proceedings in the bankruptcy court; (2) That such reinstatement, if and when allowed, will cause the filing date of any claim so reinstated to related back to the original filing date of this action against said party; (3) That any petition for reinstatement must be filed by a party within 60 days after the bankruptcy court has taken such action that entitles that party to seek reinstatement; and (4) That this order is being entered subject to the understanding that it should not adversely affect the plaintiffs' rights to appeal the order, judgment, and opinion of the court entered on 3/15/2021 (Doc. 223 , Doc. 224 , and Doc. 225 ). See Pls.' Agreement to Entering Standing Order (Doc. 226 at 1). If this order does adversely affect such rights, the parties may move the court to vacate it. The clerk of the court is DIRECTED to mail a copy of this order to the bankruptcy court. This case is closed, and not just administratively but in full. Signed by Honorable Judge Myron H. Thompson on 3/19/2021. Furnished Bankrupty Clerk as directed. (Attachments: # 1 Email by Counsel, # 2 Civil Appeals Checklist)(dmn, )** (Entered: 03/19/2021) |
| 05/12/2021 | 228 | NOTICE OF APPEAL by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson ("Mekko George Thompson") as to 223 Opinion, 224 Judgment, 225 Order entered 3/15/2021. ( Filing fee $ 505.00 receipt number AALMDC-3015685.) (King, Lauren) Modified on 5/13/2021 to clean up text and remove Musco.ce Creek Nation as a filer, not listed on pdf. (dmn, ) (Entered: 05/12/2021) |
| 05/13/2021 | 229 | Appeal Instructions sent to Lauren King, counsel for Appellants Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson ("Mekko George Thompson") re 228 Notice of Appeal. A copy of the Transcript Information Form must be mailed to each court reporter from whom you are requesting a transcript. (Attachments: # 1 Transcript Information Form)(dmn, ) (Entered: 05/13/2021) |
| 05/13/2021 | 230 | Transmission of 228 Notice of Appeal, 225 Order, 224 Judgment, 223 Opinion, and Docket Sheet to US Court of Appeals. (Attachments: # 1 Docket Sheet and Appeal Record)(dmn, ) (Entered: 05/13/2021) |

| 05/17/2021 | 231 | USCA Case Number 21-11643-D for 228 Notice of Appeal, filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson. Fee Status: Fee Paid. Awaiting Appellant's Certificate of Interested Persons due on or before 5/27/2021 as to Appellant Hickory Ground Tribal Town. Awaiting Appellee's Certificate of Interested Persons due on or before 6/10/2021 as to Appellees Auburn University, D. H. Griffin Wrecking Company, Inc., Flintco, LLC, Martin Construction, Inc., Buford Rollin and Secretary, U. S. Department of the Interior. (dmn, ) (Entered: 05/19/2021) |
|---|---|---|
| 05/27/2021 | 232 | TRANSCRIPT INFORMATION FORM by Hickory Ground Tribal Town, Muscogee (Creek) Nation, Muscogee Creek Nation, George Thompson re 228 Notice of Appeal, with the following notation, "No transcript is required for appeal purposes." (King, Lauren) Modified on 5/27/2021 to include additional text. (dmn, ) (Entered: 05/27/2021) |
| 11/23/2021 | | ORDER of USCA as to 228 Notice of Appeal, filed by Hickory Ground Tribal Town, Muscogee (Creek) Nation, George Thompson, 11th Circuit Appeal No. 21-11643-D: Motion to Withdraw as Counsel filed by Lauren King is GRANTED by clerk. Attorney terminated: Attorney Lauren King terminated as counsel for Appellants George Thompson, Muscogee (Creek) Nation and Hickory Ground Tribal Town in 21-11643. (dmn, ) (no pdf) (Entered: 11/23/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/27/2023 09:55:45 | | | |
| **PACER Login:** | dmcknight6258 | **Client Code:** | Muscogee |
| **Description:** | Docket Report | **Search Criteria:** | 2:12-cv-01079-MHT-CSC |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# TAB 190

The Honorable Myron H. Thompson

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MUSCOGEE (CREEK) NATION, a federally recognized Indian tribe, HICKORY GROUND TRIBAL TOWN, and MEKKO GEORGE THOMPSON, individually and as traditional representative of the lineal descendants of those buried at Hickory Ground Tribal Town in Wetumpka, Alabama.

　　　　　　　　　　　　　Plaintiffs,

　　　v.

POARCH BAND OF CREEK INDIANS, a federally recognized tribe; STEPHANIE A. BRYAN, individually and in her official capacity as Chair of the Poarch Band of Creek Indians ("Poarch") Tribal Council; ROBERT R. MCGHEE, individually and in his official capacity as Vice Chair of Poarch Tribal Council; AMY BRYAN, in her official capacity as Treasurer of the Poarch Band of Creek Indians Tribal Council; CHARLOTTE MECKEL, in her official capacity as Secretary of the Poarch Band of Creek Indians Tribal Council; DEWITT CARTER, in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; SANDY HOLLINGER, individually and in her official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; KEITH MARTIN, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; ARTHUR MOTHERSHED, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; GARVIS SELLS, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; EDDIE L. TULLIS, an individual; BUFORD ROLIN, an individual; DAVID GEHMAN, an

2:12-cv-1079-MHT-CSC

SECOND AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT

1

individual; LARRY HAIKEY, in his official capacity as Poarch
Band of Creek Indians Tribal Historic Preservation Officer; PCI
GAMING AUTHORITY d/b/a WIND CREEK HOSPITALITY;
WESTLY L. WOODRUFF, in his official capacity as board
member of the PCI Gaming Authority; STUART MARK
ALTMAN, in his official capacity as board member of the PCI
Gaming Authority; VENUS MCGHEE PRINCE, in her official
capacity as board member of the PCI Gaming Authority; TERESA
E. POUST, in her official capacity as board member of the PCI
Gaming Authority; TIMOTHY A. MANNING, in his official
capacity as board member of the PCI Gaming Authority; MARTIN
CONSTRUCTION, INC., an Alabama Corporation; THE
DEPARTMENT OF THE INTERIOR; TARA MACLEAN
SWEENEY, in her official capacity as Assistant Secretary of
Indian Affairs; DAVID BERNHARDT, in his official capacity as
Secretary of the United States Department of the Interior; DAVID
VELA, in his official capacity as Acting Director of the National
Park Service; and AUBURN UNIVERSITY;

Defendants.

2

## CONTENTS

INTRODUCTION ........................................................................................................ 5

THE PARTIES.......................................................................................................... 7

    Plaintiffs ................................................................................................... 7

    Poorch Band .............................................................................................. 8

    Poarch Council Defendants......................................................................... 8

    PCI Gaming Authority................................................................................ 8

    PCI Gaming Authority Board Defendants.................................................... 8

    Poarch Tribal Historic Preservation Officer ................................................ 9

    Individual Defendants................................................................................. 9

    Martin Construction, Inc............................................................................ 9

    Federal Defendants .................................................................................. 10

    Auburn University ................................................................................... 10

JURISDICTION AND VENUE .............................................................................. 11

GENERAL ALLEGATIONS ................................................................................. 13

    A.    History Of Hickory Ground. ............................................................ 13

    B.    Poarch Bought Hickory Ground With Federal Preservation Grant Funds After Promising to Preserve This Sacred Place. .................................. 17

    C.    Interior Illegally Takes The Hickory Ground Site Into Trust For Poarch. .......... 20

    D.    Poarch Requests Delegation Of Federal Historic Preservation Responsibilities On The Eve Of Expiration Of The 20-Year Protective Covenant, And Then Begins To Desecrate Hickory Ground. ............................. 24

    E.    Poarch Builds A Casino Resort Over A Muscogee (Creek) Sacred Site............. 28

    F.    To Make Way For Its Casino Resort, Poarch Desecrates The Muscogee (Creek) Human Remains And Funerary Objects. ................................. 30

    G.    Plaintiffs Repeatedly Request That The Hickory Ground Site Be Preserved As Poarch Promised. ............................................................. 33

    H.    Poarch Intentionally Excludes The Muscogee (Creek) Nation And Hickory Ground From Decisions About Their Ancestors' Reburial And Conducts The Reburial In Secret. ......................................................... 35

    I.    Hickory Ground Today And The False Promise Of Preservation. ...................... 39

COUNT I: VIOLATION OF THE INDIAN REORGANIZATION ACT................................... 45

*OPERATIVE COUNTS IF THIS COURT RULES IN FAVOR OF PLAINTIFFS ON COUNT I AND DETERMINES INTERIOR LACKED AUTHORITY TO TAKE THE HICKORY GROUND SITE INTO TRUST FOR POARCH* ........................................................ 46

    COUNT II: UNJUST ENRICHMENT (ALABAMA COMMON LAW) ...................... 46

COUNT III: PROMISSORY ESTOPPEL (ALABAMA COMMON LAW) .................. 48

COUNT IV: OUTRAGE ...................................................................................... 49

*OPERATIVE COUNTS IF THIS COURT RULES AGAINST PLAINTIFFS ON COUNT I* ........ 53

COUNT V: UNJUST ENRICHMENT (FEDERAL COMMON LAW) ......................... 53

COUNT VI: PROMISSORY ESTOPPEL (FEDERAL COMMON LAW) ................... 53

COUNT VII: VIOLATION OF THE NATIVE AMERICAN GRAVES
PROTECTION AND REPATRIATION ACT ...................................................... 53

COUNT VIII: PORTIONS OF NAGPRA AND ARPA, IF CONSTRUED IN A
MANNER THAT RESULTS IN A SUBSTANTIAL BURDEN ON
PLAINTIFFS' RELIGION, VIOLATE THE FIRST AMENDMENT,
THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS
ACT, AND THE RELIGIOUS FREEDOM RESTORATION ACT .................. 59

COUNT IX: VIOLATION OF THE ARCHEOLOGICAL RESOURCES
PROTECTION ACT ......................................................................................... 61

*OPERATIVE COUNTS REGARDLESS OF RULING ON COUNT I* ............................................ 64

COUNT X: VIOLATION OF THE NATIONAL HISTORIC PRESERVATION
ACT ................................................................................................................... 64

    A.    Interior And Poarch Failed To Comply With Their Obligations To
Meaningfully Consult With Plaintiffs ...................................................... 66

    B.    Interior And Poarch Failed To Take Into Account The Effect On
The Hickory Ground Site Of Allowing Excavation And
Construction Of A Casino Resort, And Interior Failed To Take
Into Account The Effect On The Hickory Ground Site Of
Delegating Historic Preservation Responsibilities To Poarch. .............. 67

    C.    Interior and Poarch Failed To Seek Ways To Avoid, Minimize, Or
Mitigate The Harm To The Hickory Ground Site. .................................. 68

    D.    Poarch Violated Its Historic Preservation Responsibilities Under
the NPS Agreement ...................................................................................... 69

    E.    Poarch's And The Federal Defendants' Violation Of Their Historic
Preservation Responsibilities Has Caused Serious, Irreparable, And
Ongoing Harm to Plaintiffs ......................................................................... 70

    F.    The National Park Service Has Illegally Continued To Award
Federal Preservation Funds to Poarch ...................................................... 71

COUNT XI: VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION
ACT ................................................................................................................... 72

PRAYER FOR RELIEF ...................................................................................................... 76

## INTRODUCTION

1.      Defendant Poarch Band of Creek Indians ("Poarch") acquired Hickory Ground, a sacred historic site of the Muscogee (Creek) Nation that is located in Wetumpka, Alabama. Poarch claimed it was buying this culturally significant site to protect it from development and repeatedly promised to preserve it. Poarch broke those promises and desecrated the holy site, removing over 57 bodies of Plaintiffs' ancestors and thousands of sacred artifacts to build a casino with the help of a Poarch tribal member-owned construction company. The other Defendants violated statutory, common law, and contractual obligations when they failed to stop Poarch from paving over this important historic site and traditional burial ground. Plaintiffs seek redress for this greedy, tragic, outrageous, and illegal act.

2.      Hickory Ground is a parcel of land located near Wetumpka, Alabama. It is sacred to the Plaintiffs: it is part of the Muscogee (Creek) Nation's aboriginal lands, the location of the Muscogee (Creek) Nation's last capital before the tribe was forcibly removed from Alabama, and is a historic ceremonial ground and burial site. Direct ancestors of the current members of the Hickory Ground Tribal Town lived, died and are buried there.

3.      Poarch obtained Hickory Ground using federal preservation grant funds under the pretense that Poarch would protect the site from development. The site has been listed on the National Register of Historic Places since 1980.

4.      In its application for the federal funds, Poarch represented to the Muscogee (Creek) Nation, the federal government, and the Alabama State Historical Commission that Poarch would use the funds to purchase Hickory Ground to *save it* from being developed, and that it would protect the site "*without* excavation."

5.      Poarch then excavated Hickory Ground to make way for a $246 million casino resort called Wind Creek Wetumpka. Poarch exhumed at least 57 human burials and mistreated

the human remains. Some remains, and numerous archaeological artifacts have never been reburied and are being mishandled and improperly stored by Poarch and Auburn University.

6.     Poarch's construction of a casino over the Plaintiffs' sacred burial grounds, its removal of the Plaintiffs' ancestors from what was intended to be their final resting place, and its mistreatment of the remains and artifacts has caused, and continues to cause, harm to the Plaintiffs, in violation of the laws of the United States and Alabama.

7.     Statutes and contract impose upon the Department of the Interior ("Interior"), including the Bureau of Indian Affairs and the National Park Service, and their respective officials (listed in Paragraphs 26 to 31, *infra*) (collectively the "Federal Defendants") obligations to protect Plaintiffs' rights, including but not limited to duties to provide notice and consultation and obtain consent prior to allowing such damage to occur.

8.     Poarch and its officers and agents, including the third parties it hired to conduct the excavation of Hickory Ground and construction of the casino resort, also have statutory, contractual, and common law duties to protect Plaintiffs' rights and to avoid damaging their sacred burial grounds.

9.     Poarch has been unjustly enriched and continues to be unjustly enriched as a result of its wrongful and unlawful conduct. The actions of all Defendants have caused, and continue to cause, irreparable harm to the Plaintiffs, who bring this lawsuit to remedy past damage and stop further damage.

10.     Poarch promised to preserve the sacred Hickory Ground site forever. It should be held to its word.

## **THE PARTIES**

**Plaintiffs**

11.     Plaintiff Muscogee (Creek) Nation is a federally recognized Indian tribe based in Oklahoma, with over 87,000 tribal citizens. Before its people were forced to move to Indian Territory (now Oklahoma), the Muscogee (Creek) Nation existed as a confederacy of Tribal Towns throughout what is now the southeastern United States. For thousands of years before non-Indian contact, they inhabited what is now Alabama.

12.     Plaintiff Hickory Ground Tribal Town is a traditional Tribal Town and ceremonial ground of the Muscogee (Creek) Nation that is now located in Henryetta, Oklahoma. Before the Muscogee (Creek) Nation's removal from Alabama, Hickory Ground Tribal Town was located in what is now Wetumpka, Alabama.

13.     Tribal Town membership is matrilineal. The members of the modern Hickory Ground Tribal Town are directly tied historically, culturally and lineally to Hickory Ground in Wetumpka.

14.     Plaintiff George Thompson is the chief ("Mekko") of Hickory Ground Tribal Town. He has held that lifetime position for 42 years. He is a citizen of the Muscogee (Creek) Nation domiciled in Oklahoma, and brings this suit individually and as the traditional representative of all the lineal descendants of those buried at Hickory Ground under the Muscogee (Creek) Nation traditional matrilineal Tribal Town kinship system.

15.     Under Andrew Jackson's direction, the United States forcibly removed the Muscogee (Creek) Nation and its Tribal Towns, including Hickory Ground, from Alabama in the early 1800s. Some Creek individuals (often individuals of mixed heritage not living in tribal towns) helped Andrew Jackson fight against their brethren in Alabama, and in exchange they were allowed to stay in Alabama, on the condition they renounce their tribal citizenship, as *all*

tribes were to be removed from the area.

**Poorch Band**

16.    The Poarch Band is a group that was first recognized as an Indian tribe by the United States in 1984, after claiming to descend from a "settlement of 'half-bloods'"[1] who lived in Tensaw, Alabama.

17.    This group was not, and is not, a Muscogee (Creek) Tribal Town.

18.    The Muscogee (Creek) Nation did not, and does not, have "bands."

**Poorch Council Defendants**

19.    Defendants Stephanie A. Bryan, Robert R. McGhee, Amy Bryan, Charlotte Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells are members of the Poarch Tribal Council and officials of Poarch (the "Poarch Council Defendants"). They are sued in their official capacities for violations of federal and state law for which Plaintiffs seek mandamus, declaratory and injunctive relief. Certain Poarch Council Defendants are also sued in their individual capacities. *See infra* ¶ 24.

**PCI Gaming Authority**

20.    Defendant PCI Gaming Authority is a commercial enterprise of the Poarch Band that is at least partly responsible for the gaming development and operations at Hickory Ground.

21.    PCI Gaming Authority is the principal gaming entity of the Poarch Band, and runs the Wind Creek Casino and Hotel Wetumpka.

**PCI Gaming Authority Board Defendants**

22.    On information and belief, Defendants Westly L. Woodruff, Stuart Mark Altman, Venus McGhee Prince, Teresa E. Poust, and Timothy A. Manning (the "PCI Gaming Authority

---

[1] The outdated term "half-bloods" in this excerpt from Poarch's petition for federal recognition refers to individuals who possessed half Indian, half non-Indian blood as of the mid-1800s.

Board Defendants") are members of the PCI Gaming Authority Board. They are sued in their official capacities for violations of federal and state law for which Plaintiffs seek mandamus, declaratory and injunctive relief.

**Poarch Tribal Historic Preservation Officer**

23.    Defendant Larry Haikey is the Tribal Historic Preservation Officer for the Poarch Band of Creek Indians ("Poarch THPO"). He is sued in his official capacity for violations of federal and state law for which Plaintiffs seek mandamus, declaratory and injunctive relief.

**Individual Defendants**

24.    Defendants Eddie Tullis, Buford Rolin and David Gehman are former members of the Poarch Tribal Council and are sued in their individual capacities for the tort of outrage that they personally committed against Mekko Thompson. Defendants Stephanie A. Bryan, Robert R. McGhee, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells are also sued in their individual capacities for the tort of outrage that they personally committed against Mekko Thompson. The defendants referred to in this Paragraph are collectively referred to as the "Individual Defendants." Mekko Thompson seeks equitable and monetary relief from the Individual Defendants for outrage.

**Martin Construction, Inc.**

25.    Defendant Martin Construction, Inc. is a corporation organized and existing under the laws of Alabama, with a principal place of business at 110 W. Louisville Avenue; Atmore, Alabama 36502.

**Federal Defendants**

26.     Defendant United States Department of the Interior is responsible for administration and management of federal lands, historic places, and Indian Affairs.

27.     The National Park Service and Bureau of Indian Affairs are agencies of the United States government, within the Department of the Interior. Among other things, the National Park Service administers and oversees historic preservation grants and delegations of historic preservation responsibilities. The Bureau of Indian Affairs is responsible for, among other things, administering and overseeing archaeological activities on Indian land and taking land into trust on behalf of Indian tribes.

28.     Defendant Tara MacLean Sweeney is the Assistant Secretary for Indian Affairs within the Department of the Interior, and is sued in her official capacity.

29.     Defendant David Vela is Acting Director of the National Park Service within the Department of the Interior, and is sued in his official capacity.

30.     Defendant David Bernhardt is Secretary of the United States Department of the Interior and is sued in his official capacity.

31.     Collectively, the Defendants listed in Paragraphs 26-30 are referred to herein as the "Federal Officer Defendants."

**Auburn University**

32.     Defendant Auburn University ("Auburn") is an educational institution in the State of Alabama that receives federal funding and, on information and belief, exercises, and has exercised, possession or control over cultural items excavated at Hickory Ground, including possession or control of human remains at the time of the filing of this Second Amended Complaint.

## JURISDICTION AND VENUE

33.     Plaintiffs' claims arise under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*; the Indian Reorganization Act, 25 U.S.C. §§ 461, *et seq.*; the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 100101 *et seq.* (formerly 16 U.S.C. §§ 470 *et seq.*); the Native American Graves Protection and Repatriation Act of 1990 ("NAGPRA"), 25 U.S.C. §§ 3001 *et seq.*; the Archeological Resources Protection Act ("ARPA"), 16 U.S.C. §§ 470aa *et seq.*; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 28 U.S.C. § 1361 (mandamus); federal common law; and supplemental state law claims.

34.     Plaintiffs also seek their reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the NHPA, 54 U.S.C. § 307105.

35.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 (federal question jurisdiction), 1361 (action to compel a governmental officer to perform his duty), 1362 (jurisdiction over civil actions brought by Indian tribes arising under the laws of the United States), 1367 (supplemental jurisdiction over state law claims forming part of the same claim or controversy); 25 U.S.C. § 3013 (jurisdiction over actions alleging violations of NAGPRA); and 54 U.S.C. § 307105 ("any interested person" may enforce NHPA).

36.     Pursuant to 28 U.S.C. § 1391(b)(2) & (e), venue is proper in this Court because this action relates to lands located within this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

37.     Federal Defendants have waived their sovereign immunity against civil actions alleging harm arising from such agencies' actions or failures to act as required by law and seeking relief other than monetary damages. 5 U.S.C. § 702.

38.     The Court also has jurisdiction over the Federal Officer Defendants in their

official capacities because they are federal governmental officials against whom Plaintiffs seek declaratory and injunctive relief only in relation to continuing violations of federal law. *See Ex Parte Young*, 209 U.S. 123 (1908).

39.     The Court has jurisdiction over the Poarch Council Defendants (listed in Paragraph 19), the PCI Gaming Authority Board Defendants (listed in Paragraph 22), and the Poarch THPO in their official capacities because they are tribal officials against whom the Plaintiffs seek declaratory and injunctive relief only in relation to continuing violations of federal law. *See Ex Parte Young*, 209 U.S. 123 (1908).

40.     This Court has jurisdiction over the Individual Defendants because they committed the tortious actions alleged in this complaint in this judicial District.

41.     Martin Construction, Inc. ("Martin Construction") is subject to personal jurisdiction in this District because it has conducted, and does conduct, business in the United States and Alabama. Martin Construction is owned by a Poarch tribal member, and performed construction services to build the Wetumpka casino resort in this judicial District.

42.     The Court has jurisdiction over Auburn University under NAGPRA, 25 U.S.C. §§ 3001 *et seq.*, and ARPA, 16 U.S.C. §§ 470aa *et seq.*, as Auburn receives federal funds and, on information and belief, exercised, and continues to exercise, possession or control over remains and cultural items that Auburn excavated from Hickory Ground. Auburn is listed as a Defendant solely to the extent that this Court enters orders concerning the possession, custody, control, or relocation of the cultural items at issue.

## <u>GENERAL ALLEGATIONS</u>

**A.      History Of Hickory Ground.**

43.      For millennia before the Removal Treaty of 1832, the Muscogee (Creek) people inhabited most of what is now Alabama. The Muscogee (Creek) Nation was composed of Tribal Towns, including the Tribal Town site called *Ocevpofv* by the Muscogee (Creek) people, and known as "Hickory Ground Tribal Town" by English speakers.

44.      Hickory Ground is of major importance in the history of the Muscogee (Creek) Nation, Hickory Ground Tribal Town, and the United States. It was the last tribal capital of the Muscogee (Creek) Nation prior to removal. Hickory Ground was critical to the very formation of the United States.  When European nations questioned the sovereignty of the newly born United States, President George Washington lent legitimacy to the nascent country by signing treaties with Indian Nations, including the Muscogee (Creek) Nation, whose sovereignty had previously been affirmed through treaties with France, Spain, and England. Thus, in 1790, nearly two centuries before Poarch was recognized as a tribe, President George Washington executed a treaty with the Muscogee (Creek) Nation. The head of the Muscogee treaty delegation was from Hickory Ground.

45.      Tribal Town affiliation is matrilineal, and the current members of Hickory Ground Tribal Town in Oklahoma are the lineal descendants of the ancestors buried at the historic Hickory Ground in Wetumpka, Alabama.

46.      Each Tribal Town is led by its chief, or *mekko*. Mekko George Thompson is the *kosa mekko* of Hickory Ground, and has been since 1977. He is known as *kosa mekko*, or Coosa Chief, as Hickory Ground dates back to the first Tribal Town at the time of the beginnings, known as *kosa* or Coosa. Since time immemorial, Mekko Thompson's ancestors have served as Mekko of Hickory Ground Tribal Town.

13

47.     Hickory Ground is located on the east bank of the Coosa River, south of the present-day Wetumpka and approximately two miles north of Fort Toulouse.

48.     Under the terms of the Removal Treaty, the Muscogee (Creek) Nation ceded all of its land east of the Mississippi River, including Hickory Ground, and a new reservation for the Muscogee (Creek) Nation was established west of the Mississippi River. 7 Stat. 366, Arts. I & XIV (1832). To stay with their tribe, the members of the Muscogee (Creek) Nation were required to remove to what is now Oklahoma and leave behind their ancient villages and the many generations of their ancestors who were buried there.

49.     Hickory Ground Tribal Town, like all Tribal Towns of the Muscogee (Creek) Nation, contains a ceremonial ground (square ground), council house, plaza, burial sites, and individual graves containing human remains and funerary objects of the ancestors of the Plaintiffs. Hickory Ground has profound cultural and religious importance to the Plaintiffs.

50.     Hickory Ground is a state-registered archaeological site (1EE89) and is listed on the National Register of Historic Places. Hickory Ground was placed on the National Register of Historic Places in 1980, after the Alabama State Historic Commission applied for its placement on the Register on behalf of Poarch. The part of Hickory Ground listed on the National Register of Historic Places and currently considered to be trust or reservation land is referred to herein as the "Hickory Ground Site."

51.     In the Muscogee (Creek) culture and religion, there are specific burial places for those who held particular positions in Tribal Town traditional governance, and specific governance structures over Tribal Towns, including burials within those Tribal Towns.

52.     For example, Hickory Ground *mekkos* are buried under the *mekkos*' arbor (the east-facing arbor) in the ceremonial grounds.

53.     It was a common practice to bury family members who did not have a position in the ceremonial grounds in the earth underneath a family's home.

54.     The map of archaeological features at the Hickory Ground Site on the next page shows human burials concentrated under the arbors in the square ground and under house structures:



16

Kelly Ervin, *A Comparative Spatial Analysis of Two Communities from the Hickory Ground Site in Wetumpka, Alabama* 26 (Auburn University Thesis, December 13, 2014).

55.     It is the Plaintiffs' long-established religious belief that burial and ceremonial grounds are sacrosanct and must not be entered, let alone disturbed, without the proper religious protocol.

56.     It is also the Plaintiffs' long-established religious belief that their ancestors must be left at peace in their final resting places with their possessions (funerary objects), and are not to be disturbed, mistreated, or disrespected in any manner.

57.     Plaintiffs, as the living descendants and next of kin of the deceased, owe a religious duty to their ancestors to care for the graves and bodies of the deceased and to follow traditional religious protocol in such care.

58.     In the Muscogee (Creek) traditional religion, certain protocols must be followed in all burials. These protocols are based on Tribal Town and Clan religion and tradition.

59.     Because the *mekko* is the chief of the town, the *mekko* ultimately decides all Tribal Town issues, including treatment of the dead.

60.     It is viewed as heinous and extremely disrespectful in the Muscogee (Creek) traditional religion for any persons not belonging to the Muscogee (Creek) Nation or Tribal Town to exhume or rebury Muscogee (Creek) ancestors and their funerary objects, especially where those persons mistreat the remains and perform invented and non-traditional ceremonies accompanying reburial.

**B.     Poarch Bought Hickory Ground With Federal Preservation Grant Funds After Promising to Preserve This Sacred Place.**

61.     Poarch obtained the Hickory Ground Site in 1980 with $165,000 in federal preservation grant funds and a $165,000 donation from the landowner.

62.     In the same year, pursuant to standard terms of federal preservation grant awards, a protective covenant was placed on the property for 20 years.

63.     Poarch had never occupied Hickory Ground prior to 1980. *See* Poarch Federal Acknowledgement Memo., pp. 2, 3, 16, 64, 65 of 131 (1983), *available at* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ofa/petition/013_prchcr_AL/013_pf.pdf.

64.     Poarch represented to the Alabama Historic Commission, the Muscogee (Creek) Nation and the United States that its purpose in acquiring the Hickory Ground Site was to preserve the historic property for the benefit of all Creek Indians, including the "existing Hickory Ground tribal town in Oklahoma," and to preserve the Site "without excavation." Poarch Application for Historic Preservation Grant Re U.S. Department of the Interior (HCRS [Heritage Conservation and Recreation Service]) letter 712 at 2 (2/12/1980) ("Federal Preservation Grant Application"), attached hereto as Exhibit A.

65.     The Muscogee (Creek) Nation and Hickory Ground Tribal Town were the intended third party beneficiaries of Poarch's agreement to preserve Hickory Ground.

66.     In its application for the $165,000 federal preservation grant to purchase the Hickory Ground Site, Poarch (then calling itself the "Creek Nation East of the Mississippi"), stated that "Hickory Ground (site no. 1-Ee-89) is of major importance in the history of the Muscogee (Creek) Nation. It has supplied many of the important leaders in Creek history." *Id.* at 1. "Hickory Ground was involved in nearly all the major historic events in the southeast before the removal of Creeks from Alabama in 1836," including significant battles fought by Andrew Jackson. *Id.* at 1-2.

67.     In the section of its Federal Preservation Grant Application titled "The Use Of The Land," Poarch unequivocally represented and promised that "[a]cquisition of the property is

principally a protection measure. Acquisition will prevent development on the property…. [P]lans will be developed to minimize continued destruction of the archaeological resources." *Id.* at 2. "The property will serve as a valuable resource for cultural enrichment of Creek people…. The Creek people in Oklahoma pride in heritage and ties to original homeland can only be enhanced. **There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved…. The Hickory Ground site will continue to enhance their understanding of their history, without excavation**." *Id.* (emphasis added).

68.     In the section of Poarch's Federal Preservation Grant Application titled "Specific Standards of Protection," Poarch stated that the site "will be maintained almost entirely by minority groups," including the Creek Nation Foundation, Inc. in Oklahoma, representing the Muscogee (Creek) Nation in Oklahoma. *Id.* at 3. "[T]he property will be jointly owned by both groups of Creeks." *Id.* An attorney for the Creek Nation Office of Justice in Oklahoma would handle the legal matters for the Muscogee (Creek) Nation. *Id.* at 4. A trained anthropologist would "act as an advisor to the tribal councils on plans for permanent protection of the site." *Id.* "Specific end products of the project is to provide protection for a particularly important site in Creek History…. **Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home**." *Id.* at 3 (emphasis added). "**Destruction of archaeological resources in Alabama … destroy[s] the cultural history of Creek people**." *Id.* at 5 (emphasis added). "In order to halt the destruction planned for the site and to insure [sic] against future destruction, funds for acquisition of fee simple title are requested. As the landowner is very much interested in developing the property for commercial purposes it is felt acquisition of fee simple title is **necessary to prevent destruction of the site**." *Id.* at 2-3

(emphasis added).

69.     Poarch corresponded with representatives of the Muscogee (Creek) Nation regarding its preservation plans for the Hickory Ground Site.

70.     Additionally, in a 1983 Congressional Hearing in which both the Chief of the Muscogee (Creek) Nation and Poarch Chairman Eddie Tullis testified regarding a bill governing disbursement of Indian Claims Commission awards, the Poarch Chairman testified that, as Poarch was "in ownership of one of the last historical sites of the Creek nation before the removal to Oklahoma," Poarch "propose[d] to use part of this money to make that site, not only available to all of our people, but to the general public as well." S. Hrg. 98-200 at 21-22 (5/26/1983).

71.     The Poarch Chairman's written testimony that was submitted to Congress and included in the hearing record added more detail to this proposal: "Preservation of a historical site: Along with [Poarch's] effort to join the mainstream of American life there is a strong desire among our people to preserve and share our unique history. To this end our tribe has acquired titled [sic] to 'Hickory Ground', one of the most important Creek historical sites. We propose to use fifty percent of the proceeds of S. 1224 to preserve and to present to both Indian and non-Indian this unique and historical site." S. Hrg. 98-200 at 24 (5/26/1983).

72.     Relying on Poarch's unqualified assurances that it would perpetually protect the Hickory Ground Site, the Muscogee (Creek) Nation did not object to Poarch's acquisition of the Site, either in fee or trust.

**C.      Interior Illegally Takes The Hickory Ground Site Into Trust For Poarch.**

73.     On June 11, 1984, the Department of the Interior extended federal recognition to the Poarch Band of Creek Indians. 49 Fed. Reg. 24083 (June 11, 1984). Effective April 12, 1985,

the United States wrongfully accepted legal title to a majority of the Hickory Ground Site in trust for the benefit of Poarch, 50 Fed. Reg. 15502 (April 18, 1985); 50 Fed. Reg. 19813 (May 10, 1985), purportedly pursuant to the Indian Reorganization Act of 1934.

74.    Under the Indian Reorganization Act, 25 U.S.C. § 5123 *et seq.*, a tribe must have been "under federal jurisdiction" in 1934 in order for Interior to have authority to take land into trust for the tribe. *See also Carcieri v. Salazar*, 555 U.S. 379 (2009).

75.    The Solicitor for the Department of the Interior has construed "under federal jurisdiction" to involve a two-part inquiry into whether (1) the United States took actions reflecting federal obligations, duties, responsibility for, or authority over a tribe in or before 1934, and (2) that relationship continued through 1934. Sol. Op. M-37029, *available at* https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37029.pdf.

76.    Poarch and the federal government have correctly and repeatedly recognized that Poarch was not under federal jurisdiction within the meaning of the Indian Reorganization Act.

     a.    In 2005, Poarch submitted a letter through its legal counsel to the National Indian Gaming Commission stating that "the federal government clearly ended its relationship with Poarch Creek following removal [in 1832]. . . . [T]he historical record amply demonstrates that the federal government terminated the government-to-government relationship with the Creek in Alabama through a broad course of dealings that included express statements by top federal officials disclaiming any federal relationship with the Tribe - and that this termination of federal recognition extended back almost 150 years prior to Poarch Creek regaining federal recognition in 1984." Letter from W. Perry, Sonosky Chambers, to K. Zebell, National Indian Gaming Commission ("NIGC"), at pp. 10-11 (June

3, 2005), attached as Exhibit B hereto.

b.   The Department of the Interior Solicitor's Office, Division of Indian Affairs, stated in 2008 that it "does not believe that the Poarch Creek Band ever had a government-to-government relationship with the United States until it was [recognized in 1984].... [T]he **record simply does not support the Band's existence as a separate tribal entity with a governmental relationship with the United States**." Letter from David Bernhardt, then-Interior Solicitor, to Hogen, NIGC Chairman, p. 1 (June 13, 2008) (emphasis added), attached as Exhibit C hereto.

c.   The National Indian Gaming Commission in 2008 agreed that, after the Muscogee (Creek) Nation's removal from Alabama in the 1830s, "the United States specifically and repeatedly disclaimed any relationship with the Poarch Band" until 1984. Letter from NIGC Acting General Counsel to Bernhardt, p. 2 (July 30, 2008), attached as Exhibit D hereto.

d.   In 1951, in seeking to intervene in proceedings relating to compensation from the United States for lands ceded in past treaties with the Creek Nation, Poarch (then calling itself the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians") stated that it was "but a **newly formed** band of descendants of the original Creek nation." Perdido Band Memo. In Supp. Of Mot. To Intervene, p. 4 (1951) (emphasis added), attached as Exhibit E hereto.

e.   Later that year, Chairman Calvin McGhee and Secretary Ruby Weatherford signed a resolution changing the name of the band to the "Creek Nation East of the Mississippi." Ex. A to Mot. To Change Record Name Of One of Movants for

22

Leave to Intervene (8/29/1951), attached as Exhibit F hereto.

f.   Poarch (by this time going by the name Creek Nation East of the Mississippi) stated in November 1951 in a United States Court of Claims appellate brief that "they possessed no territory and were **not dealt with by the United States as a group**" since removal. Creek Nation East of the Mississippi's Appellate Br. re Intervention in Muscogee (Creek) Nation ICC Case, p. 137 (11/6/1951) (emphasis added), attached as Exhibit G hereto.

g.   The brief also stated that "**the Federal Government had no dealings with those east of the Mississippi**, as a group," who, "unlike the Creeks in Oklahoma, had no organization, occupied no bounded grant of territory and **were not under the guardianship of the Federal Government**." *Id.* p. 152 (emphasis added).

h.   In 1952, the United States submitted an appellate brief in the United States Court of Claims stating that "those [Creeks] who remained in the East [after removal] abandoned their tribal relationships; and **they never continued a tribal government recognized by the United States and they entered into no treaties or other political arrangements with the United States** … and only recently organized themselves, apparently for the purpose of this suit." US Appellate Br. Opposing Creek Nation E. of the Mississippi's Intervention in Muscogee (Creek) Nation ICC Case, p. 2 (Jan. 1952) (emphasis added and footnote omitted), attached as Exhibit H hereto.

i.   The United States' 1952 brief also stated that the Creeks who remained east of the Mississippi "are not recognized by the administrative or legislative arm of the Government…." *Id.* at 16.

23

j.   The Court of Claims found that the United States had "no occasion for further dealings with [those Creeks who remained east of the Mississippi] since 1832." *McGhee v. Creek Nation*, 122 Ct. Cl. 380, 391 (1952), *cert. denied*, 344 U.S. 856 (1952).

77.   Where a tribe is not "under federal jurisdiction" under the Indian Reorganization Act, Interior has no authority to take land into trust for that tribe.

78.   Because Poarch was not "under federal jurisdiction" within the meaning of the Indian Reorganization Act, the Hickory Ground Site is not properly held in trust for Poarch.

**D.   Poarch Requests Delegation Of Federal Historic Preservation Responsibilities On The Eve Of Expiration Of The 20-Year Protective Covenant, And Then Begins To Desecrate Hickory Ground.**

79.   The 20-year protective covenant on the Hickory Ground Site expired in July 2000.

80.   The year before the covenant expired, Poarch requested that the National Park Service delegate historic preservation responsibilities to Poarch on "all lands within the exterior boundaries of [Poarch's] Reservation," which included the Hickory Ground Site. The National Park Service agreed.

81.   The National Park Service's June 10, 1999 agreement with Poarch (the "NPS Agreement," attached hereto as Exhibit I) requires that:

a.   Poarch follow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800 *et seq.* (NPS Agreement § 5), which mandates consultation with any tribe that attaches religious and cultural significance to a historic site (*see* 16 U.S.C.S. §§ 470a(d)(6), 470f; 36 C.F.R. § 800.1 *et seq.*).

b.   The Poarch THPO "will, in accordance with Section 101(d)(4)(C) [of the NHPA],

provide for … consultation with representatives of any other tribes whose traditional lands may have been within the Poarch Band of Creek Indians Reservation," and "will periodically solicit and take into account comments on the program from all those individuals and groups who may be affected by the program's activities" (NPS Agreement § 7);

c.   "In any case where an action arising pursuant to the Act may affect the traditional lands of another Tribe, the [Poarch THPO] will, on an as-needed basis, seek and take into account the views of that Tribe." NPS Agreement § 7.

82.    The National Park Service could not and would not have delegated the historic preservation duties to Poarch without Poarch's agreement to undertake the enumerated duties.

83.    The Hickory Ground Site is in the traditional lands of the Muscogee (Creek) Nation.

84.    The Hickory Ground Site contains the ceremonial grounds and burials of members of the Hickory Ground Tribal Town.

85.    Plaintiffs were intended third party beneficiaries of the NPS Agreement.

86.    Under the NPS Agreement, at least every four years the National Park Service was obligated to "carry out a periodic review of the Tribe's program pursuant to the Act, to ensure that the Tribe is carrying out the program consistent with the agreement." NPS Agreement § 14. NPS could terminate the Agreement if Poarch did not "carr[y] out its assumed responsibilities in accordance with this agreement, the Act, or any other applicable Federal statute or regulation." NPS Agreement § 15; *see also* 54 U.S.C. § 302108.

87.    At the time the National Park Service approved of and executed the NPS Agreement with Poarch, Poarch's Office Of Cultural And Historic Preservation Field

Methodology had a policy that "[u]nder no circumstances are the burials on the Poarch Creek Indians Reservations, or lands under their control, to be excavated, nor are they to be subjected to **any** examination or testing. Burial sites take precedence over any project or program plan." Poarch Field Methodology Policy, p. 6 (April 1999) (emphasis in original), attached hereto as Exhibit J.

88.     The Poarch Field Methodology Policy also emphasized: "AGAIN! **THE POARCH BAND OF CREEK INDIANS TRIBAL ARCHAEOLOGICAL AND HISTORIC RESOURCES CODE EMPHASIZES AVOIDANCE AND PRESERVATION OF FEATURES RATHER THAN EXCAVATION**." *Id.* (emphasis in original).

89.     On information and belief, after the National Park Service delegated historic preservation responsibilities to Poarch, Poarch reversed these policies with respect to the Hickory Ground Site.

90.     In 2001, various parties complained to the Bureau of Indian Affairs and others that Poarch was disturbing the Hickory Ground Site.

91.     In response to these complaints, the Bureau of Indian Affairs Archaeologist and Federal Preservation Officer recommended that the Bureau of Indian Affairs conduct an investigation at the site to determine whether ground-disturbing activity was damaging archaeological resources in violation of ARPA. Briefing Statement to Assistant Secretary for Indian Affairs (10/1/2001).

92.     The Bureau of Indian Affairs concluded as of March 2002 that no burials or archaeological resources had *yet* been disturbed on trust land.

93.     The complaints—which continued through 2001 and 2002, notified the Bureau of Indian Affairs, the Secretary of Interior, and the Assistant Secretary of Indian Affairs that

26

continued ground-disturbing activity *would* result in irreparable damage to the Site in violation of applicable law on lands that Interior considered to be trust lands.

94.     The complaining parties included the Alabama Historical Commission, the Governor of Alabama, then-Senator Jeff Sessions, Dr. Craig Sheldon with Auburn University (who had authored several archaeological reports on the Hickory Ground Site), and the City of Wetumpka (via a lawsuit). *See* Letter from L. Warner, Exec. Director of Alabama Historical Commission, to Secretary of Interior (10/26/2001); Letter from D. Siegelman to Secretary of Interior (11/14/2001); Letter from C. Sheldon to Alabama Historical Commission (1/28/2002); Letter from L. Warner, Exec. Director of Alabama Historical Commission, to Hon. Jeff Sessions (3/14/2002); City of Wetumpka Amended Complaint, Civil Case No. 01-A-1146-N (M.D. Ala. 11/9/2001).

95.     The Alabama State Historic Commission also listed Hickory Ground as a "place in peril" in the year 2000, and listed yet another Poarch casino site in Montgomery as a "place in peril" in 2002, as Poarch's construction of a casino in that location also threatened Muscogee (Creek) burial mounds.

96.     Despite these warnings, Interior (including the National Park Service) failed to conduct the required reviews of Poarch's compliance with the NPS Agreement and failed to enforce federal law.

97.     Such reviews should have taken place by 2004, 2008, and 2012.

98.     The National Park Service did not conduct any such reviews.

99.     If it had, it would have discovered that Poarch violated the NPS Agreement and other federal laws.

**E.      Poarch Builds A Casino Resort Over A Muscogee (Creek) Sacred Site.**

100.    After the 20-year covenant expired in July 2000 and Poarch secured delegation of historic preservation responsibilities, Poarch caused a significant portion of the Hickory Ground Site to be destroyed to make way for its second casino resort (Poarch already had one in Atmore).

101.    At Poarch's direction, archaeologists affiliated with Auburn University conducted a phase III excavation of the Hickory Ground Site.

102.    On information and belief, this excavation commenced in the years following delegation by the National Park Service to Poarch of historic preservation responsibilities, and ended in 2011.

103.    Phase III excavations are designed to record the data a site contains before a project proceeds and the site is lost.

104.    Collecting this data involves the archaeologists disturbing remains, funerary objects, and additional cultural materials through the excavation of soil across the site. After the items are excavated and collected, they are taken to a laboratory where the materials are washed and analyzed. Analysis for the funerary objects and other cultural materials and soil may also include Accelerator Mass Spectrometry dating (carbon-14 dating), chemical analysis, organic residue analysis, and other examinations.

105.    Not all cultural items are removed during a phase II excavation and before construction. Generally, the task of phase III investigators is to record archaeological information about the site before development. Archaeologists remove some material, but other cultural items are left at the site. This means that the construction at Hickory Ground likely destroyed many cultural items forever.

106.    On information and belief, no phase III excavation of the Hickory Ground Site had taken place before the excavation ordered by Poarch after the protective covenant expired.

107.    However, earlier investigations commissioned by Poarch concluded at least as early as 1990 that "well defined and undisturbed cultural remains," including human burials, were abundant at the Site.

108.    To perform the phase III excavation, Auburn University, at the behest of Poarch, obtained archaeological permits under the Archaeological Resources Protection Act. At least some, if not all, of these permits required that the permittee:

  a.   Abide by the "Archaeological Resources Protection Act … and its regulations … and interdepartmental regulations (25 CFR 261) as to Indian lands";

  b.   Abide by "the Native American Graves Protection and Repatriation Act of 1990 [and] the regulations for the curation of Federally-owned and administered archaeological collections (36 CFR 79)";

  c.   Follow special permit conditions requiring that any "[e]xcavation or removal of any Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony must be preceded by consultation or, in the case of tribal lands, consent of the appropriate Indian tribe or Native Hawaiian organization. Consultation should be conducted with the lineal descendants, tribal land owners, Native American representatives, and traditional religious leaders of all Indian tribes and Native Hawaiian organizations that can reasonably be assumed to be culturally associated with the cultural items"; and

  d.   "[W]ithin approximately 6 weeks of the conclusion of field work," submit "a preliminary report of work performed under th[e] permit, illustrated with

representative photographs and listing new and significant collected materials" to the Bureau of Indian Affairs.

109.   Poarch did not comply with the prerequisite conditions listed in the permits.

110.   Poarch did not consult with, or obtain consent from, the Muscogee (Creek) Nation, Hickory Ground Tribal Town, or Mekko Thompson, the recognized traditional religious leader of Hickory Ground Tribal Town, before commencing the phase III excavation at Hickory Ground.

111.   Nor did Poarch submit the required report of work performed under the permits to the Bureau of Indian Affairs.

112.   Likewise, none of the Federal Defendants consulted with, or obtained consent from, the Muscogee (Creek) Nation, Hickory Ground Tribal Town, or Mekko Thompson prior to granting each permit allowing the phase III excavation to take place.

113.   Nor did Interior "ensure that the work was conducted in accordance with statutory and regulatory requirements and any terms and conditions stipulated in the permit," as the permit stated it would do.

114.   With the grant of each ARPA permit, Interior performed a new application of its unauthorized decision to take lands into trust for Poarch, as the ARPA permits only allowed excavations to take place "on lands under the jurisdiction of the Department of Interior."

## F.   To Make Way For Its Casino Resort, Poarch Desecrates The Muscogee (Creek) Human Remains And Funerary Objects.

115.   The graves at Hickory Ground are abundant and unmarked.

116.   According to Auburn's archeologists who performed initial archaeological investigations at the Hickory Ground Site on behalf of Poarch, "[i]n almost all tested areas evidence of well defined and undisturbed cultural remains were discovered." Sheldon et al.,

*Additional Archaeological Investigations of the Hickory Ground Site*, p. 27 (1990). "[I]t is virtually impossible to undertake any construction activities without a high probability of seriously damaging the many irreplaceable archaeological deposits, artifacts, and human graves remaining at Hickory Ground." Declaration of Craig Sheldon, p. 3 (9/27/2001).

117.    At least 57 sets of human remains along with their associated funerary objects were exhumed during the phase III excavation.

118.    These human remains represent the direct lineal ancestors of Hickory Ground members. Under Muscogee (Creek) tradition and religion, Mekko George Thompson, as Chief of Hickory Ground, represents those members, including in decisions on the appropriate actions to take with regard to the remains.

119.    Numerous other artifacts were removed from the Site.

120.    On information and belief, Poarch directed that the cultural items from the Hickory Ground Site be stored in a manner that caused, and is continuing to cause, further damage to the items.

121.    Some cultural items, including human remains, are still in storage.

122.    On information and belief, the containers and buildings in which the items were stored (and in which some items, including human remains, are still stored) did not (and still do not) have proper ventilation, did not (and still do not) have temperature controls, improperly separated (and continue to improperly separate) funerary objects from the human remains with which they were buried, and did not (and still do not) otherwise meet minimum curatorial standards.

123.    This manner of storage can cause mold and accelerate decomposition.

124.    This manner of storage is viewed as abhorrent in the Muscogee (Creek) religion.

125.    Over 7,000 archaeological features, representing historic and ancient Muscogee (Creek) buildings, houses, ceremonial locations, and other sacred locations, were recorded during the phase III excavation and then destroyed by the excavation and later construction of the casino.

126.    The remains and artifacts removed from the site were subjected to archaeological examination.

127.    In the Muscogee (Creek) religion, archaeological examination violates the sanctity of tribal ancestors and destroys the ancestors' spiritual existence until they are put back at peace using appropriate religious protocol.

128.    In the Muscogee (Creek) religion, the soil that surrounds a body is considered part of the body, because as the remains decompose, they are absorbed into the soil. Thus, removing the soil from around the body is akin to removing a limb in the Muscogee (Creek) religion.

129.    On information and belief, Poarch failed to instruct Auburn to treat the soil surrounding human remains as part of the body during the excavation by removing the surrounding soil along with the bones.

130.    As a result, the excavations and subsequent construction resulted in parts of the bodies being permanently removed from the remains and spread across undisclosed locations.

131.    The casino resort was likely built on top of these body parts.

132.    Martin Construction, a construction company owned by a Poarch Band member, performed construction services to build the Wetumpka casino resort from 2012 to 2014.

133.    Martin Construction undertook the majority of these activities *after* Plaintiffs filed a complaint emphasizing the religious and cultural importance of the Site, notifying Defendants of violations of applicable law, and requesting immediate injunctive relief to halt these activities.

*See* Dkt. Nos. 1 & 57.

134.   On information and belief, Poarch and/or Martin Construction failed to maintain adequate records of inadvertent discovery of cultural items during construction activities.

135.   On information and belief, Poarch and Martin Construction failed to stop activity when cultural items were discovered.

136.   Constructing a building on a site prevents non-invasive analysis of whether remains are still present under the building.

**G.   Plaintiffs Repeatedly Request That The Hickory Ground Site Be Preserved As Poarch Promised.**

137.   On information and belief, Poarch first notified the Muscogee (Creek) Nation of the phase III excavation in 2006.

138.   By that time, some human remains from the Hickory Ground Site had already been exhumed and archaeologically examined as part of the phase III excavation.

139.   Beginning in 2006, Plaintiffs engaged in a years-long effort to persuade Poarch not to excavate and desecrate the remains of Plaintiffs' ancestors and other cultural items and to return any cultural items already excavated from Hickory Ground to their original resting place.

140.   This leader-to-leader effort is the traditional way that the Muscogee (Creek) Nation and Hickory Ground attempt to resolve disputes.

141.   This effort to negotiate methods for enforcing the common law and statutory protections of Plaintiffs' rights regarding Hickory Ground eventually failed in 2011.

142.   After visitation and discussion with Poarch and Auburn University in 2006 and 2007 regarding human remains and associated funerary objects that were being exhumed at Hickory Ground, Mekko George Thompson, on behalf of Plaintiffs, sent a letter dated March 12, 2008 to the Director of the National Park Service relaying eight allegations regarding NAGPRA

violations arising from disturbance and/or removal of human remains and funerary objects from the Hickory Ground Site.

143.   These allegations were based upon personal observations of Mekko Thompson and other members of Hickory Ground during their visits to the Hickory Ground Site.

144.   In an April 21, 2009 letter from the Department of the Interior to Auburn University, which was copied to Plaintiff Mekko Thompson, Interior conveyed its determination that Plaintiff Thompson's claims and allegations of violations under NAGPRA "have not been substantiated," based on eight factual findings and legal conclusions.

145.   Interior's determination was based largely on its incorrect determination that Poarch retained legal interest in the "NAGPRA items from the Hickory Ground site."  With this determination, Interior once again performed a new application of its unauthorized decision to take lands into trust for Poarch, as the determination relied not only on an incorrect application of NAGPRA, but on the presumption that the lands were "tribal lands" belonging to Poarch within the definitions in NAGPRA.

146.   However, under NAGPRA, Poarch never had either ownership or the right of control over the disposition of the excavated human remains and associated funerary objects. 25 U.S.C. §§ 3002(a), (c)(2)-(3).

147.   Instead, Mekko Thompson, as the representative of all lineal descendants of the ancestors buried at Hickory Ground under the Muscogee (Creek) traditional kinship structure, has ownership and right of control over the disposition of such remains and objects.

148.   Plaintiffs repeatedly requested that the remains of their ancestors and associated funerary objects be reinterred in their original resting places, that no further exhumations occur, that the construction and excavation stop, and that Hickory Ground be preserved in a natural

state.

149.    Poarch, through its officials, eventually refused all these requests. Upon

information and belief, Poarch never intended to comply with Plaintiffs' requests.

**H.    Poarch Intentionally Excludes The Muscogee (Creek) Nation And Hickory Ground From Decisions About Their Ancestors' Reburial And Conducts The Reburial In Secret.**

150.    After the years-long excavations were completed, and with the knowledge that

Plaintiffs' religion required the cultural items to be placed in their original and intended final

resting place, Poarch hurriedly reburied most of those remains and objects *away from* their final

resting places in 2012.

151.    Poarch did so while avoiding having any Muscogee (Creek) or Hickory Ground

members present for the reburial.

152.    Poarch accomplished this by unilaterally deciding to rebury the remains in April

2012 without consulting with the Muscogee (Creek) Nation or Hickory Ground Tribal Town, and

then purposefully providing late notice of the planned reburial to Mekko Thompson and the

Muscogee (Creek) Nation.

153.    On Wednesday, April 4, 2012, Buford Rolin (then-Chair of the Poarch Band) sent

letters via hardcopy mail to the P.O. Box addresses for Mekko Thompson and the Muscogee

(Creek) Nation Principal Chief. The letters stated that Poarch council members "hope that we"

(Mekko Thompson, the Muscogee (Creek) Nation, and Poarch) can "work together regarding re-

interment," and asked that Mekko Thompson and the Principal Chief "[p]lease let us know as

soon as possible if you would like to join us" for the reburial. Letter to Mekko Thompson

attached as Exhibit K hereto.

154.    The letters made no mention of the date of reinterment.

155.    The Principal Chief of the Muscogee (Creek) Nation did not receive the letter, only learning of it after Mekko Thompson brought a copy to his office.

156.    Once the Principal Chief learned about the letter, representatives of the Muscogee (Creek) Nation immediately called Rolin's office and the Poarch Band attorney.

157.    On Friday, April 13, 2012, the Principal Chief of the Muscogee (Creek) Nation, on behalf of the Muscogee (Creek) Nation and Mekko Thompson, sent a response to Rolin via facsimile and mail (attached hereto as Exhibit L) requesting a "Tribal Leader to Tribal Leader" discussion "as soon as possible."

158.    On Tuesday, April 17, 2012, Rolin sent another hardcopy letter (attached hereto as Exhibit M) to Mekko Thompson and the Principal Chief of the Muscogee (Creek) Nation, stating that "[w]hen we did not immediately hear from you in response to our April 4th letter, we assumed you did not wish to participate in the reinterment process" and that "[l]ast week we proceeded with the reinterment" of the remains and objects "in the manner to which we agreed during prior discussions."

159.    In other words, after six years of negotiations, Poarch sent ambiguous letters to Muscogee (Creek) Nation and Hickory Ground stating that it intended to rebury the remains and objects at some unidentified date in the future. Poarch then unilaterally reinterred the remains and objects without waiting for a response. It conducted the reinterment *less than 10 days* after sending the letters to Mekko Thompson and Chief Tiger.

160.    At no point did any Plaintiff agree to reinterment away from the remains' and associated funerary objects' original resting place.

161.    At the time of the reburial, Poarch was aware that Mekko Thompson and the Muscogee (Creek) Nation wanted the remains and associated funerary objects to be reinterred in

36

their original resting place.

162.     For example, in a letter to the Muscogee (Creek) Nation and Mekko Thompson in November 2010 (attached hereto as Exhibit N), Rolin acknowledged that "the beliefs and customs of the [Hickory Ground ceremonial grounds leadership]" required "reinterment in [the original resting] place," and that Hickory Ground had requested reburial in such places.

163.     At the time of the reburial, Poarch was aware that the remains and associated funerary objects that it was reburying would have to be exhumed again if they were to be reinterred in their original resting place.

164.     During reinterment, Poarch officials performed ceremonies viewed as abhorrent in the Muscogee (Creek) religion because they violate religious protocol, further desecrating and disrespecting the remains of the Hickory Ground people.

165.     On or about July 11, 2012, Poarch announced plans to construct a $246 million casino resort on Hickory Ground.

166.     Poarch moved forward with casino construction in October 2012, issuing a press release (attached hereto as Exhibit O) stating that "we are being faced with demands to remove ancestral remains that have already been reinterred. . . . We cannot change the fact that remains were found and removed. Those remains are now reinterred and we cannot support disturbing those remains again. . . . [N]o one cares more about the sanctity of our land . . . than we do."

167.     The press release falsely stated that the remains "have been reinterred at Hickory Ground Town [sic] in a manner previously agreed to by traditional leaders in Oklahoma."

168.     In response to continuing objections from the Plaintiffs to the desecration of their sacred site and their ancestors' burial sites, Defendant Stephanie Bryan, on behalf of Poarch, mailed a letter to tribal leaders nationwide.

169.    On information and belief, this letter was sent in 2013.

170.    In the letter (attached hereto as Exhibit P), Bryan attached a "fact sheet" containing statements indicating that Poarch believes that applicable law allows it to destroy and mistreat Muscogee (Creek) human remains and other cultural items on trust lands without notice to, consultation with, or consent from the Muscogee (Creek) Nation.

171.    The letter falsely states that Poarch "is under no legal obligation to negotiate with any other sovereign Indian nation" about activities on its trust lands.

172.    The letter falsely states that the "Wind Creek Wetumpka development protects our past."

173.    The letter also falsely states that "[Poarch] is in compliance with all applicable federal historic and cultural preservation laws pertaining to the property."

174.    The letter also misrepresents the importance, quality, and quantity of the archaeological resources at the Site, falsely suggesting that they were not well-preserved or significant.

175.    The letter falsely states that it was "consistent with the Muskogee [sic] Tribe's [sic] Constitution" to reinter the remains away from their original resting places "with prayer and ceremony."

176.    The letter falsely states that the remains were "reintered [sic] with dignity and honor."

177.    The letter makes no mention of the phase III excavation or removal of human remains or funerary objects pursuant to the phase III excavation.

178.    The statements listed in Paragraphs 171 to 177 are false and misleading, and highlight the outrageous disrespect with which Poarch treated the religious and cultural beliefs of

the Plaintiffs.

I.    **Hickory Ground Today And The False Promise Of Preservation.**

179.    In 1988, the Hickory Ground Site looked like this:



Figure 1. Aerial View of 1EE89. Photo Taken in 1988.

Cameron Wallace Gill, *Ceramic Analysis of Proto-Historic Domestic Structures from 1EE89: A Transitional Culture on the Coosa* 2 (Auburn University Thesis, December 13, 2010).

180.    The Hickory Ground Site looked like this by September 2012 (see next page):



Google Earth Image (9/23/2012).

181.   The numerous archaeological features and cultural items found throughout the

Site are shown on the next page:

40



Kelly Ervin, *A Comparative Spatial Analysis of Two Communities from the Hickory Ground Site in Wetumpka, Alabama* 26 (Auburn University Thesis, December 13, 2014).

182.   The archaeological features and cultural items relative to the casino resort are shown below:



*Id.* at 28.

183.    Today, the Hickory Ground Site looks like this:



Google Maps Image (2019).

184.   Poarch's wrongful actions are not only continuing, they are capable of repetition and evading review.

185.   There are still Muscogee (Creek) burials, funerary objects, and other cultural items in the lands at the Hickory Ground Site.

186.   There are also significant Muscogee (Creek) burials, funerary objects, and other cultural items in Poarch's Montgomery lands—which Interior also incorrectly and without authority took into trust.

187.   Under Poarch's stated interpretation of the law, it can destroy these sites and any burials contained therein without notifying the Muscogee (Creek) Nation.

188.   Poarch's conduct demonstrates that it is more than willing to act unilaterally, in breach of its preservation promises made to obtain the land and without regard to the requirements under the NPS Agreement and federal law. Prior to the phase III excavation, Poarch knew that Hickory Ground held historical, cultural, and spiritual significance to the Muscogee (Creek) Nation and Hickory Ground, and that any destruction or unearthing of remains at Hickory Ground would, in Poarch's own words from its preservation grant application, "destroy[] the cultural history of Creek people."

189.   Plaintiffs seek to restore, to the extent possible, the Hickory Ground Site to the condition it was in before the wrongful excavation and construction of the casino resort, to compel Poarch to abide by its agreement to preserve Hickory Ground "without excavation," to hold the Defendants responsible for the outrageous harm they caused to the Plaintiffs, and to declare Defendants' responsibilities under applicable law to prevent continuing violations of the Plaintiffs' rights.

## COUNT I: VIOLATION OF THE INDIAN REORGANIZATION ACT

190.    Under the Indian Reorganization Act, 25 U.S.C. § 5123 *et seq.*, a tribe must have been "under federal jurisdiction" in 1934 in order for Interior to have authority to take land into trust for the tribe. *See also Carcieri v. Salazar*, 555 U.S. 379 (2009).

191.    Because Poarch was not under federal jurisdiction in 1934, *see* Paragraph 76, the Secretary did not have authority to take the Hickory Ground Site into trust for Poarch. Thus, the trust transaction was unlawful, *ultra vires*, and void *ab initio*.

192.    Because the Hickory Ground Site was not validly taken into trust, Interior did not have authority to grant permits allowing the phase III archaeological excavations.

193.    The gaming at the Hickory Ground Site is illegal under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, because such gaming can only occur on certain trust lands. Because it was taken into trust in violation of the Indian Reorganization Act, the Hickory Ground Site does not constitute trust land where gaming can legally occur.

194.    The Hickory Ground Site is properly considered fee land owned by Poarch that is subject to state, not federal, law.

195.    Given Poarch's representations to the Muscogee (Creek) Nation that Poarch would always protect the Hickory Ground Site, Plaintiffs had no reason to believe they would be harmed by Interior's acceptance of the Hickory Ground Site in trust for Poarch in 1985.

196.    It was not until 2006 that Poarch notified the Muscogee (Creek) Nation that Poarch was not protecting the Hickory Ground Site from development "without excavation," as it had promised it would do.

197.    This Court should declare that Interior lacked authority to take land into trust because Poarch was not "under federal jurisdiction," and therefore Interior's taking of the Hickory Ground Site into trust for Poarch was void *ab initio*.

198.   Because the trust transaction is void, the Hickory Ground Site is not tribal reservation or federal land. Instead, Poarch retains fee simple title to the Hickory Ground Site.

199.   Gaming on the Hickory Ground Site is thus not legal under applicable Alabama law and the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* (authorizing gaming on "Indian lands" only).

## *OPERATIVE COUNTS IF THIS COURT RULES IN FAVOR OF PLAINTIFFS ON COUNT I AND DETERMINES INTERIOR LACKED AUTHORITY TO TAKE THE HICKORY GROUND SITE INTO TRUST FOR POARCH*

200.   Counts II-IV of this Complaint present claims that are applicable only if the Court determines that the Department of the Interior lacked authority to take the Hickory Ground Site into trust for Poarch.

## COUNT II: UNJUST ENRICHMENT (ALABAMA COMMON LAW)

201.   Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

202.   Poarch unjustly enriched itself by acquiring the Hickory Ground Site at no cost to Poarch and without objection from Plaintiffs based on promises that it would perpetually protect the Site. Instead of preserving the Site in accordance with its promises, Poarch has further unjustly enriched itself by destroying a large part of the Site to make way for a multimillion-dollar casino resort that is generating hundreds of millions of dollars in gambling and resort revenues for Poarch each year.

203.   In its application for federal preservation grant funds, Poarch expressly assured that its acquisition of the Hickory Ground Site would result in the "existing Hickory Ground tribal town in Oklahoma…. know[ing] their home in Alabama is being preserved," "without excavation"; that Poarch would provide "permanent protection of the site"; and that "Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral

home." Poarch warned that "[d]estruction of archaeological resources in Alabama … destroy[s] the cultural history of Creek people."

204.    Poarch continued to make promises of protection of Hickory Ground in the presence of Muscogee (Creek) Nation prior to Poarch's recognition.

205.    Poarch's bid for federal recognition was accompanied by a proposal to take Hickory Ground into trust as part of Poarch's initial reservation.

206.    Had the Muscogee (Creek) Nation known that Poarch would desecrate Hickory Ground, it would have taken steps to prevent Poarch from acquiring the land and would have opposed Poarch's bid for federal recognition.

207.    In justifiable reliance on Poarch's promises in the federal preservation grant application, including promises that Poarch would provide "permanent protection of the site," "without excavation," so that "Creeks from Oklahoma may return and visit their ancestral home," the Muscogee (Creek) Nation did not object to Poarch's acquisition of Hickory Ground in fee or in trust. Instead, the Muscogee (Creek) Nation supported Poarch's bid for recognition.

208.    Thus, Poarch not only acquired the Hickory Ground Site at no cost, it also gained the benefit of the Muscogee (Creek) Nation's support in its federal recognition bid and the Nation's lack of objection to Poarch acquiring the Hickory Ground Site.

209.    Poarch further unjustly enriched itself by expediting the construction and opening of the casino through (1) knowingly and intentionally breaching the NPS Agreement by *avoiding* providing notice to, or consulting with, Plaintiffs or involving the Plaintiffs in any way with respect to the exhumation or reburial of their deceased family members; and (2) choosing to continue construction after Plaintiffs repeatedly demanded that Poarch cease all plans for development of the Site and return the human remains, funerary objects, and other cultural items

to their original resting places.

210.    Poarch knew that it would not have obtained the preservation funds, the Muscogee (Creek) Nation's support and lack of objection to acquisition of the Site, or the National Park Service's Agreement to entrust it with historic preservation responsibilities if it had disclosed that it would desecrate, damage and destroy large portions of the Site in the future.

211.    It would be inequitable for Poarch, who benefited from acquiring the Hickory Ground Site (at no cost) based on its promises of permanent protection, to profit to the tune of billions of dollars in gambling revenues by breaching those promises and irreparably harming those who trusted that it would keep its promises.

212.    The Court should impose equitable remedies, among other things, requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and Poarch THPO to abide by Poarch's promises and restore the property, to the greatest extent possible, to its pre-excavation and pre-construction condition.

213.    The Court should order the Federal Officer Defendants to take any actions that may be necessary to implement the above-described equitable remedies.

### COUNT III: PROMISSORY ESTOPPEL (ALABAMA COMMON LAW)

214.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

215.    Poarch promised the Muscogee (Creek) Nation and Hickory Ground that it would preserve the Hickory Ground Site in perpetuity.

216.    The Muscogee (Creek) Nation relied on that promise to its detriment in not objecting to Poarch's acquisition of the property, either in fee or trust, and in supporting Poarch's federal recognition.

217.    Poarch was aware that, had the Muscogee (Creek) Nation known that Poarch

would not protect the Hickory Ground Site as it promised and instead would destroy Plaintiffs' sacred burial grounds and religious sites, the Muscogee (Creek) Nation would have objected immediately to Poarch's acquisition of the land in any status (fee or trust) and made efforts to prevent the acquisition.

218.   The injustice of Poarch enriching itself by breaking its promises and thereby causing irreparable harm to the Muscogee (Creek) Nation and Hickory Ground can only be avoided by enforcing those promises. *See Beatty v. Kurtz*, 27 U.S. 566, 584-85 (1829); *Bessemer Land & Sykes v. Payton*, 441 F. Supp. 2d 1220, 1224 (M.D. Ala. 2006); *Improv. Co. v. Jenkins*, 111 Ala. 135, 148 (1895).

219.   The Court should impose equitable remedies, among other things, requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and Poarch THPO to abide by Poarch's promises and restore the property, to the greatest extent possible, to its pre-excavation and pre-construction condition.

220.   The Court should order the Federal Officer Defendants to take any actions that may be necessary to implement the above-described equitable remedies.

## COUNT IV: OUTRAGE
### (Plaintiff Mekko Thompson Against The Individual Defendants And Defendant Martin Construction)

221.   Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.  Plaintiff Mekko Thompson is the only Plaintiff asserting a claim under this Count.

222.   Under Alabama law, outrage occurs where the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.

223.   The Individual Defendants, knowing that Hickory Ground and the human remains and funerary objects buried there were sacred in the culture and traditional religion of Mekko Thompson, intentionally and outrageously caused the desecration of Hickory Ground by ordering that the bodies and funerary objects buried there be exhumed, disassociated, dismantled, analyzed, and reinterred in a manner considered abhorrent in the Muscogee (Creek) traditional religion.

224.   Plaintiffs were robbed of the promise they relied upon—that Poarch would always protect the Hickory Ground Site so that it would "be a place where Creeks from Oklahoma may return and visit their ancestral home" and so that the Muscogee (Creek) Nation and Hickory Ground members would "know their home in Alabama is being preserved."

225.   As the living descendants of the deceased, Plaintiffs, including Mekko Thompson, owe a moral and religious duty to their ancestors under Plaintiffs' traditional religion to care for the graves and bodies of the deceased. Failing in that duty is considered to be a failure to one's ancestors, Tribal Town, Clan, and culture. As traditional chief of Hickory Ground Tribal Town, Mekko Thompson has a heightened responsibility to fulfill this duty on behalf of all Hickory Ground Tribal Town members. The Individual Defendants' desecration of Plaintiffs' deceased family members at Hickory Ground has caused and is continuing to cause Mekko Thompson abject pain, sorrow, anguish, torment, suffering, helplessness, grief, and anger.

226.   The remains of the Hickory Ground members' deceased family members were placed in newspaper and plastic bins and left in a non-air conditioned shed through numerous hot Alabama summers. The Individual Defendants even authorized the bodies of infants to be exhumed. Bodies of Plaintiffs' deceased family members were left exhumed, exposed, ill-attended, and disregarded for years before Poarch wrongfully reinterred them away from their

final resting places. Some remains, funerary objects, and cultural items have not been reinterred and are still being stored in this manner.

227.    The Individual Defendants intentionally concealed what was happening to Plaintiffs' ancestors from Plaintiffs, including Mekko Thompson. The fact that such a terrible tragedy occurred without their knowledge has imposed an enduring feeling of helplessness and fear in Mekko Thompson that this will happen again. Mekko Thompson, as chief of Hickory Ground Tribal Town, has not been able to assure the children and young people of the Tribal Town, or other related Clan members or Tribal Towns, that the Individual Defendants will be held accountable for their egregious actions, or that Poarch will not commit similar atrocities in the future.

228.    The Individual Defendants further caused emotional distress to Mekko Thompson by exhibiting blatant carelessness about the religious, historical, and cultural importance of the Site to Plaintiffs, and by affirmatively and repeatedly lying about what happened at Hickory Ground. It would have been unthinkable to the Plaintiffs, including Mekko Thompson, that the Individual Defendants would commit such a sacrilege against the ancestors of any people or the desecration of any people's hallowed ground.

229.    The Muscogee (Creek) Nation trusted Poarch and Poarch's leadership, who claim to be Creek people, to understand the Muscogee (Creek) members' religious and cultural duties to their ancestors. Plaintiffs trusted Poarch to protect Hickory Ground forever, just as Poarch promised to do. Instead, the Individual Defendants intentionally prevented Mekko Thompson, and Plaintiffs generally, from fulfilling Plaintiffs' duties to their deceased family members and sacred grounds, and caused Mekko Thompson the irreparable anguish of knowing that the ancestors were wrenched from what was intended to be their final resting places, disrespected,

and grotesquely mistreated.

230.    Martin Construction, having notice of the Hickory Ground Site's religious and cultural significance to Plaintiffs and to Mekko Thompson specifically through having been served with Plaintiffs' Complaint, *see* Dkt. Nos. 1 & 57, proceeded with construction on the Hickory Ground Site.

231.    On information and belief, Martin Construction desecrated Plaintiffs' ancestors' remains by dismembering them through removing and discarding soil—part of those ancestors' bodies.

232.    On information and belief, Martin Construction also failed to stop construction even after cultural items were discovered, intentionally desecrating gravesites of extreme religious and cultural importance to Plaintiffs.

233.    The Individual Defendants' and Martin Construction's intentional, extreme, and outrageous behavior caused Mekko Thompson emotional distress so severe that no reasonable person should be expected to endure it. The harm and emotional distress from the Individual Defendants' wrongful actions is, and will be, continuing until such time as Poarch is required to take appropriate remedial measures.

234.    Plaintiffs do not seek monetary damages against any tribal or federal defendant in his or her official capacity. Mekko Thompson seeks monetary damages against the Individual Defendants in their individual capacities, and against Martin Construction, for the tort of outrage that they personally committed against him.

235.    This Court should order the Individual Defendants and Martin Construction to pay damages to Mekko Thompson for the extreme emotional distress they have caused him to suffer.

***OPERATIVE COUNTS IF THIS COURT RULES AGAINST PLAINTIFFS ON COUNT I***

236.    Counts V-IX of this Complaint present claims that are applicable if the Court determines that the Department of the Interior had authority to, and properly did, take the Hickory Ground Site into trust for Poarch.

## COUNT V: UNJUST ENRICHMENT (FEDERAL COMMON LAW)

237.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

238.    Because the elements of unjust enrichment under both federal and Alabama common law are substantially the same, Plaintiffs specifically incorporate the allegations in Paragraphs 202 through 213 above without repeating them here.

## COUNT VI: PROMISSORY ESTOPPEL (FEDERAL COMMON LAW)

239.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

240.    Because the elements of promissory estoppel under both federal and Alabama common law are substantially the same, Plaintiffs specifically incorporate the allegations in Paragraphs 215 through 220 above without repeating them here.

## COUNT VII: VIOLATION OF THE NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT

241.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

242.    Enacted in 1990, NAGPRA safeguards the rights of Native Americans by protecting tribal burial sites and rights to items of cultural and religious significance to Native Americans. Cultural items protected under NAGPRA include Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony. 25 U.S.C. § 3001(3).

NAGPRA was intended to protect the dignity of the human body after death by ensuring that Native American graves and remains be treated with respect.

243.    NAGPRA confers jurisdiction to federal courts over "any action brought by any person alleging a violation of this Act." 25 U.S.C. § 3013.

244.    Under NAGPRA, the intentional removal or excavation of Native American cultural items from Federal or tribal lands is permitted only if:

    a.  Such items are excavated or removed pursuant to a permit issued under section 470cc of Title 16, which states that, before any permit is issued, "any Indian tribe which may consider the site as having religious or cultural importance" be notified and meaningfully consulted if such issuance "may result in harm to, or destruction of, any religious or cultural site";

    b.  Such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate Indian tribe under 25 U.S.C. § 3002(c), 43 C.F.R. § 10.5, 25 C.F.R. § 262.5(d) (providing that "[d]etermination as to which tribe is the appropriate tribe shall be made in accordance with § 262.8(a)"), and 25 C.F.R. § 262.8(a) (listing lineal descendants as having the highest priority);

    c.  The custody (ownership and right of control) of the disposition of such items is compliant with the priority order provided in NAGPRA, 43 C.F.R. § 10.6; *and*

    d.  Proof of consultation or consent is shown to the Federal agency official responsible for the issuance of the required permit.

25 U.S.C. § 3002(c); 43 C.F.R. §§ 10.3, 10.5, 10.6; 25 C.F.R. § 262.5(d); and 25 C.F.R. § 262.8(a).

245.    Sections 5 and 7 of the NPS Agreement likewise require Poarch to consult with

Indian tribes on whose traditional lands the planned activity will occur, along with associated individuals and groups who would be affected by Poarch's activity on such lands.

246.    As a delegee of federal functions, Poarch and its officials performing the delegated functions are federal actors, liable as federal officials.

247.    The following paragraphs allege multiple independent violations of NAGPRA and conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

248.    Neither Poarch nor the Federal Defendants followed any of the requirements listed in Paragraph 244.

249.    Likewise, Poarch violated the NPS Agreement by failing to consult with Plaintiffs prior to authorizing excavations and construction on the Hickory Ground Site.

250.    NAGPRA and its associated provisions in ARPA require consent from the Muscogee (Creek) Nation, as *parens patriae* representative of the lineal descendants at the Site and as the tribe with the closest cultural and religious connection to the Site, prior to excavation of Native American cultural items from the Hickory Ground Site. *See* 25 C.F.R. § 262.5(d), 262.8(a).

251.    As the traditional kinship system representative of lineal descendants of those buried at the Hickory Ground Site, Mekko Thompson has the right to custody of the human remains and associated funerary objects at the Hickory Ground Site. *See* 25 U.S.C. § 3002; 43 C.F.R. §§ 10.6, 10.14.  As the tribe most closely culturally and religiously affiliated with the Hickory Ground Site, the Muscogee (Creek) Nation has the right to custody over all other cultural items at the Site. *Id.*; *see infra* Paragraphs 262-270.

252.    In violation of NAGPRA and ARPA, neither Poarch nor the Federal Defendants

have given custody of (1) the human remains and funerary objects excavated at the Hickory Ground Site to Mekko Thompson; or of (2) the other cultural items found at the Site to the Muscogee (Creek) Nation. 25 U.S.C. § 3002; 43 C.F.R. § 10.3; 25 C.F.R. § 262.5(d); 25 C.F.R. § 262.8(a).

253.    The National Park Service also violated NAGPRA by failing to establish a preservation program for the protection of historic properties that ensures that the agency's procedures for compliance with Section 106 of the NHPA "provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with section 3(c) of [NAGPRA]." 25 U.S.C. § 3002(c).

254.    No final inventory or report regarding the cultural items recovered at the Hickory Ground Site has been prepared, nor was the Muscogee (Creek) Nation consulted regarding such report, as required by NAGPRA.

255.    Furthermore, on information and belief, Poarch and Martin Construction violated NAGPRA by failing to follow its mandatory procedures regarding inadvertent discoveries of cultural items. On information and belief, no report of such discoveries was made to the appropriate officials, and even if there were such reports, Poarch and Martin Construction failed to stop the construction activity and take reasonable steps to protect the cultural items before resuming activity. *See* 25 U.S.C. § 3002(b)-(c) and 43 C.F.R. § 10.4.

256.    Had Poarch and the Federal Defendants complied with the consultation requirements of NAGPRA, they would have been informed that the Muscogee (Creek) religion requires the following:

  a.    That no destructive scientific study take place on the cultural items, as such testing violates the Muscogee (Creek) religious beliefs that the dead should

remain undisturbed;

b. That, if disturbance is absolutely unavoidable, all parts of the human remains, including the surrounding soils, be removed and held together during excavation;

c. That, if disturbance is absolutely unavoidable, the excavated remains and funerary objects be stored together in a certain fashion;

d. That, if disturbance is absolutely unavoidable, Mekko Thompson, as religious and ceremonial leader of Hickory Ground, prescribe removal and reburial procedures that must be followed for the cultural items under Muscogee (Creek) religious protocol, including protocol for bundling of the remains and funerary objects;

e. That, if disturbance is absolutely unavoidable, Mekko Thompson and other representatives of the Muscogee (Creek) Nation be present during handling of any remains or funerary objects, for any purpose, to ensure that such treatment conformed with, to the greatest extent possible, the Muscogee (Creek) religion.

257.   Had Poarch and the Federal Defendants complied with NAGPRA, the Muscogee (Creek) Nation would have refused consent for the excavation of the Hickory Ground Site.

258.   Even if the Muscogee (Creek) Nation's advance consent were not required prior to any excavation and construction (it was), NAGPRA still required Poarch and the Federal Defendants to meaningfully consult with the Muscogee (Creek) Nation prior to excavation or construction. If Poarch and the Federal Defendants had consulted with Plaintiffs as they were required to do under NAGPRA, they could have avoided tragedies such as the permanent separation of body parts from the human remains of Plaintiffs' deceased family members.

259.   Further, if Poarch and Martin Construction had followed NAGPRA's procedures for inadvertent discoveries, further tragedies such as the permanent loss of remains and other

cultural items could have been avoided.

260.    NAGPRA gives this Court the "authority to issue such orders as may be necessary to enforce" the statute. 25 U.S.C. § 3013.

261.    To enforce the statute, this Court should issue an injunction requiring Poarch Council Defendants, the PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants to obtain consent from the Muscogee (Creek) Nation for the excavation and construction of the casino resort, and, if the Muscogee (Creek) Nation does not consent:

a.    Requiring the Poarch Council Defendants, Poarch THPO, and PCI Gaming Authority Board Defendants to undo, to the greatest extent possible, the unconsented-to actions and restore the Site to its prior condition, to the greatest extent possible;

b.    Requiring the Federal Officer Defendants and Auburn to make such approvals and take such actions as may be necessary to accomplish reversal of the unconsented-to actions and restoration of the Site;

c.    Requiring Poarch Council Defendants, the Poarch THPO, the PCI Gaming Authority Board Defendants, the Federal Officer Defendants, and Auburn to involve the Muscogee (Creek) Nation throughout this process, including abiding by the Muscogee (Creek) Nation's instructions regarding how all cultural items should be handled at all stages of the process; and

d.    Ordering such relief against Martin Construction as may be appropriate given its violations of NAGPRA's provisions regarding inadvertent discoveries and its continuation of construction despite Plaintiff's lawsuit.

**COUNT VIII: PORTIONS OF NAGPRA AND ARPA, IF CONSTRUED IN A MANNER THAT RESULTS IN A SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGION, VIOLATE THE FIRST AMENDMENT, THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT, AND THE RELIGIOUS FREEDOM RESTORATION ACT**

262. Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

263. The First Amendment of the United States Constitution prohibits Congress from making any law "respecting an establishment of religion, or prohibiting the free exercise thereof."

264. Similarly, the Religious Land Use and Institutionalized Persons Act ("RLUIPA") prohibits the government from imposing or implementing "a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.S. § 2000cc.

265. Likewise, the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*, was enacted in 1993 and requires that federal governmental action that substantially burdens a tribe's religious practice or exercise must promote a compelling interest (rather than simply having a rational basis). Its protections encompass tribal religious beliefs. *See* American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, *et seq*.

266. NAGPRA and related provisions in ARPA are laws specifically directed at religion and religious practice, and establish rules governing whether intentional removal or excavation of Native American cultural items from Federal or tribal lands can take place. If such excavation *can* take place, NAGPRA establishes a priority preference regarding who should be

given the excavated cultural items.

267.    Specifically, excavation of Native American cultural items from tribal lands is not permitted without the consent of the "appropriate Indian tribe." *See supra* ¶ 244. If excavation is allowed, NAGPRA provides that the cultural items be given to, in order of priority: first, the lineal descendants; second, the tribal landowner (in the event lineal descendants cannot be ascertained); third, the tribe who aboriginally occupied the subject lands; and fourth, the tribe with the "strongest cultural relationship" with the cultural items.

268.    As discussed in greater detail above, Plaintiffs owe a moral and religious duty to their ancestors under Plaintiffs' traditional religion to ensure protection of the graves, bodies, and cultural items of the deceased. If those graves, bodies, or cultural items are disturbed, Plaintiffs are required by their religion to bring such remains or items back to peace with the appropriate religious protocol. Government action that does not allow them to do so forces them to choose between either abandoning their religious beliefs or facing civil or criminal sanctions for fulfilling their religious duty to their ancestors.

269.    To the extent that the requirement of consent of the "appropriate Indian tribe" under ARPA and the related provisions in NAGPRA are interpreted to allow any tribe other than the Muscogee (Creek) Nation to provide consent for excavation or removal of cultural items with respect to the Hickory Ground Site, (1) there is no compelling governmental interest, or even rational basis, justifying the attendant burden on Plaintiffs' religion, (2) the law does not use the least restrictive means to further the governmental interest; and (3) these provisions violate the First Amendment as applied to the Muscogee (Creek) Nation, and irreconcilably conflict with the Religious Land Use and Institutionalized Persons Act and Religious Freedom Restoration Act.

270.    To the extent that NAGPRA and the related provisions in ARPA are interpreted to

provide higher priority of ownership of the excavated cultural items in any entity other than

Mekko Thompson or the Muscogee (Creek) Nation, (1) there is no compelling governmental

interest, or even rational basis, justifying the attendant burden on Plaintiffs' religion, (2) 25

U.S.C. § 3002(a)(2) and associated provisions do not use the least restrictive means to further the

governmental interest; and (3) 25 U.S.C. § 3002(a)(2) and associated provisions (i) violate the

First Amendment as applied to Plaintiffs, who have an inviolable religious and cultural right to

the remains and other cultural items, and (ii) irreconcilably conflict with the Religious Land Use

and Institutionalized Persons Act and Religious Freedom Restoration Act.

## COUNT IX: VIOLATION OF THE ARCHEOLOGICAL RESOURCES PROTECTION ACT

271.   Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the

preceding Paragraphs.

272.   Under ARPA, "[n]o person may excavate, remove, damage, or otherwise alter or

deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological

resource located on public lands or Indian lands unless such activity is pursuant to a permit

issued under [16 U.S.C. § 470cc]." 16 U.S.C. § 470ee; *see also* 25 C.F.R. § 262.3(a).

273.   16 U.S.C. § 470cc(c), 25 C.F.R. § 262.5, 25 C.F.R. § 262.7, and the permits

obtained by Auburn to excavate at the Hickory Ground Site require that, at least 30 days before

issuing the permit, the Federal land manager notify all Indian tribes which may consider the site

as having religious or cultural importance if the permit may result in harm to, or destruction of,

any religious or cultural site, as determined by the Federal land manager.

274.   The following Paragraphs allege multiple independent violations of ARPA and

conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of

discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

275.    On information and belief, Poarch officials falsely represented that no religious or cultural site would be harmed or destroyed by the proposed work at Hickory Ground, in violation of ARPA, 25 C.F.R. § 262.5(c); the NPS Agreement; and Poarch's agreement to perpetually preserve Hickory Ground.

276.    ARPA also requires consent from the Muscogee (Creek) Nation, as *parens patriae* of the lineal descendants of those buried at the Site and as the tribe with the closest cultural and religious connection to the Site, prior to excavation of Native American cultural items from the Hickory Ground Site. *See* 25 C.F.R. §§ 262.5(d), 262.8(a).

277.    The Federal Defendants did not notify, consult with, or get consent from the Muscogee (Creek) Nation prior to issuing the ARPA permits, and did not ensure Poarch notified, consulted with, or obtained consent from the Muscogee (Creek) Nation, in violation of ARPA, the permit conditions, the NPS Agreement, and the Federal Defendants' trust responsibility to the Muscogee (Creek) Nation.

278.    Even if it were legal to issue such permits without the Muscogee (Creek) Nation's consent (it is not):

    a.    Poarch did not meet the conditions precedent of those permits;

    b.    The Bureau of Indian Affairs issued permits allowing excavation of Hickory Ground without verifying that the conditions precedent were met;

    c.    Neither Poarch nor the Federal Defendants notified or consulted with the Muscogee (Creek) Nation to discuss its interests, including ways to avoid or mitigate potential harm or destruction, prior to the Bureau of Indian Affairs issuing the permits, in violation of ARPA;

    d.    The activities pursuant to the permits were "inconsistent with a[] management

plan"—specifically, the NPS Agreement and Poarch's agreement to perpetually preserve the Hickory Ground Site;

e.  Poarch failed to curate the archaeological resources in accordance with 36 C.F.R. § 79;

f.  The Bureau of Indian Affairs did not "ensure that the work was conducted in accordance with statutory and regulatory requirements and any terms and conditions stipulated in the permit."

*See* Permit Conditions, *supra* Paragraph 108; 16 U.S.C. § 470cc(b)(4); 43 C.F.R. § 7.7; 25 U.S.C. § 3002(c).

279.   Furthermore, on information and belief, Poarch (and/or Auburn at the behest of Poarch) obtained some permits under section 470cc of Title 16, but such permits did not cover the full time period during which the phase III excavations were performed under Poarch's direction on the Hickory Ground Site.

280.   Thus, Poarch also violated ARPA by causing the excavation, removal, damage, alteration and defacement of archaeological resources at the Hickory Ground Site without a valid permit, as Poarch failed to meet the permit conditions precedent listed in Paragraph 108.

281.   Because the above ARPA provisions are incorporated into NAGPRA, this Court has the "authority to issue such orders as may be necessary to enforce" those provisions. 25 U.S.C. § 3013.

282.   To enforce these provisions, this Court should issue an injunction requiring the Poarch Council Defendants, the PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants to obtain consent from the Muscogee (Creek) Nation for the excavation and construction of the casino resort, and, if the Muscogee (Creek) Nation does not

consent, issue an injunction:

    a.   Requiring the Poarch Council Defendants, the PCI Gaming Authority Board Defendants, and the Poarch THPO to undo, to the greatest extent possible, the unconsented-to actions and restore the Site to its prior condition, to the greatest extent possible; and

    b.   Requiring the Federal Officer Defendants and Auburn to make such approvals and take such actions as may be necessary to facilitate reversal of the unconsented-to actions and restoration of the Site.

### *OPERATIVE COUNTS REGARDLESS OF RULING ON COUNT I*

283.    Counts X through XI present claims that are applicable regardless of how the Court rules on Count I, which relates to the authority of the Department of the Interior to take the Hickory Ground Site into trust for Poarch.

### COUNT X: VIOLATION OF THE NATIONAL HISTORIC PRESERVATION ACT

284.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

285.    The Hickory Ground Site is subject to protection under the NHPA because it is listed as a historic property on the National Register of Historic Places.

286.    On information and belief, the Hickory Ground Site is currently considered to include both tribal land (reservation lands, 54 U.S.C. § 300319) and federally-controlled land (trust land, 54 U.S.C. § 306101) as defined in the NHPA.

287.    The Secretary of Interior and the National Park Service are responsible for delegations of their historic preservation responsibilities, including consulting with tribes whose aboriginal land may be affected by such delegation. 54 U.S.C. § 302702. Despite any such delegation, the National Park Service and Bureau of Indian Affairs retain all non-delegable

responsibilities arising from the trust relationship between the United States and the Muscogee (Creek) Nation. *See* 36 C.F.R. § 800.2(c)(2)(ii)(B)-(C).

288.    When the National Park Service delegates its authority, the delegee carries out the delegated responsibilities on behalf of the National Park Service. Poarch's assumption of responsibility under the NHPA pursuant to federal law means that Poarch acts as a *de facto* government agency with respect to the delegated responsibilities.

289.    Poarch's, the National Park Service's, and the Bureau of Indian Affairs' performance of (and failure to perform) their historic preservation responsibilities regarding the Hickory Ground Site are an "undertaking" within the meaning of 54 U.S.C. § 300320.

   a.    Poarch received federal financial assistance to carry out its historic preservation responsibilities. *See, e.g.*, 2011 Preservation Grant Announcement, *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/press_release/pdf/idc014222.pdf (awarding Poarch over $30,000).

   b.    The excavation and construction at the Hickory Ground Site also required prior Bureau of Indian Affairs' approval under ARPA, the excavation permit conditions, NAGPRA, and the trust responsibilities arising therefrom. Furthermore, the gaming at the Hickory Ground site required the approval of gaming ordinances by Interior—an approval that is dependent on the land validly being held in trust.

290.    The following Paragraphs allege multiple independent violations of NHPA and conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

**A.   Interior And Porch Failed To Comply With Their Obligations To Meaningfully Consult With Plaintiffs.**

291.   The NHPA requires Interior to consult with "any Indian tribe … that attaches religious and cultural significance to" a historic property. 54 U.S.C. § 302706.

292.   This consultation duty extends through the entire NHPA Section 106 process. *See* 36 C.F.R. §§ 800.2, 800.4(a)(4), 800.4(d)(2), 800.5(a), 800.5(d)(2), 800.6.

293.   Interior never consulted with the Muscogee (Creek) Nation regarding the excavation or construction of a casino resort on the Hickory Ground Site, or the reburial of the human remains and associated funerary objects, in violation of the aforementioned provisions and its trust responsibilities to the Muscogee (Creek) Nation.

294.   The Federal Defendants and Porch also failed to invite the Advisory Council on Historic Preservation to participate in the Section 106 process regarding Porch's planned activities prior to those activities being undertaken, as required by the NHPA.

295.   Porch did not consult with the Muscogee (Creek) Nation prior to authorizing the phase III excavation; actively avoided consulting with the Muscogee (Creek) Nation regarding the reburial of the human remains and associated funerary objects; and did not meaningfully consult with the Muscogee (Creek) Nation regarding the construction of the casino resort, as Porch made no adjustments to its plans in response to the adverse effects the construction would clearly have on the Hickory Ground Site.

296.   The National Park Service has never consulted with the Muscogee (Creek) Nation regarding the continued delegation to Porch of historic preservation responsibilities, despite the continuing threat to Muscogee (Creek) religious and cultural sites caused by the continuing delegation. These failures violate the 54 U.S.C. §§ 302702 & 302706, the NPS Agreement, and the National Park Service's trust responsibilities to the Muscogee (Creek) Nation.

B.   **Interior And Porch Failed To Take Into Account The Effect On The Hickory Ground Site Of Allowing Excavation And Construction Of A Casino Resort, And Interior Failed To Take Into Account The Effect On The Hickory Ground Site Of Delegating Historic Preservation Responsibilities To Porch.**

297.    The NHPA requires Interior to "take into account the effect of [any] undertaking" on any National Register-listed site, in consultation with all tribes that "attach[] religious and cultural significance" to the site. 54 U.S.C. § 306108; *see also* 36 C.F.R. § 800.5.

298.    Porch is required to do the same under the NPS Agreement.

299.    The Bureau of Indian Affairs did not take into account, or consult with the Muscogee (Creek) Nation regarding, the effect of approving/licensing Porch's excavation of the Hickory Ground Site before granting permits for the excavation, and did not take into account the effect of Porch's construction of a casino resort over the Hickory Ground Site before approving the gaming operation at the Site.

300.    Porch likewise did not take into account, or consult with the Muscogee (Creek) Nation regarding, the effect of Porch's excavation of cultural resources and construction of a casino resort over the Hickory Ground Site.

301.    The National Park Service failed to take into account the effect of delegating preservation responsibilities to Porch on the Hickory Ground Site before executing such delegation, and has failed to take into account the effect of *continuing* to delegate such responsibilities after Porch failed to comply with the NPS Agreement and other applicable law.

302.    The National Park Service further violated the NPS Agreement and the NHPA by failing to perform the required reviews of Porch's performance under the Agreement and by failing to perform required reviews of the threats to the Hickory Ground Site. *See* NPS Agreement Section 14; 54 U.S.C. §§ 302108.

303.    Had the National Park Service timely performed evaluations of Porch's

compliance with the NPS Agreement, it would have "determine[d] that a major aspect of [the tribal] program is not consistent with" the NHPA, obligating the Secretary to "disapprove the program and suspend in whole or in part any contracts or cooperative agreements … until the program is consistent with [the NHPA]." 54 U.S.C. § 302302; *see* also NPS Agreement § 15.

## C.   Interior and Poarch Failed To Seek Ways To Avoid, Minimize, Or Mitigate The Harm To The Hickory Ground Site.

304.   36 C.F.R. § 800.6 required Interior and Poarch (through the NPS Agreement) "to seek ways to avoid, minimize, or mitigate the adverse effects" of the casino project on the Site through, in part, (1) consulting with the Muscogee (Creek) Nation and (2) inviting the Advisory Council on Historic Preservation to participate in the Section 106 process.

305.   The excavation of, and construction of a casino resort at, the Hickory Ground Site and the reburial of excavated human remains and associated funerary objects had numerous foreseeable adverse effects, including but not limited to violations of the Muscogee (Creek) religion, physical destruction and desecration of part of a Muscogee (Creek) sacred site; a change of the character of the property's use or of physical features within the Site's setting that contribute to its historic significance; and introduction of visual, atmospheric, and audible elements that diminish the integrity of the Site's significant historic features. 36 C.F.R. § 800.5(a).

306.   Neither Poarch nor Interior sought ways to avoid, minimize, or mitigate the adverse effects to the Hickory Ground Site prior to commencement of:

   a.   The phase III excavation;

   b.   The reburial of human remains and associated funerary objects; or

   c.   The construction on the Site.

307.   No memorandum of agreement was executed or implemented with respect to the

Hickory Ground Site. 36 C.F.R. § 800.6.

308.    Even if it were legal to excavate the Hickory Ground Site without the consent of the Muscogee (Creek) Nation (it is not), the Poarch Council Defendants', PCI Gaming Authority Board Defendants', and Martin Construction's decision to proceed with the casino project without first completing the required historic preservation review process foreclosed options that would provide greater—and crucial—protection to burials and the Site, including a no-build alternative and alternative locations.

309.    To the extent that Federal Defendants have concluded that any effects of the phase III excavation, construction, or reburial would be acceptable or adequately mitigated, such conclusion represents a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and thus a violation of the NHPA and the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

**D.    Poarch Violated Its Historic Preservation Responsibilities Under the NPS Agreement.**

310.    Poarch's failure to notify and consult with Plaintiffs or take into account Plaintiffs' views on its planned actions that would affect the traditional lands (i.e., the Hickory Ground Site) of the Muscogee (Creek) Nation violated Poarch's responsibilities under Section 7 of the NPS Agreement.

311.    Poarch's failure to follow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800, including its failure to consult with the appropriate federal agencies in accordance with Section 106, violated Poarch's responsibilities under Sections 1(G) and 5 of the NPS Agreement.

E.     **Poarch's And The Federal Defendants' Violation Of Their Historic Preservation Responsibilities Has Caused Serious, Irreparable, And Ongoing Harm to Plaintiffs.**

312.   Had the Federal Defendants or Poarch timely consulted the Muscogee (Creek) Nation regarding the planned activities at the Hickory Ground Site, destruction of a holy site of cultural and religious significance to the Nation could have been avoided, or, even if the activities had continued, Plaintiffs could have in the very least instructed the Federal Defendants and Poarch regarding how to treat the cultural items excavated at the site to avoid further mistreatment of the items in violation of the law and the Muscogee (Creek) religion.

313.   Had the Federal Defendants and Poarch timely involved the Advisory Council on Historic Preservation prior to excavation and construction of a casino resort over the Hickory Ground Site, the Advisory Council would have alerted the Federal Defendants and Poarch of the dire effects of the planned undertaking on Hickory Ground and the necessity of consulting with the Muscogee (Creek) Nation.

314.   When the Advisory Council on Historic Preservation was finally notified of Poarch's excavation activities in 2006, it opined that the actions undertaken by Poarch had "adversely affected the National Register-listed property," and that "the archaeological surveys and data recovery were not carried out in compliance with Section 106 of the NHPA." Letter from ACHP to National Indian Gaming Commission NEPA Compliance Officer, p. 1 (Nov. 14, 2006), attached hereto as Exhibit Q.

315.   The Advisory Council concluded that Section 106 had been violated because "there was no Federal agency review of the archaeological investigations carried out by the Poarch Band … [and] no consultation with any other Indian tribe, particularly the Muscogee Creek Nation. The initial notification of the ACHP (see 36 CFR 800.6(a)(1)) did not occur until after the destruction of the site. Furthermore, there is no indication that the public has been

70

notified about the nature of the undertaking and its effects on historic properties (36 CFR 800.3(e)).” *Id.* at 2. “Since the Section 106 process must be initiated by a Federal agency *prior to* the initiation of project activities, it is unclear why the applicant, a tribe with a tribal historic preservation office approved by the National Park Service pursuant to Section 101(d)(2) of the NHPA, proceeded with project planning and archaeological investigations.” *Id.* at 1 (emphasis added).

**F.    The National Park Service Has Illegally Continued To Award Federal Preservation Funds to Poarch.**

316.    Section 110(k) of the NHPA prohibits a Federal agency from granting “assistance to an applicant who, with intent to avoid the requirements of Section 106, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed such significant adverse effect to occur.” 36 C.F.R. § 800.9.

317.    Poarch “intentionally significantly adversely” affected the Hickory Ground Site, over which it was delegated federal historic preservation responsibilities, with intent to avoid the requirements of Section 106, and had the legal power to prevent such adverse effects but instead allowed the adverse effects to occur.

318.    Interior has continued to award federal preservation grants to Poarch in violation of Section 110(k) of the NHPA. *See, e.g.*, 2019 Preservation Grant Announcement, *available at* https://www.nps.gov/orgs/1207/shpo_thpo_2019.htm (awarding Poarch $55,000); 2018 Preservation Grant Announcement, *available at* https://www.doi.gov/pressreleases/interior-and-national-park-service-announce-more-60-million-historic-preservation (awarding Poarch over $56,000); 2011 Preservation Grant Announcement, *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/press_release/pdf/idc014222.pdf (awarding

Poarch over $30,000).

319.    This Court should order that the Federal Officer Defendants terminate their delegation of historic preservation authority to Poarch and to cease awarding any historic preservation grants to Poarch.

320.    This Court should issue an injunction requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, Poarch THPO, and the Federal Officer Defendants to comply with the NHPA and consult with the Muscogee (Creek) Nation to avoid or mitigate further adverse effects to the Hickory Ground Site during restoration of the Site in accordance with the requested relief in this Complaint.

## COUNT XI: VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT

321.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

322.    The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*, was enacted in 1993 and requires that federal governmental action that substantially burdens a tribe's religious practice or exercise must promote a compelling interest (rather than simply having a rational basis). Its protections encompass tribal religious beliefs. *See* American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, *et seq.*

323.    Hickory Ground is a significant and sacred place to the Muscogee (Creek) Nation, Hickory Ground Tribal Town, and Mekko George Thompson. Hickory Ground is a sacred site unique to the Plaintiffs and the religious significance of it and the activities that occur there cannot be replicated elsewhere.

324.    Hickory Ground also is a significant and sacred place to Plaintiffs because the remains of their ancestors were ceremonially buried there. The ceremonial ground located there is regarded as a sacred place for prayer.

325.    Under Plaintiffs' religion, they owe a moral and religious duty to their ancestors to care for the graves and bodies of the deceased. Living tribal members—descendants of the deceased—will fail in that duty if they are not permitted to complete required religious protocol and return the bodies of their ancestors, along with their funerary objects, to their intended final resting places. Government action that does not allow them to fulfill this duty forces them to choose between either abandoning their religious beliefs or facing civil or criminal sanctions for fulfilling their religious duty to their ancestors. Indeed, when Muscogee (Creek) citizens and Hickory Ground Tribal Town members tried to comply with their religious duties at the Hickory Ground Site in 2013, they were arrested and charged with crimes. *See, e.g.*, Casey Toner, *Ancient Indian burial ground dispute at Wind Creek Casino set for Wednesday trial*, AL.com, Jan. 14, 2015, *available at* https://www.al.com/news/2015/01/poarch_creek_muscogee_wind_cre.html.

326.    Under Plaintiffs' religion, their ancestors are not and will not be at peace unless properly buried in accordance with Plaintiffs' traditional religious protocol.

327.    Under Plaintiffs' religion, the ceremonial grounds cannot be entered or altered without prior authorization and cleansing rituals. Poarch has allowed, and continues to allow, access to the ceremonial grounds by unauthorized persons who desecrate the ceremonial grounds by not following these rituals and by altering the grounds in violation of Plaintiffs' religion.

328.    It is sacrilegious in the Muscogee (Creek) traditional religion to have alcohol anywhere near ceremonial grounds. In violation of this belief, the casino serves alcohol at all times the casino is open, in close proximity to the ceremonial grounds. Indeed, the front page of the Wind Creek Wetumpka site prominently features alcohol:





Wind Creek Wetumpka site, https://windcreekwetumpka.com/ (last visited May 22, 2019).

329.    Excavation and construction of the casino, buildings, parking lots, and other facilities at Hickory Ground, and Poarch's and the Federal Defendants' exclusion of Plaintiffs during the handling, treatment, and reburial of their ancestors' remains and funerary objects, substantially burden Plaintiffs' exercise of their religious practices because these actions have, and will continue to:

    a.    Prevent Plaintiffs from fulfilling their ongoing religious obligations to their ancestors to ensure that their deceased family members' bodies are left at peace in their original resting places and treated with respect and the proper religious protocol;

    b.    Actively desecrate the ceremonial grounds site and the bodies buried there by leaving them where (1) persons unqualified and unauthorized to bury the

bodies failed to observe the required protocol and thus left the bodies perpetually disturbed; and (2) prohibited substances and practices (such as the proximity of alcohol, intoxicated patrons, and entrance into the ceremonial grounds by unauthorized persons who have not performed the required rituals) continue to desecrate the ceremonial grounds;

c.   Desecrate and damage a hallowed ground for practitioners of Muscogee (Creek) traditional religion.

330.   The above-listed actions will prevent Plaintiffs—absent acts of civil or criminal disobedience—from exercising their religious obligations to their ancestors unless and until the bodies and their associated funerary objects are placed back into their final resting places following the proper religious protocol and the active desecration of the ceremonial grounds ceases.

331.   No compelling government interest makes destruction of the Hickory Ground Site or continued operation of a third casino resort for Poarch necessary. The public interest, as expressed in NAGPRA, ARPA, the NHPA, the ARPA permit conditions, the NPS Agreement, is to *preserve* sites of historic, cultural, and religious importance, with paramount importance placed on consultation with affected tribes. Especially here, where Poarch's own promises to the Muscogee (Creek) Nation, the federal government and the public at large indicated that Poarch and the federal government *knew* the religious and cultural importance of Hickory Ground to Plaintiffs and indicated that Poarch had no plans to *ever* build a commercial development on the Hickory Ground Site (and instead acquired the Site to *prevent* this), there is no indicia that there is any public interest in having a commercial development at the Site.

332.   The federal government has at its disposal other, less restrictive means to serve

any compelling interest it has while permitting Plaintiffs' to fulfill their religious duties.

333. The Federal Defendants and Poarch have substantially burdened Plaintiffs' religious freedoms by preventing them from fulfilling their religious duties to their ancestors and by illegally allowing excavation and construction of a casino resort over a large portion of a sacred site of critical religious importance to the Plaintiffs.

334. This Court should order that the Federal Officer Defendants, Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO cease preventing Plaintiffs from fulfilling their religious obligations. Specifically, this Court should order that the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO cause the Hickory Ground Site to be restored, to the greatest extent possible, to the condition it was in prior to the phase III excavation, construction, and reburial, and that the Federal Officer Defendants and Auburn take the necessary actions to facilitate this process.

## PRAYER FOR RELIEF

WHEREFORE, incorporating, restating, and re-alleging all preceding Paragraphs, the Plaintiffs respectfully request that this Court:

(a) Enter a judgment declaring that Interior lacked authority to take the Hickory Ground Site into trust for Poarch, and an order in the nature of mandamus requiring that Secretary Bernhardt take the Hickory Ground Site out of trust;

(b) If this Court enters the judgment and order described in Paragraph (a):

   i. Enter a judgment declaring that Poarch should be held to its promises to perpetually preserve the Hickory Ground Site under the Alabama common law doctrines of unjust enrichment and promissory estoppel;

   ii. Enter an order imposing a remedy of constructive trust over the Hickory Ground Site as relief for Poarch's breach of its promises to the Muscogee

76

(Creek) Nation;

iii.    Enter a judgment declaring that the Individual Defendants' and Martin Construction's actions constituted outrage, and an order awarding appropriate monetary damages to Mekko Thompson;

iv.    Enter a judgment declaring that Poarch violated the NHPA and the NPS Agreement;

v.    Enter an order in the nature of mandamus requiring Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO to abide by the NHPA with respect to the Hickory Ground Site;

vi.    Enter an order in the nature of mandamus requiring that Federal Officer Defendants comply with the NHPA by terminating any delegations of historic preservation authority to Poarch and ceasing awarding federal preservation grants to Poarch.

(c)  In the alternative, if this Court does not enter the judgment and order described in Paragraph (a), it should:

i.    Enter a judgment declaring that Poarch should be held to its promises to perpetually preserve the Hickory Ground Site under the federal common law doctrines of unjust enrichment and promissory estoppel;

ii.    Enter an order in the nature of mandamus requiring Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO to cause the Hickory Ground Site to be protected perpetually in accordance with its promises to the Muscogee (Creek) Nation, including through restoration of the property, to the greatest extent possible, to its

pre-excavation and pre-construction condition, and requiring the Federal Officer Defendants to take any necessary actions to implement these remedies;

iii.    Enter a judgment declaring that Poarch Council Defendants, PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Defendants violated NAGPRA, ARPA, the NHPA, RFRA, and the NPS Agreement; and that, with respect to Federal Defendants and Poarch representatives acting as federal officers under the NPS Agreement, their actions violated the Administrative Procedures Act;

iv.    Enter an order in the nature of mandamus requiring Poarch Council Defendants, PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants to abide by NAGPRA, ARPA, the NHPA, RFRA, and the NPS Agreement in the future with respect to the Hickory Ground Site;

v.    Enter an order in the nature of mandamus requiring that Federal Officer Defendants comply with the NHPA by terminating any delegations of historic preservation authority to Poarch and ceasing awarding federal preservation grants to Poarch;

vi.    Enter a judgment declaring that Martin Construction violated NAGPRA's provisions regarding inadvertent discovery of cultural items, and an order awarding such relief against Martin Construction as may be appropriate given its violations of NAGPRA and its continuation of construction despite Plaintiffs' lawsuit.

(d) Whether or not the Court enters an order and judgment consistent with that described in Paragraphs (b) or (c) above, the Court should also:

    i.    issue a Permanent Injunction enjoining Poarch Council Defendants, PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants from substantially burdening Plaintiffs' religious exercise by undertaking or providing assistance for any further ground disturbing, clearing, grading, leveling, or construction activity at the Hickory Ground Site, except that required to comply with (ii) below;

    ii.    Issue a Permanent Injunction ordering the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO to cause the Hickory Ground Site to be returned to the condition it was in prior to construction of the casino resort and the phase III excavation, including returning the excavated cultural items to their original burial locations; requiring Poarch to consult with and involve the Plaintiffs before, during, and after this process to ensure the proper processes are followed; and requiring the Federal Officer Defendants and Auburn to fully cooperate to facilitate this process, including making the necessary approvals, returning any human remains and associated funerary objects to Mekko Thompson, returning any other cultural items to the Muscogee (Creek) Nation for reburial in accordance with the Muscogee (Creek) culture and religious protocols, and completing the archaeological report regarding the phase III excavation;

    iii.    Order all Defendants except Auburn to pay for Plaintiffs' reasonable

attorney's fees and costs for prosecuting this action;

iv.     Permit amendment of the pleadings pursuant to Fed. R. Civ. P. 15(b) and

54; and

v.     Order such further relief as allowed under Fed. R. Civ. P. 54(c) and as this

Court may deem just and equitable.

DATED this 9th day of March, 2020.

OF COUNSEL

Lauren J. King
Email: lauren.king@foster.com
Foster Garvey, P.C.
1111 Third Avenue, Suite 3000
Seattle, WA 98101
Tel: 206-447-6286
*Counsel for Plaintiffs*
(*Admitted Pro Hac Vice*)

s/ Stewart Davidson McKnight, III
Stewart Davidson McKnight, III (ASB-6258-G63S)
Email: dmcknight@dillardmcknight.com
Dillard, McKnight, James & McElroy
2700 Highway 280
Suite 110 East
Birmingham, AL 35223
Tel: 205-271-1100
*Counsel for Plaintiffs*

## Certificate of Service

I hereby certify that on the 9th day of March, 2020, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

| | |
|---|---|
| Charles A. Dauphin (ASB-5833-H65C)<br>Dauphin Paris, LLC<br>300 Vestavia Parkway, Suite 3400<br>Vestavia Hills, AL 35216<br>Phone: 205.979.6019<br>Email: cdauphin@dauphinparis.com<br><br>OF COUNSEL:<br><br>Catherine F. Munson<br>Kilpatrick Townsend & Stockton LLP<br>607 14th Street, N.W., Suite 900<br>Washington, D.C. 20005-2018<br>Phone: 202.824-1435<br>Email: cmunson@kilpatricktownsend.com<br>(Admitted *pro hac vice*)<br><br>Mark H. Reeves, Georgia Bar No. 141847<br>Kilpatrick Townsend & Stockton LLP<br>Enterprise Mill<br>1450 Greene Street, Suite 230<br>Augusta, GA 30901<br>Phone: 706.823.4206<br>Email: mreeves@kilpatricktownsend.com<br>(Admitted *pro hac vice*)<br><br>*Attorneys for Tribal Defendants* | Dennis Mitchell Henry<br>Frank Eady Bankston , Jr.<br>Webster, Henry, Lyons, White, Bradwell, &<br>Black PC<br>105 Tallapoosa Street<br>Montgomery, AL 36104<br>Email: mitch@websterhenry.com<br>Email: fbankston@websterhenry.com<br>*Counsel for Defendant Martin Construction,*<br>*Inc.* |
| **James Joseph DuBois**<br>U. S. Attorney's Office<br>PO Box 197<br>Montgomery, AL 36101<br>334-223-7280<br>Fax: 334-223-7418<br>Email: james.dubois2@usdoj.gov<br>*Counsel for Federal Defendants* | **Devon Lehman McCune**<br>US DOJ<br>Environmental & Natural Resources<br>999 18th St / S Terrace - Ste 370<br>Denver, CO 80026<br>303-844-1487<br>Email: devon.mccune@usdoj.gov<br>*Counsel for Federal Defendants* |

| | |
|---|---|
| **David Randall Boyd**<br>**Griffin Lane Knight**<br>**Jordan Dorman Walker, Jr.**<br>Balch & Bingham LLP<br>PO Box 78<br>Montgomery, AL 36101<br>Email: dboyd@balch.com<br>Email: lknight@balch.com<br>Email: dwalker@balch.com<br>*Counsel for Defendant Auburn University* | **Jaime Stone Hammer**<br>Auburn University<br>182 South College Street<br>101 Samford Hall<br>Auburn, AL 36849<br>334-844-5176<br>Fax: 334-844-4575<br>Email: jsh0073@auburn.edu<br>*Counsel for Defendant Auburn University* |
| **Morgan Mccue Sport**<br>Auburn University<br>182 S College St - 101 Samford Hall<br>Auburn, AL 36849<br>334-844-5176<br>Fax: 334-844-4575<br>Email: mms0116@auburn.edu<br>*Counsel for Defendant Auburn University* | |

s/ Stewart Davidson McKnight, III
Counsel

TAB 190-1

**EXHIBITS TO SECOND AMENDED COMPLAINT**

Exhibit No.                                    Description

A.      Poarch Application for Historic Preservation Grant Re U.S. Department of
        Interior (Feb. 1980)

B.      Letter from W. Perry, Sonosky Chambers, to K. Zebell, NIGC (June 3, 2005)

C.      Letter from Bernhardt, Interior Solicitor, to Hogen, Chairman of the National
        Indian Gaming Commission (June 13, 2008)

D.      Letter from NIGC Acting General Counsel to Bernhardt (July 30, 2008)

E.      Perdido Band Memorandum In Support Of Motion To Intervene (1951)

F.      Motion To Change Record Name Of One of Movants for Leave to Intervene
        (8/29/1951)

G.      Creek Nation East of the Mississippi's Appellate Brief re Intervention in
        Muscogee (Creek) Nation ICC Case (11/6/1951)

H.      US Appellate Brief Opposing Creek Nation E. of the Mississippi's Intervention in
        Muscogee (Creek) Nation ICC Case (Jan. 1952)

I.      The National Park Service's June 10, 1999 Agreement with Poarch (the "NPS
        Agreement")

J.      Poarch Field Methodology Policy (April 1999)

K.      Letter from Buford Rolin to Mekko George Thompson (April 4, 2012)

L.      Letter from Principal Chief George Tiger to Buford Rolin (April 13, 2012)

M.      Letter from Buford Rolin to George Tiger and Mekko Thompson (April 17, 2012)

N.      Letter from Buford Rolin to Mekko Thompson and Second Chief Alfred Berryhill
        (Nov. 8, 2010)

O.      Poarch Press Release (Oct. 31, 2012)

P.      Poarch Tribal Leader Letter and "Fact Sheet" (2013)

Q.      Letter from ACHP to National Indian Gaming Commission NEPA Compliance
        Officer (Nov. 14, 2006)

# EXHIBIT A

TO:     F. Lawerence Oaks
        Executive Director
        Alabama Historical Commission
        725 Monroe St.
        Montgomery, Alabama    36130

FROM:   Creek Nation East of the Mississippi Inc.
        Poarch Band of Creeks
        Route 3, Box 243-A
        Atmore, Alabama    36502

Re:     U. S. Department of Interior (HCRS) letter 712

Dear Sir;

    Application is hereby made for funds from the Historic Preservation
Discretionary Fund Grant-in-Aid program. This application should be
considered under Category #1 as the proposed undertaking both assists
in preserving part of a historic district of Native Americans and results
in the direct participation of Native American Groups.

    Hickory Ground (1-Ee-89) is of major importance in the history
of the Muscogee (Creek) Nation. It has supplied many of the important
leaders in Creek history. One of particular note was Alexander McGillvray.

    "O-Che-au-po-fau"; from the Muskogean "Oche-ub", a hickory tree,
and "po-fau", in or among, called by the traders "Hickory Ground"(Owen
1921:1088). Hickory Ground was located on the east bank of the Coosa
River, south of the present-day Wetumpka approximately two miles above
the French Fort Toulouse(Pickett 1962:229,343,357; Owen 1921:1088; Hemperly
1969:224; Brewer 1955:25; Swanton 1952:162).

    Hickory Ground was an Upper Creek town and by tradition was originally
inhabited by the Coosa or Abihkas(Corkran 1967:307; Owen 1921:1088; Swanton
1922:242). It was here that Lachland McGillvray married Sehoy Marchand
in 1745, and established a trading house(Brewer 1955:15; Debo 1967:38;
Swanton 1922:242). Lachland and Sehoy were the parents of Alexander
McGillvray an  important Creek leader having special trade relationships
with the Panton Leslie and Company trading house in Pensacola.

    With the French established at Ft. Toulouse McGillvray's residence
at Hickory Ground was the center of Spanish, French, British and American
intrigue. Don Pedro Olivier, a frenchman in the Spanish Service, spent
many months at Hickory Ground(Debo 1967:52; Pickett 1962:413). Hickory
Ground was loyal to the British during the revolutionary war, and was
a place of refuge for many loyalists(Brewer 1955:25-26; Corkran 1967:307-308).
President Washington sent Col. Willett to Hickory Ground to encourage
Alexander McGillvray to come to the capitol at New York for treaty negotiations
(Brewer 1955:27; Pound 1951:58). Hickory Ground was visited by Benjamin

Hawkins, the first american agent to the Creeks, many times(Pound 1951:111; Hemperly 1969:224; Owen 1921:1088; Swanton 1952:154).

During the Creek War of 1813-1814, Otchiapofa was listed as a hostile Creek town, and was visited by Tecumseh. Here he was able to enlist more followers (Halbert and Ball 1969:68,79,99-100; Pickett 1962:511). As a hostile Creek town Hickory Ground was not un-noticed by Andrew Jackson. The Jackson Trace was opened primarily so Jackson could move his army to Hickory Ground(Brewer 1955: 15; Pickett 1962:592).

From the above it is apparent that Hickory Ground was involved in nearly all the major historic events in the southeast before the removal of Creeks from Alabama in 1836. With the proper techniques and data recovery methods Creek involvement in these events can be studied. More importantly the effects of these activities upon the Creek Nation can be understood. Hickory Ground has the potential of measuring changes in the political, social, and economic structures of the Creek people in pre-removal times.

As outlined by the Secretary of the Interior this project is designed to meet the general and specific standards for acquisition as applies to this particular site.

## THE USE OF THE LAND

Acquisition of the property is principally a protection measure. Acquisition will prevent development on the property. All historic structures on the site have been destroyed. What is left consists of below surface remains. Through proper archaeological methods and techniques these below surface features can reveal a tremendous amount of information about the Creek way of life in the late 1700's and early 1800's. Upon gaining fee-simple title to the land as called for in this proposal plans will be developed to minimize continued destruction of the archaeological resources. Prior to any type of development of the property a scientifically sound archaeological program will be conducted to mitigate or minimize effects upon the historic resources.

The property will serve as valuable resource for cultural enrichment of Creek people. The site can serve as a place where classes of Creek culture may be held. The Creek people in Oklahoma pride in heritage and ties to original homeland can only be enhanced. There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved. The site may serve as an open air classroom where Creek youth can learn of their heritage. Interpretive programs can be developed around the vast array of history connected with Hickory Ground. The Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) has already conducted CETA sponsored training in archaeological methods for Creek youth. The Hickory Ground site will continue to enhance their understanding of their history, without excavation.

## SPECIFIC STANDARDS OF PROTECTION

For most cases land in the hands of Realtors and developers is veiwed from the prospective of income producing property. At this location in order to have

a commercial development the land will have to be cleared and leveled. In order to halt the destruction planned for the site and insure against future destruction, funds for acquisition of fee simple title are requested.

As the landowner is very much interested in developing the property for commercial purposes it is felt acquisition of fee simple title is necessary to prevent destruction of the site. The land was scheduled for commercial development. Plans for development called for construction of Recreation facilities and multi-family dwellings.

To the immediate east of the property is existing commerical property. These commerical properties include a Hardees and local resturant. To the immediate south ajoining the land of the site, a contract has been entered into with an option to by agreed upon between Aeronov Corporation and the landowner, Mr. W. D. DeBardeleben. This agreement is based upon Aeronov's plans for construction /a Kmart store upon the property.

Mr. Gary Skaret and the landowner have plans for constructing apartments for low-income and handicapped persons upon the land to the immediate west of the proposed Kmart and to the immediate south of the Hickory Ground site.

From the forgoing it is evident that the surrounding area, and indeed the land, the site itself, is prime development land and may very well be bulldozed and cleared soon.

The property is in the process of being nominated to the National Register of Historic Places. The Alabama State Historic Perservation Officer has determined the property eligible and the required forms are now being processed by the Keeper of the National Register.

Project does conform to Secretary of Interior Standard for Historic preservation projects. Specific end products of the project is to provide protection for a particularly important site in Creek History, while providing a foundation for innovative educational programs. Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home.

Upon approval of the proposal the site will be maintained almost entirely by minority groups. One half the appraised value will be donated to Creek Nation Foundation, Inc. in Oklahoma. The grants-in-aid proposal is designed to be awarded to Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks). Both are Native American groups. The Creek Nation Foundation, Inc. represents western Creeks that were removed to Oklahoma from Alabama. While Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) represents a group of Creeks that were excluded from removal and remained in Alabama in the Mobile Region.

Under this plan the property will be jointly owned by both groups of Creeks. They will be equally responsible for the protection and care of the site. This is an opportunity for the Creek people to enter into cultural resource management by guarding and preserving a site directly connected with their culture history.

The significant aspect of this project is the protection by acquisition of a historic Creek site by Creeks. Archaeological resources, directly related to Native Americans have for the most part been managed and investigated by non-Native Americans. This is an apportunity for Native Americans to manage their archaeological records. Presently on staff with the Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) is Larry D. Haikey who has a Master's degree in Anthropology. Mr. Haikey is well trained and aware of the proper management of archaeological resources. He will act as advisor to the tribal councils on plans for permanent protection of the site.

Time for complete acquisition of the site is not expected to take longer than forty-five days. This time schedule includes time necessary for mailing contracts between Oklahoma and Alabama. Both tribal groups will have adequate time for review by respective lawyers and approval of council meetings.

The Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) agrees to the provisions of covenants and letter of agreements. They are also aware of the information needed for an acquisition Project Completion Report. A detailed completion report will be the responsibility of Creek Nation East of the Mississippi, Inc., and will be done by Mr. Haikey as a part of his normal job activities, at no cost to the Hertiage Conservation and Recreation Service (HCRS) Project.

Consultant and technical assistance will be in the nature of legal services. The property deed and other agreements will need to be legally sound with respects to the by-laws and intents of the corporations. These legal services will be the responsibilities of the respective tribal groups.

Mr. John Charloe, Attorney for Creek Nation Office of Justice, will handle legal matters for Creek Nation Foundation, Inc. in Oklahoma.  Mrs. Hollis Geer, Legal Services Corporation of Alabama, will handle matters for Creek Nation East of the Mississippi, Inc. Technical advice concerning the site as to maintaining its archaeological integrity will be handled by Larry Haikey and other archaeologists with interest in Creek cultural history.

Hickory Ground fits in a historic preservation district which includes the area of Wetumpka, Alabama. There have been numerous maps of Creek sites referenced in historic documents as being located in this area (Swanton 1922; Owen 1921). Swanton (1922) provides numerous maps of Creek Tribal town locations at various times in their history. One, (Appendix A) is partially reproduced for enclosure with this proposal, it shows the location of Hickory Ground as concerns this project and in the time period for which the site has been dated. As is evidenced by the other town locations on the map the area was heavily populated by Creek in the pre-removal period. Some of the other towns have been located and are on record in Alabama archaeological site files. An item of importance concerning Hickory Ground is the immediacy of its near destruction. The others that have been located are not as close to destruction at this time.

A matter of great importance about this project is the involvement of Creek People through their government in the management and protection of their

archaeological resources. It can be safely said that anthropology and archaeology have had a bad name among Native American groups. This has stemmed from the arch-aeologists being more concerned in the research potential of the sites rather than the significance as they relate to Native Americans. The excavation and research has been carried out without very much returned to the Indian community, causing Native Americans to distrust the motives of archaeologists.

The Creek Nation is attempting to take an active role in management of their cultural resources. In the winter of 1978 and 1979 the Creek Nation East of the Mississippi cooperated with the University of Alabama in Birmingham on an arch-aeological excavation to test an area of burial remains. Attention was called to the site after treasure hunters removed a couple of burials.

In the summer of 1979 the Creek Nation East of the Mississippi conducted a CETA Title VI training program in archeaology. The main emphasis of this program was to train young Creek people in the proper techniques of archaeology. It was hoped that some of these young people would continue into the field and help preserve Creek archaeological resources.

Destruction of archaeological resources in Alabama adversely effects the profession of Archaeology, while destroying the cultural history of Creek people. There is an increased recognition in the field of archaeology of the need for Native Americans and archaeologists to work together in the cultural resource management area (Lipe 1977:22-23; Schiffer and Gumerman 1977:586). Creek People feel that this proposed project would do a great deal toward bridging the communication gap between archaeology and Native Americans.

Enclosed appendix contains information documenting the two Creek groups as legal entities:

| | |
|---|---|
| Appendix A | Map of towns of the Creek confederacy, 1818 |
| Appendix B | Organizational chart of Creek Nation East of the Mississippi and list of Tribal Council |
| Appendix C | Articles of Incorporation of Creek Nation East of the Mississippi |
| Appendix D | Constitution of the Muscogee (Creek) Nation in Oklahoma |
| Appendix E | Minutes of Creek Nation East of the Mississippi, Inc., (PBC) tribal council meeting giving approval to apply for HCRS grant |
| Appendix F | Certificate of Assurances & Certifications |
| Appendix G | Budget |

# EXHIBIT B

LAW OFFICES
## SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP
1425 K STREET, NW, SUITE 600
WASHINGTON, DC 20005
TEL (202) 682-0240 | FAX (202) 682-0249
WWW.SONOSKY.COM

MARVIN J. SONOSKY (1909-1997)
HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER
DOUGLAS B. L. ENDRESON
DONALD J. SIMON
MYRA M. MUNSON (AK)*
ANNE D. NOTO
MARY J. PAVEL
DAVID C. MIELKE
JAMES E. GLAZE
GARY F. BROWNELL (NM)*
COLIN C. HAMPSON
JAMES T. MEGGESTO

June 3, 2005

By Hand

MARISSA K. FLANNERY (AK)*
MELANIE B. OSBORNE (AK)*
VANESSA L. RAY-HODGE
AARON M. SCHUTT (AK)*
HEATHER WHITEMAN RUNS HIM (NM)*
WALTER VIAR III (CA)*
WILLIAM F. STEPHENS (CA)*
ADDIE C. ROLNICK (CA)*

OF COUNSEL
ARTHUR LAZARUS, JR., P.C.
ROGER W. DUBROCK (AK)*
KAY E. MAASSEN GOUWENS (AK)*
MATTHEW S. JAFFE
DOUGLAS W. WOLF
RICHARD D. MONKMAN (AK)*

*NOT ADMITTED IN DC

Katherine L. Zebell, Esq.
National Indian Gaming Commission
1441 L Street N.W., Suite 9100
Washington, D.C. 20005

Re: Poorch Band of Creek Indians – Tallapoosa Site

Dear Ms. Zebell:

In connection with our request for a restored lands determination for the Tallapoosa Site, you have asked that we provide to the NIGC evidence that the federal government took affirmative action, at a time prior to acknowledgment, to terminate its relationship with the Poorch Band of Creek Indians.[1] Your request, which you indicated relates to the issue of whether Poorch Creek is a "restored" tribe under section 20 of IGRA, seemed to focus on the question of whether there was a specific document (or set of documents) in which the federal government expressly "terminated" the Tribe. This letter responds to your request by addressing three points: 1) the proper test for determining whether a tribe is a "restored" tribe under IGRA, 2) the significant

---

[1] The Tribe's request to the NIGC was submitted on March 29, 2004. Supplemental submissions, responding to NIGC requests for additional information, were provided to the NIGC on September 3, 2004 and November 2, 2004.

Katherine L. Zebell, Esq.
June 3, 2005
Page 2

differences between the circumstances regarding Poarch Creek and those that were
involved in the *Karuk* case, and 3) the documentation demonstrating that, based on the
totality of the circumstances, Poarch Creek clearly is a "restored" tribe.

## I.      The proper test for determining whether a tribe lost its federal recognition.

        We understood the premise of your request to be that additional documentation of
the kind you referenced, if available, could strengthen Poarch Creek's submission to the
NIGC regarding the status of the Tallapoosa Site.  While we agree with that proposition,
and we provide such documentation along with this letter, we do so in support of our
strongly held view that a determination of whether a tribe is "restored" to federal
recognition under section 20 of IGRA depends on the totality of the circumstances.  While
documentation of a federal action expressly disavowing the federal relationship with a
tribe can be probative in this regard, that is not the only way to demonstrate that a tribe is
"restored."  It is the broadly defined course of dealings by the federal government with
regard to a tribe – and not simply whether there is an express disclaimer of a federal-tribal
relationship – that controls the determination of whether a tribe lost its federal
recognition.  No particular written document, and certainly no magic words by the federal
government, are necessary.  If the government failed, on a continuing basis, to treat the
tribe as it treats other recognized tribes – in terms of providing benefits to tribal members
based on their membership in the tribe and other factors – the tribe lost its recognition.
Such a tribe, when it regains federal recognition (by administrative or congressional
action), is a "restored" tribe under section 20 of IGRA.

        To the extent your inquiry is intended to suggest a per se rule – to the effect that a
tribe could be a "restored" tribe under section 20 of IGRA only if it can provide
documents expressing termination of the tribe by the federal government – we
respectfully submit that such a rule is not warranted under IGRA.  Most fundamentally,
the language of section 20 contains no such requirement.  To the contrary, section 20
neither speaks in terms of termination, nor mandates that a tribe provide an express
statement of any kind from the federal government regarding the loss of the tribe's
recognized status.

        Instead, the relevant provision states that gaming is permitted on lands acquired
after the effective date of IGRA where those lands are part of the "restoration of lands for

Katherine L. Zebell, Esq.
June 3, 2005
Page 3

an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).
As noted in our March 29, 2004 letter to NIGC Chairman Hogen and U.S. Attorney
Canary, it is well settled that these terms are to be given their normal meaning. March 29,
2004 letter, at 6-9. *See Grand Traverse Band of Ottawa and Chippewa Indians v. Office
of the U.S. Attorney*, 369 F.3d 960, 965 (6th Cir. 2004). The term "restore" has ordinary,
dictionary meanings including: "to give back, return, make restitution, reinstatement,
renewal and reestablishment." *Id*. at 967. The term "federal recognition," in the context
of federal dealings with Indian tribes, means an entity that is eligible for special programs
and services, and that enjoys certain privileges and immunities under federal law, by
virtue of being an Indian tribe. *See, e.g.,* 25 U.S.C. § 479a-1(a) ("Publication of list of
recognized tribes"); 25 U.S.C. § 476(f) (privileges and immunities). So, under section 20
of IGRA, for a tribe to be "restored to federal recognition," it must meet three
requirements – it must have been previously recognized, it must have lost its recognized
status, and then it must be returned to recognized status. *See Grand Traverse Band,* 369
F.3d at 967 (a restored tribe is one that has a "history of governmental recognition,
withdrawal of recognition, and then reinstatement of recognition").

The courts have rejected all arguments seeking to limit "restored" tribes to those
which lost or regained their recognized status only in particular ways. For example, the
courts have soundly rejected the contention that only those tribes that regain their
recognized status through an Act of Congress can be "restored" tribes under section 20.
*E.g., Grand Traverse Band,* 369 F.3d at 970; *TOMAC v. Norton,* 193 F. Supp. 2d 182,
194 n.8 (D.D.C. 2002). This is so, notwithstanding the fact that section 20 contains a
separate provision to enable after-acquired land to be taken into trust as "the initial
reservation of an Indian tribe acknowledged by the Secretary under the Federal
acknowledgment process." 25 U.S.C. § 2719(b)(1)(B)(ii). Concluding that "nothing in
the statute suggests that Congress prohibited such a result," the courts give full effect to
the plain meaning of the restored lands provision, while harmonizing it with the "initial
reservation" provision. *E.g., Grand Traverse Band of Ottawa and Chippewa Indians v.
United States Attorney*, 198 F. Supp. 2d at 933. The courts have uniformly been
unwilling to put any gloss or construction on the word "restored" that would have the
effect of excluding tribes that fit within the normal meaning of the term.

Just as a tribe can regain its recognized status in various ways, so a tribe can lose
its recognized status – for purposes of section 20 analysis – by legislative or

Katherine L. Zebell, Esq.
June 3, 2005
Page 4

administrative means. In *Grand Traverse*, the State argued that a tribe that claimed to have lost its recognized status through an action of the executive branch could not be a "restored" tribe under section 20, because only Congress has the authority to extinguish the trust relationship. *Grand Traverse Band*, 369 F.3d at 967. In rejecting the State's argument, the Court stated:

> There is no dispute that only Congress had the *legal* right to terminate the Band's recognition because Congress originally had recognized the Band. But the relevant question is whether a termination nevertheless took place because the executive branch of the government *illegally* acted as if the Band's recognition had been terminated, as evidenced by its refusal to carry out any trust obligations for over one hundred years.

*Id.* at 968. Having framed the question to include the possibility that a tribe may lose its recognized status by federal government inaction (that is, by the government's "refusal to carry out" its obligations to the tribe), the Court further noted that:

> A prominent treatise on federal Indian law states that federal recognition of a tribe requires (1) a legal basis for recognition (i.e. Congressional or Executive action) *and* (2) the empirical indicia of recognition, namely, a "continuing political relationship with the group, such as by providing services through the Bureau of Indian Affairs." Cohen, Handbook of Federal Indian Law 6 (1982). . . . The implication of Professor Cohen's two-part test, which we adopt today, is that the empirical acts that are tantamount to the termination of tribal recognition are analytically distinct from the legality of those acts, just as the empirical act of terminating an individual's employment (e.g., being told to leave the workplace and never to return) is distinct from the legality of that act (e.g., breach of contract).

*Id.* The Court thereby endorsed the understanding that recognition (and loss of recognition) is based on the totality of the circumstances ("empirical indicia") – the most

Katherine L. Zebell, Esq.
June 3, 2005
Page 5

basic of which is whether the federal government provided services to the tribe. Applying
this analysis to the facts of that case, the Court found that:

> The State has conceded that "[t]he United States unilaterally
> ceased to treat the Band as a federally-recognized tribe
> commencing in 1872, when Secretary of the Interior Columbus
> Delano improperly severed the government-to-government
> relationship between the United States and the Band." In other
> words, acting through the Secretary of the Interior, the federal
> government terminated the political relationship with the group,
> in particular, the provision of services. Because the Department
> of Interior refused to recognize the Band as a political entity,
> "the Band experienced increasing poverty, loss of land base and
> depletion of the resources of its community," particularly when
> compared to those tribes that appeared on the Department of
> Interior's list of federally recognized tribes. *Grand Traverse
> Band II*, 198 F. Supp. 2d at 924. Thus, the undisputed facts
> show that the federal government withdrew the Band's
> recognition in 1872 under the second factor of the Cohen test.

*Id.* at 968-969.

As *Grand Traverse* makes clear, the key to determining whether a tribe is
recognized is whether it has a continuing political relationship with the federal
government – the best evidence of which is whether the federal government is providing
services to the tribe and its members. Likewise, in determining whether a tribe has had its
recognition taken away, the fundamental question is whether the political relationship
and, "in particular, the provision of services" have ceased. *Id.*

While it is true that in the case of *Grand Traverse,* there was an express
repudiation of the government-to-government relationship by the Secretary of the Interior
in 1872, that can not properly be viewed as the only circumstance under which tribal
recognition can be lost by administrative means. As the Sixth Circuit framed it, the
question in *Grand Traverse* was not whether the Secretary had expressly disclaimed the
tribe's recognized status, but was instead whether the executive branch had conducted

Katherine L. Zebell, Esq.
June 3, 2005
Page 6

itself "as if the Band's recognition had been terminated, as evidenced by its refusal to
carry out any trust obligations for over one hundred years." *Id*. at 968. As this language
underscores, it is the broad course of conduct of the government over time, and not the
presence or absence of a particular document stating how the government is viewing the
tribe's status, that is central to the inquiry. Thus, as the Sixth Circuit found, a tribe
"which has had its federal recognition terminated by administrative action <u>or inaction</u>, can
be restored to federal recognition through the administrative acknowledgment process."
*Id*. at 970 (emphasis supplied). In short, *Grand Traverse* supports the proposition that the
way in which the federal government relates to a tribe – whether through actions and
express statements or through inaction and neglect – determines whether the tribe has lost
its recognized status. What federal officials say in the form of express disclaimers of
tribal recognition can be probative in this regard, but it is what the federal government
does (or fails to do), and not just what it says, that in the end is determinative.

This principle – that loss of federal recognition can be demonstrated by federal
action or inaction – finds further support in the purpose of the restored lands provision.
The provision of section 20 concerning restored lands along with the provision regarding
initial reservations for acknowledged tribes

> appear to be intended to place tribes that are belatedly
> acknowledged or restored in the same or similar position as
> tribes recognized by the United States earlier in their history.
> The statute expressly provides that lands located within or
> contiguous to the tribe's reservation on the effective date of the
> IGRA are exempt from the procedures of § 2719(b). *See* 25
> U.S.C. § 2719(a)(1). Tribes which are belatedly recognized or
> acknowledged, however, have not had the ability to have lands
> placed in trust by the Secretary for the purpose of establishing
> or preserving a reservation. As a result, the statute appears to
> allow belatedly recognized tribes to have lands exempted by
> way of certain other exceptions.

*Grand Traverse Band,* 198 F. Supp. 2d at 931. So, the restored lands provision is
intended to authorize tribes that have been "belatedly recognized" – and that therefore in
the absence of some special provision would not benefit from the IGRA's general

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 7

application to Indian tribes with Reservations that pre-dated IGRA – to participate
reasonably in the economic development benefits of IGRA. That purpose would be
undermined if some of the tribes that meet the ordinary definition of "restored" were
excluded simply because they lost their recognized status by an unbroken course of
federal inaction and neglect, rather than through an express document purporting to
terminate the tribe's federal recognition.

Moreover, it would be unreasonable to ascribe to Congress an intent to make such
a distinction in the restored lands provision. This is illustrated by the following example.
Assume that there were two tribes. Each tribe entered a treaty with the United States and
had a full government-to-government relationship with the federal government into the
mid-nineteenth century. Each tribe, from the same date in the mid-nineteenth century,
was consistently treated by the federal government as though it was no longer a tribe.
Among other things, no services were provided to either tribe from that day forward, for
over 150 years. In all respects, except one, the entire course of dealings between each of
these tribes and the federal government was essentially the same for over 150 years. The
only difference was that one tribe had a letter from the Secretary of the Interior stating
that it was no longer recognized as a tribe – while the other Tribe had no such letter.
Each Tribe was, in the late twentieth century, recognized through the administrative
process under 25 C.F.R. § 83. It strains credulity to suggest that Congress, in enacting
section 20 of IGRA, somehow intended that one of these tribes could be a "restored"
tribe, while the other could not. There is simply no foundation for ascribing to Congress
such an absurd result.

## II.    NIGC's lands opinion on the Karuk Tribe arose in very different
circumstances than those here.

The governing principle – that loss of federal recognition depends on the totality of
the circumstances and can be supported by evidence of both federal action and inaction –
is not undermined by the NIGC's lands ruling on the Karuk Tribe of California. *See*
Letter from Penny Coleman, Acting General Counsel, NIGC to Bradley G. Bledsoe
Downes, Esq. of Oct. 12, 2004 (hereafter "Karuk Opinion"). Rather, the Karuk Opinion
simply suggests that, in the particular circumstances involved there, that tribe did not
show that its recognition had been terminated. But the circumstances in Karuk were very
different than those here.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 8

First, while Poarch Creek was recognized through the rigorous Federal
Acknowledgment Process under 25 C.F.R. § 83, the same was not true for the Karuk
Tribe. Rather, in seeking to establish eligibility as a "restored" tribe under section 20 of
IGRA, the Karuk Tribe pointed to a one-page Interior Department memorandum from
1979. *See* Memorandum of the Assistant Secretary for Indian Affairs to the Sacramento
Area Director 1 (Jan. 15, 1979), Exhibit 61. That memorandum indicates that based on a
staff-level field trip by BIA personnel, "the continued existence of the Karoks [sic] as a
federally recognized tribe of Indians has been substantiated." *Id.* The language of that
memorandum – speaking in terms of "revitalization" and "continued existence" – is
consistent with the view that the Karuks never lost their recognized status. At a
minimum, the language of that 1979 memorandum is ambiguous in this regard and does
not provide solid evidence of the Karuk tribe's prior loss of recognized status.

In contrast, Poarch Creek – although it applied for federal recognition prior to the
effective date of the Department's regulations on federal recognition[2] – was considered
under the Department's regulations in 25 C.F.R. § 83. As the regulations in effect at the
time of Poarch Creek's recognition make clear, recognition is a "prerequisite to the
protection, services and benefits from the Federal Government available to Indian tribes."
25 C.F.R. § 83.2 (1983), Exhibit 24. Further, by the time Poarch Creek gained
recognition pursuant to the regulations, the Department had been publishing, on an annual
basis, a list of recognized tribes – and Poarch Creek was not on the list until after its
recognition petition was granted. *Compare* Exhibits 4 and 5.[3] The Department's
consideration of Poarch was extensive, as reflected in the Summary of Evidence and
Technical Reports issued by the Department. *See* Exhibits 25 and 26. Thus, in connection
with Poarch Creek's recognition, the Department's course of conduct – not listing Poarch
Creek on its list of all recognized tribes, allocating substantial resources to apply the part
83 regulations, and determining that Poarch Creek met the standards for recognition – all
reflect action by the Department that only makes sense if Poarch Creek had previously
lost its recognized status. Unlike the situation in Karuk, the Department took actions with

---

[2] The effective date was October 2, 1978. *See* Exhibit 62.

[3] At the time of the Department's "Revitalization" memo on Karuk, Exhibit 61, the
Interior Department's practice of officially listing tribes was just beginning – so Karuk, unlike
Poarch Creek, had no ongoing history of being left off of a list of recognized tribes.

Katherine L. Zebell, Esq.
June 3, 2005
Page 9

respect to Poarch Creek which reflect the Department's unambiguous understanding that
Poarch Creek had earlier lost its recognized status.

Second, while prior to recognition in 1984 Poarch Creek members received no
benefits or services from the federal government, the same was not true for the members
of the Karuk Tribe prior to the 1979 "Revitalization" memo. As described below, once
the majority of Creek were removed from Alabama in the 1830's and 1840's, the Creek
who remained in Alabama were not provided with ongoing federal services that the
United States provided to recognized tribes. In contrast, the record before the NIGC
reflected that the opposite was true for Karuk, as to which "the United States provided
benefits to individual tribal members." Karuk Opinion at 4. Since the provision of
federal services and benefits to tribes and their members is among the most significant
factors relating to federal recognition, the fact that Karuk received federal benefits and
Poarch Creek did not strongly supports the view that Karuk is not controlling (or even
persuasive) on the issue of whether Poarch Creek lost its recognized status.

Third, Karuk arose in the unique circumstances of the California Indians – who,
from the time gold was discovered in 1848, were dealt with by the federal government
harshly and unevenly. With regard to many California tribes, that special history left
considerable uncertainty regarding federal recognition. That special history of the
California Indians provides a backdrop for the Karuk Opinion, but is not properly part of
the analysis of Poarch Creek.

Based on an unusual confluence of circumstances, the record before the NIGC
regarding Karuk apparently did not clearly establish whether the Karuk Tribe had ever
lost its federal recognition at all. The peculiar history of the California Indians, the
preservation over time of federal benefits for the members of the Tribe, and the absence
of any formal administrative process regarding recognition all added to the uncertainty in
this regard. In that context, the NIGC stated that:

> the Tribe provided no evidence of any affirmative action by the
> United States to terminate the relationship with the tribe. In
> other words, we have no evidence supporting a conclusion that
> the United States withdrew its recognition of the Tribe.

Katherine L. Zebell, Esq.
June 3, 2005
Page 10

Karuk Opinion at 4. Thus, the Karuk Opinion means that where the record before the
NIGC points toward a Tribe having never lost its recognized status, the NIGC needs clear
evidence in the other direction to support a finding that the Tribe lost its recognized status
and can therefore (if other requirements are met) be deemed a "restored" tribe.

The Karuk Opinion does not suggest that such a finding would have been
impossible to make in the Karuk case itself – if the Tribe had provided appropriate
evidence that on balance outweighed the evidence that was already in the record (such as
continued federal benefits) suggestive of continued, never-terminated federal recognition.
Further, Karuk does not suggest that other ways of demonstrating the loss of federal
recognition – in addition to evidence of affirmative action by the United States – are not
properly part of the analysis. Rather, Karuk simply reinforces the point that where the
record is devoid of any clear indication that a tribe lost its federal recognition – and, to the
contrary, all factors in the record are consistent with continued federal recognition – such
a tribe has not been shown itself to be a "restored" tribe under IGRA. Accordingly, the
Karuk Opinion both suggests the need for a factual basis in the determination by the
NIGC, and supports the notion that the loss of tribal recognition depends on the totality of
the circumstances for that tribe. As we discuss below, Poarch Creek clearly meets this
test.

III.    **Evidence demonstrating that Poarch Creek's status as a recognized tribe was
        lost prior to 1984.**

As we demonstrate above, the determination of whether a tribe lost its recognized
status is a fact-based inquiry, and the facts arising in the Karuk Tribe's case are far
removed from the facts here. Accordingly, in our view the proper analysis here regarding
the loss of federal recognition by Poarch Creek turns not on how the NIGC viewed Karuk
(or any other tribe), but rather on consideration of the federal course of dealings with
Poarch Creek – including both federal action and inaction. Under this standard, the
federal government clearly ended its relationship with Poarch Creek following removal,
as we show below. In any event, even if a narrower view of the proper inquiry is taken –
such that consideration would be limited only to affirmative actions or statements by
federal officials indicating an intent to "terminate" relations with the Tribe – Poarch
Creek would easily meet that test as well. This is so because the historical record amply
demonstrates that the federal government terminated the government-to-government

Katherine L. Zebell, Esq.
June 3, 2005
Page 11

relationship with the Creek in Alabama through a broad course of dealings that included
express statements by top federal officials disclaiming any federal relationship with the
Tribe – and that this termination of federal recognition extended back almost 150 years
prior to Poarch Creek regaining federal recognition in 1984. [4]

The 1832 Treaty between the United States and the Creeks underscored the intent
of the federal government to end, within a few short years, its relationship with the Creek
in Alabama.  Treaty with the Creeks, Mar. 24, 1832, 7 Stat. 366, Exhibit 3.  As the Treaty
recited, "[t]he United States are desirous that the Creeks should remove to the country
west of the Mississippi, and join their countrymen there . . . ." *Id.* at Art. XII.  To
facilitate this goal of removal of the Creeks from Alabama, the Treaty provided for a
cession by the Creeks of all land east of the Mississippi. *Id.* at Art. I.  The Treaty also
provided various payments for those Creek who removed to Oklahoma – for removal
expenses and subsistence expenses for a year, *id.* at Art. XII, for rifles and blankets, *id.* at
Art. XIII, and for education and blacksmiths, *id.*  Perhaps most tellingly in this regard, the
1832 Treaty expressly provided for permanent federal protection of Creek Tribal lands in
Oklahoma:

> The Creek country west of the Mississippi shall be solemnly
> guarantied to the Creek Indians, nor shall any State or Territory
> ever have a right to pass laws for the government of such
> Indians, but they shall be allowed to govern themselves, so far
> as may be compatible with the general jurisdiction which
> Congress may think proper to exercise over them.

*Id.* at Art. XIV.

In contrast, the Creek who stayed in Alabama received no payments for
subsistence, rifles, blankets, education or blacksmiths.  Moreover, the Treaty provided not
for federal protection but rather for the cession of all Creek lands in Alabama, with only

---

[4] We note that, despite the federal government's longstanding treatment of Poarch
Creek as not federally recognized, the Tribe maintained its continuous political existence
as a Tribe throughout this period as demonstrated and confirmed by the acknowledgment
decision the Tribe received in 1984. *See* Exhibits 1 and 25.

Katherine L. Zebell, Esq.
June 3, 2005
Page 12

parcels of fee land to be conveyed to principal Chiefs and the heads of families. *Id.* at
Art. II. Those fee lands could be conveyed by the Indians. *Id.* at Art. III. Intruders were
to be removed from these land selections, but only for five years. *Id.* at Art. V. Nothing
in the 1832 Treaty provided any ongoing federal role with respect to the Creek in
Alabama, beyond that five-year period.

Further, while the Treaty expressly recognized the right of the Creek in Oklahoma
"to govern themselves," no such recognition appears in the Treaty with respect to the
Creek in Alabama. So, under the 1832 Treaty, permanent federal protection and federal
acknowledgment of Tribal self-government were promised to the Creek who moved to
Oklahoma, but not the Creek who remained in Alabama. In expressly mentioning these
rights but only for the Oklahoma Creek, the Treaty clearly suggests the absence of such
rights to the Alabama Creek.

Furthermore, to the extent the 1832 Treaty might be viewed as suggesting a
vestigial federal role associated with the fee lands conveyed to Creek Indians in Alabama,
Congress later expressly disclaimed such a construction of the Treaty. In 1912, Congress
enacted a measure releasing all possible federal interest in these lands. The 1912 Act
stated:

> That the United States of America hereby forever relinquishes,
> releases, and quitclaims all right, title, and interest in and to all
> the lands now held under claim or color of title by individual or
> private ownership or municipal ownership and situated in the
> State of Alabama which were reserved, retained, or set apart to
> or for the Creek Tribe or Nation of Indians or any member or
> members thereof, under and by virtue of the treaties entered into
> between the United States of America and the Creek Tribe or
> Nation of Indians on the ninth day of August, eighteen hundred
> and fourteen, and at Washington on the twenty-fourth day of
> March, eighteen hundred and thirty-two, by which all the lands
> of said Creek Tribe or Nation of Indians east of the Mississippi
> River were ceded to the United States of America . . . .

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 13

Act of June 4, 1912, ch. 151, Pub. L. No. 62-177, 37 Stat. 122, Exhibit 63. This Act was
intended to remove all doubt about the status of lands that were conveyed under the 1832
Treaty, but as to which, for whatever reason, patents had not issued. *See.* H. R. Rep. No.
62-357 (Feb. 26, 1912) (Title to Creek Indian Lands in Alabama), Exhibit 64. The Act
negated any notion that the federal government had an ongoing role regarding Creek
lands in Alabama arising from the 1832 Treaty.

While the 1832 Treaty was unquestionably an instrument of the federal
government's removal policy, it nevertheless stopped short of mandating the immediate
removal of all Creek from Alabama. As the Treaty stated, "this article shall not be
construed so as to compel any Creek Indian to emigrate, but they shall be free to go or
stay, as they please." Exhibit 3 at Art. XII. Despite this provision, the federal
government in fact soon removed most of the Creek from Alabama by forced, military
action. First, the government failed to protect the individual Creek fee lands conveyed
under the 1832 Treaty:

> Despite its promises to evict intruders, the federal government
> in fact was unwilling or unable to do so, and the Creek lands
> were quickly overrun. Moreover, the Indians, unused to
> handling financial matters, were victimized by speculators, who
> moved in to gain title to the allotments and force the Indians off
> the land. The frauds were spectacular and widespread, making
> a mockery of the treaty intentions, and the government seemed
> impotent to stem the speculators' chicanery. The commissioner
> of Indian affairs, on receiving the report of a commission sent
> to investigate, declared in exasperation in 1838: "It is shocking
> to reflect on the disclosures elicited. They embrace men of
> every degree. Persons, heretofore deemed respectable, are
> implicated in the most disgraceful attempts to defraud those who
> are incapacitated from protecting their own interests; whose
> presence, as far from being any interruption to the plundering of
> themselves, was sometimes sought, as their instrumentality was
> used to effect their own ruin. This conduct, derogatory to
> civilized men, was not inaptly termed 'land stealing.'"

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 14

F. Prucha, The Great Father, at 222, Exhibit 12. These gross land frauds soon erupted into violence, with the U.S. Army being sent into Alabama against the Creeks to "subdue them, and force their removal to the West." *Id*. at 223. The Army succeeded in its objective, leading to the harsh removal of most of the remaining Creeks in Alabama:

> The subdued Creeks were now removed to the West. Dejected warriors, handcuffed, chained, and guarded by soldiers, left Fort Mitchell on July 2, followed by wagons and ponies carrying the children and old women and the sick . . . . [and] embarked at Montgomery and conveyed down the Alabama River to Mobile, thence to New Orleans and up the rivers to the western lands of the Creeks. The remainder of the hostiles left Montgomery on August 2. The friendly Creeks soon followed their brothers west.

*Id*. Surely any notion that the federal government continued to recognize the Creeks in Alabama was effectively terminated by the military action physically removing the Creeks to Oklahoma. Forced removal is inconsistent with continued federal recognition for those Creek who remained.

This point – that upon completion of removal, the federal government ended its governmental relationship with the Creeks in Alabama – has been reaffirmed by the statements and conduct of the federal officials most responsible for Indian Affairs. For example, this termination of the federal recognition of Poarch Creek is reflected in the Annual Reports of the Commissioner of Indian Affairs.[5] These Reports summarize, generally on a state-by-state (or territory-by-territory) basis, the activities of the federal government with respect to all recognized tribes. The Reports describe both the manner in which federal Indian policy was implemented, and the general conditions of each recognized tribe, during that year.

---

[5] We have examined the Annual Report of the Commissioner of Indian Affairs for each year from 1841 – 1912. The one exception was the 1907 Annual Report which was not available in the library of the Interior Department.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 15

During the 1840's, the Annual Reports note the diminishing number of Creeks remaining in Alabama, and the imminence of their removal to Oklahoma. *E.g.*, 1845-1846 Annual Report of the Commissioner of Indian Affairs at 1 ("The few remaining Creeks in Alabama . . . , amounting in number to about one hundred and sixty, including slaves, are prepared to remove."). By 1849, the removal policy regarding the Creek was deemed essentially completed, and the Commissioner reported that, from the next year forward, the federal government would not be responsible for Creek Indians who remained in Alabama:

> Within the last year, forty-four of the few Creek Indians remaining in Alabama, and five hundred and forty-seven Choctaws from the State of Mississippi, have removed to the country of their brethren west, leaving about two thousand five hundred of the latter people still east of the Mississippi river, notwithstanding the great exertions and the large expenditures that have been made for some years past in endeavoring to effect their emigration. These Indians were made citizens by the laws of the States where they are, and the effort to remove them was an obligation voluntarily assumed by the government for their benefit and the advantage of those States. New arrangements have been adopted for a final effort to effect that object, which it is hoped will be attended with success. <u>All that can be induced to go will probably be removed within another year, at the end of which all further proceedings and expenses should be terminated, and those that shall then remain be permitted to do so in the quiet enjoyment of their rights as citizens</u>.

Annual Report of the Commissioner of Indian Affairs (1849) at 948, Exhibit 65 (emphasis added). This is an explicit statement, from the highest federal official in Indian affairs, disclaiming any further federal role ("all further proceedings and expenses should be terminated") with respect to the Creek in Alabama.

Subsequent Annual Reports confirm that the 1849 Report accurately depicted the end of federal recognition of the Creek in Alabama. The Annual Reports from 1850 to 1912 (the years we reviewed) all report on the Creek – but only with regard to the Creek

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 16

in Indian territory (Oklahoma). There are no separate reports, in any Annual Report in this period, regarding the Creek in Alabama.[6] Indeed, after 1871, the Annual Reports contain no mention at all of the Creek in Alabama. There simply could not have been a recognized tribe that escaped the notice of the Commissioner in his comprehensive reports to Congress over such an extended period of time. This unbroken record of no federal involvement for a long period of time – following a clear statement in 1849 indicating that no further federal involvement was to take place – clearly shows that the federal government terminated its relationship with Poarch Creek.

This pattern – federal neglect of Poarch Creek, coupled with express federal disclaimers of any federal relationship with Poarch Creek – was a recurring theme in the Tribe's history thereafter. For example, in 1906 an attorney named John D. Beck wrote to the President of the United States seeking federal help for the Creek Indians in Alabama. The letter was forwarded to the Office of Indian Affairs. The Acting Commissioner of Indian Affairs responded to Beck's letter by stating

> this Office knows of no band of Indians located in the southern part of Alabama. It is possible, of course, that there are persons of Indian or part Indian blood located in Alabama, as there are in many other States, but these people are in no way connected with the tribes of Creeks, Chickasaws and Cherokees that are located in the Indian Territory. The Creeks, Chickasaws and Cherokees that are now in the Indian Territory located there many years ago by virtue of treaties made between their leaders and the United States, and the individual members of such tribes that may have elected to and did remain east of the Mississippi

---

[6] During this entire period, there were only two instances in which the Annual Reports even mention the Creeks outside of Oklahoma. In one instance, there is a passing reference to the sale of 34 sections of lands of Creek Indians, presumably the fee lands conveyed under the 1832 Treaty. 1856 Annual Report at 19. In one Report, the Commissioner noted "It is reported to me that there are also some indigent Creeks remaining in Alabama, who would like to be again incorporated with their tribe in its western home." 1871 Annual Report at 576. This reference both suggests that the Commissioner has no direct dealings with the Creek in Alabama ("it is reported to me"), and underscores that the Commissioner views a Creek being "incorporated" in their "Tribe" as being something that could only take place in Oklahoma.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 17

> River when the general emigration of the tribes took place,
> surrendered any right to share in the property of the tribes as at
> present constituted in the Indian Territory. <u>Such Indians as may
> be found in southern Alabama at the present time are the
> descendants of those who chose to remain there rather than
> emigrate to what is now the Indian Territory, and so far as this
> Office is concerned, are citizens of that State and are entitled to
> no consideration not due to other citizens who may be of white
> blood.</u>

Letter to John D. Beck from Acting Commissioner of Indian Affairs (Dec. 31, 1906) at 1-
2, Exhibit 66 (emphasis added). The Acting Commissioner's point was clear – as of 1906
the federal government recognized no Tribe in Alabama, and the federal relationship with
individual Creeks in Alabama was no different than its relationship with non-Indians.

    Even during the era of the Indian Reorganization Act – when federal policy overall
sought to promote Tribal self-sufficiency and self-government – the federal government
continued to refuse requests to help Poarch Creek. In 1931, Reverend Edgar Van W.
Edwards, an Episcopal clergyman who was working among the Creek near Atmore,
Alabama, wrote to the Commissioner of Indian Affairs stating "I have become interested
in a small tribe of Indians located near here, and I want to make an appeal to you and
through you to the Indian Bureau to see if something of a permanent nature can be done
for them." Letter to Charles J. Rhoads, Commissioner of Indian Affairs, from Rev. Edgar
Van W. Edwards (Sept. 10, 1931), Exhibit 67. Reverend Edwards asked for land for the
Creek and for "some reliable person who would act as agent, to protect them." *Id*. The
Assistant Commissioner of Indian Affairs replied that, with regard to Reverend Beck's
reference to 200 acres of Creek land in Alabama, "[n]o record has been found of a tribal
reserve of 200 acres having been set apart by the Government for these Indians." Letter
to Rev. Edgar Van W. Edwards from Henry J. Scattergood, Assistant Commissioner of
Indian Affairs (Sept. 25, 1931), Exhibit 68. Further, since the June 4, 1912 Act, "we [the
federal government] have had little or nothing to do with any Creek Indians in Alabama."
*Id*. Scattergood concluded that the federal government is "not in a position to grant the
relief requested." *Id*.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 18

Despite this clear rebuff, Reverend Edwards continued his efforts to gain federal
assistance for the Poarch Creek. On March 19, 1936, Reverend Edwards again wrote,
this time to the Bureau of Indian Affairs. In his letter, Reverend Edwards stated "[o]ff
and on for nearly six years I have been writing to the Indian Affiars [sic] Depart. To our
Senators and others, in behalf of a small group of Indians near here, and it seems
impossible to get action." Letter to Hon. Willard Walcott Beatty from Rev. Edgar Van
W. Edwards (March 19, 1936), Exhibit 69. Reverend Edwards again asked whether the
Bureau would "help me help these helpless people?" *Id.*

John Collier, the Commissioner of Indian Affairs, responded to Edwards.
Although he was a strong advocate for tribal rights and improving tribal social and
economic conditions, Collier stated that "[t]here is reason to doubt whether this Office
has authority to assume jurisdiction over the affairs of the Indians of Alabama . . . ."
Letter to Rev. Edgar Van W. Edwards from John Collier, Commissioner of Indian Affairs
(April 21, 1936), Exhibit 70. With regard to the Bureau's delay in replying to Reverend
Edwards' previous requests, John Collier said:

> We assure you of our appreciation of the good work you are
> doing, and that the delay in replying to your letter is because <u>at
> present we would have to refuse all help on the basis of
> information now available</u>. We are withholding a decision in
> order that all the possibilities may be thoroughly reviewed and
> we may be sure that our final decision is in accordance with the
> law and its fairest interpretation.

*Id.* (emphasis added). While holding out the possibility that someday something could be
done, Collier's answer – like that of every other federal official – was no. Federal
assistance was not available for Poarch Creek.

Similarly, in 1938, in response to more requests for assistance for Poarch Creek,
the BIA's Director of Education, Willard W. Beatty, wrote to Reverend Edwards
expressing unwillingness to aid the Indians in Alabama. Letter to Rev. Edwin [sic]
Edwards from Willard W. Beatty, Director of Education, Bureau of Indian Affairs (May
27, 1938), Exhibit 71. According to Mr. Beatty:

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 20

rejected on the ground that there was no federally recognized tribe in Alabama. Federal officials uniformly told all those who asked that, as far as the federal government was concerned, there was no Poarch Band of Creeks in Alabama, and that the educational and other needs of the Tribe had to be met through non-federal sources.

This pattern continued until the Tribe gained recognition in 1984. As the Tribe's long-time Chairman, Eddie L. Tullis, notes:

> I have been active in the political, social and economic activities of the Tribe since 1964. From 1964 until the Tribe gained federal recognition in 1984, the federal government did not provide to Poarch Creek or its members the programs, benefits and services that the government provided to tribes that were federally recognized and their members. For example, during this period the Bureau of Indian Affairs provided no funds to the Tribe, and no services to our people, for any purpose. Likewise, our tribal members received no health care services from the Indian Health Service, and the Tribe received no federal funding to run its own health programs. Further, the Tribe received no funding from HUD for purposes of establishing or implementing a Tribal housing program. While the Administration for Native Americans (ANA) provided the Tribe with a small amount of grant funds in this period, those were specifically limited to tasks relating to our efforts to gain federal recognition – further demonstrating the government's understanding that Poarch Creek's recognition had previously been removed and that work was needed to restore the Tribe to recognized status. So, based on my own experience and knowledge of the Tribe's dealings, the Tribe and tribal members received no funds appropriated by Congress for purposes of serving federally recognized tribes during the period from 1964 until recognition in 1984. In fact, this pattern by the federal government of not treating Poarch Creek as it treated all federally recognized tribes extended back to the time of removal in the 1840's.

73264.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 21

Supplemental Affidavit of Eddie L. Tullis at ¶ 2 (May 26, 2005), Exhibit 73.

Even a 1975 request by Governor George Wallace urging the federal government to take land into trust for Poarch Creek – for a school – did not spur any action by the federal government:

> In 1975, Governor George C. Wallace of Alabama wrote to Morris Thompson, the Commissioner of Indian Affairs of the U.S. Department of the Interior. Governor Wallace stated that Alabama wished to transfer a parcel of land in Escambia County to the Tribe – and specifically requested that the parcel be held in trust for the Tribe by the United States. No action was taken on this request at the time, because the Tribe was not federally recognized. In 1980, Governor Fob James wrote to William E. Hallet, the new Commissioner of Indian Affairs. Governor James addressed the same request to have land taken into trust for the Tribe, stating that "we would like to see them [Poarch Creek] extended Federal recognition and this land [that is, the parcel Governor Wallace offered to transfer in trust for the Tribe] in their possession." The parcel involved in this correspondence was finally taken into trust – but only after the Tribe gained federal recognition. The parcel is referred to as Parcel 1, and it is the site of a school house and pow-wow grounds. This example regarding the State's attempt to transfer land in trust to the Tribe – and the federal government's refusal to accept the land in trust prior to recognition – further demonstrates that during this period the federal government treated the Tribe as an unrecognized tribe.

*Id.* at ¶ 3.[7]

---

[7] *See* letter to Morris Thompson, Commissioner of Indian Affairs from George C. Wallace, Governor of Alabama (Sept. 15, 1975), Exhibit 74; letter to William E. Hallet, Commissioner of Indian Affairs from Fob James, Governor of Alabama (May 27, 1980), Exhibit 75.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 22

## Conclusion

In sum, long before it recognized the Tribe in 1984, the federal government terminated its relationship with Poarch Creek. The 1832 Treaty promoted removal and provided funds and permanent protection only for those Creek who removed to Oklahoma. Those Creek who remained in Alabama received no promise of an ongoing federal role and, to the contrary, the 1832 Treaty provided for no continuing federal role regarding the Poarch Creek after 5 years. The Treaty's intent to remove the Creek from Alabama was implemented by the U.S. military – an overt action fundamentally at odds with continued federal recognition for Poarch Creek. By 1849, the Commissioner of Indian Affairs had expressly disclaimed any federal responsibility for the Poarch Creek. This was followed by a lack of dealings by the federal government and the absence of federal services for the Tribe and its members for well over a century. During this long time period, whenever they were asked to provide assistance to Poarch Creek, federal officials uniformly declined – on the ground that the federal government recognized no tribe in Alabama. This was true, as the documents referenced here demonstrate, in 1849, 1906, 1931, 1936, 1938, 1975 and 1980.

The totality of these circumstances – federal action, inaction and express statements – convincingly demonstrates that the federal government terminated its relationship with Poarch Creek and that the Tribe remained unrecognized for almost 150 years. Having been federally recognized in Treaty times, having had that recognition removed by the federal government as described here, and having regained it in 1984 through the Federal Acknowledgment Process, Poarch Creek is a "restored" tribe under IGRA. We urge NIGC to so find.

Respectfully submitted,

*/s/ William R. Perry*
William R. Perry

cc:    Eddie L. Tullis, Chairman

73114.1

# EXHIBIT C

06 13 2007  14 25 FAX                                                                    ☑002



## United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO

### JUN 1 3 2008

Honorable Phillip N. Hogen
Chairman, National Indian Gaming Commission
1441 L St., NW
Suite 9100
Washington, DC 20005

Dear Chairman Hogen,

I am writing in regard to your May 19, 2008 letter to former Assistant Secretary – Indian
Affairs Carl Artman and Deputy Associate Solicitor, Division of Indian Affairs, Edith
Blackwell enclosing your May 19, 2008 Indian lands opinion for the Poarch Band of
Creek Indians, which purports to recognize the Band's right to game on the Tallapoosa
Site in Alabama. In the letter, you informed Mr. Artman and Ms. Blackwell that you
were issuing the Indian lands opinion despite the fact that your Office of General Counsel
(OGC) and the Solicitor's Office Division of Indian Affairs (DIA) had not reached
agreement on whether the Tallapoosa Site is restored lands and thus covered by an
exception to the general prohibition on gaming on lands acquired after October 17, 1988.

On January 14, 2008, the Deputy Associate Solicitor provided your Acting General
Counsel with a letter of non-concurrence in the National Indian Gaming Commission's
(NIGC's) draft Indian lands opinion. The January 14, 2008 letter provided specific
details as to why DIA disagreed with the draft opinion. The non-concurrence focused on
the restored tribe analysis. Generally, DIA does not believe that the Poarch Creek Band
ever had a government-to-government relationship with the United States until it was
acknowledged through the Part 83 process in 1983. The Deputy Associate Solicitor
concluded that the record simply does not support the Band's existence as a separate
tribal entity with a governmental relationship with the United States, nor does it support
that the United States terminated this governmental relationship. The Deputy Associate
Solicitor also questioned the Band's relationship with the Creek burial grounds located at
the Tallapoosa Site. Your May 19, 2008 opinion does not address any of the concerns
raised in our January 14, 2008 letter.

Given that the legal conclusions reached by OGC are inconsistent with the legal views of
the Office of the Solicitor, and that, as discussed below, NIGC has no statutory mandate
to issue Indian lands opinions independently, the Secretary has directed me to inform you
that he is invoking his authority referenced in 43 C.F.R. § 4.5 to review your decision and
has asked me to assist him in that review. Accordingly, in accordance with 43 C.F.R. §
4.5(c), please provide me with the administrative record supporting your May 19, 2008

1

decision. Pending this review, you may not take any further action to implement your May 19, 2008 decision.

I understand that the matter concerning the Poarch Creek Band first arose in November 2003, when the Assistant Attorney General for the State of Alabama questioned the Band's gaming activities on three parcels. From what I understand, NIGC reviewed two of those parcels and determined that they met the initial reservation exception in 25 U.S.C. § 2719(b)(1)(B)(ii). The third gaming location, the Tallapoosa Site, remained at issue, however, because the land was taken into trust in 1995 and is not within the Band's initial reservation. The Band has continued its gaming operation on the Tallapoosa Site during the pendency of NIGC's review.

While the request from the Assistant Attorney General came to NIGC in November 2003, it was not until January 2006 that the DIA received OGC's first draft of its Poarch Creek Indian lands opinion. Attorneys in DIA expressed their concern with the Poarch draft as early as February 2006. OGC attorneys and DIA attorneys met in May, October, and December 2006 to discuss DIA's concerns with the draft opinion. After the December 12, 2006 meeting, OGC agreed to revise the January 2006 draft opinion. DIA attorneys and OGC attorneys met together with the Tribe on March 13, 2007 to discuss the unresolved issues. On March 26, 2007, the Band's attorneys provided OGC and DIA with their response to the restored lands issues raised at the March 13 meeting. It was not until September 24, 2007 that OGC provided DIA with a revised draft dated July 18, 2007.

After receipt of the July 18, 2007 draft, attorneys in OGC and DIA tried to reach consensus on the legal position. On December 27, 2007, OGC notified DIA that it wanted DIA's response prior to December 31, 2007. On January 3, 2008, the Deputy Associate Solicitor sent OGC a short letter expressing DIA's non-concurrence with the July 18, 2007 draft. On January 7, 2008, you, the Deputy Solicitor, and attorneys from OGC and DIA met via a conference call to discuss the unresolved issues. At that time, OGC requested a detailed written non-concurrence.

On January 14, 2008, the Deputy Associate Solicitor provided a six-page letter that detailed most of the rationale for the non-concurrence to OGC's July 18, 2007 opinion. Since its receipt of the January 14, 2008 letter, OGC has made no efforts to resolve the issues raised by DIA. As previously noted, the May 19, 2008 opinion you signed made no reference to the concerns raised in the January 14, 2008 letter.

Generally, the Office of the Solicitor and the OGC have worked cooperatively on Indian lands opinions since the inception of your Office of General Counsel. In March 2000, the cooperative process was memorialized in a Memorandum of Understanding signed by the Associate Solicitor, DIA and General Counsel, NIGC. In 2006, it became apparent that a new Memorandum of Understanding needed to be negotiated. I signed a Memorandum of Agreement (MOA) on May 31, 2006, for a six-month period. That agreement was renewed in February 2007 for another six-month term. While it expired in August 2007 and has not been renewed, OGC and DIA have both expressed a willingness to continue

to abide by its terms. Inexplicably, the NIGC took no steps after receiving the
January 14, 2008 non-concurrence to attempt to follow the MOA's process for resolution
of non-concurrence issues. For example, no effort was made to have further discussions
with DIA or senior Solicitor's Office officials, including discussions whether to refer the
matter to the Office of Legal Counsel, as was expressly provided in the MOA.

Generally, when OGC attempts to draft an Indian lands opinion, it typically writes a
broad and wide-ranging opinion that touches on issues not unique to gaming. NIGC
Indian lands opinions discuss a tribe's jurisdiction over lands, a tribe's governmental
authority, the boundaries of a tribe's reservation, and the history of a tribe. In NIGC's
Indian lands opinion regarding the restored land for a restored tribe exception, OGC
extensively delves into the history of the tribe's relationship with the United States,
especially with the Secretary of the Interior. OGC also looks at the history of the tribe's
occupation of certain lands and communications between the Department of the Interior
and the tribe. DIA has in the past questioned the need for delving into such issues that
are not specific to gaming. While the Solicitor's Office and OGC have reached
consensus on all Indian lands opinions prior to the Poarch Creek decision. it has not been
without controversy. DIA has on several occasions agreed with NIGC's conclusions but
not with its analysis. For the Poarch Creek decision, as the January 14, 2008 letter sets
out, my Office did not agree that the Poarch Creek Band is a restored tribe for Indian
Gaming Regulatory Act (IGRA) purposes.

As the chief legal officer for the Department of the Interior, it is incumbent on me to
ensure that all legal opinions are consistent and sound. Nothing in IGRA changes my
role as the principal legal adviser to the Secretary and the chief legal officer of the
Department. Congress expressly placed the NIGC "within the Department of the
Interior."[1] It is my responsibility to supervise the legal work of the Department.[2]

What is at issue is only the Poarch Creek Band's Indian lands opinion and the prospective
drafting, review, and approval of Indian lands opinions.[3] The Department is not seeking
to review previously issued NIGC Indian lands opinions through this process. In
addition, DIA and OGC worked together to draft language in the 25 C.F.R. Part 292
regulations that provided that the regulations do not apply to final agency actions based
on legal opinions issued prior to the effective date of the regulations. Nor is the
Department calling into question the overall good work of the NIGC. NIGC's role in the
regulation of Indian gaming has been and will continue to be positive and important. The
Secretary has no desire to intrude in NIGC's statutory role for the regulation of Indian
gaming.

---

[1] 25 U.S.C. § 2704(a).

[2] *See* 109 DM 3.1, 110 DM 2.2; 209 DM 3.

[3] My Office defines Indian lands opinions as legal opinions that analyze whether gaming is authorized on
particular lands. These include opinions on whether lands meet the definition of Indian lands; whether a
tribe is exercising jurisdiction and governmental authority over those lands; whether gaming is authorized
under 25 U.S.C. § 2719; and a legal analysis of 25 C.F.R. Part 292.

3

However, IGRA does not vest all authority for Indian gaming in one entity. IGRA is not an example of a statute that transferred all responsibility out of the Department. The scope and parameters of the NIGC's power are established and limited by the language of IGRA, the NIGC's sole source of statutory authority. In the purpose section of IGRA,[4] Congress clearly stated its intent to establish the NIGC as a commission to regulate Indian gaming. However, the scope of the power granted to the NIGC is not determined by the ultimate purpose of regulating Indian gaming. Rather, the scope of the NIGC's power is based upon the specific means prescribed by Congress to achieve that ultimate purpose.[5] IGRA sets out in detail the specific means to be employed by the NIGC to carry out its discrete powers to issue orders of temporary closure of gaming activities; levy and collect civil fines; approve tribal ordinances or resolutions; approve management contracts for Class II and Class III gaming;[6] and monitor, inspect, and examine Class II gaming activities.[7]

IGRA grants authority over other aspects of Indian gaming to the Secretary, Indian tribes, and the States. Therefore, it is evident from the plain language of IGRA that, although Congress established the NIGC as a commission for the purpose of regulating Indian gaming, it did not grant the NIGC the power to regulate, interpret, or decide all aspects of Indian gaming or matters related to Indian gaming.

As with the NIGC, it is clear that Congress did not grant the Secretary the power to regulate, interpret, or decide all aspects of Indian gaming. The Secretary has limited authority over those aspects of gaming that are assigned by IGRA to the NIGC, Indian tribes, or the States. Unlike the NIGC, the Secretary has authority for Indian gaming matters and matters related to Indian gaming that are not expressly assigned to any entity under IGRA. This authority is based upon statutes other than IGRA that give the Secretary broad authority to manage matters of Indian affairs and implement the laws governing Indians, and specific authority over Indian lands and tribal governments. Thus, the scope of the Secretary's authority is much broader than that of the NIGC and includes many general matters.

The authority of the NIGC is strictly limited to the discrete powers that are expressly assigned to it by Congress in IGRA. While it may interpret the statute and fill gaps with respect to its specific powers, the NIGC has no general authority over the regulation of Indian gaming based on the ultimate purpose of its authorizing statute. By contrast, the scope of the Secretary's authority extends broadly to most matters of Indian affairs and includes implementing many of the laws governing relations with tribes and individual Indians. Moreover, based on longstanding and specific authority under the Indian Reorganization Act and other generally applicable Indian law, the Secretary has the specific authority and subject matter expertise to decide issues concerning Indian lands and tribal jurisdiction. Thus, it is the Secretary, not the NIGC, who has the implicit authority to interpret any ambiguities and fill any gaps in IGRA, particularly with respect

---

[4] 25 U.S.C. § 2702(4).
[5] *See MCI v. AT&T Co.*, 512 U.S. 218, 231 (1994)
[6] 25 U.S.C. § 2705(a).
[7] 25 U.S.C. § 2706(b).

to ambiguities or gaps that concern what constitutes Indian lands and the scope of tribal jurisdiction.

Indian lands opinions are by definition legal opinions that analyze whether lands are eligible for gaming. Indian lands opinions include issues such as whether lands meet the definition of Indian lands; whether a tribe is exercising jurisdiction and governmental authority over those lands; whether gaming is authorized under 25 U.S.C. § 2719; and a legal analysis of 25 C.F.R. Part 292. Resolution of these questions has not been delegated to the NIGC. Moreover, resolution of these issues relies on the particular expertise of the Solicitor's Office regarding overall Indian issues and not just Indian gaming concerns.

I am sending a copy of this letter to all parties copied on your May 19, 2008 opinion.

Sincerely,

David L. Bernhardt
Solicitor

cc:   Buford L. Rolin, Tribal Chairman
      William Perry, Sonosky, Chambers, Sachse, Endreson, & Perry
      Cindy Altimus, Region Director
      Troy King, Attorney General, State of Alabama

5

# EXHIBIT D



July 30, 2008

David L. Bernhardt, Solicitor
United States Department of the Interior
Office of the Solicitor
Mail Stop 6352
Washington, DC 20240

Dear Mr. Bernhardt:

We received your June 13, 2008 letter that seeks to review the National Indian Gaming
Commission (NIGC or Commission) Chairman's decision to continue regulating the Poarch
Band of Creek Indians' (Tribe) gaming facility in Tallapoosa, Alabama. You also request a copy
of the administrative record on which the Chairman relied. We will provide the record to you as
a matter of courtesy under separate cover. I respectfully and categorically reject, however, your
assertions that the Secretary of the Interior (Secretary) has the authority to review and approve or
disapprove the Chairman's decision. I also strongly disagree with your characterization of the
respective authorities of the NIGC and the Secretary under the Indian Gaming Regulatory Act
(IGRA).

### Background

This matter began when the State of Alabama wrote to the NIGC expressing concern over the
eligibility of the Tallapoosa site for gaming. *See* Letter from Jack Park, Assistant Attorney
General for the State of Alabama to Penny Coleman, Acting General Counsel (Nov. 20, 2003).
The Tribe operates a Class II gaming facility regulated by the NIGC. That regulation includes,
among other things, conducting site visits to determine compliance with IGRA, processing
fingerprints and reviewing background investigation reports for key employees and primary
management officials, accepting fees for regulating, accepting and reviewing audit and agreed
upon procedures reports, and providing such technical assistance as may be required.

Upon receipt of the State's inquiry, the Chairman reviewed the Tallapoosa site's status to
determine its eligibility for gaming and whether an enforcement action might be necessary. To
accomplish this review, NIGC sought records and documentation from the Department of the
Interior (Department), particularly focusing on information the Department had relied on to
recognize the Tribe and to acquire the Tallapoosa site into trust. Unfortunately, the Department
was not able to timely comply with NIGC's record request. Therefore, the Commission's review
was delayed. The factual record, which was ultimately compiled by NIGC, was extensive and
included the Department's acknowledgement and land-into-trust records; Bureau of Indian
Affairs' (BIA) land records; historical records, maps, archaeological reports; and other
documentation from the Tribe.

now the State of Alabama in the first half of the nineteenth century. Before the forced resettlement to the Indian Territory, ancestors of the Poarch Band allied with the United States to fight against the other Creeks. Thereafter, they were rewarded with land grants and were allowed to remain in Alabama. As a result of the forced resettlement, what was once the Creek Nation of Alabama now exists as the Poarch Band, the Muskogee (Creek) Nation in Oklahoma and certain recognized tribal towns.

The Tribe's government-to-government relationship with the United States ended under the terms of an 1832 treaty, which terminated United States' protection over the Tribes's lands in 1837. Subsequently, the United States specifically and repeatedly disclaimed any relationship with the Poarch Band. It was not until the Tribe was recognized under the Department of Interior's recognition regulations in 1984 did the Tribe once again enjoy a government-to-government relationship with the United States.

Because of the complexity of the issues presented by the Band's history, the Commission's review was careful, comprehensive, and included many discussions with the Office of the Solicitor, Division of Indian Affairs (Division). As the review progressed and issues were raised, both the Office of General Counsel (OGC) and the Division asked the Tribe to provide additional documentation and views to address these issues. Given the different views presented and the extensive factual record compiled, the OGC exercised great care in its restored lands analysis.

In the end, the OGC's last draft legal opinion sent to the Division supported a conclusion that the Tribe could conduct gaming on the Tallapoosa site. That opinion was based specifically on a theory recommended by the Department's attorneys. OGC was dismayed, therefore, when the same attorneys then refused to concur with the draft opinion. OGC requested the non-concurrence in writing.

In reviewing the non-concurrence, we determined that the Division's analysis failed for several reasons. The analysis (1) failed to remain consistent with previous interpretations of the Indian Gaming Regulatory Act; (2) failed to take into account the Indian canon of construction, which requires that an ambiguous statute must be interpreted in favor of tribes; (3) was inconsistent with case law that the NIGC cited in previous determinations; and (4) was contrary to case law because it recognized only Congressional termination and not administrative termination of the government-to-government relationship. We also realized that there were weaknesses in the General Counsel's draft and addressed those issues during the first few months of 2008. Regrettably, as we struggled with those weaknesses, we did not continue to collaborate as we developed our views.

During that time, we were advised by tribal representatives that the Commission's hesitation was adversely affecting the Tribe's business dealings. The Department of the Interior also indicated its intent to issue regulations governing the applicability of 25 U.S.C. § 2719 when the Secretary acquires lands into trust. Those regulations were not immediately effective, and the Chairman recognized that if he relied upon them, he might have to start the review process over again.

Therefore, because the Tribe had waited for over four years for the Commission's views and because the Chairman believed that he had a thoroughly researched and well-reasoned basis for a decision, the Chairman chose to issue his decision. Consequently, on May 19, 2008, the Chairman concluded that he would not take an enforcement action against the Tribe, and the Commission would continue to regulate the Tallapoosa Entertainment Center.

Additionally, I note that throughout your June 13, 2008 letter, you refer to the decision as an "opinion," suggesting that it was merely advisory and issued by the OGC. On the contrary, the May 19, 2008 letter was a decision by the Chairman pursuant to the enforcement authority granted to him under IGRA. 25 U.S.C. § 2713. As such, his decision is an agency action with legal effect. It is reviewable only by the Commission and the federal courts. Further, even if his May 19 decision had been an opinion of the OGC, the opinion would be reviewable only by the Chairman.

ANALYSIS

I.    The Secretary's authority under IGRA is strictly limited.

Your statements that the "Secretary has authority for Indian matters and matters related to Indian gaming that are not expressly assigned to any entity under IGRA" and that the Secretary has the power to "fill any gaps in IGRA" ignore the plain and unambiguous language of IGRA. It is well settled that the proper interpretation of an unambiguous statute requires nothing else. *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms".) (*quoting United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (*in turn quoting Caminetti v. United States*, 242 U.S. 470, 485 (1917)). Contrary to your claims, section 2709 of IGRA specifically and unambiguously transfers all of the Secretary's powers over gaming to the NIGC. 25 U.S.C. § 2709. Accordingly, the Secretary retains only those powers that he has been specifically delegated under IGRA.

Section 2709 states that the Secretary's general authority over gaming was expressly taken from him and given to the Commission:

> Notwithstanding any other provision of this chapter, the Secretary shall continue to exercise those authorities vested in the Secretary on the day before October 17, 1988, relating to supervision of Indian gaming until such time as the Commission is organized and prescribes regulations. . . .

This section is clear and unambiguous. The Secretary was able to exercise his authority over gaming until the Commission prescribed the bulk of its regulations in 1993. *See* 57 Fed. Reg. 12382 (April 9, 1992) and 58 Fed. Reg. 5802 (January 2, 1993). Consequently, any authority the Secretary may have had over gaming vested with the Commission by 1993.

To the same effect is section 2711(h), which removed from the Secretary the power to approve management contracts under 25 U.S.C. § 81 and vested it in the Commission:

The authority of the Secretary under section 81 of this title [25 U.S.C. § 81], relating to management contracts regulated pursuant to this Act, is hereby transferred to the Commission.

25 U.S.C. § 2711(h).

Therefore, when Congress granted the Department authority under 25 U.S.C. § 2719(b)(1), it was not a general grant of authority. Rather, under § 2719, Congress granted the Secretary authority to act only in specifically delimited circumstances: to determine whether gaming on certain parcels may be in the best interest of an Indian tribe and not detrimental to the surrounding community, 25 U.S.C. § 2719(b)(1)(A); to identify the former reserves in Oklahoma 25 U.S.C. § 2719(a)(2)(A)(i); and to determine reservation status, 2002 Dep't of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, § 134, 115 Stat. 414, 442-43 (2001). In the balance of IGRA, the Secretary's authority is limited to approving tribal revenue allocation plans so as to allow per capita payments from net gaming revenue, 25 U.S.C. § 2710(b)(3)(B); approval of tribal-state compacts, 25 U.S.C. § 2710(d)(8); and issuance of procedures in lieu of a tribal-state compact under specified conditions, 25 U.S.C. § 2710(d)(7)(B)(vii).

Contrary to your claim, it is the NIGC and not the Department that administers IGRA, and it is the NIGC and not the Department that fills any "gaps" that exist in IGRA. This, the courts have made abundantly clear, is why Congress delegated to the Commission and not to the Department the authority to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions" of IGRA. 25 U.S.C. § 2706(b)(10). "NIGC is the agency expressly charged by Congress with administering the IGRA" by virtue of 25 U.S.C. 2706(b)(10). *Citizens Against Casino Gambling in Erie County (CACGEC) v. Kempthorne*, 471 F. Supp. 2d 295, 321 (W.D.N.Y 2007). *See also, Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1023 (10th Cir. 2003) ("NIGC's broad powers include inspecting tribes' books and records… levying and collecting civil fines, monitoring and shutting down unauthorized tribal games, and promulgating regulations and guidelines to implement IGRA."); *Shakopee Mdewakanton Sioux Community v. Hope*, 16 F.3d 261, 263 (8th Cir. 1994) ("IGRA established the Commission to regulate Indian gaming, and specifically authorized the Commission to promulgate regulations and guidelines necessary to implement the provisions of the Act."); *CACGEC*, 471 F. Supp. 2d at 322 (grant of rulemaking authority carries with it "the primary authority to interpret any ambiguous phrases or terms contained in the IGRA.").

What is more, NIGC's role as the administrator of IGRA carries with it the ability to make Indian lands determinations. *See, e.g., Grand Traverse Band of Ottawa & Chippewa Indians v. United States Atty.*, 46 F. Supp. 2d 689, 707 (W.D. Mich. 1999) (the question of restored land is within the NIGC's "special competence."); *County of Amador, California v. United States DOI*, 2007 U.S. Dist. LEXIS 95715 at *17, n. 7 (E.D. Cal. Dec. 12, 2007) ("[O]utside the context of the trust application, NIGC retains the authority for determining whether the restored lands exception applies."); *CAGEC*, 471 F. Supp. 2d at 303 ("the Indian lands determination is one that

Congress placed in the NIGC's hands..."). As shown more fully below, the language of IGRA makes this so.[1]

## II.   Congress specifically delegated to the NIGC the authority to determine the status of Indian lands as part of its oversight of Indian gaming.

That NIGC is responsible for administering IGRA means, under IGRA's plain terms, that NIGC has oversight authority over Indian gaming. *Kansas v. United States*, 249 F.3d 1213, 1218 n. 1 (10th Cir. 2001) ("Although the NIGC is nominally part of … Interior, Congress has given the NIGC exclusive authority to regulate Indian gaming conducted pursuant to IGRA"); For example, IGRA provides NIGC with the authority to monitor and inspect the premises on which gaming takes place. 25 U.S.C. § 2706(b)(1)-(2). Moreover, IGRA specifically requires the Chairman to review and approve tribal gaming ordinances that authorize gaming on Indian lands. 25 U.S.C. § 2710(b)(2) and (d)(1)(A). It also requires the Chairman to review and approve management contracts for tribal gaming operations. 25 U.S.C. § 2711. Further, IGRA permits the Chairman to take enforcement action against the operators of tribal gaming facilities that violate any section of IGRA, NIGC regulations, or approved tribal gaming ordinances. 25 U.S.C. § 2713; 25 C.F.R. parts 573 and 575. Appeals from the Chairman's actions are heard by the full Commission, which is authorized to hold hearings on appeal and to request all witnesses and documents needed to make its decision. 25 U.S.C. §§ 2715 and 2716; 25 C.F.R. parts 539 and 577; 25 U.S.C. §§ 2706(b)(4), (8), 2713(a)(2-3), and 2715(a) and (d). Finally, the Chairman's enforcement actions are reviewable only by the Commission or the courts. 25 U.S.C. §§ 2713(c), 2714.

That said, Indian gaming is only permissible on *Indian lands*, which IGRA defines as:

> All lands within the limits of an Indian reservation; and any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703 (4). In other words, IGRA expressly provides for Indian gaming only where land qualifies as *Indian lands* under the Act. *See, e.g., State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701 (1st Cir. 1994) (finding that the Act's key provisions are limited to any Indian tribe having jurisdiction over Indian lands and to Indian lands within such tribe's jurisdiction). IGRA's "on Indian lands" requirement is integrally woven throughout the regulatory tapestry of the Act. 25 U.S.C. § 2710(a)(1-2), (b)(1), (d)(1), (d)(3)(A-B)(permitting Class II and Class III gaming *only* on Indian lands). As Congress established NIGC to oversee

---

[1] We do not mean to suggest, however, that the Secretary cannot decide the status of Indian lands under his own separate authority to acquire land into trust. *County of Amador*, 2007 US Lexis 95715 at *7-*8 ("While NIGC regulates gaming, DOI analyzed whether gaming would be permissible on the land, because, under regulations implementing Section 5 of the IRA, DOI must take into account the purpose for which the land will be used. 25 C.F.R. §151.11. This is not to suggest, however, that DOI's analysis is subsequently binding upon the NIGC.")

exercised on Indian lands.

As the agency head specifically tasked under the statute with the duty to monitor gaming, approve management contracts, approve ordinances, and take enforcement action, the Chairman must have the power to first determine the extent of his agency's jurisdiction. As that jurisdiction is necessarily coextensive with Indian lands, IGRA necessarily grants the Chairman the authority to make Indian lands determinations in the process of exercising these powers. It is beyond question that administrative agencies have the authority to determine their own jurisdiction prior to taking action. *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 647 (1972); *Newport News Shipbuilding & Dry Dock Co. v. Schauffler*, 303 U.S. 54, 57 (1938). *See also United States v. Morton Salt Co.*, 338 U.S. 632, 641-643 (1950) ("When investigative duties are delegated by statute to an administrative body, it . . . may . . . inform itself as to whether there is a probable violation of the law."); *United Transp. Union-Illinois Legislative Bd. v. Surface Transp. Bd.*, 169 F.3d 474, 476 (7th Cir. 1999) (agency's determination of its own jurisdiction not entitled to *Chevron* deference upon judicial review).

Put slightly differently, where a statute vests an administrative agency with authority to oversee a particular industry or subject matter, it necessarily confers on that agency the authority to determine whether particular activities, actions or entities fall within its jurisdiction. *See, e.g., Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508-509 (1943) (Secretary of Labor empowered to determine which employees and government contracts fall within Walsh-Healey Public Contracts Act, mandating minimum wages in government contracts and allowing sanctions for violations and non-compliance.); *Reliable Automatic Sprinkler Co., Inc. v. Consumer Product Safety Commission*, 324 F.3d 726 (D.C. Cir. 2003) (whether sprinkler heads are "consumer products" within statutory jurisdiction of Consumer Products Safety Commission).

### A. The NIGC Chairman has exclusive authority to make, and is required to make, an Indian lands determination when presented with a tribal gaming management contract.

Congress gave the NIGC Chairman the authority to review and approve gaming management contracts, 25 U.S.C. § 2711, which he is required to do before such a contract is valid. Again, in giving the Chairman this power, Congress stripped it from the Secretary. 25 U.S.C. § 2711(h).

Management contracts have certain submission and content requirements set forth in IGRA and NIGC regulations. 25 U.S.C. § 2711(a)-(c), (g); 25 C.F.R. §§ 531.1, 533.1, and 533.3. Among these requirements is that a management contract must relate to a specific gaming site that qualifies as Indian lands. To determine whether to approve a management contract, therefore, the Chairman must determine whether the desired gaming will occur on Indian lands that meet IGRA's requirements. 25 U.S.C. §§ 2703(4), 2719. To make this determination, the Chairman must conduct an Indian lands analysis prior to contract approval. In light of this, your suggestion that the Chairman must request land opinions from your office when reviewing a management contract is inconsistent with federal law.

In fact, the District Court of Kansas emphasized this point:

> The IGRA created the NIGC to, among other things, review management
> contracts for class II gaming.... Part of that responsibility included determining
> whether or not a tribe exercises governmental authority over the land on which it
> seeks to conduct gaming....

*Miami Tribe of Oklahoma v United States*, 927 F. Supp. 1414, 1423 (D. Kan. 1996).

The Ninth Circuit Court of Appeals echoed this sentiment in *AT&T Corp. v. Coeur D'Alene
Tribe*, 295 F.3d 899, 902 (9th Cir. 2002), when it addressed the Chairman's approval of a
management contract for a tribal telephone lottery:

> The NIGC is statutorily obliged to reject any lottery proposal that does not
> conform to IGRA . . . In fact, the NIGC has previously refused to approve
> management agreements when it believed the proposed gaming activity will not
> be conducted "on Indian lands" for IGRA purposes.

295 F.3d at 909 (*citing Miami Tribe of Oklahoma v. United States*, 5 F. Supp.
2d 1213, 1218 (D. Kan. 1998)). Thus, the NIGC Chairman has the exclusive authority to
determine Indian lands for the purpose of gaming when he reviews and approves management
contracts.

### B. The NIGC Chairman has exclusive authority to make, and is required to make, an Indian lands determination when presented with a site-specific tribal gaming ordinance.

Next, as with management contracts, Congress gave the Chairman the authority to review tribal
gaming ordinances to determine whether they meet IGRA's requirements. The Chairman must
approve an ordinance before it is valid. 25 U.S.C. §§ 2710(b)(2) and (d)(1)(A). While IGRA
requires ordinances to include certain provisions, 25 U.S.C. § 2710(b)(2)-(4); 25 C.F.R. § 522.4,
and parts 556 and 558, tribes often exercise their sovereign legislative powers and include
additional provisions that are not mandated by IGRA. A common additional provision is a clause
authorizing gaming on a specific parcel of land creating a so-called *site-specific ordinance*. To
date, the Chairman has reviewed over 23 site-specific ordinances and continues to receive such
requests for approval. The plain and unambiguous language of IGRA requires the Chairman to
make an Indian lands determination when faced with a site-specific ordinance authorizing Class
II gaming:

> The Chairman shall approve any tribal ordinance or resolution concerning the
> conduct, or regulation of Class II gaming on the Indian lands within the tribe's
> jurisdiction if such ordinance or resolution provides that . . . .

25 U.S.C. § 2710(b)(2). By incorporating this language by reference for Class III gaming, IGRA
requires this same determination for a site-specific Class III ordinances. 25 U.S.C.
§ 2710(d)(1)(A)(ii).

That is, IGRA only authorizes the Chairman to approve a site-specific ordinance if it authorizes gaming on *Indian lands*, as IGRA defines the term. Without confirmation that the site-specific ordinance authorizes gaming on Indian lands eligible for gaming, the Chairman would have to disapprove the ordinance. To approve an ordinance that specifically permitted gaming on ineligible lands would authorize a tribe to offer gaming that IGRA prohibits. *AT&T Corp.*, 295 F.3d at 908 ("the statutory framework suffices to demonstrate that the NIGC must consider the legality of Class III gaming before approving compacts, resolutions, ordinances, and management contracts . . . ").

Federal courts recognize the NIGC's authority to issue land opinions in connection with ordinance reviews:

> The NIGC is charged with interpreting and applying the IGRA to Indian lands for gaming. *See Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1422 (D. Kan. 1996) (holding that NIGC had the authority to determine whether particular lands were within the tribe's jurisdiction for purposes of determining whether they constituted "Indian lands" within the meaning of the statute).

*Grand Traverse*, 46 F. Supp. 2d at 707. Further, the District Court for the Western District of New York insisted that the Chairman must complete such a determination as part of his duties:

> Having fully considered the purpose and structure of the IGRA, and the authority delegated to the NIGC by Congress, this Court rejects Defendants' contention that the NIGC Chairman is not required to make "Indian lands" determinations when he acts on a tribal gaming ordinance. To the contrary, whether Indian gaming will occur on Indian lands is a threshold jurisdictional question that the NIGC must address on ordinance review to establish that: 1) gaming is permitted on the land in question under the IGRA, and 2) the NIGC will have regulatory and enforcement power over the gaming activities occurring on that land.

*CACGEC*, 471 F. Supp. 2d at 303. In fact, the court in *CACGEC* vacated the Chairman's ordinance approval because the Chairman did not make an Indian lands determination on a site-specific compact: "Because the Indian lands determination *is one that Congress placed in NIGC's hands*, the NIGC's 2002 ordinance approval is vacated . . . ." *Id.* at 303 (emphasis added).

The statutory obligation to review and approve site-specific ordinances grants the NIGC Chairman the exclusive authority in those instances to determine Indian lands for the purpose of gaming.

### C. The NIGC Chairman has the exclusive authority to make, and is required to make, an Indian lands determination prior to the initiation of an enforcement action.

Lastly, Congress gave the Chairman authority to bring enforcement actions against any tribal gaming operator or manager that violates IGRA's provisions, NIGC regulations, or tribal gaming ordinances. 25 U.S.C. § 2713. To assist the Chairman in an enforcement investigation, the Commission may use its power to request witnesses and documents and issue subpoenas. 25 U.S.C. § 2715(a). Additionally, the Commission may order depositions with proper notice to the parties. 25 U.S.C. § 2715(d). For violations of IGRA, the Chairman may assess civil fines of up to $25,000 per day or closure of all or part of a gaming operation. 25 U.S.C. § 2713(a)-(b).

IGRA's specific language is:

> The Chairman shall have the authority to levy and collect appropriate civil fines, not to exceed $25,000 per violation, against the tribal operator of an Indian game or a management contractor engaged in gaming for any violation of this chapter, any regulation prescribed by the Commission pursuant to this chapter, or tribal regulations, ordnances, or resolutions approved under section 2710 and 2712 of this title.

25 U.S.C. § 2713(a).

The Chairman may only bring enforcement actions against those operations that come within the Commission's jurisdiction, and as explained above, the Commission's jurisdiction extends only to Indian lands. Accordingly, the Chairman must have the ability to determine whether the operations are on Indian lands in order to be able to bring an enforcement action in the first place.

Once again, courts recognize this. The District Court for the Western District of Washington recently held that "tribal gaming under IGRA must occur on 'Indian lands' and the NIGC is the agency charged with ensuring this happens." *North County Community Alliance v. Kempthorne*, No. C07-1098-JCC, slip op. at 14 (W.D. Wash. Nov. 16, 2007).

Again, then, the Chairman's statutory authority to bring enforcement actions for IGRA violations necessarily gives him the exclusive authority in those instances to determine Indian lands for the purpose of assessing his jurisdiction. For the same reasons, the Chairman also has exclusive authority to make an Indian lands determination as part of investigating whether a tribe is gaming on Indian lands where gaming is prohibited under IGRA. This was the essence of the Chairman's Poarch Band determination. He acted under the authority expressly granted to him under IGRA, 25 U.S.C. §§ 2705(a)(1)-(2), 2713(a), and responded to the State of Alabama's concern that the Tribe was gaming on lands in violation of IGRA. The Chairman issued a decision concluding that no enforcement action was warranted because the Tribe was gaming in compliance with IGRA. The Chairman's decision was squarely within this statutory enforcement authority.

Case 2:12-cv-01079-MHT-CSC  Document 190-1  Filed 03/09/20  Page 46 of 146
USCA11 Case: 21-11648  as Document 36  Date Filed: 07/27/2023  Page: 177 of 1019
the authority to order the NIGC to take actions on whether to regulate gaming

All of that said, the Secretary lacks the authority to oversee the Chairman's Poarch decision for other, equally sufficient reasons. NIGC's nominal placement "within" the Department of the Interior is insufficient to give the Secretary any authority over NIGC decisions. Congress, courts, and other federal agencies have all acknowledged NIGC as an independent agency. Your analysis ignores this. It also ignores IGRA's language and legislative history, case law that specifically addresses the NIGC's independence, the course of dealing between the Department and NIGC that treated the NIGC as independent, and the history of the treatment of the NIGC as independent by other offices of the Executive branch and the Congress.

### A. The NIGC Meets All of the Characteristics of Independent Agencies

Justice Sutherland described the independent agency:

> [It is] a body of experts who shall gain experience by length of service —
> a body which shall be independent of executive authority, except in its
> selection, and free to exercise its judgment without the leave or hindrance
> of any other official or any department of the government.

*Humphrey's Ex'r v. United States,* 295 U.S. 602, 624, 625-626 (1935) (internal citations omitted), cited in Breger & Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies,* 52 ADMIN. L. REV. 1112, 1113. (Fall 2000).

Numerous other law review articles and treatises have been written on the subject of independent agencies and their identifying characteristics. *See, e.g., Symposium: The Independence of Independent Agencies,* 1988 DUKE L.J. 215; *A Symposium on Administrative Law: The Uneasy Constitutional Status of the Administrative Agencies,* 36 AM. U. L. Rev. 277 (1987); Geoffrey P. Miller, *Independent Agencies,* 1986 SUP. CT. REV. 41; Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch,* 84 COLUM. L. REV. 573 (1984); and Bernard Schwartz, *Administrative Law* § 1.10 at 20 (3d ed. 1991). The Breger & Edles article is noteworthy here, however, not only because it explains those identifying characteristics but also because it analyzes the NIGC as part of its survey of 32 independent agencies. Breger & Edles at 1139, 1272-1273.

The following are the fundamental characteristics of agencies that are independent of executive authority:

- A multi-member commission whose members serve fixed terms.

- Protection against removal except "for cause."

  > The defining characteristic of the 32 agencies discussed in Breger and Edles's
  > article is that at least one member of the agency is appointed by the President
  > to a full-time, fixed term position with the advice and consent of the Senate

and has protection against summary removal by some form of "for cause" restriction on the President's authority. *Id.* at 1113.

This "for cause" removal feature continues to be a critical criterion by which scholars typically distinguish between "independent" and executive branch agencies. *See, e.g.,* Davis & Pierce, *Administrative Law* § 2.5 at 46 (3d ed. 1994) ("The characteristic that most sharply distinguishes independent agencies is the existence of a statutory limit on the President's power to remove the head (or members) of an agency." Schwartz, §1.10 at 20 ("The key to independence is security of tenure."); and Peter L. Strauss, *An Introduction to Administrative Justice in the United States* 15 (1989) ("Because [independent commission] members are appointed for fixed terms from which they cannot be dismissed without formal cause, they are more remote from presidential influence and control than the more usual 'executive' agency.").

- Possess a combination of rulemaking, enforcement, and adjudication powers and functions.

- Members generally appointed by the President with the advice and consent of the Senate.

    This is not always the case as Breger and Edles noted with the NIGC: "For example, the chairman of the National Indian Gaming Commission is appointed by the President with the advice and consent of the Senate, but the other two members are appointed by the Secretary of the Interior. All members serve three-year terms and can only be removed from office for good cause." Breger and Edles at 1139.

- Typically, agency statutes require political balance, *i.e.* no more than a bare majority of members may come from the same political party.

- Agency has specialized mandate directing it to focus either on particular industry or on specific cross-cutting problems.

- Agency makes its own submissions to Congress.

- Agency chairperson is the chief executive and appoints and supervises staff and prepares the agency's budget and expenditure of funds.

*Id.* at 1112, 1138-1142, 1115 and 1165.

The NIGC possesses all of these hallmarks of an independent agency:

- The Commission is a multi-member body whose members serve fixed terms. 25 U.S.C. § 2704 (b)(4)(A).

- Commission members enjoy secure tenure. Commissioners are removable only for cause. 25 U.S.C. § 2704(b)(6).

- The Commission possesses a combination of rulemaking, enforcement and adjudication powers and functions. *See, e.g.,* 25 U.S.C. § 2706(b)(10) (the Commission "shall promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this Act"); 25 U.S.C. § 2706(b)(1)-(4) (Commission to monitor gaming, inspect gaming facilities, conduct background investigations and audits); 25 U.S.C. § 2715(a) (subpoena and deposition authority for any matter under investigation); 25 U.S.C. §§ 2705(a)(2), 2713(a) (Chairman has authority to assess civil fines of $25,000 per day); 25 U.S.C. § 2705(a)(1), 2713(b) (Chairman has authority to order temporary closure of casino); 25 U.S.C. § 2706(b)(8) (Commission may hold hearings and take testimony as necessary); 25 U.S.C. § 2713(a)(2) (appeal of Chairman's civil fine assessment to full Commission); and 25 U.S.C. § 2713(b)(2) (appeal of Chairman's closure order to full Commission).

- The Chairman is appointed by the President with the advice and consent of the Senate. 25 U.S.C. § 2704(b)(1)(A).

- Appointments to the Commission are limited by political party and tribal membership. Specifically, no more than two commissioners may be from the same political party and at least two commissioners must be enrolled members of an Indian tribe. 25 U.S.C. § 2704 (b)(3).

- Congress delegated powers to the Commission in furtherance of a specific mandate, namely the oversight and protection of Indian gaming and the promotion of tribal economic development, tribal self sufficiency, and strong tribal government. 25 U.S.C. §§ 2701, 2702.

- The Commission is required to submit its own report to Congress with information on its funding, recommendations for amendments to IGRA, and any other matters considered appropriate by the Commission. 25 U.S.C. § 2706(c).

- The Chairman is the chief executive of the NIGC. He appoints the General Counsel, 25 U.S.C. § 2707(a), and appoints and supervises other staff of the Commission. 25 U.S.C. § 2707(b). At the request of the Chairman, "the head of any federal agency is authorized to detail of the personnel of such agency to the Commission . . . ." 25 U.S.C. § 2707(d). The Chairman and the Commission prepare and adopt the agency's budget. 25 U.S.C. § 2706(a)(1).

Moreover, other executive departments have independent agencies "within" or "in" them. For example, the Federal Energy Regulatory Commission's (FERC) enabling legislation describes it as an "independent regulatory commission" within the Department of Energy. Notwithstanding its location, courts treat FERC as an entity independent of the Department of Energy. *Consumer Energy Council of America v. FERC,* 673 F.2d 425, 472 (D.C. Cir. 1982) (identifying FERC as

functionally independent of the Executive Branch due to tenure of commissioners and finding that the Supreme Court has upheld "the constitutionality of such agency independence"). Additionally, the legislation creating the Surface Transportation Board states that "[t]here is hereby established within the Department of Transportation the Surface Transportation Board." 49 U.S.C. § 701(a). *See also Commonwealth of Pennsylvania v. Surface Transportation Board*, 290 F. 3d 522, 524 (3rd Cir. 2002) ("The Surface Transportation Board is the independent federal agency established by Congress within the Department of Transportation and has the responsibility for the economic regulation of the country's railroads."). Likewise, the legislation creating the United States Parole Commission provides that "[t]here is hereby established an independent agency in the Department of Justice. . . ." 18 U.S.C. § 4202. *See also U.S. v. Coyer*, 732 F.2d 196, 200 (1984) (describing the Parole Commission as "an independent agency of the Executive subject to the supervisory oversight of the Congress . . .").

### B. IGRA's Statutory Provisions and Legislative History Show that NIGC is an Independent Agency

Congress explicitly made the NIGC an independent agency. IGRA states, "the purpose of this chapter is . . . to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands . . . and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(3)). While this language could be construed to create authority independent of tribes and states rather than to create a regulatory body independent of the Executive, a review of the legislative history dispels this notion.

Again, where "the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Toibb v. Radloff*, 501 U.S. 157, 162 (1991), *citing Blum v. Stevenson*, 465 U.S. 886, 896 (1984). Here, the Senate report accompanying the passage of IGRA provides Congress's intention clearly and unambiguously: the bill "established a National Indian Gaming Commission as an independent agency within the Department of Interior." S. Rep. No. 100-446, at 1 (1988). This language clarifies, beyond any doubt, Congress's intention to create the NIGC as an independent agency. Lest there be any doubt, however, Congress reiterated its intention when it amended IGRA in 2005:

> Additionally, it is to be noted that the NIGC is an independent regulatory agency. This status has ramifications, including, that the agency is not governed by Executive Order 13175, which compels agencies other than independent regulatory agencies to consult tribal officials in the development of regulatory policies that have tribal implications. The Executive Order encourages independent agencies to observe its precepts, however, and the Committee notes with approval that the Commission, through its current consultation policy, has endeavored to do so.

S. Rep. No. 109-122 at 3 (2005).

Several courts have held that NIGC is an independent agency. In 1991, shortly after IGRA was passed and before the NIGC was fully functional, the Tenth Circuit Court of Appeals recognized that under IGRA, gaming "is subject to the supervision of a newly created, independent regulatory authority – the National Indian Gaming Commission – established to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." *United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1176 (10th Cir. 1991), *quoting* 25 U.S.C. §§ 2702(3), 2704. IGRA was described by this court as "a comprehensive and pervasive piece of legislation that in many respects preempts other federal laws that might apply to gaming." *Id.*, *quoting Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 743 F. Supp. 645, 648 (D.Wis. 1990). Likewise, in two separate cases, the Seventh Circuit noted NIGC's independence. *United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208 (7th Cir. 1995) (the NIGC is a "three-member independent agency within the Department of Interior."); *United States ex rel. Mosay v. Buffalo Bros. Management*, 20 F.3d 739 (7th Cir. 1994) ("Congress enacted the Indian Gaming Regulatory Act, which establishes a three-member independent agency within the Department of Interior, the National Indian Gaming Commission, to supervise Indian gambling.").

### D. The Course of Dealing Between the Department and NIGC Supports NIGC's Independent Authority.

I note that the your current claim stands in stark contrast not only to the court opinions discussed above, but to the Department's own position as stated in *Sac and Fox Nation v. Norton*, 240 F.3d 1250, 1265 n. 12 (10th Cir. 2001) ("Although the Commission is nominally part of the Department of the Interior, the Secretary conceded at oral argument that the Commission functions as an independent entity.").

You cite to the Departmental Manual for support of your new claim that the Department must supervise the work of the NIGC. *See* Letter from Bernhardt to Hogen of 6/13/08. This fails to acknowledge the true nature of the relationship: the Department is obligated through contractual relationship to provide NIGC with administrative services. By statute, the NIGC is free to contract elsewhere for such services, though the Department is obligated to provide them upon request. 25 U.S.C. § 2707(e).

In particular, NIGC contracts with the Department for support services such as personnel services and hearing officials for administrative appeals before the Commission. The NIGC pays for all services it receives, and the Department provides these services at NIGC's request because it is required to do so under IGRA. 25 U.S.C. § 2707(e). If the NIGC were simply part of the Department, a Congressional mandate of services would be unnecessary. Thus, despite this relationship of contractual service, IGRA indicates that the NIGC is independent from the Secretary, and it stretches the imagination to think this relationship could give the Secretary any authority over the NIGC.

Further, contrary to your assertion that the Commission must seek its legal advice from the Department, IGRA specifically directs the Chairman to appoint a General Counsel. 25 U.S.C. § 2707(a). If Congress had intended the Chairman to rely on the Department for advice, it would not have provided for a separate General Counsel who is answerable only to the Chairman. In fact, Congress underscored the importance of independent legal advice by making the General Counsel the only staff position specifically designated within IGRA. What is more, given that IGRA gives to the Chairman the authority to appoint a general counsel, the legal advice given by the general counsel's office is for the use and approval of the Chairman and the Commission alone. They, and only they, are OGC's clients. As such, even if the Chairman's May 19 Poarch Band decision was an opinion of the OGC, neither the Secretary nor your office has the ability to review, approve, or reject it.

Looked at slightly differently, Congress has tasked the NIGC with providing technical assistance to the tribes. 25 U.S.C. § 2706(d)(2). Technical assistance encompasses a broad range of activities, and one particular way that the Commission meets this obligation is to provide legal opinions through the OGC on matters over which the Commission exercises jurisdiction. These opinions may clarify various matters under IGRA from game classifications to Indian lands status. The Secretary's interpretation of IGRA, however, would deny the Commission's ability to opine on Indian lands generally. This runs afoul of the requirement to provide technical assistance and would improperly prevent NIGC from fulfilling its statutory mandates.

On occasion, the NIGC does require legal advice in matters of general law. Pursuant to a memorandum of understanding with the Office of the Solicitor, the NIGC formally requests advice and pays for the service. *See* Memorandum of Understanding, from Tadd Johnson, Chairman of NIGC, to Robert More, Director of Administration, Department of the Interior (undated). As with the administrative services, the Department provides occasional legal advice only through a contractual relationship and the NIGC is free to adopt such advice or obtain it elsewhere. As such, when the NIGC seeks to do business with the Department of Interior, it frequently does so through a memorandum of understanding or other cooperative agreement, not through any perceived chain of command.

### E. Congress Treats the NIGC as an Independent Agency

After all these years of functioning as an independent agency, one would think Congress would let the NIGC know if it did not intend for it to be one. To the contrary, however, Congress interacts with the NIGC as an independent agency and recently reiterated its independence. Again, in 2005, when Congress raised the cap on the amount of fees the NIGC can collect from tribal gaming revenue, the Senate report accompanying the legislation noted the NIGC's status as an independent regulatory agency. S.Rep. No. 109-122 at 3 (2006).

Further, NIGC makes its own submissions to Congress. Pursuant to IGRA, the NIGC issues its own biannual reports to Congress. 25 U.S.C. § 2706(c). The Commission has submitted reports for fiscal years 1998, 1999, 2000, 2003 and 2004. Since passage of NIGC fees legislation in 2005, the NIGC is required to comply with the Government Performance and Results Act of 1993 (GPRA). 31 U.S.C. § 1115 *et. seq.* Furthermore, the NIGC Chairman testifies directly

it holds NIGC oversight hearings.

### F. The Department of Justice and the National Archives and Records Administration Treat the NIGC as an Independent Agency

The Department of Justice (DOJ) also recognizes the NIGC as an independent agency. The NIGC is involved in litigation in its own name. *See, e.g., Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 2007 U.S. App. LEXIS 1651 (D.C. Cir. Jan. 23, 2007); *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1021 (10th Cir. 2003); *JPW Consultants, Inc. v. Nat'l Indian Gaming Comm'n*, 1999 U.S. App. LEXIS 11022 (D.C. Cir. Apr. 29, 1999); *Cabazon Band of Mission Indians v. National Indian Gaming Comm'n*, 304 U.S. App. D.C. 335 (D.C. Cir. 1994); *Citizens for Responsibility & Ethics in Wash. v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 45 (D.D.C. 2006).

Furthermore, in the Unified Agenda listing published twice a year by the National Archives and Records Administration, which summarizes the rules and proposed rules that each federal agency expects to issue during the next six months, the NIGC is listed separately from the Department and with all of the other independent agencies. *See* http://www.gpoaccess.gov/ua/browse1204.html. Congress, the courts, the Department, and other federal agencies have all acknowledged NIGC's independence from the Department. Therefore, the Secretary's claims of authority over NIGC are unfounded.

### V. The Secretary cannot grant himself more power through regulation than Congress has granted through statute.

Finally, you claim that the Secretary has power to review Commission decisions under the Department's regulation 43 C.F.R. § 4.5(a). Yet IGRA specifically states that decisions of the Chairman are reviewable only by the Commission and federal courts. 25 U.S.C. §§ 2713, 2714. You may not interpret 43 C.F.R. § 4.5 in a way that allows you to usurp the authority that Congress expressly granted to the Commission. "An agency literally has no power to act . . . unless and until Congress confers power upon it. . . . An agency may not confer power upon itself." *La. Public Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Section 4.5 gives the Secretary the authority "to review any decision of any employee . . . of the Department . . . or to direct any such employee . . . to reconsider a decision . . . ." In carrying out this authority, the Secretary will issue a written notice, request the administrative record, and subsequently issue a new written decision on the matter. 43 C.F.R. § 4.5(c). While this rule clarifies the Secretary's authority to review decisions made by his subordinate divisions, it does not grant him power to review the decisions of those outside his chain of command. *MCI Telecom. v. AT&T*, 512 U.S. 218, 231 (1994); *see also Massachusetts v. EPA*, 127 S.Ct. 1438, 1462 (2007). Thus, the Department's regulation in section 4.5 (or any other regulation) does not give the Secretary the authority to review or overturn decisions of the NIGC Chairman.

The Secretary may only review those decisions under section 4.5 that he has the authority to review. The Chairman is expressly granted enforcement authority over IGRA violations. 25

U.S.C. §§ 2705, 2713. The Chairman's decision in the Poarch matter was not an opinion but a determination of NIGC jurisdiction and a conclusion that the Tribe was not violating IGRA. To decide whether the Tribe was violating IGRA, the Chairman had to determine whether the lands constituted Indian lands on which the Tribe could conduct gaming. The Chairman's decision was a precursor to an enforcement action over which the Secretary can claim no authority.

Allowing the Secretary to review the Chairman's exercise of his statutory powers would directly contravene the express will of Congress. "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do." *La. Public Serv. Comm'n v. FCC*, 476 U.S. at 374-375.

## CONCLUSION

After thorough review of your letter, statutes, and case law, I conclude that the Secretary does not have the broad authorities you claim. Congress created the NIGC as an independent agency to administer IGRA and thereby vested regulatory authority for Indian gaming with the Chairman. The Department's authority under IGRA is limited to that expressly authorized by statute. Where IGRA is silent in delegation, that authority must necessarily rest with the administrator of the statute, the NIGC. Further, IGRA grants NIGC the power to determine its jurisdiction to monitor Indian gaming and to take action on site-specific ordinances, management contracts, and enforcement. This necessarily grants the agency the power to issue Indian lands decisions in those contexts. The Chairman acted within his statutory enforcement authority when he investigated the complaint of the State of Alabama and ultimately determined that the Poarch Band was properly gaming on lands within the definition of IGRA. The Chairman's decisions are reviewable only by the Commission and the federal courts. Any review by the Secretary would fail to account for NIGC's status as an independent agency and directly contravene express statutory language transferring the Secretary's authority over gaming to the Commission.

For all these reasons, you do not have the authority to review the Chairman's Poarch Band decision or to order the Commission not to act in compliance with that decision. Consequently, the Commission will continue to regulate the Tallapoosa site as mandated under IGRA.

Sincerely,

Penny J. Coleman

Penny J. Coleman
Acting General Counsel

cc: Buford L. Rolin, Poarch Band Tribal Chairman
   William Perry, Sonosky, Chambers, Sachse, Endreson & Perry
   Troy King, Attorney General, State of Alabama

# EXHIBIT E



RG279  Records of the Indian Claims
Commission

Closed Docketed Case Files, 1947-82

Docket # 21

Box 319                              Entry  11UD

318



MU001253

3267

BEFORE THE INDIAN CLAIMS COMMISSION

THE CREEK NATION,                    )                    (TITLE OMITTED)
          Petitioner,                )
                                     )
     VS.                             )          DOCKET NO. 21
                                     )
THE UNITED STATES,                   )
          Defendant.                 )

------------------------------------------------------------

STATEMENT OF SPECIFIC POINTS OF LAW AND AUTHORITIES
IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE.

------------------------------------------------------------

I.

THIS COMMISSION CAN AND SHOULD GRANT INTERVENTION IN PROCEEDINGS BEFORE
IT ON A PROPER SHOWING.

1.  The right to intervene is one well-recognized by federal tribunals as
a fundamental right; no express statutory authority is required.

a.  While in some jurisdictions the authority of courts to allow
intervention is not recognized in the absence of statute, it has been
recognized for many years in federal tribunals as a fundamental power of
courts not dependent on statute.  See Moore, Federal Practice and Procedure,
Section 24.

b.  Rule 24 of the Federal Rules of Civil Procedure now provides for
intervention in federal district courts as follows:

(a)  "Intervention of Right.  Upon timely application anyone
shall be permitted to intervene in an action.  (1)  When

- 1 -

MU001254

Case 2:12-cv-01079-MHT-CSC Document 190-1 Filed 03/09/20 Page 58 of 146
USCA11 Case: 21-11643 Document: 36 Date Filed: 07/27/2023 Page: 189 of 1019

3267                                                                           96

a statute of the U. S. confers an unconditional
right to intervene; or (2) when the representation
of the applicant's interest by existing parties is
or may be inadequate and the applicant is or may be
bound by a judgment in the action; or (3) when the
applicant is so situated as to be adversely affected
by a distribution or other disposition of moneys in
the custody of the court or of an officer thereof.

(b)   "Permissive Intervention. Upon timely application
anyone may be permitted to intervene in an action:
(1) When a statute of the U. S. confers a conditional
right to intervene; or (2) when an applicant's claim
or defense and the main action have a question of
law or fact in common. In exercising its discretion
the court shall consider whether the intervention
will unduly delay or prejudice the adjudication of the
rights of the original parties.

******************"

c. While the Federal Rules are not directly applicable to procedure

before this Commission, Rule 24 is a clear statement of the rule in all

federal tribunals, even in the absence of statute or any specific rule of

court. For, as the Committee Note, written at the time of promulgation of

the Rules, states concerning Rule 24:

"This rule amplifies and restates the present federal
practice in law and in equity".

2. In line with its broad jurisdiction and powers, this Commission has

the authority to grant intervention.

a. The Act creating this Commission gives it an exceedingly broad

jurisdiction over Indian claims, with the avowed purpose, as shown by the

language of the Act and by the Committee Reports, of enabling the Commission to

determine finally all claims of Indian groups. (Act of August 13, 1946, 60 Stat.

1049; Report No. 1466 of the Committee on Indian Affairs of the House of

Representatives, 79th Congress, 2d Session; Report No. 1715 of the Senate

- 2 -

MU001255

3267                                                      97

*start with folio*

11
12
25

Committee on Indian Affairs, 79th Congress, 2d Session).

    b. The grant of this broad jurisdiction necessarily implies the grant
of authority to permit these claims to be brought and adjudicated in the most
expeditious and just manner.

    c. The Act gives the Commission the power to establish its own rules
of procedure. (Act of August 13, 1946, 60 Stat. 1049, Section 9). The Commission
is thus the master and not the servant of its written rules of procedure, which
were doubtless promulgated by the Commission for its convenience and that of
claimants, and not to define the limits of the procedural authority of the
Commission.

    3. The Commission should grant intervention where it will avoid multiplicity
of actions or prevent injustice.

    a. It is obviously to the interest of the Commission as well as of
claimants before it to apply rules of procedure granting intervention, everywhere
recognized by statute or court decision as promoting a just, equitable and
expeditious handling of causes.

II.

APPLICANTS FOR INTERVENTION HEREIN ARE A TRIBE, BAND OR OTHER IDENTIFIABLE
GROUP WITHIN THE MEANING OF THE INDIAN CLAIMS COMMISSION ACT.

    1. Applicants are members of, claiming on the relation of, the Perdido
Band, a band of Creek Indians, duly organized.

    2. Applicants claim under the rights of the Creek nation as constituted
at the time of the injury, prior to the migration of a number of its members.

- 3 -

MU001256

Case 2:12-cv-01079-MHT-CSC  Document 190-1  Filed 03/09/20  Page 60 of 146
USCA11 Case: 21-11643   Document: 36   Date Filed: 07/27/2023   Page: 191 of 1019

98

3267

3. While the Perdido Band is but a newly formed band of descendants of
the original Creek nation, the effect of granting intervention will be to
place before this Commission the claim of the entire Creek nation as it existed
in 1814, and the right of all living descendants of its members to recover.

4. The original Creek nation of Indians is a readily identifiable tribe
or nation whose aboriginal territory was in Alabama, Georgia and Florida.
An official census of its members, known as Parsons' and Abbott's census, was
taken in 1832.

### III.

### APPLICANTS FOR INTERVENTION HAVE SUCH AN INTEREST IN THE CONTROVERSY THAT THEY SHOULD BE ALLOWED TO INTERVENE.

1. Where the interest of a party is of such direct and immediate character
that he will either gain or lose by the direct legal operation and effect of
judgment, he is entitled to intervene. (39 Am. Jur 935).

2. The injury for which relief is sought in this proceeding is one inflicted
on the Creek nation in 1814 by the taking of its lands. (Petition, Paragraphs 4 to
19, inclusive).

3. These lands were held as communal property. (U. S. vs. the Cherokee Nation,
(1906) 202 U. S. 101, 26 S. Ct. 588, 599, affirming (1905) 40 Ct. Cl. 252.).

4. The right of compensation for the taking belonged to all then members
of the nation. U. S. v. Cherokee Nation, supra, 26 S. Ct. at p 599, quoting with
approval from the opinion of the Court of Claims, as follows:

> "While the United States have always, or nearly always,
> treated the members of an Indian tribe as communal owners,
> they have never required that all the communal owners shall

- 4 -

MU001257

Case 2:12-cv-01079-MHT-CSC   Document 190-1   Filed 03/09/20   Page 61 of 146
USCA11 Case: 21-11643   Document: 36   Date Filed: 07/27/2023   Page: 192 of 1019

99

3267

join in the conveyance of cession of the land.
From the necessities of the case, negotiations have
been with representatives of the owners. The chiefs
and head men have ordinarily been the persons who
carried on the negotiations and who signed the treaty.
But they have not formed a body politic or a body
corporate, and they have not assumed to hold the title
or be entitled to the purchase money. They have simply
acted as representatives of the owners, making the cession
on their behalf, but allowing them to receive the considera-
tion per capita. In the present case the Cherokee Nation
takes the place, so far as communal ownership is involved,
of the chiefs and head men of the uncivilized tribes. This,
too, is consonant with the usage of nations. The claims of
individuals against a foreign power are always presented,
not by them individually, but by their government. The
claims are pressed as international, but the money received
is received in trust, to be paid over to the persons entitled
to it."

5.  Any recovery was distributable per capita to these members. (U. S. v.
Cherokee Nation, supra, 26 S. Ct. at p. 600).

6.  The organization of the Creeks in what is now Oklahoma has never been
recognized as the full successor to the original Creek nation. The fact that
this organization represents only those Creeks migrating westward and settling
in the Indian Territory in what is now Oklahoma is commonly recognized in treaties
and Acts of Congress.

a.  In the Treaty of February 14, 1833, adjusting the boundaries of the
Creek lands in the west, it was recognized that the Creek representatives signing
the Treaty were authorized to act only for Creeks west of the Mississippi. The
contracting Creeks were described as those "west of the Mississippi" and it
was stated that their Chiefs had "full power and authority to act for their
people west of the Mississippi". The parties to the Treaty also recognized that
the greater body of the Creek nation as of that time remained "on the east side
of the Mississippi." (7 Stat. 417).

b.  The description of the organization of the Creeks of the Indian
Territory appearing in treaties and statutes has commonly recognized the limited

- 5 -

MU001258

Case 2:12-cv-01079-MHT-CSC  Document 190-1  Filed 03/09/20  Page 62 of 146
USCA11 Case: 21-11643  Document: 36  Date Filed: 07/27/2023  Page: 193 of 1019

100

3257

character of petitioner by describing it as the Creek tribe "west of the
Mississippi River" (Treaty of August 7, 1856, 11 Stat. 699), or as the
"Creek Nation in the Indian Territory" (Act of June 28, 1898, 30 Stat. 495;
Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500).

7. This right passed to their descendants regardless of whether they
became members of the part of the nation residing in Indian Territory. U. S. v.
Cherokee Nation, supra, 26 S. Ct. at p. 600, quoting with approval from the
opinion of the Court of Claims, as follows:

> "As to those Cherokees who remained in Georgia and
> North Carolina, in Alabama and Tennessee, they owe
> no allegiance to the Cherokee Nation, and the nation
> owes no political protection to them. But they, as
> communal owners of the lands east of the Mississippi,
> at the time of the treaty of 1835, were equally
> interested, with the communal owners who were carried
> to the West, in the $5,000,000 fund which was the
> consideration of the cession, so far as it was to be
> distributed per capita. The Cherokee Nation was not
> bound to prosecute their claims against the United
> States for the unpaid balance of the $5,000,000 fund,
> but their rights were inextricably interwoven with
> the rights and equities of the Cherokees who were
> citizens of the nation, and the nation properly made
> no distinction when parting with the Outlet, but
> demanded justice from the Cherokee point of view for all
> Cherokees who had been wronged by the nonfulfilment of
> the treaty of New Echota. As to these Eastern nonresident
> Cherokee aliens the nation acted simply as an attorney
> collecting a debt. In its hands the moneys would be an
> implied trust for the benefit of the equitable owners."

8. Recognition by the United States of the tribal organization of the
migrating Creeks as the political body of the Creek nation could not constitutionally
operate to deprive your applicants and others similarly situated of their rights.

9. These rights were specifically guaranteed by the Act of February 8,
1887 and the Act of May 8, 1906 (24 Stat. 388, Section 6; 34 Stat. 182). The
latter act amended the earlier act to read in part as follows:

- 6 -

MU001259

3267

101

"Sec. 6.  That at the expiration of the trust period and
when the lands have been conveyed to the Indians by patent
in fee, as provided in section five of this act, then each
and every allottee shall have the benefit of and be subject
to the laws, both civil and criminal, of the State or
Territory in which they may reside; and no Territory shall
pass or enforce any law denying any such Indian within its
jurisdiction the equal protection of the law.  And every
Indian born within the territorial limits of the United States
to whom allotments shall have been made and who has received
a patent in fee simple under the provisions of this act, or
under any law or treaty, and every Indian born within the
territorial limits of the United States who has voluntarily
taken up within said limits his residence, separate and apart
from any tribe of Indians therein, and has adopted the habits
of civilized life, is hereby declared to be a citizen of the
United States, and is entitled to all the rights, privileges,
and immunities of such citizens, whether said Indian has been
or not, by birth or otherwise, a member of any tribe of Indians
within the territorial limits of the United States without in
any manner impairing or otherwise affecting the right of any
such Indian to tribal or other property: ******************"

"And provided further, That the provisions of this act shall
not extend to any Indians in the Indian Territory." *******"
(34 Stat. 137)

10.  Applicants, as Creek Indians and descendants of members of the original

Creek nation, are entitled to share per capita in any recovery with all others

similarly situated.

11.  Applicants therefore have a direct and immediate interest in this

proceeding.

12.  This interest is not being adequately represented by Petitioner,

representing Oklahoma Creeks, which claims exclusive right for its enrolled

members and their descendants to any recovery obtained.

IV.

THIS MOTION FOR LEAVE TO INTERVENE IS TIMELY.

1.  39 Am. Jur. 943 states:

- 7 -

MU001260

3267

> "In the absence of statute, if the trial of a suit
> will not be delayed thereby, a person may, with leave
> of court, intervene at any time before the issues are
> fully determined between the plaintiff and the defendant,
> and it is said to be within the discretion of the court
> to permit an intervention, even though the defendant is
> in default, where the application is made at the earliest
> possible opportunity. The tendency of the courts, however,
> is to exercise their discretion in favor of the diligent
> only."

2. In fact, intervention will be granted even after judgment were it in the interest of justice. (39 Am. Jur. 943). The defense of laches is expressly denied to the United States in claims before this Commission (60 Stat. 1049, Section 2).

3. The claim for which recovery is sought originated in 1814.

4. It is thus the sense of the Congress and the logic of the claim before this Court that your applicants should not be penalized for any delay in prosecuting their claim.

5. No party will be prejudiced by any delay in applicants' having presented their claim.

   a. The basic issue in the proceeding remains the same.

   b. No new trial of this issue is sought or will be required.

   c. Any issues presented concerning the interest of applicants in the recovery will not require extensive additional proof.

6. Applicants have acted with due diligence to bring this motion upon learning of the claim of the Petitioner.

V.

A SERIOUS INJUSTICE WILL RESULT IF INTERVENTION IS NOT GRANTED.

1. Since the unlined right asserted is one belonging to the entire Creek

- 8 -

MU001261

Case 2:12-cv-01079-MHT-CSC Document 190-1 Filed 03/09/20 Page 65 of 146
USCA11 Case: 21-11643 Document: 36 Date Filed: 07/27/2023 Page: 196 of 1019

103

3267

nation, great injustice will result if applicants are not permitted to intervene and assert the right of all Creeks to participate per capita in the recovery which should properly be granted to the original Creek nation.

- 9 -

MU001262

# EXHIBIT F



RG279 Records of the Indian Claims
Commission

Closed Docketed Case Files, 1947-82

Docket # 21

Box 319                    Entry 11UD

318

MU001701



MU001702

FILED

AUG 2 9 1951

(FILE ENDORSEMENT OMITTED)

INDIAN CLAIMS COMMISSION

BEFORE THE INDIAN CLAIMS COMMISSION

(TITLE OMITTED)

THE CREEK NATION,
                    Petitioner,

            vs.                                    DOCKET NO. 21

THE UNITED STATES,
                    Defendant.

---

MOTION TO CHANGE RECORD NAME OF ONE
OF MOVANTS FOR LEAVE TO INTERVENE - Filed Aug. 29, 1951

---

Come now C. W. McGHEE, RUBY Z. WEATHERFORD, JOHN V. PHILLIPS and JOHN WILLIAMS, as members of and on the relation of The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians, by their attorney, C. LeNoir Thompson, and move this Commission that the group on the relation of which said individual movants are appearing before this Commission be changed on the records of this Commission so as henceforth to appear as:  THE CREEK NATION EAST OF THE MISSISSIPPI, and as grounds for said motion state that:

1.  Prior to August 4, 1951, the group on the relation of which the individual movants are appearing was known by the name of "The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians" which name had been duly adopted by the members of said group.

2.  On August 4, 1951, at a general meeting of the members of said group, the members of said group, by unanimous resolution duly passed in accordance with the by-laws of said group, changed the name of said group to "THE CREEK NATION EAST OF THE MISSISSIPPI".

3.  At this meeting the membership confirmed, ratified and adopted all actions taken by the group occurring prior to the change of name.

- 1 -

4. A certified copy of the minutes of said meeting, including the two above described resolutions, is attached hereto as Exhibit "A" and made a part hereof.

5. No change in the organization or composition of the group resulted from or accompanied the change in name.

6. A change in the record in this proceeding is necessary in order to reflect the above described change of name.

7. No hearing is requested on this Motion for the reason that it appears to be one which may be acted upon ex parte under Section 5 (c) of the rules of this Commission.

WHEREFORE, it is prayed that this motion be granted.

C. LeNOIR THOMPSON,
ATTORNEY FOR C. W. MCGHEE,
RUBY Z. WEATHERFORD, JOHN V.
PHILLIPS AND JOHN WILLIAMS,
AND THE CREEK NATION EAST OF
THE MISSISSIPPI, FORMERLY THE
PERDIDO FRIENDLY CREEK INDIAN
BAND OF ALABAMA AND NORTHWEST
FLORIDA INDIANS
Bay Minette, Alabama

- 2 -

MU001704

Exhibit "A" to Motion

BE IT REMEMBERED THAT THIS DAY upon the call of Calvin McGhee, permanent chairman, the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, has assembled in a meeting duly and regularly called.

That on a motion made by J. C. Webb, AND SECONDED BY John Williams, the following resolution authorizing the name of the band be changed from the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, to the Creek Nation East of the Mississippi, was voted upon and was unanimously adopted.

And that on a motion made by Willie B. Olsen, and seconded by Thelman Webb, adopting, ratifying and confirming the present officers and attorneys and all actions, agreements, contracts and proceedings of the band by its former name, and of its Council, was voted upon and unanimously adopted.

Ruby Weatherford
Secretary to Council.

Approved:

C. W. McGhee
Permanent Chairman.

MU001705

3267

Be it hereby resolved that we as members of The Creek Nation East of the Mississippi do hereby accept, adopt and confirm those actions done, contracts made and agreements entered into by the band under its former name of The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and we do hereby accept, adopt and confirm those actions, agreements and contracts entered into or done by the Permanent Chairman and by the Council of the band under its former name and we do hereby adopt confirm and ratify the designation of the four members of the band designated and authorized to represent the band in the several courts of the United States which members are Ruby L. Weatherford, C. W. McGhee, John Williams and John V. Phillips.

And be it further resolved that we do hereby adopt confirm and ratify the agreement entered into by the said authorized representatives of the band under its former name with the following named attorneys: C. LeNoir Thompson, Hugh Rozelle, and Frank Horne, which agreement was authorized on the 9th day of January, 1951 at a Council meeting regularly called in which the attorneys herein named were authorized and empowered to associate by assignment the Honorable Claude Pepper as an attorney of record in behalf of the band.

That we do authorize and empower each of our duly named officers and representatives and our specifically named attorneys to continue all proceedings instituted in the name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida by amending such proceedings and continuing them in the name of The Creek Nation East of the Mississippi.

That we do authorized our chairman and secretary to forward copies of the resolutions adopted here at this meeting to the proper officials of the United States Government and we do instruct our several officers named herein to lend all aid and service possible toward furthering our claims against the United States Government under that special act of Congress approved August 13, 1946 (60 Stat. 929, 25 U.S.C. 70).

Done at Poarch, Escambia County, Alabama on this the 4th day of August, 1951.

C. W. McGhee
Permanent Chairman

MU001706

former name of The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and we do hereby accept, adopt and confirm those actions, agreements and contracts entered into or done by the Permanent Chairman and by the Council of the band under its former name and we do hereby adopt confirm and ratify the designation of the four members of the band designated and authorized to represent the band in the several courts of the United States which members are Ruby A. Weatherford, C. W. McGhee, John Williams and John V. Phillips.

And be it further resolved that we do hereby adopt confirm and ratify the agreement entered into by the said authorized representatives of the band under its former name with the following named attorneys: O. LeNoir Thompson, Hugh Rozelle, and Frank Horne, which agreement was authorized on the 9th day of January, 1951 at a Council meeting regularly called in which the attorneys herein named were authorized and empowered to associate by assignment the Honorable Claude Pepper as an attorney of record in behalf of the band.

That we do authorize and empower each of our duly named officers and representatives and our specifically named attorneys to continue all proceedings instituted in the name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida by amending such proceedings and continuing them in the name of The Creek Nation East of the Mississippi.

That we do authorized our chairman and secretary toforward copies of the resolutions adopted here at this meeting to the proper officials of the United States Government and we do instruct our several officers named herein to lend all aid and service possible toward furthering our claims against the United States Government under that special act of Congress approved August 13, 1946 (60 Stat. 929, 25 U.S.C. 70).

Done at Poarch, Escambia County, Alabama on this the 4th day of August, 1951.

C.W. McGhee
Permanent Chairman

Ruby Weatherford
Secretary of Council.

MU001707

124

Be it hereby resolved that we, descendants by blood of the original Creek Nation which resided in what is now known as the states of Alabama, Georgia and Florida having on the 19th day of October, 1950 organized ourselves into a band in accordance with and in compliance with a certain act of Congress approved August 13, 1946 (60 Stat. 959, 25 U. S. C. 70) which band was known as the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and that we have here met in an official meeting of the band after having given due notice to those on the membership rolls of said band for the purpose of changing the name of our band from that of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida to the name, "The Creek Nation East of the Mississippi," which was our original name and the name of our Indian forefathers. Which meeting is now held this 4th day of August at the consolidated Indian School at Poarch Community, seven miles from Atmore, Alabama.

Be it further resolved that we do hereby change our name as of this date to be known henceforth and hereafter as "THE CREEK NATION EAST OF THE MISSISSIPPI," and our band shall by this name be hereafter known and called.

Adopted this August 4, 1951 at a general meeting assembled on the grounds of the consolidated Indian School in the Poarch Community, Escambia County, Alabama, and that having adopted as our proper and official name the designation "The Creek Nation East of the Mississippi" and unamiously confirm their election as such officials. Those who were elected by the band under its former name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, and that said officials and their offices are as follows: Calvin McGhee, permanent chairman, Ruby L. Weatherford, Secretary of Council, Roberta Sells, Recording Secretary, Council Members: Ruby Weatherford, Leola Manac, Kenzie McGhee, John Williams, Dave Presley, Arthur Reid, John Phillips, J. C. Webb, Tom Weatherford, Brooks Rolin, Claude Colbert, and Roberta Sells.

C. W. McGhee
Permanent Chairman.

MU001708

Creek Nation which resided in what is now known as the states of Alabama, Georgia and Florida having on the 19th day of October, 1950 organized ourselves into a band in accordance with and in compliance with a certain act of Congress approved August 13, 1946 (60 Stat. 959, 25 U. S. C. 70) which band was known as the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and that we have here met in an official meeting of the band after having given due notice to those on the membership rolls of said band for the purpose of changing the name of our band from that of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida to the name, "The Creek Nation East of the Mississippi," which was our original name and the name of our Indian foregathers. Which meeting is now held this 4th day of August at the consolidated Indian School at Poarch Community, seven miles from Atmore, Alabama.

Be it further resolved that we do hereby change our name as of this date to be known henceforth and hereafter as "THE CREEK NATION EAST OF THE MISSISSIPPI," and our band shall by this name be hereafter known and called.

Adopted this August 4, 1951 at a general meeting assembled on the grounds of the consolidated Indian School in the Poarch Community, Escambia County, Alabama, and that having adopted as our proper and official name the designation "The Creek Nation East of the Mississippi" and unamiously confirm their election as such officials. Those who were elected by the band under its former name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, and that said officials and their offices are as follows: Calvin McGhee, permanent chairman, Ruby L. Weatherford, Secretary of Council, Roberta Sells, Recording Secretary, Council Members: Ruby Weatherford, Leola McNac, Kensie McGhee, John Williams, Dave Presley, Arthur Reid, John Phillips, J. C. Webb, Tom Weatherford, Brooks Rolin, Claude Colbert, and Roberta Sells.

C. W. McGhee
Permanent Chairman.

Ruby Weatherford
Secretary of Council.

MU001709

# EXHIBIT G

*Received by mail.*
*Nov. 7, 1951.*

IN THE

# United States Court of Claims

Appeal Docket No. 14.

C. W. McGHEE, RUBY Z. WEATHERFORD, JOHN V. PHIL-
LIPS AND JOHN WILLIAMS, as Members of and on
the Relation of the Creek Nation East of the Mis-
sissippi, *Appellants,*

v.

THE CREEK NATION AND THE UNITED STATES,
*Appellees.*

## BRIEF FOR APPELLANTS.

CLAUDE PEPPER,
Cafritz Building,
Washington, D. C.,
*Attorney for Appellants.*

C. LeNOIR THOMPSON,
Bay Minette, Alabama,
FRANK G. HOME,
Atmore, Alabama,
HUGH ROZELLE,
Atmore, Alabama,
*Of Counsel.*

PRESS OF BYRON S. ADAMS, WASHINGTON, D. C.

MU003649

## INDEX.

| | Page |
|---|---|
| Statement of Facts | 130 |
| Statement of the Case | 137 |
| Questions Presented | 140 |
| Argument | 141 |

The Indian Claims Commission Committed Reversible Error in Denying Appellants' Amended Motion for Leave to Intervene.... 141

I. The Indian Claims Commission Erred in Determining that ''the Petitioner in this Case Has ('The Creek Nation' of Oklahoma) the Exclusive Right to Prosecute the Claim Here Asserted'' ........................................ 141

   A.  The Injury Inflicted by the United States in Exacting and Enforcing the Treaty of 1814 was Suffered by all Creeks, Not Simply Those Now in Oklahoma........... 141

   B.  Petitioner-appellee ''the Creek Nation'' of Oklahoma is Not Identical with the Original Creek Nation Which Existed at the time of the Asserted Injury ........ 143

   C.  Appellants and Other Creeks Did Not Lose Their Rights in the Claim in Issue by Not Emigrating to Settle in Oklahoma 146

   D.  Petitioner-appellee ''the Creek Nation'' of Oklahoma is Not Entitled to Represent the Entire Creek Nation in Prosecuting Claims Before the Indian Claims Commission .................................. 151

II. The Commission Erred in Determining that Appellants Are Not Members of a ''Tribe, Band or Other Identifiable Group of Indians'' Entitled to Have Their Claim Determined by the Commission.............. 153

MU003650

Page

III. The Commission Erred in Determining that
it Did Not Have Jurisdiction to Define the
Group Entitled to Recovery on a Claim Be-
fore It ................................. 157

Conclusion ................................. 161

Appendix .............................. 163-169

## TABLE OF AUTHORITIES.

CASES:

Choctaw Nation, Ind. Cl. Com. Dkt. No. 16, op. ent.
July 14, 1950 .............................. 154
Eastern Band of the Cherokee Indians v. United
States, 117 U. S. 288 (1886).................. 146
Fort Sill Apaches, Ind. Cl. Com. Dkt. No. 30, op.
ent. May 6, 1949 ....................154, 158, 161
Kaw Tribe of Indians ex rel Keenan Pappan
et al., Ind. Cl. Com. Dkts. Nos. 33, 34, 35, op. ent.
September 26, 1950 ......................... 158
Lewis et al. ex rel. the Creek Freedmen Associa-
tion, Ind. Cl. Com. Dkt. No. 31, op. ent.
August 4, 1949 ............................ 153
Loyal Creek Band or Group of Creek Indians,
Ind. Cl. Com. Dkt. No. 1, op. ent. May 6, 1949
153, 162
McCauley ex rel. the Kaw Tribe of Indians, Ind.
Cl. Com. Dkts. Nos. 33, 34, 35, op. ent. Septem-
ber 17, 1951 .............................. 154
Oakes v. United States, 172 F. 305 (C.C.A. 8th,
1909) ................................... 149
Pawnee Indian Tribe of Oklahoma, Ind. Cl. Com.
Dkt. No. 10, op. ent. July 14, 1950............ 154
Red Lake, Pembina and White Earth Bands, Ind.
Cl. Com. Dkt. No. 18-A, op. ent. September 17,
1951 ................................155, 162
Snake or Piute Indians of the Former Malheur
Reservation in Oregon, Ind. Cl. Com. Dkt. No.
17, op. ent. December 29, 1950............... 162

Page

Thompson et al. ex rel. Indians of California, Ind.
Cl. Com. Dkt. No. 31, op. ent. December 15, 1950  153
United States ex rel. Besaw v. Work, 6 F. 2d 694
(App. D.C., 1925) .......................... 149
United States v. Cherokee Nation, 202 U. S. 101
(1906) ................................... 147

STATUTES:

24 Stat. 333, Section b ...................... 134
25 Stat. 757 (1889) ......................... 134
27 Stat. 645 (1893) ......................... 135
29 Stat. 321 (1896) ......................... 135
30 Stat. 495 (1898) .............134, 135, 136, 145
31 Stat. 861 (1901) ................134, 135, 145
32 Stat. 500 (1902) ....................134, 145
34 Stat. 137 (1906) ...............136, 145, 168
60 Stat. 959 (1946), 25 U.S.C. 70 . ......130, 137, 161

TREATIES:

Treaty of August 7, 1790, 7 Stat. 35 ........131, 142
Treaty of August 9, 1814, 7 Stat. 120 .......... 131
Treaty of January 24, 1826, 7 Stat. 286.....144, 165
Treaty of March 24, 1832, 7 Stat. 366.......144, 165
Treaty of February 14, 1833, 7 Stat. 417
134, 165, 167
Treaty of August 7, 1856, 11 Stat. 699......134, 145
Treaty of June 14, 1866, 14 Stat. 785.......... 134

MU003651

**129**

IN THE

# United States Court of Claims

Appeal Docket No. 14.

C. W. McGHEE, RUBY Z. WEATHERFORD, JOHN V. PHIL-
LIPS AND JOHN WILLIAMS, as Members of and on
the Relation of the Creek Nation East of the Mis-
sissippi, *Appellants,*

v.

THE CREEK NATION AND THE UNITED STATES,
*Appellees.*

## BRIEF FOR APPELLANTS.

This proceeding is one of brother against brother.
Creeks in Oklahoma, suing to repair an injury inflicted
upon the common ancestor, seek to deny the right of
their brother Creeks elsewhere to share in the recov-
ery.

This appeal is from an Order of the Indian Claims
Commission entered June 4, 1951, in its docket number
21, *The Creek Nation* v. *The United States,* denying
appellant Creeks' Amended Motion for Leave to Inter-
vene as parties plaintiff therein. The proceeding be-

**130**

low, in which intervention was sought and denied, was one brought against the United States before the Indian Claims Commission under the Indian Claims Commission Act (60 Stat. 959, 25 U. S. C. 70) by "The Creek Nation", a political body of Creek Indians inhabiting the Creek reservation in Oklahoma, to recover damages for the wrongful taking of lands in what is now Alabama and Georgia in 1814 from the original Creek nation of Indians.

### STATEMENT OF FACTS.[1]

Appellants, C. W. McGHEE, RUBY Z. WEATHERFORD, JOHN V. PHILLIPS, and JOHN WILLIAMS, are Creek Indians, descendants of Creeks who were members of the Creek nation of Indians on August 9, 1814, when by a certain treaty between the United States and the Creek nation the latter ceded to the United States a vast tract of land in what is now Alabama and Georgia, and members themselves by blood of that nation. (R. 88).

The original Creek nation of Indians, once known as the Muskogee Confederation was a great and powerful confederation of Indian tribes who were the aboriginal inhabitants of a large area in what is now Alabama and Georgia and parts of Florida and Mississippi. (R. 2, 89)  On August 7, 1790, the Creek nation entered into a treaty of friendship with the United States, whereunder it placed itself under the protection of the United States, ceded certain lands to the United States,

[1] Since no findings of fact have been made in this proceeding, no evidence taken on appellants' amended motion, and the evidence in the principal proceeding is not a part of the record on appeal, the facts are taken from undenied allegations of the pleadings and motions herein, from the Commission's opinion and from the United States Statutes-at-Large. Much that is historical appears a proper subject of judicial notice.

**131**

and in return was guaranteed all its lands within boundaries defined in that treaty. (R. 89, 7 Stat. 35)

During the War of 1812, certain of the Creeks were persuaded to assist the British. Much the greater number of the Creeks remained loyal to the United States, and in fact, fought against the rebellious Creeks, incurring great casualties, much suffering, and serious losses. Finally, of course, with the assistance of the United States, the uprising was put down. (R. 4, 5, 6)

In purported retaliation for this incident, the United States sent its emissaries to complete a new treaty with the Creek nation under which, on August 9, 1814, the Creek nation was compelled, by duress and threats of force, to convey to the United States 23,267,600 acres of its domain without receipt of any consideration therefor. (7 Stat. 120) (R. 6, 7, 8, 89)

It is the claim of petitioner-appellee "The Creek Nation" of Oklahoma, as well as of appellants, that the taking of these lands by the United States under this treaty was an unfair imposition by the United States upon the Creek nation and inflicted an injury upon it for which recovery is authorized under the Indian Claims Commission Act. (R. 13, 93)

Subsequent to this treaty, as the white settlers of the United States desired more and more room for expansion, it became the policy of the United States to move as many Indians as possible westward. (R. 90)

As the Commission found: "On January 24, 1826, 7 Stat. 286, the Creek Nation concluded a treaty with the United States by which it ceded an area of its domain located in Georgia and lying on the east side of the Chattahoochee river. A portion of the tribe wished to move west of the Mississippi river and the treaty pro-

MU003653

**132**

vided (Art. 6) for a 'deputation of five persons' to select a country west of the river as a home for that part of the Creek Nation desiring to move west.'' (R. 114) The area, located in what shortly became the Indian Territory and is now part of Oklahoma, was duly selected and a number of the members of the tribe migrated.

The pressure of the Federal Government on the Creeks to move westward continued. As the Commission found: ''On March 24, 1832, 7 Stat. 366, by treaty of that date, the Creeks ceded 'all their land, East of the Mississippi river' to the United States. This treaty contained this provision (Art. XII):

'The United States are desirous that the Creeks should remove to the country west of the Mississippi, and join their countrymen there; and for this purpose it is agreed, that as fast as the Creeks are prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new homes— Provided however, *that this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.'* (Italics added.)

''Article II thereof required the United States to survey the ceded area and allowed 'ninety principal chiefs of the Creek tribe to select one section each, and every other head of a Creek family to select one half section each, which tracts shall be reserved from sale for their use for a term of five years, unless sooner disposed of by them.' Provisions were also made for taking a census of the persons making selections and for making selection of twenty sections for the benefit of or-'

**133**

phan children of the Creeks. Article III authorized the sale of the selections, and Article IV provided:

'At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor in fee simple, from the United States.'

''Article XII of this treaty quoted above discloses the desire of the United States to move all Creeks west of the Mississippi river, and as an inducement to move, agreed to pay the expenses of removal, provide subsistence during removal and for a year after their arrival west. However, such removal was not compulsory as to individual Creeks, for the article, as shown above, contained the proviso 'that this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.' '' (R. 115, 116)

On February 14, 1833, the ''Muskogee or Creek nation of Indians, west of the Mississippi'' represented by ''chiefs and head-men of the said Muskogee or Creek Indians, having full power and authority to act for their people west of the Mississippi,'' entered into a treaty with the United States in which title to the territory in Oklahoma was confirmed and guaranteed by the United States. The treaty provided that these lands ''be taken and considered the property of the whole Muskogee or Creek nation, as well as of those now residing upon the land, as the great body of said nation who still remain on the east side of the Mississippi.'' Only those settling in the territory have ever derived any benefit from these lands. Grants of money also agreed upon in the treaty were expressly stated to be ''intended solely for the use and benefit of that

MU003654

**134**

portion of the Creek nation, who are now settled west of the Mississippi." (7 Stat. 417)

History does not record how many Creeks migrated to Oklahoma and how many remained in the Southeast, but it appears that the number staying behind was so substantial that it might fairly be said that the Creek nation was divided by the migration. (R. 91, 92)

The migrating Creeks formed an organization for the management of their affairs in the Indian Territory and were first called in treaties "the Creek tribe of Indians west of the Mississippi" (Treaty of August 7, 1856, 11 Stat. 699), sometimes simply "The Creek Nation" (Treaty of June 14, 1866, 14 Stat. 785) and later generally, in treaties and Acts of Congress, "The Creek Nation in the Indian Territory" (Act of March 1, 1889, 25 Stat. 757; Act of June 28, 1898, 30 Stat. 495; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500). All of these treaties and laws related to affairs of the Creeks in Oklahoma.

Commencing in the 1880s, in preparation for the admission of Oklahoma to statehood, it became the policy of the United States to do away with the local self-government of the tribes in the Indian Territory, as well as the communal ownership of lands by these tribes. By a series of laws commencing with the Act of February 8, 1887, Congress provided for eventual citizenship of the Indians who were members of these tribes and for the allotment of the tribal lands to the individual members. The Act of 1887, in granting citizenship to Indians leaving their tribes, expressly guaranteed the existing rights to tribal or other property of all Indians, including those who had theretofore left their tribes. (24 Stat. 388, Section 6.)

In pursuance of the federal policy to extinguish tribal rights in lands in the Indian Territory, a Com-

**135**

mission to the Five Civilized Tribes was created by Act of March 3, 1893 (27 Stat. 645). By Act of June 10, 1896, this Commission was empowered and directed to make rolls of the citizens in the Indian Territory of these tribes to afford the basis of allotment of the tribal lands in the Indian Territory and division of tribal moneys arising from the sale of lands. (29 Stat. 321) This allotment was further implemented by the Act of June 28, 1898, which made additional provisions for enrollment, and provided that, for the purpose of this allotment, "No person shall be enrolled who has not heretofore moved to and in good faith settled in the nation in which he claims citizenship." (30 Stat. 495)

A subsequent agreement of March 8, 1900, between the United States and "The Creek Nation in the Indian Territory," confirmed by the Act of March 1, 1901, prescribing further terms for the allotment of Creek lands in the Indian Territory, restricted enrollment to those persons living in the Creek area in the Indian Territory. (31 Stat. 861.)

By Act of May 8, 1906, Congress re-affirmed its guarantee of the rights of Indians who had left their tribes and become citizens of the United States, amending the Act of February 8, 1887, to provide in part:

"Sec. 6. That at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section five of this act, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits

**136**

of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this act, or under any law or treaty, *and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States*, and is entitled to all the rights, privileges, and immunities of such citizens, *whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property:* * * *

"And provided further, That the provisions of this act shall not extend to any Indians in the Indian Territory. * * * * " (Italics ours.) (34 Stat. 137.)

This series of agreements and Acts of Congress provided for eventual abolition of the jurisdiction of the Indian tribes over the local affairs of their members, and of the tribal title to lands, abolished the enforcement of tribal laws, did away with the power of the tribes to collect money for account of the members or for their account and in general diminished and provided for eventual abolition of the power and authority of the tribal organizations. All moneys awarded on claims to be distributed per capita to members or descendants of members of tribes are distributed directly to these members by the Secretary of the Interior. (Act of June 28, 1898, 30 Stat. 495) (R. 91, 92)

"The Creek Nation" of Oklahoma still maintains its tribal organization. (R. 2)

**137**

Appellants and the thousands of other Creeks they represent are descended from that portion of the Creek nation which remained East of the Mississippi. Because they possessed no territory and were not dealt with by the United States as a group, they did not retain a general tribal organization, although various groups of them have resided together in small close-knit communities and preserved their tribal ties and certain of their customs. (R. 83)

Appellants and other Creeks in the Southeastern States have recently joined together for their common benefit in an organization known first as the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians"; its name has now been changed to "The Creek Nation East of the Mississippi" as more appropriate to its scope. The sole requirement for membership is that one be a lineal descendant of a member of the original Creek nation and be not enrolled in petitioner-appellee. (R. 88, 120)

### STATEMENT OF THE CASE.

The Indian Claims Commission is a statutory tribunal; proceedings before it are based upon the Indian Claims Commission Act (60 Stat. 959, 25 U.S.C. 70) which authorizes the Commission to hear and determine all claims of "any Indian tribe, band, or other identifiable group of American Indians" against the United States for injuries inflicted upon them by the United States.

The proceeding below was begun by "The Creek Nation" of Oklahoma on January 29, 1948, by the filing of a petition with the Indian Claims Commission, claiming damages for the taking of lands of the Creek nation by the United States under the Treaty of Au-

gust 9, 1814. (R. 55) A trial of the issues on the merits was held on October 17 and 19 and November 16, 1949, and January 24, 1950, and arguments were heard on November 29, 1950, and the issues are now awaiting decision by the Commission.

On January 5, 1951, the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians" filed a "Motion to Intervene", with a "Petition for Leave to Intervene" attached. (R. 65, 67) Thereafter, on January 15, 1951, petitioner-appellee "The Creek Nation" filed its objections to this motion and on January 23, 1951, defendant-appellee, the United States, filed its objections. (R. 72, 81) On April 4, 1951, appellants, as members of and on the relation of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians, filed an "Amended Motion for Leave to Intervene", attaching a "Petition of Intervenors" and a "Statement of Specific Points of Law and Authorities in Support of Motion for Leave to Intervene". (R. 83, 88, 95) Objections to said amended motion were duly filed by petitioner-appellee, "The Creek Nation" of Oklahoma, on April 17, 1951. (R. 104) The amended motion was argued on April 18, 1951, before the Indian Claims Commission. Appellants filed a "Supplement to Statement of Specific Points of Law and Authorities in Support of Motion for Leave to Intervene" on May 14, 1951. On June 4, 1951, the Commission entered its Order denying the amended motion, and filed its *per curiam* opinion. (R. 112, 113)

Thereafter, on appellants' motion, an Order was entered noting in the record the change of the name of the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians" to "The Creek Nation East of the Mississippi". (R. 125)

On September 4, 1951, appellants filed their Notice of Appeal with the Indian Claims Commission and on September 6, 1951, the record on appeal was duly filed with the Clerk of this Court. (R. 126, 128)

The grounds upon which appellants sought to intervene as parties petitioner in the proceedings below are stated in their Amended Motion, Petition and Statement of Points and Authorities. Appellants' basic premise is that the injury inflicted by the United States in 1814 was to the Creek nation as then constituted and that the right to recover therefor belongs to that nation, to be enjoyed by all its members. Their position is that petitioner-appellee "The Creek Nation" of Oklahoma, whose membership is restricted to Creeks in Oklahoma, is not identical with or the full successor of the Creek nation, and that it improperly claims to be, thus denying rather than representing the rights of appellants. Appellants brought their amended motion to intervene on the relation of the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians" now "The Creek Nation East of the Mississippi", whose rolls are open to all those who can prove lineal descent from the members of the original Creek nation, as the appropriate way of assuring that the original Creek nation be in effect made the petitioner in the proceeding below, so that judgment may be entered in its favor rather than petitioner's. In appropriating for this judgment and providing for its distribution, Congress may then appropriately direct that rolls be created of all those now members by blood of the original Creek nation or succeeding to the rights of its members.

The position of petitioner-appellee "The Creek Nation" of Oklahoma is that it is identical with the orig-

MU003657

## 140

inal Creek nation, the successor to its rights, and solely entitled to recover for the injury. It further contended below that intervention was procedurally impossible before the Commission, that the motion was not timely, and that appellants are not members of a "tribe, band or other identifiable group" entitled under the Indian Claims Commission Act to have their claims determined by the Commission.

The reasons given by the Commission in its *per curiam* opinion for its denial of appellants' amended motion may be summarized as follows:

1. Appellants are not members of a "tribe, band or other identifiable group" within the meaning of the Indian Claims Commission Act in that they do not have a "common claim".

2. Petitioner-appellee has the exclusive right to prosecute the claim for the 1814 injury to the Creek nation.

3. The jurisdiction of the Commission does not extend to defining identity of the group entitled to recover on any claim placed before it.

It is appellants' position that the denial of the motion was error and that all of the above grounds for it are erroneous.

### QUESTIONS PRESENTED.

1. Are appellants members of a "tribe, band or other identifiable group of American Indians" within the meaning of the Indian Claims Commission Act?

2. Do appellants have a "common claim" within the meaning of the decisions imposing this requirement for jurisdiction of the Commission?

## 141

3. Is Petitioner-appellee "The Creek Nation" of Oklahoma the proper petitioner solely entitled to assert the claim for the injury inflicted upon the Creek nation under the authority of the Treaty of 1814?

4. Did the Indian Claims Commission have jurisdiction to determine whether petitioner-appellee is the party entitled to recover on the claim asserted or whether another group should be added or substituted as petitioner for the purposes of judgment?

### ARGUMENT.

**THE INDIAN CLAIMS COMMISSION COMMITTED REVERSIBLE ERROR IN DENYING APPELLANTS' AMENDED MOTION FOR LEAVE TO INTERVENE.**

#### I.

**The Indian Claims Commission Erred in Determining that "The Petitioner In This Case ['The Creek Nation' of Oklahoma] Has the Exclusive Right to Prosecute the Claim Here Asserted."**

A. *The Injury Inflicted by the United States in Exacting and Enforcing the Treaty of 1814 was Suffered by all Creeks, Not Simply Those Now in Oklahoma.*

One hundred thirty-seven years ago when a grievous wrong was done to the Creek nation in depriving it of a large part of its territory in Alabama and Georgia without compensation, it was a homogeneous people. It is doubtful if there was anyone of the Creek blood anywhere who was not privileged to call himself a member of the nation and to share in the enjoyment of its common lands and goods. It enjoyed independence

**142**

and sovereignty. While the encroachments of the white settlers had begun, only 24 years had passed since the United States had guaranteed its boundaries and promised protection. (7 Stat. 35)

The burden of the taking of over 23 million acres fell upon all the Creeks equally, because of their common ownership. It made all of them and all of their descendants poorer, by depriving them of their enjoyment of the land and of the fruits of its use or sale through the succeeding years down to the present generation.

The time has at last come when it appears that the United States may make reparation for its mistreatment of the Creeks, as well as of other Indian groups. There would appear to be no question that the repayment must be for the benefit of all Creeks, since all Creeks were injured. Yet petitioner-appellee contends that it alone is entitled to the relief for the injury to all, for the benefit of its members, and the Indian Claims Commission has agreed that it alone can prosecute the claim.

Those now members of "The Creek Nation" of Oklahoma are not all, or even nearly all, the members by blood of the original Creek nation. They are simply those whose ancestors decided to migrate to the Indian Territory and were there granted new lands and allotments, and who have since enjoyed the bounty and guardianship of the federal government. They are, if anything, less injured because of the wrong and less deserving of recompense than the thousands of others whose ancestors stayed behind to make their own way on the small allotments parceled out to them and accepted the responsibilities of full citizenship.

**143**

Compelling arguments should be required to support the denial of relief for this ancestral wrong to the nation as a whole and the granting of relief only to those Creeks who happened to reside on a reservation in Oklahoma on certain dates in the early 1900s when a roll was made of those so residing.

The Commission appears to have reached this inequitable decision as a result of three erroneous conclusions. The first is that "The Creek Nation" of Oklahoma is nothing but the original Creek nation transplanted to Oklahoma. The second is that, because it has maintained a continuous organization, dealt with by the Federal Government, and because it bears the name "The Creek Nation", it is the sole representative of Creek people qualified to present their claims to the Commission. The third is that, conversely, because appellants have been members of no continuous political organization of Creeks recognized by the government, they must be denied the right to present claims.

**B.** *Petitioner-appellee "The Creek Nation" of Oklahoma Is Not Identical With the Original Creek Nation Which Existed at the Time of the Asserted Injury.*

The Indian Claims Commission was apparently misled by the identity of the name of the present "Creek Nation" of Oklahoma with that of the original Creek nation into stating in its opinion that appellants, in effect, concede petitioner-appellees' exclusive right to prosecute the claim in issue by asking that "the members of the Creek Nation" be granted recovery. (R. 117). Appellants did and do ask that the Creek nation be granted relief but strongly affirm that petition-

**144**

er-appellee is *not* the Creek nation in a generic sense nor the Creek nation which sustained injury in 1814.

The Creek nation, as a national entity, was disorganized and divided as a result of events occurring shortly after the Treaty of 1814. These events are related in detail in the statement of facts, *supra*. They resulted from the pressure of the inland movement of the whites along the eastern seaboard. In 1814 the Creek nation had ceded land to the United States. In 1826 it ceded more land, and a group of its members, desiring to move westward to avoid the white man, obtained permisson to send 5 delegates to the West to select land, which the United States promised to give them and to which it promised to move them within 24 months. (7 Stat. 286) In 1832 the Creek nation ceded all its land east of the Mississippi, and encouragement was offered all Creeks to emigrate to the territory west of the Mississippi. At the same time, it was expressly agreed that they were not compelled to go, and detailed provision was made for a survey, a census and for allotment of sections and half-sections of land to those electing to remain. (7 Stat. 366)

As might be expected, many chiefs and heads of families elected to remain in their native surroundings. One need only to check Parsons & Abbotts' Census of the Creeks in 1832 in the National Archives, subsequent censuses of the Southeastern States and local land and birth records, or the membership rolls of "The Creek Nation East of the Mississippi", to gain an idea of their great number, alleged in appellants' original motion to be approximately 10,000.

In the first treaty made by the United States with those migrating westward, the latter were identified as "the Creek nation of Indians west of the Mississippi",

**145**

it being stated that the signatory chiefs had "full power and authority to act for their people west of the Mississippi". It was also recited in the treaty that the great body of the Creek nation as of that time remained "on the east side of the Mississippi".

The political organization of the Creeks in the area granted to them in the Indian Territory used the name "The Creek Nation", but this name was almost always accompanied by restrictive language limiting it to those Creeks in the Indian Territory (Treaty of August 7, 1856, 11 Stat. 699; Act of June 28, 1898, 30 Stat. 495; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500; Act of April 26, 1906, 34 Stat. 137.)

The rolls of "The Creek Nation" of Oklahoma were closed in 1907.

The rolls made at that time were created for the express purpose of effecting the allotment of the Creek lands in the Indian Territory in Oklahoma. (Act of June 28, 1898, 30 Stat. 495.) Appellants and other Creeks like them cannot now be enrolled. They were never entitled to gain enrollment, except by taking up residence in the Creek territory in Oklahoma, for enrollment was expressly restricted to those residing in the Creek reservation or who moved to it prior to a given date. (Act of June 28, 1898, 30 Stat. 495.) Thus the very limitations on membership prove the limitations of the organization, which was for the purpose of governing affairs of the Creek Indians in Oklahoma, the division of lands located there and the handling of other administrative and financial matters pertaining to that group. This, together with the repeated recognition in treaties and Acts of Congress of the restrictive character of petitioner-appellee, conclusively

proves that "The Creek Nation" of Oklahoma is not the same as the original Creek nation or even a full successor to it, but a restricted organization for the government of those Creeks in Oklahoma.

To make this restricted organization the successor to all rghts of parent nation and membership in it the basis of enjoyment of relief granted for the wrong to the parent not only will ignore the history of the Creek nation, but will work a grave injustice upon many of those who are blood members of it.

### C. *Appellants and Other Creeks Did Not Lose Their Rights in the Claim in Issue by Not Emigrating to Settle in Oklahoma.*

Petitioner-appellee urged very strongly in its objections to appellants' original and amended motions that appellants and other similar descendants of members of the injured Creek nation had forfeited their rights in the claim by electing not to go west and become members of the group there whose descendants comprise petitioner-appellee. (R. 75-78, 106-110) In support of this position it cited and quoted *Eastern Band of the Cherokee Indians* v. *United States,* 117 U. S. 288 (1886) (R. 77). The language quoted might be somewhat persuasive were it not for the fact that the facts there are so easily distinguishable from those at issue here. In that case, unorganized Eastern Cherokees who had failed to migrate westward were attempting to claim a share in funds arising from the sale of the lands *in Oklahoma* which the migrating Cherokees had settled, and from commutation of annuities granted in exchange for surrender of those Oklahoma lands. They were properly denied the right to share. Obviously appellants would have no right,

nor do they claim any, to share in lands or moneys or claims arising out of the affairs of petitioner-appellee in Oklahoma. But appellants have not, simply by not going to Oklahoma, surrendered their rights to the claim in issue, arising out of an injury to their nation in the east prior to the migration. This is made clear in *United States* v. *Cherokee Nation,* 202 U. S. 101, 26 S. Ct. 588 (1906) wherein the unorganized eastern Cherokees were claiming to be entitled to share in funds owing by the United States to the Cherokee Nation under the Treaty of New Echota of May 23, 1836. The Supreme Court said (26 S. Ct. at 599-600), quoting with approval from the opinion of this Court:

"While the United States have always, or nearly always, treated the members of an Indian tribe as communal owners, they have never required that all the communal owners shall join in the conveyance or cession of the land. From the necessities of the case, the negotiations have been with representatives of the owners. The chiefs and head men have ordinarily been the persons who carried on the negotiations and who signed the treaty. But they have not formed a body politic or a body corporate, and they have not assumed to hold the title or be entitled to the purchase money. They have simply acted as representatives of the owners, making the cession on their behalf, but allowing them to receive the consideration *per capita.* In the present case the Cherokee Nation takes the place, so far as communal ownership is involved, of the chiefs and head men of the uncivilized tribes. This, too, is consonant with the usage of nations. The claims of individuals against a foreign power are always presented, not by them individually, but by their government. The claims are pressed as international, but the money received is received in trust, to be paid over to the persons entitled to it.

MU003661

"As to those Cherokees who remained in Georgia and North Carolina, in Alabama and Tennessee, they owe no allegiance to the Cherokee Nation, and the nation owes no political protection to them. But they, as communal owners of the lands east of the Mississippi, at the time of the treaty of 1835, were equally interested, with the communal owners who were carried to the West, in the $5,000,000 fund which was the consideration of the cession, so far as it was to be distributed *per capita*. The Cherokee Nation was not bound to prosecute their claims against the United States for the unpaid balance of the $5,000,000 fund, but their rights were inextricably interwoven with the rights and equities of the Cherokees who were citizens of the nation, and the nation properly made no distinction when parting with the Outlet, but demanded justice from the Cherokee point of view for all Cherokees who had been wronged by the nonfulfillment of the treaty of New Echota. As to these Eastern nonresident Cherokee aliens the nation acted simply as an attorney collecting a debt. In its hands the moneys would be an implied trust for the benefit of the equitable owners.

"After a careful consideration of the circumstances and conditions of these cases, the court is of the opinion that the moneys awarded should be paid directly to the equitable owners."

The rights of those in the position of appellants were expressly saved and guaranteed by the Act of February 8, 1887, 24 Stat. 390, as amended March 3, 1901, 31 Stat. 1447 and May 8, 1906, 34 Stat. 182:

"Every Indian born within the territorial limits of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this Act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has

voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, *whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property.*" (Italics ours)

In discussing this statute and the general trend of government policy toward the Indians and Indian tribes, the Court of Appeals of the District of Columbia, in *United States ex rel. Besaw v. Work*, 6 F. 2d 694, 698 (1925), quoting with approval from *Oakes v. United States,* 172 F. 305 (C.C.A. 8th, 1909), said:

"On this point the court said: 'For many years the treaties and legislation relating to the Indians proceeded largely upon the theory that the welfare of both the Indians and the Whites required that the former be kept in tribal communities separated from the latter, and while that policy prevailed, effect was given to the original rule respecting the right to share in tribal property; but Congress later adopted the policy of encouraging individual Indians to abandon their tribal relations and to adopt the customs, habits, and manners of civilized life, and, as an incident to this change in policy, statutes were enacted declaring that the right to share in tribal property should not be impaired or affected by such a severance of tribal relations, whether occurring theretofore or thereafter.'

"After citing and quoting from a number of the acts of Congress, the court said: 'These acts dis-

MU003662

**150**

close a settled and persistent purpose on the part of Congress so to broaden the original rule respecting the right to share in tribal property as to place individual Indians who have abandoned tribal relations, once existing, and have adopted the customs, habits, and manners of civilized life, upon the same footing, in that regard, as though they had maintained their tribal relations. Not only this, but these acts, omitting that of 1865, are general and continuing in their nature, and therefore are as applicable to the Chippewas in Minnesota as to other Indians, unless the act of 1889 discloses, either expressly or by necessary implication, that Congress intended otherwise. In our opinion that act does not thus disclose such an intention.' ''

\*      \*      \*      \*      \*      \*      \*      \*      \*

''Confusion seems to have arisen through failure to distinguish between membership in an Indian tribe and the mere severance of tribal relations. The breaking or severance of tribal relations occurs where a member of the tribe abandons the tribal life, removes from the tribal habitation, and by marriage, exercise of the homestead right, or otherwise, establishes a residence elsewhere and adopts the habits and customs of civilized life. But membership in an Indian tribe is based upon the firm foundation of right by blood inherited from Indian ancestry.

''Nor is the test one of citizenship. In the absence of a treaty or an act of Congress conferring citizenship upon Indains, who already had, or who would in the future, abandon tribal life and adopt the habits and customs of civilized life, expressly reserved to such Indians all their rights in tribal property held in common for the benefit of the membership of the tribe. Hence the mere transfer of citizenship is not important, so far as the question of the rights in tribal property is concerned. \*  \*  \*  ''

**151**

Thus neither in fact nor in legal fiction is petitioner-appellee the full successor to the Creek nation, entitled to exclude descendants of its members not presently enrolled in petitioner-appellee from participation in any recovery.

D. *Petitioner-appellee ''The Creek Nation'' of Oklahoma Is Not Entitled to Represent the Entire Creek Nation in Prosecuting Claims Before the Indian Claims Commission.*

Petitioner-appellee, the political organization of the Creeks in the Creek territory of Oklahoma, is not representative of all the Creek nation, as demonstrated above. It removes any lingering possibility of its being considered the organization entitled to represent all by expressly disclaiming the right or obligation. It denies, in its ''Objections to Amended Motion to Intervene'', that the portion of the Creek nation including appellants is entitled to repreesntation before the Commission, or to participate in any recovery. (R. 104-111)

The Commission appears to have determined that the long-continued existence of petitioner-appellee and its record of dealings with the federal government, as contrasted with appellants' lack of formal organization for many years and lack of treaty dealings, vested it with the right to represent the nation. In determining that ''the petitioner in this case has the exclusive right to prosecute the claim here asserted,'' the Commission states that after 1833:

''  \*  \*  \*  all dealings of the Federal Government were made with the Creeks in Oklahoma, and we find no treaties, contracts or other transactions with those members of the tribe who remained

MU003663

east, or that defendant ever recognized those re-
maining east as the Creek Nation.

"There are other instances by which the United
States recognized the tribal government of the
Creeks in Oklahoma, notably the Act of April 26,
1906, 34 Stat. 137, section 28, of which 'continued
in full force and effect for all purposes, authorized
by law' the Creek tribal government.'' (R. 117)

It is interesting that the Commission selected the
1906 Act as an instance of recognition by the United
States of petitioner-appellee. For that act is entitled
''An act to provide for the final disposition of the af-
fairs of the Five Civilized Tribes *in the Indian Terri-
tory,* and for other purposes'' (Italics ours), peti-
tioner-appellee is referred to as the ''Creek Tribe *in
the Indian Territory*'' (Italics ours) and the act deals
exclusively with matters relating to the Indian Terri-
tory.

The fact that the Federal Government recognized
and dealt with the political organization of the *Creeks
in Oklahoma* in regard to *Oklahoma affairs* is of course
no indication that it regarded it as representative of
*all Creeks.* Furthermore, the fact that the Federal
Government had no dealings with those east of the
Mississippi, as a group, is equally of no significance,
since the latter, unlike the Creeks in Oklahoma, had no
organization, occupied no bounded grant of territory
and were not under the guardianship of the Federal
Government.

The fact that petitioner-appellee is recognized by the
Federal Government, whereas appellants can point to
no organization recognized as representing *all* Creeks,
is certainly no basis for granting petitioner-appellee
the representation of all Creeks, or denying appellants

the right to appear and represent themselves and that
portion of the nation *not* represented by petitioner-
appellee. If there existed a recognized organization
representative of the entire Creek nation, it would
doubtless have exclusive right of representation. But
certainly the existence of a recognized organization
representative of only part of the nation, which, more-
over, takes the position that the remaining unorgan-
ized portion has no claim, cannot preclude the remain-
ing unorganized portion of the larger group from
being represented.

**II.**

## The Commission Erred in Determining that Appellants are not Members of a "Tribe, Band, or Other Identifiable Group of Indians" Entitled to Have Their Claim Determined by the Commission.

The Commission Determined that Appellants Are
Not Members of Any ''Tribe, Band, or Other Identi-
fiable Group''. In doing so, the Commission ruled
that in order to be an identifiable group under the Act,
it is necessary that petitioners have ''a common
claim.'' The Commission held that appellants have
no common claim but present instead ''a common suit
for individual claims.'' (R. 118)

The Commission's ruling that the essential for suit
before the Indian Claims Commission is that the In-
dians suing have a common claim was in accordance
with its earlier decisions. *The Loyal Creek Band or
Group of Creek Indians,* Ind. Cl. Com. Dkt. No. 1, opin-
ion entered May 6, 1949; *Lewis et al. ex rel. the Creek
Freedmen Association,* Ind. Cl. Com. Dkt. No. 25, opin-
ion entered August 4, 1949; *Thompson et al. ex rel.
Indians of California,* Ind. Cl. Com. Dkt. No. 31, opin-

MU003664

**154**

ion entered December 15, 1950. But it committed clear error in holding that appellants are not members of a group having a common claim.

The Commission itself has held an individual claim to be one for a direct injury to an individual, sustained in his individual capacity. In *The Fort Sill Apaches,* Ind. Cl. Com. Dkt. No. 30, opinion entered May 6, 1949, in denying the petitioner the right to sue for the alleged false imprisonment of 450 of its members, the Commission said:

> "* * * The rights violated were those of the individuals and who in turn experienced the 'harm, suffering and humiliation' as a result of the alleged wrong. Thus it would seem that a personal or individual wrong has been inflicted on each Indian which damaged him individually and even though all the individual members sustained their respective injuries by the same common incident (arrest and imprisonment at the same time and place), the rights of each individual for the injury so sustained would be and remain several and independent of each other."

On the other hand, a common claim is one for injury to a group right as distinguished from an individual right. The Commission has repeatedly held that a claim for the taking of tribal lands is a common claim. *The Choctaw Nation,* Ind. Cl. Com. Dkt. No. 16, opinion entered July 14, 1950; *McCauley ex rel. the Kaw Tribe of Indians,* Ind. Cl. Com. Dkt. Nos. 33, 34 and 35, opinion entered September 17, 1951; *Pawnee Indian Tribe of Oklahoma,* Ind. Cl. Com. Dkt. No. 10, opinion entered July 14, 1950.

On the basis of these cases, there can be no question that the Indian Claims Commission is wrong and that appellants have a common claim of a group character.

**155**

The claim presented is one for injury to the Creek nation as it existed in 1814 from the taking of its communal lands. Any judgment of the Indian Claims Commission must therefore be in favor of the Creek nation. Appellants are thus not asserting individual claims of themselves or the other Creeks, but are asserting as descendants of members of the Creek nation the common claim possessed by the nation which, because of the lack of present organization, can only be presented in a representative suit by individuals.

It does not matter whether the Creek nation be regarded as still in existence through blood ties or whether, because of the scattering of many of its members, it be regarded as having ceased to exist as a nation. In one event, appellants and those similarly situated whom they represent, who have for common protection formed "The Creek Nation East of the Mississippi", are members of the nation; in the other event they are members of an identifiable group in that they prosecute the common claim of the Creek nation descended to the present Creeks through lineal descent.

One of the Commission's own decisions, entered subsequent to its decision on appellants' amended motion, demonstrates this conclusively. In *Red Lake, Pembina and White Earth Bands,* Ind. Cl. Com. Dkt. No. 18-A, opinion entered September 17, 1951, one of the claims was that of the "Pembina Band" for the taking of lands under an 1863 treaty. The United States defended on the ground that it was not a "tribe, band or other identifiable group" at the time of the suit, although it had been at the time of the injury. The issue, the facts and the Commission's decision are best presented in its own language:

> "The defendant takes the position that a tribe, band or other group must be an existing political

**156**

entity in order to have its claim determined by this Commission. Counsel for defendant does not deny the existence of the Pembina Indians as an organized band and its recognition as such by the United States at the time the treaty of October 2, 1863 was concluded with said band and the lands involved in this claim were ceded by it to the Government, but counsel contends that such a band of Indians as the Pembina Band no longer exists and has not existed since 1891, at which time its members were merged with either the Red Lake or White Earth Bands of Chippewa Indians, and are enrolled as members of those bands.

"A similar contention was made by the defendant in the case of The Loyal Creek Band or Group of Creek Indians v. The United States, Docket No. 1, decided May 6, 1949. In that case this Commission decided that the three classes of *claimants who are permitted to assert claims* under the Indian Claims Commission Act, namely, a 'tribe, band, or other identifiable group' *do not have to be existing political groups in order to be heard by the Commission. The controlling question is whether the claimant group can be identified and have a common claim.* We believe that the decision in that case applies to the contention made by the defendant in the present suit.

"As the plaintiffs concede that the Pembina Indians are no longer organized as a band, *the question then is whether members, or descendants of members of the Pembina Band as it existed and was recognized at the time of the 1863 treaty, can be identified.* If they can be so identified, then any one of their group is authorized by express statute to present this claim as a representative of all the members, as provided by Section 10 of the Indian Claims Commission Act (25 U.S.C. 70a), which provides that: 'any claim within the provisions of this Act may be presented to the

**157**

Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all its members. * * * " (Italics ours)

Similarly, in the instant case, the Creek nation was organized and recognized at the time of the Treaty of 1814, it now lacks a comprehensive organization, but the descendants of its members can be identified through blood lines.

### III.

### The Commission Erred in Determining that it did not Have Jurisdiction to Define the Group Entitled to Recovery on a Claim Before it.

The Commission appears to have misunderstood the basic question it was called upon to decide on appellants' motion. In doing so it abrogated a necessary part of its jurisdiction, which is part of the jurisdiction of any tribunal authorized to hear and determine claims. In performing its duty to determine claims of any Indian "tribes, bands or other identifiable group" against the United States, it must determine not only whether a claim exists against the United States and in favor of someone, but whether the group suing is, in fact, the injured group or has otherwise acquired title to the claim. The United States defended petitioner-appellee "The Creek Nation's" case on the ground that no injury had been inflicted on anyone. It could as well have asserted the additional defense that "The Creek Nation" of Oklahoma was not the proper claimant, not being the full successor of the original Creek Nation nor entitled to recover full damages for any injury to it, nor properly representative of the entire

MU003666

**158**

Creek Nation, the proper claimant. If this had been done, we doubt that the Commission would have questioned its own power to determine this issue. *Cf. The Kaw Tribe of Indians ex rel. Keenan Pappan et al.,* Ind. Cl. Com. Dkts. Nos. 33, 34, 35, opinion entered September 26, 1950.

In *The Fort Sill Apaches,* Ind. Cl. Com. Dkt. No. 30, opinion entered May 6, 1949, this precise question was presented on motion to dismiss of the United States, on the ground that necessary parties had been omitted. The Fort Sill Apaches, formerly members of the Chiricahua and Warm Spring bands of Apaches, were suing on a claim for the taking of the reservation of the Warm Springs band. The United States contended that other descendants of the Chiricahua and Warm Spring bands were living at Mescalero reservation and were entitled to a portion of the claim. While declining to determine the question on the United States' motion because of the issues of fact presented, the Commission recognized the materiality of the issue and its obligation to determine it, saying:

> "* * * This contention of the Respondent may be correct in the event the petitioner fails to establish by its proof that it is the legal successor of the two bands, but we believe that it is only after proof of all the relevant facts and circumstances has been received on this issue that the Commission may, in view of the allegations of the petition, determine petitioner's right to maintain this action for the claim of the Warm Spring band of Apache Indians."

Since the United States failed to raise this question in the instant proceeding, it became necessary for appellants to do so. This they might appropriately do, since

**159**

their interests are those affected. Their amended motion and petition raised this question and presented an issue which the Commission should have determined, probably, in the light of the foregoing decision, by granting appellants' motion and taking evidence on the issue presented by its petition and the answers to be filed to it by the other parties as to "petitioner's right to maintain this action for the claim of 'the Creek nation'." Yet the Commission appears to have doubted its power to determine whether the entire Creek nation or only petitioner-appellee and its members were entitled to prosecute the claim. For it stated that by its amended motion "the Perdido Band is in reality asking us to determine the individual Indians who may participate in any award that may be made." (R. 118)

Appellants contributed to the Commission's error in requesting, in the prayer for relief of the "Amended Petition of Interveners", that "Interveners be declared entitled to share in said recovery on a per capita basis with all others who come before this Commission and establish that they are descendants of the members of the original Creek nation or, in the alternative, that a commission be created to determine and make a roll of the living descendants of members of the original Creek nation, in order to determine who shall be entitled to share in any recovery." It is doubtful that the Commission possesses the power to do this or that it is a part of its function to determine the specific individuals to whom an award is to be distributed. This may be left to the Secretary of the Interior under the direction of Congress once a judgment has been entered making it clear that the claim and consequent judgment are the property of the original

**160**

Creek nation to be enjoyed by their descendants. It will then be a matter for each individual to establish his descent.

But even if erroneous, this prayer of appellants does not, under established rules of pleading, deprive them of the right to that relief to which they are entitled. The allegations of appellants' amended motion tendered an issue as to the proper petitioner to prosecute the claim before the Commission:

"5. The injury for which relief is sought in this proceeding is the taking of lands in Alabama and Georgia by the United States from the Creek nation under the Treaty of August 9, 1814 between the United States and the Creek nation.

"6. The injury was thus one to the Creek nation, as then constituted, and the right to recover therefor passed to the descendants of all its members, who possessed communal rights to its lands, and the right to participate in any recovery for their taking.

"7. Because of the division of its members, and the present lack of any formal organization representing all members of the Creek nation, it must be regarded for the purpose of claims before this Commission under the Act of August 13, 1946, arising out of events prior to the westward migration of a portion of its members, as an unorganized tribe or other identifiable group of Indians.

"8. Even if the organization of the Oklahoma Creeks be regarded as the political successor of the earlier Creek nation, and thereby entitled to sue in a representative capacity for wrongs inflicted on the Creek nation, any recovery would be the rightful property of the original Creek nation, distributable to the descendants of those who were its members as of the time of the Treaty of 1814.

**161**

"9. The organization of the Oklahoma Creeks, petitioner herein, does not purport to represent any Creeks other than those of the Indian Territory. It claims that its members and their descendants, as shown by its rolls, are entitled to recover and keep the full damages for the 1814 injury to the Creek nation. Its interests are thus to this extent adverse to those of your Applicants for leave to intervene, who claim the right, with all other descendants of the original Creek nation, to participate in any recovery.

"10. The interest of the Perdido Band and its members and other Creeks similarly situated, not enrolled or descendants of those enrolled in the organization of the Oklahoma Creeks, are thus not presently represented in this proceeding, in which they have a direct and immediate financial interest." * * *

Consistent with its own later decision in the *Fort Sill Apaches* case, *supra,* the Commission possessed the power to determine the issue presented as to the right of appellants to representation, and should have done so.

### CONCLUSION.

The unsatisfied claims of Indians for abuses practiced by the United States upon them have been a source of discontent among Indians everywhere and a source of proper shame to our government for many years. In creating the Indian Claims Commission, Congress' avowed purpose was to provide a forum for the remedy of all wrongs done to Indian groups, whether legal wrongs or simply those based upon a breach of principles of "fair and honorable dealings." (60 Stat. 959, 25 U.S.C. 70)

**162**

Appellants and the claim they assert surely fall within this Congressional purpose.

They are Creek Indians. They are descendants of those who were the Creek nation at the time of the unconscionable treaty which took its lands. They are not a few stragglers, but thousands. They present not a bundle of individual claims, but a claim for injury to the nation. Theirs is a claim which, but for the existence of petitioner-appellee, the Commission, consistent with its decision in *Red Lake, Pembina and White Earth Bands, supra; Loyal Creek Band or Group of Creek Indians, supra,* and *Snake or Piute Indians of the Former Malheur Reservation in Oregon,* Ind. Cl. Com. Dkt. No. 17, opinion entered December 29, 1950, would certainly have heard.

Why, then, should the existence of petitioner-appellee be a bar to appellants' rights? Certainly membership or non-membership in a group in Oklahoma cannot have been intended by Congress to be a ground for distinction among those who are all commonly descended from the injured group. Certainly petitioner-appellee cannot be held solely entitled to represent the Creeks when it disclaims its representation of appellants and the very existence of their claim.

The decision of the Commission violates the purposes of the Indian Claims Commission Act and its own precedents. It should be reversed and appellants permitted to intervene so that the rights of all descendants of members of the injured nation not members of petitioner-appellee can also be represented and a determination made of the group entitled to recover.

CLAUDE PEPPER,
Cafritz Building,
Washington, D. C.,
*Attorney for Appellants.*

**163**

## APPENDIX.

BEFORE THE INDIAN CLAIMS COMMISSION

Dockets No. 21

THE CREEK NATION, *Petitioner,*

v.

THE UNITED STATES, *Defendant.*

### Order Denying Motion to Intervene.

On the 5th day of January, 1951, a group of Indians, designated as the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," filed a motion in the above-entitled cause for leave to intervene therein, and thereafter, and on April 4, 1951, the same petitioners filed an amended motion accompanied by a changed petition of intervention, and a hearing was had upon said amended motion and the petition attached thereto, on April 18, 1951, and after argument of counsel for the applicant, the petitioner and the defendant before the Commission, the same was taken under advisement, and the Commission being now fully advised in the premises adjudges that said amended motion for leave to intervene in the above-entitled cause should be denied.

IT IS THEREFORE ORDERED AND ADJUDGED by the Commission that the amended motion for leave to intervene, filed herein on the 4th day of April, 1951, by said "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," be and the same is hereby denied.

MU003669

**164**

Dated at Washington, D. C., this 4th day of June, 1951.

EDGAR E. WITT
*Chief Commissioner*
LOUIS J. O'MARR
*Associate Commissioner*
WM. M. HOLT
*Associate Commissioner*

BEFORE THE INDIAN CLAIMS COMMISSION

Docket No. 21

THE CREEK NATION, *Petitioner*,

v.

THE UNITED STATES, *Defendant*.

### Opinion of Commission.

PER CURIAM. On January 5, 1951, a group of Creek Indians, designated as the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," filed a motion in the above-entitled cause for leave to file a petition of intervention, which accompanied the motion. Thereafter, and on April 4, 1951, the same petitioners, who will hereafter be referred to as the Perdido Band, filed an amended motion accompanied by another, considerably changed petition of intervention, and a hearing was had on the amended motion and the petition attached thereto, on April 18, 1951.

The Perdido Band, according to the statements contained in the amended motion and the petition accompanying it, is composed of descendants of members of the Creek Nation of Indians who remained in Alabama, Georgia and North Florida under the treaties of January 4, 1826 and March 24, 1832, between the United States and the Creek Nation. Neither the peti-

**165**

tioner, the Creek Nation, nor defendant denies these statements.

The petition of intervention also states that enrollment in the Perdido Band is limited to those Indians who are descendants of members of the original Creek Nation, and this allegation is not questioned.

The Perdido Band is not asking for an award independently of that sought in the above case; on the contrary, they are supporting the pending claim. What they are demanding is that they and all other descendants of members of the original Creek Nation be recognized as having the right to participate in any award that might be made in the above case even though they are not enrolled as members of the petitioner, Creek Nation, as now constituted.

Without going into the history of the Creek Nation in much detail, it may be stated that this tribe was one of the larger Indian tribes and originally occupied a large territory in Georgia, Alabama and Florida. On January 24, 1826, 7 Stat. 286, the Creek Nation concluded a treaty with the United States by which it ceded an area of its domain located in Georgia and lying on the east side of the Chatahoochee river. A portion of the tribe wished to move west of the Mississippi river and the treaty provided (Art. 6) for a "deputation of five persons" to select a country west of the river as a home for that part of the Creek Nation desiring to move west. The country was selected and the selection confirmed by treaty, as will be shown later. Treaty of Febr. 14, 1833, 7 Stat. 417.

On March 24, 1832, 7 Stat. 366, by treaty of that date, the Creeks ceded "all their land, East of the Mississippi river" to the United States. This treaty contained this provision (Art. XII):

**166**

"The United States are desirous that the Creeks should remove to the country west of the Mississippi, and join their countrymen there; and for this purpose it is agreed, that as fast as the Creeks are prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new homes—Provided however, *that this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.*" (Italics added.)

Article II thereof required the United States to survey the ceded area and allowed "ninety principal chiefs of the Creek tribe to select one section each, and every other head of a Creek family to select one half section each, which tracts shall be reserved from sale for their use for a term of five years, unless sooner disposed of by them." Provisions were also made for taking a census of the persons making selections and for making selection of twenty sections for the benefit of orphan children of the Creeks. Article III authorized the sale of the selections, and Article IV provided:

"At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor in fee simple, from the United States."

Article XII of this treaty quoted above discloses the desire of the United States to move all Creeks west of the Mississippi river, and as an inducement to move, agreed to pay the expenses of removal, provide subsistence during removal and for a year after their arrival west. However, such removal was not compulsory as to individual Creeks, for the article, as shown above, contained the proviso "that this article shall

**167**

not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please."

The treaty of Febr. 14, 1833, 7 Stat. 417, confirmed the selection of land authorized by the 1826 treaty (Art. VIII), and Article III thereof provided for a patent in fee simple to be issued to the "Creek Nation." Article IV made it unmistakably clear that the land ceded under this treaty in what is now Oklahoma was for the benefit and use of the entire Creek people, for it provided:

"It is hereby mutually understood and agreed between the parties to this treaty, that the land assigned to the Muskogee Indians, by the second article thereof, shall be taken and considered the property of the whole Muskogee or Creek nation, as well of those now residing upon the land, as the great body of said nation who still remain on the east side of the Mississippi; and it is also understood and agreed that the Seminole Indians of Florida, whose removal to this country is provided for by their treaty with the U. S. dated May 9th, 1832, shall also have a permanent and comfortable home on the lands hereby set apart as the country of the Creek nation; and they (the Seminoles) will hereafter be considered a constituent part of said nation, but are to be located on some part of the Creek country by themselves—which location will be selected for them by the commissioners who have signed these articles of agreement or convention." (II Kapp. 390.)

The 1826 treaty did not, at least by its terms, contemplate a removal of the entire tribe west, but the 1832 treaty discloses a purpose to recognize those who migrated to the west as the main governing body of the tribe since provision was made for enabling indi-

MU003671

**168**

vidual chiefs and heads of families wishing to do so to remain east and select tracts in their aboriginal land which was reserved for that purpose in said treaty of 1832. This purpose was confirmed by the treaty of 1833, which was made with the Creek Nation at Fort Gibson in Indian Territory, and in which the territory ceded by the United States was assigned to the whole Muskogee or Creek Nation—those residing east and those residing west of the Mississippi. Thereafter, all dealings of the Federal Government were made with the Creeks in Oklahoma, and we find no treaties, contracts or other transactions with those members of the tribe who remained east, or that defendant ever recognized those remaining east as the Creek Nation.

There are other instances by which the United States recognized the tribal government of the Creeks in Oklahoma, notably the Act of April 26, 1906, 34 Stat. 137, section 28 of which "continued in full force and effect for all purposes, authorized by law" the Creek tribal government. We are of the opinion the petitioner in this case has the exclusive right to prosecute the claim here asserted. In fact, the Perdido Band does not really question the right of petitioner to maintain the action, for, as before stated, it asked that the members of the Creek Nation be awarded the amount prayed for, insisting, however, that the award be for the benefit of all Creek descendants and not confined to those enrolled under the various agreements with the Creek Nation, confirmed by Acts of Congress.

This Commission decided in the Loyal Creek case, Docket No. 1, and the Western Cherokee case, Docket No. 24, that an "identifiable group," under the Indian Claims Commission Act, must have a common claim, and that a common suit for individual claims does not

**169**

create an identifiable group. It is plain from the statements in the amended motion and the allegations of the petition accompanying it that the Perdido Band has no common claim, and is therefore not an "identifiable group" under said Act.

Furthermore, the Perdido Band is in reality asking us to determine the individual Indians who may participate in any award that may be made. They pray in their petition that the members of the Perdido Band be declared entitled to share in the recovery or that a Commission be created to make a roll of the living descendants of the original Creek Nation in order to determine who shall be entitled to share in any recovery. Counsel for applicants mistake the powers of the Indian Claims Commission. The Act authorizes us to determine claims of Indian tribes, bands or identifiable groups. We have no power to determine the membership of the groups who may successfully prosecute their claims, for that is an administrative function over which we have no control.

For the reasons stated above, the amended motion of the Perdido Band must be denied.

The Commission now has under advisement for decision only the issue of fact and law relating to the petitioner's right to recover. (Sec. 22(b) of Rules of Procedure). Ordinarily, we would postpone the determination of the amended motion of the Perdido Band until after we had determined that issue, but for fear longer delay might cause embarrassment to the Band because of the expiration of the time for filing claims on August 13, 1951, we concluded an earlier determination of the amended motion proper.

Dated this 4th day of June, 1951.

# EXHIBIT H

**Appeals Docket No. 14**

# In the United States Court of Claims

C. W. McGHEE, RUBY Z. WEATHERFORD, JOHN V.
PHILLIPS AND JOHN WILLIAMS AS MEMBERS OF
AND ON THE RELATION OF THE CREEK NATION EAST
OF THE MISSISSIPPI, APPELLANTS

*v.*

THE CREEK NATION AND THE UNITED STATES,
APPELLEES

**BRIEF FOR THE APPELLEE, THE UNITED STATES**

WM. AMORY UNDERHILL,
*Assistant Attorney General.*

RALPH A. BARNEY,
*Attorney.*

MU003701



# INDEX

|  | Page |
|---|---|
| I. The Facts | 1 |
| II. The Issue | 4 |
| III. Argument | 4 |
|     A. Exclusive right to sue | 4 |
|     B. Appellants are not a tribe, band, or other identifiable group of Indians | 10 |
|     C. Jurisdiction of Commission | 16 |
| Conclusion | 19 |

## CITATIONS

*Cases:*

| | |
|---|---|
| *Choctaw Nation* v. *United States*, decided Oct. 2, 1951 | 10 |
| *Cook* v. *Cook*, decided Dec. 3, 1951 | 4 |
| *Gritts* v. *Fisher*, 224 U. S. 640 | 10 |
| *Kohpay* v. *Chapman*, 190 F. 2d 666 | 12 |
| *Loyal Creek Indians* v. *United States*, 1 Ind. Cls. Comm'n 122 | 13 |
| *Lowe* v. *Fisher*, 223 U. S. 95 | 10 |
| *Mayflower Hotel Stockholders Protective Committee* v. *Mayflower Hotel Corp.*, 73 F. Supp. 721 (1947) | 14, 15 |
| *Montoya* v. *United States*, 180 U. S. 261 | 17 |
| *Red Lake Indians* v. *United States*, 1 Ind. Cls. Comm'n, 575, 589 | 11 |
| *Scanlon* v. *Snow*, 2 App. D. C. 137 | 14 |
| *Tully* v. *United States*, 32 C. Cls. 1 | 17 |
| *Wallace* v. *Adams*, 204 U. S. 415 | 10, 16 |

*Statutes and Treaties:*

| | |
|---|---|
| Act Feb. 8, 1887, 24 Stat. 390 | 9 |
| Act Mar. 1, 1901, 31 Stat. 861 | 13 |
| Act Aug. 13, 1946, 60 Stat. 1049, secs. 9 and 10, | 4, 5, 6, 7, 8, 9, 12, 17 |
| Treaty Aug. 7, 1790, 7 Stat. 35 | 8 |
| Treaty June 29, 1796, 7 Stat. 56 | 8 |
| Treaty June 16, 1802, 7 Stat. 68 | 8 |
| Treaty Nov. 14, 1805, 7 Stat. 96 | 8 |
| Treaty Aug. 9, 1814, 7 Stat. 120 | 1, 3, 11 |
| Treaty Aug. 24, 1835, 7 Stat. 474 | 2 |
| Treaty Nov. 23, 1838, 7 Stat. 574 | 2 |
| Treaty Jan 4, 1845, 9 Stat. 821 | 2 |
| Treaty June 13, 1854, 11 Stat. 599 | 2 |
| Treaty June 14, 1866, 14 Stat. 785 | 2, 13 |

*Miscellaneous:*

| | |
|---|---|
| Hearings on S. 2731, 73d Cong., 1st sess., p. 40 | 17 |
| 13 Fletcher Cyclopedia, Corporations, sec. 5972 | 14 |

(I)

MU003702

# In the United States Court of Claims

Appeals Docket No. 14

C. W. McGHEE, RUBY Z. WEATHERFORD, JOHN V.
PHILLIPS AND JOHN WILLIAMS AS MEMBERS OF
AND ON THE RELATION OF THE CREEK NATION EAST
OF THE MISSISSIPPI, APPELLANTS

*v.*

THE CREEK NATION AND THE UNITED STATES,
APPELLEES

**BRIEF FOR THE APPELLEE, THE UNITED STATES**

### I. The Facts

Insofar as they relate to this appeal the facts
are not in dispute. Prior to 1812 the Creek In-
dians were living east of the Mississippi River.

In that year they joined with Britain for its sec-
ond war with the United States. On August 9,
1814, a treaty of peace, amity, and cession was
signed at Fort Jackson. It is the land ceded by this
treaty that is the basis of the case now pending be-
fore the Indian Claims Commission in which the
Intervenors seek to join. As the result of a series
of treaties thereafter concluded with the Creek
Nation it ceded all of its lands east of the Missis-
sippi River and acquired a new domain in what is
now Oklahoma.

(1)

MU003703

2

The majority of the Creeks went West, but many stayed behind and continued to live in or around their old homes.[1] Those who moved West took with them their form of government and were recognized by the United States as "The Creek Nation."[2] Those who remained in the East abandoned their tribal relationships; and they never continued a tribal government recognized by the United States and they entered into no treaties or other political arrangements with the United States[3] or with other Indian tribes or groups, and only recently organized themselves, apparently for the purpose of this suit.[4]

On January 29, 1948, "The Creek Nation" filed its claim with the Commission. The evidence is in, the case has been briefed, argued and submitted. It is now awaiting decison. On January 5, 1951, the appellants, then calling themselves "The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians" filed a motion to intervene which was objected to by "The Creek Nation," the original petitioner, and by the Government as the defendant. An amended motion to intervene

[1] Provision was made for a reservation for each out of the lands ceded. Opinion of Commission, appellants' brief, p. 166.

[2] See treaties of August 24, 1835, 7 Stat. 474; November 23, 1838, 7 Stat. 574; January 4, 1845, 9 Stat. 821; June 13, 1854, 11 Stat. 599; and June 14, 1866, 14 Stat. 785.

[3] In their brief they say: "Furthermore, the fact that the Federal Government had no dealings with those east of the Mississippi, as a group, is equally of no significance, *since the latter*, unlike the Creeks in Oklahoma, *had no organization, occupied no bounded grant of territory and were not under the guardianship of the Federal Government*." [Italics supplied.] Br. p. 152. See also Br. p. 155.

[4] Op. Commission, appellants' Br. p. 168. In their brief appellants say they "have recently joined together for their common benefit * * *." *Id.* p. 137.

3

was filed and presented to the Commission and on June 4, 1951, an order[5] was made by the Commission denying The Perdido Band the right to intervene. From that order the appellants, now calling themselves the "Creek Nation East of the Mississippi" appeal.

According to their brief[6] their "basic premise is that the injury inflicted by the United States in 1814 was to the Creek nation as then constituted and that the right to recover therefor belongs to that nation, to be enjoyed by all its members." No contention is made that the claim filed by "The Creek Nation" is improper, nor has it been suggested that the case was improperly tried; in fact, it was specifically stated before the Commission that there was no desire to reopen the case. In its opinion[7] the Commission said:

> The Perdido Band is not asking for an award independently of that sought in the above case; on the contrary, they are supporting the pending claim. What they are demanding is that they and all other descendants of members of the original Creek Nation be recognized as having the right to participate in any award that might be made in the above case even though they are not enrolled as members of the petitioner, Creek Nation, as now constituted.

Thus it appears that appellants actually are seeking only to have it determined that they are entitled to participate in any judgment ultimately awarded in this case. This is not the function of the Indian Claims Commission.

[5] Appellants' Br. p. 163.
[6] *Id.* p. 139.
[7] Appellants' Br. p. 165.

MU003704

4

## II. The Issue

On the foregoing facts this appeal presents to this Court a single but important question of law concerning the administration of the Indian Claims Commission Act. The issue may be formulated this way:

> Where a claim is filed in the name of an historic Indian tribe by the group commonly recognized by the United States, may individuals who claim a right to share with and participate in any recovery intervene in the action?

The Government contends that under the law and the Rules of the Commission the intervention sought is unauthorized and that the practice ought not to be countenanced nor permitted in the interests of orderly procedure.[8]

## III. Argument

The appellants present their argument under three main contentions. We will follow this arrangement.

### A. *Exclusive right to sue.*

Section 10 of the Indian Claims Commission Act provides as follows:

> Any claim within the provisions of this Act may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the represen-

---

[8] In this connection we think the words of Mr. Justice Frankfurter in the recent case of *Cook* v. *Cook,*   U. S. (decided Dec. 3, 1951) are applicable: "I am not one of those who think that procedure is just folderol or noxious moss. Procedure—the fair, orderly and deliberative method by which claims are to be litigated—goes to the very substance of law."

5

tative of all its members; but wherever any tribal organization exists, recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group, such organization shall be accorded the exclusive privilege of representing such Indians, unless fraud, collusion, or laches on the part of such organization be shown to the satisfaction of the Commission.

To make this statute effective the Commission, under its "power to establish its own rules of procedure,"[9] has provided in Rule 1 as follows:

> (b) Claims by Indian tribes, bands, or groups which have tribal organizations recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group shall be filed and presented by the duly appointed or elected officers of such organization, except as provided in paragraph (c) of this section.
>
> (c) Where by virtue of fraud, collusion, or laches on the part of a recognized tribal organization a claim has not been presented (or has not been included as part of a presented claim), any member of such tribe, band, or group may file claim on behalf of all the other members of such tribe, band, or group upon complying with the provisions of section 8 (b).
>
> (d) Claims on behalf of any unorganized tribe, band, or other identifiable group may be filed by any member of such tribe, band or identifiable group as the representative of all its members.

Rule 8 reads as follows:

> Sec. 8. *Capacity.* (a) Petitions filed by any tribal organization recognized by the Secre-

---

[9] Act Aug. 13, 1946, sec. 9.

MU003705

6

tary of the Interior as having authority to represent a tribe, band, or group need not aver the capacity of such organization to sue except to the extent required to show the jurisdiction of the Commission. When the United States desires to raise an issue as to the capacity of such a recognized tribal organization to sue, it shall do so by specific negative averments, which shall include supporting particulars.

(b) If a petition is filed by one or more members of a tribe, band, or other identifiable group having a tribal organization which is recognized by the Secretary of the Interior because the tribal organization has failed or refused to take any action authorized by the act, the petition shall be verified and shall aver that the petitioner is a member of the tribe, band, or group. The petitioner shall also set forth with particularity the efforts of the petitioner to secure from the duly constituted and recognized officers of said tribal organization such action as he desires and the reasons for his failure to obtain such action (such as fraud, collusion, or laches) or the reasons for not making such effort.

(c) Petitions filed by one or more members on behalf of an unorganized tribe, band, or other identifiable group shall be verified and shall aver (1) that the petitioner or petitioners are members of the tribe, band, or group (2) a description of the unorganized tribe, band, or group of sufficient comprehension to identify the tribe, band, or group on whose behalf the petition is filed.

On January 29, 1948, "The Creek Nation" filed this case before the Indian Claims Commission. It was alleged that "The Creek Nation" was a tribe within the meaning of the Indian Claims

7

Commission Act and it was further alleged that the attorney who filed the suit was authorized to do so by a contract approved by the Secretary of the Interior. The defendant, recognizing the historic fact that a group of Indians known as "The Creek Nation" has existed since the first settlement in southeastern United States, and still exists today, took no exception to the filing of the claim.

The case had been fully tried, briefed, argued, and submitted for decision to the Commission when, on January 5, 1951, the appellants, calling themselves "The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," sought to intervene in the case. Admittedly [10] they were not an organized group of Indians recognized by the Secretary of the Interior; they charged no fraud, collusion, or laches on the part of the petitioners in the filing of the case; they made no complaint concerning the manner in which the case was presented to the Commission, and they specifically denied any desire to reopen the case;[11] apparently all they wanted was an adjudication by the Commission that the persons who composed the so-called "Perdido Band" had the right to participate in the distribution of any award.

As between the petitioner—"The Creek Nation" —and the appellants, there can be no question that the former met the requirements of section 10 of the

[10] Appellants' Br. p. 152.  In the Amended Motion for Leave to Intervene it is said (p. 2): "Said Perdido Band has not yet been recognized by the Secretary of the Interior."

[11] Amended Motion to Intervene (p. 14): "13. Applicants do not seek to alter or expand in any way in this proceeding the claim of the Creeks against the United States * * *. They do not seek to re-open the record for the taking of additional evidence on these issues * * *."

MU003706

8

act. The United States has consistently recognized the duly elected or appointed officials of "The Creek Nation" as having authority to represent the Creek Indians both prior [12] and subsequent [13] to their removal west of the Mississippi River. We believe that in enacting section 10 the Congress intended to extend the recognition previously accorded to the existing tribal organization into the field of Indian claims.

The reasons are both obvious and practical. In authorizing the recognized tribal organizations to bring the action the Congress had some assurance that tribal claims would be presented and it would avoid a multiplicity of suits by a variety of groups each contending that it was the true representative of the tribe. That is now what has happened in this case.

Appellants now seek to divert the inquiry of the Commission from a determination of whether the Creek Indians have a recognized claim against the United States to a determination of whether "The Creek Nation" or the "Creek Nation East of the Mississippi" has the right to present this claim. They say: [14]

Their amended motion and petition raised this question and presented an issue which the Commission should have determined, probably, in the light of the foregoing decision, by granting appellants' motion and taking evidence on the issue presented by its petition and the answers to be filed to it by the other parties as to

[12] See treaties of August 7, 1790, 7 Stat. 35; June 29, 1796, 7 Stat. 56; June 16, 1802, 7 Stat. 68; November 14, 1805, 7 Stat. 96, etc.

[13] See fn. 2, supra.

[14] Br. p. 159.

9

"petitioner's right to maintain this action for the claim of 'the Creek nation'."

The purpose of section 10 clearly was to avoid such excursions into secondary questions if that could be done without harm to the tribe. The contingencies provided by Congress were where fraud, collusion, or laches was shown on the part of the recognized organization. None of these conditions have been suggested by the appellants, nor have they complied with the rules of the Commission. Since the case was filed on January 29, 1948, laches certainly cannot be charged, nor is it suggested that fraud or collusion exists. It seems clear, therefore, that both under the statute and the rules of the Commission the intervenors are not entitled, as against the recognized organization of the Creek Nation, to maintain this action.

The question of whether appellants and other Creeks did or did not lose their rights in the claim by not emigrating to Oklahoma [15] was not before the Commission and is not before the Court now. The Commission has no power to determine the manner in which any award will be disbursed or the persons entitled to receive it. Section 22(a) of the act provides merely that when the report of the Commission has been filed with Congress "there is hereby authorized to be appropriated such sums as are necessary to pay the final determination of the Commission."

The contention by appellants that the rights of those Creeks who did not remove to Oklahoma have been fully preserved by the Act of February 8, 1887, 24 Stat. 390, as amended, does not aid appel-

[15] Appellants' Br. p. 146.

MU003707

10

lants now. On the contrary, assuming the position to be legally correct—concerning which we express no opinion—it proves that it is wholly unnecessary for them to intervene to protect their rights.

Since the Commission has no authority to determine the names of persons who would be entitled to participate [16] in any distribution, the mere fact that the appellants were made parties to the proceeding would not determine their right to participate. This Court has just recently pointed out that as long as Indian funds are tribal in character Congress has full power to legislate concerning citizenship and to deal with such property without infringing on individual rights. *Choctaw Nation* v. *United States*, decided Oct. 2, 1951.

And so it is in this case. We do not know, nor do we pretend to say, what disposition Congress will make of any judgment which might be rendered in favor of the Creeks. But we do know that under *Wallace* v. *Adams*, 204 U. S. 415; *Gritts* v. *Fisher*, 224 U. S. 640, and *Lowe* v. *Fisher*, 223 U. S. 95, the Congress is free to make such disposition of any such judgment as may seem best to it, without in any way making the Government liable to appellants.

### B. *Appellants are not a tribe, band, or other identifiable group of Indians.*

At the present stage of the proceedings appellants have no standing before the Commission or this Court. Admittedly they are not enrolled members of the Creek Nation. They are merely an aggregation of individuals who *claim* to be Creek

[16] This is now apparently admitted by appellants. See Br. p. 159.

11

Indians, descendants of Creeks who were members of the Creek Nation of Indians on August 9, 1814, when the lands were ceded to the United States. Thus we have the situation of an aggregation of people who *say* they are Creek Indians seeking to enter a lawsuit without an adjudication that any of them is, in fact, a Creek Indian. Thus this case differs from the *Red Lake* case, No. 18-A, decided by the Commission on September 17, 1951, and cited in appellants' brief.[17] There the Commission found as a fact that the individual petitioners were enrolled members of the Pembina Band. The Commission, therefore, held that they had authority to maintain the action on behalf of an historic band which no longer maintained a separate tribal existence but whose members were identified. The language of the decision is:[18]

> As heretofore stated, the Pembina Band of Indians was recognized as a separate and distinct band of Chippewa Indians and was dealt with as such by the Government at the time the 1863 treaty was negotiated. The record shows that some years thereafter the United States officials moved the members of the band and settled them on a portion of the White Earth Reservation. They were listed separately on the census rolls at that reservation as Pembina Indians until 1923—the 1922 roll showing 519 of them. But apparently due to a change in the method of making the census rolls, no separate roll appears to have been maintained of these Indians as Pembina Indians after 1922. However, regardless of how these Pembina Indians were listed on the census rolls after 1922, we believe the evidence

[17] P. 155.
[18] 1 Ind. Cls. Comm'n pp. 575, 589.

12

shows quite conclusively there is a group of Pembina Indians now living who are descendants of members of the Pembina Band that was a party to the October 2, 1863, treaty out of which the present claim arose, and they can be identified and have a group claim which they are entitled to have determined by this Commission. The existence of such a group having been established, and our conclusion is that it has been, we do not consider it necessary for jurisdictional purposes to determine who are all the individual members of said group. (Indians of California v. United States, Docket No. 31.) The plaintiffs have alleged in the petition and satisfactorily established by the evidence that the named individual plaintiffs, Rosetti Villebrun and Katherine Carl Barrett, are members of this group of Pembina Indians who are descendants of the original members of the Pembina Band and they are therefore entitled, under Section 10 of the Act, to maintain this action in a representative capacity on behalf of themselves and all other members of the claimant group.

This is not the case now under consideration. Intervenors have never been identified as members of the Creek Nation, and the Commission is without jurisdiction to determine that they are members of the Creek Nation entitled to participate in any judgment. As to this point, a somewhat analogous situation arose in *Kohpay* v. *Chapman, Secretary of the Interior*.[19] There the plaintiff sued for her pro rata distribution of the Osage tribal funds on the ground that she was an Osage Indian although her name did not appear on the approved roll. The court of appeals, in affirming

---

[19] 190 F. 2d 666.

13

the district court and denying the relief sought, held that enrollment was a prerequisite to participation in the distribution, and that the plaintiff must first apply to the Secretary of the Interior for enrollment:

> Then under the *Jump case* [73 App. D. C. 141, 117 F. 2d 769] if the appellant considers the action of the Secretary arbitrary or capricious, he may apply to the federal courts for relief. The relief which the appellant requests here flows as a natural consequence of having her name on the roll, but we cannot grant the requested relief in a mandamus suit which itself by-passes the steps which must be taken.

The principle is the same here. In the absence of a previous determination that appellants are Creek Indians they quite obviously have no right to prosecute this action. The Commission does not have jurisdiction to determine the question of membership in an Indian tribe. This is a question which Congress has always reserved to itself.

The Congress has never recognized the Creek Indians, who failed to go West, as an entity. Thus the case differs from that of the Loyal Creeks,[20] who were recognized by the Creek Nation and the United States in the Treaty of June 14, 1866, 14 Stat. 785, and the agreement between the Creek Nation and the United States of March 8, 1900, ratified by Act of Congress of March 1, 1901, 31 Stat. 861, and whose identity was determined by the roll prepared in accordance with the provisions of the treaty of 1866. In the present case there has been no recognition by Congress and there has

---

[20] 1 Ind. Cls. Comm'n p. 122.

MU003709

14

been no identification of the persons who compose the group.

This disposes of the argument that appellants have a common claim. We quite agree that a claim for tribal lands under the Indian Claims Commission Act is a common claim, and we have so recognized that fact in this case in the suit filed by "The Creek Nation." The difficulty with appellants' position is that the persons seeking to intervene have not shown themselves capable of maintaining the action for that common claim.

The situation is completely analogous to a stockholders' suit on behalf of a corporation. Admittedly under proper circumstances a stockholder may sue on behalf of a corporation, *but he must be a stockholder.*[21] The case of *Scanlon* v. *Snow,* 2 App. D.C. 137, is quite analogous to the present situation. The court in its statement of facts said:[22] "In the course of the testimony, or at the end of it, a petition was filed on behalf of Charles E. White, asking to be made a party complainant, which was agreed to and allowed. He claimed to be a stockholder and adopted the averments of the bill."

[21] See generally 13 Fletcher Cyclopedia, Corporations, sec. 5972. In the case of *Mayflower Hotel Stockholders Protective Committee* v. *Mayflower Hotel Corp.,* 73 F. Supp. 721 (1947), Judge Holtzoff apparently considered the matter so well settled he did not consider it necessary to cite any authority for his statement: "In view of the fact that a stockholders' suit may be brought solely by persons who were stockholders of the corporation at the time that the cause of action accrued and who are still stockholders at the time of the institution of the suit, the plaintiff, Mayflower Hotel Stockholders Protective Committee, has no right to bring this action, since the Committee is not and never has been a stockholder, insofar as appears from the allegations of the complaint."
[22] P. 146.

15

Mr. Justice Morris, in delivering the opinion of the Court, said:[23]

It is very clear to us that the petitioner White has no standing in this case. * * * In his petition filed in this cause, Mr. White alleged that he was a stockholder of the present company; but in the stipulation entered into with reference to the petition and which served for an answer to it, this allegation was explicitly denied, as well as the other allegations of the petition, and no proof whatever was taken to overcome this denial. On the contrary, the proof adduced on behalf of complainants showed conclusively that he was not a stockholder in fact, whether he was entitled so to be or not. And the dismissal of his bill, as already stated, would seem to indicate that he was not entitled to any interest whatever in the new organization. His petition, therefore, in this cause was very properly dismissed.

With the exception of a previous determination that White had no interest in the corporation the facts in that case and the present one are the same. Admittedly the names of appellants are not on the rolls of the Creek Nation. They are not, therefore, recognized members of the nation and, hence, are not entitled to prosecute this action.

It may be that some tribunal of competent jurisdiction may determine that they are legally members of the Creek Nation and, therefore, entitled to participate in an award if there is one. But the Indian Claims Commission has no jurisdiction to determine that question. That is a matter for Congress or such tribunal as Congress may

[23] P. 147.

MU003710

16

create.[24] Since the appellants admittedly are not recognized by the administrative or legislative arm of the Government, they cannot, collectively, be said to be a "tribe, band, or other identifiable group" within the meaning of the Indian Claims Commission Act.

### C. *Jurisdiction of Commission*

Under this heading appellants say that the Commission must determine "not only whether a claim exists against the United States and in favor of some one, but whether the group suing is, in fact, the injured group or has otherwise acquired title to the claim."[25]

The defendant might be willing to concede that this position was correct if there were two recognized groups competing with each other for the right to maintain this action. But that is not this case.

The appellants have not been recognized by anyone. As a matter of fact they do not pretend to say just who they are. They say[26] that their "rolls are open to all those who can prove lineal descent from the members of the original Creek nation." They thus seek to usurp the functions of Congress. Congress may, or may not, adopt this criterion for "membership" in a reconstituted Creek Nation; but the appellants certainly have no authority to define membership in the Creek Nation and to determine that all who come within this definition constitute "The Creek Nation" or even an "identifiable group" within the meaning of the Indian

---

[24] *Wallace* v. *Adams,* 204 U.S. 415.

[25] Appellants' Br. p. 157.

[26] Br. p. 139.

---

17

Claims Commission Act. Certainly, unless the Commission and this Court are to restrict the term "other identifiable group" to those groups which have received recognition by some branch of the Government or by the Indians themselves,[27] the term "identifiable group" is meaningless and amounts to nothing more than an aggregation of persons voluntarily associating themselves together and giving themselves a name. This was not the intention of the authors of the Indian Claims Commission Act.

During the 74th Congress three bills were introduced to create an Indian Claims Commission,[28] all of which authorized the Commission to investigate claims "of any Indian tribe, band, or other *communal* group of American Indians." Hearings were held on both H. R. 7837 and S. 2731. In the hearings on S. 2731 considerable discussion ensued concerning the meaning of the words "or other communal group." The following colloquy between Senator Steiwer and the Commissioner of Indian Affairs makes it clear that the claimants must not only have a historic identity, but that their claim must be of the "common" or "group" type:[29]

Senator Steiwer. * * * While I have interrupted, may I ask what is the significance of the word "communal" in line 12.

Mr. Collier. It simply means a community. It is an attempt to go beyond the limitations of the meaning of "band" which has been imposed by this single definition, and to take a

---

[27] *Montoya* v. *United States,* 180 U.S. 261, 265; *Tully* v. *United States,* 32 C. Cls. 1.

[28] S. 2731; H. R. 6655, and H. R. 7837.

[29] Hearings on S. 2731, 73d Cong., 1st sess., p. 40.

18

simple *group of Indians who have a common interest, who have suffered a common injury,* but who may not heretofore have been recognized by any branch of the Government.

\*  \*  \*  \*  \*

Mr. Collier. Yes; because I doubt if there is a case anywhere where an Indian has a claim that he cannot find another Indian that has that kind of claim. We do not want these innumerable, heterogenous Indian claims put on the doorstep of the court if we can help it. *Some qualifying word—maybe "communal" is not the right word—which indicates a historic identity, or an identity of habitat, makes the thing a communal group, a group with historic identity, and not just a detached group of people who got together and made out they were a group so as to get into this court.*

Senator Steiwer. The essential thing is that they have a common claim, is it not?

Mr. Collier. Yes; a common claim of a group character. [Italics supplied.]

Thus it appears that Commissioner Collier recognized that the group must have a "historic identity" and that he did not have in mind "just a detached group of people who got together and made out they were a group so as to get into this court."

19

### CONCLUSION

For all of these reasons we say that the order of the Commission dated June 4, 1951, denying appellants leave to intervene in this case was correct and should be affirmed.

WM. AMORY UNDERHILL,
*Assistant Attorney General.*

RALPH A. BARNEY,
*Attorney*

JANUARY 1952

☆ U. S. GOVERNMENT PRINTING OFFICE: 1951    981403    871

MU003712

# EXHIBIT I

AGREEMENT BETWEEN
THE NATIONAL PARK SERVICE, U. S. DEPARTMENT OF THE INTERIOR
AND THE POARCH BAND OF CREEK INDIANS OF ALABAMA
FOR THE ASSUMPTION BY THE TRIBE OF CERTAIN RESPONSIBILITIES
PURSUANT TO THE NATIONAL HISTORIC PRESERVATION ACT (16 U.S.C. 470)

WHEREAS, sovereign Indian tribes are uniquely suited to make decisions about historic resources on tribal lands; and

WHEREAS, enhancing the role of Indian tribes in the national historic preservation partnership will result in a stronger and better national effort to identify and protect historic and cultural resources for future generations of all Americans; and

WHEREAS, Section 101(d)(2) of the National Historic Preservation Act provides that, "A tribe may assume all or any part of the functions of a State Historic Preservation Officer in accordance with subsections (b)(2) and (b)(3), with respect to tribal lands;" and

WHEREAS, for the purposes of this agreement tribal lands means all lands within the exterior boundaries of the Poarch Band of Creek Indians Reservation and any dependent Indian communities formally recognized as such by the Department of the Interior; and

WHEREAS, in accordance with Section 101(d)(2)(A), the chief governing authority of the Poarch Band of Creek Indians has requested approval to assume certain of those functions; and

WHEREAS, in accordance with Section 101(d)(2)(B), the Poarch Band of Creek Indians has designated a tribal preservation official to administer the tribal historic preservation program; and

WHEREAS, in accordance with Section 101(d)(2)(C), the Tribe has provided to the Secretary of the Interior acting through the National Park Service a plan that describes how the functions the tribes propose to assume will be carried out; and

WHEREAS, the National Park Service, on behalf of the Secretary, has reviewed the Tribe's plan for conformance with the following applicable Federal regulations: 36 CFR 60 and 36 CFR 61; and has determined that the plan meets the requirements of those regulations; and

WHEREAS, the National Park Service, on behalf of the Secretary, has reviewed the Tribe's plan and has determined in accordance with Section 101(d)(2)(D)(i) that the Poarch Band of Creek Indians is fully capable of carrying out the functions specified in the Tribe's plan; now, therefore,

THE NATIONAL PARK SERVICE AND THE POARCH BAND OF CREEK INDIANS OF ALABAMA DO HEREBY AGREE AS FOLLOWS:

1. The Poarch Band of Creek Indians assumes responsibility on tribal lands for the following functions set out in Section 101(b)(3) of the Act:

A. Direct and conduct a comprehensive, Reservation-wide survey and maintain an inventory of historic and culturally significant properties;

B. Identify and nominate eligible properties to the National Register of Historic Places and otherwise administer applications for listing historic properties on the National Register;

C. Develop and implement a comprehensive, Reservation-wide historic preservation plan;

D. Advise and assist, as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities;

E. Cooperate with the Secretary, the Advisory Council on Historic Preservation, and other Federal agencies, State agencies, local governments, and organizations and individuals to ensure that historic properties are taken into consideration at all levels of planning and development;

F. Provide public information, education and training, and technical assistance in historic preservation;

G. Consult with the appropriate Federal agencies in accordance with Section 106 of the Act on:

> i. Federal undertakings that may affect historic and culturally significant properties on tribal lands;
>
> ii. the content and sufficiency of any plans to protect, manage, or to reduce or mitigate harm to such properties;

H. Cooperate with local governments in the development of local historic preservation programs and assist local governments in becoming certified pursuant to subsection (c) of the Act;

I. Advise and assist in the evaluation of proposals for rehabilitation projects that may qualify for Federal assistance, such as the historic preservation income tax credits.

2. In accordance with the Tribe's plan noted above, the Alabama State Historic Preservation Officer (SHPO) retains no responsibility on tribal land for the functions in Section 101(b)(3).

3. The Poarch Band of Creek Indians will consider nominations to the National Register of Historic Places in accordance with 36 CFR 60. The Tribe's process is set out in the Tribe's plan and includes review of nominations by the Historic Preservation Office, by the Poarch Band of Creek Indians Cultural Resources Board, and by the Tribal Council. The Cultural Resources Board will have access to appropriately qualified individuals in carrying out its review of nominations.

4. Because all Poarch Band of Creek Indians tribal land is under the direct control of the Tribal Council, the Tribal Historic Preservation Officer, in accordance with 36 CFR 60, will provide written notice to the Tribal Council of his intent to bring a National Register nomination before the Cultural Resources Board and the Tribal Council for consideration. The notice shall be sent at least 30 but not more than 75 days before the meeting of the Cultural Resources Board, unless the Tribal Council agrees to an expedited review period. In submitting a nomination to the Keeper of the National Register, the Tribal Historic Preservation Officer shall also forward to the Keeper all comments received by the Tribe concerning that nomination. Because Poarch Band of Creek Indians tribal land includes no privately owned property, the provisions of the Act and of 36 CFR 60 concerning private owner objections to nominations are not applicable.

5. The Tribe will carry out its responsibilities for review of Federal undertakings pursuant to Section 106 of the Act in accordance with the regulations (36 CFR Part 800) of the Advisory Council on Historic Preservation. In the event that the Tribe seeks to substitute its own review procedures for those established by the Council, such substitution is subject to a separate negotiation with the Council, pursuant to Section 101(d)(5) of the Act.

6. As directed by Article 25 of the Poarch Band of Creek Indians Historic Preservation Code, the Tribal Historic Preservation Office, relying on its special knowledge, training, and experience, will evaluate the significance of, and impact on, all properties surveyed within the reservation. This will be done with regard to historic, architectural, archeological, anthropological, religious, and cultural considerations. The Historic Preservation Office will, as it deems proper and as it deems needed, consult with recognized authorities meeting the Secretary of the Interior's Professional Qualifications Standards.

7. The Tribal Historic Preservation Officer will, in accordance with Section 101(d)(4)(C), provide for the appropriate participation in the historic preservation program by the Tribe's traditional cultural authorities, and for consultation with representatives of any other tribes whose traditional lands may have been within the Poarch Band of Creek Indians Reservation, and for consultation with the interested public.

Concerning the involvement of traditional cultural authorities, the Tribe has officially recognized William Day, William Bailey, and Gayle Thrower as official spokespersons in matters concerning tribal culture and historic preservation. These three individuals also serve as staff of the Tribe's Historic Preservation Department. In addition, the Preservation Officer will periodically solicit and take into account comments on the program from all those individuals and groups who may be affected by the program's activities, as the tribe deems appropriate and consistent with the practice of other tribal programs. In any case where an action arising pursuant to the Act may affect the traditional lands of another Tribe, the Preservation Officer will, on an as-needed basis, seek and take into account the views of that Tribe.

8. As of the date of this Agreement, there is no land within the Reservation boundaries that is not held in trust for the Tribe or owned by a non-tribal member. In the event that this condition changes, the Tribal Historic Preservation Officer will, in accordance with Section 101(d)(2)(D)(iii), ensure that, for properties neither owned by tribal members nor held in trust for the Tribe by the Secretary of the Interior, the property

owners are aware that they may request the participation of the State Historic Preservation Officer, along with the Tribal Historic Preservation Officer, in decisions pursuant to the Act that may specifically affect their property.

9. As directed by the Poarch Band of Creek Indians Historic Preservation Code, the Tribal Historic Preservation Office shall prepare and submit to the Tribal Council an annual report on historic preservation and educational activities carried out under its authority, a copy of which will be provided to the National Park Service at the end of each calendar year. Included in that report, and specifically under the authority of this agreement, the Tribal Historic Preservation Office will report the number of properties surveyed and added to the tribe's inventory and the number of Federal undertakings reviewed pursuant to Section 106 of the National Historic Preservation Act. The National Park Service is authorized to use this information and similar data from other Tribes assuming formal responsibilities under section 101(d) of the Act to report annually to the Administration, the Congress, and other interested parties on the national accomplishments of this program.

10. As of the date of this agreement, the Poarch Band of Creek Indians' Tribal Historic Preservation Officer is William Day. The Tribe will notify the National Park Service whenever there is a vacancy in the position and whenever a successor is designated by the Tribe.

11. The National Park Service will, in accordance with Section 101(d)(2)(A) of the Act foster communication, cooperation, and coordination among the Tribe, the State Historic Preservation Officer, and Federal agencies in the administration of the national historic preservation program. All such efforts by NPS will be on an as-needed basis and will be based on consultation with the Tribe to ensure that tribal values are fully respected.

12. The National Park Service, upon execution of this agreement, will notify all Federal Preservation Officers, the Advisory Council on Historic Preservation, and the Alabama State Historic Preservation Officer, that the Poarch Band of Creek Indians has assumed formal responsibility on tribal lands for all of the functions set out in Item 1 above. In particular, such notice shall make clear that the Tribe has assumed the role of the State Historic Preservation Officer on tribal lands for the purposes of consultation on Federal undertakings pursuant to Section 106 of the National Historic Preservation Act.

13. The National Park Service will consult with the Poarch Band of Creek Indians to determine what technical assistance the Tribe needs and wants in order to enhance its participation in the national historic preservation program. Based on that consultation, NPS will make available to the Tribe such technical assistance as is appropriate and feasible. Nothing in this Agreement requires the National Park Service to provide financial assistance to the Tribe to carry out the functions it has assumed under this agreement. Only a separate grant agreement, cooperative agreement, or contract obligates the National Park Service to provide funding for tribal activities.

14. The National Park Service, pursuant to Sections 101(d)(2) and 101(b)(2) of the Act, and in direct consultation with the Tribe, will carry out a periodic review of the Tribe's program pursuant to the Act, to ensure that the Tribe is carrying out the program consistent with this agreement. The review will be a collegial process that involves both NPS and the Tribe in a mutual evaluation and assessment of the program. Generally, such a review will occur every four years.

15. The Poarch Band of Creek Indians may terminate this agreement for any reason by providing the National Park Service sixty days' written notice of such termination. The National Park Service may terminate this agreement upon determining that the Tribe has not carried out its assumed responsibilities in accordance with this agreement, the Act, or any other applicable Federal statute or regulation. Unless circumstances warrant immediate action, NPS will not terminate the agreement without first providing the Tribe a reasonable and appropriate opportunity to correct any deficiencies.

16. This agreement may be amended by the mutual consent of the Poarch Band of Creek Indians and the National Park Service.

17. This agreement shall become effective upon signature by the Director of the National Park Service or his designee, which signature shall not occur until after the Chairman of the Poarch Band of Creek Indians has signed the agreement.

FOR THE NATIONAL PARK SERVICE:

_____   06/10/99
Director                    Date

FOR THE POARCH BAND OF CREEK INDIANS:

_____   5-24-99
Chairman                    Date

# EXHIBIT J

No. 21-11643

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

### MUSCOGEE (CREEK) NATION, et al.,

### Plaintiffs-Appellants,

### v.

### BUFORD ROLIN, et al.,

### Defendants-Appellants.

---

**Appeal from the District Court of the United States for the Middle District of Alabama, Northern Division**
**District Court No. 2:12cv1079-MHT (CSC) (Hon. Myron H. Thompson)**

---

### APPELLANTS' APPENDIX – VOLUME 2

---

Mary Kathryn Nagle
ATTORNEY AT LAW
P.O. Box 506
McLean, VA 22101
(202) 407-0591

David McKnight
DILLARD, MCKNIGHT, JAMES &
MCELROY, LLP
2700 Highway 280
Suite 110 East
Birmingham, AL 35223


Devra R. Cohen
FOSTER GARVEY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
(206) 447-4400

*Counsel for Plaintiffs-Appellants*

# INDEX OF APPENDIX

**Docket/Tab #**

## Volume 1

District Court Docket Sheet……………………………………………….    A

Second Amended Complaint and Supplemental Complaint………………    190

Exhibits to Second Amended Complaint………………………………….    190-1

## Volume 2

Answer of Defendant Auburn University to Second Amended…………..
Complaint    194

Notice of Constitutional Question…………………………………………    197

Federal Defendants' Motion to Dismiss Second Amended
Complaint  and Supplemental Complaint………………………………….    199

Federal Defendants' Memorandum in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and Supplemental
Complaint………………………………………………………………….    200

Tribal Defendants' Motion to Dismiss Second Amended Complaint……..    201

Brief in Support of Tribal Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….    202

Declaration of Lori M. Stinson in Support of Tribal Defendants'
Motion to Dismiss Second Amended Complaint………………………….    203

## Volume 3

Individual Defendants' Motion to Dismiss Second Amended
Complaint………………………………………………………………….    204

Brief in Support of Individual Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….    205

Notice of Correction…………………………………………………….. 213

Plaintiffs' Response and Memorandum in Support of Response
to Federal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………... 213-1

Plaintiffs' Response and Memorandum in Support of Response
to Individual Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………... 213-2

Plaintiffs' Response and Memorandum in Support of Response
to Tribal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………... 213-3

## Volume 4

Federal Defendants' Reply in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and
Supplemental Complaint…………………………………………………... 216

Tribal Defendants' Reply Brief in Support of Motion to Dismiss
Second Amended Complaint…………………………………………….. 217

Individual Defendants' Reply and Memorandum in Support of
Motion to Dismiss Second Amended Complaint………………………….. 218

Final Opinion……………………………………………………………. 223

Final Judgment………………………………………………………….. 224

Order re Martin Construction bankruptcy………………………………. 225

## Volume 5

Judgment re Martin Construction bankruptcy……………………………... 227

Plaintiffs' Notice of Appeal……………………………………………... 228

Certificate of Service

# POARCH BAND OF CREEK INDIANS OFFICE OF CULTURAL AND HISTORIC PRESERVATION
## FIELD METHODOLOGY

*E.L.E.*

Approval

*4-13-99*

Date

(1 of 6)

**POARCH BAND OF CREEK INDIANS OFFICE OF CULTURAL AND HISTORIC PRESERVATION**

## FIELD NOTES

Day notes should be taken every day the crew is in the field regardless of the situation or type of fieldwork. These notes should be taken only on the front of the page. The first page of the day notes must include the following information.

Site name, number, project, and date
Crew members
Objectives

A narrative description should be given of each crew member of the field activity during the course of the day. When surveying, note the transect assignments, approximate acreage covered, lengths and orientation of transects, and areas where tests were not excavated and why. Also, note any and all important finds, in terms of artifacts found and whether they were found in a shovel test. The exact locations of sites will be noted and plotted on the appropriate quad immediately. Similarly, note the vegetation, ground cover, terrain, and slope. If defining a site, sketch a site map. This map will include positive and negative tests, artifact counts for these tests. Site maps will always include pertinent natural and manmade features, a scale, north arrow, date, and site name and number.

## UNIT NOTES

Unit notes must include the following;

Site name and number and date
Excavation Unit number and coordinates

When a unit is opened record:

a)   grid location
b)   location of unit datum and measurement of line level above ground surface
c)   depths of ground surface in four corners and center
d)   method of excavation
e)   locations of, and rationales for, unit extensions

For each level record the following:

a)   level number and depth below datum (surface or unit datum)
b)   excavation techniques (include screening technique)
c)   draw plan views and profiles and note any changes in stratigraphy
d)   feature locations and types
e)   the Munsell soil colors and texture
f)   the strata number or letter
g)   artifacts found
h)   inclusions
i)   whether or not soil or float samples were taken
j)   draw profiles and plan views

*ELP*
Approval
4-13-99
Date

(2 of 6)

## SURVEY METHODOLOGY

The survey methodology will vary under most circumstances. Under most circumstances, shovel tests and parcels will be spaced at 30m intervals.

At the start of a new parcel, the Project Manager or Crew Chief will determine the proper orientation of the parcels. In most instances, the parcels will be orientated in a north/south or east/west direction. However, parcels may follow natural or manmade features such as roads or natural levees. While surveying, it is important for the crew members to stay within sight of one another or in radio contact.

Shovel tests are to be excavated with a spade or "round-headed" shovel, and will measure 30 x 30 cm in diameter. The depths of these shovel tests will generally be 30 cm. All shovel tests are to be screened with 1/4" mesh hand-held screens, or troweled or checked by hand for the presence of artifacts.

When a positive shovel test is excavated, bag the artifact and label bag with the proper transect number, shovel test number or grid coordinate, date, and site designation. In case of a surface find, the location of the find must be noted on the bag, along with the site designation and other relevant information. Surface scatters located during survey are to be flagged and left in the field until site definition can be conducted.

## SITE DEFINITION

Site definition's procedures will be undertaken at each positive shovel test or surface find in order to determine the extent of subsurface and surface artifact deposits. A site datum will be established at the location of a positive shovel test, or in the approximate center of surface scatter. Shovel tests are to be excavated in 10 m intervals from the datum. The shovel tests will be excavated until two negative shovel tests have been excavated. If the surface scatter continues beyond this point, the shovel test line will be extended to the edge of the scatter.

A surface scan for artifacts is to be conducted at every positive locale in order to determine the presence or absence of surficial artifacts. Only diagnostic artifacts are to be collected during a general surface collection. Dense patches of artifacts will noted on the site map. Also, a 2 x 2 m collected during a 2 x 2 m collection. Label the bad and place the 2 x 2 m area on the site map. Recovery of five or more artifacts is evidence for a site. Less than five artifacts represents an isolated find. A 50 x 50 cm test unit is to be excavated during site definition. This unit will be excavated in 10 cm arbitrary levels, and continued until two culturally sterile levels have been excavated. Munsell colors and depths will be taken of all sites. Black and white photographs and color slides will be taken of one wall profile.

Approval

Date

(3 of 6)

A detailed map will be drawn of the site. All shovel test, the 50 x 50 cm unit, the 2 x 2 m surface collection, and extent of surface scatter will be shown on the map. Positive shovel tests will be shown as an filled in circle on the map. Negative shovel tests will be shown with an open circle. The extent of the surface scatter will be shown with a dotted line. The 50 x 50 cm unit will be shown as a filled in square, while the 2 x 2 m collection will be shown as an open square.

During site definition, photographs should be taken of the four cardinal directions from datum. If these are important cultural or natural features they will be photographed as well and this information will be recorded on the site map and in the field notes. A "Site Bag" will be kept at each site. All bags (e.g. shovel test bags, 50 x 50 cm level bags, general surface collection, etc.) will be kept in the site bag. The site bag will be labeled with the appropriates site number, the date the site was defined, and the number of bags inside.

## EXCAVATION METHODOLOGY

The placement of excavation units on site can be determined through random selection or high probability selection. In the former, grid locations are chosen randomly. During high probability selection, the placement of the units is determined by the likelihood of recovering artifacts or exposing features.

One the units have been selected and laid our on the grid, the units must be enclosed with nylon string. Elevations of all four corners and of the center of the unit will then be taken with transit and recorded in the field notes and on the level form. Opening photographs are necessary. All photographs should be recorded in the photo-log.

Once the opening photographs have been taken, a unit datum will be established. This datum should be placed in the highest corner of the unit. The unit datum is a fixed elevation, usually shot with the transit, used to determine the depths of each level. If the unit is placed on level ground, then the datum can be positioned in the northeast corner (where the unit designation is taken). A string will be strung from the unit datum. A line level will then be placed on the string approximately half way up the string, then take a measurement with a folding rule from the string to the ground as a measurement below datum.

Two crew members will excavate a single unit. One person in charge of screening while the other digs. The excavator will work in conjunction with the screener in filling out the level form and accompanying notes. Excavations should proceed in 10 cm (or less) levels within natural strata. Levels of 20 cm may be used under certain circumstances. The level should be ten halted if there is a soil color or texture change. The level form should include the appropriate information (including the reason for the halting at a specified depth).

*EIB*

Approval
4-13-99
Date

The level bag must include the following information:

> Project name
> Site number
> Grid coordinates
> Level number and depth
> Date
> Excavator Initials

It is necessary to take photographs when a new stratum or feature is encountered. All photographs will be recorded in the photo-log. A plan view (sketch of the floor) will be drawn at the end of each level or the first appearance of a feature. The plan view should include a scale. Munsell colors and soil textures will be included on the plan view. Place a key on the plan view. Elevations will be taken at the top of each new strata with the transit.

Before beginning the plan views, record the following information in the upper right hand corner of the graph paper:

> Site name and/or number
> Your initials
> The date
> Excavation unit designation
> Depth of plan view
> North arrow
> The scale (if you usually write the ratio (e.g. 1:10), be sure to also draw a bar indication 1 cm = 10 cm)

Draw the outline of the unit on graph paper. Outline any features that are recognizable in the floor of the unit. Lay one folding rule parallel to one of the walls. Hold a plumb bob over the point being measured. Use the second tape to measure the distance from the point to the first folding rule to establish x and y coordinates of the point. Plot the point on the graph paper. Record the Munsell color, soil type, and texture for every different soil in the plan view.

A profile should be drawn at the end of the excavation.

Set up a paper level over the area to be profiled. Mark this line on graph paper, and measure and record the elevation of this line in relation to unit datum. Set one folding rule above the area to be profile with the "O" aligned with one edge of the profile. Outline the visible strata with the point of a trowel. Measure the depth of the level line of the ground surface, the interface of each of the strata, and the base of the unit at the corner of the area profiled. Mark these points on the graph paper. Repeat the process at regular intervals (as measured on the folding rule at the top of the profile). Take spot coordinates on individual artifacts, lenses, etc. Connect the dots to delineate the strata.

_E.T.P._

Approval

4-13-99

(5 of 6)                                      Date

## FEATURES

Features should be assigned a feature number in the field.  In some cases, they may be assigned a catalogue number as well.  When a feature is encountered, the feature should be photographed, planned (in relation to the unit), and Munsell readings and elevations should be taken.  A decision will be made at this time as to excavate, or leave the feature in tact.  No excavation will undertaken until such a decision is made final by the Office of Cultural and Historic Preservation (see Poarch Band of Creek Indians Archaeological and Resources Code).  Under most circumstances the feature should be cross-sectioned and profiled.  The excavator will fill out a separate form for the feature.  A center line should be drawn across the feature and center string strung across the feature at approximately 2 cm above the ground surface.  Once the first half of the feature has been taken out, a profile sketch will be made.  The second half of the feature will then be excavated.  The soil from the feature should be screened separately or floated.  After the feature has been removed, a final elevation should be taken.  AGAIN!  **THE POARCH BAND OF CREEK INDIANS TRIBAL ARCHAEOLOGICAL AND HISTORIC RESOURCES CODE EMPHASIZES AVOIDANCE AND PRESERVATION OF FEATURES RATHER THAN EXCAVATION.**

Soil will be screened through 1/4" wire mesh screen.  A bag will be labeled before any soil is screened for a particular level.

Once sterile soil has been reached, a profile sketch will be made of two separate but adjacent wall.  Photographs will be taken and recorded in the phot-log.  Notes on the unit will be finalized.

## HUMAN REMAINS

If human remains are encountered on the surface of the site, they are **not** to be collected.  Similarly, if you find them while digging a shovel test, backfill without disturbing them.  If you find them while excavating a unit, cover them up and do not dig any further.  Document the site, and place red field flags in a circle 2 m from the remains or burial.

Under no circumstances are the burials on the Poarch Creek Indians Reservations, or lands under their control, to be excavated, nor are they to be subjected to **any** examination or testing.  Burial sites take precidence over any project or program plan.

Do not open any additional holes.

*E.T.T.*
Approval
4-13-99
Date

# EXHIBIT K



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road • Atmore, Alabama 36502
Tribal Offices: (251) 368-9136 • Administrative Fax: (251) 368-4502
www.poarchcreekindians-nsn.gov

April 4, 2012

George Thompson, Jr.
Mekko, Hickory Ground
P.O. Box 903
Henryetta, OK 74437

Re:    Reinterment at Hickory Ground

Dear Mekko Thompson:

I write to you to provide additional information regarding the re-internment at Hickory Grounds. As you know, our tribal Nations have been in good faith discussions regarding the issue of re-interment since May 2006. Over the past five years, we have had numerous formal and informal discussions including large delegation meetings of the principals on at least five occasions. Throughout this time, our Tribe has attempted to address your delegation's concerns and demonstrated our commitment to finding a mutually agreeable resolution by, among other things, amending our original plans for a memorial garden and interpretative center in the northern half of the property in favor of leaving the area in a natural state, developing security plans for the area of re-interment, and proposing to fully participate in joint preservation efforts throughout this region. Most significantly, both our Nations agreed to preserve the Hickory Ground ceremonial site in perpetuity and jointly participated in these critical efforts.

The last official meeting of our delegations was in September 2010, and we have attempted to coordinate a follow-up meeting on several occasions since that time. You responded to our last proposal in March 2011 and expressed a desire to schedule another official meeting. Although our Nations' delegations intended to meet last August, we were unable to do so due to scheduling conflicts. Nonetheless, your delegation visited the site in any event, and introduced a new member of your delegation, John Beaver, Muscogee Nation Museum Director and Curator, to Robert Thrower, our Tribal Historic Preservation Officer. Since that time, on your behalf, Mr. Beaver has been communicating with Mr. Thrower regarding the final inventory and potential follow-up visits.

Given the five and a half years of good faith negotiations and the recent productive exchanges between Mr. Beaver and Mr. Thrower regarding the final inventory, we were disappointed to learn that the Muscogee Nation/Hickory Ground delegation sought to introduce a resolution at the National Congress of American Indians Annual Convention this past November, which did not name us but clearly related to our land. We were further dismayed to hear that, despite continued communications from your delegate Mr. Beaver with our THPO, you appeared in front of the Senate Committee on Indian Affairs during a roundtable discussion in early March with the same allegations. You indicated during those comments that you wished to take

*Seeking Prosperity and Self Determination*

possession of the remains. In all of our discussions, you have never requested that we allow the Muscogee Nation or Hickory Ground to take possession of the remains.

We regret that there appears to have been a breakdown in our communications and we hope that these recent actions are not indicative of a more adversarial approach on the part of the Muscogee Nation. We continue to stand prepared to continue a good faith and cooperative approach.

In furtherance of a good faith approach, we wanted to inform you that we have obtained the final inventory and are currently preparing for re-interment. With the hope that we can continue to work together regarding re-interment and restore the relationship between our sister Nations, we welcome your participation in this process. Please let us know as soon as possible if you would like to join us.

Best regards,

Buford L. Rolin
Tribal Chairman
Poarch Band of Creek Indians

cc:    George Tiger, Muscogee Nation Principal Chief
       John Beaver, Muscogee Nation Museum Director/Curator
       Marcella Giles, Attorney for Muscogee Nation & Hickory Ground
       Poarch Band of Creek Indians Tribal Council
       Robert Thrower, Poarch Band of Creek Indians THPO
       Venus McGhee Prince, Poarch Band of Creek Indians Attorney General

# EXHIBIT L



# Muscogee (Creek) Nation

*George P. Tiger*
*Principal Chief*

*Executive Office*

*Roger Barnett*
*Second Chief*

April 13, 2012

*VIA U.S.P.S and Facsimile (251) 368-4502*

Buford L. Rolin, Tribal Chairman
Poarch Band of Creek Indians
5811 Jack Springs Road
Atmore, Alabama 36502

Re:   Hickory Ground

Dear Chairman Rolin:

I am in receipt of your letter dated April 4, 2012 addressed to Mekko Thompson and copied to me and other individuals. I would like to thank you for keeping me apprised during this sensitive cultural matter.

In the past, Second Chief, Roger Barnett and I have met with the Poarch Band of Creek Indians as Representatives of the National Council for the Muscogee (Creek) Nation. Now, we would like to meet with you as Chief and Second Chief to discuss past and future negotiations and communications between your delegation and the Muscogee Nation/Hickory Ground delegation.

As you are aware, we both are newly elected, and we are requesting the opportunity to have a discussion from Tribal Leader to Tribal Leader. We are aware that time is of the essence for this sensitive issue, and we are willing to meet with you in Alabama.

Please call me to discuss arranging a meeting, and if you would like for us to come to Alabama or if we could make arrangements for you to visit the Muscogee (Creek) Nation. I look forward to seeing you and hope that we can meet as soon as possible.

Sincerely,

George Tiger
Principal Chief

# EXHIBIT M



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road • Atmore, Alabama 36502
Tribal Offices: (251) 368-9136 • Administrative Fax: (251) 368-4502
www.poarchcreekindians-nsn.gov

April 17, 2012

George Tiger
Principal Chief
Muscogee Nation
P.O. Box 580
Okmulgee, OK 74447-0580

George Thompson, Jr.
Mekko, Hickory Ground
P.O. Box 903
Henryetta, OK 74437

**Re:   Reinterment at Hickory Ground**

Dear Principal Chief Tiger and Mekko Thompson:

Thank you for your response by letter dated April 13, 2012 regarding Hickory Ground, which was brought to my attention this morning. When we did not immediately hear from you in response to our April 4th letter, we assumed that you did not wish to participate in the reinterment process. Last week we proceeded with the reinterment of our ancestors' remains and associated funerary objects in the manner to which we agreed during our prior discussions. We will preserve the area of reinterment in perpetuity. We welcome you to visit the ceremonial site and area of reinterment and hope that we will work together on further preservation efforts. Please contact me if you would like to visit and/or discuss future communications.

Best regards,

Buford L. Rolin
Tribal Chairman
Poarch Band of Creek Indians

cc:   Roger Barnett, Muscogee Nation Second Chief
      John Beaver, Muscogee Nation Museum Director/Curator
      Marcella Giles, Attorney for Muscogee Nation & Hickory Ground
      Poarch Band of Creek Indians Tribal Council
      Robert Thrower, Poarch Band of Creek Indians THPO
      Venus McGhee Prince, Poarch Band of Creek Indians Attorney General

*Seeking Prosperity and Self Determination*

# EXHIBIT N



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road • Atmore, Alabama 36502
Tribal Offices: (251) 368-9136 • Administrative Fax: (251) 368-4502
www.poarchcreekindians-nsn.gov

November 8, 2010

George Thompson, Jr.                              Alfred Berryhill
Mekko, Hickory Ground                             Second Chief, Muscogee Nation
P.O. Box 903                                      P.O. Box 580, Highway 75 & Loop 56
Henryetta, OK 74437                               Okmulgee, OK 74447

### Re:   Reinterment at Hickory Ground

Dear Mekko Thompson and Chief Berryhill:

Thank you for your letter dated October 8, 2010. Our Tribal Council and I were also greatly encouraged by our September 9th meeting. At the same time, we are now somewhat discouraged by the decision to require reinterment in place for all human remains and associated funerary objects for Hickory Ground.

Our proposal at the September 9th meeting consisted of two parts:

(1)   Reinterment. We proposed to reinter the remains and funerary objects in a pristine area to the northern end of our trust property at Hickory Ground and in a natural fashion (i.e., wrapped in muslin cloth and no markers or the like). We emphasized that we believed that this approach was an appropriate compromise.

(2)   Joint Preservation Efforts. We proposed a joint effort to locate and purchase significant areas of land within the State of Alabama in order to reinter any remains and associated funerary objects from all tribal towns that may be repatriated to either of our Tribes. We could also potentially place a joint THPO office at one of the sites to coordinate our joint efforts.

We were hopeful that a compromise could be reached on the issue of reinterment on Hickory Ground, so that we could pursue the joint preservation efforts. We believe the joint preservation efforts could set historical precedent for both of our Nations and could be followed or joined by other tribes. We are extremely excited about the possibility of working together now and in the future.

We respect the beliefs and customs of the Tusteneggi. However, we cannot agree that reinterment in place at this point in time is the best way to honor our ancestors. We plan to prepare for reinterment in the northern part of our trust property and, as always, welcome your participation in this process. As you mention, we would also like to schedule a planning session with Dr. Cottier and Auburn University to obtain the final inventory pursuant to NAGPRA and take possession of the remains and associated funerary objects. Please let us know your availability for such a meeting during December and January.

*Seeking Prosperity and Self Determination*

We know that these conversations about such sensitive issues are difficult ones. But we are guided by the fundamental idea that in the end we are sister Nations and we must work together for the benefit of our peoples past, present and future. We appreciate your continuing willingness to work with us, and we are optimistic that we can reach an accord. We look forward to seeing you soon.

Best regards,

Buford L. Rolin
Tribal Chairman
Poarch Band of Creek Indians

cc:     Poarch Band of Creek Indians Tribal Council
        Robert Thrower, Poarch Band of Creek Indians THPO

# EXHIBIT O



FOR IMMEDIATE RELEASE                                      CONTACT:      Sharon Delmar
                                                                        251-368-9136
                                                                        sdelmar@pci-nsn.gov

## POARCH CREEK RESUMES DEVELOPMENT OF WETUMPKA PROPERTY

**Poarch Creek Indian Nation, Alabama –** October 31, 2012 - The Poarch Band of Creek Indians has resumed its development plans for a hotel and casino on land it owns in Wetumpka, Alabama.  This decision comes after suspending construction of the project in a show of good faith so that leadership from Poarch Creek and the Muscogee Nation in Oklahoma could once again meet to discuss the concerns of both tribes.  Poarch Creek made the decision to resume construction after meeting in Oklahoma this week with elected leaders of the Muscogee Creek Nation and traditional leaders of Hickory Ground Town (a traditional Indian town within the Muscogee Nation). After careful consideration of the Muscogee Nation's views, Poarch Creek believes the decision to move forward with its plans represents a fair and balanced approach to the development and preservation of the property.

Tribal Council Member Arthur Mothershed remarked, "We have been extremely careful to plan a development that is culturally sensitive while ensuring the economic well-being of our Tribal members, our community, and our State. It is a balanced, reasonable approach for using land that we own, which has been met with increased opposition from some in Oklahoma. Now, we are being faced with demands to remove ancestral remains that have already been reinterred.  We can ensure that no more remains will be excavated.  It has been almost eight years since any remains have been unearthed.  We cannot change the fact that remains were found and removed. Those remains are now reinterred and we cannot support disturbing those remains again."

The Poarch Band of Creek Indians is the only federally recognized Indian tribe in Alabama. Its tribal members have lived continuously in the region for centuries, specifically near present day Atmore, Alabama, since the early 1800's.  As a recognized sovereign nation, Poarch Creek is under no legal obligation to negotiate with any other government about the use of its own land. However, out of respect for their shared cultural and familial ties, Poarch Creek leadership began conversations with the Muscogee Nation about the development of the Wetumpka property in 2006. Discussions continued for several years, but opposition by some members of Hickory Ground and Muscogee Nation to Poarch Creek's plans to develop the Wetumpka site reached a crescendo when Poarch Creek announced its plans to build a hotel and casino on the property this summer.

"We are indeed saddened by the outcome of this recent trip to Oklahoma made by representatives of our Tribal Council," said Buford L. Rolin, Poarch Creek's Tribal Chairman. "Since 2006, we have reached out to the Muscogee Nation with the hope that they would be open to understanding the facts about the 21st century conditions of what was once Hickory Ground Town and would recognize that our development in Wetumpka does not alter that. Unfortunately we have reached an impasse."

Wetumpka is one of several Alabama communities that originated on the site of Hickory Ground Town, a historic Creek Indian community that, at one time, covered more than 1000 acres. While both the Poarch Creek and the Muscogee Nation have cultural ties to the land, it was the Poarch Creek that purchased approximately 34 acres of the original site in 1980.

At the time of the sale, the land had been used for agricultural purposes and was zoned for commercial use. The Poarch Creek had limited financial resources and had to apply for a grant to buy the property. Poarch Creek invited the Muscogee Nation to partner with it on the grant application, but the Muscogee Nation did not commit before the grant deadline.

"We have taken great effort to make sure the original Hickory Ground ceremonial site is preserved, and the remains that were removed in earlier years have been reinterred at Hickory Ground Town in a manner previously agreed to by traditional leaders in Oklahoma.  The remaining acreage located on the northern part of Hickory Ground will be preserved in a pristine, natural state for posterity," said Robert McGhee, who heads the Tribe's Governmental Affairs Office and is a Poarch Tribal Council Member.

The Tribe is in compliance with applicable federal laws, including historic preservation laws, pertaining to the property.  The expansion, in no way, compromises the site as construction plans do not call for any further excavation. Despite Muscogee claims to the contrary, there will be no expansion in other areas at the Hickory Ground site.

The development originally included a cultural center as well as a hotel and casino, but Poarch Creek modified the plans after Muscogee Nation and Hickory Ground representatives expressed concerns about the site on which the center would be located. Poarch Creek leadership is now reviewing those plans and has made a commitment to build a center on a nearby site as it moves forward with the hotel and casino development.

Poarch Creek's Tribal Council will also set aside appropriate acreage of pristine land that has never been subject to agricultural use or development that can be used by Poarch Creek, as well as by other Tribes who may be facing sensitive issues of reinterment. The Tribal Council is establishing a historical and cultural preservation fund that will be made available to other tribes to support their preservation efforts.

Chairman Rolin said, "We respect the past, acknowledge the present, and recognize the challenges of the future. This development is a reasonable approach to land use; and no one cares more about the sanctity of our land and the well-being of our people and our neighbors than we do."

####

# EXHIBIT P

USCA11 Case: 21-11643     Document: 36     Date Filed: 07/27/2023     Page: 275 of 1019



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road • Atmore, Alabama 36502
Tribal Offices: (251) 368-9136
www.poarchcreekindians-nsn.gov

Dear Tribal Leader,

As the leader of one sovereign nation to another, I am writing to make sure that you have accurate information concerning the development of the Poarch Band of Creek Indians' Wetumpka, Alabama trust land. Poarch Creek has taken the utmost care to preserve our tribal history and culture while undertaking projects that assure the financial stability of our Tribal government and jobs for our people.

Development of Poarch Creek trust lands near Wetumpka is the subject of an increasingly belligerent misinformation campaign run by a handful of individuals from Hickory Ground town and the Muskogee Nation in Oklahoma. These men have made violent threats toward our tribal members, employees, customers and property. They have also attempted to intimidate, threaten, and humiliate our Tribal leadership at national gatherings in Indian Country.

One of the leaders of this group was arrested on Poarch Creek trust property last year after he threatened to burn down our casino. He was subsequently convicted of disorderly conduct and trespassing in an Alabama state court. Even after this incident, this individual and other members of his group have harassed and accosted Poarch Creek tribal leaders at multiple national Indian gatherings. Clearly, these are threats to our reputation and our safety that we take very seriously.

Attached is a Fact Sheet to help clarify this issue. If you would like to discuss any of these issues or have additional questions, I and other Members of the Poarch Creek Council would be happy to talk more with you.

We think it is important to remember that, first and foremost, no one is more aware of the importance of preserving Poarch's history and culture than we are. We remain committed to the integrity of our Tribe and are actively involved in ensuring the future of Indian Country. We are proud that Chief Calvin McGhee helped craft the Declaration of Indigenous Purpose and that he had the honor of presenting this document to President Kennedy. Former Chairmen Buford L. Rolin and Eddie Tullis continue to provide leadership roles throughout Indian Country in their work on Healthcare, Aging, and Sovereignty. Our Tribal Council Vice Chairman Robbie McGhee serves on the boards of the Native American Rights Fund, the Center for Native American Youth, the National Indian Child Welfare Association and our entire Tribal Council continuously advocates to strengthen national tribal Indian policy on issues related to education, VAWA, health care, child welfare, taxation, trust lands protection and other areas of importance to all Tribes.

In closing, we remain hopeful that these individuals who are now involved in unproductive and divisive activities will come to understand that our strength, as sovereign Indian nations, depends on our ability to work together on solving the problems and meeting the challenges that affect us all while maintaining the crucial tenets of sovereignty and self-determination. It's a dangerous road for all of Indian country to take when one sovereign seeks to enforce its will on the trust lands of another.

Sincerely,

*Stephanie A. Bryan*

Stephanie A. Bryan, Tribal Chair
Poarch Band of Creek Indians

*Seeking Prosperity and Self Determination*

USCA11 Case: 21-11643     Document: 36     Date Filed: 07/27/2023     Page: 276 of 1019

**Fact Sheet: Poorch Band of Creek Indians' Wind Creek Development In Wetumpka, Alabama**

- Many years ago the Poorch and Muscogee Creek Tribes were separated by historical events. Today, we are separate sovereign nations with completely separate lands.

- We, the Poorch Band of Creek Indians, have continually lived on our Alabama Tribal lands and survived years of poverty.

- The Poorch Band's Wetumpka trust property (approximately 34 acres) is a small portion of what had been a large Indian town called Hickory Grounds. The land had been farmed and developed by others for decades.

- When the property came up for sale, we had no gaming operation and few resources. However, we believed that we should make every effort to purchase the property because it was an opportunity to regain some of our historical lands, protect our ancestors and history, and provide for our people and our communities.
    - We asked the Muscogee Nation to jointly apply for a grant to purchase the property. They did not respond.
    - The land was in a part of the country that had been farmed and developed for well over a century.
    - In fact, the current town of Wetumpka, Alabama is built on what was once the Indian town of Hickory Ground.
    - We still believed that the site was historically significant as a center of Creek Indian trade, government, and economic development.

- Unbeknownst to us, a small part of the property we acquired was the site of Creek Ceremonial Grounds. The Ceremonial Grounds have never been disturbed, remain protected, and we have memorialized and preserved the site to this day.
    - Northern 17 acres of our trust property is preserved in perpetuity as a memorial to the historical significance of the site.
    - Remains found within the Ceremonial Grounds were never removed.
    - In accordance with Poorch Creek Tribal Law and consistent with the Muskogee Tribe's Constitution, remains found outside the Ceremonial Grounds were interred adjacent to the Ceremonial Grounds with prayer and ceremony.
    - The previously disturbed and fragmented remains found scattered across the other 17 acres have been reinterred with dignity and honor.

USCA11 Case: 21-11643    Document: 36    Date Filed: 07/27/2023    Page: 277 of 1019

- In the 1990's, Alabama archeologists asked to study the site and we agreed. At the time:
    - There was no visible evidence of a burial ground.
    - The site was eroding because of farming and lack of maintenance.
    - We had limited finances and limited technology.
    - When evidence was discovered, the archeologists' work stopped and their discoveries were stored for several years. The remains and funerary objects were reinterred according to Indian tradition in April of 2013.

- The Tribe is in compliance with all applicable federal historic and cultural preservation laws pertaining to the property.

- Poarch Creek is, and was, under no legal obligation to negotiate with any other sovereign Indian nation about the use of our own land. However, out of respect for our shared cultural and familial ties, Poarch began discussions with the Muscogee about planned development of the Wetumpka property in 2006.

- Since 2006, Poarch regularly reached out to the Muscogee Nation in the hopes that its leadership would be open to understanding the 21st century conditions of the Poarch land in Wetumpka. Negotiations continued for several years, but the Muscogee Nation's opposition to Poarch Creek's plans to develop the land reached a crescendo when plans were announced to expand the existing gaming facility into a resort on the property in the summer of 2012.

- We have continued to be open to dialogue with the Muscogee elected leadership and have expressed our desire for a good relationship between the two nations.

- We are encouraged that these efforts are making a difference as evidenced by the visit of over 150 Muscogee tribal members to our Wind Creek Wetumpka resort. They visited the memorial site, were served refreshments, and shared pleasant conversation with Poarch tribal members.

- The Wind Creek Wetumpka development protects our past and helps provide for the future of our tribal members.

# EXHIBIT Q



*Preserving America's Heritage*

November 14, 2006

Mr. Brad Mehaffy, REM
NEPA Compliance Officer
National Indian Gaming Commission
1441 I Street, N.W., Suite 9100
Washington, D.C. 20005

REF: *Proposed Approval of a Management Contract for the Expansion of Existing Gaming
Facility by the Poarch Band of Creek Indians
Wetumpka, Alabama*

Dear Mr. Mehaffy:

On October 3, 2006, the Advisory Council on Historic Preservation (ACHP) received the additional
documentation regarding the referenced undertaking. ACHP requested this information in response to
your notification that the National Indian Gaming Commission (NIGC) was reviewing the Poarch Band
of Creek Indians' (Poarch Band) proposed management contract for expansion of the existing gaming
facility on Hickory Ground, a property listed in the National Register of Historic Places. Based upon this
documentation, it is apparent that activities undertaken by the Poarch Band prior to the completion of the
review required by Section 106 of the National Historic Preservation Act (NHPA) have adversely affected
the National Register-listed property.

According to the documentation provided, the Poarch Band sponsored extensive investigations and
ultimately data recovery at Hickory Ground between 1988 and the present. The investigations included
archaeological site identification surveys within the approximately 16-acre trust property and the
approximately 5-acre tract of fee land. As a result, a multi-component archaeological site, Hickory
Ground, was delineated, boundaries expanded, and finally, extensive archaeological data recovery was
undertaken, including the removal of numerous human burials. As we understand, the recovered remains,
artifacts, and site documentation are in various stages of analysis and curation by the Poarch Band's
consultants.

Regrettably, the archaeological surveys and data recovery were not carried out in compliance with
Section 106 of the NHPA. Since the Section 106 process must be initiated by a Federal agency prior to
the initiation of project activities, it is unclear why the applicant, a tribe with a tribal historic preservation
office approved by the National Park Service pursuant to Section 101(d)(2) of the NHPA, proceeded with
project planning and archeological investigations. As you know, the Federal agency must consult with the
State Historic Preservation Officer (SHPO), any Indian tribes that attach religious and cultural
significance to historic properties affected by the undertaking, and other appropriate stakeholders, and
provide adequate notification to the public in carrying out the steps of the Section 106 review.

ADVISORY COUNCIL ON HISTORIC PRESERVATION

1100 Pennsylvania Avenue NW, Suite 809 • Washington, DC 20004
Phone: 202-606-8503 • Fax: 202-606-8647 • achp@achp.gov • www.achp.gov

Based on the information provided, there was no Federal agency review of the archaeological investigations carried out by the Poarch Band; no consultation with the Alabama SHPO prior to excavation of the portion of the site on fee lands, and no consultation with any other Indian tribe, particularly the Muscogee Creek Nation. The initial notification of the ACHP (see 36 CFR 800.6(a)(1)) did not occur until after the destruction of the site. Furthermore, there is no indication that the public has been notified about the nature of the undertaking and its effects on historic properties (36 CFR 800.3(e)).

In your correspondence, you indicate that the Poarch Band completed more than 90% of the archeological data recovery within the area of potential effect for the proposed project. In the initial letter to the ACHP regarding this project, you invited us to participate in consultation to resolve the potential adverse effects of the undertaking. You have also indicated that NIGC intends to invite the Alabama SHPO to participate in any further Section 106 consultation, and have outlined steps NIGC will take to complete the Section 106 review process for any areas where there has been no land disturbance. NIGC has indicated that it proposes to develop a memorandum of agreement with all parties following consultation.

Please note, however, that Section 110(k) of the NHPA requires that

> Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant who, with intent to avoid the requirements of section 106 of this Act, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, allowed such significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant (16 U.S.C. 470h-2(k)).

While NIGC has provided documentation regarding archaeological work conducted to date, we have no indication of NIGC's views regarding the applicability of Section 110(k) and no record of the views of the Alabama SHPO and others, specifically the Muscogee Creek Nation regarding this matter. In accordance with Section 800.9(c)(2) of the ACHP's regulations, NIGC must determine whether or not the Poarch Band's actions were undertaken with the intent to avoid the requirements of Section 106. If NIGC determines that this did occur, NIGC should notify the ACHP and provide documentation specifying the circumstances under which the adverse effects to the historic property occurred and the degree of damage to the integrity of the historic property. This documentation must include any views obtained from the applicant, SHPO, and other parties known to be interested in the undertaking. Within thirty days of receiving such information, unless otherwise agreed to by NIGC, the ACHP will provide the agency with its opinion as to whether circumstances justify NIGC granting its approval to the applicant and any possible mitigation of the adverse effect. If, after considering the views of the ACHP, NIGC determines to grant its approval, NIGC should consult further with the ACHP and other consulting parties to conclude a memorandum of agreement for treatment of the remaining effects to historic properties resulting from the project.

Should you have any questions or wish to discuss this matter further, please contact Valerie Hauser, Native American Program Coordinator at 202-606-8530, or by email at vhauser@achp.gov.

Sincerely,

L. Klima
Director
Office of Federal Agency Programs

# TAB 194

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| MUSCOGEE CREEK NATION, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:12-cv-01079 |
| | ) | |
| POARCH BAND OF CREEK INDIANS et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER OF DEFENDANT AUBURN UNIVERSITY TO SECOND AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT

Defendant Auburn University ("Auburn") answers the Second Amended Complaint and Supplemental Complaint as follows:

## Prefatory Statement

Paragraph 42 of the Second Amended Complaint and Supplemental Complaint ("the new complaint") states that Auburn is named as a defendant "solely to the extent that this Court enters orders concerning the possession, custody, control, or relocation of the cultural items at issue." Understanding that it is included in this action as a defendant solely for purposes of permitting the Court to provide full and complete relief should Plaintiffs prevail, Auburn will respond only to those numbered paragraphs of the new complaint that expressly reference Auburn's role in maintaining and storing the cultural items at issue, and the current status of those items.

## Responses to Specific Paragraphs

5.      Auburn admits that certain artifacts that were removed from Hickory Ground, including a small amount of human remains, are being stored and maintained at its Auburn, Alabama

campus. Certain related photographs and documents are maintained at the Auburn-Montgomery campus. Exhibit 1 to this answer is hereby incorporated into this response. Auburn denies having mishandled or improperly stored these artifacts or remains.

32.     Auburn admits that it is a public university created under the Constitution and laws of the State of Alabama, and that it receives federal funding. Auburn admits that certain artifacts that were excavated at Hickory Ground, including a small amount of human remains, are currently being stored and maintained at its Auburn, Alabama campus. Certain related photographs and documents are maintained at the Auburn-Montgomery campus.  Exhibit 1 to this answer is hereby incorporated into this response.

42.     Auburn admits that Plaintiffs bring claims under the cited statutes and admits that it receives federal funds. Auburn denies any violation of the cited statutes, or any other law, in connection with the matters and things alleged in the new complaint. For further response, Auburn adopts its response to paragraphs 5 and 32. Auburn understands that it is named as a defendant solely for purposes of allowing the Court, should Plaintiffs prevail, to provide full and complete relief as to the cultural items presently being stored and maintained by Auburn.

120-122. To the extent, if at all, that these paragraphs are intended to refer to Auburn's maintenance and storage of cultural items currently in its possession, the allegations are denied.

261. b. & c.    In response to these sub-paragraphs in Count VII of the new complaint, Auburn reaffirms its willingness to cooperate with and facilitate whatever relief measures may be ordered by this Court. Because the nature and scope of any such potential relief is unknown at this time, however, Auburn reserves its right to be heard in connection with any remedial requirements affecting or potentially affecting it that may be considered by the Court. Auburn denies the necessity of any injunction as to it.

282. b. In response to this sub-paragraph in Count IX of the new complaint, Auburn reaffirms its willingness to cooperate with and facilitate whatever relief measures may be ordered by this Court. Because the nature and scope of any such potential relief is unknown at this time, however, Auburn reserves its right to be heard in connection with any remedial requirements affecting or potentially affecting it that may be considered by the Court. Auburn denies the necessity of any injunction as to it.

334.   In response to this paragraph in Count XI, Auburn reaffirms its willingness to cooperate with and facilitate whatever relief measures may be ordered by this Court. Because the nature and scope of any such potential relief is unknown at this time, however, Auburn reserves its right to be heard in connection with any remedial requirements affecting or potentially affecting it that may be considered by the Court. Auburn denies the necessity of any injunction as to it.

In response to paragraph (d) ii. of the Prayer for Relief in the new complaint (p. 79), Auburn reaffirms its willingness to cooperate with and facilitate whatever relief measures may be ordered by this Court. Because the nature and scope of any such potential relief is unknown at this time, however, Auburn reserves its right to be heard in connection with any remedial requirements affecting or potentially affecting it that may be considered by the Court. Auburn denies the necessity of any injunction as to it.

**Additional Defenses**

1.   Auburn, as an arm of the State of Alabama, is protected from suit, and from some or all of the claims asserted herein, by the Eleventh Amendment of the United States Constitution.

2.   Auburn asserts sovereign immunity under Article I, Section 14 of the Constitution

3

8600694.1

of Alabama.

3.     Auburn denies that (i) it has violated any statute or federal regulation, and (ii)

Plaintiffs have been deprived of any legally cognizable right or interest as a result of any alleged

action or inaction of Auburn.

**Right to Assert Additional Defenses**

Auburn reserves the right to supplement this answer to raise additional factual and legal

defenses as they may become known through discovery and during the proceedings in this case.

Respectfully submitted this the 23rd day of March, 2020.


*s/David R. Boyd*
One of the Attorneys for Defendant Auburn
University

**OF COUNSEL:**

David R. Boyd (ASB-0717-D52D)
Email: dboyd@balch.com
G. Lane Knight (ASB-6748-I72K)
Email: lknight@balch.com
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone:     (334) 834-6500
Facsimile:     (334) 269-3115

Jaime S. Hammer (ASB-1557-C00Z)
Email: jhammer@auburn.edu
Morgan Sport (ASB-3230-M71S)
Email: mms0116@auburn.edu
Auburn University
Office of General Counsel
101 Samford Hall
Auburn, AL  36849
Telephone:     (334) 844-5176

4

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected upon the following CM/ECF participant(s) electronically on this the 23rd day of March, 2020:

Lauren J. King
Foster Pepper PLLC
1111 Third Avenue; Suite 3000
Seattle, WA 98101

Stewart Davidson McKnight , III
William Joseph Baxley
Baxley, Dillard, McKnight, James & McElroy
P.O. Box 530333
Birmingham, AL 35253-0333

Charles Alexander Dauphin
Dauphin Paris LLC
300 Vestavia Parkway; Suite 3400
Vestavia Hills, AL 35216

David Coventry Smith
Southern Ute Indian Tribe - Legal Department
356 Ouray Drive
Ignacio, CO 81137

Mark H. Reeves
Kilpatrick Townsend & Stockton LLP
Enterprise Mill
1450 Greene Street, Suite 230
Augusta, GA 30901

James Joseph DuBois
U. S. Attorney's Office
P.O. Box 197
Montgomery, AL 36101

Helen Johnson Alford
Christina May Bolin
Alford Bolin, LLC
One Timber Way, Suite 101
Daphne, AL 36527

Daniel E Gomez
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK 74172

Joseph Lister Hubbard
William Allen Sheehan
Capell Howard PC
P.O. Box 2069
Montgomery, AL 36102

Larry Bailey Lipe
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK 74172

Paige N. Shelton
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK 74172

Dennis Mitchell Henry
Frank Eady Bankston , Jr.
Webster, Henry, Lyons, White, Bradwell, & Black PC
105 Tallapoosa Street
Montgomery, AL 36104

Jody Helen Schwarz
U.S. Department of Justice, Environment and Natural Resource
P.O. Box 7611
Washington, DC 20044

Devon Lehman McCune
United States Department of Justice
Environmental & Natural Resources
999 18th Street, S. Terrace, Ste. 370
Denver, CO 80026

s/David R. Boyd
Of Counsel

8600694.1

# TAB 197

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action Number: |
| POARCH BAND OF CREEK INDIANS, et al., | ) | 2:12-cv-01079-MHT-CSC |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF CONSTITUTIONAL QUESTION

Rule 5.1 of the Federal Rules of Civil Procedure requires Notice to be served when a complaint contains a constitutional challenge and "the United States, one of its agencies, or one of its officers or employees in an official capacity" is not a party in the case. United States agencies and their officers in their official capacity are defendants in this case: the Department of the Interior; Tara Maclean Sweeney, in her official capacity as Assistant Secretary of Indian Affairs; David Bernhardt, in his official capacity as Secretary of the Department of the Interior; and David Vela, in his official capacity as Acting Director of the National Park Service. However, out of an abundance of caution, Plaintiffs hereby file this Notice of Constitutional Question.

In the Plaintiffs' Second Amended Complaint and Supplemental Complaint filed with this Court on March 9, 2020, there are conditional constitutional challenges to the Native American Graves Protection and Repatriation Act (codified at 25 U.S.C. §§ 3001 *et seq.*) (NAGPRA) and the Archaeological Resources Protection Act (codified as amended at 16 U.S.C. §§ 470aa *et seq.*) (ARPA).  More specifically, and as described in further detail in Count VIII of the Plaintiffs' Second Amended Complaint and Supplemental Complaint, the Plaintiffs question:

(1) to the extent NAGPRA and ARPA are construed to allow any tribe other than the Muscogee (Creek) Nation to consent to the excavation or removal of certain cultural items, whether portions of NAGPRA and ARPA violate the Plaintiffs' First Amendment right to the free exercise of religion; and (2) to the extent NAGPRA and ARPA are construed to provide a higher priority of ownership of the excavated cultural items to any entity other than Plaintiffs Thompson and Muscogee (Creek) Nation, whether portions of NAGPRA and ARPA, , violate the Plaintiffs' First Amendment right to the free exercise of religion.

The Plaintiffs will serve the Attorney General of the United States with a copy of this Notice of Constitutional Question and a copy of the paper that raises the constitutional question (the Plaintiffs' Second Amended Complaint and Supplemental Complaint), via UPS Next Day Air.

Respectfully submitted this 21st day of April, 2020.

OF COUNSEL
Lauren J. King
Email: lauren.king@foster.com
Foster Garvey, P.C.
1111 Third Avenue, Suite 3000
Seattle, WA 98101
Tel: 206-447-6286
*Counsel for Plaintiffs*
(*Admitted Pro Hac Vice*)

s/ Stewart Davidson McKnight, III
Stewart Davidson McKnight, III (ASB-6258-G63S)
Email: dmcknight@dillardmcknight.com
Dillard, McKnight, James & McElroy
2700 Highway 280
Suite 110 East
Birmingham, AL 35223
Tel: 205-271-1100
*Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that on the 21st day of April, 2020, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

| | |
|---|---|
| Charles A. Dauphin (ASB-5833-H65C)<br>Dauphin Paris, LLC<br>300 Vestavia Parkway, Suite 3400<br>Vestavia Hills, AL 35216<br>Phone: 205.979.6019<br>Email: cdauphin@dauphinparis.com<br><br>OF COUNSEL:<br><br>Catherine F. Munson<br>Kilpatrick Townsend & Stockton LLP<br>607 14th Street, N.W., Suite 900<br>Washington, D.C. 20005-2018<br>Phone: 202.824-1435<br>Email: cmunson@kilpatricktownsend.com<br>(Admitted *pro hac vice*)<br><br>Mark H. Reeves, Georgia Bar No. 141847<br>Kilpatrick Townsend & Stockton LLP<br>Enterprise Mill<br>1450 Greene Street, Suite 230<br>Augusta, GA 30901<br>Phone: 706.823.4206<br>Email: mreeves@kilpatricktownsend.com<br>(Admitted *pro hac vice*)<br><br>*Attorneys for Tribal Defendants* | Dennis Mitchell Henry<br>Frank Eady Bankston , Jr.<br>Webster, Henry, Lyons, White, Bradwell, &<br>Black PC<br>105 Tallapoosa Street<br>Montgomery, AL 36104<br>Email: mitch@websterhenry.com<br>Email: fbankston@websterhenry.com<br>*Counsel for Defendant Martin Construction,*<br>*Inc.* |
| **James Joseph DuBois**<br>U. S. Attorney's Office<br>PO Box 197<br>Montgomery, AL 36101<br>334-223-7280<br>Fax: 334-223-7418<br>Email: james.dubois2@usdoj.gov<br>*Counsel for Federal Defendants* | **Devon Lehman McCune**<br>US DOJ<br>Environmental & Natural Resources<br>999 18th St / S Terrace - Ste 370<br>Denver, CO 80026<br>303-844-1487<br>Email: devon.mccune@usdoj.gov<br>*Counsel for Federal Defendants* |

| **David Randall Boyd** | **Jaime Stone Hammer** |
|---|---|
| **Griffin Lane Knight** | Auburn University |
| **Jordan Dorman Walker, Jr.** | 182 South College Street |
| Balch & Bingham LLP | 101 Samford Hall |
| PO Box 78 | Auburn, AL 36849 |
| Montgomery, AL 36101 | 334-844-5176 |
| Email: dboyd@balch.com | Fax: 334-844-4575 |
| Email: lknight@balch.com | Email: jsh0073@auburn.edu |
| Email: dwalker@balch.com | *Counsel for Defendant Auburn University* |
| *Counsel for Defendant Auburn University* | |
| **Morgan Mccue Sport** | |
| Auburn University | |
| 182 S College St - 101 Samford Hall | |
| Auburn, AL 36849 | |
| 334-844-5176 | |
| Fax: 334-844-4575 | |
| Email: mms0116@auburn.edu | |
| *Counsel for Defendant Auburn University* | |

I further hereby certify that on the 21st day of April, 2020, I served the foregoing document, together with a copy of the Plaintiffs' Second Amended Complaint and Supplemental Complaint referenced therein, by mailing a copy thereof via UPS Next Day Air to the U.S. Attorney General at the following address:

William Barr
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

 s/ Stewart Davidson McKnight, III
Counsel

# TAB 199

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action Number: |
| POARCH BAND OF CREEK INDIANS, | ) | 2:12-cv-01079-MHT-CSC |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT AND SUPPLEMENTAL COMPLAINT**

The United States Department of the Interior, Tara MacLean Sweeney, David Bernhardt, and David Vela (collectively, "Federal Defendants") hereby move to dismiss Plaintiffs' Second Amended Complaint (ECF No. 190) pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons explained in the supporting Memorandum filed herewith, Federal Defendants respectfully request that this Court dismiss the Second Amended Complaint in full.

Respectfully submitted this 23rd day of April, 2020.

PRERAK SHAH
Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Devon Lehman McCune*
DEVON LEHMAN McCUNE
Colorado Bar No. 33223
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section

999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1487
Fax: (303) 844-1350
devon.mccune@usdoj.gov

OF COUNSEL
Stephen L. Simpson
United States Department of the Interior
Office of the Solicitor

*Counsel for Federal Defendants*

**Certificate of Service**

I hereby certify that on the 23rd day of April, 2020, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to:

- **Helen Johnson Alford**
  halford@alfordbolin.com,khoward@alfordbolin.com
- **Frank Eady Bankston , Jr**
  fbankston@websterhenry.com,dremiger@websterhenry.com
- **Christina May Bolin**
  cmbolin@csattorneys.com,kbhhoward@csattorneys.com
- **David Randall Boyd**
  dboyd@balch.com,mgreen@balch.com
- **Charles Alexander Dauphin**
  CDauphin@Dauphinparis.com
- **James Joseph DuBois**
  james.dubois2@usdoj.gov,Michael.Murphy5@usdoj.gov,annie.williams@usdoj.gov,Rita
  .Richard@usdoj.gov,Marsha.Tunnell@usdoj.gov,Michael.Gipson@usdoj.gov,CaseView.
  ECF@usdoj.gov
- **Jaime Stone Hammer**
  jsh0073@auburn.edu
- **Dennis Mitchell Henry**
  mitch@websterhenry.com,tpoff@websterhenry.com,ehailes@websterhenry.com
- **Joseph Lister Hubbard**
  jlh@chlaw.com,nancy.legear@chlaw.com
- **Lauren J. King**
  lauren.king@foster.com,litdocket@foster.com,sandra.lonon@foster.com
- **Griffin Lane Knight**
  lknight@balch.com,mgreen@balch.com
- **Devon Lehman McCune**
  devon.mccune@usdoj.gov,efile_nrs.enrd@usdoj.gov,seth.allison@usdoj.gov,carla.valent
  ino@usdoj.gov
- **Stewart Davidson McKnight , III**
  dmcknight@dillardmcknight.com,lmunkus@dillardmcknight.com
- **Catherine F. Munson**
  cmunson@kilpatricktownsend.com,
- **Mark H. Reeves**
  mreeves@kilpatricktownsend.com,,dshaw@kilpatricktownsend.com,schick@kilpatrickto
  wnsend.com,agracey@kilpatricktownsend.com
- **William Allen Sheehan**
  was@chlaw.com,julie@chlaw.com

- **Morgan Mccue Sport**
  mms0116@auburn.edu,cindywalker@auburn.edu,jennifer.wynn@auburn.edu
- **Jordan Dorman Walker , Jr**
  dwalker@balch.com,mgreen@balch.com


*s/ Devon Lehman McCune*
Senior Attorney

# TAB 199

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action Number: |
| POARCH BAND OF CREEK INDIANS, | ) | 2:12-cv-01079-MHT-CSC |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT AND SUPPLEMENTAL COMPLAINT**

The United States Department of the Interior, Tara MacLean Sweeney, David Bernhardt, and David Vela (collectively, "Federal Defendants") hereby move to dismiss Plaintiffs' Second Amended Complaint (ECF No. 190) pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons explained in the supporting Memorandum filed herewith, Federal Defendants respectfully request that this Court dismiss the Second Amended Complaint in full.

Respectfully submitted this 23rd day of April, 2020.

PRERAK SHAH
Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Devon Lehman McCune*
DEVON LEHMAN McCUNE
Colorado Bar No. 33223
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section

999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1487
Fax: (303) 844-1350
devon.mccune@usdoj.gov

OF COUNSEL
Stephen L. Simpson
United States Department of the Interior
Office of the Solicitor

*Counsel for Federal Defendants*

**Certificate of Service**

I hereby certify that on the 23rd day of April, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

- **Helen Johnson Alford**
  halford@alfordbolin.com,khoward@alfordbolin.com
- **Frank Eady Bankston , Jr**
  fbankston@websterhenry.com,dremiger@websterhenry.com
- **Christina May Bolin**
  cmbolin@csattorneys.com,kbhhoward@csattorneys.com
- **David Randall Boyd**
  dboyd@balch.com,mgreen@balch.com
- **Charles Alexander Dauphin**
  CDauphin@Dauphinparis.com
- **James Joseph DuBois**
  james.dubois2@usdoj.gov,Michael.Murphy5@usdoj.gov,annie.williams@usdoj.gov,Rita.Richard@usdoj.gov,Marsha.Tunnell@usdoj.gov,Michael.Gipson@usdoj.gov,CaseView.ECF@usdoj.gov
- **Jaime Stone Hammer**
  jsh0073@auburn.edu
- **Dennis Mitchell Henry**
  mitch@websterhenry.com,tpoff@websterhenry.com,ehailes@websterhenry.com
- **Joseph Lister Hubbard**
  jlh@chlaw.com,nancy.legear@chlaw.com
- **Lauren J. King**
  lauren.king@foster.com,litdocket@foster.com,sandra.lonon@foster.com
- **Griffin Lane Knight**
  lknight@balch.com,mgreen@balch.com
- **Devon Lehman McCune**
  devon.mccune@usdoj.gov,efile_nrs.enrd@usdoj.gov,seth.allison@usdoj.gov,carla.valentino@usdoj.gov
- **Stewart Davidson McKnight , III**
  dmcknight@dillardmcknight.com,lmunkus@dillardmcknight.com
- **Catherine F. Munson**
  cmunson@kilpatricktownsend.com,
- **Mark H. Reeves**
  mreeves@kilpatricktownsend.com,,dshaw@kilpatricktownsend.com,schick@kilpatricktownsend.com,agracey@kilpatricktownsend.com
- **William Allen Sheehan**
  was@chlaw.com,julie@chlaw.com

- **Morgan Mccue Sport**
  mms0116@auburn.edu,cindywalker@auburn.edu,jennifer.wynn@auburn.edu
- **Jordan Dorman Walker , Jr**
  dwalker@balch.com,mgreen@balch.com

*s/ Devon Lehman McCune*
Senior Attorney

TAB 200

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE CREEK NATION, *et. al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case  No. 2:12-cv-01079-MHT-CSC |
| | ) | |
| v. | ) | Judge Myron H. Thompson |
| | ) | |
| POORCH BAND OF CREEK | ) | |
| INDIANS, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT**
**OF THEIR MOTION TO DISMISS PLAINTIFFS' SECOND**
**AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT**

i

## I.      INTRODUCTION

Defendants the United States Department of the Interior ("Interior"), Tara MacLean Sweeney, David Bernhardt, and David Vela (collectively, "Federal Defendants"), hereby move to dismiss the Second Amended Complaint and Supplemental Complaint ("Second Amended Complaint"), ECF No. 190, filed filed by Plaintiffs Muscogee Creek Nation, Hickory Ground Tribal Town, and Mekko George Thompson (collectively "Plaintiffs") pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, and Rule12(b)(6) for failure to state a claim upon which relief may be granted.

This dispute is part of a deeper conflict regarding the Poarch Band of Creek Indian's ("Poarch Band") construction and operation of a gaming facility on land located near Wetumpka, Alabama (the "Wetumpka property"). The Wetumpka property, which the Poarch Band purchased in 1980 and is held in trust for its benefit by the United States, is the site of "Hickory Ground," the last known capital of the Creek Nation in Alabama before its removal to the Indian Territory in the eastern sections of present-day Oklahoma. Plaintiffs claim cultural, historic, and lineal ties to the Wetumpka property and state that it holds religious significance to them. The Second Amended Complaint seeks injunctive and declaratory relief to have the Wetumpka property taken out of trust for the Poarch Band and to have the Poarch Band return the entire Wetumpka property to its natural state. 2d Am. Compl., Prayer for Relief.

Plaintiffs allege in their Amended Complaint that Federal Defendants violated the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C.§ 5123 (Claim I), the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. §§ 3001-3013 (Claim VII), the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. §§ 470aa-mm (Claim IX), the

National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101–320303 (Claim X), the

Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4 (Claim XI), and

violated Plaintiffs' free exercise of religion (Claim VIII).  These claims fail and must be

dismissed for several reasons.  First, Plaintiffs' IRA claim challenges Interior's 1984 decision to

take land into trust for the Poarch Band.  This Court lacks jurisdiction over this count because it

is brought well outside the statute of limitations, and Plaintiffs lack standing to challenge the

decision.  Second, this Court also lacks jurisdiction over Plaintiffs' NAGPRA claim because the

Wetumpka property is not federal land under NAGPRA, and Federal Defendants had no duty to

act.  Third, Plaintiffs' allegations under ARPA fail to state a claim because the challenged

activities — the Poarch Band's construction of a gaming facility on its land — are specifically

exempted by the statute and applicable regulations and no permit is required.   In addition, the

Court lacks jurisdiction over this claim because it challenges permits issued more than six years

ago.  Fourth, the Court is similarly without jurisdiction over Plaintiffs' NHPA claim because

Plaintiffs cannot demonstrate that Federal Defendants failed to take a discrete agency action that

they were required to take.  They have also failed to state a claim under the NHPA.  Fifth,

Plaintiffs fail to state a claim under RFRA, given that the Federal Defendants have not

substantially burdened Plaintiffs' exercise of religion.  And, finally, Plaintiffs' claims that

NAGPRA and ARPA substantially burden their exercise of religion should be dismissed because

the First Amendment and the Religious Land Use and Institutionalized Persons Act are not

implicated here.  Accordingly, for all these reasons, Federal Defendants move for the dismissal

of Plaintiffs' Second Amended Complaint and Supplemental Complaint.

## II.   BACKGROUND

### A.   Factual Background

Plaintiffs and the Poarch Band claim cultural affiliation with and descent from Creek Indians that historically inhabited land within the State of Alabama.  2d Am. Compl. ¶¶ 13, 45. In 1980, the Poarch Band acquired approximately 35 acres of land in the proximity of Wetumpka, Alabama.  *Id.* ¶ 61.  This property included a significant archeological site known as Hickory Ground, which was an early 19th century tribal town of the Creek Nation.  *Id.* ¶¶ 1–2, 44–54.  In the same year the Poarch Band acquired the land, the NPS included the property as a historic property on the National Register of Historic Places.  *Id.* ¶¶ 3, 61.  As a result, the land was encumbered with a twenty year covenant with measures to protect the archeological site that elapsed at the end of 2000.  *Id.* ¶¶ 50, 285.  In 1984, the Poarch Band gained Federal recognition and the land was acquired in trust for the benefit of the Poarch Band under the IRA.  *Id.* ¶ 73.

In the early 1990s, the Poarch Band submitted a management agreement to the Bureau of Indian Affairs ("BIA") as part of a plan to develop the site with a community center, bingo hall, and museum.  In 1991, the BIA, as part of its duties under the NHPA, entered into consultation with the Alabama State Historic Preservation Office ("SHPO") and the BIA proposed archeological excavations as a means to resolve any potential adverse effects to Hickory Ground. Decl. of Devon Lehman McCune ("McCune Decl.") ¶¶ 2–3, Exs. A, B.[1]  The SHPO did not

---

[1] This Court may consider materials outside the four corners of the complaint in support of a motion to dismiss without converting it to one for summary judgment when jurisdictional facts are challenged.  Factual attacks challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (citations omitted). The Eleventh Circuit has explained that in a factual attack, the presumption of truthfulness afforded a plaintiff under Rule 12(b)(6) does not attach, and the court is free to weigh the

believe excavations would mitigate any potential adverse effects and BIA elevated the matter to

the Advisory Council on Historic Preservation ("ACHP").  *Id.*  In 1992, ACHP and BIA formally

terminated consultation when they failed to reach an agreement.  *Id.*  BIA approved the

management agreement, contingent on further archeological work to recover information that

might be lost in development.  *Id.*  In 1999, the NPS entered into an agreement with the Poarch

Band for assumption by the Tribe of certain responsibilities pursuant to the NHPA.  2d Am.

Compl., Ex. I (ECF No. 190-1).  The Poarch Band began developing the site in 2000.

Plaintiffs submitted many objections and challenges to the Poarch Band's construction

activities over the years.  On October 31, 1992, after BIA approved the management agreement,

Plaintiff the Muscogee (Creek) Nation (the "Nation") passed an ordinance objecting to the

Poarch Band's proposed construction and requesting that the BIA investigate alleged violations

of section 106 of the NHPA, NAGPRA, ARPA, and the Antiquities Act of 1906.  McCune Decl.

¶ 4, Ex. C.  On October 19, 2002, Plaintiff Hickory Ground Tribal Town ("HGTT") submitted its

claim for remains or objects and cultural property to the Poarch Band and Interior's Eastern Area

Office.  *Id.* ¶ 5, Ex. D.  In its submission, HGTT alleged violations of NAGPRA and ARPA and

alleged that NHPA section 106 was not properly followed.  *Id.*  On October 23, 2002, the

Muscogee (Creek) National Council submitted correspondence to the NPS seeking further

information regarding the 1999 Agreement and the process NPS undertook to review the Poarch

Band's proposal to assume the responsibilities of the Alabama SHPO.  *Id.* ¶ 6, Ex. E.  In addition

---

evidence.  *Scarfo v. Ginsberg*, 175 F.3d 957, 960–61 (11th Cir. 1999) citing *Lawrence*, 919 F.2d
at 1529 (quoting *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981))) *see also Mowa
Band of Choctaw Indians v. United States*, No. 07-0508-CG-B, 2008 WL 2633967, at \*1 (S.D.
Ala. July 2, 2008).

to these specific instances, there have been many communications between Plaintiffs, municipalities, and other interested parties and Defendants regarding the Poarch Band's construction activities on the Wetumpka property. The controversy has been reported and commented upon in newspapers, internet sites, and other media outlets.

In 2001, the City of Wetumpka, a member of the Creek Nation, and the Alabama Preservation Alliance filed a complaint against the Poarch Band, the Department of the Interior, the Secretary of the Interior, Assistant Secretary-Indian Affairs, the Indian Gaming Commission, and the BIA in the United States District Court for the Middle District of Alabama. *See* Compl., ECF No. 1, *City of Wetumpka v. Norton,* No. 2:01-cv-1146-WHA-VPM (M.D. Ala. filed Sept. 28, 2001). In their complaint, plaintiffs alleged violations of ARPA, NAGPRA, section 106 of the NHPA, APA, National Environmental Preservation Act, and the Indian Gaming Act. *Id.* The lawsuit was voluntarily dismissed on November 21, 2011. ECF No. 22.

In 1987 to 1988 and 2001, the BIA issued ARPA permits to the Poarch Band for test excavations on Hickory Ground. The BIA issued a permit in 2003 and extended it in 2005 for more extensive data recovery excavations. McCune Decl. ¶ 7, Ex. F. Over the years, BIA investigated two possible ARPA violations. The first occurred in 1991 when the Poarch Band approved archeological work by a professional archeologist, and work was started before the BIA issued a permit. *Id.* ¶ 7, Ex. F. The BIA did not consider this to be an intentional violation and no penalty was assessed. The second occurred in 2001 when the Poarch Band's contractor began construction activities in an area within the boundaries of the archeological site. The BIA could not verify that damages had occurred to the archeological site and no penalty was assessed. *Id.* ¶ 9, Ex. H. On March 12, 2008, Plaintiff Mekko George Thompson contacted the NPS regarding

alleged violations of NAGPRA by Auburn University. *Id.* ¶ 10, Ex. I. Interior investigated these allegations and on April 21, 2009, found that Auburn University was not in violation of the statute. *Id.* ¶ 11, Ex. J.

## B.   Procedural History

Plaintiffs initially brought this litigation in December 2012. Compl., ECF No. 1. Plaintiffs filed an amended complaint on January 8, 2013. ECF No. 57. On February 27, 2013, Federal Defendants moved to dismiss the amended complaint, as did other defendants. ECF No. 94; *see also* ECF Nos. 74, 75, 77, 88, 90. In January 2018, the court stayed the case pending settlement negotiations. ECF No. 155.

On March 4, 2020, this Court granted Plaintiffs' motion to amend their complaint and on March 9, 2020, Plaintiffs filed their Second Amended Complaint and Supplemental Complaint. ECF No. 190. The Second Amended Complaint raises eleven counts. Count I asserts that the Federal Defendants violated the Indian Reorganization Act by taking land into trust for the Poarch because it was not under federal jurisdiction in 1934. 2d Am. Compl. ¶¶ 190–99. Counts II through IV "are applicable only if the Court determines that the Department of the Interior lacked authority to take the Hickory Ground Site into trust for Poarch." *Id.* ¶ 200. These counts assert claims based on Alabama common law against the Poarch Defendants for unjust enrichment, promissory estoppel, and outrage, all under Alabama common law.[2] Plaintiff asserts

_____

[2] Federal Defendants read Counts II–VI to be asserted only against the Poarch Band Defendants and not against Federal Defendants. To the extent they are asserted against Federal Defendants, they should be dismissed for failure to state a claim as they do not identify any final agency action or statute or regulation that Federal Defendants purportedly violated, and for lack of jurisdiction because they do not identify any final agency action or nondiscretionary duty that Federal Defendants were required to take. *See infra* Section IV.

Claims V through IX if the Court determines that Federal Defendants had authority to take the land into trust. *Id.* ¶ 236. Counts V and VI are against the Poarch Defendants for violations of federal common law. *Id.* ¶¶ 237–40.

Count VII asserts that the Federal Defendants and the Poarch Defendants violated NAGPRA in various ways. Count VIII asserts that portions of NAGPRA and ARPA, if construed in a way that would allow anyone other than Plaintiffs to give authority for excavation or removal of remains from the site, violate Plaintiffs' free exercise of religion under the First Amendment, as well as Religious Land Use and Institutionalized Persons Act ("RLUIPA") and RFRA. Count IX asserts a violation of ARPA. Finally, Plaintiffs assert Count X, violation of the NHPA, and Count XI, violation of RFRA.

## III.    STATUTORY BACKGROUND

### A.    The Indian Reorganization Act of 1934

In 1934, Congress enacted the IRA to encourage tribes "to revitalize their self-government," to take control of their "business and economic affairs," and to assure a solid territorial base by "put[ting] a halt to the loss of tribal lands through allotment." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151 (1973). This "sweeping" legislation, *Morton v. Mancari*, 417 U.S. 535, 542 (1974), manifested a sharp change of direction in federal policy toward the Indians. It replaced the assimilationist policy at the time of the General Allotment Act, which had been designed to "put an end to tribal organization" and to "dealings with Indians . . . as tribes." *United States v. Celestine*, 215 U.S. 278, 290 (1909).

The "overriding purpose" of the IRA, however, was more far-reaching than remedying the negative effects of the General Allotment Act. *Morton*, 417 U.S. at 542. Congress sought to "establish machinery whereby Indian tribes would be able to assume a greater degree of self

government, both politically and economically." *Id.* Congress thus authorized Indian tribes to

adopt their own constitutions and bylaws, 25 U.S.C. § 476, and to incorporate, 25 U.S.C. § 477.

> Of particular relevance here, section 5 of the IRA provides in pertinent part that:

> [t]he Secretary of the Interior is [hereby] authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in land[], water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

> …

> Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 5108.

Section 19 of the IRA provides an inclusive definition of those who are eligible for its

benefits, including eligibility for land into trust acquisitions. That section provides that

"'Indian'. . . shall include all persons of Indian descent who are members of any recognized

Indian tribe now under Federal jurisdiction . . . ." 25 U.S.C. § 5129. The IRA also includes

within its definition of "Indian" "all persons who are descendants of such members who were, on

June 1, 1934, residing within the present boundaries of any Indian reservation," and "all other

persons of one-half or more Indian blood." *Id.*

**B.      The Native American Graves Protection and Repatriation Act**

The NAGPRA, 25 U.S.C. §§ 3001-3013, creates procedures through which lineal

descendants and culturally affiliated tribes can recover remains and cultural objects from federal

agencies and museums. It was enacted by Congress subsequent to the enactment of ARPA to

8

protect rights to items of tribal cultural significance, including Native American human remains,

funerary objects, sacred objects, and objects of cultural patrimony (collectively "cultural items").

25 U.S.C. § 3001(3).  This repatriation process can proceed on two different tracks, depending on

when the cultural items were discovered.  Section three of NAGPRA, relevant here, provides

guidance for determining who should get ownership or control of Native American human

remains and objects discovered and excavated from federal and tribal lands after NAGPRA's

enactment on November 16, 1990.  25 U.S.C. § 3002(a)-(d).  The first priority "in the case of

Native American human remains and associated funerary objects, is "the lineal descendants of

the Native American."  *Id.* § 3002(a)(1).  Section 3(c) allows for the intentional excavation or

removal of human remains on tribal lands, provided that an ARPA permit is issued by the BIA

and consent is given by the tribe owning the land.  25 U.S.C. § 3002(c).  NAGPRA is not

prospective and is triggered only after a person has made an inadvertent discovery.  *San Carlos*

*Apache Tribe v. United States*, 272 F. Supp. 2d 860, 889 (D. Ariz. 2003), *aff'd* 417 F.3d 1091

(9th Cir. 2005).

## C.    The National Historic Preservation Act

The NHPA, 54 U.S.C. §§ 300101–317108, "requires each federal agency to take

responsibility for the impact that its activities may have upon historic resources, and establishe[d]

the Advisory Council on Historic Preservation ("ACHP") . . . to administer the Act."  *City of*

*Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1508 (D.C. Cir. 1994).  It "neither . . .

forbid[s] the destruction of historic sites[,] nor . . . command[s] their preservation."  *United*

*States v. 162.20 Acres of Land*, 639 F.2d 299, 302 (5th Cir. 1981).  Under section 106 of the

NHPA, federal agencies "shall take into account the effect of the undertaking on any historic

9

property," and "afford the [Advisory Council on Historic Preservation ("ACHP")] a reasonable opportunity to comment with regard to the undertaking.  54 U.S.C. § 306108.  NHPA's obligations are chiefly procedural in nature; the NHPA is a "stop, look, and listen" statute that merely requires that an agency acquire information before acting.  *Ill. Commerce Comm'n v. Interstate Commerce Comm'n*, 848 F.2d 1246, 1260-61 (D.C. Cir. 1988).

As a first step in the section 106 process, agency officials assess whether a proposed action meets the definition of "undertaking" in 36 C.F.R. § 800.16(y).  36 C.F.R. § 800.3(a).  ACHP promulgates regulations implementing section 106, including the section 800.16(y) definition, pursuant to its authority under 54 U.S.C. § 304108.  The NHPA regulations define "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).   If the agency finds there is an undertaking, the action agency must next initiate consultation with the appropriate State Historic Preservation Officer ("SHPO") and/or Tribal Historic Preservation Officer ("THPO").  The action agency must also plan to involve the public and identify other consulting parties.  36 C.F.R. § 800.3(e-f).

The third step in the section 106 process is for the agency to determine whether effects on historic properties will be adverse, using the criteria specified in the regulations, in consultation with the SHPO.  36 C.F.R. § 800.5(a).  If an adverse effect is found, the agency official shall consult further to resolve the adverse effect pursuant to 36 C.F.R. § 800.6.  *Id.* at 800.5(d)(2).

Fourth, the agency must attempt to reach agreement with other consulting parties in developing and evaluating alternatives to avoid, minimize, or mitigate adverse effects.  36 C.F.R. § 800.6.  Although all consulting parties participate in this step, in most cases, only the action

agency and the SHPO must actually reach agreement, as expressed in a Memorandum of

Agreement ("MOA").  *Id.* at § 800.6(b)(1).  If the ACHP participates, either on its own initiative

or at the request of the SHPO, tribe or consulting party, it must also be a signatory to the MOA.

*Id.* at § 800.6(c).  In the event that consultation does not lead to an MOA, the agency, SHPO or

the Council may decide that further consultation will not be productive, and the process moves

on to the fifth and final step.  *Id.* at § 800.6(c)(8).

When the action agency terminates consultation, it must ask ACHP to comment on the

undertaking.  36 C.F.R. § 800.7(a)(1).  If the SHPO terminates consultation, the agency and

ACHP may continue consultation and execute a MOA without the SHPO's involvement.  *Id.* at §

800.7(a)(2).  In the absence of a MOA, the undertaking may proceed, but only if the decision is

made by the head of the agency and his or her decision explains the rationale for the decision and

produces evidence that the agency considered ACHP's comments.  *Id.* at § 800.7(c)(4).

## D.     Archaeological Resources Protection Act

The ARPA was enacted in 1979 with the goal of protecting "archaeological resources"

(including remains) "on public lands and Indian lands."  16 U.S.C. § 470aa.  ARPA prohibits the

excavation or removal of archaeological resources located on public lands and Indian lands

unless done in accordance with a permit or exempted under the Act or implementing regulations.

*Id.* at § 470cc.  In 1984, the Secretary of the Interior promulgated uniform government-wide

regulations under ARPA dealing with the custody of archaeological resources, and amended

them in 1995 to implement the requirements of NAGPRA.  43 C.F.R. § 7.13.  The amended

regulations provide that "[a]rchaeological resources excavated or removed from Indian lands

remain the property of the Indian or Indian tribe *having rights of ownership over such resources*"

and the Secretary of the Interior may "promulgate regulations providing for . . . the ultimate disposition of archaeological resources . . . when such resources have been excavated or removed from public lands and Indian lands."  43 C.F.R. § 7.13(b)-(c) (emphasis added).  The BIA has promulgated specific regulations that confirm the application of NAGPRA to archaeological resources that comprise human remains and other NAGPRA cultural items from Indian lands.  *See* 25 C.F.R. § 262.8(a); Protection of Archaeological Resources, 58 Fed. Reg. 65246, 65248 (Dec. 13, 1993).

**E.    Religious Freedom Restoration Act**

The RFRA provides that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . "is the least restrictive means of furthering [a] compelling governmental interest," *id.* § 2000bb-1.  "Government" is defined as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States . . . ."  *Id.* § 2000bb-2(1).  This statute was Congress's response to a First Amendment decision of the Supreme Court that, in Congress's view, "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion."  *Id.* § 2000bb(a)(4).  RFRA restores the compelling interest test set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and "guarantee[s] its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1); *see also Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008).  Although RFRA "restored" the standard by which federal government actions burdening religion were to be judged, it does not expand the

12

class of actions to which the standard would be applied.  *Vill. of Bensenville v. FAA*, 457 F.3d 52, 62 (D.C. Cir. 2006) (citing *Hall v. Am. Nat'l Red Cross*, 86 F.3d 919, 921 (9th Cir. 1996)).

## F.      The Religious Land Use and Institutionalized Persons Act

RLUIPA prevents governments from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest, and (B) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. §§ 2000cc.  "RLUIPA, by its terms, prohibits only state and local governments from applying regulations that govern land use or institutionalized persons to impose a 'substantial burden' on the exercise of religion."  *Navajo Nation*, 535 F.3d at 1077 (citing 42 U.S.C. §§ 2000cc; 2000cc-1; 2000cc-5(4)(A)).  Generally, RLUIPA does not apply to a federal government action, and "even for state and local governments, RLUIPA applies only to government land-use regulations of private land — such as zoning laws — not to the government's management of its own land."  *Id.* (citing § 2000cc-5(5)).

## G.      The Administrative Procedure Act

The APA waives sovereign immunity for suits seeking relief other than money damages from federal agencies.  *See* 5 U.S.C. § 702.  The APA does not, through section 702, create an independent basis of jurisdiction.  *See Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998).  With certain exceptions, the APA provides for judicial review of agency action that is made reviewable by statute or for which there is no other adequate remedy in a court.  5 U.S.C. §§ 702, 704.  Under the APA, the reviewing court may, *inter alia*, "compel

agency action unlawfully withheld or unreasonably delayed," or "hold unlawful and set aside agency action" that is arbitrary, capricious, or not in accordance with law.  *Id.* § 706.  The APA does not apply to certain categories of agency action, including agency action that is "committed to agency discretion by law."  *Id.* § 701(a)(2).

The APA authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ."  5 U.S.C. § 702.  A federal court has authority to review only "final agency action" pursuant to 5 U.S.C. § 704, unless another statute provides a right of action.  *Wilderness Soc'y v. Alcock*, 83 F.3d 386, 388 n.5 (11th Cir. 1996).  Two conditions must be satisfied for an agency action to be final.  "First, the action must mark the consummation of the agency's decision-making process— it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations and citations omitted).  Absent "agency action" within the meaning of the APA, the action is not reviewable.  Section 704 specifies that agency action is not final if the agency "requires by rule[,] and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."  5 U.S.C. § 704.  In other words, agency action is not final for purposes of section 704 until "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule . . . ."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).

Courts also have authority to "compel . . . action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  However, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is *required to take*."

*Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 64 (2004).  To satisfy that standard,

Plaintiffs must identify one of the discrete agency actions in 5 U.S.C. § 551(13) and demonstrate

that the action in question is one that is legally required.  *See SUWA*, 542 U.S. at 61–63.  A

court's power to "compel agency action" is carefully circumscribed to situations where an agency

has ignored a specific legislative command.  *Hells Canyon Pres. Council v. U.S. Forest Serv.*,

593 F.3d 923, 932 (9th Cir. 2010).  The Supreme Court made it clear that a "'failure to act' is not

the same thing as a 'denial'" and an agency's act of saying no to a request properly is challenged

under section 706(2) rather than section 706(1).  *SUWA*, 542 U.S. at 63.

## IV.   STANDARDS OF REVIEW

Federal court jurisdiction is limited, present only where authorized by statute or the

Constitution.  *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  Once

challenged, the burden of establishing a federal court's subject matter jurisdiction rests on the

party asserting jurisdiction.  *Id.*  If a plaintiff cannot meet this burden, the case should be

dismissed.

A motion to dismiss for lack of subject matter jurisdiction must be granted if the court

lacks the statutory authority to hear and decide the dispute.  Fed. R. Civ. P. 12(b)(1).  Facial

attacks on a complaint "require[] the court merely to look and see if [the] plaintiff has

sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [plaintiff's]

complaint are taken as true for the purposes of the motion."  *Lawrence v. Dunbar*, 919 F.2d

1525, 1529 (11th Cir. 1990) (citations omitted).  Factual attacks challenge "the existence of

subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the

pleadings, such as testimony and affidavits, are considered."  *Id.* at 1529 (citations omitted).

This circuit has explained that in a factual attack, the presumption of truthfulness afforded a plaintiff under Rule 12(b)(6) does not attach, and the court is free to weigh the evidence. *Scarfo v. Ginsberg*, 175 F.3d 957, 960-61 (11th Cir. 1999) (citing *Lawrence*, 919 F.2d at 1529). Where, as here, the defendant challenges subject matter jurisdiction, the burden of establishing jurisdiction falls squarely upon the plaintiff. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A claim may be dismissed under Rule 12(b)(6) either because it asserts a legal theory that is not cognizable as a matter of law or because it fails to allege sufficient facts to support a cognizable legal claim. *See Kjellvander v. Citicorp*, 156 F.R.D. 138, 141 (S.D. Tex. 1994). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the specificity in pleading required by Rule 8 necessary to survive a motion to dismiss. The Court stated that a plaintiff's obligation to set forth the "grounds" of its entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted). The Court added that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted); *see also Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 974 (11th Cir. 2008). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 557). In *Iqbal*, the Supreme Court stated that a claim must have facial plausibility, which "asks for more than a sheer possibility that

a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* at 678 (internal quotation marks, brackets and citations omitted).

Further, federal courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citation omitted).  Under Rule 12(b)(6), "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003); *see also S. Fla. Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 409 n.10 (11th Cir. 1996) ("As a general rule, conclusory allegations and unwarranted deductions of fact are not admitted as true in a motion to dismiss") (citing *Assoc. Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).

## V.    ARGUMENT

Plaintiffs' claims against the Federal Defendants should be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.  Plaintiffs fail to identify final agency action or a discrete, nondiscretionary duty that Federal Defendants failed to take and accordingly have not established jurisdiction under the APA.  In addition, many of Plaintiffs' claims are brought outside the statute of limitations.  Plaintiffs also fail to state claims for violation of the IRA, RFRA, the First Amendment, and the RLUIPA.

## A.    Plaintiffs' IRA Claim fails for lack of subject matter jurisdiction and failure to state a claim.

Plaintiffs' first claim asserts that Federal Defendants violated the IRA by taking land into trust for the Poarch Band.  Plaintiffs assert that under the Supreme Court's holding in *Carcieri v. Salazar*, 555 U.S. 379 (2009), Interior can only take land into trust for tribes that were under

federal jurisdiction in 1934 and because the Poarch Band was not federally recognized as a tribe until 1984, Interior's taking of land into trust for the Poarch Band was void *ab initio*.  2d Am. Compl. ¶¶ 191, 197.  According to Plaintiffs, therefore, Interior did not have the authority to authorize archeological excavations and gaming on the site is illegal.  Plaintiffs' IRA claim should be dismissed because it is brought outside the statute of limitations and Plaintiffs lack standing to bring the claim.

      **1.**       **Plaintiffs' IRA claim was brought outside the statute of limitations.**

Plaintiffs' claim should be dismissed for lack of subject matter jurisdiction because it is barred by the applicable statute of limitations.  The final agency action challenged, the taking of land into trust, occurred in 1984, almost 29 years prior to the time of Plaintiffs' filing their Complaint (and 25 years prior to the *Carcieri* decision).

The Court does not have jurisdiction over Plaintiffs' claims if they are brought outside the statute of limitations.  *See Phillips v. United States,* 260 F.3d 1316, 1317 (11th Cir. 2001).  Plaintiffs' claim alleging a violation of the IRA is properly analyzed under the APA.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220–21 (2012) (challenge of an Interior fee-to-trust decision is a "garden-variety APA claim").  Because the statute of limitations is a jurisdictional limit, "[t]he burden is on the plaintiff to plead and prove compliance."  *Gibbs v. United States*, 865 F. Supp. 2d 1127, 1156 (M.D. Fla. 2012), *aff'd,* 517 F. App'x 664 (11th Cir. 2013) (citing *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 210, 214 (2d Cir. 1987)).

Under the APA, a plaintiff has six years to bring a claim.  *See* 28 U.S.C. § 2401(a); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007); *Southwest Williamson Cty. Ass'n v.*

*Slater*, 173 F.3d 1033, 1036 (6th Cir. 1999).  The limitations period begins to run from the time of "final agency action."  *Southwest*, 173 F.3d at 1036 (citing 5 U.S.C. § 704); *Alabama v. United States*, 630 F. Supp. 2d 1320, 1325 (S.D. Ala. 2008).  The action challenged by Plaintiffs, the United States' decision to acquire the land in trust for the benefit of the Poarch Band, occurred in 1984.  This decision represented the final agency action.  *See Patchak*, 567 U.S. at 216–217; *see also McAlpine v. United States*, 112 F.3d 1429, 1432-35 (10th Cir. 1997).

Section 2401(a) operates as a jurisdictional time bar and is not subject to equitable tolling.  *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34; *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006) (per curiam) (finding that "[t]he terms 'upon which the Government consents to be sued must be strictly observed and exceptions are not to be implied'" (citations omitted)).  "Failure to sue the United States within the limitations period is not merely a waivable defense.  It operates to deprive federal courts of jurisdiction."  *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997); *see also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988) ("Exceptions to the limitations and conditions upon which the government consents to be sued are not to be implied." (citing *Soriano v. United States*, 352 U.S. 270, 276 (1957))).

Therefore, based upon the applicable six-year statute of limitations, Plaintiffs had until 1990 to challenge the decision to acquire the Wetumpka property in trust.  It failed to do so and this Court therefore lacks jurisdiction over this claim.  The Eleventh Circuit has specifically found that the statute of limitations to challenge the taking of land into trust for the Poarch Band began running in 1984.  *See Alabama v. PCI Gaming Authority*, 801 F.3d 1278, 1292 (11th Cir.

2015) (finding that because Alabama was aware that the Secretary took land into trust for the Poarch Band, the statute of limitations began running at that time).  The Eleventh Circuit affirmed this holding later, holding that when the plaintiff could have raised a timely challenge to the land-into-trust decision, the statute of limitations had run.  *Poarch Band of Creek Indians v. Hildreth*, 656 F. App'x 934, 944 (11th Cir. 2016).  The court noted that "[t]o recognize an exception and permit a collateral challenge nearly 30 years later, where the record clearly reflects that [the plaintiff] could have raised a timely challenge but did not, would turn *PCI Gaming* on its head."  *Id.*  Similarly, here, there is no indication that Plaintiffs were not aware that the Secretary took the land into trust for the Poarch Band in 1984.  They could have raised a timely challenge but did not.  They should not be permitted now to challenge a decision that is over thirty years old.

Should Plaintiffs argue that the statute of limitations did not begin to run until 2006, when they assert that they were informed the Poarch Band planned to excavate the site instead of preserve it from development, the Court should reject this argument for several reasons.  2d Am. Compl. ¶ 196.  First, "[u]nder the APA, a right of action accrues at the time of 'final agency action.'"  *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) (citing 5 U.S.C. § 704.).  The federal agency action taking the land into trust was complete in 1984 and Plaintiffs' cause of action, if any, accrued then.  Second, the representation that Plaintiffs were unaware that excavation was occurring at the site is inconsistent with the Muscogee (Creek) Nation Resolution issued in 1992 that found that the Poarch Band was endangering Hickory Ground.  McCune Decl. ¶ 4, Ex. C.  The Resolution also indicates that the Nation know that when the Poarch Band purchased the land in 1980, it entered into a twenty-year protective covenant.  Thus, any time

after 2000, the Poarch Band was no longer bound by the covenant to preserve the historical and archeological integrity of the site. In addition, in 2002, Plaintiff HGTT submitted its claim for remains or objects and cultural property to the Poarch Band and Interior's Eastern Area Office, specifically noting that objects had been excavated. *Id.* ¶ 5, Ex. D. In short, Plaintiffs' argument that its injury did not accrue until it received notice of excavation does not withstand scrutiny.

Because the statute is jurisdictional, equitable tolling of their IRA claim is not available to Plaintiffs. Therefore, their IRA claim is barred by the statute of limitations and must be dismissed for lack of jurisdiction.

### 2. Plaintiffs lack standing to bring their IRA claim.

Plaintiffs also lack standing to assert a claim under the IRA. Plaintiffs' alleged injury, the excavation and disturbance by construction activities on land they claim is historically and religiously significant, does not stem from the United States' acquisition of the Wetumpka property in trust.

"Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1)." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n. 42 (11th Cir.1991). Before it can reach the merits of Plaintiffs' IRA claim, this Court must first determine that it has the jurisdiction to do so. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998). The threshold inquiry in evaluating Plaintiffs' IRA claim, therefore, is whether they have met their burden and properly invoked this court's limited subject matter jurisdiction. *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1002–03 (11th Cir. 2004) (quoting *Wolff v. Cash 4 Titles*, 351 F.3d 1348,

1353 (11th Cir. 2003). Because, as demonstrated below, Plaintiffs fail to meet their burden, this Court lacks jurisdiction to review the merits of Plaintiffs' claim.

Standing is a constitutional requirement imposed pursuant to the "cases and controversies" provision of Article III. *Stalley*, 524 F.3d at 1232. To satisfy the constitutional standing requirements of Article III of the Constitution, Plaintiffs must establish: (1) they suffered an injury in fact; (2) that the injury is fairly traceable to the challenged conduct; and (3) that the injury is likely to be redressed by the proposed remedy. *Parker*, 386 F.3d at 1003–04. "The injury must be 'concrete and particularized,' not 'conjectural' or 'hypothetical,' and 'must affect the plaintiff in a personal and individual way.'" *Id.* at 1021 n.4 (quoting *Lujan*, 504 U.S. at 560 & n.1). Plaintiffs must also establish that the injury is "actual [and] imminent." *Stalley*, 524 F.3d at 1232. When the injury is a threatened injury, it must be "certainly impending" to constitute injury in fact for purposes of standing. *Babbitt v. Farm Workers*, 442 U.S. 289, 298, *vacated by* 442 U.S. 289 (1979) (quoting *Pennsylvania v. W. Virginia*, 262 U.S. 553, 593 (1923)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983); *United States v. Richardson*, 418 U.S. 166, 177- 78 (1974); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Plaintiffs must also demonstrate that the injury is fairly traceable to the challenged action, and not injury that results from the independent action of some third party. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–44 (1976). Further, Plaintiffs have the burden of establishing all three prongs of the standing test:

> Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice, for on a motion to dismiss we presum[e] that general
allegations embrace those specific facts that are necessary to support the claim.

*Lujan*, 504 U.S. at 561 (internal quotes and citations omitted).

Here, Plaintiffs' claim of injury fails to meet the second prong of the test because

Plaintiffs' alleged injuries by the construction activities on the Wetumpka property is not "fairly

traceable" to the United States' acquisition of the land in trust decades ago.  Even if the United

States had not acquired the land in trust, the Poarch Band would still be the owners of the

Wetumpka property and able to manage the land in their own interests as they are now.  The

covenant entered into by Poarch Band when it first purchased the property in 1980 was for the

duration of twenty years, after which the Poarch Band was allowed to use the land, including

engaging in construction activities.  In sum, any injury Plaintiffs allege is not the result of Interior

taking the land into trust in 1984.

Plaintiffs also fail to establish the third prong of the standing test, because declaring the

United States' decision to acquire the land in trust unlawful will not redress their alleged injury.

There must be a "'substantial likelihood' that this injury will be redressed by the relief [sought]."

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 808 (11th Cir. 1993)

(quoting *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978)).

Plaintiffs assert injury due to "Poarch's construction of a casino over the Plaintiffs' sacred burial

grounds, its removal of the Plaintiffs' ancestors from what was intended to be their final resting

place, and its mistreatment of the remains and artifacts. . . ."  2d Am. Compl. ¶ 6.  But requiring

the land to be taken out of trust will not redress this injury.  The Poarch Band will still own the

Wetumpka property in fee.  Plaintiffs' Second Amended Complaint makes clear that it is not

solely the construction of a gaming facility that they oppose but any construction on the property,

23

as well as the removal and alleged mistreatment of remains and artifacts.  *See, e.g.*, *id.* ¶¶ 6, 124–130, Prayers for Relief.  If the land is not held in trust, the Poarch Band will still have the right to conduct activities on the land.  *See Yankton Sioux Tribe v. U.S. Army Corps of Engr's*, 396 F. Supp. 2d 1087, 1094 (D.S.D. 2005) (court found tribe had no standing where it failed to establish a causal connection between the transfer of land and the complained of conduct).  Due to the attenuated causation alleged by Plaintiffs, Plaintiffs lack standing to challenge the 1984 decision to take the land into trust and Count I should be dismissed.

**B.      Plaintiffs fail to allege jurisdiction for their NAGPRA claim.**

This Court also lacks jurisdiction over Plaintiffs' NAGPRA claim.  While NAGPRA contains a private right of action, it does not contain a waiver of sovereign immunity and NAGPRA claims therefore rely on the APA's waiver of sovereign immunity.  25 U.S.C. § 3013; *San Carlos Apache Tribe*, 272 F. Supp. 2d at 886 ("The APA waives the sovereign immunity of the Government for NAGPRA claims.").  Here, there has been no final agency action for purposes of the APA because the Wetumpka property is not federal land under NAGPRA, and Federal Defendants had no duty to act.

NAGPRA defines "tribal land" as "(A) all lands within the exterior boundaries of any Indian reservation; (B) all dependent Indian communities; (C) any lands administered for the benefit of Native Hawaiians . . ."  25 U.S.C. § 3001(15).  NAGPRA does not define the term "reservation."  However, "'federal lands' are 'any land *other than tribal lands* which are controlled or owned by the United States' and lands held in trust by the federal government for an Indian tribe are 'tribal,' rather than 'federal.'"  *Rosales v. United States*, No. 07-cv-0624, 2007

WL 4233060, *6 (S.D. Cal. Nov. 28, 2007) (quoting 25 U.S.C. § 3001(15) (internal quotations omitted)).

Under NAGPRA, the Wetumpka property is tribal land.  In 1980, the Poarch Band purchased the land in fee.  2d Am. Compl. ¶ 61.  In 1984, the United States accepted legal title to the Wetumpka property in trust for the Poarch Band.  *Id.* ¶ 73.  The Supreme Court has held that "the test for determining whether land is Indian country does not turn upon whether that land is denominated 'trust land' or 'reservation,'" but on whether the land has been "validly set apart" for the use of Indians.  *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 511 (1991).  Soon after, the Supreme Court interpreted the term "reservation," as used in the Indian country statute, 18 U.S.C. § 1151(a), to include formal and informal reservations.  *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993).  In *Sac & Fox*, the Court stated that Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments.  The Court also concluded that tribal trust land outside a formal reservation boundary qualified as "any Indian reservation" under 18 U.S.C. § 1151(a), presumably as an informal reservation.[3]  To meet the goals of NAGPRA, the term "any reservation," as used in the definition of "tribal lands," may draw on the interpretation of "any reservation" under 18 U.S.C. 1151(a) and refer to both formal and informal reservations.  Informal reservations may include tribal trust land outside the boundaries of formal reservations.

--------

[3]  *See also United States v. Roberts*, 185 F.3d 1125, 1131 (10th Cir. 1999) (tribal trust land outside formal reservation boundary determined to be Indian Country under 18 U.S.C. § 1151(a)); *United States v. Azure*, 801 F.2d 335, 339 (8th Cir. 1986) (actions of the federal government in its treatment of Indian land can create a *de facto* reservation for certain purposes).

Because the Wetumpka property is tribal land, no federal agency NAGPRA duty has been triggered. NAGPRA's division between tribal control on tribal land and federal duties on *federal land* promotes the Tribe's independence and sovereignty. The NAGPRA statute itself as well as the administrative history indicates that tribes are afforded responsibility for compliance on tribal lands, rather than federal agencies:

> Section 3(a)(2)(A) of the Act makes it clear that *Indian tribes* have preference regarding custody of human remains, funerary objects, sacred objects, or objects of cultural patrimony excavated intentionally or discovered inadvertently on their tribal lands second only to lineal descendants. The regulatory text is consistent with Federal recognition of an *Indian tribe's sovereignty regarding administration of their lands* and has not been changed.

NAGPRA Regulations, 60 Fed.Reg. 62134-01 at 62142 (Dec. 4, 1995) (emphasis added); *see also Rosales*, 2007 WL 4233060, at *8. NAGPRA's regulations further illuminate this division, discussing the steps for the responsible Indian tribe official following notification of an inadvertent discovery on tribal land in one subsection, and the steps for the responsible federal agency official following notification of inadvertent discovery on federal land in another subsection. *Compare* 43 C.F.R. § 10.4(e) ("Tribal lands.") *with* 43 C.F.R. § 10.4(d) ("Federal lands."). At no point does NAGPRA or its regulations assign any nondiscretionary duty to the federal government in the event of an inadvertent discovery on tribal land. Because the discoveries here took place on tribal land, Federal Defendants do not have any nondiscretionary duties that they failed to perform. *See SUWA,* 542 U.S. at 62–64. As such, the Court lacks subject matter jurisdiction under the APA.

Plaintiffs allege that the Defendants failed to consult with Plaintiffs prior to excavation and removal, failed to obtain Plaintiffs' consent, and failed to give custody of human remains and cultural objects found to Plaintiffs. 2d Am. Compl. ¶¶ 241–61. These alleged duties, however,

are not found in the statute.  First, the statutory duty of repatriation under 25 U.S.C. § 3005 applies to "Native American human remains and objects *possessed or controlled by Federal agencies and museums*." *Id.* § 3005(a) (emphasis added).  Similarly, Plaintiffs allege that "no final inventory or report regarding the cultural items recovered" was prepared, nor were Plaintiffs consulted regarding such a report.  *Id.* ¶ 254.  But this requirement also applies only to "[e]ach Federal agency and each museum which has *possession or control* over holdings or collections of Native American human remains and associated funerary objects . . . ."  *Id.* § 3003 (emphasis added).  Plaintiffs have not alleged, nor can they allege, that any federal agency has "possession or control" of any items from the Wetumpka property.

Plaintiffs also allege that NPS violated NAGPRA "by failing to establish a preservation program for the protection of historic properties that ensures that the agency's procedures for compliance with section 106 of the NHPA 'provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with section 3(c) of [NAGPRA].'"  2d Am. Compl. ¶ 253.  NAGPRA does not contain such a requirement.  The NHPA contains such a requirement, but even if that requirement was violated, it would not be a NAGPRA violation.  *See* 54 U.S.C. § 306102.

In addition, Plaintiffs allege a violation of 25 U.S.C. § 3002, which covers inadvertent discoveries on both federal and tribal lands.  As discussed, *supra*, the Wetumpka property is tribal land for purposes of NAGPRA.  Under section 3002, the person who makes an inadvertent discovery must notify "the responsible Federal agency official with respect to Federal lands" or "the responsible Indian tribal official" on tribal lands.  43 C.F.R. § 10.4(b); 25 U.S.C. § 3002(d)(1).  Upon notification, the federal official has three days to perform specific

27

responsibilities, including securing and protecting the discovered items and notifying any affiliated tribes. 43 C.F.R. § 10.4(d). While the federal official "must" take these steps, the responsible Indian tribal official "may" take similar steps. *Compare id.* § 10.4(d) *with id.* § 10.4(e). The only responsibility of a federal agency triggered by an inadvertent discovery on tribal lands relates to permits. *Id.* § 10.4(g) ("All Federal authorizations to carry out land use activities on Federal lands or tribal lands, including all leases and permits, must include a requirement for the holder of the authorization to notify the appropriate Federal or tribal official immediately upon the discovery of human remains, funerary objects, sacred objects, or objects of cultural patrimony pursuant to § 10.4(b) of these regulations."). In this case, the United States issued such a permit, which provided that:

> Excavation or removal of any Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony must be preceded by consultation with or, in the case of tribal lands, consent of the appropriate Indian tribe or Native Hawaiian organization. Consultation should be conducted with the lineal descendants, tribal land owners, Native American representatives, and traditional religious leaders of all Indian tribes and Native Hawaiian organizations that can reasonably be assumed to be culturally associated with the cultural items or, if the cultural affiliation of the objects cannot be reasonably ascertained, from whose judicially established aboriginal lands the cultural items originated."

McCune Decl. ¶ 8, Ex. G. In issuing such a permit, the federal agencies' duties regarding inadvertent discoveries on tribal land was thus satisfied. 43 C.F.R. § 10.4(g).

Plaintiffs also allege a violation of section 3002(c)(1), which refers to permits under ARPA, and specifically, 16 U.S.C. § 470cc. Section 470cc(g)(1) provides that no permit is required "for the excavation or removal by any Indian tribe or member thereof of any archeological resource located on Indian lands of such Indian tribe . . . ." Here, as discussed,

28

*supra*, the alleged excavation and removals are taking place by the Poarch Band on its own land and no permit is required under this particular section.  2d Am. Compl. ¶¶ 1–2, 6.

Because Plaintiffs fail to allege a duty to act under NAGPRA, they also fail to identify a discrete agency inaction in violation of a nondiscretionary duty, which they must for Federal Defendants to waive their sovereign immunity under the APA.  *See SUWA*, 542 U.S. at 64. Accordingly, the Court lacks subject matter jurisdiction over Plaintiffs' NAGPRA claims.

**C.**     **Plaintiffs' NHPA claim fails for lack of subject matter jurisdiction.**

Plaintiffs' Claim X argues that Federal Defendants failed to comply with the NHPA regulations requiring an agency to take certain actions prior to proceeding with construction or other action that might adversely impact a site of historical or cultural significance.  2d Am. Compl. ¶¶ 291–303.  Plaintiffs contend that Federal Defendants failed to comply with section 106 of the NHPA, codified at 54 U.S.C. § 306108, and the implementing regulations by failing to meaningfully consult with Plaintiffs, and failing to take into account the impacts on the Wetumpka property of allowing a casino resort and of delegating historic preservation responsibilities to the Poarch Band.  *Id*.  Plaintiffs further allege that Federal Defendants violated the NHPA by failing to seek ways to minimize, avoid, and mitigate the harm, and by continuing to award the Poarch Band federal historical preservation funds.  *Id.* ¶¶ 304–09.  Plaintiffs' NHPA claims must be dismissed because they fail to challenge final agency action and to assert that Federal Defendants did not take a discrete agency action that they were required to take.

Section 106 of the NHPA requires a government agency to "take into account the effect of [any] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register."  54 U.S.C. § 306108.  This requirement is

29

governed by numerous federal regulations which establish a procedure generally referred to as

the Section 106 process. *See* 36 C.F.R. §§ 800–899. "The process is designed to foster

communication and consultation between agency officials . . . and other interested parties such as

Indian tribes, local governments, and the general public." *Pueblo of Sandia v. United States*, 50

F.3d 856, 859 (10th Cir. 1995). "Section 106 of NHPA is a 'stop, look, and listen' provision that

requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe*

*v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). NHPA is a narrow statute. Its main

thrust is to encourage preservation of historic sites and buildings rather than to mandate it. *Nat'l*

*Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996), *aff'd* 203 F.3d 53 (D.C.

Cir. 1999).

> NHPA defines "undertaking" as:
>
> a project, activity, or program funded in whole or in part under the direct or
> indirect jurisdiction of a Federal agency, including--
>
> > (1) those carried out by or on behalf of the Federal agency;
> >
> > (2) those carried out with Federal financial assistance;
> >
> > (3) those requiring a Federal permit, license, or approval; and
> >
> > (4) those subject to State or local regulation administered pursuant to a
> > delegation or approval by a Federal agency.

54 U.S.C. § 300320. "As defined by the Advisory Council regulations, an 'undertaking' includes

'new and continuing projects, activities, or programs and *any of their elements not previously*

*considered under section 106.*'" *McMillan Park Comm. v. Nat'l Capital Planning Comm'n*, 968

F.2d 1283, 1288 (D.C. Cir. 1992) (quoting 36 C.F.R. § 800.2(o) (emphasis added). "[U]nless a

project is federally funded or federally licensed, § 106 does not apply." *Menominee Indian Tribe*

*of Wis. v. U.S. Env't Prot. Agency*, 360 F. Supp. 3d 847, 855 (E.D. Wis. 2018), *aff'd*, 947 F.3d

1065 (7th Cir. 2020).

Judicial review under the APA is expressly conditioned on the existence of a final agency

action, if no other statute provides for this review.  *See Gallo Cattle*, 159 F.3d at 1198.

Plaintiffs, however, fail to identify the particular final agency action taken that they challenge.

The Second Amended Complaint therefore does not place Federal Defendants on notice of the

alleged actions that Plaintiffs contend are final and that they intend to challenge.  Given the long

history of this dispute and Plaintiffs' active involvement in objecting to the Poarch Band's

activities since the late 1980s, Plaintiffs also must identify when these alleged final agency

actions took place.  *See supra*, Section II.A.  For example, if Plaintiffs' complaint is that Federal

Defendants failed to consult with Plaintiffs for construction or excavation of the casino, the

statute of limitations would act as a jurisdictional bar to that claim, as discussed in more detail

below.

The NHPA does not provide for a private cause of action against Federal Defendants and

it may only be enforced by an action brought pursuant to the APA.  *San Carlos Apache Tribe v.

United States*, 417 F.3d 1091, 1094 (9th Cir. 2005).  Therefore, the six-year statute of limitations

applicable to APA actions applies to Plaintiffs' NHPA claims.  *See* 28 U.S.C. § 2401(a); *U. S.

Steel*, 495 F.3d at 1280; *Southwest*, 173 F.3d at 1036.

Plaintiffs allege that the funding for the acquisition of the Wetumpka property, accepting

the property into trust, approving the Poarch Band's gaming ordinance, permitting excavations,

and providing funding for preservation programs all constituted undertakings for which Federal

Defendants failed to consult with them under the section 106 process.  2d Am. Compl. ¶ 291–

31

320.  Setting aside whether these instances even constituted an undertaking as defined by the Act, most of these actions clearly occurred outside of the relevant statute of limitations.  The BIA issued permits for excavation in 2003 and extended it in 2005.  McCune Decl., ¶ 9Ex. G.  The approval of gaming ordinances, 2d Am. Compl. ¶ 289, took place well before 2012.  Further, Plaintiffs allege that Federal Defendants failed to consult with them, but they allege the duty to consult stems from 54 U.S.C. § 302706, which applies only to listing properties on the National Register of Historic Sites, and § 302702, which applies to tribes assuming the functions of a State Historic Preservation Officer.  The property was listed on the National Register in 1980, and Federal Defendants delegated historic preservation duties to the Poarch Band in 1999. Plaintiffs allege that the Federal Defendants should have involved the Advisory Council on Historic Preservation, but also assert that the ACHP responded to claims that the site had been adversely affected in November 2006, more than six years before Plaintiffs brought suit.  These actions are well outside the statute of limitations.

The only activities alleged to be an undertaking that might possibly have taken place within the six years prior to Plaintiffs filing this lawsuit is their allegation of the provision of federal funding to the Poarch Band to implement tribal and federal preservation programs.  2d Am. Compl. ¶ 318.  Despite failing to provide any further details about these programs, such as the date of funding and the funding agency, these activities do not constitute undertakings for NHPA purposes.  Mere provision of funding is not an undertaking.  *See Woodham v. Fed. Transit Admin.*, 125 F. Supp. 2d 1106, 1110 (N.D. Ga. 2000) (finding that "federal financial assistance alone is insufficient to trigger the requirements of NHPA.") (citing *Maxwell St.*

*Historic Pres. Coal. v. Bd. of Trs. of the Univ. of Ill.*, No. 00-C-4779, 2000 WL 1141439, at \*4

(N.D. Ill. Aug. 11, 2000)).

**D.      Plaintiffs fail to allege jurisdiction as to their ARPA claim.**

Plaintiffs have failed to allege that this Court has jurisdiction to hear their ARPA claim

and it must be dismissed.  ARPA, 16 U.S.C. §§ 470aa-mm, sets up a permitting system to

regulate excavation and removal of "archaeological resources" from public and Indian lands.

Archaeological resources are defined as material remains of past human life or activities that are

of archaeological interest.  In order to obtain an ARPA permit, one must satisfy the Federal land

manager that the "activity is undertaken for the purpose of furthering archaeological knowledge

in the public interest."  16 U.S.C. § 470cc(b)(2).  The findings section of ARPA sets forth

Congress's intent to prevent "uncontrolled excavations and pillage" and to facilitate orderly

access to archaeological sites by professionals.  *See* 16 U.S.C. § 470aa(a)(3).  ARPA and its

implementing regulations establish a permitting regime to allow those focused on archaeological

resources to maintain access to those resources on federal land.  Interior has promulgated

uniform regulations for protection of archaeological resources under ARPA.  *See* 43 C.F.R. Pt. 7.

While ARPA does maintain a permitting process, there are exemptions from the permitting

process, which include: "general earth moving excavations," officials carrying out official duties

under a federal land manager's direction, and Indian tribes excavating on their own lands.  *See* 43

C.F.R. §§ 7.5(b)(1) and (c); 16 U.S.C. § 470cc(g)(1).  Here, Plaintiffs assert various violations of

ARPA, all of which fail to state a claim upon which relief may be granted.

Plaintiffs assert that the Federal Defendants failed to get their consent "as *parens patriae*

of the lineal descendants of those buried at the Site and as the tribe with the closest cultural and

religious connection to the Site," before excavation.  2d Am. Compl. ¶ 276.  They also assert that Federal Defendants were required to notify, consult, and get consent from Plaintiffs or ensure that the Poarch Defendants did so.  Generally, Plaintiffs assert that activities were undertaken on the Wetumpka property without a valid ARPA permit, pursuant to an invalid ARPA permit, or in violation of valid ARPA permits.  *See* 2d Am. Compl. ¶¶ 271–79.

Plaintiffs' allegations fail to state a claim because the challenged activities — the Poarch Band's construction of a gaming facility on its land — are specifically exempted by the statute and applicable regulations and no permit is required.  *See* 2d Am. Compl. ¶ 5 (alleging that the Poarch Band is constructing a gaming facility and related construction on the Wetumpka property).  ARPA provides that, "[n]o permit shall be required . . . for the excavation or removal by any Indian tribe or member thereof of any archaeological resource located on Indian lands or such Indian tribe . . . ."  16 U.S.C. § 470cc(g)(1); *see also Attakai v. United States*, 746 F. Supp. 1395, 1411 (D. Ariz. 1990).  In *Attakai*, the court found that the plaintiffs, a neighboring Indian tribe, failed to state a claim for a violation of ARPA because the Indian Tribe did not need a permit "even for excavations of qualifying archaeological resources . . . on its land."  *Id.* (citing 16 U.S.C. § 470cc(g)(1)).

Even though ARPA permits, as noted above, were not required, BIA did issue a permit to Auburn University, dated April 15, 2003.  2d Am. Compl. ¶¶ 108, 114; McCune Decl. ¶ 8, Ex. G.  Any challenge to this permit is outside the statute of limitations and this Court accordingly lacks jurisdiction.  In addition, under 16 U.S.C. § 470cc(f), enforcement of the permit is committed to the discretion of the Federal land manager (including the imposition of civil penalties or a request to Justice to pursue criminal penalties).  Plaintiffs therefore cannot state a

34

claim for relief that the Poarch Band violated the permit.  Accordingly, Plaintiffs cannot plead a cause of action under ARPA and their ARPA claim must be dismissed.

## E.  **Plaintiffs fail to state a claim for RFRA violations.**

Plaintiffs claim that their religious beliefs have been substantially burdened and assert that Federal Defendants thus violate RFRA.  2d Am. Compl. ¶¶ 321–334.  Plaintiffs' allegations do not support a RFRA claim for two reasons.  First, RFRA is not implicated because the Federal Defendants' actions in this case are not the source of what Plaintiffs contend is a substantial burden placed on their free exercise of religion.  Second, the Plaintiffs' allegations in and of themselves, and regardless of whether they are imputed to Federal Defendants, do not state a claim under RFRA because they do not allege a substantial burden on Plaintiffs' exercise of religion.

At the heart of Plaintiffs' RFRA claim are the allegations that the excavation and construction of the casino, parking lots, and other facilities, and operation of the casino on the Wetumpka property prevent Plaintiffs from fulfilling their religious obligations.  2d Am. Compl. ¶¶ 329–33.  Plaintiffs assert that their religion requires them to rebury the remains in accordance with Plaintiffs' traditional religious protocol, and protect the site from improper access and use. *Id.*  In order for RFRA to apply to the Federal Defendants, Plaintiffs must demonstrate that "'there is a sufficiently close nexus between the [Federal Defendants] and the challenged action of [the Poarch Band] so that the action of the latter may be fairly treated as that of the [Federal Defendants themselves].'" *Vill. of Bensenville*, 457 F.3d at 62 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)); *Jackson v. Metro. Edison Co.*, 419 U.S. 354, 351 (1974).  Plaintiffs cannot do so.

35

First, Plaintiffs have not identified any federal actions that substantially burden their religious practice. The *Village of Bensenville* decision is instructive. In that case, plaintiffs, two suburbs, a church, and individuals located or residing near Chicago's O'Hare Airport, challenged under RFRA the Federal Aviation Administration's ("FAA") approval of a plan to expand O'Hare requiring the relocation of a church cemetery. 457 F.3d at 57. The plaintiff groups challenged the decision on the basis that it burdened their exercise of religion and that the runway expansion plan, which required the relocation of a cemetery, was not the least restrictive means of satisfying the government's compelling interest in reducing delays. *Id*. In finding that the burden on religious exercise was not fairly attributable to the FAA, the court examined whether the FAA's role in the specific conduct challenged was "'[m]ere approval of or acquiescence in' the City's plan or whether the FAA 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [FAA].'" *Id.* at 64 (quoting *Blum*, 457 U.S. at 1004). The court noted that "absent government coercion or significant government encouragement of the measure under inspection," *Id.* (quoting *Lunceford v. Dist. of Columbia Bd. of Educ.*, 745 F.2d 1577, 1581 (D.C. Cir. 1984)), the Supreme Court has held that the federal government may not be held responsible for a measure taken by a private actor. *Id.* The court found that it was the City of Chicago that was the cause of any burden on religious exercise because it was the organizer and builder. The FAA exercised no coercive power nor provided significant encouragement for the project. *Id.* at 65.

Likewise, Plaintiffs do not allege that Federal Defendants exercised any coercive power or provided significant encouragement for the construction activities at the Wetumpka property.

36

The specific activities that they complain burden their religious exercise, excavation and construction of facilities by the Poarch Band on its own property are the private actions of the Poarch Band.  Although Plaintiffs cite to Federal Defendants' issuance or non-issuance of permits, that action is only the mere approval of the Poarch Band's excavation on its land, which is insufficient to justify imposition of RFRA's compelling interest test.  *See Vill. of Bensenville*, 457 F.3d at 66; *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53–54 (1999).  Therefore, RFRA is not applicable to Federal Defendants in this case.

Second, even if Federal Defendants' actions could be considered to be significant encouragement of or coercive power over the specific activities of which Plaintiffs complain, Plaintiffs' RFRA claims would still be subject to dismissal because the governmental action asserted does not "substantially burden" Plaintiffs' exercise of religion.  To establish a prima facie RFRA claim, Plaintiffs must allege that a governmental action "substantially burdens" their exercise of religion.  *Navajo Nation v. U.S. Forst Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008).  Under governing Eleventh Circuit precedent, a "substantial burden" is imposed if an action "completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion."  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (citing *Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir.1995)) (applying RFRA, court found no substantial burden when religion did not require particular means of expressing religious view and alternative means of religious expression were available); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1550 (11th Cir. 1993) (finding a substantial burden when regulation had the effect of mandating religious conduct).  "In *Holt v. Hobbs*, the Supreme Court held that a policy

substantially burdens a prisoner's religious exercise if it forces him to choose between engaging in conduct that seriously violates his religious beliefs or facing a serious penalty." *Robbins v. Robertson*, 782 F. App'x 794, 802 (11th Cir. 2019) (quoting *Holt v. Hobbs*, 574 U.S. 352 (2015)).

Plaintiffs allege that the excavation and construction activities burdens the exercise of their religious practices because it will prevent them from performing significant and important religious activities related to the Wetumpka property, including "return[ing] the bodies of their ancestors, along with their funerary objects," to the Wetumpka property. *See* 2d Am. Compl. ¶¶ 325, 329. These allegations do not demonstrate government action has completely prevented from engaging in religiously mandated activity, that they are required to participate in an activity prohibited by their religion, or that their religious conduct is being mandated. Plaintiffs do not claim that the government will impose a serious penalty on them from exercise of their religion. Rather, Plaintiffs' claim that the excavation and construction activities by the Poarch Band effect their emotional experience or diminishes their spiritual fulfillment, which courts have found fall short of the "substantial burden" cognizable under RFRA. *See Navajo Nation*, 535 F.3d at 1069–70; *see also Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002) (A "substantial burden" requires "substantial pressure on an adherent to modify his behavior and to violate his beliefs," including potential sanctions) (citation and internal quotation marks omitted).

The diminishment of a religious experience does not constitute a "substantial burden" under RFRA. *See Navajo Nation*, 535 F.3d at 1069-70; *see also Lyng*, 485 U.S. at 439.[4] In

---

[4] As the Ninth Circuit observed in *Navajo Nation*, "[t]hat *Lyng* was a Free Exercise Clause, not RFRA, challenge is of no material consequence. Congress expressly instructed the courts to look

*Lyng*, the plaintiff tribes challenged the Forest Service's decision to construct a logging road on an area of a National Forest that the Tribes considered sacred and where they alleged they practiced their religion. *Id.* at 442-43. In rejecting the plaintiffs' claims, the Court recognized that the challenged project might "interfere significantly" with the plaintiffs' religious practices, but emphasized that the government's actions neither coerced plaintiffs into violating their beliefs, nor denied them rights or privileges enjoyed by other citizens as a penalty for their religious practices. *Id.* at 447–49. In fact, in *Lyng*, the Supreme Court found no cognizable RFRA claim even if it assumed that the proposed logging road "virtually destroy[ed] the . . . Indians' ability to practice their religion." 485 U.S. at 451–52 (quoting opinion below, *Nw. Indian Cemetery Prot. Ass'n v. Peterson*, 795 F.2d 688, 693 (9th Cir. 1985)). Similarly, in *Navajo Nation*, the Ninth Circuit sitting en banc held that the use of recycled wastewater to create snow for a ski resort located on a peak claimed to be sacred by several Native American tribes was not a "substantial burden" because the plaintiffs were not required to choose between a government benefit and their exercise of religion, or threatened with fines or penalties for practicing their religion. 535 F.3d at 1070-72. In *Snoqualmie Indian Tribe v. FERC*, the plaintiffs alleged that a proposed hydraulic dam would, among other things, deny them access to waterfalls necessary for their religious experiences. 545 F.3d 1207, 1213 (9th Cir. 2008). The court of appeals found that:

> [t]he Tribe's arguments that the dam interferes with the ability of tribal members to practice religion are irrelevant to whether the hydroelectric project either forces them to choose between practicing their religion and receiving a government

---

to *pre-Smith* [*Empl. Div. v. Smith*, 494 U.S. 872, (1990)] Free Exercise Clause cases, which include *Lyng*, to interpret RFRA." 535 F.3d at 1071 n.13 (citing 42 U.S.C. § 2000bb(a)(5)).

benefit or coerces them into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction.

*Id.* at 1214. Based on *Lyng* and *Snoqualmie*, Plaintiffs' allegations of the excavation and construction at the Wetumpka property desecrating and damaging the sacred place for the practitioners of their spiritual beliefs are not germane to the question of whether they are being penalized by the challenged actions or deprived of otherwise available benefits.

**F.    Plaintiffs' Religious Exercise claim should be dismissed.**

Finally, Plaintiffs' Count VIII asserts that if NAGPRA and ARPA are construed in a manner that results in a substantial burden on Plaintiffs' religion, they violate the First Amendment, RLUIPA, and the RFRA. This count should be dismissed for several reasons.

First, Plaintiffs have not identified any final agency action they are challenging. Instead, they appear to be challenging a ruling that this Court might make. This cannot be the basis for a proper claim against the Federal Defendants.

Second, Plaintiffs' religion has not been substantially burdened by Federal Defendants for the reasons discussed above. To the extent that Plaintiffs are prevented from practicing their religion because they cannot access the site or the remains, this is true regardless of Federal Defendants' actions. Even if the land is not properly in trust, the Poarch Band would own the land in fee and would not have to provide Plaintiffs access.

Third, Plaintiffs have not stated a claim for relief under the First Amendment. The First Amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*...." (emphasis added). "As interpreted by the Supreme Court, the Free Exercise Clause of the First Amendment does not prohibit the government from burdening religious practices through generally applicable laws."

40

*Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1143 (N.D. Cal. 2007), *aff'd sub nom. Multi-Denominational Ministry of Cannabis & Rastafari, Inc. v. Holder*, 365 F. App'x 817 (9th Cir. 2010) (citing *Employment Division v. Smith*, 494 U.S. 872, 890 (1990)).  Government programs that have the incidental effect of "mak[ing] it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not violate the Free Exercise Clause.  *Lyng,* 485 U.S. at 450–51.  Plaintiffs do not demonstrate any law prohibiting the exercise of religion.  NAGPRA and ARPA are generally applicable laws aimed at protecting Native American grave sites and archaeological resources, not at the exercise of religion.  Plaintiffs therefore cannot state a claim for which relief can be granted.

RLUIPA also does not provide Plaintiffs a cause of action.  "RLUIPA, by its terms, prohibits only state and local governments from applying regulations that govern land use or institutionalized persons to impose a 'substantial burden' on the exercise of religion."  *Navajo Nation*, 535 F.3d at 1077.  Thus, RLUIPA does not apply to the case at bar, as it neither involves a state or local government nor a land use regulation.

And, as discussed above, Plaintiffs have not stated a claim for relief under the RFRA.  In short, Plaintiffs have failed to state a claim that NAGRPA and ARPA violate their free exercise of religion.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed for lack of jurisdiction under Rule 12(b)(1), and for failure to state a claim under Rule 12(b)(6).

Dated: April 23, 2020          Respectfully submitted,

41

PRERAK SHAH
Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Devon Lehman McCune*
DEVON LEHMAN McCUNE
CO Bar No. 33223
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1487
Fax: (303) 844-1350
devon.mccune@usdoj.gov

OF COUNSEL
Stephen L. Simpson
United States Department of the Interior
Office of the Solicitor

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties entitled to receive notice.

*/s/ Devon Lehman McCune*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |
|---|---|
| MUSCOGEE CREEK NATION, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) No. 2:12-cv-01079-MHT-CSC |
| POARCH BAND OF CREEK INDIANS, et al., | ) Judge Myron H. Thompson |
| Defendants. | ) |

### DECLARATION OF DEVON LEHMAN McCUNE IN SUPPORT OF
### FEDERAL DEFENDANTS' MOTION TO DISMISS

I, Devon Lehman McCune, hereby declare as follows:

1.      I am attorney of record appearing in the above-captioned matter for the Federal Defendants.

2.      Attached hereto as Exhibit A is a true and correct copy of the Advisory Council on Historic Preservation's April 27, 1992, Release on the Federal Historic Preservation Commission Recommends Against Plans to Develop Hickory Ground in Alabama.

3.      Attached hereto as Exhibit B is a true and correct copy of the Advisory Council on Historic Preservation Executive Director's Report Addendum: Termination of Consultation in Accordance with § 800.6(b) of the Regulations of the Council dated April 1992.

4.      Attached hereto as Exhibit C is a true and correct copy of the October 31, 1992, Muscogee (Creek) Nation Ordinance, NCA92-153, Protecting the Cultural, Historical, and Archaeological Integrity of Hickory Ground, Alabama.

5.      Attached hereto as Exhibit D is a true and correct copy of the October 19, 2002, letter from the Hickory Ground Tribal Town to the Poarch Band and the United States Bureau of Indian Affairs regarding claims for remains or objects and cultural property.

6.      Attached hereto as Exhibit E is a true and correct copy of the October 23, 2002, letter from the Muscogee (Creek) National Council to the National Park Service regarding the NPS 1999 Agreement with Poarch Creek.

7.      Attached hereto as Exhibit F is a true and correct copy of an October 1, 2001, Briefing Statement prepared for the Assistant Secretary—Indian Affairs, through the Deputy Commissioner of Indian Affairs, regarding possible violations of ARPA during site preparation for a gaming facility on trust lands of the Poarch Creek Indians in Wetumpka, Alabama.

8.      Attached hereto as Exhibit G is a true and correct copy of United States Department of the Interior Federal Archaeological Permit dated April 15, 2003.

9.      Attached hereto as Exhibit H is a true and correct copy of the May 20, 2002, Revised Report submitted by Donald R. Sutherland, PhD, Bureau of Indian Affairs, regarding inspection of construction activity.

10.     Attached hereto as Exhibit I is a true and correct copy of the March 12, 2008, letter from George Thompson, Mekko Hickory Ground Tribal Town, to the Director of the National Park Service, regarding potential NAGPRA violations.

11.     Attached hereto as Exhibit J is a true and correct copy of the April 21, 2009, letter from Will Shafroth, Acting Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior, to Dr. Jay Gogue, President, Auburn University, regarding potential NAGPRA violations.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 23rd day of April, in Lafayette, Colorado.


*/s/  Devon Lehman McCune*
Devon Lehman McCune

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties entitled to receive notice.

*/s/ Devon Lehman McCune*

# EXHIBIT A

# Advisory Council On Historic Preservation

The Old Post Office Building
1100 Pennsylvania Avenue. NW. #809
Washington, DC 20004

For further information contact:
David Dutton (202) 786-0505 or
Elizabeth Moss (202) 786-0503

April 27, 1992
For immediate release

## FEDERAL HISTORIC PRESERVATION COMMISSION RECOMMENDS AGAINST PLANS TO DEVELOP HICKORY GROUND IN ALABAMA

Washington, DC--

The Advisory Council on Historic Preservation today transmitted to Secretary of the Interior Manuel Lujan its comments concerning plans by the Poarch Band of the Creek Indians, a federally recognized tribe, to develop a community center/museum and bingo gaming operation at Hickory Ground, located near Montgomery, Alabama.  Recommending that the Bureau of Indian Affairs deny approval of the proposed project, the Council encouraged that agency to work with the tribe and the State of Alabama to identify an alternative site for development.  It also recommended that the Department of the Interior resolve conflicting claims among various tribes of the Creek Nation concerning cultural affinity with Hickory Ground and take steps to ensure appropriate treatment of the site and disposition of the human remains it contains.

## About the Council
The Advisory Council on Historic Preservation serves as primary policy advisor to the President and Congress on historic preservation matters.  It also administers the Federal Government's historic preservation regulatory system, commonly known as "Section 106 review," which ensures that historic values are given due consideration in the planning of federally

2

sponsored or assisted projects or actions. The proposed
development at Hickory Ground requires approval by BIA before the
Poarch Band can commence construction.

About Hickory Ground
The historical governmental center of the Upper Creek Nation,
Hickory Ground was acquired in part with funds provided by a
historic preservation discretionary fund administered by the
Department of the Interior. It was then conveyed to the Poarch
Band with a historic preservation covenant to protect the
significance of the site. In 1984, the land was placed in trust
for the tribe by BIA.

Section 106 consultation
In January 1991, BIA provided the Council with a copy of the
proposed development plan and mitigation proposal with a request
for formal review. Subsequent discussions focused on project
goals and objectives including possible alternatives which might
avoid or lessen adverse effects to the site's significant
archeological resources which include human remains. These
discussions proved unsuccessful, however, and on February 28,
1992, BIA terminated consultation and requested the final
comments of the Council.

BIA termination leads to Council panel
Upon learning of BIA's decision, representatives of the 19-member
Council convened to consider the implications of this action as
specified under Federal regulations (36 CFR Part 800, "Protection
of Historic Properties"). At the meeting, panelists heard
presentations from BIA, the Poarch Band, and the Alabama SHPO, as
well as representatives from other tribes within the Creek
Nation, various groups and organizations and the general public.

Recommendations for future action
Based on a review of the facts presented and public testimony,
the panel consequently commended the tribe's goal of economic
independence to be pursued under the provisions of the Indian
Gaming Regulatory Act but found that the proposed undertaking at
Hickory Ground would endanger the significant historic and
cultural values of the National Register-listed site. The panel
also highlighted the need for DOI to resolve under the Native
American Graves Protection and Repatriation Act of 1990 which
tribe within the Creek Nation has closest cultural affiliation
with Hickory Ground. BIA must consider these recommendations
before making further decisions on the project at hand.

Council members who heard the case included historic preservation
experts Avery C. Faulkner, FAIA, panel chairman, and Lucille C.
Dumbrill, Newcastle, Wyoming; and Department of Agriculture
Assistant Secretary for Administration Charles Hilty, Washington,
DC, representing the Secretary of Agriculture.

3

<u>Council advises President, Congress</u>
Established by the National Historic Preservation Act of 1966,
the Advisory Council is composed of four historic preservation
experts, four private citizens, a governor, a mayor, the
Secretaries of Transportation, HUD, Treasury, and the Director of
the (White House) Office of Administration, all appointed by the
President; the Secretaries of the Interior and Agriculture, the
Architect of the Capitol, the president of the National
Conference of State Historic Preservation Officers, and the
chairman of the National Trust for Historic Preservation.  The
Council is headquartered in Washington, DC.

###

EXHIBIT Y

# EXHIBIT B

# Advisory Council on Historic Preservation

## Executive Director's Report

## Addendum

---

### Termination of Consultation
in Accordance with §800.6(b)
of the
Regulations of the Council

---

## The Bureau of Indian Affairs
## United States Department of the Interior

## Proposed Development at Hickory Ground
by the Poarch Band of the Creek Indians
Elmore County, Alabama

A

**Advisory
Council On
Historic
Preservation**

The Old Post Office Building
1100 Pennsylvania Avenue, NW. #809
Washington. DC 20004

**Construction of a Community Center/Museum
and Bingo Gaming Operation at
Hickory Ground, Elmore County, Alabama**

Executive Director's Report

ADDENDUM

The Executive Director's Report identified several issues
critical to this case for which the National Park Service (NPS),
acting on behalf of the Department of the Interior, has a policy
interest, legal responsibility under statute or otherwise, or
serves as a source of technical advice and guidance to the
Federal Government.  These issues are:

> 1.  Enforcement of the preservation covenant that was a
> condition of the Federal grant which assisted with the
> acquisition of Hickory Ground;

> 2.  Possible violation of the Archeological Resources
> Protection Act pertaining to previous excavations at the
> site;
> 3.  Compliance with the requirements of the Native American
> Graves Protection and Repatriation Act in view of the human
> remains present at the site; and

> 4.  Evaluation of the traditional cultural significance of
> Hickory Ground.

To ensure that the Council members would have the benefit of the
opinions of the NPS in its review of the Hickory Ground case, the
Executive Director wrote to Jerry Rogers, Associate Director,
Cultural Resources, NPS, on March 16, 1992, requesting that NPS
provide the Council its position on these issues and, if
possible, to do so by April 3, 1992 (see Executive Director's
Report, Appendix B).   The printing and distribution schedule for
the Executive Director's Report did not allow for inclusion of
the NPS reply, received on April 8, 1992 (attached, Appendix A,
Executive Director's Report Addendum).  Because of the importance

2

of these issues to Council members' deliberations, this addendum provides additional views of the Executive Director with regard to how the NPS response might bear upon the Council review of the Hickory Ground case.

1.  Enforcement of the Covenant (see reply 1, 2, & 3)
NPS confirms that the Federal Government does have the authority to enforce the covenant as it "runs with the land and is enforceable as part of the Indian trusteeship responsibility." With the legal status of the covenant resolved, NPS then examines whether proposed project plans are consistent with the covenant requirements.  Citing standard advice given to State Historic Preservation Officers under such circumstances, NPS states that when conflicts regarding enforcement arise, accommodations should be reached "so long as substantial integrity of the historic property is retained."  NPS apparently did not undertake an independent analysis and accepted BIA's argument that this test is being met by the proposed development plans by the Poarch Band.

Beyond the more general and subjective test of "substantial" integrity suggested by the NPS, it would seem necessary to critically evaluate the proposed development against the specific language of the covenant. The covenant requires that actions by the owner should "preserve the historical and archeological integrity of the property . . . in order to protect and enhance those qualities that made the property eligible for listing in the National Register of Historic Places" (emphasis added). While the NPS apparently does not have sufficient information to answer these questions conclusively, it does acknowledge that the proposed development is "extensive," and that there would be "damage" to Hickory Ground.  NPS further raises the question of delisting the property, concluding that it "is hard to say" whether the extent of damage would be sufficient to justify such an action.

Absent any definitive NPS opinion to the contrary, the Executive Director stands firmly behind conclusions expressed in his report.  The proposed development will significantly threaten both the extensive archeological resources of Hickory Ground as well as the other equally important associative and historical values that qualify it for listing in the National Register. Such actions, therefore, appear to violate the requirements of the covenant.

2.  Archeological Resources Protection Act (ARPA)
(see reply 4 & 5)
NPS determined "there was a violation of Section 6(a)--excavation without a valid permit and possible violation of Section 6(d)--causing another person to violate ARPA, although this latter has

3

not been investigated." Concluding that BIA's effort to avoid
any repetition is "the appropriate remedial step," NPS implies
(though it does not emphatically state) that it is not pursuing
further investigations.

While this ARPA violation is important in understanding factors
influencing previous consultation, it does not appear to have a
direct bearing on the larger issues confronting the Council at
this stage. For the Council's purposes, the NPS reply has
sufficiently clarified questions regarding the status of NPS
investigations.


3.  <u>Native American Graves Protection and Repatriation Act
(NAGPRA)</u> (see reply 6 & 7)
An important dimension to this case is the presence of Native
American human remains at Hickory Ground and the ongoing dispute
between various tribes of the Creek Nation and the Poarch Band
over who has jurisdiction over those remains. The resolution of
this dispute is particularly important, because NAGPRA sets forth
explicit procedures to be followed in the removal and treatment
of Native American human remains on Federal or tribal lands.
Specifically, Section 3(c)(2) of NAGPRA states that the
intentional removal from or excavation of Native American
cultural items from Federal or tribal lands is permitted only if
"such items are excavated or removed after consultation with or,
<u>in the case of tribal lands, the consent of the appropriate (if
any) Indian tribe</u>" (emphasis added). The dispute concerning
which tribe has the closest cultural affiliation with the remains
at Hickory Ground, therefore, must be resolved in order for the
provisions of NAGPRA to be met.

Compliance with NAGPRA could have an significant impact on the
ability of the Poarch Band to proceed with development plans at
Hickory Ground. The Council, therefore, requested the views of
NPS who has been delegated the responsibilities of the Secretary
of the Interior under NAGPRA. In response to the Council's
question of whether the provisions of NAGPRA apply, NPS states
that they do. NPS is uncertain, however, as to which tribal
entity would have jurisdiction over the remains and has asked BIA
to request the Poarch Band to initiate consultation with other
Creeks in Alabama and Oklahoma to determine which band(s) is
traditionally affiliated with the site.

Lacking any indication from NPS that this issue has been
confronted and its resolution initiated, the Executive Director
must reaffirm the imperative nature of recommendation IV in the
Executive Director's Report, i.e., that the Department of
Interior should determine which tribal group has the closest
cultural affiliation with the remains at Hickory Ground if the
existing disagreements among tribal members are to be resolved.

*[Handwritten margin note:] Do we know that a foot, and bone, and fragment a Native Am site was used by blacks & writes als*

4

4. <u>Traditional cultural value of Hickory Ground</u> (see reply 8)
Citing the role of Hickory Ground as the last governmental center
of the Creek Nation in the East prior to forced removal, the
Executive Director asked NPS to provide its views on the possible
traditional cultural significance of the site and to comment on
how the proposed development might specifically impact upon such
values.  This request seemed appropriate given that the
Department of Interior holds special authority under Section 502
of the National Historic Preservation Act, as amended, to advise
the Federal Government on ways to preserve and conserve
"intangible elements of our cultural heritage." In response to
this requirement, NPS has published National Register Bulletin
#38, "Guidelines for Evaluating and Documenting Traditional
Cultural Properties," which was intended to serve as "an aid in
determining whether properties thought or alleged to have
traditional cultural significance are eligible for inclusion in
the National Register" when such properties are being considered
for nomination to the National Register or eligibility under the
Section 106 process (page 2).

NPS chose not to issue a definitive response to the Executive
Director's query as to the traditional cultural value of the
site; it states "we do not know," continuing: "It is possible
given that the land was purchased in 1980 after a long period out
of tribal hands; however, consultations and research on this
question have not occurred."  Absent a conclusive statement, the
Council takes this as acknowledgment that such values are, in
fact, associated with the site and led NPS to list the property
in the National Register in 1980 and provide a Federal grant for
purchase and protection of the site in that same year.  In the
final analysis, no action more clearly indicates the regard of
NPS for the property's significance than the 1980 decision to
assist the State in purchasing the site.

The Executive Director remains convinced that Hickory Ground is a
site of unique importance to the Creek Nation.  The National
Register nomination form for Hickory Ground states clearly that
the site is "primarily significant as the last capital (1802-
1814) of the National Council of the Creek Nation in the Creeks
original homeland...." In Bulletin #38, NPS establishes that a
traditional cultural property is one that is significant:

> "because of its association with cultural practices or
> beliefs of a living community that (a) are rooted in that
> community's history, and (b) are important in maintaining
> the continuing cultural identity of the community."

In the view of the Executive Director, Hickory Ground meets this
test without question.

# Appendix A

 United States Department of the Interior 

NATIONAL PARK SERVICE
P.O. Box 37127
Washington, D.C. 20013-7127

IN REPLY REFER TO:

H32(413)

APR 8 1992

Dr. Robert D. Bush
Executive Director
Advisory Council on Historic Preservation
The Old Post Office Building
1100 Pennsylvania Avenue, NW
Suite 809
Washington, DC 20004

Dear Dr. Bush:

Thank you for your letter of March 16, 1992, concerning the Hickory Ground Site in Wetumpka, Alabama. This letter confirms the key points of our telephone conversation on April 3, 1992. Your letter asked for clarification of eight questions which are provided below. In general, we are limited in how much we can say that is definitive since there are so many unknown or unclear aspects about the site and the proposed action.

1. Do we agree that the proposed development will threaten or damage the Hickory Ground site listed in the National Register of Historic Places? Of course there would be damage. Whether it would be sufficient to delist the property from the National Register is hard to say. The archeological testing and evaluation so far has been appropriately conservative. The results clearly indicate the presence of important archeological village remains and the ethnohistoric analysis of the site's identity is reasonable. The data are insufficient to precisely anticipate the impact of development on the site. However, the proposed development is extensive when one considers the aggregate of buildings, utilities, roads, parking, and landscaping berms and plantings.

2. Does the Federal Government have the authority to enforce the covenant? Yes, the covenant runs with the land and is enforceable as part of the Indian trusteeship responsibility.

3. If the Federal Government has the authority to enforce, do we intend to take any action? The Bureau of Indian Affairs (BIA) has indicated that they believe they are enforcing the covenant. The covenant is not written to prevent the exercise of any discretion in land use. It is a 20 year restriction that ends in the year 2000. In addition to protection of the integrity of the site, it provides the owner with discretion for developing the site so long as this does not threaten or damage the archeological resource. In practice, the enforcement of nearly all covenants is done by State Historic Preservation Offices. The NPS generally has advised States, when these conflicts arise, to reach accommodation so long as substantial integrity of the historic property is retained. In this case, BIA has assured NPS that it is taking this approach.

4. What is the outcome of the Service's investigation of possible Archeological Resources Protection Act (ARPA) violations? In 1991 we determined that there was a violation of Section 6(a) -- excavation without a valid permit, and possibly of Section 6(d) -- causing another person to violate ARPA, although this latter has not been investigated. These results have been provided to BIA.

5. What actions does the Service propose to take regarding the formal investigation? The BIA recognizes that there was a violation of ARPA procedures and they have assured the Service that they have taken steps to avoid any repetition. The circumstances in this case are that the unauthorized excavation was conducted by a professionally qualified archeologist and the work was immediately stopped when this was requested by BIA. Given this, we believe BIA's effort to reinforce the control process is the appropriate remedial step.

6. Does the Native American Graves Protection and Repatriation Act (NAGPRA) apply? Yes.

7. If NAGPRA applies, who can claim cultural affiliation to the Hickory Ground Site? We do not know. We have asked BIA to request that the Poarch Band initiate consultation with other Creeks in Alabama and Oklahoma pursuant to NAGPRA. This would be to identify which band or bands are traditionally affiliated with the site and cannot be limited to federally recognized tribes.

8. Does the Service think that the property has traditional cultural value? We do not know. It is possible given that the land was purchased in 1980 after a long period out of tribal hands; however, consultations and research on this question have not occurred.

I trust this information will be helpful to the Chairman and members of the panel. We will not be able to send someone to the April 16 meeting but appreciate the invitation. Please call on us if we can be of further assistance.

Sincerely

Jerry L. Rogers
Associate Director, Cultural Resources

# EXHIBIT C



NCA92-153

AN ORDINANCE OF THE MUSCOGEE (CREEK) NATION PROTECTING THE CULTURAL, HISTORICAL AND ARCHEOLOGICAL INTEGRITY OF HICKORY GROUND, ALABAMA

Section 100.   Be it enacted by the Muscogee (Creek) Nation in Council Assembled:

Section 101.   Findings:

The National Council finds that an Ordinance is required to protect Hickory Ground in Wetumpka, Alabama, because the cultural, historical and archeological integrity of that site is threatened by actions of the Poarch Band of Creek Indians, pending approval of an Economic Development Plan and a Bingo Management Contract by the U.S. Bureau of Indian Affairs, and said approvals are dependent upon decisions of the National Historic Preservation Commission.

TITLE 1.    SUSPENSION OF GOVERNMENT-TO-GOVERNMENT RELATIONSHIP

Section 110.   Special Finding.    The National Council finds that the Poarch Band of Creek Indians has taken actions which, although in their economic interest, are threatening the cultural, historical and archeological integrity of Hickory Ground, Alabama. Said actions are contrary to the culture, traditions and best interests of all Muscogee people. Said actions have been taken without consultation with the Muscogee Nation nor with the people of Hickory Ground Tribal Town and Hickory Ground Ceremonial Ground, who are located here within the boundaries and within the body politic of the Muscogee Nation. The Nation recognizes the difficult questions which arise when one tribe owns land which contains the cultural artifacts and human remains of another tribe, but feels that when two groups of one culture are involved, and that culture has specific answers to those questions, that to ignore those cultural precedents is to break the only bonds we have in common.

Section 111.   The government-to-government relationship between the Muscogee Nation and the Poarch Band of Creek Indians which was established by Ordinance NCA 83-32 is hereby suspended until such time as the Principal Chief certifies in writing to the Speaker of the National Council that Hickory Ground, in Alabama, is protected by any means recommended in this Ordinance (or otherwise) to restore its cultural, historical and archeological integrity.

TITLE 11.    RECOMMENDATIONS TO THE STATE OF ALABAMA

Section 201.   Special Finding.   The National Council finds that a condition required by the National Park Service of the U.S. Department of the Interior in the grant which funded the purchase of Hickory Ground from the State of Alabama by the Poarch Band of Creek Indians was a preservation covenant, which requires the Poarch Band "to assume the cost of continued maintenance and repair of the property so as to preserve the historical and archeological integrity of the property for 20 years in order to protect and enhance those properties that made the property eligible for listing in the National Register of Historic Places."; and if this property is removed from the National Register of Historic Places, it is no longer protected by Section 106 of the Historic Preservation Act.

Section 202.   The Principal Chief is authorized to notify the Governor of the State of Alabama that this covenant has been broken, and to request said Governor to direct or request the

1

Attorney General of the State of Alabama to negotiate with the Poarch Band for an exchange of properties, said exchange to protect the cultural, historical and archeological integrity of Hickory Ground, Alabama, and protect the economic development interests of the Poarch Band in Class 11 and Class 111 gaming by the Governor of Alabama agreeing to concur in any future finding by the Secretary of the Interior under 25 USC 2719(b)(1)(A) that acquisition of new lands for gaming are in the best interests of the Poarch Band and would not be detrimental to the surrounding community; or, in the alternative, to file legal action to enforce the covenant, or to quiet title to this site in the name of the State of Alabama because of the violation of the covenant, and for the purpose of protecting the cultural, historical and archeological integrity of the Hickory Ground, Alabama, site.

TITLE 111.   CENSURE OF THE BUREAU OF INDIAN AFFAIRS

Section 301.   Special Findings.

A.   The Bureau of Indian Affairs has a legal responsibility to consult with federally recognized tribal governments in matters which affect cultural, historical and archeological resources located upon Indian lands when said resources are culturally or historically related to a tribe which is different from the tribal owner of said lands, including a fair distinction between the beneficial owner of the cultural resources and the actual owner of title.

B.   The Bureau or Indian Affairs has failed to consult with the Muscogee Nation and with the people of Hickory Ground Tribal Town and Hickory Ground Ceremonial Ground regarding the protection of cultural, historical and archeological resources located upon Hickory Ground, Alabama.

Section 302.   The Bureau of Indian Affairs is hereby censured for failing to consult with the Muscogee Nation regarding the protection of cultural, historical and archeological resources located upon Hickory Ground, Alabama.

Section 303.   The Bureau of Indian Affairs is requested to investigate the violations of Section 106 of the National Historic Preservation Act, the Native American Graves Protection and Repatriation Act, the Antiquities Act of 1906, and the Archeological Resources Protection Act at the Hickory Ground site in Wetumpka, Alabama, prior to the approval of any further actions by the Poarch Band of Creek Indians in the development of any gaming facilities at that site.

Section 304.   The Muscogee Nation recommends that the Bureau of Indian Affairs deny approval for any contract or contract agreements which would disturb any human remains or cultural artifacts at the Hickory Ground site in Wetumpka, Alabama, and to deny any mitigation plan which includes the disturbance of any human remains or cultural artifacts.

TITLE IV.   PROTECTION OF CULTURAL, HISTORICAL, AND ARCHAEOLOGICAL RESOURCES ASSOCIATED WITH HICKORY GROUND, ALABAMA

Section 401.   Special Findings.     The National Council finds:

A.   It is in the interests of the Muscogee Nation to protect the cultural, historical and archeological resources associated with Hickory Ground, Alabama, because of its importance as the daughter town of Kusa Town, its importance as a leading White Town of the Muscogee people, its importance as the last Capitol of the Muscogee Nation east of the Mississippi, and its importance as an internment camp created by the armies of the United States as part of the violent removal or our people from Alabama in violation of our Treaty of 1832 with the United States of America.

2

B.    The people of the Muscogee Nation who lived at Hickory Ground, Alabama, did not abandon that site, but were forcibly removed in violation of our Treaty of 1832 with the United States of America.

Section 402.    The Principal Chief is authorized to implement the following actions, in consultation with the recognized Mekko of Hickory Ground ceremonial ground, to preserve the cultural, historical and archeological integrity of the site known as Hickory Ground, Alabama.

A.    To negotiate to acquire title in Hickory Ground, Alabama, from the United States in trust for the Poarch Band of Creek Indians, or from the State of Alabama if said state should recover said property by negotiation or by court action. Said acquisition, and the appropriation of any funds necessary for said acquisition, shall be subject to the approval of the Muscogee Nation by Ordinance.

B.    To file notices, under the Native American Graves Protection and Repatriation Act, for the remains of two or more Muscogee Nation, Hickory Ground Town, individuals to be reinterred in their original burial site at Hickory Ground, Alabama, along with all artifacts associated with said burials.

C.    To file notices, under the Native American Graves Protection and Repatriation Act, for all other archeological resources taken from Hickory Ground, Alabama, to be returned to the Muscogee Nation, for examination by the people of Hickory Ground Tribal Town, or their representative, and the Mekko of Hickory Ground Ceremonial Ground, or his representative, to determine whether any artifacts should be returned to the people or officers, or whether the Muscogee Nation should be the ultimate custodian of these artifacts. The Principal Chief shall make arrangements for a recognized museum to take temporary custody of said artifacts until such time as a tribal museum is constructed and in operation.

D.    To take any other action which is necessary and proper for the protection of the cultural, historical and archeological integrity of Hickory Ground, Alabama, which is consistent with the intent and purpose of this Ordinance, in consultation with the National Council Committee on Health, Social Services and Culture.

E.    To direct the Attorney General to appeal any determination that the Hickory Ground people of the Muscogee Nation are not culturally related to the site at Hickory Ground, Alabama, and therefore the beneficial owners of any cultural artifacts.

F.    The Principal Chief shall request, under the Inter-Governmental Personnel Act, that the U.S. Forest Service provide a 120 day detail for a cultural archeologist to prepare a consulting report on the cultural relationship between the site of Hickory Ground, Alabama, and the people of Hickory Ground Tribal Town and Hickory Ground Ceremonial Ground, including consultation with Daniel Pinton (National Park Service Archeologist, Southeastern Archeological Center), Ned Jenkins (Ranger, Fort Toulouse State Park, Alabama), David Fridel (Southern Methodist University), Kent Reilly (Symbolic Ethnographer, University of Texas), and any other recognized ethnologist familiar with the Hickory Ground, Alabama, site,

Section 403.    Authorization of expenditures.

Mileage and per diem for four members of Hickory Ground Ceremonial Ground and Hickory Ground Tribal Town to be present at the re-interment of the remains which have been unlawfully and irreligiously disturbed. The members shall be picked by the Principal Chief and Hickory Ground Mekko to conduct said services consistent

with the traditional religion of those persons disinterred. These are allowable costs under the 1993 Comprehensive Budget.

**ENACTED** by the Muscogee (Creek) National Council on this 31st day of October, 1992.

**IN WITNESS WHEREOF**, the Presiding Officer of the Muscogee (Creek) National Council has hereto attached his signature.

Clarence Cloud, Speaker
National Council
Muscogee (Creek) Nation

### CERTIFICATION

I, the undersigned, certify that the foregoing is a true extract from the minutes of the Muscogee (Creek) National Council, comprised of thirty-one members with 27 members attending this meeting on the 31st day of October, 1992, and that the above is in conformity with the provisions therein adopted by a vote of 21 in favor, 0 against, 0 abstentions, and that said ordinance has not been rescinded or amended in any way and the above is the signature of the Speaker of the National Council.

Lisa K. Deere, Recording Secretary
National Council
Muscogee (Creek) Nation

### APPROVAL

I, the Principal Chief of the Muscogee (Creek) Nation, hereby affix my signature this 4th day of November, 1992, to the above Ordinance, NCA92-153, authorizing it to become an Ordinance under Article VI, Section VI of the Constitution of the Muscogee (Creek) Nation.

Bill S. Fife, Principal Chief
Muscogee (Creek) Nation



# EXHIBIT D

October 19, 2002


Poarch Band
c/o Eddie Tullis
5811 Jack Springs Road
Atmore, AL 36502


Federal Land Manager
c/o Area Director or Acting Area Director
Eastern Area Office
U.S. Bureau of Indian Affairs
711 Stewart Ferry Pike
Nashville, TN 37214


### SUBJECT: CLAIM FOR REMAINS OR OBJECTS AND CULTURAL PROPERTY


Hickory Ground Tribal Town, by and through its traditional leadership by their signatures below, hereby file claim with the Poarch Band and its Federal Land Manager as outlined below:


1). Hickory Ground Tribal Town is the owner of all remains or objects, including human remains, burial goods, and items of cultural patrimony which have been found in any historic or prehistoric context at the site known as Hickory Ground, located south of Wetumpka, Alabama, and held by the United States in Trust for the Poarch Band and/or by the Poarch Band in fee simple.


2). Hickory Ground Tribal Town claims this ownership as the lineal descendants of the persons therein buried, and also as the lineal descendants of the persons who attended the burials and at that time placed any item within the burial location, and also as the lineal descendants of the clans of Hickory Ground Tribal Town whose particular customs were followed in the making of burials and the

addition of burial goods, and also as the living descendants of and present members of the political entity then and now known as Hickory Ground Tribal Town which has an uninterupted existence from time immemorial through the present date, and also as the Indian Tribe under 25 USC 3002 which is recognized as aboriginally occupying the area in which the objects were discovered, being a traditional tribal town of the Muscogee (Creek) Nation [a federally recognized tribal government] and entitled to observe our customs and traditions as part of our uninterrupted, unterminated and inherent sovereignty, under Muscogee common law, and under Article 2, Section 5 of the Muscogee (Creek) Constitution of 1979 as ratified following approval of the Secretary of the Interior pursuant to the provisions of the Oklahoma Indian Welfare Act of 1936, including Section 9 of said Act.

3). Hickory Ground Tribal Town claims all remains and objects, whether exposed by intentional excavation or by inadvertent discovery.

4). Hickory Ground Tribal Town also claims that the entire site is a Cultural Property as defined by the Native American Graves Protection and Repatriation Act, that the Cultural Property is a common property of and exclusive to the people of Hickory Ground Tribal Town, and acknowledges that, although the extent of the Cultural Property is as yet undefined, the Cultural Property includes not only the entirety of the site owned by the Poarch Band but also extends beyond the ownership of the Poarch Band into neighboring title ownership. One the one hand, the heart of the Cultural Property claimed is the ceremonial ground (sometimes called by scholars a square ground, or, by casual observers, a stomp ground), which is of primary cultural importance to the people of Hickory Ground Tribal Town because of its historical significance to our self-government and to the principal religion of many of the Hickory Ground people; however, on the other hand, the ceremonial ground was only the center of the community, and every other location within the Cultural Property is significant because of its relative location in comparison to the ceremonial ground.

5). Hickory Ground Tribal Town denies that there is any evidence that any different Indian tribe has a stronger cultural relationship with the remains or objects or Cultural Property than does Hickory Ground Tribal Town, denies that any items were excavated or removed after consultation with Hickory Ground Tribal Town, denies that there is any

evidence of consultation with or consent by Hickory Ground Tribal Town, denies that the ownership of any remains and/or object(s) or Cultural Property has been expressly relinquished by Hickory Ground Tribal Town, and denies that any right of possession has been obtained by the Poarch Band or others by the voluntary consent of an individual member of Hickory Ground that had authority of alienation or by the body politic of Hickory Ground Tribal Town.

The Poarch Band and its Federal Land Manager have each failed to file notice as required by the Native American Graves Protection and Repatriation Act of November 16, 1990, P.L. 101-601, 104 STAT., 3048, informing Hickory Ground Tribal Town that the Poarch Band is in knowing possession of remains and objects, whether interred or exposed, and whether exposed by intentional excavation or by inadvertent discovery. Solely because of this lack of legal notice, several persons have advised Hickory Ground Tribal Town that we can only surmise that the Poarch Band is selling, using for profit, or transporting for sale or profit the remains and objects claimed, contrary to 18 USC 1170. We hope this is not the case. However, if the Poarch Band has without consultation unilaterally allowed any human remains to be disturbed or covered by the construction of its gaming facility, utilities, parking or other construction at the Hickory Ground, Alabama, site, it will be our position that by failure to notify Hickory Ground Tribal Town and consult with us, and thereby avoiding the cost of consultation, state-of-the-art nondestructive examination and evaluation, and protection of the human remains and burial goods, the Poarch Band is profiting by failure to make required expenditures for consultation, examination, evaluation, excavation, conservation and repatriation or reinterment.

Furthermore, Hickory Ground Tribal Town objects in the strongest terms to the facts displayed in the written record that not less than three (3) sets of human remains have been excavated and removed from the property without prior consultation with Hickory Ground Tribal Town. We cannot stress enough the cultural and religious ramifications that these actions have had upon us. There is nothing in our culture which is more reprehensible than the opening of a grave, unless it is the removal of the burial and its associated items offered in mourning. It is a central precept of our culture that we believe that this action exposes not only the perpetrator and their associates but also our people, here at Hickory Ground, to danger and disease. If we had been consulted we could have

warned the Poarch Band that this should never take place, and, worse, that if it were to happen that our people have no ceremonies for the re-burial of our dead, such events being outside the experience of this generation and those who came before who have taught us.

We have also been told that the burials of our relatives which were disinterred have been sent to universities for "scientific analysis." We hereby object, and request that the Poarch Band, upon receipt of this Claim, immediately notify the universities in custody of the remains of our relatives to immediately cease and desist from any analysis, scientific or otherwise, or the publication or communication of any analysis made prior to this Claim, without the explicit and written permission of the leadership of Hickory Ground Tribal Town, and that the Poarch Band expend funds for the remains of our relatives to be immediately removed from any university or other institution and temporarily placed in an independent and secure mortuary or mausoleum until our leadership can determine what, if anything, can be done in this unfortunate situation.

Hickory Ground Tribal Town reminds the Poarch Band that "The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this act and shall have the authority to issue such orders as may be necessary to enforce the provisions of this Act [25 USC 3013] {emphasis added}." Hickory Ground Tribal Town will not hesitate to request injunctive, declaratory or equitable relief if necessary, including but not limited to the physical removal of any utility or structure to ascertain the location of any remains or object, and/or the reinterment of human remains within the grave from which they were taken, in a location and manner and by such persons as we may designate.

On April 16, 1992, Comments were issued by a panel of members of the Advisory Council on Historic Preservation on Approval by the Bureau of Indian Affairs of the Proposed Development at Hickory Ground by the Poarch Band of Creek Indians to develop a Community Center/ Museum and Bingo gaming operation.  The panel met pursuant to Section 800.6 (b) of the Council's regulations, " Protection of Historic Properties" (36 CFR Part 800), which implement Section 106 of the National Historic Preservation Act, as amended (16 USC 470f). A federally recognized Indian Tribe may secure private-sector

financing for its projects, but it must obtain Bureau of Indian
Affairs approval within the Department of Interior.  Recommendations
made by this panel were directed to the BIA, but were ignored regarding
determination of the most culturally affiliated Muscogee to Hickory
Ground even though the mention of the Hickory Ground Ceremonial
Ground was made in the initial funding request to purchase the site by
another agency within the Interior Department. Half interest in this
property was to be vested to be Muscogee (Creek) Nation of Oklahoma,
but was never clearly clarified as to why this did not occur or why a
permanent covenant was not placed on the deed, which was brought for
the purpose of protection. The BIA has treated the Poarch Band as a
stand alone Tribe from the beginning and has never considered that the
Muscogee culture does not have bands. The major portion of the
Muscogee people being forcibly removed to Oklahoma seemed out of the
question for the Eastern Area Office of the BIA to consider in their
"Final" decisions on the Hickory Ground. In this period no Regulatory
laws were ever triggered throughout the Department of the Interior's
Agencies. The Chief Ethnologist of the Southeast Region of the National
Park Service, while a Professor of Florida State University, wrote the
Poarch petition for Recognition and never notified the BIA (East or
West) that the other Muskogian Tribal Governments should be included
in the Process of decision-making.  This individual also sits on the
advisory Broad of the NPS certified Historic Preservation Office and has
been repeatedly advised of the Poarch Bands activities, regarding
the Hickory Ground. The strategy of the Poarch Band's Preservation
Office has been to deliberately avoid any consideration of their Gaming
practices from the State Historic Preservation Office (SHPO) of the
State of Alabama on properties having Historic and Prehistoric Cultural
Resources on
them related to the Muscogee culture.  Now, the Poarch Band has
allegedly falsified documents to unknowing Federal Historic
Preservation Officers of the BIA through their Chairman and
Preservation Officer regarding locations of burials on the Hickory
Ground, which has led to BIA approval both by the FHPO and BIA's
Assistant Secretary.  The charge of violation of the Archaeological
Resource Protection Act of 1979(ARPA) was not investigated by the
properly by the BIA FHPO. The Historical and Archaeological Data
Preservation Act of 1974 provides for the preservation of hisorical and
archaeological data that might otherwise be lost as the result of
alterations to the terrain caused by a Federal or federally licensed

activity or program. To carry out the purposes of the Act, HADPA allows for the transfer of up to one percent of the appropriations for the project to the Secretary of the Interior. Unlike Section 106, which mandates consideration of historic properties during planning, HADPA guides the implementation measures once an agency decision is reached. ARPA is designed to protect archaeological resources on Federal and Indian lands and to encourage the exchange of information pertaining to such properties between the Federal Government, Tribal Government and the archaeological community. ARPA strengthens its predecessor HADPA by providing specific permit procedures that all persons, including private applicants as well as State, Tribal (36CFR, part 61) and Federal agencies, must follow prior to excavating or removing any archaeological resources on Federal or Indian lands. Unlike NHPA, ARPA provides both civil and criminal penalties for failure to comply with the ACT. NAGPRA may overlay Section 106 when undertakings occur on Federal or Tribal lands.

Hickory Ground Tribal Town takes this opportunity to remind the Poarch Band that we are a living, breathing group of people with a known and recognized body politic and widely recognized leadership, and that we can be found in the same location we have shared since prior to the U.S. Civil War. We await your response to this claim.

_George Thompson_ (MEKKO)

_Lisa Billie_

_Nora Thompson_

_John Billie_

for Hickory Ground Tribal Town of the Muscogee Nation

cc:   Principal Chief, Muscogee Nation
      Speaker, Muscogee National Council
      Secretary, U.S. Department of the Interior

# EXHIBIT E

October 23, 2002

Mr. Bryan Mitchell
United States Department of the Interior
National Park Service
Preservation Initiatives
1849 C Street
Washington, D.C.   20240

Dear Mr. Mitchell:

The Muscogee (Creek) National Council is making inquiry into questions relating to the Poarch Band of Creek Indians' assumption of the Alabama State Historic Preservation Office responsibilities on the Poarch reservation.

It is my understanding that, in evaluation of the Poarch proposal to assume SHPO responsibilities, the National Park Service, by statute, was required to enter into consultation with federally recognized Native American Nations having historic properties that may be effected by execution of the proposed plan. NPS compliance with this requirement would have resulted in consultation with the Muscogee (Creek) Nation prior to making any determination on the Poarch proposal.

Please provide my office with any and all records that document consultation between the United States National Park Service and the Muscogee (Creek) Nation relevant to the Poarch Band of Creek Indians' proposal to assume responsibilities of the Alabama State Historic Preservation Office on real properties constituting the Poarch Reservation.

While my office is now in possession of the NPS-Poarch Agreement authorizing the Tribe's assumption of SHPO responsibilities, the Muscogee (Creek) National Council will also require a copy of the Poarch Historic Preservation Plan that NPS, by statute, would have reviewed before entering into the Agreement. I would also request any and all records in possession of NPS that document Poarch Band consultation with the Muscogee (Creek) Nation as specified in the NPS-Poarch Band Agreement regarding Poarch undertakings on reservation properties in Elmore and Montgomery counties in the state of Alabama.

I trust you will be able to respond to this request as soon as possible. Thank you in advance for your attention to this matter.

Sincerely,


Wilbur Gouge, Speaker
Muscogee (Creek) National Council


cc:
Perry Beaver, Principal Chief, Muscogee (Creek) Nation
Alan Cook, Alan Cook and Associates

EXHIBIT X

# EXHIBIT F

# BRIEFING STATEMENT

**PREPARED FOR:**  Assistant Secretary - Indian Affairs        **STATE:** Alabama
**THROUGH:**  Deputy Commissioner of Indian Affairs

**SUBMITTED:**  October 1, 2001

---

**ISSUE:**  Possible violation of the Archeological Resources Protection Act during site preparation for a gaming facility on trust lands of the Poarch Creek Indians in Wetumpka, Alabama

**BACKGROUND:**

▸ In 1980, the Poarch Creek Indians (Tribe), then a corporate entity, acquired some 35 acres of land in Wetumpka, Alabama, with the assistance of a substantial Historic Preservation Fund grant, administered through the U.S. Department of the Interior and the Alabama Historical Commission. The property is listed in the National Register of Historic Places as the site of Hickory Ground, the last capital of the National Council of the Creek Nation in the Creek's original homeland. The intent of the grant was to preserve the site, hence the deed included a covenant that for a period of 20 years prohibited any development on the site that might damage its archeological resources.

▸ In 1984, the Tribe was granted federal recognition and the land in Wetumpka taken into trust. By 1987, the Tribe was looking into the possibility of establishing a Bingo facility on the site, so between 1988 and 1993 they sponsored three (3) archeological survey and testing operations to determine if some portion of the site could be developed without damaging archeological resources. These studies found areas where archeological resources were less dense than in others, but no area where such resources were totally absent. Moreover, the site was found to contain Indian burials.

▸ Efforts to develop the site apparently ceased after 1993. Then, on September 19, 2001, the BIA Eastern Regional Director contacted me about a report he had received about possible ground disturbing activity at the Wetumpka site.

▸ *Why might this be of concern to the BIA?*  The covenant prohibiting development that might damage archeological resources at the Wetumpka site elapsed at the end of the year 2000. Despite this, the property remains subject to the <u>Archeological Resources Protection Act of 1979</u> (ARPA) because of its trust status. ARPA is a criminal statute that prohibits anyone from excavating, removing, or damaging archeological resources on Indian trust lands without a federally issued permit. The BIA is responsible for enforcing ARPA on Indian trust lands.

▸ *Has ground disturbing activity actually taken place at the site?*  Yes. See the digital photographs of activity on the site taken by the Alabama State Archeologist on September 18, 2001. [These photographs are attached to the e-mail transmitting this Briefing Statement.]

▸ *Do we have reason to believe that archeological resources at the site have been removed or damaged?* The Tribe has its own Historic Preservation Officer. He informed me that no archeological resources at the site were being affected. In contrast, the archeological reports on the site indicate that there are no areas that are completely free of archeological resources. In addition, the Alabama State Archeologist plus two other professional archeologists employed by the State and familiar with the site told me that the activity they observed was indeed likely to have affected archeological resources. The BIA can only determine this through an on-site inspection.

▸ *BUT, isn't this Tribe exempt from the permit requirements of ARPA?* An Indian tribe that has its own tribal law (as does this one) regulating the excavation or removal of archeological resources on its tribal trust lands is not required to have a federal permit for such excavation or removal. Neither are its members. There are, however, at least three things to consider in interpreting this exemption.

　(1) While the tribal government itself may not need a federal permit, prior solicitor views have held that individuals who do the excavating or removing must have federal permits, unless they are members of the tribe.

　(2) The deferral to tribal law is for excavation and removal in accordance with the purposes of ARPA -- i.e. furthering archeological knowledge in the public interest. Anything else constitutes site damage, and the deferral may not apply to "damage."

　(3) The Tribe may not have followed its own permitting requirements in this case. If such were the case, the ARPA requirement for a federal permit may come back into play.

▸ *What if a tribe has its own, National Park Service-approved, Historic Preservation Officer?* Approval of a Tribal Historic Preservation Officer (THPO) is related to the National Historic Preservation Act. It has nothing to do with ARPA. ARPA is a criminal statute enforced by the federal government. A tribe may designate its THPO to issue tribal archeology permits or to enforce tribal laws on archeological resources, but not as a functionary for the federal statute.

**BIA POSITION:** The only reason for the BIA to become involved with current activity at Wetumpka is the possibility that archeological resources have been removed or damaged in violation of ARPA. Such a violation might have occurred if earth containing archeological resources was moved on the site by a heavy equipment operator who was not a member of the tribe and who did not have a tribal or federal permit. Moreover, even if such an operator did have a tribal permit, the permit might not meet the purposes of ARPA if the operator were not a qualified archeologist.

There appears to be enough reason to believe in this case that an archeological site may have been damaged in violation of ARPA. The formal procedure is for an investigator from BIA Law Enforcement and a BIA archeologist to visit the site to determine if a violation has occurred and, if so, the dollar value of any resulting damage. Due to the possibility of ongoing ground disturbance at the site, this should be done without delay. *If we do not investigate this case, possible violators of ARPA whom we do investigate could claim we are applying the law arbitrarily and capriciously.*

**TRIBAL POSITION:**  The only indication I have of the Tribe's position comes from a telephone conversation I had on September 27, 2001 with their THPO.  He responded with hostility to my request for information about what was happening at the site, saying it was the business of no one but the Tribe.  Tribal law enforcement officers are guarding the site.

My impression is that the Tribe does not believe that ARPA would apply to anything they are doing at Wetumpka, and that the Tribe would not allow anyone from the BIA to inspect the site unless forced to do so by a federal (BIA) law enforcement officer as part of a formal investigation.  *If we do investigate this case, the Tribe is likely to strongly protest and to seek legal recourse to counter our action.*

**RECOMMENDATIONS:**  Notify the Tribal chairman that the BIA has reason to believe a violation of ARPA may have occurred at Wetumpka and that we are sending a BIA law enforcement officer and the BIA's principal archeologist to conduct a formal investigation.  This investigation may well conclude that no violation has occurred, or even that circumstances are such that ARPA does not apply, but is necessary to the BIA's consistency in enforcing the law.  We should approach any investigation with extreme caution, however, because if a violation has occurred, it is not entirely out of the question that individual Tribal members could end up being implicated.

|  | Work number | Room number |
|---|---|---|
| **PROGRAM CONTACT:** Donald Sutherland<br>Archeologist/Federal<br>Preservation Officer | 208-4791 | 4521-MIB |

cc:  Eastern Regional Director
     Director, Office of Trust
      Responsibilities
     Mary Anne Kenworthy
     Office of the Solicitor

EXHIBIT G

# EXHIBIT G

Please use this number
when referring to this permit
No.: ERO-03-01

DI Form 1991 (Sept. 1992)
OMB No. 1024-0037
Approved through 10/31/2001

# UNITED STATES DEPARTMENT OF THE INTERIOR

## FEDERAL ARCHEOLOGICAL PERMIT

To conduct work upon public and Indian lands owned, controlled or held in trust by the Department of the Interior under:
☐ The Archaeological Resources Protection Act of 1979 (P.L. 96-95; 93 Stat. 721, 16 U.S.C. 470aa-mm) and its regulations (43 CFR 7).
☐ The Antiquities Act of 1906 (P.L. 59-209; 34 Stat. 225, 16 U.S.C. 431-433) and its regulations (43 CFR 3).

1. Permit issued to: Auburn University

2. Under application dated: March 20, 2003

3. Name, address and official status of person:
   a. In general charge: John W. Cottier
      6090 Haley Center
      Auburn University
      Auburn, AL 36849-5209

   b. In direct charge: John W. Cottier, plus:
      Craig Sheldon, Jr., Auburn University at Montgomery, AL
      Rex Oggs, Auburn Universiity, Auburn, AL

4. Activity authorized: Excavation, collection and intensive study of a specific site, as described in the attached application; Scope of Work, and Proposal for Phase III Archaeological Investigations ... (etc.)

5. On lands described as follows: A portion of the Hickory Ground property located in the east 1/2 Section 24, Township 18 North, Range 18 East, near Wetumpka, Alabama; held in trust by the United States for the Poarch Creek Indians. Shown on map in attached Scope of Work.

Control No. ERO-03-01

6. For period: April 15, 2003                          to    July 15, 2004

7. University, museum or other scientific or educational institution in which the materials collected under this permit will be deposited for permanent preservation: (A copy of a current, valid curation agreement must be kept on file with the land managing agency (ies)).
Materials to be retained by Poarch Creek Indians.

8. Special conditions: This permit, as checked above, is subject to the provisions of the Archaeological Resources Protection Act of 1979, and its regulations (43 CFR 7), or the Antiquities Act of 1906, its regulations (43 CFR 3), and interdepartmental regulations (25 CFR 261) as to Indian lands. All permits are subject to the provisions of the Native American Graves Protection and Repatriation Act of 1990, the regulations for the curation of Federally-owned and administered archeological collections (36 CFR 79), and the special conditions as listed on the reverse side.

9. Preliminary report: Within approximately 6 weeks of the conclusion of field work, a preliminary report of work performed under this permit, illustrated with representative photographs and listing new and significant collected materials, should be furnished to: Principal Archeologist/Federal Preservation Officer
Bureau of Indian Affairs, 1849 C Street, NW, Washington, DC 20240

10. Signature and title of approving official:

11. Date  4/15/2003

Brian J. Pogue
Deputy Regional Director
Bureau of Indian Affairs
Eastern Regional Office

Paperwork Reduction Act Statement

This information is being collected to report on the results of archeological studies conducted on lands under the jurisdiction of the Department of the Interior. This information will be used to ensure that the work was conducted in accordance with statutory and regulatory requirements and any terms and conditions stipulated in the permit. Response to this request is required to obtain a benefit. The public reporting burden for the preliminary and final reports is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining data, and completing and reviewing the reports. Direct comments regarding the burden estimate or any other aspect of this form to the Information Collection Clearance Officer, National Park Service, 1849 C Street N.W., Room 3317, Washington, D.C. 20240 and the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

8. (CONTINUED) Special conditions are ecked (X) as appropriate to this permit:

a. _x_   This permit shall not be exclusive in character, and there is hereby reserved unto the landowners the right to use, lease or permit the use of said land or any part thereof for any purpose.

b. _   Other institutions may be engaged in archeological research in the general area covered by this permit. In case there should be conflict with respect to a site not specifically designated in a permit, the parties concerned shall reach agreement between themselves as to which shall work the site.

c. _x_   The Department of the Interior, including its bureaus and employees and the landowners and their grantees, shall be held blameless for any and all events, deeds or mishaps, regardless of whether or not they arise from operations under this permit.

d. _x_   Such guidance and protection as is consistent with duties of the Department of the Interior official in charge of the area will be afforded the permit holder and his party.

e. _x_   Transportation in Department of the Interior vehicles cannot be furnished, except in cases where no extra expense to the Department is involved.

f. _x_   All costs shall be borne by the permittee.

g. _x_   Excavation or removal of any Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony must be preceded by consultation with or, in the case of tribal lands, consent of the appropriate Indian tribe or Native Hawaiian organization. Consultation should be conducted with the lineal descendants, tribal land owners, Native American representatives, and traditional religious leaders of all Indian tribes and Native Hawaiian organizations that can reasonably be assumed to be culturally associated with the cultural items or, if the cultural affiliation of the objects cannot be reasonably ascertained, from whose judicially established aboriginal lands the cultural items originated.

h. _x_   All excavated areas shall be restored by filling in the excavations and otherwise leaving the area in as near to original condition as is practicable.

i. _x_   The permittee shall conduct all operations in such a manner as to prevent the erosion of the land, pollution of the water resources, and damage to the watershed, and to do all things necessary to prevent or reduce to the fullest extent the scarring of the lands.

j. _x_   Any findings of mined or processed metals or other treasure or treasure trove in the area covered by this permit are the exclusive property of the landowners, and shall not be disturbed or removed from the site without specific written permission from the Department of the Interior.

k. _x_   Two copies of the final report, a completed NTIS report documentation form (optional form 272), and required information for listing in the National Archeological Database (NADB-Reports) administered by the National Park Service will be submitted to the office issuing the permit: _____ Procedures for submitting the required information for NADB listing are available from the issuing office.

l. _   Before undertaking any work on lands administered by the Bureau of Reclamation, clearance should be obtained from the official in charge of the area.

m. _   Before undertaking any work on lands administered by the National Park Service, clearance should be obtained from the superintendent in charge of the area.

n. _   Before undertaking any work on lands administered by the Bureau of Land Management, clearance should be obtained from the Office of the State Director and from the BLM District Officer in direct charge of the area concerned.

o. _   Before undertaking any work on lands administered by the Fish and Wildlife Service, clearance should be obtained from the Office of the Regional Director and from the Refuge Manager in charge at the appropriate Fish and Wildlife Refuge. Possession or use of firearms in such areas is prohibited.

p. _   Before undertaking any work on Indian tribal lands or on individually owned trust or restricted Indian lands, clearance should be obtained from the Bureau of Indian Affairs official having immediate jurisdiction over the property.

q. _x_   Other special conditions continued on attached sheet(s). *SEE PAGE 4 OF ATTACHED SCOPE OF WORK.*

# EXHIBIT H

MAY 2 0 2002

# REVISED REPORT

INSPECTION OF CONSTRUCTION ACTIVITY ON TRUST LANDS OF THE
POARCH CREEK INDIANS, WETUMPKA, ALABAMA, TO DETERMINE IF
SUCH ACTIVITY MIGHT HAVE OCCASIONED A VIOLATION OF THE
ARCHEOLOGICAL RESOURCES PROTECTION ACT OF 1979

SUBMITTED BY

Donald R. Sutherland, PhD
Principal Archeologist/Federal Preservation Officer
Bureau of Indian Affairs

## INTRODUCTION

This report revises a report of the same title, originally submitted to the Bureau of Indian Affairs'
(BIA) Eastern Regional Director in October, 2001. The revisions are in response to a letter of
January 28, 2002, from Craig. T. Sheldon, Associate Professor of Anthropology, Auburn University
Montgomery, to Thomas Maher, Alabama State Archaeologist. Mr. Sheldon pointed out that the
map location shown in the report for the ground disturbing activity on Poarch Creek trust lands at
Wetumpka was incorrect. Although Mr. Sheldon was right about the error, the location he gave for
the activity was also incorrect. The actual location, as shown in this revised report, was provided
by the Tribal Development Planner for the Poarch Creek Indians, Joel Lambert, on March 28, 2002.

The corrected location for the ground disturbing activity on 1/4 acre of Indian trust land is, as
described in this revised report, in an area where archeological resources are more abundant and
human burials more proximate than the location identified in the original report. To establish a
violation of the Archeological Resources Protection Act (ARPA) or of the Native American Graves
Protection and Repatriation Act (NAGPRA), however, it would still be necessary to show that these
archeological resources or burials had been removed or damaged, and that they had been removed
or damaged by this particular activity. With respect to these factors, neither the relative abundance
of archeological resources nor the proximity of burials changes the findings of this report.

## CHRONOLOGY

September 19, 2001 – Contacted by the BIA Eastern Regional Director about a report he had
received about possible ground disturbing activity on trust lands of the Poarch Creek Indians in
Wetumpka, Alabama. The land contains the site of Hickory Ground, an historic Creek Indian town.
The property is listed in the National Register of Historic Places.

September 24, 2001 – Contacted (after unsuccessful attempts on September 20 and 21, 2001) Stacy
Hathorn, Staff Archeologist for the Alabama Historical Commission, for any information she might
have about such activity. I did this because her office is located in Montgomery, Alabama, some
15 miles from Wetumpka, which put her in a convenient position to provide direct professional
observation of the site. She informed me that the Alabama State Archeologist, Tom Mayer had

observed ground disturbing activity at the site on September 18, and had taken digital photographs. She e-mailed me a selection of the photos taken on September 18, 2001.

– Later this day, Tom Maher called me to describe what he had observed. Both he and Ms. Hathorn were convinced that the ground disturbing activity had affected archeological resources at Hickory Ground. For further confirmation, I contacted a professional archeologist employed at Fort Toulouse State Historic Site, located near Wetumpka. He, too, had observed the ground disturbing activity and believed it likely to have affected archeological resources. I do not recall this individual's name, but his associate, Greg Rinehart (sp.?), former Staff Archeologist with the Alabama Historical Commission, was with him during the conversation.

IN SUM: By the close of business on September 24, 2001, it appeared to me to be possible that archeological resources on Indian trust lands might have been removed or damaged in violation of the ARPA.

September 25, 2001 – Consulted with Mary Anne Kenworthy, Attorney, Indian Affairs Division Department of the Interior, Office of the Solicitor, to determine if a violation of ARPA or other federal laws was legally possible in the context presented. We concluded that the only way to be certain whether a violation had occurred was to visit the site.

September 26, 2001 – Contacted Bill Day, Tribal Historic Preservation Officer for the Poarch Creek, to obtain details on the ground disturbing activity at Wetumpka, to determine if any of the activity might have required a tribal or an ARPA permit, and, if so, to learn if any permit had been issued. He informed me (1) that as far as he knew, no archeological resources had been excavated or removed from trust lands, but he was going to Wetumpka to determine if this was so; and (2) that he had not issued a tribal archeology permit, nor had he reviewed any application for an ARPA permit in connection with the ground disturbing activity. He also intimated to me that the Tribe would not welcome any outside investigation of what he described as a Tribal matter and that the Tribe had Tribal police posted to keep people (which I supposed to include the BIA) off of the site.

September 27, 2001 – Consulted with Mary Anne Kenworthy over options for investigating the situation at Wetumpka. This situation was that we had reason to suspect that archeological resources may have been damaged, or removed from trust lands, by a non-Tribal construction contractor who did not have a Tribal archeology or an ARPA permit, but that we would not be allowed on site to investigate informally. Our options were (1) to go to Wetumpka and view the ground disturbing activity without entering the property or (2) to conduct a formal investigation with BIA law enforcement, which would force access to the property. Though we did not prefer option (2), we decided to discuss the situation with BIA Law Enforcement.

September 28, 2001 – Briefed BIA Law Enforcement, obtained a pledge of assistance, and began planning for travel to Wetumpka for the purpose of conducting a formal, ARPA investigation.

– Briefed Deputy Commissioner of Indian Affairs on the situation and options. She believed the Assistant Secretary - Indian Affairs should decide how to proceed on the matter, so asked me to prepare a briefing for him, to include a recommendation that he contact the Tribal Chairman regarding a formal ARPA investigation.

October 1, 2001 – Contacted by Brian Pogue, Eastern Regional Assistant Director, to inform me that a law suit on Wetumpka had been filed against the Poarch Creek and that the Tribal Chairman, Eddie Tullis, had invited us to inspect the site. This occurred before the above referenced briefing reached the Assistant Secretary, and opened the way for us to visit the site without involving BIA Law Enforcement.

October 2, 2001 – Made arrangements for travel to Wetumpka.

October 3, 2001 – En route to Wetumpka.

October 4, 2001 – Met on the Poarch Creek trust lands at Wetumpka at about 11:30 a.m. with Brian Pogue, Eddie Tullis, Bill Day, and a tribal administrative assistant and the tribal attorney, whose names I do not recall. Inspected ground disturbing activity.

May 20, 2002 – Report revised..

FINDINGS

1.      Almost all of the ground disturbing activity that had been reported at Wetumpka occurred on fee land belonging to the Poarch Creek. This land is an approximately 50 yard-wide strip, bordered on the north by the trust land and on the south by a private development of multi-unit condominiums. According to Chairman Tullis, excess dirt from the construction of the private development was deposited without the Tribe's permission on the fee land in the mid 1990's. The ground disturbing activity on the fee land consisted of stripping surface vegetation, spreading the deposited dirt over the property and evening the surface. The ground elevation of this property is noticeably higher than that of the adjacent properties. (See Attachment 1, photos.)

2.      The only activity that occurred on trust land was confined to an approximately 100X100 foot square area (about 1/4 acre), bordered on the south side by the fee land. Vegetation consisting of four year-old scrub trees was first cleared from the area, then, according to Chairman Tullis, an approximately 3 foot layer of fill taken from the fee land was spread and leveled over the area. While I did not conduct tests to verify the thickness of this fill, the area is clearly elevated /built up above the adjacent trust land. (See Attachment 2, lower photo.) Notwithstanding, for reasons stated in the next paragraph, the thickness of the fill makes little difference with respect to possible damage to archeological resources.

A metal building consisting of six 60X12 foot, adjoined mobile units was moved onto this prepared area on trust land. The units remain on their wheeled carriages, which are further supported by cinder block piers on 2X2 foot flat concrete slabs that are resting on the surface of the fill. Neither the wheels nor the slabs supporting the piers penetrate more than four inches into the fill, and they do not penetrate at all into the original ground surface. (See Attachment 2, photos.) In fact, even if the building site were not covered with fill, the piers would not penetrate through the already-disturbed (by cultivation, previous archeological testing, etc.) plow zone. Archeological testing in and adjacent to the area has shown the plow zone here to be at least 8 inches thick.

There has been no excavation relating to utilities, or for any other purpose on the trust land. According to Chairman Tullis, parking lots and ground disturbing activity for the connection of

utilities associated with the building will all be located on the <u>fee</u> land. A mobile construction office and a dumpster currently located near the area are also on fee land.

3.    Information on the nature and condition of archeological resources previously identified from within the 100X100 area of trust land comes from the following sources.

Mueller, Diane Silvia. 1992. Report on the Archaeological Investigations at the Hickory Ground (1EE89), Elmore County, Alabama, Part II: Parcel 21 and a Planned Road and Sewer Line.

Sheldon, Craig T., John W. Cottier and Gregory A. Waselkov. 1988. An Initial Report on the Subsurface Testing of a Portion of the Creek Indian Property at Hickory Ground.

Sheldon, Craig T., John W. Cottier and Gregory A. Waselkov. 1990. Additional Archaeological Investigations of the Hickory Ground Site, Elmore County, Alabama.

4.    Attachment 3 depicts the archeological investigations that have occurred in the area where the mobile-unit building is located. Open lines show where in 1987 and 1988 Sheldon, <u>et.al</u>. broke the ground surface with a tractor drawn disc and collected the artifacts that were thus exposed. Filled lines show where they used a blade and hand excavation to strip the plow zone to reveal intact "features" from human activity. These stripped areas were some 11 feet wide and 11 inches deep.

The test area (#4) running east-west in the place where the mobile-unit building is located revealed twenty post molds and two pits. One of the pits contained Creek pottery, an iron hoe, a knife and fork and a ceramic pipe. The other contained Creek pottery, charred bark and peach pits, faunal remains and bricks. Artifacts recovered from the portions of the disced transects crossing the building site are under Sheldon, <u>et.al</u>.'s Field Specimen Catalogue numbers 101-103, 112-114 and 124-126. Sheldon, <u>et.al</u>. do not tabulate the kinds and quantities of artifacts for those catalogue numbers. Neither do they display distributional data for artifacts for that portion of the Hickory Ground site, except for Figure 9 in their 1988 report, which shows the density of aboriginal ceramics from surface collections to be relatively low there.

In 1990, Mueller (1992) conducted tests on the fee land south of the mobile-unit building site. She encountered and excavated a historic period house structure and four (4) adult burials between 25 and 50 feet south of the building site, and recovered about 1500 small artifacts from surface collections and test trenches in the two 50X50 foot units adjacent to the site. Approximately one-third of the artifacts were fragments of aboriginal pottery, and another third, flakes from tool manufacture. The remaining third included fragments of brick/mortar, glass, metal, and fire-cracked rock, plus some 35 functionally defined objects. Two of these were gun flints. The rest were unspecified stone "tools."

5.    The mobile-unit building is clearly located in an area of the Hickory Ground site that is likely to contain important archeological resources. Despite that, there is no physical evidence that archeological resources were removed from Indian trust lands *by the siting of this building*. It would be virtually impossible to find artifacts that could be shown to have once been located within the 1/4 acre prepared for the building AND to have been removed by this preparation activity. Both are prerequisite for establishing an ARPA violation.

There is also no evidence that archeological resources in the area where the mobile-unit building is located were or may be damaged. Because of the layer of fill, which rests on top of several inches of plow zone soil, intact archeological features located below the plow zone would not be affected. As noted earlier, the piers supporting the mobile unit building have small footprints and do not penetrate even into the plow zone. Any archeological resources located beneath the building site would become less accessible to researchers, but not irreversibly so, as the mobile units are removable.

There is, further, no evidence that archeological resources in the plow zone on the area where the mobile-unit building is located were damaged *by the siting of this building*. The area had been disturbed by repeated clearing and cultivating in the decades before its acquisition by the Poarch Creek, and was subject to intensive surface collecting during previous archeological investigations. The only possible effect on the plow zone from site preparation would be from the uprooting of scrub trees while clearing the site and from the wheels of heavy equipment during the initial deposition of fill. These activities could have displaced or fragmented artifacts, but not more so than would previous clearing or cultivation. In any case, as noted earlier, it is probably impossible to produce artifacts that could be proven both to have come from the area prepared for the building and to have been displaced or damaged specifically by this preparation activity.

6.    There is no demonstrable evidence that a violation of ARPA occurred on trust lands of the Poarch Creek Indians in Wetumpka, Alabama, hence no reason to launch a formal investigation or otherwise pursue the matter.

7.    There is no evidence that a violation of NAGPRA occurred on trust lands of the Poarch Creek Indians in Wetumpka, Alabama. Though Mueller (1992) found four burials on fee land and Sheldon, et. al. (1988), one on trust land that were located within 60 feet of the mobile-unit building site, no human remains or cultural items, as defined in NAGPRA, were visible in or around the area prepared for the building. More important from the standpoint of establishing any NAGPRA violation, none exist that can be shown to have come from this area. In addition, for the reasons stated in the second paragraph under Finding 5, it is highly unlikely that any burials that might be present would have been physically affected by site preparation for and placement of the building.

Attachment 3 shows the locations of the above referenced burials, plus those of others found to date on both the trust and fee lands. In addition to the sources listed earlier, information on these burials came from the following sources:

Mueller, Diane Silvia. 1991.  A Summary of the Archaeological Mitigation Completed From January Through March, 1991, of Areas A and C at the Hickory Ground Site, Elmore County, Alabama.

Mueller, Diane Silvia. 1992.  Report on the Archaeological Investigations at the Hickory Ground (1EE89), Elmore County, Alabama (1990-1991), Part I: Areas A and C.

# EXHIBIT I

**GEORGE THOMPSON**
**Mekko, Hickory Ground Tribal Town**
P.O. Box 903
Henryetta, Oklahoma  74437
918-650-0820

March 12, 2008

Director
National Park Service
8149 C Street NW
Washington, DC 200240

Dear Director:

My name is George Thompson, and I am Mekko of the traditional tribal town of Hickory
Ground, Ocevpofv, a traditional town (Etvlwa) within the Muscogee (Creek) Nation
(MN). The people of Hickory Ground tribal town in Oklahoma intend to pursue
NAGPRA claims as lineal descendants to protect the Hickory Ground sacred site in
Alabama. Under MN tribal law, NCA 06-185 (Attachment #1), I am authorized to pursue
claims in the protection of the Hickory Ground sacred site in Alabama with the use of
funds appropriated from Muscogee (Creek) Nation.

I allege that Auburn University, Department of Sociology, Anthropology and Social
Work, 7030 Haley Center, Auburn, Alabama 36849, Tele. 334-844-5049 has failed to
comply with the requirements of the Native American Graves Protection and Repatriation
Act (NAGPRA), and I am bringing this allegation to the attention of the Secretary of the
Interior through you, and in writing, pursuant to the NAGPRA regulations concerning
civil penalties (43 C.F.R. 10.12).

I have read the definition of the "receives Federal funds," at 43 C.F.R. 10.2(a)(3)(iii), and
I believe that Auburn University receives Federal funds.  The facts that lead me to this
belief are:

    1.  Title IX funds are received by Auburn University

I have read the definitions of "possession" and "control," at 43 C.F.R. 10.2(3)(i) &(ii) , as
well as the definitions of the types of Native American cultural items covered by
NAGPRA, at 43 C.F.R. 10.2(d)(1)-(4), and I believe that the Auburn University has
possession or control of:

1

EXHIBIT P

1.  57 or more sets of human remains and possibly more excavated from the Hickory Ground site in Wetumpka, Alabama.

2.  Associated funerary objects associated with the 57 sets of remains and possibly more associated and non-associated objects.

The facts that lead me to this belief are:

1.  On May 9, 2006 at the invitation of the Poarch Band of Creek Indians (Poarch Band), representatives from the Muscogee (Creek) Nation and Hickory Ground tribal town traveled to Wetumpka, Alabama to discuss reinterment of 57 or more sets of human remains. Archaeologists from Auburn University extended an invitation to people at the meeting who wanted to view the remains that the archaeologists placed in white plastic buckets and moved to a trailer at the site.

2.  On August 23, 2007 , a committee representing the Hickory Ground tribal town from Muscogee Nation in Oklahoma, made a research visit to the Auburn University. (Attachment #2-Report) Field notes and burial records were shared. (Attachment #3 –Copies of field notes)

3.  As direct lineal descendants, the Hickory Ground people regard Hickory Ground in Alabama as an ancient and historical sacred site which is now held as trust property by the Poarch Band of Creek Indians. For reinterment plans, it is imperative that associated funerary objects be identified as a part of the burial process. During the Aug. 23, 2007 research visit to Auburn University, the committee was briefed by archaeologists from the Auburn Department of Sociology, Anthropology, and Social Work advising that 56 remains were being held in a trailer at the Hickory Ground site in Wetumpka, Alabama. Professor Sheldon informed us a final inventory had not been completed.

I have read the definition of "failure to comply" at 43 C.F.R. 10.12(b)(1)(i)-(viii), and I believe that Auburn University, Department of Sociology, Anthropology, and Social Work has failed to comply with specific provisions of NAGPRA because it:

1.    failed to comply with 43 CFR 10.12(b)(1)(i) - After November 16, 1990, sells or otherwise transfers human remains, funerary objects, sacred objects, or objects of cultural patrimony contrary to provisions of the Act, including, but not limited to, an unlawful sale or transfer to any individual or institution that is not required to comply with the Act;

2.    failed to comply with 43 CFR 10.12(b)(1)(ii) - After November 16, 1993, has not completed summaries as required by the Act;

2

3.    failed to comply with 43 CFR 10.12(b)(1)(iii) - After November 16, 1995, or the date specified in an extension issued by the Secretary, whichever is later, has not completed inventories as required by the Act;

4.    failed to comply with 43 CFR 10.12(b)(1)(iv) - After May 16, 1996, or 6 months after completion of an inventory under an extension issued by the Secretary, whichever is later, has not notified culturally affiliated Indian tribes and Native Hawaiian organizations;

5.    failed to comply with 43 CFR 10.12(b)(1)(v) - Refuses, absent any of the exemptions specified in Sec. 10.10(c) of this part, to repatriate human remains, funerary object, sacred object, or object of cultural patrimony to a lineal descendant or culturally affiliated Indian tribe or Native Hawaiian;

6.    failed to comply with 43 CFR 10.12(b)(1)(vi) - Repatriates a human remains, funerary object, sacred object, or object of cultural patrimony before publishing the required notice in the Federal Register;

7.    failed to comply with 43 CFR 10.12(b)(1)(vii) - Does not consult with lineal descendants, Indian tribe officials, and traditional religious leaders as required;

8.    failed to comply with 43 CFR 10.12(b)(1)(viii) - Does not inform the recipients of repatriations of any presently known treatment of the human remains, funerary objects, sacred objects, or objects of cultural patrimony with pesticides, preservatives, or other substances that represent a potential hazard to the objects or to persons handling the objects.

The facts that lead me to this belief are:

1.    Auburn University in violation of 43 CFR 10.12(b)(1)(i) transferred human remains after November 16, 1990 from the University to be held at the Hickory Ground site in a trailer on trust property owned by the United States for the benefit of the Poarch Band of Creek Indians. The extent to which the Band is required to comply with the Act is problematic.

2.    Auburn University in violation of 43 CFR 10.12(b)(1)(ii) did not complete summaries of its Hickory Ground holdings of human remains and objects after November 16, 1993.

3.    Auburn University in violation of 43 CFR 10.12(b)(1)(iii) did not complete inventories as required by the NAGPRA after November 16, 1995.

3

4.  Auburn University in violation of 43 CFR 10.12(b)(1)(iv) did not complete an inventory after May 16, 1996 nor was it issued an extension by the Secretary and has not notified Hickory Ground, a culturally affiliated tribe.

5.  Auburn University in violation of 43 CFR 10.12(b)(1)(v) has specified to the Committie formed by Mekko Thompson that it is under contract to the Poarch Band of Creek Indians and only reports to its clients. It does not repatriate to Hickory Ground tribal town , a culturally affiliated Indian tribe.

6.  Auburn University in violation of 43 CFR 10.12(b)(1)(vi) has never published a notice of repatriation in the Federal Register.

7.  Auburn University in violation of 43 CFR 10.12(b)(1)(vii) has never consulted with Hickory Ground tribal town, a culturally affiliated tribe with direct lineal descendants.

8.  Auburn University in violation of 43 CFR 10.12(b)(1)(viii) did not inform Poarch Band of Creek Indians of any known treatment of human remains.

Aside from the above facts, I do not have knowledge that written materials exist pertaining to Auburn University's receipt of federal funds . I am not providing you with any written materials as to Auburn University's receipt of federal funds.

Aside from the above facts, I have knowledge that written materials exist pertaining to Auburn University's possession or control of Native American cultural items. I am providing you with some of the written materials I know to exist. See Attachment #3.

Aside from the above facts, I have knowledge that written materials exist pertaining to Auburn University's failure to comply with specific provisions of NAGPRA. I am providing you with some of the written materials I know to exist. See Attachment #3.

I trust you will expeditiously forward this written allegation that the Auburn University has failed to comply with the requirements of NAGPRA to the enforcement coordinator in the National NAGPRA Program for consideration. Thank you.

EXHIBIT Q

# EXHIBIT J



United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

APR 2 1 2009



Dr. Jay Gogue
President
Auburn University
107 Samford Hall
Auburn, AL 36849

Dear Dr. Gogue:

Pursuant to 25 U.S.C. 3007 and 43 C.F.R. 10.12 (c), this letter serves as notice to Auburn University that eight allegations (**0820-0827_AUBURN**) concerning Auburn University's failure to comply with the requirements of the Native American Graves Protection and Repatriation Act (NAGPRA) were filed with the Department of the Interior. Based on an investigation conducted in August 2008, none of these eight allegations has been substantiated. Additionally, the Department of the Interior wishes to advise Auburn University that the National NAGPRA Program is ready to assist the University in otherwise achieving NAGPRA compliance.

George Thompson, a resident of Mekko, Hickory Ground Tribal Town, alleged that:

1. Auburn University had control of Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony from the Hickory Ground site, located in or near Wetumpka, Alabama;

2. After November 16, 1990, Auburn University transferred human remains, funerary objects, sacred objects, or objects of cultural patrimony from the Hickory Ground site contrary to the provisions of NAGPRA, which transfer constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(i) (**0820_AUBURN**);

3. After November 16, 1993, Auburn University had not completed summaries for cultural materials from the Hickory Ground site, which omission constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(ii) (**0821_AUBURN**);

4. After November 16, 1995, or a date specified in an extension issued by the Secretary of the Interior, Auburn University had not completed inventories for human remains from the Hickory Ground site, which omission constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(iii) (**0822_AUBURN**);

5. After November 16, 1995, or six months after completion of an inventory under an extension issued by the Secretary of the Interior, Auburn University had not notified culturally affiliated Indian tribes of the completion of its inventory for human remains from the Hickory Ground site, which omission constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(iv) (**0823_AUBURN**);

6. Auburn University refused, absent any of the exemptions specified in 43 C.F.R. 10.10(c), to repatriate human remains, funerary objects, sacred objects, or objects of

cultural patrimony from the Hickory Ground site to a lineal descendant or culturally affiliated Indian tribe, which refusal constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(v) (**0824_AUBURN**);

7. Auburn University repatriated human remains, funerary objects, or objects of cultural patrimony from the Hickory Ground site before publishing the required notice in the Federal Register, which omission constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(vi) (**0825_AUBURN**);

8. Auburn University did not consult with lineal descendants, Indian tribe officials, and traditional religious leaders concerning NAGPRA items from the Hickory Ground site, which omission constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(vii) (**0826_AUBURN**);

9. Auburn University did not inform the recipients of repatriated NAGPRA items from the Hickory Ground site of known treatments of the items with pesticides, preservatives, or other substances representing a potential hazard to the objects or to persons handling the objects, which omission constitutes a failure to comply with the requirements of NAGPRA, as set forth at 43 C.F.R. 10.12 (b)(1)(viii) (**0827_AUBURN**).

The investigation found that:

1. The Hickory Ground site, located in or near Wetumpka, Alabama is owned by the Poarch Band of Creek Indians (Poarch Band Creek);

2. The Poarch Band Creek contracted with Auburn University to carry out cultural resource management work at the Hickory Ground site, including the curation of cultural materials removed from the site;

3. The Poarch Band Creek did not transfer any legal interest in the cultural materials from the Hickory Ground site to Auburn University;

4. Auburn University did not repatriate or otherwise transfer NAGPRA items from the Hickory Ground site to any party contrary to the provisions of NAGPRA.

Based on the above findings of fact, I have made the following determinations with respect to the eight allegations concerning Auburn University's failure to comply with the requirements of NAGPRA:

1. As the Poarch Band Creek did not transfer any legal interest in the cultural materials from the Hickory Ground site to Auburn University, the university does not have a sufficient legal interest in any NAGPRA items from the Hickory Ground site to treat them as part of its collection for purposes of NAGPRA. Thus, Auburn University does not or did not have possession or control of NAGPRA items from the Hickory Ground site, as the terms "possession" and "control" are defined at 43 C.F.R. 10.2 (a)(3)(i) & (ii). Consequently, the following allegations have not been substantiated: **0821_AUBURN**, **0822_AUBURN**, **0823_AUBURN**, **0824_AUBURN**, and **0826_AUBURN**.

2. As Auburn University did not repatriate or otherwise transfer NAGPRA items from the Hickory Ground site to any party contrary to the provisions of NAGPRA, the following allegations have not been substantiated: **0820_AUBURN**, **0825_AUBURN**, and **0827_AUBURN**.

TOTAL P.04

You may contact NAGPRA Civil Enforcement Coordinator David Tarler, at (202) 354-2108, if you have any questions regarding this matter.  If you seek technical assistance on NAGPRA compliance, you may contact National NAGPRA Program Manager Sherry Hutt, at (202) 354-1479.

Sincerely,

Will Shafroth
Acting Assistant Secretary for Fish
and Wildlife and Parks

cc:    George Thompson, Mekko, Hickory Ground Tribal Town
       John W. Cottier, Associate Professor, Department of Sociology, Anthropology
       and Social Work, Auburn University
       Robert Thrower, Tribal Preservation Officer, Poarch Band of Creek Indians

Enclosures:    25 U.S.C. 3001-3013
               43 C.F.R. Part 10

EXHIBIT B

TAB 201

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| MUSCOGEE CREEK NATION, *et al.*,　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　Plaintiffs,　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| vs.　　　　　　　　　　　　　　　) | Civil Action Number: |
| 　　　　　　　　　　　　　　　　) | 2:12-cv-01079-MHT-CSC |
| POARCH BAND OF CREEK INDIANS, *et* ) | |
| *al.*,　　　　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　Defendants.　　　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |

**TRIBAL DEFENDANTS' MOTION
TO DISMISS SECOND AMENDED COMPLAINT**

COME NOW Defendants Poarch Band of Creek Indians (PBCI), PCI Gaming Authority, d/b/a Wind Creek Hospitality (PCI Gaming), Stephanie A. Bryan, Robert R. McGhee, Amy Bryan, Charlotte Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells, in their official capacities and members of the PBCI Tribal Council, Larry Haikey, in his official capacity as the PBCI Tribal Historic Preservation Officer, and Westly L. Woodruff, Stuart Mark Altman, Venus McGhee Prince, Teresa E. Poust, and Timothy A. Manning, in their official capacities as board members of PCI Gaming (collectively, the Tribal Defendants) and move for dismissal of the Plaintiffs' Second Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. As set forth in the brief filed in support of this motion, the Court lacks subject matter jurisdiction over the Plaintiffs' claims against the Tribal Defendants, and the Plaintiffs furthermore have failed to allege facts sufficient to state any claims on which relief, particularly the relief sought in the Second Amended Complaint, can be granted against the Tribal Defendants. The Tribal Defendants thus respectfully move and request that all claims against them be dismissed with prejudice.

Additionally, because the Plaintiffs have not stated a single valid claim against the Tribal Defendants and because PBCI is a necessary party without whom adequate relief cannot be fairly or equitably granted, the Tribal Defendants move for dismissal of the Second Amended Complaint in its entirety pursuant to Rule 19 of the Federal Rules of Civil Procedure.

Respectfully submitted this 23rd day of April, 2020.

s/ Mark H. Reeves
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W.
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Tribal Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of April, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties entitled to receive notice.

s/ Mark H. Reeves

Mark H. Reeves

# TAB 202

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE CREEK NATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action Number: |
| | ) | 2:12-cv-01079-MHT-CSC |
| POARCH BAND OF CREEK INDIANS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF IN SUPPORT OF TRIBAL DEFENDANTS' MOTION**
**TO DISMISS SECOND AMENDED COMPLAINT**

Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
699 Broad Street, Suite 1400
Augusta, GA 30901-1453
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W., Suite 900
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Tribal Defendants*

### <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ...............................................................................................1

BACKGROUND .................................................................................................2

STANDARD FOR MOTION TO DISMISS ........................................................6

ARGUMENT AND ANALYSIS .........................................................................7

    **I.**    The Tribal Defendants' sovereign immunity deprives the Court of
        subject matter jurisdiction over all claims against them. ........................9

        A.    Defendants PBCI and PCI Gaming enjoy sovereign
               immunity. ......................................................................................9

        B.    The Tribe's sovereign immunity also applies to the tribal
               officials sued in their official capacities. ...................................10

    **II.**    The Plaintiffs' IRA claim should be dismissed for lack of subject
        matter jurisdiction and failure to state a claim upon which relief
        can be granted. .....................................................................................16

        A.    The Plaintiffs lack standing to challenge the Secretary's
               1984 decision. ............................................................................17

        B.    The Plaintiffs cannot state an IRA claim against the Tribal
               Defendants. .................................................................................21

        C.    Any attack on the Secretary's 1984 decision is time-barred. ....22

    **III.**    The Plaintiffs' promissory estoppel claim fails a matter of law. ..........25

        A.    The promissory estoppel claim is time barred. .........................26

        B.    The statute of frauds bars the Plaintiffs' promissory
               estoppel claim. ...........................................................................30

        C.    The Plaintiffs have failed to allege the elements of
               promissory estoppel. ..................................................................32

    **IV.**    The Plaintiffs' unjust enrichment claim should be dismissed. ..............38

        A.    The elements and limitations of unjust enrichment. ..................38

        B.    The Plaintiffs do not allege that the Tribal Defendants have
               retained a benefit that rightfully belongs to the Plaintiffs. ........39

C.       The Plaintiffs' unjust enrichment claim is untimely and
         barred by the statute of frauds...................................................41

D.       The Plaintiffs' contention that they seek a constructive trust
         does not revive their unjust enrichment claim or take it
         outside the statute of frauds. ......................................................42

V.       The Plaintiffs have failed to state a claim on which any relief can
         be granted under NAGPRA and cannot obtain their requested relief
         in any event. ..............................................................................................42

A.       The Plaintiffs misconstrue key aspects of NAGPRA. .............................43

B.       The Plaintiffs allege no viable NAGPRA claims against the
         Tribal Defendants........................................................................44

C.       NAGPRA does not require that burial sites be maintained
         in a pristine, undisturbed condition and cannot justify the
         relief sought in the SAC..............................................................50

VI.      The Plaintiffs have failed to state a claim upon which relief can be
         granted against the Tribal Defendants under ARPA...............................52

VII.     The Plaintiffs have failed to state a claim on which relief can be
         granted under the NHPA...............................................................56

VIII.    The Plaintiffs have failed to state a claim against the Tribal
         Defendants under the Religious Freedom Restoration Act....................61

A.       RFRA is inapplicable to the Tribal Defendants. ........................................62

B.       The facts alleged in the SAC do not give rise to a RFRA
         violation. ......................................................................................66

IX.      NAGPRA and ARPA do not violate federal law or the
         Constitution..........................................................................................70

X.       The Plaintiffs have not identified any legal basis for the sweeping
         relief sought in the SAC..............................................................72

XI.      Because the Plaintiffs have no valid claims against PBCI and this
         case cannot appropriately be resolved in its absence, the entire
         SAC should be dismissed pursuant to Rule 19. ....................................73

CONCLUSION...........................................................................................76

# TABLE OF AUTHORITIES

## Cases

*AAL USA, Inc. v. Black Hall Aerospace, Inc.*,
   No. 2:16-CV-02090-KOB, 2018 WL 3368855 (N.D. Ala. July 10, 2018) ..................... 33

*Ala. Space Sci. Exhibit Comm'n v. Odysseia Co., Ltd.*,
   2016 WL 9781806 (N.D. Ala. Sept. 30, 2016) .............................................. 26

*Alabama v. PCI Gaming Auth.*,
   801 F.3d 1278 (11th Cir. 2015) ..................................................... 10, 22, 23, 24

*Aldridge v. DaimlerChrysler Corp.*,
   809 So. 2d 785 (Ala. 2001) ......................................................... 32, 34

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ....................................................................... 52

*Allman v. Creek Casino Wetumpka*,
   2011 WL 2313706 (M.D. Ala. May 23, 2011) ............................................. 10

*Annen v. Fed. Nat'l Mortg. Ass'n*,
   2016 WL 11567870 (N.D. Ga. Nov. 16, 2016) ............................................. 6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................. 45, 47

*Attakai v. United States*,
   746 F. Supp. 1395 (D. Ariz. 1990) .................................................... 53

*Auburn Univ. v. IBM*,
   716 F. Supp. 2d 1114 (M.D. Ala. 2010) ................................................ 28

*Avis Rent A Car Sys., Inc. v. Heilman*,
   876 So. 2d 1111 (Ala. 2003) .......................................................... 38

*Baily v. Montgomery*,
   433 F. Supp. 2d 806 (E.D. Ky. 2006) ................................................. 12

*Bates v. Jim Walter Res., Inc.*,
   418 So. 2d 903 (Ala. 1982) ........................................................... 34

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................ 7, 45

*Big Lagoon Rancheria v. California*,
   789 F.3d 947 (9th Cir. 2015) ........................................................ 22, 23

*Boman v. City of Gadsden*,
   220 So. 3d 298 (Ala. 2016) ........................................................... 30

*Bosarge Offshore, LLC v. Compass Bank*,
   943 So. 2d 782 (Ala. 2006) ........................................................... 36

*Branch Banking & Tr. Co. v. Nichols*,
   184 So. 3d 337 (Ala. 2015) .................................................... 30, 33, 42

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) ................................................................... 64

*Burrell v. Teacher's Ret. Sys. of Ala.*,
   2009 WL 113692 (M.D. Ala. Jan. 16, 2009) ................................. 12

*Bus. & Residents All. of E. Harlem v. Jackson*,
   430 F.3d 584 (2d Cir. 2005) ....................................................... 59

*Bykov v. Radisson Hotels Intern., Inc.*,
   221 Fed. App'x 490 (8th Cir. 2007) .......................................... 40

*Cantrell v. City Federal Sav. & Loan Ass'n*,
   496 So. 2d 746 (Ala. 1986) ....................................................... 35

*Cheavins v. Pub. Serv. Corp. of Colo.*,
   176 F. Supp. 3d 1088 (D. Colo. 2016) .................................. 52, 57

*Church of the Lukumi Bablua Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ................................................................... 71

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
   406 F. Supp. 3d 1258 (M.D. Ala. 2019) ................................... 6, 7

*Ctr. for Biological Diversity v. Hamilton*,
   453 F.3d 1331 (11th Cir. 2006) .................................................. 25

*Daisy, Inc. v. Pollo Operations, Inc.*,
   2015 WL 1418607 (M.D. Fla. Mar. 27, 2015) ............................. 47

*Dallas v. Hill*,
   2019 WL 403713 (E.D. Wis. Jan. 31, 2019) ............................... 71

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) ................................................................... 17

*Davis v. Wells Fargo Home Mortg., Inc.*,
   2016 WL 393850 (N.D. Ala. Feb. 2, 2016) ................................. 42

*Day v. Shalala*,
   23 F.3d 1052 (6th Cir. 1994) ............................................... 57, 58

*Dickinson v. Cosmos Broad., Inc.*,
   782 So. 2d 260 (Ala. 2000) ....................................................... 38

*Ex parte Young*,
   209 U.S. 123 (1908) ..................................................... 11, 12, 13, 15

*First Assembly of God of Naples, Fla., Inc. v. Collier County*,
   20 F.3d 419 (11th Cir. 1994) ..................................................... 71

*Fla. Wildlife Fed'n, Inc. v. U.S. Army Corps of Eng'rs*,
   859 F.3d 1306 (11th Cir. 2017) ....................................... 73, 74, 75

*Florer v. Congregation Pidyon Shevuyim, N.A.*,
  639 F.3d 916 (9th Cir. 2011) ............................................... 62, 63, 64

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
  344 F.3d 1263 (11th Cir. 2003) .................................................... 73

*Freemanville Water Sys., Inc. v. PBCI*,
  563 F.3d 1205 (11th Cir. 2009) .................................................... 10

*Friends of Lydia Ann Channel v. U.S. Army Corps. of Eng'rs*,
  701 Fed. App'x 352 (5th Cir. 2017) ......................................... 22, 56

*Furry v. Miccosukee Tribe of Indians of Fla.*,
  685 F.3d 1224 (11th Cir. 2012) ...................................................... 9

*Griffin Indus., Inc. v. Irvin*,
  496 F.3d 1189 (11th Cir. 2007) .................................................... 35

*Gulf States Steel, Inc. v. Lipton*,
  765 F. Supp. 696 (N.D. Ala. 1990),
  *aff'd*, 934 F.2d 1265 (11th Cir. 1991) ........................................ 27

*Haavik v. Farnell*,
  87 So. 2d 629 (Ala. 1956 ........................................................... 30

*Hancock-Hazlett Gen. Constr. Co., Inc. v. Trane*,
  499 So. 2d 1385 (Ala. 1986) ........................................................ 40

*Hardy v. IGT, Inc.*,
  2011 WL 3583745 (M.D. Ala. Apr. 23, 2011) ............................. 75

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ....................................................... 6

*Harvey v. Harvey*,
  949 F.2d 1127 (11th Cir. 1992) .................................... 62, 64, 65, 66

*Hawk v. Danforth*,
  2006 WL 6928114 (E.D. Wis. Aug. 17, 2006) ........................ 44, 50

*Henslee v. Merritt*,
  82 So. 2d 212 (Ala. 1955) ........................................................... 30

*Hollywood Mobile Estates Ltd. v. Cypress*,
  415 F. Appx. 207 (11th Cir. 2011) .......................................... 11, 15

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*,
  641 F.3d 1259 (11th Cir. 2011 .................................................... 17

*Horsely v. Feldt*,
  304 F.3d 1125 (11th Cir. 2002) ..................................................... 6

*I-359, Inc. v. AmSouth Bank*,
  980 So. 2d 419 (Ala. Civ. App. 2007) ......................................... 29

*Idaho v. Coeur d'Alene Tribe of Idaho*,
  521 U.S. 261 (1997) .............................................................. 14, 15

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) ................................................................................ 64

*Jones v. Tyson Foods, Inc.*,
   971 F. Supp. 2d 671 (N.D. Miss. 2013) ................................................. 12

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
   475 F.3d 1291 (D.C. Cir. 2007) ...................................................... 22, 56

*Knowles v. Canant*,
   51 So. 2d 355 (Ala. 1951) ....................................................................... 27

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*,
   2012 WL 2884992 (C.D. Cal. July 13, 2012) ....................................... 68

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*,
   2013 WL 4500572 (C.D. Cal. Aug. 16, 2013),
   *aff'd*, 603 F. App'x 651 (9th Cir. 2015) ............................................... 67

*Lambert v. First Fed. Mortg.*,
   47 F. Supp. 3d 1310 (N.D. Ala. 2014) ................................................... 31

*Lawrence v. Dunbar*,
   919 F.2d 1525 (11th Cir. 1990) ............................................................... 7

*Lee v. Town of Good Hope*,
   1998 WL 465114 (N.D. Ala. June 24, 1998) ......................................... 30

*Litton Fin. Printing Div. v. NLRB*,
   501 U.S. 190 (1991) ................................................................................ 18

*Lopez v. Jet Blue Airways*,
   662 F.3d 593 (2d Cir. 2011) ................................................................... 52

*Love v. Delta Air Lines*,
   310 F.3d 1347 (11th Cir. 2002) ............................................................. 52

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................ 17

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
   485 U.S. 439 (1988) ................................................................... 67, 68, 69

*Madison Cty. v. Evanston Ins. Co.*,
   340 F. Supp. 3d 1232 (N.D. Ala. 2018) ........................................... 32, 36

*Martin Marietta Materials, Inc. v. Limestone Redbay, Inc.*,
   No. 7:12-CV-02765-HNJ, 2017 WL 3444738 (N.D. Ala. June 30, 2017) ..................... 30

*Martin v. Ala. Historical Comm'n*,
   2014 WL 28850 (M.D. Ala. Jan. 2, 2014) ............................................. 56

*Martin v. Wilcox Cnty., Ala.*,
   2014 WL 1202943 (S.D. Ala. Mar. 21, 2014) ....................................... 56

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................ 22

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014)......................................................................... 12

*Midrash Sephardi, Inc. v. Town of Surfside*,
    366 F.3d 1214 (11th Cir. 2004) ............................................... 66, 71

*Moisiuc v. Argent Mortg. Co., LLC*,
    2019 WL 1330283 (S.D. Tex. Mar. 25, 2019)................................ 26

*N. Arapaho Tribe v. Harnsberger*,
    697 F.3d 1272 (10th Cir. 2012) ..................................................... 74

*N.B.C. v. Commc'ns Workers of Am., AFL-CIO*,
    860 F.2d 1022 (11th Cir. 1988) ..................................................... 65

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008) ........................................... 66, 68, 69

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
    463 F.3d 50 (1st Cir. 2006)........................................................... 59

*Nettles v. AT&T*,
    55 F.3d 1358 (8th Cir. 1995) ........................................................ 26

*Newberg v. Schweiss*,
    2009 WL 3202380 (D. Minn. Sept. 30, 2009) .............................. 26

*Nicholl v. Attorney Gen. of Ga.*,
    769 F. App'x 813 (11th Cir. 2019) ................................................ 11

*Otwell v. Ala. Power Co.*,
    944 F. Supp. 2d 1134 (N.D. Ala. 2013),
    *aff'd*, 747 F.3d 1275 (11th Cir. 2014).......................................... 27

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) ...................................................... 7

*Papasan v. Allain*,
    478 U.S. 265 (1986)...................................................................... 11

*PBCI v. Hildreth*,
    656 F. App'x 934 (11th Cir. 2016) ................................................ 24

*Philistin v. Ocwen Loan Servicing, LLC*,
    2019 WL 1474329 (S.D. Fla. Mar. 18, 2019)................................ 47

*Pit River Home & Agric. Co-op Ass'n v. United States*,
    30 F.3d 1088 (9th Cir. 1994) ........................................................ 75

*Pittman v. Cole*,
    267 F.3d 1269 (11th Cir. 2001) ..................................................... 72

*Radenhausen v. Doss*,
    819 So. 2d 616 (Ala. 2001)........................................................... 27

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008)...................................................................... 74

*Ritter v. Cecil Cty. Office of Hous. & Cmty. Dev.*,
    33 F.3d 323 (4th Cir. 1994) .......................................................... 57

*Robbins v. N.Y. Corn & Soybean Growers Ass'n, Inc.*,
    244 F. Supp. 3d 300 (N.D.N.Y. 2017) ........................................ 57

*Rosales v. United States*,
    2007 WL 4233060 (S.D. Cal. Nov. 28, 2007) ........................ 49, 75

*Rutledge v. Aveda*,
    2015 WL 2238786 (N.D. Ala. May 12, 2015) ......................... 38, 40

*San Carlos Apache Tribe v. United States*,
    272 F. Supp. 2d 860 (D. Ariz. 2003) ......................................... 54

*San Carlos Apache Tribe v. United States*,
    417 F.3d 1091 (9th Cir. 2005) ................................................... 56

*Sanderford v. Creek Casino Montgomery*,
    2013 WL 131432  (M.D. Ala. Jan. 10, 2013) ............................. 10

*Santa Clara Pueblo v. Martinez*,
    436 U.S. 49 (1978) ..................................................................... 70

*Santiago v. Puerto Rico*,
    655 F.3d 61 (1st Cir. 2011) ....................................................... 65

*Scrushy v. Tucker*,
    955 So. 2d 988 (Ala. 2006) ........................................................ 38

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009) ................................................. 47

*Sisseton-Wahpeton Oyate v. United States Dep't of State*,
    659 F. Supp. 2d 1071 (D.S.D. 2009) ........................................ 56

*Slockish v. United States Federal Highway Administration*,
    2018 WL 4523135 (D. Or. Mar. 2, 2018) ................................. 69

*Snider v. Morgan*,
    113 So. 3d 643 (Ala. 2012) .................................................. 38, 41

*Snoqualmie Indian Tribe v. FERC*,
    545 F.3d 1207 (9th Cir. 2008 ................................................... 69

*Sream, Inc. v. Hookah Me Up, Inc.*,
    2019 WL 2269740 (S.D. Fla. Feb. 5, 2019) ............................. 47

*Sugarloaf Citizens Ass'n v. FERC*,
    959 F.2d 508 (4th Cir. 1992) ..................................................... 20

*Summit Med. Assocs., P.C. v. Pryor*,
    180 F.3d 1326 (11th Cir. 1999) ................................................. 11

*Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*,
    173 F.3d 1033 (6th Cir. 1999) .............................................. 22, 57

*Sykes v. Sykes*,
    78 So. 2d 273 (Ala. 1954) ......................................................... 30

*Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*,
    177 F.3d 1212 (11th Cir. 1999) ................................................. 11

*Tiller v. State Farm Mut. Auto. Ins. Co.*,
    549 Fed. App'x 849 (11th Cir. 2013) ....................................... 38

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) .......................................................... 17, 20

*U.S. ex rel. Long v. SCS Bus. & Tech. Inst.*,
    999 F. Supp. 78 (D.D.C. 1998) ................................................. 40

*U.S. ex rel. Long v. SCS Bus. & Tech. Inst.*,
    999 F. Supp. 78 (D.D.C. 1998) ................................................. 40

*United States ex rel. Mathews v. Decatur Hotels, L.L.C.*,
    2008 WL 11375354 (N.D. Ala. Aug. 21, 2008) ................... 38, 39, 40

*Walk, Inc. v. Zimmer*,
    2014 WL 2465311 (N.D. Ala. May 30, 2014) ........................... 34

*Weiss v. Smulders*,
    96 A.3d 1175 (Conn. 2014) ....................................................... 26

*West v. Atkins*,
    487 U.S. 42 (1988) .................................................................... 63

*Willett v. United States*,
    24 F. Supp. 3d 1167 (M.D. Ala. 2014) ...................................... 7

*Williams v. Kitchens*,
    74 So. 2d 457 (Ala. 1954) ......................................................... 29

*Williams v. PBCI*,
    839 F.3d 1312 (11th Cir. 2016) ................................................. 10

*Willis v. Univ. Health Servs., Inc.*,
    993 F.2d 837 (11th Cir. 1993) ................................................... 65

*Wyatt v. BellSouth, Inc.*,
    176 F.R.D. 627 (M.D. Ala. 1998) ............................................ 33

*Wyatt v. BellSouth, Inc.*,
    18 F. Supp. 2d 1324 (M.D. Ala. 1998) ..................................... 36

*Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    396 F. Supp. 2d 1087 (D.S.D. 2005) ........................................ 19

## Statutes

16 U.S.C. § 470aa ........................................................................ 14, 19

16 U.S.C. § 470bb .............................................................................. 19

16 U.S.C. § 470cc(g)(1) ............................................................... 46, 53

16 U.S.C. § 470ee ................................................................................................ 52

16 U.S.C. § 470ff ................................................................................................. 52

25 C.F.R. § 262.5(d) ........................................................................................... 46

25 C.F.R. § 262.8(a) ............................................................................................ 46

25 U.S.C § 3001(3) .............................................................................................. 48

25 U.S.C. § 3001(4) ............................................................................................. 43

25 U.S.C. § 3001(8) ............................................................................................. 43

25 U.S.C. § 3002(a)(2)(A) ................................................................................... 45

25 U.S.C. § 3002(c) ............................................................................................. 51

25 U.S.C. § 3002(d) ............................................................................................. 49

25 U.S.C. § 3002(d)(1) ........................................................................................ 49

25 U.S.C. § 3003 .................................................................................................. 50

25 U.S.C. § 5101 .................................................................................................. 16

25 U.S.C. § 5108 .................................................................................................. 16

42 U.S.C. § 2000bb .............................................................................................. 61

42 U.S.C. § 2000bb-1 .......................................................................................... 66

42 U.S.C. § 2000bb-1(a) ...................................................................................... 62

42 U.S.C. § 2000bb-2(1) ...................................................................................... 62

42 U.S.C. § 2000bb-2(2) ...................................................................................... 62

42 U.S.C. § 2000cc(a)(1) ..................................................................................... 71

42 U.S.C. § 2000cc-5(4) ...................................................................................... 71

5 U.S.C. § 510 ........................................................................................................ 8

5 U.S.C. § 551 ...................................................................................................... 56

54 U.S.C § 306108 ............................................................................................... 60

54 U.S.C. § 302706 .............................................................................................. 58

54 U.S.C. § 306108 .............................................................................................. 59

7 Stat. 120 .............................................................................................................. 2

Ala. Code § 6-2-33(2) ......................................................................................... 29

Ala. Code § 6–2–34(9) ........................................................................................ 29

Ala. Code § 6-2-38(l) .......................................................................................... 29

Ala. Code § 8-9-2(1) ........................................................................................... 30

I25 U.S.C. § 2701 .................................................................................................. 5

**Other Authorities**

*Cohen's Handbook of Federal Indian Law* (2005 ed.), § 20.02(2)(d) .......................... 52

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 7

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 7

Fed. R. Civ. P. 19(a) ............................................................................................... 73

Fed. R. Civ. P. 19(a)(1) ........................................................................................... 73

Fed. R. Civ. P. 19(b) ............................................................................................... 74

**Regulations**

25 C.F.R. § 262.8(a) ................................................................................................ 55

36 C.F.R. § 79.1(a) ................................................................................................. 54

36 C.F.R. § 800.6 ................................................................................................... 60

43 C.F.R. § 10.14(b) ............................................................................................... 44

43 C.F.R. § 10.2(b)(1) ....................................................................................... 44, 45

43 C.F.R. § 10.2(d)(1) ............................................................................................. 48

43 C.F.R. § 10.3 ..................................................................................................... 51

43 C.F.R. § 10.4 ..................................................................................................... 49

43 C.F.R. § 10.4(b) ................................................................................................. 49

43 C.F.R. § 10.9 ..................................................................................................... 50

43 C.F.R. § 7.1(a) ................................................................................................... 53

43 C.F.R. § 7.15 ..................................................................................................... 52

43 C.F.R. § 7.3(c)(2) ............................................................................................... 53

49 Fed. Reg. 24083 ................................................................................................. 2

84 Fed. Reg. 1200 .................................................................................................... 2

84 Fed. Reg. 1203 .................................................................................................... 4

## INTRODUCTION

In their Second Amended Complaint (SAC, Doc. 190), Plaintiffs Muscogee Creek Nation (MCN), Hickory Ground Tribal Town, and Mekko George Thompson ask this Court to, *inter alia*, undo a 35-year old federal decision to take property into trust for the benefit of the Poarch Band of Creek Indians (PBCI), force PBCI to remove tens of millions of dollars in improvements to land that PBCI has owned for forty years, permanently enjoin PBCI from engaging in any construction, clearing, grading, or other "ground disturbing" activity on its property, and transfer *de facto* control of PBCI's federal trust land to the Plaintiffs. Attempting to justify their untimely request for this astoundingly broad relief, the Plaintiffs accuse PBCI, the PCI Gaming Authority (PCI Gaming), the officials in charge of those tribal entities, PBCI's Tribal Historic Preservation Officer (collectively, the Tribal Defendants),[1] various federal officials, and a private contracting company of violating numerous federal laws pertaining to Indian tribes, the preservation of historic, cultural, and archeological resources on federal and Indian lands, and religious freedom. They also allege, for the first time in the SAC, various common law infractions. None of the Plaintiffs' claims have merit, and they are entitled to none of the relief that they seek.

As set forth in detail below, the Plaintiffs have failed to establish this Court's subject matter jurisdiction over the Tribal Defendants and over many of their claims. They furthermore

---

[1] The officials named in the SAC include Defendants Stephanie Bryan, Robert McGhee, Amy Bryan, Charlotte Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells, who are sued in their official capacities as members of the PBCI Tribal Council, Westly Woodruff, Stuart Mark Altman, Venus McGhee Prince, Teresa Poust, and Timothy Manning, who are sued in their official capacities as PCI Gaming board members, and Larry Haikey, sued in his official capacity as the Tribal Historic Preservation Officer (THPO). Six members of the Tribal Council, as well as former Tribal Council members Eddie Tullis, Buford Rolin, and David Gehman, were newly added to the case as defendants in their individual capacities (the Individual Defendants) by the SAC. This brief addresses only the claims against the Tribal Defendants; the newly named Individual Defendants are moving separately to dismiss the newly asserted tort claim against them.

have failed to allege facts sufficient to support a claim for relief against the Tribal Defendants under a single one of the scattershot theories set forth in the SAC. Accordingly, the Tribal Defendants have moved to dismiss all claims and now file this brief in support of that motion.

## BACKGROUND

The Tribal Defendants dispute many of the SAC's bald assertions and mischaracterizations of alleged facts and will refute them should this case proceed. Nevertheless, those allegations generally must be taken as true at this stage in the proceedings.[2] The background information set forth here thus consists of material drawn from the SAC, previously filed or referenced documents central to the Plaintiffs' claims, and published federal legal sources. Even so limited, the facts show that the Plaintiffs have no viable claims against the Tribal Defendants.

PBCI is a federally recognized Indian tribe. SAC ¶ 12; *see also* 84 Fed. Reg. 1200, 1203 (Feb. 1, 2019) (listing federally recognized tribes). It is a successor-in-status to the Creek Nation and has been a party to federal treaties dating as far back as the early 19th century. *See, e.g.*, 49 Fed. Reg. 24083 (June 11, 1984); Treaty of Fort Jackson, Aug. 9, 1814, 7 Stat. 120 (reserving land for "friendly" Creek Indians). PCI Gaming is a tribal enterprise wholly owned by PBCI that is responsible for gaming activity on PBCI lands, including the land at issue here. SAC ¶¶ 20-21.

In 1980, PBCI acquired property in the vicinity of Wetumpka, Alabama (the Wetumpka property) that is sometimes referred to as Hickory Ground. *Id.* ¶ 61. While seeking funding to aid its acquisition of the Wetumpka property, PBCI applied for a grant from the Alabama Historical

---

[2] As noted below, to the extent of the Tribal Defendants' factual challenge to this Court's subject matter jurisdiction, no presumption of truth attaches to allegations on that point, and the Court is free to consider evidence beyond the pleadings.

Commission (AHC). *See generally* Doc. 190-1, Ex. A, 3-7.[3] In support of its grant request, PBCI noted that the property was set for commercial development by its then-current owner, that it "may very well be bulldozed and cleared soon," and that the proposed acquisition would prevent the land's imminent commercial development and facilitate the protection and study of its archaeological resources. Doc. 190-1 at 5-6.[4] At the same time, PBCI's application letter contemplated the potential future development of the property after its acquisition, indicating that "[p]rior to any type of development of the property a scientifically sound archaeological program will be conducted to mitigate or minimize effects upon the historic resources." *Id.* at 4. Although the proposal described in PBCI's grant application letter never came to fruition,[5] PBCI ultimately obtained exclusive fee ownership of the property and entered into a written protective covenant to preserve it for 20 years. *See* SAC ¶ 62; July 28, 1980 Protective Covenant, filed herewith as Exhibit A to the Declaration of Lori Stinson. That written protective covenant made no reference to the Plaintiffs, as intended third party beneficiaries or otherwise. *See* Stinson Decl., Ex. A. The covenant also contemplated archaeological investigation of the property, mandating the placement of "any archaeological data and material recovered" from the property with an appropriate institution. *See id.* at 2. The written protective covenant expired by its own terms on July 3, 2000. *See id.*; SAC ¶ 79.

---

[3] All pin cites to previously filed documents are to the ECF generated page numbers.

[4] Much of the fee land surrounding the Wetumpka property, including part of the Hickory Ground site, was indeed commercially developed many years ago, some with archaeological excavation. *See, e.g.*, Doc. 179-1 at 6 (referencing human remains in the possession of Defendant Auburn University that were excavated from the Hickory Ground historic site on fee land adjacent to the Wetumpka property during the 1990s); Doc. 190-1 at 5 (describing commercial developments on surrounding property).

[5] For example, the proposal described in the application letter envisioned joint ownership of the Wetumpka property by PBCI and a foundation managed by Plaintiff Muscogee Creek Nation. *See* Doc. 190-1 at 5-6. This never came to pass.

In 1984, the United States confirmed PBCI's tribal status and acknowledged that PBCI, like other federally recognized tribes, is eligible for special services and programs provided by the United States to Indians. *See id.* ¶ 12; 84 Fed. Reg. at 1203; 49 Fed. Reg. at 24083. Prior to formally acknowledging PBCI's status, the United States posted public notice of its proposed decision and invited public comment. 49 Fed. Reg. at 24083. The proposed decision received no objections. *Id.* The United States subsequently accepted title to the Wetumpka property into trust for PBCI in 1984 and declared it part of PBCI's initial reservation in 1985. SAC ¶ 73 (citing Federal Register notices of reservation designation); 1984 Trust Deed, filed herewith as Exhibit B to the Stinson Declaration.

During the nearly thirty years between the United States' decision to accept the Wetumpka property into trust for PBCI and the filing of the initial complaint in this case, PBCI and/or trained archeologists conducted a number of archaeological investigations and excavations on and around the property. *See, e.g.*, SAC ¶¶ 101-02, 107, 116; Doc. 190-1 at 145. The Plaintiffs raised concerns and objections regarding that archaeological activity at the Wetumpka property over at least two decades before filing suit. In October of 1992, Plaintiff MCN formally suspended its government-to-government relationship with PBCI over allegations that PBCI had allowed excavations, including of human remains, on the property. *See* Doc. 95-6 at 2, 4-5.[6] In October of 2002, more than a decade before the original complaint, Mekko Thompson, writing on behalf of Plaintiff Hickory Ground Tribal Town, expressed dismay at the archaeological excavation of human remains from the Wetumpka property and threatened litigation, citing many of the federal statutes and legal arguments relied upon in the SAC. *See*

---

[6] The letter from MCN suspending the government-to-government relationship states that MCN would take additional steps "in consultation with" Mekko Thompson, indicating that all Plaintiffs were aware of the alleged violation in 1992. *See* Doc. 95-6 at 4.

Doc. 95-7 at 4-6. That same month, MCN sent a letter objecting to the National Park Service's (NPS) 1999 agreement allowing PBCI to assume historic preservation responsibilities at the Wetumpka property. *See* Doc. 95-8; SAC ¶ 81.

The Plaintiffs and PBCI engaged in numerous consultations through the years regarding the appropriate disposition of remains and objects excavated at the Wetumpka property during and prior to the Phase III archaeological excavation described in the SAC, with extended discussions specifically involving reinterment of excavated human remains beginning more than six years prior to the December 12, 2012, filing of the original complaint. *See, e.g.*, SAC ¶¶ 137, 139 (noting that PBCI notified Plaintiffs of a Phase III archaeological excavation in 2006); Doc. 190-1 at 128 (indicating that re-interment discussions began in May of 2006). In a 2008 letter to NPS, Mekko Thompson specifically stated that representatives of Plaintiffs MCN and Hickory Ground Tribal Town traveled to Wetumpka on May 9, 2006, to discuss reinterment of 57 or more sets of human remains—the same number alleged to have been excavated from the Wetumpka property. *See* Doc. 95-11; SAC ¶ 117. Despite their repeated and longstanding objections to archaeological excavations on the property and many years of consultations with PBCI, the Plaintiffs have never alleged that any of the remains or objects recovered from the Wetumpka property belonged to any identifiable individual.

PBCI, through PCI Gaming, for many years has operated a gaming facility at the Wetumpka property pursuant to its inherent sovereign authority as recognized in the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701, *et seq. See, e.g.*, SAC ¶¶ 20-21; Doc. 190-1 at 145 (referencing a proposed expansion of existing gaming facilities on the Wetumpka property in 2006). When Plaintiffs filed their initial complaint in December 2012, PBCI had completed a Phase III archeological excavation of the Wetumpka property and was engaged in additional

construction activity, including the construction of a casino expansion, a hotel, and resort facilities. *See* SAC ¶¶ 102, 150, 165-66; Doc. 159 at 5. That construction activity was completed no later than 2014. *See* SAC ¶ 132.

The Plaintiffs contend that any excavation, "ground disturbing, clearing, grading, leveling, or construction activity at the Hickory Ground Site" is offensive to them and unlawful and should be enjoined in perpetuity. *See, e.g.*, *id.* Prayer for Relief ¶¶ (d)(i). They further allege that any person who sets foot on at least some portions of the Wetumpka property "without prior authorization [from the Plaintiffs] and cleansing rituals" or consumes or possesses alcohol "anywhere near" such portions of the property unlawfully offends their religious beliefs. *See* SAC ¶¶ 327-28. Taken together, these statements indicate that almost any conceivable active use of the Wetumpka property by PBCI, including, but not limited to, residential, commercial, and municipal uses, would be objectionable and offensive to the Plaintiffs.

**STANDARD FOR MOTION TO DISMISS**

When deciding a motion to dismiss, the court generally assumes the facts set forth in the complaint to be true for purposes of the motion and construes them in the plaintiff's favor. *See Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1268 (M.D. Ala. 2019) (citations omitted). In addition to the facts so construed, the court may consider matters of public record and documents attached to or referenced in the complaint as well as documents attached to the motion, so long as those documents are central to the complaint and their authenticity is not disputed. *Horsely v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999); *Annen v. Fed. Nat'l Mortg. Ass'n*, 2016 WL 11567870, \*\*3-4 (N.D. Ga. Nov. 16, 2016). Furthermore, where a defendant makes a factual challenge to allegations of subject matter jurisdiction, "'no presumptive truthfulness attaches to

[the] plaintiff's allegations,'" and the Court is free to consider evidence outside of the pleadings in order to determine its jurisdiction. *Willett v. United States*, 24 F. Supp. 3d 1167, 1173 (M.D. Ala. 2014) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

In order to survive a motion to dismiss, the complaint must set forth allegations establishing a claim to relief that is "plausible on its face." *Id.* at 1180 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The allegations "must be enough to raise a right to relief above the speculative level;" the use of "mere labels and conclusions … will not do." *Twombly*, 550 U.S. at 555. "Crucially … the court need not accept as true 'conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts.'" *Coral Ridge*, 406 F. Supp. 3d at 1268 (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

## ARGUMENT AND ANALYSIS

The Plaintiffs, having waited to bring suit until decades after learning of relevant federal decisions and allegedly offensive conduct by the Tribal Defendants, now seek staggeringly sweeping relief that is not justified by any of the litany of federal statutes or common law doctrines cited in the SAC. For the reasons explained below, the Plaintiffs' claims should be dismissed in their entirety due to this Court's lack of subject matter jurisdiction and the Plaintiffs' failure to state a single claim upon which relief—certainly the relief sought in the SAC—can be granted against the Tribal Defendants. *See* Fed. R. Civ. P. 12(b)(1) & (6).

As an initial matter, the Court lacks subject matter jurisdiction over the Plaintiffs' claims against the Tribal Defendants due to sovereign immunity. Settled principles of federal Indian law, discussed in detail *infra*, provide that one of the many aspects of inherent tribal sovereignty is a broad immunity from suit without tribal consent or an unmistakable congressional

abrogation of immunity. Neither condition being met here, the Tribal Defendants are immune from suit and the Court lacks subject matter jurisdiction over all claims against them.

The Plaintiffs' Indian Reorganization Act (IRA) claim fails for multiple reasons in addition to sovereign immunity. First, the Court lacks subject matter jurisdiction over the IRA claim because the Plaintiffs lack Article III standing to pursue it. Second, like many of the statutes cited in the SAC, an IRA claim can be asserted, if at all, only pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 510, *et seq.* Because the APA does not provide a right of action against non-federal parties, the IRA claim (and all other APA claims asserted in the SAC) necessarily fails to the extent that it is asserted against the Tribal Defendants. And to the extent that the Plaintiffs seek to assert an APA-based IRA claim against the Federal Defendants—the only defendants subject to such a claim—this Court lacks subject matter jurisdiction over that claim because it is hopelessly time-barred.

The alternatively pled common law claims against the Tribal Defendants fare no better.[7] Plaintiffs' claims for unjust enrichment and promissory estoppel are both time-barred and barred by the statute of frauds, and the facts alleged, even when taken in the light most favorable to the Plaintiffs, do not establish all of the elements of either claim. Accordingly, the Court should dismiss all common law claims against the Tribal Defendants.

The Plaintiffs' remaining statutory claims also are defective for various reasons, each of which is discussed in detail below. Briefly stated, the statutes upon which these claims are based (1) are inapplicable to the Tribal Defendants on their face or under the facts presented; (2) do not create private rights of action; (3) do not create any judicially enforceable rights against any

---

[7] The Plaintiffs' state law outrage claim is asserted only against the Individual Defendants and Martin Construction, and thus is not addressed herein.

entity; or (4) do not and cannot provide the relief that the Plaintiffs seek. For all of these reasons, the Plaintiffs' statutory claims should be dismissed in their entirety.

Even assuming, *arguendo*, that the Plaintiffs had some viable right of action against the Tribal Defendants under any of the legal theories laid out in the SAC, none of those theories justifies the incredibly sweeping, intrusive relief that the Plaintiffs seek. Neither the common law doctrines nor the federal statutes envision stripping a sovereign government of ownership, jurisdiction, and control of its property, ordering the permanent fallowing of such property, or requiring the removal of scores of millions of dollars of development and real property improvements, at a cost of untold jobs and community wide economic injury. The SAC should be dismissed—even if it states some valid claim—to the extent that it seeks unavailable relief.

Finally, because all claims against the Tribal Defendants are due to be dismissed and it would be impossible for this action to fairly proceed without PBCI's involvement, the entire SAC should be dismissed under Rule 19.

## I.     The Tribal Defendants' sovereign immunity deprives the Court of subject matter jurisdiction over all claims against them.

### A.     Defendants PBCI and PCI Gaming enjoy sovereign immunity.

Defendants PBCI and PCI Gaming are immune from suit, and this court accordingly lacks subject matter jurisdiction over all claims against those defendants. The "Supreme Court has made clear that a suit against an Indian tribe is barred unless the tribe has clearly waived its immunity or Congress has expressly and unequivocally abrogated that immunity." *Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1226 (11th Cir. 2012). The Eleventh Circuit repeatedly has recognized that federal courts lack subject matter jurisdiction over unconsented suits against PBCI, and it also has confirmed "that PCI [Gaming] shares in the Tribe's immunity because it operates as an arm of the Tribe." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1287

(11th Cir. 2015); *see also Williams v. PBCI*, 839 F.3d 1312, 1325 (11th Cir. 2016) (affirming that the district court lacked subject matter jurisdiction over an ADEA claim against PBCI due to the Tribe's sovereign immunity); *Freemanville Water Sys., Inc. v. PBCI*, 563 F.3d 1205, 1209-10 (11th Cir. 2009) (affirming district court's dismissal of claims against PBCI and PCI Gaming on the grounds that their sovereign immunity deprived the district court of subject matter jurisdiction); *Sanderford v. Creek Casino Montgomery*, 2013 WL 131432 at *2 (M.D. Ala. Jan. 10, 2013) ("Defendant Creek Casino is indistinguishable from the Tribe for the purposes of tribal sovereign immunity."); *Allman v. Creek Casino Wetumpka*, 2011 WL 2313706, at *2 (M.D. Ala. May 23, 2011) (holding that PBCI's sovereign immunity extended to one of the Tribe's gaming facilities).

The Plaintiffs do not allege that Defendants PBCI and PCI Gaming have waived their immunity or that Congress has abrogated it. In fact, the SAC does not even allege that this Court has jurisdiction over those two defendants. *See* SAC ¶¶ 37-42 (alleging the Court's jurisdiction over all other defendants, but omitting any reference to PBCI or PCI Gaming). Because PBCI and PCI Gaming enjoy sovereign immunity, this Court lacks subject matter jurisdiction to hear claims against them. *See Williams*, 839 F.3d at 1325; *PCI Gaming*, 801 F.3d at 1287-88; *Freemanville*, 563 F.3d at 1206-07. All claims against PBCI and PCI Gaming should be dismissed with prejudice pursuant to Rule 12(b)(1).

      B.    <u>The Tribe's sovereign immunity also applies to the tribal officials sued in their official capacities.</u>

Sovereign immunity also deprives the Court of subject matter jurisdiction over claims against the members of the PBCI Tribal Council, the PCI Gaming board, and the THPO who are sued in their official capacities (the Tribal Officials). It is settled law that tribal officials are protected by their tribe's sovereign immunity when acting in their official capacity and within

the scope of their authority. *See generally Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*, 177 F.3d 1212, 1226 (11th Cir. 1999). Under the doctrine first elucidated in *Ex parte Young*, 209 U.S. 123 (1908), however, tribal officials can sometimes be sued for prospective declaratory and injunctive relief to stop ongoing violations of federal law. *See, e.g.*, *Tamiami Partners*, 177 F.3d at 1226. The Plaintiffs allege that the *Young* doctrine gives this Court jurisdiction over their claims against the Tribal Officials. SAC ¶ 39. They are incorrect.

The *Young* doctrine is inapplicable for at least two reasons here. First, the Plaintiffs generally seek not to stop ongoing violations of federal law, but to adjudicate the legality of discrete past acts. *Young* does not apply in such circumstances. *See, e.g.*, *Nicholl v. Attorney Gen. of Ga.*, 769 F. App'x 813, 815-16 (11th Cir. 2019). Second, even if the Plaintiffs alleged ongoing violations of federal law, the *Young* doctrine is applicable to claims, such as the Plaintiffs' IRA claim, that implicate "special sovereignty interests." *Hollywood Mobile Estates Ltd. v. Cypress*, 415 F. Appx. 207, 211 (11th Cir. 2011). The Plaintiffs simply cannot circumvent tribal sovereign immunity. Accordingly, this Court lacks jurisdiction over their claims against all Tribal Defendants, and those claims should be dismissed under Rule 12(b)(1).

1.    *The Young doctrine is inapplicable because the Tribal Officials are not engaged in ongoing violations of federal law.*

As an initial matter, the *Young* doctrine is inapplicable to the extent that the Plaintiffs' claims are based on alleged past violations of federal law. The "*Young* doctrine applies only to ongoing and continuous violations of federal law. In other words, a plaintiff may not use the doctrine to adjudicate the legality of past conduct." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999) (citing, *inter alia*, *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986)); *Nicholl*, 769 F. App'x at 815-16 (holding the *Young* doctrine inapplicable to a claim based on an alleged past violation of law, even where the effects of that violation remained in

place); *Jones v. Tyson Foods, Inc.*, 971 F. Supp. 2d 671, 680-81 (N.D. Miss. 2013) (holding *Young* inapplicable where the plaintiff alleged an ongoing injury arising out of past violations of federal law); *Burrell v. Teacher's Ret. Sys. of Ala.*, 2009 WL 113692, at *3 (M.D. Ala. Jan. 16, 2009) (finding the *Young* doctrine inapplicable, in part, because the claims "addresse[d] past conduct, not ongoing violations of federal law"); *Baily v. Montgomery*, 433 F. Supp. 2d 806, 810-11 (E.D. Ky. 2006) (holding *Young* inapplicable where plaintiff alleged unlawful past conduct and sought injunctive relief barring its repetition).

For Count I of the SAC (the IRA claim), the Plaintiffs fail to adequately allege any violation of federal law by the Tribal Defendants, past or ongoing. That count principally—and erroneously—asserts that the United States violated federal law when it took the Wetumpka property into trust for PBCI in 1934. *See* SAC ¶¶ 190-99. It goes on to baldly state a legal conclusion that gaming conducted by PBCI on the property violates IGRA because the land is not properly in trust, *id.* ¶¶ 193, 199, but this allegation is inherently contradictory and invalid. The fact of the matter is that the land <u>is</u> held in trust, and gaming conducted on it is therefore lawful under IGRA. *See* SAC ¶ 73 (acknowledging that the land is in trust, but alleging that the entrustment decision was improper); *id.* ¶ 286 (conceding that the Wetumpka property includes reservation and trust lands). But assuming, counterfactually, that the land was not held in trust, it would be owned by Poarch in fee and, as the Plaintiffs concede, it would "be subject to state, not federal, law." *Id.* ¶ 194. In other words, because the land is trust land, PBCI's gaming is lawful under IGRA; if it was not trust land, IGRA would be inapplicable, and there would be no violation of federal law. *See, e.g.*, *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (holding that IGRA regulates gaming activity on Indian trust lands "and nowhere else"). In

neither case would Count I allege an ongoing violation of federal law by the Tribal Defendants, so the *Young* doctrine is inapplicable to that claim.

For newly asserted Counts II, III, V, and VI, the alleged violations of law by PBCI officials relate to the excavation and reburial of remains and objects from the Wetumpka property, ostensibly without proper consultation with or deference to the Plaintiffs, and the construction of a hotel and resort and gaming facilities on the property. *See generally* SAC ¶¶ 201-20, 237-40. Taking the SAC's allegations at face value, all excavation was completed by 2011 and reinterment took place in April of 2012—well in advance of the initial complaint— and construction activities were concluded by 2014, five years before the Plaintiffs sought leave to file the SAC that first asserted these claims. *See id.* ¶¶ 102, 132, 150, 158-59. Again, there is no allegation of any ongoing and continuing violation of federal law to support application of the *Young* doctrine.

This same timeline of events bars the *Young* doctrine's application to the Plaintiffs' federal statutory claims against the Tribal Officials. Count VII, alleging violations of the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. §§ 3001, *et seq.*, accuses the Tribal Defendants of failing to follow appropriate procedures for consulting with the Plaintiffs before and during intentional excavations and construction on the Wetumpka property. *See* SAC ¶¶ 246-50, 255, 258. All excavations having been completed by 2011 and all construction by 2014, claims based on those activities do not allege any ongoing violation of federal law.[8]

---

[8] Insofar as the Plaintiffs allege that they are entitled to repatriation of certain remains or artifacts under NAGPRA and that those remains or artifacts are being wrongfully withheld from them, SAC ¶¶ 251-52, they may allege an ongoing violation of federal law to that limited extent. But any such claim, in addition to failing for reasons set forth below, is separate and distinct from allegations based on the conduct of long completed archaeological excavations or the

Count IX, based on the Archeological Resources Protection Act (ARPA), 16 U.S.C. §§ 470aa, *et seq.*, alleges that the Tribal Defendants made false statements to obtain ARPA permits for the long-since concluded excavations, failed to consult with the Plaintiffs prior to the issuance of those permits, failed to comply with the permits and curate archaeological resources, and performed unpermitted excavations, all before 2011. *Id.* ¶¶ 102, 273-80. And Count X, alleging violations of the National Historic Preservation Act (NHPA), likewise focuses overwhelmingly on asserted failures to consult with the Plaintiffs prior to undertaking excavation and construction activities, *id.* ¶¶ 291-311, with additional allegations of failure to mitigate harm to resources during the construction that concluded no later than 2014. *Id.* ¶¶ 305-09. Once again, all of the conduct underlying these allegations has long since ended and cannot provide the basis for claims to proceed under the *Young* doctrine.

The *Young* doctrine does not afford the Plaintiffs a means of circumventing PBCI's sovereign immunity from litigation challenging the legality of past conduct. Accordingly, all claims against the Tribal Officials based on alleged past violations of federal law must be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).

> 2. *The Young doctrine is inapplicable because the Plaintiffs' claims implicate PBCI's special sovereignty interests in the Wetumpka property.*

Even where its ordinary prerequisites are satisfied, the *Young* doctrine does not apply in cases implicating "special sovereignty interests." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997). This is such a case. In *Coeur d'Alene*, the Supreme Court declined to allow the Coeur d'Alene Tribe (CDT) to proceed with a suit seeking a declaration of its ownership of shore and submerged lands surrounding and underlying Lake Coeur d'Alene and

---

acquisition, in fee or trust, of the Wetumpka property. The *Young* doctrine does not allow the Plaintiffs to pursue these latter claims.

nearby rivers and streams. *See id.* at 264-65. CDT named state officials as defendants, *id.* at 265, asserted "an ongoing violation of its property rights in contravention of federal law," and sought prospective, non-monetary relief, which the Supreme Court acknowledged "is ordinarily sufficient to invoke the *Young* fiction." *Id.* at 265, 281. Nevertheless, the Supreme Court did not allow the suit to proceed under the *Young* doctrine because it implicated "special sovereignty interests"—namely, the State of Idaho's sovereign and regulatory interests in its lands. *Id.* at 281-83. As the Court explained, "if [CDT] were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Id.* at 287. The Supreme Court held that these "special circumstances" barred reliance on the *Young* doctrine to circumvent sovereign immunity. *Id.*

The Plaintiffs in this case seek relief every bit as intrusive on PBCI's sovereign interests as the relief that CDT sought in *Coeur d'Alene*. They explicitly seek, *inter alia*, (1) to revoke the trust status of the Wetumpka property, which would convert it to ordinary private property and completely destroy PBCI's sovereign and jurisdictional authority over it, (2) to have the property placed in a constructive trust (with themselves as beneficiaries assuming *de facto* control of the property), and (3) issuance of an affirmative injunction directing PBCI to remove tens of millions of dollars in fixtures and to effectively leave the land untouched in perpetuity. *See generally* SAC, Prayer for Relief. In no uncertain terms, the Plaintiffs seek to "remove … land from the tribe's jurisdiction or permanently deprive the tribe of its property interests." *Cypress*, 415 F. App'x at 211 (recognizing the special circumstances exemption but declining to apply it where the tribal property interest at issue was a leasehold rather than a jurisdictional or permanent proprietary interest). Accordingly, *Young* is inapplicable, the Tribal Officials are protected by PBCI's sovereign immunity, and the Court lacks subject matter jurisdiction over the

Plaintiffs' claims against them. All of the claims against the Tribal Officials should be dismissed with prejudice pursuant to Rule 12(b)(1).

## II.     The Plaintiffs' IRA claim should be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Count I of the SAC alleges a violation of the Indian Reorganization Act, 25 U.S.C. §§ 5101, *et seq.*, a federal statute that, *inter alia*, gives the Secretary of the Interior the discretionary authority to acquire lands in trust for the benefit of Indians.[9] *See* 25 U.S.C. § 5108. The Secretary exercised this discretionary authority to take the Wetumpka property into trust for PBCI in 1984. *See* Stinson Decl., Ex. B. The Plaintiffs allege that the Secretary lacked authorization to take land into trust for PBCI, that the Secretary's decision should be treated as void *ab initio*, and that the Wetumpka property's trust status should be revoked, leaving the property in the fee simple ownership of PBCI. SAC ¶¶ 197-98.

The Plaintiffs' IRA claim fails for several reasons in addition to the Tribal Defendants' sovereign immunity. As an initial matter, this Court lacks jurisdiction over the claim because the Plaintiffs do not have Article III standing to challenge the trust status of the Wetumpka property. If the Plaintiffs did have standing, they could not state an IRA claim against the Tribal Defendants because such a claim may be brought only under the APA, which does not provide a right of action against nonfederal parties. Finally, even if the Plaintiffs could bring an APA-based IRA claim against the Tribal Defendants (and to the extent that they have alleged such a claim against the Federal Defendants), any such claim is hopelessly time barred and beyond this Court's subject matter jurisdiction.

---

[9] The IRA was previously codified at 25 U.S.C. §§ 461, *et seq.*

A.    <u>The Plaintiffs lack standing to challenge the Secretary's 1984 decision.</u>

The Plaintiffs lack standing to bring an IRA-based challenge to the Wetumpka property's trust status because their alleged injuries are not fairly traceable to the Secretary's 1984 entrustment decision and could not be redressed by a favorable ruling on this claim in any event. Standing is a jurisdictional issue that must be assessed at the time the complaint is filed. *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1264-65 (11th Cir. 2011). "[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the *particular claims* asserted." *Id.* at 1265 (emphasis added & citation omitted). Supreme Court precedent "make[s] clear that 'standing is not dispensed in gross.' To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Where a plaintiff lacks standing to pursue any particular claim or relief, the court lacks jurisdiction, and the relevant claim must be dismissed. *See Hollywood Mobile*, 641 F.3d at 1265.

To establish standing, a plaintiff must show (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely, not merely possible, to be redressed by a favorable decision from the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Hollywood Mobile*, 641 F.3d at 1265-66. An alleged injury is only redressable "when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that *directly redresses* the injury suffered." *Hollywood Mobile*, 641 F.3d at 1266 (emphasis added) (citation omitted).

The Plaintiffs' alleged injuries arise out of archaeological excavations and construction activities on the Wetumpka property and the ostensible mistreatment of excavated remains and artifacts, all of which allegedly occurred in violation of various federal statutes and a putative commitment by PBCI to preserve the Wetumpka property in perpetuity. *See, e.g.*, SAC ¶¶ 4-8. The Plaintiffs do <u>not</u> allege that their injuries arise out of the conduct of gaming activity on the property *per se*; they would have suffered the same alleged injuries if the property had been excavated and used as the site for a shopping mall, restaurant, sports stadium, apartment complex, or any other major public amenity. While their allegations arguably satisfy the first prong of the standing inquiry, the Plaintiffs can go no further on their IRA claim. Their own factual allegations and internal tensions in their legal theories demonstrate that they cannot (1) fairly trace their alleged injuries to the Secretary's decision to take land into trust for PBCI or (2) obtain redress of their alleged injuries through any relief available under that act.

First, the Plaintiffs' alleged injuries are not fairly traceable to the Secretary's decision to accept land into trust for PBCI. PBCI acquired the Wetumpka property in fee in 1980, four years prior to the Secretary's decision to take it into trust. *See id.* ¶ 61; Stinson Decl., Ex. B. When PBCI acquired the property, it entered into a written protective covenant to preserve the property for 20 years. SAC ¶ 62; Stinson Decl., Ex. A. Once that covenant expired in 2000, PBCI was free to engage in the archaeological excavations, construction, and other activities that serve as the basis for the complaint regardless of whether the Secretary had taken the land into trust.[10] *Accord Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective contractual obligations ....").

---

[10] Indeed, when PBCI applied for a grant to assist its acquisition of the property in 1980, it explicitly contemplated the possibility of eventually developing the property and committed to conducting "a scientifically sound archaeological program" in advance of such development. Doc. 190-1 at 4.

Because the Secretary's 1984 decision to take the Wetumpka property into trust was not a necessary prerequisite to any excavation, construction, or other ground disturbing activity on the property and did not authorize or approve any such activity, any alleged injuries based on or arising out of that activity are not fairly traceable to the Secretary's decision. *Accord Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 396 F. Supp. 2d 1087, 1093-94 (D.S.D. 2005) (dismissing similar claims on standing grounds where the tribal plaintiff could not tie potential non-compliance with federal statutes to a federal land-transfer decision). The Plaintiffs therefore lack standing to challenge that decision, and their IRA claim should be dismissed pursuant to Rule 12(b)(1).

Second, the Plaintiffs' alleged injuries are not redressable through their IRA claim. The reason for this is simple. The requested and only potentially available remedy for the Plaintiffs' IRA claim is to have the trust status of the Wetumpka property revoked. That would not undo the archaeological excavation or development on the property or address any of the Plaintiffs' concerns about the treatment of excavated remains and resources.[11] On the contrary, it would severely reduce the likelihood of the Plaintiffs obtaining the redress of the injuries alleged in the SAC, as the property's reversion to fee simple ownership would render the litany of federal preservation statutes relied upon in other counts of the SAC inapplicable to the property. *See, e.g.*, 16 U.S.C. §§ 470aa – 470bb (providing that ARPA applies only to public lands and Indian

---

[11] The Plaintiffs do allege that gaming on the property would be unlawful but for the Secretary's decision to take the Wetumpka property into trust, implying that such activity would cease if they prevail on their IRA claim, but that is irrelevant to their standing. *See, e.g.*, SAC ¶¶ 193, 199. While the Wetumpka property's trust status is instrumental to PBCI's ability to conduct gaming on the property pursuant to IGRA, the Plaintiffs have not alleged that they are injured by the conduct of gaming activity *per se*, nor have they sought any relief specifically addressing gaming activity. Their alleged injuries arise out of archaeological excavations and development on the property—injuries unchanged by the ultimate purpose or use of the development.

lands held in trust by or subject to alienation restrictions imposed by the United States); 25 U.S.C. §§ 3001-3002 (providing that NAGPRA applies only to federal lands and Indian reservation lands); *Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 514-15 (4th Cir. 1992) (citing several cases for the proposition that the NHPA is a narrow statute triggered only when the federal government has control over a project). In other words, were the Plaintiffs to succeed on their IRA claim, the alleged statutory grounds for the Court to order the Tribal Defendants to refrain from any construction, excavation, or other activities on the property, to restore the property to some prior state, or to treat excavated remains and other archeological resources in any specific manner would fall away. Rather than redressing their alleged injuries, a favorable ruling on the Plaintiffs' IRA theory effectively would foreclose their desired remedies.

Having had these fatal standing problems pointed out in multiple motions to dismiss their First Amended Complaint, which asserted only statutory claims, the Plaintiffs attempt to sidestep them in the SAC by asserting new common law causes of action against the Tribal Defendants. *See* SAC, Counts II-III & V-VI. Specifically, they now plead state and federal common law claims for promissory estoppel and unjust enrichment in the alternative, making the Court's disposition of the IRA claim determinative as to which are operable. *See* SAC ¶¶ 200, 236. Presumably, they will contend that this confers standing to litigate their IRA claim. It does not.

As noted above, it is black letter law that a plaintiff must establish standing independently for each claim in the complaint and each form of relief requested. *See, e.g.*, *Town of Chester*, 137 S. Ct. at 1650. If the Plaintiffs lack standing to litigate their IRA claim—and they do—they cannot manufacture standing by saying that the Court must decide the IRA claim to ascertain which of their remaining claims are operative. Instead, the Court must dismiss the IRA

claim due to lack of standing, then address the claims that the Plaintiffs have identified as operative in the event that the Court does not rule in their favor on the IRA claim.[12]

Even if it were possible for a plaintiff to generate standing to litigate a claim in the way that the Plaintiffs appear to have attempted, the effort would be unsuccessful in this case. This is because, as discussed in detail above and below, the Plaintiffs' common law claims themselves are subject to dismissal for lack of subject matter jurisdiction (due to sovereign immunity) and failure to state a claim. Because the common law claims fail regardless, there would be no need for the Court to address the merits of the IRA claim to determine which are operable even if it were otherwise appropriate to do so.

For all of the foregoing reasons, the Plaintiffs lack standing to challenge the Secretary's 1984 decision to accept the Wetumpka property into trust. The Court accordingly lacks subject matter jurisdiction over Count I of the SAC and should dismiss it under Rule 12(b)(1).

B.    The Plaintiffs cannot state an IRA claim against the Tribal Defendants.

Even if they had standing to challenge the Secretary's 1984 entrustment decision, the Plaintiffs' IRA claim would still be subject to dismissal for failure to state a claim to the extent that it is asserted against the Tribal Defendants. The IRA itself provides no right of action for the Plaintiffs to sue the Tribal Defendants or anyone else. Rather, as the Eleventh Circuit recently held, "[t]he proper vehicle for [a plaintiff] to challenge the Secretary's decisions to take land into

---

[12] The Plaintiffs also contingently assert a common law outrage claim seeking monetary damages exclusively against the Individual Defendants and Martin Construction, who are not parties to this motion or targets of the IRA claim. *See* SAC Count IV. To the extent that the Plaintiffs may argue that their method of pleading their outrage claim—such that it is operative only if the Court rules in their favor on the IRA claim—somehow grants them standing to assert the IRA claim against the Tribal or Federal Defendants, this is subject to the same problems as their alternative federal and state common law claims against the Tribal Defendants. That problem is magnified by the fact that, in this instance, the Plaintiffs would be attempting to generate standing to sue one group of defendants and obtain one type of relief by asserting an entirely separate, contingent claim seeking a completely different form of relief against an entirely different group of defendants.

trust for the Tribe is an APA claim." *PCI Gaming*, 801 F.3d at 1291 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012), for the proposition that "a challenge to the Secretary's land-into-trust decision [i]s a 'garden-variety APA claim'"); *see also Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (*en banc*). Of course, "it is well settled that suits under the APA may not be pursued against *nonfederal* entities, nor may federal courts enjoin nonfederal entities based on the conduct of federal agencies held to run afoul of the APA." *Friends of Lydia Ann Channel v. U.S. Army Corps. of Eng'rs*, 701 Fed. App'x 352, 358 (5th Cir. 2017) (citing numerous federal appellate decisions); *see also Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1298 (D.C. Cir. 2007) ("[N]othing in the APA authorizes claims against nonfederal entities …."); *Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1035-36 (6th Cir. 1999). Because a challenge to the Secretary's decision to accept the Wetumpka property into trust may be brought, if at all, only under the APA, and an APA claim cannot be brought against nonfederal parties such as the Tribal Defendants, Count I of the SAC should be dismissed under Rule 12(b)(6) for failure to state a claim against the Tribal Defendants.

C.   Any attack on the Secretary's 1984 decision is time-barred.

Even if the Plaintiffs had standing to challenge the Secretary's 1984 decision and could do so through a claim against the Tribal Defendants (and to the extent that they do so through a claim against the Federal Defendants), their claim still must be dismissed on the grounds that it is long since time barred. As noted above, the only avenue for challenging a land-into-trust decision by the Secretary of the Interior is through a direct APA claim. *See*, *e.g.*, *Patchak*, 567 U.S. at 220; *PCI Gaming*, 801 F.3d at 1291; *Big Lagoon*, 789 F.3d at 953. The statute of limitations for bringing a claim under the APA is six years, and it "begins to run when the

agency issues the final action that gives rise to the claim." *PCI Gaming*, 801 F.3d at 1292; *see* 28 U.S.C. § 2401(a). The Secretary took the Wetumpka property into trust in 1984—more than thirty-five years ago, and nearly thirty years before the Plaintiffs filed this lawsuit. *See* Stinson Decl., Ex. B. The untimeliness of any challenge to the Secretary's decision to accept the Wetumpka property into trust for PBCI is readily apparent.

*PCI Gaming* is directly on point and controlling. There, the State of Alabama sued PBCI and other tribal parties attempting, *inter alia*, to set aside the Secretary's decisions to take the Wetumpka property and other lands within the exterior geographic boundaries of the State into trust for PBCI. When PBCI moved to dismiss on the grounds that the State's suit constituted an improper collateral attack on federal agency action, the State attempted to amend its complaint to add a direct APA claim against the Secretary. *See PCI Gaming*, 801 F.3d at 1292. The Eleventh Circuit upheld the denial of leave to amend, holding that the proposed amendment would have been futile because the statute of limitations to bring an APA challenge to the Secretary's 1984 decision had run by 1991. *Id.*

The State, as the Plaintiffs presumably intend to do here, tried to argue around the obvious time bar by alleging that the Secretary's entrustment decision was *ultra vires* and that its challenge thus was not subject to the APA's statute of limitations. *Id.* While acknowledging the existence of an exception allowing otherwise untimely as-applied challenges to certain *ultra vires* agency decisions, the Eleventh Circuit held that exception inapplicable to the Secretary's 1984 decision, explaining that Alabama was contemporaneously aware of the decision and could have timely challenged it, but did not. *Id.* (citing *Big Lagoon*, 789 F.3d at 954 n.6). As the Court of Appeals succinctly explained, "[b]ecause Alabama could have brought a timely APA

23

challenge, we will not carve out an exception to the six-year statute of limitations … to disturb the Secretary's long ago decisions to take the lands in question into trust." *Id.*

Less than a year after it decided *PCI Gaming*, the Eleventh Circuit reviewed another challenge to the trust status of PBCI trust lands, this one by the Escambia County tax assessor. *See PBCI v. Hildreth*, 656 F. App'x 934 (11th Cir. 2016). The assessor, Hildreth, also "argue[d] that the Secretary's ultra vires decision to take the land into trust constitutes a valid exception to the APA's limitations period." *Id.* at 943. The Court of Appeals was unpersuaded, noting that it had "rejected the same argument on similar facts in *PCI Gaming*" and that allowing a party with prior notice of the Secretary's land entrustment decision to challenge that decision "nearly 30 years later … would turn *PCI Gaming* on its head." *Id.* at 943-44.

*PCI Gaming* and *Hildreth* mandate dismissal of the Plaintiffs' challenge to the Wetumpka property's trust status. Like the State of Alabama and Hildreth, Plaintiffs had contemporaneous knowledge of the Secretary's decision and could have brought a timely APA challenge, but chose not to do so. *See, e.g.*, SAC ¶¶ 216-17 (indicating that the Plaintiffs would have opposed the trust acquisition of the Wetumpka property had they known that Poarch would eventually excavate and develop it, necessarily implying contemporaneous awareness of the decision). Even if they counterfactually deny contemporaneous knowledge of the decision, it is indisputable that the Plaintiffs were aware of the Secretary's decision, the Department of the Interior's taking action based on that decision, and of PBCI's allegedly offensive activity on the Wetumpka property more than 10 years prior to filing this lawsuit in December 2012. *See, e.g.*, Doc. 190-1 at 128 (referencing intertribal discussions of reinternment of remains excavated from the Wetumpka property as far back as May 2006); Doc. 100 at 22 (Plaintiffs' brief referring to October 2002 NAGPRA claim by Plaintiffs regarding Hickory Ground excavations); Doc. 95-8

24

(2002 letter from MCN complaining that NPS entered into an agreement for PBCI to assume historic preservation responsibilities on the Wetumpka property without consultation with MCN); Doc. 95-7 (2002 letter from Mekko Thompson objecting to excavations on the Wetumpka property, alleging violations of various federal statutes, and claiming ownership, apparently under NAGPRA, of "all remains or objects" excavated from the Wetumpka trust property). Accordingly, even assuming, *arguendo*, that the APA's six-year limitations period did not begin to run until the Plaintiffs were aware of any or all of those events, it would still bar the Plaintiffs' IRA claim.

Because the Plaintiffs' failed to bring their IRA claim within the APA's six-year limitations period, this Court lacks subject matter jurisdiction over that claim and should dismiss it with prejudice under Rule 12(b)(1). *See, e.g.*, *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006).

### III.   The Plaintiffs' promissory estoppel claim fails a matter of law.

The Plaintiffs assert a promissory estoppel claim primarily against the Tribal Defendants based upon their failure to keep an alleged promise to "preserve" Hickory Ground in perpetuity.[13] This claim fails for several reasons, including: (1) it is untimely; (2) it is barred by the statute of frauds; and (3) the Plaintiffs have not alleged any of the essential elements of the claim. It should be dismissed.

---

[13] The SAC includes two counts of promissory estoppel, one under state law and one under federal common law, offered in the alternative such that only one will be operative depending on the Court's disposition of the IRA claim. *See* SAC Counts III and VI; ¶¶ 200, 236. As the Plaintiffs allege that the controlling law is substantially the same regardless of which claim is operative and base the alternative claims on the same facts, *id.* ¶¶ 238, 240, the Tribal Defendants will treat them as a single claim for purposes of this brief. The Tribal Defendants will do the same for the Plaintiffs' alternatively plead unjust enrichment claims.

A.    <u>The promissory estoppel claim is time barred.</u>

Alabama law imposes a two year statute of limitations on claims for promissory estoppel. *See* Ala. Code § 6-2-38(l); *Ala. Space Sci. Exhibit Comm'n v. Odysseia Co., Ltd.*, 2016 WL 9781806, at *11 (N.D. Ala. Sept. 30, 2016). A claim for promissory estoppel accrues, for limitations purposes, when the plaintiff knew or had reason to know of the defendant's breach of the alleged promise. *See Ala. Space*, 2016 WL 9781806, at *11; *see also, e.g.*, *Nettles v. AT&T*, 55 F.3d 1358, 1363-64 (8th Cir. 1995); *Moisiuc v. Argent Mortg. Co., LLC*, 2019 WL 1330283, at *3 (S.D. Tex. Mar. 25, 2019) (holding that "the latest a cause of action for promissory estoppel could accrue is when the promisor breaches his promise" (citation omitted)); *Newberg v. Schweiss*, 2009 WL 3202380, at *4 (D. Minn. Sept. 30, 2009); *Weiss v. Smulders*, 96 A.3d 1175, 1187 (Conn. 2014). Alabama courts have not recognized promissory estoppel as a possible continuing tort.

The Plaintiffs alleged in 1992 that PBCI was taking actions that allegedly "threatened" the "cultural, historical and archeological integrity of the site," and they knew no later than 2002 that excavations, including of human remains, had occurred at the site. *See* Docs. 95-6, 95-7. The record further shows that the Plaintiffs sent representatives to Wetumpka, Alabama to discuss reinternment of excavated human remains on May 9, 2006—more than six and a half years prior to the filing of the initial complaint in this case. Doc. 190-1 at 128; Doc. 95-8. Even the SAC concedes that the Poarch Band notified the Plaintiffs of a Phase III excavation at the site by 2006, that the Plaintiffs began an extended dialogue with the Poarch Band that year, and that Mekko Thompson visited Alabama that year to discuss the issues with representatives of the Poarch Band and Auburn University. *See* SAC ¶¶ 137-42. Based on these established facts and allegations, it is impossible for the Plaintiffs to bring a timely promissory estoppel claim today,

and it was impossible for them to do so when they filed the initial complaint in the waning days of 2012. Therefore, the promissory estoppel claim should be dismissed.

      1.    *The Plaintiffs' contention that they seek a constructive trust does not extend the limitations period.*

The Plaintiffs have argued that their promissory estoppel claim is not subject to a two-year statute of limitations because it is "rooted in equity and seek[s] the equitable remedy of an injunction and constructive trust." Doc. 179 at 11. Thus, they assert, the promissory estoppel claim is "in the nature of recovery of real property" under Alabama Code § 6-2-33(2) and the applicable statute of limitations is ten years. The Plaintiffs' attempt to evade the applicable statute of limitations by seeking inapplicable relief to which they are not entitled is unavailing.

To begin, constructive trust is a not an independent cause of action, but "a remedy imposed to prevent the enjoyment of a fraud or of a breach of a fiduciary duty." *Gulf States Steel, Inc. v. Lipton*, 765 F. Supp. 696, 704 (N.D. Ala. 1990), *aff'd*, 934 F.2d 1265 (11th Cir. 1991); *see also Otwell v. Ala. Power Co.*, 944 F. Supp. 2d 1134, 1160 n.22, 1161 (N.D. Ala. 2013), *aff'd*, 747 F.3d 1275 (11th Cir. 2014) (noting defendant was entitled to summary judgment on plaintiffs' claim for the remedy of a constructive trust). Two of the cases that the Plaintiffs cited in support of their motion for leave to amend illustrate underscore the limited availability of this remedy. In *Radenhausen v. Doss*, 819 So. 2d 616 (Ala. 2001), for example, the Alabama Supreme Court explains that constructive trust, as sought by defendants in counterclaiming for breach of fiduciary duty, conversion, and fraud, "is an equitable remedy; and a request to impose such a trust is not a cause of action that will stand independent of some wrongdoing." *Id*. at 620. Likewise, in *Knowles v. Canant*, 51 So. 2d 355 (Ala. 1951), the Alabama Supreme Court held that constructive trust arises whenever the legal title to property has been "obtained through actual fraud, misrepresentation, concealments, or through undue influence, duress, taking

advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest." *Id.* at 333, 357. Plaintiffs have not plead fraud or breach (or even the existence) of any fiduciary duty here, and the alleged facts would not support any such claim. On the contrary, the alleged facts are that PBCI agreed to a written, 20-year preservation covenant when it acquired the Wetumpka property—with no assistance from the Plaintiffs—and that it began to develop the property after that agreement expired in a manner that is offensive to the Plaintiffs. SAC ¶¶ 62, 79, 100. Constructive trust is not an appropriate remedy under these facts, and the Plaintiffs' request for this unavailable remedy cannot alter the limitations period for their promissory estoppel claim.

Plaintiffs further argued in support of their motion for leave that their promissory estoppel claim should be treated as neither a tort claim nor an implied contract claim, relying on *Auburn Univ. v. IBM*, 716 F. Supp. 2d 1114, 1118 (M.D. Ala. 2010). Their reliance is misplaced. While this court opined in *Auburn* that "it would be improper to classify all unjust-enrichment claims as either tort claims subject to the two-year statute of limitations or implied-contract claims subject to the six-year statute of limitation," it plainly meant that not all such claims should be treated as torts claims and not all should be treated as contract claims, not that some should be treated as neither. *See id.* (finding that the unjust enrichment claim at issue presented a "classic tort injury" to which the two year limitations period applied). And because the Plaintiffs' promissory estoppel claim accrued, at the latest, on May 9, 2006—more than six years and a half years prior to the filing of their initial complaint—it is time barred regardless of whether it is

28

subject to the two-year tort limitations period set forth in Ala. Code § 6-2-38(l) or the six year contract statute of limitations set forth in Ala. Code § 6–2–34(9).[14]

Lastly, it is significant that the Plaintiffs only request a constructive trust in the event that the Court enters a judgment in their favor on the IRA claim alleged in Count I of the SAC. *See* SAC Prayer for Relief (a), (b)(ii). Accordingly, any arguments that seeking a constructive trust alters the limitations period and statute of frauds are unavailable to the extent that the Court rules against the Plaintiffs on that claim.

2.    *The Plaintiffs do not seek recovery of land.*

Plaintiffs contend that the limitations period for their promissory estoppel claim is governed by Ala. Code § 6-2-33(2), which addresses "[a]ctions for the recovery of lands, tenements or hereditaments or the possession thereof." Consistent with its language, this statute has been held to apply to cases where the ***recovery*** of possession of or title to land is at issue. *See, e.g.*, *I-359, Inc. v. AmSouth Bank*, 980 So. 2d 419, 423 (Ala. Civ. App. 2007) (holding that a 10-year statute of limitations applied to claim of breaches of covenants regarding title); *Williams v. Kitchens*, 74 So. 2d 457, 463 (Ala. 1954) (indicating that a suit for the "recovery of land" is for "the immediate enjoyment of its possession, and will not lie for any property whereon no right of entry exists."). Here, Plaintiffs do not seek to "recover" the Wetumpka property and have made no claim that they own or should actually own it. Instead, they object to the Tribal Defendants' development of property that PBCI independently acquired from a third party.

The Plaintiffs' failure to seek recovery of the land differentiates their case from those in which courts applied the ten-year statute of limitations in Ala. Code § 6-2-33(2). Unlike the

---

[14] Indeed, based on Plaintiff Thompson's October 19, 2002, letter to PBCI and federal officials threatening legal action over excavations at the Wetumpka property, *see* Doc. 95-7, it appears that the Plaintiffs' promissory estoppel claim accrued more than 10 years prior to the filing of the initial complaint, which would render their constructive trust argument moot.

present case, those cases typically involve disputes where a party sought a constructive trust because possession or title to the property was disputed. *See Haavik v. Farnell,* 87 So. 2d 629, 630 (Ala. 1956) (seeking an order giving plaintiff title to certain lands held by his former wife and his sister); *Henslee v. Merritt*, 82 So. 2d 212, 214 (Ala. 1955) (seeking to establish trust in widow's favor over land sold for division among devisees of deceased husband's will); *Sykes v. Sykes*, 78 So. 2d 273, 274 (Ala. 1954) (seeking to have trust in real property decreed in plaintiff's favor as the equitable owner of real estate purchased during her marriage to defendant). In this case, the Plaintiffs do not claim that they are the rightful owners of the Wetumpka property or dispute PBCI's title to it. Thus, the ten year statute of limitations does not apply, and the Plaintiff's promissory estoppel claim is time barred.

> B.   The statute of frauds bars the Plaintiffs' promissory estoppel claim.

The Plaintiffs' promissory estoppel claim also fails because it would violate the statute of frauds. Alabama law does not allow the use of promissory estoppel to enforce an agreement that is void under the statute of frauds. *See Branch Banking & Tr. Co. v. Nichols*, 184 So. 3d 337, 347-48 (Ala. 2015); *see also Boman v. City of Gadsden*, 220 So. 3d 298, 303 n.3 (Ala. 2016); *Martin Marietta Materials, Inc. v. Limestone Redbay, Inc.*, No. 7:12-CV-02765-HNJ, 2017 WL 3444738, at *7 (N.D. Ala. June 30, 2017). And under Alabama's statute of frauds, an agreement that cannot be performed within one year is void unless made in writing. Ala. Code § 8-9-2(1); *see also Boman*, 220 So. 3d at 303 n.3 ("Had an unwritten agreement existed, however, it appears it would be void under the Statute of Frauds because such an agreement by its terms could not be performed within one year of its making."); *Lee v. Town of Good Hope*, 1998 WL 465114, at *11 (N.D. Ala. June 24, 1998). Given that a promise to protect land "in perpetuity" by its very terms cannot be performed within one year, the statute of frauds bars the Plaintiffs'

promissory estoppel claim unless the Tribal Defendants made the alleged promise in an enforceable written contract. They did not.

The Plaintiffs have not alleged the existence of any written agreement between the parties wherein the Tribal Defendants committed to preserve the subject property in perpetuity in exchange for the Plaintiffs' not objecting to "Poarch's acquisition of the property, either in fee or trust, and in supporting Poarch's federal recognition." *See* SAC ¶¶ 214-17. At most, they allege that the Poarch Band committed to preserving the property in a letter to a third party, the Alabama Historical Commission, seeking a federal historic preservation grant administered by that Commission. *See* SAC ¶¶ 64, *et seq.* (citing SAC Ex. A, Doc. 190-1). But that application letter is not a contract, nor does it set forth an unequivocal commitment to preserve the property in perpetuity without development. On the contrary, it explicitly contemplates eventual development, stating that "[p]rior to any type of development of the property a scientifically sound archaeological program will be conducted to mitigate or minimize effects upon the historic resources." Doc. 190-1 at 4. Nor does the letter reflect other terms of any alleged agreement between the Plaintiffs and the Tribal Defendants; indeed, it sets forth no consideration or commitment by the Plaintiffs and makes no reference whatsoever to PBCI's eventual federal recognition or transfer of the property into trust. *See generally* Doc. 190-1, Ex. A. Accordingly, to the extent that the Plaintiffs rely upon the letter as the writing necessary to satisfy the Statute of Frauds, their argument fails because that letter does not set out all essential terms of the alleged agreement. *See Lambert v. First Fed. Mortg.*, 47 F. Supp. 3d 1310, 1319 (N.D. Ala. 2014) (holding that an alleged agreement violated the statute of frauds where the plaintiffs were "attempting to enforce what they claim to be a verbal contract with some terms reduced to writing … and at least one essential term *not in writing*").

31

Finally, should the Plaintiffs attempt to assert that any as-yet unidentified written contract compliant with the statute of frauds does encapsulate the entire agreement that they seek to enforce via promissory estoppel, their claim still would fail because promissory estoppel cannot be invoked to enforce an agreement set forth in a valid, written contract. *Madison County v. Evanston Ins. Co.*, 340 F. Supp. 3d 1232, 1291 (N.D. Ala. 2018) ("A promissory estoppel claim has no viability in the presence of a valid breach-of-contract claim regarding the same promise."); *see also Aldridge v. DaimlerChrysler Corp.*, 809 So. 2d 785, 794 (Ala. 2001) (indicating that Alabama courts proceed to promissory estoppel analysis only *after* they have "determined that no binding contract existed"). In short, the statute of frauds bars enforcement of the Tribal Defendants' alleged perpetual preservation promise to the extent that it was not fully set forth in a valid written contract, and Alabama law provides that promissory estoppel is unavailable to enforce promises that are set forth in such a contract.[15] The facts of this case thus leave the Plaintiffs with no avenue to assert a viable promissory estoppel claim.

    C.    <u>The Plaintiffs have failed to allege the elements of promissory estoppel</u>.

Even if the Plaintiffs' promissory estoppel claim were timely and not barred by the statute of frauds, it would still fail because the Plaintiffs have not alleged facts establishing the essential elements of promissory estoppel. Under Alabama law, there are four elements of promissory estoppel: (1) the defendant made a promise; (2) the defendant should have reasonably expected to induce action or forbearance of definite and substantial character; (3) the promise did, in fact, induce action or forbearance; and (4) injustice can be avoided only by enforcing the promise. *AAL USA, Inc. v. Black Hall Aerospace, Inc.*, No. 2:16-CV-02090-KOB,

---

[15] PBCI did enter into a written, enforceable agreement to preserve the property for 20 years. *See* Stinson Decl., Ex. A. That agreement expired in 2000, the Plaintiffs do not allege its breach, and any such claim would be hopelessly time barred in any case. *See* SAC ¶¶ 62, 100. To the extent that the Plaintiffs ask this Court to equitably impose a perpetual preservation agreement on the Tribal Defendants, they effectively ask it to nullify the written agreement's express term.

2018 WL 3368855, at *5 (N.D. Ala. July 10, 2018) (citing *Branch Banking*, 184 So. 3d at 347). The Plaintiffs have failed to allege that the Tribal Defendants made an enforceable promise, that those defendants should have reasonably expected forbearance based on that purported promise, or that the Plaintiffs detrimentally relied on that promise.

1.    *The Plaintiffs have not alleged an enforceable promise.*

The Plaintiffs generally allege that PBCI "promised to preserve the Hickory Ground Site in perpetuity." SAC ¶ 215. It is unclear from the allegations in the SAC, however, what "preserve" means and thus exactly what the Plaintiffs allege that PBCI promised to do. Because the alleged promise is not sufficiently clear or specific, it cannot be enforced by this Court. Moreover, the principal document that the Plaintiffs rely upon as evidence of an alleged promise also contains numerous statements contradicting those relied upon by Plaintiffs, revealing that PBCI, in fact, made no promise at all.

In order "for a promise to create an estoppel, the promise must be sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." *Wyatt v. BellSouth, Inc*., 176 F.R.D. 627, 631 (M.D. Ala. 1998). To allege that Poarch Band promised to preserve the property in perpetuity, without any development, destruction, or excavation, Plaintiffs cherry-pick a smattering of phrases from the aforementioned grant application letter that PBCI submitted to the Alabama Historical Society. *See* SAC ¶¶ 64, 67. Yet other parts of the same letter contemplate development of the property, archeological excavation, and plans to minimize destruction of unstudied archeological remains. *See generally* Doc. 190-1, Ex. A. Contemplation of development and archeological excavation and commitments to minimize damage to archeological resources are inconsistent with, and flatly contrary to, PBCI's alleged promise to perpetually preserve property without any excavation, destruction, or

33

development. And a mere promise to "minimize destruction" is far too general and lacking in specifics to be enforced by a Court. *See*, *e.g.*, *Aldridge*, 809 So. 2d at 794 (holding that a promissory estoppel claim failed because the alleged promise was "general" and not specific); *Bates v. Jim Walter Res., Inc.*, 418 So. 2d 903, 905 (Ala. 1982) (holding that a promissory estoppel claim fails where the alleged promise did not contain material terms); *Walk, Inc. v. Zimmer*, 2014 WL 2465311, at* 9 (N.D. Ala. May 30, 2014) (dismissing promissory estoppel claim that alleged promise in "non-specific terms").

Not only is the alleged promise insufficiently specific, even a cursory review of the five-page letter leads one to the inescapable conclusion that PBCI made no promise at all to preserve the Wetumpka property in perpetuity, without development, excavation, or destruction, as the Plaintiffs allege. Indeed, the letter read as a whole, as it must be, makes clear that Poarch Band intended to develop the property in the future. Specifically, the letter indicates that:

> [T]hrough proper archeological methods and techniques these below the surface features can reveal a tremendous amount of information about the Creek way of life in the late 1700's and 1800's. Upon gaining fee-simple title to the land as called for in this proposal plans will be developed to minimize continued destruction of the archeological resources. Prior to any development of the property, a scientifically sound archeological program will be conducted to mitigate or minimize effects upon the historic resources.

Doc. 190-1 at 4. Because the very document on which the Plaintiffs rely contemplated the eventual development and excavation of the property and did not unequivocally promise to preserve it in perpetuity, their promissory estoppel claim fails.

The Plaintiffs also rely, to a much lesser extent, on written congressional testimony submitted by PBCI's Chairman in 1983, after PBCI acquired the property, regarding PBCI's plans for certain unrelated trust funds. The SAC alleges that PBCI "'propose[d] to use part of this money to make that site, not only available to all of our people, but to the general public as well.'" SAC ¶ 70. It also quotes a portion of the testimony wherein PBCI's Chairman "proposes

to use fifty percent of the proceeds of S. 1224 to preserve and to present to both Indian and non-Indian this unique and historical site." *Id.* ¶ 72. This testimony is non-specific and unenforceable. The statements do not amount to an unequivocal commitment to maintain the property in perpetuity without development, destruction, or excavation. Rather, it amounts to a non-specific "proposal" to "preserve and present" the site to Indian and non-Indian people. This is not a statement that a court could possibly enforce and thus cannot be the basis for a promissory estoppel claim.[16] Because the Plaintiffs have not alleged any judicially enforceable promises by PBCI, their promissory estoppel claim fails. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) (holding that at the motion to dismiss stage "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibit govern"); *seei e.g.*, *Cantrell v. City Federal Sav. & Loan Ass'n*, 496 So. 2d 746, 751 (Ala. 1986) (holding that statements made were not a promise and without a promise upon which they could have relied, plaintiffs could not recover on a promissory estoppel theory).

2.   *PBCI could not have reasonably foreseen that the Plaintiffs would rely on statements made in the grant application letter and congressional testimony.*

The promissory estoppel claim also fails because PBCI could not have reasonably foreseen that the Plaintiffs would rely upon the purported promises at issue. First, because PBCI made no promise to preserve the property in perpetuity and in fact represented in its grant application that it contemplated development in the future, it could not have reasonably foreseen that the Plaintiffs would misconstrue the letter and rely on their erroneous interpretation. Nor could PBCI have reasonably foreseen that the Plaintiffs would rely upon a vague proposal contained in congressional testimony about unrelated funding. Second, the fact that PBCI did not

_____

[16] The testimony also was given after PBCI acquired the property, meaning that the Plaintiffs could not possibly have relied upon it to forebear opposing that acquisition.

make the alleged representations to the Plaintiffs, but to the Alabama Historical Society and Congress, further undermines any claim that it should have anticipated the Plaintiffs' reliance. Third, the grant application letter describes an unrealized "plan" for PBCI and MCN to jointly own and manage the Wetumpka property, which obviously did not occur. *See* Doc. 190-1 at 5 ("Under this plan, the property will be jointly owned by both groups of Creeks. They will be equally responsible for the protection and care of the site."). PBCI could not reasonably be expected to foresee the Plaintiffs' reliance on statements extracted from a proposal that never came to fruition. In the absence of foreseeable reliance, the Plaintiffs cannot state a claim for promissory estoppel.

> 3.   *The Plaintiffs have failed to allege facts establishing detrimental reliance.*

The Plaintiffs also have not alleged facts establishing the essential element of detrimental reliance, which is the "gravamen of the claim of promissory estoppel …." *Wyatt v. BellSouth, Inc.*, 18 F. Supp. 2d 1324, 1326 (M.D. Ala. 1998); *see also Madison County*, 340 F. Supp. 3d at 1290-91. To establish detrimental reliance, a party must show that it was damaged as a result of its reliance on another; in other words, there must be a link between the reliance and the detriment. *Accord Bosarge Offshore, LLC v. Compass Bank*, 943 So. 2d 782, 787 (Ala. 2006) ("The notion that *detrimental* reliance is untethered to damage … is completely unfounded.").

The Plaintiffs ground their promissory estoppel claim on their assertion that, based on an alleged promise from the Tribal Defendants, they refrained from objecting to: (1) PBCI's 1980 acquisition of the Wetumpka property in fee; (2) PBCI's 1984 federal recognition; and (3) the United States' decision to take the property into trust in 1985. *See* SAC ¶¶ 61, 73, 214-17. And they allege that they were harmed by subsequent excavation and construction activity on the property. But the Plaintiffs do not and cannot establish any causal connection between their

withholding of objections and their alleged harm. They thus necessarily fail to show detrimental reliance.

As to the first assertion, the Plaintiffs do not claim they had any legal or practical authority to prevent PBCI from acquiring the property in fee. They did not own the land when PBCI initially purchased it, nor did they provide any funding for its acquisition. Because they lacked any authority to prevent the purchase, the Plaintiffs cannot establish that their objection would have carried any weight. And even if they had somehow managed to prevent the Poarch Band from acquiring the property, their own evidence indicates that the result would have been imminent commercial development of the property in the 1980s—meaning that even a successful objection would not have prevented their asserted injury. *See* Doc. 190-1 at 5. The Plaintiffs therefore cannot establish that, by refraining from objecting to PBCI's fee acquisition of the subject property, they *detrimentally* relied on any representation by the Tribal Defendants.

The Plaintiffs' second and third assertions are equally unavailing. They cannot show that their objection would have prevented the Poarch Band's 1984 federal recognition or the United States' taking of the property into trust in 1985. And even if the Plaintiffs had successfully opposed either action, PBCI still would have held the land in fee with the right to excavate and develop the property as it saw fit after the expiration of the 20-year preservation covenant. Once again, there simply is no connection between the Plaintiffs' withholding of objections and the harm that they allege. Because the Plaintiffs cannot show detriment resulting from their alleged inaction in reliance on PBCI's putative promise, they cannot establish a viable promissory estoppel claim.

IV.    **The Plaintiffs' unjust enrichment claim should be dismissed.**

Like their promissory estoppel claim, the Plaintiffs' unjust enrichment allegations fail to

state a claim. The claim fails as a matter of law because: (1) the Plaintiffs have not adequately

alleged necessary elements; (2) it is untimely; and (3) it is barred by the statute of frauds.

A.    The elements and limitations of unjust enrichment.

"'To prevail on a claim of unjust enrichment, the plaintiff must show that the defendant

holds money which, in equity and good conscience, belongs to the plaintiff or holds money

which was improperly paid to defendant because of mistake or fraud.'" *Scrushy v. Tucker*, 955

So. 2d 988, 1011 (Ala. 2006) (emphasis omitted) (quoting *Avis Rent A Car Sys., Inc. v. Heilman*,

876 So. 2d 1111, 1122-23 (Ala. 2003)). Importantly, the plaintiff asserting unjust enrichment

must show not only that the defendant has been unjustly enriched, but also that the alleged unjust

enrichment came *at the plaintiff's expense*. *See United States ex rel. Mathews v. Decatur Hotels,

L.L.C.*, 2008 WL 11375354, at **6-7 (N.D. Ala. Aug. 21, 2008) (analyzing *Scrushy*, *Dickinson*,

and other Alabama case law); *see also Rutledge v. Aveda*, 2015 WL 2238786, at **13-14 (N.D.

Ala. May 12, 2015) (dismissing a claim by a plaintiff who alleged that the defendant unjustly

retained a benefit provided by third parties); *accord Tiller v. State Farm Mut. Auto. Ins. Co.*, 549

Fed. App'x 849, 856-57 (11th Cir. 2013) (applying Georgia law to hold that "a transfer of some

benefit from plaintiff to defendant is an element of an unjust enrichment claim" and noting that

its holding "conforms to the traditional notion of unjust enrichment"). Additionally, Alabama

law imposes, at the outside most, a six-year limitations period on claims for unjust enrichment—

a limitations period that the Plaintiffs have not met. *See Snider v. Morgan*, 113 So. 3d 643, 655

(Ala. 2012) (noting that Alabama courts have not determined whether the statute of limitations

for unjust enrichment is two or six years). And like a claim for promissory estoppel, claims for

unjust enrichment are subject to the statute of frauds. *Branch Banking*, 184 So. 3d at 347 (holding the statute of frauds bars both promissory estoppel and unjust enrichment claims).

      B.    <u>The Plaintiffs do not allege that the Tribal Defendants have retained a benefit that rightfully belongs to the Plaintiffs.</u>

The Plaintiffs allege that the Tribal Defendants were unjustly enriched by: (1) acquiring the property at issue at no cost and without objection by the Plaintiffs; (2) allegedly "destroying a large part" of the Hickory Ground site to accommodate construction of a profitable hotel and gaming facility; and (3) continuing and expediting construction of that facility without adequately notifying or consulting with the Plaintiffs and over their objections. *See* SAC ¶¶ 202, 208-09, 211. Even if accepted as true, these allegations do not provide grounds for the Plaintiffs to state a viable unjust enrichment claim because the Plaintiffs have not identified any benefit retained by the Tribal Defendants that rightfully belongs to the Plaintiffs.

Judge Hopkins' opinion in *Decatur Hotels* illustrates the problem with the Plaintiffs' unjust enrichment theory. There, the plaintiff, a former employee of the defendant hotel company, filed False Claims Act and unjust enrichment claims alleging that the hotel company had submitted improper claims for reimbursement under a federal program intended to provide housing for individuals displaced by Hurricane Katrina. *See generally Decatur Hotels*, 2008 WL 11375354. In rejecting the unjust enrichment theory, the court emphasized that the plaintiff was "not seeking restitution from [defendant] for something which she claims it holds that rightfully belongs to her." *Id.* at *6. Instead, the plaintiff argued that Alabama law allowed her to maintain an unjust enrichment claim merely based on the defendant's alleged unjust receipt of a benefit from a third party. *Id.* at **6-7. The Court rejected the plaintiff's argument, holding that an "unjust enrichment claim cannot proceed as a matter of law" when the defendant "does not have in its possession any money belonging to [the plaintiff]." *Id.* at *7 (internal quotation omitted)

(citing *Hancock-Hazlett Gen. Constr. Co., Inc. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986));
*see also Rutledge*, 2015 WL 2238786, at **13-14 (holding that a plaintiff failed to alleged the
elements of unjust enrichment when she contended that it was unjust for the defendants to retain
benefits provided by third parties).

The Plaintiffs' unjust enrichment claim suffers the same flaw as those at issue in *Decatur
Hotels* and *Rutledge*. While the Plaintiffs contend that the Tribal Defendants were unjustly
enriched by acquiring the subject property "at no cost," SAC ¶ 202, they do not contend that they
bore the cost of the property or otherwise were deprived of a benefit by the Poarch Band. On the
contrary, the SAC explicitly alleges that the Poarch Band acquired the property via a federal
grant and a donation from the former landowner. *Id.* ¶ 61. To the extent that the Plaintiffs assert
that they should be able to recover based on a benefit conferred on the Tribal Defendants by third
parties, they fail not only to allege the necessary elements of unjust enrichment, but also the
basic minimum requirements of Article III standing. *See Rutledge*, 2015 WL 2238786, at **13-
14 (citing *U.S. ex rel. Long v. SCS Bus. & Tech. Inst.*, 999 F. Supp. 78, 92 (D.D.C. 1998)
(holding that where the alleged unjustly retained benefit was conferred by someone other than
the plaintiff, the plaintiff lacks standing to sue for unjust enrichment), *rev'd on other grounds by*
173 F.3d 870 (D.C. Cir. 1999); *see also Bykov v. Radisson Hotels Int'l., Inc.*, 221 F. App'x 490,
491-92 (8th Cir. 2007) (affirming dismissal of unjust enrichment claim on standing grounds
where plaintiff's employer, rather than plaintiff, paid allegedly overstated hotel bill). And while
the Plaintiffs allege that the Tribal Defendants were unjustly enriched by constructing and
operating a commercial development on the subject property many years after acquiring it, SAC
¶¶ 209-12, the Plaintiffs offer no explanation of how that allegedly unjust enrichment could be
construed as a benefit that rightfully belongs to them. Simply put, the legal theory of unjust

enrichment does not match the injuries that the Plaintiffs allege. The unjust enrichment claim fails as a matter of law, and the Court should dismiss it.

C.     The Plaintiffs' unjust enrichment claim is untimely and barred by the statute of frauds.

As explained in *Snider*, while the statute of limitations for unjust enrichment in Alabama is unsettled, it certainly is no more than six years. *See Snider*, 113 So. 2d at 655. Accordingly, to the extent that the Plaintiffs' claim of unjust enrichment is based on any of: (a) PBCI's acquisition of the property "at no cost to Poarch" in 1980, SAC ¶ 202; (b) the United States' formal acknowledgement of PBCI's tribal status and acceptance of the property into trust without objection from the Plaintiffs in 1984, *id.* ¶¶ 205-08; or (c) PBCI's allowing archaeologists to perform excavations on the property beginning in or before 2006 in violation of an alleged promise to preserve the property without excavation, *id.* ¶ 209, any such claim was time barred when the Plaintiffs filed their original complaint in December 2012.

Alabama law does appear to allow for a form of continuing unjust enrichment under limited circumstances, with the *Snider* court holding that an unjust enrichment claim might be viable where a defendant was obligated to undertake serial performances and had been unjustly enriched by failing to do so within the limitations period, *see Snider*, 113 So. 2d at 655-56, but no such serial performance obligation is present here. PBCI's acquisition of the land in fee, its transfer of the land into trust, and its breach of an alleged obligation to perpetually preserve the property were all discrete events, each of which occurred outside of the limitations period. Any unjust enrichment claim based on those actions is therefore time barred and futile, providing a further reason for Court to deny the Plaintiffs' request to add a claim of unjust enrichment.

The Plaintiffs' unjust enrichment claim suffers also suffers from the same statute of frauds problem as their promissory estoppel claim. Alabama law does not allow the use of unjust

41

enrichment to enforce an agreement or promise that is void under the statute of frauds. *See Branch Banking*, 184 So. 3d at 347-48; *Davis v. Wells Fargo Home Mortg., Inc.*, 2016 WL 393850, at \*\*4-5 (N.D. Ala. Feb. 2, 2016) ("Because Wells Fargo's alleged oral promise to postpone foreclosure is barred by the Statute of Frauds, the Plaintiff's unjust enrichment and fraud claims, which are based on that same oral promise, are likewise barred."). The Plaintiffs' unjust enrichment claim relies upon the same purported representations as their promissory estoppel claim, and it accordingly fails for reasons previously addressed. *See* SAC ¶¶ 202-03.

     D.   <u>The Plaintiffs' contention that they seek a constructive trust does not revive their unjust enrichment claim or take it outside the statute of frauds.</u>

Just as they did for promissory estoppel, the Plaintiffs argued in support of their motion for leave to amend that their claim for unjust enrichment is subject to a ten year statute of limitations and falls outside the statute of frauds because it seeks constructive trust as a form of relief. That argument fails in the unjust enrichment context for all of the reasons that it fails in support of promissory estoppel. *See supra* Part III.

**V.    The Plaintiffs have failed to state a claim on which any relief can be granted under NAGPRA and cannot obtain their requested relief in any event.**

Count VII of the SAC alleges that PBCI and the Federal Defendants have committed numerous violations of NAGPRA. Broadly speaking, these putative violations consist of: (1) alleged failures to appropriately consult with or obtain consent from the Plaintiffs prior to archaeological excavation or construction on the Wetumpka property; (2) not transferring custody of remains and artifacts to the Plaintiffs; and (3) alleged failures to comply with NAGPRA reporting and record-keeping requirements. *See generally* SAC ¶¶ 244-55. For reasons explained in detail below, none of the alleged conduct by the Tribal Defendants constitutes a violation of NAGPRA. Moreover, even if the Plaintiffs had successfully alleged NAGPRA violations, any such violations cannot justify the vast majority of the relief demanded in the

SAC. Accordingly, the Plaintiffs' NAGPRA claims should be dismissed in their entirety for failure to state a claim pursuant to Rule 12(b)(6). And to the extent that they seek relief that is unavailable as a matter of law, they are not redressable and should be dismissed for lack of standing under Rule 12(b)(1).

A.   The Plaintiffs misconstrue key aspects of NAGPRA.

While the SAC purports to identify numerous violations of NAGPRA, it does not state any claims for which relief can be granted against the Tribal Defendants under that statute. To understand why, it is helpful to briefly review relevant provisions of NAGPRA and its implementing regulations.

First, NAPGRA applies only on federal and tribal lands, and it applies differently on each. The Wetumpka property is tribal land, which NAGPRA defines as including "all lands within the exterior boundaries of any Indian reservation." 25 U.S.C. § 3001(15)(A); *see* SAC ¶ 73 (citing Federal Register notices declaring the Wetumpka property part of PBCI's reservation).[17]

Second, NAGPRA imposes specific duties on "Federal agencies," which it defines as "any department, agency, or instrumentality of the United States" other than the Smithsonian, 25 U.S.C. § 3001(4), and on "museum[s]," which are defined, with certain exclusions not relevant here, as "any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native American cultural items." *Id.* § 3001(8). Neither the definition of "federal agency" nor the definition of "museum" includes Indian tribes or tribal enterprises; in fact, NAGPRA separately defines "Indian tribe" as "any tribe, band, nation … which is recognized as eligible for the special

---

[17] NAGPRA excludes tribal lands from its definition of "federal lands." *See* 25 U.S.C. § 3001(5).

programs and services provided by the United States to Indians because of their status as Indians." *Id.* § 3001(7). PBCI is an Indian tribe; it is not a federal agency or a museum as those terms are defined for NAGPRA. *See, e.g.*, *Hawk v. Danforth*, 2006 WL 6928114, at *1 (E.D. Wis. Aug. 17, 2006) ("NAGPRA applies mainly to federal agencies and museums, and the Tribe is neither.")

Third, for purposes of determining ownership of human remains and objects, NAGPRA provides a ranked preference list topped by "lineal descendants," followed by "the Indian tribe … on whose tribal lands such objects or remains were discovered." *Id.* § 3002. "Lineal descendant," in turn, is defined as "an *individual* tracing his or her ancestry directly and without interruption … *to a known Native American individual* whose remains, funerary objects, or sacred objects are being claimed under these regulations." 43 C.F.R. § 10.2(b)(1) (emphases added); *see also id.* § 10.14(b) (repeating this definition). This definition excludes Plaintiffs MCN and Hickory Ground Tribal Town from qualifying as lineal descendants, as neither of those tribal governmental entities are individuals. Additionally, "[t]his standard requires that the earlier person be identified as an individual whose descendants can be traced." *Id.* § 10.14(b). Accordingly, in the absence of an individually identified earlier person whose descendants can be traced, there necessarily cannot be "lineal descendants" as that term is used in NAGPRA. PBCI, as the Indian tribe on whose tribal lands all remains and artifacts at issue in this case were discovered, is the rightful owner of such remains and artifacts under NAGPRA's preference list in the absence of any lineal descendants.

    B.    <u>The Plaintiffs allege no viable NAGPRA claims against the Tribal Defendants.</u>

The aspects of NAGPRA discussed above provide critical context for the assessment and rejection of the Plaintiffs' NAGPRA claims against the Tribal Defendants. For example, many of the alleged violations rest, in whole or in part, on the erroneous premise that the Plaintiffs are or

represent the "lineal descendants" of persons whose remains were excavated at Hickory Ground. *See, e.g.*, SAC ¶¶ 118, 250-52, 256-59. It is clear that the Plaintiffs are <u>not</u> lineal descendants for NAGPRA purposes, however, because they cannot (and do not even attempt to) identify any known, historical Native American individual whose remains or funerary objects are at issue, and thus do not satisfy the definition of lineal descendants set forth in 43 C.F.R. §§ 10.2(b)(1), 10.14(b). The SAC's repeated statements that Plaintiffs are or represent the lineal descendants of individuals whose remains were excavated from the Wetumpka property constitute, in the context of NAGPRA, legal conclusions that are not entitled to any presumption of validity. Moreover, in the absence of any attempt to identify the alleged historic individuals whose remains or belongings they claim are at issue, the Plaintiffs' bald assertions that they qualify as lineal descendants for NAGPRA purposes are perfect examples of the sort of "labels and conclusions" and "naked assertion[s] devoid of further factual enhancement" that "will not do" to sustain a cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted) (citing *Twombly*, 550 U.S. at 555, 557).

Because the Plaintiffs have not adequately alleged that they are the lineal descendants of identified individuals whose remains have been recovered from the Wetumpka site, they have no ownership interest in such remains under NAGPRA. The act specifically provides that where lineal descendants, as defined in the act's regulations, cannot be ascertained, remains and associated funerary objects unearthed on Indian lands belong to "the Indian tribe … on whose tribal land such objects or remains were discovered." 25 U.S.C. § 3002(a)(2)(A). Here, that is PBCI. Therefore, absent adequate allegations of lineal descent from an identified individual—allegations that the SAC makes no pretense of making—any human remains or associated funerary objects discovered on the Wetumpka property belong to PBCI. Any allegations or

claims for relief against the Tribal Defendants that hinge upon the Plaintiffs' alleged ownership or entitlement to custody of such objects (or PBCI's lack thereof) should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), as should any allegation that PBCI failed to comply with requirements to consult with or obtain the consent of lineal descendants. *See, e.g.*, SAC ¶¶ 244, 248, 250-52.

The Plaintiffs' claims based on alleged violations of putative requirements for the Tribal Defendants to consult with or obtain the consent of MCN or obtain certain permits prior to the intentional excavation or removal of remains or artifacts from Wetumpka property also fail to state a valid claim. *See, e.g.*, SAC ¶¶ 244-45, 248-50, 257-58. For example, the Plaintiffs allege that the Tribal Defendants violated NAGPRA by failing to comply with the requirements for obtaining an ARPA permit (which they contend required their consultation and consent as lineal descendants, *inter alia*) prior to engaging in intentional archaeological excavations at the Wetumpka property. *Id.* ¶ 244, 248, 250, 256-58. This argument initially fails because the Plaintiffs are not lineal descendants, and their consultation and consent thus are not required under the relevant ARPA regulations. *See* 25 C.F.R. § 262.5(d) (requiring consent of "the appropriate Indian tribe" as determined under § 262.8(a)); § 262.8(a) (incorporating NAGPRA's ranked preference list, where the tribe on whose Indian lands an excavation occurs is second only to lineal descendants). Putting that aside, the Plaintiffs' argument still would fail because even assuming, *arguendo*, that a violation of ARPA constitutes a violation of NAGPRA, ARPA explicitly provides that "[n]o permit shall be required … for the excavation or removal by any Indian tribe or member thereof of any archaeological resource located on Indian lands of such Indian tribe …." 16 U.S.C. § 470cc(g)(1). Because the Wetumpka property is PBCI's "Indian land," ARPA explicitly exempts the Tribal Defendants from its permitting requirements with

respect to intentional excavations at the Wetumpka property. The Tribal Defendants' alleged non-compliance with those permitting requirements thus does not violate ARPA and cannot possibly constitute a NAGPRA violation by extension.[18] The Plaintiffs' attempt to conjure a NAGPRA violation from an alleged failure to comply with inapplicable provisions of ARPA fails as a matter of law, and should be dismissed pursuant to Rule 12(b)(6).

The Plaintiffs' allegations that the Tribal Defendants violated NAGPRA's inadvertent discovery provisions also fail to state a claim, albeit for slightly different reasons. Preliminarily, the Plaintiffs have failed to adequately allege that inadvertent discoveries occurred. After making no allegation of inadvertent discoveries in their original or First Amended Complaint, *see generally* Docs. 1, 57, they now offer wholly conclusory and unsupported allegations "on information and belief" that such discoveries took place. *See* SAC ¶¶ 134-35, 255. While courts sometimes construe allegations made on information and belief as satisfying the *Iqbal* pleading standard in appropriate circumstances, those courts still require plaintiffs to provide a "factual basis other than ... speculation" supporting such allegations. *Daisy, Inc. v. Pollo Operations, Inc.*, 2015 WL 1418607, at *6 (M.D. Fla. Mar. 27, 2015) (citing *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009)); *see also, e.g.*, *Sream, Inc. v. Hookah Me Up, Inc.*, 2019 WL 2269740, at *2 (S.D. Fla. Feb. 5, 2019) ("Factually unsupported allegations based 'on information and belief' are not entitled to assumption of truth."); *Philistin v. Ocwen Loan Servicing, LLC*, 2019 WL 1474329, at **2-3 (S.D. Fla. Mar. 18, 2019). The Plaintiffs offer no factual basis for their newfound "belief" that the Tribal Defendants made and ignored

---

[18] The Plaintiffs' failure to state a claim against the Tribal Defendants under ARPA is discussed in more detail below.

inadvertent discoveries of "cultural items" as that term is defined in NAGPRA.[19] *See* 25 U.S.C §

3001(3). Indeed, any such belief is strongly undermined by the fact that trained archaeologists

from Auburn University conducted a Phase III archaeological excavation of the site before the

Tribal Defendants started construction of the facility expansion during which the inadvertent

discoveries supposedly occurred. *See* SAC ¶¶ 100-104, 108, 230-32, 255. There is no reason to

infer that trained archaeologists conducting an excavation "designed to record the data a site

contains before the project proceeds to construction and the site is lost," SAC ¶ 103, would fail

to identify or record NAGPRA qualified cultural items, instead leaving them to be lost during

subsequent construction. Because the Plaintiffs have failed to adequately allege that inadvertent

discoveries occurred at all, they fail to state a claim based on violations of duties triggered by

such discoveries, and all such claims should be dismissed under Rule 12(b)(6).

Even if the SAC adequately alleged that cultural items were inadvertently discovered

during the construction activity that occurred between 2012 and 2014, it still would fail to state a

viable inadvertent discovery NAGPRA claim against the Tribal Defendants for several reasons.

The provision of NAGPRA and the accompanying regulation pertaining to inadvertent

discoveries on tribal lands direct the discovering party to (1) notify appropriate tribal officials,

(2) cease ongoing construction or related activity in the area for thirty days after such notice is

certified received, (3) take reasonable efforts to protect inadvertently discovered cultural items.

---

[19] To be clear, NAGPRA does not apply to all discoveries of any Native American archaeological deposits or artifacts, even on federal and tribal lands. Its inadvertent discovery provision, 25 U.S.C. § 3002(d), is only applicable to and triggered by the discovery of "cultural items" as defined in the act. It certainly does not apply to soil, to the extent that the Plaintiffs' allegations are based on the moving of soil that once was located in the vicinity human remains. *See* SAC ¶ 231 (alleging that moving soil was an outrageous desecration of human remains); 43 C.F.R. § 10.2(d)(1) (defining "human remains" as "the physical remains of the body of a person of Native American ancestry").

*See* 25 U.S.C. § 3002(d); 43 C.F.R. § 10.4.[20] Importantly, because any alleged inadvertent discoveries in this case took place on PBCI's tribal lands, PBCI was the only entity entitled to receive notice under these provisions and, to the extent that tribal consent or authorization was required to resume activities, PBCI was the tribe to provide it. *See* 25 U.S.C. § 3002(d)(1); 43 C.F.R. § 10.4(b), (e); *see also Rosales v. United States*, 2007 WL 4233060, at *8 (S.D. Cal. Nov. 28, 2007) (explaining that federal officials must be notified when discovery occurs on *federal* lands, and tribal officials must be notified when discoveries occur on *tribal* lands). Because the Plaintiffs were not entitled to notification, the Tribal Defendants did not violate NAGPRA by not providing it and the Plaintiffs were not injured by not receiving it. Any claims based on alleged inadvertent discoveries therefore must be dismissed with prejudice pursuant to Rule 12(b)(6) and under Rule 12(b)(1) on the grounds that the Plaintiffs' lack of any injury, much less one fairly traceable to a violation by the Tribal Defendants, deprives them of standing to assert this claim.

The Plaintiffs also erroneously allege a NAGRPA violation arising out of the Tribal Defendants' putative violation of an NPS agreement pursuant to which PBCI assumed certain historic preservation responsibilities. SAC ¶¶ 245, 249. The NPS agreement, however, was entered into between PBCI and NPS pursuant to the NHPA, and the provisions that the Plaintiffs accuse PBCI of violating reference only certain obligations under the NHPA. *See id.*; Doc. 190-1 at 115, 117. While the Tribal Defendants address the Plaintiffs' failure to state a claim under the NHPA below, even if PBCI had violated its agreement with NPS, there is no indication that the Plaintiffs have any right to enforce that agreement at all, much less to assert a NAGPRA claim based on any such breach. The NPS agreement also appears to be the basis for the Plaintiffs' assertion that the Tribal Defendants are delegees of federal functions and thus constitute federal

---

[20] Paragraph 255 of the SAC cites different subsections of § 3002, but from context it is clear that the Plaintiffs intended to refer to 25 U.S.C. § 3002(d).

actors, liable as federal officials. *See* SAC ¶ 246. Whatever the merits—or lack thereof—of this argument as to the federal functions identified in the NPS agreement, it has no relevance to the Plaintiffs' NAGPRA claim. As noted above, PBCI is not a federal agency as that term is defined in NAGPRA, and the NPS agreement does not delegate to PBCI responsibility for any federal obligations imposed by NAGPRA. To the extent that the attempt to base any NAGRPA claim on the NPS agreement, their claim should be dismissed pursuant to Rule 12(b)(6).

Finally, the SAC alleges that the Tribal Defendants have violated NAGPRA by not providing a final inventory or report regarding cultural items recovered from the Wetumpka property. *See* SAC ¶ 254. This is incorrect. The final inventory/report obligation is found in 25 U.S.C. § 3003 and expanded upon in 43 C.F.R. § 10.9, both of which explicitly apply only to museums and federal agencies. *See id.*; *Hawk*, 2006 WL 6928114, at *1. PBCI, as explained above, is neither a federal agency nor a museum. The final inventory requirement is this inapplicable on its face to the Tribal Defendants, and the Plaintiffs' claim based on alleged noncompliance with that requirement must be dismissed under Rule 12(b)(6).

In sum, none of the ostensible violations of NAGPRA alleged in the SAC give rise to a viable claim against the Tribal Defendants. The Court accordingly should dismiss Count VII in its entirely for failure to state a claim and, to the extent that it fails to allege injuries that are fairly traceable to any conduct by the Tribal Defendants, for lack of subject matter jurisdiction due to the Plaintiffs' lack of standing.

C.   <u>NAGPRA does not require that burial sites be maintained in a pristine, undisturbed condition and cannot justify the relief sought in the SAC.</u>

The Plaintiffs appear to assume, incorrectly, that NAGPRA empowers them to demand that the Wetumpka property remain entirely undisturbed and that any remains found there be left in place or, if already removed, returned to their initial resting place, with no further activity

occurring on the site. *See*, *e.g.*, SAC ¶¶ 256-61. NAGPRA does not contemplate or confer any such right on the Plaintiffs or anyone else.[21] Rather, it explicitly contemplates the removal of human remains and associated objects and provides steps to be taken for the preservation and transfer or repatriation of such remains to their rightful Indian owners. *See*, *e.g.*, 25 U.S.C. § 3002(c) (providing for the "intentional removal … or excavation" of protected Indian cultural items, which is defined to include human remains); 43 C.F.R. § 10.3 (permitting the excavation and removal of human remains and protect objects and providing appropriate procedures to follow). The only provision of NAGPRA that provides for a cessation of construction or other activity on property containing protected resources is § 3002(d), which provides, in the event of an inadvertent discovery of cultural items on tribal lands, that construction or other activity shall be suspended for thirty days to allow the tribe on whose lands the discovery occurred to take steps to protect and preserve such objects pending their repatriation.

There is nothing whatsoever in NAGPRA that grants the Plaintiffs the power to insist that the PBCI forever cease construction or any other activities on its own lands or preserve those lands in any particular condition. Accordingly, to the extent that the Plaintiffs' request for a permanent injunction on construction or other activity at the Wetumpka site or their demand that the site be restored to some pre-existing condition with remains replaced in their original locations are based on NAGPRA, they far exceed the scope of relief available under that act (or any other law). The Court should dismiss the Plaintiffs' NAGPRA claims against the Tribal Defendants in their entirety for all of the reasons stated above, but even if it does not, it should dismiss them to the extent that they seek relief beyond what is available under the act.

---

[21] As explained above, the Plaintiffs are not "lineal descendants" for NAGPRA purposes, but even lineal descendants would not be entitled to the relief that the Plaintiffs seek.

**VI.     The Plaintiffs have failed to state a claim upon which relief can be granted against the Tribal Defendants under ARPA.**

The Plaintiffs have failed to state a claim on which relief can be granted against any of the Tribal Defendants under ARPA. As an initial matter, ARPA does not provide for a private right of action. *See Cohen's Handbook of Federal Indian Law* (2005 ed.), § 20.02(2)(d) (*Cohen*) ("ARPA does not authorize private actions in federal court."); *Cheavins v. Pub. Serv. Corp. of Colo.*, 176 F. Supp. 3d 1088, 1094 (D. Colo. 2016). The act is generally directed to federal officials, and while it certainly proscribes certain activities by non-federal entities and individuals, the enforcement mechanisms for these prohibitions consist of statutorily defined civil and criminal penalties. *See* 16 U.S.C. §§ 470ee, 470ff; 43 C.F.R. §§ 7.15-7.17. Importantly, enforcement of ARPA's civil penalties is left to the relevant federal land manager, and there is a specific provision providing that private parties who provide information that results in assessment of civil penalties against a violator are entitled to share in the proceeds of the penalty. *See id.*; *Cohen*, § 20.02[d]. Such an enforcement regime clearly does not contemplate—indeed it leaves no room for—private civil actions seeking to enforce ARPA, particularly against nonfederal actors. *See*, *e.g.*, *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596-97 (2d Cir. 2011) (citing *Alexander v. Sandoval*, 532 U.S. 275 (2001)) (explaining that federal statutes only give rise to a private right of action where the "text and structure of a statute yield a clear manifestation of congressional intent to create" one); *Love v. Delta Air Lines*, 310 F.3d 1347, 1351-54 (11th Cir. 2002) (discussing and applying *Sandoval*). Accordingly, the Plaintiffs' ARPA-based claims against the Tribal Defendants should be dismissed for failure to state a claim upon which relief can be granted.

Even if ARPA did authorize private civil enforcement actions, the SAC would not state any valid ARPA claims against the Tribal Defendants for several reasons. First, many of the

Plaintiffs' ARPA allegations pertain to ostensible non-compliance with ARPA permitting requirements or ARPA permits. *See, e.g.*, SAC ¶¶ 275, 277-80. These allegations necessarily fail to state a claim because ARPA expressly exempts the Tribal Defendants from its permitting requirements for excavations on PBCI tribal lands. *See* 16 U.S.C. § 470cc(g)(1) ("No permit shall be required … for the excavation or removal by any Indian tribe or member thereof of any archaeological resource located on Indian lands of such Indian tribe …."); *see also Attakai v. United States*, 746 F. Supp. 1395, 1411 (D. Ariz. 1990). *Attakai* is directly on point, as it involved the dismissal of ARPA claims for failure to state a claim when the alleged ARPA violations arose out of the Hopi Tribe's activities on Hopi lands. 746 F. Supp. at 1411. As the court explicitly recognized, "no permit is required, even for excavations of qualifying archaeological resources, by an Indian Tribe on its land." *Id.* To the extent that the SAC's ARPA claims against the Tribal Defendants hinge on alleged non-compliance with ARPA permitting requirements or failure to adhere to the terms of such permits,[22] they fail as a matter of law and should be dismissed with prejudice.

The SAC also fails to state any ARPA claim against the Tribal Defendants to the extent that it alleges violations by federal defendants or violations of any duties, such as those set forth in 43 C.F.R. Part 7 and 26 C.F.R. Part 79, that apply only to federal actors. *See, e.g.*, SAC ¶¶ 277-78. By its express terms, 43 C.F.R Part 7 applies only to "Federal land managers," which "[i]n the case of Indian lands … means the Secretary of the Interior. 43 C.F.R. §§ 7.1(a), 7.3(c)(2). The Tribal Defendants do not control and are not responsible for the alleged actions of the Secretary of the Interior or any other federal officials, and to the extent that putative claims

---

[22] To the extent that the Tribal Defendants allegedly failed to comply with permits that they did obtain, any such alleged violations would still constitute lawful exercise of PBCI's statutory authority to excavate its own lands without an ARPA permit.

against the Tribal Defendants are based on the alleged action or inaction of such officials, they should be dismissed for failure to state a claim. Similarly, 36 C.F.R. Part 79 prescribes "standards, procedures, and guidelines to be followed by Federal agencies" to preserve federally owned and administered archaeological collections. 36 C.F.R. § 79.1(a). It has no applicability to the Tribal Defendants, and any claim against those defendants based on those regulations should be dismissed with prejudice.

Additionally, while it appears the Plaintiffs now have abandoned any attempt to ground ARPA claims on construction or related activities on the Wetumpka property, it is important to note that ARPA does not apply to such activities. On the contrary, ARPA applies only to "purposeful excavation and removal of archaeological resources," not "construction activities [or] … excavations which may, or in fact inadvertently do, uncover such resources." *Attakai*, 746 F. Supp. at 1410; *see also San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 888 (D. Ariz. 2003) ("No ARPA permit is required to conduct activities … entirely for purposes other than the excavation or removal of archaeological resources."), *aff'd*, 417 F.3d 1091 (9th Cir. 2005). This is particularly significant given that most or all ARPA permitting activities and excavation of human remains from the Wetumpka property were completed prior to December 2006—more than six years before the Plaintiffs filed their initial complaint. *See* SAC ¶¶ 117, 137, 139; Doc. 190-1 at 128 (indicating that re-interment discussions began in May of 2006); Doc. 95-11; Doc. 95-9 (ARPA permit issued to Defendant Auburn University on April 15, 2003). Thus, to the extent that the Plaintiffs seek to base ARPA claims on such activity (particularly to the extent that those claims rely on the APA—*see* SAC ¶ 274), it appears that their claims are time barred.

The remaining allegations supposedly supporting the Plaintiffs' ARPA claims can be summarily addressed. *See* SAC ¶¶ 275-76, 278, 281. The Plaintiffs' attempt to state ARPA claims based on alleged violations of the NPS agreement, *see id.* ¶¶ 275, 278(d), fails for reasons discussed *supra*—because the NPS agreement incorporates only the NHPA, not other federal statutes. Alleged ARPA violations contingent on the Plaintiffs status as lineal descendants of those whose remains were recovered from the Wetumpka property, *see id.* ¶ 276, fail because the Plaintiffs do not satisfy the statutory definition of lineal descendants. *See supra* Part V; 25 C.F.R. § 262.8(a) (incorporating NAGPRA's ranked preference list for ownership of cultural items and providing that all other items excavated from Indian lands remain the property of the Indian tribal landowner). Assertions that the Tribal Defendants violated ARPA by failing to keep a non-existent agreement to perpetually preserve Hickory Ground, *see* SAC ¶¶ 275, 278(d), fail because ARPA imposes no such requirement and because, as discussed *supra*, the Tribal Defendants made no such agreement.

For all of the foregoing reasons, the Plaintiffs have failed to state any valid ARPA claim against the Tribal Defendants, and Count IX of the SAC should be dismissed with prejudice as to those defendants. But even if that were not the case, the Plaintiffs would not be entitled to the relief that they seek for alleged violations of ARPA. The act includes statutorily defined civil and criminal penalties, neither of which approach the relief prayed for in the SAC. *See* 16 U.S.C. §§ 470ee – 470ff. The SAC's attempt to incorporate NAGPRA's remedy provision into ARPA by reference is without support in either statute, and would not avail them in any case given that NAGPRA likewise does not contemplate the type of relief requested here. *See supra* Part V.C. The unavailability of the requested relief provides a separate and independent basis for the dismissal of the Plaintiffs' ARPA claims against the Tribal Defendants.

**VII.  The Plaintiffs have failed to state a claim on which relief can be granted under the NHPA.**

The Plaintiffs cannot state a claim against the Tribal Defendants under the NHPA because that act does not create a private right of action generally and, in particular, does not give rise to a private right of action against nonfederal defendants. It is well settled that the NHPA does not give rise to any private right of action and can be enforced only against federal officials, if at all, through an action brought under the APA. *See, e.g.*, *Karst*, 475 F.3d at 1295 ("NHPA, like NEPA, contains no private right of action ...."); *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093 (9th Cir. 2005) (affirming dismissal of NHPA claim on the grounds that the act creates no private right of action); *Sisseton-Wahpeton Oyate v. United States Dep't of State*, 659 F. Supp. 2d 1071, 1080 (D.S.D. 2009) (holding that "no private right of action was created by the NHPA"); *Martin v. Wilcox Cnty., Ala.*, 2014 WL 1202943, at *1 (S.D. Ala. Mar. 21, 2014) ("[T]he NHPA creates no private right of action in favor of the plaintiff against either the federal government or others."); *Martin v. Ala. Historical Comm'n*, 2014 WL 28850, at *3 (M.D. Ala. Jan. 2, 2014) (dismissing NHPA claims on the grounds that the act does not create a private right of action). Because the NHPA creates no private right of action and an APA claim cannot be brought against nonfederal parties, the Plaintiffs necessarily fail to state a claim against the Tribal Defendants under the act. *See, e.g.*, *Friends of Lydia Ann*, 701 F. App'x at 358; *Karst*, 475 F.3d at 1298; *Martin*, 2014 WL 28850, at *3.

The Plaintiffs try to avoid this fatal flaw in their NHPA claim by alleging that the Tribal Defendants are a *de facto* federal agency to the extent that NPS has contractually delegated duties to PBCI under the NHPA and thus are subject to suit through the APA. *See* SAC ¶¶ 288-90. This is incorrect. The APA applies to federal agencies, which it defines as "each authority of the Government of the United States ...." 5 U.S.C. § 551. The Tribal Defendants are not an

"authority of the Government of the United States." And the mere existence of a contractual relationship or funding agreement between PBCI and a federal agency such as NPS does not change that fact. *See, e.g.*, *Ritter v. Cecil Cty. Office of Hous. & Cmty. Dev.*, 33 F.3d 323, 327 (4th Cir. 1994) (holding the APA inapplicable to a claim against a state agency that administered a federally funded housing program); *Day v. Shalala*, 23 F.3d 1052, 1064 (6th Cir. 1994) (holding that a state agency, even if completely funded by and subject to a contractual relationship with a federal agency, was not subject to suit under the APA); *Robbins v. N.Y. Corn & Soybean Growers Ass'n, Inc.*, 244 F. Supp. 3d 300, 304-05 (N.D.N.Y. 2017) (holding that a state entity that collected assessments for a federal agency and was subject to federal audits but had no federal employees was not subject to suit under the APA); *Cheavins*, 176 F. Supp. 3d at 1094-95 (holding that a plaintiff could not state a claim against a state agency for direct violation of the NHPA or violation of the terms of a National Forest Service permit).

Even if it were possible for a nonfederal actor to be subject to suit under the APA when performing delegated federal functions, there is no evidence that the Tribal Defendants took on such a role in this case. On the contrary, the NPS agreement that the Plaintiffs cite throughout the SAC provides for PBCI's assumption of roles normally performed by a <u>state</u> agency under the NHPA. *See, e.g.*, Doc. 190-2 at 188, ¶ 12 (stating that the NPS will provide notice to relevant state and federal agencies that PBCI "has assumed the role of the State Historic Preservation Officer on tribal lands for the purposes of consultation on Federal undertakings pursuant to section 106" of the NHPA); *id.* at 116 (describing the duties assumed by PBCI under the agreement). The Tribal Defendants are unaware of any authority indicating that such an assumption of state agency duties opens the door for the Plaintiffs to bring suit against the Tribal Defendants under the APA. *Accord, e.g.*, *Sw. Williamson*, 173 F.3d at 1035 ("By its own terms,

the APA does not apply to state agencies."); *Day*, 23 F.3d at 1064; *Cheavins*, 176 F. Supp. 3d at 1094-95.

In light of the foregoing, the specific instances of the Tribal Defendants' ostensible non-compliance with the NHPA alleged in the SAC are immaterial. Nevertheless, the Tribal Defendants will briefly address some of the many flaws in the Plaintiffs' assertions.

Part A of Count X claims that the Federal and Tribal Defendants failed to consult or to meaningfully consult with the Plaintiffs prior to PBCI undertaking excavation and construction activities on the Wetumpka property. *See* SAC ¶¶ 291-96. These allegations rely on a duty supposedly established by 54 U.S.C. § 302706. SAC ¶ 291. That provision provides that "a Federal agency" shall consult with certain tribes when "carrying out its responsibilities under section 306108 of this title." § 302706(b). Section 306108, in turn, directs "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking" or the authority to license such an undertaking to "take into account the effect of the undertaking on any historic property." *Id.* These provisions are inapplicable here because (1) the Tribal Defendants are not a federal agency, (2) they certainly are not the head of a federal agency, and (3) their excavation of and construction on their own tribal lands was not a federal undertaking. Additionally, the record shows that the excavation in question took place more than six years prior to the filing of the initial complaint, meaning that any APA claim based on an alleged failure to consult with the Plaintiffs prior to that activity is time barred. *See* SAC ¶¶ 137, 139 (noting that PBCI notified Plaintiffs of a Phase III archaeological excavation in 2006); Doc. 190-1 at 128 (indicating that re-interment discussions began in May of 2006); Doc. 95-9 at 2 (ARPA permit for Auburn University to conduct Phase III archaeological excavation at Wetumpka property issued on April 15, 2003). Finally, the record reflects that the Tribal

Defendants, while under no legal obligation to do so, did in fact engage in <u>years</u> of discussions with the Plaintiffs regarding the reinternment of human remains and funerary objects excavated from the Wetumpka property. *See, e.g.*, SAC ¶ 159 (indicating that PBCI proceeding with reinternment of excavated human remains "after six years of negotiations"); Doc. 95-1 at 3 (2008 letter from Mekko Thompson indicating that he traveled to Wetumpka on May 9, 2006, at PBCI's invitation "to discuss reinternment of 57 or more sets of human remains"). The Plaintiffs' dissatisfaction with the result of that consultation does not give rise to a valid claim under the NHPA, or any other law. *See, e.g.*, *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 60 (1st Cir. 2006) (recognizing that the NHPA "is a procedural statute that requires agency decisionmakers to stop, look, and listen, but not to reach particular outcomes" (citation omitted)); *Bus. & Residents All. of E. Harlem v. Jackson*, 430 F.3d 584, 591 (2d Cir. 2005) (noting that the NHPA is a procedural statute that "does not itself require a particular outcome"). Part A of Count X does not come close to stating a viable claim against the Tribal Defendants.

Part B of Count X alleges that 54 U.S.C. § 306108 requires Interior to "take into account" the effect of any federal undertaking on a National Register-listed historical site in consultation with relevant tribes, that the NPS agreement imposes this same obligation on PBCI, and that PBCI failed to comply with this requirement in connection with its excavation of the Wetumpka property or construction of its gaming facility.[23] SAC ¶¶ 297-98, 300. These allegations fail to state a claim against the Tribal Defendants for many of the same reasons as those in Part A of Count X, and the Tribal Defendants will not repeat them here. Additionally, the allegation that

---

[23] Part B of Count X, and many other portions of the SAC, includes separate allegations against the Federal Defendants that, while wholly without merit, are beyond the scope of the Tribal Defendants' motion.

the NPS agreement transfers federal agency obligations under § 306108 to PBCI is flatly contradicted by the agreement, which directs PBCI not to consult with third parties, but to "[c]onsult *with the appropriate Federal agencies* in accordance with Section 106 of the Act."[24] Doc. 190-1 at 116 (emphasis added); *id.* at 118 (stating that PBCI has assumed the role of the State Historic Preservation Officer, as opposed to that of the head of a federal agency, for purposes of § 106 consultations). That the NPS agreement did not transfer to the Tribal Defendants the duties that Part B of Count X claims were violated provides yet another ground for finding that Part B fails to state a claim against the Tribal Defendants.

Part C of Count X alleges that 36 C.F.R. § 800.6 imposes on PBCI, via the NPS agreement, the obligation to consult with MCN regarding how to avoid, minimize, or mitigate adverse effects of its construction project on the Wetumpka property. SAC ¶ 304. In addition to failing for reasons already discussed, Part C rests on a flawed premise. As previously explained, under the NPS Agreement, PBCI assumed the role of the State Historic Preservation Officer (SHPO), not the role of a federal agency. *See* Doc. 159-3 at 116, 118. 36 C.F.R. § 800.6 does not require SHPOs to consult with tribes or third parties. Instead, it provides that an "agency official shall consult with the SHPO/THPO and other consulting parties, including Indian tribes …." *Id.* To the extent that it applied to excavation and construction at the Wetumpka property at all, § 800.6 may have required a relevant federal official to consult with PBCI and even MCN. But it plainly imposes no requirement for SHPO/THPOs to consult with third parties.

Part D of Count X repeats the error of Part C by incorrectly assuming that the NPS agreement imposed federal agency consultation requirements on PBCI. In fact, Part D expressly asserts that PBCI's alleged failure to notify and consult with the Plaintiffs violated, *inter alia*,

---

[24] Section 106 of the NHPA is the provision codified, as amended, at 54 U.S.C § 306108.

Paragraph 1.G of the NPS agreement, the provision directing PBCI to "[c]onsult *with the appropriate federal agencies* in accordance with Section 106 of the Act" on particular matters. Doc. 190-1 at 116 (emphasis added). As the Plaintiffs are not federal agencies, PBCI's alleged failure to consult with them necessarily did not violated its obligations under Paragraph 1.G or any other provision of the NPS agreement.

Part E of Count X focuses on allegations that the injuries asserted in the SAC could have been mitigated if the Federal and Tribal Defendants had complied with their ostensible obligations under the NHPA. *See* SAC ¶¶ 312-13. Because there is no viable NHPA-based claim against the Tribal Defendants for reasons already identified, this argument is irrelevant as to those defendants. Moreover, because the NHPA does not give the Plaintiffs the right to insist on any course of action, any claim that the consultation they claim to have been entitled to would have produced a different outcome is entirely speculative.[25]

For all of the foregoing reasons, the Plaintiffs have failed to state a claim upon which relief can be granted against the Tribal Defendants under the NHPA. All such claims should be dismissed with prejudice under Rule 12(b)(6).

**VIII.  The Plaintiffs have failed to state a claim against the Tribal Defendants under the Religious Freedom Restoration Act.**

Count XI of the SAC alleges that the Tribal Defendants have violated the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb, *et seq.*, by: (1) allowing unauthorized persons to access the Plaintiffs' ceremonial grounds; (2) altering or disturbing those grounds via excavation and construction; (3) serving or allowing the presence of alcohol near those grounds; (4) preventing the Plaintiffs from ensuring that the remains of their ancestors are restored to their original resting places; and (5) reinterring excavated remains without required protocol. SAC ¶¶

---

[25] The allegations in Part F of Count X apply exclusively to NPS funding decisions and are beyond the scope of the Tribal Defendants' motion. *See* SAC ¶¶ 316-19.

327-29. The Plaintiffs further allege that these activities require them to choose between committing acts of civil or criminal disobedience and following their religious beliefs that require appropriate reinternment of remains excavated from the Wetumpka property, and that this results in the Federal and Tribal Defendants placing a substantial burden on the Plaintiffs' exercise of their religion in violation of RFRA. *Id.* ¶¶ 330, 333. These allegations fail to state a RFRA claim against the Tribal Defendants for several reasons.

A.   RFRA is inapplicable to the Tribal Defendants.

Like many of the statutes on which the Plaintiffs attempt to rely, RFRA does not apply to the Tribal Defendants. RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion …." 42 U.S.C. § 2000bb-1(a). It goes on to define "government" as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." § 2000bb-2(1). The term "covered entity" is then defined as "the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States." § 2000bb-2(2). Because RFRA applies only to certain "government[s]" and does not include Indian tribes or tribal governments within its definition of that term, the statute by its terms is inapplicable to the Tribal Defendants.[26] The Plaintiffs' RFRA claims against those defendants thus fail as a matter of law.

Should the Plaintiffs attempt to evade RFRA's inapplicability by arguing that the Tribal Defendants have acted under color of federal law, presumably citing the NPS agreement, any such argument is invalid. As an initial matter, private actors such as PBCI and the THPO presumptively do not act under color of law. *See Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011); *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992) ("Only in rare circumstances can a private party be viewed as a 'state actor' …."). To establish

---

[26] Even the SAC acknowledges that RFRA applies to "federal governmental action." SAC ¶ 322.

that a defendant acts under color of law, a plaintiff must show that the defendant "'exercised power by virtue of [federal] law and made possible only because the wrongdoer is clothed with the authority of [federal] law.'" *Florer*, 639 F.3d at 922 (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)).[27] In order to meet this burden, a plaintiff mush show that (1) the alleged deprivation in question was caused by a right or privilege created by the government or a rule imposed by the government and (2) the person(s) charged with the alleged deprivation may fairly be characterized as a governmental actor. *Id.* at 922 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)); *Harvey*, 949 F.2d at 1130. The Plaintiffs cannot carry their burden of establishing that the Tribal Defendants acted under color of federal law when engaging in the activities that allegedly constitute RFRA violations.

The Plaintiffs fail the first step of the color of law analysis because they cannot identify any federally established privilege or rule that compelled the Tribal Defendants' to engage in the activities that allegedly burden their religious exercise. The only allegations in the SAC pertaining to the Tribal Defendants' exercise of federal authority or responsibility relate to the NPS agreement. And as discussed *supra*, the only federal duties delegated under that agreement are limited functions under the NHPA. None of those functions required excavation or construction on the Wetumpka property or the presence of people or alcohol in its vicinity. Nor does the NPS agreement evince a federally created privilege authorizing such activity. Simply put, the federal government did nothing to authorize PBCI to take any of the challenged actions; PBCI, as the owner of the Wetumpka property, elected to and had the authority to perform those acts of its own volition. The Plaintiffs thus fail to satisfy the first prong of the color of law

---

[27] This standard is drawn from § 1983 case law. Courts have held that the inquiry into whether a defendant acted "under color of law" is the same in the context of § 1983, RFRA, and RLUIPA actions. *See Florer*, 639 F.3d at 922.

analysis. *See Florer*, 639 F.3d at 923-24 (holding that allegations that the government "allowed" the defendant to conduct the activity in question did not satisfy the test because the government did not "dictate" the activity).

The Plaintiffs also fail the second step of the analysis, as the Tribal Defendants cannot fairly be characterized as a state actor when performing the allegedly burdensome acts. The Tribal Defendants can be considered governmental actors only if there exists "'such a close nexus between the [government] and the challenged action that seemingly private behavior may be fairly treated as that of the [government] itself.'" *Florer*, 639 F.3d at 924 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). The Eleventh Circuit recognizes three tests for determining whether such a nexus exists: the public function test, the state compulsion test, and the nexus/joint action text. *Harvey*, 949 F.2d at 1130. None of those tests are satisfied here.

The public function test requires a plaintiff to show that the defendant is exercising powers or performing functions "that are 'traditionally the *exclusive* prerogative of the State." *Id.* at 1131 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). "Few activities are exclusively reserved to the states" under this test. *Harvey*, 949 F.2d at 1131 (citation omitted). It is not enough that the defendant performs a function having great public importance, even when such performance is highly regulated and overseen by the government. *See Jackson*, 419 U.S. at 352-353. Rather, the scope of activities that satisfy the public function test is exceedingly narrow and includes only actions "traditionally associated with sovereignty, such as eminent domain …." *Id.* at 353. *See also Florer*, 639 F.3d at 924 ("The public function test is satisfied only on a showing that the function at issue is both traditionally and exclusively governmental." (citation omitted)); *Harvey*, 949 F.2d at 1131; *N.B.C. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d

1022, 1026 (11th Cir. 1988) ("The public function test for state action has been limited strictly ….").[28]

The Tribal Defendants undertook—and the Plaintiffs allege—no public functions here. Conducting or allowing archeological excavations, constructing a resort, hosting business patrons, serving alcohol, and reinterring excavated archeological items fall well short. *See, e.g.*, *Harvey*, 949 F.2d at 1131 (holding that involuntary commitment of the mentally ill does not clear the bar for the public function analysis); *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837 (11th Cir. 1993) (holding that a corporation created for the purpose of assuming the duties of a county hospital authority and actually assuming such duties was not performing a public function for state action purposes). The Tribal Defendants are not state actors under the public function test.

The Plaintiffs likewise fail to satisfy the other state action tests. They cannot seriously allege state compulsion, as they can point to no governmental directive or mandate that the Tribal Defendants perform any of the acts allegedly burdening the Plaintiffs' exercise of their religion. *See Harvey*, 949 F.2d at 1130-31 (holding that the state compulsion test was not satisfied where state law permitted, but did not require or encourage involuntary commitment). Nor can they satisfy the nexus/joint action test, which requires a showing that the government "has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" *Id.* at 1131 (alteration in original) (quoting *NBC*, 860 F.2d at 1026). Importantly, federal regulation, the existence of a contract between the federal government and the defendant, and even federal funding of an activity are insufficient to meet

---

[28] The few activities found to satisfy the public function test include "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection and, in at least limited circumstances, the operation of a municipal park." *Santiago v. Puerto Rico*, 655 F.3d 61, 69 (1st Cir. 2011) (citation omitted). "These activities are characterized by exclusivity born of pervasive government involvement." *Id.*

this test. *See Harvey*, 949 F.2d at 1131 (citing multiple cases). Whatever limited involvement the federal government may have had in the Tribal Defendants activities on the Wetumpka property, it plainly was not a joint participant in PBCI's efforts to conduct archeological excavations and construct and operate resort facilities.

In sum, RFRA is inapplicable to the Tribal Defendants on its face. And even if it were possible for to state a RFRA claim against an entity outside the statute based on a state action theory, the Plaintiffs' allegations fall well short of establishing that the Tribal Defendants qualified as state actors when taking the actions that allegedly burden the Plaintiffs' exercise of their religion. The RFRA claim against the Tribal Defendants should be dismissed under Rule 12(b)(6).

B.     <u>The facts alleged in the SAC do not give rise to a RFRA violation.</u>

Even if RFRA were applicable to the Tribal Defendants, the facts alleged in the complaint do not give rise to a RFRA violation. In order to implicate RFRA, governmental action must "substantially burden" a person's exercise of religion without compelling justification. 42 U.S.C. § 2000bb-1. In order to constitute a "substantial burden" under RFRA, governmental activity must "completely prevent[] the individual from engaging in religiously mandated activity" or constitute "pressure that tends to force adherents to forego religious precepts or … that mandates religious conduct." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (citations omitted); *see also Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) ("Under RFRA, a substantial burden is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." (citations omitted)).

66

The Plaintiffs allege that their religion requires them to ensure that their ancestors' remains and funerary objects are kept or reinterred in their intended final resting places and to prevent anyone from entering or approaching ceremonial grounds without proper authorization and rituals or while intoxicated or in possession of alcohol. SAC ¶¶ 325-28. They allege that the Tribal Defendants have placed a substantial burden on their religious exercise by (1) allowing or directing excavation and construction on the Wetumpka property that disturbed the remains of their ancestors, (2) failing to reinter those remains in their original resting places with proper ceremony, and (3) allowing unauthorized persons and the presence of alcohol near the ceremonial grounds. *Id.* ¶¶ 325-29. They further allege that, as a result of the Tribal Defendants' actions, they are forced to choose between exercising their religious obligations and committing unspecified acts of civil or criminal disobedience. *Id.* ¶ 330.

The Plaintiffs' argument can be boiled down to a claim that their religious beliefs require them to have full and unfettered access to and control of PBCI's property, including the ability to exclude visitors from it and to prevent the conduct of business on it. Neither RFRA nor any other law grants them the right to impose what amounts to a "religious servitude" over PBCI's lands. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452-53 (1988). On the contrary, it is settled that denial of access to or control over another's property does not constitute a substantial burden on religious practice. *See, e.g.*, *id.*; *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, 2013 WL 4500572, at *10 (C.D. Cal. Aug. 16, 2013), *aff'd*, 603 F. App'x 651 (9th Cir. 2015).

*Lyng* is instructive. There, the plaintiffs argued that expansion of a federal highway and timber harvesting on publicly owned land would substantially burden their religion by causing serious and irreparable damage to sacred sites in the area. *See Lyng*, 485 U.S. at 442-43. The

Court accepted that the challenged projects "could have devastating effects on traditional Indian religious practices," which required, *inter alia*, "privacy" and "undisturbed naturalness" on government lands that they held sacred. *Id.* at 450-53. But it pragmatically noted that the plaintiffs' "beliefs could easily require *de facto* beneficial ownership" of public lands, and that "the Constitution simply does not provide a principle that could justify upholding [their] legal claims."[29] *Id.* Here, the Plaintiffs expressly seek the remedy that the *Lyng* Court identified as a troubling possibility—*de facto* beneficial ownership of another's property. And here, as in *Lyng*, there is no sound legal basis for awarding it.

Other case law is in accord. In the *La Cuna* litigation, the plaintiffs challenged a federal decision allowing the construction of a fenced solar generation plant that prevented them from accessing religiously significant sites on federal land. *See La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, 2012 WL 2884992, at **1, 6 (C.D. Cal. July 13, 2012) (*La Cuna I*); *see also La Cuna*, 2013 WL 4500572 (*La Cuna II*), at *2. As here, the plaintiffs alleged that they were being forced to choose between foregoing access to sites important to their religious duties and being subject to criminal trespass. *See La Cuna II*, 2013 WL 4500572, at *10; *La Cuna I*, 2012 WL 2884992, at *6. The court rejected the claim, citing *Lyng* for the proposition that "Plaintiffs face no civil or criminal sanction for practicing their religion—the choice to use those parts of the [site at issue] is simply not available to them." *La Cuna II*, 2013 WL 4500572, at *10. As the court explained, there is a legally significant difference between government action that interferes with one's ability to practice one's religion and coercing someone to practice their religion under fear of civil or criminal sanction. *La Cuna*

---

[29] As the Ninth Circuit noted in *Navajo Nation*, the fact that *Lyng* was a Free Exercise Clause case rather than a RFRA case "is of no material consequence" in light of Congress's explicit instruction for courts to look to *Lyng*-era case law to interpret RFRA. *See Navajo Nation*, 535 F.3d at 1071 n.13.

*I*, 2012 WL 2884992, at *8 (citing *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1214 (9th Cir. 2008)). Barring access to a site falls into the former category, and does not constitute a substantial burden. *See id.* ("[N]o one is forcing Plaintiffs to trespass.").

Similarly, in *Slockish v. United States Federal Highway Administration*, a group of plaintiffs argued that the destruction of ancient burial grounds and the construction of a guardrail blocking access to the site substantially burdened and interfered with their religious exercise. *See* 2018 WL 4523135, at *2 (D. Or. Mar. 2, 2018), *report and recommendation adopted*, 2018 WL 2875896 (D. Or. June 11, 2018). Relying on *Lyng* and *Navajo Nation*, the court found no substantial burden because the plaintiffs failed to show that they were being coerced to act contrary to their religious beliefs under the threat of sanctions or that a governmental benefit was being conditioned upon conduct that would violate their religious beliefs. *Id.* at *5. "'Were it otherwise," the court noted, "[e]ach citizen would hold an individual veto to prohibit the government action solely because it offends his religious beliefs, sensibilities, or tastes, or fails to satisfy his religious desires.'" *Id.* at *3 (quoting *Navajo Nation*, 535 F.3d at 1063).

The Plaintiffs' RFRA claims, in essence, amount to a desire for the federal government or the Tribal Defendants to enact or apply laws in a way that facilitates and favors the Plaintiffs' exercise of their religion over PBCI's property rights or any other competing interests. The law does not require or even allow that; on the contrary, "[t]he First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion." *Lyng*, 485 U.S. at 452. There being no public program prohibiting the Plaintiffs' exercise of their religion in this case, this Court cannot allow the Plaintiffs' religious preferences to trump the Tribal Defendants' rights in their lands. The Plaintiffs' RFRA claim should be dismissed pursuant to Rule 12(b)(6).

IX.     **NAGPRA and ARPA do not violate federal law or the Constitution.**

Count VIII of the SAC erroneously alleges that NAGPRA and ARPA, if interpreted as they are written, substantially burden the Plaintiffs' exercise of their religion in violation of the First Amendment of the United States Constitution, RFRA, and the Religious Land Use and Institutionalized Persons Act (RLUIPA). Specifically, they claim that NAGPRA and ARPA are unconstitutional to the extent that they require or allow any tribe other than MCN to consent to the excavation or removal of artifacts from the Wetumpka property or give any other tribe a higher priority of ownership in such artifacts, because such an outcome would unjustifiably impose a substantial burden on their religious beliefs. SAC ¶¶ 266-70. This argument fails for several reasons.

Count VIII initially fails because it relies on a fatally flawed premise. It is not ARPA and NAGPRA that give PBCI primacy of ownership over artifacts excavated from PBCI's tribal lands. On the contrary, it is only pursuant to those statutes that the Plaintiffs have any possible claim to ownership of archeological resources recovered from land that they do not own. Much like the Plaintiffs' RFRA argument, then, Count VIII of the SAC amounts to a demand that federal law be interpreted and applied in a way that elevates the Plaintiffs' religious beliefs above all other considerations, including PBCI's property rights. As discussed *supra*, the law does not and cannot allow that.

Additionally, to the extent that Count VIII alleges that ARPA and NAGPRA's provisions governing ownership of archeological artifacts amount to a First Amendment violation, it fails to state a claim against the Tribal Defendants because the First Amendment is inapplicable to tribal governments. *See, e.g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) ("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained

by those constitutional provisions framed specifically as limitations on federal or state authority."); *Dallas v. Hill*, 2019 WL 403713, at *2 (E.D. Wis. Jan. 31, 2019) ("As an initial matter, the First Amendment … does not apply to Indian tribes and tribal officials."). Additionally, ARPA and NAGPRA are neutral laws of general applicability that in no way target or restrict religious practices as such. Accordingly, and contrary to the SAC's assertion in ¶¶ 266-67, they "'need not be justified by a compelling governmental interest even if [they have] the incidental effect of burdening a particular religious practice.'" *First Assembly of God of Naples, Fla., Inc. v. Collier County*, 20 F.3d 419, 423 (11th Cir. 1994) (quoting *Church of the Lukumi Bablua Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)). The SAC thus fails to allege a First Amendment violation.

To the extent that Count VIII alleges that ARPA and NAGPRA violate RFRA, it fails to state a claim against the Tribal Defendants for all of the reasons set forth above in response to the Plaintiffs' RFRA claim. Finally, Count VIII fails to assert an RLUIPA violation for at least three reasons. First, RLUIPA, like RFRA, does not apply to Indian tribes. *See* 42 U.S.C. § 2000cc-5(4) (providing a definition of "government" that does not include tribes or tribal officials). Second, an RLUIPA violation requires a substantial burden on religious exercise, which does not exist here for reasons discussed above in Part VIII.B. *See, e.g.*, *Midrash Sephardi*, 366 F.3d at 1225. Third, there is no land use regulation at issue here, which is a necessary prerequisite to an RLUIPA claim not involving an institutionalized person. *See, e.g.*, 42 U.S.C. § 2000cc(a)(1) (barring the imposition or implementation of "a land use regulation in a manner that imposes a substantial burden" on religious exercise); *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005) (indicating that RLUIPA targets land use regulation and religious exercise by institutionalized

persons). Count VIII thus fails to state a claim generally, and particularly against the Tribal Defendants, and the Court should dismiss it pursuant to Rule 12(b)(6).

**X.      The Plaintiffs have not identified any legal basis for the sweeping relief sought in the SAC.**

For all of the reasons discussed above, none of the Plaintiffs' allegations of statutory and common law violations state a claim on which relief can be granted against the Tribal Defendants. Even if the Court were to conclude otherwise, however, it is readily apparent that there is no basis for it to award the sweeping relief requested in the SAC. In particular, the Plaintiffs have identified no legal basis—and none exists—to remove the Wetumka property from trust, to permanently enjoin the Tribal Defendants from "undertaking or providing assistance for any further ground disturbing, clearing, grading, leveling, or construction activity" on the property, to order PBCI to tear down improvements on the property and restore it to its pre-construction condition, or to require the replacement of excavated remains and artifacts in their original location. SAC Prayer for Relief. All of these remedies far exceed those available under or contemplated by any of the federal statutes or common law doctrines set forth in the SAC.

It is hornbook law that "plaintiffs bear the burden of showing their entitlement to relief." *Pittman v. Cole*, 267 F.3d 1269, 1288 (11th Cir. 2001). With respect to the requested items of relief highlighted in the preceding paragraph, the Plaintiffs have failed to even make allegations that, if ultimately proven true, would enable them to carry that burden. Accordingly, their claims should be dismissed with prejudice to the extent that they seek (1) a permanent injunction or declaration of illegality of construction and other activity on the Wetumpka property, (2) an order requiring the Tribal Defendants to restore the Wetumpka property to any previous state or

reinter any remains in situ, or (3) any other form of relief that would amount to granting them *de facto* ownership of PBCI's property.

**XI.    Because the Plaintiffs have no valid claims against PBCI and this case cannot appropriately be resolved in its absence, the entire SAC should be dismissed pursuant to Rule 19.**

As explained throughout this brief, all of the Plaintiffs' claims against PBCI and the other Tribal Defendants are barred by sovereign immunity or fail to state a claim and should be dismissed. The SAC therefore should be dismissed as to all Defendants, as it is clear that PBCI is a required party under Fed. R. Civ. P. 19(a) and that adjudication of the case in its absence could not provide an adequate remedy without prejudicing PBCI's interests in the extreme. Rule 19(b) therefore requires dismissal of the entire case.

Rule 19(a) provides that a party is necessary if it "claims an interest relating to the subject of the action and is so situated that disposing of the action in [its] absence may: (i) as a practical matter impair or impede that [party's] ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1). "'[P]ragmatic concerns, especially the effect on the parties and the litigation, control' this analysis." *Fla. Wildlife Fed'n, Inc. v. U.S. Army Corps of Eng'rs*, 859 F.3d 1306, 1316 (11th Cir. 2017) (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003)). If a necessary party cannot be joined, Rule 19(b) directs the court to consider whether the case can proceed in its absence, taking into account: (1) whether a judgment rendered in the missing party's absence might prejudice it or existing parties; (2) the extent to which the court could structure a judgment to limit that prejudice; (3) whether a judgment in the missing party's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy of the case was dismissed for

nonjoinder. Fed. R. Civ. P. 19(b). Where the missing party cannot be joined due to sovereign immunity, courts are required to give special solicitude to its interests under this test "out of recognition that any consideration of the merits in the sovereign's absence is 'itself an infringement on … sovereign immunity.'" *Fla. Wildlife*, 859 F.3d at 1318 (quoting *Republic of Philippines v. Pimentel*, 553 U.S. 851, 865 (2008)).

PBCI is indisputably a necessary party under Rule 19(a). The overarching objective of the SAC's claims against the Tribal and Federal Defendants is to deprive PBCI of jurisdiction and control over part of its reservation, to order it to expend substantial resources to remove scores of millions of dollars in real property improvements from its land, and to literally dismantle one of its major economic engines. PBCI thus has an incredibly strong interest relating to the subject matter. And it is clear that allowing this matter to proceed against the Federal Defendants in PBCI's absence, potentially leading to an order affecting the status of the PBCI Reservation or otherwise directing action on its property, could both impair PBCI's ability to protect its interest and subject the Federal Defendants to a risk of incurring multiple or inconsistent obligations with respect to complying with a potential court order and their trust duties to PBCI as a federally recognized Indian tribe. Under these circumstances, the pragmatic concerns of Rule 19(a) are easily satisfied. *See*, *e.g.*, *Fla. Wildlife*, 859 F.3d at 1316-17 (holding that a suit over a Florida water control project could not proceed against a federal agency in the absence of a state entity that operated and maintained much of the project, as in injunction of the former would impede the latter's discretion and impair cooperation between the entities); *N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1281-82 (10th Cir. 2012) (affirming dismissal of a case brought by one Indian tribe that, if adjudicated, would have prejudiced the interests of another tribe that could not be joined); *Hardy v. IGT, Inc.*, 2011 WL 3583745, at *5 (M.D. Ala.

Apr. 23, 2011). While this Court in *Hardy* "struggle[d] to envision a more severe practical impediment to [PBCI's] interests" than a determination that gaming on its reservation was illegal, this case clears that bar by asking the Court to determine that the existence of the Reservation itself, as well as all of PBCI's activities on it, are unlawful. *Hardy*, 2011 WL 3583745, at *5. PBCI is unquestionably a necessary party under Rule 19(a).

It is beyond dispute that this case cannot proceed in equity and good conscience without PBCI's involvement and that PBCI is accordingly indispensable under Rule 19(b). In addition to being a fundamental "affront to [PBCI's] sovereignty," *Fla. Wildlife*, 859 F.3d at 1318, adjudicating this case in PBCI's absence, given the relief that the Plaintiffs seek, would risk inevitably and catastrophically affecting PBCI's interests, and there is no way that the Court could tailor or limit any order adverse to PBCI's interests to avoid that result. *Id.* at 1318-19; *Pit River Home & Agric. Co-op Ass'n v. United States*, 30 F.3d 1088, 1101 (9th Cir. 1994) (recognizing propriety of dismissal of suit implicating tribal property and governance when necessary tribal defendant could not be joined); *Rosales*, 2007 WL 4233060, at *5 (holding that a tribe was an indispensable party to a suit against federal officials seeking to enjoin the tribe's activities on its own property); *see also Hardy*, 2011 WL 3583745, at *6 (noting that the Rule 19(b) prejudice test is "essentially the same as the practical impediment of an interest test under Rule 19(a)"). Nor would a judgment in PBCI's absence be adequate, as it would not be binding on PBCI and thus could not achieve the Plaintiffs' aims. *See Fla. Wildlife*, 859 F.3d at 1319; *Hardy*, 2011 WL 3583745, at *7. And while dismissing the entire case may mean that the Plaintiffs lack a remedy for their alleged injuries, that potential prejudice cannot, as a matter of law, outweigh the prejudice to PBCI of proceeding with this case in its absence. *See Fla. Wildlife*, 859 F.3d at 1320 (citing *Pimentel*, 553 U.S. at 872); *Pit River*, 30 F.3d at 1102-03;

*Hardy*, 2011 WL 3583745, at *7 (holding that the prejudice of allowing a suit to go forward in PBCI's absence outweighed the prejudice of leaving a plaintiff without a remedy).

Simply stated, there is no way that any aspect of this case fairly could or should move forward without PBCI's participation. Thus, to the extent that the Court dismisses all claims against PBCI, it should dismiss the entire case pursuant to Rule 19.

## CONCLUSION

This case presents emotionally charged issues that are doubtlessly important to the Plaintiffs. There is similar emotion on the Tribal Defendants' side, as PBCI has struggled for many years to benefit its people by creating viable economic development on its own land through the exercise of its inherent rights as a self-governing sovereign. However, whatever the emotions on either side, the key consideration here is that the SAC has no *legal* merit. The Plaintiffs' beliefs and emotions, however heartfelt, cannot overcome sovereign immunity, nor can they give rise to valid claims in the absence of supporting law. The statutes upon which the Plaintiffs attempt to rely represent a finely wrought, carefully tailored and balanced federal scheme for dealing with Indian tribes, issues pertaining to their sovereignty, and the protection and preservation of historical, cultural, and archeological resources on Indian lands. In considering the appropriate balancing of those interests, Congress has legislated in a way that, for all of the reasons discussed above, leaves the Plaintiffs without a viable cause of action against any of the Tribal Defendants. Accordingly, the SAC, and all claims stated therein, should be dismissed with prejudice.

Respectfully submitted this 23rd day of April, 2020.

s/*Mark H. Reeves*
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**

Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W.
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Tribal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of April, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties entitled to receive notice.

s/*Mark H. Reeves*
Mark H. Reeves

# TAB 203

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

MUSCOGEE CREEK NATION, *et al.*,            )
                                            )
      Plaintiffs,                           )
                                            )
vs.                                         )
                                            )
POARCH BAND OF CREEK INDIANS, *et*          )
*al.*,                                      )     Civil Action Number:
                                            )     2:12-cv-01079-MHT-CSC
      Defendants.                           )
                                            )

**DECLARATION OF LORI M. STINSON IN SUPPORT OF TRIBAL DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

I, Lori M. Stinson, hereby declare as follows:

1.    I am the Attorney General of the Poarch Band of Creek Indians (PBCI). In that capacity, I am familiar with the history of PBCI's real property transactions and their documentation.

2.    Attached hereto as Exhibit A is a true and correct copy of the written protective covenant that PBCI entered into when it acquired the property that is the subject of the above-styled litigation, which is referenced in the Second Amended Complaint filed in that case.

3.    Attached hereto as Exhibit B is a copy of the 1984 deed transferring the property that is the subject of the above-styled litigation from PBCI to the United States of America, in trust for the benefit of PBCI.

I hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 22nd day of April, 2020, in Atmore, Alabama.

                                           Lori M. Stinson

1

July 28, 1980

TO:  ALABAMA HISTORICAL COMMISSION (State of Alabama)

    We, Creek Nation East of the Mississippi, Inc., a non-profit corp-
oration (Poarch Band of Creeks) hereby agree to a covenant placed upon
the title of property purchased with the assistance of Department of
Interior, Historic Preservation Discretionary Fund Grant-in-Aid Program,
located in Elmore County, Alabama, whose legel description is:

    Commence at the SE corner of Section 24, T. 18, R. 18, Elmore
    County, Alabama, and run thence west along section line a distance
    of 900.0 feet; thence N. 1° 02' W. along west property line of
    Southern Natural Gas Co. a distance of 340 feet; thence N. 19° 09'
    East a distance of 1019.03 feet to west right of way of U.S. Highway
    231; thence S. 78° 16' West a distance of 316.80 feet; thence
    N. 59° 56' West a distance of 440 feet; thence N. 30° 04' E. a
    distance of 875 feet; thence S. 59° 56' East a distance of 489.46
    feet to the point of beginning of tract herein conveyed; thence
    N. 9° 04' East a distance of 231.24 feet; thence N. 8° 56' East
    a distance of 150.26 feet; thence N. 80° 59' W. a distance of
    17.41 feet; thence N. 0° 39' E. a distance of 120.0 feet; thence
    N. 80° 29' W. a distance of 97.56 feet; thence N. 0° 21' W. a
    distance of 665 feet; thence N. 89° 39' East a distance of 50
    feet; thence N. 0° 21' West a distance of 645.87 feet (said point
    shall be hereinafter called "POINT A" for a 60 foot easement described
    below); thence continue N. 0° 21' West a distance of 495 feet;
    thence N. 70° 42' W. a distance of 425 feet, more or less, to the
    east bank of the Coosa River, thence run southwesterly along said
    east bank a distance of 1960 feet, more or less, thence S. 59° 56'
    East a distance of 1264.46 feet, mor or less, to the point of
    beginning. Said tract being located in the East half of Sec. 24,
    T. 18, R. 18, Elmore County, Alabama, and contains 35.8 acres,
    more or less.

    LESS AND EXCEPT a 60 foot by 60 foot easement on the NE corner
    for rights of egress and ingress.

    ALSO:  A 60 foot easement described as beginning at "Point A"
    in above description and run thence N. 89° 39' East a distance
    of 254.81 feet, more or less, to the West right of way of U.S.
    highway 231 and South Main Street in the City of Wetumpka, Alabama,
    and said bearing and distance being the centerline of a 60 foot
    easement to above described property.

PROVISIONS  This covenant contains the following provisions:

    Maintenace.  The owner, Creek Nation East of the Mississippi, Inc.
    (Poarch Band of Creeks), agrees to assume the cost of continued
    maintenance and repair of the property so as to preserve the historical
    and archaeological integrity of the property for 20 years in order
    to protect and enhance those qualities that made the property eligible

EXHIBIT A

July 28, 1980

for listing in the National Register of Historic Places.  Nothing
in this agreement shall prohibit the subgrantee from seeking financial
assistance from any source available to him.

Public Access.  The owner, Creek Nation East of the Mississippi, Inc.
(Poarch Band of Creeks), agrees to provide public access to the site
no less than 12 days a year on an equitably spaced basis, and at
other times by appointment.  Nothing in this agreement will prohibit
the owner or subgrantee from charging a reasonable nondiscriminatory
admission fee, comparable to fees charged at similar facilities in
the area.

Site Protection.  The owner, Creek Nation East of the Mississippi, Inc.
(Poarch Band of Creeks), agrees to assure the protection of the site
against willful damage or vandalism.  Nothing in this agreement prohibits
the owner or subgrantee from developing the site in such a manner
that will not threaten or damage the archaeological resource.

Recovered Data Protection.  The owner, Creek Nation East of the Miss-
issippi, Inc. (Poarch Band of Creeks), agrees to assure that any
archaeological data and material recovered will be placed on permanent
loan with an institution that will care for the recovered data in
the manner prescribed in 36 CFR 1210 (formerly 36 CFR 66).

Dates and times when the property will be open to the public will be
published in newspapers of general circulation in the community or area
in which the property is located.

This covenant shall be for a period of 20 years commencing July 3, 1980 and
ending July 3, 2000.

IN WITNESS WHEREOF we have hereunto set our hand and seal this 28th
day of July 1980.

_____, Eddie Leon Tullis, Tribal Chairman,
as duly authorized Chairman of Creek Nation East of the Mississippi, Inc.
(Poarch Band of Creeks).

I, the undersigned authority in and for Escambia County, Alabama,
hereby certify that Eddie Leon Tullis, Tribal Chairman, whose names
are signed to the foregoing instrument, and who are known to me,
acknowledged before me, on this day, that being informed of the contents
of this instrument, they executed the same voluntarily on the day the
same bears date.

Given under my hand this 28th day of July, 1980.

NOTARY PUBLIC   My Commission Expires 2/24/82

ORIGINAL

BUREAU OF INDIAN AFFAIRS, WASH., D. C.
Deed Volume_____ 208  Page 20

STATE OF ALABAMA   X

ELMORE   COUNTY   X

:     STATUTORY WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS:  That CREEK NATION EAST OF THE MISSISSIPPI, INCORPORATED (POARCH BAND OF CREEKS), a corporation, herein joined by its successor, POARCH BAND OF CREEK INDIANS, a federally recognized Indian tribe organized under the laws of the United States, for and in consideration of the sum of ONE DOLLAR AND OTHER GOOD AND VALUABLE CONSIDERA-TIONS to it in hand paid by UNITED STATES OF AMERICA, in Trust for the Poarch Band of Creek Indians as authorized by Sec. 5 of the act of June 18, 1934 (48 Stat. 985, 25 U.S.C. 465), the Grantee, the receipt whereof is hereby acknowledged, do grant, bargain, sell and convey unto the said Grantee the real estate situated, lying and being in Elmore County, Alabama which is described on the attached Schedule A.

TO HAVE AND TO HOLD the same unto the Grantee, its succes-sors in trust and assigns.

IN WITNESS WHEREOF the undersigned has caused these pres-ents to be executed this 21st day of November, 1984.

ATTEST:

_Eugene Madison_
   Secretary

CREEK NATION EAST OF THE MISSISSIPPI, INCORPORATED (POARCH BAND OF CREEKS), a corporation

By: _Eddie L. Tullis_
    Tribal Chairman

ATTEST:

_Eugene Madison_
   Secretary

POARCH BAND OF CREEK INDIANS

By: _Eddie L. Tullis_
    Tribal Chairman

ROLL 35 FRAME___

000970

FILED IN PROBATE OFFICE
ELMORE COUNTY, AL.
E.W. ENSLEN, JUDGE

1984 NOV 29  AM 10: 42

EXHIBIT B

ORIGINAL

BUREAU OF INDIAN AFFAIRS  WASH., D. C.
Deed Volume

ROLL 35 FRAME___

000971

FILED IN PROBATE OFFICE
ELMORE COUNTY, AL.
E.W. ENGLISH, JUDGE

1984 NOV 28  AM 10: 42

STATE OF ALABAMA    X
                   :
ESCAMBIA  COUNTY    X

    I, Robert H. Maxwell, a notary public in and for the State
of Alabama at Large, hereby certify that Eddie L. Tullis and
Eugene Madison, whose names as Tribal Chairman and Secretary,
respectively, of CREEK NATION EAST OF THE MISSISSIPPI, INCOR-
PORATED (POARCH BAND OF CREEKS), a corporation, are signed to
the foregoing conveyance, and who are known to me, acknowledged
before me on this day that, being informed of the contents of the
conveyance, they as such officers and with full authority, exe-
cuted the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this 21st day of
November, 1984.

NOTARY PUBLIC
My commission expires:   8-8-88.

STATE OF ALABAMA    X
                   :
ESCAMBIA  COUNTY    X

    I, Robert H. Maxwell, a notary public in and for the State
of Alabama at Large, hereby certify that Eddie L. Tullis and
Eugene Madison, whose names as Tribal Chairman and Secretary,
respectively, of POARCH BAND OF CREEK INDIANS, a federally recog-
nized Indian tribe organized under the laws of the United States,
are signed to the foregoing conveyance, and who are known to me,
acknowledged before me on this day that, being informed of the
contents of the conveyance, they as such officers and with full
authority, executed the same voluntarily for and as the act of
said tribe.

    Given under my hand and official seal this 21st day of
November, 1984.

NOTARY PUBLIC
My commission expires:   8-8-88.

ORIGINAL

BUREAU OF INDIAN AFFAIRS, WASH., D. C.
Deed Volume _____ 208 _____ Page 22

SCHEDULE A

Commence at the Southeast corner of Section 24, Township 18,
Range 18, Elmore County, Alabama, and run thence West along
section line a distance of 900.0 feet; thence N 1° 02' West
along West property line of Southern Natural Gas Co. a dis-
tance of 340 feet; thence N 19° 09' East a distance of 1019.03
feet to West right of way of U. S. Highway 231; thence S 78°
16' West a distance of 316.80 feet; thence N 59° 56' West a
distance of 440 feet; thence N 30° 04' E a distance of 875
feet; thence S 59° 56' East a distance of 489.46 feet to the
point of beginning of tract herein conveyed; thence N 9° 04'
East a distance of 231.24 feet; thence N 8° 56' East a dis-
tance of 150.26 feet; thence N 80° 59' W a distance of 17.41
feet; thence N 0° 39' E a distance of 120.0 feet; thence N 80°
29' W a distance of 97.56 feet; thence N 0° 21' W a distance
of 665 feet; thence N 89° 39' East a distance of 50 feet;
thence N 0° 21' West a distance of 645.87 feet (said point
shall be hereinafter called "POINT A" for a 60 foot easement
described below); thence continue N 0° 21' West a distance of
495 feet; thence N 70° 42' W a distance of 425 feet, more or
less, to the East bank of the Coosa River; thence run South-
westerly along said East bank a distance of 1960 feet, more or
less; thence S 59° 56' East a distance of 1264.46 feet, more
or less, to the point of beginning, said tract being located
in the East Half of Section 24, Township 18, Range 18, Elmore
County, Alabama, and containing 35.8 acres, more or less,

LESS AND EXCEPT a 60 foot by 60 foot easement on the Northeast
corner for rights of egress and ingress;

ALSO:  a 60 foot easement described as beginning at "POINT A"
in above description and run thence N 89° 39' East a distance
of 254.81 feet, more or less, to the West right of way of U. S.
Highway 231 and South Main Street in the City of Wetumpka,
Alabama, and said bearing and distance being the centerline of
a 60 foot easement to above described property;

SUBJECT TO restrictive covenants dated July 28, 1980 (Card
014716) in the office of the Judge of Probate of Elmore County,
Alabama,

SUBJECT TO sewage easement to the city of Wetumpka, and

SUBJECT TO flood rights of the United States of America.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     Pursuant to the authority delegated in 3 B.I.A.M. 3.1.3

and Sec. 5 of the Act of 1934 (48 Stat. 984, 25 U.S.C. 465) this

deed is herewith APPROVED AND ACCEPTED by the Secretary of the

Interior.

_____
Acting Area Director
Eastern Area Office — B.I.A.

FILED IN PROBATE OFFICE
ELMORE COUNTY, AL.
E.W. ENGLISH, JUDGE

1984 NOV 28  AM 10: 42

This instrument was prepared by
ROBERT H. MAXWELL
ATTORNEY AT LAW
104 North Main Street
ATMORE, ALABAMA 36502

ROLL 35 FRAME ___

000972

mail: Gay V. Drew
Rt. 3 Box 243-A
Atmore, Al 36502

No. 21-11643

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## MUSCOGEE (CREEK) NATION, et al.,

### Plaintiffs-Appellants,

### v.

## BUFORD ROLIN, et al.,

### Defendants-Appellants.

---

**Appeal from the District Court of the United States for the Middle District of Alabama, Northern Division**
**District Court No. 2:12cv1079-MHT (CSC) (Hon. Myron H. Thompson)**

---

## APPELLANTS' APPENDIX – VOLUME 3

---

Mary Kathryn Nagle
ATTORNEY AT LAW
P.O. Box 506
McLean, VA 22101
(202) 407-0591

David McKnight
DILLARD, MCKNIGHT, JAMES &
MCELROY, LLP
2700 Highway 280
Suite 110 East
Birmingham, AL 35223


Devra R. Cohen
FOSTER GARVEY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
(206) 447-4400

*Counsel for Plaintiffs-Appellants*

# INDEX OF APPENDIX

**Docket/Tab #**

**<u>Volume 1</u>**

District Court Docket Sheet………………………………………………….    A

Second Amended Complaint and Supplemental Complaint………………    190

Exhibits to Second Amended Complaint………………………………….    190-1

**<u>Volume 2</u>**

Answer of Defendant Auburn University to Second Amended…………..    194
Complaint

Notice of Constitutional Question…………………………………………    197

Federal Defendants' Motion to Dismiss Second Amended
Complaint  and Supplemental Complaint…………………………………    199

Federal Defendants' Memorandum in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and Supplemental
Complaint………………………………………………………………….    200

Tribal Defendants' Motion to Dismiss Second Amended Complaint……..    201

Brief in Support of Tribal Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….    202

Declaration of Lori M. Stinson in Support of Tribal Defendants'
Motion to Dismiss Second Amended Complaint………………………….    203

**<u>Volume 3</u>**

Individual Defendants' Motion to Dismiss Second Amended
Complaint………………………………………………………………….    204

Brief in Support of Individual Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….    205

Notice of Correction…………………………………………………..    213

Plaintiffs' Response and Memorandum in Support of Response
to Federal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………...    213-1

Plaintiffs' Response and Memorandum in Support of Response
to Individual Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………...    213-2

Plaintiffs' Response and Memorandum in Support of Response
to Tribal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………...    213-3

## <u>Volume 4</u>

Federal Defendants' Reply in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and
Supplemental Complaint………………………………………………...    216

Tribal Defendants' Reply Brief in Support of Motion to Dismiss
Second Amended Complaint……………………………………………    217

Individual Defendants' Reply and Memorandum in Support of
Motion to Dismiss Second Amended Complaint…………………………..    218

Final Opinion……………………………………………………………    223

Final Judgment…………………………………………………………...    224

Order re Martin Construction bankruptcy…………………………………    225

## <u>Volume 5</u>

Judgment re Martin Construction bankruptcy………………………………...    227

Plaintiffs' Notice of Appeal……………………………………………...    228

Certificate of Service

# TAB 204

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE CREEK NATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action Number: |
| | ) | 2:12-cv-01079-MHT-CSC |
| POARCH BAND OF CREEK INDIANS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INDIVIDUAL DEFENDANTS' MOTION
TO DISMISS SECOND AMENDED COMPLAINT**

COME NOW Defendants Stephanie A. Bryan, Robert R. McGhee, Sandy Hollinger, Keith Martin, Arthur Mothershed, Garvis Sells, Eddie L. Tullis, Buford Rolin, and David Gehman, all in their individual capacities (the Individual Defendants), and move for dismissal of the claim alleged against them in the Plaintiffs' Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As set forth in the brief filed in support of this motion, the Plaintiffs have failed to allege facts sufficient to state a claim on which relief can be granted against any of the Individual Defendants. Those Defendants thus respectfully move and request that all claims against them be dismissed with prejudice.

Respectfully submitted this 23rd day of April, 2020.

s/ Mark H. Reeves
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W.
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Individual Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of April, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties entitled to receive notice.


*s/ Mark H. Reeves* _____
Mark H. Reeves

# TAB 205

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE CREEK NATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action Number: |
| | ) | 2:12-cv-01079-MHT-CSC |
| POARCH BAND OF CREEK INDIANS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF IN SUPPORT OF INDIVIDUAL DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
699 Broad Street, Suite 1400
Augusta, GA 30901-1453
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W., Suite 900
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Individual Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 1

STANDARD FOR MOTION TO DISMISS ................................................. 3

ARGUMENT ....................................................................................................... 4

I.     The outrage claim is barred by legislative immunity ................................ 4

II.    Plaintiff Thompson fails to state a claim for outrage ............................ 6

III.   The outrage claim is time barred. ............................................................. 9

     A.    *The outrage claim does not relate back.* ....................................... 10

     B.    *The outrage claim against the Council Members is time barred.* ......... 13

CONCLUSION ................................................................................................... 14

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................... 3

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998) ......................................................................... 4, 5

*Busby v. Truswal Sys. Corp.*,
    551 So.2d 322 (Ala. 1989) ................................................................ 7

*Cmty. House, Inc. v. City of Boise*,
    623 F.3d 945 (9th Cir. 2010) ........................................................... 5

*Cont'l. Cas. Ins. Co. v. McDonald*,
    567 So. 2d 1208 (Ala. 1990) ......................................................... 13

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
    406 F. Supp. 3d 1258 (M.D. Ala. 2019) ..................................... 3, 4

*Estate of Rowell v. Walker Baptist Med. Ctr.*,
    290 F.R.D. 549 (N.D. Ala. 2013) ................................................... 9

*Ex parte Profit Boost Mktg., Inc.*,
    254 So. 3d 862 (Ala. 2017) ............................................................. 9

*Grand Canyon Skywalk Dev., LLC v. Hualapai Indian Tribe of Ariz.*,
    966 F. Supp. 2d 876 (D. Ariz. 2013) ............................................. 5

*Gray Brown-Serv. Mortuary, Inc. v. Lloyd*,
    729 So. 2d 280 (Ala. 1999) ............................................................. 7

*Holloway v. Am. Media, Inc.*,
    947 F. Supp. 2d 1252 (N.D. Ala. 2013) ...................................... 13

*Hous. Inv'rs, Inc. v. City of Clanton*,
    68 F. Supp. 2d 1287 (M.D. Ala. 1999) ....................................... 4, 5

*Hughes v. City of Montgomery*,
    2013 WL 146397 (M.D. Ala. Jan. 14, 2013) ................................. 8

*Itel Capital Corp. v. Cups Coal Co.*,
    707 F.2d 1253 (11th Cir. 1983) ................................................... 11

*Jennings v. City of Huntsville*,
    677 So. 2d 228 (Ala. 1996) ........................................................... 14

*Johnson v. Fed. Express Corp.*,
    147 F. Supp. 2d 1268 (M.D. Ala. 2001) ....................................... 8

*Krupski v. Cost Crociere S.P.A.*,
    560 U.S. 538 (2010) ............................................................... 11

*Levite Undertakers Co. v. Griggs*,
    495 So. 2d 63 (Ala. 1986) ....................................................... 8

*Little v. Robinson*,
    72 So. 3d 1168 (Ala. 2011) ..................................................... 7

*Mardis v. Robbins Tire & Rubber Co.*,
    669 So. 2d 885 (Ala. 1995) ................................................... 13

*McMillian v. Johnson*,
    1994 WL 904652 (M.D. Ala. Feb. 18, 1994) ....................... 13

*National Sec. Fire & Cas. Co. v. Bowen*,
    447 So.2d 133 (Ala. 1983) ...................................................... 7

*Nobles v. Rural Cmty. Ins. Servs.*,
    303 F. Supp. 2d 1279 (M.D. Ala. 2004) .............................. 12

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) .............................................. 4

*Powers v. Graff*,
    148 F.3d 1223 (11th Cir. 1998) .............................. 10, 11, 12

*Runs After v. United States*,
    766 F.2d 347 (8th Cir. 1985) .................................................. 5

*Stewart v. Bureaus Inv. Grp., LLC*,
    309 F.R.D. 654 (M.D. Ala. 2015) ................................... 10, 12

*Strange v. Travelers Indem. Co.*,
    915 F. Supp. 2d 1243 (N.D. Ala. 2012) .............................. 13

*Supreme Court of Va. v. Consumers Union of the U.S., Inc.*,
    446 U.S. 719 (1980) ................................................................. 5

*Sykes v. Payton*,
    441 F. Supp. 2d 1220 (M.D. Ala. 2006) ............................ 6, 8

*Thomas v. BSE Indus. Contractors, Inc.*,
    624 So. 2d 1041 (Ala. 1993) .................................................. 6

*Wells v. HBO & Co.*,
    813 F. Supp. 1561 (N.D. Ga. 1992) ................................. 10, 12

*Whitt v. Hulsey*,
    519 So.2d 901 (Ala. 1987) .................................................. 7, 8

## Statutes

Ala. Code § 6-2-38(l) ................................................................... 13

## Rules

Fed. R. Civ. P. 15(c) ...................................................... passim

Fed. R. Civ. P. 15(c)(1)(C) ..................................................................................... 10, 11

# INTRODUCTION

In the recently filed Second Amended Complaint (SAC, Doc. 190), Plaintiff Mekko Thompson (Plaintiff Thompson) added a new claim of outrage against nine defendants, past and present members of the Poarch Band of Creek Indians' (PBCI) Tribal Council who are now sued for the first time in their individual capacities (the Individual Defendants). The Individual Defendants move to dismiss this claim pursuant to Federal Rule 12(b)(6) on several grounds. First, the claim must be dismissed because Plaintiff Thompson's allegations only involve the Individual Defendants' legislative activities as members of the PBCI Tribal Council, and the claim is thus barred by legislative immunity. Second, the SAC fails to adequately allege all of the necessary elements of an outrage claim. Third, because the outrage claim against the newly-named Individual Defendants does not relate back to the filing of the original Complaint for statute of limitations purposes, it is untimely. The outrage claim against the Individual Defendants should be dismissed for any and all of these reasons.

# BACKGROUND

A thorough and detailed description of the relevant facts is set forth in the concurrently filed Brief in Support of Tribal Defendants' Motion to Dismiss and will not be repeated here. Only a handful of the facts alleged in the SAC are relevant to the issue at hand.[1]

PBCI acquired the property at issue in this litigation in 1980, in the face of its imminent commercial development by third parties. SAC ¶ 61; SAC Ex. A, Doc. 190-3, at 5.[2] To fund its acquisition of the property, PBCI used a combination of federal preservation grant funds and a

---

[1] While the Individual Defendants vehemently dispute many of the allegations and characterizations of putative facts in the SAC, they will treat those allegations and characterizations as accurate for purposes of this filing as they would be required to do in the context of a motion to dismiss.

[2] All pin cites to previously filed documents are to the ECF generated page number.

donation from the previous private landowner. SAC ¶ 61. When it acquired the property, PBCI agreed to a written protective covenant to preserve the property for 20 years. *Id.* ¶ 62. PBCI also contemporaneously indicated that "[p]rior to any type of development of the property a scientifically sound archaeological program will be conducted …." Doc. 190-3 at 4. The 20-year protective covenant expired in 2000. SAC ¶ 79. After the expiration of the 20-year protective covenant, PBCI arranged for professional archaeologists affiliated with Auburn University to conduct Phase III archaeological excavations on the property prior to its potential development. *Id.* ¶¶ 100-01. Some of the cultural items, including human remains, excavated from the property are still in storage. *Id.* ¶ 121.

The Plaintiffs, Muscogee (Creek) Nation, Hickory Ground Tribal Town, and Plaintiff Thompson, allege that the PBCI first notified them of excavation on the property in 2006, at which point the Plaintiffs and the PBCI began a prolonged dialogue about the excavation and the proper treatment of excavated material. *Id.* ¶¶ 137, 139. The Plaintiffs further allege that they visited and spoke with representatives of PBCI and Auburn University in 2006 regarding human remains and associated funerary objects that had been excavated from the property. *Id.* ¶ 142; *see also* Doc. 95-11 at 2 (indicating that a meeting took place in Wetumpka, Alabama on May 9, 2006). PBCI oversaw the reinterment of excavated remains and funerary objects in 2012. SAC ¶ 150. The Plaintiffs filed suit against PBCI, the PCI Gaming Authority, several tribal officers in their official capacities, and numerous other defendants, but not the Individual Defendants, on December 12, 2012. *See* Doc. 1. The Plaintiffs allege that construction of PBCI's hotel and gaming facility took place from 2012-2014. *See* SAC ¶ 132; *see also* Doc. 124-1; Doc. 159 at 5, 11. They do not allege that any wrongful excavation or construction activity has taken place on the property since 2014.

In the Complaint filed in 2012, Plaintiff Thompson named the then-current members of the PBCI Tribal Council as defendants in their official capacities, seeking declaratory and injunctive relief for alleged violations of several federal laws. Plaintiff Thompson brought no outrage claim, did not sue anyone in an individual capacity, and did not seek monetary damages until the Second Amended Complaint, filed on March 9, 2020.[3] SAC ¶ 24. The SAC contains no allegations of discrete, individual conduct by the Individual Defendants. Rather, the SAC adds former and present "members of the Poarch Tribal Council" in their individual capacities and alleges only that they have ordered or authorized certain activity. SAC ¶¶ 24, 223, 226. In briefing in connection with his request for leave to file the SAC, Plaintiff Thompson further elaborated on the nature of the allegations against the Individual Defendants by saying that those who remain on the PBCI Tribal Council possess, by voting majority, the "power to stop the continuing outrageous, *ultra vires* conduct, but have chosen not to." Doc. 179 at 10 (citing to Tribal Council's constitutional powers and majority voting requirements).

## STANDARD FOR MOTION TO DISMISS

When deciding a motion to dismiss, the court generally assumes the facts set forth in the complaint to be true for purposes of the motion and construes them in the plaintiff's favor. *See Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1268 (M.D. Ala. 2019) (citations omitted). To survive a motion to dismiss, the complaint must set forth allegations establishing a claim to relief that is "plausible on its face." *Id.* at 1275 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The allegations "must be enough to raise a right to relief above the speculative level;" the use of "mere labels and conclusions … will not do." *Twombly*,

---

[3] The Plaintiffs initially sought leave to file the SAC on June 5, 2019, *see* Doc. 159, but treating the SAC as if it were filed on that date would not alter the analysis set forth herein.

550 U.S. at 555. "Crucially … the court need not accept as true 'conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts.'" *Coral Ridge*, 406 F. Supp. 3d at 1268 (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

# ARGUMENT

Plaintiff Thompson fails to state a claim on which relief can be granted against the Individual Defendants for three principal reasons. First, because all of the acts alleged arise from the collective action of the Individual Defendants undertaken in exercise of their legislative authority as members of PBCI's Tribal Council, the outrage claim is barred by the doctrine of legislative immunity. Second, the Individual Defendants' alleged conduct is not sufficiently extreme and outrageous to support a claim of outrage. Third, the outrage claim is barred by the statute of limitations because Plaintiff Thompson cannot meet the requirements of Federal Rule of Civil Procedure 15(c) governing the relation back of claims, and the SAC has not alleged any tortious conduct by the Individual Defendants within the two-year statute of limitations for outrage. The Court should dismiss the Individual Defendants from this case.

## I.    The outrage claim is barred by legislative immunity.

The outrage claim is barred because the Individual Defendants are protected by legislative immunity. Plaintiff Thompson's allegations of outrage stem from the collective action of the Council Members undertaken in the exercise of their legislative authority as members of PBCI's governing Tribal Council. "The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law." *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998). Legislative immunity is broad-sweeping, and applies to both claims for damages and claims for declaratory and injunctive relief. *Hous. Inv'rs, Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1295 (M.D. Ala. 1999); *see also Cmty. House, Inc. v. City of Boise*,

4

623 F.3d 945, 959 (9th Cir. 2010) (citing *Supreme Court of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732-733 (1980)). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. Legislative immunity applies to members of a tribal government, including each of the Individual Defendants. *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) (tribal council members enjoy "absolute legislative immunity"); *Grand Canyon Skywalk Dev., LLC v. Hualapai Indian Tribe of Ariz.*, 966 F. Supp. 2d 876, 885-86 (D. Ariz. 2013) (holding same).

Plaintiff Thompson makes sweeping allegations that the Council Members "order[ed]" and "authorized" certain acts related to the property (SAC ¶¶ 223, 226), but does not allege that any Individual Defendant committed any outrageous act alone or outside the context of collective, legislative action of PCBI's Tribal Council.[4] In fact, in support of their motion for leave to amend their Complaint to add the outrage claim, the Plaintiffs attempted to justify the addition of individual capacity claims by arguing that the Individual Defendants who remain on the PCBI Tribal Council possess, by voting majority, the "power to stop the continuing outrageous, *ultra vires* conduct, but have chosen not to." Doc. 179 at 10 (citing to Tribal Council's constitutional powers and majority voting requirements). That argument reveals that Plaintiff Thompson's claims against the Individual Defendants derive not from their individual actions, but rather from their collective authority to take legislative action on behalf of the Tribe, specifically through a majority vote of the PBCI Tribal Council. *Housing Investors*, 68 F. Supp. 2d at 1295-96 (finding that

---

[4] The Plaintiffs allege that Individual Defendants Stephanie Bryan and Buford Rolin, current and former chairpersons of the PBCI Tribal Council, respectively, sent letters to the Plaintiffs regarding the Tribe's actions. SAC ¶¶ 153, 158, 168. The Plaintiffs also allege that Individual Defendant Eddie Tullis, former chairman of the PBCI Tribal Council, testified regarding a bill governing disbursement of Indian Commission Claims awards. *Id.* ¶¶ 70-71. But none of these acts relate to or give rise to the outrage claim.

members of a city council and planning commission were entitled to legislative immunity for voting to reject a proposed housing project). Because the Individual Defendants' alleged actions (or inactions) giving rise to the outrage claim are plainly legislative in nature, they are entitled to legislative immunity, and Plaintiff Thompson's outrage claim should be dismissed.

## II.      Plaintiff Thompson fails to state a claim for outrage.

Even if the outrage claim was not barred by legislative immunity, Plaintiff Thompson has not sufficiently alleged all of the elements of outrage for each Individual Defendant. The independent "tort of outrage is a very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). A tort of outrage requires: "(1) that the defendant's conduct was intentional or reckless; (2) that the conduct was extreme or outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Sykes v. Payton*, 441 F. Supp. 2d 1220, 1222 (M.D. Ala. 2006).  To satisfy the second element, "the conduct must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"  *Id.* (citation omitted). Plaintiff Thompson has failed to allege the requisite intent and, in any event, the Individual Defendants' conduct is not sufficiently extreme and outrageous to support a claim of outrage.

To satisfy the first element, Plaintiff Thompson would have to allege that the conduct of each Individual Defendant was intentional or reckless. As a threshold matter, and as discussed in Section I *supra*, while Plaintiff Thompson broadly asserts that the Individual Defendants collectively committed outrageous acts intentionally, *see, e.g.*, SAC ¶ 223, he fails to articulate what each Individual Defendant actually did. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'" (citation omitted). Without even

identifying the discrete, allegedly outrageous acts that each Individual Defendant committed, Plaintiff Thompson certainly cannot sufficiently allege that each of them possessed the requisite mental state for committing an act of outrage. This alone prevents Plaintiff Thompson from stating a claim for outrage.

Plaintiff Thompson also must allege that the conduct of each Individual Defendant was extreme or outrageous. In Alabama, conduct has reached the level of tortious outrage only in three circumstances: "(1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So.2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So.2d 322 (Ala. 1989)." *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011). The conduct alleged here, causing the archeological excavation and analysis of the remains of unidentified historic individuals and artifacts, does not fall into any of these categories and does not rise to the level required to maintain a claim for tortious outrage. Indeed, a contrary holding would effectively outlaw the practice of archeology in the State of Alabama.

Plaintiff Thompson no doubt intends to liken the Individual Defendants' alleged conduct to that found in cases holding that acts associated with family burials may sometimes constitute tortious outrage. He cannot do so. Plaintiff Thompson alleges desecration—in the form of scientific excavation, study, and storage—of unidentified archaeological findings on land that belongs to PBCI, not destruction of a family cemetery plot or desecration of a recently deceased person's remains such as has been found to constitute outrage. *See, e.g., Gray Brown-Serv. Mortuary, Inc. v. Lloyd*, 729 So. 2d 280 (Ala. 1999) (affirming a jury's finding of outrage where funeral-home employees disinterred the plaintiff's wife's remains, removed them from her casket, destroying it in the process, poured caustic chemical on the body, and reinterred the remains in a

7

fouled crypt); *Whitt*, 519 So. 2d at 902 (upholding a jury verdict of outrage where the defendant bulldozed part of a fenced family burial plot on neighboring property); *Levite Undertakers Co. v. Griggs*, 495 So. 2d 63 (Ala. 1986) (affirming jury finding of outrage where undertaker wrongfully retained remains of plaintiff's husband to force payment of funeral expenses). The Individual Defendants are unaware of any case finding outrageous conduct in the context of the archeological excavation and study of the remains of unknown individuals. Accordingly, Plaintiff Thompson's allegations do not rise to the level of outrage under Alabama law.

Even if the exhumation and analysis of the archeological remains was sufficiently egregious to support a claim of outrage, Plaintiff Thompson's claim still would fail. While Plaintiff Thompson makes broad accusations that the Individual Defendants collectively ordered and authorized exhumation of sacred items, he does not allege that any single defendant directly participated in the actual exhumation, specifically ordered or directed any exhumation, or ordered or directed in the method that were used to study and store excavated materials. *Accord Hughes v. City of Montgomery*, 2013 WL 146397, at *2 (M.D. Ala. Jan. 14, 2013) (dismissing outrage claim for failing to sufficiently plead that defendants were liable for alleged conduct). By failing to allege sufficient facts that would allow the Court to make a reasonable inference as to liability, if any, for each Individual Defendant, Plaintiff Thompson fails to properly satisfy the second element of an outrage claim as to any of them.

Finally, the tort of outrage must cause "emotional distress so severe that no reasonable person could be expected to endure it." *Sykes*, 441 F. Supp. 2d at 1222. In order to be actionable, alleged conduct "must go beyond all bounds of decency and, basically, bring tears to the eyes of a thick-skinned person." *Johnson v. Fed. Express Corp.*, 147 F. Supp. 2d 1268, 1277 (M.D. Ala. 2001). The archeological excavation and study of a historic site, even including human remains

found there, simply does not rise to this level. Plaintiff Thompson alleges that he has suffered "abject pain, sorrow, anguish, torment, suffering, helplessness, grief, and anger." SAC ¶ 225. While this may be subjectively true, the proper standard is that of an objective reasonable person. The archeological removal and study of unidentified remains and artifacts is not substantially "severe" from an objective standpoint. As such, Plaintiff Thompson's allegations do not establish the tort of outrage.

### III.   The outrage claim is time barred.

Even if Plaintiff Thompson had alleged the elements of a viable outrage claim that was not barred by legislative immunity, any such claim would be untimely. Prior to the SAC, the Plaintiffs have never asserted an outrage claim or any other claim against the Individual Defendants. Because Plaintiff Thompson cannot meet the standards of Federal Rule 15(c), specifically that the Individual Defendants should have known back in 2012 that they would have been sued then but for a mistake regarding their identities, the outrage claim does not relate back and is long since barred by the statute of limitations.[5] Moreover, Plaintiff Thompson has failed to allege any conduct by each or any of the Individual Defendants within the limitations period that would give rise to a claim of outrage. Therefore, the continuing tort doctrine does not revive the outrage claim.

---

[5] The law is unsettled as to whether Alabama rules or the Federal Rules of Civil Procedure govern relation back in cases like this one, where the Plaintiffs seek to bring a purely state law claim pursuant to this Court's supplemental jurisdiction. *See, e.g.*, *Estate of Rowell v. Walker Baptist Med. Ctr.*, 290 F.R.D. 549, 561 (N.D. Ala. 2013) ("Eleventh Circuit authority on whether relation back is governed by federal or state law in federal court is presently unsettled …."). That question need not be resolved, however, as Alabama's Rule 15(c)—the rule governing relation back of amendments changing parties or the naming of a party and the only rule that could potentially provide for the relation back of the SAC's proposed outrage claim—is modeled after its federal counterpart, and the outcome is the same regardless of which rule the Court applies. *See Ex parte Profit Boost Mktg., Inc.*, 254 So. 3d 862, 869 (Ala. 2017) (assessing Federal Rule 15(c) case law in addressing a question under Ala. Rule 15(c)).

A.   *The outrage claim does not relate back.*

When, as here, a plaintiff amends a complaint to add a defendant, but does so after the

running of the statute of limitations, Rule 15(c) "controls whether the amended complaint may

'relate back' to the filing of the original complaint and thereby escape a timeliness objection."

*Powers v. Graff*, 148 F.3d 1223, 1225 (11th Cir. 1998) (citation omitted). The Rule allows relation

back for amendments changing the party only if within 120 days of the original filing of the

Complaint the party brought in by amendment:

> (i) received such notice of the action that it will not be prejudiced in defending on
> the merits; **and** (ii) knew or should have known that the action would have been
> brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C) (emphasis added).

The Eleventh Circuit has held that the purpose of "Rule 15(c) is to permit amended

complaints to relate back to original filings for statute of limitations purposes when the amended

complaint is 'correcting a mistake about the identity of the defendant.'" *Powers*, 148 F.3d at 1226

(citation omitted). That is not the case here. Rather than correcting his misidentification of a

defendant to a claim set forth in or contemplated by the initial complaint, Plaintiff Thompson seeks

to add an entirely new claim—common law outrage—against the Individual Defendants. The

relation back doctrine is flatly inapplicable under these circumstances. *See Wells v. HBO & Co.*,

813 F. Supp. 1561, 1567 (N.D. Ga. 1992) (denying motion to amend to add officers of corporate

defendant when the plaintiff knew the identity of the officers from the outset); *see also Stewart v.*

*Bureaus Inv. Grp., LLC*, 309 F.R.D. 654, 659-61 (M.D. Ala. 2015) ("[T]he relation-back doctrine

does not apply in instances where a plaintiff attempts to join entirely new defendants in addition

to existing defendants.").

Plaintiff Thompson maintained in support of his motion for leave to file the SAC that the

requirements of Rule 15(c)(1)(C) are met because the Individual Defendants were named in their

official capacities in the original Complaint and thus on notice of the litigation. This argument completely disregards the second half of the Rule. For relation back to occur, a newly-added defendant must have had reason to believe at the time of the original complaint that he was omitted due to mistaken identity. The Eleventh Circuit explained the importance of this aspect of Rule 15(c) in *Powers*, a case in a similar posture to this one. There, the plaintiff filed claims against a corporation based on alleged wrongdoing by the company and its brokers for manipulation of the market for certain securities. *Powers*, 148 F.3d at 1225. After the running of the statute of limitations, the plaintiff sought to add individual control persons. The plaintiff relied upon *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253 (11th Cir. 1983), to argue that the amended complaint should relate back. *Powers*, 148 F.3d at 1226. The Eleventh Circuit disagreed, explaining that "*Itel* established no general rules about suits originally filed against a corporation where the plaintiff later attempts to add corporate control persons or owners as individual defendants." *Id.* The Court further explained that the purpose of Rule 15 does not support relation back in "cases where the newly added defendants were known to the plaintiff before the running of the statute of limitations and where the potential defendants should not necessarily have known that, absent a mistake by the plaintiff, they would have been sued." *Id.* The Court further pointed out that the plaintiff in *Powers* knew that the added defendants could be proper parties and that "[t]he same law and circumstances would give Defendants no reason to believe that they were omitted from the original complaint on account of mistake as opposed to some kind of strategic choice by Plaintiffs." *Id.* at 1227, n.8; *see also Krupski v. Cost Crociere S.P.A.*, 560 U.S. 538, 541 (2010) (holding that "relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known").

11

The same is true here. Plaintiff Thompson obviously knew of the Individual Defendants' identities when he filed the original Complaint because he named them in their official capacities. And yet, he failed to add them in their individual capacities and omitted a claim of outrage altogether. This was a strategic choice not a mistake in identity. And the Individual Defendants had no reason to suspect otherwise, because the original complaint sought only injunctive and declaratory relief that could not be entered against them in their individual capacities (but were potentially available in official capacity claims). Only in the newly-minted outrage claim did Plaintiff Thompson first assert any claim for monetary relief that would not have been available in his original, official capacity action.

As *Powers* makes clear, Rule 15(c) is intended to allow the correction of mistakes; it does *not* apply where, as here, the plaintiff knew the identity of a potential defendant at the time of the initial complaint, but chose, for whatever reason, not to sue that potential defendant. *See also Stewart*, 309 F.R.D. at 661-62; *Nobles v. Rural Cmty. Ins. Servs.*, 303 F. Supp. 2d 1279, 1286-87 (M.D. Ala. 2004) (Thompson, J.) (denying motion to amend because their "'mistake' was a mistake in legal judgment not a mistake in the naming of the party"); *Wells*, 813 F. Supp. at 1567 ("[E]ven the most liberal interpretation of 'mistake' cannot include a deliberate decision not to sue a party whose identity plaintiff knew from the outset."). Having alleged official capacity claims against each of the Individual Defendants in the initial complaint in this case, *see* Doc. 1, Plaintiff Thompson cannot deny knowledge of their identity. Moreover, just like the corporate control defendants in *Powers*, the Individual Defendants had no reason to suspect that they were not named individually due to a mistake as to their identity, as opposed to it being a strategic choice by Plaintiff Thompson to seek only declaratory and injunctive relief. Having made a deliberate

decision not to name the known Individual Defendants in their individual capacities in 2012, Plaintiff Thompson cannot now claim that his newly adopted legal theory relates back to that date.

> B.    *The outrage claim against the Council Members is time barred.*

Whether it relates back or not, the outrage claim is time barred. Under Alabama law, a claim for outrage must be brought within two years. *See, e.g.*, Ala. Code § 6-2-38(l); *Strange v. Travelers Indem. Co.*, 915 F. Supp. 2d 1243, 1244 (N.D. Ala. 2012) ("Alabama, which recognizes the tort of outrage under severely limited circumstances, has a two-year statute of limitations for the tort."). A claim for outrage accrues "at the moment the plaintiff actually suffers … distress by becoming aware of the distress-inducing information or conduct." *Holloway v. Am. Media, Inc.*, 947 F. Supp. 2d 1252, 1270 (N.D. Ala. 2013). According to the SAC, the Plaintiffs became aware of the allegedly outrageous conduct—the excavation of remains from PBCI's Wetumpka property—in 2006, so any claim for outrage first accrued at that time. *See* SAC ¶ 137.

While the initial accrual date is not necessarily dispositive, because outrage sometimes can be a continuing tort under Alabama law, *see Cont'l. Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1216 (Ala. 1990), that is of no help to Plaintiff Thompson here. Even assuming, *arguendo*, that Plaintiff Thompson has alleged facts supporting a continuing tort theory, Alabama continuing tort law still requires that a claim be brought within two years of the last outrageous act. *See Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 888 (Ala. 1995); *McMillian v. Johnson*, 1994 WL 904652, at *18 (M.D. Ala. Feb. 18, 1994). Because Plaintiff Thompson sought leave to file the SAC on June 5, 2019, he could not base a timely outrage claim on conduct occurring prior to June 5, 2017.[6] Plaintiff Thompson alleges no such conduct. On the contrary, the conduct alleged in

---

[6] This assumes the limitations period goes back to the date that Plaintiff Thompson sought leave to file the SAC. If calculated from the actual filing date, only conduct after March 9, 2018 would be covered.

support of the outrage claim pertains to the excavation of remains and funerary objects prior to and during the construction of the Tribe's hotel and gaming facility—conduct that allegedly concluded by 2014 at the latest. *See* SAC ¶¶ 132, 223-39; *see also, e.g.*, Doc. 124-1; Doc. 159 at 10 (noting that the outrage claim is asserted "against the individuals who served as Poarch officials *at the time the excavation and construction took place*" rather than against the current Tribal Council members (emphasis added)); Doc. 159 at 5 (noting that the archaeological excavation "concluded in 2011"); Doc. 159 at 11 (alleging that construction at the site continued through at least 2014, but no further); Doc. 179 at 9. Accordingly, even under a continuing tort theory, the absolute latest that Plaintiff Thompson possibly could have brought a viable outrage claim arising out of excavation or construction activity on the property was some time in 2016.

That Plaintiff Thompson continues to be distraught over actions taken outside of the limitations period, *see* SAC ¶¶ 225, 233, does not suffice to make his claim viable or timely. *See, e.g.*, *Jennings v. City of Huntsville*, 677 So. 2d 228, 230 (Ala. 1996). Otherwise, any plaintiff with a permanent injury would have an evergreen right of action. The continuing tort doctrine operates when wrongful conduct is ongoing, not when the harm for concluded conduct lingers. It does not apply here. [7]

## CONCLUSION

Plaintiff Thompson's effort to obtain money damages against the Individual Defendants in their personal capacities for their collective actions as members of the PBCI Tribal Council fails for multiple reasons. It is barred by legislative immunity. It is not supported by sufficient

---

[7] To the extent Plaintiff Thompson relies upon any more recent activity to support his outrage claim, including the continued storage of remains alleged in passing in ¶ 226 of the SAC, he fails to allege any conduct by any Individual Defendant related to that activity. In any event, the allegedly improper storage of archeological artifacts does not rise to the requisite level of extreme and outrageous conduct under Alabama law.

allegations, particularly as to each Individual Defendant's conduct, to satisfy the elements of

outrage under Alabama law. And it is hopelessly time barred. Each of these problems constitutes

a separate and sufficient ground for the Court to dismiss the outrage claim under Rule 12(b)(6)

and to dismiss the Individual Defendants from this case.

Respectfully submitted this 23rd day of April, 2020.

/s/*Mark H. Reeves*
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W.
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Individual Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties entitled to receive notice.

/s/*Mark H. Reeves*
Mark H. Reeves

TAB 213

**UNITED STATES DISTRICT COURT**

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

ONE CHURCH STREET

MONTGOMERY, ALABAMA 36104

DEBRA P. HACKETT, CLERK

TELEPHONE (334) 954-3600

July 8, 2020

# NOTICE OF CORRECTION

**From:**               **Clerk's Office**

**Case Style:**         **Muscogee (Creek) Nation et al v. Poarch Band of Creek Indiana, et al**

**Case Number:**        **2:12-cv-1079-MHT-CSC**

**Referenced Document:**  **Document 210, 211, 212, Responses and Memorandums**

**This notice has been docketed to enter the correct pdfs of the referenced documents into the record. The original pdfs did not contain signatures. The correct pdfs are attached to this notice.**

# TAB 213-1

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action Number: |
| POORCH BAND OF CREEK INDIANS, et al., | ) | 2:12-cv-01079-MHT-CSC |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE AND MEMORANDUM IN SUPPORT OF RESPONSE
TO FEDERAL DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT AND SUPPLEMENTAL COMPLAINT**

# TABLE OF ABBREVIATIONS

APA:                        Administrative Procedures Act

ARPA:                       Archaeological Resources Protection Act

BIA:                        Bureau of Indian Affairs

Federal Defendants:         United States Department of the Interior, National Park Service, Bureau of
                            Indian Affairs, Tara Sweeney (the Assistant Secretary for Indian Affairs
                            within the Department of the Interior), David Vela (Acting Director of the
                            National Park Service within the Department of the Interior), and David
                            Bernhardt (Secretary of the United States Department of the Interior).

IGRA:                       Indian Gaming Regulatory Act

IRA:                        Indian Reorganization Act

NAGPRA:                     Native American Graves Protection and Repatriation Act

NHPA:                       National Historic Preservation Act

NPS Agreement:              National Park Service Agreement, Dkt. 190-1, Ex. I

Poarch:                     Poarch Band of Creek Indians

RFRA:                       Religious Freedom Restoration Act

RLUIPA:                     Religious Land Use and Institutionalized Persons Act

Tribal Defendants:          Poarch, the PCI Gaming Authority, the officials in charge of those
                            entities,[1] and the Poarch Tribal Historic Preservation Officer

---

[1] For Poarch, these officials are Tribal Council members Stephanie Bryan, Robert McGhee, Amy Bryan, Charlotte
Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells. Dkt. 190 at 8. For PCI
Gaming Authority, these officials are Board members Westly Woodruff, Billy Smith, Eddie Tullis, Teresa Poust,
and Timothy Manning. *See* Dkt. 207 at 1; Dkt. 190 at 8-9.

i

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ................................................................................ i

I.     INTRODUCTION ......................................................................................15

II.    BACKGROUND .......................................................................................16

III.   STANDARD FOR MOTION TO DISMISS .............................................18

IV.    ARGUMENT ............................................................................................20

       A.     Plaintiffs state a claim over which this Court has jurisdiction under the
              Indian Reorganization Act. ....................................................................20

              1.     The Indian Reorganization Act and its application here ............................20

              2.     Plaintiffs' Indian Reorganization Act claim is timely because the
                     Federal Defendants applied their decision to Plaintiffs less than six
                     years before this lawsuit was filed. ...........................................................24

              3.     Plaintiffs have standing to bring their Indian Reorganization Act
                     Claim because they have alleged particularized, concrete, and
                     actual or imminent injury resulting from the Secretary's decision
                     that will be redressed by a finding that Hickory Ground is not
                     validly held in trust. ................................................................................29

       B.     The Plaintiffs properly allege subject matter jurisdiction for their
              NAGPRA claim. ....................................................................................33

              1.     Dismissal cannot be granted on the basis of a procedural
                     requirement in the APA that is not jurisdictional in nature. .....................34

              2.     Even if the APA's procedural requirements were jurisdictional
                     (they are not), Plaintiffs have plausibly alleged a claim based on
                     agency actions. ........................................................................................44

       C.     Plaintiffs' NHPA claim against the Federal Defendants does not fail for
              lack of subject matter jurisdiction. ........................................................66

              1.     The Tribal Defendants' assumption of NHPA obligations did not
                     absolve the Federal Defendants of their own NHPA obligations. .............66

              2.     The Plaintiffs have alleged various "undertakings" under the
                     NHPA. .....................................................................................................68

              3.     The Federal Defendants violated the NHPA. .............................................73

              4.     The Federal Defendants' NHPA violations are reviewable under
                     the NHPA and the APA and are subject to redress under the
                     Court's broad equitable powers. ...............................................................75

       D.     Plaintiffs allege jurisdiction under the Archaeological Resources
              Protection Act. .......................................................................................78

       E.     The Plaintiffs have stated a claim against the Federal Defendants and
              Tribal Defendants under RFRA. ............................................................82

1.      RFRA provides broader protections for religious liberty than were provided prior to the Supreme Court's 1990 decision in *Employment Division v. Smith*. ..................................................................83

2.      RFRA applies to the Tribal and Federal Defendants because Tribal Defendants were federal actors who had been delegated federal authority and obligations in the NPS Agreement. ....................................84

3.      Tribal Defendants, as federal actors, are substantially burdening Plaintiffs' religious exercise by forcing them to choose between fulfilling their religious duties or facing criminal and civil penalties. ...................................................................................................89

F.      This Court should not dismiss Count VIII of the Second Amended Complaint..............................................................................................95

V.      CONCLUSION...............................................................................................95

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Ala.-Coushatta Tribe of Tex. v. United States*,
  757 F.3d 484 (5th Cir. 2014) ................................................26

*Ala. Mun. Ins. Corp. v. Ala. Mun. Ins. Corp. v. Ala. Ins. Underwriting Ass'n*,
  No. 2:06CV291-CSC, 2008 WL 4493433 (M.D. Ala. Sept. 30, 2008)..................71

*Alabama v. PCI Gaming Auth.*,
  801 F.3d 1278 (11th Cir. 2015) ................................................14, 15

*Alabama v. Shalala*,
  124 F. Supp. 2d 1250 (M.D. Ala. 2000) ................................................11

*All. to Save Mattaponi v. U.S. Army Corps of Eng'rs*,
  515 F. Supp. 2d. 1 (D.D.C. 2007)........................................28, 30, 43, 47

*Arbaugh v. Y & H Corp.*,
  546 U.S. 500 (2006)........................................24, 26, 30, 32

*Arthur v. Thomas*,
  974 F. Supp. 2d 1340 (M.D. Ala. 2013) ................................................5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................5, 32

*Bennett v. Spear*,
  520 U.S. 154 (1997)........................................63

*Blue Cross & Blue Shield of Alabama v. Sanders*,
  138 F.3d 1347 (11th Cir. 1998) ................................................31

*Boarhead Corp. v. Erickson*,
  923 F.2d 1011 (3d Cir. 1991)........................................61

*Bonnichsen v. U.S. Dep't of Army*,
  969 F. Supp. 614 (D. Or. 1997) ................................................21

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001)........................................71, 74

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)........................................69, 70, 76, 77

*C.f. Pit River Tribe v. United States Forest Service*,
    469 F.3d 768 (9th Cir. 2006) ........................................................59, 60

*Califano v. Sanders*,
    430 U.S. 99 (1977)....................................................................................24

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987)............................................................................56, 57

*Carcieri v. Salazar*,
    555 U.S. 379 (2009)....................................................................................7

*Center for Biological Diversity v. United States Forest Service*,
    640 F. App'x 617 (9th Cir. 2016) (unpublished) ...................................44

*Chehazeh v. Attorney General of the U.S.*,
    666 F.3d 118 (3d Cir. 2012)..............................................................27, 32

*Citizens Against Casino Gambling in Erie Cty. v. Hogen*,
    No. 07-CV-0451S, 2008 WL 2746566 (W.D.N.Y. July 8, 2008) ...................17, 19

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001) ..............................................................41

*Cohen v. Bd. of Trs. of the Univ. of the D.C.*,
    819 F.3d 476 (D.C. Cir. 2016) ..................................................................5

*Comanche Nation v. United States*,
    2008 WL 4426621 (W.D. Okla. 2008) ...........................................76, 77, 80

*Crosby Lodge, Inc. v. Nat'l Indian Gaming Comm'n*,
    No. 306-CV-00657-LRH-RAM, 2008 WL 5111036 (D. Nev. Dec. 3, 2008)..................12, 13

*CTIA-Wireless Ass'n v. Fed. Comm. Comm'n*,
    466 F.3d 105 (D.C. Cir. 2006) ..........................................................55, 58

*Delano Farms Co. v. Cal. Table Grape Comm'n*,
    655 F.3d 1337 (Fed. Cir. 2011)..........................................23, 25, 28, 29

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    __ U.S. __, 2020 WL 3271746 (2020)....................................................41

*Dotson v. Shelby Cty.*,
    No. 13-2766-JDT-TMP, 2014 WL 3530820 (W.D. Tenn. July 15, 2014) ............74

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990)............................................................................69, 70

*Erickson v. Pardus,*
   551 U.S. 89 (2007)..............................................................................5

*Evans v. Newton,*
   382 U.S. 296 (1966)...........................................................................74

*Fein v. Peltier,*
   949 F.Supp. 374 (D. V.I. 1996) ..........................................54, 56, 58, 67

*Florer v. Congregation Pidyon Shevuyim, N.A.,*
   639 F.3d 916 (9th Cir. 2011) .............................................................74

*Flytenow, Inc. v. F.A.A.,*
   808 F.3d 882 (D.C. Cir. 2015)...........................................................26

*Focus on the Family v. Pinellas Suncoast Transit Auth.,*
   344 F.3d 1263 (11th Cir. 2003) .........................................................71

*Friends of Animals v. Bernhardt,*
   __ F.3d __, 2020 WL 3244011 (D.C. Cir. 2020)................................26

*Geronimo v. Obama,*
   725 F. Supp. 2d 182 (D.D.C. 2010) ..........................................21, 22, 32

*Geyser v. United States,*
   No. CV 17-7315-DMG (ASX), 2018 WL 6990808 (C.D. Cal. Aug. 30, 2018)...............16, 19

*Havasupai Tribe v. Provencio,*
   906 F.3d 1155 (9th Cir. 2018) ...........................................................63

*Hishon v. King & Spalding,*
   467 U.S. 69 (1984)..............................................................................6

*Iowa League of Cities v. E.P.A.,*
   711 F.3d 844 (8th Cir. 2013) .............................................................42

*K.T. v. Royal Caribbean Cruises, Ltd.,*
   931 F.3d 1041 (11th Cir. 2019) ...........................................................5

*Karst Envtl. Educ. & Prot., Inc. v. Envtl. Prot. Agency,*
   475 F.3d 1291 (D.C. Cir. 2007).........................................................62

*La Cuna De Aztlan Sacred Sites Protection Circle Advisory Committee v. U.S.*
*Department of the Interior,*
   No. 2:11-CV-00395-ODW, 2012 WL 2884992 (C.D. Cal. July 13, 2012)............................78

*Lujan v. Nat'l Wildlife Fed'n.,*
   497 U.S. 871 (1990)......................................................................23, 42

*Lyng v. Northwest Indian Cemetery Protective Association*,
  485 U.S. 439 (1988).......................................................................................79

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012).......................................................................................16

*Michigan v. U.S. Army Corps of Eng'rs*,
  667 F.3d 765 (7th Cir. 2011) ................................................................23, 25, 29

*Midrash Sephardi, Inc. v. Town of Surfside*,
  366 F.3d 1214 (11th Cir. 2004) ...................................................................76

*Montana Wilderness Ass'n v. Fry*,
  408 F.Supp.2d 1032 (D. Mont. 2006).........................................................63

*Morrison v. Amway Corp.*,
  323 F.3d 920 (11th Cir. 2003) ....................................................................31

*Muniz-Muniz v. U.S. Border Patrol*,
  741 F.3d 668 (6th Cir. 2013) ......................................................................25

*Narragansett Indian Tribe v. Rhode Island Dept. of Transp.*,
  903 F.3d 26 (1st Cir. 2018)..........................................................................61

*Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*,
  860 F.2d 1022 (11th Cir. 1988) ..................................................................71

*Nat'l Indian Youth Council v. Watt*,
  664 F.2d 220 (10th Cir. 1981) ....................................................................52

*Nat'l Parks Conservation Ass'n v. Norton*,
  324 F.3d 1229 (11th Cir. 2003) ..................................................................26

*Nat'l Trust for Hist. Pres. v. Blanck*,
  938 F.Supp. 908 (D. D.C. 1996) ...........................................................19, 55

*Navajo Nation v. Dep't of the Interior*,
  876 F.3d 1144 (9th Cir. 2017) ........................................................... passim

*Navajo Nation v. U.S. Forest Service*,
  535 F.3d 1058 (9th Cir. 2008) ....................................................................78

*Navajo Nation v. United States Dept. of Interior*,
  819 F.3d 1084 (9th Cir. 2016) ...............................................................48, 49

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004)............................................................................. passim

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
   503 F.3d 18 (1st Cir. 2007) ................................................................................25

*Ochoa v. Holder*,
   604 F.3d 546 (8th Cir. 2010) ....................................................................27, 29, 32

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*,
   498 U.S. 505 (1991) ..............................................................................36, 37

*Okla. Tax Comm'n v. Sac & Fox Nation*,
   508 U.S. 114 (1993) ......................................................................................36

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   957 F.3d 1024 (9th Cir. 2020) ...................................................................30, 43

*Patchak v. Salazar*,
   632 F.3d 702 (D.C. Cir. 2011), *aff'd and remanded sub nom. Match-E-Be-
   Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ........16, 17, 18

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ..................................................................25

*Poarch Band of Creek Indians v. Hildreth*,
   656 F. App'x 934 (11th Cir. 2016) ...........................................................11, 14, 15

*Preminger v. Peake*,
   552 F.3d 757 (9th Cir. 2008) .........................................................................16

*Presbyterian Church v. United States*,
   870 F.2d 518 (9th Cir. 1989) ...................................................................23, 28

*Pueblo of San Ildefonso v. Ridlon*,
   103 F.3d 936 (10th Cir. 1996) ....................................................................20

*Pyramid Lake Paiute Tribe of Indians v. Morton*,
   354 F. Supp. 252 (D. D.C. 1972) ...............................................................51

*Red Lake Band of Chippewa Indians v. Barlow*,
   846 F.2d 474 (8th Cir. 1988) ...................................................................25, 29

*Reese v. Ellis, Painter, Ratterree & Adams, LLP*,
   678 F.3d 1211 (11th Cir. 2012) ......................................................................5

*Ringsred v. City of Duluth*,
   828 F.2d 1305 (8th Cir. 1987) ....................................................................58

*Rosales v. United States*,
   No. 07-0624, 2007 WL 4233060 (S.D. Cal. Nov. 28, 2007) (unpublished)............................21

*S.E.C. v. Mut. Benefits Corp.*,
  408 F.3d 737 (11th Cir. 2005) ............................................................31

*San Carlos Apache Tribe v. United States*,
  272 F. Supp. 2d 860 (D. Ariz. 2003), *aff'd* 417 F.3d 1091 (9th Cir. 2005)................21, 22, 62

*Seminole Nation v. United States*,
  316 U.S. 286 (1942)......................................................................41

*Sherbert v. Verner*,
  374 U.S. 398 (1963)......................................................................70

*Sheridan Kalorama Hist. Ass'n v. Christopher*,
  49 F.3d 750 (D.C. Cir. 1995) ........................................................54, 56

*Slockish v. United States Federal Highway Admin.*,
  682 F. Supp. 2d 1178 (D. Or. 2010), No. 3:08-CV-1169-ST, 2012 WL 398989
  (D. Or. Feb. 7, 2012)..................................................................64, 77

*Snoqualmie Indian Tribe v. FERC*,
  545 F.3d 1207 (9th Cir. 2008) ...........................................................79

*Stand Up for California! v. U.S. Dep't of the Interior*,
  919 F. Supp. 2d 51 (D.D.C. 2013) ..............................................17, 18, 19

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*,
  205 F.Supp.3d 4 (D.D.C. 2016) .........................................................54

*Thorpe v. Borough of Thorpe*,
  770 F.3d 255 (3d Cir. 2014), *cert. denied*, 136 S.Ct. 84 (2015)........................20

*TOMAC v. Norton*,
  193 F. Supp. 2d 182 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of
  Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) .............17, 19

*Treasurer of N.J. v. U.S. Dep't of Treasury*,
  684 F.3d 382 (3d Cir. 2012)......................................................23, 25, 31

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006) ............................................... passim

*United Keetoowah Band of Cherokee Indians v. Fed. Comm. Comm'n*,
  933 F.3d 728 (D.C. Cir. 2019) ...........................................................54

*United States v. Azure*,
  801 F.2d 336 (8th Cir. 1986) ........................................................37, 38

*United States v. Papakee*,
  485 F. Supp. 2d 1032 (N.D. Iowa 2007)............................................................38

*United States v. Roberts*,
  185 F.3d 1125 (10th Cir. 1999) ........................................................................37

*Upstate Citizens for Equal., Inc. v. United States*,
  841 F.3d 556 (2d Cir. 2016)...........................................................16, 17, 19

*Vahora v. Holder*,
  626 F.3d 907 (7th Cir. 2010) ............................................................................27

*Vietnam Veterans of Am. v. Shinseki*,
  599 F.3d 654 (D.C. Cir. 2010)...........................................................................26

*Vieux Carre Prop. Owners, Residents & Assoc., Inc. v. Brown*,
  875 F.2d 453 (5th Cir.1989) .............................................................................61

*Vieux Carre Property Owners, Residents & Assoc., Inc. v. Brown*,
  948 F.2d 1436 (5th Cir. 1991) ..........................................................................63

*Vill. of Bensenville v. Fed. Aviation Admin.*,
  457 F.3d 52 (D.C. Cir. 2006) ....................................................................73, 80

*White v. Univ. of Cal.*,
  No. 12-01978, 2012 WL 12335354 (N.D. Cal. Oct. 9, 2012) (unpublished) ...................21, 22

*Wilderness Soc. v. Alcock*,
  83 F.3d 386 (11th Cir. 1996) ............................................................................42

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972).....................................................................................70, 76

*Yankton Sioux Tribe v. U.S. Army Corps of Eng's*,
  209 F. Supp. 2d 1008 (D. S.D. 2002) ...............................................................20

*Yankton Sioux Tribe v. United States Army Corps of Engineers*,
  194 F.Supp.2d 977 (D. S.D. 2002) ....................................................................61

*Yates v. United States*,
  574 U.S. 528 (2015)...........................................................................................38

## STATUTES

5 U.S.C. § 551 .........................................................................................42, 49

5 U.S.C. § 701 ....................................................................................26, 42, 49

5 U.S.C. § 702 ....................................................................................... passim

5 U.S.C. § 704 ........................................................................................... passim

5 U.S.C. § 706 ........................................................................................... passim

15 U.S.C. § 657a(b)(5)(C)(i) .............................................................................. 33

16 U.S.C. 470cc ................................................................................................ 39

16 U.S.C. § 470a ......................................................................................... 72, 73

18 U.S.C. § 1151 ....................................................................................... passim

25 U.S.C. § 1304 .............................................................................................. 34

25 U.S.C. § 1903 .............................................................................................. 34

25 U.S.C. § 3001 .......................................................................... 13, 33, 35, 38, 39

25 U.S.C. § 3002 ....................................................................................... passim

25 U.S.C. § 3009 .............................................................................................. 41

25 U.S.C. § 3010 .............................................................................................. 41

25 U.S.C. § 3013 ....................................................................................... passim

28 U.S.C. § 1331 .............................................................................................. 64

28 U.S.C. § 1738B(b)(9) .................................................................................... 34

28 U.S.C. § 2401(a) .......................................................................................... 11

42 U.S.C. § 2000bb .................................................................................... 70, 80

54 U.S.C. § 300308 ........................................................................................... 52

54 U.S.C. § 300320 ........................................................................................... 54

54 U.S.C. § 302302 ............................................................................ 52, 53, 54, 58

54 U.S.C. § 302702 ........................................................................................... 52

54 U.S.C. § 302704 ........................................................................................... 53

54 U.S.C. §§ 302706 ......................................................................................... 59

54 U.S.C. § 302906 ..................................................................................... 56, 61

54 U.S.C. § 302907 ..................................................................................... 56, 61

54 U.S.C. § 306102 ............................................................................................53

54 U.S.C. § 306108 ............................................................................................52

54 U.S.C. § 306113 ............................................................................................60

54 U.S.C. § 307105 ............................................................................................61

Administrative Procedures Act ................................................................... passim

American Indian Religious Freedom Act,
    42 U.S.C. § 1996 ...........................................................................................69

Archeological Resources Protection Act, 16 U.S.C. § 470aa et seq..................... passim

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq ...........................17, 34, 57, 80

Indian Reorganization Act of 1934,
    25 U.S.C. § 5123 *et seq*...................................................................................6

National Historic Preservation Act, 54 U.S.C. §§ 300101 *et seq* ..............................4, 70

Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001, *et
    seq.*, .............................................................................................. passim

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*........................ passim

Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq* ...................74

## OTHER AUTHORITIES

25 C.F.R. Part 543............................................................................................58

25 C.F.R. § 151.12(d)(2)(ii) ................................................................................14

25 C.F.R. § 262.3 ..............................................................................................64

25 C.F.R. § 262.4 .......................................................................................40, 46, 66

25 C.F.R. § 262.8 ..............................................................................................67

25 C.F.R. § 559.2 ..............................................................................................57

36 C.F.R. § 79 .............................................................................................67, 68

36 C.F.R. § 800 ......................................................................................... passim

43 C.F.R. § 7.5 .........................................................................................55, 66, 67

43 C.F.R. § 10 ............................................................................. passim

60 Fed. Reg. 62134, 62140 (Dec. 4, 1995) .......................................33, 34

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2020) ......................................................................5

14 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Jurisdiction* § 3659 (4th ed.) .........................................................25

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 174 (2012) .............................................................37, 38

Department of Interior Memorandum, "Determining Eligibility under the First Definition of 'Indian' in Section 19 of the Indian Reorganization Act of 1934," available at https://www.indianz.com/News/2020/03/11/doisol031020.pdf ...............8

Department of Interior Memorandum, "Procedure for Determining Eligibility for Land-into-Trust under the First Definition of 'Indian' in Section 19 of the Indian Reorganization Act," available at https://www.indianz.com/News/2020/03/11/doisol030520.pdf) ...............8

Department of Interior Opinion M-37054, available at https://www.doi.gov/sites/doi.gov/files/uploads/m-37054.pdf .................8

Department of Interior Withdrawal Memorandum, https://www.doi.gov/sites/doi.gov/files/uploads/m-37055.pdf (last visited July 2, 2020) .......................................................................................7

Fed. R. Civ. P. 8 .........................................................................4, 81

Fed. R. Civ. P. 12 ....................................................................... passim

Fed. R. Civ. P. 15(a)(2) .................................................................81

Fed. R. Civ. P. 19 ........................................................................6, 7

H.R. Rep. No. 101-877 (1990) ...........................................................35

Interior Office of Inspector General Semiannual Report to Congress 9 (Oct. 2006), *available at* https://www.doioig.gov/sites/doioig.gov/files/Semiannual-OCT2006SAR.pdf ...........................................................................80

Jack R. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 ARIZ. ST. L.J. 35 (1992) ..........................................................39, 44, 45, 46

Megan Mineiro, *Native Tribe Could Lose Its Land Under New Trump Administration Guidelines*, Courthouse News Service (May 20, 2020), https://www.courthousenews.com/native-tribe-could-lose-reservation-land-under-new-trump-administration-guideline/ ............................................................... 8

Native American Graves Protection and Repatriation Act Regulations, 60 Fed. Reg. 62,134, 62,134–35 (Dec. 4, 1995) ...................................... 48

Op. Solic. Dept. Int. M-37045, *Reaffirmation of the United States' Unique Trust Relationship with Indian Tribes and Related Indian Law Principles*, 2017 WL 7805664, at \*5 (Jan. 18, 2017) ..................................................... 6

S. Rep. No. 101-473 (1990) ................................................................. 12, 65

Sol. Mem., *Procedure for Determining Eligibility for Land-into-Trust under the First Definition of 'Indian' in Section 19 of the Indian Reorganization Act* 6, 8 ............ 8, 9, 10

Southern Utah Wilderness Alliance ("SUWA") ............................................. 43

Wind Creek Hospitality Property Overview, *available at* https://windcreekhospitality.com/properties-2/overview (last visited July 6, 2020) ........................................................................................................ 80

Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3rd ed.) ..................................... 31

## I.      INTRODUCTION

Plaintiffs Muscogee (Creek) Nation, Hickory Ground Tribal Town, and Mekko George Thompson seek relief from this Court for the systematic, wrongful, and ongoing desecration of the sacred historic burial place of their ancestors at Hickory Ground caused by the excavation, construction and operation of an opulent and highly profitable casino by the Poarch Band of Creek Indians. Poarch dug up Plaintiffs' ancestors from their intended final resting places, with some remains and related artifacts removed from the site entirely, while others were scattered about the site and then paved over or buried beneath the buildings.

Poarch's conduct, and the conduct of the individually-named defendants, represents a shocking betrayal of unequivocal commitments made by Poarch when it acquired the Hickory Ground property. Poarch assured Plaintiffs and represented in its application for federal preservation grants that it would protect the property from excavation and development in perpetuity. As a result, Plaintiffs did not oppose that acquisition or Poarch's efforts to have the land taken into trust by the Federal government. The Tribal Defendants then reneged on their promises and desecrated Hickory Ground in pursuit of profit.

Poarch and the Federal Defendants later entered into an agreement that obligated Poarch to take on cultural and historic preservation obligations imposed by various federal statutes. Poarch and its officials violated that agreement and the applicable federal laws by failing to consult with, or obtain consent from, Plaintiffs before conducting excavation and construction at Hickory Ground. The Federal Defendants failed in their independent obligations to oversee and enforce those obligations, and by allowing the illegal conduct. Plaintiffs are now barred from exercising and fulfilling the tenets of their religion because they are prevented from returning their ancestors to their rightful resting places and conditions.

Defendants do not dispute that Hickory Ground was and is a sacred place, that Plaintiffs' ancestors were buried there, or that the ancestors have been ripped from the resting place that the Tribal Defendants promised Plaintiffs they would preserve in perpetuity. Instead, they raise a

plethora of technical legal reasons why they cannot be held responsible for the harm they have caused.

At this stage of the litigation, Plaintiffs' only obligation is to allege a "short, plain statement of the case" demonstrating that their claim for relief is plausible. For the reasons explained in detail below, Plaintiffs have more than met that burden. Plaintiffs request that the Court deny the motions to dismiss in their entirety and allow this litigation to proceed so that these claims can be presented for resolution on the merits based on a fully developed record.

## II.    BACKGROUND

This case arises from the Poarch Band of Creek Indians' desecration of the sacred grounds and burial places of Plaintiffs' ancestors in Wetumpka, Alabama. The Muscogee (Creek) Nation, Hickory Ground Tribal Town, and the Tribal Town chief, Mekko Thompson, know this sacred place as "Hickory Ground." Poarch acquired Hickory Ground by promising it would always preserve and protect the site. Instead, it removed over 57 bodies of Plaintiffs' ancestors, and thousands of Plaintiffs' cultural artifacts, from the sacred place to bulldoze it for construction of Poarch's third casino. Plaintiffs brought this lawsuit to seek redress for this greedy, tragic, outrageous, and illegal act.

The Hickory Ground Tribal Town was one of over forty Tribal Towns within the Muscogee (Creek) Nation before the Nation was forcibly removed from Alabama to Oklahoma Territory in the early 1800s on the Trail of Tears. Hickory Ground was the last tribal capital of the Muscogee (Creek) Nation before removal. The members of the Hickory Ground Tribal Town took the embers from the ceremonial grounds at Hickory Ground on their long journey to Oklahoma Territory to maintain their sacred ties to their homeland and the original birthplace of their Tribal Town. The members of the modern-day Hickory Ground Tribal Town are matrilineal descendants of those buried at Hickory Ground in Alabama, and continue their centuries-old religious ceremonies today. *See* Dkt. 190 at 7, 13, 72–73.

Although Poarch never historically resided at Hickory Ground, it acquired Hickory Ground in 1980 using federal preservation grant funds. In its application for the funds, Poarch

16

promised that it would "prevent development on the property" and preserve Hickory Ground "without excavation." *See id.* at 19. Poarch emphasized that this preservation would benefit Plaintiffs: because Hickory Ground "is of major importance in the history of the Muscogee (Creek) Nation," the Site would "be a place where Creeks from Oklahoma may return and visit their ancestral home; the "existing Hickory Ground tribal town in Oklahoma" in particular "will be pleased to know their home in Alabama is being preserved." *Id.* Vowing that its purchase of Hickory Ground would save the property from being demolished by development, Poarch cautioned that "[d]estruction of archaeological resources in Alabama . . . destroy[s] the cultural history of Creek people." *Id.* at 5.

The federal government awarded the requested preservation grant funds to Poarch. Pursuant to the standard terms of preservation grant awards, a protective covenant was placed on Hickory Ground for 20 years. Despite its repeated promises to protect the sacred site, Poarch began a years-long desecration of Hickory Ground after the covenant expired in 2000 to clear the land for construction of its third casino. Dkt. 190 at 24–44. At the time, Poarch already had casinos in Atmore and Montgomery. Poarch did not notify the Muscogee (Creek) Nation about the excavations until 2006. *Id.* at 33.[2]

To make way for the $246 million casino resort, Poarch exhumed over 57 human remains of Plaintiffs' ancestors and removed thousands of artifacts in a massive excavation that concluded in 2011. In 2012, Poarch unilaterally reburied many of these remains *away from* their original resting places, using invented ceremonies that disrespected the dead and left the spirits

---

[2] Plaintiffs dispute the Tribal and Federal Defendants' assertions that Plaintiffs knew in 1992 or 2002 that Poarch did not plan to abide by its promises to preserve Hickory Ground. For example, a Bureau of Indian Affairs Archeologist and Federal Preservation Officer issued a Briefing Statement to the Assistant Secretary of Indian Affairs recounting that Poarch conducted limited exploratory testing at the Site around 1992 "to determine if some portion of the site could be developed without damaging archeological resources," and such activity "ceased after 1993" after the testing found "no area where such resources were totally absent." Dkt. 200-2 at PDF p. 29. Indeed, as of April 1999, Poarch's Office of Cultural and Historic Field Methodology had a policy that "'[u]nder no circumstances are the burials on the Poarch Creek Indians Reservations, or lands under their control, to be excavated, nor are they to be subjected to any examination or testing. Burial sites take precedence over any project or program plan.'" Dkt. 190 at 25-26 (quoting Dkt. 190-1, Ex. J). Hickory Ground Tribal Town's October 19, 2002 letter ultimately states that Hickory Ground Tribal Town heard rumors through third parties that Poarch may be disturbing the site, and "hope[s] this is not the case." Dkt 200-1 at PDF page 26; *see also* Dkt. 190 at 26, ¶ 92.

of Plaintiffs' ancestors in perpetual unrest. Many remains and artifacts have never been reburied. *Id.* at 5–6, 30–37.

The Department of the Interior, National Park Service, and Bureau of Indian Affairs facilitated Poarch's desecration of Hickory Ground by illegally providing assistance to Poarch and failing to comply with applicable law.

Poarch's mistreatment of Plaintiffs' ancestors and cultural items, and the Federal Defendants' facilitation of this mistreatment, violated the National Historic Preservation Act, Native American Graves Protection and Repatriation Act, Archaeological Resources Protection Act, Religious Freedom Restoration Act, Indian Reorganization Act, Poarch's preservation agreement with the National Park Service, and Poarch's promises to protect Hickory Ground "without excavation." In addition, Poarch has been unjustly enriched to the tune of hundreds of millions of dollars through its breach of its promises to protect Hickory Ground in perpetuity. Dkt. 190 at 46–48, 53–76. Now, having affirmatively chosen to move forward with construction without legal basis, even *after* Plaintiffs filed this lawsuit, Poarch calls the casino "improvements on the property" that it insists it should get to keep. Dkt. 202 at 72. The law does not allow this.

Plaintiffs brought this action to bring peace to their ancestors by returning them to their intended final resting places in accordance with their religious duties. Plaintiffs seek to hold Poarch to its promises to protect and preserve Hickory Ground, and to hold Federal Defendants to their obligations under the law. Hickory Ground should be restored, to the greatest extent possible, to its condition prior to construction of the casino. The remains and artifacts should be returned to their original resting places.

### III.   STANDARD FOR MOTION TO DISMISS

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows a party to assert by motion a defense of "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

"Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the...claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 555). "In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* at 93–94. The court must assume that the factual allegations set forth in the complaint are true and must construe them in the light most favorable to the plaintiff. *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215 (11th Cir. 2012); *Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1343 (M.D. Ala. 2013). All reasonable inferences must be drawn in the plaintiff's favor. *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1043 (11th Cir. 2019).

A motion under Rule 12(b)(6) does not pose the question of whether the plaintiff can ultimately prevail on the merits—"a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556; *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2020) ("Whether the plaintiff ultimately can prevail on the merits is a matter properly determined on the basis of proof, which means on a summary judgment motion or at trial by the judge or a jury, and not merely on the face of the pleadings."). The burden of persuasion is on the party moving under Rule 12(b)(6) to demonstrate that no legally cognizable claim for relief exists. *Cohen v. Bd. of Trs. of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (quoting 5B Wright & Miller, *supra* § 1357) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists."). The complaint may be dismissed "only if it is clear that no

relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

## IV.   ARGUMENT

**A.   Plaintiffs state a claim over which this Court has jurisdiction under the Indian Reorganization Act.**

Federal Defendants and Tribal Defendants both argue that this Court should dismiss Plaintiffs' Indian Reorganization Act claim because it is untimely and because Plaintiffs do not have standing. Both groups of Defendants' arguments are addressed here.[3] Plaintiffs' Indian Reorganization Act claim is timely because their claim is an "as-applied" challenge under the Administrative Procedures Act that was filed within six years of the date Interior's decision was applied to Plaintiffs. Plaintiffs also have standing because their particularized, concrete, and ongoing injuries result from Interior's decision to take land into trust and thereby allow the excavation and construction that desecrated Hickory Ground, and Plaintiffs' requested relief would redress that injury by unwinding the trust decision that enabled the illegal excavation and construction.

### 1.   The Indian Reorganization Act and its application here.

The Indian Reorganization Act of 1934, 25 U.S.C. § 5123 *et seq.*, was intended to reverse prior policy of weakening the status of tribes as self-governing entities and dispossessing them of their lands. *See* Op. Solic. Dept. Int. M-37045, *Reaffirmation of the United States' Unique Trust Relationship with Indian Tribes and Related Indian Law Principles*, 2017 WL 7805664, at *5 (Jan. 18, 2017). Indians had been "stripped of their property," and the Indian Reorganization's land provisions were intended to "put[ ] a halt to the loss of tribal lands." *See id.*

---

[3] Plaintiffs' Indian Reorganization Act claim is against Secretary Bernhardt, not Tribal Defendants, consistent with innumerable other cases challenging the Secretary's authority to take land into trust. Though Tribal Defendants appear to acknowledge this, *see* Dkt. 202 at 21 (addressing the claim "to the extent that it is asserted against the Tribal Defendants"), they dedicate ten pages to opposing the claim, *see id.* at 16-25. Tribal Defendants' Rule 19 argument with respect to this claim is addressed in Section IV.J of Plaintiffs' Response to Tribal Defendants' Motion to Dismiss.

As Poarch emphasized in its application for federal preservation funds, Hickory Ground is within the Muscogee (Creek) Nation's original homelands. Dkt. 190 at 18–19. Hickory Ground was the Nation's last tribal capital before the Nation was stripped of its land in the southeast and forcibly removed to what is now Oklahoma. *See* Dkt. 190 at 13. Poarch, on the other hand, stated in its petition for federal recognition that it historically resided within an 18-mile radius around Tensaw, Alabama, about 160 miles away from Wetumpka. *See* Recommendation and Summary of Evidence for Proposed Finding for Federal Acknowledgment, p. 1–2 of 121 (Dec. 29, 1983), *available at* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ofa/petition/013_prchcr_AL/013_pf.pdf.[4]

One way the Indian Reorganization Act provided means for tribes to regain lands was through authorizing the Secretary of the Interior to acquire land and hold it in trust for the purpose of providing land for tribes "now under Federal jurisdiction." *Carcieri v. Salazar*, 555 U.S. 379, 381–82 (2009) (citing 25 U.S.C. §§ 5108 & 5129 (previously §§465 & 479). In *Carcieri v. Salazar,* 555 U.S. 379 (2009), the Supreme Court held that qualifying tribes are "those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934." *Id.* at 395; *see also* Dkt. 190 at 21.

The federal government has construed "under federal jurisdiction" to involve an inquiry into whether (1) the United States took actions reflecting federal obligations, duties, responsibility for, or authority over a tribe in or before 1934, and (2) that relationship continued through 1934. Dkt 190 at 21 (citing Sol. Op. M-37029, *available at* https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37029.pdf). On March 9, 2020, the same day Plaintiffs filed their Second Amended Complaint, the Solicitor's Office withdrew Opinion M-37029[5] and issued Opinion M-37054, available at https://www.doi.gov/sites/doi.gov/files/uploads/m-37054.pdf, along with a March 5, 2020 memo

---

[4] Tensaw too was part of the Muscogee (Creek) Nation's territory, so the individuals living there "applied for and were given permission by the council of the Creek Nation to settle on the Alabama-Tensaw River lands." *Id.* at 3.
[5] *See* Withdrawal Memorandum at https://www.doi.gov/sites/doi.gov/files/uploads/m-37055.pdf (last visited July 2, 2020).

titled "Determining Eligibility under the First Definition of 'Indian' in Section 19 of the Indian Reorganization Act of 1934" (available at https://www.indianz.com/News/2020/03/11/doisol031020.pdf) and a March 10, 2020 memo titled "Procedure for Determining Eligibility for Land-into-Trust under the First Definition of 'Indian' in Section 19 of the Indian Reorganization Act" (available at https://www.indianz.com/News/2020/03/11/doisol030520.pdf) (all sites last visited July 2, 2020). While this new guidance has been criticized as "incomprehensible and so convoluted that it couldn't guide any lawyer in the field,"[6] it turns on the same inquiry as the government's prior interpretation: whether the tribe had a government-to-government relationship with the United States in 1934. *See* Sol. Mem., *Procedure for Determining Eligibility for Land-into-Trust under the First Definition of 'Indian' in Section 19 of the Indian Reorganization Act* 6, 8. The guidance establishes specific presumptive indicia of having such a government-to-government relationship, *see id.* at 2–7, and if no such indicia exists for a tribe, then Interior is required to consider whether the "cumulative weight of an applicant's evidence" establishes that the tribe was "under federal jurisdiction." As demonstrated by the facts alleged in the Second Amended Complaint and discussed below, Poarch cannot demonstrate the existence of the required "government-to-government" relationship, so the new guidance does not alter Poarch's failure of that test.

Poarch was not federally recognized until 1984. It has admitted in its own submissions to the federal government and federal courts that it had no relationship with the federal government for at least 140 years before it was recognized, including in 1934. In 2005, Poarch emphasized that "the federal government clearly ended its relationship with Poarch Creek following removal [in 1832]" and "the historical record amply demonstrates that," as of the 1830s, the federal government had "terminated the government-to-government relationship with the Creek in

---

[6] Megan Mineiro, *Native Tribe Could Lose Its Land Under New Trump Administration Guidelines*, Courthouse News Service (May 20, 2020), https://www.courthousenews.com/native-tribe-could-lose-reservation-land-under-new-trump-administration-guideline/ (quoting District of Columbia district court judge in hearing regarding an Indian Reorganization Act challenge).

Alabama through a broad course of dealings that included express statements by top federal officials disclaiming any federal relationship with the Tribe" until Poarch was federally recognized in 1984. Dkt. 190 at 21 (citation omitted). In the 1950s, Poarch took a consistent position, stating that it was "but a newly formed band of descendants of the original Creek nation" that was "not under the guardianship of the Federal Government" and had "possessed no territory and were not dealt with by the United States as a group" since the 1830s. *Id.* at 22–23 (citations omitted).

The United States agreed that there was no government-to-government relationship with Poarch before 1984. The Department of the Interior Solicitor's Office stated in 2008 that it "does not believe that the Poarch Creek Band ever had a government-to-government relationship with the United States until it was [recognized in 1984]," and in the same year the National Indian Gaming Commission agreed that "the United States specifically and repeatedly disclaimed any relationship with the Poarch Band" from the 1830s until 1984. *Id.* at 22 (alteration in original; citations omitted). In 1952, the United States wrote in an appellate brief to the United States Court of Claims that "those [Creeks] who remained in the East [after removal] abandoned their tribal relationships; and they never continued a tribal government recognized by the United States and they entered into no treaties or other political arrangements with the United States . . . and only recently organized themselves, apparently for the purpose of this suit." *Id.* at 23 (citation omitted). The brief also stated that these eastern Creeks were "not recognized by the administrative or legislative arm of the Government." *Id.* (citation omitted). The Court of Claims found that the United States had "no occasion for further dealings with [those Creeks who remained east of the Mississippi] since 1832." *Id.* at 24 (quoting *McGhee v. Creek Nation*, 122 Ct. Cl. 380, 391 (1952), *cert. denied*, 344 U.S. 856 (1952)).

Plaintiffs allege that because Poarch was not "under federal jurisdiction" within the meaning of the Indian Reorganization Act, Interior never had authority to take the Hickory Ground Site into trust for Poarch. *Id.* at 24, 45. Plaintiffs also allege that the federal government performed new applications of its land-into-trust decision through (1) granting permits under the

Archaeological Resources Protection Act covering certain time frames and allowing excavation at Hickory Ground that occurred through the year 2011, *see* Dkt. 190 at 28, 30, and (2) denying Plaintiff Mekko Thompson's Native American Graves Protection and Repatriation Act claim in 2009 based on its determination that Poarch retained legal interest in the "NAGPRA items from the Hickory Ground site," *id.* at 34.

Because the Hickory Ground Site was not validly taken into trust, Interior did not have authority to grant permits allowing Poarch to undertake the archaeological excavations. Dkt. 190 at 45. Any such excavation would be subject to state law. *Id.* Likewise, in denying Mekko Thompson's resulting NAGPRA claim, the federal government erred in determining that the lands from which the items were taken were "tribal lands" belonging to Poarch within the meaning of NAGPRA. Dkt. 190 at 34.

Absent the land-into-trust decision and the Department of the Interior's re-applications of that decision with respect to the excavation and disposition of excavated remains and other objects, Poarch could not have conducted the excavation or built its casino. Indeed, as discussed in Section IV.A.2 of Plaintiffs' Response to Tribal Defendants' Motion to Dismiss, neither federal nor state law allows gaming at the Site, so there would have been no point to constructing the casino. Dkt. 190 at 45–46.

**2.    Plaintiffs' Indian Reorganization Act claim is timely because the Federal Defendants applied their decision to Plaintiffs less than six years before this lawsuit was filed.**

Both the Federal Defendants and Tribal Defendants argue that Plaintiffs' claim that the Department of the Interior did not have authority to take the Hickory Ground Site into trust for Poarch is untimely because the land was taken into trust in 1984 and the statute of limitations under the Administrative Procedures Act ("APA") therefore expired in 1990. This argument incorrectly assumes that Plaintiffs' cause of action accrued on the date of agency action in 1984. Instead, because Plaintiffs' are challenging Interior's action as *ultra vires*, and because Interior

did not apply its decision to Plaintiffs until within six years of this lawsuit, Plaintiffs' claim is timely.

The APA allows a party who is "adversely affected or aggrieved" by a federal agency's decision to challenge the action as *ultra vires*, procedurally deficient, or as an arbitrary policy choice. 5 U.S.C. §§ 702, 706(2)(A)–(D). Such a challenge must be "filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a).

When an APA claim accrues depends on the nature of the claim. Claims under the APA that challenge the action "on the grounds that an agency exceeded its constitutional or statutory authority"—just as the Plaintiffs' Indian Reorganization Act claim does—accrue when the agency applies the action to the "specific challenger." *Alabama v. Shalala*, 124 F. Supp. 2d 1250, 1270 (M.D. Ala. 2000) (first citing *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991); then citing *Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152 (D.C. Cir. 1990)). As stated above, Plaintiffs allege that the federal government applied its land-into-trust decision to Plaintiffs through (1) granting ARPA permits that allowed the excavation that occurred through 2011 and (2) denying Plaintiff Mekko Thompson's Native American Graves Protection and Repatriation Act claim in 2009 based on its determination that Poarch retained legal interest in the "NAGPRA items from the Hickory Ground site," Dkt. 190 at 34.

   a) ***The Department of the Interior applied its decision to Plaintiffs by issuing ARPA permits dependent on both "Indian lands" status and prior notification to the Muscogee (Creek) Nation.***

As explained in Section IV.D below, the Archaeological Resources Protection Act requires that permits first be obtained from the federal government before excavations on "Indian lands" by third parties can occur. 16 U.S.C. § 470ee(a). Here, the Department of the Interior illegally granted permits to Auburn University to excavate on "Indian lands." *See* Dkt. 190 at 29–30, 62–63; Dkt. 200-1 at PDF p. 37. That excavation extended through 2011, and the permits covered only some of this time period; much of the excavation took place without a permit at all. Dkt. 190 at 28, 63.

Before issuing those permits, Interior was required to (1) determine that it had the authority to issue the permits; and (2) "notify any Indian tribe which may consider the site as having religious or cultural importance," 16 U.S.C. § 470cc(c). Dkt. 190 at 61. The notice requirement is intended to give tribes an opportunity to intervene in development activity in order to safeguard cultural items. *See* S. Rep. No. 101-473, at 10 (1990). Interior incorrectly determined the lands were "Indian lands," *see, e.g.*, Dkt. 200-1 at PDF p. 37, Section 8, and issued the permits without notifying or consulting with the Muscogee (Creek) Nation, who clearly attached religious and cultural importance to these "Indian Lands." Dkt. 190 at 54–55, 61–63. "With the grant of each ARPA permit, Interior performed a new application of its unauthorized decision to take lands into trust for Poarch, as the ARPA permits only allowed excavations to take place 'on lands under the jurisdiction of the Department of Interior.'" Dkt. 190 at 30.

With respect to the accrual of this claim, Poarch first notified Plaintiffs of the excavation in 2006, and only through subsequent related public records requests did Plaintiffs receive copies of the permits for the excavation that were illegally issued by Interior. Due to no fault of Plaintiffs, both the Tribal Defendants and the Federal Defendants failed to notify Plaintiffs of the excavation in violation of the law, and Plaintiffs first learned that Interior had issued the permits after being notified of the excavation in 2006 by Poarch. This claim is subject to equitable tolling and therefore accrued when Plaintiffs obtained records of the permits. *See Crosby Lodge, Inc. v. Nat'l Indian Gaming Comm'n*, No. 306-CV-00657-LRH-RAM, 2008 WL 5111036, at *5 (D. Nev. Dec. 3, 2008) ("Equitable tolling applies in situations where, 'despite all due diligence, [the party invoking equitable tolling] is unable to obtain vital information bearing on the existence of the claim,'" and "[t]he party invoking tolling need only show that his or her ignorance of the limitations period was caused by circumstance beyond the party's control . . . and that these circumstances go beyond a 'garden variety claim of excusable neglect'") (*quoting Socop–Gonzalez v. I.N.S.*, 272 F.3d 1176, 1193 (9th Cir. 2001)) (alteration in original). Plaintiffs' claim

26

arising from Interior's re-application of its land-into-trust decision in issuing ARPA permits is therefore timely under the APA.

> **b)** ***The Department of the Interior also applied its decision to Plaintiffs by disposing of Mekko Thompson's NAGPRA claim in 2009 on the basis that the Site qualified as "tribal lands."***

In 2008, Mekko George Thompson, on behalf of Plaintiffs, submitted a NAGPRA complaint to the federal government relating to the excavation at Hickory Ground. Dkt. 190 at 33–34. The Department of Interior rejected Mekko Thompson's claims in 2009, based largely on its incorrect determination that Poarch retained legal interest in the "NAGPRA items from the Hickory Ground site." *Id.* at 34. Under NAGPRA, the tribal landowner is second in line for repatriation after lineal descendants for items excavated from "tribal land," *see* 25 U.S.C. § 3002(a); Dkt. 190 at 60. "Tribal land" means, in relevant part, "all lands within the exterior boundaries of any Indian reservation." 25 U.S.C. § 3001(15).[7] In disposing of Mekko Thompson's claim, Interior determined that NAGPRA and its provisions governing "tribal land" applied to Hickory Ground, and disregarded Mekko Thompson's lineal descendancy claim in deciding that Poarch, as the owner of "tribal land," retained legal interest in the excavated items. The fatal flaw in this argument is that Interior did not have authority to take Hickory Ground into trust as a reservation for Poarch, so Hickory Ground was not then, and is not now, "tribal land."

Thus, Interior's 2009 denial of Mekko Thompson's NAGPRA claim was "a new application of its unauthorized decision to take lands into trust for Poarch, as the determination relied not only on an incorrect application of NAGPRA, but on the presumption that the lands were 'tribal lands' belonging to Poarch within the definitions in NAGPRA." Dkt. 190 at 34. Plaintiffs' claim arising from Interior's re-application of its land-into-trust decision in disposing of Mekko Thompson's NAGPRA claim is therefore timely under the APA.

---

[7] "Tribal land" also includes "dependent Indian communities" and lands administered for Native Hawaiians, but those categories are irrelevant here as no party has suggested the lands qualify under either definition.

c) *Plaintiffs' Indian Reorganization Act claim did not arise more than six years prior to December 12, 2012, when they filed this lawsuit.*

As alleged in the Second Amended Complaint, "[b]ecause the Hickory Ground Site was not validly taken into trust, Interior did not have authority to grant permits allowing the phase III archaeological excavations." Dkt. 190 at 45. Plaintiffs' Indian Reorganization Act claim arising from Interior's re-application of its land-into-trust decision accrued after 2006, as discussed above. Interior also re-applied its land-into-trust decision in 2009 when it rejected Mekko Thompson's NAGPRA claim.

 Federal Defendants and Tribal Defendants incorrectly argue that *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1287 (11th Cir. 2015) and *Poarch Band of Creek Indians v. Hildreth*, 656 F. App'x 934, 944 (11th Cir. 2016) are controlling, see Dkt. 200 at 19–20; Dkt. 202 at 23–24. Defendants are wrong, because unlike the plaintiffs in *PCI Gaming* and *Hildreth*, Plaintiffs here could not have challenged the land-into-trust decision within six years of that decision.

A basic requirement of an APA claim is that the plaintiff be "adversely affected or aggrieved" by a federal agency's decision. 5 U.S.C. § 702. In 1984 when the Secretary of the Interior took Hickory Ground into trust for Poarch, the Muscogee (Creek) Nation had no reason to know it would be adversely affected by the decision. *See generally* Plaintiffs' Response to Tribal Defendants' Motion to Dismiss, §§ IV.C & D. Poarch itself had represented just four years earlier that it would preserve Hickory Ground "without excavation," and the Muscogee (Creek) Nation reasonably relied on those assurances. *See id.* As discussed above, it was not until within six years of this lawsuit that Interior's decision was applied to adversely affect Plaintiffs.

In contrast, the plaintiffs in *PCI Gaming* and *Hildreth* were aggrieved immediately upon the agency taking action. In *PCI Gaming*, the Eleventh Circuit held that Alabama's request to amend its complaint to add an "as-applied" APA claim against the Secretary would be futile because Alabama was notified of the land-into-trust decision that removed state power from the lands in 1984. *See* 801 F.3d at 1292. The court did not go into great detail on its ruling, but

Interior is required to notify an affected state of a land-into-trust decision precisely because of the resulting jurisdictional shift and related immediate effects on the state. *See* 25 C.F.R. § 151.12(d)(2)(ii).

*Hildreth* also involved a state governmental entity that was immediately impacted by the land-into-trust decision. There, the plaintiff Tax Assessor of Escambia County sought a ruling that Poarch's Atmore lands were subject to county taxation despite being notified at least as early as 1986 that the land-into-trust transaction removed the land from the County's taxing jurisdiction. 656 F. App'x at 937, 943–44.

Plaintiffs' "as-applied" challenge to the Secretary's *ultra vires* action is thus distinguishable from the plaintiffs in *PCI Gaming* and *Hildreth*. Because the Federal Defendants did not apply the decision to Plaintiffs, and Plaintiffs were not "aggrieved," until within six years of the date of filing their lawsuit, their APA claim is timely. And, to the extent the parties disagree over when the Plaintiffs were aggrieved, Plaintiffs are entitled to resolve that factual dispute on the merits.

      **3.**    **Plaintiffs have standing to bring their Indian Reorganization Act Claim because they have alleged particularized, concrete, and actual or imminent injury resulting from the Secretary's decision that will be redressed by a finding that Hickory Ground is not validly held in trust.**

Both Tribal Defendants and Federal Defendants argue that Plaintiffs lack standing to bring an Indian Reorganization Act-based challenge to Hickory Ground's trust status because their injuries are not fairly traceable to the land-into-trust decision and could not be redressed by a favorable ruling. Dkt. 200 at 23, Dkt. 202 at 16-21. This is plainly wrong. But for Interior making the legally incorrect determination that the Hickory Ground Site was "Indian land," it would not and could not have granted the ARPA permits allowing excavation at the Site, and the excavation and subsequent construction of the casino would not have happened. Indeed, there would have been no reason to make way for a casino when gambling would have been illegal under both state and federal law. *See* Dkt. 190 at 46. Reversing Interior's decision will directly redress this error. Furthermore, Plaintiffs go into great detail in the Second Amended Complaint

about the significant and ongoing harm the excavation and construction is causing to them. Plaintiffs' requested injunction to unwind the illegal excavation and construction would redress their injury. *See* Dkt. 190 at 76–77. Plaintiffs therefore have standing.

Article III injury "may be minimal" and even "'an identifiable trifle' is sufficient to establish standing" if the alleged harm affects the plaintiff in a "personal and individualized way." *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) (first quoting *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008); then quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). As the cases discussed below make clear, standing exists if the harms suffered by the party challenging the "fee-to-trust" decision would have been avoided if that decision had come out the other way.

In *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, another case challenging a fee-to-trust decision, the plaintiff "contended that he lived 'in close proximity to' the [property] and that a casino there would 'destroy the lifestyle he has enjoyed' by causing 'increased traffic,' . . . 'an irreversible change in the rural character of the area,' and 'other aesthetic, socioeconomic, and environmental problems.'" 567 U.S. 209, 213 (2012). The Court held that the "economic, environmental, and aesthetic harm [suffered] as a nearby property owner" established standing. *Id.* at 224–228. And the Court of Appeals decision that the Supreme Court affirmed found "no doubt" that Article III standing was satisfied: "[T]he impact of the Band's facility on [the plaintiff's] way of life *constituted an injury-in-fact fairly traceable to the Secretary's fee-to-trust decision, an injury the court could redress with an injunction that would in effect prevent the Band from conducting gaming* on the property." *Patchak v. Salazar*, 632 F.3d 702, 704 (D.C. Cir. 2011) (emphasis added), *aff'd and remanded sub nom. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012).

Similarly, where plaintiffs lived near a planned casino and would suffer increased traffic as a result of construction of the casino, they satisfied standing requirements. *See Geyser v. United States*, No. CV 17-7315-DMG (ASX), 2018 WL 6990808, at *7 (C.D. Cal. Aug. 30, 2018). In *Upstate Citizens for Equal., Inc. v. United States*, two towns, a civic organization, and

several residents of the area near the questioned trust land who alleged "loss of enjoyment of the aesthetic and environmental qualities of the agricultural land surrounding the casino site," "loss of tax revenue currently generated by the agricultural land that comprises the casino site," and "the loss of business and recreational opportunities, such as retail stores and restaurants, that will be forced out by the casino" was enough to establish standing. 841 F.3d 556, 565–66 (2d Cir. 2016).

Likewise, the Picayune Tribe had standing to contest a land-into-trust decision for another tribe because the planned gaming on that land would "have a devastating economic impact" on the Picayune Tribe. *Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 56 n.7 (D.D.C. 2013). The injury to the Picayune Tribe "will be fairly traceable to the defendants' conduct since it will result, if at all, because of the defendants' decision to transfer-in-trust the . . . Site and permit gaming thereon." *Id.* And, "the Picayune Tribe's injury in fact is likely to be redressed by a favorable decision because, if the plaintiffs are successful on the merits, the Secretary's determinations will likely be vacated, and the economic injury to the Picayune Tribe will not occur." *Id.; see also TOMAC v. Norton*, 193 F. Supp. 2d 182, 188 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) (the link between Interior's actions and a group of residents' injuries to their enjoyment of their neighborhoods and viewing local wildlife is "easy to identify" "because the taking of the site in trust is a necessary prerequisite to both Class II and III gaming," and the residents' claims against the land-into-trust decision were redressable "since a decision *not* to take the land in trust would prevent the [tribe] from building a casino on that site and from satisfying the requirements of IGRA for casino gambling") (emphasis in original); *Citizens Against Casino Gambling in Erie Cty. v. Hogen*, No. 07-CV-0451S, 2008 WL 2746566, at *20 (W.D.N.Y. July 8, 2008) (Plaintiffs' challenge to land-into-trust decision to prevent casino construction was redressable because "were the Court to agree that the Buffalo Parcel is not 'Indian lands' within the meaning of the IGRA, no [tribal] gaming can lawfully occur on that restricted fee land").

31

Plaintiffs' alleged harms are several orders of magnitude worse than the harms alleged in *Patchak* and the other cases discussed above. As discussed in greater detail in Sections IV.C and D of Plaintiffs' Response to Tribal Defendants' Motion to Dismiss, Plaintiffs have rights to the preservation of the land arising not only from Poarch's promises but also from common law rights to gravesites and their contents. As Plaintiffs allege in the Second Amended Complaint, Hickory Ground is sacred to them; it has "profound cultural and religious importance." Dkt. 190 at 14. Hickory Ground's desecration is violating their deeply held religious beliefs and destroying their cultural history—just as Poarch warned it would in its application for federal preservation funds. *See* Second Amended Complaint, Dkt. 190 at 13–14, 17, 19, 28, 31–32, 37, 44, 72–76. Plaintiffs' cultural identity and religion is inextricably tied to their homelands and ancestors; they owe constant and continuing duties to care for their ancestors and their ceremonial grounds. *See id.* at 72–76. Thus, Hickory Ground is part of Plaintiffs' culture and way of life. The unique importance of Hickory Ground to Plaintiffs is similar to the significance of Bethlehem in Christianity, and to Philadelphia in the history of the United States. This place dates back to the time of the beginnings for Hickory Ground Tribal Town and was the last tribal capital of the Muscogee (Creek) Nation prior to its forcible removal from the southeast. *See* Dkt. 190 at 13. Thus, Plaintiffs will suffer ongoing injury to their cultural identity, heritage, and way of life if Poarch's continuing desecration of Hickory Ground is allowed.

Like the injury to the Picayune Tribe in *Stand Up for California!*, the injuries to Plaintiffs here are traceable to the Secretary's decision and are likely to be redressed by a favorable decision from this Court. The ongoing harm to Plaintiffs has resulted because of the Secretary's decision to take the land into trust and permit excavation thereon, just as the Picayune Tribe's injury would result from the "defendants' decision to transfer-in-trust the . . . Site and permit gaming thereon." *Stand Up for California!*, 919 F. Supp. 2d at 56 n.7.

Finally, Plaintiffs' injury in fact is likely to be redressed by a favorable decision, because as with the Picayune Tribe's claim, "if the plaintiffs are successful on the merits, the Secretary's determinations will likely be vacated, and the economic injury to the [plaintiff] will not [continue

to] occur." *Id.* Federal Defendants' and Tribal Defendants' arguments that Poarch would still be able to develop its property in fee are simply red herrings. The tribes in all of the above cases already held their lands in fee prior to the land-into-trust decision. *See Patchak*, 632 F.3d at 703 (noting "[t]he Band owned the land and wanted to construct and operate a gambling facility there"); *Geyser*, 2018 WL 6990808, at *2 (noting the property was "fee land owned by the Tribe"); *Upstate Citizens*, 841 F.3d at 563 ("All of the land was already owned by the Tribe."); *Stand Up for California!*, 919 F. Supp. 2d at 55 (noting the transaction was "fee-to-trust"). Absent the disputed fee-to-trust decisions, each tribe could still develop its fee land in accordance with applicable law—development that might cause similar injuries to the plaintiffs. However, the issue is not what speculative use might have been made of the *fee* land—which use the parties are free to dispute once the use is made—but rather what use and resulting harm arose from the *trust* decision. *See Stand Up for California!*, 919 F. Supp. 2d at 56 n.7; *TOMAC*, 193 F. Supp. 2d at 188; *Citizens Against Casino Gambling in Erie Cty.*, 2008 WL 2746566, at *20.

Plaintiffs have shown they will suffer a particularized, concrete, and actual or imminent injury resulting from the Secretary's decision that will be redressed by a finding that Hickory Ground is not validly held in trust. Plaintiffs therefore have standing. Their Indian Reorganization Act claim is also timely because it was raised within six years of Interior applying its decision to Plaintiffs. This Court should deny Federal Defendants' and Tribal Defendants' motions to dismiss this claim.

**B.   The Plaintiffs properly allege subject matter jurisdiction for their NAGPRA claim.**

The Federal Defendants have moved to dismiss the Plaintiffs' NAGPRA claim for lack of subject matter jurisdiction. They argue that the Plaintiffs have not alleged an appropriate agency action under the APA, and that the Court accordingly lacks jurisdiction. But jurisdiction and the right of action in this case is provided by NAGPRA. And while the APA provides a waiver of sovereign immunity in this case, the APA's procedural requirements, including its various requirements regarding agency actions, are not jurisdictional. So dismissal on that basis for lack

of jurisdiction cannot be granted, and the Federal Defendants' motion to dismiss the NAGPRA claim for lack of subject matter jurisdiction must be denied. Even if that were not the case, the Plaintiffs' NAGPRA claim is sufficient to withstand the motion to dismiss.

**1. Dismissal cannot be granted on the basis of a procedural requirement in the APA that is not jurisdictional in nature.**

NAGPRA provides both subject matter jurisdiction and a private right of action in this case. And the APA provides a waiver of sovereign immunity for NAGPRA claims against the federal government. Accordingly, this Court has subject matter jurisdiction over the Plaintiffs' NAGPRA claim against the Federal Defendants. Importantly, the procedural requirements of the APA are ***not*** jurisdictional and do not limit the APA's waiver of sovereign immunity in this case. Thus, they cannot serve as a basis for dismissal for lack of subject matter jurisdiction, as the Federal Defendants argue.

**a) NAGPRA grants a private right of action.**

NAGPRA's enforcement provision, 25 U.S.C. § 3013, provides: "The United States district courts *shall have jurisdiction* over any action brought by any person alleging a violation of this chapter and shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter." (Emphasis added.) NAGPRA's implementing regulations also recognize that "the United States District Courts have jurisdiction over any action brought that alleges a violation of the Act." 43 C.F.R. § 10.17(a).

Not surprisingly, given that plain language, courts are in agreement that NAGPRA's enforcement provision vests the federal courts with jurisdiction over claims alleging violation of NAGPRA. *E.g.*, *Thorpe v. Borough of Thorpe*, 770 F.3d 255, 259 (3d Cir. 2014), *cert. denied*, 136 S.Ct. 84 (2015) ("NAGPRA's jurisdictional provision vests federal courts with jurisdiction over 'any action brought by any person alleging a violation of' NAGPRA."); *Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936, 939 (10th Cir. 1996) (stating that Section 3013 "explicitly vests jurisdiction in federal courts,"); *Yankton Sioux Tribe v. U.S. Army Corps of Eng's*, 209 F.

Supp. 2d 1008, 1016 (D. S.D. 2002) ("The Court has jurisdiction in this case pursuant to 25 U.S.C. § 3013….").

Courts are also in agreement (and the Federal Defendants concede) that NAGPRA's enforcement provision creates a private right of action.[8] Indeed, as the *Bonnichsen* court stated, "[i]t is difficult to see how Congress could be more express than that." 969 F. Supp. at 627. Accordingly, NAGPRA provides both jurisdiction and a private right of action in this case.

### b) Plaintiffs' NAGPRA claim for non-monetary relief can proceed under APA Section 702's broad waiver of sovereign immunity.

The APA provides a waiver of sovereign immunity for NAGPRA claims against the federal government.[9] The APA states, in pertinent part:

> [1] A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. [2] An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. The distinction (in brackets, above) between the first and second sentences is important for purposes of this discussion. As discussed below, it is the second sentence of Section 702 that provides the waiver of sovereign immunity, and that is relevant here.

---

[8] *E.g.*, *Geronimo v. Obama*, 725 F. Supp. 2d 182, 185 (D.D.C. 2010) (stating that Section 3013 "expressly provides for a private right of action."); *White v. Univ. of Cal.*, No. 12-01978, 2012 WL 12335354, at *2 (N.D. Cal. Oct. 9, 2012) (unpublished)\ ("Significantly, NAGPRA includes an enforcement provision that creates a private right of action."), *aff'd*, 765 F.3d 1010 (9th Cir. 2014); *Rosales v. United States*, No. 07-0624, 2007 WL 4233060, at *3 (S.D. Cal. Nov. 28, 2007) (unpublished) ("NAGPRA creates a private right of action…"); *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 886 (D. Ariz. 2003) ("There is a private right of action under NAGPRA…."), *aff'd* 417 F.3d 1091 (9th Cir. 2005); *Bonnichsen v. U.S. Dep't of Army*, 969 F. Supp. 614, 627 (D. Or. 1997) (stating that NAGPRA appears to establish a private right of action); Dkt. 200 at 25 ("NAGPRA contains a private right of action....").

[9] At least one court, in one of the most prominent NAGPRA cases to date, has suggested that an argument can be made that NAGPRA itself provides a waiver of sovereign immunity. *Bonnichsen*, 969 F.Supp. at 627 n.17 ("An argument can be made in favor of an implied waiver of sovereign immunity in § 3013, since a primary purpose of NAGPRA is the repatriation of remains and other items that are in the possession of federal agencies or that may be discovered on federal lands."). Although the Plaintiffs do not waive this argument, they do not assert it for purposes of the Federal Defendants' motion to dismiss.

The waiver of sovereign immunity in the second sentence of Section 702 is not just for APA claims, but is for all claims seeking non-monetary relief. *E.g.*, *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("We have previously, and repeatedly, rejected [the argument that the waiver applies only to actions arising under the APA], expressly holding that the 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not.'"). This specifically includes NAGPRA claims. *White*, 765 F.3d at 1024 (stating that suits concerning the United States under NAGPRA are authorized under the APA, "which contains an express limited sovereign immunity waiver for suits seeking non-monetary relief against the United States"); *Geronimo*, 725 F. Supp. 2d at 185 ("The waiver of sovereign immunity applicable to a claim under NAGPRA is the waiver found within the [APA]."); *San Carlos Apache Tribe*, 272 F. Supp. 2d at 886 ("The APA waives the sovereign immunity of the Government for NAGPRA claims.").

The combination of a grant of jurisdiction with a private right of action in NAGPRA, and the a waiver of sovereign immunity in the APA, provides this Court with subject matter jurisdiction over the Plaintiffs' claim of NAGPRA violations, and the Federal Defendants' motion to dismiss for lack of jurisdiction should be denied.

### c) Section 702's waiver of sovereign immunity is not dependent upon an "agency action" being reviewed.

Despite the statutory guidance and precedent, the Federal Defendants nevertheless argue that this Court lacks subject matter jurisdiction over the Plaintiffs' NAGPRA claim. They say that a discrete agency inaction in violation of a nondiscretionary duty is required for a waiver of sovereign immunity, and hence for jurisdiction, under the APA. Not true. The "agency action" of Section 702's first sentence does not apply here, and the APA's other procedural requirements are not jurisdictional in nature.

The "agency action" provision in the first sentence of Section 702 is not relevant here, because "[c]laims not grounded in the APA," like the NAGPRA claim here, "'do[] not depend on the cause of action found in the first sentence of [Section] 702.'" *Navajo Nation v. Dep't of*

*the Interior*, 876 F.3d 1144, 1170 (9th Cir. 2017) (second alteration in original) (citation omitted). As discussed above, NAGPRA provides its own cause of action, so only the waiver of sovereign immunity in the second sentence of Section 702 is relevant.  In 1976, Congress amended Section 702 to add the second sentence, which provides "a broad waiver of sovereign immunity for actions seeking relief other than money damages against federal agencies, officers, or employees." *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1344 (Fed. Cir. 2011). The two sentences of Section 702 are quite distinct from one another. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 774 (7th Cir. 2011) ("The first and second sentences of § 702 play quite different roles." (internal quotation marks omitted)).  The first sentence provides an "omnibus judicial-review provision, which permits suit for violations of numerous statutes…*that do not themselves include causes of action for judicial review*," while the second sentence provides the "broad waiver of sovereign immunity" discussed above.  *Navajo Nation*, 876 F.3d at 1168 (emphasis added) (internal quotation marks omitted).

Importantly, the second sentence is not limited by the first sentence. By placing the waiver of sovereign immunity in Section 702, Congress did not mean to limit that waiver to actions arising under the APA. *E.g.*, *Delano*, 655 F.3d at 1345 (rejecting an argument that "the placement of the waiver of sovereign immunity in section 702 of the APA suggests that the waiver was meant to be limited to actions arising under the APA itself or under a statute directed at the review of 'agency action' as that term is defined in the APA."); *see also Presbyterian Church v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) (rejecting an argument that the waiver of sovereign immunity in the second sentence applies only if there is an agency action under the first sentence, finding that the second sentence contains no limitation regarding "agency action," and concluding that the waiver "was clearly intended to cover the full spectrum of agency conduct, regardless of whether it fell within the technical definition of 'agency action'"); *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 399–400 (3d Cir. 2012) (agreeing with *Delano*, *Presbyterian Church*, and others on this point). This differs from the situation where a litigant is claiming a right of review under the first sentence of Section 702.

Compare *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 882 (1990) (review under the *first sentence* of Section 702 (and not under a separate federal statute, as is the case here) must identify some "agency action"). Thus, the waiver of sovereign immunity in the second sentence of Section 702 applies in this case without regard to the "agency action" provision of the first sentence of Section 702.

The waiver of sovereign immunity also applies regardless of the APA's other procedural requirements, because the APA's other procedural requirements are not jurisdictional in nature. The U.S. Supreme Court recognized decades ago that the APA is not a jurisdiction-granting statute. *Califano v. Sanders*, 430 U.S. 99, 107 (1977) (holding that the APA does not grant subject-matter jurisdiction). As discussed above, it merely provides a cause of action for some cases (for which there must still be an independent basis of jurisdiction), and a waiver of sovereign immunity. And while a handful of federal courts over the subsequent years occasionally and incorrectly "loosely referred" to certain requirements of the APA as being "jurisdictional," *Trudeau*, 456 F.3d at 184, that has changed drastically in more recent years.

In the 2006 case of *Arbaugh v. Y & H Corp.*, the U.S. Supreme Court established a "readily administrable bright line" regarding whether statutory requirements are jurisdictional:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

546 U.S. 500, 515-16 (2006) (internal footnote and citation omitted).

The *Trudeau* court was one of the first federal appellate courts to consider the effect of the APA's requirements after *Arbaugh*. The *Trudeau* court noted that the courts that had previously "loosely referred" to certain requirements of the APA as being "jurisdictional," 456 F.3d at 184, did not have "the benefit of the 'bright line' that the Court recently drew between jurisdictional and nonjurisdictional requirements in *Arbaugh*." *Id*. at 184 n.6.  The *Trudeau* court proceeded to consider the effect of Section 704 of the APA, which requires "agency action" for

claims made reviewable by statute (such as NAGPRA) and "final agency action" for claims for which there is no other remedy. *Id.* at 184-85; 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). The "final agency action" requirement of Section 704 was the one relevant in *Trudeau*. The *Trudeau* court reaffirmed prior cases holding "that the APA's final agency action requirement is not jurisdictional," 456 F.3d at 184, held that Section 702's waiver of sovereign immunity applied regardless of whether there was a "final agency action," and stated that the "district court therefore had subject-matter jurisdiction ... and its dismissal of the complaint for lack of jurisdiction pursuant to Rule 12(b)(1) was erroneous." *Id.* at 187.

Nearly every federal appellate court since has followed suit in holding that the APA's procedural requirements are not jurisdictional in nature. While these cases have most often pertained to the requirements of Section 704, courts have reached the same conclusion with respect to other provisions of the APA as well, and the conclusion should be the same for any requirements of the APA. *Cf.* 14 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Jurisdiction* § 3659 (4th ed.) ("[N]umerous circuits have held that the APA's waiver of sovereign immunity under § 702 extends to all challenges to Government actions, ***regardless of whether other requirements of the APA cause of action***—particularly that agency action be final—***are met***." (emphasis added)).

Thus, the federal appellate courts are now in "near-unanimity" that the second sentence of Section 702 waives sovereign immunity broadly for all causes of action that meet its terms, and does not incorporate the requirements of Section 704. *Navajo Nation*, 876 F.3d at 1172.[10]

---

[10] The D.C. Circuit, Federal Circuit, and 1st, 3rd, 6th, 7th, 8th, and 9th Circuits are all in accord. *E.g.*, *Navaho Nation,* 876 F.3d at 1172; *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); (stating that the finality requirement and adequate remedy bar of Section 704 does not determine whether there is subject matter jurisdiction); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013) ("We now join all of our sister circuits who have done so in holding that § 702's waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of 'agency action' or 'final agency action' as set forth in § 704."); *Treasurer of N.J.*, 684 F.3d at 400 ("Accordingly, section 704 in limiting review to 'final agency action' concerns whether a plaintiff has a cause of action under the APA that can survive a motion to dismiss under Rule 12(b)(6) but does not provide a basis for dismissal on grounds of sovereign immunity."); *Delano*, 655 F.3d at 1344 ("We hold that section 702 of the APA waives sovereign immunity for non-monetary claims against federal agencies....[i]t is not limited to 'agency action' or 'final agency

The Eleventh Circuit has not addressed this issue since the Supreme Court decided *Arbaugh*. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1240 (11th Cir. 2003) (referring loosely, in a pre-*Arbaugh* decision, with little analysis, to Section 704's "final agency action" requirement as "implicat[ing] federal subject matter jurisdiction").  As noted by the *Trudeau* court, the *National Parks* court did not, at that time, have the benefit of *Arbaugh*'s bright-line rule regarding jurisdictional and nonjurisdictional requirements. *See* 546 U.S. at 515-16.  And *Arbaugh* itself suggests that this type of decision, which is not "meticulous" on the "subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy," "should be accorded 'no precedential effect'" on the question of a federal court's authority to adjudicate a claim. *Id.* at 511.  Moreover, the *National Parks* court relied on D.C. Circuit case law for the proposition that finality is jurisdictional under the APA, 324 F.3d at 1236 (citing *Indep. Petrol. Ass'n of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001)), but the D.C. Circuit no longer follows the case law on which *National Parks* relied.  *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 661 & n.8 (D.C. Cir. 2010) (commenting that cases such as *Independent Petroleum Association* ignored a U.S. Supreme Court footnote "that the judicial review provisions of the APA are not jurisdictional"); *Friends of Animals v. Bernhardt*, __ F.3d __, 2020 WL 3244011, at *6 (D.C. Cir. 2020) ("[F]inality under the APA is no longer considered jurisdictional"); *Flytenow, Inc. v. F.A.A.*, 808 F.3d 882, 888 (D.C. Cir. 2015) ("After a period of uncertainty in our circuit, it is 'now firmly established' that finality under the APA is non-jurisdictional.");  *National Parks* can also be distinguished because it involved claims brought directly under the APA, rather than

---

action,' as those terms are defined in the APA."); *Michigan*, 667 F.3d at 775  (explaining that "the conditions of § 704 affect the right of action contained in the first sentence of § 702, but they do not limit the waiver of immunity in § 702's second sentence"); *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 33 (1st Cir. 2007) ("We have previously held that the APA's finality requirement is not jurisdictional in nature."); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988) ("[T]he waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief."). The Fifth Circuit appears to be alone in holding otherwise. *Navajo Nation*, 876 F.3d at 1172 n.36.  *See Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) (treating "agency action" as a requirement for establishing a waiver of sovereign immunity under Section 702).

under another federal statute providing jurisdiction and a private cause of action, as here. 324 F.3d at 1231.

Since *Arbaugh,* several circuits have similarly found that a provision of the APA that excepts "agency action [that] is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is not jurisdictional, *e.g.*, *Chehazeh v. Attorney General of the U.S.*, 666 F.3d 118, 125 n.11 (3d Cir. 2012) (agreeing with *Ochoa* and *Vahora* that even if Congress has committed an action to agency discretion, it does not deprive the courts of jurisdiction under the APA); *Vahora v. Holder*, 626 F.3d 907, 917 (7th Cir. 2010) (agreeing with *Ochoa* that the issue of whether an action is committed to agency discretion "is not termed properly one of jurisdiction"); *Ochoa v. Holder*, 604 F.3d 546, 549 (8th Cir. 2010) (explaining that if a plaintiff complains about an action that is committed to agency discretion by law, it does not mean that a court lacks subject matter jurisdiction over the claim; instead the court will properly grant a motion to dismiss the complaint for failure to state a claim). Notably, the *Ochoa* court, which the other circuits followed, was clearly applying *Arbaugh* in its decision, noting with an omitted citation to *Arbaugh* that "[t]he Supreme Court's recent proscription against 'drive-by jurisdictional rulings' compels us to make this distinction in the interest of facilitating the clarity sought by the Court." *Id*.

### d) APA Section 706 is procedural and neither confers nor restricts the Court's jurisdiction.

While there appears to be a dearth of similar case law regarding 5 U.S.C. § 706 specifically, which is the provision the Federal Defendants rely upon for their jurisdictional argument, all of the same considerations apply to the requirements of that section, which are procedural, not jurisdictional, in nature.[11] First, as discussed above, the APA is not a jurisdiction-granting statute. Nor does it restrict jurisdiction. *Trudeau*, 456 F.3d at 185 (stating that "the APA neither confers ***nor restricts*** jurisdiction") (emphasis added). If the provisions of Section 706 do

---

[11] Section 706 sets forth procedures regarding how the reviewing court should conduct its review. It is discussed in more detail in Section IV.B.2.c.(2)below.

41

not grant jurisdiction, then, by the same token, they cannot deprive a federal court of any jurisdiction it otherwise has. *Cf. id*. at 184–85 (making the same point about Section 704). Accordingly, the only issue relating to jurisdiction is whether Section 706 limits Section 702's waiver of sovereign immunity. It does not.

As the courts in the decisions discussed above have reasoned in reaching their conclusions that other provisions of the APA are not jurisdictional, neither the text, nor the legislative history, of Section 702 supports any limitation of its waiver. As the *Presbyterian Church* court stated first:

> On its face, the 1976 amendment is an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable. Nothing in the language of the amendment suggests that the waiver of sovereign immunity is limited to claims challenging conduct falling in the narrow definition of "agency action."

870 F.2d at 525 (internal footnote omitted). Attempting to restrict the waiver of sovereign immunity, such as to only actions challenging agency action, "offends the plain meaning of the amendment." *Id*. This reasoning applies with equal force here. Subsequent courts have similarly noted the absence of various terms from the text of Section 702 in concluding that the absent terms did not limit Section 702's waiver. *E.g.*, *Delano*, 655 F.3d at 1344 (noting that nothing in the text of Section 702's waiver limits its scope to "agency action" or "final agency action"); *Trudeau*, 456 F.3d at 187 (noting that Section 702's waiver sentence "does not use either the term 'final agency action' or the term 'agency action.'"). It is axiomatic that courts must not read into statutes language that is not there. On its face, Section 702's waiver does not reference Section 704's requirements of "agency action" or "final agency action," much less the "discrete agency inaction in violation of a nondiscretionary duty" requirement under Section 706(1) advanced by Federal Defendants as the basis for dismissal (language which is *not even in Section 706(1)*, but rather is a *paraphrase of case law interpreting 706(1)*). Accordingly, the express language of Section 706 does not limit Section 702's waiver of sovereign immunity.

Moreover, nothing in the legislative history of the 1976 amendment suggests that Congress intended to limit the waiver. *Presbyterian Church*, 870 F.2d at 525. "On the contrary, Congress stated that 'the time [has] now come to eliminate the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity.'" *Id.* (emphasis and alteration in original); *see also, e.g.*, *Trudeau*, 456 F.3d at 187 ("Nor does the legislative history refer to either limitation. To the contrary, the House and Senate Reports' repeated declarations that Congress intended to waive immunity for 'any' and 'all' actions for equitable relief against an agency make clear that no such limitations were intended." (internal citations omitted)).

"The APA is a procedural statute that provides no substantive requirements but merely provides the framework for judicial review of agency action." *Ochoa*, 604 F.3d at 549. Nothing about Section 706 suggests that it is any different than the rest of the APA in that regard. It simply sets forth procedures regarding how a reviewing court should conduct its review. *See Delano*, 655 F.3d at 1344 (characterizing Sections 704 and 706 as providing merely "rules governing" judicial review under the APA). Other courts are in agreement that Section 702's waiver of sovereign immunity is not limited by the APA's procedures and review provisions, which would logically include those in Section 706. *E.g.*, *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988) ("[T]he waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief."). *Michigan*, 667 F.3d at 775 ("Moreover, the waiver in § 702 is not limited to claims brought pursuant to the review provisions contained in the APA itself."). Like the rest of the APA, Section 706 is procedural, not jurisdictional, in nature, and it does not limit the waiver of sovereign immunity provided in Section 702.

The primary case upon which the Federal Defendants rely, *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), or *SUWA*, as they refer to it, is not to the contrary. Nowhere in *SUWA* does the Court discuss, much less decide, the issues of whether Section 706 is

jurisdictional in nature, or whether it limits Section 702's waiver of sovereign immunity.[12] And even if the Court's silence on those issues could somehow be construed to mean something, only Section 706(1) was at issue in that case, *id.* at 57, and the Plaintiffs here have primarily, although not exclusively, invoked Section 706(2), which *SUWA* does not address. *See generally Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1031 n.6 (9th Cir. 2020) (characterizing *SUWA* as "inapposite" in a case involving Section 706(2), because SUWA pertains to Section 706(1)); *All. to Save Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d. 1, 10 (D.D.C. 2007) (noting that *SUWA* "does not reach claims encompassed within § 706(2)," which are "unaffected by *SUWA*").

This Court should decline the Federal Defendants' invitation to issue a proscribed "drive-by jurisdictional ruling[]" that conflates the APA's nonjurisdictional procedural requirements with subject matter jurisdiction. *Cf. Arbaugh*, 546 U.S. at 511. Dismissal of Plaintiffs' NAGPRA claim for lack of subject matter jurisdiction would be erroneous. *Trudeau*, 456 F.3d at 187 (holding that the APA's waiver of sovereign immunity applied regardless of whether there was a final agency action, so the district court had subject matter jurisdiction and "its dismissal of the complaint for lack of jurisdiction pursuant to Rule 12(b)(1) was erroneous."). Because the Federal Defendants **only** argue that the NAGPRA claim should be dismissed for lack of jurisdiction, their motion to dismiss should be denied with respect to the NAGPRA claim without further consideration.

### 2.   Even if the APA's procedural requirements were jurisdictional (they are not), Plaintiffs have plausibly alleged a claim based on agency actions.

Only if this Court were to hold, contrary to the great weight of authority discussed above, that the APA's procedural requirements are jurisdictional, must it consider the Federal

---

[12] *SUWA*, which is discussed in more detail in Section IV.B.2.c.(2), below, does state that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." 542 U.S. at 64 (emphasis in original). However, in light of *Arbaugh*'s more recent admonitions, and the subsequent case law discussed above concluding that the APA's procedural provisions are nonjurisdictional and do not limit Section 702's waiver of sovereign immunity, this is more appropriately understood as speaking to the issue of whether a plaintiff has stated a claim.

Defendants' subject matter jurisdiction arguments under Rule 12(b)(1). "[A] federal court may dismiss a federal question claim for lack of subject matter jurisdiction only if: (1) 'the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction'; *or* (2) 'such a claim is wholly insubstantial and frivolous'" (meaning that the claim has no plausible foundation or is clearly foreclosed by a prior Supreme Court decision). *Blue Cross & Blue Shield of Alabama v. Sanders*, 138 F.3d 1347, 1352 (11th Cir. 1998) (citing *Bell v. Hood*, 327 U.S. 678 (1946)). Notably, the test is *not* whether a claimant can prevail on the cause of action. *Id*.

If the Federal Defendants are correct that  Section 706(1) is jurisdictional, then the question of whether the Plaintiffs have satisfied that section intertwines jurisdiction and the merits, and consequently is not appropriate for dismissal under 12(b)(1). *See Morrison v. Amway Corp.*, 323 F.3d 920 (11th Cir. 2003) ("[T]he district court should only rely on Rule 12(b)(1) '[i]f the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action*.'") (citing  *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997)); *S.E.C. v. Mut. Benefits Corp.*, 408 F.3d 737, 741–42 (11th Cir. 2005) (if the challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court is to "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case"); *see also* Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3rd ed.).

In any event, the Court should ***not*** proceed to consider dismissal of the Plaintiffs' NAGPRA claim any further, because the Federal Defendants have not argued that the NAGPRA claim should be dismissed on any basis ***other than*** lack of subject matter jurisdiction. Specifically, they ***have not*** argued that the NAGPRA claim should be dismissed for failure to state a claim. While the Federal Defendants move to dismiss the case as a whole for both lack of subject matter jurisdiction and failure to state a claim, they specifically argue one basis or the other (or sometimes both bases) for dismissal with respect to each claim. And nowhere do they argue that the NAGPRA claims should be dismissed for failure to state a claim.

45

If the Court nevertheless proceeds to further consider dismissal of the NAGPRA claim, it must do so under the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See, e.g.*, *Treasurer of N.J. v. United States*, 684 F.3d 382, 400 (3d Cir. 2012) ("Accordingly, section 704 in limiting review to 'final agency action' concerns whether a plaintiff has a cause of action under the APA that can survive a motion to dismiss under Rule 12(b)(6) but does not provide a basis for dismissal on grounds of sovereign immunity."); *Chehazeh v. Attorney General*, 666 F.3d 118, 125 n.11 (3d Cir. 2012) (agreeing with *Ochoa* that even if Congress has committed an action to agency discretion, it does not deprive the courts of jurisdiction; rather, the "question is whether a plaintiff can state a claim for relief from such action under the APA"); *Ochoa v. Holder*, 604 F.3d 546, 549 (8th Cir. 2010) (explaining that if a the action at issue is committed to agency discretion, the court should grant a motion to dismiss the complaint for failure to state a claim); *Geronimo v. Obama*, 725 F.Supp.2d 182, 186 (D. D.C. 2010) (dismissing a NAGPRA claim for under Rule 12(b)(6) where the plaintiff alleged no federal agency involvement whatsoever); *cf. Arbaugh*, 546 U.S. at 511 (criticizing "unrefined dispositions" that do not meticulously distinguish between dismissal for lack of subject matter jurisdiction or failure to state a claim).

Plaintiffs have met the *Twombly* standard for pleading a plausible claim. Much of the Federal Defendants' argument is premised on the assertion that the land in question is "tribal land," not "Federal lands," for purposes of NAGPRA. However, as discussed in Section IV.B.2, *infra*, at least some of the land in question is "Federal lands" for purposes of NAGPRA. And, as discussed in Section IV.B.2.c, *infra*, the Plaintiffs have alleged violations of NAGPRA that also constitute sufficient agency actions under the APA. No "final agency action" is required under the APA in this case. Accordingly, even though the Court should ***not*** undertake further consideration of the Plaintiffs' NAGPRA claim at this point, if it does, it should still deny the Federal Defendants' motion to dismiss the NAGPRA claim.

a)   *"Federal lands" are at issue in this case for purposes of NAGPRA.*

The Plaintiffs have alleged that the Hickory Ground Site includes both reservation land and trust land. Dkt. 190 at 64. Importantly, the Federal Defendants do not contest that allegation. Land status matters here because NAGPRA distinguishes between "tribal land" and "Federal lands" in some ways, as discussed in Section IV.B.2.c, below. While reservation land constitutes "tribal land" for purposes of NAGPRA, any off-reservation trust land in this case constitutes "Federal lands" for purposes of NAGPRA.

NAGPRA defines "Federal lands," in relevant part, as "any land other than tribal lands which are controlled or owned by the United States." 25 U.S.C. § 3001(5). Land held in trust by the United States is plainly "owned or controlled by the United States," so as long as the trust land in question here does not fall within the definition of "tribal land" (which it does not, for the reasons explained below), then it constitutes "Federal lands" for NAGPRA purposes.

NAGPRA defines "tribal land," in relevant part, as "(A) all lands within the exterior boundaries of any Indian reservation; [and] (B) all dependent Indian communities." 25 U.S.C. § 3001(15). NAGPRA's implementing regulations indicate that the phrase "dependent Indian communities" should be interpreted pursuant to 18 U.S.C. § 1151. 43 C.F.R. § 10.2(f)(2)(ii). Section 1151 defines the term "Indian country" for purposes of criminal jurisdiction, but its definition of "Indian country" is sometimes used for other purposes as well. In paraphrase, Section 1151 defines "Indian country" as (a) reservation land, (b) dependent Indian communities, and (c) certain allotments not relevant here. Significantly, however, ***only*** the "dependent Indian communities" category of Section 1151 is relevant for NAGPRA purposes, because it is the only category referenced in NAGPRA's implementing regulations with respect to the definition of "tribal lands." *See also* 60 Fed. Reg. 62134, 62140 (Dec. 4, 1995) (referencing the "dependent Indian communities" subsection of 18 U.S.C. 1151(b) specifically).

The Federal Defendants argue that all of the land in question, apparently including any off-reservation trust land, is "Indian country," and therefore constitutes "tribal land" under NAGPRA. But they are painting with far too broad a brush. Under NAGPRA, the question is not

47

whether land is "Indian country," but rather, whether it meets ***NAGPRA's definition of "tribal land"*** because it is either (1) within the exterior boundaries of an Indian reservation, or (2) a dependent Indian community. If Congress had intended the definition of "tribal land" in NAGPRA to merely mirror the definition of "Indian country" in 18 U.S.C. § 1151, it could have simply said so, as it has done in numerous other federal statutes. *E.g.*, 15 U.S.C. § 657a(b)(5)(C)(i) (defining the term "Indian reservation" as having "the same meaning as the term 'Indian country' in section 1151 of Title 18," with certain exceptions); 25 U.S.C. § 1304(a)(3) ("The term 'Indian country' has the meaning given the term in section 1151 of Title 18"); 28 U.S.C. § 1738B(b)(9) (defining the term "State" to include "Indian country (as defined in section 1151 of title 18)").

Congress did not make NAGPRA's definition of "tribal land" coextensive with "Indian country." Rather, it included within NAGPRA's definition of "tribal land" only the narrower categories of (1) reservation land and (2) dependent Indian communities. Had Congress wished to include off-reservation trust land within the coverage of NAGPRA, it certainly knew how to do so. *See*, *e.g.*, 25 U.S.C. § 1903(10) (defining "reservation" as including both "Indian country" as defined in 18 U.S.C. § 1151 ***and*** any trust lands not covered by that section); 25 U.S.C. § 2703 (4) (defining "Indian lands" as including both reservation lands and trust lands). The fact that it did not do so here indicates that Congress did not intend to include off-reservation trust land in the definition of "tribal land" (unless it constitutes a dependent Indian community; this is not the case here). *See also* 60 Fed. Reg. 62134, 62140 (rejecting a suggestion to include off-reservation trust lands in the definition of tribal lands found in NAGPRA's implementing regulations because it would be "inconsistent with the Act's definition of tribal lands"); *id*. at 62142 ("Lands outside the exterior boundary of an Indian reservation that are held in trust by the United States for an Indian tribe do not meet the statutory definition of tribal lands. These lands are under federal control. . . .").

Accordingly, to the extent the Hickory Ground Site is within the boundaries of Poarch's reservation, it constitutes "tribal land" under NAGPRA. The parts of the Hickory Ground Site

48

that include trust land lying outside the boundaries of Poarch's reservation constitute "Federal lands" under NAGPRA because they do not qualify as a "reservation" under NAGPRA.

> **b)** *The off-reservation trust land is not "reservation" land for purposes of NAGPRA.*

As noted above, the Federal Defendants have not challenged the Plaintiffs' allegation that the Hickory Ground Site includes both reservation land and trust land. The Federal Defendants contend that the term "reservation" as used in NAGPRA should be interpreted coextensively with the term "reservation" under the Indian Country Statute, 18 U.S.C § 1151, which recognizes informal reservations. *See* Dkt. 200 at 25. This argument fails for three reasons. First, what matters here is whether the land constitutes reservation land for purposes of NAGPRA, ***not*** for purposes of Section 1151(a). Second, NAGPRA's definition of "tribal land" should be interpreted narrowly, according to what it actually says (which the cases cited by the Federal Defendants do not contradict). Third, reading NAGPRA's "reservation" provision to include informal or *de facto* reservations would render its "dependent Indian communities" provision largely superfluous, in contravention of the canon of statutory construction against surplusage.

The issue here is whether the off-reservation trust land at Hickory Ground constitutes land "within the exterior boundaries of any Indian reservation" for purposes of NAGPRA pursuant to 25 U.S.C. § 3001(15)(A). Notably, neither that section, nor the relevant provision of NAGPRA's implementing regulations, 43 C.F.R. § 10.2(f)(2)(i), refers to 18 U.S.C. § 1151(a). Accordingly, this Court need not, and should not, turn to case law interpreting 18 U.S.C. § 1151(a) to determine whether the off-reservation trust land in this case constitutes reservation land for purposes of NAGPRA. According to a plain meaning interpretation, it does not—it is off the reservation, and therefore not "within the exterior boundaries of any Indian reservation."

Congress could easily have incorporated 18 U.S.C. § 1151's definition of Indian country into NAGPRA definition of "tribal land" by reference, but it did not. And it could have made NAGPRA's definition of "tribal land" more inclusive, but it did not. This indicates that NAGPRA's definition of "tribal land" is specific and limited, and should not be given the

flexible interpretation, based on a different statute, that the Federal Defendants urge. Indeed, the legislative history of NAGPRA supports this proposition. H.R. Rep. No. 101-877, at 15 (1990) ("The term 'tribal land' . . . is for purposes of this Act only and may be inapplicable in other circumstances.").

The cases the Federal Defendants cite do not involve NAGPRA's definition of "tribal land." Rather, they involve the question of whether certain land constitutes "Indian country" more broadly. *See* Dkt. 190 at 25. Those cases also involve completely different legal issues. *See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 507 (1991) (addressing state regulatory authority in Indian country); *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 116 (1993) (addressing federal criminal jurisdiction in Indian country). Accordingly, they do not support the proposition that the reservation land provision of NAGPRA's definition of "tribal land" should be read to include informal reservations as in case law interpreting a definition of an entirely different term ("Indian country") in an entirely different federal statute (18 U.S.C. § 1151(a)).

The issue in *Citizen Band Potawatomi Indian Tribe* was whether a state had the authority to tax a tribe's cigarette sales on trust land. 498 U.S. at 507. The state argued that the tribe's sovereign immunity should not apply because the land was not a "reservation." *Id.* at 511. The Court did not specifically cite 18 U.S.C. § 1151, and (unlike the instant case) no specific definition in another federal statute was at issue. The Court's holding was narrow: it held that the trust land "qualifies as a reservation *for tribal immunity purposes*." *Id.* at 510 (emphasis added).

The issue in *Sac & Fox Nation* was whether a state had the authority to impose its income and motor vehicle taxes on tribal members in a tribe's territory. 508 U.S. at 116. The state argued that the tribe's reservation had been disestablished. *Id.* at 121. The Court cited 18 U.S.C. § 1151's definition of "Indian country," *id.* at 115, 123, but no specific definition in another federal statute was involved. While the Court alluded to the possibility that an "informal reservation" might constitute "Indian country," *id.* at 123, 125, the Court did not so hold.

Instead, the Court remanded the case for a determination of whether the land in question was "Indian country." *Id*. at 126, 128.

The circuit court cases to which the Federal Defendants cite are likewise inapposite. *See* Dkt. 200 at 25 n.3 (citing *United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999), and *United States v. Azure*, 801 F.2d 336 (8th Cir. 1986)). *Roberts* and *Azure* are both criminal cases involving questions of federal criminal jurisdiction under 18 U.S.C. § 1151 directly. The *Roberts* court, admitting that "the relationship between informal reservations and dependent Indian communities is not entirely clear under the current case law," did not actually determine whether the tribal government complex in question was a reservation under 18 U.S.C. § 1151(a) or a dependent Indian community under 18 U.S.C. § 1151(b), although it did determine that the land was Indian country regardless. 185 F.3d at 1133. And while the *Azure* court was more decisive, its holding was narrow, like that of the *Potawatomi* Court—it held that the tribal housing area in question "can be classified as a *de facto* reservation, ***at least for purposes of federal criminal jurisdiction***." 801 F.2d at 339 (emphasis added).

Accordingly, the cases upon which the Federal Defendants rely illustrate, at best, that ***in some areas of federal Indian law***, and under appropriate factual circumstances, it may be appropriate to apply a more flexible interpretation of the term "reservation" as used in 18 U.S.C. 1151(a). But that statute is not at issue here, and the statute that is at issue—NAGPRA's definition of "tribal land"—should be read to mean what it says: that "tribal land" includes only reservation land (according to a plain meaning of the term "reservation," which would not include informal reservations) and dependent Indian communities (which could, under appropriate circumstances not met here, include informal reservations). If Congress had wanted to include more, it would have said so.

Finally, the canon against surplusage cautions strongly against the interpretation of NAGPRA's "tribal land" definition advanced by the Federal Defendants. Under the canon of surplusage, "[i]f possible, every word and every provision is to be given effect. None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another

provision or to have no consequence." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 174 (2012). Explained further:

> Because legal drafters should not include words that have no effect, courts avoid a reading that renders some words altogether redundant. If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.

*Id*. at 176 (internal citation omitted); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) ("We resist a reading of [a statute] that would render superfluous an entire provision passed in proximity as part of the same Act."). If any informal or *de facto* reservation could constitute a "reservation" for purposes of NAGPRA, then the "dependent Indian community" portion of NAGPRA's definition of "tribal land" would be rendered largely superfluous because, in many cases, a *de facto* reservation ***is*** a dependent Indian community. *See, e.g.*, *Azure*, 801 F.2d at 339 (stating that a tribal housing area on trust land near a tribe's reservation could be classified as a *de facto* reservation ***and*** a dependent Indian community); *United States v. Papakee*, 485 F. Supp. 2d 1032, 1041, 1044–45 (N.D. Iowa 2007) (holding that the Meskwaki Settlement is an informal reservation, but that even if it were not, a tribal housing area on trust land within the Settlement "can be considered a 'dependent Indian community'"). Interpreting NAGPRA's definition of "tribal land" in accordance with its plain meaning—as including only formal reservations under the "reservation" provision of the definition—would avoid that surplusage while still allowing informal or *de facto* reservations to fall under the "dependent Indian communities" provision in situations not presented here.

The Federal Defendants have not denied that there is some reservation land in question and some off-reservation trust land at Hickory Ground. Under NAGPRA's definition of "tribal land," the reservation land constitutes land "within the exterior boundaries of any Indian reservation," 25 U.S.C. § 3001(15)(A), but the off-reservation trust land does not.[13]

---

[13] "Tribal land" also includes a "dependent Indian community" and lands administered for Native Hawaiians, 25 U.S.C. § 3001(15), but no party has suggested that either of those two categories applies here.

**c)** ***The Federal Defendants had duties to act under NAGPRA and the Plaintiffs have alleged a viable claim under both NAGPRA and the APA that the Federal Defendants violated those duties.***

The Plaintiffs' NAGPRA claim alleges multiple violations of NAGPRA by the Federal Defendants. These violations constitute agency actions reviewable under the APA. The NAGPRA claim should survive the Federal Defendants' motion to dismiss.

*(1)      NAGPRA Requirements.*

NAGPRA is a remedial human rights statute passed after "decades of struggle by Native American tribal governments and people to protect against grave desecration, to repatriate thousands of dead relatives or ancestors, and to retrieve stolen or improperly acquired religious and cultural property back to Native owners." Jack R. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 ARIZ. ST. L.J. 35 (1992). It specifically affords protection to Native American "cultural items," which include human remains, associated funerary objects, unassociated funerary objects, sacred objects, and other objects of cultural patrimony.[14] 25 U.S.C. § 3001(3).

Among other things, Section 3002 of NAGPRA provides prohibits such items from being disturbed unless several carefully-prescribed requirements are met:

"The intentional removal from or excavation of Native American cultural items from Federal or tribal lands . . . is permitted only if—
(1) such items are excavated or removed *pursuant to a permit* issued under [16 U.S.C. 470cc] which shall be consistent with this chapter;
(2) such items are *excavated or removed after consultation with or, in the case of tribal lands, consent* of the appropriate [Indian tribe];
(3) the *ownership and right of control of the disposition* of such items shall be as provided in subsections (a) and (b); and
(4) *proof of consultation or consent* under paragraph (2) is shown."

25 U.S.C. § 3002(c) (emphasis added).

The permit required by Section 3002(c)(1) is a federal permit issued under the ARPA to excavate or remove any archaeological resource located on public lands or Indian lands. 16 U.S.C. § 470cc(a). If harm to, or destruction of, any religious or cultural site may result, notice to

---

[14] Each of these terms is further defined in the statute, but the definitions are not of central relevance here.

"any Indian tribe which may consider the site as having religious or cultural significance" is required before the permit may be issued. 16 U.S.C. § 470cc(c); *see also* 43 C.F.R. § 10.3(c). While there is an exception under the ARPA for tribes performing archaeological excavations on their own lands, 16 U.S.C. § 470cc(g)(1), that does not apply to non-tribal individuals or entities, even if they are acting on behalf of a tribe. *Id.*; *see also* 25 C.F.R. § 262.4(c) (clarifying that consultants, advisors, and others serving by contractual agreement as agents for Indian tribes are not exempt from permit requirements under the ARPA, although they may be able to expedite the permit). Nor does it apply to individual tribal members in the absence of tribal law regulating the excavation or removal of archaeological resources on Indian lands. 16 U.S.C. § 470cc(g)(1). Indeed, in some limited circumstances, the exception may not even apply to tribal employees, particularly if the tribe does not ensure that permit requirements have been met by other documented means. 25 C.F.R. § 262.4(c)(2).

The consultation requirements of Section 3002(c)(2) are further detailed in 43 C.F.R. §§ 10.3 and 10.5. Notably, these requirements do not depend solely on the Federal Defendants receiving notice of an excavation or inadvertent discovery—the requirements are also triggered if they otherwise become aware of it. 43 C.F.R. § 10.5(b). Under Section 10.5, consultation must be conducted with lineal descendants, tribes on whose aboriginal lands the excavation will occur, tribes that are culturally affiliated with the cultural items, and tribes that have a demonstrated cultural relationship with the cultural items. 43 C.F.R. § 10.5(a). The consultation requirements are extensive, and include development of a plan of action that will cover topics such as how the cultural items will be treated, the planned disposition of the cultural items and more. 43 C.F.R. § 10.5(b)-(e). Moreover, Federal Agencies are instructed to enter into comprehensive agreements with tribes that are affiliated with the cultural items "whenever possible." 43 C.F.R. § 10.5(f). If a planned activity is also subject to review under Section 106 of the NHPA, then the federal agency should coordinate its NAGPRA and NHPA consultation and agreement processes. 43 C.F.R. § 10.3(c)(3).

Of the ownership and control requirements in Section 3002(c)(3), those under Section 3002(a) are primarily relevant here. They control to whom ownership or control of cultural items must be given. Ownership or control of human remains and associated funerary objects is in the lineal descendants of the deceased. 25 U.S.C. § 3002(a)(1). If the lineal descendants cannot be ascertained, then ownership or control will be as provided for unassociated funerary objects and other cultural items. 25 U.S.C. § 3002(a)(2). Ownership or control of those items is in *inter alia*, first the tribe on whose tribal land the objects or remains were discovered, and second the tribe which has the closest cultural affiliation with such remains or objects. *Id*.

NAGPRA does not relieve the federal government of responsibility for actions occurring on tribal land. Also notably, NAGPRA does not *limit* the federal government's responsibility to its obligations under NAGPRA. 25 U.S.C. § 3009. And NAGPRA expressly recognizes the "unique relationship between the Federal Government and Indian tribes," 25 U.S.C. § 3010, which includes its trust responsibility to tribes. *See, e.g.*, *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) (stating that the federal government, in its dealings with Indians, "has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards"); *Cobell v. Norton*, 240 F.3d 1081, 1086 (D.C. Cir. 2001) ("The federal government has substantial trust responsibilities toward Native Americans. This is undeniable.").

*(2)    APA Requirements.*

The APA establishes a presumption in favor of judicial review for one suffering legal wrong because of agency action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, __ U.S. __, 2020 WL 3271746, at *7 (2020). As discussed in Section IV.B.1, above, in a case like this, where another federal statute provides a jurisdiction and a cause of action, the second sentence of Section 702 of the APA provides a waiver of sovereign immunity. 5 U.S.C. § 702. The other provisions of the APA set forth the procedures for a reviewing court to follow.

For example, under Section 704, "*[a]gency action made reviewable by statute* and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704 (emphasis added). That means that where, as here, another federal statute authorizes judicial review, *no "final agency action" is required—only an "agency action." Cf. Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004) ("Where no other statute provides a private right of action, the 'agency action' complained of must be '*final* agency action.'"); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"); *Wilderness Soc. v. Alcock*, 83 F.3d 386, 388 n.5 (11th Cir. 1996) ("Agency action is subject to judicial review only if it is 'final agency action' or '[a]gency action made reviewable by statute.' Since the NFMA does not provide for judicial review of agency actions taken pursuant to the Act, we have jurisdiction over a challenge under the NFMA only if the agency action is final.") (internal citation omitted); *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 863 n.12 (8th Cir. 2013) ("[W]e decline to conjure up a finality requirement for '[a]gency actions made reviewable by statute' where none is located in the text of the APA, particularly where the Supreme Court has implied that the two phrases incorporate distinct requirements."). The Federal Defendants appear to recognize that no "final agency action" is required for purposes of the NAGPRA claim. But because their argument regarding NAGPRA does contain one errant reference to a lack of "final agency action," Dkt. 200 at 24, it is important to highlight that point here—only "agency action" is required.

The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 701(b)(2) (incorporating by reference certain definitions from 5 U.S.C. § 551, including the definition of "agency action"); 5 U.S.C. § 551(13) (defining "agency action").

Section 706 outlines procedures for the scope of review, including what actions the "reviewing court shall" take. 5 U.S.C. § 706. First, the reviewing court must "compel agency

action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Second, the reviewing court must "*hold unlawful and set aside* [certain] agency action, findings, and conclusions," including those "found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2) (emphasis added).

In *Southern Utah Wilderness Alliance* ("*SUWA*"), the U.S. Supreme Court proclaimed that a claim for agency inaction under § 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." 542 U.S. at 64 (emphasis in original). *SUWA* pertained to Section 706(1), and several courts since *SUWA* have concluded that it did not impact Section 706(2) (which, as discussed in Section IV.B.2.c), below, is the primary focus of the Plaintiffs' NAGPRA claim). *E.g.*, *Oregon Natural Desert Assoc. v. United States Forest Serv.*, 957 F.3d 1024, 1031 n.6 (9th Cir. 2020) (characterizing *SUWA* as "inapposite" in a case involving Section 706(2), because SUWA pertains to Section 706(1)); *Alliance to Save Mattaponi v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d. 1, 10 (D. D.C. 2007) (noting that *SUWA* "does not reach claims encompassed within § 706(2)," which are "unaffected by *SUWA*"). *Alliance* further explains:

> "This reading is bolstered by the fact that according to the plain terms of APA, 'failures to act' fall under the scope of *both* § 706(1) and § 706(2): the Act defines an 'agency action' as 'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*.' 5 U.S.C. § 551(13) (emphasis added). Thus, plaintiffs' claim here—that EPA wrongly failed to exercise discretion in their favor—is directed not at an 'agency action unlawfully withheld,' but rather at a consummated 'agency action' that APA views as final, notwithstanding the fact that the agency 'did' nothing. The court, therefore, has subject matter jurisdiction over these claims pursuant to § 706(2)."

*Id*. Accordingly, *SUWA* should not apply to any claims for action or inaction that the Plaintiffs bring under 5 U.S.C. § 706(2).

*SUWA* itself also illustrates the type of case to which it should apply. In *SUWA*, the federal agency had a relatively vague statutory mandate to manage certain public lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness." *Id*. at 59.

Environmental groups wanted the federal agency to protect the public lands from off-road vehicles. *Id.* at 60–61. Accordingly, they brought suit under Section 706(1), seeking declaratory and injunctive relief for the federal agency's alleged failure to do so. *Id.* The Court concluded, *inter alia*, that while the statute was mandatory as to the object to be achieved, it left the agency a great deal of discretion in deciding how to achieve it and did not mandate, with the clarity necessary to support judicial action under 706(1), the total exclusion of off-road vehicles. *Id.* at 66. As discussed in Section IV.B.2.c(3), below, the instant case is easily distinguishable from *SUWA*.

Moreover, *SUWA* should be inapplicable where, as here, a separate federal statute provides a cause of action that, by its own terms is not limited to compelling non-discretionary action unlawfully withheld. *See Center for Biological Diversity v. United States Forest Service*, 640 F. App'x 617, 619 (9th Cir. 2016) (unpublished). The statute at issue in that case "grants courts the ***power*** to 'restrain any person who has contributed to' disposal of a solid or hazardous waste that presents an imminent and substantial danger, and to '***order*** such person to take ***such other action as may be necessary.***" *Id.* (quoting 42 U.S.C. § 6972(a)) (emphasis added). Similarly, NAGPRA provides: "The United States district courts shall have ***jurisdiction*** over any action brought by any person alleging a violation of this chapter and shall have the ***authority to issue such orders as may be necessary to enforce the provisions of this chapter***." 25 U.S.C. § 3013 (emphasis added).

*(3)*     *Plaintiffs' Claims.*

In considering whether Plaintiffs have alleged plausible claims under NAGPRA, the court should focus on the purposes for which it was passed—as remedial human rights legislation intended to protect Indians and Indian tribes, such as the Plaintiffs, from the desecration of their ancestors' graves and to require the return of their wrongfully taken ancestors and cultural items to them. Jack R. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24

58

ARIZ. ST. L.J. 35, 59–60 (1992). "In interpreting NAGPRA, it is critical to remember that it must be liberally interpreted as remedial legislation to benefit the class for whom it was enacted. *Id*. at 76. And the federal government is primarily responsible for administering and enforcing NAGPRA. It is unusual and shocking for another federally recognized Indian tribe, acting on its own reservation and trust lands, to be the party accused of wrongdoing, as here. But that scenario does not excuse the Federal Defendants' abdication of their responsibility to enforce NAGPRA and uphold their trust responsibilities to the Plaintiffs. The Plaintiffs are entitled to the protections of NAGPRA for their ancestors and cultural items, regardless of who desecrated their graves and sacred site and wrongfully took the remains and cultural items therein.

Plaintiffs have alleged, among other things,[15] that the Federal Defendants, in violation of NAGPRA, knowingly allowed the excavation of the Plaintiffs' ancestors, their funerary objects, and other cultural items from the Hickory Ground Site without appropriate notice, consultation, permits, or proper disposition of the items excavated. The Federal Defendants also failed to perform independent obligations they had along the way, such as giving notice to the Plaintiffs at various points, and engaging in consultation with the Plaintiffs. They also had obligations to ensure that NAGPRA's consultations requirements were fulfilled by others, and to ensure that the Plaintiffs were given ownership and control of the excavated remains and cultural items.

More specifically, the Plaintiffs have alleged that at least 57 sets of human remains and associated funerary objects were excavated from the Hickory Ground Site. Dkt. 190 at ¶ 117. And numerous other cultural items were removed from the site. *Id*. at ¶119. They have further alleged that the Federal Defendants knew about this excavation, and the Plaintiffs' concerns about it. They state that concerns about violations of NAGPRA at the Hickory Ground Site were brought to the Federal Defendants' attention on several occasions, by several individuals. *Id*. at ¶¶ 90, 93–94, 142. They also point out that the Federal Defendants did issue one or more permits, and knew or should have known of the removals based on conditions of the permits,

---

[15] The Plaintiffs streamline their arguments for purposes of the instant motion only; they do not waive any other allegations set forth in the Second Amended Complaint, or any arguments pertaining thereto.

such as submitting reports of work performed under the permit(s). *Id.* at ¶¶ 108–111. Accordingly, this is not a case in which the Federal Defendants were legitimately unaware of what was happening.

    ***Anyone other than Poarch itself*** who engaged in intentional excavation, ***whether on "tribal land" or "Federal lands"*** for purposes of NAGPRA, was required to obtain a permit under the ARPA (and Poarch itself was required to obtain a permit for any intentional excavations on Federal lands), as discussed above. 25 U.S.C. § 3002(c)(1); 16 U.S.C. § 470cc(g)(1). That includes archaeologists affiliated with Auburn University and its associated archaeologists, who the Plaintiffs allege conducted excavations, Dkt. 190 at ¶ 101, and any other non-tribal individuals or entities who discovery may reveal conducted excavations, even if they were contracted by Poarch or otherwise acting on Poarch's behalf. 16 U.S.C. § 470cc(g)(1); *see also* 25 C.F.R. § 262.4(c) (clarifying that consultants, advisors, and others serving by contractual agreement as agents for Indian tribes are not exempt from permit requirements under the ARPA). Individual Poarch tribal members would also have been required to obtain permits if, as it appears may be the case, there was an absence of tribal law regulating the excavation or removal of archaeological resources on Indian lands (or the excavation may have been in violation of that law if it did exist). *See* 16 U.S.C. § 470cc(g)(1); Dkt. 190 at ¶¶ 87–89 (Poarch had a policy in place at one time prohibiting excavation, but upon information and belief, later reversed it). Indeed, in limited cases, it could even include Poarch tribal *employees*, particularly if permit requirements were not met by other means, which there is no indication that they were. Any excavation that took place without a permit was in violation of NAGPRA and the Federal Defendants could and should have stopped it.

    Moreover, the Federal Defendants were required to provide notice to the Muscogee (Creek) Nation ***before*** granting any permit(s) they did issue. 16 U.S.C. § 470cc(c); *see also* 43 C.F.R. § 10.3(c). The Plaintiffs allege that the Federal Defendants issued one or more permit(s), Dkt. 190 at ¶ 108, and the Federal Defendants concede that they issued at least one permit, but

they do not cite to any materials properly before this Court showing they provided the required notice to the Plaintiffs before doing so.

When the Federal Defendants received notice *or otherwise became aware of* an excavation or inadvertent discovery on any "Federal lands" for purposes of NAGPRA, as discussed in Section IV.B.2.c(1), above, they were required to initiate consultation with the Plaintiffs. 43 C.F.R. § 10.5(b). Plaintiffs fall within *all* of the categories for which consultation is required under 43 C.F.R. § 10.5(a). Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are lineal descendants of the excavated ancestors. Dkt. 190 at ¶¶ 2, 13–14, 45–46, 118, 147. And the Hickory Ground Site is within the aboriginal lands of the Muscogee (Creek) Nation, which is also culturally affiliated with the cultural items, and which also has a demonstrated cultural relationship with the cultural items. *Id.* at ¶¶ 2, 43–46. None of this was unknown to the Federal Defendants. Yet the Plaintiffs have alleged that the Federal Defendants did not consult with them before granting the permit(s). *Id.* at ¶ 112. And the Federal Defendants do not contest that allegation, or suggest that they fulfilled it at any time. Had the Federal Defendants fulfilled NAGPRA's consultation requirements, perhaps, at the very least, the Plaintiffs' ancestors could have been treated in a culturally appropriate way, which the Plaintiffs would have had the opportunity to provide direction for. 43 C.F.R. § 10.5(b)–(e).

As noted above, as part of the consultation process, the Federal Defendants also should have entered into a comprehensive agreement with the Muscogee (Creek) Nation if possible. 43 C.F.R. § 10.5(f). Because the Hickory Ground Site is listed on the National Register of Historic Places, Dkt. 190 at ¶ 50, the Federal Defendants also should have coordinated their NAGPRA and NHPA consultation and agreement processes. 43 C.F.R. § 10.3(c)(3).

The Federal Defendants also had a duty to ensure that ownership and control of the excavated cultural items was given to the appropriate parties. This required ownership and control of the human remains and associated funerary objects to go to Plaintiffs Mekko Thompson and Hickory Ground Tribal Town, as lineal descendants. 25 U.S.C. § 3002(a)(1). The Federal Defendants appear to argue that they have no duty with respect to the disposition of the

cultural items under 25 U.S.C. § 3002(c)(3) because they do not possess or control the cultural items. While they may not have physical possession of the cultural items, they do have a legal interest in the cultural items as the owner of all land in question, which falls within the definition of control. 43 C.F.R. § 10.2(a)(3)(ii) (defining "control" to include a legal interest in cultural items, with or without physical custody). *See also Native American Graves Protection and Repatriation Act Regulations*, 60 Fed. Reg. 62,134, 62,134–35 (Dec. 4, 1995) (explaining that the term "control" extends not just to cultural items in federal agency collections or museums, but also to cultural items intentionally excavated or inadvertently discovered on Federal or tribal lands, and the Federal agencies are responsible for their appropriate treatment and care, even when held by non-governmental repositories). Allowing other parties to exert ownership or control over the cultural items without an appropriate determination of who was entitled to ownership and control under NAGPRA constitutes a NAGPRA violation and is reviewable under the APA. *Cf. Navajo Nation v. United States Dept. of Interior*, 819 F.3d 1084, 1086 (9th Cir. 2016) ("By deciding to undertake NAGPRA's inventory process, the Park Service conclusively decided that it, and not the Navajo Nation, has the present right to 'possession and control' of the remains and objects").

Indeed, even the Federal Defendants' decision(s) that they had no obligations under NAGPRA with respect to the Hickory Ground Site, *e.g.*, Dkt. 190 Compl. ¶ 145, is subject to review under NAGPRA and constitutes a sufficient agency action under the APA. *See* 43 C.F.R. § 10.1(b)(3) ("Any final determination making the Act or this part inapplicable is subject to review under [25 U.S.C. § 3013]."); *Navajo Nation*, 819 F.3d at 1086 (Park Service's decision to inventory remains and objects was a determination of "possession and control" and constituted a final agency action).

Both the NAGPRA violations committed by the Federal Defendants and those they permitted to occur in violation of NAGPRA are continuing. The Plaintiffs have yet to receive the required notices for the ARPA permits issued by the Federal Defendants. They have yet to be invited to consult with the Federal Defendants. Some of the cultural items, including human

remains, to which the Plaintiffs are entitled to ownership and control are still in storage, outside of their ownership and control. Dkt. 190 at ¶¶ 120–124. The rest also remain outside of their ownership and control, having been reburied by Poarch *away from* their final resting places in 2012, knowingly contrary to the Plaintiffs' wishes. *Id*. at ¶¶ 150, 160–62. The Plaintiffs also fear that the NAGPRA violations are capable of repetition and evading review. *Id*. at ¶¶ 184–188.

The foregoing NAGPRA violations are reviewable under the APA. As discussed above, only an "agency action" is required in this case, because NAGPRA makes claims of NAGPRA violations reviewable. Various "agency actions" occurred here. A permit issued under NAGPRA and the ARPA, such as the one(s) in question here, constitutes a "license" under the APA. 5 U.S.C. § 551(8) (defining "license" to include "an agency permit"). The requirement of a license also constitutes a "sanction" under the APA, with the failure to require the license accordingly constituting a "failure to act" thereunder. *Id*. at §§ 551(10)(F) (defining "sanction" to include a "requirement, revocation, or suspension of a license") and (13) (including "failure to act" in the definition of "agency action"). Likewise, giving a required notice, or conducting a required consultation, constitutes a "sanction" under the APA, with the failure to take the required action constituting a "failure to act." *Id*. at §§ 551(10)(G) and (13). Various decisions under NAGPRA constitute "order[s]" under the APA, such as a decision that NAGPRA does not apply, or a decision that directly or indirectly recognizes a right to ownership or control in a party. *Id*. at § 551-(6) (defining "order"); *see also* 43 C.F.R. § 10.1(b)(3) ("Any final determination making the Act or this part inapplicable is subject to review under [25 U.S.C. § 3013].");  *Navajo Nation*, 819 F.3d at 1086 (Park Service's decision to inventory remains and objects was a determination of "possession and control" and constituted a final agency action). All of these constitute "agency action" reviewable under the APA. 5 U.S.C. § 701(a)(2) (incorporating by reference certain definitions from 5 U.S.C. § 551, including the definition of "agency action"); 5 U.S.C. § 551(13) (defining "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." ).

This Court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As discussed above, *SUWA* arguably should not apply here, because NAGPRA, which provides jurisdiction and a right of action here, broadly authorizes this Court to issue "such orders as may be necessary to enforce the provisions of this chapter." 25 U.S.C. § 3013. But even if *SUWA* does apply with respect to Section 706(1), the Plaintiffs here have asserted that the Federal Defendants failed to take discrete agency actions that they were required to take, such as issuing notices and engaging in consultation. These types of actions are distinguishable from those in *SUWA*, where the statutory mandate was vague, and the claimants sought to require the agency to do something it was not clearly required to do. Moreover, the Plaintiffs do not argue that a particular result is mandated (which could be problematic under *SUWA*), just that the requirements of NAGPRA must be followed going forward, and past failures must be corrected.

This Court must also "hold unlawful and set aside [certain] agency action, findings, and conclusions," including those "found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). As discussed above, *SUWA* does not affect Section 706(2). And the Plaintiffs primarily rely on Section 706(2) for their NAGPRA claim. Dkt. 190 at 55 ¶ 247 (using language from Section 706(2) specifically). Accordingly, this Court may hold unlawful and set aside any of the foregoing agency actions that it finds to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. This would logically include failure to require a required permit, failure to provide a required notice before issuing a required permit, failure to engage in a required consultation, making a *de facto* determination of ownership and control without appropriate consideration and procedures, determining that NAGPRA or certain NAGPRA requirements do not apply without appropriate consideration, and more.

Finally, even if the land in question were all "tribal land" for purposes of NAGPRA (which it is not), it cannot be the case that the Federal Defendants, who hold the land in trust and

have asserted control (at least by statute and regulation, if not in practice, as they should) over the excavation and disposition of cultural items on the land, can simply turn a blind eye and allow the desecration of the Hickory Ground Site. The federal government's failure to uphold its responsibilities under NAGPRA (whether by promulgating regulations that allow it to turn a blind eye in situations like this one, or by affirmatively turning that blind eye) violates its trust responsibility to the Plaintiffs under the "unique relationship" recognized in NAGPRA. This failure is arbitrary and capricious for purposes of the APA. *See generally Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252, 257–58 (D. D.C. 1972) (finding an agency action that failed to demonstrate an adequate recognition of the government's fiduciary duty to a tribe to be "arbitrary, capricious, an abuse of discretion, and not in accordance with law").

At this stage in the proceedings, the Plaintiffs do not have to show that they will ultimately prevail on the merits. The Federal Defendants have argued that this Court lacks jurisdiction because of a procedural requirement in the APA. The Plaintiffs have shown that this argument is incorrect as a legal matter, and the Federal Defendants motion to dismiss the NAGPRA claim should therefore be denied. Even if this Court proceeds to further consider the Federal Defendants' arguments (which it should not), it should do so under a Rule 12(b)(6) standard, which the Plaintiffs have met. The Plaintiffs have stated a facially plausible claim that gives the defendant fair notice of what the NAGPRA claim is and the grounds upon which it rests. Even if the Court were to apply a Rule 12(b)(1) standard, the Plaintiffs' NAGPRA claim is not clearly immaterial, made solely for the purpose of obtaining jurisdiction, or wholly insubstantial and frivolous. The Plaintiffs have alleged viable claims that the Federal Defendants, *inter alia*, failed to provide them with notice before issuing one or more permits, failed to consult with them upon becoming aware of excavations on federal land, and failed to ensure that ownership and control of human remains and funerary objects went to lineal descendants, all agency actions that violate NAGPRA and are reviewable under the APA. The Federal Defendants' motion to dismiss should be denied with respect to the Plaintiffs' NAGPRA claim.

**C.     Plaintiffs' NHPA claim against the Federal Defendants does not fail for lack of subject matter jurisdiction.**

The purpose of NHPA is the preservation of historic resources. *See Nat'l Indian Youth Council v. Watt*, 664 F.2d 220 (10th Cir. 1981). The Hickory Ground Site has been listed on the National Register of Historic Places since 1980. *See* Dkt. 190 at 5, 14. Accordingly, it is a "historic property" subject to NHPA. 54 U.S.C. § 300308 (defining "historic property" as including sites included on the National Register).

Section 106 of NHPA (codified at 54 U.S.C. § 306108) requires Federal agencies to take into account the effects of their undertakings on historic properties. 36 C.F.R. § 800.1. This is commonly referred to as the "Section 106 process."

> The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

*Id*. Federal agencies must complete the Section 106 process *before* approving the expenditure of any Federal funds or issuing any license. 54 U.S.C. § 306108; 36 C.F.R. § 800.1.

In considering the Federal Defendants' NHPA obligations in this case, it is important to keep in mind the Federal Defendants' trust responsibility to the Plaintiffs. Like NAGPRA, NHPA expressly recognizes the "unique legal relationship" the Federal Government has with tribes. 36 C.F.R. § 800.2(c)(2)(ii). The Federal Defendants should be held to a heightened standard of accountability in light of this trust responsibility.

**1.     The Tribal Defendants' assumption of NHPA obligations did not absolve the Federal Defendants of their own NHPA obligations.**

The Tribal Defendants' assumption of NHPA obligations did not absolve the Federal Defendants of their own continuing NHPA obligations. NHPA provides for a tribe to assume all or part of the functions of a State Historic Preservation Officer with respect to tribal land. 54 U.S.C. § 302702. Section 302702 incorporates by reference 54 U.S.C. § 302302, which makes

evaluation of such a program mandatory *not less than every 4 years*, and generally *requires* disapproval of the program if, at any time, the Secretary determines that a major aspect of the program is not consistent with the historic preservation program regulations.

Poarch entered into such an agreement with Federal Defendants the National Park Service and Department of the Interior for the assumption of NHPA responsibilities (the "NPS Agreement"). Dkt. 190-1 at 115-19. Under the NPS Agreement, Poarch expressly assumed responsibility for certain NHPA functions on tribal lands. *Id*. These include, *inter alia*, to cooperate with various other entities to "ensure that historic properties are taken into consideration at all levels of planning and development;" to consult with appropriate Federal agencies regarding any "Federal undertakings that may affect historic and culturally significant properties on tribal lands;" and to consult with appropriate Federal agencies regarding "the content and sufficiency of any plans to protect, manager, or mitigate harm to such properties." *Id*. Poarch also agreed to "carry out its responsibilities for review of Federal undertakings pursuant to Section 106 of the Act in accordance with [its implementing regulations]." *Id*. at 117.

Of paramount importance, Poarch also expressly agreed to provide for "consultations with representatives of any other tribes whose traditional lands may have been within [Poarch's reservation]." *Id*. Even more specifically, in any case where an action covered by NHPA might affect the traditional lands of another tribe, Poarch agreed to "seek and take into account the views of that Tribe." *Id*. These provisions are an integral and mandatory part of any such agreement. *See* 54 U.S.C. § 302704 (Secretary may *only* enter into such an agreement if it provides for appropriate participation by "representatives of other Indian tribes whose traditional land is under the jurisdiction of the Indian tribe assuming responsibilities," among other things).

Poarch's assumption of these responsibilities did not absolve the Federal Defendants of their responsibilities. *See* 54 U.S.C. § 306102 (providing that each Federal agency must establish a program that *inter alia*, appropriately considers the preservation of historic property under its jurisdiction or control, and that it carries out its preservation-related activities in consultation with tribes and others who are carrying out historic preservation activities); 36

67

C.F.R. 800.2(a) (stating that Federal agencies have a statutory obligation to fulfill the requirements of section 106 and to ensure that an agency official, which may be a SHPO or THPO, takes responsibility for Section 106 compliance).  The NPS agreed to carry out a periodic review to ensure that Poarch was carrying out its program consistent with the NPS Agreement. Dkt. 190-1 at 118.  And it reserved the right to terminate the NPS Agreement if Poarch was not carrying out its assumed responsibilities in accordance with the NPS Agreement, NHPA, or "any other applicable Federal statute or regulation."  *Id.* at 119.  54 U.S.C. § 302302 makes both of these things mandatory.  So even though Poarch may have assumed certain historic preservation obligations under the NHPA, the Federal Defendants remained responsible for compliance with the NHPA, including the Section 106 process.

## 2. The Plaintiffs have alleged various "undertakings" under the NHPA.

"Undertaking" means a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency."  54 U.S.C. § 300320.  It includes projects, activities, or programs carried out by or on behalf of a Federal agency, those carried out with Federal financial assistance, and those requiring a Federal permit, license, or approval.  *Id.* Courts have construed the statute to mean that only a Federal permit, license, or approval is required for an action to be a federal undertaking—federal funding is not necessarily required. *See United Keetoowah Band of Cherokee Indians v. Fed. Comm. Comm'n*, 933 F.3d 728, 734 (D.C. Cir. 2019); *Sheridan Kalorama Hist. Ass'n v. Christopher*, 49 F.3d 750, 755 (D.C. Cir. 1995) (finding that the definition of "undertaking" included projects requiring a federal permit or merely federal approval, because a narrower reading would "deprive the references to licensing in § 106 of any practical effect); *Standing Rock Sioux Tribe v. U. S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4 (D.D.C. 2016) ("An undertaking is defined broadly to include any 'project, activity, or program' that requires a federal permit."); *Fein v. Peltier*, 949 F.Supp. 374, 379 (D.V.I. 1996) (reading the phrase "funded in whole or in part" as modifying only the word "program," and finding that "an undertaking for purposes of section 106 includes a project or

activity under the direct or indirect jurisdiction of the NPS which requires its prior approval, regardless of whether the project or activity is funded in whole or in part by the federal government.").

The federal decision need not be particularly formal, and it need not result in affirmative action in order to constitute an undertaking.  For example, the construction of wireless communication towers has been held to constitute an undertaking subject to NHPA review based on an online registration process for the towers that takes mere minutes to complete.  *CTIA-Wireless Ass'n v. Fed. Comm. Comm'n*, 466 F.3d 105, 114 (D.C. Cir. 2006).  A decision to take *no action* has also been held to constitute an undertaking.  *Nat'l Trust for Hist. Pres. v. Blanck*, 938 F. Supp. 908, 920 (D. D.C. 1996).  In that case, Walter Reed Army Medical Center made a decision not to excess (*i.e.*, sell) historic buildings, even though it was not using the buildings, did not have the resources to maintain the buildings, and had allowed the condition of the historic buildings to significantly deteriorate.  *Id*. at 910, 919–20.  As the court explained, "[t]hat decision had the sort of serious and long-term consequences" for the historic buildings that the NHPA requires be undertaken in accordance with the Section 106 process.  *Id*. at 920.

As in *Blanck*, the decision to allow the excavation (whether with or without required ARPA permits) "had the sort of serious and long-term consequences" for the National Register-listed Hickory Ground Site that should have triggered the Section 106 process.  It would be nonsensical if a short, online registration process for something that *might* have an impact on a historic site was an undertaking, as in *CTIA-Wireless*, but a decision to allow excavation of a known Muscogee (Creek) Nation historic burial and ceremonial site was not.

By these standards, several "undertakings" occurred in connection with the desecration of the Hickory Ground site.  Both the issuance of ARPA permits and the decision to allow excavation of the Hickory Ground Site to occur without required ARPA permits constitute undertakings.  Although issuance of an ARPA permit alone is generally not an undertaking requiring compliance with Section 106 of NHPA, 43 C.F.R. § 7.12, the excavation of the Hickory Ground Site was an undertaking, and thus NHPA required the Section 106 process to be

completed before any federal funds could be approved in connection with the project and before any permits allowing activity at the site were issued.  *See Sheridan Kalorama Hist. Ass'n v. Christopher*, 49 F.3d 750, 754 (D.C. Cir. 1995) (it is the project that constitutes the undertaking, not the decision to fund or license).  The excavation took place on land owned by the federal government in trust for Poarch, for which the federal government had delegated Poarch historic preservation responsibilities subject to NPS oversight. *See Fein*, 949 F. Supp. at 379 (concluding that the NHPA applied, citing federal ownership of the land and a contractual obligation not to disturb historic ruins on the land and to allow NPS representatives to enter upon the property at reasonable times). Moreover, the Plaintiffs have alleged facts sufficient to support a reasonable belief that the excavation was federally funded, in whole or in part.  *See* Dkt. 190 at 65, 71 (indicating that Poarch appears to generally receive federal historic preservation funds on an annual basis); 54 U.S.C. §§ 302906, 302907 (authorizing grants to tribes for the preservation of their cultural heritage, as well as for the purposes of carrying out a historic preservation program).  Such funding would make the project an undertaking.

Construction and operation of the casino and hotel on the Hickory Ground Site also constituted an undertaking, because an Indian gaming facility is by its very nature a project conducted with the approval and extensive involvement of the federal government.  From the very earliest days of the Indian gaming industry, the federal government has been extensively involved in all aspects of Indian gaming.  The federal government actively promoted gaming as a way of meeting federal goals for tribes, such as economic development and self-determination. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217 & n.21 (1987).  Multiple departments of the federal government, including Federal Defendant the Department of the Interior, provided financial assistance to tribes to develop the nascent industry. *Id.* at 218. Federal Defendant the Secretary of the Interior originally approved tribal gaming ordinances, regulated the gaming activities, and reviewed management contracts for tribal gaming facilities. *Id*. Indeed, the very reason the Indian gaming industry exists as it does is because of the important tribal ***and federal*** interests involved, which preempt state regulation.  *See id.* at 216–

22 (balancing the interests of the federal government first, tribal governments second, and state government third, in order to determine whether state regulation was preempted, and determining that it was).

After *Cabazon*, the federal government further formalized its regulation of the Indian gaming industry by enacting the Indian Gaming Regulatory Act ("IGRA"), codified at 25 U.S.C. §§ 2701–2721. IGRA established the National Indian Gaming Commission ("NIGC") within the Department of the Interior, 25 U.S.C. § 2704(a), and granted the NIGC extensive authority over Indian gaming operations. For example, gaming can only be conducted with an ordinance approved by the NIGC Chairman. 25 U.S.C. § 2710(b)(1)(B). The NIGC is required to monitor gaming conducted on Indian lands on a continuing basis, and to inspect and examine all premises located on Indian lands on which gaming is conducted. 25 U.S.C. § 2706(b). IGRA imposes requirements regarding the uses of gaming revenues and, notably for purposes of this case, the construction of gaming facilities. 25 U.S.C. § 2710(b). The NIGC even plays a role in the hiring and retention of employees. *Id.*; 25 U.S.C. § 2710(c) (primary management officials and key employees must be licensed, and background checks must be conducted and sent to the NIGC before licenses are issued; NIGC may require the suspension of a license if it does not approve of the employee). NIGC approval is required, and the NIGC mandates terms, for certain contracts. 25 U.S.C. § 2711 (requiring the Chairman's approval of management contracts and collateral agreements, setting limits on the term of management contracts and fees under such contracts, and prescribing certain other terms in the contracts). The NIGC has the authority to close a gaming operation. 25 U.S.C. § 2713(b). And, notably for purposes of this case, the NIGC is funded by tribal gaming operations—the casino built on the Hickory Ground Site is required to pay a percentage of its revenues to the NIGC. 25 U.S.C. § 2717(a).

Pursuant to NIGC regulations, a tribe must notify the NIGC at least 120 days before opening any new gaming facility. 25 C.F.R. § 559.2(a). Assuming Poarch complied with this requirement, as it should have, the federal government accordingly had at least four months' notice that the casino was under construction. Finally, the NIGC prescribes extremely detailed

71

standards for all aspects of tribal gaming operations. *See, e.g.*, 25 C.F.R. Part 543 (Minimum Internal Control Standards for Class II Gaming).

The federal government's ownership of the Hickory Ground Site; its extensive involvement in the gaming operation, from construction on; and its receipt of revenues from the gaming operation make the planning, construction, and operation of the gaming facility an undertaking for NHPA purposes. *Cf. Fein*, 949 F. Supp. at 379; *CTIA-Wireless*, 466 F.3d at 114–15 (retention of approval authority constituted an undertaking). This is not a situation in which non-federal land and resources were used for a construction project. *See, e.g., Ringsred v. City of Duluth*, 828 F.2d 1305, 1306, 1308-09 (8th Cir. 1987) (parking ramp to be built adjacent to a pre-IGRA Indian gaming facility was not an undertaking for purposes of NHPA because it would be built on City land, using City funds, the federal government would provide no financial aid and receive no revenue from it, there were no federal licensing requirements, and the federal government would have no input regarding design or construction).

Finally, each extension of the NPS Agreement without appropriate review and without terminating the NPS Agreement for noncompliance constituted an undertaking. The National Park Service was statutorily mandated to evaluate Poarch's historic preservation program at least every four years, and was required to disapprove the program if, at any time, the Secretary determined that a major aspect of the program was not consistent with historic preservation program regulations. 54 U.S.C. § 302302. The National Park Service was also contractually obligated by the NPS Agreement to carry out this review. Dkt. 190-1 at 118. And it reserved the right to terminate the NPS Agreement if Poarch was not carrying out its assumed responsibilities in accordance with the NPS Agreement, NHPA, or "any other applicable Federal statute or regulation." *Id.* at 119. Yet the National Park Service did not conduct these required reviews. Dkt. 190 at 27. Its failure to do so, particularly when doing so would have revealed the Federal Defendants' egregious violations of the NPS Agreement, NHPA, and other applicable federal statutes and regulations and could have prevented some or much of the desecration of the Hickory Ground Site, should be treated as an extension of the NPS Agreement constituting an

72

undertaking requiring NHPA review. *Cf. Pit River Tribe v. United States Forest Service*, 469 F.3d 768, 787 (9th Cir. 2006) (holding that extension of leases was a federal undertaking requiring NHPA review).

### 3.       The Federal Defendants violated the NHPA.

In carrying out its obligations under the Section 106 process, a Federal agency must consult with Indian tribes, among others. 54 U.S.C. § 302706(b); *Id.* § 306102(b).  If a historic property may be affected by an undertaking, the agency official must consult with any Indian tribe that "attaches religious and cultural significance" to the historic property.   36 C.F.R. § 800.2(c)(2)(ii); 36 C.F.R. § 800.3(f)(2).  The Federal Defendants had the duty to consult with the Muscogee (Creek) Nation, as a tribe—indeed the primary tribe—that attaches religious and cultural significance to the National Register listed Hickory Ground Site, with respect to any undertakings that might affect the Hickory Ground Site.

Consultation obligations arise throughout the Section 106 process.  For example, consideration of adverse effects to a historic property must be done in consultation with any tribe that attaches religious and cultural significance to the property.  36 C.F.R. § 800.5.  If a party disagrees with a finding of no adverse effect, then the agency official must either consult with the party to resolve the disagreement or request the Advisory Council on Historic Preservation to review the finding.  *Id.*  § 800.5(c)(2). If an adverse effect is found, the agency official must consult further to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects.  *Id.* § 800.5(d)(2); 36 C.F.R. § 800.6.  The consultation process is intended to give a tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  36 C.F.R. § 800.2(c)(2)(ii)(A).

Plaintiffs have alleged that the Federal Defendants did not engage in consultation with the Muscogee (Creek) Nation at *any* of these required points in the consultation process, with respect to any of the undertakings discussed above. Dkt. 190 at 66. The Federal Defendants do not dispute this allegation. These failures to consult caused real-world harm to Plaintiffs. The Federal Defendants' wholesale disregard of these consultation obligations deprived the Plaintiffs of the opportunity to identify their concerns about undertakings at the Hickory Ground Site and to participate in the resolution of adverse effects. If Plaintiffs had been consulted as they should have been, perhaps the parties would have been able to avoid the egregious harms that occurred. At a minimum, the Plaintiffs could have advised as to how to treat their ancestors' remains and cultural items in a culturally appropriate fashion.

The repeated extension of the NPS Agreement also violated NHPA's review and disapproval requirements. As discussed above, each extension should be treated as an undertaking requiring NHPA review. *See Pit River Tribe*, 469 F.3d at 787. This is particularly true if the NPS Agreement was initially approved without consultation with the Muscogee (Creek) Nation. *See id.* at 786–87 (stating that a federal agency does not satisfy the National Environmental Policy Act ("NEPA") by ignoring the statute at the critical stage, then hiding behind the assertion that the decision has already been made).

Finally, the Federal Defendants' continued granting of historic preservation program funds to Poarch, even as Poarch was destroying the National Register-listed Hickory Ground Site and thereafter, violates NHPA. 54 U.S.C. § 306113 provides:

> Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to void the requirements of section 306108 of this title, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant.

Plaintiffs have alleged facts sufficient to support a reasonable belief that the excavation was federally funded, in whole or in part.  *See* Dkt. 190 at 65, 71 (indicating that Poarch appears to generally receive federal historic preservation funds on an annual basis); 54 U.S.C. §§ 302906, 302907 (authorizing grants to tribes for the preservation of their cultural heritage, as well as for the purposes of carrying out a historic preservation program).  Having pleaded a plausible claim on this issue, the Plaintiffs should be allowed to conduct discovery in order to obtain information in the exclusive possession and control of the Defendants to determine whether any portion of that funding related to the Hickory Ground Site.

> ### 4.    The Federal Defendants' NHPA violations are reviewable under the NHPA and the APA and are subject to redress under the Court's broad equitable powers.

The Federal Defendants' NHPA violations are reviewable under the NHPA.  Most or all of the NHPA violations discussed above took place within the six years before the Plaintiffs filed their original Complaint.  Thus, they are within the APA's six-year statute of limitations.

The NHPA expressly contemplates enforcement actions by "any interested person."

> In any civil action brought in any United States district court **by any interested person** to enforce this division, if the person substantially prevails in the action, the court may award attorney's fees, expert witness fees, and other costs of participating in the civil action, as the court considers reasonable.

54 U.S.C. § 307105 (emphasis added).

Courts across the country have found that section provides a private right of action. *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1017 (3d Cir.1991); *Vieux Carre Prop. Owners, Residents & Assoc., Inc. v. Brown*, 875 F.2d 453, 458 (5th Cir.1989); *Yankton Sioux Tribe v. United States Army Corps of Engineers*, 194 F.Supp.2d 977, 990 (D. S.D. 2002).  *See also Narragansett Indian Tribe v. Rhode Island Dept. of Transp*., 903 F.3d 26, 29-30 (1st Cir. 2018) ("We have previously assumed, without deciding, that the NHPA creates some type of private right of action….we can continue to indulge in this assumption, again…because the Tribe in its complaint does not purport to bring any claim to enforce the NHPA.").  *But see Karst Envtl.*

*Educ. & Prot., Inc. v. Envtl. Prot. Agency*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (stating in passing, and without analysis, that NHPA contains no private right of action); *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005) (agreeing with its "sister circuits" that the attorney fees provision "demonstrates Congressional intent that individuals may sue to enforce the NHPA," but concluding that it does not give rise to a private action against the government).

As discussed in Section IV.B.1, above, the APA provides a broad waiver of sovereign immunity where, as here, another federal statute provides the cause of action.  5 U.S.C. § 702. This waiver of sovereign immunity is not limited by the "agency action" requirement found in the first sentence of Section 702.  Nor is it limited by the other procedural requirements of the APA, such as those of 5 U.S.C. § 706.  And because the NHPA makes the Federal Defendants' actions reviewable, only an "agency action" is required under 5 U.S.C. § 704, not a "final agency action."

The Federal Defendants' actions with respect to the following undertakings are all agency actions for which relief is available under Section 706 of the APA: issuance of ARPA permits and the decision to allow excavation of the Hickory Ground Site to occur without required ARPA permits; approval of the construction and operation of the casino and hotel on the Hickory Ground Site; and extension of the NPS Agreement without appropriate review and without terminating the NPS Agreement for noncompliance. The Federal Defendants' continued granting of historic preservation program funds to Poarch even as it destroyed the Hickory Ground Site and thereafter, in violation of the NHPA, is also an agency action for which relief is available under Section 706 of the APA.

Even if the Court were to find, contrary to the weight of the authority, that NHPA does not provide a private right of action, in which case a "final agency action" would be required, Plaintiffs have alleged final agency actions reviewable under Section 706 of the APA as well.  In order to be a "final agency action," the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. *Bennett v.*

*Spear*, 520 U.S. 154, 177–78 (1997). Second, the action must be one by which rights or obligations have been determined, or from which legal consequence will flow. *Id.* at 178. "'[C]ourts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled.'" *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2018) (quoting *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014)). Courts therefore "'focus on both the practical and legal effects of the agency action,' and define the finality requirement 'in a pragmatic and flexible manner.'" *Id.* (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)).

The agency actions alleged here meet these standards. A decision to issue an ARPA permit (or not to require one when one should be required) is a final decision, not interlocutory in nature, from which legal consequences will flow (and tragically did in this case). Further discovery would be required to determine exactly when the Federal Defendants' approval of the casino on the Hickory Ground Site became final, but it necessarily must have occurred at some point between the preparation for construction and the present day, otherwise the casino would not be in operation, given the federal government's ability to shut it down. Likewise, each decision to extend the NPS Agreement and each award of historic preservation program funds to Poarch constitute final agency actions—there were to be no further decisions or actions, and consequences flowed from each of the foregoing decisions. The Court should conclude that the NHPA provides a private right of action, so only an "agency action" is required. But even if it concludes that a "final agency action" is required, Plaintiffs have alleged sufficient facts to find one or more final agency actions as well.

Finally, the Court has broad equitable powers to order appropriate relief in an NHPA case. *See, e.g.*, *Vieux Carre Property Owners, Residents & Assoc., Inc. v. Brown*, 948 F.2d 1436, 1447 (5th Cir. 1991) ("There is, in other words a broad range of remedies that could conceivably emerge from NHPA review. We find it inappropriate to pre-judge those results as being limited to the extremes of either maintaining the status quo or totally demolishing the park."); *see also Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1034–35, 1039 (D.

Mont. 2006) (noting in a NEPA/NHPA/ESA case that the court's equitable powers were broad, and listing its options for injunctive relief, which included requiring that a pipeline be removed, although it ultimately chose to order the pipeline shut down instead). The Court should exercise those equitable powers on the basis of a fully-developed record and after fact finding. *Slockish v. United States Federal Highway Admin.*, 682 F. Supp. 2d 1178, 1185 (D. Or. 2010). Resolution at an earlier stage would be premature. "Such a determination will best be made in any remedial phase of this litigation after the facts have been established and the legal issues have been decided." *Id.*

At this stage of the case, all the Court needs to decide is whether Plaintiffs have alleged a plausible claim for relief under the NHPA. Once the facts are determined, the Court can decide whether the Federal Defendants violated the NHPA and the NPS Agreement; whether an order in the nature of mandamus requiring them to abide by the NHPA going forward is needed to prevent further tragedies of this nature; and whether to issue an injunction requiring them to consult with the Plaintiffs during such restoration of the Hickory Ground Site as the Court may order. Those are important decisions that should be made on a full record.

**D.      Plaintiffs allege jurisdiction under the Archaeological Resources Protection Act.**

As alleged in the Second Amended Complaint, Dkt. 190 at 11, this Court has jurisdiction to hear the Plaintiffs' Archeological Resources Protection Act ("ARPA") claim under 28 U.S.C. § 1331 (federal question jurisdiction). The claim is reviewable under the APA, which also provides a waiver of sovereign immunity. 5 U.S.C. § 702.

The purpose of ARPA is to secure "the protection of archaeological resources and sites . . . on public lands and Indian lands." 16 U.S.C. § 470aa(b). Under ARPA, "[n]o person may excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands *unless such activity is pursuant to a permit issued* under [16 U.S.C. § 470cc]." 16 U.S.C. § 470ee(a) (emphasis added); *see also* 25 C.F.R. § 262.3(a). For purposes of ARPA, "Indian

lands" means, in relevant part, land held in trust by the United States for Indian tribes. 16 U.S.C. § 470bb(4). "Public lands" means certain lands owned and administered by the United States, such as national parks, national forests, etc. 16 U.S.C. § 470bb(3). The Hickory Ground Site constitutes "Indian lands" for purposes of ARPA, because it is held in trust by the United States for Poarch.

The permit requirement is a very important part of the process under ARPA (and NAGPRA, which incorporates it) for preserving ancestral and cultural relics, because it requires the Federal land manager to "notify any Indian tribe which may consider the site as having religious or cultural importance" before issuing a permit that may result in harm to a religious or cultural site. 16 U.S.C. § 470cc(c). This notice requirement is intended to give tribes an opportunity to intervene in development activity in order to safeguard cultural items. *See* S. Rep. No. 101-473, at 10 (1990). Failing to give notice to the appropriate tribes before issuing a permit and allowing excavation to be conducted on Indian lands without a required permit are both very serious lapses of oversight.

Plaintiffs allege that the Federal Defendants issued one or more ARPA permit(s), Dkt. 190 at 29, and the Federal Defendants concede that they issued at least one such permit, Dkt. 200 at 34, but the Federal Defendants do not claim to have provided the required notice to the Plaintiffs before doing so. This permit, and any other permit that the Federal Defendants issued without notice to the Plaintiffs, violated the mandatory notice requirements under ARPA.

The Federal Defendants argue that they were not required to issue other permits because of two exceptions to ARPA's permit requirement—an exception for tribes excavating on their own lands, and an exception for general earth moving excavations. Dkt. 200 at 33. But the Second Amended Complaint pleads a plausible claim that neither of these exceptions applies in this case.

While there is an exception to the permit requirement for tribes (and sometimes tribal members, depending on the circumstances) performing the excavation or removal of archaeological resources on their own Indian lands, 16 U.S.C. § 470cc(g)(1), as discussed in

79

Section IV.B.2.c above, that exception does ***not*** apply to others performing excavation on a tribe's behalf.  25 C.F.R. § 262.4(c).  Indeed, in some circumstances, it may not even apply to tribal employees.  *Id.*  So while Poarch itself may not have needed a permit, those performing excavation and removal of archaeological resources on its behalf did, and the Federal Defendants had a duty to ensure that they obtained the appropriate permits.  To the extent the Federal Defendants allowed any excavation to occur without a permit, as the Plaintiffs have alleged, Dkt. 190 at 63, they violated ARPA. At minimum, Plaintiffs have pleaded sufficient facts to be entitled to conduct discovery and have this claim resolved on a fully-developed record.

The plain language of the other exception in ARPA's implementing regulations relied upon by the Federal Defendants demonstrates that it is not applicable in this case.  That exception excludes from the permit requirements activities that are "***exclusively*** for purposes other than the excavation and/or removal of archaeological resources, even though those activities might incidentally result in the disturbance of archaeological resources," 43 C.F.R. § 7.5(b)(1) (emphasis added).  But that exception applies only to "activities on the ***public lands***." *Id*. (emphasis added).  Under the facts alleged here, the lands at issue here are "Indian lands," not "public lands," for purposes of ARPA, so this exception does not apply and cannot excuse excavation done without satisfying the notice requirements that are a prerequisite to validly issuing a permit under ARPA.

Even assuming (incorrectly) that this exception applied to Indian lands (it does not), the exception does not apply in a situation such as this one, where the actor *knew* that archaeological resources were present and that excavation would cause their excavation and removal.

> [T]he actions of the plaintiff in this case are easily characterized as 'purposeful excavation and removal of archaeological resources' inasmuch as Fein was made aware through the language of the Deed that historical ruins were present in the area he proposed to build a house. ***He and his agents*** were thus charged with the knowledge that any digging on the site would certainly cause the excavation and removal of archaeological resources, which would be 'purposeful' and not inadvertent.

*Fein v. Peltier*, 949 F.Supp. 374, 380 (D. V.I. 1996) (emphasis added). Thus, the court concluded that an ARPA permit was required. *Id.* Plaintiffs have well-pleaded allegations that the Hickory Ground site was so extensively populated with human remains and cultural artifacts that any amount of excavation would disturb them. Dkt. 190 at 30–31, 41. Put differently, excavation at Hickory Ground would not have involved "incidental" disruption of Plaintiffs' ancestors—it was a site devoted to their eternal resting places. Accordingly, to the extent the Federal Defendants allowed excavations to occur at the Hickory Ground Site without the appropriate permits, they violated ARPA.

Plaintiffs have alleged plausible claims that the Federal Defendants violated ARPA requirements beyond those involving notice and permits. Primary among these is the requirement that archaeological resources excavated or removed from Indian lands remain the property of the Indian or Indian tribe having rights of ownership over such resources. 43 C.F.R. § 7.13. As discussed in Section IV.B.2.c, above, that tribe was the Muscogee (Creek) Nation, according to the order of priority set forth in 25 C.F.R. § 262.8. The Federal Defendants' violation of this requirement is ongoing.

The Federal Defendants also had duties regarding the curation of excavated cultural items. To issue any permit in the first place, the Federal land manager had to determine, among other things, that the applicant "possesses adequate curatorial capability for safeguarding and preserving the archaeological resources and all associated records." 43 C.F.R. § 7.8(a)(6). Plaintiffs' allegations regarding the deplorable and disrespectful manner of storage of the human remains and cultural items found at Hickory Ground state a plausible claim that this requirement was either ignored entirely or was not satisfied. Dkt. 190 at 50 (describing human remains placed in newspaper and plastic bins and left in a non-air-conditioned shed through numerous hot Alabama summers). Federal agencies are also required to ensure that archaeological resources excavated pursuant to ARPA are curated pursuant to 36 C.F.R. Part 79. 36 C.F.R. § 79.3(a). Those regulations set specific standards for the curation and use of such archaeological resources, which include inventory and recordkeeping, proper storage and conservation, safety

and security, availability for tribal religious uses, and more. *See, e.g.*, 36 C.F.R. § 79.9; 36 C.F.R. § 79.10.  The conditions in which these sacred items were stored here as described in the Second Amended Complaint do not come anywhere near those standards.

The Federal Defendants' action of allowing excavation of the Hickory Ground Site to take place without required permits, inaction of failing to provide notice to the Muscogee (Creek) Nation before issuing any permit(s) they did issue, and failure to ensure appropriate curation of the items, are unquestionably agency actions that are reviewable under Section 706 of the APA.

Nor is there any doubt that the Plaintiffs' ARPA claim is timely.  Plaintiffs allege that the Phase III excavation ended in 2011, Dkt. 190 at 28, the year before the original Complaint in this matter was filed in 2012, making it well within the statute of limitations.  Second, any excavation, removal, damage, alteration, or defacement to archaeological resources by or at the direction of the Tribal Defendants without a required permit violated ARPA, regardless of whether it occurred during the Phase III excavation or during the subsequent construction of the casino (which the Plaintiffs allege concluded in 2014, Dkt. 190 at 32).  For all of the foregoing reasons, the Plaintiffs have stated a timely and plausible claim under ARPA, and the Federal Defendants' motion to dismiss the ARPA claim should be denied.

**E.    The Plaintiffs have stated a claim against the Federal Defendants and Tribal Defendants under RFRA.**

Federal Defendants and Tribal Defendants contend that Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*, does not apply here because there is not a sufficient nexus between federal actions and the Tribal Defendants' actions and because the federal actions are not substantially burdening Plaintiffs' religion. Dkt. 200 at 35; Dkt. 202 at 62–69.[16] These arguments cannot require dismissal because the well-pleaded allegations state a plausible claim that the Tribal Defendants are federal actors, and therefore their actions are federal actions under

---

[16] Because Tribal Defendants and Federal Defendants advance very similar arguments in their motions to dismiss Plaintiffs' RFRA claim, Plaintiffs address both Tribal Defendants' and Federal Defendants' arguments in this brief for the sake of convenience and efficiency.

RFRA. Further, Plaintiffs have alleged that these federal actions are preventing them from practicing their religion and forcing them to choose between violating their religious mandates and facing civil or criminal penalties. Therefore, the federal actions are substantially burdening Plaintiffs' exercise of their religion. No compelling government interest justifies this substantial burden, and even if there were such an interest, there are means that are less restrictive on Plaintiffs' religion to fulfill that interest.

### 1.      RFRA provides broader protections for religious liberty than were provided prior to the Supreme Court's 1990 decision in *Employment Division v. Smith*.

RFRA prohibits the federal government from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 690–91 (2014). Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) (hereinafter *Smith*), holding that neutral state laws not targeting specific religious practices do not violate the free exercise clause of the First Amendment. *Id.* at 877-83. The effect of the ruling was to deny unemployment benefits to two Native Americans who were fired for ingesting peyote as part of religious ceremony. *Id.* at 874–75.

The dissent in *Smith* cautioned that the Court's deviation from its prior decisions seemed to stem from the fact that *Smith* involved Native American religion, as opposed to a religion with which the Court might be more familiar. *Id.* at 920–21 (Blackmun, J., dissenting). The dissent cautioned that the Court should not "turn a blind eye to the severe impact of a State's restrictions on the adherents of a minority religion," and must instead "scrupulously apply its free exercise analysis to the religious claims of Native Americans, however unorthodox they may be." *Id*. The dissent emphasized that this is especially important "in light of the federal policy-reached in reaction to many years of religious persecution and intolerance-of protecting the religious freedom of Native Americans" as embodied in the American Indian Religious Freedom Act, 42 U.S.C. § 1996, providing that:

> it shall be the policy of the United States to protect and preserve for American
> Indians their inherent right of freedom to believe, express, and exercise the
> traditional religions . . . , including but not limited to access to sites, use and
> possession of sacred objects, and the freedom to worship through ceremonials and
> traditional rites.

*Id.* at 920 (quoting 42 U.S.C. § 1996). Failing to live up to these standards means that "both the

First Amendment and the stated policy of Congress will offer to Native Americans merely an

unfulfilled and hollow promise." *Id.* at 921.

The purpose of RFRA was to restore the compelling interest test as set forth in *Sherbert*

*v. Verner,* 374 U.S. 398 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205 (1972)." 42 U.S.C.

§ 2000bb(b)(1). RFRA "provide[s] even broader protection for religious liberty than was

available under" *Sherbert* or *Yoder* because the government must also show that it used the least

restrictive means to achieve its compelling interest. *Burwell*, 573 U.S. at 695.

### 2.     RFRA applies to the Tribal and Federal Defendants because Tribal Defendants were federal actors who had been delegated federal authority and obligations in the NPS Agreement.

Federal Defendants and Tribal Defendants contend that there is not a sufficient nexus

between any federal actions and the Tribal Defendants' actions for RFRA to apply. Dkt. 200 at

35; Dkt. 202 at 62. Not so. The federal government's delegation of enumerated federal

preservation functions and powers to the Tribal Defendants, which is subject to compliance with

federal regulations, federal oversight, and entwinement with both state and federal governments,

makes the Tribal Defendants federal actors subject to RFRA.

First, the National Park Service delegated federal functions and obligations under the

National Historic Preservation Act to Tribal Defendants, making the Tribal Defendants actions

those of government officials. *See* Dkt. 190 at 55, 72. Second, even if Tribal Defendants were

acting as a private entity, as they contend, they are acting under color of law within the meaning

of 42 U.S.C. § 2000bb-2(1) and therefore subject to RFRA because they are acting (1) as a

delegee of federal functions, (2) as a joint actor with the federal government, and (3) as a party

entwined with governmental policies and (4) whose management or control is entwined with the

government. Each of these independently establishes Tribal Defendants as federal actors. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (a challenged activity may be state action when "a private actor operates as a 'willful participant in joint activity with the State or its agents,'" when the private actor "has been delegated a public function by the State," when it is "entwined with governmental policies," or when government is "entwined in [its] management or control" (citations omitted)).

In the Eleventh Circuit, the listed factors from *Brentwood* have been incorporated into three tests: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) (quoting *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993)); *see also Ala. Mun. Ins. Corp. v. Ala. Ins. Underwriting Ass'n*, No. 2:06CV291-CSC, 2008 WL 4493433 (M.D. Ala. Sept. 30, 2008) (applying the *Brentwood* factors). Under the public function test, a private entity acts under color of state law when it exercises powers that are "traditionally and exclusively governmental." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, AFL-CIO, 860 F.2d 1022, 1026 (11th Cir. 1988) (quoting *Jackson v. Met. Edison Co.*, 419 U.S. 345, 353 (1974)). Under the joint action/nexus test, courts consider whether "the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Id.* (quoting *Jackson*, 419 U.S. at 357–58). "To charge a private party with state action under this standard, the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Id.* (quoting *Jackson*, 419 U.S. at 357).

The factors enumerated above from *Brentwood* and incorporated in the public function and joint action/nexus tests are plainly embodied in the delegation of the vital federal preservation functions to Tribal Defendants, and show that Tribal Defendants satisfy the public function and nexus/joint action tests. Under the NPS Agreement between Poarch and the federal government, Poarch assumed "the *functions* of a State Historic Preservation Officer . . . . with respect to tribal lands." Dkt. 190-1 at PDF p. 115 (emphasis added) (quoting 16 U.S.C. § 470a). In addition, before allowing a delegation of responsibility to Tribal Defendants, the Secretary

was required to determine "that the tribal preservation program is fully capable of carrying out the [delegated] *functions*" and that the preservation plan "defines the *remaining responsibilities* of the Secretary and the State Historic Preservation Officer." 16 U.S.C. § 470a(d)(C)(2)(D)(i)–(ii) (emphasis added). The delegated functions under the NPS Agreement are comprehensive, leaving no "remaining responsibilities" for the State Historic Preservation Officer. *See* Dkt. 190-1 at PDF p. 115–16. Several of the delegated functions require ongoing joint action with the federal and state government. For example, Poarch agreed to "[a]dvise and assist, as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities"; to "[c]ooperate with the Secretary, the Advisory Council on Historic Preservation, and other Federal agencies, State agencies, local governments, and organizations and individuals to ensure that historic properties are taken into consideration at all levels of planning and development"; to "[c]onsult with the appropriate Federal agencies in accordance with Section 106 of the Act" on certain matters. *Id.* at PDF p. 116. Upon execution of the Agreement, the National Park Service sent notification to several federal and state entities that Poarch had "assumed formal responsibility on tribal lands for all of the [listed] functions." *Id.* at PDF p. 118.

In turn, the federal government assumed oversight of the delegation. For example, the Agreement requires Advisory Council on Historic Preservation involvement if Tribal Defendants want to deviate from the Council's procedures for reviewing federal undertakings. *Id.* at PDF p. 116. It also requires Tribal Defendants to provide an annual report on their activities pursuant to the delegated functions; to notify the National Park Service of vacancies and successors to the Tribal Historic Preservation Officer position; and to undergo regular reviews of the Tribe's program "to ensure that the Tribe is carrying out the program consistent with this agreement." *Id.* If the Tribe fails to "carr[y] out its assumed responsibilities in accordance with th[e] agreement, the [NHPA], or any other applicable Federal statute or regulation," the National Park Service can terminate the agreement. *Id.* at PDF p. 119. In addition, federal regulations require that the "agency official"—defined as "a State, local, or tribal government official" who has been

delegated federal responsibilities—take "legal and financial responsibility for section 106 compliance in accordance with [the Section 106 process]." 36 C.F.R. § 800.2.

Importantly, the delegation itself, as well as the delegated functions, obligated the Federal Defendants and Tribal Defendants to notify and consult with the Muscogee (Creek) Nation with respect to activity subject to the delegation that could affect the Nation's aboriginal tribal lands. Even before the delegation occurred, the Secretary was required to consult with "other tribes . . . whose tribal or aboriginal lands may be affected by the conduct of the tribal preservation program." 16 U.S.C. § 470a(d)(C)(2)(D); *see also* Dkt. 190 at 64, 66. Tribal Defendants and Federal Defendants were required to seek ways to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate the adverse effects" of the casino project on the Site through consulting with the Muscogee (Creek) Nation. 36 C.F.R. § 800.6; Dkt. 190 at 68. The NPS Agreement also obligated Tribal Defendants to consult with "representatives of any other tribes whose traditional lands may have been within the Poarch Band of Creek Indians Reservation," in "any case where action arising pursuant to the [NHPA] may affect the traditional lands of another Tribe," and where individuals or groups "may be affected by the program's activities." Dkt. 190 at 24–25, 69. Given the broad scope of this delegated authority, Tribal Defendants—as federal actors—are carrying out delegated federal functions and they are doing so in a manner that substantially burdens Plaintiffs' exercise of their religion.

Federal Defendants rely on the D.C. Circuit's decision in *Village of Bensenville*, 457 F.3d 52 (D.C. Cir. 2006) to argue that there is an insufficient basis for a federal nexus in this case. However, in *Bensenville*, the court found the federal government played merely a "peripheral role" in issuing a single approval for the City of Bensenville's airport reconfiguration plan. *Id.* at 65. The airport reconfiguration was carried out *subject to* federal regulations, but not pursuant to a broad delegation of federal functions—as Tribal Defendants' excavation and construction was here. *Id.* The federal government's role in *Bensenville* was solely as a regulator, whereas here the Tribal Defendants themselves carried out their activities *as federal actors* pursuant to the

delegation of federal functions. Thus, Tribal Defendants' actions are federal actions subject to RFRA. *See Brentwood Acad.*, 531 U.S. at 289 (private association was a state actor because its "nominally private character is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings"); *Evans v. Newton,* 382 U.S. 296, 299, 301 (1966) (private trustees to whom a city had transferred a park were nonetheless state actors barred from enforcing racial segregation, since the park served the public purpose of providing community recreation, and "the municipality remain[ed] entwined in [its] management [and] control"); *Dotson v. Shelby Cty.*, No. 13-2766-JDT-TMP, 2014 WL 3530820, at *13 (W.D. Tenn. July 15, 2014) (finding private entity that provided food service at a prison to be a state actor for purposes of Plaintiffs' Religious Land Use and Institutionalized Persons Act and Free Exercise claims).

For the same reasons, Tribal Defendants' reliance on *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011), is misplaced and not persuasive. The plaintiff in *Florer* failed to present any evidence that the government delegated its obligations to the private entity at issue. *Id.* at 925 (private entity's professional standards were not governed by the state). In contrast, here there are clear delegations of federal functions governed by federal law and federal oversight. *See, e.g.*, 36 C.F.R. § 800.2 (defining a "tribal government official who has been delegated legal responsibility for compliance with section 106 in accordance with Federal law" as an "agency official" obligated to comply with federal law); Dkt. 190-1 at PDF p. 115 (noting that the Secretary reviewed and approved Poarch's preservation plan for conformance with federal regulations).

Tribal Defendants' affirmative and ongoing choice to carry out their delegated federal functions made them federal actors.  As discussed below, their actions have and continue to substantially burden Plaintiffs' exercise of their religion, which violates RFRA.

**3.      Tribal Defendants, as federal actors, are substantially burdening Plaintiffs'
religious exercise by forcing them to choose between fulfilling their religious
duties or facing criminal and civil penalties.**

Federal Defendants and Tribal Defendants assert that the facts alleged in the Second
Amended Complaint do not give rise to a RFRA violation because the governmental activity
does not "substantially burden" Plaintiffs' exercise of religion. However, as Plaintiffs have
alleged, the manner in which Tribal Defendants—as federal actors—are carrying out their
delegated federal functions is causing a substantial burden to Plaintiffs' continuing and
affirmative religious duties to care for the Hickory Ground ceremonial site and for the graves and
bodies of the deceased by preventing them from carrying out those duties. Dkt. 190 at 72–76.
This forces Plaintiffs to choose between either abandoning their religious beliefs or facing civil
or criminal sanctions for fulfilling their religious duty to their ancestors. *See id.* at 73, 75. No
compelling government interest justifies the continued desecration of the Hickory Ground Site,
as its acquisition was made for the precise purpose of preserving the Site for the benefit of
Plaintiffs. *Id.* at 75. Nor is a complete prohibition of Plaintiffs fulfilling their religious
obligations the least restrictive means to serve any compelling government interest that may
exist, given Tribal Defendants' broad landholdings and well-demonstrated ability to serve their
self-governance and economic interests at those locations. Plaintiffs have therefore stated a claim
against Tribal Defendants under RFRA.

Hickory Ground is a place of profound religious importance to Plaintiffs; for Hickory
Ground Tribal Town and Mekko Thompson in particular, this place represents their origin in this
world. Dkt. 190 at 13. Without bothering to consult with or seek consent from Plaintiffs, Tribal
Defendants exhumed Plaintiffs' ancestors, placed them in a perpetual state of unrest, and
continue to desecrate the burial and ceremonial site by mistreating the remains and funerary
objects and allowing prohibited persons and substances in and around the ceremonial grounds.
*Id.* at 73–76. Tribal Defendants' actions were fully subject to their delegated federal functions,
and Tribal Defendants affirmatively contend their actions comported with those functions. *See*
Dkt. 202, Sections V-VII.

Tribal Defendant's actions have caused, and are causing, Plaintiffs to fail in their religious duties because Plaintiffs are not being permitted to complete required religious protocol and return the bodies of their ancestors, along with their funerary objects, to their original and intended final resting places. *Id.* at 73–76. Tribal Defendants' actions are preventing Plaintiffs from fulfilling this duty, forcing Plaintiffs to choose between either abandoning their religious beliefs or facing civil or criminal sanctions for fulfilling their religious duty to their ancestors. *See id.* at 73, 75. Tribal members have already been arrested and charged with crimes for attempting to comply with their religious duties. *Id.* at 73; Dkt. 100 at 23.

These are precisely the kinds of situations that constitute a substantial burden on Plaintiffs' religious exercise.

The Supreme Court in *Wisconsin v. Yoder* held that a government act substantially burdens free exercise if it "affirmatively compel[s a person], under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." 406 U.S. at 218. A substantial burden is also exerted when the government act causes "pressure that tends to force adherents to forego religious precepts," *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004), or when the government makes the practice of religion more expensive in the context of business activities, *see Burwell*, 573 U.S. at 710. Thus, the Supreme Court had "little trouble" concluding that a law that required business owners to choose between following their religion and dropping their business health insurance, for which they would face penalties, substantially burdened the owners' religion. *Id.* at 719–20.

Similarly, in *Comanche Nation v. United States*, 2008 WL 4426621 (W.D. Okla. 2008), the court found that construction of a federal building near a site the Comanche held sacred would impose a substantial burden on their religious practices because the proposed location was the central sight-line to the site and an unobstructed view was required to practice the Comanche religion. *Id.* at * 2, 17 (noting that the building "would further encroach on the last remaining open viewscape on the southern approach to the [sacred site]"). Because other land was available to the government, the planned location was not the least restrictive alternative. *Id.* at *18. The

Comanche thus established a likelihood of prevailing on their RFRA claim, and the court granted a preliminary injunction. *Id.* at *7.

The burden on Plaintiffs' religion in this case is greater than the burden held to be substantial in *Comanche*. Tribal Defendants' actions have put Plaintiffs' ancestors and the sacred site of Hickory Ground Tribal Town's origin in a state of perpetual unrest that Plaintiffs are compelled by their religion to remedy. *See id.*; Dkt. 190 at 73–76. When Hickory Ground Tribal Town members attempted to comply with their religious duties at Hickory Ground in 2013, they were arrested and charged with crimes. *See id.*; Dkt. 100 at 23. Like the plaintiffs in *Burwell*, Plaintiffs are forced to either follow their religion and face these consequences or violate their religion with the heart-wrenching knowledge that they are leaving their mutilated ancestors in a state of perpetual unrest and their sacred place of origin desecrated. And, like the plaintiff in *Comanche*, Tribal Defendants' religious exercise is prevented by the development at Hickory Ground.

This case is distinguishable from the magistrate's recommendation in *Slockish v. United States Federal Highway Administration* (and cases cited therein), cited by Tribal Defendants. No. 3:08-CV-01169-YY, 2018 WL 4523135, at *6 (D. Or. Mar. 2, 2018). In that case, the plaintiffs failed to show that they were forced to act contrary to their religious beliefs by the threat of civil or criminal sanctions. *Id.* Notably, at the pleading phase, the magistrate observed that "[w]ithout the artifacts and free access to the site, plaintiffs may be forced to act contrary to their religious beliefs," and furthermore that it could not ascertain whether the defendants "took the least restrictive means for implementing the Project and whether they followed all appropriate procedures." *Id.* at *10 n.9. As a result, the district court denied the defendants' earlier motion to dismiss for failure to state a claim. *See Slockish v. U.S. Fed. Highway Admin.*, No. CV-08-1169-ST, 2011 WL 7167042, at *9 (D. Or. Sept. 21, 2011), *report and recommendation adopted in part*, No. 3:08-CV-1169-ST, 2012 WL 398989 (D. Or. Feb. 7, 2012) (noting that fact issues needed to be resolved in order to determine the existence of a substantial burden and whether defendants took the least restrictive means in implementing the project).

91

Whatever the decision might be in this case on a fully-developed record, the allegations in the Second Amended Complaint undoubtedly state a plausible claim under RFRA.

Tribal Defendants also rely on *La Cuna De Aztlan Sacred Sites Protection Circle Advisory Committee v. U.S. Department of the Interior*, but that case is also distinguishable because the plaintiffs there did not "demonstrate that they have in fact been barred from the Project site or received actual threats of arrest," and alleged a burden on their religion that was in the nature of decreased "spiritual fulfillment" and visits to a religious site, as opposed to affirmative religious duties to take action at the Site. No. 2:11-CV-00395-ODW, 2012 WL 2884992, at *7–8 (C.D. Cal. July 13, 2012). Here, Plaintiffs have been barred from Hickory Ground, because virtually all of it is covered over in concrete and asphalt, and they would face civil and criminal penalties if they took action to return their ancestors to their intended resting sites and protected the ceremonial grounds as their religion requires. Thus, *La Cuna De Aztlan* is inapposite.

That is precisely the "substantial burden" that the Tribal Defendants have imposed on Plaintiffs here.  They have paved over the vast majority of the ceremonial and burial grounds at the Hickory Ground Site, and are desecrating the entirety of the Site by mistreating the remains and funerary objects and allowing prohibited persons and substances in and around the ceremonial grounds. Worse, neither the Tribal Defendants nor the Federal Defendants ever consulted with the Plaintiffs prior to the delegation of federal duties or prior to the excavation. Nor are the Defendants covering a small part of a sacred ground with tainted snow; they disrupted the burial grounds with heavy machinery and wrenched Plaintiffs' ancestors from their graves and mutilated them, leaving them strewn among construction debris, plastic bins, Auburn University, and the makeshift reburial site that was hurriedly filled in 2012. *See* Dkt. 190 at 50–52; Dkt. 179-1 a6–7. This case is also distinguishable from *Navajo Nation v. U.S. Forest Service*, because the Navajo there were not forced "to act contrary to their religion under the threat of civil or criminal sanctions," 535 F.3d 1058, 1070 (9th Cir. 2008), unlike the prohibitions applicable to Plaintiffs here, *see* Dkt. 190 at 73; Dkt. 100 at 23.

In contrast, here the Tribal Defendants have paved over the vast majority of the ceremonial and burial grounds at the Hickory Ground Site, and are desecrating the entirety of the Site by mistreating the remains and funerary objects and allowing prohibited persons and substances in and around the ceremonial grounds. Furthermore, the Defendants in this case never consulted with the Plaintiffs prior to the delegation of federal duties or prior to the excavation. Nor are the Defendants just creating snow; they wrenched the Plaintiffs' ancestors from their graves and mutilated them, leaving them strewn among construction debris, plastic bins, Auburn University, and the makeshift reburial site that was hurriedly filled in 2012. *See* Dkt. 190 at 50–52; Dkt. 179-1 at PDF pp. 6–7.

The Federal Defendants also improperly rely on *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207 (9th Cir. 2008). In that case, Snoqualmie argued that a planned federal action would "interfere with" (as opposed to completely prevent) tribal members' practice of religion, and did not establish that they would face criminal or civil sanctions for complying with their religion. *Id.* at 1214. Here, Plaintiffs have asserted that Defendants' actions are completely preventing them from fulfilling their religious duties, and that if they did obey their religious tenets, they would face civil and criminal sanctions just as they did when they attempted to fulfill their duties in 2013.

Nor are Defendants helped by *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988). In that case, the challenged project ensured that "[n]o sites where specific rituals take place were to be disturbed," and the route of the project was planned to as far removed as possible from spiritual sites. *Id.* at 454. This case is the opposite of *Lyng*; Plaintiffs' spiritual sites were disrupted, unearthed, paved over and now lie beneath a mammoth structure where activities abhorrent to their traditions take place, with human remains displaced and subjected to varying forms of continuing mistreatment.

Because Plaintiffs establish a substantial burden on the exercise of their religion, the burden of persuasion shifts to the Defendants to prove that the challenged conduct is "in furtherance of a compelling government interest" and is implemented by "the least restrictive

means" of furthering that interest. 42 U.S.C. § 2000bb-1(b). When "'a plausible, less restrictive alternative is offered . . . it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.'" *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 77 (D.C. Cir. 2006) (quoting *United States v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000)). Here, there is no compelling government interest that justifies the continued desecration of the Hickory Ground Site, and there are less restrictive means to accomplish any compelling interest that may exist. *Id.* at 75–76. The acquisition of Hickory Ground, made with federal preservation funds, was made for the purpose of preserving the Site for the benefit of Plaintiffs—a fact known at the time of acquisition by both Interior (who provided the funds) and Tribal Defendants (who asked for the funds). As discussed in Sections IV.C and D. of Plaintiffs' Response to Tribal Defendants' Motion to Dismiss, Tribal Defendants voluntarily undertook obligations to perpetually preserve the Site, and had protected it for over two thirds of the time it owned the Site by the time this suit was filed.  By 2005, Poarch was operating IGRA gaming at its casinos in Montgomery[17] and Atmore (opened in 1985)[18]. Like the defendant in *Comanche*, Tribal Defendants have alternatives available to them. For example, Poarch has numerous trust and fee properties and therefore has ample opportunity to pursue its interests on its own lands. *See* Wind Creek Hospitality Property Overview, *available at* https://windcreekhospitality.com/properties-2/overview (last visited July 6, 2020) (listing ten casino and resort locations). Furthermore, the public interest, as expressed in NAGPRA, ARPA, the NHPA, the ARPA permit conditions, and the NPS Agreement, is to preserve sites of historic, cultural, and religious importance, with paramount importance placed on consultation with affected tribes. Requiring Poarch not to substantially burden Plaintiffs' religion at just one of its parcels of land does not impose any obligations beyond those Tribal Defendants already undertook when acquiring Hickory Ground.

---

[17] *See* U.S. Department of the Interior Office of Inspector General Semiannual Report to Congress 9 (Oct. 2006), *available at* https://www.doioig.gov/sites/doioig.gov/files/Semiannual-OCT2006SAR.pdf (last visited July 3, 2020).
[18] *See* Dkt. 190 at 28.

Because Tribal Defendants' actions are federal actions, and because those federal actions are substantially burdening Plaintiffs' exercise of religion by forcing Plaintiffs to choose between religious compliance and sanctions without a compelling government interest, this Court should deny Federal Defendants' motion to dismiss Plaintiffs' RFRA claim.

**F.    This Court should not dismiss Count VIII of the Second Amended Complaint.**

Because Tribal Defendants and Federal Defendants advance very similar arguments in their motions to dismiss Count VIII, Plaintiffs address both Tribal Defendants' and Federal Defendants' arguments in Section IV.I of their Response to Tribal Defendants' Motion to Dismiss for the sake of convenience and efficiency.

## V.    CONCLUSION

For the reasons explained in detail above, the Court should reject the Federal Defendants' improper efforts to obtain a dismissal of this case before discovery and before the claims can be presented to the Court on the basis of a fully-developed record.  Plaintiffs' have satisfied the requirements of Rule 8 and Rule 12(b)(6) with thorough factual allegations stating facially plausible claims for relief.  The Court should deny the Federal Defendants' motion in its entirety and allow this case to proceed forward on the merits. If the motion is granted to any extent, Plaintiffs request that the Court condition such dismissal on the ability of Plaintiffs to submit a revised complaint. This is consistent with the liberal policy in favor of allowing amendments under Fed. R. Civ. P. 15(a)(2) (the "court should freely give leave when justice so requires."). *See also Espey v. Wainwright*, 734 F.2d 748, 750 (11th Cir. 1984).

Respectfully submitted this 6th day of July, 2020.

s/ *Lauren J. King*

OF COUNSEL

Lauren J. King
Email: lauren.king@foster.com
Foster Garvey PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
Tel: 206-447-6286
*Counsel for Plaintiffs*
(*Admitted Pro Hac Vice*)

s/ *Stewart Davidson McKnight, III*

Stewart Davidson McKnight , III (ASB-6258-G63S)
Email: dmcknight@dillardmcknight.com
Dillard, McKnight, James & McElroy, LLP
2700 Highway 280
Suite 110 East
Birmingham, AL 35223
Tel: 205-271-1100
*Counsel for Plaintiffs*

**<u>Certificate of Service</u>**

I hereby certify that on the 6th day of July, 2020, I caused to be electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties entitled to receive notice.

_s/ Lauren J. King_
Lauren J. King, Of Counsel

# TAB 213-2

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action Number: |
| POORCH BAND OF CREEK INDIANS, et al., | ) | 2:12-cv-01079-MHT-CSC |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE AND MEMORANDUM IN SUPPORT OF RESPONSE
TO INDIVIDUAL DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT AND SUPPLEMENTAL COMPLAINT**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................ 1

II. BACKGROUND ........................................................................................ 1

    A.    Hickory Ground Is A Historic Burial Site Sacred To Muscogee (Creek) Nation. ................................................................................................ 1

    B.    Poarch Promised To Preserve Hickory Ground, But Then Desecrated It For Money. ....................................................................................... 3

    C.    Individual Defendants Had Timely Notice Of These Claims. ............... 5

III. STANDARD FOR MOTION TO DISMISS ................................................. 6

IV. ARGUMENT ............................................................................................ 7

    A.    Mekko Thompson has pleaded facts supporting a plausible claim for outrage. .......................................................................................... 8

        1.    The Individual Defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct. ........................................... 10

        2.    The Individual Defendants' conduct was extreme and outrageous. ......... 13

        3.    Mekko Thompson has stated a plausible claim that the Individual Defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it. .................................... 19

    B.    The outrage claim should not be dismissed on the basis of legislative immunity. ...................................................................................... 21

        1.    It would be premature to dismiss on the basis of legislative immunity. ................................................................................... 21

        2.    Legislative immunity does not attach to the conduct alleged. .................. 24

    C.    Dismissal on the basis of the statute of limitations would not be appropriate, but even if it were, the outrage claim is timely. ................ 28

        1.    The outrage claim is timely. ...................................................... 28

        2.    Although it does not need to, the outrage claim relates back to the filing of the original Complaint. ................................................ 34

V. CONCLUSION ....................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Am. Rd. Serv. Co. v. Inmon*,
    394 So. 2d 361 (Ala. 1980)..............................................................................8

*Archie v. Enter. Hosp. & Nursing Home*,
    508 So. 2d 693 (Ala. 1987)......................................................................14, 29

*Arthur v. Thomas*,
    974 F. Supp. 2d 1340 (M.D. Ala. 2013) ...................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................6, 7

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998)..........................................................................23, 24, 25

*Boyd v. Warden, Holman Corr. Facility*,
    856 F.3d 853 (11th Cir. 2017) ..................................................................28

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ...............................................................22

*Callens v. Jefferson Cty. Nursing Home*,
    769 So. 2d 273 (Ala. 2000)...............................................................8, 35, 36

*Carney v. Knollwood Cemetery Ass'n*,
    514 N.E.2d 430 (Ohio Ct. App. 1986)...................................13, 14, 20

*Cates v. Taylor*,
    428 So. 2d 637 (Ala. 1983)........................................................................9

*Ceasar v. Shelton Land Co.*,
    646 S.E.2d 689 (Ga. Ct. App. 2007)...................................................14, 18, 20

*Chumney v. U.S. Repeating Arms Co.*,
    196 F.R.D. 419 (M.D. Ala. 2000) ..........................................................34

*Codell Constr. Co. v. Miller*,
    202 S.W.2d 394 (Ky. 1947)..............................................................14, 19, 20

*Cohen v. Bd. of Trs. of the Univ. of the D.C.*,
    819 F.3d 476 (D.C. Cir. 2016)..................................................................7

*Cont'l Cas. Ins. Co. v. McDonald*,
    567 So. 2d 1208 (Ala. 1990) ........................................................................ passim

*Contreraz v. Michelotti-Sawyers*,
    896 P.2d 1118 (Mont. 1995) ........................................................................ 14, 20

*Corn v. City of Lauderdale Lakes*,
    997 F.2d 1369 (11th Cir. 1993) .................................................................... 24, 25

*Crymes v. DeKalb Cty.*,
    923 F.2d 1482 (11th Cir. 1991) .......................................................................... 25

*Dobrich v. Walls*,
    380 F. Supp. 2d 366 (D. Del. 2005) .................................................................. 28

*Doe v. Pittsylvania Cty.*,
    842 F. Supp. 2d 906 (W.D. Va. 2012) ............................................................... 28

*Edwards v. Hyundai Motor Mfg. Alabama, LLC*,
    603 F. Supp. 2d 1336 (M.D. Ala. 2009) ......................................................... 9, 20

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ................................................................................................ 6

*Ex parte Bole*,
    103 So. 3d 40 (Ala. 2012) ................................................................................... 8

*Ex parte Novus Utils., Inc.*,
    85 So. 3d 988 (Ala. 2011) ............................................................................ 34, 36

*Exford v. City of Montgomery*,
    887 F. Supp. 2d 1210 (M.D. Ala. 2012) ............................................................. 8

*First Nat'l Bank of Birmingham v. Chichester*,
    352 So. 2d 1371 (Ala. Civ. App. 1977) ............................................................ 35

*Fortner v. Thomas*,
    983 F.2d 1024 (11th Cir. 1993) ......................................................................... 22

*Gostowski v. Roman Catholic Church of the Sacred Hearts*,
    186 N.E. 798 (N.Y. 1933) .......................................................................... 13, 15

*Gravel v. U.S.*,
    408 U.S. 606 (1972) ...................................................................................... 24, 25

*Gray Brown-Service Mortuary, Inc. v. Lloyd*,
    729 So. 2d 280 (Ala. 1999) ................................................................................. 9

*Hegner v. Dietze*,
   524 N.W.2d 731 (Minn. Ct. App. 1994) ...................................................................24

*Hill v. Shelander*,
   924 F.2d 1370 (7th Cir. 1991) ...................................................................38, 39, 40

*Holmes v. Oxford Chem., Inc.*,
   672 F.2d 854 (11th Cir. 1982) ...................................................................9

*Hughes v. City of Montgomery*,
   No. 12-1007, 2013 WL 146397 (M.D. Ala. Jan. 14, 2013) (unpublished) ...................11, 12

*Itel Capital Corp. v. Cups Coal Co.*,
   707 F.2d 1253 (11th Cir. 1983) ...................................................................37, 38, 39

*Jennings v. City of Huntsville*,
   677 So. 2d 228 (Ala. 1996) ...................................................................30, 31

*K.T. v. Royal Caribbean Cruises, Ltd.*,
   931 F.3d 1041 (11th Cir. 2019) ...................................................................7

*Krupski v. Costa Crociere S.p.A.*,
   560 U.S. 538 (2010) ...................................................................37

*L.D.G., Inc. v. Robinson*,
   290 P.3d 215 (Alaska 2012) ...................................................................23

*Lamm v. Shingleton*,
   55 S.E.2d 810 (N.C. 1949) ...................................................................13

*Levite Undertakers Co. v. Griggs*,
   495 So. 2d 63 (Ala. 1986) ...................................................................9

*Likes v. DHL Express*,
   No. 10-2989, 2011 WL 13230347 (N.D. Ala. July 26, 2011) (unpublished) ...................23, 24

*Lindley v. Birmingham*,
   652 F. App'x 801 (11th Cir. 2016) ...................................................................40

*Little v. Robinson*,
   72 So. 3d 1168 (Ala. 2011) ...................................................................8

*Marx v. Gumbinner*,
   855 F.2d 783 (11th Cir. 1988) ...................................................................22

*Moon v. Harco Drugs, Inc.*,
   435 So. 2d 218 (Ala. 1983) ...................................................................29, 30, 31

*N.Y. State Corr. Officers & Police Benevolent Ass'n v. New York,*
    911 F. Supp. 2d 111 (N.D.N.Y. 2012) ...................................................................23

*O'Neal v. Veazey,*
    84 S.E. 962 (Ga. 1915) .......................................................................................15

*O'Rear v. B.H.,*
    69 So. 3d 106 (Ala. 2011) ....................................................................................9

*Papieves v. Lawrence,*
    263 A.2d 118 (Pa. 1970) ...............................................................................14, 19

*Patrick v. Garlick,*
    66 F. Supp. 3d 325 (W.D. N.Y. 2014) .................................................................37

*Payne v. Ala. Cemetery Ass'n,*
    413 So. 2d 1067 (Ala. 1982) ...............................................................................29

*Potts v. Hayes,*
    771 So. 2d 462 (Ala. 2000) ..................................................................................8

*Powers v. Graff,*
    148 F.3d 1223 (11th Cir. 1998) ...............................................................35, 36, 37

*Prior v. Cancer Surgery of Mobile, P.C.,*
    959 So. 2d 1092 (Ala. 2006) ...............................................................................35

*Reese v. Ellis, Painter, Ratterree & Adams, LLP,*
    678 F.3d 1211 (11th Cir. 2012) .......................................................................6, 10

*Rice v. United Ins. Co. of Am.,*
    465 So. 2d 1100 (Ala. 1984) ......................................................................9, 16, 17

*Robinson v. Clipse,*
    602 F.3d 605 (4th Cir. 2010) ..............................................................................39

*Rubin v. Matthews Int'l Corp.,*
    503 A.2d 694 (Me. 1986) ..............................................................................10, 15

*Runs After v. United States,*
    766 F.2d 347 (8th Cir. 1985) .........................................................................25, 26

*Sanders-Burns v. City of Plano,*
    594 F.3d 366 (5th Cir. 2010) .........................................................................39, 40

*Sass v. Dist. of Columbia,*
    316 F.2d 366 (D.C. Cir. 1963) ............................................................................23

*Scarpaci v. Milwaukee Cty.*,
    292 N.W.2d 816 (Wis. 1980) ................................................................14

*Schultes v. Kane*,
    856 N.Y.S.2d 684 (N.Y. App. Div. 2008) ............................................12

*Scott v. Taylor*,
    405 F.3d 1251 (11th Cir. 2005) ...........................................................22

*Smith & Gaston Funeral Dirs, Inc. v. Dean*,
    80 So. 2d 227 (Ala. 1955) ...................................................................13

*State Emps. Bargaining Agent Coal. v. Rowland*,
    494 F.3d 71 (2d Cir 2007) ...................................................................22

*Stephens v. Creel*,
    429 So. 2d 278 (Ala. 1983) .................................................................29

*Stock W. Corp. v. Taylor*,
    942 F.2d 655 (9th Cir. 1991) ...............................................................23

*Sunkyong Int'l, Inc. v. Anderson Land & Livestock Co.*,
    828 F.2d 1245 (8th Cir. 1987) .............................................................39

*Thomas v. Williams*,
    21 So. 3d 1234 (Ala. Civ. App. 2008) .................................................19

*Tohono O'Odham Nation v. Ducey*,
    No. 15-01135, 2016 WL 3402391 (D. Ariz. June 21, 2016) (unpublished) .....................26, 27

*Whitehair v. Highland Memory Gardens, Inc.*,
    327 S.E.2d 438 (W. Va. 1985) ...........................................15, 16, 18, 20

*Whitt v. Hulsey*,
    519 So. 2d 901 (Ala. 1987) ........................................................ passim

*Wisconsin v. Baker*,
    464 F. Supp. 1377 (W.D. Wis. 1978) ..................................................26

*Woodley v. City of Jemison*,
    770 So. 2d 1093 (Ala. Civ. App. 1999) ...............................................17

*Yeldell v. Cooper Green Hosp., Inc.*,
    956 F.2d 1056 (11th Cir. 1992) ...........................................................25

*Yeldell v. Wells Fargo Bank*,
    No. 09-01584, 2011 WL 13287064 (N.D. Ala. Mar. 2, 2011) (unpublished) ....................8, 25

## OTHER AUTHORITIES

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §
     1357 (3d ed. 2020) .........................................................................................7

6A Wright & Miller § 1498.2 ...............................................................................35

Alabama Rule of Civil Procedure 15(c)..............................................................34

Fed. R. Civ. P. 8(a)(2)...........................................................................................6

Fed. R. Civ. P. 9(b) ..............................................................................................12

Fed. R. Civ. P. 12(b)(6)................................................................................. passim

Fed. R. Civ. P. 15 .................................................................................................36

Fed. R. Civ. P. 15(c) .................................................................................... passim

Fed. R. Civ. P. 15(c)(1)........................................................................................34

Fed. R. Civ. P. 15(c)(1)(B) ...................................................................................36

Fed. R. Civ. P. 15(c)(1)(C) ...................................................................................35

Fed. R. Civ. P. 15(c)(1)(C)(ii)..............................................................................37

James Wm. Moore, *Moore's Federal Practice* § 15.19(3)(a) (3d ed. 2020)..............36

## I.     INTRODUCTION

Plaintiff Mekko George Thompson ("Mekko Thompson") has stated a plausible claim for outrage.  The claim must not be dismissed on the basis of legislative immunity, not only because it would be premature, but also because legislative immunity does not attach to the conduct alleged.  The outrage claim is timely.  It is a continuing tort that is not time barred and, in any event, it relates back to the filing of the original Complaint in this matter, which was unquestionably timely.  For these reasons and the additional reasons laid out in more detail below, this Court should deny the Individual Defendants' Motion to Dismiss.

## II.     BACKGROUND

The circumstances most relevant to Mekko Thompson's outrage claim are discussed below.  A more complete discussion of the factual background is set forth in the Plaintiffs' Brief in Response to the Tribal Defendants' Motion to Dismiss filed contemporaneously herewith.

### A.     Hickory Ground Is A Historic Burial Site Sacred To Muscogee (Creek) Nation.

Defendants Stephanie A. Bryan, Robert R. McGhee, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells are members of Tribal Council of the Poarch Band of Creek Indians ("Poarch").  Dkt. No. 190 at 8, ¶ 19.  Defendants Eddie L. Tullis, Buford Rolin, and David Gehman are former members of the Poarch Tribal Council.  *Id*. at 9, ¶ 24.  Collectively, these current and former Tribal Council members are hereinafter referred to as the "Individual Defendants."

Over an extended period of time, the Individual Defendants intentionally and outrageously caused the desecration of the Hickory Ground Site.  *Id*. at 50, ¶ 223.  The Hickory Ground Site is a sacred site that is also listed on the National Register of Historic Places.  *Id*. at 5, ¶¶ 2-3.  Historically, the Hickory Ground Site was home to the Hickory Ground Tribal Town of the Muscogee (Creek) Nation.  *Id*. at 5, ¶ 2.  It was the last capital of the Muscogee (Creek) Nation before the Muscogee (Creek) Nation, including Hickory Ground Tribal Town, was forcibly removed from Alabama.  *Id*. at 5, 7, ¶¶ 2, 12.  George Thompson is the Mekko, or chief,

of the current Hickory Ground Tribal Town, which has resided in Oklahoma since its forced removal.  *Id*. at 7, ¶¶ 12, 14.  His ancestors have served as Mekko of Hickory Ground Tribal Town since time immemorial.  *Id*. at 13, ¶ 46.  As Mekko, he has heightened moral and religious obligations to care for the graves and bodies of the deceased members of Hickory Ground Tribal Town, and failing in that duty is considered to be a failure to his ancestors, Hickory Ground Tribal Town, clan, and culture.  *Id*. at 50, ¶ 225.

Among the spiritual and religious beliefs of Mekko Thompson, Hickory Ground Tribal Town, and the Muscogee (Creek) Nation are: that burial and ceremonial grounds are sacrosanct and must not be entered, let alone disturbed, without the proper religious protocol, *id*. at 17, ¶ 55; that ancestors must be left at peace in their final resting places, together with their possessions/funerary items, *id*. at 17, ¶ 56; that their descendants have a religious duty to care for the graves and remains of the deceased, *id*. at 17, ¶ 57; that certain burial protocols must be followed, *id*. at 17, ¶ 58; that archaeological examination violates the sanctity of the ancestors and destroys their spiritual existence until they are put back at peace using appropriate religious protocol, *id*. at 32, ¶ 127; that the soil that surrounds a body is considered part of the body, and separating it from the body is akin to removing a limb, *id*. at 32, ¶ 128; and that it is sacrilegious to have alcohol near ceremonial grounds, *id*. at 73, ¶ 328.  As Poarch tribal members and Tribal Council members, the Individual Defendants were presumably at least somewhat familiar with some or all of these beliefs.  *See*, *e.g.*, *id*. at 37, ¶ 162 (describing a letter from Individual Defendant Rolin acknowledging that "the beliefs and customs of the [Hickory Ground ceremonial grounds leadership]" required "reinterment in [the original resting] place"); *id.* at 51-52, ¶ 229 (stating that the "Muscogee (Creek) Nation trusted Poarch and Poarch's leadership, who claim to be Creek people, to understand the Muscogee (Creek) members' religious and cultural duties to their ancestors.").

**B.      Poarch Promised To Preserve Hickory Ground, But Then Desecrated It For Money.**

Human burials, associated funerary objects, other cultural items, remains of ceremonial grounds, and remains of various structures are located almost everywhere throughout the Hickory Ground Site.  *Id*. at 15-17, 30-31, ¶¶ 54, 116.  Poarch had long promised to preserve the Hickory Ground Site, acknowledging that destruction of the Hickory Ground Site would destroy the cultural history of Creek people.  *Id*. at 18-20, ¶¶ 67-71.  Nevertheless, sometime between 2000 and 2011, Poarch[1] directed excavations at the Hickory Ground Site.  *Id*. at 28, ¶¶ 100-102.  Poarch failed to direct appropriate protocols, such as keeping remains and surrounding soil together.  *Id*. at 32, ¶ 129.  At least 57 sets of human remains and associated funerary objects were exhumed during this period.  *Id*. at 31, ¶ 117.  These are the direct lineal ancestors of Mekko Thompson and other Hickory Ground Tribal Town members.  *See id*. at 31, ¶ 118.  Numerous other cultural items were removed as well.  *Id*. at 31, ¶¶ 119-20.  Poarch directed the storage of these ancestors and their possessions in a manner that is abhorrent in the Muscogee (Creek) religion (*e.g.*, separated from their surrounding soil and associated funerary objects, stored in newspaper and plastic bins in a non-air conditioned shed, etc.).  *Id*. at 31, 50-51, ¶¶ 120-124, 226.

Mekko Thompson and the other Plaintiffs engaged in extensive traditional dispute resolution efforts and other efforts to stop Poarch's outrageous conduct, but their efforts were to no avail.  *Id*. at 33-35, ¶¶ 139-49.  In April 2012, Poarch abruptly, without appropriate notice to Mekko Thompson and the Muscogee (Creek) Nation and in a manner abhorrent to their religion, reinterred most of the ancestors' remains and possessions *away* from their original and intended final resting places.  *Id*. at 35-36, ¶¶ 150-159.  Needless to say, the appropriate religious

---

[1] As Mekko Thompson's outrage claim demonstrates, Mekko Thompson believes that the Individual Defendants bear responsibility for all acts relevant to the outrage claim, whether because they authorized, directed, conducted, or participated in the acts.  To the extent that the Plaintiffs have been able to determine, through their own investigatory efforts, which Individual Defendants have committed specific acts, they have so alleged.  But further development of the record will be necessary in order to determine all specific acts taken by each Individual Defendant.

protocols were not followed.  *Id*. at 37, ¶ 164.  To add insult to injury, Poarch then issued a false and misleading press release about these events.  *Id*. at 37, ¶¶ 166-67.

Poarch then proceeded to build a casino and hotel right on top of the sacred and historic Hickory Ground Site—on top of remains and funerary items left behind by the excavations, historic remains of structures, and other cultural items.  *Id*. at 39-43, ¶¶ 179-183.  The main entrance of the facility directly abuts the principal ceremonial site.  *Id*.  Construction of the casino likely destroyed many other cultural items forever.  *Id*. at 28, ¶ 105.  Poarch did not ensure that construction activity was stopped when cultural items were discovered, and did not ensure that adequate records were kept of such discoveries.  *Id*. at 33, ¶¶ 134-35.  Sometime during construction, Individual Defendant Bryan again added insult to injury by distributing a false and misleading letter about the events to other tribes **nationwide**.  *Id*. at 37-39, ¶¶ 168-178.  Poarch's motivation for this shocking conduct is simple:  the casino generates hundreds of millions of dollars in gambling and resort revenue each year for Poarch and its members.  *Id.* at 46, 48, ¶¶ 202, 211.

The exhumations and construction may have since stopped (at least for now), but the injury to Mekko Thompson and the other Plaintiffs continues.  Some of their ancestors' remains and cultural items remain in storage (in plastic bins in Wetumpka and in forgotten boxes at Auburn University) others remain beneath the casino, others remain improperly reinterred, and others are at risk of being disinterred at the whim of the Individual Defendants.  Meanwhile, the Individual Defendants continue to desecrate the Hickory Ground Site by allowing the general public access to the site, and authorizing/directing the service of alcohol at the site.  *See id*. at 50-52, 73; Dkt. 179-1 at PDF pp. 6-7.  And not only are Muscogee (Creek) Nation members prevented as a practical matter from accessing the site by the presence of the casino, they have even been arrested for attempting to perform ceremonies at the Hickory Ground Site.  Dkt. 190 at 39-43, 73, ¶¶ 179-183, 325.  Moreover, the Individual Defendants have never corrected the false and misleading information they distributed in the public realm.  The Individual Defendants

could reverse, stop, or at least mitigate, the harm they have caused and continue to cause, but they have consistently refused to do so.

These events have caused Mekko Thompson to fail in his moral and religious duties, and have caused him "abject pain, sorrow, anguish, torment, suffering, helplessness, grief, and anger." *Id.* at 50, ¶ 225. He lives with an "enduring feeling of helplessness and fear…that this will happen again, *id.* at 51, ¶ 227, and the "irreparable anguish of knowing that the ancestors were wrenched from what was intended to be their final resting places, disrespected, and grotesquely mistreated." *Id.* at 51-52, ¶ 229. Together with the other Plaintiffs, he has filed this lawsuit, in part, so that the Individual Defendants will be held accountable for their egregious actions. *See id.* at 51, ¶ 227.

### C. Individual Defendants Had Timely Notice Of These Claims.

Each of the Individual Defendants was named as a defendant in the original Complaint and the First Amended Complaint filed in this matter. Dkt. Nos. 1, 57. Accordingly they have always had notice of this matter, and have always been parties to this matter. The Second Amended Complaint merely clarifies that they were named as defendants in their individual capacities as well. *Compare* Dkt. No. 57 at 5, ¶ 13, *with* Dkt. No. 190 at 8-9, ¶¶ 19, 24. *See also* Dkt. No. 159-4 at 2. The Second Amended Complaint arises out of the same conduct and series of occurrences as alleged in the original Complaint, but it adds additional specificity and clarification. For example, the original Complaint stated:

> Defendants' actions proximately caused and **continue to cause harm to Plaintiffs**. Plaintiffs are experiencing severe emotional distress because of the violation of the burial sites of their ancestors and the violation of their religious and cultural beliefs, including but not limited to their inability to respect their ancestors, pray on the ceremonial ground, and keep Hickory Ground sacred.

Dkt. No. 1 at 10, ¶ 39 (emphasis added). It also stated that the ground-disturbing activities (which ultimately continued with respect to excavation until 2011, and with respect to construction activities until 2014, *see* Dkt No. 190 at 28, 32, ¶¶ 100-02, 132, "are damaging

5

the Plaintiffs including but not limited to causing severe emotional, spiritual and dignitary harm." Dkt. No. 1 at 16, ¶ 67.  The Second Amended Complaint more clearly states an express claim of outrage against the Individual Defendants.  Dkt. No. 190 at 49-52, ¶¶ 221-29, 233-35.  The outrage claim is asserted as a continuing tort.  The Individual Defendants now move to dismiss the outrage claim.  Dkt. Nos. 204, 205.  For the reasons that follow, their motion must be denied.

## III.    STANDARD FOR MOTION TO DISMISS

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) allows a party to assert by motion a defense of "failure to state a claim upon which relief can be granted."  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

"Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the...claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 555).  "In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id*. at 93-94.  The court must assume that the factual allegations set forth in the complaint are true and must construe them in the light most favorable to the plaintiff. *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215 (11th Cir. 2012); *Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1343 (M.D. Ala. 2013).  All reasonable inferences must be

drawn in the plaintiff's favor. *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1043 (11th Cir. 2019).

A motion under Rule 12(b)(6) does not pose the question of whether the plaintiff can ultimately prevail on the merits—"a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556; *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2020) ("Whether the plaintiff ultimately can prevail on the merits is a matter properly determined on the basis of proof, which means on a summary judgment motion or at trial by the judge or a jury, and not merely on the face of the pleadings."). The burden of persuasion is on the party moving under Rule 12(b)(6) to demonstrate that no legally cognizable claim for relief exists. *Cohen v. Bd. of Trs. of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (quoting 5B Wright & Miller, *supra* § 1357) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

## IV.    ARGUMENT

Mekko Thompson need only state a claim that is plausible on its face, and that gives the Individual Defendants fair notice of the grounds upon which it rests. With respect to his claim of outrage, he has done this, while the Individual Defendants have not met their burden of showing that he has not.

Nor are the Individual Defendants entitled to a dismissal at the pleading state of the case based on their affirmative defenses. Dismissal on the basis of the affirmative defense of legislative immunity would be premature, and legislative immunity does not apply to the facts and conduct alleged in the Second Amended Complaint. Dismissal on the basis of the affirmative defense of the statute of limitations would also be inappropriate. In a case like this, outrage is a continuing tort that is not time barred. Moreover, the outrage claim relates back to

the filing of the original Complaint, which was unquestionably timely.   Accordingly, the
Individual Defendants' motion to dismiss must be denied.

### A.   Mekko Thompson has pleaded facts supporting a plausible claim for outrage.

The tort of outrage was first recognized by the Alabama Supreme Court in *Am. Rd. Serv.
Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).  The Court stated:

> we now recognize that one who by extreme and outrageous conduct intentionally
> or recklessly causes severe emotional distress to another is subject to liability for
> such emotional distress and for bodily harm resulting from the distress.  The
> emotional distress thereunder must be so severe that no reasonable person could
> be expected to endure it.  Any recovery must be reasonable and justified under the
> circumstances, liability ensuing only when the conduct is extreme.  By extreme
> we refer to conduct so outrageous in character and so extreme in degree as to go
> beyond all possible bounds of decency, and to be regarded as atrocious and utterly
> intolerable in a civilized society.

*Id*. (internal citations omitted).  The elements of the tort are, accordingly:

> (1) that the defendants either intended to inflict emotional distress, or knew or
> should have known that emotional distress was likely to result from their conduct;
> (2) that the defendants' conduct was extreme and outrageous; and (3) that the
> defendants' conduct caused emotional distress so severe that no reasonable person
> could be expected to endure it.

*Callens v. Jefferson Cty. Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000); *see also, e.g.*, *Exford
v. City of Montgomery*, 887 F. Supp. 2d 1210, 1230 (M.D. Ala. 2012).

Courts often repeat the maxim that the Alabama Supreme Court has only recognized the
tort of outrage in three circumstances:  "(1) wrongful conduct in the family-burial context; (2)
barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual
harassment."  *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (internal citations omitted)
(quoting *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).  But other circumstances may also
give rise to a viable claim of outrage.  *Ex parte Bole*, 103 So. 3d 40, 53 (Ala. 2012) ("That is not
to say, however, that the tort of outrage is viable in only the three circumstances noted in
*Potts*."); *Yeldell v. Wells Fargo Bank*, No. 09-01584, 2011 WL 13287064, at *19 (N.D. Ala.

Mar. 2, 2011) (unpublished) (stating that "no court has specifically held that a plaintiff may recover for outrage only in these three circumstances").[2]

Courts applying Alabama law have found that the tort of outrage was sufficiently pled and/or supported by sufficient evidence in numerous circumstances involving the improper treatment of human remains.  In one case with hauntingly familiar facts, a mortuary that inappropriately disinterred, desecrated, and reinterred/disposed of human remains was held liable for $2 million.  *Gray Brown-Service Mortuary, Inc. v. Lloyd*, 729 So. 2d 280, 284, 286 (Ala. 1999) (affirming a $2M general verdict for claims including outrage).  An outrage claim was also upheld when a portion of an old cemetery was damaged by the defendants conduct, which included clearing of the land and knocking down a fence and tombstones.  *Whitt v. Hulsey*, 519 So. 2d 901, 905-06 (Ala. 1987).  In another case in which an outrage claim was asserted, a funeral home was held liable for refusing to turn over a family member's body until the family paid for services it claimed it had already rendered.  *Levite Undertakers Co. v. Griggs*, 495 So. 2d 63, 64-65 (Ala. 1986) (affirming judgment in favor of plaintiffs, albeit without analysis of the outrage claim).  Liability for outrage was also upheld when a cemetery operator refused to allow burial in a particular cemetery lot just 30 minutes before the scheduled funeral, which required the plaintiffs to procure a different lot in the same cemetery.  *Cates v. Taylor*, 428 So. 2d 637, 640 (Ala. 1983).

Given the powerful emotional, cultural, religious, and personal interests surrounding the handling of human remains, it is no surprise that outrage claims have been recognized in these circumstances or that conduct like that alleged in the Second Amended Complaint has been determined to be outrageous.  As shown below, Mekko Thompson has pleaded a plausible claim

---

[2] Alabama courts and federal courts applying Alabama law have recognized outrage claims in a wide range of contexts.  *See, e.g., Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F. Supp. 2d 1336, 1355 (M.D. Ala. 2009) (supervisor's sexual harassment of an employee); *Holmes v. Oxford Chem., Inc.*, 672 F.2d 854, 857 (11th Cir. 1982) (90% reduction in disability payment); *O'Rear v. B.H.*, 69 So. 3d 106, 119 (Ala. 2011) (doctor providing addictive drugs in return for sex), *abrogated on other grounds by Ex parte Vanderwall*, 201 So. 3d 525 (Ala. 2015); *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1212-13, 1221-22 (Ala. 1990) (insurer's improper withholding of funds to force a settlement); *Rice v. United Ins. Co. of Am.*, 465 So. 2d 1100, 1102 (Ala. 1984) (firing of pregnant employee for refusing to take disability leave).

for outrage.  Such a claim should not be dismissed at the pleading stage "because reasonable [people] could differ as to the outrageousness of [a] defendant's conduct, [and] it [is] for the jury to determine whether the conduct was sufficiently extreme and outrageous to result in liability." *Rubin v. Matthews Int'l Corp.*, 503 A.2d 694, 699 (Me. 1986).  Accordingly, the Individual Defendants' motion to dismiss for the outrage claim should be denied.

### 1. The Individual Defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct.

The Individual Defendants concede that Mekko Thompson has alleged "that the Individual Defendants collectively committed outrageous acts intentionally."  Dkt. No. 205 at 11.  And they reference Mekko Thompson's allegations regarding excavation of the Hickory Ground Site, desecration of what they disrespectfully term the "archaeological findings," the continued storage of some of the human remains and cultural items excavated, *id. at* 12, and the oversight of the reinterment of some excavated remains and funerary objects, *id.* at 12-13.  While the Individual Defendants' characterization of these events is obviously much different than Mekko Thompson's is, it is Mekko Thompson's version of events that must be presumed to be true and given the benefit of all reasonable inferences at this point.  *See Reese*, 678 F.3d at 1215.  The Individual Defendants' recognition of these allegations shows that they have fair notice of what the claim is and the grounds upon which it rests.  That should be the end of the court's inquiry as to the first element of Mekko Thompson's claim of outrage.

The court need not, and should not, proceed further in order to find that Mekko Thompson's allegations are sufficient to state a claim with respect to this element.  But if it does, the court should find that the allegations are, indeed, sufficient.  Among other things, Mekko Thompson alleges:

> The Individual Defendants, knowing that Hickory Ground and the human remains and funerary objects buried there were sacred in the culture and traditional religion of Mekko Thompson, intentionally and outrageously caused the desecration of Hickory Ground by ordering that the bodies and funerary objects

buried there be exhumed, disassociated, dismantled, analyzed, and reinterred in a manner considered abhorrent in the Muscogee (Creek) traditional religion.

Dkt. No. 190 at 50, ¶ 223.  Accepting these allegations as true and drawing all reasonable inferences in favor of the Plaintiff, as the court must (*see* Section III, above), it would be impossible to conclude that knowing something is sacred to someone, yet intentionally proceeding to desecrate it, does not meet the intent element for a claim of outrage.

Mekko Thompson also alleges various other acts by Individual Defendants that a reasonable person would know, or should know, were likely to result in emotional distress. Without limitation, these acts include that the construction at Hickory Ground, authorized and directed by the Individual Defendants, "likely destroyed many cultural items forever,"  Dkt. No. 190 at 28, ¶ 105; that Poarch (necessarily via the Individual Defendants) directed the storage of Mekko Thompson's ancestors and their possessions in an "abhorrent" manner, *id*. at 31, 50-51, ¶¶ 120-124, 226; that they wrongfully reinterred the remains and funerary objects of Mekko Thompson's ancestors, without appropriate notice to Mekko Thompson, in a location and manner that they knew violated Mekko Thompson's religious beliefs, *id*. at 35-37, ¶¶ 153-58, 162, 164; that they intentionally concealed their conduct from Mekko Thompson, *id*. at 51, ¶ 227; and that they affirmatively and repeatedly lied about their conduct (including on a nation-wide scale), *id*. at 37-39, 51, ¶¶ 166-178, 228.

The Individual Defendants' argument that Mekko Thompson should be required to allege specific actions by each Individual Defendant is unavailing.  The authority they cite for this proposition is easily distinguishable.  That case, *Hughes v. City of Montgomery*, No. 12-1007, 2013 WL 146397 (M.D. Ala. Jan. 14, 2013) (unpublished), involved a claim of outrage brought against private citizens but premised solely on allegedly improper acts by a police officer, with only the threadbare allegation that the police officer was acting at the "behest" of the private citizens (which the private citizens, moreover, denied).  *Id*. at *1-2.  The plaintiff alleged no actions whatsoever by the private citizens.  *Id*. at *2.  Here, by contrast, Mekko Thompson has alleged that the Individual Defendants authorized, directed, conducted, and/or participated in

11

various actions.  And unlike in *Hughes*, where private citizens have no authority to direct the actions of police officers, Tribal Council members do have the authority, or at least the apparent authority, for the authorizations and directions complained of here (although that does not necessarily mean that they were acting in that capacity, or within the scope of that authority, or otherwise properly).

There is no obligation to plead the facts showing the Individual Defendants' intent with specificity.  Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  Nor is it reasonable to expect Mekko Thompson to be able to identify with specificity all of the acts of each Individual Defendant at this point in the proceedings, or what their intent was, when no discovery has taken place.  To the extent the Plaintiffs have been able to identify, through their own investigational efforts, specific acts by specific Individual Defendants, they have alleged those acts with specificity.  *E.g.*, Dkt. No. 190 at 35-37, ¶¶ 153-158, 162 (describing specific actions and acknowledgments by Individual Defendant Buford Rolin concerning the wrongful reinterment of Mekko Thompson's ancestors); *id.* at 37-39, ¶¶ 168-178 (describing a "false and misleading" letter that Individual Defendant Stephanie Bryan mailed to tribal leaders nationwide regarding the circumstances in question).  Having pleaded a plausible claim for outrage, Mekko Thompson is entitled to proceed with discovery to obtain the information that is necessarily within the Individual Defendants' sole control to determine which Individual Defendants took which actions, and what their intent was in taking those actions.  *See*, *e.g.*, *Schultes v. Kane*, 856 N.Y.S.2d 684, 687 (N.Y. App. Div. 2008) (reversing the dismissal of a claim for intentional infliction of emotional distress with respect to a defendant because the question of that defendant's intent "cannot be resolved without further development of the record").

At this stage in the proceedings, Mekko Thompson is not required to prove all of the elements of his outrage claim, but merely to state a plausible claim, giving defendants fair notice of what the claim is and the grounds upon which it rests; specific facts are not necessary, *see* Section III, above.  Mekko Thompson has done so with respect to the intent element.

### 2.   The Individual Defendants' conduct was extreme and outrageous.

"The sentiment of all civilized peoples regards the resting place of the dead as hallowed ground." *Smith & Gaston Funeral Dirs, Inc. v. Dean*, 80 So. 2d 227, 232 (Ala. 1955) (quoting 10 Am. Jur. *Cemeteries* § 22). "The tenderest feelings of the human heart center around the remains of the dead." *Lamm v. Shingleton*, 55 S.E.2d 810, 813 (N.C. 1949). "Who so disturbs a dead body merely to suit his own convenience does so at his own risk. He may do a wrong for which he should be punished. He knows what he is doing." *Gostowski v. Roman Catholic Church of the Sacred Hearts*, 186 N.E. 798, 800 (N.Y. 1933). Accordingly, "[l]egal authorities have long acknowledged the likelihood of mental anguish resulting from the mishandling of dead bodies." *Carney v. Knollwood Cemetery Ass'n*, 514 N.E.2d 430, 433 (Ohio Ct. App. 1986). Alabama courts too have recognized viable claims of outrage in a number of circumstances involving damage to burial grounds; improper disinterment, desecration, and/or reinterment of human remains; and other conduct involving the dead and their burial rites resulting in severe emotional distress. *See* Section IV.A above.

Most relevant of the Alabama precedent is *Whitt*, 519 So. 2d 901. In that case, the plaintiffs were unspecified "descendants" of an ancestor who had died in 1853—more than 130 years ago at the time of the lawsuit. *Id*. at 902. They alleged that in 1983, the defendant damaged a portion of the old family cemetery in which their ancestor was buried, including by clearing a portion of the land and knocking down a fence and several tombstones. *Id*. at 902, 904-906. They sued for outrage, among other claims. The Alabama Supreme Court affirmed judgment in the plaintiffs' favor, stating with respect to the outrage claim:

> We are persuaded that sufficient evidence was presented to support the submission of the outrageous conduct count to the jury. The evidence at the very least supports an inference that Whitt acted recklessly in clearing the land around the cemetery where relatives of the plaintiffs were buried. We realize that there may be differences of opinion regarding the dividing line between merely offensive conduct and conduct that is atrocious and intolerable in a civilized society. Great respect is afforded the resting place of the dead…."Our decisions lay much stress upon the sacredness of the resting ground of the dead ..., and the

13

> exclusive right of interment and possession being shown, guard the spot against unlawful invasion and give a right of action for any illegal interference....” Under the particular facts of this case, and in view of the deep human feelings involved, we find the evidence sufficient to support the claim of outrageous conduct, where the alleged act was the desecration and destruction of a portion of a family burial ground.

*Id*. at 906 (internal citations omitted) (second and third alterations in original).

Substantial persuasive precedent from other jurisdictions is in accord. *E.g.*, *Ceasar v. Shelton Land Co.*, 646 S.E.2d 689, 690-91 (Ga. Ct. App. 2007) (reversing grant of summary judgment in favor of defendants on plaintiffs’ claims, which included claim for intentional infliction of emotional distress,[3] where defendants had bulldozed over an old cemetery containing children of plaintiffs’ indirect ancestors, even though plaintiffs did not know the children’s names, nobody had been buried there in many years, and the family did not tend the area); *Contreraz v. Michelotti-Sawyers*, 896 P.2d 1118, 1121 (Mont. 1995) (“[W]e hold that one who negligently removes, withholds, mutilates, embalms, provides funeral, burial, or crematory services, or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to the deceased person’s close relatives for resulting emotional distress.”); *Carney*, 514 N.E.2d at 431, 433 (affirming denial of defendants’ motion for directed verdict after jury verdict in favor of plaintiffs on plaintiffs’ claim for emotional distress resulting from disturbance of ancestor’s gravesite and improper disposal of some of ancestor’s remains); *Scarpaci v. Milwaukee Cty.*, 292 N.W.2d 816, 820, 835 (Wis. 1980) (concluding that plaintiffs’ complaint for performing an autopsy on their deceased child without their permission and after they had made it known they did not want an autopsy states a claim upon which relief can be granted); *Papieves v. Lawrence*, 263 A.2d 118, 121 (Pa. 1970) (“We conclude that recovery may be had for serious mental or emotional distress directly caused by the intentional and wanton acts of mishandling a decedent’s body which are here alleged.”); *Codell Constr. Co. v. Miller*, 202

---

[3] Other jurisdictions may use other terms, such as “intentional infliction of emotional distress.” This is equivalent to the tort of outrage. *Archie v. Enter. Hosp. & Nursing Home*, 508 So. 2d 693, 694-95 (Ala. 1987) (explaining that the tort of outrage is often referred to as the intentional infliction of emotional distress, and that they state the same cause of action).

S.W.2d 394, 397, 399 (Ky. 1947) (stating that descendants' allegations regarding highway project's destruction of ancestor's graves were sufficient to state a cause of action, even though descendants had not visited graves in 40 or more years, did not know their ancestors, and did not remember them; but reversing jury verdict based on erroneous jury instructions); *Gostowski*, 186 N.E. at 799-800  (affirming a jury verdict that included damages for mental suffering and anguish where funeral flowers were moved to another grave and the body was reinterred in another lot without notice).

Even less egregious conduct, such as failing to deliver a memorial stone on time, or removing foliage from a burial ground, may constitute outrage, according to persuasive precedent. *E.g.*, *Rubin*, 503 A.2d at 696, 700 (finding that the complaint stated a cause of action for intentional infliction of emotional distress where the defendant failed to deliver a memorial stone in time for an unveiling ceremony as promised); *O'Neal v. Veazey*, 84 S.E. 962, 963 (Ga. 1915) (affirming verdict for plaintiffs and stating that damages for injury to the peace and happiness of the plaintiffs are recoverable where defendant removed trees and bushes from burial ground of plaintiffs' ancestors).

The West Virginia Supreme Court of Appeals case of *Whitehair v. Highland Memory Gardens, Inc.*, 327 S.E.2d 438 (W. Va. 1985), is particularly instructive as persuasive precedent. In that case, the defendant undertook to relocate bodies buried in a cemetery in preparation for construction of a new highway. *Id*. at 439. The plaintiff alleged that the remains of her sister and two aunts were lost or misplaced after removal, that the defendant failed to remove all of the remains of her cousin, and that the remains of her uncle and father were left behind and presumably now rest under the new highway. *Id*. Moreover, the defendant failed to notify her of the disinterment so that she could be present, despite its assurances that it would do so. *Id*. at 440. The Court found the failure to notify the plaintiff of the disinterment was actionable, as was the losing of bodies, and parts of bodies, after disinterment, thereby preventing reinterment. *Id*. at 442. Accordingly, the Court reversed the dismissal of the plaintiff's complaint for failure to state a claim upon which relief could be granted. *Id*. at 444. Notably, this was the result even

15

though the defendant had the lawful authority to disinter and reinter the remains—the issue was the ***manner*** in which the acts were performed.  *Id.* at 440.

Mekko Thompson has alleged conduct by the Individual Defendants that was similarly extreme and outrageous, including, without limitation, the improper exhumation of his ancestors and their possessions, in violation of his and the Muscogee (Creek) Nation's religious beliefs, Dkt. No. 190 at 17, ¶¶ 55-56, 60; the removal of his ancestors and their possessions from their final resting places, in violation of his and Muscogee (Creek) Nation's religious beliefs, *id.*; the archaeological study of his ancestors and their possessions in violation of his and Muscogee (Creek) Nation's religious beliefs, *id.* at 32, ¶ 127; the storage, at Poarch's direction (necessarily via the Individual Defendants), of his ancestors and their possessions in a manner abhorrent to the Muscogee (Creek) religion, *id.* at 31, ¶¶ 120-124; the failure to instruct personnel not to separate the surrounding soil from remains, in accordance with Muscogee (Creek) Nation religious beliefs, *id.* at 32, ¶ 128; the reinterment of some of the ancestors' remains without appropriate notice to Mekko Thompson, and in a location and manner that violated Mekko Thompson's and Muscogee (Creek) Nation's religious beliefs, *id.* at 35-37, ¶¶ 150-59, 164; and the subsequent nationwide issuance of false and misleading press releases and other communications regarding their actions,[4] *id.* at 37-39, 51, ¶¶ 166-178, 228.  The damage done in *Whitt* was minor in comparison to the damage in this case.  And the subsequent treatment of the ancestors' remains and lack of appropriate notice of the reinterment should be actionable as in *Whitehair.*

---

[4] The Individual Defendants reference some of these communications and assert that they do not "relate to or give rise to the outrage claim."  Dkt. No. 205 at 10 n.4.  Not so.  The outrage claim specifically incorporates by reference all of the factual allegations stated previously.  Dkt. No. 190 at 49, ¶ 221.  And the communications they reference do relate to the outrage claim—they involve the lack of appropriate notice of the reinterment (which is actionable as outrage, per *Whitehair,* 327 S.E.2d at 442), the knowledge that the location of the reinterment violated Mekko Thompson's religious beliefs (which is relevant to the intent element of the outrage claim), and the harmful propaganda campaign subsequent to the reinterment (which supports the claim of outrage, in accordance with *Rice*, 465 So. 2d at 1102).

Additionally, several circumstances further support the conclusion that Mekko Thompson has sufficiently pled this element of his outrage claim.  First, Mekko Thompson has alleged a pattern of activity encompassing an extended period of time, which the *Rice* court cited as a distinguishing factor supporting a claim of outrage.  *Rice v. United Ins. Co. of Am.*, 465 So. 2d 1100, 1102 (Ala. 1984).  Second, the Individual Defendants' alleged behavior involved a great many persons (including Auburn University, federal government agencies and officials, construction companies, press releases to the general public, and false and misleading communications to other tribes ***nationwide***) in addition to Mekko Thompson and the Individual Defendants, which the *Rice* court also cited as a distinguishing factor.  *Id*.  Third, the outrageous actions alleged by Mekko Thompson were allegedly directed toward an illegal purpose— violation of federal laws,[5] which the *Rice* court also cited as a distinguishing factor.  *Id*.  Finally, because they were acting under the cloak of federal delegated authority,[6] the Individual Defendants were in a position of elevated trust and had a greater responsibility to observe the law, as there were essentially no checks on their conduct concerning the Hickory Ground Site.  Taken together, these factors strongly support denial of their motion to dismiss.  *See Woodley v. City of Jemison*, 770 So. 2d 1093, 1096 (Ala. Civ. App. 1999) (stating that a police officer is in a position of heightened public trust, and holding that the question of whether conduct that breached that public trust was outrageous should go to the jury).

The Individual Defendants' disingenuous attempt to characterize their conduct as "archaeological excavation and study of the remains of unknown individuals," Dkt. No. 205 at 13, falls far short of their burden to prove that no legally cognizable claim for relief exists.  Only their actions actually relating to the exhumation and study of Mekko Thompson's ancestors and their possessions and historic Tribal Town could even arguably qualify as archaeological excavation and study.  Yet as alleged in Plaintiffs' Second Amended Complaint and discussed

---

[5] *See* Plaintiffs' Brief in Response to Tribal Defendants' Motion to Dismiss for discussion of the alleged federal law violations.

[6] *See* Plaintiffs' Brief in Response to Tribal Defendants' Motion to Dismiss for discussion of delegated federal authority, which is beyond the scope of the instant Brief.

further in Plaintiffs' Brief in Response to the Tribal Defendants' Motion to Dismiss, this so-called "archaeological excavation and study" was conducted in violation of federal law. *See, e.g.*, Dkt. No. 190 at 26-27, ¶¶ 91-99.

Even if this conduct were lawful (which it was not), that would not defeat Mekko Thompson's claim. As in *Whitehair*, 327 S.E.2d at 440-41, the ***manner*** in which the acts in question were performed would still give rise to a viable claim of outrage. And as discussed above, Mekko Thompson has alleged numerous other actions by the Individual Defendants that in no way relate to any "archaeological excavation and study," including, without limitation, destruction of cultural items with the construction of the casino; building the casino over cultural items; reinterring Mekko Thompson's ancestors without appropriate notice to Mekko Thompson, in a location they knew violated Mekko Thompson's religious beliefs, and in a manner abhorrent to those beliefs; issuing false and misleading press releases to the general public; and sending a false and misleading letter to other tribes ***nationwide***.

Finally, Mekko Thompson's ancestors are not "unknown individuals." Regardless of whether he might or might not know all of their names currently, he knows that they are his ancestors, and he is their lineal descendent, according to their (and his) traditional kinship system. Dkt. No. 190 at 55, ¶ 251. In some cases, the individuals may be even more closely identifiable as his direct ancestors based on the location of their burial. *E.g.*, *id.* at 13-14, ¶¶ 46, 52 (describing how Mekko Thompson's ancestors have served as Mekko of Hickory Ground Tribal Town since time immemorial, and how *mekkos* are buried in a certain location). No finding of direct descendancy or recency of death is necessary in order to allege a viable claim of outrage. In *Whitt*, 519 So. 2d 901, there was neither a finding of direct descendancy, nor a finding that the grave of the ancestor in question was one of those damaged. And the ancestor in question had passed away 130 years ago at the time of the desecration. *Id.* at 902. Persuasive precedent from other jurisdictions supports this proposition as well. *E.g.*, *Ceasar*, 646 S.E.2d at 690-91 (reversing grant of summary judgment in favor of defendants on plaintiffs' claims, which included claim for intentional infliction of emotional distress, where defendants had bulldozed

over an old cemetery containing children of plaintiffs' indirect ancestors, even though plaintiffs did not know the children's names, nobody had been buried there in many years, and the family did not tend the area); *Codell Constr.*, 202 S.W.2d at 397, 399 (stating that descendants' allegations regarding highway project's destruction of ancestor's graves were sufficient to state a cause of action, even though descendants had not visited graves in 40 or more years, did not know their ancestors, and did not remember them; but reversing jury verdict based on erroneous jury instructions)

At this stage in the proceedings, Mekko Thompson is not required to prove all of the elements of his outrage claim, or to show that he will ultimately prevail on the merits, *see* Section III, above.   Mekko Thompson has alleged extreme and outrageous conduct by the Individual Defendants sufficient to defeat their motion to dismiss.

> **3.     Mekko Thompson has stated a plausible claim that the Individual Defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it.**

Mekko Thompson has alleged that the Individual Defendants' actions have caused him to fail in his moral and religious duties, and have caused him "abject pain, sorrow, anguish, torment, suffering, helplessness, grief, and anger." Dkt. No. 190 at 50, ¶ 225.  He lives with an "enduring feeling of helplessness and fear…that this will happen again, *id*. at 51,  ¶ 227, and the "irreparable anguish of knowing that the ancestors were wrenched from what was intended to be their final resting places, disrespected, and grotesquely mistreated," *id*. at 51-52, ¶ 229.  He has alleged that his emotional distress (which is continuing) is so severe that no reasonable person could be expected to endure it.  *Id*. at 52, ¶ 233.

This is more than sufficient to survive a motion to dismiss for failure to state a claim. *Thomas v. Williams*, 21 So. 3d 1234, 1240 (Ala. Civ. App. 2008) ("We further conclude that Thomas's cursory statement that she was 'subjected to severe emotional distress' was sufficient to survive a motion to dismiss."); *Papieves*, 263 A.2d at 122 (reversing dismissal, holding that plaintiffs had stated a cause of action by averring "that they have suffered emotional disturbance,

mental anguish, embarrassment, and humiliation as a direct consequence of the defendants' intentional acts in withholding the body of their son from them and burying it without authorization"); *cf. Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F. Supp. 2d 1336, 1355 (M.D. Ala. 2009) (denying summary judgment and stating that it is for a jury to decide whether the defendant's behavior was outrageous and had caused the plaintiff to suffer extreme emotional distress where the plaintiff had presented evidence that the defendant's behavior "caused her significant emotional distress; she broke down in tears, lost sleep, and even sought medical help because of depression"); *Carney*, 514 N.E.2d at 432-33  (affirming denial of defendants' motion for directed verdict on plaintiffs' claim for emotional distress resulting from disturbance of ancestor's gravesite and improper disposal of some of ancestor's remains where the relatives "testified that they were horrified, angry, and saddened, and that they wept and were unable to sleep").

Even if some additional proof of reasonableness were necessary at this stage in the proceedings (which it is not), Mekko Thompson's emotional distress is reasonable.  *Contreraz*, 896 P.2d at 1122 ("It is reasonable that a family member would become emotionally distressed after learning of, but not seeing, a debasing, humiliating, or disrespectful act committed to the decedent's body.").  The results favorable to the plaintiffs in *Whitt* and similar cases from other jurisdictions discussed above (*e.g.*, *Ceasar*, *Codell Constr.*, and *Whitehair*) also support the reasonableness of Mekko Thompson's emotional distress.   Indeed, the circumstances in a number of the cases discussed above were less egregious than the outrage Mekko Thompson has alleged.

Finally, the reasonableness of Mekko Thompson's emotional distress cannot be determined in accordance with an ethnocentric worldview that does not respect Mekko Thompson's religious beliefs (including the importance of religious connection with ancestors) and ignores the impact of historical traumas such as forced relocation and centuries of desecration of Indian graves, theft of cultural patrimony, and horrific practices in the name of archaeology, scientific study, and museology.  The Individual Defendants' attempt to minimize

their conduct as "archaeological removal and study of unidentified remains and artifacts," Dkt. No. 205 at 14, and hence suggest that the severity of Mekko Thompson's emotional distress is not reasonable, comes dangerously close to urging the adoption of just such an ethnocentric standard.

Mekko Thompson's allegations of severe emotional distress are more than sufficient to survive a motion to dismiss. Although he does not need to prove reasonableness at this time, the severity of his emotional distress is reasonable. A finding that his emotional distress is not reasonable would be premature at this time, when there has been no opportunity to develop the record in order to prove the outrageousness of the Individual Defendants' conduct, the nature of Mekko Thompson's religious beliefs, and the reasonableness of his emotional distress, *inter alia*. In summary, Mekko Thompson has adequately pled each element of his outrage claim and the Individual Defendants' motion to dismiss must, accordingly, be denied.

### B.    The outrage claim should not be dismissed on the basis of legislative immunity.

Dismissal of the outrage claim on the basis of legislative immunity would be inappropriate for two reasons. First, it would be premature. Second, as a substantive matter, legislative immunity does not attach to the conduct alleged.

### 1.    It would be premature to dismiss on the basis of legislative immunity.

Dismissal on the basis of legislative immunity would be premature for several reasons. First, analysis of legislative immunity as an affirmative defense under Rule 12(b)(6) is generally limited to the face of the complaint, and the complaint in this case contains no allegations of legislative acts. Second, the Individual Defendants have failed to meet their burden because they have identified no legislative acts to which legislative immunity would attach. Third, dismissal at this stage is not advisable where the law on an issue is not settled, as is the case regarding the question of legislative immunity for Tribal Council members. And fourth, the record is not

sufficiently developed to support a determination as to whether the Individual Defendants are entitled to legislative immunity.

Legislative immunity is an affirmative defense, not a jurisdictional bar. *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir 2007) ("It is well-settled that legislative immunity is not a jurisdictional bar, but is rather a personal defense."); *Scott v. Taylor*, 405 F.3d 1251, 1255 (11th Cir. 2005) (referring to legislative immunity, in passing, as "a personal defense").  In considering whether to grant a motion to dismiss on the basis of an affirmative defense under Rule 12(b)(6), analysis is generally limited to the face of the complaint and attachments thereto. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997).  Nowhere in the Second Amended Complaint do the Plaintiffs allege or identify legislative acts by the Individual Defendants (*see* Section B.2, below, for discussion of what constitutes a legislative act).  For that reason alone, dismissal is not proper on the basis of legislative immunity.  *Cf. Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993) (noting that an affirmative defense generally will not support dismissal on a rule 12(b)(6) motion unless the defense "clearly appears on the face of the complaint"); *Marx v. Gumbinner*, 855 F.2d 783, 788-89 (11th Cir. 1988) (if a government official moves to dismiss under Rule 12(b)(6) on the basis of absolute immunity, the court must determine only whether the allegations of the complaint disclose activities protected by absolute immunity and grant or deny the motion on that basis), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991).

Moreover, the Individual Defendants, who have the burden of persuasion on this issue, have not identified any legislative acts to which they claim legislative immunity attached (*see* Section B.2, below, for discussion of what constitutes a legislative act).  They begin their argument regarding legislative immunity with the general assertion that the allegations stem from their "collective action" as Council Members, and end their argument with the conclusory statement that their actions "are plainly legislative in nature."  Dkt. No. 205 at 9, 11.  Yet nowhere in between do they identify any legislative actions they claim to have taken.  Accordingly, by failing to identify any legislative acts, the Individual Defendants have failed to

22

show that they are entitled to legislative immunity, and dismissal also should not be granted on that basis.

The Individual Defendants have asserted no Constitutional or legislative basis for their claimed legislative immunity. Therefore, Mekko Thompson can only assume they assert common law legislative immunity. The United States Supreme Court has long extended legislative immunity to federal legislators, but has only more recently extended it to state and regional legislators, in 1951 and 1979, respectively. *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). Not until 1998 did it extend legislative immunity to local legislators. *Id*. at 49, 54. And it has not yet extended legislative immunity to Tribal Council members. The question of whether Tribal Council members are entitled to legislative immunity appears to have been addressed by only a handful of tribal courts, three federal district courts, and the Eighth Circuit (this case law is discussed in Section B.2, below). No federal court in the Eleventh Circuit has considered the issue, nor have the Alabama courts. With no binding precedent on this issue, and very little persuasive precedent, the law regarding this question remains unsettled. Where, as here, the law is not settled regarding a claimed governmental immunity, it is not advisable to dismiss a complaint at this early stage of the proceedings. *See Sass v. Dist. of Columbia*, 316 F.2d 366, 366-68 (D.C. Cir. 1963); *cf. Likes v. DHL Express*, No. 10-2989, 2011 WL 13230347, at *6 (N.D. Ala. July 26, 2011) (unpublished) (denying a motion to dismiss for failure to state a claim where the Eleventh Circuit law on the issue in question was unsettled); *L.D.G., Inc. v. Robinson*, 290 P.3d 215, 222 (Alaska 2012) (stating, albeit with regard to a different legal issue, that where the law is unsettled, there is at least a viable claim, such that Rule 12(b)(6) dismissal is inappropriate).

Likewise, a case like this should not be dismissed on grounds of legislative immunity at such an early stage of the litigation, based upon the sparse record. *See N.Y. State Corr. Officers & Police Benevolent Ass'n v. New York*, 911 F. Supp. 2d 111, 136 (N.D.N.Y. 2012) ("At this stage of the litigation, based upon the sparse record, the Court cannot state as a matter of law, that defendants are entitled to legislative immunity."); *cf. Stock W. Corp. v. Taylor*, 942 F.2d

655, 664-65 (9th Cir. 1991) (concluding that it was premature for the district court to have granted summary judgment on the basis of tribal official immunity when "we cannot say on the record before us whether Taylor was acting within his representative capacity, and whether he was within the scope of his delegated authority"); *Hegner v. Dietze*, 524 N.W.2d 731, 735 (Minn. Ct. App. 1994) (affirming the district court's denial of summary judgment in favor of tribal official because a factual dispute remained over whether the official's position with the tribe was sufficient to provide him with the claimed immunity and/or privilege); *Likes*, 2011 WL 13230347, at *5 (noting the "underdeveloped record," in combination with unsettled law in the Eleventh Circuit on the issue in question, in denying the defendant's motion to dismiss for failure to state a claim).  To determine whether any immunity applies, it will be necessary to analyze the precise nature of the Individual Defendants' actions to determine whether they constitute legislative acts (and, then, whether there is some reason to qualify or limit it).  The record is simply not developed enough to undertake that analysis at this time.  Dismissal on the basis of legislative immunity would be premature.

### 2.     Legislative immunity does not attach to the conduct alleged.

Legislative immunity only attaches to actions taken "in the sphere of legitimate legislative activity." *Bogan*, 523 U.S. at 54 (citation omitted).  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id*.  Speech and debate in the legislature is the heart of what is protected, and other elements of the legislative process such as committee reports, resolutions, and the act of voting are also protected. *Gravel v. U.S.*, 408 U.S. 606, 617, 625 (1972).  But the fact that legislators perform certain acts in their official capacity as legislators does not necessarily make all such acts legislative in nature. *Id*. at 625.  For example, a legislator's communications with the executive branch and administrative agencies is not protected legislative activity. *Id*.  The Eleventh Circuit draws a line between legislative actions and administrative actions. *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1392-93 (11th Cir. 1993).  For example, acts of zoning enforcement,

24

rather than rulemaking, are not legislative. *Crymes v. DeKalb Cty.*, 923 F.2d 1482, 1485 (11th Cir. 1991). "If the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative." *Id.* "Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." *Id.*

Accordingly, the *Bogan* Court found that the actions of City Council members in introducing, voting for, and signing an ordinance were legislative because they were integral steps in the legislative process. 523 U.S. at 55-56. But a Senator's private publication of materials he had introduced into a subcommittee record was not legislative. *Gravel*, 408 U.S. at 625-26. In *Corn,* 997 F.2d 1369, a City Council's adoption of three ordinances which affected a property was protected by legislative immunity, but its decision to deny the site plan for the property was not. *Id.* at 1371, 1393. The Eleventh Circuit has characterized the following types of acts as legislative: "voting, speech making on the floor of the legislative assembly, preparing committee reports, and participating in committee investigations and proceedings." *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992) (internal citations omitted). By contrast, it has characterized the following types of acts as non-legislative: "the public distribution of press releases and newsletters, the acceptance of bribes in return for votes on pending legislative business, the administration of penal facilities, and the denial of licenses." *Id.* In addition, the *Yeldell* court held that personnel decisions are administrative, not legislative, acts. *Id.* at 1062-63.

The very few courts that have considered the question of legislative immunity for Tribal Council members have also recognized (or denied) legislative immunity depending on whether the actions in question were legislative in nature. Indeed, the cases support the proposition that tribal lawmaking activity must be directly at issue in order for legislative immunity to attach. The only federal appellate court to consider the question is the Eighth Circuit in the case of *Runs After v. United States*, 766 F.2d 347 (8th Cir. 1985). Directly at issue in that case was the validity of two Tribal Council resolutions precluding certain tribal members from running for positions on the Tribal Council. *Id.* at 348-49. The Eighth Circuit affirmed the district court's

dismissal of the complaint for a number of reasons, including legislative immunity, stating: "we believe that the individual members of the Tribal Council would enjoy absolute legislative immunity from liability . . . for official actions taken when acting in a legislative capacity. . . . Here, the two Tribal Council resolutions at issue are essentially legislative acts." *Id*. at 354-355. *Runs After* accordingly illustrates the type of case in which legislative immunity is appropriate—where adoption of tribal laws was directly at issue—which is not this type of case.

In *Wisconsin v. Baker*, 464 F. Supp. 1377 (W.D. Wis. 1978), the Tribal Council passed, and intended to enforce, ordinances to regulating hunting, fishing, ricing, trapping, and boating. *Id*. at 1379.  The State of Wisconsin sought a judgment against Tribal Council members declaring that the "promulgation and enforcement" of the laws was invalid.  *Id*.  The Tribal Council members asserted legislative immunity, but the court found that legislative immunity did not bar the claim because, "[d]espite the reference to promulgation of the codes, the action is clearly directed toward defendants' enforcement of the codes."  *Id*. at 1387.  The court implied that the enforcement of the codes was an exercise of executive powers, not legislative powers. *Id*.  The court also noted that the State did not seek to compel any legislative action.  *Id*.  *Baker* accordingly illustrates that even some involvement of tribal lawmaking activity may not be sufficient for the protection of legislative immunity to apply—if the action is primarily directed toward something outside the legislative sphere, and does not seek to compel legislative action, then legislative immunity may not be a bar.

Also instructive is *Tohono O'Odham Nation v. Ducey*, No. 15-01135, 2016 WL 3402391 (D. Ariz. June 21, 2016) (unpublished).  In *Ducey*, a state official sought to compel the production of notes, minutes, and agendas from closed sessions of two tribal legislative bodies, and to compel witnesses to testify about discussions at those closed sessions.  *Id*. at *1.  The tribe asserted legislative privilege.  *Id*. at *3.  In analyzing the question of legislative immunity for the first tribal legislative body, the court found the following factors relevant:  (1) that the closed sessions involved ad hoc decision making (*i.e.*, actions taken for a particular purposes rather than for the general public good) rather than legislative action; (2) that the actions were narrowly

focused—on efforts to purchase land to develop a casino; (3) that the actions were not legislative in nature (the court noted that the tribe had not identified a single piece of relevant legislation); and (4) that there were no hallmarks of traditional legislation—all that was revealed was that the tribal legislative bodies discussed the project in closed session. *Id.* at *4-5. The court found that the tribe had not shown that the relevant actions were legislative. *Id.* With respect to the other tribal legislative body, two resolutions were potentially relevant, so the court concluded that it would need to review notes pertaining to the two resolutions *in camera* to determine whether they were entitled to legislative privilege. *Id.* at *5. The *Ducey* court also discussed the possibility that it may be appropriate to qualify or limit legislative immunity in certain circumstances. *Id.* at *5-6.[7] *Ducey* accordingly illustrates what types of tribal actions may be legislative—those specifically relating to resolutions—and what types may not—ad hoc decision making, project-specific administrative actions, etc. It also illustrates the careful analysis, specificity, and care that should go into these determinations (which, as discussed above, would make dismissal at this stage inappropriate).

The Second Amended Complaint neither alleges nor references any legislative acts—no Tribal Council resolutions, no ordinances, no speech/deliberation regarding the same, no reports regarding the same, nothing that would normally be construed as falling within the legislative sphere. Nor have the Individual Defendants identified any such legislative acts. Thus, the Individual Defendants have not shown that they are entitled to the protection of legislative immunity.

Nor does it appear that they can. While it is possible that the Individual Defendants may have passed certain resolutions or laws that relate to the allegations in this case that could ultimately be found entitled to the protection of legislative immunity, Mekko Thompson has also alleged numerous other actions that are not of the type normally considered legislative, such as ad hoc decision-making, administrative actions with respect to the casino project, failing to give

---

[7] This issue may become relevant if the Individual Defendants identify any actions that they claim are entitled to legislative immunity.

27

appropriate notice of the reinterment of his ancestors, conducting the reinterment with "ceremonies" that violate the Muscogee (Creek) Nation religion,[8] issuing of press releases and other non-legislative communications, and more.  *See, e.g.*, Dkt. 190 at 35-39, 47-48. These are not legislative acts, so legislative immunity does not attach.  In summary, dismissal on the basis of legislative immunity would be premature, and legislative immunity does not attach to the conduct alleged in any event.

### C.   Dismissal on the basis of the statute of limitations would not be appropriate, but even if it were, the outrage claim is timely.

Dismissal on the basis of the statute of limitations would not be appropriate, but even if it were, Mekko Thompson's outrage claim is timely.  The outrage claim is asserted as a continuing tort, alleging a pattern of extreme and outrageous conduct by the Individual Defendants continuing up to (and past) the filing of the original Complaint, and even the Second Amended Complaint.  As such, it is timely filed.  Even if that were not the case, however, it relates back to the filing of the original Complaint and is, accordingly, timely.

### 1.   The outrage claim is timely.

"The statute of limitations is an affirmative defense, so 'a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred.'"  *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 872 (11th Cir. 2017) (citation omitted).  Yet instead of meeting their burden of showing that it is apparent from the face of the complaint that the claim is time barred, the Individual Defendants concede that "outrage sometimes can be a continuing tort under Alabama law," Dkt. No. 205 at 18, and that Mekko Thompson has alleged conduct "concluded by 2014 at the latest," *id.* at 19.  While

---

[8] Note that even prayer opening a legislative session should not be considered legislative. *Doe v. Pittsylvania Cty.*, 842 F. Supp. 2d 906, 916 (W.D. Va. 2012) (stating that "legislative immunity only applies to activities integral to the legislative process and does not embrace non-legislative acts such as opening prayers").  *But see Dobrich v. Walls*, 380 F. Supp. 2d 366, 376-77 (D. Del. 2005) (holding that school board members were entitled to legislative immunity in connections with policies and practices adopted regarding opening prayers for meetings).

Mekko Thompson disputes that the conduct in question concluded in 2014, these concessions by the Individual Defendants demonstrate that dismissal is not appropriate because it is not apparent from the face of the complaint that the claim is time barred.  Moreover, as the following discussion will illustrate, that is not the case here.  Accordingly, the statute of limitations is not currently an appropriate basis for dismissal.

The outrage claim is timely.  The statute of limitations begins to run upon the Individual Defendants' last tortious act.  Here, Mekko Thompson has alleged a pattern of outrageous conduct, continuing up to (and past) not only the filing of the original Complaint, but the Second Amended Complaint as well.  This constitutes a continuing tort of outrage that is not time barred.  Even if the statute of limitations were deemed to have begun running earlier (which it should not be), the Second Amended Complaint relates back to the original Complaint, as discussed below, and is therefore timely.  The Alabama Supreme Court has held that the statute of limitations for the tort of outrage is two years.  *Archie v. Enter. Hosp. & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1987).  The statute of limitations normally begins to run not from the date of a defendant's actions, but rather from the date of the plaintiff's injury.  *Payne v. Ala. Cemetery Ass'n*, 413 So. 2d 1067, 1072 (Ala. 1982) (holding that where bodily remains and a casket went missing in 1975, the statute of limitations did not begin to run until 1979, when it was discovered that the remains and casket were missing and the injury to the plaintiff actually occurred); *see also Stephens v. Creel*, 429 So. 2d 278, 280 (Ala. 1983) (explaining in dicta that "in the tort context a showing of injury or damage is an integral part of the cause of action").

However, the Alabama Supreme has also recognized that the tort of outrage may be a continuing tort.  *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1216 (Ala. 1990).  This term describes "a defendant's repeated tortious conduct which has repeatedly and continuously injured a plaintiff."  *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983).  For statute of limitations purposes, "an action such as this, arising from continuing dealings between the parties, will not be barred until ***two years after the last tortious act by the defendant***, particularly

where the defendant's conduct does not cross the threshold and become an actionable tort until it is demonstrably extreme and outrageous." *McDonald*, 567 So. 2d at 1216 (emphasis added).

In *McDonald*, the plaintiff alleged an ongoing pattern (going back five years or more, and continuing until he filed suit) by an insurance company of delaying payments and refusing to pay for medically necessary items in an attempt to get him to settle his medical claim. *Id*. at 1210, 1212, 1215-17, 1220. The defendant argued that the plaintiff's outrage claim was barred by the statute of limitations. *Id*. at 1215. The court held that it was not, because it was a "continuing tort," with the conduct "continuing even up to the time the action was filed." *Id*. at 1217. Citing the relatively high standard for an outrage claim, the court explained its reasoning as follows:

> Thus, there is clearly a threshold beyond which an insurance company's recalcitrance must go before it crosses into outrageous conduct. If we were to hold that McDonald was barred from bringing this action upon the expiration of…two years after the first time he suffered severe emotional distress over CNA's handling of his claim, we would place plaintiffs in the untenable position of not knowing whether their claim is premature and thus subject to summary judgment for lack of a genuine question of material fact,…or has been in existence long enough for the period of limitations to run, as CNA argues here. The better policy would be to encourage cooperation and attempts to work out differences, like McDonald's attempts in this case, and to preserve the cause of action should those attempts prove futile.

*Id*. at 1216. *McDonald* is the case most similar to the instant case, as well as the most instructive. And it clearly contemplates that a plaintiff could suffer severe emotional distress as a result of a defendant's actions on numerous occasions, without the statute of limitations beginning to run until the last of those occasions.

By contrast, in *Jennings v. City of Huntsville*, 677 So. 2d 228 (Ala. 1996), the plaintiff alleged actions by the defendants that culminated in, and ended with, the plaintiff's arrest and conviction. *Id*. at 230. The plaintiff sought to characterize the defendants' actions as "continuous torts," claiming that their injuries to him continued and renewed every day he was in jail and every day afterwards that the defendants remained silent about their actions. *Id*. Unsurprisingly, the court disagreed. *Id*. Likewise, in *Moon*, 435 So. 2d 218, the plaintiff alleged personal injuries arising from a pharmacy selling the wrong insulin. *Id*. at 219. The court held

30

that the injury occurred, and the cause of action accrued, when the plaintiff became ill from taking the insulin, not when she later discovered she was taking the wrong insulin. *Id.* at 220. Thus, the claim was time barred. *Id.* In an attempt to get around the statute of limitations, the plaintiff attempted to argue that the pharmacy's negligence constituted a "continuous tort," beginning on the date of the sale and continuing on every occasion when she injected herself with the insulin. *Id.* at 221. This argument, if successful, would have brought the claim within the statute of limitations. But the court rejected this plaintiff's "continuous tort" argument as well. *Id.* These cases are easily distinguishable from the present case. Both *Jennings* and *Moon* involve one action, or a discrete set of actions, by the defendants with a definite end date, followed by no further actions by the defendants, and expiration of the statutory limitations period. Thus, the plaintiffs had to resort to artifice in their unsuccessful attempts to evade the statute of limitations—that each day in jail, or each injection of insulin continued the defendants' torts. As discussed below, that is not at all the case here, where the Individual Defendants' conduct continued (and still continues) over an extended period.

Here, as in *McDonald*, the Mekko Thompson has alleged an ongoing pattern of outrageous behavior by the Individual Defendants that has repeatedly and continuously caused him severe emotional distress going back numerous years, and continuing until (and past) the filing of the original Complaint, as well as the Second Amended Complaint. That is the very definition of a continuing tort of outrage.

The allegations in both the original Complaint and the First Amended Complaint emphasize the continuing nature of the outrage. The original Complaint specifies that:

> Defendants' actions proximately caused and **continue to cause harm to Plaintiffs**. Plaintiffs are experiencing severe emotional distress because of the violation of the burial sites of their ancestors and the violation of their religious and cultural beliefs, including but not limited to their inability to respect their ancestors, pray on the ceremonial ground, and keep Hickory Ground sacred.

Dkt. No. 1 at 10, ¶ 39 (emphasis added); Dkt. No. 57 at 10, ¶ 39.  The ground-disturbing activities (which ultimately continued with respect to excavation until 2011, and construction activities until 2014, *see* Dkt. No. 190 at 28, 32-33, ¶¶ 100-102, 132-133, "are damaging the Plaintiffs including but not limited to causing severe emotional, spiritual and dignitary harm," Dkt. No. 1 at 16, ¶ 67; Dkt. No. 57 at 16, ¶ 67.  The Second Amended Complaint alleges that "Poarch's construction of a casino over the Plaintiffs' sacred burial grounds, its removal of the Plaintiffs' ancestors from what was intended to be their final resting place, and its mistreatment of the remains and artifacts has caused, and **continues to cause, harm to the Plaintiffs**," who "bring this lawsuit to remedy past damage and stop further damage." Dkt. No. 190 at 6, ¶¶ 6, 9 (emphasis added).   The Second Amended Complaint likewise specifies that that the harm and emotional distress from the outrageous conduct "is, and will be, **continuing** until such time as Poarch is required to take appropriate remedial measures."  *Id.* at 52, ¶ 233 (emphasis added).  It further alleges that some remains of Plaintiffs' ancestors and other sacred items have still not been reinterred and are being mistreated and damaged, and that all remains located outside of their original burial locations will not be at peace until they are back in their intended final resting places.  *Id.* at 17, 31, 50-52, ¶¶ 55-56, 60, 117-124, 223, 225-233.  All of these are atrocities in the Muscogee (Creek) religion that continue to cause severe emotional distress to Mekko Thompson.  *Id.* at 50-52, ¶¶ 225-233.  As then-Poarch chairman and Tribal Defendant Buford Rolin acknowledged in 2010, "the beliefs and customs of the [Hickory Ground ceremonial grounds leadership]" require "reinterment in [the original resting] place." *Id.* at 37, ¶ 162.  Both complaints seek an injunction to stop the continuing harm.  *See* Dkt. No. 1 at 24-25, ¶¶ 100-106; *id.* at 25 (requesting injunction enjoining Defendants from "disturbing the Hickory Ground premises" and "restor[ing] Hickory Ground to its pre-excavation condition and to reinter the remains and objects at the sacred places where they were excavated" in order to "stop such activities and prevent the harms [Plaintiffs] suffer."); Dkt. No. 57 at 25-26, ¶¶ 100-106; Dkt. No. 190 at 58, 79-80, ¶ 261.

Accordingly, Mekko Thompson asserts that the Individual Defendants' tortious acts continue to the present. Even if the court were to adopt the Individual Defendants' approach (which it should not)—that the last allegedly tortious act concluded in 2014, with the completion of construction of the Tribe's hotel and gaming facility—the original Complaint (to which the Second Amended Complaint relates back) was actually filed *before* that so it is not time barred. The only other possible approach (which the court should not adopt either) would be to determine that the statute of limitations began to run at some earlier date of injury. However, as *McDonald* instructs (and as the discussion regarding elements of outrage in Section A, above illustrates), that would involve an analysis and determination of precisely when, in the extended course of continuing dealings between the parties, the threshold for the tort of outrage was met. In other words, when did the Individual Defendants' conduct become sufficiently outrageous, and Mekko Thompson's emotional distress become sufficiently severe, to establish the elements of the tort of outrage? Such an analysis is not appropriate here for several reasons. First, as discussed above, it goes beyond what is permitted for analysis of an affirmative defense in the context of a Rule 12(b)(6) motion. Second, as discussed and illustrated in Section A, above, the record is simply not yet developed enough to undertake such an analysis. And third, it would be inconsistent with the *McDonald* court's instruction that "[t]he better policy would be to encourage cooperation and attempts to work out differences…and to preserve the cause of action should those attempts prove futile." 567 So. 2d at 1216. That is exactly what the Plaintiffs in this case did, both before and after filing suit, *see* Dkt. No. 190 at 33-34, ¶¶ 139-144 (describing extensive traditional dispute resolution efforts); Dkt. No. 156 (staying case in January 2018 pending settlement negotiations); Dkt. No. 161 (lifting the stay approximately a year and a half year later, when settlement discussions were unsuccessful), and they should not now be penalized for it. In summary, the outrage claim is timely.

**2.**      **Although it does not need to, the outrage claim relates back to the filing of the original Complaint.**

It does not actually matter whether the outrage claim relates back to the filing of the original Complaint because, as discussed in Section C.1 above, the outrage claim is a continuing tort that continued up to (and past) even the filing of the Second Amended Complaint. Assuming for the sake of argument that relation back was required, the outrage claim does properly relate back to the filing of the original Complaint because (1) it arises out of the same conduct, transaction, or occurrence set out in the original pleading; and (2) the Individual Defendants were already parties to the case, and the Second Amended Complaint merely clarifies that they are being sued in the individual capacities, as well as their official capacities.

a)      *Change in capacity is not a change in parties.*

Rule 15(c)(1) of the Federal Rules of Civil Procedure[9] provides, in relevant part, that an amendment to a pleading relates back to the date of the original pleading when:

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; *__or__*
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

---

[9] Mekko Thompson agrees with the Individual Defendants' assessment that that law is unsettled as to whether Alabama or Federal Rules of Procedure govern relation back in cases like this one, but that the rules and their interpretations are substantially similar.  *Chumney v. U.S. Repeating Arms Co.*, 196 F.R.D. 419, 428 (M.D. Ala. 2000) (noting that the language of Alabama Rule of Civil Procedure 15(c) is "virtually identical to its federal counterpart," and that an Alabama state court would have "presumably reached a result identical to the one which a federal court would reach in applying Rule 15(c) of the Federal Rules of Civil Procedure."); *Ex parte Novus Utils., Inc.*, 85 So. 3d 988, 996 (Ala. 2011) ("We note that federal decisions construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure because the Alabama Rules were patterned after the Federal Rules.").

(emphasis added).  Mekko Thompson asserts that a mere change in capacity, for a defendant who is already a party, does not constitute a change in party for purposes of Rule 15(c)(1)(C).  6A Wright & Miller, *supra* § 1498.2. ("An amendment by which plaintiff seeks to change the capacity in which defendant is being sued also does not change the parties before the court and typically will relate back without needing to meet the other requirements in Rule 15(c)(1)(C)."); *cf. First Nat'l Bank of Birmingham v. Chichester*, 352 So. 2d 1371, 1373 (Ala. Civ. App. 1977) ("Though the amendment here was designated as an addition of parties defendant, it was in fact and effect a mere change in the capacity of the defendants…. Of course, the amendment related back…."). The cases cited by the Individual Defendants are not to the contrary. For example, in the case of *Powers v. Graff*, 148 F.3d 1223 (11th Cir. 1998), on which the Individual Defendants primarily rely, the issue was not merely a change in capacity, but rather a change in parties. The plaintiffs in that case originally sued a corporation then, in their Fourth Amended Complaint three years later, added control persons of the corporation as defendants. *Id.* at 1225. Notably, these defendants were not previously parties to the case *in any capacity*—they were entirely new defendants. *Id.* at 1227-28. Therefore, Rule 15(c)(1)(C) did not apply in *Powers*.

Accordingly, the outrage claim need only assert a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading, which it does. An amended complaint relates back to the original complaint when "the same substantial facts are pleaded merely in a different form." *Prior v. Cancer Surgery of Mobile, P.C.*, 959 So. 2d 1092, 1095 (Ala. 2006). In *Prior*, a plaintiff's amended complaint made new factual allegations, and attempted to hold a defendant vicariously liable for the actions of a different doctor, on a different day, from what she had alleged in the original complaint. *Id.* at 1097. The court found that the amended complaint did not relate back. *Id.* By contrast, in *Callens*, 769 So. 2d 273, the plaintiff amended her complaint to add claims for personal injury and negligent hiring, training, and supervision. *Id.* at 276. The plaintiff alleged that the new claims arose out of the same events as the claims in the original complaint. *Id.* at 278. The court reversed the trial court's dismissal of the new claims, stating that it was possible that the

negligent acts alleged could have related back to the date of the original complaint. *Id*. Here, the Individual Defendants do not dispute that the outrage claim "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading" as required by Rule 15(c)(1)(B). Therefore, the court should conclude that the outrage claim relates back to the filing of the original Complaint.

> b)   ***The outrage claim relates back to the initial filing.***

Even if the change in capacity did constitute a change in party (which it did not), the outrage claim should still relate back under Rule 15(c). "The purpose of the relation back concept is to permit a claim to be tried on its merits rather than being dismissed based on a technicality so long as the purpose underlying the statute of limitations has been satisfied." *Ex parte Novus Utils., Inc.*, 85 So. 3d 988, 997 (quoting *Mitchell v. CFC Fin., LLC*, 230 F.R.D. 548, 549–50 (E.D. Wis. 2005)); *see also* James Wm. Moore, *Moore's Federal Practice* § 15.19(3)(a) (3d ed. 2020).

> The primary purpose of statutes of limitation is to ensure that defendants have notice of an action against them before evidence has been lost or becomes unavailable and with enough time to prepare an adequate defense. Thus, if a party has been notified of litigation involving a specific factual occurrence, it has received the protection that the statute of limitations requires. Under such circumstances, courts should freely grant leave to amend.

*Ex parte Novus Utils.*, 85 So. 3d at 997 (internal citations omitted). Even the case primarily relied upon by the Individual Defendants, *Powers*, notes that "the relation back provisions of Rule 15 are to be somewhat liberally applied." 148 F.3d at 1226.

The sole basis for the Individual Defendants' argument that the outrage claim does not relate back is that it is levied against "newly-added" defendants. Dkt. No. 205 at 6, 16-18. While their argument might hold water if these defendants were truly brand new to the litigation and did not have notice of the claims against them, under Rule 15(c), amendments to the capacity in which *existing* defendants are named *do* relate back and are timely if the original complaint against such defendants was timely.

Here, all nine Tribal Council defendants that Plaintiffs name in their *individual and official* capacities in the Second Amended Complaint were *already named* in the First Amended Complaint in their *official* capacities. *Compare* Dkt. No. 57 at 5, ¶ 13, *with* Dkt. No. 190 at 9, ¶ 24.[10] Relation back under Rule 15(c) focuses on whether defendants were aware of the claims asserted against them in an amended complaint within the statute of limitations. Tellingly, the only cases cited by the Individual Defendants involve addition of entirely new parties to the lawsuit, and not amendments like this one that are limited to the capacity in which *existing* defendants are named. *See, e.g.*, *Powers*, 148 F.3d at 1225 (involving the addition of control persons of a corporation as defendants, when they had not been previously made defendants in any capacity).

Numerous courts have rejected the Individual Defendants' argument that a proposed amendment to the capacity in which an existing defendant is named does not relate back because the initially-named capacity should be deemed an affirmative choice by the plaintiff not to name the correct defendant. In *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253 (11th Cir. 1983), the Eleventh Circuit held that an amendment adding a company owner as a defendant related back because the original complaint named his company as a defendant. *Id.* at 1258. The court held that as owner of the company, he "was on notice as to the action when it was first filed," and "knew or should have known, but for a mistake by [the plaintiff], that he would have been named as a defendant when the complaint was filed." *Id.* The Individual Defendants seize on the word "mistake," arguing that the outrage claim cannot relate back

---

[10] As the Supreme Court made clear in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010), "focusing on [Plaintiffs'] knowledge" regarding defendants' identities, as the Individual Defendants do here, is "the wrong starting point." *Id.* at 548. "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known…, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Id.* Furthermore, "[n]othing in the case law or in the text of Rule 15(c) limits its applicability to unsophisticated plaintiffs, particularly in light of the Supreme Court's repeated statements in *Krupski* that it is a defendant's knowledge that is relevant for Rule 15(c) analysis." *Patrick v. Garlick*, 66 F. Supp. 3d 325, 328 (W.D. N.Y. 2014) (quoting *Gerloff v. Hostetter Schneider Realty*, No. 12-9404, 2014 WL 1099814, at *5 (S.D.N.Y. Mar. 20, 2014)).

because it was not a "mistake" not to name the Individual Defendants in their individual capacities originally.  *See, e.g.*, Dkt. No. 205 at 14-17.  However, the *Itel* court also instructs that "we read the word 'mistake' in Rule 15(c) liberally."  *Itel*, 707 F.2d at 1258 n.9.

In *Hill v. Shelander*, 924 F.2d 1370 (7th Cir. 1991), the Seventh Circuit found that an amendment naming a defendant police officer in his individual capacity related back where the prior complaints did not identify a capacity.  *Id.* at 1377-78.  The Seventh Circuit reversed the district court's grant of summary judgment on statute of limitation grounds, concluding that:

> [the plaintiff's] amendment relates back to the filing of the suit because [the officer] was already before the court and the effect of the amendment was merely to correct the capacity in which he was sued.  Since there was no surprise to defendant, and because plaintiff satisfied the requirements of Rule 15(c), it is fair and wholly consistent with the spirit of the Rule to permit relation back.

*Id.* at 1378.  The court added that "[e]ven if [the plaintiff's] first complaint named [the officer] in his official capacity rather than in no capacity at all, it would be entirely consistent with Rule 15(c) to permit relation back" because the plaintiff sought redress for alleged injuries the officer personally inflicted on the plaintiff and alleged that the officer bore responsibility for using excessive force.  *Id.*

Indeed, "[i]t would be a bizarre result were this Court to hold that a plaintiff could amend his complaint under Rule 15(c) when he identified the wrong defendant, but could not amend his complaint when the right defendant is named in the wrong capacity."  *Id.* at 1377.  "The very purpose underlying relation back is to permit amendments to pleadings when the limitations period has expired, so long as the opposing party is not unduly surprised or prejudiced," and a mere amendment to capacity "greatly reduces the risk that a party will be without notice, because the party itself has already been identified correctly and has received notice."  *Id.*  Because "Rule 15(c) is a liberal pleading rule designed to prevent parties from nipping legitimate grievances in the bud by asserting formal objections," preventing amendment "would carve out a restrictive exception to Rule 15(c), inconsistent with its broad purposes."  *Id.*

Similar facts have resulted in the same outcomes in the Fourth, Fifth, and Eighth Circuits. *See Robinson v. Clipse*, 602 F.3d 605, 609-10 (4th Cir. 2010) (finding amendment related back where plaintiff sought to replace defendant police department with police officer in his individual capacity); *Sanders-Burns v. City of Plano*, 594 F.3d 366, 379-80 (5th Cir. 2010) (amendment naming police officer in individual capacity related back where officer was already a defendant by virtue of being named in his official capacity; "relation back is appropriate because the defendant is already before the court" (internal citation and quotation omitted)); *Sunkyong Int'l, Inc. v. Anderson Land & Livestock Co.*, 828 F.2d 1245, 1251-52 (8th Cir. 1987) (plaintiff's proposed amendment related back where plaintiff sought to name defendants in their individual capacities *and* as trustees, and original complaint named defendants only in individual capacity; "[a]n amendment which simply changes the capacity in which a person is sued, without changing the ultimate liability sought to be imposed, relates back to the date of filing the original complaint" (internal citations and quotation marks omitted)).

Here, the nexus for purposes of notice is identical to the nexus in *Hill* and much closer than the nexus in *Itel*. All the individual Council members of the Poarch Band—and not just the Poarch Band itself—were named in the original complaint. Furthermore, in the original complaint, Plaintiffs alleged that, given Defendants' knowledge that Hickory Ground "contained the burial sites of Plaintiffs' ancestors" and has "historical, cultural, and spiritual significance to Plaintiffs," "[i]t was for[e]seeable that excavating the human remains and associated funerary objects of Plaintiffs' ancestors would cause emotional harm to Plaintiffs." Dkt. No. 1 at 10, ¶ 38; Dkt. No. 57 at 10, ¶ 38. Plaintiffs also alleged that "Defendants' actions proximately caused and continue to cause harm to Plaintiffs," who "are experiencing severe emotional distress because of the violation of the burial sites of their ancestors and the violation of their religious and cultural beliefs, including but not limited to their inability to respect their ancestors, pray on the ceremonial ground, and keep Hickory Ground sacred." Dkt. No. 1 at 10, ¶ 39; Dkt. No. 57 at 10, ¶ 39.

The Tribal Defendants responded by asserting that Poarch tribal officials "retain sovereign immunity when acting in their official capacity." Dkt. No. 101 at 3. Thus, the Tribal Defendants knew, or should have known, that the emotional distress claims were intended to be against them in their individual capacities. *See, e.g.*, *Hill*, 924 F.2d at 1378 (holding that even if plaintiff had expressly named the defendant in his official capacity in plaintiff's original complaint (rather than not specifying capacity), the fact that plaintiff sought a remedy unavailable in an official capacity suit effectively notified defendant that the lawsuit was against him personally); *Sanders-Burns*, 594 F.3d at 378 (5th Cir. 2010) (finding that defendant was sufficiently notified because "[t]he inclusion of the affirmative defense of qualified immunity…suggests that the attorney representing [the defendant] in his official capacity, is likely to have communicated to [the defendant] that he may have been sued in his individual capacity"). Thus, the Tribal Defendants' response indicated that they were on notice that, but for misnomer by Plaintiffs, they would have been named in their individual capacities.

The Tribal Defendants cite no case in which amended pleadings to make a change in capacity has been held to bar relation back under Rule 15(c). Instead, the overwhelming weight of authority allows relation back where the amendment merely changes the capacity in which the defendant is named. Furthermore, "[c]onstructive notice satisfies Rule 15(c)'s requirements and can be imputed to a new defendant through her attorney if that attorney also represents the parties originally sued." *Lindley v. Birmingham*, 652 F. App'x 801, 804 (11th Cir. 2016). Thus, Mekko Thompson's outrage claim relates back.

## V.   CONCLUSION

Mekko Thompson has stated a plausible claim for outrage. And neither legislative immunity nor the statute of limitations provides an appropriate basis for dismissal. Accordingly, the Court should deny the Individual Defendants' motion to dismiss in its entirety. If the motion is granted to any extent, Plaintiffs request that the Court condition such dismissal on the ability

of Plaintiffs to submit a revised complaint. This is consistent with the liberal policy in favor of allowing amendments under Fed. R. Civ. P. 15(a)(2) (the "court should freely give leave when justice so requires."). *See also Espey v. Wainwright*, 734 F.2d 748, 750 (11th Cir. 1984).

Respectfully submitted this 6th day of July, 2020.


s/ *Lauren J. King*

OF COUNSEL

Lauren J. King

Email: lauren.king@foster.com

Foster Garvey PC

1111 Third Avenue, Suite 3000

Seattle, WA 98101

Tel: 206-447-6286

*Counsel for Plaintiffs*

(*Admitted Pro Hac Vice*)


s/ *Stewart Davidson McKnight, III*

Stewart Davidson McKnight , III (ASB-6258-G63S)

Email: dmcknight@dillardmcknight.com

Dillard, McKnight, James & McElroy, LLP

2700 Highway 280

Suite 110 East

Birmingham, AL 35223

Tel: 205-271-1100

*Counsel for Plaintiffs*

**<u>Certificate of Service</u>**

I hereby certify that on the 6th day of July, 2020, I caused to be electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties entitled to receive notice.


 s/ *Lauren J. King*
Lauren J. King, Of Counsel

42

# TAB 213-3

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action Number: |
| POARCH BAND OF CREEK INDIANS, et al., | ) | 2:12-cv-01079-MHT-CSC |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE AND MEMORANDUM IN SUPPORT OF RESPONSE TO**
**TRIBAL DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**AND SUPPLEMENTAL COMPLAINT**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| APA: | Administrative Procedures Act |
| ARPA: | Archaeological Resources Protection Act |
| BIA: | Bureau of Indian Affairs |
| Federal Defendants: | United States Department of the Interior, National Park Service, Bureau of Indian Affairs, Tara Sweeney (the Assistant Secretary for Indian Affairs within the Department of the Interior), David Vela (Acting Director of the National Park Service within the Department of the Interior), and David Bernhardt (Secretary of the United States Department of the Interior). |
| IGRA: | Indian Gaming Regulatory Act |
| IRA: | Indian Reorganization Act |
| NAGPRA: | Native American Graves Protection and Repatriation Act |
| NHPA: | National Historic Preservation Act |
| NPS Agreement: | National Park Service Agreement, Dkt. 190-1, Ex. I |
| Poarch: | Poarch Band of Creek Indians |
| RFRA: | Religious Freedom Restoration Act |
| RLUIPA: | Religious Land Use and Institutionalized Persons Act |
| SHPO: | State Historic Preservation Officer |
| THPO: | Tribal Historic Preservation Officer |
| Tribal Defendants: | Poarch, the PCI Gaming Authority, the officials in charge of those entities,[1] and the Poarch Tribal Historic Preservation Officer |

---

[1] For Poarch, these officials are Tribal Council members Stephanie Bryan, Robert McGhee, Amy Bryan, Charlotte Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells. Dkt. 190 at 8. For PCI Gaming Authority, these officials are Board members Westly Woodruff, Billy Smith, Eddie Tullis, Teresa Poust, and Timothy Manning. *See* Dkt. 207 at 1; Dkt. 190 at 8-9.

## TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ........................................................................... i

I.     INTRODUCTION ................................................................... 16

II.    BACKGROUND ................................................................... 17

III.   STANDARD FOR MOTION TO DISMISS ................................. 19

IV.   ARGUMENT ...................................................................... 21

     A.   Tribal Defendants' authority does not include unchecked power to violate applicable law; they do not have sovereign immunity under *Ex Parte Young*. ...................................................................21

         1.   Defendants Poarch Band of Creek Indians and PCI Gaming do not have sovereign immunity from Plaintiffs' claims against them as delegees of federal authority. ...................................................21

         2.   Tribal official Defendants are not immune from *Ex Parte Young* claims for ongoing violations of applicable law. ...........................................25

     B.   The Plaintiffs' Indian Reorganization Act claim should not be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. ...................................................................39

     C.   The Plaintiffs' promissory estoppel claim should not be dismissed. .....................39

         1.   The promissory estoppel claim is timely. ....................................................40

         2.   Plaintiffs have alleged the elements of promissory estoppel. ....................50

         3.   The Promissory Estoppel Claim is Not Barred by the Statute of Frauds. ...................................................................61

     D.   The Plaintiffs' unjust enrichment claim should not be dismissed. ........................63

         1.   Unjust enrichment claims include the loss of rights in property. ..............63

         2.   Plaintiffs allege that the Tribal Defendants have retained a benefit to the loss of the Muscogee (Creek) Nation. ...............................................64

         3.   Plaintiffs' unjust enrichment claim is timely. .............................................65

         4.   The statute of frauds does not bar Plaintiffs' unjust enrichment claims. ...................................................................67

     E.   The Plaintiffs have stated a claim under NAGPRA. ...........................................68

         1.   NAGPRA requirements. ...............................................................................69

2.      Plaintiffs' claims. ............................................................73

3.      NAGPRA provides a private right of action and broad equitable
        authority to the Court to craft a remedy for the Tribal Defendants'
        violations.........................................................................79

F.      The Plaintiffs have stated a claim against the Tribal Defendants under
        ARPA.....................................................................................82

G.      The Plaintiffs have stated a claim against the Tribal Defendants under the
        NHPA.....................................................................................85

1.      NHPA imposes a mandatory process for assessing impacts on
        historic places.................................................................85

2.      NHPA's requirements apply to the Tribal Defendants because they
        assumed NHPA obligations by agreement with the National Park
        Service............................................................................86

3.      The Plaintiffs have alleged various "undertakings" under the
        NHPA...............................................................................87

4.      The Tribal Defendants violated the NHPA................................91

H.      The Plaintiffs have stated a claim against the Federal Defendants and
        Tribal Defendants under RFRA because Tribal Defendants are federal
        actors whose actions are substantially burdening Plaintiffs' religious
        exercise. ................................................................................95

I.      This Court should not dismiss Count VIII of the Second Amended
        Complaint seeking relief from the application of NAGPRA and ARPA in
        violation of Plaintiffs' rights of religious exercise. ................................95

1.      NAGPRA's "ownership or control" rule should be applied to
        honor Plaintiffs' traditional kinship structure. ..........................96

2.      Congress intended NAGPRA to honor tribes' religious connections
        with their ancestors by allocating control over remains and cultural
        objects to the tribes and members that are related to such remains
        and cultural objects. .........................................................97

3.      Tribal Defendants' and Federal Defendants' application of
        NAGPRA substantially burdens Plaintiffs' exercise of religion in
        violation of the Free Exercise Clause, RFRA, and RLUIPA...................99

J.      Poarch is not a necessary and indispensable party under Rule 19......................101

V.      CONCLUSION............................................................................ 105

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967)....................................................................................7

*Alabama v. PCI Gaming Authority,*
    801 F.3d 1278 (11th Cir. 2015) ........................................................10, 11, 15, 16

*Ameritech Corp. v. McCann,*
    297 F.3d 582 (7th Cir.2002) ....................................................................21

*Arlington Coal. on Transp. v. Volpe,*
    458 F.2d 1323 (4th Cir. 1972) ..................................................................8

*Arthur v. Thomas,*
    974 F. Supp. 2d 1340 (M.D. Ala. 2013) ....................................................5

*Artichoke Joe's v. Norton*,
    216 F. Supp. 2d 1084 (E.D. Cal. 2002)....................................................89

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................5

*Auburn University v. IBM,*
    716 F. Supp. 2d 1114 (M.D. Ala. 2010) ..........................................26, 27

*Bassett v. Mashantucket Pequot Tribe,*
    204 F.3d 343 (2d Cir. 2000).....................................................................86

*Beatty v. Kurtz,*
    27 U.S. 566 (1829)......................................................................32, 33, 35

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................5

*Berry v. Druid City Hosp. Bd.,*
    333 So. 2d 796 (Ala. 1976).......................................................................53

*Boarhead Corp. v. Erickson,*
    923 F.2d 1011 (3rd Cir.1991) ...................................................................78

*Bonnichsen v. U.S. Dep't of Army,*
    969 F. Supp. 614 (D. Or. 1997) ...............................................................65

*Branch Banking & Tr. Co. v. McDonald,*
    No. 2:13-CV-000831-KOB, 2013 WL 5719084 (N.D. Ala. Oct. 18, 2013) ...................27, 31

iv

*Brown v. Maplewood Cemetery Ass'n,*
    89 N.W. 872 (1902) ........................................................................33

*Burlington N. & Santa Fe Ry. Co. v. Vaughn,*
    509 F.3d 1085 (9th Cir. 2007) ......................................................11

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014)........................................................................85

*Bush v. Bush,*
    278 Ala. 244, 177 So.2d 568 (1964) ............................................46

*Caddo Nation of Oklahoma v. Wichita & Affiliated Tribes,*
    786 F. App'x 837 (10th Cir. 2019) ........................................8, 9, 10

*Califano v. Sanders,*
    430 U.S. 99, 105 (1977)....................................................................7

*California v. Cabazon Band of Mission Indians,*
    480 U.S. 202 (1987)........................................................................75

*Castro Romero v. Becken,*
    256 F.3d 349 (5th Cir. 2001) ........................................................65

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993)..................................................................84, 85

*Cohen v. Bd. of Trs. of the Univ. of the D.C.,*
    819 F.3d 476 (D.C. Cir. 2016) ........................................................5

*Cole v. Adkins,*
    358 So. 2d 447 (Ala. 1978)............................................................47

*Columbian Fin. Corp. v. Stork,*
    702 F. App'x 717 (10th Cir. 2017) ................................................21

*Compare Ringsred v. City of Duluth,*
    828 F.2d 1305, 1306, 1308-09 (8th Cir. 1987) ............................76

*Crowe & Dunlevy, P.C. v. Stidham,*
    640 F.3d 1140 (10th Cir. 2011) ....................................................11

*CTIA-Wireless Ass'n v. Fed. Comm. Comm'n,*
    466 F.3d 105 (D.C. Cir. 2006)............................................73, 74, 76

*Curling v. Secretary of State of Georgia,*
    761 F. App'x 927 (11th Cir. 2019) ..........................................12, 21

v

*Erickson v. Pardus*,
    551 U.S. 89 (2007)......................................................................................5

*Espey v. Wainwright*,
    734 F.2d 748 (11th Cir. 1984) ..................................................................90

*Ex parte Young*,
    209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)........................... passim

*Fein v. Peltier*,
    949 F.Supp. 374 (D. V.I. 1996) ...........................................69, 73, 74, 76

*Forney v. Calhoun Cnty.*,
    84 Ala. 215 (1887)...........................................................31, 32, 35, 43

*Geronimo v. Obama*,
    725 F. Supp. 2d 182 (D. D.C. 2010)........................................................64

*Gingras v. Rosette*,
    2016 WL 2932163 ....................................................................................89

*Gingras v. Think Fin., Inc.*,
    922 F.3d 112 (2d Cir. 2019), *cert. denied sub nom. Sequoia Capital
    Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020)........................11, 15, 89

*Glass v. Cook*,
    57 So. 2d 505 (1952)................................................................................31

*Henslee v. Merritt*,
    82 So. 2d 212 (Ala. 1955).........................................................................27

*Hill v. Kemp*,
    478 F.3d 1236 (10th Cir.2007) .................................................................21

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984).....................................................................................6

*Hollywood Mobile Estates Ltd. v. Cypress*,
    415 F. App'x 207 (11th Cir. 2011) ....................................13, 20, 21, 22

*Houston v. McClure*,
    456 So. 2d 788 (Ala. 1984).......................................................................47

*Hughes v. Branton*,
    141 So. 3d 1021 (Ala. 2013)......................................................................29

*Hutto v. Finney*,
    437 U.S. 678 (1978)..........................................................................13, 24

*Idaho v. Coeur d'Alene Tribe of Idaho,*
   521 U.S. 261 (1997) ................................................................................12, 20, 21, 22

*Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.,*
   603 F.3d 365 (7th Cir. 2010) ..................................................................................21

*James River & Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority,*
   359 F. Supp. 611 (E.D. Va. 1973), *aff'd,* 481 F.2d 1280 (4th Cir. 1973)...........9, 10

*Jordan v. Mitchell,*
   705 So.2d 453 (Ala. Civ. App. 1997) ....................................................................49

*K.T. v. Royal Caribbean Cruises, Ltd.,*
   931 F.3d 1041 (11th Cir. 2019) ..............................................................................5

*Kansas v. United States,*
   249 F.3d 1213 (10th Cir. 2001) ........................................................................88, 89

*Karst Envtl. Educ. & Prot., Inc. v. Envtl. Prot. Agency,*
   475 F.3d 1291 (D.C. Cir. 2007) ..............................................................................78

*Kennedy v. Polar-BEK & Baker Wildwood P'ship,*
   682 So. 2d 443 (Ala. 1996)......................................................................................53

*Line v. Ventura,*
   38 So. 3d 1 (Ala. 2009)............................................................................................29

*Lacano Investments, LLC v. Balash,*
   765 F.3d 1068 (9th Cir. 2014) ................................................................................20

*Lane v. Cent. Ala. Cmty. Coll.,*
   772 F.3d 1349 (11th Cir. 2014) ........................................................................12, 20

*Lloyd Noland Found., Inc. v. Tenet Healthcare Corp.,*
   No. CV-01-S-437-S, 2001 WL 37124708 (N.D. Ala. June 20, 2001)....................89

*Martin v. Houston,*
   196 F. Supp. 3d 1258 (M.D. Ala. 2016) .................................................................86

*Mazer v. Jackson Ins. Agency,*
   340 So. 2d 770 (Ala. 1976)............................................................................. passim

*Michigan v. Bay Mills Indian Community,*
   572 U.S. 782 (2014)....................................................................................10, 11, 15

*Micor Indus., Inc. v. C2JS Holdings, Inc.,*
   No. 12-02654, 2012 WL 5931707 (N.D. Ala. Nov. 26, 2012).........................48, 49

*Mitchell v. K & B Fabricators, Inc.*,
   274 So. 3d 251 (Ala. 2018).....................................................28, 29, 50

*Mont. Wilderness Ass'n v. Fry*,
   408 F. Supp. 2d 1032 (D. Mont. 2006)..........................................66, 79

*Muscogee (Creek) Nation v. Pruitt*,
   669 F.3d 1159 (10th Cir. 2012) ...........................................................21

*N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*,
   991 F.2d 458 (8th Cir.1993) ................................................................11

*Named Individual Members of San Antonio Conservation Soc. v. Texas Highway Dep't*,
   446 F.2d 1013 (5th Cir. 1971) .......................................................10, 63

*Narragansett Indian Tribe v. Rhode Island Dept. of Transp.*,
   903 F.3d 26 (1st Cir. 2018)..................................................................78

*Nat'l Indian Youth Council v. Watt*,
   664 F.2d 220 (10th Cir. 1981) ............................................................70

*Nat'l Trust for Hist. Pres. v. Blanck*,
   938 F. Supp. 908 (D.D.C. 1996) ...............................................43, 73, 74

*Newell v. Newell*,
   254 So. 3d 878 (Ala. 2017).................................................................46

*Perryman v. Pugh*,
   114 So.2d 253 (Ala. 1959)............................................................47, 53

*Pueblo of San Ildefonso v. Ridlon*,
   103 F.3d 936 (10th Cir. 1996) ............................................................65

*Radenhausen v. Doss*,
   819 So. 2d 616 (Ala. 2001).................................................................29

*Ralston Oil & Gas Co. v. July Corp.*,
   719 P.2d 334 (Colo. Ct. App. 1985) ..................................................47

*Reese v. Ellis, Painter, Ratterree & Adams, LLP*,
   678 F.3d 1211 (11th Cir. 2012) ...........................................................5

*Robinson v. Sanders*,
   530 So. 2d 821 (Ala. 1988) (per curiam) ..........................................27

*S.C. Wildlife Fed'n v. Limehouse*,
   549 F.3d 324 (4th Cir. 2008) .............................................................10

*Sac and Fox Nation v. Norton*,
   240 F.3d 1250 (10th Cir. 2001) ....................................................88, 89

*Salt River Project Agr. Imp. & Power Dist. v. Lee*,
   672 F.3d 1176 (9th Cir. 2012) .....................................................87, 88

*San Carlos Apache Tribe v. United States*,
   417 F.3d 1091 (9th Cir. 2005) ...........................................................79

*Santa Clara Pueblo v. Martinez*,
   436 U.S. 49 (1978)...............................................................................10

*Schwindler v. Comm'r, Ga. Dep't of Corr.*,
   605 F. App'x 971 (11th Cir. 2015) ....................................12, 13, 16

*Sheridan Kalorama Hist. Ass'n v. Christopher*,
   49 F.3d 750 (D.C. Cir. 1995) .......................................................72, 74

*Slockish v. U.S. Fed. Highway Admin.*,
   682 F. Supp. 2d 1178 (D. Or. 2010) ...........................................65, 79

*Snider v. Morgan*,
   113 So. 3d 643 (Ala. 2012)..................................................................52

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*,
   205 F. Supp. 3d 4 (D.D.C. 2016)........................................................73

*Sykes v. Payton*,
   441 F. Supp. 2d 1220 (M.D. Ala. 2006) .........................35, 39, 42, 46

*Sykes v. Sykes*,
   78 So. 2d 273 (Ala. 1954) ...................................................................27

*Tarrant Reg'l Water Dist. v. Sevenoaks*,
   545 F.3d 906 (10th Cir. 2008) ............................................................21

*Thompson v. Hickey*,
   8 Abb. N. Cas. 159 (N.Y. Sup. Ct. 1880) .....................................33, 35

*Thorpe v. Borough of Thorpe*,
   770 F.3d 255 (3d Cir. 2014)...............................................................65

*Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*,
   609 F. App'x 972 (11th Cir. 2015) ....................................................30

*United Keetoowah Band of Cherokee Indians v. Fed. Comm. Comm'n*,
   933 F.3d 728 (D.C. Cir. 2019)............................................................72

*Va. Office for Prot. and Advocacy v. Stewart*,
   563 U.S. 247 (2011) ..................................................................................11

*Vann v. Kempthorne*,
   534 F.3d 741 (D.C. Cir. 2008) ...................................................11, 21, 24

*Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*,
   535 U.S. 635 (2002) ....................................................................14, 20, 21

*Vieux Carre Prop. Owners, Residents & Assoc., Inc. v. Brown*,
   875 F.2d 453 (5th Cir.1989) .....................................................................78

*Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*,
   948 F.2d 1436 (5th Cir. 1991) ............................................................65, 79

*West v. Sec'y of Dep't of Transp.*,
   206 F.3d 920 (9th Cir. 2000) ....................................................................65

*Williams On Behalf of J.E. v. Reeves*,
   954 F.3d 729 (5th Cir. 2020) ....................................................................21

*Wonders v. Crutchfield*,
   No. 1:12-CV-514-WKW, 2013 WL 2453535 (M.D. Ala. June 4, 2013) ................7

*Wyatt v. Bellsouth, Inc.*,
   18 F. Supp. 2d 1324 (M.D. Ala. 1998) .....................................................42

*Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   194 F. Supp. 2d 977 (D.S.D. 2002) ....................................................65, 78

## STATUTES

42 U.S.C.A. § 2000cc-3(h) ...........................................................................85

5 U.S.C. § 701(a) ...........................................................................................7

5 U.S.C. § 702 ................................................................................................7

16 U.S.C. 470cc ...........................................................................................54

16 U.S.C. §§ 470a(d)(6), 470f .......................................................................8

16 U.S.C. § 470bb(3) ...................................................................................67

16 U.S.C. § 470bb(4) ...................................................................................67

16 U.S.C. § 470cc ........................................................................................67

16 U.S.C. § 470cc(a) .............................................................................56, 83

16 U.S.C. § 470cc(c) ..........................................................................56, 59, 67

16 U.S.C. § 470cc(g)(1) ...................................................................56, 59, 67

25 U.S.C. 3002(c)(1) .....................................................................................70

25 U.S.C. 3002(c)(2) .....................................................................................60

25 U.S.C. 3004(b)(1) .....................................................................................83

25 U.S.C. §§ 2701-2721 ................................................................................75

25 U.S.C. § 2704(a) .......................................................................................75

25 U.S.C. § 2706(b) .......................................................................................75

25 U.S.C. § 2710(b) .......................................................................................75

25 U.S.C. § 2710(b)(1)(B) .............................................................................75

25 U.S.C. § 2710(c) .......................................................................................75

25 U.S.C. § 2711 ............................................................................................75

25 U.S.C. § 2713(b) .......................................................................................76

25 U.S.C. § 2717(a) .......................................................................................76

25 U.S.C. § 3001(3) ...............................................................................54, 83

25 U.S.C. § 3001(5) ...............................................................................56, 59

25 U.S.C. § 3001(15) .............................................................................56, 59

25 U.S.C. § 3002(a) ...............................................................................57, 81

25 U.S.C. § 3002(a)(1) ..........................................................................57, 62

25 U.S.C. § 3002(a)(2) ..........................................................................57, 64

25 U.S.C. § 3002(c) ...............................................................................passim

25 U.S.C. § 3002(d) ........................................................................55, 57, 61

25 U.S.C. § 3003(b)(1) ..................................................................................83

25 U.S.C. 3013 ......................................................................................64, 65, 70

42 U.S.C. § 2000cc-5(4)(B) ..........................................................................85

42 U.S.C. § 2000cc *et seq.* ............................................................................85

54 U.S.C. §§ 300101-307108 ........................................................................70

54 U.S.C. § 300308 ........................................................................................71

54 U.S.C. § 300320 ........................................................................................72

54 U.S.C. § 302702 ........................................................................................71

54 U.S.C. § 302704 ........................................................................................72

54 U.S.C. § 302706(b) ...................................................................................76

54 U.S.C. §§ 302906, 302907 .......................................................................74

54 U.S.C. § 306102(b)(5)(C) ...........................................................................6

54 U.S.C. § 306108 ........................................................................................71

54 U.S.C. § 307105 ........................................................................................78

Administrative Procedure Act ......................................................................7, 9

Alabama Code § 6-2-33 ......................................................................... passim

Alabama Code § 6-2-38(l) .......................................................................25, 26

Alabama Code § 13A ......................................................................................15

Alabama Code § 19-3B-1301 .........................................................................46

Alabama Code § 35-1-4(a) .......................................................................33, 34

Alabama Code Title 6, Chapter 2 ..................................................................51

Archaeological Resources Protection Act, 16 U.S.C. § 470aa et seq .................. passim

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq ...........................14, 75, 88, 89

Indian Reorganization Act,
    25 U.S.C. § 5123 *et seq.* ..................................................................... passim

Jack F. Trope and Walter R. Echo-Hawk, *The Native American Graves Protection
    and Repatriation Act: Background and Legislative History*, 24 ARIZ. ST. L.J.
    35, 36 (1992) ...........................................................................................53

National Environmental Policy Act ..............................................................9, 66

National Historic Preservation Act, 54 U.S.C. §§ 300101 *et seq* ........................................... passim

Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001, *et seq.*, ..................................................................................................................... passim

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.* .................................4, 20, 23, 81

Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq* ............ passim

Restatement (First) of Restitution § 1 cmt. b
    (Am. Law Inst. 1937) ...................................................................................................49

Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (Am. Law
    Inst. 2011) ...................................................................................................................53

## OTHER AUTHORITIES

25 C.F.R. § 262.3(a) .......................................................................................................67

25 C.F.R. § 262.4(c) ...........................................................................................56, 59, 67

25 C.F.R. § 262.4(c)(2) ...................................................................................................56

25 C.F.R. § 262.5(d) ...........................................................................................57, 60, 68, 84

25 C.F.R. § 262.8(a) ................................................................................................... passim

25 C.F.R. § 262.8(a)(1) .......................................................................................57, 60, 84

25 C.F.R. § 262.8(a)(2) .......................................................................................57, 61, 64

25 C.F.R. § 543 ..............................................................................................................76

25 C.F.R. § 559.2(a) .......................................................................................................76

36 C.F.R. § 800 *et seq.* ....................................................................................................8

36 C.F.R. § 800.1(a) .......................................................................................................71

36 C.F.R. § 800.1(c) .......................................................................................................71

36 C.F.R. § 800.1 *et seq.* ..................................................................................................8

36 C.F.R. § 800.2 .............................................................................................................7

36 C.F.R. § 800.2 ...........................................................................................................72

36 C.F.R. § 800.2(a)(1) .....................................................................................................6

36 C.F.R. § 800.2(a) and (c) ...................................................................77

36 C.F.R. § 800.2(c)(2)(ii) .......................................................................76

36 C.F.R. § 800.2(c)(2)(ii)(A) .................................................................77

36 C.F.R. § 800.3(f)(2) .............................................................................77

36 C.F.R. § 800.5 .....................................................................................77

36 C.F.R. § 800.6 .....................................................................................77

43 C.F.R. § 7.5(b)(1) ................................................................................69

43 C.F.R. § 7.12 .......................................................................................73

43 C.F.R. § 7.35 .......................................................................................68

43 C.F.R. § 10.2(a)(5) ..............................................................................55

43 C.F.R. § 10.2(b)(1) ..............................................................................63

43 C.F.R. §§ 10.2(b)(1), 10.14 ................................................................81

43 C.F.R. §§ 10.3 and 10.5 ..........................................................56, 57, 83

43 C.F.R. § 10.3(b)–(c) ............................................................................60

43 C.F.R. § 10.3(b)-(c) .............................................................................56

43 C.F.R. § 10.3(c) ..............................................................................56, 59

43 C.F.R. § 10.4(a)–(c) ............................................................................61

43 C.F.R. § 10.4(a)-(c) .............................................................................57

43 C.F.R. § 10.4(d) ...................................................................................58

43 C.F.R. § 10.4(d) ...................................................................................61

43 C.F.R. § 10.4(e) ..............................................................................58, 61

43 C.F.R. § 10.5(a) ..............................................................................56, 60

43 C.F.R. § 10.5(b)–(e) ............................................................................60

43 C.F.R. § 10.5(b)-(e) .............................................................................56

43 C.F.R. § 10.6(a) ...................................................................................81

25 CFR § 262.5(c)(1) ...........................................................................68

136 Cong. Rec. 35,678 (1990) (statement of Sen. Inouye) ...................82

49 Fed. Reg. 24,083-01 (June 11, 1984) ..............................................35

60 Fed. Reg. 62134, 62135 (Dec. 4, 1995) ..........................................63

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §
    1357 (3d ed. 2020) .......................................................................5

13 Wright & Miller, Fed. Prac. & Proc. § 3524.3 (3d ed.) ....................13

Fed. R. Civ. P. 2(b)(6) .................................................................. passim

Fed. R. Civ. P. 8 ..................................................................................90

Fed. R. Civ. P. 8(a)(2) ...........................................................................4

Fed. R. Civ. P. 12(b)(6) .......................................................................90

Fed. R. Civ. P. 15(a)(2) .......................................................................90

Fed. R. Civ. P. 19 ...............................................................86, 87, 89, 90

Fed. R. Civ. P. 19(a) ...........................................................................87

Fed. R. Civ. P. 19(a)-(b) .....................................................................87

H.R. Rep. No. 101-877  (1990), *as reprinted in* 1990 U.S.C.C.A.N. 4367, 4373 ........................83

John Reed Swanton, *Modern Square Grounds of the Creek Indians* 9
    (Smithsonian Institution, 1931), *available at*
    https://repository.si.edu/bitstream/handle/10088/23920/SMC_85_Swanton_19
    31_8_1-46.pdf ...........................................................................40

*Preserve*, Merriam-Webster.com, https://www.merriam-
    webster.com/dictionary/preserve (last visited June 29, 2020) ...........38, 39

Restatement of Contracts ...............................................................35, 42

S. Rep. No. 101-473 (1990) .................................................................64

## I.      INTRODUCTION

Plaintiffs Muscogee (Creek) Nation, Hickory Ground Tribal Town, and Mekko George Thompson seek relief from this Court for the systematic, wrongful, and ongoing desecration of the sacred historic burial place of their ancestors at Hickory Ground caused by the excavation, construction and operation of an opulent and highly profitable casino by the Poarch Band of Creek Indians. Poarch dug up Plaintiffs' ancestors from their intended final resting places, with some remains and related artifacts removed from the site entirely, while others were scattered about the site and then paved over or buried beneath the buildings.

Poarch's conduct, and the conduct of the individually-named defendants, represents a shocking betrayal of unequivocal commitments made by Poarch when it acquired the Hickory Ground property. Poarch assured Plaintiffs and represented in its application for federal preservation grants that it would protect the property from excavation and development in perpetuity. As a result, Plaintiffs did not oppose that acquisition or Poarch's efforts to have the land taken into trust by the Federal government. The Tribal Defendants then reneged on their promises and desecrated Hickory Ground in pursuit of profit.

Poarch and the Federal Defendants later entered into an agreement that obligated Poarch to take on cultural and historic preservation obligations imposed by various federal statutes. Poarch and its officials violated that agreement and the applicable federal laws by failing to consult with, or obtain consent from, Plaintiffs before conducting excavation and construction at Hickory Ground. The Federal Defendants failed in their independent obligations to oversee and enforce those obligations, and by allowing the illegal conduct. Plaintiffs are now barred from exercising and fulfilling the tenets of their religion because they are prevented from returning their ancestors to their rightful resting places and conditions.

Defendants do not dispute that Hickory Ground was and is a sacred place, that Plaintiffs' ancestors were buried there, or that the ancestors have been ripped from the resting place that the Tribal Defendants promised Plaintiffs they would preserve in perpetuity. Instead, they raise a

plethora of technical legal reasons why they cannot be held responsible for the harm they have caused.

At this stage of the litigation, Plaintiffs' only obligation is to allege a "short, plain statement of the case" demonstrating that their claim for relief is plausible. For the reasons explained in detail below, Plaintiffs have more than met that burden. Plaintiffs request that the Court deny the motions to dismiss in their entirety and allow this litigation to proceed so that these claims can be presented for resolution on the merits based on a fully developed record.

## II.  BACKGROUND

This case arises from the Poarch Band of Creek Indians' desecration of the sacred grounds and burial places of Plaintiffs' ancestors in Wetumpka, Alabama. The Muscogee (Creek) Nation, Hickory Ground Tribal Town, and the Tribal Town chief, Mekko Thompson, know this sacred place as "Hickory Ground." Poarch acquired Hickory Ground by promising it would always preserve and protect the site. Instead, it removed over 57 bodies of Plaintiffs' ancestors, and thousands of Plaintiffs' cultural artifacts, from the sacred place to bulldoze it for construction of Poarch's third casino. Plaintiffs brought this lawsuit to seek redress for this greedy, tragic, outrageous, and illegal act.

The Hickory Ground Tribal Town was one of over forty Tribal Towns within the Muscogee (Creek) Nation before the Nation was forcibly removed from Alabama to Oklahoma Territory in the early 1800s on the Trail of Tears. Hickory Ground was the last tribal capital of the Muscogee (Creek) Nation before removal. The members of the Hickory Ground Tribal Town took the embers from the ceremonial grounds at Hickory Ground on their long journey to Oklahoma Territory to maintain their sacred ties to their homeland and the original birthplace of their Tribal Town. The members of the modern-day Hickory Ground Tribal Town are matrilineal descendants of those buried at Hickory Ground in Alabama, and continue their centuries-old religious ceremonies today. *See* Dkt. 190 at 7, 13, 72–73.

Although Poarch never historically resided at Hickory Ground, it acquired Hickory Ground in 1980 using federal preservation grant funds. In its application for the funds, Poarch

promised that it would "prevent development on the property" and preserve Hickory Ground "without excavation." *See id.* at 19. Poarch emphasized that this preservation would benefit Plaintiffs: because Hickory Ground "is of major importance in the history of the Muscogee (Creek) Nation," the Site would "be a place where Creeks from Oklahoma may return and visit their ancestral home; the "existing Hickory Ground tribal town in Oklahoma" in particular "will be pleased to know their home in Alabama is being preserved." *Id.* Vowing that its purchase of Hickory Ground would save the property from being demolished by development, Poarch cautioned that "[d]estruction of archaeological resources in Alabama . . . destroy[s] the cultural history of Creek people." *Id.* at 5.

The federal government awarded the requested preservation grant funds to Poarch. Pursuant to the standard terms of preservation grant awards, a protective covenant was placed on Hickory Ground for 20 years. Despite its repeated promises to protect the sacred site, Poarch began a years-long desecration of Hickory Ground after the covenant expired in 2000 to clear the land for construction of its third casino. Dkt. 190 at 24–44. At the time, Poarch already had casinos in Atmore and Montgomery. Poarch did not notify the Muscogee (Creek) Nation about the excavations until 2006. *Id.* at 33.[2]

To make way for the $246 million casino resort, Poarch exhumed over 57 human remains of Plaintiffs' ancestors and removed thousands of artifacts in a massive excavation that concluded in 2011. In 2012, Poarch unilaterally reburied many of these remains *away from* their original resting places, using invented ceremonies that disrespected the dead and left the spirits

---

[2] Plaintiffs dispute the Tribal and Federal Defendants' assertions that Plaintiffs knew in 1992 or 2002 that Poarch did not plan to abide by its promises to preserve Hickory Ground. For example, a Bureau of Indian Affairs Archeologist and Federal Preservation Officer issued a Briefing Statement to the Assistant Secretary of Indian Affairs recounting that Poarch conducted limited exploratory testing at the Site around 1992 "to determine if some portion of the site could be developed without damaging archeological resources," and such activity "ceased after 1993" after the testing found "no area where such resources were totally absent." Dkt. 200-2 at PDF p. 29. Indeed, as of April 1999, Poarch's Office of Cultural and Historic Field Methodology had a policy that "'[u]nder no circumstances are the burials on the Poarch Creek Indians Reservations, or lands under their control, to be excavated, nor are they to be subjected to any examination or testing. Burial sites take precedence over any project or program plan.'" Dkt. 190 at 25-26 (quoting Dkt. 190-1, Ex. J). Hickory Ground Tribal Town's October 19, 2002 letter ultimately states that Hickory Ground Tribal Town heard rumors through third parties that Poarch may be disturbing the site, and "hope[s] this is not the case." Dkt 200-1 at PDF page 26; *see also* Dkt. 190 at 26, ¶ 92.

18

of Plaintiffs' ancestors in perpetual unrest. Many remains and artifacts have never been reburied. *Id.* at 5–6, 30–37.

The Department of the Interior, National Park Service, and Bureau of Indian Affairs facilitated Poarch's desecration of Hickory Ground by illegally providing assistance to Poarch and failing to comply with applicable law.

Poarch's mistreatment of Plaintiffs' ancestors and cultural items, and the Federal Defendants' facilitation of this mistreatment, violated the National Historic Preservation Act, Native American Graves Protection and Repatriation Act, Archaeological Resources Protection Act, Religious Freedom Restoration Act, Indian Reorganization Act, Poarch's preservation agreement with the National Park Service, and Poarch's promises to protect Hickory Ground "without excavation." In addition, Poarch has been unjustly enriched to the tune of hundreds of millions of dollars through its breach of its promises to protect Hickory Ground in perpetuity. Dkt. 190 at 46–48, 53–76. Now, having affirmatively chosen to move forward with construction without legal basis, even *after* Plaintiffs filed this lawsuit, Poarch calls the casino "improvements on the property" that it insists it should get to keep. Dkt. 202 at 72. The law does not allow this.

Plaintiffs brought this action to bring peace to their ancestors by returning them to their intended final resting places in accordance with their religious duties. Plaintiffs seek to hold Poarch to its promises to protect and preserve Hickory Ground, and to hold Federal Defendants to their obligations under the law. Hickory Ground should be restored, to the greatest extent possible, to its condition prior to construction of the casino. The remains and artifacts should be returned to their original resting places.

### III.    STANDARD FOR MOTION TO DISMISS

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows a party to assert by motion a defense of "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

19

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Twombly*, 550 U.S. at 563.

"Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 555).  "In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  *Id.* at 93–94.  The court must assume that the factual allegations set forth in the complaint are true and must construe them in the light most favorable to the plaintiff.  *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215 (11th Cir. 2012); *Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1343 (M.D. Ala. 2013).  All reasonable inferences must be drawn in the plaintiff's favor.  *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1043 (11th Cir. 2019).

A motion under Rule 12(b)(6) does not pose the question of whether the plaintiff can ultimately prevail on the merits—"a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Twombly*, 550 U.S. at 556; *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2020) ("Whether the plaintiff ultimately can prevail on the merits is a matter properly determined on the basis of proof, which means on a summary judgment motion or at trial by the judge or a jury, and not merely on the face of the pleadings.").  The burden of persuasion is on the party moving under Rule 12(b)(6) to demonstrate that no legally cognizable claim for relief exists.  *Cohen v. Bd. of Trs. of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (quoting 5B Wright & Miller, *supra* § 1357) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").  The complaint may be dismissed "only if it is clear that no

relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

## IV.   ARGUMENT

**A.   Tribal Defendants' authority does not include unchecked power to violate applicable law; they do not have sovereign immunity under *Ex Parte Young*.**

### 1.   Defendants Poarch Band of Creek Indians and PCI Gaming do not have sovereign immunity from Plaintiffs' claims against them as delegees of federal authority.

Plaintiffs have sued the Poarch Band ("Poarch") and PCI Gaming in their capacities as delegees of federal preservation responsibilities under the National Historic Preservation Act ("NHPA"). These responsibilities also include obligations to comply with related laws, including the Native American Graves Protection and Repatriation Act and the Archeological Resources Protection Act. Specifically, the Second Amended Complaint alleges that "[a]s a delegee of federal functions, Poarch and its officials performing the delegated functions are federal actors, liable as federal officials" and that "[w]hen the National Park Service delegates its authority, the delegee carries out the delegated responsibilities on behalf of the National Park Service. Poarch's assumption of responsibility under the NHPA pursuant to federal law means that Poarch acts as a de facto government agency with respect to the delegated responsibilities." Second Amended Complaint, Dkt. 190 at 55, 64. The Second Amended Complaint also alleges that, among other things, Poarch and its agents failed to comply with the NHPA responsibilities delegated by the National Park Service. *See id.* at 55, 64–69. These responsibilities incorporate obligations under the Native American Graves Protection and Repatriation Act, *see* 54 U.S.C. § 306102(b)(5)(C), and the Archaeological Resources Protection Act, *see* 36 C.F.R. § 800.2(a)(1).

Poarch and PCI Gaming cannot have it both ways: they cannot accept federal "legal responsibility" under the NHPA and their agreement with the National Park Service and at the same time retain sovereign immunity. Such a result would impermissibly allow the federal government and its delegees to frustrate the purpose of the Administrative Procedure Act's waiver of sovereign immunity.

21

The Administrative Procedure Act ("APA") generally waives the federal government's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority" and further provides that anyone "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

"[T]he APA is a waiver of sovereign immunity in cases to which it applies. . . ." *Wonders v. Crutchfield*, No. 1:12-CV-514-WKW, 2013 WL 2453535, at *4 (M.D. Ala. June 4, 2013) (quoting 5 U.S.C. § 702). The APA applies "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has held that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702), *abrogated on other grounds by statute as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977).

This protection for aggrieved persons—the right for judicial review—does not simply disappear when the agency delegates its authority to another entity, as the National Park Service did here in its agreement delegating National Historic Preservation Act responsibilities to Poarch. Instead, the delegation comes with a mandate that the "agency official"—defined as "a State, local, or tribal government official" who has been delegated federal responsibilities—take "**legal and financial responsibility** for section 106 compliance in accordance with subpart B of this part ["the Section 106 process"]." 36 C.F.R. § 800.2 (emphasis added).  Put differently, the delegee steps into the shoes of the agency that made the delegation in the first place.

Thus, when NPS delegated preservation responsibilities to Poarch, Poarch was required, among other things, to:

> a.    Follow Section 106 of the NHPA in accordance with the regulations codified at
>
> 36 C.F.R. § 800 *et seq.*, which mandates consultation with any tribe that attaches

religious and cultural significance to a historic site, *see* 16 U.S.C. §§ 470a(d)(6),

470f; 36 C.F.R. § 800.1 e*t seq.*;

b.     "[P]articipat[e] in the historic preservation program and "consult[] with

representatives of any other tribes whose traditional lands may have been within

the Poarch Band of Creek Indians Reservation"; and

c.     "In any case where an action arising pursuant to the [NHPA]may affect the

traditional lands of another Tribe . . . seek and take into account the views of that

Tribe."

NPS Agreement, Dkt. 190-1 at 117 §§ 5, 7; *see also* Second Amended Complaint, Dkt. 190 at

24–25.

Under Tribal Defendants' theory of the case, aggrieved persons could seek redress where

federal authority is exercised by *federal agencies* in violation of applicable law, but not if the

**exact same authority** is exercised by a *federal delegee* in violation of applicable law. Although

the delegee would not have the authority to act *but for* the federal delegation, the Tribal

Defendants contend that the accompanying accountability falls into the ether after delegation

occurs. Such a result would be absurd and "would make a sham of the reconsideration required

by federal law." *Arlington Coal. on Transp. v. Volpe*, 458 F.2d 1323, 1329 (4th Cir. 1972)

(jurisdiction over the delegee's action prevents "emasculation of remedy clearly available against

the federal respondents").

The Tenth Circuit addressed a similar delegation issue in *Caddo Nation of Oklahoma v.

Wichita & Affiliated Tribes*, 786 F. App'x 837, 840–42 (10th Cir. 2019). In that case, the Caddo

Nation sued the Wichita Tribe for violations of the National Historic Preservation Act in

developing an area that may have been located on grave sites. The Wichita Tribe's development

project was funded using a Department of Housing and Urban Development ("HUD") grant,

which empowered HUD to delegate its responsibilities and "require that a grantee like

Wichita Tribe comply with both NEPA and NHPA." *Id.* at 840 (citing 42 U.S.C. § 3535(d); 24

C.F.R. §§ 58.1, 58.4, 58.5, 1003.605). The Wichita Tribe moved to dismiss Caddo Nation's

complaint on the basis of tribal sovereign immunity. The district court rejected this defense but dismissed the complaint on other grounds. On cross-appeal, the Wichita Tribe challenged the district court's conclusion that the claims were not barred by sovereign immunity.

The Tenth Circuit Court of Appeals affirmed the district court's conclusion that the Caddo Nation's claims were not barred by sovereign immunity because HUD had delegated its National Historic Preservation Act responsibility to the Wichita Tribe. The court explained that "[b]y specifically accepting and assuming HUD's rights, duties, and obligations to act in conformity with NEPA and NHPA, Wichita Tribe waived its sovereign immunity for just the type of APA-based suit at issue in this case." *Id.* at 841. In reaching this conclusion, the court observed that the statutory and regulatory scheme "could not be more clear: HUD can condition the provision of a grant to an Indian tribe on the tribe's acceptance of HUD's obligation to comply with NEPA and NHPA, an obligation enforceable via the APA." *Id.* at 840 (citing 5 U.S.C. § 702; 42 U.S.C. §§ 5304(g), 5306(a)). That is precisely why the Poarch delegees have no sovereign immunity to Muscogee (Creek) Nation's APA-based claims.

Similarly, in *James River & Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority*, the court held that because the Richmond Metropolitan Authority "purposefully availed itself of the benefits of federal laws," it "constitute[d] a waiver of sovereign immunity as to the requirements of the federal statutes involved." 359 F. Supp. 611, 624 (E.D. Va. 1973), *aff'd*, 481 F.2d 1280 (4th Cir. 1973). In that case, the plaintiff challenged the proposed construction of an expressway that would require destruction or relocation of the historically significant James River and Kanawha Canal. Among other things, the plaintiff sought compliance with the NHPA. The court held that jurisdiction over this claim extended to the United States defendants and "to the nonfederal defendants as well, since it is alleged that they have taken advantage of the benefits conferred by federal law and because their activities could otherwise make a 'sham' of federal statutory requirements if these requirements must be met in this case." *Id.* at 622 (citing *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1329 (4th Cir. 1972)). *See also S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 330 (4th Cir.

2008) ("Where 'the challenged activities' of state actors 'would make a sham of the reconsideration required by federal law,' federal courts may entertain suits against state actors 'to preserve federal question jurisdiction in the application of federal statutes.'") (quoting *Arlington Coalition*, 458 F.2d at 1329); *Named Individual Members of San Antonio Conservation Soc. v. Texas Highway Dep't*, 446 F.2d 1013, 1028 (5th Cir. 1971) (by accepting federal funding and participation, the state "voluntarily submitted itself to federal law. It entered with its eyes open, having more than adequate warning of the controversial nature of the project and of the applicable law.").

Here, as in *Caddo Nation* and *James River*, Poarch has accepted federal benefits in the form of a delegation of National Historic Preservation Act authority and acceptance of preservation grant funds. The NPS Agreement and the applicable regulations obligate Poarch to comply with federal law, and Poarch *certified it would comply* in the NPS Agreement. *See* NPS Agreement, Dkt. 190-1 at PDF p. 117 §§ 5, 7. A ruling that Poarch and its agents were not subject to the very laws with which they certified they would comply would render the certification meaningless and would allow circumvention of laws that carry out vital policies of national importance—like protecting historically significant places.

## 2.   Tribal official Defendants are not immune from *Ex Parte Young* claims for ongoing violations of applicable law.

Under the doctrine of *Ex Parte Young,* tribal sovereign immunity does not bar a suit for prospective relief against tribal officers allegedly acting in violation of applicable law. *See Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 796 (2014); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978) ("As an officer of the [tribe], [the tribe's governor] is not protected by the tribe's immunity from suit"). The Eleventh Circuit expressly held in *Alabama v. PCI Gaming Authority* that Poarch tribal officials were not immune from a claim alleging that they were "engaged in ongoing conduct that violates federal law," noting that "[s]everal other circuits similarly have held that the *Ex parte Young* doctrine applies to make tribal officials

25

subject to suit to enjoin ongoing violations of the Constitution or federal law." 801 F.3d 1278, 1288 & n.19 (11th Cir. 2015).[3]

The "applicable law" implicating the *Ex Parte Young* doctrine as it pertains to tribal officials includes federal law, *PCI Gaming*, 801 F.3d at 1288, including federal common law, *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1156 (10th Cir. 2011), and state law, *see Bay Mills*, 572 U.S. at 796; *PCI Gaming*, 801 F.3d at 1290. "Given that tribal immunity arises from tribes' statuses as sovereigns, it is unremarkable that they too can be sued for prospective, injunctive relief based on violations of [applicable] law," including applicable state law. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121-24 (2d Cir. 2019), *cert. denied sub nom. Sequoia Capital Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of [applicable] law and seeks relief properly characterized as prospective.'" *Va. Office for Prot. and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (alterations in original) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

The Tribal Defendants' principal argument is that the *Young* doctrine does not apply because the Tribal Officials' violations of law are not ongoing. Dkt 202 at 11–14. They also argue that if the Tribal Officials *are* engaged in ongoing violations of law (they are), the *Young* doctrine still wouldn't apply because Plaintiffs' claims implicate "special sovereignty interests." *Id.* at 11. Not so. The Second Amended Complaint plainly alleges the ongoing violations for which Plaintiffs seek prospective injunctive relief.  The "special sovereignty interests" exception to the doctrine has been cabined to the facts from *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), and the claims here do not approach those facts in any way.

---

[3] These other circuits include the D.C. Circuit, the Eighth Circuit, the Ninth Circuit and the Tenth Circuit. *See Vann v. Kempthorne,* 534 F.3d 741, 750 (D.C. Cir. 2008); *N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.,* 991 F.2d 458, 460 (8th Cir.1993); *Burlington N. & Santa Fe Ry. Co. v. Vaughn,* 509 F.3d 1085, 1092 (9th Cir. 2007); *Crowe & Dunlevy, P.C. v. Stidham,* 640 F.3d 1140, 1154 (10th Cir. 2011).

a) *The Complaint alleges ongoing violations of law.*

Tribal Defendants advocate a standard for "ongoing violations" that would insulate a sovereign actor's ongoing harm from judicial review whenever it is caused by an action taken in the past. That result would turn *Ex Parte Young* on its head.

Three cases from the Eleventh Circuit demonstrate that actions in the past can result in ongoing harm for which injunctive relief is available under *Ex Parte Young*. In *Curling v. Secretary of State of Georgia*, the Eleventh Circuit rejected the defendants' contention that the Plaintiffs had not alleged an ongoing violation of law because their claims centered on the unreliability of voting machines in past elections. 761 F. App'x 927, 932 (11th Cir. 2019). The Court held that the showing of the past unreliability of the machines was to show "that past is prologue to their future injuries caused by the same election system." *Id.* (citing *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction.").

Similarly, a state inmate's claim for injunctive relief was allowed to proceed under *Ex Parte Young* because the failure to remedy the loss of his court files constituted an ongoing violation of his right of access to the court. *Schwindler v. Comm'r, Ga. Dep't of Corr.*, 605 F. App'x 971 (11th Cir. 2015). The Eleventh Circuit emphasized that "most importantly," the inmate was seeking "the *replacement* of his lost or destroyed files, to the extent possible," and that the district court had improperly "ignored the possibility that the Commissioner's continued refusal to attempt to replace the files that were lost . . . is itself an ongoing violation" of the inmate's right to have access to the courts. *Id.* at 972; *see also Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (reaffirming that requests for reinstatement after loss of employment "constitute prospective injunctive relief that fall within the scope of the *Ex parte Young* exception").

Finally, *Hollywood Mobile Estates Ltd. v. Cypress*, 415 F. App'x 207 (11th Cir. 2011), illustrates the difference between what does and does not fall within the ambit of *Ex Parte*

*Young*. A landlord sued to recover possession of certain leased premises and for rents collected from subtenants. The defendant was the Seminole Tribe of Florida. The Eleventh Circuit held that *Ex Parte Young*'s sovereign immunity exception did *not* apply to the business's request for return of rent, because it was a request for monetary damages from a past legal breach "rather than a prospective request for relief." *Id.* at 209. However, the exception *did* apply to the business's request for an injunction compelling them to return possession of the leased premises. *Id.* The Eleventh Circuit rejected the Seminole Tribe's argument that the injunction request was not prospective because "it would remedy past, rather than future, harms" and "really requests an undoing of what was done in the past." *Id.* The court reasoned that the alleged past wrong (eviction) gave rise to the ongoing harm of depriving the business of its right to occupy the property. *Id.* The court concluded that the business's request for an injunction "directing the tribal defendants to restore it to the property" constituted prospective relief that would "cure [the] ongoing violation," and the tribal officials therefore did not have immunity to the claim. *Id.*

As *Curling*, *Schwindler*, and *Hollywood Mobile Estates* indicate, the appropriate inquiry to determine whether a claim alleges an ongoing violation is whether the plaintiff seeks *injunctive relief*, as opposed to *damages*. "If the violation has ceased, the only remedy available would be retrospective compensatory damages, which are barred by the Eleventh Amendment;" thus, *Ex Parte Young* cannot be employed where "a pattern of illegal conduct by [government] officers ceases" such that injunctive relief would not provide a remedy. 13 Wright & Miller, Fed. Prac. & Proc. § 3524.3 (3d ed.). Importantly, "[t]he line between retroactive and prospective relief cannot be so rigid that it defeats the effective enforcement of prospective relief." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). Thus, a plaintiff who "seeks a declaration of the *past,* as well as the *future,* ineffectiveness of the [defendant]'s action" does not run afoul of *Ex Parte Young* so long as the plaintiff does not seek monetary damages from a past breach of legal duty from the sovereign via its officials (named in their official capacities). *Verizon Md., Inc.*, 535 U.S. at 646.

Plaintiffs seek declarations of the illegality of certain of the Tribal Officials' past conduct, but seek only prospective, non-monetary relief against them designed to address the

28

ongoing harm from that conduct. Plaintiffs' claims therefore satisfy the "straightforward inquiry" into whether the complaint alleges an ongoing violation of law and seeks prospective relief. Each claim is addressed in turn.

*(1) Count I: Ongoing violation of the Indian Reorganization Act.*

Count I alleges that, because Poarch was not "under federal jurisdiction" within the meaning of the Indian Reorganization Act, 25 U.S.C. § 5123 *et seq.*, the Secretary did not have authority to take land into trust for Poarch and the land is "properly considered fee land subject to state, not federal, law." Dkt. 190 at 45. If so, "[g]aming on the Hickory Ground Site is thus not legal under applicable Alabama law and the Indian Gaming Regulatory Act." *Id.* at 46.

Count I is is a claim against the Secretary, not Poarch, and does not require Poarch's involvement, as discussed in Section IV.J below. However, Plaintiffs address Poarch's arguments here.

Tribal Defendants attempt to dismiss Count I by advancing a "heads I win, tails you lose" proposition. *See* Dkt. 202 at 12–13. They argue that if the land is *not* validly in trust, then it is not subject to the Indian Gaming Regulatory Act and there is no violation under that statute. If the land *is* validly held in trust, then the gaming there is lawful under the Indian Gaming Regulatory Act. But Plaintiffs specifically allege that gaming is not legal under "applicable Alabama law" *as well as* the Indian Gaming Regulatory Act. Dkt. 190 at 46.

If the legal basis for gaming at the Hickory Ground site is the Indian Gaming Regulatory Act, that statute requires that the gaming occur on "Indian lands," which are limited to trust and reservation lands. This requirement is not met if the land is not validly in trust. *See* Indian Gaming Regulatory Act, 25 U.S.C. §§ 2703(4), 2710 (defining "Indian lands"; stating that tribes may engage in gaming on "Indian lands" subject to certain restrictions). Nor would the gaming be legal under state law. For example, Alabama Code Section 13A enumerates numerous criminal gambling offenses that would apply to the gambling activity at Hickory Ground.

In *Bay Mills*—which also involved a question of whether a tract of land qualified as

"Indian lands"—the Supreme Court specifically stated that the State of Michigan could pursue state law claims against Bay Mills officials under *Ex Parte Young*:

> Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license. *See* [Mich. Comp. Laws Ann.] § 432.220; see also § [Mich. Comp. Laws Ann.] 600.3801(1)(a) (West 2013) (designating illegal gambling facilities as public nuisances). As this Court has stated before, analogizing to *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), tribal immunity does not bar such a suit for injunctive relief against *individuals,* including tribal officers, responsible for unlawful conduct. *See Santa Clara Pueblo,* 436 U.S., at 59, 98 S.Ct. 1670.

*Bay Mills*, 572 U.S. at 795–96 (emphasis in original). Accordingly, "tribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands." *PCI Gaming*, 801 F.3d at 1290. "The Supreme Court has already blessed *Ex parte Young*-by-analogy suits against tribal officials for violations of state law," and "[t]here is a minimal intrusion on sovereignty if federal courts are available as forums for enforcing violations of a state's law against tribal officials because tribes cannot empower their officials to violate [applicable] state law." *Gingras*, 922 F.3d at 121–22.

The Tribal Defendants' motion to dismiss conveniently ignores Plaintiffs' allegations that gaming at Hickory Ground is illegal under state law. *See* Dkt. 190 at 46. Just as tribes are not empowered to authorize their officials to violate applicable federal law, they also lack the power to authorize their officials to violate applicable state law. Thus, Count I alleges a violation of applicable law, regardless of whether Hickory Ground is considered fee or trust land.

Count I also alleges an ongoing violation of law. The Eleventh Circuit already held that a plaintiff adequately alleged ongoing violations of law by alleging that gaming at a site was illegal because the site was not validly held in trust. "Because [the plaintiff] alleges that the Individual [Poarch] Defendants are engaged in ongoing conduct"—namely, gambling on lands not validly taken into trust—"that violates federal law, the Individual Defendants are not entitled to immunity." *PCI Gaming*, 801 F.3d at 1288, 1290.

30

Similarly, here Plaintiffs allege that Tribal Officials are engaged in ongoing conduct—violation of applicable state and federal law—and resolution of certain of Plaintiffs' causes of action depends on whether Hickory Ground was validly taken into trust.

*(2) Counts II and V: Ongoing Unjust Enrichment.*

Counts II and V allege (under state and federal law, respectively) that Poarch unjustly enriched itself by acquiring the Hickory Ground Site without objection from Plaintiffs based on promises that it would perpetually protect the Site, and enjoying ongoing profits based on contraventions of those promises. Dkt. 190 at 46-48. Poarch promised, among other things, that it would provide "permanent protection of the site"; and that "Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home." *Id.* at 46-47.

These counts allege an ongoing violation of state and federal law: they allege that Poarch is continuing to be unjustly enriched because, instead of providing "permanent protection of the Site" as it promised, Poarch is operating a casino resort "that is generating hundreds of millions of dollars in gambling and resort revenues" while sacred remains and burial objects remain displaced from their intended resting places. *Id.* at 46-48.

Counts II and V also seek prospective relief to remedy the ongoing violation: Plaintiffs ask the Court to "impose equitable remedies, among other things, requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and Poarch THPO to abide by Poarch's promises and restore the property, to the greatest extent possible, to its preexcavation and pre-construction condition." *Id.* at 48. Similar to the prospective claim in *Schwindler* seeking "replacement of [] lost or destroyed files, to the extent possible," Counts II and V seek to remedy the continuing unjust enrichment by means of an injunction requiring the return of displaced sacred items and restoration of the Site to the extent possible. This prospective relief would remedy the ongoing failure of the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and Poarch THPO to fulfill the promise of "permanent protection of the Site."

*(3) Counts III and VI: Promissory Estoppel.*

Counts III and VI allege (under state and federal law, respectively) that Poarch promised the Muscogee (Creek) Nation and Hickory Ground that it would preserve the Hickory Ground Site in perpetuity; that the Muscogee (Creek) Nation relied on that promise in not objecting to (and instead supporting) Poarch's acquisition of the site, and that Poarch was aware that if Poarch had instead disclosed that it would desecrate the site, the Muscogee (Creek) Nation would have sought to prevent the acquisition.  Second Amended Complaint, Dkt. 190 at 48-49.

These counts allege an ongoing violation of state and federal law: they allege that Poarch is continuing to violate state and federal law regarding promissory estoppel by continuing to desecrate the Site in violation of its promise to protect the site, to the detriment of Plaintiffs. *Id.* at 46-48.

Counts III and IV also seek prospective relief to remedy the ongoing violation: Plaintiffs ask the Court to "impose equitable remedies, among other things, requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and Poarch THPO to abide by Poarch's promises and restore the property, to the greatest extent possible, to its preexcavation and pre-construction condition."  *Id.* at 49. As with the unjust enrichment claim, these counts seek to remedy Poarch's continuing failure to fulfill its promise to permanently protect the Site by means of an injunction requiring the return of displaced sacred items to their intended final resting places and restoration of the Site to the extent possible.

*(4) Count VII: Ongoing violations of the Native American Graves Protection and Repatriation Act.*

Count VII alleges that Tribal Defendants violated the Native American Graves Protection and Repatriation Act ("NAGPRA") by failing to (1) consult with, and obtain consent of, the Muscogee (Creek) Nation, before intentionally removing or excavating Native American cultural items; and (2) dispose of any removed items in accordance with NAGPRA, under which Mekko Thompson has the right to custody of human remains and funerary objects and the Muscogee

(Creek) Nation has the right to custody of all other cultural items at the Site. *See* Second Amended Complaint, Dkt. 190 at 53-58.

Count VII alleges an ongoing violation of federal law: it alleges that the Tribal Officials are violating NAGPRA by failing to give custody of the human remains and funerary objects from the Hickory Ground Site to Mekko Thompson (*id.* at 55-56), failing to give custody of other cultural items found at the Site to the Muscogee (Creek) Nation (*id.*), and failing to comply with the inadvertent discovery, consent, and consultation requirements of NAGPRA, resulting in ongoing improper treatment, storage, and displacement of the excavated items (*id.* at 56-57). Tribal Defendants admit that Plaintiffs "may allege an ongoing violation of federal law" in their claims that they are entitled to repatriation of remains and artifacts. *See* Dkt. 202 at 13 n.8.

Count VII also seeks prospective relief: an injunction requiring the Tribal Officials to come into compliance with NAGPRA by seeking the consent of the Muscogee (Creek) Nation to the excavation and construction, and reversing any unconsented-to actions, including restoration of the site to the extent possible if the Nation does not consent to any excavation or construction that was subject to NAGPRA. *Id.* at 58. In addition, even if the Court determines consent is not required, NAGPRA requires that excavated items subject to NAGPRA be given to Mekko Thompson and the Nation, as described above. *Id.* at 55-56.

> *(5) Count IX: Ongoing violations of the Archeological Resources Protection Act.*

Count IX alleges that Tribal Officials violated the Archeological Resources Protection Act ("ARPA") by failing to meet the prerequisites for excavation at the Hickory Ground Site. *See* Second Amended Complaint, Dkt. 190 at 61-63. In other words, the items at the Site never should have been excavated because the legal prerequisites were not met, and the excavated items were wrongfully displaced, and continue to be wrongfully displaced, from the Site. This is the very thing the Archeological Resources Protection Act seeks to avoid.

Thus, Count IX alleges an ongoing violation: the continuing wrongful displacement of the excavated remains and other items from the archaeological site. *Id.*

Count IX also seeks prospective relief: an injunction requiring the Tribal Officials to come into compliance with the Archeological Resources Protection Act by seeking the consent of the Muscogee (Creek) Nation to the excavation and other activities subject to the Archeological Resources Protection Act, and reversing any unconsented-to actions, including restoration of the site to the extent possible if the Nation does not consent to any such activity. *Id.* at 64. In addition, even if the Court determines consent is not required, the Archeological Resources requires that excavated items subject to the Act be curated in accordance with particular requirements under the law. *Id.* at 63.

(6) *Count X: Ongoing violations of the National Historic Preservation Act.*

Count X alleges that Tribal Officials violated the National Historic Preservation Act by failing to carry out its obligations as a delegee of federal preservation responsibilities under the Act. *See* Second Amended Complaint, Dkt. 190 at 64-69. (specifying multiple failures and violations of delegated duties). As a result, damage is occurring at the Site that could have been avoided had Tribal Officials fulfilled their legal responsibilities, including ongoing mistreatment of the excavated remains and items. *Id.* at 5, 6, 31, 70. This ongoing mistreatment includes improper storage and handling of remains and items that have yet to be reburied and continued displacement of all remains and items from their intended resting places, *id.*—displacement that never would have occurred if Defendants had complied with the law.

Count X alleges ongoing violations: the continuing wrongful displacement and improper treatment of the excavated remains and other items from the Site. *Id.* at 5, 6, 31, 64-71.

Count X also seeks prospective relief: an injunction requiring Tribal Officials to comply with the National Historic Preservation Act and consult with the Muscogee (Creek) Nation during restoration of the Site to avoid or mitigate further adverse effects to the Site. *Id.* at 72.

> *(7) Counts XI and VIII: Ongoing violations of the Free Exercise Clause, Religious Freedom Restoration Act, and Religious Land Use and Institutionalized Persons Act.*

Counts XI and VIII allege an ongoing violation of federal law: it alleges that the Tribal Officials are substantially burdening Plaintiffs' religious obligations to (1) remove their ancestors from what is in Plaintiffs' religion akin to purgatory by returning them to their intended resting places and (2) adhere to religious protocol in the reburial and maintenance of the Site thereafter. Second Amended Complaint, Dkt. 190 at 72-76, 59-61.

Plaintiffs also seek prospective relief: an order requiring Tribal Officials to "cease preventing Plaintiffs from fulfilling their religious obligations" by restoring the Site to its pre-excavation condition. *Id.* at 76, 78-79.

One key, common thread runs through all counts against Tribal Officials in the Second Amended complaint: Plaintiffs seek prospective relief for ongoing violations of law. Nowhere is there a claim for damages against Tribal Officials for past acts. All counts therefore satisfy the "straightforward inquiry" required under *Ex Parte Young*.

### b)  *None of Plaintiffs' claims implicate "special sovereignty interests."*

The Tribal Officials claim that even if they are committing ongoing violations of applicable law, their "special sovereignty interests" prevent the application of the *Young* doctrine. "Special sovereignty interests" are a "unique" and "narrow" exception to *Young* established by the Supreme Court in *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261 (1997). Nearly all appellate circuit courts that have addressed this exception after the *Verizon* Court clarified the "straightforward inquiry" under *Ex Parte Young* have either (1) held that *Couer d'Alene* applies only where "an action implicates the exact issues of *Coeur d'Alene* itself, namely navigability of waters or the state's control over submerged lands,"[4] or (2) held that the exception no longer exists after *Verizon*.[5]

---

[4] *Lacano Investments, LLC v. Balash*, 765 F.3d 1068, 1074 (9th Cir. 2014) (internal citations and quotations omitted); *see also*:

- Eleventh Circuit: *Hollywood Mobile Estates*, 415 Fed. Appx. at 211 (explaining that the interests must be of the type in *Coeur d'Alene*, i.e., "the functional equivalent of a quiet title action against the state"); *Lane v. Cent. Alabama Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (observing that the exception in *Coeur*

Last year in *Curling,* the Eleventh Circuit limited *Coeur d'Alene* to its facts. 761 F. App'x 927, 933–34 (11th Cir. 2019) (*Couer d'Alene* was an "unusual case" with facts that gave rise to a narrow exception to *Ex parte Young*). The Eleventh Circuit in *Curling* held that there was nothing so unusual about the claim that state election officials weren't comporting with the Constitution that "warrants applying *Coeur d'Alene Tribe*'s narrow exception." 761 F. App'x at 934. In making this observation, the court relied on the Tenth Circuit's opinion in *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 912 (10th Cir. 2008). That case held that *Verizon* limited the "reach" of *Coeur d'Alene Tribe*, and the Tenth Circuit later clarified that *Verizon* eliminated the special sovereignty interests inquiry from the *Ex Parte Young* analysis altogether. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012) (citing *Verizon,* 535 U.S. at 645; *Hill v. Kemp,* 478 F.3d 1236, 1259 (10th Cir.2007); *see also Columbian Fin. Corp. v. Stork*, 702 F. App'x 717, 722 (10th Cir. 2017) ("we have recognized that, after *Verizon Maryland*, this inquiry [regarding special sovereignty interests] is no longer required").

This case does not implicate the issues involved in *Coeur d'Alene*. The facts are instead similar to those in *Hollywood Mobile Estates*, 415 Fed. Appx. 207, where a business sued tribal officials to regain possession of leased premises from the tribe from which the business was

---

*d'Alene* was driven by the "particular and special circumstances" of that case, and holding that the exception did not apply because "[t]his case is not like *Coeur d'Alene*").

- D.C. Circuit: *Vann v. Kempthorne*, 534 F.3d 741, 756 (D.C. Cir. 2008) ("we cannot extend *Coeur d'Alene* beyond its 'particular and special circumstances,' 521 U.S. at 287, 117 S.Ct. 2028, which involved the protection of a State's land");

[5] *See*:

- Fifth Circuit: *Williams On Behalf of J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) ("We have never before applied the holding of *Coeur d'Alene* in a context outside of the unique land rights challenge in that case. . . . To the contrary, this circuit has rejected the idea that *Coeur d'Alene* affects the traditional application of *Ex parte Young*.") (internal quotations and citations omitted).

- Seventh Circuit: *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.,* 603 F.3d 365, 372 (7th Cir. 2010) ("Although *Coeur d'Alene Tribe* seemed to introduce a new balancing approach (and new uncertainty) to the application of *Ex parte Young*, . . . the Supreme Court then turned away from that balancing approach [involving special sovereignty interests] in *Verizon Maryland* and returned to the "straightforward" inquiry into "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." 535 U.S. at 645); *Ameritech Corp. v. McCann*, 297 F.3d 582, 588 (7th Cir.2002) ("While the Supreme Court [in *Coeur d'Alene Tribe*] seemed to advocate this balancing approach, a majority of the Court in *Verizon* rejected it.").

- Tenth Circuit: *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012) (noting that the special sovereignty interests exception was abrogated by *Verizon*).

allegedly wrongfully ejected. The tribal officials argued that the business's claims should be barred under *Coeur d'Alene* because it implicated special sovereignty interests, given that the relief the business sought required "(1) ordering the tribal council members into session; (2) compelling them to place matters on the agenda contrary to established procedures; and (3) forcing members to abandon their obligations of office and vote as the court has directed, contrary to the interests of the Tribe." *Id.* at 210. The Eleventh Circuit rejected the argument that *Coeur d'Alene* applied on those facts:

> Here, the requested injunction would merely affect the tribe's possessory rights to the property for the remainder of the lease term. It would not remove the land from the tribe's jurisdiction or permanently deprive the tribe of its property interests. The fact the tribal officials may have to take a vote to effect compliance with such an injunction does not create a "special sovereignty interest." We therefore hold that the district court erred in concluding the relief sought implicates special sovereignty interests. Instead, we hold, based on this record and these parties, that HME's request for an injunction restoring it to the premises is not barred by tribal sovereign immunity.

*Id.* at 211.

Here, the Tribal Officials make the same "special sovereignty interests" arguments as the tribal officials in *Hollywood Mobile Estates*. And, as in *Hollywood Mobile Estates*, Tribal Officials alleged sovereignty interests do not merit application of *Coeur d'Alene*.

First, this court's clarification that the Wetumpka property was not validly taken into trust in 1984 under the Indian Reorganization Act would not "extinguish" Poarch's "control over a vast reach of lands and waters long deemed . . . to be an integral part of its territory." *Coeur d'Alene*, 521 U.S. at 282. The Wetumpka property would *still be* under Poarch's control, just in fee status—as it always should have been since Poarch's acquisition of the property in 1980.

Nor is the Wetumpka property "long deemed" to be Poarch's territory. Poarch acquired it in 1980, and in its application for federal recognition, Poarch acknowledged that it did not historically occupy or control the land. Poarch's professed origin was in the "small geographic area" of "an eighteen-mile radius" around Tensaw, Alabama. *See* Recommendation and Summary of Evidence for Proposed Finding for Federal Acknowledgment, p. 1-2 of 121 (Dec.

29,      1983),      *available      at*      https://www.bia.gov/sites/bia.gov/files/assets/as-
ia/ofa/petition/013_prchcr_AL/013_pf.pdf. Individuals who resided in part of the Muscogee
(Creek) Nation's territory—which spanned most of what later became Alabama, including what
is now Wetumpka—did so pursuant to permission from the Nation. *Id.* at 3 (these individuals
"applied for and were given permission by the council of the Creek Nation to settle on the
Alabama-Tensaw River lands").

Second, the promissory estoppel claims in the Second Amended Complaint do not seek to
give Plaintiffs' "de facto control of the property," as Tribal Defendants allege (dkt. 202 at 15).
Instead, the claims seek injunctive relief to compel Poarch officials to comply with *Poarch's
own promises*. Poarch's promises that Hickory Ground would be permanently protected so that
"Creeks from Oklahoma may return and visit their ancestral home" where their ancestors were
buried are sufficient to establish a constructive trust to fulfill those promises. Dkt. 190-1, Ex. A
at PDF pp. 4-5, 7; *see infra* at 40 to 50. That Poarch is now unhappy with its own promises does
not give it special sovereign interests to break them.

Third, issuance of an affirmative injunction directing Poarch officials to restore Hickory
Ground to its pre-excavation state does not implicate special sovereignty interests. That relief is
in keeping with Poarch's own promises that it acquired Hickory Ground to *prevent* development
of the property and preserve it for the Muscogee (Creek) Nation in recognition that it was the
Nation. It is also in keeping with various other laws that prohibited excavation and development
on the property, including but not limited to the Native American Graves Protection and
Repatriation Act, the Archeological Resources Protection Act, the National Historic Preservation
Act, and the Religious Freedom Restoration Act. When Plaintiffs filed this suit, Poarch was just
beginning construction. Poarch and its officials *chose* to continue construction knowing that it
was illegal, and now argue that because construction is completed, this Court cannot require it to
comply with applicable law by undoing what the law prohibited it from doing in the first place.
Because governmental authorities have an obligation to cure violations of law, "judicial authority
may be invoked" if those authorities "fail in their affirmative obligations," and "the scope of a

district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Hutto*, 437 U.S. at 687 n.9 (internal quotation and citation omitted). These powers include *"bring[ing] an ongoing violation to an immediate halt." Id.*

As in *Curling*, Plaintiffs' claims seek injunctive relief to bring Tribal Defendants into compliance with applicable law. Quite simply and logically, a tribe "has no interest in protecting a sovereignty concern that has been taken away" in the form of applicable law prohibiting certain conduct. *Vann v. Kempthorne*, 534 F.3d 741, 755-56 (D.C. Cir. 2008). "The tribe does not just lack a 'special sovereignty interest' in [conduct that would violate applicable law]—it lacks *any* sovereign interest in such behavior." *Id.* at 756.

The Tribal Defendants have no special interest in conducting their affairs in a manner that violates the law. The Tribal Defendants are not immune from Plaintiffs' claims.

**B.     The Plaintiffs' Indian Reorganization Act claim should not be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.**

Because Plaintiffs' Indian Reorganization Act claim is against Secretary Bernhardt, not Tribal Defendants, and because Tribal Defendants and Federal Defendants raise the same arguments in support of their motion to dismiss Plaintiffs' Indian Reorganization Act claim, Plaintiffs address both groups of Defendants' arguments in Section IV.A of their Response to the Federal Defendants' Motion to Dismiss.

**C.     The Plaintiffs' promissory estoppel claim should not be dismissed.**

Plaintiffs' promissory estoppel claim asserts that, in acquiring Hickory Ground, Poarch promised to protect the Site from development and preserve the culturally significant historical and burial grounds for Plaintiffs' benefit. Dkt. 190 at 48. Plaintiffs relied on this promise by cooperating with Poarch's application to purchase the Site and foregoing other potential avenues to block development on these sacred cultural grounds. *Id.* Plaintiffs therefore ask this Court to impose the equitable remedies of an injunction and a constructive trust to halt Poarch's misuse of Hickory Ground and restore the Site to its original state. *Id.*

Tribal Defendants contend that Plaintiffs' promissory estoppel claim is barred by the statute of limitations and the statute of frauds. *See* Dkt. 202 at 26–32. These defenses fail, however, because both erroneously presuppose that Plaintiffs' claim sounds in contract. As discussed below, Alabama case law makes clear that that promissory estoppel is an equitable remedy, and the nature of the claim must be analyzed on a case by case basis. Because Plaintiffs seek the imposition of a constructive trust, rather than monetary damages or the enforcement of a specific contractual term, their claim is properly characterized as one in the nature of recovery of land. Accordingly, the applicable 10-year statute of limitations has not yet run, and the statute of frauds is inapplicable.

Tribal Defendants also contend that Plaintiffs have failed to state a claim for promissory estoppel. Dkt. 202 at 32–37. But Plaintiffs have plausibly alleged that they detrimentally relied on Poarch's representation that it would preserve Hickory Ground for the cultural benefit of the Muscogee (Creek) Nation. While Tribal Defendants may dispute the veracity of these allegations, Plaintiffs have met their burden at this early stage to plausibly allege the elements of promissory estoppel.

1.     **The promissory estoppel claim is timely.**

a)   *A ten-year statute of limitations governs the promissory estoppel claim.*

Tribal Defendants argue that the promissory estoppel claims[6] are time-barred by the two-year statute of limitations in Alabama Code § 6-2-38(l). This statute does not apply to Plaintiffs' promissory estoppel or unjust enrichment claims because they do not assert a claim in the nature of damages for personal injury as contemplated by Alabama Code § 6-2-38(l).

---

[6] The Second Amended Complaint includes a count of promissory estoppel under state law in the event the Court rules in Plaintiffs' favor on Count I (under the Indian Reorganization Act) and a count of promissory estoppel under federal law in the event the Court does not rule in Plaintiffs' favor on Count I. *See* Second Amended Complaint, Dkt. 190, Counts III and VI at 48-49, 53. As the controlling law and relevant facts are substantially the same regardless of which claim is operative, as the Tribal Defendants have treated them as a single claim for purposes of their brief, Plaintiffs treat them as a single claim in this brief as well. The Plaintiffs will do the same for the alternatively pled unjust enrichment claims, as the Tribal Defendants did in their brief. Second Amended Complaint, Dkt. 190, Counts III and VI at 46-48, 53.

Rather, these claims are rooted in equity and seek the equitable remedy of an injunction and constructive trust to enforce Poarch's promise of protection of the Hickory Ground site. *See* Second Amended Complaint, Dkt. 190 at 46-49, 76-77. They are therefore claims in the nature of recovery of real property under Alabama Code § 6-2-33(2), which provide a ten-year statute of limitations.

This Court's decision in *Auburn University v. IBM,* 716 F. Supp. 2d 1114, 1118 (M.D. Ala. 2010) teaches that the determination of which statute of limitations should apply to a particular claim depends on the nature of the claim itself. It recognizes that claims will not always fall into the same category for limitations purposes and certainly does not hold or otherwise dictate that promissory estoppel claims must be classified as either tort claims or implied-contract claims. Indeed, the Alabama Code Article governing statutes of limitations is structured this way: each section sets out a time limit, *see* Alabama Code §§ 6-2-31 to -40, and then various categories of claims are provided under each one. The court must decide the category in which a particular claim fits to determine the applicable statute of limitations.

Thus, in *Auburn University*, this Court noted that the threshold issue was whether the claim at issue—unjust enrichment—fit into the category described by Alabama Code § 6-2-38(l); i.e., "whether the claim at issue seeks recovery for an *injury* that *arises* from contract." *Auburn Univ.*, 716 F. Supp. 2d at 1118 (emphasis in original). Because unjust enrichment claims vary, including claims "for enrichment flowing from a breach of the corporate fiduciary duties of loyalty and due care" that "clearly arise from tort injuries" and claims "for enrichment flowing from the rendering of substantial performance on a merely technically invalid contract" that "clearly arise from contract injuries," "it would be improper to classify all unjust-enrichment claims as either tort claims subject to the two-year statute of limitations or implied-contract claims subject to the six-year statute of limitation." *Id.*

Another court in the Northern District recently determined that the approach of the court in *Auburn University* in "determining the appropriate statute of limitations according to the circumstances from which the unjust enrichment claim arises" is a "well-reasoned approach,"

especially "[g]iven the lack of binding authority on th[e] issue" of the appropriate statute(s) of limitation for unjust enrichment claims. *Branch Banking & Tr. Co. v. McDonald*, No. 2:13-CV-000831-KOB, 2013 WL 5719084, at *7 (N.D. Ala. Oct. 18, 2013). Noting that the options were between a six- and ten- year statute of limitations for the plaintiff's particular unjust enrichment claim, the court decided that because the claim arose from a negotiable instrument, the six-year statute of limitations applied. *Id.*

Like unjust enrichment claims, the nature of promissory estoppel claims vary such that they may fit in different categories, it would not be appropriate to treat all promissory estoppel claims as fitting in only one or two categories for statute of limitation purposes. Rather, the focus is on the nature of the claim. *Id.* Where the claim is for enforcement of a right in land, Alabama case law indicates that the ten-year statute of limitations governing actions for the recovery of lands should apply.

It is "well settled" under Alabama Supreme Court law "that an action for establishment of a resulting trust is subject to the statute of limitations of ten years," as such action is "in the nature of a suit for the recovery of land since land is the subject matter of the suit." *Sykes v. Sykes*, 78 So. 2d 273, 276 (Ala. 1954) (internal quotation and citations omitted; emphasis added); *see also Henslee v. Merritt*, 82 So. 2d 212, 214 (Ala. 1955) (same). The court in *Robinson v. Sanders*, 530 So. 2d 821, 821 (Ala. 1988) (per curiam) affirmed the lower court's judgment based on the 10-year statute of limitations applicable to the remedy of constructive trust, as such remedy was one "for recovery of land" under Alabama Code § 6-2-33.

Tribal Defendants misconstrue the facts in order to circumvent application of the ten-year statute of limitations. They incorrectly state that Plaintiffs' allegations are merely that Poarch obtained property subject to a 20-year preservation covenant and then "began to develop the property after that [covenant] expired in a manner that is offensive to the Plaintiffs. Dkt. 202 at 28. What Plaintiffs actually allege in Counts III and VI is that "Poarch promised the Muscogee (Creek) Nation and Hickory Ground that it would preserve the Hickory Ground Site in *perpetuity*"; that the Muscogee (Creek) Nation "relied on that promise to its detriment in not

42

objecting to Poarch's acquisition of the property"; and that Poarch was aware that if Poarch had instead disclosed that it would desecrate the site, the Muscogee (Creek) Nation would have sought to prevent the acquisition.  Second Amended Complaint, Dkt. 190 at 48-49, 53 (emphasis added).

Poarch was quite clear that (1) its promises were perpetual, and not limited to just 20 years, and (2) were expressly intended to benefit the Muscogee (Creek) Nation and Hickory Ground Tribal Town:

- "Acquisition of the property is principally a protection measure. Acquisition will prevent development on the property." Dkt. 190-1, Ex. A at PDF p. 4.

- "The Hickory Ground site will continue to enhance [Creek youth's] understanding of their history, *without excavation*." *Id.* (emphasis added).

- "There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved." *Id.*

- "In order to halt the destruction [i.e., clearing and leveling the land] planned for the site and to *insure [sic] against future destruction*, funds for acquisition of fee simple title are requested." *Id.* at PDF pp. 4-5 (emphasis added).

- "Specific end products of the project is to provide protection for a particularly important site in Creek History. . . . Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home." *Id.* at PDF p. 5.

*See also* Second Amended Complaint. Dkt. 190 at 18-20, 44, 46-49.

The Alabama Supreme Court recently detailed the nature of the constructive trust remedy in *Mitchell v. K & B Fabricators, Inc.*, 274 So. 3d 251 (Ala. 2018). "Equity may impress a constructive trust on property in favor of one beneficially entitled thereto when another holds title to the property by fraud, commission of wrong, abuse of a confidential relationship, or any other form of unconscionable conduct"; or "who, against the rules of equity and against good conscience, in any way either has obtained or holds and enjoys legal title to property that in justice that person ought not to hold and enjoy." *Id.* at 266 (internal quotations and citations

omitted). The obligation is "imposed not because of the intention of the parties but to prevent unjust enrichment"; thus, "[a] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Id.* (internal quotations and citations omitted). "[A]ctual or intentional fraud is not an essential element of a constructive trust . . . a constructive trust may be imposed to prevent unjust enrichment, without regard to actual fraud." *Hughes v. Branton*, 141 So. 3d 1021, 1026 (Ala. 2013) (quotation and citation omitted). A constructive trust may be also impressed upon property when the owner of the property has abused a confidential or fiduciary relationship. *Radenhausen v. Doss*, 819 So. 2d 616, 620 (Ala. 2001).[7]

Plaintiffs have pleaded the traditional bases for establishment of a constructive trust as the remedy for their promissory estoppel claims. Poarch's promises were unequivocal, and expressly involved, and were made for the benefit of, Plaintiffs, in connection with the wrongful acquisition of real property.

Poarch clearly does not intend to keep those promises—and, as Plaintiffs allege, Poarch knew that if it disclosed this to the Muscogee (Creek) Nation, "the Muscogee (Creek) Nation would have objected immediately to Poarch's acquisition of the land in any status (fee or trust) and made efforts to prevent the acquisition." Second Amended Complaint, Dkt. 190 at 48-89. This is exactly the kind of unconscionable conduct that merits a constructive trust remedy. Furthermore, a claim of promissory estoppel premised on unconscionable conduct in the acquisition and possession of real property falls within the category of "[a]ctions for the recovery of lands, tenements or hereditaments, or the possession thereof," under Alabama Code § 6-2-33

---

[7] The responsibilities of a fiduciary flow to "all persons who occupy a position out of which the duty of good faith ought in equity and good conscience to arise. It is the nature of the relation which is to be regarded, and not the designation of the one filling the relation." *Line v. Ventura*, 38 So. 3d 1, 12-13 (Ala. 2009). This includes relationships in which "one person has gained the confidence of another and purports to act or advise with the other's interest in mind," and "arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another." *Id.* at 13 (quoting *Bank of Red Bay v. King*, 482 So. 2d 274, 284 (Ala. 1985)).

governing actions for which there is a ten-year statute of limitations.[8]

Plaintiffs' allegations, which the Court is required to accept as true for purposes of this motion, dispute the Tribal Defendants' assertions that Plaintiffs knew in 1992 or 2002 that Poarch did not plan to abide by its promises to preserve Hickory Ground. For example, a Bureau of Indian Affairs Archeologist and Federal Preservation Officer issued a Briefing Statement to the Assistant Secretary of Indian Affairs recounting that Poarch conducted limited exploratory testing at the Site around 1992 "to determine if some portion of the site could be developed without damaging archeological resources," and such activity "ceased after 1993" after the testing found "no area where such resources were totally absent." Dkt. 200-2 at PDF p. 29. Hickory Ground Tribal Town's October 19, 2002 letter ultimately states that Hickory Ground Tribal Town heard rumors through third parties that Poarch may be disturbing the site, and "hope[s] this is not the case." Dkt 200-1 at PDF page 26; *see also* Dkt. 190 at 26, ¶ 92. Because these are issues of disputed fact, they should be resolved on a properly-developed record and are not an appropriate basis to dismiss the claim. *See Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 976 (11th Cir. 2015).

Plaintiffs' meritorious claim for promissory estoppel and a remedy of a constructive trust is timely because it is a claim in the nature of recovery of lands (as discussed in the next section) and is therefore accorded a ten-year statute of limitations.

---

[8] Tribal Defendants misapprehend Plaintiffs' request to impose a constructive trust in the event that the Court enters a judgment in their favor on Count I (under the Indian Reorganization Act). Dkt. 202 at 29 (citing Second Amended Complaint, Prayer for Relief at 76 (paragraphs (a), (b)(i))). Plaintiffs' request for a remedy under the federal common law of promissory estoppel to "h[o]ld [Poarch] to its promises to perpetually preserve Hickory Ground," Second Amended Complaint, Prayer for Relief at 77 (paragraph (c)(i)), is premised on the same unconscionable conduct in the acquisition and possession of real property as the state law promissory estoppel claim, and seeks equivalent protections over the real property under federal common law, and therefore falls within the category of "[a]ctions for the recovery of lands, tenements or hereditaments, or the possession thereof," for which federal common law would provide a ten-year statute of limitations through Alabama Code § 6-2-33.

> **b)** *Alabama Code § 6-2-33(2) provides a ten-year statute of limitations for all claims "in the nature of" recovery of land.*

As the above cases hold, the categories of actions falling within Alabama Code § 6-2-33(2) include those "in the nature of" a suit for recovery of land. In other words, the plaintiff need not literally seek recovery of land, as the Tribal Defendants contend.

For example, in *Glass v. Cook*, the court held that a complaint seeking rescission of a lease on the grounds of fraud was governed by the ten-year statute, as "[t]his suit is *in essence* one to recover land and is controlled by the ten-year statute." 57 So. 2d 505, 507-08 (1952) (emphasis added). Similarly, *Branch Banking & Tr. Co. v. McDonald*, No. 2:13-CV-000831-KOB, 2013 WL 5719084 (N.D. Ala. Oct. 18, 2013) involved a claim for an "equitable mortgage" after the mortgage on a property was erroneously recorded as satisfied and discharged and the discharged debtor then failed to pay on the erroneously discharged mortgage despite promises that he would continue to make payments. The court held that the "equitable mortgage" claim was an action for the recovery of lands subject to the ten-year statute of limitations in § 6-2-33(2). *Id.* at *6 (citing *Barnett v. Waddell*, 27 So. 2d 1 (Ala. 1946)) (action for equitable mortgage subject to 10-year statute of limitations as an action for the recovery of lands).

The language in Section 6-2-33(2) referring to "[a]ctions for the recovery of lands, tenements or hereditaments, or the possession thereof," and its inclusion of claims "in the nature of recovery of lands" seeking a constructive trust remedy reflect long-established common law. Specifically, state and federal common law hold that where a landowner promises specific use (or non-use) of land, the landowner can be held to its promises in the form of a constructive trust. As discussed above, claims to enforce promises regarding the use of land are "in essence" or "in the nature of" claims seeking recovery of lands.

"A dedication of land" by a landowner "may be defined to be an act by which the owner of the fee appropriates to some public use an easement in the land." *Forney v. Calhoun Cnty.*, 84 Ala. 215, 220 (1887). The landowner's promise that land will be used for a particular purpose "may be done by writing, or it may be done verbally—without any writing. It may be express, or

it may be implied. It may be by a single act, or by a series of acts properly indicative of the owner's intention." *Id.* The uses to which the land may be dedicated include any "use of a public nature," including a graveyard. *Id.* at 220-21. Once accepted, the dedication "is irrevocable," even where the original dedication "was voluntary in the sense of being made without any valuable consideration." *Id.*

Especially "[w]here the owner of land intentionally, or by culpable negligence, leads the public to believe that he has dedicated it to a public use, he will, upon every principle of fair and conscientious dealing, be *estopped* from denying the fact of such dedication to the prejudice of those whom he has thus misled." *Id.* at 221 (emphasis in original). Thus, "[a] court of chancery will intervene to protect the public in the enjoyment of this easement against any interference of the owner of the legal title, bringing to their assistance the prompt aid of its injunctive relief." *Id.* (citing *Beatty v. Kurtz*, 27 U.S. 566 (1829)) (other citations omitted).

*Beatty v. Kurtz* established the principle that equitable principles can be used to enforce promises regarding the protection of burial grounds. 27 U.S. 566 (1829). In that case, two individuals (Beatty and Hawkins) platted an addition to Georgetown, indicating on the plat that a particular parcel was for the use of the Lutheran Church. An informal group of Lutherans used the parcel for a church and burial grounds. The group sued after heirs of Beatty and Hawkins tore down fences and tombstones on the parcel to make way for redevelopment plans. A unanimous Supreme Court held that the Lutheran group's interest in the parcel had been "consecrated to their use by perpetual servitude or easement" through Beatty and Hawkins' indication that the parcel was intended for the Lutherans' use.

> [T]he sepulchres of the dead are to be violated; the feelings of religion, and the sentiment of natural affection of the kindred and friends of the deceased are to be wounded; and the memorials erected by piety or love, to the memory of the good, are to be removed so as to leave no trace of the last home of their ancestry to those who may visit the spot in future generations. It cannot be that such acts are to be redressed by the ordinary process of law. The remedy must be sought, if at all, in the protecting power of a court of chancery; operating by its injunction to preserve the repose of the ashes of the dead, and the religious sensibilities of the living.

*Id.* at 584-85. Thus finding that Beatty and Hawkins had promised that the land would be used for a particular purpose that included burials, the court imposed a constructive trust preventing development of the land.

Thus, the equitable remedy of a constructive trust has special application in the context of burial grounds. The common law provides that the dead have rights "which are committed to the living to protect," and most significantly, the right to an undisturbed repose in perpetuity. It is "an offense against good morals" to mortgage a plot of ground in a cemetery that is "dedicated exclusively, under the sanctions of the law, as a sanctuary for the dead of one's family, and already consecrated by the ashes of one's kindred"; to do so "is contrary to its equity, and is within the evils it was designed to cure, and our moral nature protests against it." *Thompson v. Hickey*, 8 Abb. N. Cas. 159, 166 (N.Y. Sup. Ct. 1880). "[B]urial places dedicated to public use . . . are not to be degraded to the sordid enterprises of the money-maker." *Brown v. Maplewood Cemetery Ass'n*, 89 N.W. 872, 877 (1902). Even absent a dedication of land to a particular use involving burial grounds, Alabama Code § 35-1-4(a) imposes upon owners of private land "on which a cemetery, graves, or burial sites are located" a "duty to allow ingress and egress to the cemetery, graves, or burial sites" by "descendants of the deceased persons buried there." That such protection of access arises automatically even on private lands underscores Alabama's recognition of the principles established in common law.

Poarch's promises that Hickory Ground would be permanently protected amply support the establishment of a constructive trust to enforce those promises. Before acquiring Hickory Ground, Poarch knew of its cultural and religious importance to the Muscogee (Creek) Nation and the Hickory Ground Tribal Town, and was aware that there were burials at the site. In its application for federal preservation funds, Poarch noted the presence of burial remains at the site and cautioned that destruction of archeological resources "destroy[s] the cultural history of Creek people" and that past destruction had given anthropology and archaeology "a bad name" because the excavation ignored "the significance . . . to Native Americans." Dkt. 190-1, Ex. A at PDF p. 7. After emphasizing the importance of the Hickory Ground Site to the Muscogee (Creek)

Nation, Poarch promised that "[t]he Hickory Ground site will continue to enhance [Creek youth's] understanding of their history, without excavation," noting that the "existing Hickory Ground tribal town in Oklahoma" will be "pleased to know their home in Alabama is being preserved" and promising that, as a "[s]pecific end product[] of the project is to provide protection for a particularly important site in Creek History," "Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home." *Id.* at PDF pp. 3-5. These promises were shared with the Muscogee (Creek) Nation; the Poarch's letter states that the preservation project was to be undertaken by two "Native American Groups," including the Creek Nation Foundation in Oklahoma that represented the Muscogee (Creek) Nation. *See id.* at PDF p. 3, 5. The detailed nature of the allocation of responsibility between Poarch and the Muscogee (Creek) Nation demonstrates that the two groups had discussed the preservation project and the related commitments at length: one half of the Site's appraised value would be donated to the Creek Nation Foundation; the property would be jointly owned by the two groups (who would be "equally responsible for the protection and care of the site" as a cultural resource management endeavor to "guard[] and preserv[e] a site directly connected with their entire history"); and an Attorney for the Creek Nation Office of Justice would handle legal matters for the Creek Nation Foundation. *Id.* at 5–6. *See also generally* Dkt. 190 at 18–20, 44, 46–49.

Three years later, the Poarch Chairman publicly testified in a Congressional hearing that Poarch was "in ownership of one of the last historical sites of the Creek nation before the removal to Oklahoma," and "propose[d] to use part of this money" that was the subject of the hearing "to make that site, not only available to all of our people, but to the general public as well." *Id.* at 20 (citing S. Hrg. 98-200 at 21-22 (May 26, 1983)). The Poarch Chairman's written testimony that was also submitted to Congress reiterated in a section titled "preservation of a historical site" that "there is a strong desire among our people to preserve and share our unique history. To this end our tribe has acquired titled [sic] to 'Hickory Ground', one of the most important Creek historical sites. We propose to use fifty percent of the proceeds of S. 1224 to preserve and to present to both Indian and non- Indian this unique and historical site." *Id.* (citing

S. Hrg. 98-200 at 24 (5/26/1983)).[9] A representative of the Muscogee (Creek) Nation Chief testified at the same hearing and was present when the Poarch Chairman made these promises.[10]

Poarch's promises are of the kind described in *Forney*, *Beatty*, and *Thompson* and are in the nature of recovery of land—imparting easement-like rights in the beneficiaries—warranting the equitable remedy of a constructive trust. The Plaintiffs' promissory estoppel claim requesting that this Court hold Poarch to its promises of protecting Hickory Ground in perpetuity, including for the purpose of the Muscogee (Creek) Nation and the Hickory Ground Tribal Town visiting their "ancestral home," thus falls within the category of claims under Alabama Code § 6-2-33 that have a ten-year statute of limitations.

### 2. Plaintiffs have alleged the elements of promissory estoppel.

"Although the full contours of the doctrine of promissory estoppel are ill-defined and still developing as part of Alabama's common law," *Sykes v. Payton*, 441 F. Supp. 2d 1220, 1223 (M.D. Ala. 2006) (citing Corbin on Contracts § 8.12), and should be informed by the above-cited cases governing promises relating to lands that house burial grounds, Alabama follows the definition of the doctrine set forth in the Restatement of Contracts. Specifically, to state a claim for promissory estoppel, a plaintiff must allege "(1) that the defendant made a promise (2) that the defendant should have reasonably expected to induce action or forbearance of definite and substantial character; (3) the promise did, in fact, induce action or forbearance; (4) and injustice can be avoided only by enforcing the promise." *Id.* at 1224 (citing *Bush v. Bush,* 278 Ala. 244, 177 So.2d 568, 570 (1964)). Plaintiffs have properly alleged these elements and facts establishing a plausible claim for purposes of Rule 12(b)(6).

---

[9] Poarch received the funds. *See* Pub. L. 98–390, 98 Stat. 1356 (1984) (providing for funds to go to "Eastern Creek entities" who obtain federal recognition by December 30, 1984); 49 Fed. Reg. 24,083-01 (June 11, 1984) (extending federal recognition to Poarch).

[10] Poarch is correct that the testimony was given after Poarch acquired Hickory Ground in *fee*. Dkt. 202 at 35 n.16. However, it was given *before* the Site was taken into trust, and Plaintiffs allege that these assurances led the Muscogee (Creek) Nation not to object or seek to prevent Poarch's acquisition "either in fee or trust." *See* Second Amended Complaint. Dkt. 190 at 20, 46-49.

The Second Amended Complaint plainly alleges the elements of promissory estoppel: (1) "Poarch promised the Muscogee (Creek) Nation and Hickory Ground that it would preserve the Hickory Ground Site in perpetuity"; (2) "Poarch was aware that, had the Muscogee (Creek) Nation known that Poarch would not protect the Hickory Ground Site as it promised and instead would destroy Plaintiffs' sacred burial grounds and religious sites, the Muscogee (Creek) Nation would have objected immediately to Poarch's acquisition of the land in any status (fee or trust) and made efforts to prevent the acquisition"; *i.e.*, Poarch expected to induce forbearance of definite and substantial character; (3) "[t]he Muscogee (Creek) Nation relied on that promise to its detriment in not objecting to Poarch's acquisition of the property, either in fee or trust, and in supporting Poarch's federal recognition"; and (4) "[t]he injustice of Poarch enriching itself by breaking its promises and thereby causing irreparable harm to the Muscogee (Creek) Nation and Hickory Ground can only be avoided by enforcing those promises." Dkt. 190 at 48–49.

Tribal Defendants argue that Plaintiffs have not alleged (1) an enforceable promise, (2) that Poarch should have reasonably expected to induce action or forbearance, or (3) that Plaintiffs relied to their detriment on Poarch's promises. Dkt. 202 at 32–33. These claims are without merit and are belied by the facts.

### a)   *Plaintiffs allege an enforceable promise.*

Tribal Defendants inexplicably insist that Poarch's application for preservation funds to acquire Hickory Ground, which expressly states that the acquisition was to "prevent development on the property" and "insure against future destruction," Dkt. 190-1 at PDF p. 4–5, instead "makes clear that Poarch Band intended to develop the property in the future." Dkt. 202 at 34. Tribal Defendants then argue that Plaintiffs have not alleged an enforceable promise. This assertion defies logic, law, and fact.

First, Tribal Defendants claim that it is unclear what "preserve" means in Plaintiffs' allegation that Poarch "promised to preserve the Hickory Ground Site in perpetuity." Dkt. 202 at

51

33. Plaintiffs detail exactly what they mean: In Paragraph 202[11] Plaintiffs allege that Poarch "promise[d] that it would perpetually protect the Site," and Paragraph 212 reiterates that the promise was "permanent protection." In Paragraph 203, Plaintiffs directly quote Poarch's application for federal preservation funds, in which Poarch does not mince words about whether Hickory Ground would be "preserved":

> In its application for federal preservation grant funds, Poarch expressly assured that its acquisition of the Hickory Ground Site would result in the "existing Hickory Ground tribal town in Oklahoma…. know[ing] their home in Alabama is being preserved," "without excavation"; that Poarch would provide "permanent protection of the site"; and that "Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home." Poarch warned that "[d]estruction of archaeological resources in Alabama … destroy[s] the cultural history of Creek people."

Paragraphs 67 and 68 (also re-alleged in the Promissory Estoppel claim, ¶214), provide more detailed direct quotes from Poarch's application: "Poarch unequivocally represented and promised that "[a]cquisition of the property is principally a protection measure. Acquisition will prevent development on the property . . . . [P]lans will be developed to minimize continued destruction of the archaeological resources." Dkt. 190 at 18–19 (quoting Dkt. 190-1 at 4). Poarch also stated that a trained anthropologist would "act as an advisor to the tribal councils [of Poarch and the Muscogee (Creek) Nation] on plans for permanent protection of the site." *Id.* (quoting Dkt. 190-1 at 6). Numerous promises focused on the Muscogee (Creek) Nation's continued access to their "preserved" "original homeland":

> "The property will serve as a valuable resource for cultural enrichment of Creek people. . . . The Creek people in Oklahoma pride in heritage and ties to original homeland can only be enhanced. There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved. . . . The Hickory Ground site will continue to enhance [Creek youth's] understanding of their history, without excavation. . . . Specific end products of the project is to provide protection for a particularly important site in Creek History."

---

[11] The Promissory Estoppel claim begins by re-alleging all prior allegations, which include but are not limited to Paragraphs 202-213. *See* Dkt. 190 at 48, ¶ 214.

*Id.* at 19 (quoting Dkt. 190-1 at 5, 6). Poarch was very clear that it was requesting *preservation* funds "[i]n order to halt the destruction planned for the site and to insure [sic] against future destruction. . . . As the landowner is very much interested in developing the property for commercial purposes it is felt acquisition of fee simple title is necessary to prevent destruction of the site." Dkt. 190 at 19, ¶ 68 *Id.* (quoting Dkt. 190-1 at 5).

Tribal Defendants contend that Poarch's preservation fund application letter "leads one to the inescapable conclusion that [Poarch] made no promise at all to preserve the Wetumpka property in perpetuity, without development, excavation, or destruction." Dkt. 202 at 34. All of this is expressly contradicted in Poarch's own application letter, which states that Poarch is acquiring the Site "to insure against future destruction," including "destruction" from "developing the property," and that the Site "will continue" to enhance Creeks' understanding of their history "without excavation." To the extent further explanation of the meaning of "preserve" is needed, the above preservation promises made by Poarch comport with the dictionary definition of the term. Merriam-Webster defines "preserve" as "to keep safe from injury,      harm,      or      destruction**:** PROTECT."      *Preserve*,      Merriam-Webster.com, https://www.merriam-webster.com/dictionary/preserve (last visited June 29, 2020).

Tribal Defendants accuse Plaintiffs of cherry-picking statements from the preservation fund application, but it is Tribal Defendants who contort specific parts of the letter into a warped meaning that no reasonable person would derive from such clear commitments to protect and preserve Hickory Ground. The letter must be read as a whole, and Poarch's statement that "[p]rior to any type of development of the property a scientifically sound archaeological program will be conducted to mitigate or minimize effects upon the historic resources" must be read in conjunction with Poarch's promises of preservation, including in the very next paragraph where Poarch states that:

> [t]he Creek people in Oklahoma pride in heritage and ties to original homeland can only be enhanced. There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved. The site may serve as an open air classroom where Creek youth can

> learn of their heritage. Interpretive programs can be developed around the vast array of history connected with Hickory Ground. The Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) has already conducted CETA sponsored training in archaeological methods for Creek youth. The Hickory Ground site will continue to enhance their understanding of their history, without excavation.

Dkt. 190-1 at PDF p. 4. The next paragraph unequivocally underscores that the acquisition of the Site is to (1) "halt the destruction planned for the site" that would involve "clear[ing] and level[ing] the land to "develop[] the property for commercial purposes," and to (2) "insure against future destruction." *Id.* at PDF pp. 4–5. These paragraphs, along with the other representations in the application, simply cannot be read to effectively say, as Tribal Defendants contend, that Poarch intends to ensure against future destruction and development of the Site by acquiring the Site and destroying it through development. Indeed, the application goes on to say that "[a] matter of great importance about this project is the involvement of Creek People through their government in the management and *protection* of their archaeological resources." *Id.* at PDF pp. 6–7 (emphasis added). At the most, these statements reflect an intention to perform non-invasive, non-destructive archaeological test digs to educate Creek citizens about their history and about archaeology; as "[d]estruction of archaeological resources in Alabama . . . destroy[s] the cultural history of Creek people," so such digs would "continue to enhance [Creek people's] understanding of their history, without excavation" while "bridging the communication gap between archaeology and Native Americans." *Id.* at PDF pp. 4, 7.

It would be nonsensical to read Poarch's promises to "prevent development on the property" and "insure against future destruction" of the site such that the Muscogee (Creek) Nation and Hickory Ground Tribal Town "will be pleased to know their home in Alabama is being preserved" with the understanding that those promises left room for Poarch develop and destroy the property in the future.

Even if Poarch's promises weren't so clear, this Court has recognized that "[a]n express promise is not necessary to establish a promissory estoppel. It is sufficient that there be promissory elements which would lull the promisee into a false sense of security." *Sykes v.*

*Payton*, 441 F. Supp. 2d at 1224 (citing *Mazer v. Jackson Ins. Agency,* 340 So. 2d 770, 774 (Ala. 1976)). Here, the Muscogee (Creek) Nation had been in detailed communications with Poarch on plans to save Hickory Ground from development and preserve it for the benefit of Creeks in Oklahoma and future generations. Nothing in Poarch's application letter indicated that Poarch, in trying to save Hickory Ground from development and ensure against future destruction—for the benefit of the Muscogee (Creek) Nation and Hickory Ground Tribal Town—instead intended to accomplish that development and destruction itself. And nothing indicated that the Muscogee (Creek) Nation's subsequent inability to participate in the acquisition would cause Poarch to abandon its promises. Indeed, after the acquisition occurred, Poarch reaffirmed its commitment to preserve the Site in its Congressional testimony. Poarch's communications with the Muscogee (Creek) Nation quite reasonably gave the Nation a sense of peace and security that Poarch would take care of the sacred site just as it promised. Just as Poarch stated in its application letter, its promises made the Muscogee (Creek) Nation and Hickory Ground Tribal Town "pleased to know their home in Alabama is being preserved."

Poarch's promises to perpetually protect Hickory Ground were specific, unambiguous, and unequivocal. Plaintiffs have alleged an enforceable promise.

**b)** ***Poarch reasonably foresaw that the Muscogee (Creek) Nation would rely on the promises made in the grant application letter, the congressional testimony, and related communication between the parties.***

Tribal Defendants next complain that Poarch could not have reasonably foreseen that Plaintiffs would rely on its promises. As described in detail above and in the Second Amended Complaint, Poarch strongly emphasized the importance of the Hickory Ground Site to the Muscogee (Creek) Nation and Hickory Ground Tribal Town in its application for federal preservation funds. Dkt. 190 at 18-20, 46-49. Poarch knew there were burials on the Site. *See* Dkt. 190-1 at PDF p. 7. And, by virtue of Hickory Ground being a tribal town, Poarch knew or should have known that there were ceremonial grounds at the Site. John Reed Swanton, *Modern Square Grounds of the Creek Indians* 9 (Smithsonian Institution, 1931), *available at*

55

https://repository.si.edu/bitstream/handle/10088/23920/SMC_85_Swanton_1931_8_1-46.pdf

("every Creek town had [a ceremonial] ground"). Poarch shared the application letter for federal preservation funding and related correspondence with the Muscogee (Creek) Nation, as the acquisition was intended to be a joint project. Dkt. 190 at 19–20. And, after the acquisition occurred, Poarch confirmed its plan to continue preserving the Site before Congress and a representative for the Chief of the Muscogee (Creek) Nation.

Poarch knew that the Muscogee (Creek) Nation objected to development of Hickory Ground because the two groups were working together to save the Site from development. *See* Dkt. 190-1 at PDF pp. 5–6. And Poarch knew that, absent the assurances it made about the perpetual preservation of the Site, the Muscogee (Creek) Nation would continue to attempt to save the Site and prevent Poarch's purchase. The same is true for Poarch's 1983 testimony: had Poarch revealed then that it had abandoned plans to preserve Hickory Ground, the Muscogee (Creek) Nation would not have supported its bid for federal recognition and would have objected to, and attempted to prevent, Poarch's acquisition of the Site in trust the next year. Indeed, disbursement of Indian Claims Commission funds—the subject of the Congressional hearing— was contingent on achieving federal recognition by the end of 1984. *See* S. Hrg. 98-200; Pub. L. 98–390, 98 Stat. 1356 (1984) (providing for funds to go to "Eastern Creek entities" who obtain federal recognition by December 30, 1984). As Plaintiffs have alleged, given the importance of the Site to the Muscogee (Creek) Nation, "Poarch was aware that, had the Muscogee (Creek) Nation known that Poarch would not protect the Hickory Ground Site as it promised and instead would destroy Plaintiffs' sacred burial grounds and religious sites, the Muscogee (Creek) Nation would have objected immediately to Poarch's acquisition of the land in any status (fee or trust) and made efforts to prevent the acquisition." Dkt. 190 at 48–49. Thus, Poarch reasonably should have foreseen that the Muscogee (Creek) Nation would rely on its promises in the application for federal funds, its Congressional testimony, and related communications.

That the project went forward without the Muscogee (Creek) Nation does not mean, as Tribal Defendants appear to argue, that the promises Poarch made—based on the supposedly

mutual reverence both groups held for Hickory Ground—were rendered unreliable or nonexistent. Nothing about the circumstances suggests that the Muscogee (Creek) Nation was forcing an unenthusiastic but grudgingly-accepting Poarch Band to protect a sacred Site, or that without the Nation's participation, Poarch would indulge unstated desires to destroy the Site. When the Muscogee (Creek) Nation was ultimately unable to join in the project, the Muscogee (Creek) Nation trusted that Hickory Ground would be protected, in reasonable reliance on Poarch's statements about the importance of the Site and unequivocal promises to preserve it. Dkt. 190 at 47–49. *See also Sykes v. Payton*, 441 F. Supp. 2d at 1225 ("the plaintiffs have alleged that they took the actions outlined above in reliance on [defendant]'s unequivocal representations. Thus, they have sufficiently pled this element of promissory estoppel.").[12]

### c) *Plaintiffs allege detrimental reliance.*

The Tribal Defendants incorrectly assert that Plaintiffs have not alleged a link between Plaintiffs' reliance and the harm they suffer. The gist of Tribal Defendants' argument is that Plaintiffs did not have "legal or practical authority" to prevent Poarch from acquiring the site in trust or fee, so there is no causal connection between Plaintiffs' harm and their forbearance from attempting to prevent Poarch's acquisition of Hickory Ground in fee or trust. Tribal Defendants simply misapprehend the concept of forbearance.

In defining the doctrine of promissory estoppel, "[Alabama] has adopted § 90 of the Restatement of Contracts First which states in pertinent part: 'A promise which the promisor should reasonably expect to induce action **or forbearance** of definite and substantial character and which does so is binding if injustice can be avoided only by enforcement thereof.'" *Wyatt v. Bellsouth, Inc.*, 18 F. Supp. 2d 1324, 1326 (M.D. Ala. 1998) (emphasis added) (quoting *Davis v. Univ. of Montevallo*, 638 So. 2d 754, 757 (Ala. 1994)). Likewise, in the context of constructive

---

[12] Notably, "reliance is evaluated objectively both for reasonableness and foreseeability. Customarily, that evaluation is done by the [factfinder] as fact issues based on all surrounding circumstances." *Sykes v. Payton*, 441 F. Supp. 2d at 1224 (quoting 3 Corbin on Contracts § 8.11).

trust, a beneficiary's acceptance "may be shown either by some positive conduct of the proper public officers evincing their consent in behalf of the public, or may be inferred from official acts of implied recognition on their part, or by long public use, or from the beneficial nature of the dedication." *Forney.*, 84 Ala. at 220.

The Tribal Defendants incorrectly assert that Plaintiffs lacked legal or practical authority to prevent Poarch from acquiring Hickory Ground in fee or in trust. As Plaintiffs allege in their Second Amended Complaint, "[h]ad the Muscogee (Creek) Nation known that Poarch would desecrate Hickory Ground, it would have taken steps to prevent Poarch from acquiring the land" either in fee or in trust, "and would have opposed Poarch's bid for federal recognition." Dkt. 190 at 47. Instead, in reliance on Poarch's promises, the Muscogee (Creek) Nation did not take such actions. *Id.* Had Poarch disclosed its true plans for the Site, the Muscogee (Creek) Nation would have certainly informed the Alabama Historical Commission and the Department of Interior, and presumably Poarch would not have received the preservation funding it purportedly needed to purchase Hickory Ground in the first instance. Furthermore, had it known that no party was intervening to save Hickory Ground from development, the Muscogee (Creek) Nation—or another party truly dedicated to preserving the Site—could have independently applied for the preservation funds or outright purchased the Site. It is not a foregone conclusion, as Tribal Defendants contend, that had Poarch not purchased the Site, no other party would have tried to save Hickory Ground and plans for development would have been executed. Indeed, Poarch's assurances were intended to, and would have, made any party who would have otherwise intervened feel secure that Hickory Ground would be preserved in perpetuity.

With respect to Poarch's *trust* acquisition of Hickory Ground, Plaintiffs allege that the Department of the Interior had no legal authority under the Indian Reorganization Act to take the site into trust for Poarch because Poarch was not "under federal jurisdiction" in 1934. *See* Dkt. 190 at 44–45. Had Poarch revealed in 1983 that it planned to develop the Site instead of reaffirming its commitment to preserve Hickory Ground, the Muscogee (Creek) Nation would have raised this argument to prevent the trust transaction. *See id.* at 48–49. If a court agreed

with the Muscogee (Creek) Nation that the acquisition was illegal, no casino would have been built at the site because gaming would not have been legal at the site. *See id.* at 46.

This case is similar to *Mazer v. Jackson Ins. Agency*, wherein developers were planning to develop an office park adjacent to residential houses in the city of Mountain Brook. 340 So. 2d 770 (Ala. 1976). The developers requested that the Mountain Brook Planning Commission pass a resolution containing assurances to the homeowners. In 1955, the developers recited the assurances in the Mountain Brook Planning Commission's resolution in a memorandum to the homeowners. Those assurances were that development would only occur if there were protections for the residential area, including a buffer between the development and homes that would be left as "natural woodland." *Id.* at 771. The memorandum stated that the developers had presented those conditions to the legislative delegation that was considering whether to annex the area to the city, and that the developers felt the homeowners "will be very happy indeed over the conclusion." *Id.* at 771–72. About 20 years later, the Mountain Brook Planning Commission rezoned the buffer zone, and the developers announced they would clear-cut and develop the zone. The court found that promissory estoppel barred the development, rejecting the developers' claim that the homeowners failed to prove an enforceable promise or detrimental reliance.

The court held that although the developers' memorandum in *Mazer* "did not state the assurances as promises from the Developers, but as provisions of the Planning Commission's resolution," it "contained sufficient promissory elements to support a promissory estoppel," including that "it was the desire and purpose of the Developers to develop their property 'in a manner which would be an asset to all of the surrounding property owners,'" and "'to assure the residents of the good faith of the developers that they would not develop the property in a manner inconsistent with [the] assurances.'" *Id.* at 773–74. The court held that "[t]he clear implication of the language of the memorandum was that the assurances represented the future intentions of the Developers with regard to their property." *Id.* at 774. The homeowners would have opposed the development without the assurances, and the resolution and memorandum were "to assure the residents of the Developers' good faith." *Id.* Thus, "[c]ommon sense and the

evidence compel the conclusion that the Developers intended that the [homeowners] cease their opposition to annexation in reliance on the assurances stated in the memorandum." *Id.* The court also found that the homeowners' cessation of opposition to the development "was forbearance of a definite and substantial character." *Id.* In addition, there was detriment to the homeowners because the annexation that facilitated the development (which they'd ceased to oppose in reliance on the assurances) reduced the homeowners' power to influence decisions of officials on zoning. *Id.* at 774–75. "Finally, if the Developers are permitted to ignore the assurances given in the memorandum, the Homeowners will lose the protection that was the sole reason for their ceasing to oppose annexation and will thereby suffer a serious injustice" in the form of making their property less desirable. *Id.*

Like the developers in *Mazer*, Poarch knew the Muscogee (Creek) Nation objected to development on the property, and would try to prevent Poarch's acquisition of Hickory Ground had it known that Poarch planned to impose the same destruction it was promising to prevent. Poarch's communications with the Muscogee (Creek) Nation were for the same purpose as the developers' memorandum to the homeowners in *Mazer*: "to assure the [recipients] of the good faith of the developers that they would not develop the property in a manner inconsistent with [the] assurances." As in *Mazer*, the clear implication of Poarch's communications to the Muscogee (Creek) Nation was that the assurances represented Poarch's future intentions with regard to the property.

As in *Mazer*, the Muscogee (Creek) Nation's forbearance—in the form of not objecting to or seeking to prevent Poarch's acquisition of Hickory Ground—was of a definite and substantial character. The Muscogee (Creek) Nation's reliance on Poarch's promises resulted to the Nation's detriment, because after the purchase—just like after annexation in *Mazer*—the Nation's power to influence what occurred at the property was significantly diminished. Had the Nation known that Poarch would clear-cut and develop Hickory Ground, it could and would have taken action to prevent Poarch's acquisition and ensure the property was acquired either by the Nation or another party dedicated to its preservation.

Finally, as in *Mazer*, if Poarch is permitted to ignore the promises given in its communications with the Muscogee (Creek) Nation, the Muscogee (Creek) Nation will lose the protection that was the very reason it did not seek to prevent Poarch's acquisition of Hickory Ground, and will thereby suffer a serious injustice. *See also Sykes v. Payton*, 441 F. Supp. 2d at 1225. Plaintiffs' ancestors have been wrenched from their graves and their sacred site and last tribal capital before removal is being desecrated. That injustice can only be avoided by enforcing Poarch's promises.

### 3.     The Promissory Estoppel Claim is Not Barred by the Statute of Frauds.

Tribal Defendants seek dismissal of Plaintiffs' promissory estoppel claim, arguing that "Alabama law does not allow the use of promissory estoppel to enforce an agreement that is void under the statute of frauds." Dkt. 202 at 30. Tribal Defendants' request to dismiss this claim should be rejected for three reasons.

First, their argument is premised on the erroneous assumption that Plaintiffs' claim must sound in contract. Promissory estoppel does not require that the plaintiff seek to enforce the terms of an oral contract. *See, e.g.*, *Bush*, 177 So.2d at 578 (applying promissory estoppel to a will, which is neither a promise nor a contract). As discussed in Sections IV.C.1 and .2, *supra*, Plaintiffs' promissory estoppel claim is one the nature of recovery of land, not enforcement of a contract or oral agreement. Accordingly, the statute of frauds does not apply to this claim and the motion should be denied.

Second, the statute of frauds is no barrier to the imposition of a constructive trust, which is the remedy Plaintiffs' seek based on their claim for promissory estoppel.  A constructive trust arises by operation of law and is not subject to the statute of frauds. Alabama Code § 19-3B-1301 states that "[n]o trust concerning lands, *except such as results by implication or construction of law*, . . . can be created, unless by instrument in writing." (emphasis added); *see also Newell v. Newell*, 254 So. 3d 878, 881 (Ala. 2017). A constructive trust is "a creature of equity," which "springs from a desire to prevent the statute of frauds from being used as a shield

which would otherwise allow a party to be unjustly enriched." *Ralston Oil & Gas Co. v. July Corp.*, 719 P.2d 334, 339 (Colo. Ct. App. 1985). Thus, if this Court concludes that a constructive trust is appropriate, "the statute of frauds is no obstacle to the establishment of such trust." *Perryman v. Pugh*, 114 So.2d 253, 259 (Ala. 1959); *see also Cole v. Adkins*, 358 So. 2d 447, 448–51 (Ala. 1978) ("A constructive trust is properly impressed upon property under certain limited circumstances even though the Statute of Frauds makes an oral agreement to convey land unenforceable.").

Third, even assuming for the sake of argument only that that the statute of frauds applies here, dismissal of the promissory estoppel claim would still not be appropriate because Plaintiffs have alleged sufficient facts to show that the Tribal Defendants partially performed on their promises. *See Houston v. McClure*, 456 So. 2d 788, 789 (Ala. 1984) (affirming a trial court's award of specific performance of a contract otherwise subject to the statute of frauds based on a showing part performance). Plaintiffs have alleged that Tribal Defendants initially performed in accordance with their promises, giving Plaintiffs reason to believe that Poarch intended to abide by those promises for decades. *See* Dkt. 190 at 45. As discussed above, it was not until the 2000s that Poarch violated its promises. At this early stage, these facts are sufficient to remove the promissory estoppel claim from the operation of the statute of frauds.

In sum, Plaintiffs have alleged the elements of promissory estoppel: the Muscogee (Creek) Nation reasonably relied on specific promises of protection for Hickory Ground that Poarch extended so that the Nation would acquiesce to Poarch's purchase of Hickory Ground, resulting in harm to the Muscogee (Creek) Nation when Poarch disregarded its promises and began desecrating the sacred site. Plaintiffs' promissory estoppel claim is in the nature of recovery of real property because it seeks imposition of a constructive trust. Therefore, the statute of frauds does not apply and the claim should not be dismissed.

**D.      The Plaintiffs' unjust enrichment claim should not be dismissed.**

As with Plaintiffs' promissory estoppel claim, Tribal Defendants contend that Plaintiffs' unjust enrichment claim does not allege all of the elements of unjust enrichment, that it is time-barred because it is subject to no more than a six-year statute of limitations, and that it is barred by the statute of frauds. These arguments lack merit and this aspect of the motion should be denied.

First, Plaintiffs have alleged a claim of unjust enrichment by asserting that Poarch is unjustly retaining a benefit—unrestrained use of the Hickory Ground Site—that belongs to Plaintiffs, because Poarch promised Plaintiffs certain restraints on the use of the Site in exchange for Plaintiffs' non-objection to Poarch's acquisition of Hickory Ground. Second, as with promissory estoppel, a ten-year statute of limitations governs unjust enrichment claims in the nature of recovery of property, so the Plaintiff's unjust enrichment claim is timely. Third, the statute of frauds does not bar the unjust enrichment claim, because Plaintiffs' unjust enrichment claim is in the nature of recovery of land such that the statute of frauds is not implicated.

**1.      Unjust enrichment claims include the loss of rights in property.**

Tribal Defendants incorrectly insist that, to prevail on a claim of unjust enrichment, it is necessary to show that the defendant holds *money* that rightfully belongs to the plaintiff. Dkt. 202 at 38–39. A claim for money is not the only form of unjust enrichment claim; such a claim can also encompass claims in the nature of recovery of real property, *see supra* at 40 to 45, or rights in or to property.

Thus, "unjust enrichment can include claims for money *and property*." *Micor Indus., Inc. v. C2JS Holdings, Inc.*, No. 12-02654, 2012 WL 5931707, at *4 (N.D. Ala. Nov. 26, 2012). A plaintiff with a claim relating to property can establish unjust enrichment by showing "unjust retention of a *benefit* to the loss of another or the retention of money *or property* of another against the fundamental principles of justice or equity and good conscience." *Id.* (internal quotation marks and citation omitted). "Whenever one person adds to the other's advantage *in any form,* whether by increasing his holdings or saving him from expense or loss, he has

63

conferred a benefit upon the other." *Id.* (emphasis added) (quoting *Am. Family Care v. Fox,* 642 So.2d 486, 488 (Ala. Civ. App. 1994)). As discussed above, an appropriate remedy for an unjust enrichment claim relating to property would be a constructive trust over the property. *Id.; see supra* at 40 to 45.

> **2.** **Plaintiffs allege that the Tribal Defendants have retained a benefit to the loss of the Muscogee (Creek) Nation.**

The Second Amended Complaint alleges that the Muscogee (Creek) Nation benefited the Tribal Defendants by withholding objections to Poarch's acquisition of Hickory Ground that they otherwise would have raised had they known Poarch would break its promises to perpetually protect the site. Dkt. 190 at 46–48. As stated in *Mazer*, 340 So. 2d at 774, forbearance of the kind the Muscogee (Creek) Nation exercised here is "definite and substantial," and that forbearance was the precise benefit Poarch sought by making the assurances that eliminated any opposition to its acquisition of Hickory Ground. The Muscogee (Creek) Nation's lack of objection in reliance on Poarch's promises resulted in Poarch obtaining federal preservation funds and purchasing Hickory Ground—two things the Muscogee (Creek) Nation would have acted to prevent had Poarch revealed its plans to desecrate Hickory Ground. Dkt. 190 at 46–48.

The Restatement (First) of Restitution § 1 cmt. b (Am. Law Inst. 1937), which was cited as authoritative in *Jordan v. Mitchell*, 705 So.2d 453, 458 (Ala. Civ. App. 1997), defines an unjust enrichment as follows:

> A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss."

Thus, is it not limited to a pecuniary benefit, but can be an intangible benefit that adds to another's advantage.

Quite simply, like the developers in *Mazer*, 340 So. 2d at 773, Poarch made promises of protection to receive a benefit: no opposition to its plans. Like the homeowners in *Mazer*, 340 So. 2d at 774, the Muscogee (Creek) Nation did not oppose acquisition in exchange for the Tribal Defendants' promises that there would not be unchecked use of the property; that instead the property would be used in a manner beneficial to the Nation and consistent with its undisputed nature as a sacred burial site. Poarch, like the developers in *Mazer*, therefore owed the forbearer something: use of the property in conformance with its promises.

Poarch is not entitled to desecrate Hickory Ground; its undertaking of obligations to preserve the Site was the reason the Muscogee (Creek) Nation did not object to its acquisition, and the reason it was able to acquire the Site. *See* Dkt. 190 at 47–48. As the court explained in *Mazer*, "if the [acquirer of the property is] permitted to ignore the assurances given [to the forbearers], the [forbearers] will lose the protection that was the sole reason for their ceasing to oppose [the acquisition] and will thereby suffer a serious injustice." *Mazer*, 340 So. 2d at 775. As alleged throughout the Second Amended Complaint, by taking away the protection that belongs to the Muscogee (Creek) Nation, Poarch is causing extreme cultural, religious, and emotional harm to Plaintiffs. Poarch thus is retaining a benefit—unbridled use of the Hickory Ground Site—where the "bridle" rightfully belongs to the Muscogee (Creek) Nation. A constructive trust effectively returns that "bridle" to the Nation by converting Poarch to a trustee and enforcing Poarch's promises. *Mitchell*, 274 So. 3d at 266.

Thus, contrary to the Tribal Defendants' contentions, Poarch is indeed benefiting from usurping a right that belongs to Plaintiffs: the right to protection of their sacred ancestral home. Plaintiffs have alleged that Tribal Defendants have retained a benefit to the loss of the Muscogee (Creek) Nation.

**3.      Plaintiffs' unjust enrichment claim is timely.**

The Tribal Defendants argue that the statute of limitations for unjust enrichment can be no more than six years. However, as the Tribal Defendants acknowledge, in Alabama there is a

lack of authority definitively stating the statute of limitations applicable to an unjust enrichment claim. Dkt. 202 at 41. As with promissory estoppel, because the nature of unjust enrichment claims vary such that they may fit in different categories provided under Title 6, Chapter 2 of the Alabama Code, the focus is on the nature of the claim. For the same reasons that a ten-year statute of limitation applies to Plaintiffs' promissory estoppel claim, *see supra* at 40 to 50, a ten-year statute of limitations governs their unjust enrichment claim.

Like their promissory estoppel claim, Plaintiffs' unjust enrichment claim is rooted in equity and seeks the equitable remedy of an injunction and constructive trust to enforce Poarch's promise of protection of the Hickory Ground site. *See* Dkt. 190 at 46–48, 76–77. The basis of Plaintiffs' unjust enrichment claim is based on Poarch's continuing usurpation and deprivation of Plaintiffs' right to the protections Poarch promised. To remedy the unjust enrichment—i.e., Poarch's retention of unchecked use of Hickory Ground where a specific "bundle of sticks" with respect to that use was effectively given to Plaintiffs—Plaintiffs seek return of that bundle of sticks in the form of a constructive trust enforcing those promises. *See id.* A claim of unjust enrichment premised on unconscionable conduct in the acquisition and possession of real property falls within the category of "[a]ctions for the recovery of lands, tenements or hereditaments, or the possession thereof," under Alabama Code § 6-2-33 governing actions for which there is a ten-year statute of limitations. In other words, Plaintiffs' unjust enrichment claim is a claim in the nature of recovery of real property under Alabama Code § 6-2-33(2), and is subject to a ten-year statute of limitations. *See supra* at 40 to 50.

As stated on page 45, Plaintiffs have made allegations disputing the Tribal Defendants' assertions that Plaintiffs knew in 1992 or 2002 that Poarch did not plan to abide by its promises. On this motion, the Court must consider Plaintiffs' allegations as true. Furthermore, the Tribal Defendants concede that "Alabama law does appear to allow for a form of continuing unjust enrichment under limited circumstances," such as "where a defendant was obligated to undertake serial performances." Dkt. 202 at 41 (citing *Snider v. Morgan*, 113 So. 3d 643, 655–56 (Ala. 2012)).

Though the Tribal Defendants assert that "no such serial performance obligation is present here," *id.*, that is precisely the obligation Poarch undertook when it promised to permanently preserve Hickory Ground. Indeed, in their statute of frauds argument, the Tribal Defendants assert that "a promise to protect land 'in perpetuity' by its very terms cannot be performed within one year," *id.* at 30, as the obligation to protect the land presumably requires serial acts of "performance" in the form of continual efforts to preserve the site. The Tribal Defendants cannot have it both ways.

The Alabama Supreme Court explained in *Snider* that the statute of limitations for an unjust enrichment claim runs from the last date the defendant was unjustly enriched. *See* 113 So. 3d at 655-56. In *Snider*, the court held that an estate was unjustly enriched each time a payment on a mortgage came due and estate failed to make that payment. *Id.* Here, Poarch is similarly unjustly enriched, because each day it owes an affirmative duty to protect Hickory Ground, and instead it reaps casino revenues while failing to fulfill its obligation to preserve the site (and while continually mistreating, and causing damage to, Plaintiffs' ancestors' remains and sacred artifacts).

Plaintiffs' meritorious claim for unjust enrichment and a remedy of a constructive trust is timely because it is a claim in the nature of recovery of lands and is therefore accorded a ten-year statute of limitations.

### 4.     The statute of frauds does not bar Plaintiffs' unjust enrichment claims.

Tribal Defendants advance substantially the same statute of frauds argument raised in opposition to Plaintiffs' promissory estoppel claim. Dkt. 202 at 41–42. The statute of frauds is inapplicable to Plaintiffs' unjust enrichment claims for the same reason it does not apply to its claim for promissory estoppel—namely, Plaintiffs' unjust enrichment claim does not seek specific performance of a contractual term. Instead, Plaintiffs ask this Court to remedy Tribal Defendants' unjust enrichment flowing from their dishonest and inequitable conduct by imposing a constructive trust. As discussed in Section IV.C.3, *supra*, the statute of frauds does

not bar enforcement of a constructive trust. *See Perryman*, 114 So.2d at 259. Tribal Defendants' statute of frauds defense is therefore inapposite.

Like Plaintiffs' claim for promissory estoppel, Plaintiffs' claim for unjust enrichment does not depend on the enforcement of the terms of a contract. Courts widely recognize that a claim for unjust enrichment is an alternative basis, which is distinct from a breach of contract claim. *See, e.g.*, *Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 447 (Ala. 1996) (recognizing that express contracts and implied contracts are "incompatible"); *Berry v. Druid City Hosp. Bd.*, 333 So. 2d 796, 798–99 (Ala. 1976) (explaining that courts imply contracts to prevent unjust enrichment and that an implied contract "is not a contract at all"); Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (Am. Law Inst. 2011) (observing that unjust enrichment is "an independent basis of liability" and serves as a "cause of action as well as the remedy"). The Tribal Defendants have been unjustly enriched by Plaintiffs' acquiescence in Poarch's purchase of Hickory Ground. "The law may impose any obligations that justice requires," *Berry*, 333 So.2d at 798–99, including the imposition of a constructive trust.

In sum, Plaintiffs have alleged the elements of unjust enrichment: a benefit—their acquiescence in Poarch's purchase of Hickory Ground—exchanged for promises that Poarch would protect the sacred site, which protections Poarch has unjustly done away with for its own enrichment and to the Plaintiffs' detriment. As with promissory estoppel, Plaintiffs' unjust enrichment claim is in the nature of recovery of real property because it seeks imposition of a constructive trust. Therefore, the statute of frauds does not apply and the claim is timely.

**E.     The Plaintiffs have stated a claim under NAGPRA.**

NAGPRA is human rights legislation passed after "decades of struggle by Native American tribal governments and people to protect against grave desecration, to repatriate thousands of dead relatives or ancestors, and to retrieve stolen or improperly acquired religious and cultural property back to Native owners."  Jack F. Trope and Walter R. Echo-Hawk, *The*

*Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 Ariz. St. L.J. 35, 36 (1992). "In interpreting NAGPRA, it is critical to remember that it must be liberally interpreted as remedial legislation to benefit the class for whom it was enacted." *Id.* at 76. NAGPRA was intended to prevent situations just like this one, where the Plaintiffs' ancestors, their funerary objects, and other religious and cultural items were wrongfully disinterred without appropriate notice to or consultation with the Plaintiffs and have been wrongfully kept from the Plaintiffs' custody. In a shocking and grimly ironic twist, the alleged wrongdoer in this case is another federally recognized Indian tribe. The Plaintiffs are entitled to the protections of NAGPRA for their ancestors and cultural items regardless of who commits the wrongful acts.

Plaintiffs have provided detailed allegations showing that the Tribal Defendants violated NAGPRA by, *inter alia*, failing to follow NAGPRA requirements with respect to intentional excavations at the Hickory Ground Site, inadvertent discoveries at the Hickory Ground Site, and the ownership and control of the ancestors buried at the Hickory Ground Site. This Court has broad equitable powers to order appropriate relief with respect to Plaintiffs' NAGPRA claim and the relief that Plaintiffs seek here is within the scope of that equitable authority. The Tribal Defendants' motion to dismiss the Plaintiffs' NAGPRA claim should be denied.

### 1.     NAGPRA requirements.

NAGPRA affords protection to Native American "cultural items," which include human remains, associated funerary objects, unassociated funerary objects, sacred objects, and other objects of cultural patrimony.[13]  25 U.S.C. § 3001(3). NAGPRA applies to (1) the intentional excavation and removal of cultural items, and (2) the inadvertent discovery of cultural items. With respect to intentional excavations, Section 3002 of NAGPRA provides:

> "The intentional removal from or excavation of Native American cultural items from Federal or tribal lands…is permitted only if—
> (1) such items are excavated or removed pursuant to a permit issued under [16 U.S.C. 470cc] which shall be consistent with this chapter;

---

[13] Each of these terms is further defined in the statute, but the definitions are not of central relevance here.

(2) such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate [Indian tribe];

(3) the ownership and right of control of the disposition of such items shall be as provided in subsections (a) and (b); and

(4) proof of consultation or consent under paragraph (2) is shown."

25 U.S.C. § 3002(c).  The relevant provisions of this subsection are discussed in more detail below.  With respect to inadvertent discoveries, Section 3002 of NAGPRA provides:

> ***Any person*** who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands after November 16, 1990, shall notify, in writing, the Secretary of the Department, or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal lands and the appropriate Indian tribe…with respect to tribal lands, if known or readily ascertainable. . . . If the discovery occurred in connection with an activity, including (but not limited to) ***construction***, mining, logging, and agriculture, the person shall ***cease the activity*** in the area of the discovery, make a reasonable effort to ***protect the items*** discovered before resuming such activity, and provide notice under this subsection.   Following the notification under this subsection, and upon certification by the Secretary of the department or the head of any agency or instrumentality of the United States or the appropriate Indian tribe or Native Hawaiian organization that notification has been received, the activity may resume after ***30 days*** of such certification.

25 U.S.C. § 3002(d)(1) (emphasis added).  In the event of inadvertently-discovered cultural items excavated or removed, the disposition is the same as for intentionally-excavated cultural items, 25 U.S.C. § 3002(d)(2), which is discussed in more detail below.

As an initial matter, it is important to point out that, by their terms, these provisions apply to *everyone*, not just to federal agencies and museums. The requirements for intentional excavations are simply generally applicable. And the requirements for inadvertent discoveries apply to "any person," which includes an "individual, partnership, corporation, trust, institution, association, or any other private entity, or, any official, employee, agent, department, or instrumentality of the United States, or of any Indian tribe . . . or of any State or political subdivision thereof." 43 C.F.R. § 10.2(a)(5). In addition, these provisions draw certain distinctions between "Federal lands" and "tribal land." "Tribal land" means, in relevant part, "(A) all lands within the exterior boundaries of any Indian reservation; [and] (B) all dependent

No. 21-11643

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

### MUSCOGEE (CREEK) NATION, et al.,

### Plaintiffs-Appellants,

### v.

### BUFORD ROLIN, et al.,

### Defendants-Appellants.

---

**Appeal from the District Court of the United States for the Middle District of Alabama, Northern Division**
**District Court No. 2:12cv1079-MHT (CSC) (Hon. Myron H. Thompson)**

---

### APPELLANTS' APPENDIX – VOLUME 4

---

Mary Kathryn Nagle
ATTORNEY AT LAW
P.O. Box 506
McLean, VA 22101
(202) 407-0591

David McKnight
DILLARD, MCKNIGHT, JAMES & MCELROY, LLP
2700 Highway 280
Suite 110 East
Birmingham, AL 35223


Devra R. Cohen
FOSTER GARVEY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
(206) 447-4400

*Counsel for Plaintiffs-Appellants*

## INDEX OF APPENDIX

**Docket/Tab #**

**Volume 1**

District Court Docket Sheet……………………………………………….   A

Second Amended Complaint and Supplemental Complaint………………   190

Exhibits to Second Amended Complaint………………………………….   190-1

**Volume 2**

Answer of Defendant Auburn University to Second Amended…………..   194
Complaint

Notice of Constitutional Question…………………………………………   197

Federal Defendants' Motion to Dismiss Second Amended
Complaint  and Supplemental Complaint…………………………………   199

Federal Defendants' Memorandum in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and Supplemental
Complaint………………………………………………………………….   200

Tribal Defendants' Motion to Dismiss Second Amended Complaint……..   201

Brief in Support of Tribal Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….   202

Declaration of Lori M. Stinson in Support of Tribal Defendants'
Motion to Dismiss Second Amended Complaint………………………….   203

**Volume 3**

Individual Defendants' Motion to Dismiss Second Amended
Complaint………………………………………………………………….   204

Brief in Support of Individual Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….   205

Notice of Correction…………………………………………………….. 213

Plaintiffs' Response and Memorandum in Support of Response
to Federal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………... 213-1

Plaintiffs' Response and Memorandum in Support of Response
to Individual Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………... 213-2

Plaintiffs' Response and Memorandum in Support of Response
to Tribal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………... 213-3

## Volume 4

Federal Defendants' Reply in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and
Supplemental Complaint………………………………………………... 216

Tribal Defendants' Reply Brief in Support of Motion to Dismiss
Second Amended Complaint…………………………………………….. 217

Individual Defendants' Reply and Memorandum in Support of
Motion to Dismiss Second Amended Complaint……………………….. 218

Final Opinion…………………………………………………………… 223

Final Judgment…………………………………………………………... 224

Order re Martin Construction bankruptcy……………………………… 225

## Volume 5

Judgment re Martin Construction bankruptcy……………………………... 227

Plaintiffs' Notice of Appeal…………………………………………….... 228

Certificate of Service

Indian communities." 25 U.S.C. § 3001(15). "Federal lands" means, in relevant part, "any land other than tribal lands which are controlled or owned by the United States."  25 U.S.C. § 3001(5).

The permit required for intentional excavations under Section 3002(c)(1) is a federal permit issued under ARPA to excavate or remove any archaeological resource located on public lands or Indian lands.  16 U.S.C. § 470cc(a).  If harm to, or destruction of, any religious or cultural site may result, notice to "any Indian tribe which may consider the site as having religious or cultural significance" is required before the permit may be issued.  16 U.S.C. § 470cc(c); *see also* 43 C.F.R. § 10.3(c).  While there is an exception under the ARPA for tribes performing archaeological excavations on their own lands, 16 U.S.C. § 470cc(g)(1), that exception does not apply to non-tribal individuals or entities, even if they are acting on behalf of a tribe. *Id.*; *see also* 25 C.F.R. § 262.4(c) (clarifying that consultants, advisors, and others serving by contractual agreement as agents for Indian tribes are not exempt from permit requirements under the ARPA, although they may be able to expedite the permit).  Nor does it apply to individual tribal members in the absence of tribal law regulating the excavation or removal of archaeological resources on Indian lands.  16 U.S.C. § 470cc(g)(1).  Indeed, in some limited circumstances, it may not even apply to tribal employees, particularly if the tribe does not ensure that permit requirements have been met by other documented means.  25 C.F.R. § 262.4(c)(2).

The consultation provisions of Section 3002(c)(2) are further detailed in 43 C.F.R. §§ 10.3 and 10.5.  Consultation is required for intentional excavations on "Federal lands" and suggested for intentional excavations on "tribal land."  43 C.F.R. § 10.3(b)-(c).  Under Section 10.5, consultation must be conducted with lineal descendants, tribes on whose aboriginal lands the excavation will occur, tribes that are culturally affiliated with the cultural items, and tribes that have a demonstrated cultural relationship with the cultural items.  43 C.F.R. § 10.5(a).  The consultation requirements are extensive, and include development of a plan of action that will cover topics such as how the cultural items will be treated, the planned disposition of the cultural items and more.  43 C.F.R. § 10.5(b)-(e).

71

In addition, intentional excavations on "tribal land" require the prior "consent of the appropriate [Indian tribe]" under 25 U.S.C. § 3002(c)(2).  Neither that section nor the relevant provisions of NAGPRA's implementing regulations, 43 C.F.R. §§ 10.3, 10.5, clarify the meaning of "appropriate" tribe.  However, BIA regulations regarding the issuance of permits for such excavations suggest that "[d]etermination as to which tribe is the appropriate tribe shall be made in accordance with [25 C.F.R.] § 262.8(a)."  25 C.F.R. § 262.5(d).  That section, in turn, gives first priority to lineal descendants for human remains and funerary objects.  25 C.F.R. § 262.8(a)(1).  For other items, the tribal landowner generally has first priority, followed by the tribe who aboriginally occupied the land, but the tribe "having the strongest cultural relationship with such remains or objects" may take precedence over both in certain circumstances.  25 C.F.R. § 262.8(a)(2).

Of the ownership and control requirements referenced in Sections 3002(c)(3) and 3002(d)(2) for both intentional excavations and inadvertent discoveries, those under Section 3002(a) are primarily relevant here.  They control to whom ownership or control of cultural items must be given.  Ownership or control of human remains and associated funerary objects is in the lineal descendants of the deceased.  25 U.S.C. § 3002(a)(1).  If the lineal descendants cannot be ascertained, then ownership or control will be as provided for unassociated funerary objects and other cultural items.  25 U.S.C. § 3002(a)(2).  Ownership or control of those items vests first in the tribe on whose tribal land the objects or remains were discovered, and second the tribe which has the closest cultural affiliation with such remains or objects.  *Id*.

With respect to inadvertent discoveries, three requirements apply to everyone, on both federal land and tribal land: (1) they must provide immediate notice of the discovery; (2), they must stop any ongoing activity for at least 30 days; and (3) they must make a reasonable effort to protect the discovered cultural items.  25 U.S.C. § 3002(d)(1); 43 C.F.R. § 10.4(a)-(c).  If the discovery is on federal lands, they must notify the appropriate federal official, and if the discovery is on tribal land, they must notify the appropriate tribal official.  On federal lands, this triggers consultation requirements and, if the discovered cultural items must be excavated or

removed, the requirements for intentional excavations must be followed (ARPA permit, consultation, appropriate disposition, etc.). 43 C.F.R. § 10.4(d). On tribal land, the tribal official is suggested to take immediate steps to further secure and protect the cultural items, and, if the discovered cultural items must be excavated or removed, the requirements for intentional excavations must be followed (ARPA permit, consultation, appropriate disposition, etc.). 43 C.F.R. 10.4(e).

### 2. Plaintiffs' claims.

In considering the Plaintiffs' claims, it is important to keep in mind that NAGPRA is, as discussed above, remedial human rights legislation that must be liberally interpreted to benefit the class for whom it was enacted, which includes the Plaintiffs. The wrongs done to the Plaintiffs are exactly those that NAGPRA was intended to prevent and redress. Applying NAGPRA in such a way so as to compound another grievous historical wrong—the forced removal of the Plaintiffs from the Hickory Ground Site—by allowing a newly recognized tribe to desecrate the Hickory Ground Site with impunity and take ownership and control over the Plaintiffs' ancestors and their cultural items to which they are not entitled contravenes the intent of NAGPRA.

As an initial matter, the Tribal Defendants have duties under NAGPRA even if they are not a federal agency or museum. The Tribal Defendants seem to imply that NAGPRA does not apply because they are not a federal agency or museum. Dkt. 202 at 43. This is wrong. As discussed above, the duties with respect to intentional excavations and inadvertent discoveries apply to everyone, not just to federal agencies and museums.

To the extent those duties turn on land status, both "federal lands" and "tribal land," as defined in NAGPRA, are at issue here. The Plaintiffs have alleged that the Hickory Ground Site includes both reservation land and trust land. Dkt. 190 at 64 ¶ 286. And the Tribal Defendants do not directly contest that allegation, providing only the conclusory statement that "[t]he Wetumpka property is tribal land." Dkt. 202 at 43. However, only the portion of the Hickory

Ground Site that is within the boundaries of Poarch's reservation is "tribal land" within the definition of NAGPRA. 24 U.S.C. § 3001(15). Any off-reservation trust land constitutes "Federal lands" under NAGPRA. 24 U.S.C. § 3001(5). The Plaintiffs explain this distinction in more detail in Section IV.B of the Plaintiffs' Brief in Response to the Federal Defendants' Motion to Dismiss, filed contemporaneously herewith.

The Tribal Defendants violated NAGPRA when they directed or allowed any intentional excavations at the Hickory Ground Site to take place without the appropriate permits. This permit requirement is a very important part of NAGPRA, because, as discussed above, it should ensure that the Muscogee (Creek) Nation receives prior notice of any excavation on the Hickory Ground Site, as a tribe who considers the site to have religious or cultural significance, 16 U.S.C. § 470cc(c); *see also* 43 C.F.R. § 10.3(c). Importantly, ***anyone other than Poarch itself*** who engaged in intentional excavation, ***whether on "tribal land" or "federal lands"*** for purposes of NAGPRA, was required to obtain a permit under the ARPA, as discussed above. 25 U.S.C. § 3002(c)(1); 16 U.S.C. § 470cc(g)(1). That includes archaeologists affiliated with Auburn University and its associated archaeologists, who the Plaintiffs allege conducted excavations at the Tribal Defendants' direction, Dkt. 190 at 28 ¶ 101, and any other non-tribal individuals or entities who discovery may reveal conducted excavations, even if they were contracted by Poarch or otherwise acting on Poarch's behalf. 16 U.S.C. § 470cc(g)(1); *see also* 25 C.F.R. § 262.4(c) (clarifying that consultants, advisors, and others serving by contractual agreement as agents for Indian tribes are not exempt from permit requirements under the ARPA, although they may be able to expedite the permit). It may also include individual Poarch tribal members, as it appears that there may have been an absence of tribal law regulating the excavation or removal of archaeological resources on Indian lands (or the excavation may have been in violation of that law if it did exist). *See* Dkt. 190 at 25–26 (describing how Poarch had at least a policy in place at one time prohibiting excavation, but upon information and belief, later reversed it). Indeed, in limited cases, it could even include Poarch tribal employees, particularly if permit requirements were not met by other means, which there is no indication that they were. Any excavation that

74

took place without a permit was in violation of NAGPRA and the Poarch should not have caused it to occur.

To the extent they conducted or directed any intentional excavations on "Federal lands," the Tribal Defendants had a duty to consult with the Plaintiffs, and they should have done so for intentional excavations on "tribal land" as well. 43 C.F.R. § 10.3(b)–(c). This consultation must be conducted with lineal descendants, tribes on whose aboriginal lands the excavation will occur, tribes that are culturally affiliated with the cultural items, and tribes that have a demonstrated cultural relationship with the cultural items. 43 C.F.R. § 10.5(a). The Plaintiffs fall within **all** of these categories. Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are lineal descendants of the excavated ancestors.[14] Dkt. 190 at 1, 7, 14, 31, 34. And the Hickory Ground Site is within the aboriginal lands of the Muscogee (Creek) Nation, which is also culturally affiliated with the cultural items, and which also has a demonstrated cultural relationship with the cultural items. *Id*. at 1, 14. The Tribal Defendants knew all of this. Yet the Plaintiffs have alleged that the Tribal Defendants did not consult with them before commencing the intentional excavations. *Id.* at 30. And the Tribal Defendants do not contest that allegation, or suggest that they fulfilled it at any time. Had the Tribal Defendants fulfilled NAGPRA's consultation requirements, perhaps, at the very least, the Plaintiffs' ancestors could have been treated in a culturally appropriate way, for which the Plaintiffs would have had the opportunity to provide direction. 43 C.F.R. § 10.5(b)–(e).

To the extent they conducted, directed, or allowed intentional excavations on "tribal land," the Tribal Defendants also had a duty to obtain the prior consent of the Muscogee (Creek) Nation as the "appropriate" tribe under 25 U.S.C. 3002(c)(2); 25 C.F.R. § 262.8(a); 25 C.F.R. § 262.5(d). Because Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are lineal descendants,[15] the Muscogee (Creek) Nation was in first priority as the appropriate tribe. 25

---

[14] The Tribal Defendants argue that Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are not lineal descendants. *E.g.*, Dkt. 202 at 44. This issue will be discussed in connection with the ownership and control violation, below, as it is more central to that violation.

[15] As noted in the previous footnote, the Tribal Defendants dispute this, and it will be discussed below.

C.F.R. § 262.8(a)(1).  And even if that were not the case, the Muscogee (Creek) Nation, as the tribe "having the strongest cultural relationship with such remains or objects" could have taken precedence over Poarch (as the current tribal landowner) for this purpose had it been given the appropriate opportunity to do so.  25 C.F.R. § 262.8(a)(2).

With respect to any inadvertent discoveries on *both* "federal lands" and "tribal land," the Tribal Defendants had specific duties to: (1) provide immediate notice of the discovery, or ensure that others provided them with immediate notice, as applicable; (2) stop any ongoing activity for at least 30 days; and (3) make a reasonable effort to protect the discovered cultural items.  25 U.S.C. § 3002(d)(1); 43 C.F.R. 10.4(a)–(c).  If the discovery was on federal lands, they had a duty to engage in consultation with the Plaintiffs and, if the discovered cultural items had to be excavated or removed, to follow the requirements for intentional excavations (ARPA permit, consultation, appropriate disposition, etc.).  43 C.F.R. 10.4(d).  And if the inadvertent discovery was on tribal land, they still should have taken immediate steps to further secure and protect the cultural items, and, if the discovered cultural items had to be excavated or removed, to follow the requirements for intentional excavations (ARPA permit, consultation, appropriate disposition, etc.).  43 C.F.R. 10.4(e).  There is no indication that they fulfilled any of these duties, and they do not argue that they did.

Instead, they argue that because Poarch itself was the tribe to which the immediate notice had to be provided, there was no NAGPRA violation.  Dkt. 202 at 49.  Tellingly, that does not address whether the notice requirement was actually complied with, much less whether the important requirements of work stoppage and protection of the cultural items were complied with.  Moreover, notice to the appropriate federal official was still required with respect to any inadvertent discoveries on Federal lands.  And even on tribal land, anyone making an inadvertent discovery still had to immediately notify the Tribal Defendants, and the Tribal Defendants had a duty to ensure that they did so, rather than turning a blind eye to the destruction and later arguing that because it occurred at their direction, no notice, work stoppage, or protection was required.

The Tribal Defendants also argue that the Plaintiffs "have failed to adequately allege that inadvertent discoveries occurred." Dkt. 202 at 47. This is incorrect. The Plaintiffs allege that cultural items were present in *almost all areas* of the Hickory Ground Site. Dkt. 190 at 30; *see also id*. at 41 (depicting extensive distribution of burials). They further allege that it would have been "*virtually impossible* to undertake *any construction activities* without a *high probability of damaging*" human remains and other cultural items. Dkt. 190 at 30 (emphasis added). The Tribal Defendants nevertheless imply that inadvertent discoveries are not likely to have occurred during construction because a Phase III excavation was previously conducted. Dkt. 202 at 47–48. But as the Plaintiffs have explained, the purpose of a Phase III excavation is to record data about a site, *not* to remove all remains and cultural items a site may contain. Dkt. 190 at 28. In a Phase III archaeological excavation *some* items are removed, but *others* are left at the site. *Id*.. At this point, the Plaintiffs are not required to identify specific inadvertent discoveries of cultural items. Discovery will reveal those details. The Plaintiffs have made allegations sufficient to support a very reasonable belief that inadvertent discoveries (and destruction) of cultural items occurred.

Finally, the Tribal Defendants had a duty to give ownership and control of the Plaintiffs' ancestors, their funerary objects, and their other cultural items to the Plaintiffs. 25 U.S.C. § 3002(c)(3). As discussed above, this duty does not apply only to federal agencies and museums, as the Tribal Defendants seem to imply, but rather, is a central and generally applicable provision of NAGPRA. *Id*. As lineal descendants of the deceased, Dkt. 190 1, 7, 14, 31, 34, Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are entitled to ownership and control of their ancestors' remains and associated funerary objects. 25 U.S.C. § 3002(a)(1). The Tribal Defendants argue that Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are not lineal descendants of the excavated ancestors. Dkt. 202 at 44. NAGPRA itself does not contain a definition of "lineal descendant," but NAGPRA's implementing regulations define "lineal descendant" as:

> an individual tracing his or her ancestry directly and without interruption by means of the traditional kinship system of the appropriate Indian tribe . . . or by the common law system of descendance to a known Native American individual whose remains, funerary objects, or sacred objects are being claimed under these regulations.

43 C.F.R. § 10.2(b)(1). By making traditional kinship system the primary standard for determining lineal descendants (the definition originally *only* referred to the traditional kinship system; the common law system was added as an alternative in response to a comment received), the Department of the Interior intended that *tribes* would be able to *determine for themselves*, as an intramural matter firmly within tribal authority, who qualifies as a lineal descendant. *See* 60 Fed. Reg. 62134, 62135 (Dec. 4, 1995) ("Reference to traditional kinship systems is designed to accommodate the different systems that individual Indian tribes use to reckon kinship."). According to the Plaintiffs' traditional kinship system, Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are the lineal descendants of the ancestors buried at the Hickory Ground Site. Dkt. 190 at 1, 7, 14, 31, 34.

While, as the Tribal Defendants point out, Dkt. 202 at 44, Hickory Ground Tribal Town may not be an "individual" according to the common sense of the word (although the term "individual" is not defined, so that cannot be ruled out), its *members* are individuals and lineal descendants. Allowing a determination of their status as lineal descendants to turn on such a technicality, particularly at this early stage of the case, would be contrary to NAGPRA's remedial purpose. The Tribal Defendants' other argument, that the ancestors are not "known Native American individual[s]," *see* Dkt. 202 at 44, is unavailing for the same reason. In addition, the Plaintiffs' ancestors are ***not*** unknown individuals. The definition of "lineal descendant" does not require that the deceased be identifiable by name, it only requires that they be known. Regardless of whether the Plaintiffs might or might not know all of the deceased's names currently, they know that the deceased are their ancestors, and that they are the lineal descendants of the deceased, according to their (and the ancestors') traditional kinship system. In some cases, the individuals may be even more closely identifiable as the Plaintiffs' direct ancestors based on the location of their burial. *E.g.*, Dkt. 190 (describing how Mekko

Thompson's ancestors have served as Mekko of Hickory Ground Tribal Town since time immemorial, and how *mekkos* are buried in a certain location).   Thus, Plaintiffs Mekko Thompson and Hickory Ground Tribal Town are lineal descendants of the ancestors buried at the Hickory Ground Site.

Even if Plaintiffs Mekko Thompson and Hickory Ground Tribal Town were not lineal descendants (which they are), the Muscogee (Creek) Nation would be entitled to ownership and control of the cultural items as the tribe which has the closest cultural affiliation with the cultural items.   25 U.S.C. § 3002(a)(2)(B).   Although the Tribal Defendants might normally occupy a higher position of priority for ownership and control as the current tribal landowner with respect to cultural items discovered on its reservation *only*, 25 U.S.C. § 3002(a)(2)(A), the Muscogee (Creek) Nation should take precedence in this case, as the tribe "having the strongest cultural relationship with such remains or objects" (as well as, next in priority, the Indian tribe who aboriginally occupied the lands).   25 C.F.R. § 262.8(a)(2).   Moreover, the drafters of NAGPRA did not intend that the interests of tribes with the closes cultural affiliation would be disregarded as they have been here.   *See* S. Rep. No. 101-473, at 9 (1990) ("The Committee also recognizes that there may be circumstances where human remains or objects found on one Indian tribe's lands may be culturally affiliated with a different Indian tribe.   In these situations . . . the Committee intends that a determination of the right of possession shall be based on the best available evidence given the totality of the circumstances.").

### 3.   NAGPRA provides a private right of action and broad equitable authority to the Court to craft a remedy for the Tribal Defendants' violations.

NAGPRA creates a private right of action and vests federal courts with jurisdiction over claims of NAGPRA violations.   NAGPRA's enforcement provision, 25 U.S.C. § 3013, provides: "The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter and ***shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter***." (emphasis added).   This provides a private right of action, *e.g.*, *Geronimo v. Obama*, 725 F. Supp. 2d 182, 185 (D. D.C. 2010) (stating that

Section 3013 "expressly provides for a private right of action."), and also vests the federal courts with jurisdiction over NAGPRA claims, *e.g.*, *Thorpe v. Borough of Thorpe*, 770 F.3d 255, 259 (3d Cir. 2014) ("NAGPRA's jurisdictional provision vests federal courts with jurisdiction over 'any action brought by any person alleging a violation of' NAGPRA."); *Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936, 939 (10th Cir. 1996) (stating that Section 3013 "explicitly vests jurisdiction in federal courts").

   On its face, Section 3013 broadly authorizes courts to issue appropriate relief, as necessary to enforce NAGPRA.  *E.g.*, *Castro Romero v. Becken*, 256 F.3d 349, 354 (5th Cir. 2001) (characterizing Section 3013 as granting "broad enforcement power"). This includes the type of declaratory, injunctive, and other relief sought by the Plaintiffs. *E.g.*, *Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 194 F. Supp. 2d 977, 986 (D.S.D. 2002) ("The Court has the authority to require the Corps to comply with its duties under NAGPRA and its implementing regulations by issuing a writ of mandamus…."); *Bonnichsen v. U.S. Dep't of Army*, 969 F. Supp. 614, 627 (D. Or. 1997) ("Section 3013 establishes a right to declaratory and injunctive relief to redress violations of NAGPRA.").  The Tribal Defendants appear to object not to the form of the relief requested, but to the nature or scope of the relief requested.   But those objections are premature.  *C.f.*, *e.g.*, *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1447 (5th Cir. 1991) ("There is, in other words, a broad range of remedies that could conceivably emerge from NHPA review.  We find it inappropriate to pre-judge those results as being limited to the extremes of either maintaining the status quo or totally demolishing the park."); *Slockish v. U.S. Fed. Highway Admin.*, 682 F. Supp. 2d 1178, 1184-85 (D. Or. 2010) (noting in an NHPA/NEPA case that the court could order a highway removed, but concluding: "It is premature, in any event, at this stage of the case to set the precise parameters of the Court's equitable authority. Such a determination will best be made in any remedial phase of this litigation after the facts have been established and the legal issues have been decided").  And even if the Tribal Defendants' objections were not premature, the scope of relief the Plaintiffs request is within the Court's equitable powers. *C.f.*, *e.g.*, *West v. Sec'y of Dep't of Transp.*, 206

F.3d 920, 925 (9th Cir. 2000) (stating in a NEPA case that "upon finding that defendants failed to comply with NEPA, our remedial powers would include remanding for additional environmental review and, conceivably, ordering the [highway] interchange closed or taken down."); *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1034-35, 1039 (D. Mont. 2006) (noting in a NEPA/NHPA/ESA case that the court's equitable powers were broad, and listing its options for injunctive relief, which included requiring that a pipeline be removed, although it ultimately chose to order the pipeline shut down instead).

The Tribal Defendants mischaracterize the relief the Plaintiffs seek with respect to their NAGPRA claim. Dkt. 202 at 50-51. Importantly, with respect to their NAGPRA claim, the Plaintiffs do ***not*** seek a permanent injunction on any activity at the Hickory Ground Site, or an order that the Hickory Ground Site be maintained in a pristine state forever, as much as the Plaintiffs might desire that. What the Plaintiffs ***do*** request is that the Tribal Defendants be required to comply with NAGPRA. Dkt. 190 at 58. As cases cited in the preceding paragraph illustrate, this could involve some degree of rolling back actions that were taken without NAGPRA compliance; and it is not clear what the outcome of the NAGPRA process would be; but there is at least a possibility that some of the adverse effects could be ameliorated through an appropriate interactive process. The Plaintiffs also request a declaratory judgment that the Tribal Defendants have violated NAGPRA, as well as an order requiring them to comply with NAGPRA going forward, so that this tragedy is not repeated. Dkt. 190 at 78. The Plaintiffs allege that there are still human remains, funerary objects, and other cultural items in the ground at the Hickory Ground Site and on other Poarch lands, Dkt. 190 at 44, that Poarch could also destroy if not held accountable. The requested relief is within this Court's authority to grant.

In summary, the Hickory Ground Site is the Plaintiffs' aboriginal land, from which they were forcibly removed. The individuals buried there are the Plaintiffs' ancestors. The Tribal Defendants must not be allowed to flout NAGPRA, desecrate the Plaintiffs' ancestors' graves, and deprive the Plaintiffs of ownership and control over their ancestors and other cultural items. The Plaintiffs have alleged a viable NAGPRA claim, and this Court has broad authority to issue

appropriate relief.  The Tribal Defendants' motion to dismiss the NAGPRA claim should be denied.

**F.     The Plaintiffs have stated a claim against the Tribal Defendants under ARPA.**

Federal law provides that  "[n]o person may excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands unless such activity is pursuant to a permit issued under [16 U.S.C. § 470cc]." Archaeological Resources Protection Act ("ARPA") 16 U.S.C. § 470ee(a); *see also* 25 C.F.R. § 262.3(a).  For purposes of ARPA, "Indian lands" means, in relevant part, land held in trust by the United States for Indian tribes.  16 U.S.C. § 470bb(4). "Public lands" means certain lands owned and administered by the United States, such as national parks, national forests, etc. 16 U.S.C. § 470bb(3). Accordingly, the Hickory Ground Site constitutes "Indian lands" for purposes of ARPA, because it was held in trust by the United States for Poarch when Poarch breached its promises to protect this sacred site from excavation and development.

The permit requirement of ARPA (which is incorporated into NAGPRA) is a vital component of the cultural preservation and protections in those statutes.  It is intended to give tribes who "may consider the site as having religious or cultural importance" prior notice of any planned excavation that may harm a religious or cultural site. 16 U.S.C. § 470cc(c).  While there is an exception to the permit requirement for tribes (and sometimes tribal members, depending on the circumstances) performing the excavation or removal of archaeological resources on their own Indian lands, 16 U.S.C. § 470cc(g)(1), as discussed in Section IV.E.2 above, that exception does ***not*** apply to others performing excavation on a tribe's behalf.   25 C.F.R. § 262.4(c).  Indeed, in some circumstances, it may not even apply to tribal employees.  *Id.*  Even if Poarch itself may not have needed a permit, the people and entities performing excavation and removal of archaeological resources on its behalf did, and Poarch had a duty to ensure that they obtained

the appropriate permits.  To the extent any excavation occurred without a permit, as the Plaintiffs

have alleged, *see* Dkt. 190 at 63, it violated ARPA.

Worse, the Tribal Defendants violated ARPA even with respect to permits that ***were***

obtained.  Plaintiffs allege, on information and belief, that Poarch officials falsely represented in

the permit application that no religious or cultural site would be harmed or destroyed by the

proposed work at the Hickory Ground Site.  Dkt. 190 at 62.  Before issuing a permit, BIA

regulations required Poarch, as the tribe having jurisdiction over the lands, to "either state that no

religious or cultural site will be harmed or destroyed by the proposed work or specify terms and

conditions that the permit must include in order to safeguard against such harm or destruction."

25 CFR § 262.5(c)(1).  As the Tribal Defendants have given no indication that they required any

safeguards (much less that such safeguards were implemented), presumably they falsely

represented that no harm or destruction would occur.  Having pleaded a plausible claim on this

issue, Plaintiffs should be allowed to conduct discovery in order to obtain the information that is

in the exclusive possession and control of Poarch about it.

Second, the Tribal Defendants or their agents failed to obtain the Muscogee (Creek)

Nation's consent for any permits that were issued.  If the lands involved in a permit application

are Indian lands, the applicant is required to obtain the consent of the "appropriate Indian tribal

authority" for the permit. 43 C.F.R. § 7.35. As discussed in more detail in Section IV.E.2, above,

25 C.F.R. § 262.5(d) provides that "[d]etermination as to which tribe is the appropriate tribe shall

be made in accordance with § 262.8(a)," which makes the Muscogee (Creek) Nation the

appropriate tribe. The Tribal Defendants' argument that Plaintiffs Mekko Thompson and

Hickory Ground Tribal Town are not lineal descendants for this purpose is unavailing, as also

discussed in Section IV.E.2, above.

There is also no question that Plaintiffs' ARPA claim is timely under the APA's six-year

statute of limitations.  Plaintiffs allege that the Phase III excavation ended in 2011, Dkt. 190 at

28, not in 2006 as the Tribal Defendants inexplicably assert. Because the original Complaint in

this matter was filed in 2012, there is no statute of limitations that would bar this claim relating

to the Phase III excavation when the allegation is taken as true. In fact, construction activities for the casino resulting in further disturbance of buried human remains and artifacts took place even after the original Complaint was filed. Dkt. 190 at 32 (casino construction activities continued until 2014). The claims from that activity cannot be deemed untimely.

Finally, excavation, removal, damage, alteration, or defacement to archaeological resources at Hickory Ground by or at the direction of the Tribal Defendants without a required permit violated ARPA, regardless of whether it occurred during the Phase III excavation or during the subsequent construction of the casino (which the Plaintiffs allege concluded in 2014, Dkt. 190 at 32). The casino construction activities are ***not*** exempt from ARPA's prohibition on conducting those activities on Indian lands without a permit. 16 U.S.C. § 470ee(a). ARPA's implementing regulations do provide an exception to the permit requirements for activities that are "***exclusively*** for purposes other than the excavation and/or removal of archaeological resources, even though those activities might incidentally result in the disturbance of archaeological resources." 43 C.F.R. § 7.5(b)(1) (emphasis added). But that exception applies only to "activities on the ***public lands***." *Id*. (emphasis added). The lands at issue here are "Indian lands," not "public lands" for purposes of ARPA, so this exception does not apply.

Assuming solely for the sake of argument that this exception *could* apply on Indian lands like Hickory Ground, the exception does not apply in a situation such as this one, where the actor knew that archaeological resources were present and that excavation would necessarily cause their excavation and removal.

> [T]he actions of the plaintiff in this case are easily characterized as 'purposeful excavation and removal of archaeological resources' inasmuch as Fein was made aware through the language of the Deed that historical ruins were present in the area he proposed to build a house. ***He and his agents*** were thus charged with the knowledge that any digging on the site would certainly cause the excavation and removal of archaeological resources, which would be 'purposeful' and not inadvertent.

*Fein v. Peltier*, 949 F.Supp. 374, 380 (D. V.I. 1996) (emphasis added). Thus, the court concluded that an ARPA permit was required. Treating as true Plaintiffs' well-pleaded

allegations that ancestral remains and artifacts were present throughout the Hickory Ground Site, making it impossible to conduct excavation and construction activity without disturbing them (Dkt. 190 at 30-31, 41), there is no way that this disruption could be deemed not "purposeful" or "incidental" for purposes of the exception, and it should not apply.

NAGPRA provides the cause of action for the Tribal Defendants' ARPA violations. *See* Dkt. 190 at 63. NAGPRA does not merely require one to obtain an ARPA permit, it requires that the items be excavated or removed "pursuant to" that permit, 25 U.S.C. 3002(c)(1)—in other words, with a permit and in accordance with the requirements of that permit. And as discussed above, NAGPRA broadly authorizes the district courts to "issue such orders as may be necessary" to enforce its provisions, which include the incorporated ARPA requirements. 25 U.S.C. § 3013.

## G.   The Plaintiffs have stated a claim against the Tribal Defendants under the NHPA.

The Tribal Defendants entered into an agreement with the National Parks Service to fulfill all responsibilities and obligations applicable to Hickory Ground under the National Historic Preservation Act ("NHPA") (codified as amended at 54 U.S.C. §§ 300101-307108). Dkt. 190 at 24. As explained in more detail below and alleged in the Second Amended Complaint, the Tribal Defendants became responsible for compliance with NHPA through that agreement, they undertook actions that required certain steps under NHPA, they violated those requirements and those violations are reviewable pursuant to NHPA. Accordingly, Plaintiffs have pleaded a plausible claim under NHPA and the Tribal Defendants' motion to dismiss this claim should be denied.

### 1.   NHPA imposes a mandatory process for assessing impacts on historic places.

The purpose of NHPA is the preservation of historic resources. *Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 226 (10th Cir. 1981). The Hickory Ground Site has been listed on the National Register of Historic Places since 1980. Dkt. 190 at 5, 14. Accordingly, it is a

"historic property" subject to NHPA. 54 U.S.C. § 300308 (defining "historic property" as including sites included on the National Register).

Section 106 of NHPA (codified at 54 U.S.C. § 306108) requires Federal agencies to take into account the effects of their undertakings on historic properties.  36 C.F.R. § 800.1(a).  This is commonly referred to as the "Section 106 process."

> The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

*Id*.  Federal agencies must complete the Section 106 process *before* approving the expenditure of any Federal funds or issuing any license.  54 U.S.C. § 306108; 36 C.F.R. § 800.1(c).

### 2.    NHPA's requirements apply to the Tribal Defendants because they assumed NHPA obligations by agreement with the National Park Service.

While NHPA requirements primarily apply to Federal agencies, tribes can assume certain legal obligations under NHPA.  NHPA provides for a tribe to assume all or part of the functions of a State Historic Preservation Officer with respect to tribal land.  54 U.S.C. § 302702.

Poarch entered into just such an agreement with Federal Defendants the National Park Service and Department of the Interior for the express purpose of assuming NHPA responsibilities, including with respect to the Hickory Ground Site (hereinafter, the "NPS Agreement").  Dkt. 190-1 at 115-19. Under the NPS Agreement, Poarch expressly assumed responsibility for certain NHPA functions on tribal lands. *Id*. at 115. These include, *inter alia*, to cooperate with various other entities to "ensure that historic properties are taken into consideration at all levels of planning and development;" to consult with appropriate Federal agencies regarding any "Federal undertakings that may affect historic and culturally significant properties on tribal lands;" and to consult with appropriate Federal agencies regarding "the content and sufficiency of any plans to protect, manage, or mitigate harm to such properties." *Id*.

at 116. Poarch also agreed to "carry out its responsibilities for review of Federal undertakings pursuant to Section 106 of the Act in accordance with [its implementing regulations]." *Id*. at 117.

Of paramount importance, Poarch also expressly agreed to provide for "consultations with representatives of any other tribes whose traditional lands may have been within [Poarch's reservation]." *Id*. Even more specifically, in any case where an action covered by NHPA might affect the traditional lands of another tribe, Poarch agreed to "seek and take into account the views of that Tribe." *Id*. These provisions are an integral and mandatory part of any such agreement. *See* 54 U.S.C. § 302704 (Secretary may ***only*** enter into such an agreement if it provides for appropriate participation by "representatives of other Indian tribes whose traditional land is under the jurisdiction of the Indian tribe assuming responsibilities," among other things).

Tribes who assume these responsibilities take legal and financial responsibility for implementing and complying with the required steps of the Section 106 process. 36 C.F.R. 800.2. In carrying out this responsibility, they exercise delegated federal legal authority. *Id*. Therefore, NHPA requirements apply to the Tribal Defendants because they assumed NHPA obligations under the NPS Agreement.

### 3.    The Plaintiffs have alleged various "undertakings" under the NHPA.

"Undertaking" means a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 54 U.S.C. § 300320. It includes projects, activities, or programs carried out by or on behalf of a Federal agency, those carried out with Federal financial assistance, and those requiring a Federal permit, license, or approval. *Id*. Courts have construed the statute to mean that only a Federal permit, license, or approval is required for an action to be a federal undertaking—federal funding is not necessarily required. *United Keetoowah Band of Cherokee Indians v. Fed. Comm. Comm'n*, 933 F.3d 728, 734 (D.C. Cir. 2019); *Sheridan Kalorama Hist. Ass'n v. Christopher*, 49 F.3d 750, 755 (D.C. Cir. 1995) (finding that the definition of "undertaking" included projects requiring a federal permit or merely federal approval, because a narrower reading would "deprive the references to licensing

in § 106 of any practical effect"); *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 205 F. Supp. 3d 4, 8 (D. D.C. 2016) ("An undertaking is defined broadly to include any 'project, activity, or program' that requires a federal permit."); *Fein v. Peltier*, 949 F. Supp. 374, 379 (D. V.I. 1996) (reading the phrase "funded in whole or in part" as modifying only the word "program," and finding that "an undertaking for purposes of section 106 includes a project or activity under the direct or indirect jurisdiction of the NPS which requires its prior approval, regardless of whether the project or activity is funded in whole or in part by the federal government.").

The federal decision need not be particularly formal, and it need not result in affirmative action in order to constitute an undertaking. For example, the construction of wireless communication towers has been held to constitute an undertaking subject to NHPA review based on an online registration process for the towers that takes mere minutes to complete. *CTIA-Wireless Ass'n v. Fed. Comm. Comm'n*, 466 F.3d 105, 114 (D.C. Cir. 2006). A decision to take *no action* has also been held to constitute an undertaking. *Nat'l Trust for Hist. Pres. v. Blanck*, 938 F. Supp. 908, 920 (D. D.C. 1996). In that case, Walter Reed Army Medical Center made a decision not to excess (*i.e.*, sell) historic buildings, even though it was not using the buildings, did not have the resources to maintain the buildings, and had allowed the condition of the historic buildings to significantly deteriorate. *Id*. at 910, 919-20. As the court explained, "[t]hat decision had the sort of serious and long-term consequences" for the historic buildings that the NHPA requires be undertaken in accordance with the Section 106 process. *Id*. at 920. By these standards, several "undertakings" occurred here.

Both the issuance of ARPA permits and the decision to allow excavation of the Hickory Ground Site to occur without required ARPA permits constitute undertakings. Although issuance of an ARPA permit alone is generally not an undertaking requiring compliance with Section 106 of NHPA, 43 C.F.R. § 7.12, the excavation of the Hickory Ground Site was an undertaking, and thus NHPA required the Section 106 process to be completed before any federal funds could be approved in connection with the project and before any permits were

issued.  *See Sheridan Kalorama Hist. Ass'n*, 49 F.3d at 754 (it is the project that constitutes the undertaking, not the decision to fund or license).  The excavation took place on land owned by the federal government in trust for Poarch, for which the federal government had delegated Poarch historic preservation responsibilities. *See Fein*, 949 F. Supp. at 379 (concluding that the NHPA applied, citing federal ownership of the land and a contractual obligation not to disturb historic ruins on the land and to allow NPS representatives to enter upon the property at reasonable times).  Moreover, the Plaintiffs have alleged facts sufficient to support a reasonable belief that the excavation was federally funded, in whole or in part.  *See* Dkt. 190 at 65, 71 (indicating that Poarch appears to generally receive federal historic preservation funds on an annual basis); 54 U.S.C. §§ 302906, 302907 (authorizing grants to tribes for the preservation of their cultural heritage, as well as for the purposes of carrying out a historic preservation program).

Having pleaded a plausible claim on this issue, the Plaintiffs should be allowed to conduct discovery in order to obtain information in the exclusive possession and control of the Tribal Defendants to determine whether any portion of that funding was intended or used for any activities concerning the Hickory Ground Site. As in *Blanck*, the decision to allow the excavation (whether with or without required ARPA permits) "had the sort of serious and long-term consequences" for the National Register-listed Hickory Ground Site that should have triggered the Section 106 process. 938 F. Supp. at 920. It would be nonsensical if a short, online registration process for something that *might* have an impact on a historic site was an undertaking, as in *CTIA-Wireless*, 466 F.3d at 114, but a decision to allow excavation of a known Muscogee (Creek) Nation historic burial and ceremonial site was not.

Construction and operation of the casino and hotel on the Hickory Ground Site also constituted an undertaking, because an Indian gaming facility is by its very nature a project conducted with federal approval and extensive federal involvement.  From the very earliest days of the Indian gaming industry, the federal government has been extensively involved in all aspects of Indian gaming.  The federal government actively promoted gaming as a way of

meeting federal goals for tribes, such as economic development and self-determination. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217 and n.21 (1987). Multiple departments of the federal government, including Federal Defendant the Department of the Interior, provided financial assistance to tribes to develop the nascent industry. *Id*. at 218. Federal Defendant the Secretary of the Interior originally approved tribal gaming ordinances, regulated the gaming activities, and reviewed management contracts for tribal gaming facilities. *Id*. Indeed, the very reason the Indian gaming industry exists as it does is because of the important tribal ***and federal*** interests involved, which preempt state regulation. *See id.* at 216–22 (balancing the interests of the federal government first, tribal governments second, and state government third, in order to determine whether state regulation was preempted, and determining that it was).

Subsequent to the *Cabazon* case, the federal government further formalized its regulation of the Indian gaming industry by enacting the Indian Gaming Regulatory Act ("IGRA"), codified at 25 U.S.C. §§ 2701-2721. IGRA established the National Indian Gaming Commission ("NIGC") within the Department of the Interior, 25 U.S.C. § 2704(a), and granted the NIGC extensive authority over Indian gaming operations. For example, gaming can only be conducted with an ordinance approved by the NIGC Chairman. 25 U.S.C. § 2710(b)(1)(B). The NIGC is required to monitor gaming conducted on Indian lands on a continuing basis, and to inspect and examine all premises located on Indian lands on which gaming is conducted. 25 U.S.C. § 2706(b). IGRA imposes requirements regarding the uses of gaming revenues and, notably for purposes of this case, the construction of gaming facilities. 25 U.S.C. § 2710(b). The NIGC even plays a role in the hiring and retention of employees. *Id*.; 25 U.S.C. § 2710(c) (primary management officials and key employees must be licensed, and background checks must be conducted and sent to the NIGC before licenses are issued; NIGC may require the suspension of a license if it does not approve of the employee). NIGC approval is required, and the NIGC mandates terms, for certain contracts. 25 U.S.C. § 2711 (requiring the Chairman's approval of management contracts and collateral agreements, setting limits on the term of management

contracts and fees under such contracts, and prescribing certain other terms in the contracts). The NIGC has the authority to close a gaming operation. 25 U.S.C. § 2713(b). And, notably for purposes of this case, the NIGC is funded by tribal gaming operations—the casino built on the Hickory Ground Site is required to pay a percentage of its revenues to the NIGC. 25 U.S.C. § 2717(a).

Pursuant to NIGC regulations, a tribe must notify the NIGC at least 120 days before opening any new gaming facility.  25 C.F.R. § 559.2(a).  Assuming Poarch complied with this requirement, as it should have, the federal government accordingly had at least four months' notice that the casino was under construction.  Finally, the NIGC prescribes extremely detailed standards for all aspects of tribal gaming operations.  *See, e.g.*, 25 C.F.R. Part 543 (Minimum Internal Control Standards for Class II Gaming).

The federal government's ownership of the Hickory Ground Site; its extensive involvement in the gaming operation, from construction on; and its receipt of revenues from the gaming operation makes the planning, construction and operation of the gaming facility an undertaking.  *Cf. Fein*, 949 F. Supp. at 379; *CTIA-Wireless*, 466 F.3d at 114-15  (retention of approval authority constituted undertaking).  *Compare Ringsred v. City of Duluth*, 828 F.2d 1305, 1306, 1308-09 (8th Cir. 1987) (concluding that a parking ramp to be built adjacent to a pre-IGRA Indian gaming facility was not an undertaking for purposes of NHPA where it would be built on City land, using City funds, the federal government would provide no financial aid and receive no revenue from it, there were no federal licensing requirements, and the federal government would have no input regarding design or construction).

### 4.      The Tribal Defendants violated the NHPA.

In carrying out its obligations under the Section 106 process, a Federal agency must consult with Indian tribes, among others. 54 U.S.C. § 302706(b); *Id.* § 306102(b).  If a historic property may be affected by an undertaking, the agency official must consult with any Indian tribe that "attaches religious and cultural significance" to the historic property.  36 C.F.R. §

800.2(c)(2)(ii); 36 C.F.R. § 800.3(f)(2).  A tribal governmental official who has been delegated legal responsibility for Section 106 compliance must likewise engage in consultation.  36 C.F.R. § 800.2(a) and (c) (tribal governmental official exercising delegated authority may be the agency official and agency official must include as a consulting party in the Section 106 process any tribe that attaches religious and cultural significance to historic properties that may be affected by an undertaking); 36 C.F.R. § 800.3(f)(2) (agency official must invite tribes that might attach religious and cultural significance to historic properties to consult).  Poarch expressly assumed consultation obligations for purposes of the Section 106 process.  Accordingly, Poarch and its Tribal Historic Preservation Officer had the duty to consult with the Muscogee (Creek) Nation, as a tribe—indeed the primary tribe—that attaches religious and cultural significance to the National Register listed Hickory Ground Site, with respect to any undertakings that might affect the Site.

Consultation obligations arise throughout the Section 106 process.  For example, consideration of adverse effects to a historic property must be done in consultation with any tribe that attaches religious and cultural significance to the property. 36 C.F.R. § 800.5. If a party disagrees with a finding of no adverse effect, then the agency official must either consult with the party to resolve the disagreement or request the Advisory Council on Historic Preservation to review the finding.  *Id.* § 800.5(c)(2). If an adverse effect is found, the agency official must consult further to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects. *Id.* § 800.5(d)(2); 36 C.F.R. § 800.6. The consultation process is intended to give a tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  36 C.F.R. § 800.2(c)(2)(ii)(A).

Plaintiffs have alleged that Poarch did not engage in consultation with the Muscogee (Creek) Nation at ***any*** of these required points in the consultation process, with respect to ***any*** of

the undertakings discussed above.  Dkt. 190 at 66.  The Tribal Defendants do not dispute this allegation.  Their argument that they did engage in some discussions with the Plaintiffs over the years, Dkt. 202 at 59, fails because these discussions did not take place *before* the undertaking, as required by the NHPA, and they do not meet the NHPA's specific requirements for consultation.  These failures to consult caused real-world harm to Plaintiffs.  Poarch's wholesale disregard of these consultation obligations deprived the Plaintiffs of the opportunity to identify their concerns about undertakings at the Hickory Ground Site and to participate in the resolution of adverse effects.  If the Plaintiffs had been consulted as they should have been, perhaps the parties would have been able to avoid the egregious harms that occurred.  At a minimum, the Plaintiffs could have advised as to how to treat their ancestors' remains and cultural items in a culturally appropriate fashion.  The Tribal Defendants violated NHPA.

### 4.   The Tribal Defendants' NHPA violations are reviewable under NHPA.

The Tribal Defendants' NHPA violations are reviewable under NHPA.  The NHPA expressly contemplates enforcement actions by "any interested person."

> In any civil action brought in any United States district court *by any interested person* to enforce this division, if the person substantially prevails in the action, the court may award attorney's fees, expert witness fees, and other costs of participating in the civil action, as the court considers reasonable.

54 U.S.C. § 307105 (emphasis added).

This section provides a private right of action.  *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1017 (3d Cir.1991); *Vieux Carre Prop. Owners, Residents & Assoc., Inc. v. Brown*, 875 F.2d 453, 458 (5th Cir.1989); *Yankton Sioux Tribe v. United States Army Corps of Engineers*, 194 F. Supp. 2d 977, 990 (D. S.D. 2002).  *See also Narragansett Indian Tribe v. Rhode Island Dept. of Transp.*, 903 F.3d 26, 29-30 (1st Cir. 2018) ("We have previously assumed, without deciding, that the NHPA creates some type of private right of action….we can continue to indulge in this assumption, again…because the Tribe in its complaint does not purport to bring any claim to enforce the NHPA.").  *But see Karst Envtl. Educ. & Prot., Inc. v. Envtl. Prot. Agency*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (stating in passing, and without analysis, that

NHPA contains no private right of action); *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005) (agreeing with its "sister circuits" that the attorney fees provision "demonstrates Congressional intent that individuals may sue to enforce the NHPA," but concluding that it does not give rise to a private action against the government).  As discussed in Section IV. A.1, above, because the Tribal Defendants were exercising delegated authority, the defense of sovereign immunity is not available.

Moreover, as discussed in Section IV.E.3, above, the Court has broad equitable powers to order appropriate relief in an NHPA case.  *See, e.g.*, *Vieux Carre Property Owners, Residents & Assoc., Inc. v. Brown*, 948 F.2d 1436, 1447 (5th Cir. 1991) ("There is, in other words a broad range of remedies that could conceivably emerge from NHPA review.  We find it inappropriate to pre-judge those results as being limited to the extremes of either maintaining the status quo or totally demolishing the park."); *see also Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1034-35, 1039 (D. Mont. 2006) (noting in a NEPA/NHPA/ESA case that the court's equitable powers were broad, and listing its options for injunctive relief, which included requiring that a pipeline be removed, although it ultimately chose to order the pipeline shut down instead).  The Court should exercise those equitable powers on the basis of a fully-developed record and after fact finding.  *Slockish v. United States Federal Highway Admin.*, 682 F. Supp. 2d 1178, 1185 (D. Or. 2010). Resolution at an earlier stage would be premature. "Such a determination will best be made in any remedial phase of this litigation after the facts have been established and the legal issues have been decided." *Id.*

At this stage of the case, all the Court needs to decide is whether Plaintiffs have alleged a plausible claim for relief under the NHPA.  Once the facts are determined, the Court can decide whether Tribal Defendants violated the NHPA and the NPS Agreement; whether an order in the nature of mandamus requiring them to abide by the NHPA going forward is needed to prevent further tragedies of this nature; and whether to issue an injunction requiring them to consult with the Plaintiffs during such restoration of the Hickory Ground Site as the Court may order.  Those are important decisions that should be made on a full record.

**H.     The Plaintiffs have stated a claim against the Federal Defendants and Tribal Defendants under RFRA because Tribal Defendants are federal actors whose actions are substantially burdening Plaintiffs' religious exercise.**

Because Tribal Defendants and Federal Defendants advance very similar arguments in their motions to dismiss Plaintiffs' RFRA claim, Plaintiffs address both Tribal Defendants' and Federal Defendants' arguments in Section IV.E of their Response to Federal Defendants' Motion to Dismiss, incorporated herein by reference, for the sake of convenience and efficiency.

**I.     This Court should not dismiss Count VIII of the Second Amended Complaint seeking relief from the application of NAGPRA and ARPA in violation of Plaintiffs' rights of religious exercise.**

Count VIII of the Second Amended Complaint asserts that the Federal Defendants and the Tribal Defendants applied NAGPRA and incorporated provisions of ARPA in a fashion that violated the Free Exercise Clause, RFRA, and Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Dkt. 190 at 59-61. Those violations consist of (1) allowing any tribe other than the Muscogee (Creek) Nation to consent to excavation of the Hickory Ground Site or (2) providing any entity other than Mekko Thompson and the Muscogee (Creek) Nation with a higher priority of ownership in the remains and other items excavated from the Site. Dkt. 190 at 60-61.  Plaintiffs seek relief from this Court to address these violations because Plaintiffs cannot do so without risking civil or criminal penalties.

Federal Defendants and Tribal Defendants contend that Count VIII should be dismissed for largely the same reasons that they argue Plaintiffs' RFRA claim should be dismissed, and because they contend the Religious Land Use and Institutionalized Persons Act ("RLUIPA") does not apply here. Dkt. 200 at 40-41; Dkt. 202 at 70-72.[16] As discussed below, relevant portions of RLUIPA do apply here, and this Court should not dismiss Count VIII for largely the same reasons this Court should not dismiss Plaintiffs' RFRA claim: without compelling justification, Federal Defendants and Tribal Defendants have applied NAGPRA and related

---

[16] Because Tribal Defendants and Federal Defendants advance very similar arguments in their motions to dismiss Count VIII, Plaintiffs address both Tribal Defendants' and Federal Defendants' arguments in this brief for the sake of convenience and efficiency.

provisions in ARPA to Plaintiffs in a manner that prevents altogether or substantially burdens Plaintiffs' exercise of their religious beliefs.

**1.      NAGPRA's "ownership or control" rule should be applied to honor Plaintiffs' traditional kinship structure.**

Plaintiffs' claims in Count VIII center on Tribal Defendants' and Federal Defendants' interpretation of NAGPRA's "ownership or control" rule, which dictates who has ownership and control over Native American cultural items excavated from a site and who must consent to excavations on tribal land. First, Tribal Defendants did not obtain consent from the Muscogee (Creek) Nation prior to excavating at Hickory Ground, and thus applied NAGPRA and ARPA's requirement to obtain consent for excavation from the "appropriate Indian tribe" to Plaintiffs in a manner that violates the Free Exercise clause of the First Amendment, the Religious Land Use and Institutionalized Persons Act, and the Religious Freedom Restoration Act. *See* Dkt. 190 at 60. Second, the Department of the Interior incorrectly denied Mekko Thompson's NAGPRA claim by applying the ownership or control rule in a manner that violates the Free Exercise clause of the First Amendment, the Religious Land Use and Institutionalized Persons Act, and the Religious Freedom Restoration Act. *See* Dkt. 190 at 60-61. In both cases, Plaintiffs are compelled by their religion to return the remains and cultural items to their original and intended burial places, but if they do so they will face civil and criminal sanctions, violating their religious freedoms and rights.

Under NAGPRA, "lineal descendants" have *first priority, over the tribal landowner*, for ownership and control of Native American cultural items excavated from tribal land. *See* 25 U.S.C. § 3002(a); 25 C.F.R. § 262.8(a); 43 C.F.R. § 10.6(a); *see also* Dkt. 190 at 54, 60. Lineal descendancy, in turn, can be established "by means of the traditional kinship system of the appropriate Indian tribe." 43 C.F.R. §§ 10.2(b)(1), 10.14.

The traditional kinship system of the Hickory Ground Tribal Town holds that all modern-day members of the Tribal Town are lineal descendants of those buried at the original Hickory Ground, as Tribal Town membership is matrilineal. Dkt. 190 at 7, 13. The Tribal Town chief, its

"mekko," represents the Tribal Town; under Hickory Ground Tribal Town's traditional kinship system, this means that Mekko George Thompson represents all lineal descendants of those buried at (and excavated from) the Hickory Ground Site. *Id.* at 13, 31. Because the Muscogee (Creek) Nation is a confederacy of Tribal Towns, the Nation's responsibility under the traditional kinship system is as *parens patriae* representative of the Tribal Towns, also referred to as "Ceremonial Grounds" in Muscogee (Creek) Nation law. *See* Dkt. 190 at 7, 55; *see, e.g.*, Muscogee (Creek Nation) Code, tit. 5, §§ 1-101, 1-104, 2-103, 2-203 (acknowledging "Ceremonial Grounds" as entities under the Nation's jurisdiction and holding the Mekko of each Grounds accountable for aid provided by the Nation), *available at* http://www.creeksupremecourt.com/wp-content/uploads/Title-5.pdf. Thus, under the Muscogee (Creek) Nation's traditional kinship structure, Mekko Thomson "has ownership and right of control over the disposition of" the human remains and associated funerary objects excavated from the Hickory Ground Site. Dkt. 190 at 34; *see also id.* at 55.

> **2.      Congress intended NAGPRA to honor tribes' religious connections with their ancestors by allocating control over remains and cultural objects to the tribes and members that are related to such remains and cultural objects.**

NAGPRA and the ARPA provisions it incorporates are laws specifically directed at religion and religious practice. *See* Dkt. 190 at 59. As stated by Senator Inouye in a hearing proceeding NAGPRA's passage, "[i]n light of the important role that death and burial rites play in native American cultures, it is all the more offensive that the civil rights of America's first citizens have been so flagrantly violated for the past century," even when "supposedly great strides have been made to recognize the rights of Indians to recover the skeletal remains of their ancestors and to repossess items of sacred value or cultural patrimony, the wishes of native Americans are often ignored by the scientific community." 136 Cong. Rec. 35,678 (1990) (statement of Sen. Inouye).  Thus, NAGPRA "is not about the validity of museums or the value of scientific inquiry" but about those "human rights." *Id.* A House Report discussion of the definition of "sacred objects" also underscores the goal of NAGPRA to honor tribal religions by

requiring repatriation of objects needed for religious ceremonies to the tribe who originally owned the objects: "[i]t is the intent of the Committee to permit traditional Native American religious leaders to obtain such objects as are needed for the renewal of ceremonies that are part of their religions," recognizing that "the practice of some ceremonies has been interrupted" due to circumstances beyond the control of the tribe. H.R. Rep. No. 101-877  (1990), *as reprinted in* 1990 U.S.C.C.A.N. 4367, 4373.

In accordance with its objective to protect sacred human remains and objects by honoring tribal religious ties to ancient remains and cultural items, NAGPRA contains requirements (1) to consult with "traditional religious leaders," *see* 25 U.S.C. §§ 3003(b)(1) (regarding human remains and associated funerary objects), 3004(b)(1) (regarding unassociated funerary objects, sacred objects, and cultural patrimony); (2) for a "committee to monitor and review the implementation of the inventory and identification process and repatriation activities" under NAGPRA that includes at least two "traditional Indian religious leaders," *id.* § 3006(a), (b)(1); and (3) defines "sacred objects" as those ceremonial objects needed "for the practice of traditional Native American religions by their present day adherents," *id.* § 3001(3)(C). The law is plainly intended to protect Native American human remains and other cultural items by giving control and ownership to the tribe and individuals with whom they are most closely related.

In recognition of tribes' general opposition to unearthing their ancestors, and to protect the sacred connection between tribes and their ancestors, NAGPRA requires "consent of the appropriate . . . Indian tribe" before intentional excavations on "tribal lands" can occur. 25 U.S.C. § 3002(c)(2).[17] Although neither that section nor the relevant provisions of NAGPRA's implementing regulations, 43 C.F.R. §§ 10.3, 10.5, clarify the meaning of "appropriate" tribe, BIA regulations regarding the issuance of permits for such excavations suggest that "[d]etermination as to which tribe is the appropriate tribe shall be made in accordance with [25

_____

[17] The permit required for intentional excavations under Section 3002(c)(1) is a federal permit issued under ARPA to excavate or remove any archaeological resource located on public lands or Indian lands.  16 U.S.C. § 470cc(a).

C.F.R.] § 262.8(a)."  25 C.F.R. § 262.5(d).  That section, in turn, gives first priority to lineal descendants for human remains and funerary objects.  25 C.F.R. § 262.8(a)(1).

As stated above, under the Muscogee (Creek) Nation and Hickory Ground Tribal Town's traditional kinship structure, Mekko Thompson has the right of ownership and control over the human remains and associated funerary objects at the Hickory Ground Site. Dkt. 190 at 34; *see also id.* at 55. Because the traditional kinship structure establishes the Muscogee (Creek) Nation as "*parens patriae* representative of the lineal descendants at the Site and as the tribe with the closest cultural and religious connection to the Site," its consent was needed prior to excavation of Native American cultural items from the Hickory Ground Site. Dkt. 190 at 55, 62 (citing 25 C.F.R. § 262.5(d)). This is consistent with NAGPRA's prioritized purpose of keeping Native American remains and other cultural items with and under the control of their lineal descendants.

### 3.   Tribal Defendants' and Federal Defendants' application of NAGPRA substantially burdens Plaintiffs' exercise of religion in violation of the Free Exercise Clause, RFRA, and RLUIPA.

Because NAGPRA is not a neutral law, to satisfy the Free Exercise Clause it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). NAGPRA's main objectives include returning sacred items and religious objects to their rightful owners, and preventing the unearthing of those items and objects absent consent of those who have ownership and control rights in them. Here, the manner in which Federal Defendants and Tribal Defendants have applied NAGPRA's order of priority to Plaintiffs ignores their traditional kinship structure. In so doing, Federal Defendants and Tribal Defendants have wrenched Plaintiffs' sacred ancestors' remains and cultural items away from them in favor of granting ownership and control to a tribe who only came into possession of the land because of forced removal of the tribe to which the deceased belonged, and who sees fit to mutilate and destroy the remains and cultural items for the sake of profit. *See* Dkt. 190 at 7, 55-57, 60-61;*see, e.g.*, Dkt. 202 at 44-45.

This construction of NAGPRA disregards the Muscogee (Creek) Nation's traditional kinship structure, which holds that the Mekko of a Ceremonial Grounds (i.e., Tribal Town) represents all lineal descendants of those buried at the Tribal Town, and therefore Mekko Thompson has ownership and control rights over the remains and items excavated from the Hickory Ground Site. *See* Dkt. 190 at 7, 50, 55. This traditional kinship structure is driven by Plaintiffs' religiously mandated duties to their ancestors. *Id.* at 50, 60. Thus, Tribal Defendants' and Federal Defendants' construction and application of NAGPRA implements a "religious gerrymander" under which traditional kinship structures of certain religions are disregarded, while others are honored, violating the Free Exercise Clause. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 534-35 (noting that the Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs," including "the effect of a law in its real operation" if the operation results in prohibition of a certain religion).

Federal Defendants and Tribal Defendants' application of NAGPRA in allowing excavation to go forward without the Muscogee (Creek) Nation's consent and in denying Mekko Thompson control and ownership of the remains and funerary objects once they were unearthed also violates RFRA for all the reasons stated in Section IV.E of Plaintiffs' Response to Federal Defendants' Motion to Dismiss.

For its part, RLUIPA provides parallel protections to RFRA with respect to land use regulations and institutionalized persons. *See* 42 U.S.C. § 2000cc *et seq*.; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014). RLUIPA's rules of construction, which apply to the federal government and to federal actors, 42 U.S.C. § 2000cc-5(4)(B), state that nothing in RLUIPA shall be construed to repeal federal law "that is *equally as protective* of religious exercise as, or *more protective* of religious exercise than, [RLUIPA]." 42 U.S.C.A. § 2000cc-3(h). Thus, if an existing law such as NAGPRA were less protective of religious exercise than RLUIPA, RLUIPA could be read to repeal it. As discussed above, Tribal Defendants and Federal Defendants have applied NAGPRA's rules regarding who must consent to excavation on tribal land, and who receives the excavated remains and items, in a manner that substantially burdens

Plaintiffs' religious exercise without a compelling government interest. Such construction is less protective of religious exercise than RLUIPA for the reasons in Section IV.E of Plaintiffs' Response to Federal Defendants' Motion to Dismiss. *See also Martin v. Houston*, 196 F. Supp. 3d 1258, 1268 (M.D. Ala. 2016) (plaintiff plausibly alleged RLUIPA violation where zoning statute "applied sufficient pressure on [plaintiff] such that it coerced him to cease his settlement ministry" in violation of his religious beliefs).

Tribal Defendants' and Federal Defendants' application of NAGPRA's rules regarding ownership and control effect a "religious gerrymander" that cannot withstand scrutiny under the Free Exercise clause, and it also violates RFRA and RLUIPA. This Court should therefore deny Tribal Defendants' and Federal Defendants' motions to dismiss Count VIII of the Second Amended Complaint.

**J.      Poarch is not a necessary and indispensable party under Rule 19.**

Poarch argues that its sovereign immunity prevents it from being sued and that this case cannot proceed in its absence under Federal Rule of Civil Procedure 19. As Plaintiffs explain in Section IV.A.1, Poarch does not have sovereign immunity from Plaintiffs' claims against them that arise from actions Poarch took at Hickory Ground as a federal delegee under the NPS agreement. With respect to Plaintiffs' other claims, Poarch is not necessary to this suit. The main purpose of the *Ex Parte Young* doctrine is to provide an avenue for plaintiffs to challenge an action that oversteps a sovereign's bounds by seeking equitable relief against responsible officials to require them to comply with the law. That is precisely what Plaintiffs' claims seek to do here. Quite simply, Rule 19 does not give tribal officials a free pass to violate applicable law. *See Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 358 (2d Cir. 2000) (even if a tribal entity were indispensable, the plaintiff would simply "need to amend its pleading to seek the injunction against the administrators of the [entity], rather than the [entity] itself," for violations of federal law).  Tribal Defendants' motion on this ground should be denied.

Under Rule 19, a party is "required" when (1) "in that person's absence, the court cannot accord complete relief among existing parties;" or (2) the party "claims an interest relating to the subject of the action and is so situated" that moving forward with the case in that party's absence may "impair or impede the [party's] ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a). If the party is "required" but cannot be joined to the lawsuit, the court must then evaluate whether the action should proceed, considering the prejudice to the absent party and the existing parties from rendering a judgment in the party's absence, the extent to which prejudice could be lessened or avoided, whether a judgment in the party's absence would be adequate, and whether the plaintiffs would have an adequate remedy if the action were dismissed for nonjoinder. Fed. R. Civ. P. 19(a)-(b). Lawsuits in which a tribe or a tribal entity might have an interest are regularly allowed to proceed when tribal officials are named as defendants. This is because an "absent party with an interest in the action is not a necessary party under Rule 19(a) 'if the absent party is adequately represented in the suit.'" *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1180 (9th Cir. 2012) (quoting *Shermoen v. United States,* 982 F.2d 1312, 1318 (9th Cir. 1992)).

Thus, the Navajo Nation was not a necessary party in a lawsuit by non-Indian entities to enjoin Navajo officials from applying tribal law to them in tribal courts, because "tribal officials can be expected to adequately represent the tribe's interests in this action and because complete relief can be accorded among the existing parties without the tribe." *Salt River Project*, 672 F.3d at 1177. The *Salt River* case involved overarching issues of tribal jurisdiction, as the plaintiff alleged that Navajo lacked jurisdiction to regulate employment matters at its on-reservation power plant under the terms of a lease and a federal right-of-way. *Id.* at 1178. The Ninth Circuit rejected the argument that proceeding with the lawsuit would impair Navajo's interests, holding that "Navajo official defendants can be expected to adequately represent the Navajo Nation's interests" for three reasons that also exist here. *Id.* at 1180. First, the officials' interests were aligned with those of the tribe: "the officials are responsible for enforcing the [relevant law] and

there is no suggestion that the officials' attempt to enforce the statute here is antithetical to the tribe's interests." *Id.* Second, "there is no reason to believe the Navajo official defendants cannot or will not make any reasonable argument that the tribe would make if it were a party." *Id.* Third, "there is no indication that the tribe would offer any necessary element to the action that the Navajo official defendants would neglect." *Id.* at 1180-81. So too here. The Defendant tribal officials are "in charge of" the Poarch Band and PCI Gaming, Dkt. 202 at 1, and their interests are aligned with those entities' interests. Furthermore, as both the entities and the officials are represented by the same law firm, there is no reason to believe that the tribal official Defendants will not make any argument that Poarch would make if it were a party. Finally, there is no indication that Poarch would offer any necessary element to the action that the tribal official Defendants would neglect. *See Kansas v. United States,* 249 F.3d 1213, 1227 (10th Cir. 2001) ("[M]ost importantly, the potential for prejudice to the Miami Tribe is largely nonexistent due to the presence in this suit of ... the tribal officials.... These Defendants' interests, considered together, are substantially similar, if not identical, to the Tribe's interests in [the action]."). Numerous other courts faced with this issue have reached the same conclusion in analogous cases, for the same reasons.

In *Sac and Fox Nation v. Norton,* 240 F.3d 1250 (10th Cir. 2001), the Wyandotte Tribe was not a necessary party to a lawsuit by the State of Kansas and three other tribes to prevent the Secretary of the Interior from taking land into trust for the Wyandotte and approving gaming activities on the same land pursuant to IGRA. The Tenth Circuit reasoned that complete relief could be accorded the parties to the lawsuit because (1) the lawsuit was focused on the propriety of the Secretary's land-into-trust and gaming determinations, and (2) as a practical matter, the Wyandotte's ability to protect its interest in the subject matter of the suit was not impaired. *Id.* at 1258–59. Although "[i]t is undisputed the Wyandotte Tribe has an economic interest in the outcome of this action" in that it "ability to conduct gaming activities on the . . . tract will survive only if all the Secretary's determinations regarding the . . . tract are upheld," the presence of the Secretary as a defendant "greatly reduced" the potential of prejudice to the Wyandotte by virtue

of the Secretary having "virtually identical" interests to the Wyandotte Tribe in defending the decisions. *Id.* at 1259. Thus, even if the Wyandotte had been a necessary party, it was not indispensable because the Secretary's presence in the suit largely offset the potential for prejudice to the tribe. *Id.* at 1259–60*; see also Kansas*, 249 F.3d at 1227 (finding that the Miami Tribe was not a necessary party to a lawsuit challenging the National Indian Gaming Commission's decision that the Miami Tribe's lands were "Indian lands" on which gaming under IGRA was permissible; the potential for prejudice was "largely nonexistent due to the presence in this suit of not only the NIGC and other Federal Defendants, but also the tribal officials . . ."); *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1118 (E.D. Cal. 2002), *aff'd sub nom. Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003) ("although the tribes can claim a legal interest in this lawsuit" challenging their gaming compacts, "they are not necessary parties because their legal interest can be adequately represented by the Secretary"). Poarch and PCI Gaming will likewise not be prejudiced in this case because their interests can be represented by the tribal official defendants and the Federal Defendants.

By way of further example, in *Gingras v. Rosette*, the court held that a tribe was not a necessary party to a lawsuit to declare that the tribe's lending business's lending model was illegal. No. 5:15-CV-101, 2016 WL 2932163, at *20 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019). The presence of tribal officers of the lending business as defendants under *Ex Parte Young* "satisfies the requirements of Rule 19," as "[t]he essential purpose of the *Ex Parte Young* doctrine is to permit suits for injunctive relief against entities such as state agencies which would otherwise be subject to sovereign immunity." *Id.* Similarly, in *Lloyd Noland Found., Inc. v. Tenet Healthcare Corp.*, No. CV-01-S-437-S, 2001 WL 37124708, at *5 (N.D. Ala. June 20, 2001), the court found that an absent party wasn't necessary under Rule 19 because existing parties in the case represented its interests: "because [the defendant] owns and controls [the absent party], defendant has access to all of the resources available to [the absent party]" and "has every incentive to prove that [the absent party] did not breach the stock purchase agreement."

As in the above cases, Poarch and PCI Gaming are adequately represented by the tribal official defendants, and there is no indication that their interests will be neglected, impaired, or impeded given that tribal official defendants control the entities and have the same interests as the entities themselves. Nor is there any reason this court could not accord complete relief among the parties, as Plaintiffs seek only relief enjoining tribal officials from violating applicable law. Poarch and PCI Gaming are not necessary parties to this action, and this Court should deny Tribal Defendants' motion to dismiss under Rule 19.

## V.   CONCLUSION

For the reasons explained in detail above, the Court should reject the Tribal Defendants' improper efforts to obtain a dismissal of this case before discovery and before the claims can be presented to the Court on the basis of a fully-developed record.  Plaintiffs' have satisfied the requirements of Rule 8 and Rule 12(b)(6) with thorough factual allegations stating facially plausible claims for relief.  The Court should deny the Tribal Defendants' motion in its entirety and allow this case to proceed forward on the merits. If the motion is granted to any extent, Plaintiffs request that the Court condition such dismissal on the ability of Plaintiffs to submit a revised complaint. This is consistent with the liberal policy in favor of allowing amendments under Fed. R. Civ. P. 15(a)(2) (the "court should freely give leave when justice so requires."). *See also Espey v. Wainwright*, 734 F.2d 748, 750 (11th Cir. 1984).

Respectfully submitted this 6th day of July, 2020.

s/ *Lauren J. King*                                          s/ *Stewart Davidson McKnight, III*

OF COUNSEL                                                  Stewart Davidson McKnight , III (ASB-6258-G63S)

Lauren J. King                                              Email: dmcknight@dillardmcknight.com

Email: lauren.king@foster.com                               Dillard, McKnight, James & McElroy, LLP

Foster Garvey PC                                            2700 Highway 280

1111 Third Avenue, Suite 3000                               Suite 110 East

Seattle, WA 98101                                           Birmingham, AL 35223

Tel: 206-447-6286                                           Tel: 205-271-1100

*Counsel for Plaintiffs*                                     *Counsel for Plaintiffs*

(*Admitted Pro Hac Vice*)

**<u>Certificate of Service</u>**

I hereby certify that on the 6th day of July, 2020, I caused to be electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties entitled to receive notice.


 s/ *Lauren J. King*
Lauren J. King, Of Counsel

TAB 216

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE CREEK NATION, *et. al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case  No. 2:12-cv-01079-MHT-CSC |
| | ) | |
| v. | ) | Judge Myron H. Thompson |
| | ) | |
| POARCH BAND OF CREEK | ) | |
| INDIANS, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION TO DISMISS PLAINTIFFS' SECOND
<u>AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT</u>**

i

## I.      INTRODUCTION

Plaintiffs' claims against the Federal Defendants should be dismissed for lack of subject matter jurisdiction and failure to state a claim because Plaintiffs fail to identify final agency action or a discrete, nondiscretionary duty that Federal Defendants failed to take and accordingly have not established jurisdiction under the APA.  In addition, many of Plaintiffs' claims are brought outside the statute of limitations, as they challenge agency action that took place long ago.  Plaintiffs also have not shown a substantial burden on their exercise of religion.  As such, this Court should grant Federal Defendants' Motion to Dismiss, ECF No. 199.

## II.     ARGUMENT

As an initial matter, Plaintiffs refer in their Opposition in multiple places to discovery and further development of the record.  Plaintiffs' claims against the Federal Defendants are brought pursuant to the APA's waiver of sovereign immunity and as such, will be reviewed on an administrative record compiled by the agency.  *See, e.g., Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007) (holding that the "district court did not abuse its discretion in disallowing . . . discovery" beyond the administrative record).  Discovery against Federal Defendants is not permitted absent "a strong showing of bad faith or improper behavior" by the agency.  *Dep't of*

*Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019); *Alabama-Tombigbee*, 477 F.3d at

1262.  Accordingly, any references to discovery should be disregarded.

**A.     Plaintiffs' IRA Claim fails for lack of subject matter jurisdiction and failure to state a claim.**

Plaintiffs' first claim asserts that Federal Defendants violated the IRA by taking land into

trust for the Poarch Band in 1984.  Federal Defendants demonstrated in their Memorandum that

Plaintiffs' IRA claim was brought outside the statute of limitations and Plaintiffs lack standing to

bring the claim.  Fed. Defs.' Mem. in Support of Their Mot. to Dismiss Pls.' 2d Am. Compl. &

Suppl. Compl. at 18-24, ECF No. 200 ("Fed. Defs.' Mem.").  In response, Plaintiffs extensively

detail a purported lack of government-to-government relationship between the Poarch Band and

the United States prior to 1984, when the Poarch Creek became a federally recognized tribe.  *See*

Pls.' Resp. & Mem. in Supp. of Resp. to Fed. Defs.' Mot. to Dismiss 2d Am. Coml. & Suppl.

Compl. at 20-24 , ECF No. 210 ("Pls.' Opp'n").  According to Plaintiffs, the Poarch Band was

not under federal jurisdiction within the meaning of the IRA, and therefore Interior did not have

authority to take the Hickory Ground Site into trust for the Poarch.  *Id.* at 23.  Whether the

Poarch Band was or was not under federal jurisdiction within the meaning of the IRA is

irrelevant, because the statute of limitations to challenge Federal Defendants' action taking land

into trust for the Poarch Band has long since passed.  In addition, Plaintiffs have not

demonstrated standing because they were not injured by Federal Defendants' actions and this

Court cannot redress their alleged injury.

**1.     Plaintiffs' IRA claim is barred by the statute of limitations.**

Plaintiffs attempt to evade the statute of limitations issue by arguing that the land-into-

trust decision was "applied" to Plaintiffs less than six years before the lawsuit was filed.  Pls.'

Opp'n at 28–29.  They argue that the decision was *ultra vires* and, therefore, the claim only accrued when the agency applied the action to "specific challenger," here, Plaintiffs.  *Id.* at 25.  This Court should reject Plaintiffs' argument that the land-into-trust decision was applied to Plaintiffs through ARPA permits that allowed excavation and by denying Mr. Thompson's alleged "NAGPRA claim" in 2009.  Plaintiffs' argument is not grounded in applicable law, and would make the statute of limitations meaningless.

Generally, the statute of limitations on an APA claim accrues at the time of the final agency action.  *See Alabama v. United States*, 630 F. Supp. 2d 1320, 1325 (S.D. Ala. 2008).  Some courts have held that "an agency regulation or other action of continuing application may be challenged after a limitations period has expired if the ground for challenge is that the issuing agency acted in excess of its statutory authority."  *Wind River Min. Corp. v. United States*, 946 F.2d 710, 714 (9th Cir. 1991) (cataloging cases); *see also Alabama v. Shalala*, 124 F. Supp. 2d 1250, 1270 (M.D. Ala. 2000) ("[A] a cause of action challenging a regulation based on the grounds that an agency exceeded its constitutional or statutory authority accrues when the agency applies the regulation to the specific challenger." (citing *Wind River*, 946 F.2d at 715)).  Those cases have been restricted to situations where the plaintiff would not have known it would be injured when the regulation was promulgated or the action of continuing application was taken.

In *Wind River*, the plaintiff challenged application of a land use designation to a particular piece of property.  946 F.2d at 712.  The Bureau of Land Management designated 138 roadless Wilderness Study Area in 1979, and the plaintiff challenged that designation in 1989 after it was barred from pursuing its mining claims on property within that area.  *Id.* at 711–12.  The court allowed the challenge, emphasizing that "no one was likely to have discovered that the

3

BLM's 1979 designation of this particular WSA was beyond the agency's authority until someone actually took an interest in that particular piece of property, which only happened when Wind River staked its mining claims." *Id.* at 715.

In a similar case to the one at bar, the Ninth Circuit held that a state's challenge to the BIA's land-into-trust decision was barred by the statute of limitations. *See Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015), *as amended on denial of reh'g* (July 8, 2015). There, the State of California argued that the tribe lacked standing under the Indian Gaming Regulatory Act because the BIA exceeded its authority when it recognized the tribe and took an eleven-acre parcel into trust in 1994. *Id.* The court held that "[t]he proper vehicle to make such a challenge is a petition for review pursuant to the APA," noting the Supreme Court's holding that "a challenge to the BIA's 'decision to take land into trust' is 'a garden-variety APA claim.'" *Id.* (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220–21 (2012) (citing 5 U.S.C. § 706(2)(A), (C))). "[P]arties cannot 'use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions.'" *Id.* (quoting *United States v. Backlund*, 689 F.3d 986, 1000 (9th Cir. 2012)). Allowing California to challenge the BIA's decision to take the eleven-acre parcel into trust on the basis that it was ultra vires, the court held, "would constitute just the sort of end-run that we have previously refused to allow, and would cast a cloud of doubt over countless acres of land that have been taken into trust for tribes recognized by the federal government." *Id.* at 954. The court noted that California had not brought an APA challenge, but found that even if it had, it would be barred by the statute of limitations. *Id.*

This Court should similarly reject Plaintiffs' attempt to make an end-run around the APA by framing their challenge as "ultra vires" or arguing that Federal Defendants' land-into-trust

4

decision has continuing application.  Plaintiffs here challenge not regulations or the application

of a general rule to them, but the specific agency decisions recognizing the Poarch Band as a

federally-recognized Indian tribe and taking land into trust.  "The proper vehicle for [Plaintiffs]

to challenge the Secretary's decisions to take land into trust for the Tribe is an APA claim."

*Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1292 (11th Cir. 2015) (citing *Match-E-Be-Nash-*

*She-Wish*, 567 U.S. at 220–21); *Porch Band of Creek Indians v. Hildreth*, 656 F. App'x 934,

943 (11th Cir. 2016) ("In *PCI Gaming*, we held that the "proper vehicle" for challenging the

Secretary's authority to take tribal lands into trust is a timely APA claim pursuant to 5 U.S.C.

§ 702, not a collateral challenge to a long-ago decision of the Secretary." (citations omitted)).

Plaintiffs' claim cannot be properly characterized as one that the agency acted ultra vires.

Instead, Plaintiffs assert that the Federal Defendants' decision to take land into trust violated the

IRA because the Poarch Band was not under federal jurisdiction in 1934, exactly the claim that

the Supreme Court termed "a garden-variety APA claim."  *Match-E-Be-Nash-She-Wish*, 567

U.S. at 220–21.  Accordingly, the decision to take land into trust was a final agency action that

cannot be challenged at this late date.

Moreover, Plaintiffs were never a disinterested party, as they had the same interest in the

Wetumpka site in 1984 as now.  Thus, the Eleventh Circuit's rulings that the time to challenge

the land-into-trust decision began to run in 1984 apply here.  *PCI Gaming*, 801 F.3d at 1292

(finding that because Alabama was aware that the Secretary took land into trust for the Poarch

Band, the statute of limitations began running at that time); *Porch Band*, 656 F. App'x at 943–

44 (finding that plaintiff "was well aware of the Secretary's decision to take the Poarch Band's

property into trust close in time to the decision").  "To recognize an exception and permit a

collateral challenge nearly 30 years later, where the record clearly reflects that [the plaintiff]

could have raised a timely challenge but did not, would turn *PCI Gaming* on its head." *Id*. Plaintiffs argue that they thought the land would be left undisturbed, but their decision to rely on the Poarch Band's alleged representations does not toll the statute of limitations. Further, Plaintiffs had knowledge of disturbance well outside the statute of limitations. *See* Fed. Defs.' Mem. at 20–21 (documenting knowledge as far back as 1992).

And in any event, the ARPA permits and the resolution of Mr. Thompson's NAGPRA concerns are not re-applications of the land-into-trust decision. They are wholly separate and occurred well after the land was already taken into trust. The permits themselves are outside the statute of limitations, having been issued in 2003 and renewed in 2005, and are not relevant to the land-into-trust decision. ECF No. 200-2 at 33 (ARPA permit issued in 2003). Nor can Federal Defendants' response to Mr. Thompson's 2008 letter be considered a re-application of the land-into-trust decision. ECF No. 200-2 at 42. Federal Defendants investigated Mr. Thompson's allegations that Auburn University, who was conducting the excavation, failed to comply with NAGPRA's requirements and determined that the allegations were not substantiated. *Id*. at 47–49. Plaintiffs' argument that this determination was a re-application of the land-into-trust decision is a red herring and is wholly irrelevant. Plaintiffs' IRA claim should be dismissed because it was brought outside the statute of limitations.

**2.     Plaintiffs lack standing to bring their IRA claim.**

Plaintiffs also lack standing to assert a claim under the IRA. Plaintiffs' alleged injury, the excavation and disturbance by construction activities on land they claim is historically and religiously significant, does not stem from the United States' acquisition of the Wetumpka property in trust. According to Plaintiffs, they are directly injured by Interior's land-into-trust decision because had Interior not found that the site is "Indian land," Poarch would have had no

6

reason to build a casino or to issue ARPA permits.  Pls.' Opp'n at 29.  Plaintiffs also argue that

they are injured by excavation and construction on the site.  *Id.* at 29–30.  Nothing in Plaintiffs'

Second Amended Complaint or Opposition directly ties their injury to the land-into-trust

decision, however, and these arguments should be rejected.

Plaintiffs' Opposition and Second Amended Complaint make clear that their injuries do

not stem from the gaming facility itself, but from the construction and excavation of the site.

Pls.' Opp'n at 30; 2d Am. Compl. ¶¶ 6, 124–130, Prayer for Relief, ECF No. 190.  But even if

Plaintiffs prevail on their IRA claim and the land is no longer held in trust for the Poarch Band,

the Poarch Band will still own the land in fee and have the right to conduct activities on the land.

*See Yankton Sioux Tribe v. U.S. Army Corps of Engr's*, 396 F. Supp. 2d 1087, 1094 (D.S.D.

2005) (finding that tribe lacked standing where it failed to establish a causal connection between

the transfer of land and the complained of conduct).  In addition, Plaintiffs now allege that the

Federal Defendants would not have issued ARPA permits absent the land-into-trust decision.

This is true, because ARPA only applies to public land and Indian land held in trust by the

United States.  Thus, the lack of an ARPA permit would not necessarily result in lack of

development on the site.[1]

Nor could this Court redress Plaintiffs' claims because a finding that the land is not

properly held in trust, the only remedy for Plaintiffs' IRA claim, would not remedy Plaintiffs'

injuries from construction and excavation, or address Plaintiffs' concerns about the treatment of

the remains that have been excavated.  Even if the Poarch Band ceased gaming on the site based

on a determination that the land is not held in trust, the excavation and construction has already

7

occurred. A finding that the land is not held in trust would not result in a finding that Plaintiffs are entitled to the remains and other cultural items, nor necessarily to removal of the casino and restoration of the site.  Plaintiffs request an injunction "to unwind the illegal excavation and construction," but the Court does not have authority to enter such an order for violation of the IRA.

Plaintiffs cite a number of cases finding standing where plaintiffs would be affected by gaming facilities.  Pls.' Opp'n at 30–31.  For example, courts found standing where landowners near a proposed gaming facility were injured due to increased traffic, aesthetic harm, and environmental harm from the gaming facility construction and operation.  *See Match-E-Be-Nash-She-Wish*, 567 U.S. at 213[2]; *Upstate Citizens for Equal., Inc. v. United States*, 841 F.3d 556, 565–66 (2d Cir. 2016); *Geyser v. United States*, No. CV 17-7315-DMG (ASX), 2018 WL 6990808, at *7 (C.D. Cal. Aug. 30, 2018).  If gaming at a facility stops, traffic to the facility would also stop, for example.  But Plaintiffs' claimed injury is of a different nature and is not based on *operation* of the casino.  It is not a neighbor affected by traffic or change in the aesthetics of the area, nor have Plaintiffs alleged they are losing tax revenue or business or recreational opportunities.  The cases simply do not support Plaintiffs' standing argument.

Plaintiffs also cite *Stand Up for California!*, where the Picayune Tribe, which operates a gaming facility, contested a decision that allowed a nearby tribe to conduct gaming on land taken into trust, because the new gaming facility would have had "a devastating economic impact" on the Picayune Tribe.  Pls.' Opp'n at 31 (citing *Stand Up for California! v. U.S. Dep't of the*

---

[1] Furthermore, if the land were not held in trust, no construction or excavation would require approval from Federal Defendants.

*Interior*, 919 F. Supp. 2d 51, 56 n.7 (D.D.C. 2013)).  The court found redressability because if the Secretary's determination was overturned, gaming would stop and the economic injury to the Picayune Tribe would not occur.  919 F. Supp. 2d at 56 n.7.  Notably, this case involved a decision allowing gaming on the site, in addition to a decision taking land into trust.  *Id*. at 54–55.  But Plaintiffs do not assert an economic harm from the operation of the casino.  Nor do Plaintiffs demonstrate how their injury would be redressed if the gaming facility simply stopped operating at this point.

In short, Plaintiffs have failed to demonstrate that they have standing to assert their IRA claim.

**B.**     **Plaintiffs fail to allege jurisdiction or state a claim for violation of NAGPRA.**

Plaintiffs' NAGPRA claim must also be dismissed.  Plaintiffs have failed to identify a valid waiver of sovereign immunity because they do not identify any NAGPRA duties that the Federal Defendants were required to but failed to take.  NAGPRA allows for removal of human remains and other cultural items on tribal lands, provided that an ARPA permit is issued by the BIA and consent is given by the tribe owning the land.  The Poarch Band gave its consent for the removal of human remains and other cultural items under NAGPRA, as well as any archaeological resources under ARPA.  Federal Defendants issued a permit for the removal of the remains and other cultural items, but then had no authority in determining how or where the remains and other cultural items should be reburied.  The Poarch Band controls these remains and other cultural items, and decisions about removal and re-interment fall within the authority of the Poarch Band.

─────────────────────

[2] *Match-E-Be-Nash-She-Wish* also involved only prudential standing, which is a less demanding

1.       **Plaintiffs have not demonstrated a valid waiver of sovereign immunity.**

Plaintiffs' NAGPRA claim relies on the APA's waiver of sovereign immunity, and accordingly Plaintiffs must meet the requirements of the APA, including final agency action.  In their response, Plaintiffs attempt to avoid the APA's requirements by asserting that they rely on the second sentence of the waiver of sovereign immunity in 5 U.S.C. § 702.  Pls.' Opp'n at 35–41.  But this argument fails for several reasons.  First, the second sentence applies only to nonstatutory claims brought against the federal government.  Plaintiffs' claims are statutory and thus fall solidly within the APA's first sentence waiver of sovereign immunity and must comply with the APA's constraints.  *See* 2d Am. Compl. ¶ 33 ("Plaintiffs' claims arise under the Administrative Procedure Act . . . .").  Second, the jurisdictional provision in NAGPRA, which Plaintiffs rely on as a private right of action should not be read as a right of action against the United States.  The APA already provides such a right of action, and this provision of NAGPRA should be read instead as providing a right of action against non-federal entities.

The APA's waiver of sovereign immunity provides that:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C.A. § 702.  Courts have held that claims falling within the first sentence of this waiver "are subject to § 704's limitation on what agency actions are subject to judicial review, while 'claims not grounded in the APA, like . . . constitutional claims . . . do not depend on the cause

---

test than constitutional standing.

of action found in the first sentence of § 702 and thus § 704's limitation does not apply to them.'" *Alegre v. United States*, No. 16-CV-02442-AJB-KSC, 2019 WL 3891036, at *4 (S.D. Cal. Aug. 16, 2019) (quoting *Navajo Nation v. U.S. Dep't of the Interior*, 876 F.3d 1144, 1170 (9th Cir. 2017)); *see also Navajo Nation*, 876 F.3d at 1172 (holding that "the second sentence of § 702 waives sovereign immunity broadly for all causes of action that meet its terms, while § 704's 'final agency action' limitation applies only to APA claims").

> NAGPRA contains a jurisdictional provision that states that:
>
> The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter and shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter.

25 U.S.C. § 3013. According to Plaintiffs, this provision allows them to proceed under the waiver in the second sentence of § 702, and thus not subject to the APA's limitations. This is incorrect.

First, Plaintiffs' claim falls solidly within the first sentence of the waiver. Plaintiffs assert that they are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. In addition, the second sentence of § 702 only applies to nonstatutory claims, such as constitutional claims. *See, e.g.*, *Navajo Nation*, 876 F.3d at 1170 (noting that "[c]ourts have distinguished between claims brought under the APA and '[c]laims not grounded in the APA, like . . . constitutional claims"); *see also Juliana v. United States*, 947 F.3d 1159, 1167–68 (9th Cir. 2020) (characterizing *Navajo Nation* as "explaining that certain constitutional challenges to agency action are 'not grounded in the APA'"). When Congress amended the APA to add the second sentence to section 702, it "plainly indicated that Congress expected the waiver to apply to nonstatutory actions, and thus not only to actions under the

11

APA." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186–87 (D.C. Cir. 2006). "'The committee does not believe,' the [Senate Report accompanying the amendment] stated, that the amendment's 'partial elimination of sovereign immunity, as a barrier to *nonstatutory review* of Federal administrative action, will create undue interference with administrative action.'" *Id.* (quoting S. REP. NO. 94–996, at 8). Plaintiffs' challenge, therefore, which asserts that the agency violated a statute, must be brought pursuant to the waiver of sovereign immunity in the first sentence of section 702.

Plaintiffs offer no explanation as to why their NAGPRA claim does not fall within the first sentence of the waiver, except to state that NAGPRA provides its own cause of action. Pls.' Opp'n at 34–35. But the NAGPRA provision should not be interpreted as a private right of action against federal defendants because the APA already provides such a cause of action. *See NAACP v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 152 (1st Cir. 1987) (interpreting statute not to provide a cause of action against the federal government because the APA provides such a vehicle. "[C]reating a direct private action against the federal government makes little sense in light of the administrative review scheme set out in the APA." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1096–97 (9th Cir. 2005). "Whether a federal statute provides a private right of action almost always arises in the context of a claim against a third party, such as a state or private entity, not, as here, against the federal government." *Id.* (citations omitted). "Even the term 'private right of action' is something of a semantic mismatch in the context of a suit to force agency action under a federal statute." *Id.* "In fact, it is difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the *federal* government, for there is hardly ever any need for Congress to do so." *NAACP*, 817 F.2d at 152. In certain rare cases such a private

12

right of action may be warranted, such as when Congress provides a cause of action for

attorney's fees that are not available under the APA. *Narragansett Indian Tribe by & through*

*Narragansett Indian Tribal Historic Pres. Office v. R.I. Dep't of Transp.*, 903 F.3d 26, 30 (1st

Cir. 2018) (noting that the NHPA may have a private right of action authorizing attorneys' fees).

Or, Congress may indicate in a statute that it intends "to confer a private right of action that

differs in its procedural contours from the review that the APA typically provides." *NAACP*, 817

F.2d at 153.

      The NAGPRA jurisdictional provision should not be read as providing a separate cause

of action against the federal government because it does not clearly indicate that Congress

intended to create a private right and a private remedy beyond the APA. *See Alexander v.*

*Sandoval*, 532 U.S. 275, 282 (2001). For example, § 3013 provides that federal courts have

jurisdiction over actions brought pursuant to NAGPRA, but federal courts already have

jurisdiction over federal defendants under the general federal jurisdiction statute, 28 U.S.C.

§ 1331. Section 3013 also provides that courts can issue orders to enforce violations of the

section, which, again, is available under the APA as against the federal government. The

provision does not provide different contours for review than would be afforded under the APA,

and should not be read as providing a separate cause of action as against the federal government.

*See NAACP*, 817 F.2d at 153. The provision does allow suits in federal court against other

entities, such as a museum, which may include a "State or local governmental agency." 43

U.S.C. § 3001. The provision thus should be read only as providing jurisdiction in the federal

courts for litigation against non-federal entities. "As Judge Breyer noted, creating a direct

private action against the federal government makes little sense in light of the administrative

review scheme set out in the APA." *San Carlos Apache Tribe*, 417 F.3d at 1096–97 (citing

*NAACP*, 817 F.2d at 152).

The Supreme Court's decision in *Bennett v. Spear* is instructive.  In that case, the

Supreme Court refused to read a citizen suit provision of the Endangered Species Act ("ESA"),

which authorizes suit against "any person" for violations of any provision of the ESA, as

authorizing suit against the Secretary of Interior.  *Bennett v. Spear*, 520 U.S. 154, 174 (1997).

The Court found that allowing such a suit would "effect a wholesale abrogation of the APA's

'final agency action' requirement."  *Id.*  "In contrast, the Court recognized a private right of

action against the Secretary under a different provision of the ESA, where the statute expressly

authorized suits 'against the Secretary.'"  *San Carlos Apache Tribe*, 417 F.3d at 1096 (citing

*Bennett*, 520 U.S. at 173–74).  This Court should likewise refuse to allow Plaintiffs to avoid the

strictures of the APA by finding a private right of action against the federal government under

NAGPRA.  There is simply no indication that Congress intended this result.

Indeed, courts have reviewed NAGPRA claims under the APA.  *See, e.g.*, *White v. Univ.

of Cal.*, 765 F.3d 1010, 1024 (9th Cir. 2014); *Bonnichsen v. United States*, 367 F.3d 864, 879

(9th Cir. 2004) (reviewing Secretary's NAGPRA determination under APA "arbitrary or

capricious" standard of review); *Geronimo v. Obama*, 725 F. Supp. 2d 182 (dismissing

complaint under NAGPRA because plaintiff failed to allege any agency action or inaction, as

required for waiver of government's sovereign immunity under the APA); *Fallon Paiute-

Shoshone Tribe v. U.S. Bureau of Land Mgmt.*, 455 F. Supp. 2d 1207, 1213 (D. Nev. 2006).  The

Ninth Circuit specifically noted that "suits concerning the United States under NAGPRA are not

authorized by any specific portion of that statute, but rather under the [APA], which contains an

express limited sovereign immunity waiver for suits seeking non-monetary relief against the

14

United States." *White*, 765 F.3d at 1024 (quoting 5 U.S.C. § 702).  In *Navajo Nation v. U.S. Department of the Interior*, 819 F.3d 1084 (9th Cir. 2016), the court held that final agency action had occurred under the APA, and thus reversed the district court's decision that it lacked jurisdiction over the plaintiff's NAGPRA claim.  *Id.* at 1090–91.

Because Plaintiffs' NAGPRA claims falls within the first sentence of the APA's waiver of sovereign immunity, Plaintiffs are required to challenge final agency action.  They have not done so. Plaintiffs also argue that the APA's "final agency action" requirement is better treated as an element of the cause of action rather than a jurisdictional prerequisite.  Pls.' Opp'n at 38–41.  But many courts continue to view "final agency action" as a jurisdictional requirement to fall within the APA's waiver of sovereign immunity.  *See Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 491–92 (5th Cir. 2014) (holding that "there is no subject-matter jurisdiction because the Tribe failed to allege 'agency action' sufficient to trigger the sovereign immunity waiver from § 702"); *Facebook, Inc. v. Internal Revenue Serv.*, No. 17-CV-06490-LB, 2018 WL 2215743, at *18 (N.D. Cal. May 14, 2018) (finding that when plaintiff had failed to challenge final agency action, the court cannot determine APA claims "must dismiss them for lack of subject-matter jurisdiction").  And more importantly, the Eleventh Circuit has framed "final agency action" as a jurisdictional requirement.  *See, e.g., United States v. Simon*, 609 F. App'x 1002, 1007 (11th Cir. 2015) ("However, the APA limits judicial review to 'final agency action' for which there is no other adequate remedy in a court." (citing 5 U.S.C. § 704)); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) (noting that "federal jurisdiction is . . . lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704"); *Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, No. 1:16-CV-876, 2017 WL 4172613, at *8 (M.D. Ala. Sept. 20, 2017), *aff'd on other*

15

*grounds,* 923 F.3d 1295 (11th Cir. 2019) (citing *Nat'l Parks Conservation Ass'n* for proposition that jurisdiction is limited by "final agency action" requirement); *Alabama v. Ctrs. for Medicare & Medicaid Servs.*, 780 F. Supp. 2d 1219, 1226 n.3 (M.D. Ala. 2011), *aff'd,* 674 F.3d 1241 (11th Cir. 2012) ("Regardless of the extent to which the APA has waived sovereign immunity, the Eleventh Circuit and this Court have previously held that the finality of an agency action is a prerequisite for exercising federal jurisdiction."). This Court should follow these holdings and find that Plaintiffs have not shown subject matter jurisdiction over their NAGPRA claim.

If this Court finds that Plaintiffs have established subject matter jurisdiction, it should dismiss Plaintiffs' NAGPRA claim for failure to state a claim for which relief can be granted. Once a plaintiff has advanced a valid waiver of the United States' sovereign immunity, the plaintiff is obligated to advance a cause of action. For an APA cause of action, Plaintiffs need to allege a final discrete agency action within the meaning of a relevant statute. As shown in Federal Defendants' motion to dismiss, Plaintiffs have failed to do so because the duties Plaintiffs allege only apply to discoveries on federal land, not on the tribal land at issue here.

**2. NAGPRA gives responsibility for remains and other cultural items found on tribal land to the landowner tribe.**

**a. Land held in trust for the Poarch Band is "tribal land" under NAGPRA.**

Plaintiffs' NAGPRA claim is based on the premise that Federal Defendants have a duty to act under NAGPRA because non-Reservation land held in trust by the United States for benefit of the Poarch Band is actually federal land. This interpretation is inconsistent with NAGPRA and the use of similar terms in other statutes.

NAGPRA defines "tribal land" as "(A) all lands within the exterior boundaries of any Indian reservation; (B) all dependent Indian communities; [and] (C) any lands administered for

16

the benefit of Native Hawaiians . . . ."  25 U.S.C. § 3001(15).  NAGPRA does not define

"reservation."  *Rosales v. United States*, No. 07-cv-0624, 2007 WL 4233060, at *6 (S.D. Cal.

Nov. 28, 2007).  The regulations define tribal lands as including lands "within the exterior

boundaries of any Indian reservation including, but not limited to, allotments held in trust or

subject to a restriction on alienation by the United States," as well as "dependent Indian

communities as recognized pursuant to 18 U.S.C. § 1151."  43 C.F.R. § 10.2(f)(2)(i), (ii).  At

least one court has held that lands held in trust for Indian tribes are "tribal lands" rather than

"federal lands" under NAGPRA.  *Id.* at § 10.2.

It is reasonable to look to 18 U.S.C. § 1151 to determine how "reservation" should be

interpreted, particularly given that the regulations look to that statute to define "dependent Indian

communities."  Courts have interpreted "reservation" in 18 U.S.C. § 1151 to include informal

reservations and land held in trust for the benefit of Indians.  *See Okla. Tax Comm'n v. Sac &*

*Fox Nation*, 508 U.S. 114, 123 (1993) (interpreting the term "reservation," as used in the Indian

country statute, 18 U.S.C. § 1151(a), to include formal and informal reservations); *Okla. Tax*

*Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 511 (1991).  The

ARPA also defines "Indian lands" to include land "held in trust by the United States or subject to

a restriction against alienation imposed by the United States."  16 U.S.C.A. § 470bb(4).  Thus, it

is reasonable here to interpret "tribal lands" as including lands held in trust for a tribe, even

when outside the bounds of a formal reservation.

The other parts of the "tribal land" definition indicate that trust land should be included.

It would make little sense to exclude non-reservation land held in trust for the benefit of Indians

from the definition of "tribal land" when allotments held in trust within the Reservation

boundaries, "dependent Indian communities," and lands administered for Native Hawaiians are

included.  25 U.S.C. § 3001(15); 43 C.F.R. § 10.2.  The Supreme Court has defined "dependent

Indian communities" in 18 U.S.C. § 1151 to include "a limited category of Indian lands that are

neither reservations nor allotments, and that satisfy two requirements — first, they must have

been set aside by the Federal Government for the use of the Indians as Indian land; second, they

must be under federal superintendence."  *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S.

520, 527 (1998).  Further, "tribal lands" includes lands administered for the benefit of Native

Hawaiians. 25 U.S.C. § 3001; 43 C.F.R. § 10.2.  It would be inconsistent for "tribal lands" to

include non-reservation land set aside and administered for the benefit of dependent Indian

communities and Native Hawaiians, but not include land held in trust for the benefit of other

federally recognized tribes.

Plaintiffs argue that if "reservation" includes informal reservations, then "all dependent

Indian communities" is surplusage because "in many cases, a *de facto* reservation *is* a dependent

Indian community."  Pls.' Opp'n at 52.[3]  But 18 U.S.C. § 1151 defines "Indian country" as

including both land within Indian reservations and dependent Indian communities.  The Supreme

Court has held that Indian "reservation" includes informal reservations, and did not find that

"dependent Indian communities" is surplusage.  In addition, as Interior noted when it amended

the NAGPRA regulations, "Cohen, in The Field of Indian Law (1982:38) concludes that 'it is

apparent that Indian reservations and dependent Indian communities are not two distinct

---

[3] Plaintiffs argue that those conditions are not met here, but do not explain why.  If this Court accepts Plaintiffs' argument that lands held in trust do not fall within the definition of "reservation," then the Court should determine that the land falls within the definition of "dependent Indian community."  Land held in trust is set aside for the benefit of Indians and is under federal superintendence.

definitions of place but rather definitions which largely overlap.'"  Native American Graves

Protection and Repatriation Act Regulations, 60 Fed. Reg. 62,134, 62,140 (1995).

Holding otherwise would contravene one of the aims of NAGPRA.  NAGPRA's division

between tribal control on tribal land and federal duties on federal land promotes the Tribe's

independence and sovereignty.  The NAGPRA statute itself, as well as the administrative

history, indicates that tribes are afforded responsibility for compliance on tribal lands, rather than

federal agencies.  *See Rosales*, 2007 WL 4233060, at *8; NAGPRA Regulations, 60 Fed. Reg. at

62,142 (noting that NAGPRA recognizes tribes' sovereignty regarding administration of their

land).  NAGPRA's regulations provide different responsibilities for inadvertent discovery on

tribal land than on federal land.  *Compare* 43 C.F.R. § 10.4(e) ("Tribal lands.") *with* 43 C.F.R. §

10.4(d) ("Federal lands.").  At no point does NAGPRA or its regulations assign any

nondiscretionary duty to the federal government in the event of an inadvertent discovery on

tribal land.  Because the discoveries here took place on tribal land, Federal Defendants do not

have any nondiscretionary duties that they failed to perform.  *See Norton v. S. Utah Wilderness*

*All. (SUWA),* 542 U.S. 55, 62–64 (2004).  As such, the Court lacks subject matter jurisdiction

under the APA and fails to state a claim upon which relief can be granted.

> **b.**     **Plaintiffs do not identify any statutory or regulatory duty the Federal**
> **Defendants were required to but failed to take.**

Plaintiffs still fail to allege with any specificity the statutory or regulatory duties that

Federal Defendants were required to undertake but did not.  They assert that Federal Defendants

knew about excavation, but provide no detail about when Federal Defendants became aware of

it, or what specific duties would have been triggered by knowledge.  Plaintiffs also appear to

assert that Federal Defendants were required to take action to enforce NAGPRA violations by

others, but do not identify a specific provision that requires Federal Defendants to do so.  Pls.'
Opp'n at 64–65.  The federal government also enjoys prosecutorial discretion.  "If [a statute] has
indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful
standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2), and
courts may require that the agency follow that law; if it has not, then an agency refusal to
institute proceedings is a decision 'committed to agency discretion by law' within the meaning
of that section."  *See Heckler v. Chaney*, 470 U.S. 821, 834–35 (1985).  Here, Plaintiffs do not
demonstrate that Federal Defendants' enforcement discretion was constrained in a way that
makes it reviewable here.

Plaintiffs assert that Federal Defendants have a duty under 25 U.S.C. § 3002(c)(3) to
ensure that ownership and control of the excavated cultural items was given to the appropriate
parties.  Pls.' Opp'n at 53.  But that provision merely provides criteria for determining who gets
control and does not itself provide any responsibility for the Federal government to ensure that
such control is given, particularly here where the remains and other cultural items were
discovered on tribal land and Federal Defendants do not control or possess the remains and other
cultural items.  In fact, the regulations set up a process by which anyone claiming an interest in
remains or other cultural items must file a claim before the remains or other cultural items are
repatriated.  43 C.F.R. § 10.15.  Plaintiffs do not allege that they have filed such a claim.

Plaintiffs also assert that that the Federal Defendants were required to consult with
Plaintiffs, citing 43 C.F.R. § 10.5(a).  Pls.' Opp'n at 54.  But these requirements apply only to
remains and other cultural items on federal lands, not tribal lands.

The statutory duty of repatriation under 25 U.S.C. § 3005 applies to "Native American
human remains and objects *possessed or controlled by Federal agencies and museums*."  *Id.*

20

§ 3005(a) (emphasis added).  Similarly, Section 3003 gives Federal agencies the duty to prepare an inventory of Native American human remains and associated funerary objects, but only if they have "possession or control over holdings or collections" of such items.  That is not the case here.

Plaintiffs argue that Federal Defendants have "a legal interest in the cultural items as the owner of all land in question, which falls within the definition of control."  Pls.' Opp'n at 62 (citing 43 C.F.R. § 10.2(a)(3)(ii).  But neither the statute nor the regulations support this proposition.  The regulations do not mention ownership of the land as a consideration in determining "control."  The full definition of "control" from the NAGPRA regulations states that:

> The term "control" means having a legal interest in human remains, funerary objects, sacred objects, or objects of cultural patrimony sufficient to lawfully permit the museum or Federal agency to treat the objects as part of its collection for purposes of these regulations whether or not the human remains, funerary objects, sacred objects or objects of cultural patrimony are in the physical custody of the museum or Federal agency.

43 C.F.R. § 10.2(a)(3)(ii).  The regulations give the example of "a museum or Federal agency that has loaned human remains, funerary objects, sacred objects, or objects of cultural patrimony to another individual, museum, or Federal agency is considered to retain control of those human remains, funerary objects, sacred objects, or objects of cultural patrimony for purposes of these regulations."  *Id.*  Federal Defendants do not have control sufficient to treat the items "as part of its collection," nor do Plaintiffs so allege.  The regulations do not support Plaintiffs' statement that any remains or other cultural items found on federal land are within the control of Federal agencies.  Nor do the regulations support any such claim with respect to remains or other cultural items found on tribal land.

21

Plaintiffs state that "[a]llowing other parties to exert ownership or control over the cultural items without an appropriate determination of who was entitled to ownership and control under NAGPRA constitutes a NAGPRA violation and is reviewable under the APA," citing the *Navajo Nation* case.  Pls.' Opp'n at 62.  But in *Navajo Nation*, the Park Service had physical possession of the remains and other cultural items.  819 F.3d at 1086.  The court held that its decision to inventory the remains under NAGPRA was a final agency action under the APA because it was a determination that NAGPRA applied.  "By deciding to undertake NAGPRA's inventory process, the Park Service conclusively decided that it, and not the Navajo Nation, has the present right to 'possession and control' of the remains and objects."  *Id*. at 1086 (citing 25 U.S.C. § 3003(a)).  The case at bar is not analogous.

Finally, to the extent that Plaintiffs argue that the United States' general trust responsibility to federally recognized tribes compelled it to take some action even if not specified in NAGPRA, that argument has no basis in law.  Federal Defendants' trust responsibilities are also "defined and governed by statutes rather than the common law."  *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011) (citation omitted).  While common law principles may be used "to inform [the court's] interpretation of statutes and to determine the scope of liability that Congress has imposed, . . . these common-law principles come into play only if a plaintiff can first 'identify a specific, applicable, trust-creating statute or regulation that the Government violated.'"  *Flute v. United States*, 808 F.3d 1234, 1243 (10th Cir. 2015) (citing *Jicarilla*, 564 U.S. at 177).  Plaintiffs have not identified any such trust-creating statute that the government violated, so common law duties are not relevant here.  There is no heightened standard for Federal Defendants here.

Plaintiffs have failed to demonstrate that the Federal Defendants violated any NAGPRA

duty.  This Court should dismiss this claim.

**C.    Plaintiffs' NHPA claim fails for lack of subject matter jurisdiction.**

Plaintiffs also fail to demonstrate that this Court has jurisdiction over their NHPA claim.

Although Tribal Defendants assumed certain historic preservation responsibilities, Plaintiffs

argue that the Federal Defendants retained responsibility for NHPA compliance.  They vaguely

assert various "undertakings" and generally state that "[m]ost or all of the NHPA violations . . .

took place within the six years before the Plaintiffs filed their original Complaint," but fail to

specifically detail when each violation occurred.  Pls.' Opp'n at 75.  Contrary to Plaintiffs'

assertion, the statute of limitations prevents review of most of Plaintiffs' allegations.  In addition,

NHPA does not contain a private right of action, and Plaintiffs again must meet the parameters

of the APA, including showing final agency action.

**1.    The NHPA does not contain a private right of action.**

As with the NAGPRA, the NHPA does not provide a private cause of action against the

United States.  Plaintiffs' assertion that "[c]ourts across the country have found that [the NHPA]

provides private right of action" is misleading for several reasons.  *Id.*  First, as Plaintiffs

acknowledge, the D.C. Circuit and the Ninth Circuit found no private cause of action under the

NHPA.  *See San Carlos Apache Tribe*, 417 F.3d at 1094; *Nat'l Tr. for Historic Pres. v. Blanck*,

938 F. Supp. 908, 915 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) (stating that "neither

the language nor the legislative history of the attorneys' fees provision of the NHPA clearly

indicates an intent on the part of Congress to create a private right of action").  But, second, most

decisions finding a private right of action pre-date *Sandoval*, 532 U.S. 275 (2001), which

changed the analysis for private rights of action.  Pls.' Opp'n at 75; *see also Friends of St.*

*Francis Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 466 n.2 (5th Cir. 2011) ("[T]he

Supreme Court's recent jurisprudence casts serious doubt on the continued viability of

the private right of action under the NHPA.").  In fact, one of the cases Plaintiffs cite explicitly

notes that *Sandoval* changed the legal landscape on this issue:

> We have previously assumed, without deciding, that the NHPA creates some
> type of private right of action.  *See Warwick Sewer Auth.*, 334 F.3d at 166 n.4.
> Such an assumption subsequently became more tenuous in the wake of the
> Supreme Court's decision in *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511 (casting
> doubt on whether statutory language that "focus[es] on the person regulated ...
> [or] the agencies that will do the regulating" "rather than the individual[ ]
> protected" can create by implication a private right of action to enforce those
> dictates).

*Narragansett Indian Tribe*, 903 F.3d at 29.

Since *Sandoval*, courts have held that the NHPA does not provide a private right of

action.  *See Camden Cnty. Historical Soc'y v. Dep't of Transp.*, 371 F. Supp. 3d 187, 188–89

(D.N.J. 2019) ("Applying the analytical framework established by the United States Supreme

Court in [*Sandoval*], which precedent the Third Circuit followed in *Wisniewski v. Rodale, Inc.*,

510 F.3d 294 (3d Cir. 2007) and *McGovern v. City of Philadelphia*, 554 F.3d 114 (3d Cir. 2009),

among other cases, the Court holds the NHPA does not create a private right of action.");

*Narragansett Indian Tribe by & through Narragansett Indian Tribal Historic Pres. Office v. R.I.*

*Dep't of Transp.*, No. CV 17-125 WES, 2017 WL 4011149, at *5 (D.R.I. Sept. 11,

2017), *aff'd,* 903 F.3d 26 (1st Cir. 2018) ("The Court is satisfied, then, that § 106 of

the NHPA does not confer a private right of action."); *Martin v. Wilcox Cnty. Alabama*, No.

CIV.A. 13-0572-WS-B, 2014 WL 1202943, at *1 (S.D. Ala. Mar. 21, 2014) (noting that "the

NHPA creates no private right of action in favor of the plaintiff against either the federal

government or others"); "the NHPA does not create a private right of action."; *Martin v.*

*Alabama Historical Comm'n*, No. 2:13-CV-648-MEF, 2014 WL 28850, at *3 (M.D. Ala. Jan. 2,

2014) (holding that NHPA does not create a private right of action); *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1080 (D.S.D. 2009) (holding that "no private right of action was created by the NHPA"); *Friends of Hamilton Grange v. Salazar*, No. 08CIV5220(DLC), 2009 WL 650262, at *18 (S.D.N.Y. Mar. 12, 2009) ("Because, as explained below, the NHPA does not create a private right of action, plaintiffs' claims require a final decision by the government that could trigger review under the APA."). Thus, Plaintiffs' argument that it can proceed under the NHPA's private right of action is not valid under current precedent.

### 2.     Plaintiffs have failed to identify final agency action.

Because the NHPA does not provide a private cause of action here, Plaintiffs' claims must proceed under the APA's waiver of sovereign immunity and Plaintiffs must therefore identify a final agency action they are challenging. *See Friends of Hamilton Grange*, 2009 WL 650262, at *21. "[T]he 'final agency action' in an NHPA claim must be a 'federal undertaking.'" *Karst Envtl. Educ. & Protect., Inc. v. EPA*, 475 F.3d 1291, 1296 (D.C. Cir. 2007). NHPA defines "undertaking" as:

> a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including--
>
> (1) those carried out by or on behalf of the Federal agency;
>
> (2) those carried out with Federal financial assistance;
>
> (3) those requiring a Federal permit, license, or approval; and
>
> (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

54 U.S.C. § 300320.

Plaintiffs' opposition purports to identify several "undertakings," none of which is valid. Pls.' Opp'n at 68–73. Specifically, Plaintiffs assert as "undertakings": (1) the issuance of ARPA permits; (2) the decision to allow excavation of the site without ARPA permits; (3) the excavation of the site; (4) federal funding; (5) construction and operation of the casino; (6) extension of the NPS Agreement without appropriate review and failure to terminate the agreement for noncompliance. Many of these alleged undertakings occurred more than six years before Plaintiffs brought their complaint and are therefore barred by the statute of limitations. In addition, none of the undertakings Plaintiffs allege is a valid final agency action that would support jurisdiction.

Plaintiffs assert that Federal Defendants' issuance of ARPA permits constitutes an undertaking under the NHPA, even as they also acknowledge that the issuance of an ARPA permit "does not constitute an undertaking requiring compliance with section 106" of the NHPA. 43 C.F.R. § 7.12; *see also* Pls.' Opp'n at 69. In addition, Plaintiffs have not identified any ARPA permit issued or renewed after 2005. *See* 2d Am. Compl. ¶ 108 (alleging that permits were issued but failing to provide dates of issuance); ECF No. 200-2 at 34 (ARPA permit issued in 2003). Thus, even if the permits could be considered an undertaking, they cannot be challenged at this date.

Plaintiffs next assert that the entire excavation is an undertaking, but do not point to any government approval of such excavation, with the exception of the ARPA permits that do not constitute an undertaking as a matter of law. It is also nonsensical to argue that issuance of an ARPA permit for excavation is not an undertaking but the actual excavation — which was carried out by non-federal actors— *is* a federal undertaking. In addition, it appears that all excavation of human remains took place before May 6, 2006, as representatives for Plaintiffs

26

traveled to Wetumpka on that date to discuss re-interment of 57 or more sets of human remains. ECF No. 95-11; 2d Am. Compl. ¶ 117.

Plaintiffs also refer to the "federal ownership" of the property, but fail to recognize that the federal government holds the land in trust for the Poarch Band and does not control the land for its own purposes. Pls.' Opp'n at 69, 71. In addition, Plaintiffs cite no authority for the proposition that ownership of the property is itself an undertaking, particularly when the land is held in trust. Further, ownership could not be considered an "undertaking" when the federal government has not taken an action of any kind and does not meet the categories listed in the NHPA definition of undertaking. *See* 54 U.S.C. § 300320.

Next, Plaintiffs allege that the excavation was federally funded, in whole or in part. Pls.' Opp'n at 70. Plaintiffs assert these grants were in violation of Section 110(k) which "prohibits a Federal agency from granting a loan, loan guarantee, permit, license or other assistance to an applicant who, with intent to avoid the requirements of section 106, has intentionally significantly adversely affected a historic property to which the grant would relate." 36 C.F.R. § 800.9. The only grants Plaintiffs specifically refer to were awarded in 2019, 2018, and 2011, 2d Am. Compl. ¶ 318, years after the excavation and Plaintiffs have not established any link between the grants and the excavation. These grants are also general historic preservation grants and Plaintiffs have not shown that these federal grants are sufficient to give the Federal Defendants "federal approval, supervision, control" over the excavation or project. *See Woodham v. Fed. Transit Admin.*, 125 F. Supp. 2d 1106, 1110 (N.D. Ga. 2000) (holding that "federal financial assistance alone is insufficient to trigger the requirements of the NHPA. Instead, '[t]here must, in addition, be some form of federal approval, supervision, control, or at least a certain level of consultation over the spending of the federal funds'" (quoting *Maxwell*

27

*Street Historic Preservation Coal. v. Bd. of Trustees of the Univ. of Ill.*, No. 00-C-4779, 2000

WL 1141439, at *4 (N.D. Ill. Aug. 11, 2000)).  Plaintiffs have not demonstrated that these funds

would violate Section 110(k), as it is not alleged or shown that the grants are related to the

historic property.

According to Plaintiffs, construction and operation of the casino also constituted an

undertaking because the federal government is involved in the Indian gaming industry.  Pls.'

Opp'n at 70.  But Plaintiffs cite only generally to federal involvement in Indian gaming and do

not point to any specific action that Federal Defendants took with regard to the casino at issue.

Plaintiffs fail to cite any authority for the proposition that general federal involvement in gaming

is sufficient to make a tribe's construction and operation of a casino a federal undertaking.  And,

the "involvement" Plaintiffs seem to be alleging is one as a regulator, not as a participant such as

a casino owner or operator.  Plaintiffs also cite to a National Indian Gaming Commission

regulation that requires a tribe give the Commission 120 days' notice before opening a new

gaming facility.  Notwithstanding the fact that the Commission is not a party to this action, the

provision requires only notice, not approval, and consequently is not a final agency action.  *See*

25 C.F.R. § 559.2(a); Pls.' Opp'n at 71.  Plaintiffs therefore have failed to establish that Federal

Defendants took final agency action under the NHPA.

Plaintiffs also assert that each extension of the NPS Agreement, allegedly without

appropriate review and without terminating the NPS Agreement for noncompliance constituted

an undertaking.  Plaintiffs do not allege any particular extension of the NPS Agreement that

could plausibly constitute final agency action, and the 1999 agreement itself is outside the scope

of the statute of limitations.

And, again, Federal Defendants' general trust responsibility to federally-recognized tribes does not require that Federal Defendants be held to a higher standard of accountability. Plaintiffs have not pointed to any statutory or regulatory requirement that Federal Defendants violated and thus there is no enforceable trust duty. *See Jicarilla Apache*, 564 U.S. at 173–74. Plaintiffs' NHPA claims must be dismissed because they fail to challenge final agency action and to assert that Federal Defendants did not take a discrete agency action that they were required to take.

**D.     Plaintiffs fail to allege jurisdiction as to their ARPA claim.**

In Federal Defendants' opening brief, we showed that Plaintiffs failed to allege jurisdiction and failed to state a claim upon which relief can be granted on their ARPA claim. Fed. Defs.' Mem. at 33.  ARPA, 16 U.S.C. §§ 470aa-mm, sets up a permitting system to regulate excavation and removal of "archaeological resources" from public and Indian lands.  The regulations set up exemptions from the permitting process for "general earth-moving excavations," officials carrying out official duties under a federal land manager's direction, and Indian tribes excavating on their own lands.  *See* 43 C.F.R. §§ 7.5(b)(1) and (c); 16 U.S.C. § 470cc(g)(1).  Plaintiffs assert in their Opposition that neither of these exemptions applies because the exemption only applies to the tribe itself and not to anyone performing excavation or removal of archaeological resources on its behalf. Pls.' Opp'n at 79–80.  Plaintiffs further assert that Federal Defendants violated ARPA by failing ensure that the appropriate permits were obtained.

To the extent that Plaintiffs seek to enforce Federal Defendants' purported duty to ensure that appropriate permits were obtained, Plaintiffs do not have a viable claim.  There is no affirmative duty in either the Uniform regulations (43 C.F.R. Part 7) or the Bureau of Indian

Affairs ("BIA") regulations (25 C.F.R. Part 262) to monitor archaeological sites for excavation without a permit.  The regulations give the federal land manager the authority to enforce violations of § 7.4 or violated permit conditions through assessment of civil penalties, but the statute does not require such a penalty be assessed.  43 C.F.R. § 7.15(a)("*may* assess a civil penalty" (emphasis added)).  In addition, the Federal Defendants have prosecutorial discretion and "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)" of the APA.  *See Heckler*, 470 U.S. at 832.

Plaintiffs also assert that Federal Defendants violated ARPA by failing to give Plaintiffs notice when it issued ARPA permits.  Pls.' Opp'n at 79.  But the Federal Defendants issued an ARPA permit to Auburn University in 2003, *see* ECF No. 200-2 at 33, outside the statute of limitations.  Nor have Plaintiffs established that failure of notice could give rise to a cause of action.

In addition, Plaintiffs assert that Federal Defendants violated ARPA because items removed from Indian lands should have remained the property of Plaintiffs, citing 43 C.F.R. § 7.13.  Pls.' Opp'n at 81.  Section 7.13(a) provides that archaeological resources removed from Indian land "remain the property of the Indian or Indian tribe having rights of ownership over such resources."  43 C.F.R. § 7.13(a).  Thus, because the Poarch Band is the beneficial owner of the land from which the archaeological resources were removed, they are the property of the Poarch Band, not Plaintiffs.  *See id.*; *see also* 25 C.F.R. § 262.8(a) ("Archaeological resources excavated or removed from Indian lands, except for [cultural items under NAGPRA], remain the property of the Indian tribe or individual(s) having rights of ownership over such lands.").  Furthermore, as with other provisions of the Uniform regulations and the BIA regulations, these provisions do not contain an affirmative duty on the part of Federal Defendants.

30

According to Plaintiffs, federal agencies are also "required to ensure that archaeological resources excavated pursuant to ARPA are curated pursuant to 36 C.F.R. Part 79," Pls.' Opp'n at 81, but that Part applies only to "Federally-owned and administered archaeological collections." *See* 36 C.F.R. Part 79.  Consequently, it does not apply here.  In addition, the regulations in this part specifically state that "any exchange or ultimate disposition of resources excavated or removed from Indian lands shall be subject to the consent of the Indian or Indian tribe that owns or has jurisdiction over such lands."  36 C.F.R. § 79.2(b)(3).  Plaintiffs have simply not shown that Federal Defendants were required to take agency action here, and their claim should be dismissed.

**E.    Plaintiffs fail to state a claim for RFRA violations.**

In our opening memorandum, Federal Defendants demonstrated that Plaintiffs had not stated a claim under RFRA because (1) Federal Defendants' actions are not the source of the alleged substantial burden on Plaintiffs' free exercise of religion and (2) Plaintiffs have not alleged a substantial burden on their exercise of religion.  Fed. Defs.' Mem. at 35.  In response, Plaintiffs assert that Tribal Defendants are federal actors and that federal actions are preventing them from practicing their religion and forcing them to choose between violating their religious mandates and facing civil or criminal penalties.  Pls.' Opp'n at 82–95.  Plaintiffs' argument is not supported by relevant authority and must be dismissed.

RFRA provides that the "*[g]overnment* shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) [of this section]."  42 U.S.C. § 2000bb–1 (emphasis added).  RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States."  42 U.S.C. § 2000bb–2(1).  Thus, unless

"the government" (in this case, Federal Defendants) has taken an action to substantially burden Plaintiffs' exercise of religion, there is no valid RFRA claim.

Tribal Defendants' actions cannot be imputed to Federal Defendants.  In arguing that Tribal Defendants are federal actors, Plaintiffs rely upon the general delegation of federal authority in the NPS Agreement.  Pls.' Opp'n at 84–88.  First, Plaintiffs fail to cite any case law showing that delegation of authority to tribal governments pursuant to the NHPA makes the federal government liable for their overall conduct.  Plaintiffs do not demonstrate that Federal Defendants retained any oversight capacity over the tribe's actions under the NPS Agreement.

Plaintiffs also fail to connect these delegations of authority to the source of alleged injury to Plaintiffs.  The NPS Agreement delegates certain NHPA responsibilities to the Poarch Band, who assumed responsibility on tribal lands for various functions under Section 101(d)(2)(C) of the NHPA.  ECF No. 190-1 at 115.  In essence, the Poarch Band is acting in place of the State Historic Preservation Officer.  *Id*.  Plaintiffs do not demonstrate how the assumption of these responsibilities resulted in injury to Plaintiffs.  For example, Plaintiffs assert that they are being prevented from returning the remains and funerary objects "to their intended final resting places."  2d Am. Compl. ¶ 325.  They also assert that the drinking of alcohol near the ceremonial grounds violates their religious beliefs.  *Id*. ¶ 328.  Plaintiffs fail to tie these, or other allegations, to Poarch's assumption of responsibilities under the NHPA.

More importantly, however, Plaintiffs cannot show a substantial burden on their exercise of religion.  Plaintiffs rely heavily on the idea that they are being forced to choose between practicing their religion or facing civil or criminal penalties.  Specifically, they assert that they "are not being permitted to complete required religious protocol and return the bodies of their ancestors, along with their funerary objects, to their original and intended final resting places."

32

Pls.' Opp'n at 90.  First, Plaintiffs misstate the test.  The question is whether the government is

imposing a sanction on Plaintiffs for exercising their religious beliefs.  *See Lyng v. Nw. Indian*

*Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988); *Slockish v. U.S. Fed. Highway Admin.*,

Case No. 3:08-cv-1169-YY, 2018 WL 4523135, at *2 (D. Or. Mar. 2, 2018).  As the Supreme

Court stated in *Lyng*, "[t]he crucial word in the constitutional text is 'prohibit' . . . ."  485 U.S. at

450–51.  Government action "which may make it more difficult to practice certain religions but

which have no tendency to coerce individuals into acting contrary to their religious beliefs" do

not constitute substantial burdens on the exercise of religion."  *Thiry v. C*arlson, 78 F.3d 1491,

1495 (10th Cir. 1996) (citing *Lyng*, 485 U.S. at 450–51).  Here, nothing the Federal Defendants

have done prohibits Plaintiffs from exercising their religion.

Second, courts in similar cases have found that denial of access to a religious site is not a

substantial burden on the exercise of religion.  *See, e.g., Snoqualmie Indian Tribe v. Fed. Energy*

*Regulatory Comm'n*, 545 F.3d 1207 (9th Cir. 2008); *Navajo Nation v. U.S. Forest Serv.*, 535

F.3d 1058 (9th Cir. 2008), *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F.

Supp. 3d 77, 91 (D.D.C. 2017) (finding that granting of an easement for a pipeline under Lake

Oahe did not substantially burden tribe's exercise of religion); *Slockish*, 2018 WL 4523135, at

*3–*6.  In *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the*

*Interi*or, the court rejected the argument Plaintiffs make here, noting that "denial of access to a

religiously significant site is not one of the factors under the substantial burden test," and even if

it were, the plaintiffs were "not being forced to do something that specifically contradicts their

religious beliefs."  No. 2:11-CV-00395-ODW, 2012 WL 2884992, at *8 (C.D. Cal. July 13,

2012).  The court found that the denial of the plaintiffs' access to a sacred site did not "constitute

pressure to violate their religious practices because they face the threat of punishment for

33

trespassing." *Id.* "They are not forced to act contrary to and relinquish their religion — no one is forcing Plaintiffs to trespass." *Id.* Similarly, in *Slockish*, the court held that even when the government destroyed a historic campground and burial grounds that was a sacred site for the plaintiff tribes, no substantial burden on the exercise of religion occurred. *Slockish*, 2018 WL 4523135, at *6.

Moreover, those cases involved government property, and the Supreme Court stated that "[w]hatever rights the Indians may have to the use of the areas, however, those rights do not divest the Government of its right to use what is, after all, *its* land." *Lyng*, 485 U.S. at 453. The case at bar involves the Poarch Band's use of its own land. Plaintiffs thus assert that their religious freedom requires limits on how another tribe uses its land. But they cite no cases finding that RFRA requires a tribe or other private party to tailor its use of its own property so as to avoid a burden on the free exercise of religion of others.

Finally, Plaintiffs do not allege that Federal Defendants exercised any coercive power or provided significant encouragement for the construction activities at the Wetumpka property. The specific activities that they complain burden their religious exercise, excavation and construction of facilities by the Poarch Band on its own property are the private actions of the Poarch Band. Although Plaintiffs cite to Federal Defendants' issuance or non-issuance of permits, that action is only the approval of the Poarch Band's excavation on its land, which is insufficient to justify imposition of RFRA's compelling interest test. *See Vill. of Bensenville v. Federal Aviation Admin.*, 457 F.3d 52, 66 (D.C. Cir. 2006). Therefore, RFRA is not applicable to Federal Defendants in this case.

34

**F.      Plaintiffs' Religious Exercise claim should be dismissed.**

Federal Defendants showed in their Motion to Dismiss that Plaintiffs' Claim VIII should be dismissed for several reasons.  Fed. Defs.' Mem. at 40–41.  First, Plaintiffs failed to identify final agency action and challenge instead a prospective ruling by this Court.  Second, Federal Defendants' actions do not substantially burden Plaintiffs' religion.  Third, Plaintiffs have not stated a claim for relief under the First Amendment because they do not point to any law prohibiting the free exercise of religion.  In addition, RLUIPA does not apply to the case at bar, as it neither involves a state or local government nor a land use regulation.  And, as discussed above, Plaintiffs have not stated a claim for relief under the RFRA.  In short, Plaintiffs have failed to state a claim that NAGRPA and ARPA violate their free exercise of religion.

In response, Plaintiffs again argue that Mekko Thompson is a lineal descendant of those buried at Hickory Ground and thus denial of his NAGPRA claim for ownership of the remains and cultural items violated Plaintiffs' religious rights and freedoms.  Plaintiffs first argue that NAGPRA is specifically directed at religion and religious practice and, thus, under the Free Exercise Clause, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest."  Pls.' Opp'n to Tribal Defs.' MTD, ECF No. 212, at 99.  Plaintiffs argue that the way Federal Defendants and Tribal Defendants have interpreted NAGPRA causes it to violate the Free Exercise Clause.  This is wrong.

First, Plaintiffs' challenge is not truly a constitutional challenge, but a challenge to Federal Defendants' decision.  In addition, Plaintiffs fail to allege final agency action that would give this Court jurisdiction.  They assert that Federal Defendants denied a NAGPRA claim by Mr. Thompson in 2009, but the action they refer to is a finding in response to Mr. Thompson's allegations that Auburn University failed to comply with NAGPRA by things such as not

completing inventories of the remains and other cultural items, not publishing a notice of

repatriation, and not consulting with Plaintiffs.  ECF No. 200-2 at 42–45, 47–49.  Mr.

Thompson's letter cannot be properly characterized as a claim to ownership of the remains, as it

is in the nature of a report of failure to follow NAGPRA's procedures.  Interior found that

Auburn did not have legal ownership over the materials and thus did not need to follow

NAGPRA's procedures for repatriation.  ECF No. 200-2 at 47–49.  This cannot be considered a

final agency action on application of NAGPRA to Plaintiffs.  Thus, Plaintiffs have not shown

that the Court has jurisdiction over their claims.

Second, Plaintiffs' assertion that NAGPRA is not a neutral law and thus must be "must

be justified by a compelling governmental interest and must be narrowly tailored to advance that

interest" takes the wrong approach.  Pls.' Opp'n to Tribal Defs.' MTD at 99.  The Free Exercise

Clause of the First Amendment provides that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend 1.  "At a

minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates

against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for

religious reasons."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532

(1993).  Plaintiffs argue that NAGPRA is not a neutral law because it is specifically directed at

religion and religious practice.  Pls.' Opp'n to Tribal Defs.' MTD at 99.  Even assuming this is

true, NAGPRA does not discriminate against religious beliefs or prohibit conduct because it is

undertaken for religious reasons.  A law is not neutral "if the object of a law is to infringe upon

or restrict practices because of their religious motivation." *Lukumi Babalu*, 508 U.S. at 533.

Nothing in NAGPRA meets this category.  In any event, Plaintiffs are not challenging NAGPRA

36

itself, but Federal Defendants' application of NAGPRA.  Because the Free Exercise Clause is aimed only at the law itself, this claim must fail.

Next, Plaintiffs argue that RLUIPA has been violated.  They acknowledge that RLUIPA applies to "land use regulations and institutionalized persons."  Pls.' Opp'n at 100.  They fail, however, to identify any land use regulation or institutionalized person that they are challenging.  They also fail to address case law establishing that, "[s]ubject to two exceptions not relevant here, RLUIPA does not apply to federal government action . . . ."  *Navajo Nation*, 535 F.3d at 1077.

They also appear to argue that RLUIPA repealed NAGPRA because NAGPRA is assertedly less protective of religious exercise than RLUIPA.  This argument is nonsensical.  First, RLUIPA states that it should not be read to repeal federal law that is as or more protective of religious exercise, but it does not imply that less protective laws are repealed.  Repeals by implication are disfavored.  *See Posadas v. Nat'l City Bank of NY*, 296 U.S. 497, 503 (1936) ("The cardinal rule is that repeals by implication are not favored.").  Further, as discussed above, NAGPRA is not a law that impinges on religious exercise, and Plaintiffs do not assert that NAGPRA itself infringes on their religious practice, only that Federal Defendants' application of NAGPRA here does so.  Thus, even under Plaintiffs' argument, RLUIPA could not repeal NAGPRA.  And notably, NAGPRA provides Plaintiffs' only avenue to claim ownership of the remains and other cultural items and if it is repealed, there is no question but that the remains and other cultural items would belong to the landowning tribe here.  This claim should be dismissed.

# III.      CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed

for lack of jurisdiction under Rule 12(b)(1), and for failure to state a claim under Rule 12(b)(6).

Dated: September 4, 2020                  Respectfully submitted,


                                          JEAN E. WILLIAMS
                                          Deputy Assistant Attorney General
                                          Environment & Natural Resources Division

                                           */s/ Devon Lehman McCune*
                                          DEVON LEHMAN McCUNE
                                          CO Bar No. 33223
                                          Senior Attorney
                                          U.S. Department of Justice
                                          Environment & Natural Resources Division
                                          Natural Resources Section
                                          999 18th St., South Terrace, Suite 370
                                          Denver, CO 80202
                                          Tel: (303) 844-1487
                                          Fax: (303) 844-1350
                                          devon.mccune@usdoj.gov

OF COUNSEL
Stephen L. Simpson
Brittany Berger
United States Department of the Interior
Office of the Solicitor

38

## CERTIFICATE OF SERVICE


I hereby certify that on September 4, 2020, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the parties entitled to receive notice.


*/s/ Devon Lehman McCune*

39

# TAB 217

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |  |
|---|---|---|
| MUSCOGEE CREEK NATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action Number: |
| | ) | 2:12-cv-01079-MHT-CSC |
| POARCH BAND OF CREEK INDIANS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TRIBAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF
## MOTION TO DISMISS SECOND AMENDED COMPLAINT

Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W.
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Tribal Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STANDARD ....................................................................................................... 2

I.  The Tribal Defendants have sovereign immunity from all claims asserted. .............. 3

    A.  PBCI and PCI Gaming have sovereign immunity. ........................................ 3

        1.  *The APA does not apply to PBCI or any nonfederal party* .................... 4

        2.  *There can be no implied waiver of tribal sovereign immunity* ............... 4

        3.  *PBCI did not assume federal functions.* ....................................... 5

        4.  *Even if the NPS Agreement waived PBCI's tribal sovereign immunity for certain claims, it would not do so for most or all of the Plaintiffs' claims.* ..................................................................... 8

        5.  *The Plaintiffs' cases do not support their argument.* ........................ 9

    B.  The Tribal Officials have sovereign immunity in their official capacities. ... 12

        1.  *The Plaintiffs do not allege ongoing violations of federal law* ............. 13

        2.  *PBCI's special sovereignty interests bar application of Ex parte Young.* ................................................................ 17

II.  The Plaintiffs' Indian Reorganization Act claim should be dismissed. .................... 20

    A.  The Plaintiffs lack standing to bring their IRA claim. ................................... 21

        1.  *The Plaintiffs have not established traceability* .............................. 21

        2.  *The Plaintiffs have not established redressability.* .......................... 23

    B.  The Plaintiffs' IRA claim is time barred. ................................................ 24

        1.  *The Secretary's 1984 decision was not ultra vires* .......................... 26

        2.  *The Plaintiffs knew the true state of affairs and did not act* ............... 27

        3.  *The Secretary's 1984 decision does not apply to the Plaintiffs at all, and certainly has not been applied by any final agency action within six years of the complaint.* ...................................................... 30

            a.  ARPA permits do not support the Plaintiffs' IRA claim. ............ 31

i

b.   The 2008 NAGPRA claim does not support the IRA claim. ........ 34

III.   The Plaintiffs' promissory estoppel claim fails as a matter of law. ........................... 35

    A.   The promissory estoppel claim is time barred. ............................................... 35

        1.   *Promissory estoppel claims have a two-year limitations period* ............ 36

        2.   *The promissory estoppel claim is not a claim for the recovery of land* .. 37

        3.   *The facts do not support imposition of a constructive trust.* ................. 40

            a.   There is no fraud or confidential relationship. ............................ 40

            b.   There is no public dedication of the Wetumpka property. .......... 42

        4.   *The promissory estoppel claim is untimely regardless.* ......................... 44

    B.   The Plaintiffs have not alleged facts establishing a promissory estoppel claim. ............................................................................................................... 45

        1.   *PCBI did not specifically promise to preserve the Wetumpka property "in perpetuity."* ............................................................................... 46

        2.   *An express, written preservation agreement superseded any ostensible perpetual preservation promise* ............................................................ 47

        3.   *Any promise to preserve the property "in perpetuity" is unenforceable* . 49

        4.   *PBCI could not have reasonably expected the Plaintiffs to rely on an abandoned joint venture proposal, and the Plaintiffs could not reasonably have done so* ........................................................................... 51

IV.   The Plaintiffs' unjust enrichment claims fails as a matter of law. ........................... 52

    A.   The Tribal Defendants are not holding any money or property that was conferred by or that rightfully belongs to the Plaintiffs ................................. 53

    B.   The Plaintiffs' unjust enrichment claim is untimely. ..................................... 55

    C.   The Plaintiffs' unjust enrichment claim is barred by the statute of frauds. . 57

V.   The Plaintiffs have failed to state a valid NAGPRA claim or request available relief. ......................................................................................................................... 58

    A.   NAGPRA provisions governing federal lands are inapplicable .................... 59

    B.   The Tribal Defendants did not engage in unlawful intentional excavations. 60

C.     The Plaintiffs have no viable claims based on hypothetical inadvertent discoveries ............................................................................ 62

D.     The Plaintiffs are not "lineal descendants" under NAGPRA. ...................... 64

E.     Much of the relief that the Plaintiffs' seek is unavailable under NAGPRA .. 66

VI.     The Plaintiffs have failed to state a claim under ARPA. ............................................. 67

VII.    The Plaintiffs have failed to state a claim under the NHPA. ...................................... 70

A.     The Plaintiffs overstate the responsibilities assumed by PBCI. ................... 70

B.     The Plaintiffs identify no undertakings that can support their NHPA claims. .................................................................................................. 72

C.     There is no private right of action against the Tribal Defendants under the NHPA. ............................................................................................. 74

VIII.   The Plaintiffs have failed to state a claim under RFRA. ............................................. 75

A.     RFRA is inapplicable to the Tribal Defendants ............................................ 75

B.     The facts alleged do not establish a RFRA violation. .................................... 78

IX.     NAGPRA and ARPA are not unlawful or unconstitutional. ...................................... 81

X.      The relief the Plaintiffs seek is unavailable as a matter of law. ................................. 83

XI.     All of the Plaintiffs' claims should be dismissed pursuant to Rule 19 ...................... 84

## TABLE OF AUTHORITIES

### Cases

*Ala. Space Sci. Exhibit Comm'n v. Odysseia Co., Inc.*,
    2016 WL 9781806 (N.D. Ala. Sept. 30, 2016) .................................................. 35, 36, 37

*Alabama v. PCI Gaming Auth.*,
    801 F.3d 1278 (11th Cir. 2015) .................................................................................15

*Alaska v. Native Vill. of Venetie Tribal Gov't.*,
    522 U.S. 520 (1998) ..................................................................................................60

*Am. Clinical Labs. Ass'n v. Azar*,
    931 F.3d 1195 (D.C. Cir. 2019) ...............................................................................26

*Am. Gen. Life & Acc. Ins. Co. v. Underwood*,
    886 So. 2d 807 (Ala. 2004) .......................................................................................56

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 991 (1999) ..................................................................................................78

*Attakai v. United States*,
    746 F. Supp. 1395 (D. Ariz. 1990) ....................................................................69, 79

*Auburn Univ. v. IBM Corp.*,
    716 F. Supp. 2d 1114 (M.D. Ala. 2010) .............................................37, 55, 56, 79

*Beatty v. Kurtz*,
    27 U.S. 566 (1829) ...................................................................................................43

*Bebee Props., LLC v. Ard*,
    241 So. 3d 719 (Ala. Ct. App. 2017) ......................................................................40

*Belcher v. Birmingham Tr. Nat'l Bank*,
    348 F. Supp. 61 (N.D. Ala. 1968) ...........................................................................39

*Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*,
    690 F. Supp. 2d 1267 (M.D. Ala. 2010) .................................................................53

*Big Lagoon Rancheria v. California*,
    789 F.3d 947 (9th Cir. 2015) (en banc).......................................................25, 27, 29

*Bodi v. Shingle Springs Band of Miwok Indians*,
    832 F.3d 1011 (9th Cir. 2016) .................................................................................11

*Branch Banking & Trust Co. v. Nichols*,
    184 So. 3d 337 (Ala. 2015) .......................................................................................58

*Branch Banking & Trust v. McDonald*,
    2013 WL 5719084 (N.D. Ala. Oct. 18, 2013) ........................................................38

*Breland v. City of Fairhope*,
    229 So. 3d 1078 (Ala. 2016) .....................................................................................36

*Burrell v. Teacher's Ret. Sys. of Ala.*,
    2009 WL 113692 (M.D. Ala. Jan. 16, 2009) ..........................................................18

*Caddo Nation of Oklahoma v. Wichita and Affiliated Tribes*,
    786 F. App'x 837 (10th Cir. 2019) ...................................................................10

*Carroll v. LJC Def. Contracting, Inc.*,
    24 So. 3d 448 (Ala. Civ. App. 2009) ...........................................................41

*Casey v. Travelers Ins. Co.*,
    585 So. 2d 1361 (Ala. 1991) ...................................................................50

*Cass v. Fuller*,
    2016 WL 8078145 (N.D. Ala. Nov. 9, 2016) ................................................42

*Citizens against Casino Gambling in Erie Cnty. v. Hogan*,
    2008 WL 2746566 (W.D.N.Y. July 8, 2008) ................................................23

*City of Oxford v. FAA*,
    428 F.3d 1346 (11th Cir. 2005) .............................................................6, 72

*Clarke v. Tannin, Inc.*,
    301 F. Supp. 3d 1150 (S.D. Ala. 2018) ...............................................42, 43

*Club One Casino v. Bernhardt*,
    959 F.3d 1142 (9th Cir. 2020) .............................................................60

*Comanche Nation v. United States*,
    2008 WL 4426621 (W.D. Okla. 2008) .....................................................81

*Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla.*,
    692 F.3d 1200 (11th Cir. 2012) ...........................................................4, 11

*Cook v. United Health Care*,
    2010 WL 3629766 (M.D. Ala. Sept. 10, 2010) ..........................................47

*Crompton v. Tuskegee Univ.*,
    2016 WL 9735710 (M.D. Ala. July 8, 2016) ............................................49

*CTIA-Wireless Ass'n v. FCC*,
    466 F.3d 105 (D.C. Cir. 2006) .............................................................74

*Davidson v. Maraj*,
    609 F. App'x 994 (11th Cir. 2015) ........................................................47

*Davis v. Univ. of Montevallo*,
    638 So. 2d 754 (Ala. 1994) ...................................................................49

*Dep't of the Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) .............................................................................8

*Dine Citizens Against Ruining Our Env't v. BIA*,
    932 F.3d 843 (9th Cir. 2019),
    *cert denied*, 2020 WL 3492672 (June 29, 2020) ......................................85

*Doe, 1-13 v. Bush*,
    261 F.3d 1037 (11th Cir. 2001) ...........................................................6

*Downs v. McNeil*,
    520 F.3d 1311 (11th Cir. 2008) ...........................................................33

*Enter. Mgmt. Consultants v. United States*,
    883 F.2d 890 (10th Cir. 1989) ...................................................85

*F.E.B. Corp. v. United States*,
    818 F.3d 681 (11th Cir. 2016) ...................................................33

*Fed. Nat'l Mortg. Ass'n v. GNM II, LLC*,
    2014 WL 1572584 (M.D. Ala. Apr. 17, 2014) ...........................42

*Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*,
    225 F.3d 1208 (11th Cir. 2000) .................................................13

*Fla. Keys Citizens Coal. Inc. v. West*,
    996 F. Supp. 1254 (S.D. Fla. 1998) .....................................30, 34

*Florida v. Seminole Tribe of Fla.*,
    181 F.3d 1237 (11th Cir. 1999) .................................................11

*Foshee v. Gen. Tel. Co. of S.E.*,
    322 So. 2d 715 (Ala. 1975) .................................................53, 54

*FSRJ Props., LLC v. Walker*,
    195 So. 3d 970 (Ala. Civ. App. 2015) ......................................39

*Fuller v. Davis*,
    594 F. App'x 935 (10th Cir. 2014) ......................................13, 16

*Functional Music, Inc. v. FCC*,
    274 F.2d 543 (D.C. Cir. 1958) ..................................................30

*Furry v. Miccosukee Tribe of Indians of Fla.*,
    685 F.3d 1224 (11th Cir. 2012) ...................................................4

*Garland v. Clark*,
    88 So. 2d 367 (Ala. 1956) .........................................................43

*Geyser v. United States*,
    2018 WL 6990808 (C.D. Cal. Aug. 30, 2018) ..........................23

*Glass v. Cook*,
    57 So. 2d 505 (Ala. 1952) .........................................................38

*Glovis Ala., LLC v. Richway Transp. Servs., Inc.*,
    2020 WL 3630739 (S.D. Ala. July 3, 2020) .............................36

*Green v. Abony Bail Bond*,
    316 F. Supp. 2d 1254 (M.D. Fla. 2004) ...................................76

*Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*,
    499 So. 2d 1385 (Ala. 1986). ...................................................53

*Harvey v. Harvey*,
    949 F.2d 1127 (11th Cir. 1992) .................................................76

*Higdon v. Smith*,
    565 F. App'x 791 (11th Cir. 2014) ...........................................78

vi

*Hollywood Mobile Estates, Ltd. v. Cypress*,
    415 F. App'x 207 (11th Cir. 2011) ...................................................... 18, 19

*Hope for Fams. & Cmty. Serv., Inc. v. Warren*,
    721 F. Supp. 2d 1079 (M.D. Ala. 2010) ...........................................44

*Horsely v. Feldt*,
    304 F.3d 1125 (11th Cir. 2002) ...........................................................49

*Idaho v. Coeur d'Alene Tribe of Idaho*,
    521 U.S. 261 (1997) .................................................................... 18, 19

*In re Takata Airbag Prod. Liab. Litig.*,
    --- F. Supp. 3d ----, 2020 WL 2764196 (S.D. Fla. May 27, 2020) ...................................55

*Jackson v. Astrue*,
    506 F.3d 1349 (11th Cir. 2007) ............................................................33

*James River & Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority*,
    359 F. Supp. 611 (E.D. Va. 1973) ......................................................10

*Jamul Action Comm. v. Chaudhuri*,
    200 F. Supp. 3d 1042 (E.D. Cal. 2016) ..............................................74

*Kansas v. Nat'l Indian Gaming Comm'n*,
    151 F. Supp. 3d 1199 (D. Kan. 2015) ................................................17

*Key Med. Supply, Inc. v. Burwell*,
    764 F.3d 955 (8th Cir. 2014) ...............................................................26

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior* (*La Cuna I*),
    2012 WL 2884992 (C.D. Cal. July 13, 2012) ...................................80

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior* (*La Cuna II*), 2013 WL 4500572 (C.D. Cal. Aug. 16, 2013),
    *aff'd*, 603 F. App'x 651 (9th Cir. 2015) ....................................... 79, 80

*Landis v. Neal*,
    374 So. 2d 275 (Ala. 1979) .................................................................40

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ............................................................................26

*Legel v. IRS Dep't of Prof'l Responsibility*,
    2011 WL 5914236 (S.D. Fla. Nov. 28, 2011) ...................................68

*Line v. Ventura*,
    38 So. 3d 1 (Ala. 2009) .......................................................................41

*Lockhart v. Kenops*,
    927 F.2d 1028 (8th Cir. 1991) .............................................................79

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988) ............................................................................79

*Manybeads v. United States*,
   730 F. Supp. 1515 (D. Ariz. 1989) ........................................................79, 82

*Martin v. Ala. Historical Comm'n*,
   2014 WL 28850 (M.D. Ala. Jan. 2, 2014) ......................................71, 72, 74

*Martin v. Am. Med. Int'l, Inc.*,
   516 So. 2d 640 (Ala. 1987) .......................................................................41

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ..................................................................................22

*Mazer v. Jackson Insurance Agency*,
   340 So. 2d 770 (Ala. 1976) ...............................................................53, 54

*McGirt v. Oklahoma*,
   140 S. Ct. 2452 (2020) (No. 18-9526) ......................................................19

*Midrash Sephardi, Inc. v. Town of Surfside*,
   366 F.3d 1214 (11th Cir. 2004) ....................................................78, 81, 82

*Myers v. Bowman*,
   713 F.3d 1319 (11th Cir. 2013) .................................................................76

*Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*,
   446 F.2d 1013 (5th Cir. 1971) ..................................................................12

*Narragansett Indian Tribe of R.I. v. Narragansett Elec. Co.*,
   89 F.3d 908 (1st Cir. 1996) ......................................................................60

*Navajo Nation v. U.S. Forest Serv.*,
   535 F.3d 1058 (9th Cir. 2008) .............................................................78, 81

*Nicholl v. Atty. Gen. of Ga.*,
   769 F. App'x. 813 (11th Cir. 2019) ...........................................12, 13, 14, 16

*Oklahoma v. Hobia*,
   775 F.3d 1204 (10th Cir. 2014) ................................................................73

*Patchak v. Salazar*,
   632 F.3d 702 (D.C. Cir. 2011) ..................................................................22

*Pit River Home & Agr. Co-op Ass'n v. United States*,
   30 F.3d 1088 (9th Cir. 1994)......................................................................84

*Poarch Band of Creek Indians v. Hildreth*,
   656 F. App'x 934 (11th Cir, 2016) .............................................................27

*Poarch Band of Creek Indians v. Moore*,
   2016 WL 4778788 (S.D. Ala. Aug. 10, 201) ..............................................27

*Portofino Seaport Vill., LLC v. Welch*,
   4 So. 3d 1095 (Ala. 2008) .........................................................................53

*Pritchett v. Turner*,
   437 So. 2d 104 (Ala. 1983) .......................................................................51

*Ramey Constr. Co. v. Apache Tribe of the Mescalero Reservation*,
    673 F.2d 315 (10th Cir. 1982) ...................................................... 8

*Rayburn ex rel. Rayburn v. Hogue*,
    241 F.3d 1341 (11th Cir. 2001) ...........................................77, 78

*Rease v. Harvey*,
    238 F. App'x 492 (11th Cir. 2007) ...........................................33

*Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*,
    980 F.2d 1043 (5th Cir. 1993) .................................................... 4

*Ritchey v. Dalgo*,
    514 So. 2d 808 (Ala. 1987) ...............................................42, 43

*Rosales v. Dutschke*,
    279 F. Supp. 3d 1084 (E.D. Cal. 2017),
    *affirmed by* 787 F. App'x 406 (9th Cir. 2019) ...........................84

*Rosales v. United States*,
    2007 WL 4233060 (S.D. Cal. Nov. 28, 2007) ..................... 59, 62, 63

*Rumford v. Valley Pest Control, Inc.*,
    629 So. 2d 623 (Ala. 1993) .......................................................36

*Sanderlin v. Seminole Tribe of Fla.*,
    243 F.3d 1282 (11th Cir. 2001) ...........................................4, 11

*Santa Clara Pueblo v. Martinez*,
    436 U.S. 49 (1978) .................................................................... 4

*Selma Hous. Dev't Corp. v. Selma Hous. Auth.*,
    2005 WL 1981290 (S.D. Ala. Aug. 16, 2005) ...........................36

*Shanks v. Dressel*,
    540 F.3d 1082 (9th Cir. 2008) .................................................74

*Sheridan Kalorama Hist. Ass'n v. Christopher*,
    49 F.3d 750 (D.C. Cir. 1995) ...................................................72

*Slockish v. U.S. Fed. Highway Admin.*,
    2018 WL 4523135 (D. Or. March 2, 2018),
    *adopted in relevant part by* 2018 WL 2875896 (D. Or. June 11, 2018) .........................80

*Snider v. Morgan*,
    113 So. 3d 643 (Ala. 2012) ...............................................55, 56

*South Carolina Wildlife Federation v. Limehouse*,
    549 F.3d 324 (4th Cir. 2008) ...................................................12

*Spears v. Warden*,
    605 F. App'x 900 (11th Cir. 2015) ...........................................32

*Stand Up for California! v. U.S. Dep't of the Interior*,
    919 F. Supp. 2d 51 (D.D.C. 2013) ...........................................23

*Summit Med. Assocs., P.C. v. Pryor*,
    180 F.3d 1326 (11th Cir. 1999) ....................................................... 12, 13

*Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*,
    177 F.3d 1212 (11th Cir. 1999) ............................................................. 8

*TOMAC v. Norton*,
    193 F. Supp. 2d 182 (D.D.C. 2002) .....................................................22

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ........................................................................24

*United States v. Roberts*,
    185 F.3d 1125 (10th Cir. 1999) ...........................................................60

*Upstate Citizens for Equal., Inc. v. United States*,
    841 F.3d 556 (2d Cir. 2016)................................................................22

*Va. Off. for Prot. & Advoc. v. Stewart*,
    563 U.S. 247 (2011) ............................................................................18

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*,
    535 U.S. 635 (2002) ............................................................................18

*Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*,
    875 F.2d 453 (5th Cir. 1989) ................................................................. 7

*Villareal v. R.J. Reynolds Tobacco Co.*,
    839 F.3d 958 (11th Cir. 2016)..............................................................33

*Walk, Inc. v. Zimmer, Inc.*,
    2014 WL 2465311 (N.D. Ala. May 30, 2014 .......................................48, 50

*Weaver v. James Bonding Co.*,
    442 F. Supp. 2d 1219 (S.D. Ala. 2006) .................................................76

*West v. Atkins*,
    487 U.S. 42 (1988) ..............................................................................76

*Whatley v. Ohio Nat'l Life Ins. Co.*,
    2019 WL 6173500 (M.D. Ala. Nov. 19, 2019)......................................48

*White Holding Co., LLC v. Martin Marietta Materials, Inc.*,
    423 F. App'x 943 (11th Cir. 2011) .....................................................48, 54

*White v. Microsoft Corp.*,
    454 F. Supp. 2d 1118 (S.D. Ala. 2006).................................................53

*Williams v. Kitchens*,
    74 So. 2d 457 (Ala. 1954) ...................................................................39

*Wind River Mining Corp. v. United States*,
    946 F.2d 710 (9th Cir. 1991)...............................................................27

*Woodham v. Fed. Trans. Admin.*,
    125 F. Supp. 2d 1106 (N.D. Ga. 2000) .............................................73, 74

*Wyoming v. United States*,
    279 F.3d 1214 (10th Cir. 2002) .................................................................26

**Statutes**

16 U.S.C § 470cc(a) ......................................................................................67

16 U.S.C. § 470cc(c) .....................................................................................32

16 U.S.C. § 470cc(g) .....................................................................................69

16 U.S.C. § 470ee(a) .....................................................................................69

16 U.S.C. §§ 470aa - 470bb ..........................................................................21

25 U.S.C. § 3001(15)(B) ...............................................................................60

25 U.S.C. § 3002(d)(1) ............................................................................62, 63

25 U.S.C. § 5108 ...........................................................................................26

28 U.S.C. § 2401(a) .......................................................................................33

42 U.S.C. § 5304(g)(3)(D) ............................................................................10

43 U.S.C. § 7.35 ............................................................................................68

5 U.S.C. § 551 .................................................................................................5

5 U.S.C. § 702 .................................................................................................5

54 U.S.C. § 302302 .........................................................................................5

54 U.S.C. § 302704 .........................................................................................6

54 U.S.C. § 306102(b)(5)(C) ..........................................................................9

54 U.S.C. § 306108 .......................................................................................72

Ala. Code § 6-2-33 ........................................................................................35

Ala. Code § 6-2-38(l) ....................................................................................35

Ala. Code. § 8-9-2(1) ....................................................................................58

Alabama Code § 6-2-33 .................................................................................37

Alabama Code § 6-2-33(2) ............................................................................55

Code 1940, Tit. 7, § 20 .................................................................................39

**Other Authorities**

NHPA § 101(b)(3) ...........................................................................................5

**Regulations**

25 C.F.R. § 262.5 ..........................................................................................61

25 C.F.R. § 262.5(c)(1) .................................................................................68

25 C.F.R. § 262.5(c)(i) ..................................................................................61

25 C.F.R. § 262.5(d) .....................................................................................61

25 C.F.R. § 262.8 .................................................................................. 62

25 C.F.R. § 262.8(a) ................................................................... 61, 69

25 C.F.R. § 262.8(a)(2) ......................................................................... 65

25 C.F.R. § 265.5(d) .............................................................................. 69

36 C.F.R. § 800 .............................................................................. 6, 71

36 C.F.R. § 800.2(a) ............................................................................... 7

36 C.F.R. § 800.2(c)(1) .......................................................................... 72

36 C.F.R. § 800.3(c) ............................................................................... 72

36 C.F.R. § 800.5(a) ............................................................................... 72

43 C.F.R. § 10.14(b) .............................................................................. 64

43 C.F.R. § 10.2(a)(5) ............................................................................ 65

43 C.F.R. § 10.2(b)(1) ............................................................................ 64

43 C.F.R. § 10.3(c)(1) ............................................................................ 61

43 C.F.R. § 10.3(c)(4) ............................................................................ 61

43 C.F.R. § 10.4(e) ................................................................................. 63

43 C.F.R. § 7.12 ..................................................................................... 73

43 C.F.R. § 7.5(a) ................................................................................... 67

43 C.F.R. § 7.5(b)(3) .............................................................................. 69

43 C.F.R. §7.5(b)(1) ............................................................................... 69

# INTRODUCTION

This case is much more straightforward than the voluminous briefing might imply. The Plaintiffs are angry about archaeological excavation and development that took place years ago on property that the Tribal Defendants[1] acquired from a third party four decades ago. While no one questions the sincerity of the Plaintiffs' feelings, their anger does not give rise to any valid legal claims. Indeed, as explained in the various motions to dismiss, every one of the eleven counts set forth in the Second Amended Complaint (SAC, Doc. 190) is fatally flawed as a matter of law, whether due to a lack of subject matter jurisdiction, sovereign immunity, expired statutes of limitations, the lack of a private right of action, or simple non-existence of necessary elements. The Plaintiffs decry the Tribal Defendants' reliance on these "technical legal reasons" supporting dismissal of the SAC, perhaps hoping that the Court will look past the law and focus exclusively on their version of the facts. Plaintiffs' Response to Tribal Defendants' Motion to Dismiss Second Amended Complaint (Plaintiffs' response), Doc. 212 at 18.[2] This the Court cannot do. Instead, because the Plaintiffs have failed to set forth a single valid claim against the Tribal Defendants or any other Defendants as a matter of law, the Court should dismiss the SAC in full.

# BACKGROUND

The Tribal Defendants' brief in support of their motion to dismiss the SAC (their principal brief, Doc. 202) sets forth key background facts relevant to their motion. *See id.* at 14-18. The Plaintiffs' recitation of background facts confirms key points set forth by the Tribal Defendants, including that Defendant PBCI acquired the Wetumpka property in 1980 subject to a 20-year preservation covenant that the Plaintiffs do not contend was violated. *See* Doc. 212 at 19. And

---

[1] As in their initial motion and brief, the Tribal Defendants comprise the Poarch Band of Creek Indians (PBCI or the Tribe), PCI Gaming, and all tribal officials sued in their official capacities. *See* Doc. 202 at 13 n.1

[2] Pin cites to previously filed documents are to the ECF-generated page numbers atop each page.

while the parties disagree on the interpretation and significance of a funding application letter that PBCI submitted to the Alabama Historical Commission describing a subsequently abandoned plan to jointly acquire and maintain the property with Plaintiff Muscogee (Creek) Nation (MCN), Doc 190-1 at 3-7, no one disputes the letter's authenticity or content.

The Plaintiffs do, however, grossly mischaracterize the substance of the October 19, 2002, letter (Doc. 200-2 at 20-25), signed by Plaintiff Thompson and others on behalf of Plaintiff Hickory Ground Tribal Town and copied to Plaintiff MCN. As explained in the Tribal Defendants' principal brief, Doc. 202 at 16, that letter establishes that in October 2002, more than ten years before filing this lawsuit, all Plaintiffs had actual knowledge of "facts displayed in the written record that not less than three (3) sets of human remains have been excavated and removed from the property without prior consultation with Hickory Ground Tribal Town." Doc. 200-2 at 22. In their response, the Plaintiffs try to back away from this clear and concrete statement of contemporaneous knowledge by saying that the letter referred only to "rumors through third parties that Poarch may be disturbing the site" and stated that the Plaintiffs "'hope[d] this is not the case.'" Doc. 212 at 19 n.2. The assertion that the 2002 letter referred only to "rumors" is manifestly irreconcilable with that document's explicit reference to "facts displayed in the written record." Moreover, the quoted language regarding the Plaintiffs' "hope [that] this is not the case" is extracted from a separate paragraph of the letter that made unsupported allegations regarding PBCI's treatment of excavated remains, not questioning whether excavation occurred. *See* Doc. 200-2 at 22. The record is clear on this point, and the Plaintiffs' effort to muddy it is unavailing.

## STANDARD

The Tribal Defendants have already addressed the standard for the Court's evaluation of their motion. *See* Doc. 202 at 18-19. They revisit the issue here only to reemphasize that when a defendant makes a factual challenge to subject matter jurisdiction, as the Tribal and Federal

Defendants do with respect to many claims, a plaintiffs' allegations are not entitled to a presumption of truthfulness, and the Court is free to consider material outside of the pleadings. *See id.* (citing cases). The Plaintiffs' response never acknowledges this rule.

## ARGUMENT AND ANALYSIS

### I.     The Tribal Defendants have sovereign immunity from all claims asserted.

Tribal sovereign immunity deprives the Court of subject matter jurisdiction over all of the Plaintiffs' claims against the Tribal Defendants. *See* Doc. 202 at 21-28. The SAC fails to even allege jurisdiction over PBCI and PCI Gaming, both of which unquestionably enjoy tribal sovereign immunity, and the tribal officials sued in their official capacities share in the Tribe's immunity. *See id.* Nothing in the Plaintiffs' response brief refutes these facts.

### A.     PBCI and PCI Gaming have sovereign immunity.

Despite not alleging subject matter jurisdiction over PBCI or PCI Gaming or otherwise questioning their sovereign immunity in the SAC, the Plaintiffs argue in their response brief that PBCI forfeited its sovereign immunity by entering into an agreement (the NPS Agreement, Doc. 190-1, at 115-19) with the National Park Service (NPS) whereby PBCI assumed certain, limited responsibilities under the National Historic Preservation Act (NHPA). *See* Doc. 212 at 22. Specifically, the Plaintiffs contend that when an entity is "delegated federal responsibilities … the delegee steps into the shoes of the agency that made the delegation in the first place." *Id.* at 23. This includes, according to the Plaintiffs, amenability to suit under, and acceptance of the federal immunity waiver set forth in, the Administrative Procedure Act (APA). *Id.* So, under the Plaintiffs' theory, PBCI's assumption of the limited responsibilities set forth in the NPS Agreement—a document that makes no mention of the APA or any waiver of tribal sovereign immunity—impliedly waived PBCI's tribal sovereign immunity from all of the claims set forth in the SAC. That is not the case for several reasons.

1.    *The APA does not apply to PBCI or any nonfederal party.*

The Plaintiffs argument fails first and most obviously because it relies on the APA as the basis for bringing claims against the Tribal Defendants. The APA applies only to federal agencies, not nonfederal entities such as Indian tribes and tribal enterprises. *See* Doc. 202 at 68-69; *see also Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1055 (5th Cir. 1993) (holding, in a suit seeking to enjoin a state agency's expenditure of federal funding, that a district court lacked jurisdiction to enjoin a state agency under the APA). The existence of a contract or funding relationship between a federal agency and nonfederal defendant does not alter this fact. *See* Doc. 202 at 69 (citing multiple cases). Because PBCI and PCI Gaming are not federal agencies, the APA and its immunity waiver are per se inapplicable to them.

2.    *There can be no implied waiver of tribal sovereign immunity.*

Putting aside the fatal fact that the APA is inapplicable to any of the Tribal Defendants, the Plaintiffs' claim also fails because they do not identify an express waiver of PBCI's sovereign immunity. Instead, they ask this Court to infer a waiver from PBCI's assumption of certain obligations in the NPS Agreement. That is impermissible. Waivers of tribal sovereign immunity cannot be implied from tribal conduct, but must be clear and unequivocal. *See, e.g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla.*, 692 F.3d 1200, 1206-08 (11th Cir. 2012); *Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1234 (11th Cir. 2012). The Eleventh Circuit has gone so far as to explain that even an express promise by a tribe to comply with a specific law "could not, without more, constitute an express and unequivocal waiver of its immunity from suit." *Furry*, 685 F.3d at 1236; *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1287-89 (11th Cir. 2001) (holding that a tribe's promise to comply with federal law, made in connection with receipt of federal funding, did not waive its immunity from suits brought under the laws with which it promised to comply). Any argument

4

that PBCI lacks immunity because it signed the NPS Agreement, which is completely silent as to tribal sovereign immunity, or because it accepted federal benefits in the form of historic preservation responsibilities or preservation grant funds, *see* Doc. 212 at 26, is irreconcilable with Supreme Court and Eleventh Circuit precedent barring the implication of a waiver of tribal sovereign immunity on the basis of a tribe's conduct.[3]

### 3.   *PBCI did not assume federal functions.*

Even if it were possible to infer a tribe's waiver of immunity from its assumption of federal functions, the Plaintiffs' argument still would fail because the responsibilities that PBCI assumed under the NPS Agreement are not federal.

The NPS Agreement expressly provides that PBCI is assuming "the functions of a State Historic Preservation Officer" (SHPO) under the NHPA, not those of NPS or any other federal agency. Doc. 190-1 at 115; *id.* at 118, § 12 (calling for NPS to issue a notice to "make clear that the Tribe has assumed the role of State Historic Preservation Officer"). It then proceeds to identify discrete responsibilities that PBCI assumed from among those "set out in Section 101(b)(3)" of the NHPA. Doc. 190-1 at 115, § 1. That provision describes "the responsibility of the State Historic Preservation Officer to administer the State Historic Preservation Program." NHPA § 101(b)(3), codified as amended at 54 U.S.C. § 302302. Accordingly, to the extent that PBCI "step[ped] into

---

[3] The Plaintiffs do not argue that there is a congressional abrogation of PBCI's immunity, and any such argument would fail. The APA waives only the immunity of the United States and provides that it does *not* "affect[] other limitations on judicial review," which would include tribal sovereign immunity. 5 U.S.C. § 702; *see also* 5 U.S.C. § 551. Like waivers, congressional abrogations of tribal sovereign immunity must be "unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58 (citation omitted). Given the APA's express limitation to federal authorities and lack of any reference to tribal sovereign immunity, it plainly does not include an unequivocal expression of congressional intent to abrogate such immunity.

the shoes" of anyone when it signed the NPS Agreement, Doc. 212 at 23, it stepped into those of a state entity—the SHPO—and not those of NPS.

Further examination of the NPS Agreement reinforces this conclusion. The Plaintiffs imply, for example, that PBCI assumed a blanket obligation to "[f]ollow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800 *et seq.*" Doc. 212 at 23 (citing Doc. 191-1 at 117, § 5). But § 5 of the NPS Agreement refers only to the performance of the SHPO consulting duties assumed in § 1(G) of that agreement—consulting with and providing feedback to federal agencies in connection with federal undertakings on tribal lands—not a general assumption of all federal functions involved in the § 106 process.[4] Doc. 191-1 at 117, § 5; *see, e.g.*, *City of Oxford v. FAA*, 428 F.3d 1346, 1356-57 (11th Cir. 2005) (reviewing the SHPO's role in consulting with federal agencies). Similarly, § 7 of the NPS Agreement, which the Plaintiffs also cite as an example of PBCI's putative assumption of "federal responsibilities," Doc. 212 at 23, provides that PBCI will act "in accordance with Section 101(d)(4)(C)" of the NHPA. Doc. 191 at 117, § 7. Section 101(d)(4)(C) of the NHPA, however, deals exclusively with tribal rights to assume certain SHPO functions—not with the delegation or assumption of any federal functions. *See id.*, codified as amended at 54 U.S.C. § 302704. Once again, PBCI is a delegee of state historic preservation responsibilities, not federal functions. As "the federal APA clearly does not apply to state agencies," it cannot apply to PBCI as a delegee of state agency duties. *Doe, 1-13 v. Bush*, 261 F.3d 1037, 1055 (11th Cir. 2001); *see also* Doc. 202 at 22, 68-69 (further explaining why an APA claim against PBCI is non-viable).

---

[4] As the Federal Defendants note in support of their motion to dismiss, the Plaintiffs have identified no relevant federal undertakings on which to base NHPA claims under the APA. *See* Doc. 200 at 30-34. Other failings of the Plaintiffs' NHPA claims are discussed in detail in the Tribal Defendants' principal brief, Doc. 202 at 68-73, and below.

The Plaintiffs attempt to evade the fact that PBCI did not assume federal functions by citing an NHPA regulation requiring federal agencies to "ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance" and providing that the relevant "agency official may be a State, local, or tribal government official who has been delegated legal responsibility for compliance with Section 106." 36 C.F.R. § 800.2(a). This regulation is completely irrelevant, however, because the Plaintiffs have not identified any federal undertakings over which PBCI has jurisdiction or for which PBCI has been delegated legal responsibility for compliance with § 106. PBCI assumed SHPO functions in the NPS Agreement, not jurisdiction over federal undertakings. It is telling that § 800.2 identifies SHPOs not as legally responsible "agency officials," but rather as parties with whom responsible federal agencies should consult during the § 106 process. *See* § 800.2(c)(1). Additionally, § 800.2(a) specifically provides that the "statutory obligation ... to fulfill the requirements of section 106" remains with the relevant federal agency, implying that it is the agency itself, not an agency official and certainly not a SHPO or tribe assuming SHPO responsibilities, that retains ultimate responsibility for ensuring compliance with § 106 and is subject to suit under the APA for any actionable noncompliance. *Id.*; *see also Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 458 (5th Cir. 1989) ("By its terms, only a federal agency can violate section 470f."[5]).

Because PBCI is not a federal agency and assumed only SHPO responsibilities rather than federal functions, the Plaintiffs' attempt to leverage the NPS Agreement to bring an APA claim against PBCI as a federal delegee fails.

---

[5] The Fifth Circuit's reference to § 470f refers to 16 U.S.C. § 470f, which previously codified § 106 of the NHPA. Section 106 is now codified at 54 U.S.C. § 306108.

4.      *Even if the NPS Agreement waived PBCI's tribal sovereign immunity for certain claims, it would not do so for most or all of the Plaintiffs' claims.*

The Plaintiffs' theory suffers additional shortcomings. Even if PBCI had waived its sovereign immunity by signing the NPS Agreement *and* could be considered a federal actor for APA purposes as a result of its assumption of SHPO responsibilities, neither of which is the case, PBCI still would retain immunity from the Plaintiffs' claims to the extent that they are not based on alleged violations of the specific responsibilities assumed in the NPS Agreement. Federal law requires that both the immunity waiver set forth in the APA and waivers of tribal sovereign immunity be strictly construed and limited to their terms. *See, e.g.*, *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (holding, in an APA case, that "a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign"); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*, 177 F.3d 1212, 1224-25 (11th Cir. 1999) (holding that where a tribe waived immunity as to certain claims, other claims falling outside the scope of the waiver remained barred by tribal sovereign immunity); *Ramey Constr. Co. v. Apache Tribe of the Mescalero Reservation*, 673 F.3d 315, 320 (10th Cir. 1982) (holding that a waiver of tribal sovereign immunity "is to be strictly construed" and that a waiver of immunity from one claim does not waive immunity from other claims). Accordingly, even if the NPS Agreement had waived PBCI's sovereign immunity, any such waiver would be limited to claims based directly on violations of federal obligations that PBCI actually assumed through that agreement.

As explained above, the responsibilities that PBCI assumed under the NPS Agreement are far narrower than the Plaintiffs contend. Rather than assuming full federal responsibility for compliance with the NHPA § 106 process for all purposes and in all respects on PBCI trust lands, as the Plaintiffs insinuate, PBCI assumed limited, expressly delineated SHPO responsibilities. *See* Doc. 190-1 at 115-18 (setting out the responsibilities assumed by PBCI). The Plaintiffs ignore this

fact. The overwhelming majority of their claims, if not all of them, are not based on alleged violations of the SHPO-type NHPA responsibilities that PBCI assumed under the NPS Agreement. Most of their NHPA claims instead allege violations of the § 106 process by the Federal Defendants, with erroneous, unsupported add-on assertions that those violations are also attributable to PBCI and thus give rise to claims under the APA. *See generally* SAC at 65-69. Any alleged waiver of PBCI's immunity could not possibly extend to claims based on ostensible violations of § 106 duties that PBCI did not assume.

The Plaintiffs also appear to argue, in passing, that because one provision of the NHPA, 54 U.S.C. § 306102(b)(5)(C), cross-references a provision of the Native American Graves Protection and Repatriation Act (NAGPRA), the NPS Agreement defeats PBCI's immunity from all of the Plaintiffs' NAGPRA-based claims. *See* Doc. 212 at 22. They then go yet another step further, implying that the passing reference to "archeological resources" in 36 C.F.R. § 800.2(a)(1)—an NHPA regulation that, as discussed above, is inapplicable to PBCI—waives PBCI's immunity from all APA claims based on the Archaeological Resources Protection Act (ARPA). *See* Doc. 212 at 22. These arguments are absurd. PBCI plainly did not assume federal NAGPRA and ARPA compliance obligations in the NPS Agreement, and its assumption of limited SHPO functions via that agreement cannot possibly be stretched so far as to effectuate a waiver of its immunity from any and all third party APA claims alleging violations of any statute mentioned anywhere in the NHPA. The Plaintiffs tellingly cite no authority supporting such a result.

5.     *The Plaintiffs' cases do not support their argument.*

The cases ostensibly supporting the Plaintiffs' contention that they can bring an APA claim against PBCI are inapposite. First, the Plaintiffs appear to contend that the PBCI's assumption of SHPO responsibilities under the NPS Agreement operates as an acceptance of the APA's immunity waiver as a matter of law under *Caddo Nation of Oklahoma v. Wichita and Affiliated Tribes*, 786

F. App'x 837 (10th Cir. 2019). *See* Doc. 212 at 24-25. But *Caddo Nation*, which involved Department of Housing and Urban Development's (HUD) delegation of certain duties to the Wichita Tribe, is readily distinguishable. The statute authorizing the HUD delegation explicitly required the delegee to "assume the status of a responsible federal official under the National Environmental Policy Act" and to "accept the jurisdiction of the federal courts for the purpose of enforcement of his responsibilities as such an official." 42 U.S.C. § 5304(g)(3)(D); *see Caddo Nation*, 786 F. App'x at 840 & 840 n.4. In other words, the HUD delegation at issue in *Caddo Nation* required an express waiver of sovereign immunity by the delegee, and the Wichita Tribe provided such a waiver. *Caddo Nation*, 786 F. App'x at 841 (noting that the Wichita Tribe "*affirmatively waived its sovereign immunity* in the certification included in the [environmental assessment]" (emphasis added)). The Plaintiffs have identified no such express waiver of PBCI's immunity here, and, as noted above, a waiver of tribal sovereign immunity cannot be implied. Because PBCI did not expressly waive its immunity, *Caddo Nation* is inapposite.[6]

The Plaintiffs also rely on dicta in a decades old Virginia district court opinion, *James River & Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority*, 359 F. Supp. 611 (E.D. Va. 1973). *See* Doc. 212 at 25. In *James River*, the Richmond Metropolitan Authority (RMA), a political subdivision of the Commonwealth of Virginia, asserted Eleventh Amendment immunity from a litany of federal statutory claims arising out of the RMA's construction of a highway system. *See generally James River*, 359 F. Supp. at 618-23. The district court held that the RMA, as a political subdivision of a state, was not entitled to Eleventh Amendment immunity as a matter of law. *Id.* at 623. It then went on to posit, in dicta, that even if the RMA otherwise would have

---

[6] Notably, the court in *Caddo Nation* dismissed all claims against the Wichita Tribe that were not directly grounded in the federal duties assumed by the Tribe and within the scope of the Tribe's affirmative immunity waiver. *See* 786 F. App'x at 839.

had immunity, it would have waived that immunity by "purposefully avail[ing] itself of the benefit of federal law." *Id.* at 624. This dicta has no relevance here.

Tribal sovereign immunity is different than Eleventh Amendment immunity, and it has been well-settled, largely in the decades since *James River*, both that tribal immunity cannot be impliedly waived and that tribal nations do not waive their immunity by "availing" themselves of federal laws. *See, e.g., Contour Spa*, 692 at 1206-08 (holding that tribal sovereign immunity is different than Eleventh Amendment immunity and that tribes, unlike states, do not waive their immunity by removing a suit to federal court or by filing suit in federal court); *see also Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1021-22 (9th Cir. 2016) (citing *Hard Rock* and holding that there could be no waiver of tribal sovereign immunity absent "an unequivocal expression of the Tribe's intent to waive"). Indeed, the Eleventh Circuit has rejected the argument that a tribe waives its immunity merely by availing itself of federal law, holding that such a result would be "patently inconsistent" with the rule against implied waivers of tribal sovereign immunity. *Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1243 (11th Cir. 1999) (rejecting the argument that a tribe waived its sovereign immunity by engaging in gaming activity pursuant to the federal Indian Gaming Regulatory Act (IGRA)). And in *Sanderlin*, the Eleventh Circuit went so far as to hold that a tribe's acceptance of federal funding conditioned on a promise to comply with non-discrimination provisions of the federal Rehabilitation Act did not waive the tribe's immunity from suits brought under that act. *Sanderlin*, 243 F.3d at 1287-89 (reasoning that "a promise not to discriminate … in no way constitute[s] an express and unequivocal waiver of sovereign immunity").

The other cases mentioned in the string cite at the end of the Plaintiffs' argument likewise offer scant support. *South Carolina Wildlife Federation v. Limehouse*, 549 F.3d 324 (4th Cir.

2008), involved a claim against a state official, not a tribe or even the state itself, and the court found that the plaintiffs avoided an Eleventh Amendment immunity bar under the *Ex parte Young* doctrine, not by bringing a claim under the APA. *See id.* at 331-32. And *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013, 1028 (5th Cir. 1971), contains no discussion of immunity whatsoever. Neither case is instructive, much less dispositive, as to whether the NPS Agreement subjects PBCI to claims under the APA.

In light of the Plaintiffs' failure to identify any clear and unequivocal waiver or abrogation of PBCI's tribal sovereign immunity from the Plaintiffs' claims, those claims should be dismissed with prejudice for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

B.   The Tribal Officials have sovereign immunity in their official capacities.

The Plaintiffs do not dispute the general rule that tribal sovereign immunity extends to tribal officials such as the PBCI Council members, PCI Gaming directors, and Tribal Historic Preservation Officer (THPO) sued here in their official capacities (the Tribal Officials). Instead, they contend that their claims can proceed against the Tribal Officials under the narrow exception to tribal sovereign immunity commonly referred to as the *Ex parte Young* doctrine. *See* Doc. 212 at 26-27. Under *Ex parte Young*, officials who would otherwise enjoy sovereign immunity can sometimes be sued for prospective declaratory or injunctive relief to stop ongoing violations of federal law. *See, e.g., Nicholl v. Atty. Gen. of Ga.*, 769 F. App'x. 813, 815 (11th Cir. 2019); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999); Doc. 202 at 23. But the *Ex parte Young* doctrine is inapplicable here both because the Plaintiffs have not alleged the requisite ongoing violations of federal law and because the Plaintiffs' claims implicate special sovereignty

interests that the Supreme Court has held trump the *Ex parte Young* exception. *See* Doc. 202 at 23-28. The Plaintiffs' efforts to rebut these arguments are unavailing.

1.   *The Plaintiffs do not allege ongoing violations of federal law.*

Recent Circuit precedent explicitly holds that "[t]he *Ex parte Young* doctrine applies only when a 'violation of federal law … is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past.'" *Nicholl*, 769 F. App'x at 815 (quoting *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir. 2000)); *see also Fuller v. Davis*, 594 F. App'x 935, 940 (10th Cir. 2014) (refusing to apply *Ex parte Young* due to lack of any ongoing violation of law when "[t]he gravamen of [the plaintiffs'] complaint is that they were tricked long ago"). Yet the Plaintiffs contend that the *Ex parte Young* doctrine's requirement of an ongoing violation of federal law is not, in fact, a temporal inquiry. Rather than asking whether there is an actual, ongoing violation of law, they assert that "the appropriate inquiry … is whether the plaintiff seeks *injunctive relief*, as opposed to *damages*." Doc. 212 at 29. Accordingly, the Plaintiffs argue, because their claims against the Tribal Officials seek prospective, non-monetary relief, they fit within the *Ex parte Young* exception despite the fact that they "seek declarations of the illegality of certain of the Tribal Officials' <u>past</u> conduct" *Id.* (emphasis added).

The Plaintiffs' characterization of *Ex parte Young* completely ignores half of the test for its applicability and contradicts binding Circuit precedent. *See, e.g.*, *Nicholl*, 769 F. App'x at 815; *Summit*, 180 F.3d at 1337; *see also* Doc. 202 at 23-24 (citing multiple cases holding the *Ex parte Young* doctrine inapplicable to claims seeking declaratory or injunctive relief based on allegedly unlawful past conduct). In *Summit*, the Eleventh Circuit confirmed that the availability of the *Ex parte Young* doctrine "turns, in the first place, on whether the plaintiff seeks retrospective or prospective relief." *Id.* But the test does not end there. In addition to being limited to prospective

relief, the Eleventh Circuit explained, "the *Ex parte Young* doctrine *applies only to ongoing and continuous violations* of federal law. In other words, a plaintiff may not use the doctrine to adjudicate the legality of past conduct." *Id.* (emphasis added); *see also Nicholl*, 769 F. App'x at 815-16 (holding *Ex parte Young* inapplicable where the complaint "challenged only past conduct"). *Nicholl* is particularly relevant, as it explicitly held the *Ex parte Young* doctrine inapplicable to a claim for injunctive relief directing the defendant to take steps to correct the continuing effects of an alleged past violation of federal law. *See* 769 F. App'x at 815 (noting that the plaintiff sought declaratory and injunctive relief). This binding authority directly refutes the Plaintiffs' argument that the *Ex parte Young* doctrine's requirement of an "ongoing violations of federal law" can be brushed aside so long as the plaintiff seeks prospective, non-monetary relief.

Presumably recognizing that their first argument misses the mark, the Plaintiffs also attempt to conjure alleged ongoing violations of federal law by the Tribal Officials. These efforts are as misguided and unavailing as their attempt to redefine the *Ex parte Young* doctrine. *See* Dec. 202 at 24-26.

With respect to the Indian Reorganization Act (IRA) claim set forth in Count I of the SAC, which seeks an order requiring the Secretary of the Interior (the Secretary) to revoke the Wetumpka property's trust status, the Plaintiffs allege that the Tribal Officials are engaged in an ongoing violation of law by allowing gaming on the property. As the Tribal Defendants have explained, the gaming activity on the Wetumpka property does not violate federal law. *See* Doc. 202 at 24-25. The Plaintiffs contend that this is irrelevant because they allege that gaming on the Wetumpka property violates *state* law. Doc. 212 at 30-31. But the Eleventh Circuit has recognized, in the very context of a suit against PBCI officials alleging that gaming on the Wetumpka property and other Indian trust lands within Alabama violated state law, that *Ex parte Young* is inapplicable to alleged

violations of state law on Indian lands. *See Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015). As the Wetumpka property is indisputably Indian land held in trust by the United States for the benefit of PBCI, *see* SAC ¶ 73 & Doc. 203-2, a claim that gaming on that property violates state law cannot support application of *Ex parte Young*. *See PCI Gaming*, 801 F.3d at 1293 ("Because the lands at issue are properly considered 'Indian lands,' the Individual Defendants are immune from Alabama's state law claim.").

Like the State of Alabama in *PCI Gaming*, the Plaintiffs want this Court to assume their success on the merits of their IRA claim and apply that holding retroactively for purposes of addressing the threshold, jurisdictional question of the Tribal Officials' sovereign immunity. That is not how it works. If the Plaintiffs were to succeed in their decades-late effort to have the Wetumpka property removed from trust and the Tribal Officials subsequently conducted gaming there in violation of some state law, then at that point, and only at that point, the Plaintiffs might be able to bring an *Ex parte Young*-style claim against the Tribal Officials based on an ongoing violation of state law, assuming they had standing to enforce state gaming laws. But presently, there is no ongoing violation of law to support applying *Ex parte Young* to the Plaintiff's IRA claim (or any other claim). *See PCI Gaming*, 801 F.3d at 1292-93.

There is yet another glaring problem with the Plaintiffs' assertion that gaming activity on the Wetumpka property brings their IRA claim within *Ex parte Young*—namely, that an injunction of gaming activity is not the relief the Plaintiffs seek through that claim. Instead, they seek "an order in the nature of mandamus requiring that Secretary Bernhardt take the Hickory Ground Site out of trust." SAC at 76, Prayer for Relief ¶ (a). This reveals that the ostensible violation of law that the Plaintiffs seek to address through their IRA claim is not ongoing gaming activity at all. It is the Secretary's decades-old decision to take the Wetumpka property into trust. Because "a

plaintiff may not use the [*Ex parte Young*] doctrine to adjudicate the legality of past conduct, *Summit*, 180 F.3d at 1337, any argument that the Plaintiffs' IRA claim falls under *Ex parte Young* fails as a matter of law. *See Nicholl*, 769 F. App'x at 815-16.

The Plaintiffs' efforts to identify ongoing violations of law on which to ground their unjust enrichment and promissory estoppel claims (Counts II-III and V-VI) against the Tribal Officials suffer an identical flaw. Rather than alleging ongoing violations of federal (or even state) law, they allege continuing effects of concluded past conduct. For both their unjust enrichment and promissory estoppel claims, the ostensibly unlawful act that the Plaintiffs identify is the Tribal Officials' violation of an alleged promise to permanently preserve the Wetumpka property. While the Tribal Defendants dispute the existence and enforceability of any such promise, any ostensible breaking of it occurred long ago. *See, e.g.*, Doc. 200-2 at 21-23 (alleging violations of the alleged permanent preservation promise prior to October 2002). Even the archaeological excavations and construction activities that followed the alleged breaking of the putative preservation commitment have long since concluded. *See* Doc. 202 at 25 (citing relevant paragraphs of the SAC). The Plaintiffs complain of lingering effects of the Tribal Officials' allegedly unlawful actions—that PBCI now operates a profitable hotel and casino on the property in question and has not reinterred excavated cultural items in their original location, causing the Plaintiffs ongoing offense—but those lingering effects not themselves an ongoing violation of federal law. As the Eleventh Circuit explained in *Nicholl*, where it held that the ongoing effect of an alleged past violation of law "does not transform a one-time past event into a continuing violation," *Ex parte Young* simply does not apply in such circumstances. *Nicholl*, 769 F. App'x at 816; *see also Fuller*, 594 F. App'x at 940 (finding *Ex parte Young* inapplicable when "[t]he gravamen of [the plaintiffs'] complaint is that they were tricked long ago"); *Kansas v. Nat'l Indian Gaming Comm'n*, 151 F. Supp. 3d 1199,

1225 (D. Kan. 2015) (declining to apply *Ex parte Young* to tribal officials in the context of an equitable estoppel claim alleging that an Indian tribe had acquired land under false pretenses, reasoning that the "alleged misrepresentation happened in the past").

The Plaintiffs' claims under NAGPRA (Count VII), ARPA (Count IX), and the NHPA (Count X) all share this fatal flaw of attempting to transform lingering effects of an alleged past violation of law into an ongoing violation of law. *See* Doc. 202 at 25-26. The Plaintiffs' argument in response—that the continued displacement and, in some instances, storage of archaeological resources does constitute an ongoing violation of federal law—is unavailing. *See* Doc. 212, 33-35. The laws on which the Plaintiffs rely do not bar the displacement or storage of archaeological resources. For the most part, they impose consultation and permitting requirements *in advance* of certain federal undertakings or archaeological excavations. The Tribal Officials' alleged violations of those requirements are past acts outside the scope of *Ex parte Young*, and the lingering effects of those alleged violations do not constitute ongoing violations of law.

Because they fail to identify actionable, ongoing violations of federal law in connection with Counts I-III, V-VI, and IX-X of the SAC as well as most aspects of Count VII, *see* Doc. 202 at 25 n.8, the Plaintiffs' efforts to circumvent the Tribal Officials' sovereign immunity by invoking the *Ex parte Young* doctrine fails as to each of those Counts.[7] Those claims should be dismissed with prejudice for lack of subject matter jurisdiction.

2.    *PBCI's special sovereignty interests bar application of Ex parte Young.*

The Plaintiffs' reliance on the *Ex parte Young* doctrine is also misplaced because settled precedent bars that doctrine's application in cases, such as this one, that implicate special

---

[7] For Count VIII, the Plaintiffs allege no violation of law by the Tribal Defendants at all. They merely contend that NAGPRA and ARPA may violate the First Amendment and other statutes intended to protect the free exercise of religion if this Court interprets them in certain ways. *See* SAC at 59-61.

sovereignty interests. The Plaintiffs' effort to revoke the Wetumpka property's trust status and usurp PBCI's control of the property brings this case squarely in line with *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997), the key Supreme Court case establishing the special sovereignty interests exception to the *Young* doctrine. *See* Doc. 202 at 26-28.

In response, the Plaintiffs argue that (1) *Coeur d'Alene* is no longer good law in light of *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), and (2) even if *Coeur d'Alene* remains good law, it is strictly limited to the specific facts before the Supreme Court, which the Plaintiffs claim are distinguishable. *See* Doc. 212 at 36. Neither argument has merit.

The argument that the Supreme Court abrogated *Coeur d'Alene* in 2002 is easily dismissed. In 2011, nine years after the *Verizon* decision, the Eleventh Circuit stated that "[t]he *Young* doctrine does not apply where the relief requested 'implicates special sovereignty interests,'" then devoted several paragraphs of analysis to *Coeur d'Alene*'s applicability to a claim involving an Indian tribe's possessory right to a piece of property for the remainder of a lease term. *See Hollywood Mobile Estates, Ltd. v. Cypress*, 415 F. App'x 207, 208, 210-11 (11th Cir. 2011) (quoting *Coeur d'Alene*, 521 U.S. at 281)). While the *Hollywood Mobile* panel ultimately ruled that *Coeur d'Alene* was inapplicable to the facts before it, it would not have identified the special sovereignty interests exception and engaged in a detailed analysis of its applicability if the exception no longer existed. Other courts to acknowledge the special sovereignty exception to *Ex parte Young* post-*Verizon* include the U.S. Supreme Court and this Court. *See, e.g.*, *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 257-58 (2011); *id.* at 268-70 (Roberts, C.J., dissenting); *Burrell v. Teacher's Ret. Sys. of Ala.*, 2009 WL 113692, at *3 (M.D. Ala. Jan. 16, 2009) (noting claims implicating "special sovereignty interests" as an exception to the *Ex parte Young* doctrine's

applicability). Repeated acknowledgement of the special sovereignty interests exception in this and higher federal courts is irreconcilable with the Plaintiffs' assertion of abrogation.

As to the Plaintiffs' second argument, it is true that lower courts have been reluctant to significantly expand *Couer d'Alene*'s special interests exception. It is also irrelevant, because, as the Tribal Defendants show in their principal brief, the relief that the Plaintiffs seek in this case—including, but not limited to revocation of the Wetumpka property's trust status and the imposition of a constructive trust granting the Plaintiffs effective control over the property in perpetuity—is every bit as intrusive on PBCI's sovereignty as the land status question in *Coeur d'Alene*.[8] *See* Doc. 202 at 26-28. The Plaintiffs argue otherwise, claiming that the facts in this case are more analogous to those in *Hollywood Mobile* than *Coeur d'Alene*. This assertion is specious.

*Hollywood Mobile* involved a dispossessed lessee's suit to recover possession of land that it had leased from the Seminole Tribe. As the Eleventh Circuit noted in rejecting application of the special sovereignty interests exclusion, "the requested injunction would merely affect the tribe's possessory rights to the property for the remainder of the lease term. It would not remove the land from the tribe's jurisdiction or permanently deprive the tribe of its property interests" like the relief sought in *Coeur d'Alene*. *Hollywood Mobile*, 415 F. App'x at 211. The Plaintiffs' requested relief here is plainly more akin to that requested in *Coeur d'Alene* than *Hollywood Mobile*. This is not a dispute over a temporary possessory interest such as a leasehold. The

---

[8] A small number of the many, many substantial effects of revoking the trust status of the Wetumpka property and the concomitant termination of PBCI's jurisdiction over the property are discussed below, as the federal preservation statutes at issue in this case apply differently and grant tribes different privileges depending on whether particular lands are Indian lands under a tribe's jurisdiction. *See* Parts V-VII, *infra*; *see also* Brief of Amicus Curiae Muscogee (Creek) Nation at 1, *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) (No. 18-9526) (noting, correctly, as part of MCN's statement of interest in a case addressing the status of its reservation lands, that the question affected MCN's "core sovereign interests").

Plaintiffs seek an order revoking the trust status of the Wetumpka property—an order that would end the land's reservation status and "remove the land from the tribe's jurisdiction." *Id.* In addition, they seek the imposition of a constructive trust giving them control over the Wetumpka property. Such an order would "permanently deprive [PBCI] of its property interests," *id.*, as would the Plaintiffs' requests for (1) mandatory injunctive relief requiring the Tribal Defendants to dismantle extensive improvements on the property and restore it to its pre-excavation status and (2) a prohibitory injunction forbidding PBCI from ever developing its property.

The Plaintiffs do not, as they claim, merely "seek injunctive relief to bring Tribal Defendants into compliance with federal law." Doc. 212 at 40. They seek injunctive relief to strip PBCI of jurisdiction and control over its lands and to transfer that control to themselves as a punishment for alleged past wrongs. The SAC and the relief that it requests represent an all-out assault on PBCI's core sovereign interests, and the law is clear that such assaults cannot be launched through *Ex parte Young*. The Plaintiffs' claims against the Tribal Officials are barred by tribal sovereign immunity and should be dismissed for lack of subject matter jurisdiction.

## II.   The Plaintiffs' Indian Reorganization Act claim should be dismissed.

In Count I of the SAC, the Plaintiffs assert that the Secretary lacked the authority under the Indian Reorganization Act (IRA) to take the Wetumpka property into trust for PBCI in 1984 and seek an order requiring the Secretary to rescind that decision. *See generally* Doc. 190 at 45-46, 76 ¶ (a). The Plaintiffs lack standing to assert this claim, and it is hopelessly barred by the six-year statute of limitations applicable to APA claims in any event.[9] *See* Doc. 202 at 28-37; Doc. 200 at 18-25.

---

[9] The Plaintiffs open their response with several pages devoted to arguing the putative merits of their IRA claim. *See* Doc. 210 at 21-25. While vehemently disputed, those arguments are irrelevant to the Tribal and Federal Defendants' jurisdictional arguments and do not require a response here.

A.   <u>The Plaintiffs lack standing to bring their IRA claim.</u>

The Court lacks subject matter jurisdiction over the Plaintiffs' IRA claim due to their lack of standing. *See* Doc. 202 at 29-33; Doc. 200 at 22-25. The Plaintiffs have failed to meet their burden of demonstrating both that their alleged injury is fairly traceable to the Secretary's 1984 land entrustment decision and that their alleged injury will be redressed by a favorable decision on their IRA claim.[10] *See* Doc. 202 at 29-33; Doc. 200 at 22-25.

In response, the Plaintiffs claim that their alleged injuries are traceable to the 1984 land entrustment decision because without that decision, the Secretary "would not and could not" have issued ARPA permits allowing excavation, so the excavation would not have occurred and the Tribe's hotel and gaming facility ostensibly would not have been built. Doc. 210 at 30. And they claim that a favorable ruling on their IRA claim will redress their injuries because it will "unwind the illegal excavation and construction." *Id.* at 31. The Plaintiffs are wrong on both counts.

1.   *The Plaintiffs have not established traceability.*

As to traceability, the Secretary indeed would not have issued ARPA permits if he had not taken the Wetumpka property into trust for PBCI, as ARPA does not apply to land owned in fee by tribes. *See* 16 U.S.C. §§ 470aa - 470bb. But rather than establishing traceability, this undermines the Plaintiffs' argument. Had the Secretary not taken the Wetumpka property into trust, PBCI would have retained ownership of the property in fee and been free to conduct excavations or otherwise develop the property as it saw fit, with no regard for ARPA (or other statutes on which the Plaintiffs attempt to ground their claims). That the Secretary's decision to take the land into

_____

[10] For purposes of this motion, the Tribal Defendants do not dispute that the Plaintiffs have alleged injury for Article III standing purposes.

trust enabled him to issue ARPA permits is thus wholly irrelevant to the Plaintiffs' standing to bring an IRA claim.

The Plaintiffs' argument that the entrustment decision facilitated PBCI's construction of a gaming facility, which they contend could not have happened absent entrustment, fares no better. As noted in PBCI's principal brief, the Plaintiffs do not complain that they are injured specifically as a result of PBCI's operation of a casino at the Wetumpka site. They contend that they are injured by excavation and construction activity that would have accompanied any development of the property. *See* Doc. 202 at 30-31. Because the land could have been developed without being placed in trust and any development would have caused the same injury to the Plaintiffs as development for a gaming facility, their injuries are not traceable to the Secretary's decision.[11]

The fact that the Plaintiffs would suffer the same injury from any development of the Wetumpka property distinguishes the cases that they cite. In *Patchak*, for example, the neighboring landowner plaintiffs' injury arose from the fact that 3.1 million people would visit the planned casino annually, causing myriad ill effects that would not have resulted from a less traffic-intensive development. *See Patchak v. Salazar*, 632 F.3d 702, 703-04 (D.C. Cir. 2011), *aff'd sub nom Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012); *see also Upstate Citizens for Equal., Inc. v. United States*, 841 F.3d 556, 565-66 (2d Cir. 2016) (finding traceability where the Secretary's entrustment decision made gaming permissible, the case turned on the lawfulness of gaming at the site, and the plaintiffs "alleged that the casino's operations cause them injury-in-fact"); *TOMAC v. Norton*, 193 F. Supp. 2d 182, 188 (D.D.C. 2002) (finding

---

[11] Any insinuation that the land would not have been developed for any purpose other than gaming is rebutted by the Plaintiffs' own exhibit indicating that the land was slated for non-gaming commercial development as far back as 1980, before PBCI acquired it in fee. *See* Doc. 190-1 at 4-5; *see also* Doc. 202 at 15 n.4.

that an anti-casino group's alleged injury "from a 24-hour-a-day casino attracting 4.5 million customers per year" was traceable to a land entrustment decision); *Citizens against Casino Gambling in Erie Cnty. v. Hogan*, 2008 WL 2746566, at *19 (W.D.N.Y. July 8, 2008) (finding traceability based on "Plaintiffs allegations of injury *from a gaming facility*" (emphasis added)). In *Geyser*, an unpublished district court opinion from California, the court found traceability where the entrustment decision was linked to specific property use plans that the plaintiffs argued would increase traffic, alter the character of the area, and were inconsistent with a pre-existing community development plan. *Geyser v. United States*, 2018 WL 6990808, at *4 (C.D. Cal. Aug. 30, 2018). The court summarily stated that the plaintiffs demonstrated redressability because the Secretary's decision "anticipate[d] specific development that will in fact cause them harm." *Id.* at *7. Even assuming this were sufficient to establish traceability, no such immediate link between the Secretary's decision and the specific development of the property exists here. And in *Stand Up for California!*, the court found that the tribal plaintiff's alleged injury was traceable to the Secretary's entrustment decision because it was based on the fact that operating a casino on the property—as opposed to some other type of development—would have a "devastating economic impact" on a plaintiff's competing casino 30 miles away. *Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 55, 56 n.7 (D.D.C. 2013) (declining to address the standing of other plaintiffs).

Perhaps if the Plaintiffs' alleged injuries—like those of the plaintiffs in the cases they cite—were the result of a specific type of development at Wetumpka that hinged upon the Secretary's approval, they might have a traceability argument. As it stands, they do not.

　　　　　　2.　　*The Plaintiffs have not established redressability.*

The Plaintiffs' redressability argument fails on the same grounds as their traceability argument. If the Court revoked the 1984 entrustment decision, PBCI would own the Wetumpka property in fee and could develop it free of federal oversight or the strictures of the various federal

statutes on which the Plaintiffs ground many of their claims. *See* Doc. 202 at 31-33; Doc. 200 at 24-25. Such an order would not redress the Plaintiffs' claim that they were harmed by excavation and development of the property.

In response, the Plaintiffs rely on the same cases discussed above, arguing that the tribal defendants in those cases, like PBCI, would still have owned the land in fee and been free to develop it absent the respective entrustment decisions, yet the courts in those cases found redressability. Doc. 210 at 34. But again, the alleged injuries in those cases arose out of the *specific type* of development at issue that was made possible only by virtue of the land's trust status. Here, the Plaintiffs' alleged injury is not tied to the type of development that took place, and thus does not hinge on the entrustment decision. Moreover, the developments at issue in the cases cited by the Plaintiffs had not yet occurred and presumably would be prevented by revocation of the entrustment decisions. Here, excavation and construction activity had been ongoing for many years before the Plaintiffs filed suit, and revoking the property's trust status—the only relief sought in the IRA claim—will not undo the excavation and construction. That the Plaintiffs seek relief that allegedly might "unwind" the excavation and construction activity, to the extent that is possible, in connection with other claims is irrelevant, because "standing is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citations omitted). Because the relief that the Plaintiffs seek in the IRA claim will not redress their alleged injury, they lack standing to bring that claim, and it should be dismissed with prejudice under Rule 12(b)(1).

B.    The Plaintiffs' IRA claim is time barred.

Even if the Plaintiffs had standing to assert their IRA claim, it would still subject to dismissal on the grounds that it is hopelessly time barred. The Plaintiffs contend that their untimely

challenge to a decades-old agency decision is permissible because it falls within an exception allowing a party to challenge an allegedly *ultra vires* agency action within six years of the agency's first application to the specific challenger. Doc. 210 at 25-26 (asserting that the IRA claim is timely because "Plaintiffs are challenging Interior's action as *ultra vires*, and because Interior did not apply its decision to Plaintiffs until within six years of this lawsuit). They are incorrect.

The "as-applied" exception on which the Plaintiffs rely allows a party to challenge an agency rule or regulation of continuing application more than six years after its promulgation if (1) the agency has taken a final action applying the rule or regulation to the challenger for the first time within the limitations period, (2) the challenger could not have brought a timely challenge to the rule, and (3) the challenger alleges that the rule or regulation was outside the agency's statutory authority. *See, e.g.*, *PCI Gaming*, 801 F.3d at 1292; *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 n.6 (9th Cir. 2015) (en banc). The Plaintiffs assert that the Secretary's 1984 land entrustment decision was an *ultra vires* act that the Secretary applied to them within six years of the December 2012 filing of the initial complaint by (1) granting ARPA permits approving excavations of the Wetumpka property without notifying the Plaintiffs and (2) denying a 2008 NAGPRA claim filed by Plaintiff Thompson. Doc. 210 at 26-28. And while they tacitly acknowledge that the ARPA permits in question were granted more than six years prior to the filing of this lawsuit, they contend that this is immaterial because the APA's limitations period supposedly was equitably tolled until the Plaintiffs obtained copies of the ARPA permits in question. *Id.* at 27.

The Plaintiffs' arguments are unavailing. First, they do not allege *ultra vires* agency action. They merely assert that the Secretary made an error of fact or law in his exercise of validly

delegated authority. Second, they misconstrue the scope and extent of the "as-applied" exception to the APA's statute of limitations, which does not apply in this instance for several reasons.

1.    *The Secretary's 1984 decision was not ultra vires.*

The Plaintiffs' *ultra vires* argument stumbles out of the gate because they do not actually allege that the Secretary's 1984 decision was *ultra vires*. To be sure, the Plaintiffs argue at length that the Secretary made errant factual findings when taking the Wetumpka property into trust.[12] *See* Doc. 210 at 21-25. Specifically, they contend that the Secretary erred in concluding that PBCI was under federal jurisdiction in 1934, as required for the Secretary to exercise his entrustment authority. *Id*. But they do *not* allege that the Secretary lacks the delegated authority to take land into trust on behalf of tribes that were under federal jurisdiction in 1934; they simply assert that he made an erroneous determination as to whether PBCI is such a tribe.

"Official action is not ultra vires or invalid 'if based on an incorrect decision as to law or fact, if the officer making the decision was empowered to do so.'" *Wyoming v. United States*, 279 F.3d 1214, 1229-30 (10th Cir. 2002) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 695 (1949)); *see also Am. Clinical Labs. Ass'n v. Azar*, 931 F.3d 1195, 1208-09 (D.C. Cir. 2019); *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 962-63 (8th Cir. 2014); *United States v. Yakima Tribal Court*, 806 F.2d 853, 859-60 (9th Cir. 1986). Here, it is undisputed that Congress has delegated to the Secretary the authority to take land into trust for Indians and Indian tribes. *See* 25 U.S.C. § 5108 ("The Secretary is authorized, in his discretion, to acquire … any interest in lands … for the purpose of providing land for Indians. … Title to any lands or rights acquired pursuant to this Act … shall be taken in the name of the United States in trust for the Indian tribe."). Because the Plaintiffs simply assert that the Secretary made an errant factual

---

[12] PBCI strongly disputes this assertion, but the correctness of the Secretary's 1984 factual findings is not before the Court and is beyond the scope of this brief.

determination in the exercise of this discretionary authority, they have not alleged an *ultra vires* action, and the as-applied exception allowing otherwise untimely APA challenges to *ultra vires* agency actions is inapplicable.

>    2.    *The Plaintiffs knew the true state of affairs and did not act.*

Even if the Secretary's entrustment decision were *ultra vires*, the Plaintiffs still could not proceed under the narrow as-applied exception to the APA's six-year limitations period because they failed to take timely action. The rationale for allowing as-applied challenges is that "'the government should not be permitted to avoid all challenges to its actions, even if *ultra vires*, simply because the agency took the action long before anyone discovered the true state of affairs.'" *Big Lagoon*, 789 F.3d at 954 n.6 (quoting *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991); *see also Poarch Band of Creek Indians v. Moore*, 2016 WL 4778788, at *5 (S.D. Ala. Aug. 10, 201) (rejecting an effort to mount an as-applied APA challenge when the challenger had been "undoubtedly aware of the 'true state of affairs'" for more than six years prior to filing suit), *report and recommendation adopted in relevant part by* 2016 WL 4745185 (S.D. Ala. Sept. 12, 2016). The exception is not intended to benefit dilatory parties or allow challengers to sit on their rights when they could have acted.

It is clear from numerous allegations in the SAC that the Plaintiffs were contemporaneously aware of the Secretary's 1984 decision and understood its legal significance. *See, e.g.*, SAC ¶¶ 205-06, 216. The Eleventh Circuit has twice held that parties with contemporaneous awareness of secretarial decisions to take land into trust for PBCI cannot decades later avail themselves of the as-applied exception to bring an otherwise untimely APA challenge. *Poarch Band of Creek Indians v. Hildreth*, 656 F. App'x 934, 943-44 (11th Cir, 2016); *PCI Gaming*, 801 F.3d at 1292.

The Plaintiffs attempt to distinguish *PCI Gaming* and *Hildreth* by claiming that the parties seeking to challenge the Secretary's decisions in those cases were immediately aggrieved by

having lands removed from their respective jurisdictions, whereas the Plaintiffs allegedly were not aggrieved by the Secretary's decision until years later. Doc. 210 at 29-30. Assuming, *arguendo*, that the Plaintiffs were not immediately aggrieved by the Secretary's 1984 decision, it is clear that they were aware of it and unhappy with its consequences well more than six years prior to filing this suit on December 12, 2012. For example, Plaintiff MCN formally suspended its government to government relationship with PBCI and censured the Bureau of Indian Affairs (BIA) in 1992 based on, *inter alia*, PBCI's plans to build an Indian lands gaming facility on the Wetumpka property and BIA's alleged failure to consult with MCN and noncompliance with the NHPA, NAGPRA, and ARPA. Doc. 200-2 at 15 §§ 101, 301-03; *id.* at 17 § 402(B). In 2002, Plaintiff Thompson wrote to PBCI and BIA asserting a NAGPRA claim for all human remains and cultural objects excavated from the Wetumpka property, complaining of a lack of consultation in connection with the construction of PBCI's gaming facility on the property, objecting to the excavation of burial sites on the property, and alleging violations of ARPA, NAGPRA, and the NHPA. *Id.* at 20-25. In many ways, Plaintiff Thompson's 2002 letter reads like a prototype of the complaint that the Plaintiffs would file more than a decade later. The Plaintiffs certainly knew the true state of affairs and could have proceeded with the threatened litigation at the time of Plaintiff Thompson's letter, yet they chose not to do so.

Less than a week after Plaintiff Thompson's 2002 letter to PBCI and BIA, the Speaker of the MCN Council wrote to NPS requesting information about PBCI's assumption of SHPO duties for the Wetumpka property—which could not have happened if the land were not in trust for PBCI—alleging statutory violations based on a failure to consult with MCN. *Id.* at 27. And in 2008, Plaintiff Thompson filed a NAGRPA claim noting, *inter alia*, that the Plaintiffs visited Alabama on May 9, 2006, to meet with PBCI officials and Auburn University archaeologists "to

discuss reinterment of 57 or more sets of human remains." *Id.* at 43. The record indisputably establishes that the Plaintiffs knew, well more than six years before filing this lawsuit, that (1) the Secretary had taken the Wetumpka property into trust, (2) PBCI was planning to develop or actually developing the property, (3) archaeological excavations, including of human remains, were occurring on the property, (4) the federal government had allowed PBCI to assume SHPO responsibilities at the Wetumpka property, (5) PBCI was not performing the SHPO responsibilities to Plaintiffs' satisfaction, and (6) the Tribal Defendants and Federal Defendants were not consulting with the Plaintiffs in connection with preservation and management of the Wetumpka property as the Plaintiffs believed the law required. These facts were more than sufficient to put the Plaintiffs on notice that they were aggrieved by the Secretary's 1984 decision. *See, e.g.*, *Big Lagoon*, 789 F.3d at 954 n.6 (holding the as-applied exception inapplicable to the State of California's effort to challenge land entrustment decision in litigation filed in 2009 because "California understood the 'true state of affairs' concerning the BIA's decision" by 1997); *id.* at 951.

Acknowledging none of these facts, the Plaintiffs argue that they were not aggrieved by the Secretary's 1984 decision—*i.e.*, that they did not know the true state of affairs—until the Department of the Interior (Interior) issued ARPA permits for excavations on Indian lands at the Wetumpka site without notifying them. They then argue that they were aggrieved again—and that another APA claim accrued—when the Secretary denied a NAGPRA claim submitted in 2008, allegedly based on the fact that the Wetumpka property was held in trust for PBCI. *See* Doc. 210 at 26-28.

The Plaintiffs cite no support for their position that a cause of action under the as-applied exception to the APA's six-year statute of limitations can accrue repeatedly, well after the specific

29

challengers have notice of the true state of affairs and the grounds for their challenge. That notion runs contrary to the rationale underlying the exception, which does not support allowing serial challenges or recognizing serial claim accrual dates for a party who has long been aware of its potential claim. *See Big Lagoon*, 789 F.3d at 954 n.6; *Fla. Keys Citizens Coal. Inc. v. West*, 996 F. Supp. 1254, 1256 (S.D. Fla. 1998) (holding that the statute of limitations for an as-applied APA challenge "would not begin to run … when the Corps *last* applied the regulation, but instead when the Corps *first* applied the regulation to Plaintiffs"); *see also Moore*, 2016 WL 4778788, at *5 (explaining that subsequent accrual of alleged new grounds to challenge a decades old land entrustment decision could not support new as-applied APA claims when the challenger already knew the true state of affairs). Accordingly, the Court should reject the Plaintiffs' multiple accruals theory and focus on the initial accrual of their as-applied APA claim. Because they knew the true state of affairs more than a decade before filing suit, the Plaintiffs cannot avail themselves of the as-applied exception to the APA limitations period.

3.   *The Secretary's 1984 decision does not apply to the Plaintiffs at all, and certainly has not been applied by any final agency action within six years of the complaint.*

Finally, the Plaintiffs have not shown that the Secretary's 1984 decision has been "applied" to them at all, and certainly not that it has been applied through final agency action within six years of the complaint. A decision to take land into trust is not a rule or regulation of continuing application; it fixes a property right and is in the nature of a one-time adjudicatory decision to which the as-applied exception is inapplicable. *See Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958). Were this not the case, secretarial land entrustment decisions and the significant rights and expectations that flow from them could never be settled. Because a one-time adjudicatory or quasi-adjudicatory decision such as a land entrustment is not subsequently "applied" to third parties, it cannot support an "as-applied" APA challenge.

Even if the Secretary's entrustment decision could be applied to the Plaintiffs, they do not identify any final agency action applying it during the six years prior to the December 12, 2012, filing of the complaint. The two ostensible actions that they contend support their as-applied challenge—the issuance of ARPA permits to conduct excavations on the Wetumpka property and the denial of a 2008 NAGPRA claim filed by Plaintiff Thompson—are insufficient.

a.       ARPA permits do not support the Plaintiffs' IRA claim.

No ARPA permits can support the Plaintiffs' IRA claim for at least two reasons. First, the issuance of ARPA permits does not "apply" the 1984 entrustment decision to the Plaintiffs. Second, there is no allegation that any ARPA permits were issued within six years of the complaint, and at least one was issued nearly a decade earlier.

Interior's issuance of an ARPA permit does not constitute an "application" of the 1984 entrustment decision to the Plaintiffs. In their response, the Plaintiffs contend that the permits support their as-applied APA challenge because Interior (1) "illegally granted permits to Auburn University to excavate on 'Indian lands'" and (2) issued ARPA permits "without notifying or consulting with the Muscogee (Creek) Nation, who clearly attached religious and cultural importance to these 'Indian lands.'" Doc. 210 at 26-27. They do not explain any connection between these two allegations or identify how either applies the 1984 entrustment decision to these specific challengers.

The allegation that Interior "illegally granted permits ... to excavate on Indian lands" plainly does not identify any application of the entrustment decision to the Plaintiffs. If Interior was correct that the lands covered by the permits were PBCI's Indian lands—which it was—then MCN did not need to consent to the permits and there is no basis for calling them illegal. If Interior had determined, as the Plaintiffs contend it should have, that the Wetumpka property was not held in trust for PBCI, then the property would have been held by PBCI in fee and no permit would

have been necessary. Neither scenario would involve the Plaintiffs in any way, and thus would not apply the Secretary's entrustment decision to them.

Nor does Interior's alleged failure to consult with the Plaintiffs pursuant to 16 U.S.C. § 470cc(c) constitute an application of the 1984 entrustment decision to the Plaintiffs. That statute directs the relevant federal land manager "notify *any* Indian tribe which may consider the site as having religious or cultural importance." *Id.* (emphasis added). Interior's apparent determination that MCN was not such a tribe does not hinge on the property's trust status, and the statute would not apply at all if the land were not held in trust. In either case, Interior's decision not to notify the Plaintiffs in no way applies the 1984 entrustment decision to them.

Assuming, *arguendo*, that Interior's issuance of ARPA permits somehow "applied" the 1984 decision to the Plaintiffs, the fact remains that they have not alleged that any ARPA permits were issued during the six years preceding the filing of the complaint. Indeed, the Plaintiffs fail to allege dates of issuance for any ARPA permits, and the only such permit in the record issued on April 15, 2003, more than nine years before the Plaintiffs filed this suit. Doc. 200-2 at 33.

Recognizing this problem, the Plaintiffs dubiously claim that PBCI first notified them of excavations at the Wetumpka property at some unspecified time in 2006, that they only learned of the "illegally issued" ARPA permits at some unspecified later date, and that the limitations period for the as-applied APA claim was equitably tolled until that unspecified date because the Tribal and Federal Defendants unlawfully failed to notify them of the excavation. Doc. 210 at 27. This argument fails on multiple levels.

First, there is no such thing as equitable tolling of the statute of limitations for bringing an APA claim. While most statutes of limitations can be equitably tolled, those that are jurisdictional in nature cannot. *See Spears v. Warden*, 605 F. App'x 900, 903 n.2 (11th Cir. 2015) ("[T]here is a

general presumption that *non-jurisdictional* federal statutes of limitations are subject to equitable tolling."); *see also F.E.B. Corp. v. United States*, 818 F.3d 681, 685 (11th Cir. 2016) (affirming that where a "statute of limitations circumscribes the scope of [a] waiver of sovereign immunity, compliance with the limitations period is jurisdictional"). The APA's statute of limitations, 28 U.S.C. § 2401(a), is jurisdictional, and thus cannot be equitably tolled. *Rease v. Harvey*, 238 F. App'x 492, 496 (11th Cir. 2007) ("We do not have jurisdiction over suits brought against the United States that are barred by section 2401(a)."); *see also* Doc. 200 at 20.

Second, the Plaintiffs have not met their burden of showing that they would be entitled to equitable tolling in any event. *See Villareal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) ("The party seeking equitable tolling has the burden of proof."). "Equitable tolling is a remedy that must be used sparingly … that is, in extreme cases where failure to invoke the principles of equity would lead to unacceptably unjust outcomes." *Downs v. McNeil*, 520 F.3d 1311, 1318 (11th Cir. 2008). To merit equitable tolling, a plaintiff must demonstrate its own diligence and the presence of extraordinary circumstances that prevented timely action. *See id.; Jackson v. Astrue*, 506 F.3d 1349, 1355 (11th Cir. 2007). The Plaintiffs have shown neither. While their carefully worded statement that *PBCI* did not notify them of excavations as the Wetumpka property until 2006 may be true, as the current record does not clearly establish that PBCI itself provided earlier notice, the record is replete with evidence showing that the Plaintiffs knew that excavations were taking place at Wetumpka well before 2006. *See supra*. They knew in 2002 that excavations had taken place with federal knowledge and that excavated remains had been "sent to universities for 'scientific analysis.'" Doc. 200-2 at 23. Diligence would have required them to investigate whether those excavations were conducted pursuant to ARPA permits and why they were not consulted. And according to the 2008 NAGPRA claim letter referenced in the SAC and

in the Plaintiffs' brief, the Plaintiffs visited Alabama on May 9, 2006—more than six and a half years before filing this suit—to meet with PBCI officials and Auburn University archaeologists "to discuss reinterment of 57 or more sets of human remains." Doc. 200-2 at 43. Their knowledge of excavations at the property by a major research university provided a further basis for inquiry notice of possible ARPA permits, inquiry the Plaintiffs could have made by simply asking at the May 2006 meeting. The Plaintiffs' alleged failure to learn of the permit(s) issued years earlier was a simple lack of diligence, and certainly not indicative of extraordinary circumstances.

Third and finally, it is not even clear from the SAC or the Plaintiffs' response that they lacked actual notice of the ARPA permits prior to December 13, 2006. They claim that their as-applied APA claim "accrued when Plaintiffs obtained records of the permits," but do not say when that happened. Doc. 210 at 27. This, in and of itself, means that they have failed to meet their burden of establishing diligence and extraordinary circumstances. *See Fla. Keys Citizens*, 996 F. Supp. at 1256-57 (dismissing putative as-applied APA challenge because the plaintiffs did "not inform the Court when these allegedly unlawful applications of the regulation occurred").

Because the issuance of ARPA permits did not apply the Secretary's 1984 decision to the Plaintiffs and there is no indication that any such permits issued during the six-year period preceding the filing of the complaint in any event, the Plaintiffs' attempt to base an as-applied APA challenge to the Secretary's decision on those permits fails as a matter of law.

b.    The 2008 NAGPRA claim does not support the IRA claim.

In addition to relying on the ARPA permits, the Plaintiffs argue that an additional as-applied APA claim accrued in 2009, when Interior denied a NAGPRA claim that Plaintiff Thompson filed against Auburn University. *See* Doc. 210 at 28; Doc. 200-2 at 42-45. This argument also fails. Contrary to the Plaintiffs' assertion, the denial of Plaintiff Thompson's 2008 NAGPRA claim was not based on the trust status of the Wetumpka property, but on the fact that

Auburn University did not transfer, possess, or control any cultural items subject to NAGPRA. *See* Doc. 200-2 at 48. Interior's denial of the claim thus did not apply the 1984 entrustment decision at all, much less to the Plaintiffs. Additionally, to the extent that the denial of a NAGPRA claim is the injury allegedly supporting the Plaintiffs' IRA claim, that injury is not redressable because success on the IRA claim would render NAGPRA inapplicable. *See infra*; Doc. 202 at 31-32.

For all of the foregoing reasons, as well as those previously set forth in the Tribal and Federal Defendants' principal briefs, the Plaintiffs' challenge to the Secretary's 1984 entrustment decision is manifestly untimely and should be dismissed for lack of subject matter jurisdiction.

## III.  The Plaintiffs' promissory estoppel claim fails as a matter of law.

The Plaintiffs' promissory estoppel claim fails as a matter of law both because it is barred by the applicable statute of limitations and because the Plaintiffs have failed to allege facts establishing the necessary elements. *See* Doc. 202 at 37-49. The Plaintiffs' response fails to refute these arguments.

### A.  The promissory estoppel claim is time barred.

Under Alabama law, "promissory estoppel … claims are subject to a two-year statute of limitations." *Ala. Space Sci. Exhibit Comm'n v. Odysseia Co., Inc.*, 2016 WL 9781806, at *11 (N.D. Ala. Sept. 30, 2016) (citing Ala. Code § 6-2-38(l)). The Plaintiffs make no effort to argue that they brought their promissory estoppel claim within two years of its accrual, nor could they. Instead, they argue that (1) § 6-2-38(l) does not apply—despite case law to the contrary—because that section is limited to claims "in the nature of damages for personal injury," and (2) their promissory estoppel claim is subject to the ten-year limitations period found in Ala. Code § 6-2-33 because they seek a constructive trust as their remedy. Doc. 212 at 41. Neither argument has

merit. And even if either did, the promissory estoppel claim would still be time-barred because the Plaintiffs were on notice of the basis for their claim more than ten years before bringing it.

1.    *Promissory estoppel claims have a two-year limitations period.*

The Plaintiffs' assertion that the two-year limitations period in § 6-2-38(l) is limited to personal injury claims is plainly belied by both the text of the statute and case law applying it. The text of the statute establishes a two-year limitations period for "[a]ll actions for any injury to the person *or rights of another* not arising from contract and not specifically enumerated in this section …." Ala. Code § 6-2-38(*l*) (emphasis added). This is a catchall provision that applies to a variety of non-contract claims that do not fall within any other enumerated limitations period. *See Breland v. City of Fairhope*, 229 So. 3d 1078, 1084-85, 1089 (Ala. 2016) (affirming that trial court's determination that claim for negligence relating to plaintiff's right to fill wetland on his property was subject to "two (2) year catch all Statute of Limitations period" of § 6-2-38(l)). Indeed, numerous Alabama state and federal courts have applied § 6-2-38(l) to promissory estoppel and other, similar claims in a variety of situations not involving personal injury. *See, e.g.*, *Ala. Space*, 2016 WL 9781806, at *11 (applying § 6-2-38(l)'s two-year limitations period to a promissory estoppel claim); *Glovis Ala., LLC v. Richway Transp. Servs., Inc.*, 2020 WL 3630739, at *16 (S.D. Ala. July 3, 2020) (applying § 6-2-38(l)'s two-year limitations period to fraud-based claims arising out of ownership of leased tractor trailers); *Selma Hous. Dev't Corp. v. Selma Hous. Auth.*, 2005 WL 1981290, at *19-20 (S.D. Ala. Aug. 16, 2005) (applying § 6-2-38(l) to a fraud claim arising out of defendants' alleged promise to provide funding for low-income housing units); *Rumford v. Valley Pest Control, Inc.*, 629 So. 2d 623 (Ala. 1993) (applying § 6-2-38(l) to fraud and negligence claims relating to non-disclosed presence of termites). This Court should as well.

The Plaintiffs try to cast doubt on § 6-2-38(l)'s applicability by citing case law holding that a claim for unjust enrichment can fall under different statutes of limitation depending upon the

nature of the claim and implying that the same is true of promissory estoppel claims. *See* Doc. 212 at 42-44 (citing *Auburn Univ. v. IBM Corp.*, 716 F. Supp. 2d 1114 (M.D. Ala. 2010)). This argument is unavailing. *Auburn University* held that claims for unjust enrichment can be based in either tort—and thus fall under the two-year statute of limitations found in § 6-2-38(*l*)—or in contract—and thus be subject to the six-year statute of limitation found in § 6-2-34. The Plaintiffs cite no case applying the same analysis to promissory estoppel claims, and the only decision the Tribal Defendants could locate addressing *Auburn University* in the context of a promissory estoppel claim held that claims for promissory estoppel are subject to the two-year limitations period found in §6-2-38(l) without any discussion of the underlying nature of the claim. *See Ala. Space*, 2016 WL 9781806, at *11.

Because the Plaintiffs' promissory estoppel is subject to the two-year limitations period found in § 6-2-38(l) and they did not bring suit within two years of learning of the Tribal Defendants' alleged breach of their ostensible promise, the promissory estoppel claim is time barred and should be dismissed.

## 2. *The promissory estoppel claim is not a claim for the recovery of land.*

The Plaintiffs also attempt to evade the two-year limitations period by mischaracterizing their promissory estoppel claim as one "'in the nature of' a suit for "recovery of land" and thus subject to the ten-year statute of limitations found in Alabama Code § 6-2-33. *See* Doc. 212 at 41-51. Unsurprisingly, however, the Plaintiffs do not cite a single case applying § 6-2-33(2)'s ten-year limitations period to a promissory estoppel claim. Alabama law, including the cases that the Plaintiffs cite, makes clear that § 6-2-33(2)'s reference to claims for "recovery of land" refers to a suit seeking *possession* of real property. The Plaintiffs have no claim of entitlement to, and do not

seek, possession of the Wetumpka property. Section 6-2-33(2)'s ten-year limitations period therefore does not apply, and the promissory estoppel claim should be dismissed as untimely.

The Plaintiffs rely on *Glass v. Cook*, 57 So. 2d 505 (Ala. 1952), to argue that claims "'in the nature of' a suit for recovery of land" fall within § 6-2-33 and that a "plaintiff need not literally seek recovery of land" for the ten-year limitations period to apply. *See* Doc. 212 at 47. But *Glass* does not support this assertion, as it involved an action by plaintiff landowners to recover possession of their property through cancellation of a lease that they alleged was procured by fraud. *Glass*, 257 So. 2d at 507. The Plaintiffs' reliance on *Branch Banking & Trust v. McDonald*, 2013 WL 5719084 (N.D. Ala. Oct. 18, 2013), is similarly misplaced. *McDonald* held, based on binding Alabama Supreme Court precedent, that a plaintiff bank's claim to impose an equitable mortgage was governed by a ten-year limitations period when the bank (1) alleged that the defendants had failed to make payments due on a commercial note secured by an erroneously canceled real estate mortgage and (2) sought to impose and foreclose an equitable mortgage to take possession of the collateral property. *Id.* at *1, *6. The court rejected the plaintiff bank's argument, similar to the Plaintiffs' here, that a ten-year limitations period applied to all of its claims, including those for declaratory relief and unjust enrichment, merely "because those counts are '[a]ctions for the recovery of lands.'" *Id.* at *6 (citation omitted). Instead, the court found that the bank's remaining claims "touch[ed] on contract" or arose from a negotiable instrument and thus were subject to the six-year limitations periods applicable to claims based on contract and negotiable instruments. *Id.* at *6-7. *McDonald* thus undercuts the Plaintiffs' argument that any claim remotely "in the nature of" one for recovery of land is subject to a ten-year limitations period, regardless of whether it seeks actual possession of the property in question.

38

Consistent with the approach taken by the Northern District in *McDonald*, and directly relying upon *Glass* and other cases, the Alabama Supreme Court has held that "a suit for the recovery of land is for the immediate enjoyment of its possession … ***and will not lie for any property whereon no right of entry exists***." *Williams v. Kitchens*, 74 So. 2d 457, 463 (Ala. 1954) (emphasis added). The plaintiff in *Williams* sought to have a constructive trust in real property declared based on the defendant's promise to provide the plaintiff with the remainder after defendant's life estate in the property. *Id.* at 458-60. Because the plaintiff did not seek immediate possession of the property, the Court rejected the argument that a ten-year limitations period then found in Section 20 of Title 7 of the Code of Alabama applied.[13] *Id.* at 460-63.

Here, the Plaintiffs have no claim of entitlement to possession of the Wetumpka property, nor do they seek possession through their promissory estoppel claim. They instead seek a "judgment declaring that Poarch should be held to its promises to perpetually preserve the Hickory Ground site under the common law doctrines of unjust enrichment and promissory estoppel" and a constructive trust. Doc. 190 at 76-77. As *Williams* makes clear, merely seeking imposition of a constructive trust or other equitable relief without an immediate right of possession of property does not make a claim a suit for "recovery of land" within the ambit of § 6-2-33(2). The Plaintiffs' promissory estoppel claim is subject to a two-year statute of limitations, not ten, and it is plainly time barred.

---

[13] Code 1940, Tit. 7, § 20 was the predecessor to Ala. Code § 6-2-33 and likewise stated that "'actions for the recovery of lands, tenements, or hereditaments, or the possession thereof, except as herein otherwise provided,' must be commenced within ten years." *Belcher v. Birmingham Tr. Nat'l Bank*, 348 F. Supp. 61, 82 (N.D. Ala. 1968); *see also FSRJ Props., LLC v. Walker*, 195 So. 3d 970, 976 (Ala. Civ. App. 2015) ("We find [*Kitchens*] instructive, although it was decided before the effective date of the Alabama Rules of Civil Procedure, which merged legal and equitable actions into one 'civil action.'"). The *Glass* case cited by the Plaintiffs also relied on Code 1940, Tit. 7, § 20.

3.   *The facts do not support imposition of a constructive trust.*

While ultimately not integral to the applicable limitations period, the Plaintiffs' responsive arguments depend heavily on their demand for a constructive trust and an argument that the Tribe "dedicated" the Wetumpka property to the public.[14] The Plaintiffs, however, have not alleged facts supporting the imposition of a constructive trust. And despite spending several pages discussing the notion and implications of public dedication, the Plaintiffs fail to allege any facts to support a claim that PBCI dedicated the Wetumpka property to the public.

a.   There is no fraud or confidential relationship.

Imposition of a constructive trust is appropriate only where property is acquired by fraud or through the abuse of a confidential relationship. *See, e.g.*, *Bebee Props., LLC v. Ard*, 241 So. 3d 719, 723 (Ala. Ct. App. 2017) (refusing to overturn trial court's dismissal of demand for constructive trust where the plaintiff "does not allege any fraud by, or any confidential relation with, [defendant]"); *Landis v. Neal*, 374 So. 2d 275, 281 (Ala. 1979) (holding that "declaration of a constructive trust is inappropriate" because defendant "did not acquire the legal title to this property by fraud, violation of confidence or of fiduciary duty"). Because the Plaintiffs allege neither that PBCI acquired the property by fraud, nor the existence of fiduciary relationship between PBCI and the Plaintiffs, they are not entitled to imposition of a constructive trust.

The Plaintiffs do not allege that PBCI acquired title to the Hickory Ground Site by fraud, but rather that the PBCI "promise[d] that it would perpetually protect the Site" and thereafter failed to do so. Doc. 212 at 52. Those allegations, even taken as true, cannot support a finding of fraud, as there is no allegation that the Tribal Defendants intended to breach any ostensible preservation

---

[14] As discussed in the Tribal Defendants' opening brief, the Plaintiffs only request a constructive trust in the event the Court rules in their favor on their claim that Interior lacked authority to take the Wetumpka property into trust for PBCI. Doc. 202 at 41.

promise at the time it was made. *See, e.g.*, *Martin v. Am. Med. Int'l, Inc.*, 516 So. 2d 640, 642 (Ala. 1987) (holding that in the context of a promise to perform or refrain from performing in the future, there is no fraud absent proof of an intent to deceive at the time the promise was made); *Carroll v. LJC Def. Contracting, Inc.*, 24 So. 3d 448, 458 (Ala. Civ. App. 2009) ("Where the misrepresentation relates to some future event, it must be shown that the person making the representation intended not to do the act promised at the time the misrepresentation was made.").

Nor do the Plaintiffs allege any facts that could support an argument that PBCI acquired title to the Hickory Ground Site by abuse of a fiduciary relationship. They selectively quote case law describing when a fiduciary relationship may arise, but do not point to a single allegation in the SAC that could support the existence of such a relationship here. *See* Doc. 212 at 45 & n.7. No such allegations exist.

The Plaintiffs' incomplete quotation of *Line v. Ventura*, 38 So. 3d 1, 12-13 (Ala. 2009), is a prime example of their efforts to modify a standard that they cannot meet. *See* Doc. 212 at 45 n.7. The relevant portion of the *Line* opinion states, in full, that a plaintiff seeking to establish a fiduciary relationship must show that:

> one person occupies toward another such a position *of adviser or counselor* as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence *are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible*.

*Line*, 38 So. 3d 1, 12-13 (Ala. 2009) (emphasis added). Plaintiff MCN is a sophisticated tribal nation with tens of thousands of citizens. SAC ¶ 11. There is not a single allegation in the SAC to

support an inference that MCN so trusted PBCI that PBCI "gain[ed] an influence or superiority" or an "overmastering influence" over MCN or that MCN or any other plaintiff was "weak" or "dependent" upon PBCI. The Plaintiffs simply have not alleged a fiduciary relationship with PBCI that could provide a basis for imposing a constructive trust. *See Cass v. Fuller*, 2016 WL 8078145, at *4-5 (N.D. Ala. Nov. 9, 2016) (dismissing breach of fiduciary duty claim where "no rational basis exists to suggest defendant ... possessed an 'overmastering influence' over the plaintiff" nor does plaintiff allege "he relied on [defendant] ... for ... investment decisions, or any other recognized basis for a fiduciary relationship to arise"); *Fed. Nat'l Mortg. Ass'n v. GNM II, LLC*, 2014 WL 1572584, at *4 (M.D. Ala. Apr. 17, 2014) (dismissing breach of fiduciary duty claim where a defendant "pleads no set of facts to show special circumstances or a confidential relationship such that could give rise to a fiduciary duty").

> b.     There is no public dedication of the Wetumpka property.

Finally, despite making no such claim in the SAC, the Plaintiffs argue that a constructive trust is justified based on PBCI's ostensible public "dedication" of the Wetumpka property under Alabama common law. Doc. 212 at 47-49. A dedication of land under Alabama common law requires "[1] acts which evidence an unequivocal *intent* by the owner to dedicate the property to a public use *and* [2] an *acceptance* by the members of the public of the property for that public use." *Ritchey v. Dalgo*, 514 So. 2d 808, 810 (Ala. 1987) (emphasis in original). The dedication must be made to the public, "there being no such thing as a dedication to an individual" or to "a limited group of persons." *Clarke v. Tannin, Inc.*, 301 F. Supp. 3d 1150, 1158 (S.D. Ala. 2018). To show acceptance by the public, a plaintiff must show "long public use" or "corporate or other public officers adopting the property for the public's use." *Ritchey*, 514 So. 2d at 811 ("It is a settled rule

that a dedication has not been made until there has been an *acceptance* of the 'offer' to dedicate.");
*see also Clarke*, 30 F. Supp. 3d at 1158. None of these requirements are satisfied here.[15]

The Plaintiffs do not allege that PBCI actually dedicated the Wetumpka property to the public for public use. At most, they allege that PBCI recognized the property's importance to the Plaintiffs and expressed possible future plans to use it for education. Doc. 212 at 49-50. This cannot possibly establish an unequivocal intent to dedicate the property for public use, and certainly not public use as a burial ground, as the Plaintiffs allege. The Plaintiffs thus have failed to satisfy the first element of a dedication claim. *See Clarke*, 301 F. Supp. 3d at 1159 (dismissing dedication claim dedication where "plaintiffs have no evidence that the defendants intended to open the Parcel to use by the public at large"); *Garland v. Clark*, 88 So. 2d 367 (Ala. 1956) (finding no dedication of parking area adjoining cemetery when only those owning cemetery lots used the parking area).

The Plaintiffs also do not allege public acceptance of any putative dedication. They allege no use of the Hickory Ground Site by the public, let alone "long public use" or any adoption of the site by a "corporate or other public officer[]" for the public's use. *Ritchey*, 514 So. 2d at 811.

Building off of the fabricated public dedication of the Wetumpka property as a burial ground, the Plaintiffs argue, citing *Beatty v. Kurtz*, 27 U.S. 566 (1829), that "the equitable remedy of a constructive trust has special application in the context of burial grounds." Doc. 212 at 48-49. *Beatty* makes no such holding. In *Beatty*, the defendant declared a portion of his property to be specifically for the German Lutheran church, which then built a church on the property, used the property as a burial ground, and paid all taxes on the property for the next 50 years. *Beatty*, 27 U.S. at 567. At no point during this time did defendant claim any right to possess or use the

---

[15] The Plaintiffs include the dedication argument in the statute of limitations section of their brief, but it is wholly irrelevant to that argument. Dedication of land is a separate claim under Alabama law, not a defense to or grounds for tolling of a statute of limitations.

property. *Id.* at 571. The Court held that the defendant had dedicated the property to the public for its use as a church and burial ground. *Id.* at 582-84. The facts of *Beatty* are easily and obviously distinguishable from the case at bar, and it offers no help to the Plaintiffs' argument. Having failed to meet either prong of the public dedication test, the Plaintiffs cannot legitimately argue that PBCI dedicated the Wetumpka property to the public.

### 4.   *The promissory estoppel claim is untimely regardless.*

While Alabama law clearly imposes a two-year limitations period on the Plaintiffs' promissory estoppel claim, the record shows that the claim is untimely even under the Plaintiffs' preferred ten-year period.

A claim for promissory estoppel accrues for limitations purposes when the plaintiff knows or has reason to know of the defendant's breach of the alleged promise. *See* Doc. 202 at 38. The Plaintiffs first asserted their promissory estoppel claim when they moved for leave to file the SAC on June 5, 2019. *See* Doc. 159. The SAC acknowledges that the Plaintiffs knew of the facts giving rise to the promissory estoppel claim well before 2009. *See, e.g.*, SAC ¶ 137. The claim therefore is unquestionably untimely if it does not relate back to the original complaint, which the Plaintiffs have not alleged. *See Hope for Fams. & Cmty. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1174-76 & n.105 (M.D. Ala. 2010) (holding that the plaintiff bears the "burden with respect to the relation back doctrine" and finding that claims did not relate back). And even assuming, *arguendo*, that the promissory estoppel claim does relate back, the record demonstrates that the Plaintiffs knew of facts ostensibly giving rise to the claim at least as early as October 2002, more than 10 years before filing their original complaint. *See* Doc. 200-2 at 22 (referring to "the facts displayed in the written record that not less than three (3) sets of human remains have been excavated and removed from the property").

The Plaintiffs argue that the Court must take the allegations of the SAC as true and that those allegations establish a dispute of fact about the Plaintiffs' knowledge when compared with the Plaintiffs' own 2002 letter setting out many of the same grievances underlying this litigation. *See* Doc. 212 at 46. Not so. The SAC does not deny that the Plaintiffs had notice of the basis for their promissory estoppel claim in October 2002;[16] it is simply and conspicuously silent on the issue. The Plaintiffs do not challenge the authenticity or veracity of the 2002 letter, and its contents are not inconsistent with any allegations in the SAC. The Plaintiffs knew of the grounds for their promissory estoppel claim more than ten years before they filed suit, so the claim is time barred regardless of which limitations period applies.

B.    The Plaintiffs have not alleged facts establishing a promissory estoppel claim.

Even if such a claim were timely, the Plaintiffs have not allege the elements of promissory estoppel. *See* Doc. 202 at 44-49. Promissory estoppel requires: (1) the existence of a specific, enforceable promise; (2) that the defendant reasonably should have expected to induce definite and substantial reliance or forbearance by the plaintiff; (3) that did induce such reliance or forbearance; and (4) that injustice can be avoided only be enforcing the promise. *See id.* at 44-45. The Plaintiffs allege that PBCI made such a promise in a preservation grant application (the Grant Application, Doc. 190-1 at 3-7) that it submitted to the Alabama Historical Commission in February of 1980. *See* Doc. 212 at 52-56. But the statements made in the Grant Application—which contemplated a joint venture between MCN and PBCI that never came to fruition—cannot possibly support promissory estoppel.

---

[16] Any such denial would be patently false and easily disproven by the 2002 letter.

1.     *PCBI did not specifically promise to preserve the Wetumpka property "in perpetuity."*

Throughout this case, the Plaintiffs have selectively mined quotes from the Grant Application to argue the Tribe promised to "preserve the Hickory Ground Site in perpetuity."[17] *See* Doc. 212 at 52-54. In reality, the Grant Application described PBCI's intent to halt *currently planned* commercial development on the property and to use "proper archaeological methods" to study the "archaeological resources," which the Grant Application refers to as the below-surface remains:

> Acquisition of the property is principally a protection measure. Acquisition will prevent development on the property. All historic structures on the site have been destroyed. What is left consists of below surface remains. ***Through proper archaeological methods and techniques these below surface features*** can reveal a tremendous amount of information about the Creek way of life in the late 1700's and early 1800's. Upon gaining fee-simple title to the land as called for in this proposal plans will be developed to minimize continued destruction of the archaeological resources.

Doc. 190-1 at 4 (emphasis added). In fact, the Grant Application explicitly contemplated future development on the Site, with PBCI committing to conduct "a scientifically sound archaeological program … to mitigate or minimize effects upon the historic resources" "[p]rior to any type of development." *Id.* Even assuming that PBCI's application for funding for an abandoned joint venture with MCN could serve as the basis for binding commitments supporting promissory estoppel, this express contemplation of archaeological study and future development is fundamentally at odds with the Plaintiffs' assertion of a clear and specific promise of perpetual preservation.

---

[17] To be clear, the word "perpetuity" is not used in the Grant Application. Nor are any analogous terms such as "forever" or "always."

In response, the Plaintiffs argue that the Grant Application's express reference to possible future development on the Site is negated by the next paragraph, including by the use of the words "without excavation." Doc. 212 at 55-56. But the next paragraph describes only *potential* possibilities for future uses of the Site, not enforceable promises, and certainly not concrete, perpetual commitments:

> There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved. The site *may serve* as an open air classroom where Creek youth can learn of their heritage. Interpretive programs *can be developed* around the vast array of history connected with Hickory Ground. The [Tribe] has already conducted CETA sponsored training in archaeological methods for Creek youth. The Hickory Ground site will continue to enhance their understanding of their history, without excavation.

Doc. 190-1 at 4 (emphases added); *see Davidson v. Maraj*, 609 F. App'x 994, 1001 (11th Cir. 2015) (applying Georgia law to hold that "[p]romissory estoppel does not apply to a promise that is vague, indefinite, or of uncertain duration," and that defendant's alleged promises to enter into joint venture with plaintiff were not "sufficiently definite to support an action for promissory estoppel"). Because the Plaintiffs identify no clear and definite promise to perpetually preserve the property, their promissory estoppel claim fails as a matter of law.

### 2. *An express, written preservation agreement superseded any ostensible perpetual preservation promise.*

The Plaintiffs offer no response to PBCI's argument that a promissory estoppel claim cannot survive where the alleged promise was superseded by the terms of an express contract. *See generally* Doc. 212 at 40-63; Doc. 202 at 44. It is well-settled under Alabama law that "where an express contract on the same subject matter exists and has not been breached, promissory estoppel cannot function to create liability." *Cook v. United Health Care*, 2010 WL 3629766, at *6 (M.D. Ala. Sept. 10, 2010); *see also Walk, Inc. v. Zimmer, Inc.*, 2014 WL 2465311, at *9 (N.D. Ala. May

30, 2014). In such cases, the express contract controls "as long as the contract purports to address the broadly disputed issues," even if it is silent about the particular details at issue. *White Holding Co., LLC v. Martin Marietta Materials, Inc.*, 423 F. App'x 943, 947–48 (11th Cir. 2011) (citation omitted) (applying Florida law).

In *Walk*, the plaintiffs entered into an agreement with defendant HMI for the sale of medical practice management technology. 2014 WL 2465311, at *1. Plaintiff Bramlett alleged that HMI's parent company (the Zimmer defendants) promised to use Bramlett's consulting services and to pay Bramlett for those services, which induced plaintiffs "to enter into the Agreement to their detriment." *Id.* at *1, 8, 10. The executed agreement between the plaintiffs and HMI, however, stated only that Bramlett would "provide assistance reasonably requested by HMI." *Id.* at *6 (emphasis & citation omitted). The court held that, "the Zimmer defendants may be subject to promissory estoppel claims for promises they may have made concerning the Agreement to induce Plaintiff to action *only if there is a determination that the Agreement is unenforceable.*" *Id.* at *10 (emphasis added). The court also held that the alleged promises were not sufficiently definite to enforce where Plaintiffs "[did] not specif[y] what terms the Zimmer defendants agreed [to], including for Bramlett's services." *Id.* The court thus granted the Zimmer defendants' motion to dismiss the promissory estoppel claim. *Id.*; *see also Whatley v. Ohio Nat'l Life Ins. Co.*, 2019 WL 6173500, at *9 (M.D. Ala. Nov. 19, 2019) (granting motion to dismiss promissory estoppel claim under Ohio law where plaintiffs alleged defendants promised to pay commissions payments to broker-dealers that would be passed on to plaintiffs, where defendants complied with the terms of their express contracts with the broker-dealers).

Here, the Plaintiffs allege that PBCI promised to preserve the Wetumpka property forever. Doc. 190 ¶¶ 64, 66-68; Doc. 190-1 at 3-7. PBCI then acquired the property using federal

preservation grant funds, and, "pursuant to standard terms of federal preservation grant awards, a protective covenant was placed on the property for 20 years." Doc. 190 ¶¶ 61-62; *see also* Doc. 203-1 at 2 ("This covenant shall be for a period of 20 years commencing July 3, 1980 and ending July 3, 2000.").[18] In other words, shortly after PBCI allegedly promised to "preserve" the Hickory Ground Site "in perpetuity," it entered into a written agreement expressly committing to preserve the Site for 20 years. This express written protective covenant superseded any other ostensible preservation commitments such that the latter cannot support a promissory estoppel claim. *See Walk*, 2014 WL 2465311, at *9; *see also Davis v. Univ. of Montevallo*, 638 So. 2d 754, 758 (Ala. 1994) ("Courts have been reluctant to permit the enforcement, by the application of the doctrine of promissory estoppel, of promises made contemporaneously with a completed contract …."); *Crompton v. Tuskegee Univ.*, 2016 WL 9735710, at *15 (M.D. Ala. July 8, 2016) (dismissing promissory estoppel claim based on alleged promise to make plaintiff a tenured employee where plaintiff entered into a written employment contract after the alleged promise because "the Court must not use promissory estoppel to add or modify" the terms of the contract). This provides a separate and independent basis to dismiss the Plaintiffs' promissory estoppel claim.

3.   *Any promise to preserve the property "in perpetuity" is unenforceable.*

Even if PBCI's statements in the Grant Application or elsewhere could be construed as a promise to preserve the Wetumpka property forever *and* that promise was not superseded by an

---

[18] This document can be considered by the court without converting this to a motion for summary judgment because the covenant is specifically referenced in the Complaint. *Horsely v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

express contract, any such promise could not be enforced by this Court both because it would violate the statute of frauds and because it is not sufficiently definite to allow judicial enforcement.

First, the Plaintiffs' efforts to avoid application of the statute of frauds are unavailing. Their promissory estoppel claim is not in "the nature of recovery of land," as discussed in Part III.A.2, *supra*. And, as discussed in Part III.A.3.a, *supra*, the Plaintiffs are not entitled to a constructive trust because they do not allege any facts to show that PBCI acquired the property by fraud or breach of a fiduciary relationship. Lastly, PBCI did not partially perform pursuant to the alleged promises in the Grant Application or elsewhere. Instead, PBCI performed pursuant to the express, written preservation agreement that accompanied its purchase of the property. *See* SAC ¶¶ 62, 100 (alleging that "[a]fter the 20-year covenant expired in July 2000," PBCI 'caused a significant portion of the Hickory Ground Site to be destroyed to make way for its second casino resort'"); Doc. 203-1 at 1-2; *see Casey v. Travelers Ins. Co.*, 585 So. 2d 1361, 1364 (Ala. 1991) (holding that defendant's partial releases did not constitute "partial performance" of alleged oral promise to release mortgage because the partial releases "were within the terms of the [written] loan agreements between the parties").

Second, the promise that the Plaintiffs allege is not specific enough for this Court to enforce. *See Walk*, 2014 WL 2465311, at *9 ("[I]n order for a promise to create an estoppel, the promise must be sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." (citation omitted)). The Plaintiffs describe the promise as one to "preserve the Hickory Ground site in perpetuity," but do not address how the Court would enforce such a promise. Doc. 212 at 53 (quoting Doc. 190 at ¶ 202); *see Selma Hous.*, 2005 WL 1981290, at *9 n.22 (holding that alleged "vague, indeterminate promise that Section 8 assistance 'would be available,' without more, is not sufficiently specific to warrant judicial

50

imposition of a perpetual obligation on [defendant]…."); *Pritchett v. Turner*, 437 So. 2d 104, 110 (Ala. 1983) (finding that covenant purporting to divest children of ownership of property if they allowed their mother "the right of possession or use or benefit" of the land "too vague to be enforced"). Would studying "below surface remains" using "proper archaeological methods and techniques" as proposed in the Grant Application violate the ostensible promise? *See* Doc. 190-1 at 4. Would cooperating with a state research university "on an archaeological excavation to test an area of burial remains" do so? *Id*. at 7. Would, as the Plaintiffs certainly seem to contend, any work to "develop" the property? *Id*. at 4. Would the ostensible promise be violated by the simple act of "holding classes on Creek culture" on the property? *Id*.; *see* SAC ¶ 327 (alleging that the Tribal Defendants are violating the law by allowing people to enter parts of the property "without prior authorization and cleansing rituals"). These few, non-exhaustive examples highlight the lack of specificity that prevents this Court from enforcing the Tribal Defendants' ostensible promise to "preserve" the property "in perpetuity."

4.    *PBCI could not have reasonably expected the Plaintiffs to rely on an abandoned joint venture proposal, and the Plaintiffs could not reasonably have done so.*

The Tribal Defendants have identified why they could not have reasonably foreseen that the Plaintiffs would rely on ostensible promises set forth in the Grant Application and why the Plaintiffs could not reasonably have done so. *See* Doc. 202 at 47-49. Those reasons include the fact that the proposal embodied in the application never came to be. *Id*. at 48. The Plaintiffs acknowledge, as they must, that the Grant Application contemplated PBCI and MCN's joint acquisition and ownership of the Wetumpka property. *See* Doc. 212 at 57 ("[T]he acquisition was intended to be a joint project."); Doc. 190-1 at 5 ("Under this plan the property will be jointly owned by both groups …."). The Grant Application is also clear that the future plans and alleged

51

promises in that document are based upon the assumption that MCN would participate in the "protection and care of the site." Doc. 190-1 at 5. That did not occur, as the Plaintiffs chose not to join in the project, leaving PBCI to acquire the property on its own. *See* Doc. 212 at 58.

While MCN was certainly within its rights to abandon the proposed joint venture, it cannot do so and then claim that it reasonably relied on plans set forth in the joint venture proposal or that PBCI should have reasonably expected it to do so. MCN's decision not to bring the proposal to fruition obviated any right to rely on it or reap its benefits. The Plaintiffs' promissory estoppel claim should be dismissed for this reason, as well as all of the others set forth above and in the Tribal Defendants' principal brief.

## IV.    The Plaintiffs' unjust enrichment claims fails as a matter of law.

The Plaintiffs' unjust enrichment claim fails both because the Tribal Defendants are not holding any benefit conferred by and rightfully belonging to the Plaintiffs and because the claim is barred by the statute of limitations and the statute of frauds. *See* Doc. 202 at 50-54. The Plaintiffs' response fails to substantively rebut these arguments. Instead, the Plaintiffs discuss non-issues and cite inapplicable case law.

The Plaintiffs open their argument by attacking a straw man, claiming that the Tribal Defendants "insist" that an unjust enrichment claim can be based only on a defendant's wrongful retention of money belonging to the plaintiff, but not other property. Doc. 212 at 64. The Tribal Defendants made no such argument and do not dispute that an unjust enrichment claim can be based on a defendants' unjust retention of money or property, so long as the other elements of the claim are satisfied. The Plaintiffs' claim fails because they do not establish the necessary elements, not because the alleged unjust enrichment involves realty rather than money.

A.   The Tribal Defendants are not holding any money or property that was conferred by or that rightfully belongs to the Plaintiffs

The most glaring problem with the Plaintiffs' unjust enrichment claim is the simple fact that the Tribal Defendants are not retaining, wrongfully or otherwise, any money or property conferred by or rightfully belonging to the Plaintiffs. *See* Doc. 202 at 51-53. The "essence" of an unjust enrichment claim is an assertion that the defendant holds either money or property that "in equity and good conscience, belongs to plaintiff[s]." *Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986). To prevail on an unjust enrichment claim, "a plaintiff must show that the defendant is legally or equitably obligated to pay money to plaintiff." *Foshee v. Gen. Tel. Co. of S.E.*, 322 So. 2d 715, 717 (Ala. 1975); *see also Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, 690 F. Supp. 2d 1267, 1275 (M.D. Ala. 2010) ("[I]n other words, [plaintiff] must show that a defendant holds its money unjustly."); *White v. Microsoft Corp.*, 454 F. Supp. 2d 1118, 1132 (S.D. Ala. 2006) (citing *Foshee*). Additionally, the benefit that the defendant allegedly unjustly holds must have been conferred *by the plaintiff*. *See Portofino Seaport Vill., LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008) ("The first requirement of unjust enrichment under either Alabama law or Florida law is that one party must have conferred a benefit on another."). The SAC's allegations simply do not establish these necessary elements.

Instead of identifying money or property that they conferred on PBCI and that they contend rightfully belongs to them, the Plaintiffs rely on (1) their "lack of objection" to PBCI's acquisition of the Wetumpka property and (2) PBCI's "benefit [of] unbridled use" of the property. Neither ostensible benefit suffices to support their unjust enrichment claim.

Citing *Mazer v. Jackson Insurance Agency*, 340 So. 2d 770 (Ala. 1976), the Plaintiffs argue that their "lack of objection" to PBCI's acquisition of the Wetumpka property satisfies the direct benefit requirement of an unjust enrichment claim. Doc. 212 at 65. A lack of objection, however,

53

is not money or property, nor is it something held by PBCI that rightfully belongs to the Plaintiffs. *Mazer* does not hold otherwise, as it did not involve a claim for unjust enrichment and did not discuss whether the mere lack of objection to the acquisition of property could support such a claim. Instead, the language that the Plaintiffs cite addressed what forbearance could support a claim for promissory estoppel. Presumably, if forbearance of the nature involved in *Mazer* (and relied upon by Plaintiffs) were sufficient to support an unjust enrichment claim, that claim would have been brought in *Mazer*—or at least in some case. Yet the Plaintiffs cannot cite a single decision indicating that the benefit required to support a claim for unjust enrichment "can be an intangible benefit" in the nature of abstention from opposition to the defendant's acquisition of property from a third party. *See* Doc. 212 at 65-66. Nor do they explain how that intangible benefit could establish that the Tribal Defendants are obligated to pay a liquidated sum to the Plaintiffs. *See Foshee*, 322 So. 2d at 717; *White*, 454 F. Supp. 2d at 1132. Their "lack of objection" cannot establish an unjust enrichment.

The Plaintiffs' assertion that the Tribal Defendants wrongfully hold the "unbridled" use of the Wetumpka property "where the bridle rightfully belongs to" MCN is wholly unsupported. The Plaintiffs did not confer the right to "unbridled use" of the Wetumpka property on PBCI. PBCI did not acquire the property from the Plaintiffs, and the Plaintiffs have not alleged any basis for asserting that they provided the property or any property interest to PBCI or held an interest in the property sufficient to "bridle" its use. So, to the extent that "unbridled" use of one's own property could possibly constitute a benefit sufficient to ground an unjust enrichment claim, the simple fact of the matter is that the Plaintiffs did not provide that benefit to PBCI and identify no valid legal grounds for arguing that that benefit rightly belongs to them. *See, e.g.*, Doc. 202 at 51-53; *In re Takata Airbag Prod. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at *15-16 (S.D. Fla. May

27, 2020) (identifying Alabama as one of many states where a promissory estoppel claim requires a plaintiffs to show "that they *directly* conferred a benefit on Defendants"). They thus have failed to allege basic elements of unjust enrichment, and their claim should be dismissed.

    B.    <u>The Plaintiffs' unjust enrichment claim is untimely.</u>

    Even if the Plaintiffs had alleged the necessary elements, their unjust enrichment claim still would have to be dismissed because it is time barred. The Plaintiffs contend that their "unjust enrichment claim is a claim in the nature of recovery of real property under Alabama Code § 6-2-33(2), and is subject to a ten-year statute of limitations." Doc. 212 at 67. As with their promissory estoppel claim, however, the Plaintiffs do not cite a single case applying a ten-year limitations period to an unjust enrichment claim. And as discussed in Part III.A.2, *supra*, the Plaintiffs' claim thus does not fall within the scope of § 6-2-33 because they do not claim any right to possession of the Wetumpka property. Their unjust enrichment claims are subject to either the two- or six-year limitations periods applicable to tort or contract claims, respectively. *See Snider v. Morgan*, 113 So. 3d 643, 655 (Ala. 2012); *Auburn Univ*, 716 F. Supp. 2d at 1117-18 (holding that this Court must determine whether the unjust enrichment claim "seeks recovery for an injury that arises from contract" and is thus "subject to the six-year statute of limitation," or "arise[s] from tort injuries" and is thus "subject to the two-year statute of limitations"); *see also* Doc. 202 at 50, 53.

    The Plaintiffs state repeatedly that their unjust enrichment claim is not in the nature of a contract claim and thus is not barred by the six-year limitations period applicable to contract actions. *See, e.g.*, Doc. 212 at 68-69 ("Plaintiffs' claim for unjust enrichment does not depend on the enforcement of the terms of a contract."). Assuming, *arguendo*, that the six-year contracts limitations period is inapplicable, then their unjust enrichment claim is instead governed by the two-year catchall statute of limitations applicable to tort actions and is plainly untimely. *See*

*Auburn Univ.*, 716 F. Supp. 2d at 1118 (holding that unjust enrichment claim was barred by two-year limitations period of § 6-2-38(l)).

The Plaintiffs alternatively argue that their claim is for "continuing unjust enrichment" because PBCI's "obligation to protect the land" requires serial acts of performance, and thus the statute of limitations can never expire. Doc. 212 at 68 ("Here, Poarch is similarly unjustly enriched, because each day it owes an affirmative duty to protect Hickory Ground …."). But the continuing claim doctrine, which requires serial or repeated performance obligations, is inapplicable here, where the Tribal Defendants' alleged wrongdoing is breach of ostensible "promises that it would perpetually protect the Site." SAC ¶ 202. Such a promise could only be breached one time—when the Tribal Defendants first acted in violation of their ostensible commitment. Once that happened, the property was no longer preserved in perpetuity; the Tribal Defendants could not undertake to preserve the property in perpetuity again the next day. Any unjust enrichment claim that the Plaintiffs may have had accrued at that time, and it is now time barred. *See Am. Gen. Life & Acc. Ins. Co. v. Underwood*, 886 So. 2d 807, 813 (Ala. 2004) (explaining that an unjust enrichment claim accrues "as soon as the defendant receives money and the circumstances imply the obligation to restore it").

The *Snider* case that the Plaintiffs cite illustrates an example of the type of serial violations that can support a continuing claim for unjust enrichment, which are not present here. As the Plaintiffs note, in *Snider* "the court held that an estate was unjustly enriched each time a payment on a mortgage came due and [the] estate failed to make that payment." Doc. 212 at 68 (citing *Snider*, 113 So. 3d at 655-56). Stated otherwise, the defendant estate was required to make repeated, serial payments on the mortgage, but wrongfully failed to do so. Each such failure

constituted a separate breach of a discrete performance obligation, resulting in a new wrongful enrichment.

The Plaintiffs have identified no such serial obligations on the part of the Tribal Defendants. Instead, they allege that they continue to be harmed by PBCI's breach of its ostensible perpetual preservation promise, which occurred more than six years prior to the December, 2012, filing of this lawsuit. *See* SAC at ¶ 100 ("After the 20-year covenant expired in July 2000 … Poarch caused a significant portion of the Hickory Ground Site to be destroyed"), ¶¶ 101-104, 137-38 (prior to 2006, "archaeologists … conducted a phase III excavation of the Hickory Ground Site" at PBCI's direction), ¶¶ 117-124 (the exhumation and storage of the human remains and associated funerary objects was performed in "a manner that caused, and is continuing to cause, further damage to the items" and in a manner that "is viewed as abhorrent in the Muscogee (Creek) religion"). Such allegations do not support the application of the "serial performance" or "continuing tort" doctrines to extend the statute of limitations indefinitely. The Plaintiffs' unjust enrichment claims are time-barred.

C.   The Plaintiffs' unjust enrichment claim is barred by the statute of frauds.

The Plaintiffs' unjust enrichment claim suffers the same statute of frauds problem as their promissory estoppel claim. *See supra*, Part III.B.3; Doc. 202 at 42-44, 53-54. The Plaintiffs contend that their unjust enrichment claim is not barred by the statute of frauds because it does not seek "specific performance of a contractual term" and "does not depend on the enforcement of the terms of a contract." Doc. 212 at 68-69. But that is exactly what the unjust enrichment claim does. In their own words, the Plaintiffs' unjust enrichment claim is based upon "Plaintiffs' acquiescence in Poarch's purchase of Hickory Ground," which was allegedly "exchanged for promises that Poarch would protect the sacred site" in perpetuity. Doc. 212 at 69. Now, the Plaintiffs ask this Court to enter a judgment "declaring that Poarch should be held to its promises to perpetually

preserve Hickory Ground under the Alabama common law doctrine[] of unjust enrichment." SAC at 76, Prayer for Relief ¶ (b)(i); *see also id.* at 77, ¶(c)(i). Because a promise to perpetually preserve property is a promise that cannot be performed within one year, the statute of frauds bars its enforcement.[19] Ala. Code. § 8-9-2(1); *Branch Banking & Trust Co. v. Nichols*, 184 So. 3d 337, 346-47 (Ala. 2015) (holding that plaintiffs' unjust enrichment claim was barred by the statute of frauds because it "turn[ed] on proof of alleged representations or promises that are invalid under the Statute of Frauds"). The Plaintiffs' unjust enrichment claim should be dismissed.

## V.   The Plaintiffs have failed to state a valid NAGPRA claim or request available relief.

The Plaintiffs have not stated any valid NAGPRA claims against the Tribal Defendants, and the relief that they seek is not available as a NAGPRA remedy in any event. *See* Doc. 202 at 54-63, 84-85. To briefly summarize the issues, many of the Plaintiffs' NAGPRA claims fail because they rely on the Plaintiffs being "lineal descendants" of known individuals buried at the Wetumpka property, and the Plaintiffs have not adequately alleged lineal descent from any known individuals as required by NAGPRA regulations. *See id.* at 56-59. Others fail because the provisions on which the Plaintiffs rely are either wholly inapplicable to the Tribal Defendants and their land or are inapplicable under the facts adequately alleged in the SAC.[20] *See id.* at 55-56, 58-

---

[19] The Plaintiffs also erroneously assert that the Tribal Defendants' statute of frauds argument, which turns on the impossibility of performing a promise to perpetually preserve property within one year, is inconsistent with those defendants' argument that they lacked a serial performance obligation. *See* Doc. 212 at 68. This argument is a *non-sequitur*. The fact that a single performance cannot be completed in one year does not convert the duty to undertake that single performance into serial duties. To illustrate, if a person promises to hold his breath for two years—a promise that by its terms cannot be performed in one year—and breaks that promise after 60 seconds, he has undertaken and failed to perform a single obligation. He could not be accused of breaking his promise anew with each breath he draws for the remainder of the two years.

[20] The Tribal Defendants do not contend, as the Plaintiffs erroneously allege, *see* Doc. 212 at 71, 74, that NAGPRA is completely inapplicable to them. But many provisions of NAGPRA, including several on which the Plaintiffs base their putative claims, explicitly apply only to federal

62. Lack of standing is also a problem, as the Plaintiffs either have not alleged any injury that is fairly traceable to the alleged violations or seek relief that is unavailable under NAGPRA, giving rise to a redressability problem. *Id.* at 61-63. The arguments in the Plaintiffs' response fail to overcome any of these defects.

A.     NAGPRA provisions governing federal lands are inapplicable.

The Plaintiffs argue, based on an erroneous assertion that some of the Wetumpka property does not qualify as tribal land under NAGPRA, that NAGPRA provisions applicable only to federal land apply here. *See* Doc. 212 at 74-75; Doc. 210 at 50-53. They are incorrect. The Plaintiffs concede that all of the Wetumpka property at issue is held in trust by the United States for the benefit of PBCI. *See, e.g.*, Doc. 210 at 50; SAC ¶ 286; *see also* 203 at 1, ¶ 3; Doc. 203-2. And as explained in the Federal Defendants' principal brief, NAGPRA's definition of "tribal land" encompasses all such land. *See* Doc. 200 at 26-27. The Plaintiffs insist that portions of the Wetumpka property that they contend are held in trust by the United States for the benefit of PBCI but not formally designated as "reservation" are not tribal land because they are not "within the exterior boundaries of any Indian reservation." Doc. 210 at 50-53. Courts have rejected similar arguments seeking to narrowly construe the definition of tribal land, and this Court should as well. *See Rosales v. United States*, 2007 WL 4233060 (S.D. Cal. Nov. 28, 2007) (holding that land held in trust for a tribe by the United States was tribal land for NAGPRA purposes and citing supporting case law); Doc. 200 at 26-27 (discussing case law).

Even if the Plaintiffs were correct that portions of the Wetumpka property were not within NAGPRA's first definition of tribal land, their argument still would founder. By focusing only on the "exterior geographic boundaries" portion of NAGPRA's tribal land definition, the Plaintiffs

---

agencies, federal agency officials, and/or museums, none of which includes the Tribal Defendants. *See* Doc. 202 at 55-56, 62.

ignore the additional language encompassing "dependent Indian communities." *See* 25 U.S.C. § 3001(15)(B). A dependent Indian community includes any land that has been explicitly set aside for an Indian tribe and is superintended by the federal government. *See Alaska v. Native Vill. of Venetie Tribal Gov't.*, 522 U.S. 520, 527-31 (1998). "Off-reservation trust land is, by definition, land set aside for Indian use and subject to federal control." *Club One Casino v. Bernhardt*, 959 F.3d 1142, 1150 (9th Cir. 2020) (holding that off-reservation trust parcels constituted "dependent Indian communities"); *see also United States v. Roberts*, 185 F.3d 1125, 1132 (10th Cir. 1999) (explaining that trust land is set aside for Indians and superintended by the United States); *Narragansett Indian Tribe of R.I. v. Narragansett Elec. Co.*, 89 F.3d 908, 920 (1st Cir. 1996). This settled law flatly contradicts the Plaintiffs' erroneous assertion that off-reservation trust land is not tribal land under NAGPRA. All of the land at issue is tribal land, and sections of NAGPRA applicable only on federal land are irrelevant.

      B.    <u>The Tribal Defendants did not engage in unlawful intentional excavations.</u>

The Tribal Defendants' principal brief explains why they did not violate NAGPRA in connection with any intentional excavations at the Wetumpka property, including the fact that Indian tribes are not required to obtain permits to conduct intentional excavations on their own lands. *See* Doc. 202 at 58-59. In response, the Plaintiffs assert that NAGPRA required "anyone other than Poarch itself who engaged in intentional excavation," including archaeologists and non-tribal individuals, to obtain an ARPA permit. Doc. 212 at 75. Putting aside the merits of this assertion, it is irrelevant to the Plaintiffs' official capacity claims against the Tribal Defendants. If the Plaintiffs believe that third parties violated NAGPRA or ARPA and that they have viable claims against those parties, they are free to pursue them. The Plaintiffs cite no law, however, supporting the notion that a tribe or its officials can be held responsible for alleged third party violations of a permitting requirement from which they are expressly exempt.

In any event, the Plaintiffs are forced to admit that the NAGPRA regulations on which they rely neither apply to tribal officials nor govern intentional excavations taking place on tribal lands such as the Wetumpka property. *See* Doc. 212 at 76. While the regulations identify numerous steps that federal agency officials "must" take with respect to intentional excavations on federal lands, including extensive notice and consultation requirements that the Plaintiffs allege were violated, *see* 43 C.F.R. § 10.3(c)(1), they provide that tribal officials on tribal lands "may take" certain steps to protect excavated resources, but impose no requirements or obligations. § 10.3(c)(4). Because the NAGPRA regulations at issue impose no mandatory duties on tribal officials with respect to intentional excavations, they cannot support a NAGPRA claim against the Tribal Defendants.

Finally, the Plaintiffs baldly assert that even though the intentional excavations were on PBCI's tribal land, the Tribal Defendants were required to obtain the Plaintiffs' consent as the "'appropriate' tribe under 25 U.S.C. 3002(c)(2)." Doc. 212 at 76 (citing 25 C.F.R. §§ 262.5(d), 262.8(a)). The cited code section provides that "[t]he intentional removal from or excavation of Native American cultural items from Federal or tribal lands … is permitted only if … such items are excavated or removed after consultation with, or in the case of tribal lands, consent of the appropriate (if any) Indian tribe." § 3002(c)(2). It is clear from context that the "appropriate Indian tribe" is the tribe whose Indian lands are at issue, and the Plaintiffs cite nothing to the contrary. In fact, the ARPA regulations that do they cite confirm this common sense reading. Specifically, 25 C.F.R. § 262.5 makes it clear that it is the Indian tribe that owns or has jurisdiction over the land— PBCI in this case—that must grant permission for a permit to conduct archaeological excavations. *See id.* § 262.5(c)(i) ("For lands of Indian tribes, permission must be granted by the Tribe."); § 262.5(d) ("If the lands containing the remains or objects are tribal lands, the permittee shall first obtain the written consent of the tribe having jurisdiction over the lands."). The other regulation

that the Plaintiffs cite, § 262.8, addresses custody of remains or cultural objects after their excavation—not permission to conduct excavations in the first instance. It plainly did not require PBCI to obtain the Plaintiffs' consent prior to conducting or allowing intentional excavations at the Wetumpka property.

C.     The Plaintiffs have no viable claims based on hypothetical inadvertent discoveries.

The Plaintiffs' claims based on speculative, non-specific allegations of inadvertent discoveries of cultural items during the development of the Wetumpka property suffer multiple, fatal flaws. *See* Doc. 202 at 59-62. Even assuming that the SAC adequately alleged that the Tribal Defendants violated NAGPRA's inadvertent discovery provisions, which it does not, the Plaintiffs have not demonstrated any actionable injury because those provisions do not require notice to or consultation with the Plaintiffs (or anyone else other than potentially PBCI). *Id.* at 60-61.

In an effort to defend their inadequate allegations, the Plaintiffs cite assertions about the widespread presence of archaeological deposits at the Wetumpka property prior to the Phase III excavation performed by Auburn University archeologists. *See* Doc. 212 at 78-79. These allegations do not support an inference that NAGPRA-covered cultural items remained in the construction zone of the property after the Phase III excavation. *See* Doc. 202 at 59-60. Regardless, the mere presence of archaeological deposits does not trigger NAGPRA's inadvertent discovery requirements, which come into play only after a person "knows or has reason to know, that such person has discovered Native American cultural items" 25 U.S.C. § 3002(d)(1). "All courts to consider this issue have held an inadvertent discovery does not occur when an agency is placed on notice of likely or certain discovery, but that discovery must be 'actual.'" *Rosales*, 2007 WL 4233060, at *9 (citing cases). The otherwise unsupported "on information and belief" allegations in the SAC simply do not meet the Plaintiffs' burden of adequately pleading a § 3002(d) violation.

62

Assuming, *arguendo*, that they adequately pleaded facts supporting the existence of inadvertent discoveries, the Plaintiffs still have not stated a claim against the Tribal Defendants. They allege, *inter alia*, that NAGPRA required PBCI to "provide immediate notice of the discovery, or ensure that others provided them with immediate notice." Doc. 212 at 77. NAGPRA imposes no such requirement. It requires a "person who knows, or has reason to know, that *such person* has discovered Native American cultural items on Federal or tribal lands" to notify the appropriate federal or tribal official and take certain other steps. 25 U.S.C. § 3002(d)(1) (emphasis added). If the discovery was made on tribal lands, the person who makes it is required to notify the tribe with jurisdiction—PBCI, in this case. *See id.* Neither NAGPRA nor its regulations impose any obligation on tribal officials to "ensure others provide[] them with immediate notice," as the Plaintiffs allege. So if Defendant Martin Construction, the entity that the Plaintiffs allege performed the construction work at the Wetumpka property, *see* SAC ¶¶ 132-33, made an inadvertent discovery of cultural items, then Martin Construction, not the Tribal Defendants, had a duty to notify PBCI. And if PBCI itself made such a discovery, which is unlikely since it retained contractors to perform the construction work, then it already had notice—the Plaintiffs would be asking this Court to hold the Tribal Defendants liable for not notifying themselves of their own actions. In any case, it is clear that there was no requirement for anyone to notify the Plaintiffs, so the Plaintiffs have no standing to assert a claim for any putative violation of the notice requirements.

The Plaintiffs also assert that the Tribal Defendants failed to take steps to secure and protect inadvertently discovered cultural items pursuant to 43 C.F.R. § 10.4(e). Doc. 212 at 77. That regulation, in contrast to the one imposing mandatory duties on federal agency officials, identifies steps that "the responsible Indian tribe official <u>may</u> take. § 10.4(e)(1) (emphasis added); *Rosales*,

63

2007 WL 4233060 at *8. The Tribal Defendants' alleged noncompliance with discretionary suggestions cannot support the Plaintiffs' NAGPRA claim.

D.    The Plaintiffs are not "lineal descendants" under NAGPRA.

All of the Plaintiffs' NAGPRA claims fail to the extent that they rely upon the Plaintiffs' status as "lineal descendants" of individuals interred at the Wetumpka property. *See* Doc. 202 at 56-58. For purposes of NAGPRA, a "lineal descendant" is a defined term meaning:

> an individual who traces his or her ancestry directly and without interruption by means of the traditional kinship system of the appropriate Indian tribe … or by the common law system of descendance to a known Native American individual whose remains, funerary objects, or sacred objects are being claimed under these regulations.

43 C.F.R. § 10.2(b)(1). The regulations further provide that a determination of lineal descent requires "that the earlier person be identified as an individual whose descendants can be traced." 43 C.F.R. § 10.14(b). Because Plaintiffs MCN and Hickory Ground Tribal Town are not individuals, and because none of the Plaintiffs have identified any "known Native American individual" whose remains or objects are at issue, the Plaintiffs have not alleged facts that could support their putative status as a lineal descendant under NAGPRA.

The Plaintiffs' responses on this point are easily rejected. First, they argue that § 10.2(b)(1)'s reference to "traditional kinship systems" allows tribes to make their own determinations about who is and is not a lineal descendant. Nothing in § 10.2(b)(1) or § 10.14(b) eliminates the obligation of identifying a "known individual" from whom descent can be traced, however; they simply identify permissible ways of tracing descent from such an individual. Second, the Plaintiffs baldly assert that it "cannot be ruled out" that Plaintiffs MCN and Hickory Ground Tribal Town are individuals. They of course offer no support for the notion that the term "individual" is intended to include governments or collectives, and their half-hearted argument is

64

undercut by the regulation's definition of "person," which separately includes "an individual" and "any Indian tribe." 43 C.F.R. § 10.2(a)(5). Had "lineal descendants" been intended to include tribal entities, its definition would have used the defined term "person," which includes such entities, rather than the term "individual," which does not. Third, the Plaintiffs argue that the requirement of descent from a "known individual" does not require that the ostensible ancestor be identifiable, merely that they be "known." Ergo, they claim, because the Plaintiffs "know" that those interred at the Wetumpka property are their ancestors, they qualify as lineal descendants. This tautology eviscerates the requirement of "known Native American individual" "whose descendants can be traced," instead allowing an assertion of lineal descendant status by any individual who can trace his or her ancestry to a particular area where remains are located. The Plaintiffs simply have not alleged facts meeting NAGPRA's standard for determining lineal descent.

Finally, the Plaintiffs contend, relying on an ARPA regulation, that lineal descent is immaterial because they assert ownership of cultural items under § 3002(a)(2)(B) as the tribe with the closest cultural affiliation. *See* Doc. 212 at 80 (citing 25 C.F.R. § 262.8(a)(2)). But the relevant NAGPRA regulation governing custody of remains discovered on Indian lands, in contrast to the ARPA regulation that the Plaintiffs cite, does not provide a mechanism by which a tribe can leapfrog the Indian landowner based on a claim of cultural affiliation. *Compare* 43 C.F.R. § 10.6(a) (providing for priority "in the order listed," with tribal landowners preceding tribes claiming cultural affiliation) *with* 25 C.F.R. § 262.8(a) (adopting an "adapted" version of the NAGPRA preference ranking that allows a tribe claiming cultural affiliation to potentially assert a custody claim superior to that of the tribal landowner). The Plaintiffs' erroneous citation of an inapplicable regulation implementing another statute obviously cannot serve as the basis for a NAGPRA claim.

E.    Much of the relief that the Plaintiffs' seek is unavailable under NAGPRA.

Finally, NAGPRA simply does not authorize or contemplate much of the relief that the Plaintiffs seek. *See* Doc. 202 at 62-63. It does not, for instance, allow a tribe to forbid excavations or construction outside of its tribal land or insist that cultural items remain buried in place. At most, it provides for notice, consultation, and the ability to assert a claim for custody or repatriation of cultural items after they are excavated. Accordingly, to the extent that the Plaintiffs' requested remedy is an order directing the Tribal Defendants to "undo … the unconsented to actions and restore the Site to its prior condition," SAC ¶ 261(a), or similar relief, any such claim is not redressable through NAGPRA.

The Plaintiffs disagree, arguing that courts have broad equitable authority to enforce NAGPRA. Assuming, *arguendo*, that this is correct, the Court cannot "enforce" NAGPRA by ordering the Tribal Defendants to take action that NAGPRA does not require. The cases that the Plaintiffs cite, which involve questions of mootness and the hypothetical extent of courts' jurisdiction to enjoin NEPA violations in APA actions against federal officials, do not establish otherwise. *See* Doc. 212 at 81-82. They certainly do not establish that a NAGPRA plaintiff can obtain relief that goes beyond the enforcement of obligations imposed by that act.

In sum, the Plaintiffs have failed to state any valid NAGPRA claim against the Tribal Defendants. The excavation and construction activities underlying the SAC all took place on Indian land held in trust for PBCI by the United States, and the Tribal Defendants did not violate any of the limited obligations that NAGPRA imposes on Indian tribes in connection with activities on their own lands. And because the land in question is PBCI's Indian land and the Plaintiffs have not identified any known individuals from whom they can trace lineal descent, the Plaintiffs' claims of priority of preference to control the disposition of excavated items also fail. The Court should dismiss all NAGPRA claims against the Tribal Defendants.

**VI.    The Plaintiffs have failed to state a claim under ARPA.**

The ARPA claims against the Tribal Defendants should be dismissed because, *inter alia*: (1) ARPA does not authorize private civil actions; (2) Indian tribes are exempt from ARPA's permitting requirements with respect to excavations on their own tribal lands; (3) most of ARPA's obligations apply only to federal agencies, not to the Tribal Defendants, and were not made applicable to the Tribal Defendants by the NPS Agreement; and (4) the Plaintiffs are not "lineal descendants" of known individuals whose remains were excavated. *See* Doc. 202 at 64-67. The Plaintiffs' response fails to rebut any of these arguments.

Regarding ARPA's lack of a private right of action, the Plaintiffs claim that "NAGPRA provides the cause of action" for their ARPA claims. Doc. 212 at 86. To the extent that NAGPRA expressly incorporates provisions of ARPA, the Plaintiffs have already asserted putative violations of those provisions as NAGPRA claims, and those claims fail for reasons previously discussed. *See supra*, Part V. To the extent that any of the allegedly violated provisions of ARPA are not incorporated into NAGPRA, the latter statute cannot provide a private right of action to enforce the former. In any case, the Plaintiffs effectively concede that ARPA provides no right of action.

The Plaintiffs also concede that ARPA does not require PBCI to obtain a permit to conduct archaeological excavations on its own Indian land and that the Wetumpka property meets ARPA's definition of Indian land. But they assert that that exemption does not extend to third parties and that the Tribal Defendants were required to ensure that third parties obtained permits. *See* Doc. 212 at 83-84. Once again, the Plaintiffs cite no authority for their imputed liability theory. ARPA provides that a person seeking to conduct an archaeological excavation on public or Indian lands must apply for a permit and that any permit issued will identify the individual responsible for ensuring compliance. *See* 16 U.S.C § 470cc(a), (e); 43 C.F.R. § 7.5(a). It says nothing about an Indian tribe being responsible for ensuring a third party's compliance. Excavations at the

67

Wetumpka property were carried out by reputable archaeologists from Auburn University, *see* SAC ¶ 108, who sought and obtained from Interior at least one ARPA permit designating those archaeologists as being "in direct charge" of the excavation.[21] *See* Doc. 200-2 at 33. Such permits imposed obligations on the permittees, not the Tribal Defendants, and the Plaintiffs cite no authority for holding the Tribal Defendants responsible for any alleged noncompliance.

The Plaintiffs erroneously allege that they have stated a viable ARPA claim against the Tribal Defendants based on a presumptive violation of 25 C.F.R. § 262.5(c)(1), which provides that a tribe's written consent to excavation on its lands "should" state that no religious or cultural site will be harmed or identify terms and conditions to mitigate such harm. *Id.* Because they are unaware of any such mitigation terms, the Plaintiffs "presume[e]" that the Tribal Defendants "falsely represented that no harm would occur." Doc. 212 at 84. This presumption is baseless. The regulation in question did not "require[]" the Tribal Defendants to do anything, as the Plaintiffs falsely state. Doc. 212 at 84; *see e.g.*, *Legel v. IRS Dep't of Prof'l Responsibility*, 2011 WL 5914236, at *6-7 (S.D. Fla. Nov. 28, 2011) (holding that a regulation saying what a party "should" do does not impose a mandatory obligation). The Tribal Defendants' "presume[ed]" noncompliance with an optional regulatory suggestion does not give rise to a claim.

Next, the Plaintiffs argue that the ARPA permits in question were improperly issued without their consent. Doc. 212 at 84. ARPA's regulations provide that a permit to conduct excavations on Indian lands requires "the consent of the appropriate tribal authority or individual Indian landowner." 43 U.S.C. § 7.35. As with the NAGPRA regulations discussed above, it is clear from context that the regulation is referring to the tribal landowner, and the Plaintiffs cite no

---

[21] The fact that Auburn sought and obtained the permit from Interior, as opposed to PBCI, undercuts any assertion that the Tribal Defendants assumed federal ARPA responsibilities.

authority for the proposition that any Indian tribe, regardless of claimed cultural affiliation, is required or even authorized to consent to archaeological excavations on another tribe's trust land. Instead, they again cite one regulation addressing the preference ranking for tribes asserting custody over archaeological resources *after* their excavation—25 C.F.R. § 262.8(a)—and another that explicitly states that where the lands in question are tribal lands, the permittee most "obtain the written consent of the tribe having jurisdiction of the lands." 25 C.F.R. § 265.5(d). Neither regulation supports the Plaintiffs' assertion that ARPA required permittees to consult with them before conducting excavations on PBCI's tribal land.

The Plaintiffs' final argument is not entirely clear. To the extent that they claim to have stated a viable ARPA claim under 16 U.S.C. § 470ee(a), a provision prohibiting excavation, removal, alteration or defacement of archaeological resources without a permit, *see* Doc. 212 at 85, that argument fails both because § 470ee explicitly incorporates by reference the permitting exception for tribal activities on their own lands and because it is a criminal statute that the Plaintiffs have no authority to enforce. *See* § 470ee(a), (d). To the extent that they assert that the Tribal Defendants' construction activities violate ARPA and are not subject to 43 C.F.R. §7.5(b)(1)'s permitting exemption for activities exclusively conducted for purposes other than archaeological excavation, the Plaintiffs, even if correct, would nevertheless fail to state a claim because the Tribal Defendants were not required to obtain an ARPA permit for activities on PBCI's own Indian lands. *See* 16 U.S.C. § 470cc(g); 43 C.F.R. § 7.5(b)(3); *Attakai v. United States*, 746 F. Supp. 1395, 1410-11 (D. Ariz. 1990) (applying this exemption to dismiss another tribe's ARPA claims arising from the Hopi Tribe's construction on its own lands).

For all of the reasons stated here and in the Tribal Defendants' principal brief, the Plaintiffs have failed to state a claim on which relief can be granted against the Tribal Defendants under ARPA, and their ARPA claims should be dismissed at least as to those defendants.

**VII.   The Plaintiffs have failed to state a claim under the NHPA.**

The Tribal Defendants have explained the many flaws in the Plaintiffs' putative NHPA claims. *See* Doc. 202 at 68-73. Chief among these are that: (1) the NHPA creates no private right of action, and nonfederal entities such as the Tribal Defendants are not subject to suit under it or the APA; (2) the NPS Agreement did not, as the Plaintiffs erroneously insist, transfer all federal NHPA compliance duties from the United States to PBCI; (3) the Plaintiffs' putative NHPA claims are untimely; and (4) the NHPA does not impose any substantive requirements or otherwise give the Plaintiffs the right to insist on a particular outcome. *See id.*; *see also* Part I.A.3-4, *supra*.

A.   The Plaintiffs overstate the responsibilities assumed by PBCI.

The Plaintiffs open their response by repeating their erroneous assertion that the Tribal Defendants, by entering into the NPS Agreement, assumed "all responsibilities applicable" to the Wetumpka property under the NHPA. Doc. 212 at 86, 92-94. The Plaintiffs tellingly cite the SAC to support this claim rather than the NPS Agreement itself. As explained above and in the Tribal Defendants' principal brief, the NPS Agreement plainly shows that PBCI assumed only the limited responsibilities typically performed by a SHPO, not all obligations imposed by the NHPA. In fact, immediately after wrongly insisting that the NPS Agreement assigned all NHPA functions to PBCI, the Plaintiffs quickly backtrack by acknowledging that NHPA requirements "primarily apply to Federal agencies" and that the Act allows tribes to assume only "the functions of a [SHPO] with respect to tribal land." *Id.* at 87.

Despite admitting that PBCI assumed only SHPO functions through the NPS Agreement, the Plaintiffs nevertheless appear to argue that the Tribal Defendants bear full responsibility for

70

ensuring federal compliance with the entire NHPA § 106 process for any undertaking at the Wetumpka property. *See* Doc. 212 at 91-93. PBCI has generally addressed that argument above and in its principal brief and will not belabor the point here beyond reiterating that it assumed SHPO responsibilities only and did *not*, as the Plaintiffs repeatedly and erroneously allege, take on pervasive "legal responsibility for Section 106 compliance." Doc. 212 at 93.

The Plaintiffs attempt to buttress their argument that PBCI assumed all "legal and financial responsibility for implementing and complying with the required steps of the Section 106 process" by noting the PBCI "expressly agreed to provide for 'consultation with representatives of any other tribes whose traditional lands may have been within Poarch's reservation.'" Doc. 212 at 89 (quoting Doc. 190-1 at 117 ¶ 7). This quotation is accurate, but incomplete. PBCI agreed to provide such consultation "in accordance with § 101(d)(4)(C)" of the NHPA, which applies only to tribal assumption of SHPO responsibilities under § 101(b)(2)-(3) of the Act, not federal functions under § 106. Despite their best efforts, the Plaintiffs simply cannot cite any legitimate basis for thrusting federal § 106 obligations onto the Tribal Defendants. And again, to the extent that the Plaintiffs assert that the Tribal Defendants failed to comply with SHPO obligations under § 101 of the NHPA rather than federal functions, they have no right of action. *See, e.g.*, *Martin v. Ala. Historical Comm'n*, 2014 WL 28850, at *3 n.3 (M.D. Ala. Jan. 2, 2014) (dismissing an NHPA claim against the Alabama Historical Commission despite the plaintiff's allegation that the Commission "operates under the enumerated powers and duties of the Secretary of the Interior" because "the NHPA applies only to federal agencies" and "it is clear that the Alabama Historical Commission itself is not a Federal agency").

The Plaintiffs also incorrectly assert that the Tribal Defendants were the "agency official" responsible for compliance with aspects of the § 106 consultation process addressed in 36 C.F.R.

Part 800. *See* Doc. 212 at 93. But these regulations make it abundantly clear that the SHPO function—the only one assumed by PBCI—is discrete from the responsibilities of an agency official. *See, e.g.*, 36 C.F.R. § 800.2(c)(1) (identifying the SHPO, or an Indian tribe that has assumed SHPO functions, as a party with whom the agency official must consult); § 800.3(c) (directing agency officials to consult with the appropriate SHPO or tribe serving in the SHPO role); § 800.5(a) (directing the agency official to consult with the appropriate SHPO/tribal official and potentially other Indian tribes in applying the adverse effect criteria); § 800.6 (same, in the context of resolving adverse effects); *City of Oxford*, 428 F.3d at 1356-56 (discussing federal agencies' obligations to consult with the SHPO); *Martin*, 2014 WL 28850, at *3 n.3. Any allegation that the Tribal Defendants did not comply with § 106 duties imposed on agency officials by 36 C.F.R. Part 800 is misplaced, as those duties simply are not a part of the SHPO responsibilities that PBCI assumed.

> B.    The Plaintiffs identify no undertakings that can support their NHPA claims.

The Plaintiffs' NHPA claims against the Tribal Defendants also fail because the Plaintiffs have not alleged relevant federal undertakings triggering application of the § 106 process. Section 106 requires the "head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking … and the head of any Federal department or independent agency having authority to license any undertaking" to "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. Section 106 obligations thus arise only in the context of an "undertaking" that is federally funded or licensed, and then only on the part of the federal agency having direct or indirect jurisdiction over or authority to license that undertaking. *See Sheridan Kalorama Hist. Ass'n v. Christopher*, 49 F.3d 750, 755-56 (D.C. Cir. 1995) (explaining that unless a project is "either federally funded or federally licensed, § 106

simply does not apply"); *Woodham v. Fed. Trans. Admin.*, 125 F. Supp. 2d 1106, 111 (N.D. Ga. 2000).

The Plaintiffs identify a handful of putative undertakings that they claim triggered the § 106 process: "the issuance of ARPA permits and the decision to allow excavation of the Hickory Ground Site to occur without required ARPA permits," Doc. 212 at 89, and "construction and operation of the casino and hotel" on the Wetumpka property. *Id.* at 90. None of the alleged undertakings can support an APA claim for an NHPA violation in this case.

With respect to the issuance or non-issuance of ARPA permits, applicable regulations explicitly provide that "[i]ssuance of a permit in accordance with this Act … does not constitute an undertaking requiring compliance with section 106" of the NHPA. 43 C.F.R. § 7.12. Even if that were not the case, the Plaintiffs do not identify any ARPA permits that were issued or any unpermitted excavations that allegedly occurred within six years of their filing this lawsuit as required to bring a timely APA claim for any alleged violation of the NHPA. These alleged undertakings therefore cannot support the Plaintiffs' NHPA claims.

The Plaintiffs' argument that construction and operation of the casino and hotel constitute a federal undertaking for § 106 purposes also misses the mark. They assert that construction of PBCI's Wetumpka facility is "by its very nature a project conducted with federal approval and extensive federal involvement" because IGRA extensively regulates Indian gaming and the National Indian Gaming Commission receives revenue from tribal gaming operations. *Id.* at 90-92. But the federal government did not construct PBCI's facility at Wetumpka, and nothing in IGRA gives it any role in permitting or licensing tribal construction projects on tribal property. *See, e.g.*, *Oklahoma v. Hobia*, 775 F.3d 1204, 1206, 1213-14 (10th Cir. 2014) (holding that IGRA did not provide a right of action for a state to enjoin a tribe's construction of an allegedly unlawful

casino); *Jamul Action Comm. v. Chaudhuri*, 200 F. Supp. 3d 1042, 1051 (E.D. Cal. 2016) ("[T]he Tribe's construction of a casino on its land is not a major federal action. Neither was the casino's construction subject to the federal defendants' approval." (citations omitted)). Construction of the hotel and casino therefore does not constitute a federal undertaking triggering the NHPA. This distinguishes cases cited by the Plaintiffs, where a federal undertaking was found as a result of requirements for pre-construction federal approval or some other federal licensing or permitting of projects.[22] *See, e.g.*, *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 114 (D.C. Cir. 2006) ("By requiring a ruling on each environmental assessment *prior* to tower construction, the FCC has retained authority over tower construction" such that construction constitutes a federal undertaking.). Because the Plaintiffs have identified no federal undertaking on which to ground any NHPA claims against the Tribal Defendants, those claims must be dismissed.

C.    There is no private right of action against the Tribal Defendants under the NHPA.

At the close of their NHPA response, the Plaintiffs erroneously assert that they have a private right of action to sue the Tribal Defendants under the NHPA. *See* Doc. 212 at 94-95. This Court, in rejecting a similar argument, has held that the NHPA does not apply to a state historical commission carrying out delegated NHPA responsibilities and that it does not create a private right of action in any event. *Martin*, 2014 WL 28850, at *3 n.3. The weight and trend of federal authority strongly supports this Court's holding. *See* Doc. 202 at 68 (citing multiple recent federal district court and appellate opinions); *see also Shanks v. Dressel*, 540 F.3d 1082, 1092 (9th Cir. 2008); *Woodham*, 125 F. Supp. 2d at 1111. In response, the Plaintiffs offer a smattering of dated case law and a more recent First Circuit decision that explicitly declines to decide whether a private right

---

[22] Operation of the hotel and casino is likewise not federally funded or licensed, but this is ultimately irrelevant because the SAC alleges failures to consult and comply with the NHPA prior to the pre-construction excavation and construction of the facility, not in connection with its ongoing operation. *See generally* SAC at 64-72.

of action arises under the NHPA. *See* Doc. 212 at 94. The Tribal Defendants stand by their authority. There is no private right of action against the Tribal Defendants under the NHPA. Accordingly, and because the Plaintiffs cannot bring an APA claim against nonfederal parties such as the Tribal Defendants for reasons discussed above and in the Tribal Defendants' principal brief, Doc. 202 at 22, 68-69, the putative NHPA claims against those defendants must be dismissed for failure to state a claim.

## VIII.   The Plaintiffs have failed to state a claim under RFRA.

The Plaintiffs have not alleged a viable claim against the Tribal Defendants under the Religious Freedom Restoration Act (RFRA) for several reasons. RFRA is applies only to certain governments not including tribes, and the facts alleged in the SAC do not support a RFRA violation regardless. Doc. 202 at 73-81.

A.    RFRA is inapplicable to the Tribal Defendants.

The Plaintiffs do not dispute that RFRA is inapplicable to tribal governments. Instead, they reiterate their erroneous assertion that the NPS Agreement converts the Tribal Defendants into federal actors for all purposes. *See* Doc. 210 at 85. The Tribal Defendants have already addressed this flawed argument above, *see supra*, Part I.A.3-4, and in their principal brief. Doc. 202 at 69-70. They did not assume federal functions under the NPS Agreement, and even if they had, the assumption of a limited federal functions, at most, could only convert PBCI into a federal actor with respect to those narrow functions, not for all purposes.

As anticipated in the Tribal Defendants' principal brief, the Plaintiffs quickly pivot to arguing that the Tribal Defendants are subject to RFRA because they acted under color of law in allegedly imposing a substantial burden on the Plaintiffs' religious exercise. For a nongovernmental entity's action to be under color of law, "[1] the deprivation must be caused by the exercise of some right or privilege created by the State or by a person for whom the State is

75

responsible, and [2] the party charged with the deprivation must be a person who may fairly be said to be a state actor." *West v. Atkins*, 487 U.S. 42, 49 (1988); *see also Myers v. Bowman*, 713 F.3d 1319, 1329-30 (11th Cir. 2013); *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). This is a two-part inquiry; a plaintiff who satisfies only one prong has not established that the action in question was taken under color of law. *See, e.g.*, *Harvey*, 949 F.2d at 1130 (affirming dismissal where plaintiff satisfied the first prong, but not the second); *Weaver v. James Bonding Co.*, 442 F. Supp. 2d 1219, 1223 n.6 (S.D. Ala. 2006) (finding no state action where the plaintiff satisfied the "state right or privilege prong" but not the "state actor" prong); *Green v. Abony Bail Bond*, 316 F. Supp. 2d 1254, 1258-60 (M.D. Fla. 2004) (same as *Weaver*).

While the Tribal Defendants have explained that the Plaintiffs fail to satisfy either prong of the state action test, the Plaintiffs offer a substantive response only on the second, "state actor" prong. *See* Doc. 210 at 85-89. This concession is fatal, but unavoidable. There is simply no basis for arguing that the Tribal Defendants' ability to engage in the activities allegedly burdening the Plaintiffs' religious exercise—namely, allowing people to access the Wetumpka property without the Plaintiff's approval, altering or disturbing the property, allowing alcohol on the property, limiting the Plaintiffs' access to the property, and reinterring excavated remains without following particular religious protocols, *see* SAC ¶¶ 327-29—derives from some federally created right or privilege. Any private landowner can control access to its property, alter that property, allow alcohol on the property, and rebury items excavated from the property. The Plaintiffs thus cannot meet the first, "state right or privilege" prong of the state action doctrine, and their state action argument necessarily fails.

While the Plaintiffs do at least address the "state actor" prong of the state action test, their arguments on that prong are unavailing. The parties agree that the Eleventh Circuit recognizes

three possible ways to satisfy the state actor prong: the public function test, the state compulsion test, and the nexus/joint action test. *See* Doc. 202 at 76; Doc. 210 at 86. They disagree on the applicability of two of those tests.[23]

The Plaintiffs assert that the public function and nexus/joint action tests are satisfied by PBCI's assumption of SHPO duties in the NPS Agreement. Doc. 210 at 86-89. They are incorrect. As the Tribal Defendants have shown, Doc. 202 at 76-77, the public function test is extremely narrow, and the activities that the Plaintiffs allege burden their exercise of their religion simply are not public functions. Regardless, the Plaintiffs' insistence that PBCI is performing a public function because it assumed federal duties under the NPS Agreement is simply irrelevant. The performance, *vel non*, of PBCI's assumed SHPO responsibilities has no connection whatsoever to the actions allegedly violating RFRA; PBCI's control of access to the property and its decisions to allow alcohol on the premises and construct facilities are completely discrete from the NHPA notice and consultation requirements that the Plaintiffs erroneously claim it assumed. *See generally Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348-49 (11th Cir. 2001) (explaining the general requirement of a direct link between the state and the "*particular conduct underlying a claimant's … grievance*") (citation omitted). The Plaintiffs cannot satisfy the public function test.

Nor can the Plaintiffs satisfy the nexus/joint action test, as the federal government was not a joint participant in the PBCI activities ostensibly giving rise to the Plaintiffs' RFRA claim. Doc. 202 at 77-78. The Plaintiffs assert that this test is met because several of the SHPO functions that PBCI assumed in the NPS Agreement "require ongoing joint action with the federal and state government" and the United States "assumed oversight of the delegation." Doc. 210 at 87. Again, the Plaintiffs' argument fails because there is no link between the SHPO responsibilities that PBCI

---

[23] The Plaintiffs do not contend that the state compulsion test is met. *See* Doc. 210 at 86-89.

assumed and the actions that allegedly burdened the Plaintiffs' religious exercise. For the nexus/joint action test to apply, "the governmental body and private party must be intertwined in a symbiotic relationship. … The Supreme Court has indicated that the symbiotic relationship must involve the 'specific conduct of which the plaintiff complains.'" *Rayburn*, 241 F.3d at 1348 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 991, 1004 (1999)); *see Higdon v. Smith*, 565 F. App'x 791, 792-93 (11th Cir. 2014) (finding the nexus/joint action test unsatisfied where a symbiotic relationship existed but the state did not encourage or sanction the particular conduct giving rise to the plaintiff's claims). To have any hope of stating a RFRA claim against the Tribal Defendants under the nexus/joint action test, the Plaintiffs would have had to allege facts indicating that the Tribal Defendants' ostensible RFRA violation arose out of their performance of assumed SHPO responsibilities. They did not do so, and their argument therefore fails.

      B.    <u>The facts alleged do not establish a RFRA violation</u>.

      Regardless of RFRA's inapplicability to the Tribal Defendants, the Plaintiffs' RFRA claims fail because they have not alleged facts amounting to government imposition of substantial burden on the exercise of their religion. *See* Doc. 202 at 78-81; Doc. 200 at 37-40. None of the actions alleged in the SAC, much less those ostensibly giving rise to the Plaintiffs' RFRA claims, "completely prevent[] the [Plaintiffs] from engaging in religiously mandated activity" or apply "pressure that tends to force adherents to forego religious precepts or … that mandates religious conduct." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004); *see also Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008).

      The Plaintiffs maintain that the Tribal Defendants have completely prevented them from engaging in religiously mandated duties to complete certain religious protocols and return the remains of their ancestors and associated funerary objects to their original resting places and/or are forcing them to choose between fulfilling those duties and facing criminal or civil sanctions.

Doc. 210 at 91. They further contend that they have been "barred from Hickory Ground, because virtually all of it is covered over in concrete and asphalt" and that the Tribal Defendants are "desecrating the site" by, *inter alia*, "allowing prohibited persons and substances in and around the ceremonial grounds." *Id.* at 93. In short, they argue that their religion requires their unfettered access to the Wetumpka property, the removal of any improvements, and that they have full control over who and what is allowed on the property.

The law is clear that RFRA, the First Amendment, and other federal law aimed at protecting individuals' free exercise of their religion do not allow an individual to impose a "religious servitude" on another's property based on the individual's religious beliefs. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452-53 (1988); *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior* (*La Cuna II*), 2013 WL 4500572, at *10 (C.D. Cal. Aug. 16, 2013), *aff'd*, 603 F. App'x 651 (9th Cir. 2015); *Attakai*, 746 F. Supp. at 1403; *Manybeads v. United States*, 730 F. Supp. 1515, 1517-18 (D. Ariz. 1989); *see also Lockhart v. Kenops*, 927 F.2d 1028, 1036 (8th Cir. 1991). The opinion in *Attakai* is blunt and directly on point: "[t]he fact that a person's ability to practice their religion will be virtually destroyed by a governmental program does not allow them to impose a religious servitude on the property of the government, much less property which the government holds in trust for another sovereign Indian tribe." *Attakai*, 746 F. Supp. at 1403. The *Manybeads* decision provides additional insight into the rationale underlying this rule. In rejecting a First Amendment claim by Navajo tribal members whose religious beliefs called for them "to remain in perpetuity on property held in trust by the United States for the exclusive use of the Hopi Tribe," the court explained that "[t]o hold otherwise would afford plaintiffs rights, benefits and privileges not enjoyed by other citizens. The rights claimed by plaintiffs in Hopi lands are in total derogation of Hopi rights in and to their reservation."

730 F. Supp. at 1517-18; *see also Slockish v. U.S. Fed. Highway Admin.*, 2018 WL 4523135, at *3-6 (D. Or. March 2, 2018), *adopted in relevant part by* 2018 WL 2875896 (D. Or. June 11, 2018). Like the Navajo plaintiffs in *Manybeads*, the Plaintiffs here seek rights in total derogation of PBCI's rights in its own reservation and trust lands. RFRA does not provide such rights.

The Plaintiffs do not dispute this critical point. Instead, they attempt to distract from it by citing minor factual distinctions between the case at bar and the authority cited by the Tribal Defendants. *See* Doc. 210 at 92-94 For example, they claim that *La Cuna* is distinguishable because an earlier opinion in the case found no evidence that the plaintiffs had actually been barred from accessing the disputed site or threatened with arrest. *Id.* at 93 (citing *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior* (*La Cuna I*), 2012 WL 2884992, at *7-8 (C.D. Cal. July 13, 2012)). While *La Cuna I* did include those observations, it went on to state that "denial of access is not one of the factors under the substantial burden test." *La Cuna I*, 2012 WL 2884992, at *8. The distinction that the Plaintiffs attempt to draw thus was rejected as meaningless even by the *La Cuna I* court. More importantly, after the plaintiffs amended their complaint specifically "to allege that they are being put to a choice between practicing their religion and being subject to criminal trespass," the court once again dismissed their RFRA claim. *La Cuna II*, 2013 WL 4500572, at *10.

The Plaintiffs' attempt to distinguish *Navajo Nation* provides another example. It is inapplicable, they argue, because the plaintiffs there "were not forced 'to act contrary to their religion under threat of civil or criminal sanctions.'" Doc. 201 at 93 (quoting *Navajo Nation*, 535 F.3d at 1070). But that is no distinction at all, as the Plaintiffs here also are not being forced to act contrary to their religion, or to act in any way at all. They are simply prevented from "dictat[ing]

the decisions that [PBCI] makes in managing 'what is, after all, *its* land.'" *Navajo Nation*, 535 F.3d at 1073 (quoting *Lyng*, 485 U.S. at 453)).

The Plaintiffs principally rely on *Comanche Nation v. United States*, 2008 WL 4426621 (W.D. Okla. 2008), in support of their putative RFRA claims. That reliance is misplaced, however, because the court applied a very different standard for assessing a substantial burden than the test set forth by the Eleventh Circuit in *Midrash Sephardi* and other case law. In order to find a substantial burden on religious exercise under Tenth Circuit precedent, the *Comanche Nation* court needed only find that a challenged governmental action "'significantly inhibit[s] or constrain[s] conduct or expression' or 'den[ies] reasonable opportunities to engage in' religious activities." *Id.* at *3 (citation omitted). That the challenged construction at issue in *Comanche Nation* satisfied the Tenth Circuit's test does not mean that the Tribal Defendants' conduct here "completely prevents the [Plaintiffs] from engaging in religiously mandated activity" or applies "pressure that tends to force adherents to forego religious precepts or … that mandates religious conduct." *Midrash Sephardi*, 366 F.3d at 1227.

In sum, the Plaintiffs' RFRA claim fails for multiple reasons. RFRA is entirely inapplicable to the Tribal Defendants, and the ostensibly federal functions assumed by PBCI that the Plaintiffs rely on to evade this fact have no connection to the injuries giving rise to their putative RFRA claims. The Plaintiffs also have not established a substantial burden on their exercise of religion and cannot use their religious beliefs to impose a servitude on PBCI's trust lands. The Court should dismiss all RFRA claims against the Tribal Defendants.

## IX.   **NAGPRA and ARPA are not unlawful or unconstitutional**.

As characterized in their response brief, Count VIII of the SAC asserts that the "Tribal Defendants applied NAGPRA and incorporated provisions of ARPA in a fashion that violated the Free Exercise Clause, RFRA, and [the] Religious Land Use and Institutionalized Persons Act

81

("RLUIPA")." Doc. 212 at 96. The ostensible violations of these religious freedom laws arise out of allowing anyone other than the Plaintiffs to consent to excavation at the Wetumpka property or establish a higher priority of ownership to excavated cultural items.[24] *Id.* The Plaintiffs appear to concede that this claim rests on substantially the same, flawed grounds as their RFRA claim. *Id.* at 96-97.

Both the Tribal and Federal Defendants have identified numerous problems with the Plaintiffs' as-applied religious exercise theory. *See* Doc. 202 at 82-84; Doc. 200 at 41-42. These include that (1) the First Amendment and RLUIPA are inapplicable to the Tribal Defendants, (2) RLUIPA is limited to cases involving land use regulations or institutionalized persons, neither of which are present here, (3) there is no substantial burden on the Plaintiffs' exercise of their religion, as required to establish a violation of any of the laws in question, and (4) any RFRA claim based on the application of ARPA or NAGPRA fails for all of the reasons as the Plaintiffs' principal RFRA claim. *See id.* The Plaintiffs' response rebuts none of those arguments.

The Plaintiffs' argument can be distilled to the assertion that the First Amendment and various religious exercise statutes are violated unless the United States implements a law elevating the Plaintiffs' religious beliefs above PBCI's rights to use and develop its own land. This is specious. Indeed, it is the existence of any such law, not its absence, that would violate the First Amendment. *See, e.g.*, *Midrash Sephardi*, 366 F.3d at 1238 ("The Supreme Court has consistently disapproved of unequal treatment that elevates religion over secular interests."); *Manybeads*, 730 F. Supp. at 1517-18.

---

[24] It is unclear how this constitutes the Tribal Defendants "appl[ying] NAGPRA and incorporated provisions of ARPA." Doc. 212 at 96.

To the extent that the Plaintiffs base their argument on claims that NAGPRA intended to elevate their interests, whether as "lineal descendants" or the "appropriate tribe," over PBCI's with respect to the Wetumpka property, *see* Doc. 212 at 97-100, those arguments have been refuted already. *See supra* Part V.A.4; Doc. 202 at 56-58. The Plaintiffs offer no support for their contention that the First Amendment or any other statute requires NAGPRA to be applied in a way inconsistent with the text of the statute and its implementing regulations. To the extent that the Plaintiffs assert that NAGPRA is not a neutral law and must be justified by a compelling interest, Doc. 212 at 100-01, they are the ones—as the parties asserting that the law must be interpreted to elevate their religious beliefs above PBCI's rights—who would bear the burden of establishing that compelling interest. And finally, in asserting that RLUIPA tacitly repealed NAGPRA to the extent that NAGPRA is less protective of their religious exercise, *id.* at 101-02, they still offer no explanation of how a statute that applies only to land use regulations and religious exercise by institutionalized persons has any relevance whatsoever to the case at bar. *See* Doc. 202 at 83-84.

In short, the Plaintiffs offer no viable support for their claim that NAGPRA and ARPA violate the First Amendment, RFRA, or RLUIPA as applied in this case. The Court should dismiss Count VIII of the SAC with prejudice for failure to state a claim.

## X.     The relief the Plaintiffs seek is unavailable as a matter of law.

As discussed above in the context of the Tribal Defendants' response to several of the Plaintiffs' discrete claims and in the Tribal Defendants' principal brief, *see* Doc. 202 at 84-85, much of the relief that the Plaintiffs seek simply is not available under any of the legal theories that they advance. As the Plaintiffs elected to defend their requested relief in the context of their individual claims in their response and the Tribal Defendants have replied in kind, they will not further belabor the matter here.

**XI.    All of the Plaintiffs' claims should be dismissed pursuant to Rule 19.**

If the Court dismisses any of the Plaintiffs' claims against the Tribal Defendants on the basis of tribal sovereign immunity, it should then proceed to dismiss those claims as to other defendants on Rule 19 grounds. *See* Doc. 202, 85-88. In response, the Plaintiffs argue that Rule 19 dismissal would not be necessary or appropriate because PBCI's interests ostensibly could be represented by the Tribal Officials or perhaps the Federal Defendants. *See* Doc. 212, 102-06. The Plaintiffs are incorrect.

With respect to the Tribal Officials, the Plaintiffs may be correct that they could adequately represent PBCI's interests for Rule 19 purposes if they remained in the suit as defendants. But the Tribal Defendants share in PBCI's immunity, and all claims against them should be dismissed as well. *See supra*, Part I.B; Doc. 202 at 22-28. To the extent that the claims against the Tribal Officials are also dismissed on the basis of sovereign immunity, as they should be, the Plaintiffs' argument that those officials adequately represent PBCI's interests will be moot.

The Plaintiffs' argument that the Federal Defendants can adequately represent PBCI's interests in this litigation is simply incorrect. Federal courts repeatedly have held that the United States cannot adequately represent the interests of an absent tribe in the context of an intertribal conflict. *See, e.g.*, *Pit River Home & Agr. Co-op Ass'n v. United States*, 30 F.3d 1088, 1101 (9th Cir. 1994) (citing several cases); *Rosales v. Dutschke*, 279 F. Supp. 3d 1084, 1092-94 (E.D. Cal. 2017), *affirmed by* 787 F. App'x 406 (9th Cir. 2019); *Rosales*, 2007 WL 4233060 at *5-6. *Dutschke* provides a particularly relevant example. There, plaintiffs alleged that the Jamul Indian Village (JIV) tribal officials violated NAGPRA and committed other legal transgressions by excavating and removing plaintiffs' ancestors' remains from a construction site. *See* 279 F. Supp. 3d at 1088. The court held that the officials had sovereign immunity and then proceeded to dismiss all remaining claims, *sua sponte* including those against federal officials, on Rule 19 grounds. *Id.* at

84

1092-94; *see also Rosales*, 2007 WL 4233060 at *5-6 (holding that an absent tribe was an indispensable party that could not be joined to a suit against federal agency defendants seeking to enjoin construction on the absent tribe's lands).

Similarly, courts have held that the United States cannot adequately represent the interests of an Indian tribe where the two sovereigns' interests do not necessarily coincide. *See, e.g.*, *Dine Citizens Against Ruining Our Env't v. BIA*, 932 F.3d 843, 855 (9th Cir. 2019 (discussing several cases), *cert denied*, 2020 WL 3492672 (June 29, 2020); *Enter. Mgmt. Consultants v. United States*, 883 F.2d 890, 894 (10th Cir. 1989). *Dine Citizens* is instructive. There, plaintiffs sued numerous federal defendants challenging the federal approval of a coal mining operation on Navajo Nation land. The Navajo Nation's Transitional Energy Company, an arm of the Nation that owned the mine at issue, intervened for the limited purpose of moving to dismiss the action on Rule 19 grounds. The Ninth Circuit rejected the plaintiffs' argument that the federal defendants would adequately represent the Navajo Nation's interests, explaining that "while Federal Defendants have an interest in defending their own analyses that formed the basis of the approvals at issue, here they do not share an interest in the *outcome* of the approvals—the continued operation of the" Nation's facilities. *Dine Citizens*, 932 F. 3d at 855. Similarly, while the Federal Defendants here have an interest in defending their own actions that may generally align with PBCI's interests, the Federal Defendants do not have anything approaching PBCI's interest in the defense of its sovereignty and jurisdiction over its land or the continued operation of its Wetumpka facilities. And at least in some instances, notably the extent of the responsibilities ostensibly shifted from the United States to the Tribe by the NPS Agreement, it is possible that the Tribal and Federal Defendants' interest could diverge more substantially. While the United States can no doubt adequately represent the interests of adequate tribes in some cases, this is not such a case.

Because the claims against PBCI must be dismissed on the basis of tribal sovereign immunity, no remaining defendant(s) can adequately represent its interests, and all of the other requirements for dismissal on Rule 19 grounds are satisfied, *see* Doc. 202 at 86-88, the Court should dismiss the SAC completely.

## CONCLUSION

For all of the foregoing reasons, the Plaintiffs have failed to state any viable claims against the Tribal Defendants. All claims against those defendants therefore should be dismissed, and because it would be impossible for this action to proceed in equity and good conscience in the absence of the Tribal Defendants, the SAC should be dismissed in its entirety.

Respectfully submitted this 4th day of September, 2020.

 s/*Mark H. Reeves*
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W.
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Tribal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of September 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Lauren J. King<br>Foster Garvey PC<br>1111 Third Avenue; Suite 3000<br>Seattle, WA 98101<br>Email: lauren.king@foster.com<br><br>Counsel for Plaintiffs | Stewart Davidson McKnight, III<br>Dillard, McKnight, James & McElroy LLP<br>P.O. Box 530333<br>Birmingham, AL 35253-0333<br>Email: dmcknight@dillardmcknight.com<br><br>Counsel for Plaintiffs |
| Frank Eady Bankston , Jr.<br>Webster Henry Bradwell Cohan Speagle &<br>Deshazo<br>105 Tallapoosa Street; Suite 101<br>Montgomery, AL 36104<br>Email: fbankston@websterhenry.com<br><br>Counsel for Defendant Martin Construction, Inc. | Dennis Mitchell Henry<br>Webster Henry Bradwell Cohan Speagle &<br>Deshazo<br>P O Box 239<br>Montgomery, AL 36101-0239<br>Email: mhenry@websterhenry.com<br><br>Counsel for Defendant Martin Construction, Inc. |
| Jody Helen Schwarz<br>U.S. Department of Justice, Environment and<br>Natural Resource<br>P.O. Box 7611<br>Washington, DC 20044<br>Email: jody.schwarz@usdoj.gov<br><br>Counsel for Federal Defendants | Devon Lehman McCune<br>US DOJ<br>Environmental & Natural Resources<br>999 18th St / S Terrace - Ste 370<br>Denver, CO 80026<br>Email: devon.mccune@usdoj.gov<br><br>Counsel for Federal Defendants |
| David Randall Boyd<br>Griffin Lane Knight<br>Jordan Dorman Walker , Jr.<br>Balch & Bingham LLP<br>PO Box 78<br>Montgomery, AL 36101<br>Email: dboyd@balch.com<br>Email: lknight@balch.com<br>Email: dwalker@balch.com<br><br>Counsel for Defendant Auburn University | Jaime Stone Hammer<br>Morgan Mccue Sport<br>Auburn University<br>182 South College Street<br>101 Samford Hall<br>Auburn, AL 36849<br>Email: jsh0073@auburn.edu<br>Email: mms0116@auburn.edu<br><br>Counsel for Defendant Auburn University |

| James Joseph DuBois<br>U. S. Attorney's Office<br>PO Box 197<br>Montgomery, AL 36101<br>Email: james.dubois2@usdoj.gov<br><br>Counsel for Federal Defendants | |

Respectfully submitted,


 s/*Mark H. Reeves*
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

# TAB 218

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MUSCOGEE CREEK NATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action Number: |
| | ) | 2:12-cv-01079-MHT-CSC |
| POARCH BAND OF CREEK INDIANS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INDIVIDUAL DEFENDANTS' REPLY AND MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

ARGUMENT ........................................................................................................... 1

I.  The Allegations as pled do not support a claim for outrage. ........................ 1

    A.  The Second Amended Complaint (SAC) does not give the Individual Defendants fair notice of the claim. ............................................................................... 1

    B.  The alleged conduct does not rise to the level of outrage. ................................... 2

    C.  Case law does not support a claim for outrage on the facts alleged. ................. 3

II.  The outrage claim is barred by legislative immunity. .................................... 5

    A.  Dismissal would not be premature. ..................................................................... 6

    B.  Legislative immunity attached to the alleged conduct. ..................................... 7

III.  Plaintiff Thompson's outrage claim is time-barred. ..................................... 9

    A.  Plaintiff Thompson's outrage claim does not relate back because he cannot satisfy Rule 15(c)(1)(C). ..................................................................................................... 9

    B.  Plaintiff Thompson alleges no outrageous acts by the Individual Defendants within the two-year limitations period. ...................................................................... 13

CONCLUSION .................................................................................................... 15

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Am. Rd. Serv. Co. v. Inmon,*
    394 So. 2d 361 (Ala. 1980) ................................................................2, 3

*Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    953 F.3d 707 (11th Cir. 2020) ............................................................ 2

*Bogan v. Scott-Harris,*
    523 U.S. 44 (1998)...............................................................................7, 8

*Callens v. Jefferson County Nursing Home,*
    769 So. 2d 273 (Ala. 2000) ...............................................................10

*Cates v. Taylor,*
    428 So. 2d 637 (Ala. 1983) ................................................................4, 5

*Cmty. House, Inc. v. City of Boise,*
    623 F.3d 945 (9th Cir. 2010) ............................................................. 7

*Colvin v. McDougall,*
    62 F.3d 1316 (11th Cir. 1995) ...........................................................9, 10

*Continental Cas. Ins. Co. v. McDonald,*
    568 So. 2d 1208 (Ala. 1990)...............................................................14, 15

*Eastland v. U. S. Servicemen's Fund,*
    421 U.S. 491, 95 S. Ct. 1813, 44 L. Ed. 2d 324 (1975) .................... 7

*Erickson v. Pardus,*
    551 U.S. 89 (2007)............................................................................. 1

*Garrett v. Raytheon Co.,*
    368 So. 2d 516 (Ala. 1979) ...............................................................13

*Grand Canyon Skywalk Dev., LLC v. Hualapai Indian Tribe of Ariz.,*
    966 F. Supp. 2d 876 (D. Ariz. 2013) ............................................... 6

*Gravel v. United States,*
    408 U.S. 606 (1972).......................................................................... 8

*Gray Brown-Serv. Mortuary, Inc. v. Lloyd,*
    729 So. 2d 280 (Ala. 1999) ............................................................... 4

*Hill v. Shelander,*
    924 F.2d 1370 (7th Cir. 1991) ...........................................................12

*Hous. Inv'rs, Inc. v. City of Clanton*,
   68 F. Supp. 2d 1287 (M.D. Ala. 1999) ........................................... 7

*Itel Capital Corp. v. Cups Coal Co., Inc.*,
   707 F.2d 1253 (11th Cir. 1983) .................................................12

*Levite Undertakers Co. v. Griggs*,
   495 So. 2d 63 (Ala. 1986) ...................................................... 4

*Ling v. Herrod*,
   445 F. Supp. 2d 892 (W.D. Tenn. 2006) ......................................10

*Lopez v. Bonanza.com, Inc.*,
   2019 WL 5199431 (S.D.N.Y. Sept. 30, 2019) ................................ 2

*Lovelace v. O'Hara*,
   985 F.2d 847 (6th Cir. 1993) ..................................................10

*Moon v. Harco Drugs, Inc.*,
   435 So. 2d 218 (Ala. 1983) ...............................................13, 14

*Potts v. Hayes*,
   771 So. 2d 462 (Ala. 2000) .................................................... 2

*Powers v. Graff*,
   148 F.3d 1223 (11th Cir. 1998) ...............................................12

*Rendall-Speranza v. Nassim*,
   107 F.3d 913 (D.C. Cir. 1997) ...............................................10

*Robinson v. Clipse*,
   602 F.3d 605 (4th Cir. 2010) .............................................10, 12

*Rosales v. Dutschke*,
   279 F. Supp. 3d 1084 (E.D. Cal. 2017),
   *aff'd*, 787 F. App'x 406 (9th Cir. 2019) ....................................2, 8

*Runs After v. United States*,
   766 F.2d 347 (8th Cir. 1985) .................................................. 6

*Sanders-Burns v. City of Plano*,
   594 F.3d 366 (5th Cir. 2010) .................................................12

*Scott v. Taylor*,
   405 F.3d 1251 (11th Cir. 2005) ............................................... 7

*Smith v. Paladino*,
   317 F. Supp. 2d 884 (W.D. Ark. 2004) ......................................10

*Sunkyong International, Inc. v. Anderson Land & Livesock Co.*,
   828 F.2d 1245 (8th Cir. 1987) ..................................................................................................12

*Supreme Court of Va. v. Consumers Union of U.S., Inc.*,
   446 U.S. 719 (1980) ...................................................................................................................... 7

*Tenney v. Brandhove*,
   341 U.S. 367 (1951) ...................................................................................................................... 7

*Tohono O'odham Nation v. Ducey*,
   CV-15-01135-PHX-DGC, 2016 WL 3402391 (D. Ariz. June 21, 2016) ......................... 6

*U.S.A. Oil, Inc. v. Smith*,
   415 So. 2d 1098 (Ala. Civ. App. 1982),
   *writ denied sub nom. Ex parte Smith*,
   415 So. 2d 1102 (Ala. 1982) ...................................................................................................... 3

*Whitehair v. Highland Memory Gardens, Inc.*,
   174 W. Va. 458, 327 S.E.2d 438 (1985) ................................................................................. 5

*Whitt v. Hulsey*,
   519 So. 2d 901 (Ala. 1987) ........................................................................................................ 3

*Wisconsin v. Baker*,
   464 F. Supp. 1377 (W.D. Wis. 1978) ..................................................................................... 6

**Rules**

Ala. R. Civ. P. 15(c)(2) ...................................................................................................................11

Fed. R. Civ. P. 15(c)(1)(B) ...........................................................................................................11

Fed. R. Civ. P. 15(c)(1)(C) .......................................................................................................9, 11

**Regulations**

Ala. Code § 6-2-38(l) ...................................................................................................................... 9

Plaintiff Thompson's response to the Individual Defendants' Motion to Dismiss fails to rebut any of the three identified grounds for dismissal of his outrage claim. First, despite alleging that Stephanie Bryan, Robert McGhee, Sandy Hollinger, Keith Martin, Arthur Mothershed, Garvis Sells, Eddie Tullis, Buford Rolin, and David Gehman—nine current or former members of the Poarch Band of Creek Indians' (PBCI) Tribal Council—are liable in their individual capacities for allegedly outrageous conduct, Plaintiff Thompson has largely failed to identify with any specificity actions allegedly taken by each individual. Second, Plaintiff Thompson has failed to overcome the Individual Defendants' legislative immunity, nor does he persuasively argue that dismissal on the basis of that immunity would be premature. Indeed, dismissal is both warranted and appropriate at this stage to spare the Individual Defendants from the burden of further litigation, as the protection intends. Finally, Plaintiff Thompson cannot avoid the fact that his outrage claim is barred by the two-year statute of limitations and subject to neither the relation-back doctrine nor the continuing tort theory. Plaintiff Thompson's claim for outrage should be dismissed.

## ARGUMENT

I.     **The Allegations as pled do not support a claim for outrage.**

      A.     <u>The Second Amended Complaint (SAC) does not give the Individual Defendants fair notice of the claim</u>.

As Plaintiff Thompson concedes, his statement of the outrage claim must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." Doc. 211 at 14 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).[1] He argues, however, that "[t]here is no obligation to plead the facts showing the Individual Defendants' intent with specificity." *Id*. at 20. While the Individual Defendants do not assert that Plaintiff Thompson must "prove all of the elements of his outrage claim" at this stage, Doc. 211 at 12, he must nonetheless plead the allegations in a manner sufficient to give each Individual Defendant fair notice of the basis for the claim. Plaintiff Thompson has failed in this requirement. With two exceptions, Plaintiff Thompson

---

[1] Pin-cites to the record are to the ECF generated page numbers atop each page.

1

only makes general allegations against the Individual Defendants collectively. *See, e.g.*, SAC ¶ 223.

Without specifying what acts each of the Individual Defendants allegedly committed, the Complaint is not sufficient to give the Individual Defendants fair notice of the claim.[2] *See, e.g.*, *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 731-33 (11th Cir. 2020); *Lopez v. Bonanza.com, Inc.*, 2019 WL 5199431, at *10 n.20 (S.D.N.Y. Sept. 30, 2019) (citing several cases); *Rosales v. Dutschke*, 279 F. Supp. 3d 1084, 1091 (E.D. Cal. 2017), *aff'd*, 787 F. App'x 406 (9th Cir. 2019). Therefore, the outrage claim should be dismissed.

     B.    <u>The alleged conduct does not rise to the level of outrage</u>.

Of the two specific acts alleged against any Individual Defendants, the first is a 2012 letter sent by then-PBCI Chair Buford Rolin to Plaintiff Thompson and the Muscogee Creek Nation (MCN) Principal Chief stating that the PBCI council members hoped to "work together regarding re-interment" and asking Plaintiff Thompson and the Principal Chief to let the Council know if they would like to join for the reburial. SAC ¶¶ 153 - 58. The second specific action alleged is the mailing of a 2013 letter by then-PBCI Chair Stephanie Bryan to "tribal leaders nationwide" that Plaintiff Thompson alleges contains false statements and misrepresentations. SAC ¶¶ 168 - 178, Ex. P. Even taken as true, neither of these actions is extreme enough to pass the threshold for outrage.

The tort of outrage is "an extremely limited cause of action" in Alabama. *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000); *see* Doc. 205 at 11-14 To be actionable, the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d at 361, 365 (Ala. 1980). It must also "intentionally or recklessly cause[] sever emotional distress to another" such that "no reasonable person could be expected to endure." *Id.*

---

[2] Plaintiff Thompson's reliance on allegations of collective conduct in lieu of identifying specific acts by each Individual Defendant underscores that the Individual Defendants acted collectively within the sphere of their legislative duties and are protected by legislative immunity. *See infra* Part II.

The Individual Defendants do not dispute that Plaintiff Thompson may have been subjectively distressed by events related to PBCI's archaeological excavation. But the standard for the tort of outrage is an objective one; whether an individual was *subjectively* impacted does not determine whether those actions rise to the level necessary to plead a plausible claim of outrage. *See Am. Rd. Serv. Co.*, 394 So. 2d at 368 (acknowledging that while a termination of employment may have been "a humiliating experience for him personally," the employer's behavior did not rise to the level of outrage); *U.S.A. Oil, Inc. v. Smith*, 415 So. 2d 1098, 1101 (Ala. Civ. App. 1982), *writ denied sub nom. Ex parte Smith*, 415 So. 2d 1102 (Ala. 1982) (concluding that, though appellee "apparently did suffer some distress, it was not so 'severe' as to support recovery for the tort of outrage"). Here, the only specifically alleged conduct by any Individual Defendants— Buford Rolin sending a letter inviting Plaintiff Thompson to join the reburial, and Chairman Stephanie Bryan mailing a letter defending the actions of her Tribe—simply do not rise to the level of being "beyond all bounds of decency." And even taking collectively alleged conduct into account, the Individual Defendants alleged "ordering," in their capacities as elected officials of the tribal government, of an archaeological excavation by professional archeologists from Auburn University does not qualify as conduct "atrocious and utterly intolerable in a civilized society." *Am. Rd. Serv. Co*, 394 So. 2d at 365. These allegations cannot support a claim of outrage.

      C.   <u>Case law does not support a claim for outrage on the facts alleged.</u>

Plaintiff Thompson cites to a number of cases ostensibly showing that he has sufficiently pled a claim for outrage. These cases are not analogous. For example, Plaintiff Thompson cites *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987), as the "[m]ost relevant of the Alabama precedent." Doc. 211 at 21. But in *Whitt*, the cemetery that the defendant bulldozed contained tombstones, which are obvious markers of the identity and location of the deceased. And in that case, witnesses could identify with specificity which individuals' remains were disturbed. *Whitt*, 519 So.2d at 905 ("[T]he tombstone of Emma Ellis, which was in the third row, stood all by itself, was gone . . . . The tombstone of little Hulda had a large chunk broken out of it."). In this case, although Plaintiff Thompson disputes that the remains at issue are "unknown individuals," he concedes that he

cannot identify any with specificity.  Doc. 211 at 26 ("Regardless of whether he might or might not know all of their names currently, he knows that they are his ancestors …."). Plaintiff Thompson does not allege with any specificity the identity of his descendants who were allegedly disturbed by the Auburn-led archaeological excavation. This distinguishes *Whitt* and other cases involving family burial plots.

Further, despite Plaintiff's assertion that the facts in *Gray Brown-Serv. Mortuary, Inc. v. Lloyd*, 729 So. 2d 280 (Ala. 1999), are "hauntingly familiar," Doc. 211 at 17, they are actually quite different. In *Lloyd*, a funeral home flagrantly mishandled the burial and subsequent interment of the plaintiff's deceased wife. Specifically, after the funeral home received complaints of an odor of decaying human remains coming from the mausoleum where plaintiff's wife was buried, funeral home employees worked to pry open the casket with a crowbar, tossed a caustic chemical on remains, and re-entombed the body after binding the casket with duct tape. *Gray Brown-Serv.,* 729 So.2d at 283. Later, funeral home employees reentered the crypt, removed most of the remains, and placed them in a body bag, leaving some remains in original casket, which they then tossed into the woods and later buried in another location. *Id.* The scientific and professionally supervised archaeological excavation at issue here cannot reasonably be compared to the willful and cruel destruction of the plaintiff's wife's remains in *Lloyd*.

Several of the other cases cited by Plaintiff can also be distinguished because they involve the reckless destruction or mishandling of the remains of a specific, identifiable decedent. In *Levite Undertakers Co. v. Griggs*, 495 So. 2d 63 (Ala. 1986), the surviving spouse and children of the decedent brought an outrage claim after the undertaker refused to turn over remains of the decedent until the undertaker received payment for services. *Id.* at 64. And, as noted by the Plaintiff, although the Court in that case affirmed summary judgment on the outrage claim, there is no discussion or analysis of that claim.

Nor does *Cates v. Taylor*, 428 So. 2d 637 (Ala. 1983), support Plaintiff Thompson's position. *Cates* involved the mishandling of plaintiff's father's remains. The plaintiff alleged that defendants interfered with his father's burial by refusing to allow the father to be buried in a

cemetery lot that the defendants had previously offered for that purpose. *Id*. at 638. Notably, the defendants made this refusal just 30 minutes before the funeral. In finding that the allegations supported a claim for outrage, the court explained that "[a] funeral is an observance laced with sorrow and personal grief. Defendants' alleged actions, including waiting until 30 minutes before the graveside services so as to disrupt the funeral . . . fit the requirement of an act 'beyond all possible bounds of decency' and . . . 'atrocious and utterly intolerable.'" *Id*. at 640. Here, no such abrupt interruption of the grief process is alleged. The facts of *Cates* bear almost no resemblance to those at bar.

Finally, although it is not necessary to distinguish the multitude of cases cited by Plaintiff which are outside of this jurisdiction, it is worth addressing Plaintiff's claim that *Whitehair v. Highland Memory Gardens, Inc*., 174 W. Va. 458, 459, 327 S.E.2d 438, 439 (1985) is "particularly instructive as persuasive precedent." Doc. 211 at 23. In *Whitehair*, the plaintiff brought suit for the alleged mishandling and loss of several bodies during exhumation and reburial when a cemetery was relocated due to highway construction. 174 W. Va. at 460. However, as with the Alabama cases discussed above, *Whitehair* involved assertions with respect to specific, identified family members of the plaintiff—*i.e.,* the mishandling of remains of her sister, two aunts, cousin, uncle and father. *Id*. Again, these facts can be differentiated from Plaintiff Thompson's claim because they involve the desecration of specific, identifiable family members, which objectively rises to the level of being "beyond all bounds of decency." PBCI's hiring of professional archeologists from Auburn University to conduct a scientific study of its own land prior to development, by any objective measure, is simply not the same as recklessly or intentionally destroying a cemetery where the location and identity of remains is marked by headstones or other markers.

None of the cases that Plaintiff Thompson cites support a claim for outrage as alleged, and the claim should be dismissed.

## II.   The outrage claim is barred by legislative immunity.

All of the Individual Defendants are entitled to legislative immunity from Plaintiff Thompson's outrage claim. *See* Doc. 205 at 9-11. Plaintiff Thompson asserts legislative immunity

does not attach to the conduct at issue and that dismissal on that basis would be premature in any event. Doc. 211 at 29 - 36. However, because it is apparent from the SAC that the Individual Defendants' alleged conduct is covered by their immunity, dismissal at this stage is both appropriate and necessary.

     A.    <u>Dismissal would not be premature</u>.

     Plaintiff Thompson claims that dismissal at this stage would be premature because dismissal "is not advisable where the law on an issue is not settled, as is the case regarding the question of legislative immunity for Tribal Council members." *Id.* at 29. Although, as Plaintiff notes, the Eleventh Circuit has not directly addressed whether the legislative privilege applies to tribal councils, other courts that have considered the issue have concluded that it does. *Tohono O'odham Nation v. Ducey*, CV-15-01135-PHX-DGC, 2016 WL 3402391, at *3 (D. Ariz. June 21, 2016) ("Although there does not appear to be any case law addressing the question, the Court concludes that the legislative privilege also applies to tribal legislative bodies."); *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) ("[I]ndividual members of the Tribal Council . . . enjoy absolute legislative immunity . . . for official actions taken when acting in a legislative capacity."); *Grand Canyon Skywalk Dev., LLC v. Hualapai Indian Tribe of Ariz.*, 966 F. Supp. 2d 876, 885-86 (D. Ariz. 2013) ("[T]o the extent the complaint names Tribal Council members for their role in passing the takings ordinance and resolution, they have legislative immunity."). Indeed, the only case cited by Plaintiff Thompson in which a court did *not* apply legislative immunity is *Wisconsin v. Baker*, 464 F. Supp. 1377, 1387 (W.D. Wis. 1978), and in that case the Court's analysis was based upon the nature of the action in question (*i.e.*, enforcement of a law), not on whether the privilege applied to the Tribe's governing body. As legislative immunity has repeatedly been applied to tribal governing bodies, there is no reason to dispute that the privilege would attach here, too.

     Dismissal on the basis of immunity should be granted as early as possible. As repeatedly recognized by the United States Supreme Court, "a private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention

from their legislative tasks to defend the litigation." *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980) (citation omitted); *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503, 95 S. Ct. 1813, 1821, 44 L. Ed. 2d 324 (1975). Legislative immunity "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.'" *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *see also Scott v. Taylor*, 405 F.3d 1251, 1256 (11th Cir. 2005) (finding legislative immunity applicable and explaining that, even where appellants would not be subject to a judgment and would not bear the cost of their own defense, "they would still face the not inconsiderable inconveniences and distractions of a trial").

Because the purpose of legislative immunity is "to free legislators from such worries and distractions," *Scott*, 405 F.3d at 1256, it would be inconsistent with that purpose to require defendants to be dragged through litigation and the discovery process where it is evident from the pleadings that they are immune from suit. As the Individual Defendants in this case are cloaked in legislative immunity, there is no reason to delay in freeing them from the burdens of litigation. The outrage claim should be dismissed.

B.    Legislative immunity attached to the alleged conduct.

Plaintiff Thompson asserts that legislative immunity does not apply to the Individual Defendants, arguing that Court must "analyze the precise nature of the Individual Defendants' actions to determine whether they constitute legislative acts." Doc. 211 at 32. However, the Court's analysis here need not extend beyond review of the SAC for it to conclude that the Individual Defendants are entitled to immunity. The legislative immunity protection is long-recognized and very broad. *Hous. Inv'rs, Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1295 (M.D. Ala. 1999); *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 959 (9th Cir. 2010) (citing *Supreme Court of Va.*, 446 U.S. at 732-33). Whether an act is "legislative" for purposes of immunity depends upon the nature of the act. *Bogan v. Scott-Harris*, 523 U.S. 44, 45 (1998). And, as Plaintiff Thompson acknowledges, resolutions and voting are elements of the legislative process which are cloaked in

7

immunity.  Doc. 211 at 32 (citing *Gravel v. United States*, 408 U.S. 606, 625, 627 (1972); *Bogan*, 523 U.S. at 55 (holding acts of voting for an ordinance to be "quintessentially legislative.").

The Individual Defendants are past or present members of the PBCI Tribal Council. Pursuant to the PBCI Constitution, the PBCI Tribal Council is the legislative body of the Tribe. PBCI Constitution, § 2-1-1(a) ("Pursuant to the Constitution of the Poarch Band of Creek Indians, the legislative body of the Poarch Band of Creek Indians shall be the Tribal Council.").[3] The Tribal Council legislates by memorializing final Council decisions in approved motions, ordinances, and Tribal Council Resolutions. *Id.* §§ 2-2-1(a), 2-2-1(g). Official actions such as those alleged by Plaintiff Thompson, including the passage of resolutions or motions or other votes by Tribal Council to take collective action, are precisely the type of activity covered by legislative immunity.

Thus, the conduct and subsequent harm alleged by Plaintiff Thompson arose from the collective action of PBCI's Council Members in the exercise of their legislative authority.

With the two exceptions addressed above, Plaintiff Thompson fails to allege any actions by any Individual Defendants that were not collective actions taken in their legislative capacities. The outrage claim is based on the Individual Defendants' alleged role in collectively arranging for an archaeological excavation of the site at issue, with Plaintiff Thompson broadly contending that the Individual Defendants "intentionally and outrageously caused the desecration of Hickory Ground" by "order[ing]" and "authoriz[ing]" certain actions. SAC ¶¶ 223, 226. These allegations are made against the Individual Defendants collectively, and Plaintiff Thompson does not allege specific conduct by each Individual Defendant sufficient to show that they participated in the "desecration." Accordingly, the Court simply has no basis to find that the Individual Defendants are not legislatively immune. *See Dutschke*, 279 F. Supp. 3d at 1091 (holding that where plaintiffs alleged a violation of NAGPRA against tribal employees but did not specify which defendants excavated and removed the human remains, the tribal defendants were immune because that

---

[3] The PBCI Constitution and Tribal Code are publicly available online at: *Tribal Constitution*, Poarch Band of Indians, https://library.municode.com/tribes_and_tribal_nations/poarch_band_of_creek_indians/codes/code_of_ordinances?nodeId=TRCO (last visited, Sept. 3, 2020).

immunity "hinges on the nature of their specific conduct, [and] plaintiffs must allege more before the court can assume on a motion to dismiss that [the defendants] excavated or removed any familial remains, and thus are not immune").

The Individual Defendants are immune from suit because the alleged actions underlying Plaintiff Thompson's outrage claim are legislative in nature. The Plaintiff's failure to allege specific conduct by the Individual Defendants in any non-legislative capacity underscores this fact. The outrage claim should be dismissed.

## III.    Plaintiff Thompson's outrage claim is time-barred.

Outrage claims are governed by a two-year statute of limitations under Alabama law. *See* Ala. Code § 6-2-38(l); Doc. 205 at 18-19. Because none of the allegedly outrageous conduct occurred in the two-year period preceding the filing of the SAC and the outrage claims do not relate back to the December, 2012 filing of the original complaint, the outrage claims must be dismissed as time-barred.

### A.    Plaintiff Thompson's outrage claim does not relate back because he cannot satisfy Rule 15(c)(1)(C).

Prior to the SAC, Plaintiff Thompson had not asserted any claim for outrage, had not sought any monetary relief, and had not asserted any claims at all against any individual capacity defendants. His 2019 assertion of an entirely new claim seeking entirely new relief against entirely new defendants does not relate back to the filing of the original complaint under Federal Rule of Civil Procedure 15(c)(1)(C). *See* Doc. 205 at 14-18.

Plaintiff Thompson asserts that "a mere change in capacity" does not implicate Rule 15(c)(1)(C). *See* Doc. 211 at 42-43. He is wrong. Many courts, including the Eleventh Circuit, apply Rule 15(c)(1)(C) to hold that the statute of limitations does not relate back for claims originally brought against a party in an official capacity and later changed to be in an individual capacity. *See, e.g., Colvin v. McDougall*, 62 F.3d 1316, 1318 (11th Cir. 1995) (denying amendment to sue police officer in his individual capacity after statute of limitations had run when original complaint was brought against him in an official capacity); *Rendall-Speranza v. Nassim*, 107 F.3d

9

913, 918 - 19 (D.C. Cir. 1997) (collecting cases where a court held there was no relation back of a claim brought against a party in his individual capacity when the original claim was in an official capacity); *Lovelace v. O'Hara*, 985 F.2d 847, 849 (6th Cir. 1993) (denying relation back of the statute of limitations for a claim against a defendant in an individual capacity where originally brought in an official capacity); *Ling v. Herrod*, 445 F. Supp. 2d 892, 895 (W.D. Tenn. 2006) (refusing to allow an amendment because the original complaint clearly stated that the defendant was being sued in his official capacity only and he had no reason to believe he may face liability individually until after the statute of limitations had run); *Smith v. Paladino*, 317 F. Supp. 2d 884, 888 (W.D. Ark. 2004) (denying plaintiff's amendment to add an individual capacity claim against Board member originally named in her official capacity, noting that "numerous courts have held that Rule 15(c) does not allow a plaintiff who sued a state entity in its official capacity to later add an individual-capacity claim").

Change to the capacity of a party triggers Rule 15(c)(1)(C) because that section governs the changing "the naming of the party." Indeed, one of the cases on which Plaintiff Thompson relies explicitly holds that when the naming of a party is changed from an official capacity to an individual capacity, Rule 15(c)(1)(C)'s additional requirements must be satisfied. *Robinson v. Clipse*, 602 F.3d 605, 608 (4th Cir. 2010). Plaintiff Thompson's new tort claim against the Individual Defendants in their individual capacities, filed years after having named them in their official capacities, is significant because it gives rise to personal liability. *See Colvin*, 62 F.3d at 1318 ("We stress as much as we can that the difference between an official capacity suit and an individual capacity suit is a big difference."); *see also Lovelace*, 985 F.2d at 850 ("[T]he distinction between an official capacity and an individual capacity suit is significant."). Disregarding the well-established federal authority on this point, Plaintiff Thompson relies upon *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273 (Ala. 2000), to argue that his untimely claim for outrage should relate back. *Callens* is inapplicable, however, because it did not involve a change in capacity or other change in the naming of a party; the plaintiff merely amended to add claims against parties in the same capacity that they had already been sued. *Id*. at 278. Accordingly, Rule

15(c)(1)(C) did not apply, and the court needed to only consider whether the claims arose out of the conduct, transaction, or occurrence set in the original pleading. *See* Fed. R. Civ. P. 15(c)(1)(B); Ala. R. Civ. P. 15(c)(2).

Because Rule 15(c)(1)(C) applies here, Plaintiff Thompson is entitled to relation back only if he can show that, within the initial Rule 4(m) service period, the Individual Defendants: (1) had notice of the action and will not be prejudiced; *and* (2) should have known that the action was brought against them individually but for a mistake in their identities. Fed. R. Civ. P. 15(c)(1)(C). With respect to notice, Plaintiff Thompson suggests that the Individual Defendants' general knowledge of the lawsuit suffices to satisfy the notice requirement of Rule 15(c)(1)(C). But the Rule requires not only general knowledge of the lawsuit, but also notice of capacity in which the party is being sued. *See, e.g.*, *Colvin*, 62 F.3d at 1318-19; *Lovelace*, 985 F.2d at 850-51. Plaintiff Thompson's previous complaints only asserted official capacity claims for declaratory and injunctive relief for alleged violations of federal statutes. SAC ¶ 234. The prior pleadings contained no tort claims or claims for emotional distress and sought no money damages. It was only after the statute of limitations on outrage had run that Plaintiff Thompson asserted the tort claim and sought to hold the Individual Defendants personally liable for monetary damages. SAC ¶ 234-35. During the statute of limitations and 4(m) service period, the Individual Defendants had no notice or reason to believe that Plaintiff Thompson intended to hold them personally liable for money damages. Absent such notice, Rule 15(c)(1)(C) is not satisfied.

Likewise, Plaintiff Thompson cannot show that the Individual Defendants should have known that the action was brought against them but for a mistake in their identities. It is clear that Plaintiff Thompson knew of the Individual Defendants' identities all along. Indeed, as he points out in his Opposition Brief, he named each and every one of them in an official capacity in the original Complaint seeking declaratory and injunctive relief—relief that is consistent with the official capacity claims. There was no "misnomer," as Plaintiff Thompson now claims. He simply made a strategic decision to only bring official capacity claims and not to seek tort liability against

the Individual Defendants. Then, after the statute of limitations had run, he changed his mind. This was not a mistake in identity.

Plaintiff Thompson relies heavily on *Itel Capital Corp. v. Cups Coal Co., Inc.*, 707 F.2d 1253 (11th Cir. 1983), an outlier case where the Court made a factual finding that the owner of a defendant corporation should have known he would be named when the complaint was filed but for a mistake by the plaintiff. *Id.* at 1258. The Eleventh Circuit has since limited *Itel* to its facts, explaining that the decision establishes "no general rule" and further clarifying that the purpose of Rule 15(c) does not support cases where the defendants were known to plaintiff at the time of the original filing. *See Powers v. Graff*, 148 F.3d 1223, 1226 (11th Cir. 1998). The out-of-Circuit cases Plaintiff Thompson that relies upon, involved similar factual findings that the defendant knew that a mistake was made and that a claim should have been brought against him individually. *See Robinson*, 602 F.3d at 610 (finding that the newly named defendant "knew within the limitation period that he was the party [plaintiff] intended to sue" because he was served and answered the amended complaint changing the claim to an individual capacity one within the Rule 4(m) period); *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (finding that plaintiff made individual claims in the original complaint but "mistakenly" named defendant in his official capacity, as opposed to having made a strategic decision).

In *Sunkyong International, Inc. v. Anderson Land & Livesock Co.*, 828 F.2d 1245 (8th Cir. 1987), another case cited by Plaintiff Thompson, the Court explained that it could only allow relation back because the change in capacity "did not open them to the imposition of additional liability." *Id.* at 1252. That is simply not the case here. On the contrary, Plaintiff Thompson is seeking to impose additional liability against the Individual Defendants in the form of a new claim seeking monetary damages. Plaintiff Thompson also relies heavily upon *Hill v. Shelander*, 924 F.2d 1370 (7th Cir. 1991), but in that case the Court made a factual finding that the original complaint "when 'read in its entirety' plainly shows that an individual capacity suit was intended." *Id.* at 1374. In contrast here, a reading of the original and first amended complaints makes clear

12

that no individual claims were brought, only claims in an official capacity, with corresponding relief applicable to the official capacity claims. No tort claims for outrage or damages were pled.

Plaintiff Thompson suggests that the fact that the defendants named in their official capacity invoked sovereign immunity somehow indicates that the Individual Defendants believed that they were being sued individually. Doc. 211 at 48. That argument is precisely backwards. The assertion that the "tribal officials retain sovereign immunity when acting in their official capacity," Doc. 76 at 10, actually demonstrates that the tribal officials understood that they were being sued in their *official* capacities. This case does not involve a misnomer or other mistake. Plaintiff Thompson made an intentional, strategic decision not to sue the Individual Defendants personally and then changed his mind when it was too late. For all these reasons, the outrage claim does not relate back under Rule 15(c)(1)(C).

B.   Plaintiff Thompson alleges no outrageous acts by the Individual Defendants within the two-year limitations period.

Plaintiff Thompson's putative outrage claim is time-barred because it accrued well over two years prior to the filing of the SAC. *See* Doc. 205 at 18-19. Plaintiff Thompson's effort to avoid the time bar by claiming to assert a continuing tort fails because he has not alleged that the Individual Defendants committed the requisite tortious acts within the statutory period.

Under Alabama law, a statute of limitations begins to run in favor of the party liable from the time the cause of action accrues. *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983) (citing *Garrett v. Raytheon Co.*, 368 So. 2d 516, 518-19 (Ala. 1979)). A cause of action accrues when injury occurs, and the statute of limitations begins to run whether or not the full amount of damages is apparent at the time of the first legal injury. *Id.* at 220. Here, according to the SAC, the Plaintiff Thompson became aware of the excavation of remains no later than 2006, so any claim accrued at or before that time. *See* SAC ¶ 137. Plaintiff Thompson filed his outrage claim in 2019. The claim is thus barred by the two statute of limitations for outrage.

Plaintiff Thompson erroneously argues that he has timely asserted a continuing tort. For a continuing tort theory to apply, Plaintiff Thompson would have had to allege that the Individual

Defendants committed "repeated wrongs." *Moon*, 435 So. 2d at 220. Here, there is no allegation of repeated tortious acts by the Individual Defendants that could be termed a "continuous tort." *Id.* (holding that the statute of limitations barred plaintiffs' claims because "[n]othing in the facts alleged . . . supports their claims that [defendant] committed repeated acts of negligence which could be termed a 'continuous tort' and which would extend the statutory limitations period.").

Even if the allegations could be considered a continuous tort, Alabama law requires that Plaintiff Thompson must have alleged that each Individual Defendant engaged in tortious conduct prior to the expiration of the two-year statute of limitations.[4] *See* Doc. 211 at 29 ("[T]he statute of limitations begins to run upon the Individual Defendants' last tortious act."); *Continental Cas. Ins. Co. v. McDonald,* 568 So. 2d 1208, 1216 (Ala. 1990) (explaining the continuing tort "arising from continuing dealings between the parties, will not be barred until two years *after the last tortious act by the defendant*") (emphasis added). Therefore, in *McDonald,* a case Plaintiff Thompson principally relies upon, the court applied the continuing tort concept because the tortious conduct "was continuing even up to the time the action was filed." 567 So. 2d at 1217. That is simply not the case here.

Plaintiff Thompson baldly asserts that "conduct" continued up to and continuing past the filing of the SAC, but he fails to identify a single tortious act by any Individual Defendant occurring within the statutory period. He alleges only that the Individual Defendants "intentionally and outrageously caused the desecration of Hickory Ground" by "order[ing]" and "authoriz[ing]" its excavation. SAC ¶¶ 223, 226. At the same time, he concedes that construction activities continued only "until 2014," making that the absolute latest date of any purported tortious act by any Individual Defendants. Doc. 211, 40 of 51. Plaintiff Thompson makes no allegations regarding any Individual Defendants' conduct occurring thereafter.[5] He makes only a vague allegation that

---

[4] Again, Plaintiff Thompson's collective allegations are a problem. Even if he alleged that one individual defendant committed a tortious act within the relevant time period—which he has not— that could not support a continuing tort theory against the other eight Individual Defendants.

[5] The only specific allegations of any conduct by particular Individual Defendants occurred in 2012 and 2013, SAC at 35, ¶¶ 153 - 58, 168 - 78, well outside the two-year limitations period.

the harm caused by Individual Defendants' prior conduct continues until "*Poarch* is required to take remedial measures," not Individual Defendants. SAC ¶ 233. Similarly, all of the allegations regarding reinternment of remains do not allege tortious conduct by Individuals Defendants, but rather by Poarch. SAC ¶ 120 ("[U]pon information and belief, *Poarch* directed the cultural items from the Hickory Ground site be stored in a manner that has caused and is continuing to cause damage further damage to the items.").

Moreover, *McDonald* does not hold that the statute of limitations turns on the plaintiff having suffered additional emotional distress during the statute of limitations, as Plaintiff Thompson suggests. Doc. 311, 36 of 51. Rather, it holds that the in the context of a continuing tort, the statute of limitations is determined by the defendant's last tortious act. *Id.* at 1216. Plaintiff Thompsons' extensive references to allegations about his continued distress are thus irrelevant. Without allegations of tortious conduct by the Individual Defendants within the statutory timeframe, Plaintiff Thompson's outrage claim fails.

## CONCLUSION

Insufficiency of the allegations as pled, legislative immunity, and the statute of limitations each and together are fatal to Plaintiff Thompson's outrage claim. As he has failed to state a claim upon which relief can be granted against the Individual Defendants, the Court should dismiss the outage claim.

Respectfully submitted this 4th day of September, 2020.

 s/*Mark H. Reeves*
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

15

Catherine F. Munson, D.C. Bar No. 985717
**Kilpatrick Townsend & Stockton LLP**
607 14th Street, N.W.
Washington, D.C. 20005
Phone: 202.508.5800
Email: cmunson@ktslaw.com
(Admitted *pro hac vice*)

Charles A. Dauphin, ASB-5833-H65C
**Dauphin Paris, LLC**
300 Vestavia Parkway, Suite 3400
Vestavia Hills, AL 35216
Phone: 205.979.6019
Email: cdauphin@dauphinparis.com

*Attorneys for Tribal Defendants*

16

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of September 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Lauren J. King<br>Foster Garvey PC<br>1111 Third Avenue; Suite 3000<br>Seattle, WA 98101<br>Email: lauren.king@foster.com<br><br>Counsel for Plaintiffs | Stewart Davidson McKnight, III<br>Dillard, McKnight, James & McElroy LLP<br>P.O. Box 530333<br>Birmingham, AL 35253-0333<br>Email: dmcknight@dillardmcknight.com<br><br>Counsel for Plaintiffs |
| Frank Eady Bankston , Jr.<br>Webster Henry Bradwell Cohan Speagle &<br>Deshazo<br>105 Tallapoosa Street; Suite 101<br>Montgomery, AL 36104<br>Email: fbankston@websterhenry.com<br><br>Counsel for Defendant Martin Construction, Inc. | Dennis Mitchell Henry<br>Webster Henry Bradwell Cohan Speagle &<br>Deshazo<br>P O Box 239<br>Montgomery, AL 36101-0239<br>Email: mhenry@websterhenry.com<br><br>Counsel for Defendant Martin Construction, Inc. |
| Jody Helen Schwarz<br>U.S. Department of Justice, Environment and<br>Natural Resource<br>P.O. Box 7611<br>Washington, DC 20044<br>Email: jody.schwarz@usdoj.gov<br><br>Counsel for Federal Defendants | Devon Lehman McCune<br>US DOJ<br>Environmental & Natural Resources<br>999 18th St / S Terrace - Ste 370<br>Denver, CO 80026<br>Email: devon.mccune@usdoj.gov<br><br>Counsel for Federal Defendants |
| David Randall Boyd<br>Griffin Lane Knight<br>Jordan Dorman Walker , Jr.<br>Balch & Bingham LLP<br>PO Box 78<br>Montgomery, AL 36101<br>Email: dboyd@balch.com<br>Email: lknight@balch.com<br>Email: dwalker@balch.com<br><br>Counsel for Defendant Auburn University | Jaime Stone Hammer<br>Morgan Mccue Sport<br>Auburn University<br>182 South College Street<br>101 Samford Hall<br>Auburn, AL 36849<br>Email: jsh0073@auburn.edu<br>Email: mms0116@auburn.edu<br><br>Counsel for Defendant Auburn University |

| James Joseph DuBois<br>U. S. Attorney's Office<br>PO Box 197<br>Montgomery, AL 36101<br>Email: james.dubois2@usdoj.gov<br><br>Counsel for Federal Defendants | |

Respectfully submitted,


 s/*Mark H. Reeves*
Mark H. Reeves, Georgia Bar No. 141847
**Kilpatrick Townsend & Stockton LLP**
Enterprise Mill
1450 Greene St., Suite 230
Augusta, GA 30901
Phone: 706.823.4206
Email: mreeves@ktslaw.com
(Admitted *pro hac vice*)

18

# TAB 223

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, a federally recognized Indian tribe, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:12cv1079-MHT (WO) |
| POARCH BAND OF CREEK INDIANS, a federally recognized Indian tribe, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

OPINION

This dispute concerns the use and ownership of a 34-acre tract of land south of Wetumpka, Alabama. The land sits at Hickory Ground, the last capital of the Creek Nation before the Tribe was forced from the eastern United States in the 1830s, an exodus known as the Trail of Tears. Burial sites and ceremonial grounds dot the area, which in 1980 was placed on the National Register of Historic Places as a site of national significance. Today the land is held by the United States Department

of the Interior in trust for Poarch Band of Creek Indians ("PBCI"), and it is the location of PBCI's Wind Creek Wetumpka casino and hotel.  The excavation of the land and the construction and operation of the Wind Creek Wetumpka are the subject of this litigation.

The three plaintiffs who bring this suit are the Muscogee (Creek) Nation; the Hickory Ground Tribal Town, which is now located in Oklahoma; and George Thompson, the chief, or "Mekko," of the tribal town.  They filed the original complaint in this suit in 2012.  In the operative second amended complaint, filed in March 2020 after the case had been stayed pending unsuccessful settlement negotiations, the plaintiffs have named three groups of defendants.  The "Federal Defendants" consist of the Interior Department, the National Park Service, the Bureau of Indian Affairs, and the officials who head each of those entities.  The "Tribal Defendants" consist of PBCI; the PCI Gaming Authority, a commercial enterprise of PBCI that operates the Wind Creek Wetumpka; various officials on the PBCI Tribal Council and the

Board of PCI Gaming Authority, who are sued in their
official capacities; and the PBCI Tribal Historic
Preservation Officer, who is sued in his official
capacity.   The "Individual Defendants" consist of former
and current members of the PBCI Tribal Council, who are
sued in their individual capacities.   The plaintiffs have
also sued Auburn University, which has not moved to
dismiss the plaintiffs' second amended complaint.[1]

The second amended complaint raises eleven claims,
most of them alleging violations of federal statutes: the
Indian Reorganization Act, or IRA, 25 U.S.C. § 5101; the
Native American Graves Protection and Repatriation Act,
or NAGPRA, 25 U.S.C. § 3001; the Archaeological Resources
Protection Act, or ARPA, 16 U.S.C. § 470aa; the Religious

---

1.   There is one other defendant in this case: Martin
Construction, Inc., a company that helped build the Wind
Creek Wetumpka.   The company is named on the plaintiffs'
NAGPRA and outrage claims; it is not wholly clear from
the second amended complaint whether any of the other
claims are also brought against the company.   Martin
Construction filed a notice of bankruptcy in April 2020.
*See* Notice of Bankruptcy (Doc. 198).   Because the filing
of such notice imposed an automatic stay of the
proceedings against Martin Construction, *see* 11 U.S.C.
§ 362, this opinion does not further address the company.

Land Use and Institutionalized Persons Act, or RLUIPA, 42 U.S.C. § 2000cc; the Religious Freedom Restoration Act, or RFRA, 42 U.S.C. § 2000bb; and the National Historic Preservation Act, or NHPA, 54 U.S.C. § 300101. Some of these claims are denominated as dependent on the court's resolution of the plaintiffs' IRA claim, the first count of their complaint. The plaintiffs also bring common-law counts of unjust enrichment, promissory estoppel, and the Alabama tort of outrage, the last of which they say applies only if the court rules in their favor on the IRA claim. This tort-of-outrage claim is the only count brought against the Individual Defendants. With these claims, the plaintiffs seek, *inter alia*, to have Hickory Ground taken out of trust for PBCI and placed in a constructive trust for them, to have federal preservation grants to PBCI for the site ceased, to prevent the Tribal and Federal Defendants from undertaking any further clearing or construction on the Hickory Ground site, and to require that the Tribal Defendants "cause the Hickory Ground Site to be returned

**4**

to the condition it was in prior to the construction of the casino resort."  Second Amended Complaint (Doc. 79) at 76-79.  They do not seek damages, except from the Individual Defendants for the tort-of-outrage claim if applicable.

This case is now before the court on the separate motions of the Federal Defendants, the Tribal Defendants, and the Individual Defendants to dismiss the plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1362 (federal-law claims brought by Indian Tribes), 1367 (supplemental jurisdiction), and 25 U.S.C. § 3013 (NAGPRA).  As explained below, the court finds that the Tribal Defendants, including the tribal officials named in their official capacities, are immune from this suit and must be dismissed.  Without the Tribal Defendants present, the remaining claims cannot be adjudicated under the precepts of Rule 19 of the Federal Rules of Civil Procedure.  The Tribal Defendants' motion to dismiss will

accordingly be granted, the motions of the Federal and Individual Defendants will be denied as moot, and this suit will be dismissed.


### I. FACTUAL BACKGROUND

The court at this stage must accept as true the factual allegations of the second amended complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). According to those allegations, Hickory Ground is a site of longstanding cultural, religious, and political importance for the Muscogee (Creek) Nation, believed to date back to the nation's original tribal town "at the time of the beginnings." Second Amended Complaint (Doc. 190) at ¶ 46. Perhaps most importantly for present purposes, the area contained ceremonial grounds and a number of burial sites and individual graves, some within the ceremonial grounds and some beneath the family homes of the dead. These graves held human remains and funerary objects of deep significance to the plaintiffs, and the graves were situated in specific places within Hickory

Ground based on the position held by the deceased individual in the town's governance structure.

The plaintiffs explain that it is their "long-established religious belief that burial and ceremonial grounds are sacrosanct and must not be entered, let alone disturbed, without the proper religious protocol." *Id.* at ¶ 55. In accordance with these religious beliefs, the plaintiffs hold "that their ancestors must be left at peace in their final resting places with their possessions," and that the plaintiffs "owe a religious duty to their ancestors to care for the graves and bodies of the deceased." *Id.* at ¶¶ 56-57.

PBCI acquired Hickory Ground in 1980 with funding from a federal preservation grant, subject to a 20-year protective covenant requiring preservation of the property. In 1984, the Interior Department took the land into trust for PBCI, following the recognition of PBCI's tribal status by the United States government earlier

that year.  *See* Trust Deed (Doc. 203-2) at 1.[2]  Shortly after the protective covenant expired in July 2000, PBCI began excavating the site alongside archaeologists from Auburn University to gather information about the cultural artifacts buried at Hickory Ground prior to development of the area.  The excavation was completed in 2011.

In the meantime, the Alabama Historical Commission and others began in 2001 to write letters to the Interior Department and the Bureau of Indian Affairs raising concerns about potential disturbance of the cultural artifacts at Hickory Ground in the course of PBCI's excavation.  The City of Wetumpka, the Alabama Preservation Alliance, and an individual member of the Creek Nation filed suit against PBCI in 2001, making many of the same allegations reiterated in the present suit, including that the then-planned excavation and clearing

---

2.  The trust deed is appropriate for the court to review at this stage because it is "central to the plaintiff's claims and is undisputed in terms of authenticity."  *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005).

of the site would violate NAGPRA, ARPA, and the NHPA. *See generally* First Amended Complaint (Doc. 20), *City of Wetumpka v. Norton*, No. 01-cv-1146-WHA (M.D. Ala. Nov. 9, 2001).  The suit was dismissed with prejudice shortly thereafter by request of the plaintiffs.  *See* Order (Doc. 22) at 1, *City of Wetumpka*, No. 01-cv-1146-WHA (M.D. Ala. Nov. 21, 2001) (Albritton, C.J.).

According to the operative complaint in this case, the plaintiffs here were first notified of the excavation sometime in 2006.  *See* Second Amended Complaint (Doc. 190) at ¶ 137.  The plaintiffs then "engaged in a years-long effort to persuade [PBCI] not to excavate and desecrate the remains of Plaintiffs' ancestors and other cultural items and to return any cultural items already excavated from Hickory Ground to their original resting place." *Id.* at ¶ 139.  The plaintiffs also contacted the National Park Service about their concerns.

Negotiations between the plaintiffs and PBCI ultimately failed in 2011.  The following year, PBCI reinterred many of the cultural artifacts removed from

Hickory Ground at other locations.  PBCI notified

plaintiffs Muscogee (Creek) Nation and Mekko Thompson[3] of

the planned reburials by letter on April 4, 2012, but

completed the reburials before the plaintiffs responded

nine days later.  *Id.* at ¶¶ 153-58.  In July 2012, PBCI

announced plans to develop what is now the Wind Creek

Wetumpka.  The plaintiffs filed the present suit that

December.  Construction was completed on the Wind Creek

Wetumpka in 2014, during the pendency of this litigation,

and the casino and resort have been operational since

then.  In March 2020, as noted above, the plaintiffs

filed the operative second amended complaint after the

case had been stayed pending unsuccessful settlement

negotiations.


## II. MOTION-TO-DISMISS STANDARD

In considering a defendant's motion to dismiss, the

court accepts the plaintiff's allegations as true, *see*

---

3.   As both the plaintiffs and the Tribal Defendants
use this honorific when identifying plaintiff Thompson
in their briefing, the court does the same.

*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).  The court may draw "reasonable inferences" from the facts alleged in the complaint.  *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

The defendants in this case also move to dismiss many of the plaintiffs' claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  A motion under Rule 12(b)(1) can present

11

either a facial or a factual attack to the court's jurisdiction. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). When resolving a facial attack under Rule 12(b)(1), as when resolving a Rule 12(b)(6) motion, the court must assume the truth of the allegations in the complaint. *See id.* If the motion instead depends on the resolution of disputed facts, however, the court must provide the parties an opportunity for discovery and a hearing before deciding the motion. *See id.*

Finally, the Tribal Defendants have moved to dismiss the entirety of the second amended complaint under Rule 12(b)(7), on the ground that PBCI is an indispensable party to the litigation but is immune from suit. In such motions, the burden is on the movant to show the necessity of the relevant party and the nature of the interests that will be unprotected in the party's absence. *See W. Peninsular Title Co. v. Palm Beach County*, 41 F.3d 1490, 1492 (11th Cir. 1995) (per curiam). As with a motion under Rule 12(b)(6), the court must assume the truth of

the factual allegations in the complaint.  *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1359 (3d ed. 2020).  But the court is not limited to the complaint, and the parties may present evidence outside the pleadings.  *See id.*  A dismissal under Rule 12(b)(7) is without prejudice.  *See id.*

## III. DISCUSSION

The court begins and ends its analysis with the Tribal Defendants' motion to dismiss.  The Tribal Defendants named in the second amended complaint are immune from the claims made here: PBCI and PCI Gaming Authority because they enjoy sovereign immunity from unconsented suit, and the tribal officials under the doctrine announced in *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997).  In the absence of any tribal representatives among the defendants, the plaintiffs' remaining claims cannot be adjudicated without serious prejudice to the interests of PBCI.  Accordingly,

pursuant to Rule 19(b) of the Federal Rules of Civil Procedure, the suit must be dismissed.

### A.   Immunity of the Tribal Defendants

The Tribal Defendants move to dismiss all of the claims against them as barred by sovereign immunity.  As to the claims against PBCI and the PCI Gaming Authority, the Tribal Defendants are plainly correct, and the claims must be dismissed.  Tribes are "separate sovereigns pre-existing the Constitution."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).  As "domestic dependent nations," they maintain "historic sovereign authority" subject only to Congress's power to abrogate their sovereign rights.  *Id.* (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)).  Among the incidents of tribal sovereign authority, Tribes such as PBCI enjoy immunity against unconsented suits absent express congressional

14

override of that immunity. *See Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1287 (11th Cir. 2015).

This case is unusual in that Tribes are present as both plaintiffs and defendants. Although tribal sovereign immunity bars suits brought by States against unconsenting Tribes absent congressional authorization, *see Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 755-56 (1998), it does not appear that either the Supreme Court or the Eleventh Circuit Court of Appeals has decided whether sovereign immunity may be asserted in suits brought by one Tribe against another. *Cf. Caddo Nation of Okla. v. Wichita & Affiliated Tribes*, 786 F. App'x 837, 840-41 (10th Cir. 2019) (assuming sovereign immunity applied to suit between Tribes absent waiver). But since "an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity," *Kiowa Tribe*, 523 U.S. at 754, and considering that Tribes are not subject to the "'mutuality of ... concession' that 'makes the States' surrender of immunity from suit by sister States

15

plausible,'" *id.* at 756 (alteration in original) (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 782 (1991)), the court does not see why inter-tribal litigation should be exempt from the principles of sovereign immunity that govern all other suits against Tribes.

As such, PBCI is entitled to have the claims against it dismissed on the basis of tribal sovereign immunity. Furthermore, the Eleventh Circuit has held that PBCI's immunity is shared by PCI Gaming Authority "because it operates as an arm of the Tribe." *PCI Gaming Auth.*, 801 F.3d at 1287. The plaintiffs' argument to the contrary--that PBCI and PCI Gaming Authority received delegated federal authority and thereby became subject to the APA's general immunity waiver when they signed an agreement with the National Park Service in 1999 to undertake certain duties prescribed by the National Historic Preservation Act--is wrong. The APA waives the immunity of federal agencies and the officers and employees thereof from suits seeking non-monetary relief.

5 U.S.C. § 702. PBCI did not turn itself into a federal agency by signing a contract with one.

The primary case the plaintiffs marshal in support of their theory, *Caddo Nation of Oklahoma*, is not on point. There, the defendant Tribe had expressly waived its immunity and consented to suit in the agreement it signed with the Department of Housing and Urban Development. *See* 786 F. App'x at 840 n.4. No consent to suit appears in PBCI's agreement with the National Park Service, nor does the complaint contain factual allegations that PBCI has otherwise consented to suit. *See* NPS Agreement (Doc. 190-1) at 115-19. "[T]he Supreme Court has made it plain that waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed." *Furry v. Miccosukee Tribe of Indians*, 685 F.3d 1224, 1234 (11th Cir. 2012) (quoting *Sanderlin v. Seminole Tribe*, 243 F.3d 1282, 1286 (11th Cir. 2001)). There is no such unequivocal waiver here, so PBCI and PCI Gaming Authority may assert their sovereign immunity.

17

Whether the tribal officials named as defendants in their official capacities are immune from suit is a more complicated question.  In general, suits for equitable relief against officers in their official capacities are not barred by sovereign immunity under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).  The Tribal Defendants argue that *Young* is inapplicable here because the plaintiffs "seek not to stop ongoing violations of federal law, but to adjudicate the legality of discrete past acts," and because the specific nature of the plaintiffs' claims implicates "special sovereignty interests" that exempt them from *Young* under the doctrine of *Coeur d'Alene*.  Br. in Supp. Tribal Defs.' Mot. to Dismiss (Doc. 202) at 23.

The first of these arguments misconstrues either the plaintiffs' complaint or the distinction drawn by the *Young* doctrine between retrospective and prospective claims.  While it is true that this suit arises from things that happened in the past--the taking of Hickory Ground into trust for PBCI, the excavation of the land,

the construction of the Wind Creek Wetumpka--the relief that the plaintiffs request is forward-looking and equitable. They ask that the defendants be enjoined from continuing to excavate Hickory Ground or operate the Wind Creek Wetumpka, and that they be required to return to the plaintiffs the cultural items removed from Hickory Ground and restore the land itself into the condition it was in before the excavations began. They say that the defendants are engaging in an ongoing violation of federal law by retaining the excavated cultural items and continuing to operate the Wind Creek Wetumpka. And they do not ask for money damages from the official defendants for these alleged violations.

As the Supreme Court has explained and the Tribal Defendants have acknowledged, this is "ordinarily sufficient to invoke the *Young* fiction." *Coeur d'Alene*, 521 U.S. at 281. Most suits, including equitable ones, arise from events that have already occurred. The fact of past harm makes clear the likelihood of future harm. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 712 (1977).

The *Young* doctrine does not require an official defendant not to have done anything wrong yet; it requires that the plaintiff seek to prevent future or ongoing wrongdoing, regardless of what happened in the past.  That is what the plaintiffs seek here, and their suit against the official defendants accordingly falls within the boundaries of *Ex parte Young*.

Still, not all suits that meet the general prerequisites of the *Young* doctrine may be heard.  As relevant here, the Supreme Court recognized in *Coeur d'Alene* that certain suits that impose on "special sovereignty interests" in important sovereign-owned lands are subject to sovereign immunity whether they are brought against the sovereign directly or by naming officials of the sovereign entity in their official capacities.  *Coeur d'Alene*, 521 U.S. at 281.  In *Coeur d'Alene*, for instance, the imposition was an action seeking relief that the Court found to be "the functional equivalent of quiet title," *id.* at 282--the suit sought to establish the Tribe's "entitlement to the exclusive

20

use and occupancy and the right to quiet enjoyment of"
certain submerged lands in Lake Coeur d'Alene that the
State claimed as its own, *id.* at 264-65.  As the Court
explained, "[t]he suit would diminish, even extinguish,
the State's control over a vast reach of lands and waters
long deemed by the State to be an integral part of its
territory."  *Id.* at 282.  A suit seeking such
"far-reaching and invasive relief" is for all practical
purposes a suit against the sovereign itself, and as such
it is barred by sovereign immunity unless the sovereign
consents.  *Id.*

*Coeur d'Alene* was, of course, an "unusual case"
establishing a "narrow exception" to *Young*.  Pls.'
Response to Tribal Defs.' Notice of Supplemental Auth.
(Doc. 220) at 3 (quoting *Curling v. Sec'y of State*, 761
F. App'x 927, 933-34 (11th Cir. 2019)).  But this case
fits within that exception.  The plaintiffs' suit seeks
to divest PBCI more or less completely of its control
over Hickory Ground.  It seeks orders from the court
requiring PBCI to dismantle the Wind Creek Wetumpka,

restore Hickory Ground, "to the greatest extent possible, to its pre-excavation and pre-construction condition," which would include "returning the excavated cultural items to their original burial locations," abstain from "any further ground disturbing, clearing, grading, leveling, or construction activity" at Hickory Ground, and placing the land in constructive trust for the plaintiffs "as relief for Poarch's breach of its promises to the Muscogee (Creek) Nation." Second Amended Complaint (Doc. 190) at 76-79. Beyond that, the plaintiffs' IRA claim seeks to convert Hickory Ground from reservation land held by the Interior Department in trust for PBCI into a parcel owned by the Tribe in fee simple. Not only would this prevent PBCI from operating a casino there, but it would transform the nature of the Tribe's relationship to Hickory Ground, changing it from one of sovereign ownership of tribal territory to an everyday property interest that might be held by a private individual or corporation. This "goes to the heart of [PBCI]'s sovereign and proprietary interests"

and is every bit as invasive as the relief sought in *Coeur d'Alene*. *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 996 (9th Cir. 2020).

In effect, the plaintiffs ask the court to order PBCI to cease the activities it currently carries out at Hickory Ground, alter the site drastically at the plaintiffs' direction to transform it back into the condition in which they desire it to remain, and then leave the land alone. These remedies might not literally revoke PBCI's title to Hickory Ground. *See* Pls.' Response to Tribal Defs.' Notice of Supplemental Auth. (Doc. 220) at 2. But they would do everything short of that, providing the plaintiffs "*de facto* beneficial ownership" of the site and divesting PBCI "of its right to use what is, after all, *its* land." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453 (1988) (emphasis in original).

Moreover, as in *Coeur d'Alene*, the particular lands addressed by this suit bear special significance to the sovereign defendant. In *Coeur d'Alene*, the plaintiffs

sought to end the State's control of certain "submerged lands, lands with a unique status in the law." *Coeur d'Alene*, 521 U.S. at 283.  As the Court explained, the history of American and English law makes clear that navigable waters and the land beneath them carry special "importance ... to state sovereignty." *Id.*  So too does Hickory Ground carry special importance to the sovereignty of PBCI.  The Tribe has owned the land for 40 years, and the casino it operates there is a major driver of its economy.  *See* Second Amended Complaint (Doc. 190) at ¶¶ 202, 211.  And PBCI has significant historical connections to Hickory Ground as well. According to the Interior Department's memorandum acknowledging PBCI's tribal status, which is cited in the plaintiffs' complaint, *see id.* at ¶ 63, the Tribe consists of the descendants of members of the Creek Nation who remained in Alabama after the Trail of Tears, *see* U.S. Dep't of the Interior, Proposed Finding for Federal Acknowledgement of the Poarch Band of Creeks of Alabama 1-3 (Dec. 29, 1983).  Hickory Ground is central

to the history of the Creek Nation in Alabama; the site "was involved in nearly all the major historic events in the southeast before the removal of Creeks from Alabama in 1836." Application for Historic Preservation Funds (Doc. 190-1) at 4.

This land, long owned by PBCI, is a vital part of both the Tribe's history and its present economy. No matter the phrasing of the plaintiffs' complaint or how the defendants they name are therein denominated, PBCI's sovereign interest in its ownership and use of Hickory Ground cannot be placed in jeopardy before this court without the Tribe's consent. As a result, the Tribal Defendants--including the tribal officials named in their official capacity--must be dismissed from this suit.

### B.   Required Joinder of Parties

Rule 19 of the Federal Rules of Civil Procedure governs the mandatory joinder of parties to a suit. Certain entities whose rights or obligations are implicated by a particular suit must be joined to that

litigation if feasible.  An entity becomes a "required party" under Rule 19(a) if "the court cannot accord complete relief" in the entity's absence or if proceeding on the action without that entity would "impair or impede the person's ability to protect their interest" or leave an existing party "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a).  If such a "required party" cannot be joined to the suit, the court must evaluate, based on various equitable factors, whether it is appropriate for the suit to proceed without the party involved.  *See* Fed. R. Civ. P. 19(b).  As noted above, the burden lies with the party seeking dismissal on Rule 19 grounds to demonstrate the necessity of the party's presence and the interests that will be damaged in the party's absence.

"[P]ragmatic concerns, especially the effect on the parties and the litigation, control" the analysis of whether a party is required under Rule 19(a).  *Fla. Wildlife Fed'n Inc. v. U.S. Army Corps of Eng'rs*, 859

26

F.3d 1306, 1316 (11th Cir. 2017) (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003)).   The Tribal Defendants argue persuasively that they are required parties to this litigation.   As they accurately describe the suit's "overarching objective," it is "to deprive PBCI of jurisdiction and control over part of its reservation, to order it to expend substantial resources ..., and to literally dismantle one of its major economic engines." Br. in Supp. Tribal Defs.' Mot. to Dismiss (Doc. 202) at 86.   Proceeding without any of the Tribal Defendants would seriously impair the Tribe's ability to protect its interest in continuing to operate its casino on its land, an interest not shared by the Federal Defendants who would remain in the suit.   The Eleventh Circuit has found considerably lesser threats of interest-impairment than this to make a party required under Rule 19(a).   *See, e.g.*, *Fla. Wildlife Fed'n*, 859 F.3d at 1317.   And the court could not afford complete relief without the Tribe or any of its representatives present.   No injunction

running against the Federal Defendants could force the Tribe to stop operating the Wind Creek Wetumpka or to tear it down, nor could the court grant such relief against the Individual Defendants, who again are sued only in their individual capacities for monetary relief on the tort-of-outrage claim.

The plaintiffs do not meaningfully contest that the Tribal Defendants as a group are required parties under Rule 19. They say instead that the interests of PBCI itself and PCI Gaming Authority could appropriately be represented by the tribal officials named as official-capacity defendants. *See* Pls.' Response to Tribal Defs.' Mot. to Dismiss (Doc. 212) at 105 (arguing that "Poarch and PCI Gaming are adequately represented by the tribal official defendants"). But as discussed above, the tribal officials too enjoy sovereign immunity and will be dismissed from this suit. Without either the

Tribe or its officials in this case, the interests of PBCI will not be adequately protected.[4]

When a required party cannot be joined to a suit, the court must weigh the relevant equities, including four specific factors set forth in Rule 19(b), to determine whether the suit can move forward without the party. In this case, the Supreme Court's decision in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), all but answers the question whether the suit can proceed

---

4. There is one exception in this suit to the general insufficiency of the remaining defendants to protect the Tribal Defendants' interests: the plaintiffs' tort-of-outrage claim against the Individual Defendants in their individual capacities. Rule 19 speaks of the parties required for an "action" to proceed, not particular claims, and it mandates dismissal of the "action" in certain instances when these required parties cannot be joined. Fed. R. Civ. P. 19(a)(1)(B), (b). But the Supreme Court has explained that a "civil action" may "comprise[] fewer claims than were included in the complaint." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559 (2005). In any event, whether or not Rule 19 would require the plaintiffs' tort-of-outrage claim to be dismissed with the other claims, the plaintiffs have expressly made the viability of their outrage claim contingent on first succeeding on their claim under the IRA. *See* Second Amended Complaint (Doc. 190) at ¶ 200. As such, because the court will dismiss the plaintiffs' IRA claim, it will treat their tort-of-outrage claim as voluntarily withdrawn.

without the Tribal Defendants present.  As the Court held, "[a] case may not proceed when a required-entity sovereign is not amenable to suit." *Id.* at 867.  "[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.*

Among the factors enumerated in Rule 19(b), the difficulties raised by proceeding with a suit that implicates an absent sovereign's interests--rather than the interests of a non-sovereign absent party--go most directly to whether a judgment rendered in the sovereign's absence could "prejudice that person or the existing parties."  Fed. R. Civ. P. 19(b)(1); *see also Pimentel*, 553 U.S. at 869.  As explained above, a judgment rendered in the absence of the Tribal Defendants could nevertheless all but entirely demolish PBCI's control over part of its tribal land.  Furthermore, there do not appear to be any circumscribed remedies the plaintiffs could seek against the other defendants that would

eliminate the burden on PBCI's interests. *See* Fed. R. Civ. P. 19(b)(2). A ruling against the Federal Defendants on the plaintiffs' IRA claim would make PBCI's further operation of the Wind Creek Wetumpka illegal; a ruling against them on the plaintiffs' NAGPRA or ARPA claim would require the federal government to do what it could to force PBCI to tear down the Wind Creek Wetumpka and restore the site to its pre-excavation status. *See* Second Amended Complaint (Doc. 190) at ¶¶ 261(b), 282(b).

Whether the judgment would be "adequate" without the Tribal Defendants present--the factor set forth in Rule 19(b)(3)--turns on the "public stake in settling disputes by wholes, whenever possible." *Pimentel*, 553 U.S. at 870 (quoting *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 111 (1968)). This longstanding dispute between the Muscogee (Creek) Nation and PBCI over control of the human remains and cultural items once interred at Hickory Ground could not be resolved as a whole without the Tribe or any of its representatives present. And while it is true that dismissing this suit

may leave the plaintiffs no forum for at least some of
their claims--the consideration raised by Rule
19(b)(4)--this is sometimes the necessary consequence of
the obligations imposed on courts and litigants by
Rule 19. *See Pimentel*, 553 U.S. at 872. Moreover, the
disposition of the present suit does not mean that all
hope is lost for these plaintiffs. As noted above, a
dismissal for failure to join a required party is without
prejudice. A narrower suit seeking more limited
relief--such as the return of the bodies and funerary
objects buried at Hickory Ground to the descendants of
the deceased--may not trigger the same sovereign
interests that preclude this litigation from proceeding,
particularly if such a suit were directed at specific
tribal officials responsible for PBCI's ongoing control
of those bodies and artifacts. In any event, the immunity
of sovereigns against unconsented suits does not bend to
the injustice of claims unheard.

## IV. CONCLUSION

For all of these reasons, the court concludes that the Tribal Defendants are required parties to this suit, that they cannot be joined to it, and that the suit may not proceed in their absence.  Accordingly, the court will grant the Tribal Defendants' motion to dismiss, deny as moot the motions to dismiss of the Federal and Individual Defendants, and dismiss this action without prejudice.[5]

In so concluding, the court does not question that the plaintiffs have grave historical, cultural, and religious interests in the treatment of Hickory Ground and those who were buried there.  But so too does PBCI, as a sovereign entity, have serious interests in not having its capacity to exercise dominion over its lands adjudicated in a federal court without its presence and consent.  Whether these plaintiffs or other descendants of the people once interred at Hickory Ground could bring

_____

5.  As noted above, this dismissal will not include the claims against Martin Construction, the company that has filed a notice of bankruptcy in this case.

33

a suit seeking more limited remedies is not before the
court today.  All the court now finds is that the sweeping
relief sought here implicates so deeply the sovereign
interests of PBCI that the claims against the Tribe and
its officials may not proceed without PBCI's consent, and
that this litigation cannot proceed without PBCI's
presence or the presence of its representatives.

                          * * *

     A separate judgment will issue.

     DONE, this the 15th day of March, 2021.

                              /s/ Myron H. Thompson
                         UNITED STATES DISTRICT JUDGE

**34**

# TAB 224

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, a federally recognized Indian tribe, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:12cv1079-MHT (WO) |
| POARCH BAND OF CREEK INDIANS, a federally recognized Indian tribe, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

### JUDGMENT

In accordance with the opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The Tribal Defendants' motion to dismiss (Doc. 201) is granted.  The claims against them are dismissed without prejudice, and these defendants are terminated.

(2) Pursuant to Rule 19 of the Federal Rules of Civil Procedure, the claims against all remaining defendants except defendant Martin Construction, Inc., are dismissed

without prejudice.   These defendants are terminated as parties.

(3) The motions to dismiss filed by these remaining defendants (Doc. 199 & Doc. 204) are denied as moot.

It is further ORDERED that no costs are taxed.

The court recognizes that the proceedings have been stayed as to defendant Martin Construction, Inc., and said defendant has not been dismissed.   If the other parties believe it is necessary for the judgment to be designated as a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, they may move the court to so designate the judgment.

This case is not closed.

DONE, this the 15th day of March, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA 11th Circuit at www.ca11.uscourts.gov
Effective on December 1, 2013, the fee to file an appeal is $505.00

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited
    by statute:

    (a)   **Appeals from final orders pursuant to 28 U.S.C. § 1291:**  Final orders and
          judgments of district courts, or final orders of bankruptcy courts which have been
          appealed to and fully resolved by a district court under 28 U.S.C. § 158, generally
          are appealable.  A final decision is one that "ends the litigation on the merits and
          leaves nothing for the court to do but execute the judgment."  *Pitney Bowes, Inc.
          v. Mestre*, 701 F.2d 1365, 1368 (11th Cir. 1983) (citing *Catlin v. United States*,
          324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)).  A magistrate judge's
          report and recommendation is not final and appealable until judgment thereon is
          entered by a district court judge.  28 U.S.C. § 636(b); *Perez-Priego v. Alachua
          County Clerk of Court*, 148 F.3d 1272 (11th Cir. 1998).  However, under 28
          U.S.C. § 636(c)(3), the Courts of Appeals have jurisdiction over an appeal from a
          final judgment entered by a magistrate judge, but only if the parties consented to
          the magistrate's jurisdiction.  *McNab v. J & J Marine, Inc.*, 240 F.3d 1326, 1327-
          28 (11th Cir. 2001).

    (b)   **In cases involving multiple parties or multiple claims**, a judgment as to fewer
          than all parties or all claims is not a final, appealable decision unless the district
          court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b).
          *Williams v. Bishop*, 732 F.2d 885, 885-86 (11th Cir. 1984).  A judgment which
          resolves all issues except matters, such as attorneys' fees and costs, that are
          collateral to the merits, is immediately appealable. *Budinich v. Becton Dickinson
          & Co.*, 486 U.S. 196, 201, 108 S.Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988);
          *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 837 (11th Cir. 1998).

    (c)   **Appeals pursuant to 28 U.S.C. § 1292(a):** Under this section, appeals are
          permitted from the following types of orders:
          i.    Orders granting, continuing, modifying, refusing or dissolving injunctions, or
                refusing to dissolve or modify injunctions; However, interlocutory appeals
                from orders denying temporary restraining orders are not permitted.
                *McDougald v. Jenson*, 786 F.2d 1465, 1472-73 (11th Cir. 1986);
          ii.   Orders appointing receivers or refusing to wind up receiverships; and
          iii.  Orders determining the rights and liabilities of parties in admiralty cases.

    (d)   **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5:**  The
          certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition
          for permission to appeal is filed in the Court of Appeals.  The district court's
          denial of a motion for certification is not itself appealable.

    (e)   **Appeals pursuant to judicially created exceptions to the finality rule:** Limited
          exceptions are discussed in cases including, but not limited to: *Cohen v.
          Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93

L.Ed. 1528 (1949); *Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc.*, 890 F.2d 371, 376 (11th Cir. 1989); *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.  **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. *Rinaldo v. Corbett*, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)  **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the order or judgment appealed from is entered. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)  **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)  **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)  **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend or reopen the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time to file an appeal may be reopened if the district court finds, upon motion, that the following conditions are satisfied: the moving party did not receive notice of the entry of the judgment or order within 21 days after entry; the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice, whichever is earlier; and no party would be prejudiced by the reopening.

(e)  **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

**3.**     <u>**Format of the notice of appeal**</u>: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format.  *See also* Fed.R.App.P. 3(c).  A *pro se* notice of appeal must be signed by the appellant.

**4.**     <u>**Effect of a notice of appeal:**</u> A district court lacks jurisdiction, *i.e.*, authority, to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 3/2011

# TAB 225

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
MUSCOGEE (CREEK) NATION,     )
a federally recognized       )
Indian tribe, et al.,        )
                             )     CIVIL ACTION NO.
        Plaintiffs,          )      2:12cv1079-MHT
                             )          (WO)
    v.                       )
                             )
                             )
MARTIN CONSTRUCTION, INC.,   )
                             )
        Defendant.           )
```

ORDER

In accordance with the opinion and judgment entered today, it is ORDERED that the clerk of the court is to close this case administratively pending resolution of defendant Martin Construction, Inc.'s bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Alabama. *See* Notice of Bankruptcy (Doc. 198).

Because the only party remaining in this case has declared bankruptcy, it is further ORDERED that the parties should inform the court by 5:00 p.m. on March 17, 2021, whether they agree to the court's entering the

following standard order when a party suggests bankruptcy:

"Defendant Martin Construction, Inc., having made a suggestion of bankruptcy (Doc. 198), and counsel for the parties having informed the court that they do not object to this order, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That defendant Martin Construction, Inc., is dismissed and terminated without prejudice to the right of any party to petition to reinstate this defendant as a party to pursue any claim embraced herein not adjudicated in or discharged by proceedings in the bankruptcy court;

(2) That such reinstatement, if and when allowed, will cause the filing date of any claim so reinstated to relate back to the original filing date of this action against said party; and

(3) That any petition for reinstatement must be filed by a party within 60 days after the bankruptcy court has taken such action that entitles that party to seek reinstatement.

"The clerk of the court is DIRECTED to mail a copy of this order to the bankruptcy court.

"This case is closed."

DONE, this the 15th day of March, 2021.

　　　　　　　　/s/ Myron H. Thompson
　　　　　　　UNITED STATES DISTRICT JUDGE

No. 21-11643

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## MUSCOGEE (CREEK) NATION, et al.,

### Plaintiffs-Appellants,

### v.

## BUFORD ROLIN, et al.,

### Defendants-Appellants.

---

**Appeal from the District Court of the United States for the Middle District of Alabama, Northern Division**
**District Court No. 2:12cv1079-MHT (CSC) (Hon. Myron H. Thompson)**

---

## APPELLANTS' APPENDIX – VOLUME 5

---

Mary Kathryn Nagle
ATTORNEY AT LAW
P.O. Box 506
McLean, VA 22101
(202) 407-0591

David McKnight
DILLARD, MCKNIGHT, JAMES &
MCELROY, LLP
2700 Highway 280
Suite 110 East
Birmingham, AL 35223


Devra R. Cohen
FOSTER GARVEY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
(206) 447-4400

*Counsel for Plaintiffs-Appellants*

## INDEX OF APPENDIX

**Docket/Tab #**

**Volume 1**

District Court Docket Sheet…………………………………………….     A

Second Amended Complaint and Supplemental Complaint………………     190

Exhibits to Second Amended Complaint………………………………….     190-1

**Volume 2**

Answer of Defendant Auburn University to Second Amended…………..     194
Complaint

Notice of Constitutional Question…………………………………………     197

Federal Defendants' Motion to Dismiss Second Amended
Complaint  and Supplemental Complaint………………………………….     199

Federal Defendants' Memorandum in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and Supplemental
Complaint………………………………………………………………….     200

Tribal Defendants' Motion to Dismiss Second Amended Complaint……..     201

Brief in Support of Tribal Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….     202

Declaration of Lori M. Stinson in Support of Tribal Defendants'
Motion to Dismiss Second Amended Complaint………………………….     203

**Volume 3**

Individual Defendants' Motion to Dismiss Second Amended
Complaint………………………………………………………………….     204

Brief in Support of Individual Defendants' Motion to Dismiss
Second Amended Complaint……………………………………………….     205

Notice of Correction………………………………………………..    213

Plaintiffs' Response and Memorandum in Support of Response
to Federal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………...    213-1

Plaintiffs' Response and Memorandum in Support of Response
to Individual Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………...    213-2

Plaintiffs' Response and Memorandum in Support of Response
to Tribal Defendants' Motion to Dismiss Second Amended
Complaint and Supplemental Complaint………………………………...    213-3

## Volume 4

Federal Defendants' Reply in Support of Their Motion to
Dismiss Plaintiffs' Second Amended Complaint and
Supplemental Complaint………………………………………………...    216

Tribal Defendants' Reply Brief in Support of Motion to Dismiss
Second Amended Complaint………………………………………….    217

Individual Defendants' Reply and Memorandum in Support of
Motion to Dismiss Second Amended Complaint…………………………..    218

Final Opinion………………………………………………………….    223

Final Judgment………………………………………………………...    224

Order re Martin Construction bankruptcy…………………………………    225

## Volume 5

Judgment re Martin Construction bankruptcy……………………………...    227

Plaintiffs' Notice of Appeal…………………………………………………...    228

Certificate of Service

# TAB 227

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
MUSCOGEE (CREEK) NATION,      )
a federally recognized        )
Indian tribe, et al.,         )
                              )     CIVIL ACTION NO.
       Plaintiffs,            )     2:12cv1079-MHT
                              )        (WO)
   v.                         )
                              )
                              )
MARTIN CONSTRUCTION, INC.,    )
                              )
     Defendant.               )
```

### JUDGMENT

Defendant Martin Construction, Inc., having made a suggestion of bankruptcy (Doc. 198), and counsel for the plaintiffs having informed the court that they do not object to this order (Doc. 226), and bankruptcy counsel for defendant Martin Construction, Inc., having informed the court by email (a copy of which is attached) that said defendant does not object to this order, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That defendant Martin Construction, Inc., is dismissed and terminated without prejudice to the right of any party to petition to reinstate this defendant as

a party to pursue any claim embraced herein not
adjudicated in or discharged by proceedings in the
bankruptcy court;

(2) That such reinstatement, if and when allowed,
will cause the filing date of any claim so reinstated to
relate back to the original filing date of this action
against said party;

(3) That any petition for reinstatement must be
filed by a party within 60 days after the bankruptcy
court has taken such action that entitles that party to
seek reinstatement; and

(4) That this order is being entered subject to the
understanding that it should not adversely affect the
plaintiffs' rights to appeal the order, judgment, and
opinion of the court entered on March 15, 2021 (Doc. 223,
Doc. 224, & Doc. 225). *See* Pls.' Agreement to Entering
Standard Order (Doc. 226) at 1.  If this order does
adversely affect such rights, the parties may move the
court to vacate it.

The clerk of the court is DIRECTED to mail a copy of this order to the bankruptcy court.

This case is closed, and not just administratively but in full.

DONE, this the 19th day of March, 2021.

    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

**From:** michael@fritzlawalabama.com <michael@fritzlawalabama.com>
**Sent:** Thursday, March 18, 2021 5:26 PM
**To:** Ben Hattem <Ben_Hattem@almd.uscourts.gov>
**Subject:** RE: 12cv1079 Muscogee (Creek) Nation v. Poarch Band of Creek Indians: Order

**CAUTION - EXTERNAL:**


I, on behalf of Martin Construction, Inc., agree to the dismissal.

Please let me know if you need something more formal.   I think that my Notice of Bankruptcy is equivalent to a Notice of Appearance.

# Michael A. Fritz, Sr.

Fritz Law Firm, LLC
25 South Court Street, Suite 200
Montgomery, Alabama 36104
334-230-9790 Main Line
334-230-9791 Direct Line
334-230-9789 Fax
michael@fritzlawalabama.com

Effective on December 1, 2013, the fee to file an appeal is $505.00

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. § 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1368 (11th Cir. 1983) (citing *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(b); *Perez-Priego v. Alachua County Clerk of Court*, 148 F.3d 1272 (11th Cir. 1998). However, under 28 U.S.C. § 636(c)(3), the Courts of Appeals have jurisdiction over an appeal from a final judgment entered by a magistrate judge, but only if the parties consented to the magistrate's jurisdiction. *McNab v. J & J Marine, Inc.*, 240 F.3d 1326, 1327-28 (11th Cir. 2001).

   (b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). *Williams v. Bishop*, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 201, 108 S.Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. § 1292(a):** Under this section, appeals are permitted from the following types of orders:
   
   i. Orders granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions; However, interlocutory appeals from orders denying temporary restraining orders are not permitted. *McDougald v. Jenson*, 786 F.2d 1465, 1472-73 (11th Cir. 1986);
   
   ii. Orders appointing receivers or refusing to wind up receiverships; and
   
   iii. Orders determining the rights and liabilities of parties in admiralty cases.

   (d) **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5:** The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93

L.Ed. 1528 (1949); *Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc.*, 890 F.2d 371, 376 (11th Cir. 1989); *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.  **<u>Time for Filing</u>:** The timely filing of a notice of appeal is mandatory and jurisdictional. *Rinaldo v. Corbett*, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

   (a)  **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the order or judgment appealed from is entered. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b)  **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c)  **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d)  **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend or reopen the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time to file an appeal may be reopened if the district court finds, upon motion, that the following conditions are satisfied: the moving party did not receive notice of the entry of the judgment or order within 21 days after entry; the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice, whichever is earlier; and no party would be prejudiced by the reopening.

   (e)  **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.     **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format.  *See also* Fed.R.App.P. 3(c).  A *pro se* notice of appeal must be signed by the appellant.

4.     **Effect of a notice of appeal:** A district court lacks jurisdiction, *i.e.*, authority, to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Rev.: 3/2011

# TAB 228

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| MUSCOGEE (CREEK) NATION, et al., | ) |
| | ) |
|      Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Civil Action Number: |
| POARCH BAND OF CREEK INDIANS, et al., | ) 2:12-cv-01079-MHT-CSC |
| | ) |
|      Defendants. | ) |
| | ) |

**PLAINTIFFS' NOTICE OF APPEAL**

Please take notice that Plaintiffs Muscogee (Creek) Nation, Hickory Ground Tribal Town, and Mekko George Thompson hereby appeal to the United States Court of Appeals for the Eleventh Circuit from: (1) the District Court's Opinion granting the Tribal Defendants' motion to dismiss (ECF No. 223 (3/15/2021)); (2) the District Court's corresponding Order (ECF No. 225 (3/15/2021)); (3) the District Court's corresponding Judgment (ECF No. 224 (3/15/2021)); and (4) all rulings, decisions, orders or other dispositions that form any part or basis of the foregoing Opinion, Order, or Judgment.

Dated: May 12, 2021.

| | |
|---|---|
| OF COUNSEL | s/ *Stewart Davidson McKnight, III* |
| Lauren J. King | Stewart Davidson McKnight , III (ASB-6258-G63S) |
| Email: lauren.king@foster.com | Email: dmcknight@dillardmcknight.com |
| Foster Garvey, P.C. | Dillard, McKnight, James & McElroy, LLP |
| 1111 Third Avenue, Suite 3000 | 2700 Highway 280 |
| Seattle, WA 98101 | Suite 110 East |
| Tel: 206-447-6286 | Birmingham, AL 35223 |
| *Counsel for Plaintiffs* | Tel: 205-271-1100 |
| (*Admitted Pro Hac Vice*) | *Counsel for Plaintiffs* |

1

**<u>Certificate of Service</u>**

I hereby certify that on the 12th day of May, 2021, I caused to be electronically filed the

Plaintiffs' Notice of Appeal with the Clerk of Court using the CM/ECF system which will send

notification of such filing to all parties entitled to receive notice.


 s/ *Lauren J. King*
Lauren J. King, Of Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2023, I electronically filed the foregoing APPELLANTS' APPENDIX with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties entitled to receive notice.

(s) *David McKnight*
OF COUNSEL